# KLAYMAN LAW GROUP

### A PROFESSIONAL ASSOCIATION

Larry Klayman, Esq.

7050 W. Palmetto Park Rd
Boca Raton, FL, 33433

Tel: 561-558-5336
leklayman@gmail.com

Via Federal Express Priority Delivery

November 4, 2022

The Honorable Timothy J. Corrigan
Chief Judge
U.S. District Court
Middle District of Florida
300 North Hogan Street
Jacksonville, Florida 32202

      Attention: Intake Clerk (Attorney Discipline)

**Re:**   **PETITION OF LARRY ELLIOT KLAYMAN TO NOT IMPOSE DISCIPLINE CONCERNING SUSPENSION BY THE DISTRICT OF COLUMBIA BAR PURSUANT TO RULE 2.04 OF THIS HONORABLE COURT**

Dear Chief Judge Corrigan:

## I.    PROCEDURAL HISTORY AND BACKGROUND

      Petitioner Larry Elliot Klayman (hereafter "Mr. Klayman") hereby respectfully petitions the Chief Judge Timothy J. Corrigan of this honorable Court to not impose reciprocal discipline with regard to an order of suspension issued by the District of Columbia Court of Appeals, which order when into effect on October 17, 2022 pursuant to D.C. Bar Rule XI, § 14 and Rule 9.10 of the Rules of the Board on Professional Responsibility.

      This petition is being timely filed pursuant to Rule 2.04 (b) of this honorable Court, as the 21st day after the suspension, which went into effect on October 17, 2022, is November 7, 2022. Thus, this petition is timely filed on November 7, 2022, as the 21st day fell on a weekend and thus carried over to Monday, November 7, 2022. During this period Mr. Klayman had been out of the state of Florida representing clients, one of which is professional golfer Patrick Reed, who

has two cases pending before this honorable Court. *Reed v. Chamblee et al*, 3:22-cv-01059-TJC-PDB; *Reed v. Ryan et al*, 3:22-cv-01181-BJD-PDB.

For the foregoing reasons, including but not limited to the fact that The Florida Bar, which had been timely notified of the suspension has yet to advise that it has opened a proceeding, this matter respectfully should await a full adjudication by The Florida Bar (and other legal redress as set forth below), before which Mr. Klayman has continuously been a member in good standing since December 7, 1977, almost forty-five (45) years ago, having begun his legal practice in his home state with the then Miami litigation firm of Blackwell, Walker, Gray, Powers, Flick and Hoehl. *See* Exhibit A – Certificate of Good Standing of The Florida Bar. A copy of Mr. Klayman's abbreviated biography is attached as Exhibit B, and his communication with The Florida Bar notifying it of the suspension is attached as Exhibit C, all of which are incorporated herein by reference.

The Bar Disciplinary Counsel of the District of Columbia (hereafter "ODC") notified by letter all bars and courts to which Mr. Klayman is a member, including this honorable Court, of the suspension by letter on September 15, 2022, when the suspension order came down but was not as yet in effect, which occurred 30 days, that is on October 17, 2022, pursuant to D.C. Bar Rule XI, § 14(f). During that period, Mr. Klayman filed a petition for rehearing en banc, which is attached as Exhibit D, and incorporated herein by reference. The petition for rehearing en banc, which sets forth fatal flaws in the suspension order, was denied without any written opinion.

Mr. Klayman then advised the District of Columbia Court of Appeals and ODC and the Board of Professional Responsibility (hereafter "DC Board") that he would file other legal contests to the suspension order, with a Superior Court Rule 60 complaint to set aside the judgment for fraud as well as a timely filed petition for writ of mandamus or certiorari before the U.S. Supreme Court. On November 4, 2022, the Superior Court Rule 60 complaint to set aside the suspension order was filed before the Superior Court for the District of Columbia and it is attached as Exhibit E and is incorporated herein by reference. Mr. Klayman's petition for writ of mandamus or certiorari is currently being prepared and will be timely filed in accord with U.S. Supreme Court rules.

In good faith and for the foregoing compelling reasons, Mr. Klayman respectfully requests that consideration of reciprocal discipline be stayed pending a determination by The Florida Bar, and his exhaustion of these other legal remedies, particularly since he has been continuously a member in good standing of The Florida Bar since December 7, 1977, when he was proudly admitted after graduation from Emory Law School.

Importantly, as previously mentioned Mr. Klayman has two pending cases before this honorable Court, *Reed v. Chamblee et al*, 3:22-cv-01059-TJC-PDB and *Reed v. Ryan et al*, 3:22-cv-01181-BJD-PDB and thus to protect and further the rights of his client, Mr. Patrick Reed, this matter should respectfully be stayed, if it is not now disposed of summarily, as occurred with both The Florida Bar and the Pennsylvania Bar about eleven (11) years ago when the complainant simultaneously filed her complaint before these state bars as well as the District of Columbia Bar. Both The Florida and Pennsylvania Bars dismissed her complaint, initially filed on November, 2010, while as discussed below ODC sat on it for nearly seven (7) years, long after the complainant had abandoned it by ODC's own policy rules, only then to have ODC institute a disciplinary proceeding for the first time with a Specification of Charges filed on July 20, 2017. A copy of the identical complaints filed before the three bars is attached as Exhibit F, as well as the cover sheet of the Specification of Charges which shows that the disciplinary proceeding was not instituted until July 20, 2017.

In addition, as set forth in the opinion letter of renowned professional ethics expert Professor Ronald Rotunda, who given the long and onerous 12 year duration of the ODC, Board and DC Court disciplinary proceeding, had died in the interim many years and could not thus testify before an Ad Hoc Hearing Committee (hereafter "AHHC"), Florida law on laches would have barred The Florida Bar from proceeding with the case, notwithstanding that it had already dismissed an identical complaint about eleven (11) years earlier. *See* Exhibit E-1 - Opinion of Legal Ethics Expert Professor Ronald Rotunda.

In sum, for a number of reasons, the disciplinary proceeding and its findings, which did not adhere to the legal threshold of clear and convincing evidence in any event, was fatally flawed and non-meritorious, and again, as set forth below, was not only dismissed in Florida and

Pennsylvania, but also time barred in Mr. Klayman's home state, where he has for forty-five (45) years earned a living for himself, his colleagues and his family as a duly licensed and respected legal practitioner who has continuously been and remains in good standing with not just the The Florida Bar, but also all three Florida federal courts and state courts before which he practices.

## II.   THERE RESPECTFULLY ARE NO FACTUAL AND LEGAL BASES TO IMPOSE RECIPROCAL DISCIPLINE ON MR. KLAYMAN.

At the outset, the letter to The Florida Bar of October 18, 2022, informing it of the suspension before District of Columbia Courts – as opposed to federal courts in the District – sets forth:

> This is to put The Florida Bar on notice that as of October 17, 2022, I am under suspension in the District of Columbia.

> A copy of the September 15, 2022 order of the District of Columbia Court of Appeals is enclosed. Exhibit 6. Suspension occurred in the District of Columbia 30 days after this order was issued.

> Of great import is that an identical bar complaint by Ms. Elham Sataki was filed before The Florida Bar and the Pennsylvania Bar on or about October 24, 2011 and both were dismissed about 11 years ago. *See* Exhibit 2. This complaint references being filed in Florida and Pennsylvania in addition to the District of Columbia.

> Also of import, the Specifications of Charges before the Office of Bar Disciplinary Counsel was not instituted for about 7 years after Ms. Sataki filed her complaint and after that this matter took a total of about 12 years to adjudicate. *See* Exhibit 3. Thus, under Florida law and its precedent, notwithstanding the dismissal of The Florida Bar, this matter is time barred under the established doctrine of laches. *Florida Bar v. Rubin*, 362 So.2d 12 (Fla. Sup. Ct. 1978); *The Florida Bar v. Walter,* 784 So.2d 1085, 1087 (Fl. Sup Ct. 2001); *The Florida Bar v. Kane,* 202 So.3d 11, 19 (Fl. Sup. Ct 2016). This is set forth in the opinion of the renowned legal ethics expert, Ronald Rotunda, among other strong bases showing why there were no ethical violations. Exhibit 1.

> In the unlikely event that this matter proceeds despite this, there are compelling legal and constitutional due process, equal protection, and other issues that would require adjudication, and I would invoke all of my rights and retain legal counsel at that time.

A brief history of this 12 year saga is briefly set forth in the attached Petition for Rehearing that I had filed before the District of Columbia Court of Appeals. *See* Exhibit 4.

In addition, I am filing this week a complaint under D.C. Superior Court Rule 60 to vacate the order and judgment of September 15, 2022, for fraud and on other grounds, as well as will soon be filing a petition for writ of mandamus before the U.S. Supreme Court.

Thus, if this matter is not closed at this time, I ask that these legal remedies be permitted to proceed before The Florida Bar considers proceeding further.

Finally, I have been a proud member of The Florida Bar continuously for nearly 45 years, since I was sworn in before the Florida Supreme Court on December 7, 1977. *See* Exhibit 5 - Certificate of Good Standing.

Please contact me if you have any questions.

Thank you in advance for your professional courtesy.

*See* Exhibit C, which incorporates the exhibits attached to this letter to The Florida Bar. The Florida Bar is thus an important if not crucial forum to determine whether reciprocal discipline is appropriate under the above circumstances and the facts and law as set forth below. It is clear that reciprocal discipline, notwithstanding that this matter was dismissed by The Florida and Pennsylvania Bars about eleven (11) years ago, and is time barred in any event under Florida Supreme Court precedent for laches in disciplinary matters and the applicable statute of limitations, should not be imposed based on a fatally flawed suspension order *In re Klayman*, 20-BG-583 (D.C.C.A.) (the "Sataki Matter"). Exhibit E-1.

Mr. Klayman also attaches hereto, and incorporates by reference, his Initial Brief and Petition for Rehearing En Banc filed at the D.C. Court of Appeals, Exhibit D, which contain his Proposed Findings of Fact and Conclusions of Law presented to the Board. Thus, when Mr. Klayman cites a "PFF" in this response, he is referring to his Proposed Findings of Fact. **Additionally, if this matter is not summarily disposed of, the honorable Chief Judge Corrigan and this honorable Court should respectively request the record in this case from the Board, and may do so by contacting the clerk, Meghan Borrazas at mborrazas@dcbpr.org.** The full record is necessary so that Chief Judge Corrigan and this

honorable Court have a full understanding of the facts and issues in this matter. Thus, Mr. Klayman respectfully requests that Chief Judge Corrigan and this honorable Court, if this matter is not disposed of summarily, carefully review these briefs and Proposed Findings, as well as the record, as they speak for themselves and show conclusively why no reciprocal discipline is warranted.

A.     **THE SATAKI MATTER IS RESPECTFULLY PRECLUDED UNDER THE FLORIDA SUPREME COURT PRECEDENT FOR LACHES AND THE STATUTE OF LIMITATIONS**

It is important to recognize that the Sataki Matter involves events that occurred in 2010 – twelve (12) years ago. Even more egregiously, this matter was not even instituted until 2017 – seven (7) years after the complaint had been filed by the complainant! *See* Exhibit F Specification of Charges. Thus, there was a minimum of (7) year delay before this case was even instituted. During those seven (7) years, having had no contact from ODC, Mr. Klayman very reasonably believed that the Sataki Matter had been closed, particularly given the fact that the Complainant, Elham Sataki ("Ms. Sataki") had filed identical Complaints in Florida and Pennsylvania and they were summarily dismissed as being frivolous and meritless. PFF 43. Mr. Klayman therefore had discarded his records pertaining to his representation of Ms. Sataki, as case records need only be kept for five (5) years in the District of Columbia,[1] making his defense after the Sataki Matter was resurrected by ODC *sua sponte* subject to extreme prejudice. As just one example among many of this extreme prejudice, one need only look to the attached ethics opinion of Professor Ronald Rotunda, who would have testified in the case, but in the interim years he passed away, prejudicing Mr. Klayman further. See Exhibit E-1, which is incorporated herein by reference. Another material and crucial witness, Arlene Aviera, Ms. Sataki's psychologist who was aware of all of the details of Mr. Klayman's representation of Ms. Sataki, Mr. Klayman in addition to Ms. Sataki having met and communicated with her on many occasions, contracted terminal cancer during this egregious and time barred delay, as set forth in the attached briefs, and thus could not testify.

_____

[1] https://www.dcbar.org/For-Lawyers/Legal-Ethics/Ethics-Opinions-210-Present/Ethics-Opinion-283#footnote11

Further compounding this prejudice caused by ODC's delay, the reason for the seven (7) year delay in even instituting the Sataki Matter was because the Complainant, Ms. Sataki had actually abandoned her complaint and chosen not to proceed further with it. This is shown in a letter from ODC to Ms. Sataki dated July 7, 2011, where ODC sent to Ms. Sataki Mr. Klayman's responses to her allegations and advised her, "[i]f we do not hear from you promptly, we may assume that you are satisfied with the attorney's explanations." Exhibit G. Despite the lack of response from Ms. Sataki, ODC did not close its case, but instead waited literally years, far beyond Florida's applied doctrine of laches and the statute of limitations for disciplinary proceedings would have allowed,  to *sua sponte* resurrect the Sataki Matter, going so far as to use an investigator to literally hunt  Ms. Sataki down to coax her to pursue her claims against Mr. Klayman. This is shown in an email from ODC's H. Clay Smith III to Kevin O'Connell stating:

> I am trying to locate a complainant that has dropped off the map. Ms. ElhSataki…. **She filed a complaint vs. Larry Klayman in 2011. Her only correspondence with us was the ethical complaint that she** filed. My letter to her dated 7/7/11 was not responded to, but was not returned by the USPS either. I recently tried to contact her by telephone, but her number is not in service. I'll appreciate your efforts to locate her and to provide some reliable contact information. Exhibit G (emphasis added).

It is truly troubling that neither the Board nor the D.C. Court of Appeals cared  that Ms. Sataki had made the choice to drop her complaint against Mr. Klayman, and ODC still hired an investigator to hunt her down in 2014 to coax her to move forward with her claims against Mr. Klayman. Still the case was not instituted until three years later in 2017. Exhibit F. This conclusively shows that ODC's purpose here was not to get "justice" for the Complainant, but instead was to manipulate and use the Complainant to fulfill their own goal and agenda to try to remove Mr. Klayman from the practice of law due, as set forth below,  apparently due to his conservative public interest advocacy, Republican Party affiliation, and litigation. No matter how many times Mr. Klayman brought this incontrovertible fact up during the pendency of the Sataki Matter, it fell on deaf ears, as the Board and D.C. Court of Appeals showed themselves as unwilling to hold ODC accountable for unconscionable delay and any of the litany of egregious ethical violations that they committed, for which they incorrectly claim are immune from legal scrutiny. However, Mr. Klayman is confident that Chief Judge Corrigan and this honorable Court, detached from the politics of the "weaponized" DC attorney disciplinary apparatus in

what some call the Washington, D.C. swamp, will see just how unjust and time barred this behavior by ODC truly was.

All this goes to show that reciprocal discipline in the Sataki Matter must, at the outset, be denied due to the doctrines of laches and statute of limitations, and in particular due to the completely unjustified and highly prejudicial nature of the delay. It is clear that Florida imposes a six-year statute of limitations for attorney discipline matters. The Bar is required to open an investigation "within 6 years from the time the matter giving rise to the investigation is discovered or, with due diligence, should have been discovered." Bar Rule 3-7.16(a)(1); *Fla. Bar v. Phoenix*, 311 So. 3d 825, 831 (Fla. 2021). And, in addition to this hard, fast statute of limitations, Florida importantly, based on Florida Supreme Court controlling precedent, also imposes the doctrine of laches to unjustifiable delays in attorney discipline matters. *See The Florida Bar v. Walter*, 784 So.2d 1085 (Fla. Sup. Ct. 2001). ); *Florida Bar v. Rubin*, 362 So.2d 12 (Fla. Sup. Ct. 1978); *The Florida Bar v. Kane,* 202 So.3d 11, 19 (Fl. Sup. Ct 2016.

Here, there was a (7)-year delay by ODC is even filing a Specification of Charges. Exhibit F. This in and of itself is dispositive. And, as set forth above, there was absolutely nothing justifiable about the delay in this matter. Thus, the Court must decline to impose reciprocal discipline on this basis alone, notwithstanding the lack of merit of the entire ODC partisan inspired disciplinary proceeding.

## B.     THE D.C. COURT OF APPEALS' SUSPENSION ORDER WAS BASED ON FRAUD AND DUE PROCESS AND OTHER VIOLATIONS OF LAW.

Mr. Klayman implores the Court to carefully review the attached briefs and Proposed Findings of Fact as they meticulously outline and detail the gross injustices, fraudulent conduct, and egregious misconduct by ODC and Ms. Sataki with regard to perjury and the suborning of perjury, that gave rise to and resulted in the D.C. Court of Appeals' suspension order. Exhibit D. Indeed, as set forth above, two respected and professional other jurisdictions in Florida and Pennsylvania considered Ms. Sataki's complaint against Mr. Klayman through neutral and unbiased eyes and summarily dismissed them as completely meritless and frivolous. PFF 43. This should tell the Court all it needs to know.

Regrettably, however, this is not what happened at the D.C. Court of Appeals, which effectively and improperly summarily adopted, that is "rubber stamped," without itself apparently delving into the record, a fatally flawed Board Report and Recommendation. In its Order, the D.C. Court of Appeals wrote, ""[w]e accept the Board's conclusion that Mr. Klayman violated the Rules of Professional Conduct, and we adopt the Board's recommended sanction," "[w]e 'accept the findings of fact made by the Board unless they are unsupported by substantial evidence of record,'" "[o]ur cases do not appear to make clear whether our review on this issue is deferential or de novo…We need not decide the issue, because we agree with the Board's conclusion," and "[w]e conclude that the Hearing Committee and the Board acted reasonably by choosing to largely credit E.S.'s testimony over that of Mr. Klayman." Exhibit H; Suspension Order at 2, 13, 18, 20 (the "Order").  This ignored the well-established precedent that under Board Rule 11.5, charges against Mr. Klayman must be proved by "clear and convincing" evidence. *In re Vohra*, 68 A. 3d 766, 784 (D.C. 2013).

If the D.C. Court of Appeals was going to ignore Mr. Klayman's facts, witnesses, and arguments – which it admittedly did - then why did it take nearly twenty (20) months to issue a decision? If its intention was to simply adopt wholesale the Report, it could have done so immediately. The only explanation is that the D.C. Court of Appeals was acting punitively and took advantage of the fact that Mr. Klayman had been "temporarily suspended" without due process - as Mr. Klayman was (1) denied his Sixth Amendment right to counsel of choice,  (2) denied a bona fide review of the record, (3) was provided with absolutely no facts or law explaining why he had been "temporarily suspended and (4) denied the right to even petition for rehearing en banc - since January of 2021 and thus wanted to extend Mr. Klayman's "temporary suspension" period. Even more, the suspension order is also factually and legally deficient, and does not contain **one record cite** to even attempt to justify its findings. Exhibit H. This shows that there was no bona fide review of the record. The suspension order is wholly conclusory, which is the by-product of the Panel of the  D.C. Court of Appeals deciding to ignore Mr. Klayman's facts, witnesses, and unrefuted testimony, and has resulted in a minimum thirty-eight (38) months total suspension, comprising a twenty month "temporary suspension" which occurred without even a hearing before the D.C. Court of Appeals, and an eighteen month actual

suspension period tacked onto that, exceeding even the Boards' recommended suspension by about twenty (20) months.

Mr. Klayman took the time and effort to have seven (7) material witnesses testify compellingly on his behalf, including the distinguished retired federal judge, the Honorable Stanley Sporkin, Gloria Allred, Tim Shamble, Keya Dash, Joshua Ashley Klayman, posthumously ethics expert Professor Ronald Rotunda through his written opinion, and himself. It is incomprehensible that at every single level of this proceeding, the testimony provided by these material and unbiased witnesses was simply ignored and given no weight, despite the fact that it was all uncontroverted testimony based on personal contemporaneous knowledge. Yet, Ms. Sataki – ODC's only material witness, who was thoroughly impeached - was just taken at her word. This simply makes no sense. Even though the D.C. Court of Appeals was forced to acknowledge yet still downplay the sworn testimony of the Honorable Stanley Sporkin, a distinguished retired federal judge, former Chief Counsel of the Central Intelligence and head of Enforcement at the Securities and Exchange Commission, who while being in bad health and in a wheelchair, for which he later died, took it upon himself at great pains to travel to the hearing to testify on Mr. Klayman's behalf without being subpoenaed. Judge Sporkin testified under oath that over the many years Mr. Klayman had appeared in cases before him, he came to see Mr. Klayman as an honest and ethical person that had no reason to doubt Mr. Klayman's character. PFF188. Order at 6-7. And, as importantly, during Mr. Klayman's representation of Ms. Sataki Judge Sporkin testified that he had discussed with Mr. Klayman his case strategy and agreed with it. *Id.* at 7, PFF 191. While the panel is forced to concede this, it accords Judge Sporkin's learned testimony no weight at all, as it obviously did not comport with its apparent predetermined mindset and objective to egregiously suspend Mr. Klayman from the practice of law in the District of Columbia, despite there being absolutely no finding of dishonesty by Mr. Klayman.

Given the frankly unbelievable injustice after injustice set forth above, it is crucial for Mr. Klayman to provide some real-world context and a highly likely explanation as to how and why the D.C. attorney disciplinary apparatus likely has acted in this manner. It is indisputable that our society has become more and more politically and ideologically polarized and people more and more dogmatic in their beliefs. Either you are a friend or a foe. There is no longer a

middle ground. Nowhere is this more evident than in the District of Columbia, and this type of combative mentality has regrettably infected the leftist and totally Democrat D.C. attorney disciplinary apparatus, where attorneys such as Mr. Klayman who are strong conservative and/or Republican public interest advocates, are no longer welcome as members of the D.C. bar by its wholly partisan Democrat left-wing leadership and have instead become targets. Mr. Klayman understands that this is a bold statement, but it is one that is completely supported by objectively verifiable facts.

At the hearing committee level, Mr. Klayman was faced with a "stacked deck" in the form of a biased and skewed Ad Hoc Hearing Committee (hereafter "AHHC"), which included even an avowed proud communist and ideological foe of Mr. Klayman, Michael Tigar. Bob Woodward wrote in his book about the Supreme Court, titled *The Brethren,* that Tigar in his early career had been fired, at the urging of FBI Director J. Edgar Hoover, from his High Court clerkship by Justice William Brennan for his communist ties. Exhibit E-2. Tigar's recently latest recently published book, *Mythologies of State and Monopoly Power*, a Marxist rant against capitalist law, with book jacket endorsements from the likes of Angela Davis and Bernadine Dohrn, is testament to his time with Fidel and the Castro brothers. His proud thank you letters from Fidel and a photo with his equally communist revolutionary brother Raul is contained in Exhibit E-2. It did not matter to the AHHC that Mr. Klayman presented seven (7) material witnesses that conclusively refuted every single one of ODC's manufactured arguments and that ODC only had one (1) material witness – Ms. Sataki – who was impeached repeatedly as set forth below. Not coincidentally, Tigar was one of a number of leftist law professors, who filed an ethics complaint against Trump White House Counselor Kellyanne Conway. *See* Exhibit K.

Then, at the Board level, presiding over this matter was its Chairman Matthew Kaiser, who was associated with the leftist legal publication "Above the Law," and wrote complementary columns extolling the virtues of an "honest" Hillary Clinton, but trashing Donald Trump, who Mr. Klayman had supported.[2] This unsurprisingly resulted in a fatally flawed and skewed Report from the Board which gave absolutely no credence to any of Mr. Klayman's

---

[2] https://abovethelaw.com/2016/08/hillary-clinton-truthfulness-and-bias-in-white-collar-cases/; https://abovethelaw.com/2016/07/trump-and-tyranny/

witnesses, legal arguments, or even uncontroverted facts. Then, at the D.C. Court of Appeals, as set forth above, the judges simply adopted the Board's Report with little to no consideration of Mr. Klayman's witnesses, legal arguments and uncontroverted facts.

Supporting Mr. Klayman's contention that this entire disciplinarily proceeding has been politically and ideologically tainted and not facts or legally based, is the fact that during the Trump years in particular, ethics complaints were filed by the likes of Tigar, accepted and initiated against Trump White House Counsellor Kellyanne Conway[3] over remarks she made on cable news, against former Trump Attorney General William Barr[4] (the complaint was outrageously and incredibly filed by all prior presidents of the D.C. Bar as well as a former senior bar counsel) for withdrawing the indictment of General Mike Flynn and for remarks he made on Fox News, Senators Ted Cruz[5] and Josh Hawley[6] over their role in advocating for President Trump in the last presidential election, Professor John Eastman[7] who served as a legal counsel for President Trump, and of course former U.S. Attorney Rudy Giuliani[8] over his representation of President Trump, to name just a few. To the contrary, when a complaint was filed against fellow leftist Democrat lawyer David Kendall of Williams & Connolly over his admitted involvement in the destruction of Hillary Clinton's 33,000 emails, many classified, and illegally retained on a private server, which complicity is not even in dispute, ODC summarily and quickly rejected a complaint filed by former Justice Department lawyer and conservative

---

[3] https://www.washingtonpost.com/politics/law-professors-file-misconduct-complaint-against-kellyanne-conway/2017/02/23/442b02c8-f9e3-11e6-bf01-d47f8cf9b643_story.html
[4] https://thehill.com/regulation/court-battles/508489-more-than-two-dozen-dc-bar-members-urge-disciplinary-probe-of-ag
[5] https://www.texasstandard.org/stories/lawyers-law-students-officially-file-grievances-seeking-to-disbar-senator-ted-cruz/
[6] https://thehill.com/homenews/state-watch/534783-attorneys-urge-missouri-supreme-court-to-probe-hawleys-actions
[7] https://www.reuters.com/legal/ex-top-justice-dept-officials-testimony-sought-ethics-hearing-trump-ally-clark-2022-10-06/
[8] https://www.law.com/newyorklawjournal/2021/03/03/nyc-bar-details-complaints-calling-for-full-attorney-discipline-investigation-of-giuliani/#:~:text=Under%20the%20New%20York%20state,censured%20or%20receive%20no%20punishment.

lawyer and public interest advocate Ty Clevenger, who was also pursued by ODC with the goal of disbarring him as well.[9]

Later, ODC's Bar Disciplinary Counsel Hamilton Fox went after other Trump affiliated Republican legal counsel, such as Jeff Clark. *See* Exhibit E-7.

Then, as the final proof of institutional bias, the Court need not look any further than the completely disparate selective prosecutorial treatment afforded by the D.C. attorney discipline apparatus to one Kevin Clinesmith in handling *In Matter of Kevin E. Clinesmith*, 21-BG-018 (D.C. App.). In that case, Kevin Clinesmith—the former senior FBI lawyer who dishonestly falsified a surveillance document in the Trump-Russia investigation and who pled guilty to felony charges—was completely ignored by ODC, and only temporarily suspended for five months after he pled guilty, and only after ODC's "blind eye" was uncovered and subjected to negative publicity. Clinesmith also did not submit any affidavit under Rule 14(g) for five (5) months after he was suspended. Despite this, not only did the D.C. attorney disciplinary apparatus fast-track if not whitewash his case—clearly in order to minimize his temporary suspension period —the D.C. Court of Appeals let Clinesmith off with "time served" in just seven (7) months. And importantly, the Court imposed no reinstatement provision on Clinesmith, as it has for Mr. Klayman, despite him literally being a convicted felon. Attached hereto as Exhibit E-3 is an article detailing this debacle and the D.C. Court of Appeals' opinion in *In Matter of Kevin E. Clinesmith*, 21-BG-018 (D.C. App.).

On the other hand, Mr. Klayman was "temporarily suspended" years ago without a hearing and due process, which temporary suspension lasted twenty (20) months, while the D.C. Court of Appeals dragged its feet, and then suspended him for another incredible eighteen (18) months as a result of contrived ethical "violations" -- while the original recommendation of the Board was only for eighteen (18) months -- with no showing of dishonesty, and of course, no criminal conviction. The discriminatory difference in treatment here is truly mind-boggling, and

---

[9] Ty Clevenger, State bar prosecutors are flouting the law, protecting Hillary Clinton and her lawyers, LawFlog, available at: https://lawflog.com/?p=1389

what's even worse is that the D.C. attorney disciplinary apparatus, having conferred itself with "absolute immunity," believes that it is above the law and therefore can and will continue to engage in this type of conduct.

This is why it is so important for the Chief Judge Corrigan and this honorable Court, if this matter is not summarily dismissed as having long since been disposed of by The Florida Bar, and time barred, which it must by law be by virtue of Florida Supreme Court precedent for laches and the statute of limitations, to now conduct a truly independent and thorough review of the record, as shown in Mr. Klayman's briefs and Proposed Findings of Fact. They conclusively show how and why each and every single "ethical violation" was either completely meritless, tainted by fraud and other egregious misconduct such as perjury and the suborning of perjury, or both, as set forth below. *See* Exhibit E; *Rule 60 Complaint*.

### C.   THERE WAS NO FAILURE TO ABIDE BY MS. SATAKI'S DECISIONS CONCERNING THE OBJECTIVES OF REPRESENTATION

Chief among the alleged ethical violations manufactured by ODC and "rubber stamped" by the Board and the D.C. Court of Appeals was a purported failure to abide by Ms. Sataki's decisions regarding the use of publicity in her case. As the record conclusively showed, this was absolutely not the case, as Ms. Sataki agreed to the use of publicity at the time – which she even admitted at the Hearing, and then personally participated in publicizing her case at the time and even after the fact.

First and foremost, at the AHHC hearing in this matter, Ms. Sataki herself was forced to admit that she had approved and agreed with the use of publicity:

> Q: **Did you ultimately agree with Mr. Klayman about the publicity?**
> A: **I did.** Tr. 775. *See* Exhibit I; *Excerpts of Transcripts*

Mr. Klayman also provided testimony from numerous witnesses who showed that Ms. Sataki's belated claim was false. Chief among these witnesses was Tim Shamble ("Mr. Shamble"), Ms. Sataki's union representative who worked closely with Mr. Klayman's in his representation Ms. Sataki. This means that Mr. Shamble was deeply involved in Mr. Klayman's representation and therefore had contemporaneous personal knowledge of the intricate details of

the events in question. The record is indisputably shows that Mr. Shamble, Mr. Klayman, and Ms. Sataki at the time discussed strategy all together and as a group, Ms. Sataki and they decided that the use of publicity would be beneficial to help Ms. Sataki achieve her desired outcome. PFF 128, 166, 167. And, even more, as the final straw which shows the egregious error by the D.C. Court of Appeals is the undisputed fact that Ms. Sataki personally participated with Mr. Shamble in publicizing her case:

> Mr. Shamble and Ms. Sataki went together on one occasion to publicize her situation. "I remember one time. The VOA was on the mall here in Washington, some kind of public -- it might have been a recruitment fair or something. But we had an article and both her and I were distributing it to people in the vicinity, tried to let people know and to let the agency know that, you know, we were going to publicize this." Tr. 893. The article that both Mr. Shamble and Ms. Sataki distributed was called ""Government War on a Freedom Loving Beauty. Exclusive, Larry Klayman Goes to Bat for Harassed Broadcaster Fighting for a Free Iran." Tr. 894. PFF 24. Exhibit I.

Mr. Shamble also testified as to why he believed the use of publicity was a good strategy. He testified that publicity was a helpful tool in dealing with an agency as notoriously difficult and anti-labor as VOA. PFF 23. Specifically, he testified "[w]e've done it. It's something that you can use to pressure managers, if they're intractable, you know, to try to get them to come to some sort of agreement. We have our own website, so we use it, too." Tr. 892-893. Exhibit I. The reason that publicity was often used, according to Mr. Shamble, was that BBG, of which VOA is a subcomponent, has been ranked the worst agency in government, and is very difficult to negotiate any settlement with because of its management's attitude and approach to employees. PFF 7.

Furthermore, Mr. Klayman also provided the same uncontroverted testimony that the use of publicity was discussed and approved as a group. "So that was the reason for the publicity. She agreed to it, Tim agreed to it, and there will be other witness(es) that will testify in this proceeding that she agreed to the publicity." PFF 50, Tr. 980. Exhibit I.

Even further buttressing the testimony of Mr. Shamble and Mr. Klayman were numerous other witnesses who had contemporaneous personal knowledge. This included Keya Dash - *see*

PFF 91 ("Mr. Dash declared under oath that he was present when the use of publicity to coax the BBG into settlement was discussed with Ms. Sataki, and that Ms. Sataki approved of its use."); This also included Joshua Ashley Klayman, Mr. Klayman's sister and herself a distinguished Wall Street lawyer - PFF 180 ("Ms. Sataki openly discussed the VOA case with Ms. Klayman many times. [Ms. Joshua Ashley Klayman testified] "Yes, quite openly. And I met her multiple times. It wasn't that I just met her one time. Yes, she was quite open with what the circumstances of her challenges were.... an, she was very, very open, which -- I'm not a litigator. I don't really know anything about litigations, but I was surprised that she was so open." Tr. 1524. Exhibit I Furthermore, and again, she testified that she thought Ms. Sataki was using Mr. Klayman. "I mean, I vacillated between kind of liking her and being suspicious of her, quite frankly, as your sister...she was very forward in terms of requesting different things for her personally." Tr. 1527-28. Exhibit I.

Lastly, and as even more clearly conclusive evidence that Ms. Sataki at all times not only approved of publicity, but also that she went out of her way to personally publicize her own case is the fact that Mr. Klayman incredibly learned during the Board briefing process that Ms. Sataki had participated in making a documentary about her case, with intimate personal details about her, against Voice of America ("VOA"), which further undercuts any possible false claim that Ms. Sataki did not agree to publicize her case.[10]  The video, which is in Ms. Sataki's Iranian native language Farsi, was translated by one of Mr. Klayman's witnesses, Keya Dash, as well as a respected Farsi certified translator who used to work for VOA. Exhibit J. To be certain of and confirm the content, Mr. Klayman had the documentary translated by Mohammad Moslehi, a certified translator who did translations for VOA. Exhibit J. Mr. Moslehi translates this "smoking gun" as follows:

> Whenever I am at my desk and I am not paying attention, he allows himself, to touch me under variety of pretexts.
> (displaying Elham [Sataki]'s photo) former broadcaster of VOA.
> Mr. Falahati, Asal has written this for us, Well: let us answer the first caller (by the name of - Translator) Hossain from Kerman. Hello, go ahead please.
> (displaying photo of Mehdi Falahati) broadcaster for the VOA network VOA: Voice of America

---

[10] https://www.youtube.com/watch?v=e3g5f61muZ4

Voice of America has been recognized as the worst entity of American government. Therefore, lots of such coteries and issues exist there. Everybody says that the atmosphere is of a security one. Nobody can talk with anybody. Everybody makes insinuations against one another. The environment is very dirty.

This week is second evening of being online with the subject of presidential elections in Iran and it's outcome, with your phone calls, emails and online weblogs and websites that Elham [Sataki] will introduce to you.

Regarding Mr. Falahati: He repeatedly asked me to go out with him. I didn't want to do it. Mr. Falahati and I started the ONLINE show together and we were performing it together. Aside from other aspects, it was very unprofessional.

When two individuals appear on camera and conduct a show, going out on a date, since it can directly affect the show is not right. They may fight with each other and that will affect the show, and vice-versa. He was not the type of person that I would accept his offer, and say that, all right let's go on a date.

The problem was, he did not know how to take a no. After a while I reached to the point that I was always calling sick and did not go to work. Since I wanted to start working, and Mr. Falahati wanted to come to my desk and again ask me let's go have a coffee or have dinner·. And this no, and saying no to him repeatedly had become exhausting for me, had made me very tired. I went to Suzanne who was our executive producer and told her the situation, that he (Mr. Falahati) does so. and I (Elham [Sataki]) don't know what to do at this point. Personally, I am not able to handle it.

The situation will go over the board of the status of going out for dinner, and he will come to my desk and while I am not paying attention, under various excuses touch me. Since I was afraid, I told her (Suzanne) that, can you handle it without anybody to know?? That day she told me that "Legally I cannot do it and you must formally file a complaint."

Mr. Falahati wanted to take revenge, since I complained and stated that the situation was so. As I was behind my desk, twice he came to my desk (audio censored) the dress that I had on and my bra-cord. I hollered at him (audio censored) he laughed and said "don't tell anybody." I was not feeling well. I was seeing psychiatrist. I was seeing psychologist. I was not feeling well. All the documents are available. Everything related (to this matter) exists. I was seeing doctor and the doctor was prescribing relaxing pills for me to take.

At this point, I am just saying, Mr. Falahati is a sick person that has not done so just with me, but the system of VOA has problem. Jamshid Chalangi testified for me. Look what happened? Mahmonir, another lady testified for me. She suffered a lot. Mr. Ali Sajjadi and Mr. Falahati were friends. At that time Mr. Sajjadi was very powerful there. They all got together. And even Suzanne who was my executive producer and was mad from this incident, she teamed up with them. And this caused the problem to be difficult for me, and no attorney was taking my case, because this case had become very big. And when the case became so big, then the Board of Governors had to defend itself, and defending itself caused the case to become against me. And they say that Elham left, Falahati stayed. When they fired me, I was not the only girl. There are a number of others.

Caption dispalying Falahati and [Sataki] with written scripts.

17

> The law suit against Mehdi Falahati due to the VOA influence did not get to anywhere, and El ham Sattaki was fired from this network .. After a short period of time Jamshid Chalangi and Ms. Mahmonir Rahimi were fired from this network.
> Display of Mehdi Falahati laughing loud.

Unsurprisingly, Ms. Sataki and ODC did not disclose this to the AHHC and Mr. Klayman's defense team had to find this themselves during the appellate briefing process. This clearly fraudulent conduct was obviously done in concert with ODC, who must have known about this crucial evidence and chose not to disclose it. This clear fraud grossly prejudiced Mr. Klayman because it was not part of the record at the AHHC hearing or the Board level, and the D.C. Court of Appeals refused a motion to remand this matter back to the Board to open the record to review this video shows its inherent bias on this and other issues – a clear violation of Mr. Klayman's due process and other rights. What would be wrong with trying to get to the truth, that is unless this does not comport with the predetermined narrative?

The second, and even more baffling and troubling alleged violation concerned the fact that the *Bivens* lawsuit filed on behalf of Ms. Sataki named Hillary Clinton as a Defendant – a fact that the D.C. attorney discipline apparatus took great umbrage at every step of the way. Completely ignored is the fact that Ms. Clinton was on the Voice of America's Board of Governors at the time, meaning that she was clearly a properly named Defendant. Even more egregious is the fact that the *Bivens* Complaint also named a conservative personal friend of Mr. Klayman, the conservative Blanquita Collum, who was also a governor, as a Defendant. PFF 95. This conclusively shows that Mr. Klayman had no political goal in mind and was simply trying to obtain an optimal result for his client. Unsurprisingly, this fact was completely ignored.

In any event, based on the foregoing, it is more than abundantly clear that the primary and case determinative alleged ethical violation found by the D.C. Court of Appeals was completely unsupported by the record, much less the standard of clear and convincing evidence.

## D.     THERE WAS NO CONFLICT OF INTEREST

Another primary "ethical violation" contrived by ODC and then "rubber stamped" was based on Mr. Klayman's "emotional interest" in Ms. Sataki – which was then twisted by ODC and the Board as a conflict-of-interest violation.

This was a truly bizarre turn, as "emotional interest" is simply not an ethical violation. If it was a violation, lawyers would be prohibited from representing friends, family members, or even spouses who they care about and love – or basically anyone that is not a complete stranger. It is clear that no such prohibition exists. Attorneys are people who have feelings and emotions. There is no ethical prohibition against this.

Thus, ODC and the Board had to disingenuously strain to manufacture an ethical violation and settled on an alleged and contrived conflict of interest. However, the record clearly reflects that when Ms. Sataki had become more than self-centered and abusive during the course of Mr., Klayman's representation, even asking Mr. Klayman to buy her a car, PFF 62, Mr. Klayman realized that it was ethical and prudent for him to suggest that she find other counsel, as legal representation became untenable. Indeed, Mr. Klayman realized that both parties needed to move on and that is why Mr. Klayman took Ms. Sataki to Gloria Allred and Tim Shea. PFF 78. However, despite this, it was Ms. Sataki who instructed Mr. Klayman to continue representing her. Thus, even if the "emotional interest" at issue could possibly constitute a conflict of interest violation, it is uncontroverted that she would have waived any such violation by asking Mr. Klayman to continue to represent her. This was even admitted by the Board in its Report where it wrote Mr. Klayman "repeatedly communicated his feelings to [Ms. Sataki]" and "she asked him to continue with the representation."

And, when ultimately Ms. Sataki did not, for whatever reason, get the result she wanted, angry and unhinged, she struck back at Mr. Klayman, sending him the below offensive email which mocked and disparaged his religion and falsely accused him of taking bribes:

I do not know if you are Christian or Jewish, because whichever suits you best, you become one. But I believe in karma and what you have done with my case and losing it. ´ Ms. Sataki also wrote: And what you have done with my case and losing it and not stopping working on it when I ordered you, one day you'll answer to God, even

19

if you throw your life and play with people life. I am nobody, just a little girl who was retaliated and harassment by some VOA employee and you seed (sic) that you can help me. Not only did you not help me, but destroyed my life to nothing....

Mr. Klayman are you happy now that you've complete destroyed and lost my case? A case with so many evidence and witnesses. Only a very bad and clueless attorney could lose it, or lost it on purps (sic) because you made a dill (sic), with the other party. PFF #163.

Exacerbating this already blatant and egregious violation, the D.C. Court of Appeals in an overt effort to tar Mr. Klayman, injected the non-existent premise of sexual harassment where none was ever alleged in the Specification of Charges or testified to by even Ms. Sataki, that "Whether or not his feelings were sexual or romantic in nature, Mr. Klayman had strong feeling for E.S. For example, he wrote that he had 'fallen in love with (E.S.). would always love her and was feeling real pain," because she did not share his feelings. Suspension Order at 20. <u>Exhibit H</u>. The last part of this statement is totally false, as Mr. Klayman never wrote that he was feeling real pain "because she did not share his feelings." What the record does show is that Mr. Klayman made it clear to Ms. Sataki that he did not want to be with her and did not want to be her boyfriend, which was contemporaneously recorded in emails. PFF 79. There was absolutely no allegation of sexual harassment of other sexual innuendo in the Specification of Charges or before the AHHC. This innuendo was inserted for no reason other than to apparently smear Mr. Klayman.

## E.     MR. KLAYMAN DID NOT REVEAL ANY CLIENT CONFIDENCES

As set forth above, notwithstanding that Ms. Sataki was forced to admit that she approved the publicity and participated directly in distributing it, PFF 170, Tr. 775, PFF 91, PFF 24, is that she herself went on Iranian television to broadcast the same alleged confidential facts. <u>Exhibit J</u>. Thus, it is incomprehensible how Mr. Klayman could possibly have been found to have revealed confidential information.

## F.     MR. KLAYMAN KEPT MS. SATAKI INFORMED EVERY STEP OF THE
##         WAY

One of the most non-sensical and bizarre "findings" of the D.C. Court of Appeals is that Mr. Klayman failed to obtain informed consent by filing a motion to disqualify the Honorable

Colleen Kollar-Kotelly during the course of his representation of Ms. Sataki. Not only is a lawyer permitted some discretion in litigation, but the record also clearly reflects that Ms. Sataki was fully informed of this motion and did not object. PFF 66. What the record actually shows is that Ms. Sataki was "kept informed of Mr. Klayman's strategy and actions on her behalf every step of the way." PFF 60.

### G.    ABSENCE OF A WRITTEN FEE AGREEMENT

The D.C. Court of Appeals chose to sidestep this issue, probably because a myriad of emails from Mr. Klayman stated that he was representing Ms. Sataki free of charge. PFF 47, 74. The issue of the contingency only arose when Ms. Sataki at the end of the representation  became more abusive, rejected other counsel to represent her, but wanted to continue with Mr. Klayman as her lawyer. PFF 152

### H.    THERE WAS NO FAILURE TO CEASE REPRESENTATION

The record similarly shows that Mr. Klayman did not fail to cease representation of Ms. Sataki in a timely fashion. is Mr. Klayman did not take steps to litigate Ms. Sataki's case further and only acted to preserve Ms. Sataki's appellate rights. PFF 68. And it was good that Mr. Klayman did so, because Ms. Sataki filed an untimely notice of appeal *pro se* only a few months later. PFF 67. And, then years later Ms. Sataki – after she was literally hunted down by ODC for ulterior and improper reasons - then asked ODC to prosecute her sexual harassment claims! Tr. 489. Exhibit I.

Furthermore, letters purportedly terminating Mr. Klayman's representation were admittedly sent to the incorrect addresses, which Mr. Klayman never received from her. PFF 71. Mr. Klayman also had a duty to confirm Ms. Sataki's purported "desires" in the August 4, 2010 letter, as it was clearly not written by her, PFF 70, Tr. 1041, RX 21, before terminating all of Ms. Sataki's rights on appeal, for which he could have been accused of legal malpractice. Exhibit I.

### I.    MS. SATAKI'S COMPLETE LACK OF CREDIBILITY

Unsurprisingly, the fact that Ms. Sataki was repeatedly impeached and repeatedly gave conflicting testimony was given no weight by the D.C. Court of Appeals, which brazenly wrote

that "[w]e conclude that the Hearing Committee and the Board acted reasonably by choosing to largely credit E.S.'s testimony over that of Mr. Klayman." This shows that the D.C. Court of Appeals was no longer concerned with facts – a very problematic approach that resulted in a fatally flawed proceeding.

Indeed, the record shows that the entire representation agreement between Ms. Sataki and Mr. Klayman was premised on a "big lie" – that she had been sexually harassed and retaliated against by managers at VOA. The Office of Civil Rights conducted a thorough investigation and found that her allegations of sexual harassment were completely manufactured and false. PFF 155. Even more, Ms. Sataki lied about wanting Mr. Klayman to drop her cases – likely at the direction of ODC so that they could manufacture an ethical violation – when the record is clear that she herself filed a Notice of Appeal and then asked ODC for help in prosecuting her claims of sexual harassment years down the road. PFF 67, 155. Ms. Sataki also gave false testimony about not wanting to publicize her cases – again certainly at the direction of ODC so that they could manufacture a claim – and was forced to admit that that she approved of publicizing her case, and personally participating in doing so. PFF 170, Tr. 775, PFF 91, PFF 24, Exhibit J. These are just a few of the numerous times that Ms. Sataki was completely and thoroughly impeached, which is set forth in full in Mr. Klayman's briefs and findings of fact based on the record. Exhibit C. Given all of this, Mr. Klayman cannot fathom how the D.C. Court of Appeals felt it was proper for the Board and later the D.C. Court of Appeals to ignore the testimony of Mr. Klayman and his seven (7) material unimpeached witnesses in favor of the Complainant, Ms. Sataki, who clearly failed to tell the truth.

## J.   NUMEROUS DUE PROCESS AND OTHER VIOLATIONS HAVE PERVADED THIS MATTER

As set forth above, Mr. Klayman had already been subject to a completely unconstitutional "temporary suspension" since January of 2021—that is twenty (20) months— before the D.C. Court of Appeals finally issued its fatally flawed September 15, 2022 suspension order suspending him for a further eighteen (18) months, with a reinstatement provision that could take additional years to conclude, which taken together could end Mr. Klayman's practice of law in the District of Columbia. This flies in the face of logic. Mr. Klayman had already been

"temporarily" suspended for longer than the new suspension period, yet was not allowed to count his "temporary" suspension as time served. And, there was absolutely no reason for the D.C. Court of Appeals to have dragged its feet for twenty (20) months when it was planning to simply "rubber stamp" the Board's Report, completely ignore Mr. Klayman's witnesses and testimony, the evidentiary record, and uncontroverted facts. It is clear that the only possible reason that the D.C. Court of Appeals took twenty (20) months to render a decision was because it had already instituted a "temporary suspension" on Mr. Klayman and was simply trying to punitively, extend that period as long as possible. When compared to the D.C. Court of Appeals' treatment of Kevin Clinesmith – a convicted felon who happens to be anti-Trump and thus ideologically akin to the DC attorney disciplinary apparatus, as set forth in detail above – there can be absolutely no doubt that the entire D.C. attorney disciplinary apparatus is openly engaging in selective prosecution based, as occurred with Mr. Klayman and many others as discussed above, on its targets' political and ideological beliefs. This is completely unacceptable, illegal, and unconstitutional misconduct.

Furthermore, the D.C. Court of Appeals has now imposed a reinstatement requirement despite, as set forth above, Judge Sporkin's testimony on Mr. Klayman's behalf that Mr. Klayman had appeared in cases before him and came to see Mr. Klayman as an honest and ethical person that had no reason to doubt Mr. Klayman's character. PFF188. Order at 6-7. This was the only character evidence proffered and ODC did not refute this. Even more, not a single witness from ODC testified that Mr. Klayman was unfit to practice law. Given that this case was over twelve (12) years old at the time of the final suspension order, the Panel's finding that somehow Mr. Klayman should be subject to reinstatement now, after an earlier recent finding that he was fit to practice law – and never a finding of any dishonesty - makes no sense substantively, other than pure retaliation and an intention to effectively try to remove him from the practice of law in D.C. And, once again, compared to Kevin Clinesmith who literally committed a felony involving dishonesty and still was not given a reinstatement provision, this rank bias cannot be ignored.

In this regard, Mr. Klayman has filed for relief under D.C. Civil Rule 60 to set aside the D.C. Court of Appeals' completely erroneous and fatally flawed and fraudulently induced order

of suspension. Exhibit H. Mr. Klayman therefore respectfully requests that if the honorable Chief Judge Corrigan and this honorable Court do not summarily decline to impose reciprocal discipline on the basis of the Florida Supreme Court precedent for laches and the statute of limitations, the early dismissals of Ms. Sataki's complaint by both The Florida and Pennsylvania Bar, and/or the substantive bases set forth herein, they at a minimum stay consideration until Mr. Klayman has had an opportunity to exhaust his legal avenues of relief, and importantly have the benefit of The Florida Bar's review of this matter, which it had already dismissed about eleven (11) years ago.

## III.   CONCLUSION

Based on the foregoing, it is abundantly clear that no reciprocal discipline is respectfully warranted. Not only should reciprocal discipline be summarily denied clearly on the basis of the clear-cut Florida Supreme Court precedent for laches and the statute of limitations, and the prior dismissal of The Florida Bar about eleven (11) years ago, should the Court review the record, which it must respectfully do if it proceeds further, it will also see that the purported "ethical violations" were contrived and prejudiced by fraud and other prosecutorial misconduct, such as the suborning of perjury, not to mention the lack of due process and other violations of Mr. Klayman's constitutional and other legal rights.

Mr. Klayman's membership in this honorable Court is very important to not just himself, but also his colleagues and his clients, such as Patrick Reed, who has a pending case before Chief Judge Corrigan and another related one before the Honorable Brian J. Davis and thus this matter is of utmost importance to prevent a manifest injustice to all concerned.

And, as a Florida citizen and resident, Mr. Klayman cherishes practicing law in his home state, which has been of utmost importance for him, his colleagues, his family for the last forty-five (45) years since he graduated from Duke University in 1973 and later Emory Law School in 1977. During this time period, Mr. Klayman has been continuously a member in good standing of The Florida Bar, and later this Honorable Court, as well as all other federal and state courts in Florida.

Respectfully submitted,

Larry Klayman, Esq.