**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

| | | |
|---|---|---|
| IN RE: LARRY KLAYMAN | } } } | |
| Petitioner | } | **Case Number: 3-22-mc-14-TJC-JRK** |
| | } } } } | |

---

**UPDATED PETITION OF LARRY KLAYMAN CONCERNING SUSPENSION BY THE DISTRICT OF COLUMBIA BAR PURSUANT TO RULE 2.04 OF THIS HONORABLE COURT AND THE MAGISTRATE JUDGE'S ORDER OF JANUARY 13, 2023**

Petitioner Larry Klayman ("Mr. Klayman") hereby respectfully submits the following response to the Court's order of January 13, 2023 of Magistrate Judge James Klindt directing him to: 1) file a notice stating that he stands on the Petition and attached exhibits that were already submitted to the Court; or 2) submit the entirety of the record for the disciplinary proceedings in the District of Columbia on or before January 27, 2023. In response, Mr. Klayman hereby respectfully submits this updated Petition which brings the Court up to date with more recent developments and discoveries.

By way of background about Mr. Klayman, attaches at <u>Exhibit B</u> is his abbreviated biography. He has been continuously a member in good standing of The Florida Bar for now over 45 years. <u>Exhibit A</u>. Mr. Klayman has also continuously been a member in good standing of this honorable Court since December 14, 1978, that is for 44 years.

Mr. Klayman currently and importantly represents professional golfer Patrick Reed in two cases before this honorable Court, *Reed v. Chamblee et al*, 3:22-cv-01059-TJC-PDB (M.D. Fl.) and *Reed v. Ryan et al*, 3:22-cv-01181-TJC-PDB (M.D. Fl.). Thus, if the issue of reciprocal

discipline is not summarily denied - which it must be, for the compelling reasons set forth below – at a minimum any consideration should be stayed pending these cases and the compelling reasons set forth below, as reciprocal discipline at this juncture would not only prejudice Mr. Klayman, but also severely prejudice his client, Mr. Reed. Also, important in this regard is the recent order and well-reasoned precedent of the U.S. Court of Appeals for the Fifth Circuit and other Courts that Mr. Klayman's legal challenges to the subject suspension order be allowed to run their course in the interests of justice and fundamental fairness.

Mr. Klayman hereby respectfully petitions this honorable Court to not impose reciprocal discipline with regard to the September 15, 2022 order of suspension issued by the District of Columbia Court of Appeals (the "Suspension Order"), which order went into effect on October 17, 2022 pursuant to D.C. Bar Rule XI, § 14 and Rule 9.10 of the Rules of the Board on Professional Responsibility.

If reciprocal discipline is not summarily denied, which it should be for the following reasons set forth in this updated and earlier Petition—including but not limited to the fact that The Florida Bar, which had been timely notified of the suspension has yet to advise that it has opened a proceeding—this matter respectfully should also await a full adjudication by The Florida Bar, before which Mr. Klayman has continuously been a member in good standing since December 7, 1977, over 45 years ago, having begun his legal practice in his home state with the then Miami litigation firm of Blackwell, Walker, Gray, Powers, Flick and Hoehl. *See* Exhibit A – Certificate of Good Standing of The Florida Bar. A copy of Mr. Klayman's abbreviated biography is attached hereto as Exhibit B, and his communication with The Florida Bar notifying it of the suspension is attached as Exhibit C, all of which are incorporated herein by reference. Indeed, the fact that Mr. Klayman submitted his response to The Florida Bar in October of 2022,

over three months ago, and has not heard anything from it strongly suggests that The Florida Bar has chosen not to act on this matter, particularly since it dismissed the underlying identical complaint over eleven (11) years ago.

Furthermore, consistent with the Court's January 13, 2023 order, Mr. Klayman will be submitting on this date via Federal Express a USB drive containing the entire record of the subject disciplinary proceeding in the District of Columbia. Mr. Klayman respectfully requests, if this matter is not summarily dismissed or stayed at this time, that the Court thoroughly review this record, as it will unequivocally show that there was simply no clear and convincing evidence of any ethical violation, as set forth more in detail herein.

## I.    PETITIONER LARRY KLAYMAN'S RENEWED MOTION FOR STAY

First, and foremost, if reciprocal discipline is not summarily denied on the basis of this updated Petition, Mr. Klayman respectfully requests that the Court stay consideration of reciprocal discipline pending the outcome of his currently ongoing challenges to the Suspension Order. When the Suspension Order was issued, Mr. Klayman had advised the District of Columbia Court of Appeals ("D.C. Court of Appeals"), the District of Columbia Office of Disciplinary Counsel ("ODC"), and the Board of Professional Responsibility ("Board") that he would file other legal contests to the Suspension Order with a D.C. Superior Court Rule 60 complaint to set aside the judgment for fraud as well as other prosecutorial and other misconduct as well as a timely filed petition for writ of mandamus or certiorari before the U.S. Supreme Court. On November 4, 2022, the Superior Court Rule 60 complaint to set aside the suspension order was filed before the Superior Court for the District of Columbia, *Klayman v. Sataki et al*, 22-CAB-5235 (D.C. Sup. Ct.), <u>Exhibit D</u>, (the "Rule 60 Complaint") and is incorporated herein

by reference. Mr. Klayman's petition for writ of mandamus has also been timely filed with the Supreme Court and is currently pending.

In good faith and for the foregoing compelling reasons, Mr. Klayman respectfully requests that consideration of reciprocal discipline be stayed pending his exhaustion of these important and necessary legal remedies as a matter of due process. As set forth previously, the U.S. Court of Appeals for the Fifth Circuit ("Fifth Circuit") issued an order and opinion letter staying consideration of reciprocal discipline pending the outcome of Mr. Klayman's legitimate and compelling challenges to the Suspension Order. Specifically, the Fifth Circuit ruled:

> On November 2, 2022, this Court issued an order directing Larry E. Klayman to show cause why his right to practice before this Court should not be suspended reciprocal to a September 15, 2022 order of suspension issued by the District of Columbia Court of Appeals. This Court's self-executing show cause suspension order became effective December 7, 2022. At the direction of the Chief Judge, IT IS ORDERED that the order of suspension hereby is WITHDRAWN.

The Fifth Circuit included a cover letter as well, which read:

> Further to your response to this Court's Order to Show Cause, please be advised that the order of suspension became final on December 7, 2022. However, the Court has chosen to withdraw the suspension order and hold this Court's reciprocal disciplinary proceeding against you in abeyance pending final disposition of your Superior Court Rule 60 complaint and writ of mandamus or certiorari petition proceedings.
>
> Please advise this Court when the above-referenced proceedings are concluded. Failure to keep this Court informed of the status of the proceedings may result in the imposition of reciprocal discipline without further notice.
>
> Please find enclosed a copy of an order with cover letter withdrawing the order of suspension. Exhibit E.

Clearly, the Fifth Circuit recognized the legitimacy and merits of Mr. Klayman's Rule 60 Complaint filed in the District of Columbia Superior Court pursuant to the Rule 60 Complaint, Exhibit D, which is why it issued the order staying consideration of reciprocal discipline. Tellingly, other courts, including the U.S. District Court for the Northern District of Texas, have

followed the Fifth Circuit's lead and also stayed any consideration of reciprocal discipline until Mr. Klayman's Rule 60 Complaint has been litigated.

This Court respectfully should follow the well-reasoned, fair, and just precedent of the Fifth Circuit and these other courts and stay any consideration of reciprocal discipline pending the outcome of Mr. Klayman's Rule 60 Complaint. However, even if it chooses not to do so, it is clear that reciprocal discipline is wholly unwarranted, as set forth in detail below.

## II.   PROCEDURAL HISTORY AND BACKGROUND

As set forth above, this matter should respectfully be stayed, if it is not now disposed of summarily, as occurred with both The Florida Bar and the Pennsylvania Bar over eleven (11) years ago when the Complainant, Elham Sataki ("Ms. Sataki") simultaneously filed her identical Complaint before these state bars as well as the District of Columbia Bar. Both The Florida Bar and the Pennsylvania Bar dismissed Ms. Sataki's Complaint, initially filed in November of 2010, while as discussed below ODC sat on it for nearly seven (7) years, long after the she had abandoned it by ODC's own policy rules, only then to have ODC institute a disciplinary proceeding for the first time with a Specification of Charges filed on July 20, 2017. Exhibit F.

Of particular importance to this instant matter is the fact that Disciplinary Counsel-In-Charge, Anthony P. Sodroski from the Pennsylvania Office of Disciplinary Counsel, has confirmed that the Complainant had submitted a Complaint in October of 2011, and that it was closed in that same month without adjudication. Exhibit G. This is of critical importance, as this unequivocally shows that the Pennsylvania Office of Disciplinary Counsel had long ago conducted a review the allegations of the Complainant and decided that it was without merit. Nothing else could explain why the Complaint would have been dismissed and this matter closed in the same month. This confirms that the same thing also occurred in Florida, where there are

no longer any records due to the fact that over a decade has now elapsed due to ODC's unconscionable and prejudicial delay in instituting this case. Indeed, as no disciplinary action was taken by The Florida Bar and Mr. Klayman has remained a member in continuous good standing for nearly 45 years, it is clear that Florida dismissed the identical Complaint as well. This is simply a case of "two plus two equals four." If it is undisputed that both The Florida Bar and the Pennsylvania Bar were already presented with the same Complaint from Ms. Sataki, and it is also undisputed that no disciplinary action was taken, then the only possible conclusion is that they determined Ms. Sataki's complaint to be meritless. Exhibit C-2. It would be fundamentally unjust to reach any other conclusion, or to conclude otherwise, where the enormous delay in adjudicating the disciplinary proceeding against him in the District of Columbia was due entirely to ODC's partisan actions and inactions as explained below, and not due to conduct by Mr. Klayman at all.

Crucially, the imposition of reciprocal discipline is no mere formality, particularly under these circumstances where an identical Complaint has already been filed by Ms. Sataki in Florida and Pennsylvania and summarily dismissed, as set forth above. *In re Reciprocal Discipline of Rokahr*, 2004 S.D. 66 (2004) is particularly instructive. In *Rokahr*, the attorney was licensed to practice in both South Dakota and Nebraska. *Id*. at P2.  Disciplinary complaints were filed against Rokahr with in both jurisdictions, similar to the facts here.  *Id*. at P6 – P7. In Nebraska, an investigation was done, and the Nebraska disciplinary referee found that Rokahr had committed three ethical violations and ordered a six-month suspension. *Id*. at P6. In South Dakota, however, the Disciplinary Board of South Dakota found that merely an admonition was appropriate. *Id*. at P7. Once the Nebraska proceeding ultimately concluded, Rokhar sent notice to South Dakota of the suspension, and thus arose the issue of whether South Dakota was bound to

impose a reciprocal six-month suspension. The South Dakota Supreme Court correctly declined to do so. In doing so, it properly reasoned:

> Each jurisdiction has its own statutes and rules. If the District's proceedings, based on its own standards and a careful evaluation of the attorney's conduct in light of those standards, conclude with the selection of one sanction, then it would surely be irrational to impose, instead, a different sanction which was selected on the basis of a different factual record under another jurisdiction's laws and rules. *Id*. at P14.

Furthermore, the South Dakota Supreme Court also found that full faith and credit must be given to an independent investigation: "There is also the question of whether an attorney disciplinary decision of a separate jurisdiction must be given full faith and credit in this jurisdiction. Indeed, Rokahr raised this same argument as a defense to the Nebraska Disciplinary proceeding, contending that because the South Dakota Disciplinary Board had already investigated the complaint based upon the same set of facts, no further discipline should be imposed." *Id*. at P15. The South Dakota Supreme Court importantly also invoked precedent from the District Columbia Court of Appeals in reaching their decision, citing *In re Cerroni*, 683 A.2d 150, 151 (D.C. 1996) ("In terms of discipline, the Board determined that it was not required to follow the doctrine of reciprocal discipline because the Hearing Committee had already conducted proceedings on the matter.").

Here, it is indisputable that Ms. Sataki had filed an identical Complaint against Mr. Klayman in Florida and Pennsylvania in 2011, and that both of these bars at the time made the decision not to pursue the matter, as the Complaints lacked merit and did not state any bona fide ethical violations on their face. Under *Rokahr*, this should conclude the question of reciprocal discipline, as full faith and credit must be given to Florida and Pennsylvania's decisions not to pursue and dismiss this Complaint back in 2011. Given that this extraordinary and highly prejudicial delay was caused solely and unequivocally by ODC – who literally resurrected an

abandoned Complaint for their own apparent ideological and political purposes after seven (7) years – it would be manifestly unfair and unjust to   stretch and draw any inferences due to the lack of available records in favor of ODC and against Mr. Klayman. This type of situation is the precise reason that doctrines such as statutes of limitations and laches were formulated – to protect citizens and in this case members of the bar who have been victimized by unexplained and undue and in this matter gross unconscionable  delay out of their own control.

## III.   THERE RESPECTFULLY ARE NO FACTUAL AND LEGAL BASES TO IMPOSE RECIPROCAL DISCIPLINE ON MR. KLAYMAN

It is clear that reciprocal discipline, notwithstanding that this matter was dismissed by The Florida Bar and the Pennsylvania Bar over eleven (11) years ago,  and is time barred in any event under well-established precedent for laches in disciplinary matters and the applicable statute of limitations, should not be imposed based on a fatally flawed Suspension Order *In re Klayman*, 20-BG-583 (D.C.C.A.) (the "Sataki Matter").

Mr. Klayman also attaches hereto, and incorporates by reference, his Initial Brief and Petition for Rehearing En Banc filed at the D.C. Court of Appeals, Exhibit C-4, which contain his Proposed Findings of Fact and Conclusions of Law presented to the Board. Thus, when Mr. Klayman cites a "PFF" in this response, he is referring to his Proposed Findings of Fact. Mr. Klayman respectfully requests that this Court, if this matter is not disposed of summarily, carefully review these briefs and Proposed Findings, as well as the record, contained as well in the forwarded USB Drive, as they speak for themselves and show conclusively why no reciprocal discipline is warranted.

### A.   THERE WAS A SIGNIFICANT DEPRIVATION OF DUE PROCESS UNDER THE DOCTRINE OF LACHES AND THE STATUTE OF LIMITATIONS

It is important to recognize that the Sataki Matter involves events that occurred in 2010 – twelve (12) years ago. Even more egregiously, this matter was not even instituted until 2017 – seven (7) years after the Complaint had been filed by the Complainant! Exhibit F. Thus, there was a minimum of (7) year delay before this case was even instituted. During those seven (7) years, having had no contact from ODC, Mr. Klayman very reasonably believed that the Sataki Matter had been closed, particularly given the fact that the Complainant, Elham Sataki ("Ms. Sataki") had filed identical Complaints in Pennsylvania and Florida and they were summarily dismissed as being frivolous and meritless. PFF 43. Mr. Klayman therefore had discarded his records pertaining to his representation of Ms. Sataki, as case records need only be kept for five (5) years in the District of Columbia[1] and in Pennsylvania[2], as well as Florida, making his defense after the Sataki Matter was resurrected by ODC *sua sponte* subject to extreme prejudice. As just one example among many of this extreme prejudice, one need only look to the attached ethics opinion of Professor Ronald Rotunda, who would have testified in the case, but in the interim years he passed away, prejudicing Mr. Klayman further. Exhibit C-1. Another material and crucial witness, Arlene Aviera, Ms. Sataki's psychologist who was aware of all of the details of Mr. Klayman's representation of Ms. Sataki, Mr. Klayman in addition to Ms. Sataki having met and communicated with her on many occasions, contracted terminal cancer during this egregious and time barred delay, as set forth in the attached briefs, and thus could not testify. Dr. Aviera's testimony would have been crucial because she contemporaneously took detailed notes and records concerning Ms. Sataki and her legal proceedings. Mr. Klayman met with both Dr. Aviera and Ms. Sataki on numerous occasions to be of assistance, and Dr. Aviera would have

---

[1] https://www.dcbar.org/For-Lawyers/Legal-Ethics/Ethics-Opinions-210-Present/Ethics-Opinion-283#footnote11
[2] Pa. R. Prof'l. Cond. 1.15

testified that Mr. Klayman had diligently represented Ms. Sataki's interests, but that when Ms. Sataki sought to take advantage of her friendship with Mr. Klayman and got too personal – i.e. when Ms. Sataki asked Mr. Klayman to buy her a car – that Mr. Klayman had advised Ms. Sataki to get new counsel, which she refused to do. Also of crucial importance is that Dr. Aviera could have testified as to Ms. Sataki's lack of candor, since she had experienced and witnessed it first-hand, and also that Ms. Sataki's mental and other issues were not caused by Mr. Klayman, but by her own doing.

This is exactly why Mr. Klayman on numerous occasions sought discovery from Dr. Aviera and others, including in his February 15, 2018 Motion to Notice and Have Issued Subpoenas Duces Tecum to Take the Depositions of Elham Sataki and Arlene Aviera. Exhibit I. In that motion, Mr. Klayman wrote, "[i]t is thus believed that the deposition testimony of…Ms. Aviera will disclose crucial exculpatory evidence necessary for Respondent's defense, and reveal that he acted properly at all times and even sought to get Ms. Sataki other counsel."

Tellingly, even this simple request was vehemently opposed by ODC and then denied by the AHHC despite discovery clearly being allowed and an integral part of the attorney discipline process, particularly in a case such as this one where ODC delayed seven years to even file a Specification of Charges, resulting in passage of time causing memories to fade, documents to be discarded and lost, and witnesses to become unavailable. *See* Board on Professional Responsibility Rules, Chapter 3.

Then, taking advantage of the AHHC's refusal to allow Mr. Klayman any discovery, and the fact that their delay had caused Dr. Aviera to be unavailable to testify due to illness, ODC and Ms. Sataki on the eve of the commencement of the hearings in this proceeding, very conveniently "discovered" so called records from Dr. Aviera that were previously undisclosed

and introduced them into the record. The AHHC did not care that these "cherry picked" so called records from Dr. Aviera constituted unsubstantiated hearsay by virtue of her not being available to authenticate them (and thus should have been inadmissible), much less an inaccurate representation of the facts. Mr. Klayman therefore renewed his request for discovery at the hearing, citing this significant due process violation, yet was still denied by the highly partisan and biased AHHC:

> At this point, for the record, as your Honor may recall, I had requested to be able to depose Dr. Aviera. That would have alleviated this issue, and I was denied. That's why I also needed her file, because this is just selective things that are being produced by Bar Counsel from her file, not the whole file. So this is a highly prejudicial area of testimony for her to be testifying, A, without my having discovery, which I requested early on, and B without Dr. Aviera to testify. Tr. at 132. Exhibit J.

Thus, everything introduced by ODC was unsubstantiated, unauthenticated hearsay, as Dr. Aviera could not appear to authenticate the records, and Mr. Klayman had no opportunity to cross examine her either. They simply came into "evidence" improperly.

Even more, Mr. Klayman was not even allowed to take the deposition of Ms. Sataki, despite the seven (7) year delay caused by ODC in even filing the Specification of Charges. Had Mr. Klayman been allowed to depose Ms. Sataki, he would have been able to avoid the severe prejudice that resulted from ODC and Ms. Sataki conspiring to introduce a litany of alleged records for the first time literally on the eve of the hearing, without giving Mr. Klayman any opportunity to review them, as set forth above. And, he would have been able to uncover fraudulently withheld exculpatory evidence in the form of a video interview of Ms. Sataki publicizing her case, despite claiming at the hearing that she did not approve of publicity in her case, as set forth in detail below.

Even further compounding this prejudice caused by ODC's delay, the reason for the seven (7) year delay in even instituting the Sataki Matter was because the Complainant, Ms. Sataki, had actually abandoned her Complaint and chosen not to proceed further with it. This is shown in a letter from ODC to Ms. Sataki dated July 7, 2011, where ODC sent to Ms. Sataki Mr. Klayman's responses to her allegations and advised her, "[i]f we do not hear from you promptly, we may assume that you are satisfied with the attorney's explanations." Exhibit H.  Despite the lack of response from Ms. Sataki, ODC did not close its case, but instead waited literally years, far beyond this Circuit's applied doctrine of laches and the statute of limitations for disciplinary proceedings would have allowed,  to *sua sponte* resurrect the Sataki Matter, going so far as to use an investigator to literally hunt  Ms. Sataki down to coax if not pressure her to pursue her claims against Mr. Klayman. This is shown in an email from ODC's H. Clay Smith III to Kevin O'Connell stating:

> I am trying to locate a complainant that has dropped off the map. Ms. ElhSataki…. **She filed a complaint vs. Larry Klayman in 2011. Her only correspondence with us was the ethical complaint that she** filed. My letter to her dated 7/7/11 was not responded to, but was not returned by the USPS either. I recently tried to contact her by telephone, but her number is not in service. I'll appreciate your efforts to locate her and to provide some reliable contact information. Exhibit H. (emphasis added).

It is truly troubling that neither the Board nor the D.C. Court of Appeals cared  that Ms. Sataki had made the choice to drop her Complaint against Mr. Klayman, and ODC still hired an investigator to hunt her down in 2014 to coax her to move forward with her claims against Mr. Klayman. Still the case was incredibly not instituted until three years later in 2017. Exhibit F. This conclusively shows that ODC's purpose here was not to get "justice" for the Complainant, but instead was to manipulate and use the Complainant to fulfill their own goal and agenda to try to remove Mr. Klayman from the practice of law due, as set forth below, apparently due to his

conservative public interest advocacy, Republican Party affiliation, and litigation. No matter how many times Mr. Klayman brought this incontrovertible fact up during the pendency of the Sataki Matter, it fell on deaf ears, as the Board and D.C. Court of Appeals showed themselves as unwilling to hold ODC accountable for unconscionable delay and any of the litany of egregious ethical violations that they committed, for which they incorrectly claim are immune from legal scrutiny. However, Mr. Klayman is confident that this honorable Court, detached from the politics of the "weaponized" DC attorney disciplinary apparatus and its highly politicized supervisory court, will see just how unjust and time barred this behavior by ODC truly was.

All this goes to show that reciprocal discipline in the Sataki Matter must, at the outset, must be denied due to the doctrines of laches and statute of limitations, and in particular due to the completely unjustified and highly prejudicial nature of the delay.

It is clear that Florida  imposes a six-year statute of limitations for attorney discipline matters. The Bar is required to open an investigation "within 6 years from the time the matter giving rise to the investigation is discovered or, with due diligence, should have been discovered." Bar Rule 3-7.16(a)(1); *Fla*. *Bar v*. *Phoenix*, 311 So. 3d 825, 831 (Fla. 2021). And, in addition to this hard statute of limitations, Florida also imposes the doctrine of laches to unjustifiable delays in attorney discipline matters. *See The Florida Bar v*. *Walter*, 784 So.2d 1085 (Fla. Sup. Ct. 2001). *Walter* is particularly instructive. In *Walter*, the petitioner was also subjected to a seven-year interim between his alleged misconduct and the filing of the Bar's complaint. *Id*. at 1087. Also similarly, the delay was not due to Mr. Walter's conduct in any way. *Id*. Under these facts, which are literally identical to those in this case, the Florida Supreme Court found, "we *do* find it "unjust or unfair" to require Walter now to answer the Bar's charges in this matter." *Id*.  Identical to *Walter*, there was a (7)-year delay by ODC is even filing a

13

Specification of Charges. <u>Exhibit F</u>.  This was an incredibly prejudicial, unexplained delay solely at the hands of ODC that renders enforcement of discipline completely inequitable and unjust. As the July 20, 2017 Specification of Charges date should be the trigger date for invoking the statute of limitations and doctrine of laches, it is clear that this matter is time barred and must be dismissed summarily. However, even if the trigger date is interpreted as the date that Ms. Sataki initially filed her Complaint with ODC, the Court still must decline to impose reciprocal discipline under the doctrine of laches because, as set forth above, there was absolutely nothing justifiable about the delay in this matter, and it has severely prejudiced Mr. Klayman's ability to present a full defense, as witnesses became unavailable due to death and illness during the seven-year delay caused solely by ODC.

This was further emphasized in the legal ethics opinion of one of the preeminent professional ethics experts, Ronald Rotunda, who had wanted and planned to testify on Mr. Klayman's behalf, pro bono, but sadly passed away during the extremely prejudicial delay of seven (7) years caused by ODC:

> *In Florida Florida Bar v. Rubin*, 362 So.2d 12 (Fla. Sup. Ct. 1 1978) (per curiam), the Florida supreme court threw out charges because the prosecutor because of the Bar's delay in violation of the Florida rules… One can summarize this case as the Bar delaying finalization of two cases (where the Bar was disappointed with the recommended discipline) because it was confident it would secure a conviction in a third case still in the pipeline in the hope of securing greater overall disc line. The Court said, 'Whatever other objects the rule may seek to achieve, it obviously contemplates that *the Bar should not be free to withhold a referee 's report which it finds loo lenient until additional cases can be developed* against the affected attorney, in an effort to justify the more severe discipline which might be warranted by cumulative misconduct. The Bar's violation of the prompt filing requirement in this case, to allow a second grievance proceeding against Rubin to mature, is directly antithetical to the spirit and intent of the rule. In addition, it has inflicted upon Rubin the 'agonizing ordeal' of having to live under a cloud of uncertainties, suspicions, and accusations for a period in excess of that which the rules were designed to tolerate. <u>Exhibit C-1</u>.

Thus, the Court must decline to impose reciprocal discipline on this basis alone, notwithstanding the lack of merit of the entire ODC partisan inspired disciplinary proceeding.

## IV. THE IMPOSITION OF RECIPROCAL DISCIPLINE WOULD RESULT IN A GRAVE AND MANIFEST INJUSTICE

Mr. Klayman respectfully requests and implores the Court to carefully review the attached briefs and Proposed Findings of Fact as they meticulously outline and detail the prosecutorial misconduct, gross injustices, fraudulent conduct, and egregious misconduct by ODC and Ms. Sataki with regard to perjury and the suborning of perjury, that gave rise to and resulted in the D.C. Court of Appeals' suspension order. Exhibit C-4. Indeed, as set forth above, both the Pennsylvania Bar and The Florida Bar already considered Ms. Sataki's Complaint against Mr. Klayman through neutral and unbiased eyes and summarily dismissed them as completely meritless and frivolous. PFF 43. This should tell the Court now all it needs to know.

Regrettably, however, this is not what happened at the D.C. Court of Appeals, which effectively and improperly summarily adopted, that is "rubber stamped," without itself apparently delving into the record, a fatally flawed Board Report and Recommendation. In its Order, the D.C. Court of Appeals wrote, ""[w]e accept the Board's conclusion that Mr. Klayman violated the Rules of Professional Conduct, and we adopt the Board's recommended sanction," "[w]e 'accept the findings of fact made by the Board unless they are unsupported by substantial evidence of record,'" "[o]ur cases do not appear to make clear whether our review on this issue is deferential or de novo…We need not decide the issue, because we agree with the Board's conclusion," and "[w]e conclude that the Hearing Committee and the Board acted reasonably by choosing to largely credit E.S.'s testimony over that of Mr. Klayman." Exhibit K. This ignored the well-established precedent that under Board Rule 11.5, charges against Mr. Klayman must be proved by "clear and convincing" evidence. *In re Vohra*, 68 A. 3d 766, 784 (D.C. 2013).

If the D.C. Court of Appeals was going to ignore Mr. Klayman's facts, witnesses, and arguments – which it admittedly did - then why did it take an unconscionable nearly twenty (20) months to issue a decision? If its intention was to simply adopt wholesale the Report, it could have done so immediately. The only explanation is that the D.C. Court of Appeals was acting in a partisan punitive fashion and took advantage of the fact that Mr. Klayman had been "temporarily suspended" without due process - as Mr. Klayman was (1) denied his Sixth Amendment right to counsel of choice,  (2) denied a bona fide review of the record, (3) was provided with absolutely no facts or law explaining why he had been "temporarily suspended and (4) denied the right to even petition for rehearing en banc - since January of 2021 and thus wanted to extend Mr. Klayman's "temporary suspension" period. Even more, the suspension order is also factually and legally deficient and fatally flawed, and does not contain **one record cite** to even attempt to justify its findings. <u>Exhibit K</u>. This shows that there was no bona fide review of the record. The suspension order is wholly conclusory, which is the by-product of the Panel of the  D.C. Court of Appeals deciding to ignore Mr. Klayman's facts, witnesses, and unrefuted testimony, and has resulted in a minimum thirty-eight (38) months total suspension, comprising a twenty month "temporary suspension" which occurred without even a hearing before the D.C. Court of Appeals, and an eighteen (18) month actual suspension period tacked onto that, incredibly exceeding even the Boards' recommended suspension by about twenty (20) months.

Mr. Klayman took the time and effort to have seven (7) material witnesses testify compellingly on his behalf, including the distinguished retired federal judge, the Honorable Stanley Sporkin, Gloria Allred, Tim Shamble, Keya Dash, Joshua Ashley Klayman, posthumously ethics expert Professor Ronald Rotunda through his written opinion, and himself.

It is incomprehensible that at every single level of this proceeding, the testimony provided by these material and unbiased witnesses was simply ignored and given no weight, despite the fact that it was all uncontroverted testimony based on personal contemporaneous knowledge. Yet, Ms. Sataki – ODC's only material witness, who was thoroughly impeached - was just taken at her word. This simply makes no sense. Even though the D.C. Court of Appeals was forced to acknowledge yet still downplay the sworn testimony of the Honorable Stanley Sporkin, a distinguished retired federal judge, former Chief Counsel of the Central Intelligence and head of Enforcement at the Securities and Exchange Commission, who while being in bad health and in a wheelchair,  for which he later died, took it upon himself at great pains to travel to the hearing, with the aid of his wife and son, to testify on Mr. Klayman's behalf without being subpoenaed. Judge Sporkin testified under oath that over the many years Mr. Klayman had appeared in cases before him, he came to see Mr. Klayman as an honest and ethical person that had no reason to doubt Mr. Klayman's character. PFF 188. Exhibit K at 6-7. And, as importantly, during Mr. Klayman's representation of Ms. Sataki Judge Sporkin testified that he had discussed with Mr. Klayman his case strategy and agreed with it. *Id*. at 7, PFF 191. While the panel is forced to concede this, it accords Judge Sporkin's learned testimony no weight at all, as it obviously did not comport with its apparent predetermined mindset and objective to improperly  suspend Mr. Klayman from the practice of law in the District of Columbia, despite there being absolutely no finding of dishonesty by Mr. Klayman.

Given the frankly unbelievable injustice after injustice set forth above, it is crucial for Mr. Klayman to provide some real-world context and a highly likely explanation as to how and why the D.C. attorney disciplinary apparatus likely has acted in this manner.  It is indisputable that our society has become more and more politically and ideologically polarized and people

more and more dogmatic in their beliefs. Either you are a friend or a foe. There is no longer a middle ground. Nowhere is this more evident than in the District of Columbia, and this type of combative mentality has regrettably infected the leftist and totally Democrat D.C. attorney disciplinary apparatus, where attorneys such as Mr. Klayman, the founder of Judicial Watch and Freedom Watch, *see* <u>Exhibit B</u>, who are strong conservative and/or Republican public interest advocates, are no longer welcome as members of the D.C. bar by its wholly partisan Democrat left-wing leadership and have instead become targets.[3] Mr. Klayman understands that this is a bold statement, but it is one that is completely supported by objectively verifiable facts. This was regrettably evident at each stage of the disciplinary proceeding against Mr. Klayman, which is set forth in *seriatim* below.

*First,* ODC had previously been run by Bar Disciplinary Counsel Wallace "Gene" Shipp prior to his retirement in 2017. During Mr. Shipp's tenure, ODC had been what it was supposed to be – a fair, unbiased, and neutral body. After Mr. Shipp retired, Hamilton Fox III ("Fox") took over, everything changed, and ODC became weaponized and morphed into a highly partisan

---

[3] The Court can look to the members of the D.C. attorney disciplinary apparatus' political contributions as shown in FEC public records as further evidence of their partisan predilections. For instance DC Bar Disciplinary Counsel Fox has donated heavily to Barack Obama and Joe Biden, as well as other leftist candidates. Former assistant bar counsel Elizabeth Herman also donated heavily to Barack Obama and Joe Biden.

Michael Tigar of the Ad Hoc Hearing Committee also donated thousands upon thousands of dollars to leftist political causes and candidates, including the Clintons, as well as ActBlue and the Democratic Congressional Campaign Committee.

Matthew Kaiser, the chairman of the Board on Professional Responsibility, has donated thousands and thousands of dollars to leftist causes, including Barack Obama, Joe Biden, and Hillary Clinton.

It is no coincidence that Mr. Klayman has sued these politicians in the course of his public interest advocacy and litigation, which helps explain the animosity that these members of the D.C. attorney discipline apparatus openly displayed towards him. In fact, a review of the AHHC recommendation shows a fixation on Mr. Klayman naming Hillary Clinton as a member of the Broadcasting Board on Governors in a *Bivens* Complaint brought on behalf of Ms. Sataki along with all the other governors.

weaponized  tool to attempt to remove conservative and Republican activist attorneys like Mr. Klayman from the practice of law. This explains why Ms. Sataki's Complaint sat dormant and thus abandoned for seven years until Fox took over, as clearly the neutral Mr. Shipp felt it was completely meritless, and then Fox saw an opportunity to try to destroy the founder of Judicial Watch and Freedom Watch, Mr. Klayman, once he took hold of ODC.

It is clear that Fox ordered ODC and his deputies Elizabeth Herman and  Julia Porter, as well as Assistant Bar Disciplinary Counsel Clay Smith, to resurrect the abandoned Sataki Complaint in order to try to remove Mr. Klayman from the practice of law.

It is extremely telling that when ODC made the choice to resurrect Ms. Sataki's Complaint in 2017, Mr. Klayman was involved in several high-profile cases that ran counter to ODC's leftist politics. For instance, Mr. Klayman had filed a RICO Complaint against Hillary Clinton, Bill Clinton, and the Clinton Foundation in the U.S. District Court for the Southern District of Florida in 2015. *Klayman v. Clinton et al*, 9:15-cv-80388 (S.D. Fl.). Mr. Klayman was also representing clients in lawsuits against President Obama, Black Lives Matter and its leaders, Louis Farrakhan, and Al Sharpton over their roles in inciting violence against law enforcement officers, resulting in the Micah Johnson mass shooting that left five police officers dead. *Klayman v. Obama et al*, 3:16-cv-2010 (N.D. Tx.); *Zamarripa v. Farrakhan et al*, 3:16-cv-3109 (N.D. Tx.). Mr. Klayman also was representing Kiara Robles in the U.S. District Court for the Northern District of California in a lawsuit against ANTIFA, after Ms. Robles had been violently attacked and assaulted at a Milo Yiannopoulos event was attacked by ANTIFA. *Robles v. ANTIFA et al*, 17-cv-4864 (N.D. CA.). Lastly, Mr. Klayman had been retained by Cliven Bundy to represent him after he was indicted following a standoff with federal law enforcement officials at his ranch in Nevada in 2014.  It is no coincidence that ODC chose to resurrect Ms. Sataki's

abandoned Complaint at this time, as this, in retrospect, can only be explained, given the facts, as a calculated effort to try to silence Mr. Klayman's conservative public interest advocacy and litigation.

Recently, it has been revealed that Fox has personally gone after other Trump affiliated Republican legal counsel, such as Jeff Clark and Rudy Giuliani, often gloating to the media about his personal involvement. Exhibit D-7. This is incredibly telling because it is almost unheard of for Bar Disciplinary Counsel to personally handle and litigate cases and not delegate them to his Deputy or Assistant Bar Disciplinary Counsel, so the fact that he chose to personally take on these matters shows conclusively what Fox's motivation is about.

*Second*, at the hearing committee level, Mr. Klayman was faced with a "stacked deck" in the form of a biased and skewed AHHC which included even an avowed proud communist and ideological foe of Mr. Klayman, Michael Tigar. Bob Woodward wrote in his book about the Supreme Court, titled *The Brethren*, that Tigar in his early career had been fired, at the urging of FBI Director J. Edgar Hoover, from his High Court clerkship by Justice William Brennan for his subversive communist ties. Exhibit D-2.  Tigar's recently latest recently published book, *Mythologies of State and Monopoly Power*, a Marxist rant against capitalist law, is testament to his time with Fidel and the Castro brothers. This book received on its back cover  endorsements from Angela J. Davis, an infamous communist from Berkeley and Bernardine Dohrn, also a communist and on top of that a convicted domestic terrorist who was on the FBI's Ten Most Wanted List, among others of Tigar's ideological ilk:

> In this brilliant collection of essays, Michael Tigar lays bare mythologies about the most important issues of our time—racism, criminal justice, free speech, worker rights, and international human rights. Beautifully written with Tigar's characteristic wit, passion, and deep knowledge of jurisprudence and literature, *Mythologies of State and Monopoly Power* explores important issues through the lens of his extraordinary personal and professional experience, and

through his analysis of some of the most important cases decided by the nation's courts. This book is a must-read for anyone interested in law, history, and the pursuit of justice. – Angela J. Davis

*Mythologies* is an incisive, unsparing, creative and brilliant critique of capitalist law and its dire human consequences. This book tears the cover off what power says about justice, and shows us what power does. Michael Tigar has written a must-read for prisoners, law students, activists, artists, lawyers, and anyone concerned with where we are and how to fight back. You'll never forget his fictional debate between Lucy Parsons and Clarence Darrow. – Bernardine Dohrn

His proud thank you letters from Fidel and a photo with his equally communist revolutionary brother Raul are contained in Exhibit D-2. It did not matter to the AHHC that Mr. Klayman presented seven (7) material witnesses that conclusively refuted every single one of ODC's manufactured arguments and that ODC only had one (1) material witness – Ms. Sataki – who was impeached repeatedly as set forth below. Not coincidentally, Tigar was one of a number of leftist law professors, who filed an ethics complaint against Trump White House Counselor Kellyanne Conway Exhibit L.  Joining Mr. Tigar was the committee chair, Anthony Warren Fitch, also of the ideological left. He at every step of the way seemed to defer to Mr. Tigar and appeared and acted as if he was in awe of him. An actual review of the record will show this.

*Third*, at the Board level, presiding over this matter was its Chairman Matthew Kaiser, who was associated with the leftist legal publication "Above the Law," and wrote complementary columns extolling the virtues of an "honest" Hillary Clinton, but trashing Donald Trump, who Mr. Klayman had supported.[4] Recently, it has been revealed that Mr. Kaiser is lead counsel  a civil lawsuit which he filed against Donald Trump, *Garza v. Trump et al*, 1:23-cv-00038 (D.D.C.), Exhibit M, apparently now believing that the self-conferred absolute immunity

---

[4] https://abovethelaw.com/2016/08/hillary-clinton-truthfulness-and-bias-in-white-collar-cases/; https://abovethelaw.com/2016/07/trump-and-tyranny/

that shields him from suit should not apply to the former president. In other words, if Mr. Klayman tries to sue Mr. Kaiser for egregious violations of constitutional rights, it is a frivolous, sanctionable lawsuit, but if Mr. Kaiser wants to sue Donald Trump, the same principles of absolute immunity do not apply. This "heads I win, tails you lose" behavior is indicative of the exact type of  partisan conduct that has infected and weaponized the entire District of Columbia attorney disciplinary apparatus. This unsurprisingly resulted in a fatally flawed and skewed Report from the Board which gave absolutely no weight and credence to any of Mr. Klayman's witnesses, legal arguments, or even uncontroverted facts.  Importantly, Mr. Klayman presented seven material witnesses and ODC only Ms. Sataki, who was caught not telling the truth and thus impeached on many occasions.

*Fourth,* further showing that the disciplinary proceeding was tainted as highly and not facts or legally based, is the fact that during the Trump years in particular, ethics complaints were filed by the likes of Tigar, accepted and initiated against Trump White House Counsellor Kellyanne Conway[5] over remarks she made on cable news, against former Trump Attorney General William Barr[6] (the complaint was outrageously and incredibly filed by all prior presidents of the District of Columbia Bar as well as a former senior bar counsel) for withdrawing the indictment of General Mike Flynn and for remarks he made on Fox News, Senators Ted Cruz[7] and Josh Hawley[8] over their role in advocating for President Trump in the

---

[5] https://www.washingtonpost.com/politics/law-professors-file-misconduct-complaint-against-kellyanne-conway/2017/02/23/442b02c8-f9e3-11e6-bf01-d47f8cf9b643_story.html
[6] https://thehill.com/regulation/court-battles/508489-more-than-two-dozen-dc-bar-members-urge-disciplinary-probe-of-ag
[7] https://www.texasstandard.org/stories/lawyers-law-students-officially-file-grievances-seeking-to-disbar-senator-ted-cruz/
[8] https://thehill.com/homenews/state-watch/534783-attorneys-urge-missouri-supreme-court-to-probe-hawleys-actions

last presidential election, Professor John Eastman[9] who served as a legal counsel for President Trump, and of course former U.S. Attorney Rudy Giuliani[10] over his representation of President Trump, to name just a few. To the contrary, when a complaint was filed against fellow leftist Democrat lawyer David Kendall of Williams & Connolly over his admitted involvement in the destruction of Hillary Clinton's 33,000 emails, many classified, and illegally retained on a private server, which complicity is not even in dispute, ODC summarily and quickly rejected a complaint filed by former Justice Department lawyer and conservative lawyer and public interest advocate Ty Clevenger, who was also pursued by ODC with the goal of disbarring him as well.[11]

*Fifth*, as the final proof of institutional bias, the Court need not look any further than the completely disparate "selective prosecutorial" treatment afforded by the D.C. attorney discipline apparatus to one Kevin Clinesmith in handling *In Matter of Kevin E. Clinesmith*, 21-BG-018 (D.C. App.). In that case, Kevin Clinesmith—the former senior FBI lawyer and admittedly anti-Trump partisan who dishonestly falsified a surveillance document in the Trump-Russia investigation and who pled guilty to felony charges—was completely ignored by ODC, and only temporarily suspended for <u>five months</u> after he pled guilty, and only after ODC's "blind eye" was uncovered and subjected to negative publicity. Clinesmith also did not submit any affidavit under Rule 14(g) for five (5) months after he was suspended. Despite this, not only did the D.C. attorney disciplinary apparatus fast-track if not whitewash his case—clearly in order to minimize

---

[9] https://www.reuters.com/legal/ex-top-justice-dept-officials-testimony-sought-ethics-hearing-trump-ally-clark-2022-10-06/

[10] https://www.law.com/newyorklawjournal/2021/03/03/nyc-bar-details-complaints-calling-for-full-attorney-discipline-investigation-of-giuliani/#:~:text=Under%20the%20New%20York%20state,censured%20or%20receive%20no%20punishment.

[11] Ty Clevenger, State bar prosecutors are flouting the law, protecting Hillary Clinton and her lawyers, LawFlog, available at: https://lawflog.com/?p=1389

his temporary suspension period —the D.C. Court of Appeals let Clinesmith off with barely a slap on the wrist  with "time served" in just  seven (7) months. And importantly, the Court imposed no reinstatement provision on Clinesmith, as it has for Mr. Klayman, despite him literally being a convicted felon over make false statements to the government. Attached hereto as Exhibit D-3 is an article detailing this debacle and the D.C. Court of Appeals' opinion in *In Matter of Kevin E. Clinesmith*, 21-BG-018 (D.C. App.).

On the other hand, Mr. Klayman, without due process, was "temporarily suspended" years ago without a hearing and due process, which temporary suspension incredibly lasted twenty (20) months, while the D.C. Court of Appeals, which oversees ODC, intentionally dragged its feet, and then suspended him for another incredible eighteen (18) months as a result of contrived  ethical "violations" -- while the original recommendation of the Board was only for eighteen (18) months -- with no showing of dishonesty, and of course, no criminal conviction or even any showing of dishonesty. The rank discriminatory difference in treatment here is truly extraordinary if not mind blowing, and what's even worse is that the D.C. attorney disciplinary apparatus, having conferred itself with "absolute immunity," believes that it is above the law and therefore can and will continue to engage in this type of conduct with regard to other conservative and Republican activist members of the D.C. Bar, as set forth above.

In sum, while it is clear that Mr. Klayman must prevail on the merits and substance alone, this rank partisanship must also be factored in by this Honorable Court, as it is the regrettable state of the toxic politics in the District of Columbia and its attorney discipline apparatus in particular. This helps to explain the almost unbelievable treatment that Mr. Klayman received throughout this twelve (12) year and counting saga, where his facts and evidence simply did not

matter, and it was already predetermined that ODC should attempt to remove him from the practice of law.

## V.   THERE IS CLEARLY NO CLEAR AND CONVINCING EVIDENCE OF ANY MISCONDUCT

### A.   There Was No Failure to Abide By Ms. Sataki's Wishes.

Chief among the alleged ethical violations manufactured by ODC and "rubber stamped" by the Board and the D.C. Court of Appeals was a purported failure to abide by Ms. Sataki's decisions regarding the use of publicity in her case. As the record conclusively showed, this was absolutely not the case, as Ms. Sataki agreed to the use of publicity at the time – which she even admitted at the Hearing, and then personally participated in publicizing her case at the time and even after the fact.

First and foremost, at the AHHC hearing in this matter, Ms. Sataki herself was forced to admit that she had approved and agreed with the use of publicity:

> Q: **Did you ultimately agree with Mr. Klayman about the publicity?**
>  A**: I did.** Tr. 775. <u>Exhibit J</u>.

Mr. Klayman also provided testimony from numerous witnesses who showed that Ms. Sataki's belated claim was false. Chief among these witnesses was Tim Shamble ("Mr. Shamble"), Ms. Sataki's union representative who worked closely with Mr. Klayman's in his representation Ms. Sataki. This means that Mr. Shamble was deeply involved in Mr. Klayman's representation and therefore had contemporaneous personal knowledge of the intricate details of the events in question. The record is indisputably shows that Mr. Shamble, Mr. Klayman, and Ms. Sataki at the time discussed strategy all together and as a group, Ms. Sataki and they decided that the use of publicity would be beneficial to help Ms. Sataki achieve her desired outcome. PFF 128, 166, 167. And, even more, as the final straw which shows the egregious error by the D.C.

Court of Appeals is the undisputed fact that Ms. Sataki personally participated with Mr. Shamble in publicizing her case:

> Mr. Shamble and Ms. Sataki went together on one occasion to publicize her situation. "I remember one time. The VOA was on the mall here in Washington, some kind of public -- it might have been a recruitment fair or something. But we had an article and both her and I were distributing it to people in the vicinity, tried to let people know and to let the agency know that, you know, we were going to publicize this." Tr. 893. The article that both Mr. Shamble and Ms. Sataki distributed was called ""Government War on a Freedom Loving Beauty. Exclusive, Larry Klayman Goes to Bat for Harassed Broadcaster Fighting for a Free Iran." Tr. 894. PFF 24. Exhibit J.

Mr. Shamble also testified as to why he believed the use of publicity was a good strategy. He testified that publicity was a helpful tool in dealing with an agency as notoriously difficult and anti-labor as VOA. PFF 23. Specifically, he testified "[w]e've done it. It's something that you can use to pressure managers, if they're intractable, you know, to try to get them to come to some sort of agreement. We have our own website, so we use it, too." Tr. 892-893. Exhibit J. The reason that publicity was often used, according to Mr. Shamble, was that BBG, of which VOA is a subcomponent, has been ranked the worst agency in government, and is very difficult to negotiate any settlement with because of its management's attitude and approach to employees. PFF 7.

Furthermore, Mr. Klayman also provided the same uncontroverted testimony that the use of publicity was discussed and approved as a group. "So that was the reason for the publicity. She agreed to it, Tim agreed to it, and there will be other witness(es) that will testify in this proceeding that she agreed to the publicity." PFF 50, Tr. 980. Exhibit J.

Even further buttressing the testimony of Mr. Shamble and Mr. Klayman were numerous other witnesses who had contemporaneous personal knowledge. This included Keya Dash - *see* PFF 91 ("Mr. Dash declared under oath that he was present when the use of publicity to coax the

BBG into settlement was discussed with Ms. Sataki, and that Ms. Sataki approved of its use."); This also included Joshua Ashley Klayman, Mr. Klayman's sister and herself a distinguished Wall Street lawyer - PFF 180 ("Ms. Sataki openly discussed the VOA case with Ms. Klayman many times. [Ms. Joshua Ashley Klayman testified] "Yes, quite openly. And I met her multiple times. It wasn't that I just met her one time. Yes, she was quite open with what the circumstances of her challenges were…. an, she was very, very open, which -- I'm not a litigator. I don't really know anything about litigations, but I was surprised that she was so open." Tr. 1524. Exhibit J. Furthermore, and again, she testified that she thought Ms. Sataki was using Mr. Klayman. "I mean, I vacillated between kind of liking her and being suspicious of her, quite frankly, as your sister…she was very forward in terms of requesting different things for her personally." Tr. 1527-28. Exhibit J.

Lastly, and as even more clearly conclusive evidence that Ms. Sataki at all times not only approved of publicity, but also that she went out of her way to personally publicize her own case, is the fact that Mr. Klayman incredibly learned during the Board briefing process that Ms. Sataki had participated in making a documentary about her case, with intimate personal details about her, against Voice of America ("VOA"), which further undercuts any possible false claim that Ms. Sataki did not agree to publicize her case.[12]  The video, which is in Ms. Sataki's Iranian native language, Farsi, was translated by one of Mr. Klayman's witnesses, Keya Dash, as well as a respected Farsi certified translator who used to work for VOA. Exhibit D-6. To be certain of and confirm the content, Mr. Klayman had the documentary translated by Mohammad Moslehi, a certified translator who did translations for VOA. Exhibit D-6. Mr. Moslehi translates this "smoking gun" as follows:

---

[12] https://www.youtube.com/watch?v=e3g5f61muZ4

Whenever I am at my desk and I am not paying attention, he allows himself, to touch me under variety of pretexts.

(displaying Elham [Sataki]'s photo) former broadcaster of VOA.

Mr. Falahati, Asal has written this for us, Well: let us answer the first caller (by the name of - Translator) Hossain from Kerman. Hello, go ahead please.

(displaying photo of Mehdi Falahati) broadcaster for the VOA network VOA: Voice of America

Voice of America has been recognized as the worst entity of American government. Therefore, lots of such coteries and issues exist there. Everybody says that the atmosphere is of a security one. Nobody can talk with anybody. Everybody makes insinuations against one another. The environment is very dirty.

This week is second evening of being online with the subject of presidential elections in Iran and it's outcome, with your phone calls, emails and online weblogs and websites that Elham [Sataki] will introduce to you.

Regarding Mr. Falahati: He repeatedly asked me to go out with him. I didn't want to do it. Mr. Falahati and I started the ONLINE show together and we were performing it together. Aside from other aspects, it was very unprofessional.

When two individuals appear on camera and conduct a show, going out on a date, since it can directly affect the show is not right. They may fight with each other and that will affect the show, and vice-versa. He was not the type of person that I would accept his offer, and say that, all right let's go on a date.

The problem was, he did not know how to take a no. After a while I reached to the point that I was always calling sick and did not go to work. Since I wanted to start working, and Mr. Falahati wanted to come to my desk and again ask me let's go have a coffee or have dinner·. And this no, and saying no to him repeatedly had become exhausting for me, had made me very tired. I went to Suzanne who was our executive producer and told her the situation, that he (Mr. Falahati) does so. and I (Elham [Sataki]) don't know what to do at this point. Personally, I am not able to handle it.

The situation will go over the board of the status of going out for dinner, and he will come to my desk and while I am not paying attention, under various excuses touch me. Since I was afraid, I told her (Suzanne) that, can you handle it without anybody to know?? That day she told me that "Legally I cannot do it and you must formally file a complaint."

Mr. Falahati wanted to take revenge, since I complained and stated that the situation was so. As I was behind my desk, twice he came to my desk (audio censored) the dress that I had on and my bra-cord. I hollered at him (audio censored) he laughed and said "don't tell anybody." I was not feeling well. I was seeing psychiatrist. I was seeing psychologist. I was not feeling well. All the documents are available. Everything related (to this matter) exists. I was seeing doctor and the doctor was prescribing relaxing pills for me to take.

At this point, I am just saying, Mr. Falahati is a sick person that has not done so just with me, but the system of VOA has problem. Jamshid Chalangi testified for me. Look what happened? Mahmonir, another lady testified for me. She suffered a lot. Mr. Ali Sajjadi and Mr. Falahati were friends. At that time Mr. Sajjadi was very powerful there. They all got together. And even Suzanne who was my executive

producer and was mad from this incident, she teamed up with them. And this caused the problem to be difficult for me, and no attorney was taking my case, because this case had become very big. And when the case became so big, then the Board of Governors had to defend itself, and defending itself caused the case to become against me. And they say that Elham left, Falahati stayed. When they fired me, I was not the only girl. There are a number of others.
Caption displaying Falahati and [Sataki] with written scripts.
The lawsuit against Mehdi Falahati due to the VOA influence did not get to anywhere, and El ham Sattaki was fired from this network .. After a short period of time Jamshid Chalangi and Ms. Mahmonir Rahimi were fired from this network.
Display of Mehdi Falahati laughing loud.

Unsurprisingly, Ms. Sataki did not disclose this to the AHHC and Mr. Klayman's defense team had to find this themselves during the appellate briefing process. This clearly fraudulent conduct was obviously done in concert with ODC, who must have known about this crucial evidence and chose not to disclose it. This clear fraud grossly prejudiced Mr. Klayman because it was not part of the record at the AHHC hearing or the Board level, and the D.C. Court of Appeals refused a motion to remand this matter back to the Board to open the record to review this video shows its inherent bias on this and other issues – a clear violation of Mr. Klayman's due process and other rights. What would be wrong with trying to get to the truth, that is unless this does not comport with the predetermined narrative?

The second, and even more bizarre and troubling alleged violation concerned the fact that the *Bivens* lawsuit filed on behalf of Ms. Sataki named Hillary Clinton as a Defendant – a fact that the D.C. attorney discipline apparatus took great umbrage at every step of the way. Completely ignored is the fact that Ms. Clinton was Secretary of State and as such was the head of the Voice of America's Board of Governors at the time, meaning that she was clearly a properly named Defendant. Even more egregious is the fact that the *Bivens* Complaint also named a conservative personal friend of Mr. Klayman, the conservative Blanquita Collum, who was also a governor, as a Defendant. PFF 95. This conclusively shows that Mr. Klayman had no

political goal in mind and was simply trying to obtain an optimal result for his client. Unsurprisingly, this fact was completely ignored. This underscored the  political and ideological bias inherent in the flawed, and now, time barred disciplinary proceeding.

In any event, based on the foregoing, it is more than abundantly clear that the primary and case determinative alleged ethical violation found by the D.C. Court of Appeals was completely unsupported by the record, much less the standard of clear and convincing evidence.

**b.     There Was No Conflict of Interest.**

Another primary "ethical violation" contrived by ODC and then "rubber stamped" was based on Mr. Klayman's "emotional interest" in Ms. Sataki – which was then twisted by ODC and the Board as a conflict-of-interest violation.

This was a truly bizarre turn, as "emotional interest" is simply not an ethical violation. If it was a violation, lawyers would be prohibited from representing friends, family members, or even spouses who they care about and love – or basically anyone that is not a complete stranger. It is clear that no such prohibition exists. Attorneys are people who have feelings and emotions. There is no ethical prohibition against this. For example, the Supreme Court of Nevada found that there was no conflict of interest where a child represented his father in divorce proceedings with his mother. "Because several of the Nevada Rules of Professional Conduct permit an attorney to represent a family member…and no rule prohibits Mark's conduct in this case, no ethical breach "infects the litigation,"… which would provide a basis for Marie to bring a motion to disqualify Mark." *Liapis v. Second Judicial Dist. Court*, 128 Nev. 414, 420-21 (2012). If there is no conflict of interest in representing one's father against one's mother, there certainly is not a conflict of interest in representing a friend that the attorney cared deeply about, as was the case here.

This is particularly true where there was no sexual component to the relationship, as was the case here with Mr. Klayman and Ms. Sataki. And, even if there had been a sexual relationship, which there was not here, bar associations around the country have had the foresight to include provisions allowing such relationships for spouses and significant others. For instance, in Florida, sexual relationships with clients are not prohibited unless that relationship "**exploits or adversely affects the interests of the client or the lawyer-client relationship**." Fl. St. Bar Rule 4-8.4. And, in Pennsylvania, "[a] lawyer shall not have sexual relations with a client **unless a consensual relationship existed between them when the client-lawyer relationship commenced**." Pa. R. Prof'l Cond. 1.8. Again, importantly, there was not even a sexual relationship between Ms. Sataki and Mr. Klayman, so it is truly the "theatre of the absurd" that this type of ethical violation was found by the DCCA, where the only factual findings were that Mr. Klayman developed a friendship with and deeply cared for Ms. Sataki. Tellingly, the Specification of Charges which belatedly began this time barred and meritless disciplinary proceeding made no such charge. Exhibit F.

Thus, ODC and the Board had to disingenuously strain to manufacture an ethical violation and settled on an alleged and contrived conflict of interest. However, the record clearly reflects that when Ms. Sataki had become more than self-centered and abusive during the course of Mr., Klayman's representation, even asking Mr. Klayman to buy her a car, PFF 62, Mr. Klayman realized that it was ethical and prudent for him to suggest that she find other counsel, as legal representation became untenable. Indeed, Mr. Klayman realized that both parties needed to move on and that is why Mr. Klayman took Ms. Sataki to Gloria Allred and Tim Shea. PFF 78. However, despite this, it was Ms. Sataki who instructed Mr. Klayman to continue representing her. Thus, even if the "emotional interest" at issue could possibly constitute a conflict of interest

violation, it is uncontroverted that she would have waived any such violation by asking Mr. Klayman to continue to represent her. This was even admitted by the Board in its Report where it wrote Mr. Klayman "repeatedly communicated his feelings to [Ms. Sataki]" and "she asked him to continue with the representation."

And, when ultimately Ms. Sataki did not, for whatever reason, get the result she wanted, angry and unhinged, she struck back at Mr. Klayman, sending him the below offensive email which mocked and disparaged his religion and falsely accused him of taking bribes:

> I do not know if you are Christian or Jewish, because whichever suits you best, you become one. But I believe in karma and what you have done with my case and losing it. ´ Ms. Sataki also wrote: And what you have done with my case and losing it and not stopping working on it when I ordered you, one day you'll answer to God, even if you throw your life and play with people life. I am nobody, just a little girl who was retaliated and harassment by some VOA employee and you seed (sic) that you can help me. Not only did you not help me, but destroyed  my life to nothing….

> Mr. Klayman are you happy now that you've complete destroyed and lost my case? A case with so many evidence and witnesses. Only a very bad and clueless attorney could lose it, or lost it on purps (sic) because you made a dill (sic), with the other party. PFF #163.

Exacerbating this already blatant and egregious violation, the D.C. Court of Appeals in an overt effort to tar Mr. Klayman, injected the non-existent innuendo of sex where none was ever alleged in the Specification of Charges or testified to by even Ms. Sataki, that "Whether or not his feelings were sexual or romantic in nature, Mr. Klayman had strong feeling for E.S. For example, he wrote that he had 'fallen in love with (E.S.). would always love her and was feeling real pain," because she did not share his feelings.  Exhibit K. The last part of this statement is totally false, as Mr. Klayman never wrote that he was feeling real pain "because she did not share his feelings." What the record does show is that Mr. Klayman made it clear to Ms. Sataki that he did not want to be with her and did not want to be her boyfriend, which was contemporaneously recorded in emails. PFF 79. There was absolutely no allegation of a sexual

component  in the Specification of Charges or before the AHHC. This innuendo was improperly inserted for no reason other than to apparently smear Mr. Klayman. And there is not ethical violation to simply love someone.

      **c.**    **Mr. Klayman Did Not Reveal Any Client Confidences.**

As set forth above, notwithstanding that Ms. Sataki was forced to admit that she approved the publicity and participated directly in distributing it, PFF 170, Tr. 775, PFF 91, PFF 24, is that she herself went on Iranian television to broadcast the same alleged confidential facts. <u>Exhibit D-6</u>. Thus, it is incomprehensible how Mr. Klayman could possibly have been found to have revealed confidential information.

      **d.**    **Mr. Klayman Kept Ms. Sataki Informed Every Step of the Way.**

One of the most non-sensical and bizarre "findings" of the D.C. Court of Appeals is that Mr. Klayman failed to obtain informed consent by filing a motion to disqualify the Honorable Colleen Kollar-Kotelly during the course of his representation of Ms. Sataki. Not only is a lawyer permitted some discretion in litigation, but the record also clearly reflects that Ms. Sataki was fully informed of this motion and did not object. PFF 66. What the record actually shows is that Ms. Sataki was "kept informed of Mr. Klayman's strategy and actions on her behalf every step of the way." PFF 60.

      **e.**    **Absence of a Written Fee Agreement.**

The D.C. Court of Appeals chose to sidestep this issue and not even address it, probably because a myriad of emails from Mr. Klayman stated that he was representing Ms. Sataki free of charge. PFF 47, 74. The issue of the contingency only arose when Ms. Sataki, at the end of the representation, became more abusive, rejected other counsel to represent her, but wanted to

continue with Mr. Klayman as her lawyer. PFF 152.  But this never went into effect in any event. PFF 152.

      **f.**      **There Was No Failure to Cease Representation.**

The record similarly shows that Mr. Klayman did not fail to cease representation of Ms. Sataki in a timely fashion. Mr. Klayman did not take steps to litigate Ms. Sataki's case further and only acted to preserve Ms. Sataki's appellate rights. PFF 68. And it was good that Mr. Klayman did so, because Ms. Sataki filed an untimely notice of appeal *pro se* only a few months later. PFF 67. And, then years later Ms. Sataki – after she was literally hunted down by ODC for ulterior and improper reasons - then asked ODC to prosecute her sexual harassment claims! Tr. 489. Exhibit J,

Furthermore, letters purportedly terminating Mr. Klayman's representation were admittedly sent to the incorrect addresses, which Mr. Klayman never received from her. PFF 71. Mr. Klayman also had a duty to confirm Ms. Sataki's purported "desires" in the August 4, 2010 letter, as it was clearly not written by her, PFF 70, Tr. 1041, RX 21, before terminating all of Ms. Sataki's rights on appeal, for which he could have been accused of legal malpractice.

      **G.**      **Ms. Sataki's Complete Lack of Credibility.**

Unsurprisingly, the fact that Ms. Sataki was repeatedly impeached and repeatedly gave conflicting testimony was given no weight by the D.C. Court of Appeals, which brazenly wrote that "[w]e conclude that the Hearing Committee and the Board acted reasonably by choosing to largely credit E.S.'s testimony over that of Mr. Klayman." This shows that the D.C. Court of Appeals was no longer concerned with facts – a very problematic approach that resulted in a fatally flawed proceeding.

Indeed, the record shows that the entire representation agreement between Ms. Sataki and Mr. Klayman was premised on a "big lie" which she used to lure Mr. Klayman to represent her as a friend – that she had been sexually harassed and retaliated against by managers at VOA. The Office of Civil Rights conducted a thorough investigation and found that her allegations of sexual harassment were completely manufactured and false. PFF 155. Even more, Ms. Sataki lied about wanting Mr. Klayman to drop her cases – likely at the direction of ODC so that they could manufacture an ethical violation – when the record is clear that she herself filed a Notice of Appeal and then asked ODC for help in prosecuting her claims of sexual harassment years down the road. PFF 67, 155.  Ms. Sataki also gave false testimony about not wanting to publicize her cases – again certainly at the direction of ODC so that they could manufacture a claim – and was forced to admit that that she approved of publicizing her case, and personally participating in doing so. PFF 170, Tr. 775, PFF 91, PFF 24. These are just a few of the numerous times that Ms. Sataki was completely and thoroughly impeached, which is set forth in full in Mr. Klayman's briefs and findings of fact based on the record. Exhibit C-4. Given all of this, Mr. Klayman cannot comprehend how the D.C. Court of Appeals felt it was proper for the Board and later the D.C. Court of Appeals to ignore the testimony of Mr. Klayman and his seven (7) material unimpeached witnesses in favor of the Complainant, Ms. Sataki, who clearly failed to tell the truth.

## VI.    CONCLUSION

Based on the facts and the law, it is abundantly clear that no reciprocal discipline is warranted. Not only should reciprocal discipline be summarily denied clearly on the basis of the clear-cut Florida Supreme Court precedent for  laches and the statute of limitations, and the prior dismissal of The Florida Bar about 11 years ago, should the Court review the record, which it

must respectfully do if it proceeds further,  it will also see that the purported "ethical violations" were contrived  and prejudiced by fraud and lack of  due process and other violations of Mr. Klayman's constitutional and other legal rights. *See* <u>Exhibit D</u>; Rule 60 Complaint.

Mr. Klayman's 44 year old membership in this honorable Court is of vital importance to not just himself, but also his colleagues, the well-being of his family, and his clients, such as Patrick Reed, who has two pending cases before Chief Judge Corrigan. Thus, if this matter is not summarily dismissed or stayed for the compelling reasons set forth herein, a finding, based on a thorough review of the record, that no reciprocal discipline is warranted is of utmost importance to prevent prejudice and manifest injustice to all concerned.

And, as a Florida citizen and resident, Mr. Klayman cherishes practicing law in this honorable Court in his home state, which has been of a great privilege for him, his colleagues, his family for the last 45 years since he graduated from Duke University and later Emory Law School in 1977. <u>Exhibit B</u>.

During this time period, Mr. Klayman has been continuously a proud member in good standing of The Florida Bar, and later this Honorable Court.  <u>Exhibit A</u>.

Dated: January 27, 2023                                   Respectfully submitted,

                                                          By: <u>*/s/ Larry Klayman*</u>
                                                          Larry Klayman, Esq.
                                                          Klayman Law Group P.A.
                                                          7050 W. Palmetto Park Rd
                                                          Boca Raton, FL, 33433
                                                          Tel: 561-558-5536 cell
                                                          leklayman@gmail.com

                                                          *Pro Se*

# EXHIBIT A



# The Florida Bar

**651 East Jefferson Street**
**Tallahassee, FL 32399-2300**

**Joshua E. Doyle**
**Executive Director**

**850/561-5600**
**www.FLORIDABAR.org**

State of Florida          )

County of Leon          )

In Re:  0246220
Larry Elliot Klayman
Klayman Law Group, PA
7050 W Palmetto Park Rd
Boca Raton, FL 33433-3426

I CERTIFY THE FOLLOWING:

I am the custodian of membership records of The Florida Bar.

Membership records of The Florida Bar indicate that The Florida Bar member listed above was admitted to practice law in the state of Florida on **December 7, 1977.**

The Florida Bar member above is an active member in good standing of The Florida Bar who is eligible to practice law in the state of Florida.

Dated this 27th day of  **January**, **2023**.

Cynthia B. Jackson, CFO
Administration Division
The Florida Bar

PG:R10
CTM-214426

# EXHIBIT B

# About Larry Klayman

Larry Klayman, founder of Judicial Watch and Freedom Watch, is known for his strong public interest advocacy in furtherance of ethics in government and individual freedoms and liberties. During his tenure at Judicial Watch, he obtained a court ruling that Bill Clinton committed a crime, the first lawyer ever to have done so against an American president. Larry became so famous for fighting corruption in the government and the legal profession that the NBC hit drama series "West Wing" created a character after him: [Harry Klaypool of Freedom Watch](). His character was played by actor John Diehl.

In 2004, Larry ran for the U.S. Senate as a Republican in Florida's primary. After the race ended, he founded Freedom Watch.

Larry graduated from Duke University with honors in political science and French literature. Later, he received a law degree from Emory University. During the administration of President Ronald Reagan, Larry was a Justice Department prosecutor and was on the trial team that succeeded in breaking up the telephone monopoly of AT&T, thereby creating competition in the telecommunications industry.

Between Duke and Emory, Larry worked for U.S. Senator Richard Schweiker (R-Pa.) during the Watergate era. He has also studied abroad and was a stagiaire for the Commission of the European Union in its Competition Directorate in Brussels, Belgium. During law school, Larry also worked for the U.S. International Trade Commission in Washington, D.C.

Larry speaks four languages—English, French, Italian, and Spanish—and is an international lawyer, among his many areas of legal expertise and practice.

The author of two books, *Fatal Neglect* and *Whores: Why and How I Came to Fight the Establishment,* Larry has a third book in the works dealing with the breakdown of our political and legal systems. His current book, *Whores,* is on now sale at WND.com, Amazon.com, BarnesandNoble.com, Borders.com, and all major stores and booksellers.

Larry is a frequent commentator on television and radio, as well as a weekly columnist, on Friday, for WND.com. He also writes a regular blog for Newsmax called "Klayman's Court."

Larry has been credited as being the inspiration for the Tea Party movement. (See "[Larry Klayman - The One Man TEA Party]()," by Dr. Richard Swier, http://fwusa.org/KFA)



**Support the work of Freedom Watch at [www.FreedomWatchUSA.org]()**

# EXHIBIT C

# KLAYMAN LAW GROUP
## A PROFESSIONAL ASSOCIATION

Larry Klayman, Esq.              7050 W. Palmetto Park Rd              Tel: 561-558-5336
                                 Boca Raton, FL, 33433

Via Certified Mail/Return Receipt Requested

October 18, 2022

The Florida Bar
651 E. Jefferson St
Tallahassee, FL, 32399

**Re:     Larry Elliot Klayman (Florida Bar No. 0246220)**

To Whom It May Concern:

This is to put The Florida Bar on notice that as of October 17, 2022, I am under suspension in the District of Columbia.

A copy of the September 15, 2022 order of the District of Columbia Court of Appeals is enclosed. Exhibit 6. Suspension occurred in the District of Columbia 30 days after this order was issued.

Of great import is that an identical bar complaint by Ms. Elham Sataki was filed before The Florida Bar and the Pennsylvania Bar on or about October 24, 2011 and both were dismissed about 11 years ago. *See* Exhibit 2. This complaint references being filed in Florida and Pennsylvania in addition to the District of Columbia.

Also of import, the Specifications of Charges before the Office of Bar Disciplinary Counsel was not instituted for about 7 years after Ms. Sataki filed her complaint and after that this matter took a total of about 12 years to adjudicate. *See* Exhibit 3. Thus, under Florida law and its precedent, notwithstanding the dismissal of The Florida Bar, this matter is time barred under the established doctrine of laches. *Florida Bar v. Rubin*, 362 So.2d 12 (Fla. Sup. Ct. 1978); *The Florida Bar v. Walter,* 784 So.2d 1085, 1087 (Fl. Sup Ct. 2001); *The Florida Bar v. Kane,* 202 So.3d 11, 19 (Fl. Sup. Ct 2016). This is set forth in the opinion of the renowned legal ethics expert, Ronald Rotunda, among other strong bases showing why there were no ethical violations. Exhibit 1.

In the unlikely event that this matter proceeds despite this, there are compelling legal and constitutional due process, equal protection, and other issues that would require adjudication, and I would invoke all of my rights and retain legal counsel at that time.

A brief history of this 12 year saga is briefly set forth in the attached Petition for Rehearing that I had filed before the District of Columbia Court of Appeals. *See* Exhibit 4.

1

In addition, I am filing this week a complaint under D.C. Superior Court Rule 60 to vacate the order and judgment of September 15, 2022, for fraud and on other grounds, as well as will soon be filing a petition for writ of mandamus before the U.S. Supreme Court.

Thus, if this matter is not closed at this time, I ask that these legal remedies be permitted to proceed before The Florida Bar considers proceeding further.

Finally, I have been a proud member of The Florida Bar continuously for nearly 45 years, since I was sworn in before the Florida Supreme Court on December 7, 1977. *See* Exhibit 5 - Certificate of Good Standing.

Please contact me if you have any questions.

Thank you in advance for your professional courtesy.

Sincerely,

Larry Klayman, Esq.

EXHIBIT 1

CHAPMAN UNIVERSITY | FOWLER SCHOOL OF LAW

ONE UNIVERSITY DRIVE
ORANGE, CALIFORNIA 92866
WWW.CHAPMAN.EDU

Ronald D. Rotunda
*The Doy & Dee Henley Chair and Distinguished Professor of Jurisprudence*
Email: rrotunda@chapman.edu
(714) 628-2698 • Fax (714) 628-2576
http://www1.chapman.edu/~rrotunda/
www.ronaldrotunda.com

19 December 2016

Larry Klayman, Esq.
Klayman Law Firm
c/o 2020 Pennsylvania Ave., N.W.
#800
Washington, D.C. 20006

RE: Bar Complaint of Oct. 20, 2011
VIA: Email, leklayman@gmail.com

Dear Mr. Klayman:

You have asked me to evaluate the Office of Bar Counsel Complaint dated October 20, 2011. Despite the fact that it is dated about six years ago, you received it only recently. Perhaps that is because the Office of Bar Counsel (OBC) sent it to the wrong address. OBC may have sent it to 2000 Pennsylvania Ave. N.W., Suite 345, while your office is at 2020 Pennsylvania Ave, NW, Suite 345.

I have evaluated the OBC Complaint of Oct. 20, 2011, and discussed the matter with you. You should feel free to show this letter to the OBC if you wish.

A very surprising item about this complaint is that it was filed over five years ago about alleged events that occurred in December 2009 and shortly thereafter. The complainant, Elham Sataki, made similar complaints to the Pennsylvania Bar and the Florida Bar, both of which dismissed the complaint years ago. For some reason, the OBC sat on this complaint for years and now is resurrecting it.

Because of the passage of time — the reasons for this delay are unknown — relevant evidence cannot be found and memories fade.

> For example, you told me that you recall a phone voice mail from someone speaking in a belligerent tone who claimed to be speaking for Ms. Sataki. This person said that you should not contact her. You had been trying, unsuccessfully, to contact Ms. Sataki to see if she wanted to appeal, and you filed a notice of appeal

- 2 -

to protect her rights. The union representative, who was representing Ms. Sataki in her employment dispute, also was unsuccessful in contacting her. Shortly after that, Ms. Sataki did so and you and her Union Representative, Mr. Shamble, did not pursue the appeal. You have moved since then and you are unable to find this voice mail. The tone and substance of this voice mail is very relevant to the complaint, but it no longer exists (or, you cannot find it) because of the passage of time.

The caselaw shows that OBC is subject to laches. In *Florida Bar v. Rubin*, 362 So.2d 12 (Fla. Sup. Ct. 11978)(per curiam), the Florida supreme court threw out charges because the prosecutor because of the Bar's delay in violation of the Florida rules.[1] One can summarize this case as the Bar delaying finalization of two cases (where the Bar was disappointed with the recommended discipline) because it was confident it would secure a conviction in a third case still in the pipeline in the hope of securing greater overall discipline. The Court said,

> Whatever other objects the rule may seek to achieve, it obviously contemplates that *the Bar should not be free to withhold a referee's report which it finds too lenient until additional cases can be developed* against the affected attorney, in an effort to justify the more severe discipline which might be warranted by cumulative misconduct. The Bar's violation of the prompt filing requirement in this case, to allow a second grievance proceeding against Rubin to mature, is directly antithetical to the spirit and intent of the rule. In addition, it has inflicted upon Rubin the "agonizing ordeal" of having to live under a cloud of uncertainties, suspicions, and accusations for a period in excess of that which the rules were designed to tolerate.

*The Florida Bar v. Rubin*, 362 So. 2d 12, 15 (footnotes omitted)(emphasis added). As *Rubin* concluded, "The Bar has consistently demanded that attorneys turn 'square corners' in the conduct of their affairs. An accused attorney has a right to demand no less of the Bar when it musters its resources to prosecute for attorney misconduct." 362 So. 2d 12, 16.

*Rubin* is no judicial orphan. Later, *The Florida Bar v. Walter*, 784 So. 2d 1085, 1087 (Fla. Sup. Ct. 2001) ruled that a *seven-year interim* between the lawyer's alleged misconduct and the filing of the Bar's complaint, makes "it 'unjust or unfair' to require Walter [the lawyer] now to answer the Bar's charges in this matter. That the Bar may have diligently pursued Chesnoff's statement does not render this seven-year interim a "reasonable time," especially considering that

---

[1]       "On January 6, 1978 fourteen months after the Bar received referee White's report and eight months after it had received referee Carey's the Bar filed both referees' reports with the Court." "Referee White's report, which recommended a public reprimand, was not filed with us until fourteen months after its receipt by the Bar. Rubin contends that this filing clearly was not prompt, and that the Bar's violation of the rule denies him due process" *The Florida Bar v. Rubin*, 362 So. 2d 12, 14 (Fla. 1978)(footnote omitted).

- 3 -

the delay is not attributable to Walter." The court ruled that the lawyer does not have "to defend against the Bar's charges after so many years have passed."[2]

See also, *In re Grigsby*, 815 N.W.2d 836 (Minn. 2012), concluding that a discipline prosecutor's failure to charge out a matter for an unreasonably long time violates the ethics rules. *Grigsby* involved a case where the lawyer did not even dispute the facts, and the lawyer's violations were "obvious," yet the court rejected the disciplinary hearing:

> Finally, it is also worth noting the procedural irregularities in this discipline matter. Grigsby was suspended for 60 days on April 16, 2009. Grigsby's single instance of misconduct resulting in this disciplinary proceeding took place sometime during April and May 2009, and the Assistant County Attorney informed the Director of it on June 3, 2009. T*he facts of this case are simple and undisputed, Grigsby's violations are obvious*, and Grigsby complied with the Director's investigation. The Director *did not file a petition for disciplinary action until May 31, 2011, 727 days after notice of the misconduct*. Because Grigsby, understandably, did not seek readmission while under investigation for practicing law while suspended, he has effectively been suspended from the practice of law since April 16, 2009, or for over 3 years. The purpose of any disciplinary proceeding, as noted earlier, is to protect the public; *the delay here tends to weaken the Director's argument that protection of the public requires a reinstatement hearing* and we decline to do so notwithstanding the legitimate concerns discussed earlier.

*In re Disciplinary Action against Grigsby*, 815 N.W.2d 836, 846–47, 2012 WL 2814088 (Minn.), *reinstatement granted sub nom. In re Disciplinary Action Against Grigsby*, 822 N.W.2d 291, 2012 WL 5355573 (Minn. 2012)(emphasis added).

In evaluating Minnesota cases, William J. Wernz, Minnesota Legal Ethics: A Treatise (6th ed. 2016) reviews the cases concludes that the Office of Bar Counsel is subject to a "Special Promptness Requirement?" Rule 3.2 of the Rules of Professional Conduct applies to Bar Counsel and that "general delay in investigation" could violate Rule 3.2.[3]

---

[2]     Cited and quoted with approval in, *The Florida Bar v. Kane*, 202 So.3d 11, 19 (Fla. Sup. Ct. 2016):

> The Court has made clear that the Bar has an obligation to process disciplinary cases in a fair and just manner. *See Fla. Bar v. Rubin*, 362 So.2d 12, 16 (Fla.1978) ("The Bar has consistently demanded that attorneys turn 'square corners' in the conduct of their affairs. An accused attorney has a right to demand no less of the Bar when it musters its resources to prosecute for attorney misconduct.").

[3]     Wernz, Minnesota Legal Ethics; A Treatise 779-80, § II(D) (2016).

Case 3:22-mc-00014-JRK   Document 5   Filed 01/27/23   Page 48 of 410 PageID 696

Rule 3.2 ("Expediting Litigation"), Model Rules of Professional Conduct, corresponds to Rule 3.2 of the D.C. Rules of Professional Conduct. As Comment 1 to the D.C. Rules asks, "The question is whether a competent lawyer acting in good-faith would regard the course of action as having some substantial purpose other than delay."[4]

In this case, OBC should explain why any competent Bar Counsel, acting in good faith, would regard the delay of 6 years since the complaint was filed and 7 years since the alleged violation occurred would this delay "as having some substantial purpose other than delay." Why has OBC waited so long?

In Indiana, when the Bar Counsel did not act with reasonable promptness, the Court imposed a new rule making clear what states like Minnesota and Florida thought were already clear. Rule 23, Disciplinary Commission and Proceedings now provides, Section 10(h):

> *Limitation on time to complete investigation.* Unless the Supreme Court permits additional time, any investigation into a grievance *shall be completed and action on the grievance shall be taken within twelve (12) months from the date grievance is received* (or the date a response is demanded to a Disciplinary Commission grievance). The purpose of the deadline is to enable the Supreme Court to promote a fair and efficient process and not to create substantive or procedural rights. Requests for additional time shall be submitted to the Supreme Court and shall briefly describe the circumstances necessitating the request. No response or objection shall be allowed. Delays caused by a respondent's noncooperation or requests for extensions of time, and periods during which the respondent is suspended from practice, shall not be counted toward the 12-month period. *If the Disciplinary Commission does not file a Disciplinary Complaint within this time, the grievance shall be deemed dismissed.*[5]

The Virgin Islands also recognizes laches applied to Bar Counsel. No "legal authority precludes this Court or the EGC from applying the common law doctrine of laches to a grievance. 'Laches, an equitable defense, is distinct from the statute of limitations, a creature of law,' and precludes an action if 'an omission to assert a right for an unreasonable and unexplained length of 'time and under circumstances prejudicial to the adverse party.' Thus, "[l]aches ... may be found even if the applicable statute of limitations has not yet run." *In Matter of Joseph*, 60 V.I. 540, 558–59, 2014 WL 547513, at *7 (V.I. Feb. 11, 2014)(internal citations omitted). Thus, the "laches defense may apply to attorney discipline proceedings in certain very narrowly defined circumstances, such as when the delay in instituting the disciplinary proceedings results in prejudice to the respondent." *Id.*

---

[4]   http://www.dcbar.org/bar-resources/legal-ethics/amended-rules/rule3-02.cfm

[5]   http://www.in.gov/judiciary/files/order-rules-2016-1103-adm-disc.pdf (last two emphases added).

- 5 -

That is what is occurring hear because memories have faded and some evidence cannot be found. The evidence collected by the Pennsylvania and Florida Bars — both of which dismissed the complaint — no longer exists. Perhaps the D.C. Bar has some evidence, but it has not given it to Mr. Klayman. One of the papers in the files the D.C. Bar refers to a draft complaint and an opinion from a lawyer who practices in the employment area, but neither the Bar Counsel nor the expert have reviewed all of the relevant files and documents of Ms. Sataki's case. Mr. Klayman has sent you a copy.

The Virgin Islands Supreme Court sets out a test that *presumes* prejudice in a case like this: "we shall only presume prejudice with respect to the laches defense when there is a substantial delay in the initiation of disciplinary proceedings." *In Matter of Joseph*, 60 V.I. 540, 559, 2014 WL 547513, at \*7 (V.I. Feb. 11, 2014). Here there is a substantial delay.

See also, *id., Joseph, id.*, citing, *In re Wade*, 814 P.2d 753, 764 (Ariz. 1991); *In re Siegel*, 708 N.E.2d 869, 871 (Ind. 1999) ("There may be factual situations in which the expiration of time destroys the fundamental fairness of the entire proceeding."); *Anne Arundel County Bar Ass'n, Inc. v. Collins*, 325 A.2d 724, 728 (Md. 1974) (laches applicable to attorney discipline proceedings if "prejudice or circumstances making it inequitable to grant the relief sought"). *Tennessee Bar Ass'n v. Berke*, 344 S.W.2d 567, 571–72 (Tenn. 1961) (dismissing disciplinary proceedings for laches when grievance filed nine years after alleged misconduct occurred with no explanation for the delay and respondent was not responsible for the delay). *In Matter of Joseph*, 60 V.I. 540, 559, 2014 WL 547513, at \*7 (V.I. Feb. 11, 2014).

Similarly., in *Hayes v. Alabama State Bar*, 719 So. 2d 787, 791 (Ala. 1998), the State Bar suspended lawyers convicted of misdemeanors for "serious crimes" and charged them with additional rules infractions. The Supreme Court held, inter alia, that the State Bar's delay in pursuing remaining formal charges following resolution of criminal proceedings warranted dismissal.[6]

---

[6]     *Hayes v. Alabama State Bar*, 719 So. 2d 787, 791, 1998 WL 321956 (Ala. 1998)(footnote omitted)(emphasis added):

In *Noojin* [*Noojin v. Alabama State Bar*, 577 So.2d 420 (Ala.1990),], this Court examined an attorney's contentions that the Alabama State Bar had erred in delaying disciplinary proceedings against him. It held that the culmination of a federal criminal matter was not "good cause" for *delaying disciplinary proceedings for nearly a year*, and it barred the Alabama State Bar from proceeding on the charges pending against the attorney. As in *Noojin*, we consider in the present case whether the Bar had "good cause" to defer or delay the disciplinary proceedings against the attorneys. Rule 14, Ala.R.Disc.P. The Bar asserts that it "stayed" the proceedings on the formal charges based on the attorneys' alleged attempts to obtain discovery for their criminal cases. Aside from this assertion, the Bar has not attempted to provide a reason for its continued delay in regard to the formal charges against the attorneys.[5] Therefore, if we accept the Bar's only explanation of "good

- 6 -

Let me now leave the subject of laches and turn to the actual complaint, filed in 2011. Ms. Sataki makes several complaints.

FIRST, she claims that Mr. Klayman was not competent to handle her case and thus violated RULE 1.1. Pennsylvania and Florida have already rejected that claim. In addition, Ms. Sataki has never filed any lawsuit claiming that there was malpractice or sexual harassment by Mr. Klayman. She also claims that he used incorrect procedures and failed to make deadlines. She does not indicate what deadlines he missed. He did tell me that he filed a notice of appeal to protect her rights when she did not bother to respond to his requests asking her if she wanted to appeal. Her union representative also could not get in contact with her. Eventually, she bothered to respond and ordered him and Mr. Shamble (her Union Representative) not to pursue appeals, so they complied. If an error was made below, the normal way we correct it is by appeal.

The OBC says that it has an opinion by a lawyer as to the alleged malpractice, but OBC has not disclosed it to Mr. Klayman so neither he nor anyone else could answer it. OBC also says that it has a complaint, which suggests OBC has prejudged the matter, by showing its complaint to someone who is not part of the Office of Bar Counsel.

SECOND, she claims Mr. Klayman violated RULE 1.3 by revealing information to the public that was not secret client information and not confidential client information. Mr. Klayman told me that when he wrote to talked about the case it was only after his client's prior permission. She and Mr. Shamble thought that publicity would help her case by encouraging the Voice of America to settle rather than suffer bad publicity.

THIRD, she claims that Mr. Klayman did not disclose the fee until several months after the case began, and thus violated RULE 1.5. Mr. Klayman tells me that he did disclose the fee when they first talked about the case. The fee was zero — he did it as a pro bono matter. Several months later, when the case got more difficult than either of them expected, he told the client that he would have charge a fee. Or, of course, she would retain another lawyer and he could transfer the files to that other lawyer. She chose not to hire a new lawyer and he proposed a contingent fee. She never signed a fee agreement because she was hard to contact and the case ended at her request. He never charged her any fee.

FOURTH, she claims a violation of RULE 1.6, by disclosing client confidences. Mr. Klayman has told me that he had her permission before he disclosed anything. She and her Union

cause" for delay, there remains a period of over a year, from February 14, 1997, to now, during which the Bar has taken no action to proceed on the merits of the formal charges. Under our *Noojin* analysis, we find that this delay in proceeding on the remaining formal charges is excessive. Therefore, because of the inordinate delay on the part of the Bar in pursuing the remaining formal charges against the attorneys, those charges are dismissed.

33

- 7 -

Representative, Mr. Shamble, thought that publicity would help her case, and she was probably right — although not pursuing an appeal undercut her case.

FIFTH, she claims that Mr. Klayman violated RULE 1.7 because he used her case for his purposes. Leaving aside the rather vague nature of those charges, Mr. Klayman says that his only motivation was to help her as a friend because she was in trouble and had other problems. He would be willing to disclose these other problems to you if Ms. Sataki waives her attorney-client privilege. After all, we do not want a situation where the OBC seeks to discipline Mr. Klayman in this case because he used what the OBC later claims is information protected by Rule 1.6. Since Mr. Klayman will not be talking to Ms. Sataki about this case, the OBC should ask for this waiver.

Sixth, Ms. Sataki says Mr. Klayman violated RULE 3.3 because he was dishonest in telling people he was her lawyer when he was not her lawyer. Mr. Klayman has told me that he never told people he was her lawyer after she discharged him. He (and her union representative) tried to contact her unsuccessfully to ask her if he wanted to appeal. Her complaint[7] says that her brother told Mr. Klayman to terminate the representation, but the caller did not identify himself as her brother, Mr. Klayman would not recognize the brother's voice, and her brother did not represent that he was her agent with authority.[8]

I am troubled that the OBC has sat on this case for nearly six years and another one involving Mr. Klayman for nearly eight years. In my view, the complaint of Oct. 20, 2011 should be dismissed, particularly under these circumstances. The OBC has not even asserted that it learned something in the intervening years to justify reopening this old complaint.

Sincerely,


Ronald D. Rotunda
Doy & Dee Henley Chair and Distinguished Professor of Law


---

[7]  I refer to the complaint as "her complaint" but I do not mean to imply that she wrote it. Mr. Klayman tells me that when he knew her, her English was not good enough to draft a complaint like this one.

[8]  Mr. Klayman has met her brother once, but does not know him well enough to recognize her voice, and he has met her mother once. Both times, he met them at the residence of Ms. Sataki, because the mother and the brother invited him — they wanted to meet the lawyer who was representing their sister/daughter. Ms. Sataki claims that he showed up "unannounced." If she is telling the truth it is only because she did not talk to her brother or mother on this matter.

**RONALD D. ROTUNDA**                                                    May 2, 2014
Email: rrotunda@chapman.edu                      Home Page ☞ http://www1.chapman.edu/~rrotunda

**Office Address:**

        Chapman University
        Dale E. Fowler School of Law
        Room 406
        One University Drive
        Orange, CA  92866-1005
        ☎:    (714) 228-2698
        Fax:   (714) 228-2576

**Experience:**

| | |
|---|---|
| Since August, 2008 | DOY & DEE HENLEY CHAIR AND DISTINGUISHED PROFESSOR OF JURISPRUDENCE, CHAPMAN UNIVERSITY |
| June 17, 2009 – Jan. 31, 2013 | COMMISSIONER, Fair Political Practices Commission a regulatory body of the State of California, |
| 2006- August 2008 | UNIVERSITY PROFESSOR AND PROFESSOR OF LAW, George Mason University |
| 2002-2006 | THE GEORGE MASON UNIVERSITY FOUNDATION PROFESSOR OF LAW, George Mason University School of Law |
| Nov. to Dec. 2002 | Visiting Scholar, Katholieke Universiteit Leuven, Faculty of Law, Leuven, Belgium |
| May 2004 | Visiting Lecturer, The Institute for Law and Economics, Institut für Recht und Ökonomik, The University of Hamburg, Germany |
| June 2004-May 2005 | Special Counsel to Department of Defense, The Pentagon |
| December 2005 | Visiting Lecturer, The Institute for Law and Economics, Institut für Recht und Ökonomik, The University of Hamburg, Germany |
| 1993 - 2002 | THE ALBERT E. JENNER, JR. PROFESSOR OF LAW, University of Illinois College of Law |
| Since 2002 | THE ALBERT E. JENNER, JR. PROFESSOR OF LAW, EMERITUS, University of Illinois College of Law |
| Fall, 2001 | Visiting Professor, George Mason University School of Law |

- 2 -

Ronald D. Rotunda

| | |
|---|---|
| Spring & Fall 2000 | Cato Institute, Washington, D.C.; Senior Fellow in Constitutional Studies [Senior Fellow in Constitutional Studies, 2001-2009] |
| Spring, 1999 | Visiting Professor, holding the JOHN S. STONE ENDOWED CHAIR OF LAW, University of Alabama School of Law |
| August 1980 - 1992 | Professor of Law, University of Illinois College of Law |
| March 1986 | Fulbright Professor, Maracaibo and Caracas, Venezuela, under the auspices of the Embassy of the United States and the Catholic University Andres Bello |
| January – June, 1981 | Fulbright Research Scholar, Italy |
| Spring 1981 | Visiting Professor of Law, European University Institute, Florence, Italy |
| August 1977 – August, 1980 | Associate Professor of Law, University of Illinois College of Law |
| August 1974 – August 1977 | Assistant Professor of Law, University of Illinois College of Law |
| April 1973 - July 1974 | Assistant Counsel, U.S. Senate Select Committee on Presidential Campaign Activities |
| July 1971 - April, 1973 | Associate, Wilmer, Cutler & Pickering Washington, DC |
| August 1970 – July 1971 | Law Clerk to Judge Walter R. Mansfield, Second Circuit, New York, N.Y. |

**Education:**

**Legal:**   HARVARD LAW SCHOOL   (1967- 1970)
Harvard Law Review, volumes 82 & 83
J.D., 1970 Magna Cum Laude

**College:**   HARVARD COLLEGE   (1963- 1967)
A.B., 1967 Magna Cum Laude in Government

**Member:**

American Law Institute (since 1977); Life Fellow of the American Bar Foundation (since 1989); Life Fellow of the Illinois Bar Foundation (since 1991); The Board of Editors, The Corporation Law Review (1978-1985); New York Bar (since 1971); Washington, D.C. Bar and D.C. District Court Bar (since 1971); Illinois Bar (since 1975); 2nd Circuit Bar (since 1971); Central District of Illinois (since 1990); 7th Circuit (since 1990); U.S. Supreme Court Bar (since 1974); 4th Circuit, since 2009. Member: American Bar Association, Washington, D.C. Bar Association, Illinois State Bar

- 3 -

Ronald D. Rotunda

Association, Seventh Circuit Bar Association; The Multistate Professional Responsibility Examination Committee of the National Conference of Bar Examiners (1980-1987); AALS, Section on Professional Responsibility, Chairman Elect (1984-85), Chairman (1985-86); Who's Who In America (since 44th Ed.) and various other Who's Who; American Lawyer Media, L.P., National Board of Contributors (1990-2000).

**Scholarly Influence and Honors:**

Symposium, *Interpreting Legal Citations*, 29 JOURNAL OF LEGAL STUDIES (part 2) (U. Chicago Press, Jan. 2000), sought to determine the influence, productivity, and reputation of law professors.  Under various measures, Professor Rotunda scored among the highest in the nation. *E.g.*, scholarly impact, most-cited law faculty in the United States, 17th (p. 470); reputation of judges, legal scholars, etc. on Internet, 34th (p. 331); scholar's non-scholarly reputation, 27th (p. 334); most influential legal treatises since 1978, 7th (p. 405).

In May 2000, *American Law Media*, publisher of *The American Lawyer*, the *National Law Journal*, and the *Legal Times,* picked Professor Rotunda as one of the ten most influential Illinois Lawyers.  He was the only academic on the list.  He was rated, in 2014, as one of "The 30 Most Influential Constitutional Law Professors" in the United States.

- 2012, Honored with, THE CHAPMAN UNIVERSITY EXCELLENCE IN SCHOLARLY/CREATIVE WORK AWARD, 2011-2012.
- Appointed UNIVERSITY PROFESSOR, 2006, George Mason University; Appointed 2008, DOY & DEE HENLEY CHAIR AND DISTINGUISHED PROFESSOR OF JURISPRUDENCE, Chapman University.
- The 2002-2003 *New Educational Quality Ranking* of U.S. Law Schools (EQR) ranks Professor Rotunda as the eleventh most cited of all law faculty in the United States. *See* http://www.leiterrankings.com/faculty/2002faculty_impact_cites.shtml
- Selected UNIVERSITY SCHOLAR for 1996-1999, University of Illinois.
- 1989, Ross and Helen Workman Research Award.
- 1984, David C. Baum Memorial Research Award.
- 1984, National Institute for Dispute Resolution Award.
- Fall, 1980, appointed Associate, in the Center for Advanced Study, University of Illinois.

- 4 -                                              Ronald D. Rotunda

### LIST OF PUBLICATIONS:

### BOOKS:

PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y., 1976) (with Thomas D. Morgan).

> CALIFORNIA SUPPLEMENT TO PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y., 1976) (with Thomas D. Morgan).

> 1978 SUPPLEMENT TO PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y., 1978) (with Thomas D. Morgan).

> 1979 PROBLEMS, CASES AND READINGS SUPPLEMENT TO PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y., 1979) (with Thomas D. Morgan).

> 1979 CALIFORNIA RULES SUPPLEMENT TO PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y., 1979) (with Thomas D. Morgan).

> 1979 STANDARDS SUPPLEMENT TO PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y., 1979) (with Thomas D. Morgan).

> 1980 CALIFORNIA RULES SUPPLEMENT TO PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y., 1980) (with Thomas D. Morgan).

> 1980 STANDARDS SUPPLEMENT TO PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y., 1980) (with Thomas D. Morgan).

CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1978) (a one volume treatise on Constitutional Law) (with John E. Nowak and J. Nelson Young).

> 1978 SUPPLEMENT TO CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1978) (with John E. Nowak and J. Nelson Young).

> 1979-1980 SUPPLEMENT TO CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1979) (with John E. Nowak and J. Nelson Young).

> 1982 SUPPLEMENT TO CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1982) (with John E. Nowak and J. Nelson Young).

Ronald D. Rotunda

MODERN CONSTITUTIONAL LAW:  CASES & NOTES (West Publishing Co., St. Paul, Minnesota, 1981).

> 1981 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1981).

> 1982 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1982).

> 1983 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1983).

> 1984 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, MINNESOTA, 1984).

PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y., 2d ed. 1981) (with Thomas D. Morgan).

> 1981 STANDARDS SUPPLEMENT TO PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y., 1981) (with Thomas D. Morgan).

> 1983 STANDARDS SUPPLEMENT TO PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y., 1983) (with Thomas D. Morgan).

THE UNITED STATES FEDERAL SYSTEM:  LEGAL INTEGRATION IN THE AMERICAN EXPERIENCE (Giuffrè, Milan, 1982) (with Peter Hay).

SIX JUSTICES ON CIVIL RIGHTS (Oceana Publications, Inc., Dobbs Ferry, N.Y., 1983) (edited and with introduction).

CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 2d ed. 1983) (with John E. Nowak and J. Nelson Young) (a one volume treatise on Constitutional Law).

PROFESSIONAL RESPONSIBILITY (West Publishing Co., 1984, Black Letter Series).

PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y., 3d ed. 1984) (with Thomas D. Morgan).

> 1984 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y. 1984) (with Thomas D. Morgan).

> 1985 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y. 1985) (with Thomas D. Morgan).

- 6 -                                                        Ronald D. Rotunda

1986 S<small>ELECTED</small> S<small>TANDARDS ON</small> P<small>ROFESSIONAL</small> R<small>ESPONSIBILITY</small> (Foundation Press, Mineola, N.Y. 1986) (with Thomas D. Morgan).

1987 S<small>ELECTED</small> S<small>TANDARDS ON</small> P<small>ROFESSIONAL</small> R<small>ESPONSIBILITY</small> (Foundation Press, Mineola, N.Y. 1987) (with Thomas D. Morgan).

**M<small>ODERN</small> C<small>ONSTITUTIONAL</small> L<small>AW</small>: C<small>ASES</small> & N<small>OTES</small>** (West Publishing Co., St. Paul, Minnesota, 2d ed. 1985).

1985 S<small>UPPLEMENT TO</small> M<small>ODERN</small> C<small>ONSTITUTIONAL</small> L<small>AW</small> (West Publishing Co., St. Paul, Minnesota, 1985).

1986 S<small>UPPLEMENT TO</small> M<small>ODERN</small> C<small>ONSTITUTIONAL</small> L<small>AW</small> (West Publishing Co., St. Paul, M<small>INNESOTA</small>, 1986).

1987 S<small>UPPLEMENT TO</small> M<small>ODERN</small> C<small>ONSTITUTIONAL</small> L<small>AW</small> (West Publishing Co., St. Paul, Minnesota, 1987).

1988 S<small>UPPLEMENT TO</small> M<small>ODERN</small> C<small>ONSTITUTIONAL</small> L<small>AW</small> (West Publishing Co., St. Paul, Minnesota, 1988).

**T<small>HE</small> P<small>OLITICS OF</small> L<small>ANGUAGE</small>: L<small>IBERALISM AS</small> W<small>ORD AND</small> S<small>YMBOL</small>** (University of Iowa Press, 1986) (with an Introduction by Daniel Schorr).

**T<small>REATISE ON</small> C<small>ONSTITUTIONAL</small> L<small>AW</small>: S<small>UBSTANCE AND</small> P<small>ROCEDURE</small>** (West Publishing Co., St. Paul, Minnesota, 1986) (*three volume treatise*) (with John E. Nowak and J. Nelson Young).

1987 P<small>OCKET</small> P<small>ART TO</small> T<small>REATISE ON</small> C<small>ONSTITUTIONAL</small> L<small>AW</small> (West Publishing Co., 1987) (with John E. Nowak).

1988 P<small>OCKET</small> P<small>ART TO</small> T<small>REATISE ON</small> C<small>ONSTITUTIONAL</small> L<small>AW</small> (West Publishing Co., 1988) (with John E. Nowak).

1989 P<small>OCKET</small> P<small>ART TO</small> T<small>REATISE ON</small> C<small>ONSTITUTIONAL</small> L<small>AW</small> (West Publishing Co., 1989) (with John E. Nowak).

1990 P<small>OCKET</small> P<small>ART TO</small> T<small>REATISE ON</small> C<small>ONSTITUTIONAL</small> L<small>AW</small> (West Publishing Co., 1990) (with John E. Nowak).

1991 P<small>OCKET</small> P<small>ART TO</small> T<small>REATISE ON</small> C<small>ONSTITUTIONAL</small> L<small>AW</small> (West Publishing Co., 1991) (with John E. Nowak).

**C<small>ONSTITUTIONAL</small> L<small>AW</small>** (West Publishing Co., St. Paul, Minnesota, 3d ed. 1986) (a one volume treatise on Constitutional Law) (with John E. Nowak and J. Nelson Young).

1988 POCKET PART TO CONSTITUTIONAL LAW (West Publishing Co., 1988) (with John E. Nowak).

JOSEPH STORY'S COMMENTARIES ON THE CONSTITUTION (Carolina Academic Press, Durham, N.C. 1987) (with introduction) (with John E. Nowak).

CONSTITUTIONAL LAW: PRINCIPLES AND CASES (West Publishing Co., St. Paul, Minnesota, 1987).

PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y., 4th ed. 1987) (with Thomas D. Morgan).

1988 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y. 1988) (with Thomas D. Morgan).

1989 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Westbury, N.Y. 1989) (with Thomas D. Morgan).

1990 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Westbury, N.Y. 1990) (with Thomas D. Morgan).

PROFESSIONAL RESPONSIBILITY (West Publishing Co., St. Paul, Minnesota, 2d ed. 1988, Black Letter Series).

MODERN CONSTITUTIONAL LAW: CASES AND NOTES (West Publishing Co., St. Paul, Minnesota, 3d ed. 1989).

1989 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1989).

1990 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1990).

1991 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1991).

1992 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1992).

PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Westbury, N.Y., 5th ed. 1991) (with Thomas D. Morgan).

1991 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Westbury, N.Y. 1991) (with Thomas D. Morgan).

1992 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Westbury, N.Y. 1992) (with Thomas D. Morgan).

1993 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Westbury, N.Y. 1993) (with Thomas D. Morgan).

1994 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Westbury, N.Y. 1994) (with Thomas D. Morgan).

1995 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Westbury, N.Y. 1995) (with Thomas D. Morgan).

CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 4th ed. 1991) (a one volume treatise on Constitutional Law) (with John E. Nowak).

PROFESSIONAL RESPONSIBILITY (West Publishing Co., St. Paul, Minnesota, 3d ed. 1992, Black Letter Series).

TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE (West Publishing Co., St. Paul, Minnesota, 2d ed. 1992) (*four volume treatise*) (with John E. Nowak).

1993 POCKET PART TO CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1993) (with John E. Nowak).

1994 POCKET PART TO CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1994) (with John E. Nowak).

1995 POCKET PART TO CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1995) (with John E. Nowak).

1996 POCKET PART TO CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1996) (with John E. Nowak).

1997 POCKET PART TO CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1997) (with John E. Nowak).

1998 POCKET PART TO CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1998) (with John E. Nowak).

1999 POCKET PART TO CONSTITUTIONAL LAW (West Group, St. Paul, Minnesota, 1999) (with John E. Nowak).

MODERN CONSTITUTIONAL LAW: CASES AND NOTES (West Publishing Co., St. Paul, Minnesota, 4th ed. 1993).

1993 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1993).

1994 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1994).

1995 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1995).

1996 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1996).

CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 5th ed. 1995) (a one volume treatise on Constitutional Law) (with John E. Nowak).

PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Westbury, N.Y., 6th ed. 1995) (with Thomas D. Morgan).

1996 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Westbury, N.Y. 1996) (with Thomas D. Morgan).

1997 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Westbury, N.Y. 1997) (with Thomas D. Morgan).

1998 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Westbury, N.Y. 1998) (with Thomas D. Morgan).

1999 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 1999) (with Thomas D. Morgan).

2000 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2000) (with Thomas D. Morgan).

PROFESSIONAL RESPONSIBILITY (West Publishing Co., St. Paul, Minnesota, 4th ed. 1995, Black Letter Series) (with computer disk).

Treatise on Constitutional Law:  Substance and Procedure — EXPANDED CD ROM EDITION (West Publishing Co., St. Paul, Minnesota, 1995) (with John E. Nowak).

MODERN CONSTITUTIONAL LAW: CASES AND NOTES (West Publishing Co., St. Paul, Minnesota, 5th ed. 1997).

1997 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1997).

1998 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1998).

1999 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1999).

**TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE** (West Group, St. Paul, Minnesota, 3d ed. 1999) (*five volume treatise*) (with John E. Nowak).

2000 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW:  SUBSTANCE AND PROCEDURE (West Group, St. Paul, Minnesota, 2000) (with John E. Nowak).

2001 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW:  SUBSTANCE AND PROCEDURE (West Group, St. Paul, Minnesota, 2001) (with John E. Nowak).

2002 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW:  SUBSTANCE AND PROCEDURE (West Group, St. Paul, Minnesota, 2002) (with John E. Nowak).

2003 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW:  SUBSTANCE AND PROCEDURE (West Group, St. Paul, Minnesota, 2003) (with John E. Nowak).

2004 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW:  SUBSTANCE AND PROCEDURE (West Group, St. Paul, Minnesota, 2004) (with John E. Nowak).

2005 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW:  SUBSTANCE AND PROCEDURE (West Group, St. Paul, Minnesota, 2005) (with John E. Nowak).

2006 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW:  SUBSTANCE AND PROCEDURE (West Group, St. Paul, Minnesota, 2006) (with John E. Nowak).

헌법: 개인의 자유와 절차를 [AMERICAN CONSTITUTIONAL LAW: INDIVIDUAL LIBERTIES AND PROCEDURE; published in Korean] (Korean Constitutional Court, 1999) (with John E. Nowak).

**PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY** (Foundation Press, Westbury, NY, 7th ed. 2000) (with Thomas D. Morgan).

2001 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2001) (with Thomas D. Morgan).

2002 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2002) (with Thomas D. Morgan).

2003 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2003) (with Thomas D. Morgan).

LEGAL ETHICS: THE LAWYER'S DESKBOOK ON PROFESSIONAL RESPONSIBILITY (ABA-West Group, St. Paul, Minn. 2000) (a Treatise on legal ethics, jointly published by the ABA and West Group, a division of Thomson Publishing).

MODERN CONSTITUTIONAL LAW: CASES AND NOTES (West Group, St. Paul, Minnesota, 6th ed. 2000).

    2000 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Group, St. Paul, Minnesota, 6th ed. 2000).

    2001 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Group, St. Paul, Minnesota, 6th ed. 2001).

    2002 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Group, St. Paul, Minnesota, 6th ed. 2002).

CONSTITUTIONAL LAW (West Group, St. Paul, Minnesota, 6th ed. 2000) (a one volume treatise on Constitutional Law) (with John E. Nowak).

PROFESSIONAL RESPONSIBILITY (West Group, St. Paul, Minnesota, 5th ed. 2001, Black Letter Series).

PROFESSIONAL RESPONSIBILITY: A STUDENT'S GUIDE (ABA-West Group, St. Paul, Minnesota, 2001).

LEGAL ETHICS: THE LAWYER'S DESKBOOK ON PROFESSIONAL RESPONSIBILITY (ABA-West Group, St. Paul, Minn., 2nd ed. 2002) (a Treatise on legal ethics, jointly published by the ABA and West Group, a division of Thomson Publishing).

PROFESSIONAL RESPONSIBILITY: A STUDENT'S GUIDE (ABA-West Group, St. Paul, Minnesota, 2nd ed. 2002).

PROFESSIONAL RESPONSIBILITY (West Group, St. Paul, Minnesota, 6th ed. 2002, Black Letter Series).

LEGAL ETHICS IN A NUTSHELL (West Group, St. Paul, Minnesota, 1st ed. 2003, Nutshell Series) (with Michael I. Krauss).

MODERN CONSTITUTIONAL LAW: CASES AND NOTES (Thomson/West, St. Paul, Minnesota, 7th ed. 2003).

    2003 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (Thomson/West, St. Paul, Minnesota, 2003).

    2004 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (Thomson/West, St. Paul, Minnesota, 2004).

2005 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (Thomson/West, St. Paul, Minnesota, 2005).

2006 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (Thomson/West, St. Paul, Minnesota, 2006).

**PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY** (Foundation Press, New York, N.Y., 8th ed. 2003) (with Thomas D. Morgan).

2004 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2004) (with Thomas D. Morgan).

2005 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2005) (with Thomas D. Morgan).

**CONSTITUTIONAL LAW** (Thomson/West, St. Paul, Minnesota, 7th ed. 2004) (a one volume treatise on Constitutional Law) (with John E. Nowak).

**PROFESSIONAL RESPONSIBILITY** (Thomson/West, St. Paul, Minnesota, 7th ed. 2004, Black Letter Series).

**PRINCIPLES OF CONSTITUTIONAL LAW** (Thomson/West, St. Paul, Minnesota, 1st ed. 2004) (with John E. Nowak).

**LEGAL ETHICS: THE LAWYER'S DESKBOOK ON PROFESSIONAL RESPONSIBILITY** (ABA-Thomson/West, St. Paul, Minn., 3rd ed. 2005) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

**PROFESSIONAL RESPONSIBILITY: A STUDENT'S GUIDE** (ABA-Thomson/West, St. Paul, Minn., 3rd ed. 2005) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

**PRINCIPLES OF CONSTITUTIONAL LAW** (Thomson/West, St. Paul, Minnesota, 2nd ed. 2005) (with John E. Nowak).

**LEGAL ETHICS IN A NUTSHELL** (Thomson/West, St. Paul, Minnesota, 2nd ed. 2006, Nutshell Series) (with Michael I. Krauss).

**PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY** (Foundation Press, New York, N.Y., 9th ed. 2006) (with Thomas D. Morgan).

2006 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2006) (with Thomas D. Morgan).

2007 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2007) (with Thomas D. Morgan).

2008 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2008) (with Thomas D. Morgan).

LEGAL ETHICS: THE LAWYER'S DESKBOOK ON PROFESSIONAL RESPONSIBILITY (ABA-Thomson/West, St. Paul, Minn., 4th ed. 2006) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

PROFESSIONAL RESPONSIBILITY: A STUDENT'S GUIDE (ABA-Thomson/West, St. Paul, Minn., 4th ed. 2006) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

MODERN CONSTITUTIONAL LAW: CASES AND NOTES (Thomson/West, St. Paul, Minnesota, 8th ed. 2007).

2007 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (Thomson/West, St. Paul, Minnesota, 2007).

2008 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (Thomson/West, St. Paul, Minnesota, 2008).

TREATISE ON CONSTITUTIONAL LAW:  SUBSTANCE AND PROCEDURE (Thomson/West, St. Paul, Minnesota, 4th ed. 2007) *(first two volumes of six volume treatise)* (with John E. Nowak).

2007 Pocket PART TO TREATISE ON CONSTITUTIONAL LAW:  SUBSTANCE AND PROCEDURE (Thomson/West, St. Paul, Minnesota, 2007) (with John E. Nowak).

LEGAL ETHICS IN A NUTSHELL (Thomson/West, St. Paul, Minnesota, 3rd ed. 2007, Nutshell Series).

LEGAL ETHICS: THE LAWYER'S DESKBOOK ON PROFESSIONAL RESPONSIBILITY (ABA-Thomson/West, St. Paul, Minn., 5th ed. 2007) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

PROFESSIONAL RESPONSIBILITY: A STUDENT'S GUIDE (ABA-Thomson/West, St. Paul, Minn., 5th ed. 2007) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

언론의 자유와 미국 헌법, FREEDOM OF SPEECH AND THE AMERICAN CONSTITUTION (Korean Studies Information Co. Ltd.  Publishers, Korea, 2007) (translated into Korean by Professor Lee Boo-Ha, Yeungnam University College of Law and Political Science), coauthored with Professor John E. Nowak.

PRINCIPLES OF CONSTITUTIONAL LAW (Thomson/West, St. Paul, Minnesota, 3rd ed. 2007) (with John E. Nowak).

Ronald D. Rotunda

TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE (Thomson/West, St. Paul, Minnesota, 4th ed. 2008) *(last four volumes of six volume treatise)* (with John E. Nowak).

2008 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE (Thomson/West, St. Paul, Minnesota, 2008) (with John E. Nowak).

2009 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE (Thomson/West, St. Paul, Minnesota, 2009) (with John E. Nowak).

2010 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE (Thomson/West, St. Paul, Minnesota, 2010) (with John E. Nowak).

2011 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE (Thomson/West, St. Paul, Minnesota, 2011) (with John E. Nowak).

2012 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE (Thomson/West, St. Paul, Minnesota, 2012) (with John E. Nowak).

PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y., 10th ed. 2008) (with Thomas D. Morgan).

2009 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2009) (with Thomas D. Morgan).

2010 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2010) (with Thomas D. Morgan).

2011 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2011) (with Thomas D. Morgan).

PROFESSIONAL RESPONSIBILITY (Thomson/West, St. Paul, Minnesota, 8th ed. 2008, Black Letter Series).

LEGAL ETHICS: THE LAWYER'S DESKBOOK ON PROFESSIONAL RESPONSIBILITY (ABA-Thomson/West, St. Paul, Minn., 6th ed. 2008) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

PROFESSIONAL RESPONSIBILITY: A STUDENT'S GUIDE (ABA-Thomson/West, St. Paul, Minn., 6th ed. 2008) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

MODERN CONSTITUTIONAL LAW: CASES AND NOTES (West Thomson Reuters, St. Paul, Minnesota, 9th ed. 2009).

2009 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (Thomson/West, St. Paul,

Minnesota, 2009).

2010 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (Thomson/West, St. Paul, Minnesota, 2010).

2011 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (Thomson/West, St. Paul, Minnesota, 2011).

LEGAL ETHICS: THE LAWYER'S DESKBOOK ON PROFESSIONAL RESPONSIBILITY (ABA-Thomson/West, St. Paul, Minn., 7th ed. 2009) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

PROFESSIONAL RESPONSIBILITY: A STUDENT'S GUIDE (ABA-Thomson/West, St. Paul, Minn., 7th ed. 2009) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

CONSTITUTIONAL LAW (Thomson/West, St. Paul, Minnesota, 7th ed. 2010) (a one volume treatise on Constitutional Law) (with John E. Nowak).

LEGAL ETHICS: THE LAWYER'S DESKBOOK ON PROFESSIONAL RESPONSIBILITY (ABA-Thomson/West, St. Paul, Minn., 8th ed. 2010) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

PROFESSIONAL RESPONSIBILITY: A STUDENT'S GUIDE (ABA-Thomson/West, St. Paul, Minn., 8th ed. 2010) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

PRINCIPLES OF CONSTITUTIONAL LAW (West-Thomson/Reuters, St. Paul, Minnesota, 4th ed. 2010) (with John E. Nowak).

PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y., 11th ed. 2011) (with Thomas D. Morgan & John S. Dzienkowski).

2012 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2012) (with Thomas D. Morgan).

2013 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2013) (with Thomas D. Morgan).

2014 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, West Academic, St. Paul, MN 2014) (with Thomas D. Morgan).

LEGAL ETHICS: THE LAWYER'S DESKBOOK ON PROFESSIONAL RESPONSIBILITY (ABA-Thomson/West, St. Paul, Minn., 9th ed. 2011) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

- 16 -                                                    Ronald D. Rotunda

PROFESSIONAL RESPONSIBILITY: A STUDENT'S GUIDE (ABA-Thomson/West, St. Paul, Minn., 9th ed. 2011) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

PROFESSIONAL RESPONSIBILITY (West: A Thomson-Reuters Co., St. Paul, Minnesota, 9th ed. 2011, Black Letter Series).

PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY: CONCISE EDITION (Foundation Press, New York, N.Y., 11th ed. 2012) (with Thomas D. Morgan & John S. Dzienkowski).

MODERN CONSTITUTIONAL LAW: CASES AND NOTES (West Thomson Reuters, St. Paul, Minnesota, 10th ed. 2012).

2012 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (Thomson/West, St. Paul, Minnesota, 2012).

2013 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (Thomson/West, St. Paul, Minnesota, 2013).

概論 アメリカの法曹倫理 第3版——事例解説 [INTRODUCTION TO AMERICAN LEGAL ETHICS] (translated by Naoyuki Toyama) (Thomson Reuters, Japan UNI Agency, Inc. Tokyo, 2012).

LEGAL ETHICS: THE LAWYER'S DESKBOOK ON PROFESSIONAL RESPONSIBILITY (ABA-Thomson/West, St. Paul, Minn., 10th ed. 2012) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

PROFESSIONAL RESPONSIBILITY: A STUDENT'S GUIDE (ABA-Thomson/West, St. Paul, Minn., 10th ed. 2012) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

TREATISE ON CONSTITUTIONAL LAW:  SUBSTANCE AND PROCEDURE (Thomson/West, St. Paul, Minnesota, 5th ed. 2012) *(first three volumes of six volume treatise)* (with John E. Nowak).

LEGAL ETHICS IN A NUTSHELL (Thomson/West, St. Paul, Minnesota, 4th ed. 2013, Nutshell Series).

TREATISE ON CONSTITUTIONAL LAW:  SUBSTANCE AND PROCEDURE (Thomson/West, St. Paul, Minnesota, 5th ed. 2013) *(last three volumes of six volume treatise)* (with John E. Nowak).

2013 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW:  SUBSTANCE AND PROCEDURE (Thomson/West, St. Paul, Minnesota, 2013) (with John E. Nowak).

2014 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW:  SUBSTANCE AND PROCEDURE (Thomson/West, St. Paul, Minnesota, 2014) (with John E. Nowak).

**LEGAL ETHICS: THE LAWYER'S DESKBOOK ON PROFESSIONAL RESPONSIBILITY** (ABA-Thomson/West, St. Paul, Minn., 11th ed. 2013) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

**PROFESSIONAL RESPONSIBILITY: A STUDENT'S GUIDE** (ABA-Thomson/West, St. Paul, Minn., 11th ed. 2013) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

- 18 -                                        Ronald D. Rotunda

**ARTICLES:**

*The "Liberal" Label: Roosevelt's Capture of a Symbol*, 17 PUBLIC POLICY 377 (Harvard University Press, 1968).

*Reform of the Presidential Nominating Conventions*, 56 VIRGINIA LAW REVIEW 179 (1970) (with Reid Chambers).

*The Public Interest Appellant: Limitations on the Right of Competent Parties to Settle Litigation Out of Court*, 66 NORTHWESTERN UNIVERSITY LAW REVIEW 199 (1971).

*The Combination of Functions in Administrative Actions: An Examination of European Alternatives*, 40 FORDHAM LAW REVIEW 101 (1971).

*Star Gallery '74,* 2 ASTRONOMY MAGAZINE 57 (Feb. 1974) (Photographs of Mercury Transit of the Sun).

*Presidents and Ex-Presidents as Witnesses: A Brief Historical Footnote*, 1975 UNIVERSITY OF ILLINOIS LAW FORUM 1 (1975).

*Constitutional and Statutory Restrictions on Political Parties in the Wake of Cousins v. Wigoda*, 53 TEXAS LAW REVIEW 935 (1975).

*Sponsors of Real Estate Partnerships as Brokers and Investment Advisors*, 23 UNIVERSITY OF CALIFORNIA-LOS ANGELES LAW REVIEW 322 (1975) (with Robert C. Hacker).

*Book Review of Freedman's "Lawyers' Ethics in An Adversary System,"* 89 HARVARD LAW REVIEW 622 (1976).

*Congressional Power to Restrict the Jurisdiction of the Lower Federal Courts and the Problem of School Busing*, 64 GEORGETOWN UNIVERSITY LAW JOURNAL 839 (1976).

*Comment*, 27 HARVARD LAW BULLETIN 4 (No. 3, 1976).

*Conforming Stock Ownership Plans with the Securities Acts*, 45 GEORGE WASHINGTON UNIVERSITY LAW REVIEW 34 (1976) (with Robert C. Hacker).

*The Commercial Speech Doctrine in the Supreme Court*, 1976 UNIVERSITY OF ILLINOIS LAW FORUM 1080 (1976).

*Commercial Speech and the First Amendment*, 1 THE COLLEGIATE FORUM 8 (Fall 1977) (published by Dow Jones & Co., Inc.).

*The First Amendment Now Protects Commercial Speech*, 10 THE CENTER MAGAZINE: A PUBLICATION OF THE CENTER FOR THE STUDY OF DEMOCRATIC INSTITUTIONS 32 (May/June 1977).

Ronald D. Rotunda

*The Word "Profession" is Only a Label — And Not a Very Useful One*, 4 LEARNING AND THE LAW 16 (Summer 1977) (publication of the American Bar Association Section of Legal Education and Admissions to the Bar).

*The SEC's Ectoplasmic Theory of an Issuer as Applied to Educational and Charitable Institutions, Bank Trustees, and Other Exempt Issuers*, 65 CALIFORNIA LAW REVIEW 1181 (1977) (with Robert C. Hacker) (published by University of California-Berkeley Law School).

*Law, Lawyers and Managers*, in, THE ETHICS OF CORPORATE CONDUCT, pp. 127-45 (Clarence Walton, ed. 1977) (published by Prentice-Hall, Inc., Englewood Cliffs, N.J., for the American Assembly of Columbia University).

*When the Client Lies: Unhelpful Guidelines from the ABA*, 1 CORPORATION LAW REVIEW 34 (1978).

*SEC Registration of Private Investment Partnerships after Abrahamson v. Fleschner*, 78 COLUMBIA LAW REVIEW 1471 (1978) (with Robert C. Hacker).

*The Reliance of Counsel Defense in Securities Cases: Damage Actions versus Injunctive Actions*, 1 CORPORATION LAW REVIEW 159 (1978) (with Robert C. Hacker).

*Liability for the Misuse of Nonpublic, Material Inside Information: The Duty to Convey and the Duty to Inquire*, 1 CORPORATION LAW REVIEW 376 (1978) (with Robert C. Hacker).

*Running Out of Time: Can the E.R.A. Be Saved,* 64 AMERICAN BAR ASSOCIATION JOURNAL 1507 (1978).

*The Duty to Take Remedial Action*, 2 CORPORATION LAW REVIEW 159 (1979) (with Robert C. Hacker).

*Waiver of Attorney Client Privilege*, 2 CORPORATION LAW REVIEW 250 (1979) (with Robert C. Hacker).

*Attorney Conflicts of Interest*, 2 CORPORATION LAW REVIEW 345 (1979) (with Robert C. Hacker).

*Standing, Waiver, Laches, and Appealability in Attorney Disqualification Cases*, 3 CORPORATION LAW REVIEW 82 (1980) (with Robert C. Hacker).

*Short-Swing Profits, Section 16(b), and Nonstatutory Insiders*, 3 CORPORATION LAW REVIEW 252 (1980) (with Robert C. Hacker).

*Restrictions on Agency and Congressional Subpoenas Issued for an Improper Purpose*, 4 CORPORATION LAW REVIEW 74 (1981) (with Robert C. Hacker).

Ronald D. Rotunda

*The Extraterritorial Regulation of Foreign Business under the U.S. Securities Laws*, 59 NORTH CAROLINA LAW REVIEW 643 (1981) (with Robert C. Hacker), reprinted in 24 CORPORATE PRACTICE COMMENTATOR 233 (1982).

*Ethical Restraints on Communications with Adverse Expert Witnesses*, 5 CORPORATION LAW REVIEW 348 (1982) (with Robert C. Hacker).

*A Comment on the Creation and Resolution of a "Nonproblem": Dames & Moore v. Regan, the Foreign Affairs Power, and the Role of the Court*, 29 UNIVERSITY OF CALIFORNIA - LOS ANGELES LAW REVIEW 1129 (1982) (with John E. Nowak).

*Corporate Confidences and the Duty to Refrain from Insider Trading*, 6 CORPORATION LAW REVIEW 53 (1983) (with Robert C. Hacker).

*Representing the Corporate Client and the Proposed Rules of Professional Conduct*, 6 CORPORATION LAW REVIEW 269 (1983) (with Robert C. Hacker).

*Ethics*, USA Today, Feb. 15, 1983, at p. 10A.

*Teaching Ethics under the New Model Rules*, 14 SYLLABUS 1 (No. 3, Sept. 1983) (a publication of the American Bar Association Section on Legal Education and Admissions to the Bar).

*Usery in the Wake of Federal Energy Regulatory Commission v. Mississippi*, 1 CONSTITUTIONAL COMMENTARY 43 (1984).

*The Doctrine of Conditional Preemption and Other Limitations on Tenth Amendment Restrictions*, 132 UNIVERSITY OF PENNSYLVANIA LAW REVIEW 289 (1984).

*Ethics*, 12 STUDENT LAWYER 14 (May 1984).

*Debate Over Model Rules Moves to the States*, 130 CHICAGO LAW BULLETIN 3, 8 (June 12, 1984).

*The Notice of Withdrawal and the New Model Rules of Professional Conduct: Blowing the Whistle and Waiving the Red Flag*, 63 OREGON LAW REVIEW 455 (1984), reprinted in, 1985 CRIMINAL LAW REVIEW 533, and excerpted in 34 LAW REVIEW DIGEST 14 (Mar./Apr. 1985).

*Instruments for Legal Integration in the European Community — A Review* (with Peter Hay and Giorgio Gaja), in 1 INTEGRATION THROUGH LAW: EUROPE AND THE AMERICAN FEDERAL EXPERIENCE 113 (Mauro Cappelletti, Monica Seccombe & Joseph Weiler, Eds.) (Walter de Gruyter, Berlin, 1986).

*Conflict of Laws as a Technique for Legal Integration* (with Peter Hay and Ole Lando) in 1 INTEGRATION THROUGH LAW: EUROPE AND THE AMERICAN FEDERAL EXPERIENCE 161 (M. Cappelletti, M. Seccombe, & J. Weiler, eds.) (Walter de Gruyter, Berlin, 1986).

Ronald D. Rotunda

*The Doctrine of the Inner Political Check, the Dormant Commerce Clause, and Federal Preemption*, 53 TRANSPORTATION PRACTITIONERS JOURNAL 263 (1986).

*The Role of Law Reviews:  The Extreme Centrist Position*, 62 INDIANA LAW JOURNAL 1 (1986).

*Intergovernmental Tax Immunity and Tax Free Municipals After Garcia*, 57 U. COLORADO LAW REVIEW 849 (1986).

*Sales and Use Tax Credits, Discrimination against Interstate Commerce, and the Useless Multiple Taxation Concept*, 20 UNIVERSITY OF CALIFORNIA-DAVIS LAW REVIEW 273 (1987) (with John E. Nowak).

*Ethical Problems in Federal Agency Hiring of Private Attorneys*, 1 GEORGETOWN JOURNAL OF LEGAL ETHICS 85 (1987).

*Bicentennial Lessons from the Constitutional Convention of 1787*, 21 SUFFOLK UNIVERSITY LAW REVIEW 589 (1987) (the Twentieth Donahue Lecture).

*Remembering Judge Walter R. Mansfield*, 45 BROOKLYN LAW REVIEW 1 (1987).

*Professionals, Pragmatists or Predators,* Part I, 75 ILLINOIS BAR JOURNAL 420, Part II, 482, Part III, 540 (1987).

*Life Under the Articles of Confederation*, 75 ILLINOIS BAR JOURNAL 544 (1987).

*Lawyers and Professionalism:  A Commentary on the Report of the American Bar Association Commission on Professionalism*, 18 LOYOLA UNIVERSITY OF CHICAGO LAW JOURNAL 1149 (1987) (the Baker-McKenzie Foundation Lecture).

*The Constitutional Future of the Bill of Rights:  A Closer Look at Commercial Speech and State Aid to Religiously Affiliated Schools*, 65 NORTH CAROLINA LAW REVIEW 917 (1987).

*Bork's Firing of Cox:  What Really Happened*, WALL STREET JOURNAL, Sept. 9, 1987, p. 32.

*An Essay on the Constitutional Parameters of Federal Impeachment*, 76 KENTUCKY LAW REVIEW 707 (1988).

*Contract Rights, Property Rights and Constitutional Restrictions on Federal Limitations of Private Claims Against Foreign Governments*, in,  LEGAL ESSAYS IN HONOR OF JOHN E. CRIBBET, pp 151-68 (Peter Hay & Michael Hoeflich, eds., U. of Ill. Press, 1988).

*Learning the Law of Lawyering,* 136 UNIVERSITY OF PENNSYLVANIA LAW REVIEW 1761 (1988).

*Original Intent, The View of the Framers, and the Role of the Ratifiers*, 41 VANDERBILT LAW REVIEW 507 (1988).

Ronald D. Rotunda

*The Confirmation Process for Supreme Court Justices in the Modern Era*, 37 EMORY LAW JOURNAL 559 (1988).

*Sheathing the Sword of Federal Preemption*, 5 CONSTITUTIONAL COMMENTARY 311 (1988).

*Is Lawyer Professionalism Declining or Advancing* (3-Part Series) 134 CHICAGO DAILY LAW BULLETIN, Mar. 5, 1988 at 2, 14 (*Part I*); Mar. 16, 1988 at 2, 14 (*Part II*); Mar. 17, 1988 at 2, 10 (*Part III*).

*Challenging the Ethics Myths*, 10 LEGAL TIMES (OF WASHINGTON, D.C.) 16-17 (Mar. 21, 1988), reprinted in, 99 FULTON COUNTY DAILY REPORT 4 (Apr. 13, 1988) (Georgia), 4 TEXAS LAWYER 20-21 (April 18, 1988), 1 MANHATTAN LAWYER, 12, 33 (Mar. 29 - Apr. 4, 1988), 14 CONNECTICUT LAW TRIBUNE 10-11 (Aug. 15, 1988).

*The Litigator's Professional Responsibility*, 77 ILLINOIS BAR JOURNAL 192 (1988), reprinted in, 25 TRIAL MAGAZINE 98 (March 1989), and in, 30 LAW OFFICE ECONOMICS AND MANAGEMENT 61 (1989).

*Race to Courthouse — Or Walk?*, 11 LEGAL TIMES (OF WASHINGTON, D.C.) 14 (Aug. 15, 1988), reprinted in, 99 FULTON COUNTY DAILY REPORT 2 (Aug. 11, 1988) (Georgia), 1 MANHATTAN LAWYER 12 (Aug. 16-22, 1988).

*State Bars Reluctant to Hear Any Evil*, 11 LEGAL TIMES (OF WASHINGTON, D.C.) 14 (Dec. 12, 1988), reprinted in, 99 FULTON COUNTY DAILY REPORT 8 (Dec. 12, 1988) (Georgia), THE RECORDER OF SAN FRANCISCO 4 (Dec. 22, 1988).

*The Court:  A Decade of Stability and Change*, 11 NATIONAL LAW JOURNAL 34-36 (Sept. 26, 1988).

*Client Fraud:  Blowing the Whistle, Other Options*, 24 TRIAL MAGAZINE 92 (Nov. 1988).

*The Lawyer's Duty To Report Another Lawyer's Unethical Violations in the Wake of Himmel*, 1988 UNIVERSITY OF ILLINOIS LAW REVIEW 977 (1988).

*Runyon v. McCrary and the Mosaic of State Action*, 67 WASHINGTON UNIVERSITY LAW QUARTERLY 47 (1989).

*Interpreting an Unwritten Constitution*, 12 HARVARD JOURNAL OF LAW & PUBLIC POLICY 15 (1989).

*Line-Item Veto: Best Budget Fix?*, 11 LEGAL TIMES (OF WASHINGTON, D.C.) 15 (Mar. 27, 1989), reprinted in, *e.g.*, 100 FULTON COUNTY (ATLANTA) DAILY REPORT 8 (Mar. 23, 1989) (Georgia), 2 MANHATTAN LAWYER 12 (Apr. 4 - Apr. 10, 1989).

Ronald D. Rotunda

*Impeaching Federal Judges: Where Are We and Where Are We Going?*, 72 JUDICATURE: THE JOURNAL OF THE AMERICAN JUDICATURE SOCIETY 359 (1989) (transcript of edited remarks).

*Cautionary Lessons from American Securities Arbitration: Litigation versus Arbitration*, 5 ARBITRATION INTERNATIONAL 199 (London Court of International Arbitration, Issue 2, 1989).

*The Impairments Clause and the Corporation: A Comment on Professors Butler's and Ribstein's Thesis*, 55 BROOKLYN LAW REVIEW 809 (1989) (Symposium).

*Eschewing Bright Lines*, 25 TRIAL MAGAZINE 52 (Dec. 1989).

*Meanwhile, Back in Mother Russia*, LEGAL TIMES (OF WASHINGTON, D.C.), Oct. 2, 1989, at 35 (with Peter B. Maggs).

*A Tribute to Eugene F. Scoles*, 1989 ILLINOIS LAW REVIEW 835 (1989).

*The Case Against Special Prosecutors*, WALL STREET JOURNAL, Jan. 15, 1990, at p. A8.

*Jurisprudent: ABA Model Rules on Client Secrets No Help*, 13 CHICAGO LAWYER 12, 56 (Feb. 1990).

*The New Illinois Rules of Professional Conduct: A Brief Introduction and Criticism*, 78 ILLINOIS BAR JOURNAL 386 (1990).

*Beholden to None, Justices Often Cut Their Own Paths*, LOS ANGELES TIMES, July 27, 1990, at p. B7.

*Predicting the Views of Supreme Court Nominees*, 26 TRIAL MAGAZINE 42 (Nov. 1990).

*Judicial Conference — Second Circuit: RICO and the Proposed Restatement of the Law Governing Lawyers* (Sept. 7, 1990), 136 FEDERAL RULES DECISIONS 233, 266-71 (1991).

*War Dissenters Reflect Freedom's Power*, 13 LEGAL TIMES (OF WASHINGTON, D.C.) 24 (Feb. 4, 1991).

*Joseph Story: A Man for All Seasons*, 1990 JOURNAL OF SUPREME COURT HISTORY: YEARBOOK OF THE SUPREME COURT HISTORICAL SOCIETY 17 (1990) (with John E. Nowak).

*When Rough Justice Rides Roughshod*, 13 LEGAL TIMES (of Washington, D.C.) 26 (April 1, 1991), reprinted in, 102 FULTON COUNTY (ATLANTA) DAILY REPORT 8 (Mar. 29, 1991), 32 BROWARD REVIEW (Fort Lauderdale, Florida) 11 (April 1, 1991), 37 PALM BEACH (FLORIDA) REVIEW 11 (April 1, 1991), 65 MIAMI REVIEW 11 (April 1, 1991), 77 NEW JERSEY LAW JOURNAL 9, 24 (April 4, 1991), 65 THE RECORDER 4, 5 (April 4, 1991).

- 24 -                                      Ronald D. Rotunda

*Nici o constitutie . . .*, 18 LUMEA AZI 4 (May 2, 1991) (published in Romanian).

*Public Executions: Should the Imposition of the Death Sentence Be Televised*?, 4 ILLINOIS QUARTERLY 36 (July 1991) (panel discussion).

*One Potato, Two Potato, Three Potato, Four*, 14 LEGAL TIMES (OF WASHINGTON, D.C.) 23 (Aug. 12, 1991) (reprinted in various legal newspapers).

*Abuse of Ethics Rule Hinders Prosecutors*, CHICAGO SUN-TIMES, Aug. 24, 1991, at p. 12, col. 1-2.

*Commercial Speech and the Platonic Ideal: Libre expression et libre enterprise*, in, FREEDOM OF EXPRESSION AND THE CHARTER 319  (David Schneiderman, ed. Carswell, Canada 1991), a collection of papers presented at the Edmonton, Alberta Conference on the Canadian Constitution, of the Centre for Constitutional Studies/Centre d'études constitutionnelles.

*Thomas' Ethics and the Court*, 13 LEGAL TIMES (OF WASHINGTON, D.C.) 20 (Aug. 26, 1991).

*A Red Herring Confirmation Issue*, THE INDIANAPOLIS STAR, Sept. 10, 1991, at p. A7, col. 1-3.

*Celebrating the Bicentennial of the Bill of Rights,* 79 ILLINOIS BAR JOURNAL 608 (1991).

*Exporting the American Bill of Rights: The Lesson from Romania*, 1991 UNIVERSITY OF ILLINOIS LAW REVIEW 1065 (1991).

*The Welfare State and the Constitution*, in THE ENCYCLOPEDIA OF THE AMERICAN CONSTITUTION 571 (Macmillan Pub. Co., Inc., K. Karst & L. Levy, Eds., Supplement I, 1992).

*The Veto Power*, in THE OXFORD COMPANION TO THE SUPREME COURT OF THE UNITED STATES 896 (Oxford University Press, Kermit L. Hall, ed. 1992).

*Legal Ethics*, 45 SOUTHWESTERN LAW JOURNAL [Southern Methodist University] 2035 (1992).

*The Best Response to Speech We Don't Like Is More Speech*, CHICAGO SUN-TIMES, May 16, 1992, at p.14, col. 1-6.

*Foreword: The Role of the Modern Supreme Court*, 26 U. RICHMOND LAW REVIEW 433 (1992).

*Simon Greenleaf on Desuetude and Judge-Made Law:  An Unpublished Letter to Francis Lieber*, 10 CONSTITUTIONAL COMMENTARY 93 (1993) (with Michael H. Hoeflich).

*Roe v. Wade: Reading It Right,* 15 LEGAL TIMES [OF WASHINGTON, D.C.] 36, 40 (Jan. 25, 1993) (reprinted in various publications, *e.g.*, TEXAS LAWYER. Feb. 8, 1993, at 16-17).

*No Impediment to Term Limits*, THE WASHINGTON POST, Feb. 13, 1993, at A31, col. 1.

- 25 -                                          Ronald D. Rotunda

*The Civil Rights Act of 1991: A Brief Introductory Analysis of the Congressional Response to Judicial Interpretation*, 68 NOTRE DAME LAW REVIEW 923 (1993) (Symposium).

*A Brief Comment on Politically Incorrect Speech in the Wake of R.A.V.*, 47 SOUTHERN METHODIST UNIVERSITY LAW REVIEW 9 (1993).

*Juggling for Power Over NAFTA: A Simple Cure for a Big Problem*, 16 LEGAL TIMES (OF WASHINGTON, D.C.) 23 (July 19, 1993).

*Free Trade's Political Alchemy,* 9 TEXAS LAWYER 10 (July 26, 1993).

*Roadblock to Mexico,* THE WASHINGTON POST, Sept. 21, 1993, at A19, col. 6.

*Impeachment Showdown: Congress vs. Judges,* 16 LEGAL TIMES (OF WASHINGTON, D.C.) 37 (Nov. 1, 1993) (reprinted, *e.g.,* in 19 THE CONNECTICUT LAW TRIBUNE 24, Nov. 8, 1993).

*The Case Against Permanent Disbarment,* 5 THE PROFESSIONAL LAWYER 22 (A.B.A., No. 2, Feb. 1994).

*Paula Jones Day in Court,* 17 LEGAL TIMES (OF WASHINGTON, D.C.) 24, 27 (May 30, 1994), *reprinted, e.g.,* 10 TEXAS LAWYER 24, 27 (June 13, 1994).

*Is the President Above the Law?*, CHICAGO TRIBUNE, June 1, 1994, § 1, at 21, col. 3 - 4.

*"Richard" Case Defies the Law As Well As the Logic,* CHICAGO TRIBUNE, July 17, 1994, § 4, at 3, col. 4.

*Setting Timer on Congressional Terms,* 17 LEGAL TIMES (OF WASHINGTON, D.C.) S31, S33 (Oct. 3, 1994).

*A Commentary on the Constitutionality of Term Limits*, in THE POLITICS AND LAW OF TERM LIMITS 141 (Edward H. Crane & Roger Pilon, eds., Cato Institute 1994).

*The Constitution Lets States Impose Term Limits,* WALL STREET JOURNAL, Nov. 30, 1994, at A21, col. 3-6 (Midwest ed.).

*Can You Say That?,* 30 TRIAL MAGAZINE 18 (December 1994).

*Rolls Royce and the Case Law,* LAKE MICHIGAN LADY, at 34-36 (Issue No. 37, 1994).

*Rethinking Term Limits for Federal Legislators in Light of the Structure of the Constitution*, 73 OREGON LAW REVIEW 561 (1994).

*Racist Speech and Attorney Discipline,* 6 THE PROFESSIONAL LAWYER 1 (A.B.A., No. 6, 1995).

- 26 -                                                   Ronald D. Rotunda

*Returning Art to the People: No Subsidies and No Strings*, 17 LEGAL TIMES (OF WASHINGTON, D.C.) 43 (Mar. 6, 1995).

*Term Limits and Lessons from Our Past,* HEARTLAND POLICY STUDY, No. 66 (HEARTLAND INSTITUTE, June 28, 1995).

*Cases Refine Definition of Federal Powers,* 17 NATIONAL LAW JOURNAL C9, C12 (July 31, 1995).

*Computerized Highways and the Search for Privacy in the Case Law: A Comment,* 11 SANTA CLARA COMPUTER AND HIGH TECHNOLOGY LAW JOURNAL 119 (1995) (part of a Conference and Symposium on Intelligent Vehicle Highway Systems).

*Fixing the War Powers Act,* THE HERITAGE LECTURES, No. 529 (The Heritage Foundation, 1995).

*What Next? Outlawing Lawyer Jokes?,* WALL STREET JOURNAL, Aug. 8, 1995, at A12, col. 3-5 (Midwest ed.).

*Innovations Disguised as Traditions:  An Historical Review of the Supreme Court Nominations Process*, 1995 UNIVERSITY OF ILLINOIS LAW REVIEW 123 (1995).

*Flat Taxes: A Progressive Way to Go*, 17 LEGAL TIMES (OF WASHINGTON, D.C.) 20 (Nov. 27, 1995).

*Embattled Clintons Should Note Watergate Lessons*, NEWSDAY, Feb. 28, 1996, A32.

*Rotunda on Travel: A Wet Toast to Limp Bacon, Loose Clothing*, 36 ILLINOIS STATE BAR NEWS 4 (No. 16, Mar 1, 1996).

*The Aftermath of Thornton*, 13 CONSTITUTIONAL COMMENTARY 201 (1996).

*A Czech Window on Ethics*, 18 NATIONAL LAW JOURNAL, at A15 (July 22, 1996).

*Legal Ethics, the Czech Republic, and the Rule of Law*, 7 THE PROFESSIONAL LAWYER 1 (A.B.A., No. 8, 1996).

*Sister Act*: *Conflicts of Interest with Sister Corporations*, in, LEGAL ETHICS: THE CORE ISSUES (1996) (Hofstra University School of Law Conference on Legal Ethics), 1 JOURNAL OF THE INSTITUTE FOR THE STUDY OF LEGAL ETHICS 215 (1996).

*The Warren Court and Freedom of the Press,* in THE WARREN COURT: A 25 YEAR RETROSPECTIVE 85 (Bernard Schwartz, ed. Oxford University Press 1996).

*Judgeships Trapped in a Political Snare?*, WASHINGTON TIMES, Oct. 29, 1996, at A15, col. 1-6.

- 27 -                                                  Ronald D. Rotunda

*Nová pravidla profesního jednání advokátu v Ceské republice (v komparaci s kodexy USA a EU)* [The New Rules of Professional Conduct for Advocates in the Czech Republic], 5 EMP: EVROPSKÉ A MEZINÁRODNÍ PRÁVO 58 (Císlo 3-4, 1996) (published in Czech and English).

*Dealing with the Media: Ethical, Constitutional, and Practical Parameters*, 84 ILLINOIS BAR JOURNAL 614 (December 1996).

*An Essay on Term Limits and a Call for a Constitutional Convention*, 80 MARQUETTE UNIVERSITY LAW REVIEW 227 (1996) (with Stephen J. Safranek).

*Heiple's Burdens*, CHICAGO TRIBUNE, January 29, 1997, at § 1, p. 11, col.  4 [reprinted in, BELLEVILLE NEWS-DEMOCRAT, February 2, 1997, at § A, p. 4A, col.  4-6].

*When Duty Calls, Courts Can Be Flexible,* WASHINGTON POST, January 29, 1997, at p. A21, col. 2-3.

*Professionalism, Legal Advertising, and Free Speech In the Wake of Florida Bar v. Went For It, Inc.*, 49 ARKANSAS LAW REVIEW 703 (1997) (Symposium), reprinted in, 12 LAWYERS' LIABILITY REVIEW 2 (No. 10, Oct. 1998) (part I), 12 LAWYERS' LIABILITY REVIEW 2 (No. 11, Nov. 1998) (part II), 12 LAWYERS' LIABILITY REVIEW 2 (No. 12, Oct. 1998) (part III).

*Conflict Problems When Representing Members of Corporate Families*, 72 NOTRE DAME LAW REVIEW 655 (1997).

*Judges as Ambulance Chasers*, 8 THE PROFESSIONAL LAWYER 14 (A.B.A., No. 8, 1997).

*West Virginia Provides Model for Legal Discipline Across State Lines*, 7 LEGAL OPINION LETTER 1 (Washington Legal Foundation, No. 15, May 16, 1997).

*The Influence of the American Law Institute's Proposed Restatement of the Law Governing Lawyers*, 1 PROFESSIONAL RESPONSIBILITY, LEGAL ETHICS, AND LEGAL EDUCATION NEWS 1, 4 (Federalist Society, No. 2, 1997).

*Handed a Lesser Veto*, 20 LEGAL TIMES (OF WASHINGTON, D.C.) 27, 28 (May 26, 1997).

*Lips Unlocked: Attorney-Client Privilege and the Government Lawyer*, 20 LEGAL TIMES (OF WASHINGTON, D.C.) 21-22, 28 (June 30, 1997).

*The War Powers Act in Perspective*, 2 MICHIGAN LAW & POLICY REVIEW 1 (1997).

*The True Significance of Clinton vs. Jones*, CHICAGO TRIBUNE, July 8, 1997, at 12, col. 1-6.

*Can a President Be Imprisoned?*, 20 LEGAL TIMES (OF WASHINGTON, D.C.) 22-23, 28 (July 21, 1997).

*The Americans with Disabilities Act, Bar Examinations, and the Constitution: A Balancing Act*, 66 THE BAR EXAMINER 6 (No. 3, August, 1997).

*Permanent Disbarment: A Market Oriented Proposal*, 9 THE PROFESSIONAL LAWYER 2 (ABA, No. 9, Nov. 1997) (with Mary Devlin).

*White House Counsel and the Attorney Client Privilege*, 1 PROFESSIONAL RESPONSIBILITY, LEGAL ETHICS, AND LEGAL EDUCATION NEWS 1  (Federalist Society, No. 3, 1997).

*When Witnesses Are Told What to Say,* WASHINGTON POST, January 13, 1998, at A15, col. 2-4 (with Lester Brickman).

*Eastern European Diary: Constitution-Building in the Former Soviet Union*, 1 THE GREEN BAG, 2d SERIES 163 (Winter 1998).

*The Chemical Weapons Convention: Political and Constitutional Issues*, 15 CONSTITUTIONAL COMMENTARY 131 (1998).

*Reporting Sensational Trials: Free Press, a Responsible Press, and Cameras in the Courts*, 3 COMMUNICATIONS LAW AND POLICY 295 (No. 2, Spring, 1998).

*Gauging the Impact of the Proposed Restatement of the Law Governing Lawyers*, 9 THE PROFESSIONAL LAWYER 2 (ABA, No.2, 1998).

*Is the Flat Tax Dead?,* CHICAGO TRIBUNE, April 15, 1998, at § 1, p. 17, col. 1-3.

*Epilogue,* in PRIME TIME LAW: FICTIONAL TV LAWYERS AND THEIR IMPACT ON AMERICA — FROM *PERRY MASON* AND *L.A. LAW* TO *LAW & ORDER* AND *ALLY MCBEAL* 265 (Robert M. Jarvis & Paul R. Joseph, eds., Carolina Academic Press, 1998).

*New Respectability, New Freedom*, 144 CHICAGO DAILY LAW BULLETIN 25, 35 (April 25, 1998).

*Resurrecting Federalism Under the New Tenth and Fourteenth Amendments*, 29 TEXAS TECH LAW REVIEW 953 (1998).

*Competitive Bidding Would End 'Pay-to-Play,'* 20 NATIONAL LAW JOURNAL A23 (June 29, 1998).

*Remarks on School Choice*, in Marshall J. Breger & David M. Gordis, eds., VOUCHERS FOR SCHOOL CHOICE: CHALLENGE OR OPPORTUNITY? — AN AMERICAN JEWISH REAPPRAISAL 82 (Wilstein Institute of Jewish Policy Studies, 1998).

*The Power of Congress Under Section 5 of the Fourteenth Amendment after City of Boerne v. Flores*, 32 INDIANA LAW REVIEW 163 (1998).

*Innovative Legal Billing, Alternatives to Billable Hours, and Ethical Hurdles,* published in, Legal Ethics: Access to Justice (1998) (Hofstra University School of Law Conference on Legal Ethics), 2 Journal of the Institute for the Study of Legal Ethics 1701 (1999).

*The Legal Profession and the Public Image of Lawyers*, 23 The Journal of the Legal Profession 51 (1999).

*Moving from Billable Hours to Fixed Fees: Task-Based Billing and Legal Ethics*, 47 University of Kansas Law Review 819 (1999).

*Multidisciplinary Practice: An Idea Whose Time Has Come,* 3 Professional Responsibility, Legal Ethics, and Legal Education News 1 (Federalist Society, No. 2, 1999).

*Subsidized Speech for the Rich*, Chicago Tribune, Dec. 12, 1999, at § 1, p.23.

*Presidential Pardon for Elian?*, Washington Times, Dec. 28, 1999, at A17.

*Independent Counsel and the Charges of Leaking:  A Brief Case Study*, 68 Fordham Law Review 869 (1999).

*Let Nothing You Display: Making Room for Religion in Public Forums*, Legal Times (of Washington, D.C.), Jan. 3, 2000, at pp. 43, 45.

*Another Clinton Victim: The Integrity of the Federal Courts*, Wall Street Journal, March 20, 2000, at p. A35, reprinted in, volume 6, Whitewater: Impeachment Aftermath, Election 2000 (Dow Jones & Co., 2001), at 145.

*Teaching Legal Ethics a Quarter of a Century After Watergate*, 51 Hastings Law Journal 661 (2000).

*The Long Gavel: In Class Actions, State Judges Are Trumping Other Jurisdictions' Laws*, Legal Times (of Washington, D.C.), May 15, 2000, at 67, 69.

*Making Work for Lawyers*, The Scripps Howard News Service (distributed to over 400 subscriber newspapers), Friday, July 7, 2000.

*Rated V for Violence*, Legal Times (of Washington, D.C.), August 14, 2000, at p. 68.

*The FTC Report on Hollywood Entertainment*, 1 Free Speech & Election Law Group News (Federalist Society, Sept. 15, 2000), http://www.fed-soc.org/Publications/practicegroupnewsletters/PG%20Links/rotunda.htm

*Constitutional Problems with Enforcing the Biological Weapons Convention*, Cato Foreign Policy Briefing (No. 61, September 28, 2000), http://www.cato.org/pubs/fpbriefs/fpb-061es.html .

*The Bar and the Legal Academy*, in THE RULE OF LAW IN THE WAKE OF CLINTON 207-29 (Roger Pilon, ed. Cato Institute 2000).

*Should States Sue the Entertainment Industry as They Did Big Tobacco?*, 16 INSIGHT ON THE NEWS 41, 43 (Oct. 30, 2000) (debate with Charlie Condon, the Attorney General of South Carolina).

*The Benefits of School Vouchers*, NATIONAL LAW JOURNAL, Oct. 23, 2000, at A17.

*How the Electoral College Works, and Why It Works Well*, KNIGHT-RIDDER NEWSPAPER CHAIN (distributed to over 400 subscriber newspapers), Friday, Nov. 15, 2000; *e.g.*, *Electoral College Works Well*, THE PRESS OF ATLANTIC CITY, Nov. 15, 2000, at p. A13, 2000 (Westlaw) WLNR 7545816.

*The Equal-Protection Clause: A Field Day for Misleading Statistics,* in NATIONAL REVIEW ON LINE, Nov. 15, 2000, http://www.nationalreview.com/comment/comment111500f.shtml .

*Simply Unconstitutional: How Hand Counting Violates Due Process*, in NATIONAL REVIEW ON LINE, Nov. 16, 2000, http://www.nationalreview.com/comment/comment111600f.shtml

*Let Legislature Decide*, USA TODAY, November 21, 2000, at 16A.

*What it Takes to Win: Using the Psychic Hotline to Decide Contested Races*, CHICAGO TRIBUNE, November 26, 2000, at § 1, p. 19.

*Don't Blame Movies*, WASHINGTON POST, Dec. 1, 2000, at A35.

*From the Supremes to Seminole*, in NATIONAL REVIEW ON LINE, Dec. 5, 2000, http://www.nationalreview.com/comment/comment120500a.shtml

*Changing the Election Law, Again*, in NATIONAL REVIEW ON LINE, Dec. 9, 2000, http://www.nationalreview.com/comment/comment120800c.shtml

*Rubbish about Recusal*, WALL STREET JOURNAL, December 13, 2000, at A26.

*The Partisanship Myth*, THE CHRISTIAN SCIENCE MONITOR, December 15, 2000, at 11.

*Court Correctly Overrules Granholm*, DETROIT NEWS, Jan. 30, 2001, at p. 11A.

*A Few Modest Proposals to Reform the Law Governing Federal Judicial Salaries*, 12 THE PROFESSIONAL LAWYER 1 (A.B.A., Fall 2000).

*The New States' Rights, the New Federalism, the New Commerce Clause, and the Proposed New Abdication*, 25 OKLAHOMA CITY UNIVERSITY LAW REVIEW 869 (2000).

Ronald D. Rotunda

*Judicial Comments on Pending Cases: The Ethical Restrictions and the Sanctions – A Case Study of the Microsoft Litigation*, 2001 UNIVERSITY OF ILLINOIS LAW REVIEW 611 (2001).

*Lawyer Advertising and the Philosophical Origins of the Commercial Speech Doctrine,* 36 UNIVERSITY OF RICHMOND LAW REVIEW 91 (2002) (Allen Chair Symposium of 2001).

*No POWs: Unlawful Combatants, American Law, and the Geneva Convention*, NATIONAL REVIEW ONLINE, Jan. 29, 2002, http://www.nationalreview.com/comment/comment-rotunda012902.shtml .

*The Role of Ideology in Confirming Federal Court Judges*, 15 GEORGETOWN JOURNAL OF LEGAL ETHICS 127 (2001).

*The Commerce Clause, the Political Question Doctrine, and Morrison*, 18 CONSTITUTIONAL COMMENTARY 319 (2001).

*ABA-Recommended Nominees Deserve Hearings*, CHICAGO SUN-TIMES, May 5, 2002, at 37.

*Monitoring the Conversations of Prisoners*, 13 THE PROFESSIONAL LAWYER 1 (ABA, No. 3, 2002).

*City's O'Hare Strategy Flouts Constitution,* CHICAGO DAILY LAW BULLETIN, June 14, 2002, at p. 5.

*Federalizing the Windy City,* NATIONAL REVIEW ONLINE, June 18, 2002, http://www.nationalreview.com/comment/comment-rotunda061802.asp

*The Eleventh Amendment, Garrett, and Protection for Civil Rights*, 53 ALABAMA LAW REVIEW 1183 (2002).

*Statement before the Senate Committee Hearings on the Judicial Nomination Process*, 50 DRAKE LAW REVIEW 523 (2002).

*Judicial Campaigns in the Shadow of Republican Party v. White*, 14 THE PROFESSIONAL LAWYER 2 (ABA, No. 1, 2002).

*Judicial Elections, Campaign Financing, and Free Speech*, 2 ELECTION LAW JOURNAL 79 (No.1, 2003).

*The Implications of the New Commerce Clause Jurisprudence: An Evolutionary or Revolutionary Court?,* 55 ARKANSAS LAW REVIEW 795 (2003).

*Pravo na svobody slova v voennoe vremiz v knostitutsii SShA: istoki i evoliutsiia*, PRAVO I ZAKONODATEL'STVO, 2003, No. 2, c. 63-65; *The Right of Freedom of Speech in Wartime*

*in the Constitution of the USA: Sources And Evolution*, LAW AND LEGISLATION, 2003, No. 2, pp. 63-65.

*Before Changing the Law, Look at SBC's Record and Credibility*, CHAMPAIGN NEWS-GAZETTE, April 13, 2003, at B1, B4.

*Yet Another Article on Bush v. Gore*, 64 OHIO STATE LAW JOURNAL 283 (2003).

*SBC's Secessionist Gambit Deserved to Fail*, CHICAGO TRIBUNE, June 15, 2003, at p. C9.

*A Preliminary Empirical Inquiry into the Connection between Judicial Decision Making and Campaign Contributions to Judicial Candidates*, 14 THE PROFESSIONAL LAWYER 16 (ABA, No. 2, 2003).

*Senate Rules to Keep Filibusters*, CHICAGO SUN-TIMES, July 4, 2003, at p. 29.

*The Perceived Connection between Judicial Decision Making and Judicial Campaign Contributions*: *Some Preliminary Data*, THE REPUBLICAN LAWYER (July, 2003), http://www.rnla.org/rotunda.doc

*Book Review: Democracy by Decree*, 23 CATO JOURNAL: AN INTERDISCIPLINARY JOURNAL OF PUBLIC POLICY ANALYSIS 155 (No. 1, Spring-Summer 2003).

*Appearances Can Be Deceiving: Should the Law Worry About Campaign Money Looking Dirty When the Facts Show That the System's Clean?*, THE LEGAL TIMES, Sept. 15, 2003, at p. 84.

*Found Money*: *IOLTA, Brown v. Legal Foundation of Washington, and the Taking of Property without the Payment of Compensation*, 2002-2003 CATO SUPREME COURT REVIEW 245 (2003).

*SBC Tries Time-Worn Corporate Power Grab*, CHICAGO SUN-TIMES, Nov. 22, 2003, p. 16.

*Media Accountability in Light of the First Amendment*, 21 SOCIAL PHILOSOPHY & POLICY 269 (Cambridge University Press, No. 2, 2004), *reprinted in*, ELLEN FRANKEL PAUL, FRED D. MILLER JR., & JEFFREY PAUL, eds., FREEDOM OF SPEECH (Cambridge U. Press 2004).

*Duck Hunting Benchmarks*, THE WASHINGTON TIMES, March 28, 2004, at B4.

*Election-Year Hunting: Should Scalia Recuse Himself from Cheney-Related Cases?*, NATIONAL REVIEW ONLINE, March 30, 2004, http://nationalreview.com/comment/rotunda200403300900.asp

*To Hasten Iraq Democracy, Put Wells in People's Hands*, ATLANTA JOURNAL-CONSTITUTION, May 14, 2004, at A19.

Ronald D. Rotunda

*Judicial Impartiality and Judicial Campaign Contributions: Evaluating the Data*, 5 ENGAGE: THE JOURNAL OF THE FEDERALIST SOCIETY'S PRACTICE GROUPS 122 (Issue 1, April 2004).

*Due Process and the Role of Legal Counsel in the War on Terror*, 5 ENGAGE: THE JOURNAL OF THE FEDERALIST SOCIETY'S PRACTICE GROUPS 131 (Issue 2, October 2004).

*The Political Question Doctrine in the United States,* in GRENZEN AAN DE RECHTSPRAAK? POLITICAL QUESTION, ACTE DE GOUVERNEMENT EN RECHTERLIJK INTERVENTIONISME 1-38, vol. 9, Publikaties Van De Staatsrechtkring Staatsrechtsconferenties (P.P.P. Bouvend'Eert, P.M. van den Eijndem, & C.A.J.M. Kortmann, eds.) (Kluwer, 2004).

*Is There Hope for Iraq's Post-Occupation Government?*, 13 COSMOS: JOURNAL OF THE COSMOS CLUB OF WASHINGTON, D.C. 65 (2004).

*Iraq on the Way to Its New Constitution*, 8 THE GREEN BAG, 2D SERIES 163 (Autumn 2004).

*Symposium*, IRAQ AND ITS NEW CONSTITUTION 23, 53, 76 (Bilkent University & Foreign Policy Institute, Ankara, 2004).

*Veto Power*, in THE OXFORD COMPANION TO THE SUPREME COURT OF THE UNITED STATES 1047 (Oxford U. Press, 2nd ed. 2005).

*A Shaky Ethics Charge*, WASHINGTON POST, September 6, 2005, at p. A25.

*The Privileges and Immunities Clause*, in THE HERITAGE GUIDE TO THE CONSTITUTION, p. 269 (Regnery Publishing, Inc. Washington, DC 2005) (member of Editorial Advisory Board).

*Opinion Letter on Judicial Ethics*, 6 ENGAGE: THE JOURNAL OF THE FEDERALIST SOCIETY'S PRACTICE GROUPS 122 (Issue 2, October 2005).

*Alleged Conflicts of Interest Because of the "Appearance of Impropriety,"* 33 HOFSTRA L. REV. 1141 (2005).

*Frische Datteln für die Häftlinge*, SUEDDEUTSCHE ZEITUNG (Germany), January 2, 2006, at p. 2.

*Guantanamo, Another Story*, The Republican Lawyer (January 15, 2006), http://www.rnla.org/Newsletter/ViewArticle.asp?ArticleID=179

*Click for Collected Wisdom*, THE LEGAL TIMES, May 8, 2006, at 46.

*The Propriety of a Judge's Failure to Recuse When Being Considered for Another Position*, 19 GEORGETOWN JOURNAL OF LEGAL ETHICS 1187 (2006).

*There's No Future in the Past of Campaign Finance: The Latest Decision Displays A Badly Fractured Court*, NATIONAL REVIEW ONLINE, June 28, 2006,

http://article.nationalreview.com/?q=NDE1MjZhZWNiMWIyNDhlMzI5MzE4YjFkYm
QxNzc4ZGY .

*CMS Information Policy Under Medicare "Part D" Creates 1st Amendment Problems*, 21
LEGAL BACKGROUNDER (Washington Legal Foundation, No. 21, July 7, 2006).

*Judicial Ethics, the Appearance of Impropriety, and the Proposed New ABA Judicial Code* (The
Howard Lichtenstein Lecture in Legal Ethics), 34 HOFSTRA LAW REVIEW 1337 (2006).

*The Courts Need This Watchdog*, WASHINGTON POST, Dec. 21, 2006, at A29.

*The Detainee Cases of 2004 and 2006 and their Aftermath*, 57 SYRACUSE LAW REVIEW 1 (2006).

*The Case for a Libby Pardon*, WALL STREET JOURNAL, March 7, 2007, at A17.

*Income Mobility and Income Tax Revenue Since the Tax Cuts*, THE REPUBLICAN LAWYER (April
2007), http://www.rnla.org/Newsletter/ViewArticle.asp?ArticleID=232 .

*Remembering Father Robert F. Drinan, S.J.,* 20 GEORGETOWN JOURNAL OF LEGAL ETHICS 203
(2007).

*Holding Enemy Combatants in the Wake of Hamdan*, 8 ENGAGE: THE JOURNAL OF THE
FEDERALIST SOCIETY'S PRACTICE GROUPS 52 (Issue 3, June 2007).

*Teaching Professional Responsibility and Ethics*, 51 ST. LOUIS UNIVERSITY LAW JOURNAL 1223
(2007).

*Rudy Thinks FAST*, THE AMERICAN SPECTATOR, January 25, 2008,
http://www.spectator.org/dsp_article.asp?art_id=12633

*Age Has Not Withered Him*, THE LEGAL TIMES, July 7, 2008, at 46.

*Teaching Professional Responsibility and Ethics*, in P. L. Jayanthi Reddy, ed., BENCH AND BAR
ETHICS 3 (Amicus Books, Icfai University Press, Hyderabad, India 2007-2008).

*Foreword*, in Paul Benjamin Linton, ABORTION UNDER STATE CONSTITUTIONS: A STATE-BY-
STATE ANALYSIS xix –xxi (Carolina Academic Press, Durham, N.C., 2008).

*Impact*, in Sandarshi Gunawardena & Karen Rosenblum, DIVERSITY AT MASON 14 (George
Mason U. 2008).

*Simplify, Simply: A Mantra for Transcendentalists and Tax Reformers Alike*, LOS ANGELES
DAILY JOURNAL, Oct. 1, 2008, at p. 6.

*Dormant Commerce Clause*, 2 ENCYCLOPEDIA OF THE SUPREME COURT OF THE UNITED STATES
(Ed., David S. Tanenhaus) (Detroit: Macmillan Reference USA, 2009), at pp. 52-54.

- 35 -                                              Ronald D. Rotunda

*A Modern Day Bleak House: The Legal Inheritance of Anna Nicole Smith*, THE AMERICAN
SPECTATOR, March 2009, at 32-36.

*Some Strings Attached: Is the Stimulus Law Constitutional?*, CHICAGO TRIBUNE, March 15,
2009, at 29.

*The Right of Free Speech, Regardless Of What Is Spoken*, THE PANTHER (Chapman University
Newspaper), at p. 13 (March 23, 2009).

*Was Madoff Good for the Economy?*, CHICAGO TRIBUNE, April 3, 2009, at 49.

*The Orange Grove: U.S. Imports of Lawsuits Rising*, ORANGE COUNTY REGISTER, June 30,
2009.

*Kenneth W. Starr: A Biography*, THE YALE BIOGRAPHICAL DICTIONARY OF AMERICAN LAW 510
(Roger K. Newman, ed., Yale U. Press, 2009).

*An Unconstitutional Nobel*, THE WASHINGTON POST, Oct. 16, 2009, at A23 (with J. Peter Pham).

*Judicial Transparency, Judicial Ethics, and a Judicial Solution: An Inspector General for the
Courts*, 41 LOYOLA U. CHICAGO L.J. 301 (2010).

*Judicial Disqualification in the Aftermath of Caperton v. A.T. Massey Coal Co.*, 60 SYRACUSE
LAW REVIEW 247 (2010).

*Campaign Disclosure Can Go too Far*, SACRAMENTO BEE, February 6, 2010, at p. 11A.

*The Efforts to Disbar Bush Lawyers*, in NATIONAL REVIEW ON LINE, March 4, 2010,
http://bench.nationalreview.com/post/?q=ZjhiMTk2MGY0ZjFiOTczZjg4ODhhODI5MD
QwMzczYWU=

*Repealing the First Amendment*, WASHINGTON EXAMINER, April 14, 2010,
http://www.washingtonexaminer.com/opinion/columns/OpEd-Contributor/Repealing-the-
First-Amendment-90851704.html#ixzz0l6TO2qIK

*What Can Congress Make You Do?*, ORANGE COUNTY REGISTER, May 23, 2010, at p. C2,
http://www.ocregister.com/articles/congress-75386-ocprint-buy-insurance.html

*Birthright Citizenship Benefits the Country*, CHICAGO TRIBUNE, Sept. 16, 2010, at p. 21,
http://www.chicagotribune.com/news/opinion/ct-oped-0916-birthright-
20100916,0,4594378.story

*What Are D.C. Police Doing Enforcing Shariah Law?*, PAJAMAS MEDIA, Sept. 16, 2010,
http://pajamasmedia.com/blog/what-are-d-c-police-doing-enforcing-sharia-
law/?singlepage=true

*A New Look at the Federal Suit against Arizona's Immigration Law*, PAJAMAS MEDIA, Oct. 5, 2010, http://pajamasmedia.com/blog/a-new-look-at-the-federal-suit-against-arizonas-immigration-law/?singlepage=true

*The Point of No Return*, WASHINGTON TIMES, Oct. 10, 2010, at p. B3.

*Can Congress Ban People from Threatening to Burn The Quran*?, ATLANTA JOURNAL-CONSTITUTION, Oct. 14, 2010, at p. 21A.

*Congressional Silence Hurts Immigrants*, THE PANTHER (Chapman University Newspaper), at p. 11 (October 25, 2010).

*Justice O'Connor's Robo Call Apology*, AOL NEWS, Oct. 28, 2010, http://www.aolnews.com/discuss/opinion-justice-oconnors-robo-call-apology-isnt-enough/19693741#gcpDiscussPageUrlAnchor .

*What's Wrong with Oklahoma's Shariah Amendment*?, AOL NEWS, Nov. 30, 2010, http://www.aolnews.com/opinion/article/opinion-whats-wrong-with-oklahomas-shariah-amendment/19737155

*Judicial Disqualification When a Solicitor General Moves to the Bench*, 11 ENGAGE: THE JOURNAL OF THE FEDERALIST SOCIETY'S PRACTICE GROUPS 94 (Issue 3, Nov. 2010), http://www.fed-soc.org/publications/pubid.2067/pub_detail.asp

*Eat Your Spinach, Says Nanny State*, 33 NATIONAL LAW JOURNAL 39 (#19, Jan. 10, 2011), http://www.law.com/jsp/nlj/PubArticleNLJ.jsp?id=1202477337422&Each_your_spinach_says_nanny_state

*Trying to Codify Caperton*, 42 MCGEORGE LAW REVIEW 95 (2010)(Judicial Ethics Symposium).

*Equal Employment Opportunities for Female Prison Guards*, NATIONAL LAW JOURNAL, Feb. 7, 2011, http://www.law.com/jsp/nlj/PubArticleNLJ.jsp?id=1202480379005&rss=nlj&slreturn=1&hbxlogin=1

*Stern v. Marshall, and the Power of Bankruptcy Courts to Issue Final Orders on All Compulsory Counterclaims*, 23 BNA BANKRUPTCY LAW REPORTER 230 (Feb. 24, 2011)

*Resolving Client Conflicts by Hiring "Conflicts Counsel,"* 62 HASTINGS LAW JOURNAL 677 (2011).

*We Do Declare: Libya and the United States Constitution,* NATIONAL REVIEW ONLINE, March 24, 2011, http://www.nationalreview.com/articles/262940/we-do-declare-kathryn-jean-lopez?page=7 .

- 37 -                                    Ronald D. Rotunda

*Constitutionalizing Judicial Ethics: Judicial Elections after Republican Party v. White, Caperton, and Citizens United*, 64 U. ARKANSAS LAW REV. 1 (2011)(Hartman-Hotz Distinguished Lecture).

*Transparenţa Judiciară, Etica Judiciară şi o Soluţie Judiciară,* REVISTA FORUMUL JUDECĂTORILOR 16 (No. 2, 2011).

*The Intellectual Forebears of Citizens United*, 16 NEXUS 113 ((2010-2011).

*Are Capitalists Happier*?, REUTERS, Aug. 12, 2011, http://blogs.reuters.com/great-debate/2011/08/12/are-capitalists-happier/ (co-authored with Vernon Smith, 2002 Nobel Laureate in Economics, & Bart Wilson), *reprinted in, e.g.,* THE DAILY STAR (Dhaka, Bangladesh), Aug. 15, 2011; ETHIOPIAN REVIEW, Aug. 12, 2011.

*Lawyers: Why We Are Different and Why We Are the Same*: *Creating Structural Incentives in Large Law Firms to Promote Ethical Behavior – In-House Ethics Counsel, Bill Padding, and In-House Ethics Training,* 44 AKRON LAW REV. 679 (2011)(Miller-Becker Professional Responsibility Distinguished Lecture Series), reprinted in, 61 DEFENSE LAW JOURNAL (Aug. 2012).

*Does ObamaCare, As Written, Prevent Congress From Repealing It?*, FOXNEWS.COM (Oct. 28, 2011, http://www.foxnews.com/opinion/2011/10/27/does-obamacare-prevent-congress-from-repealing-it/

*Perry Is Right on Immigration*, NATIONAL REVIEW ONLINE, http://www.nationalreview.com/corner/281735/perry-right-immigration-ronald-d-rotunda (Oct. 31, 2011).

*Kagan's Recusal from ObamaCare,* WASHINGTON TIMES, Dec. 15, 2011, http://www.washingtontimes.com/news/2011/dec/15/kagan-must-recuse-from-obamacare-case/ .

*Evidence Mounts against Justice Kagan for Recusal in ObamaCare Suit*, FOXNEWS.COM (Jan. 26, 2012), http://www.foxnews.com/opinion/2012/01/26/evidence-mounts-against-justice-kagan-for-recusal-in-obamacare-suit/

*Kagan Should Recuse from ObamaCare Case*, WASHINGTON EXAMINER, Feb. 14, 2012, http://washingtonexaminer.com/kagan-should-recuse-from-obamacare-case/article/269386

*Supreme Court Justice Elena Kagan and the Obamacare Constitutional Challenge*, JUDICIAL WATCH SPECIAL REPORT, March 2012.

*Obamacare vs. Conscientious Beliefs*, ORANGE COUNTY REGISTER, March 28, 2012, http://www.ocregister.com/opinion/government-346533-religious-federal.html

*Lessons of Watergate*, 54 ORANGE COUNTY LAWYER 19 (April 2012).

*Prosecutorial and Judicial Misconduct*, NATIONAL LAW JOURNAL, p. 42 (April 30, 2012)(with Alan Dershowitz), *reprinted in*, THE JERUSALEM POST, May 13, 2012.

*The Wrong Legal "Help" for NY's Poor*, NEW YORK POST, June 1, 2012.

*ObamaCare Legal Battles Not Over*, ORANGE COUNTY REGISTER, Sept. 27, 2012, at p. 9, http://www.ocregister.com/opinion/ipab-372820-congress-proposal.html

*Obama Tax-raising Against JFK precedent: Hiking Rates Will Lose Money*, WASHINGTON TIMES, Dec. 13, 2012, http://www.washingtontimes.com/news/2012/dec/12/obama-tax-raising-against-jfk-precedent/

*Geithner's "Story of Inflation,"* ORANGE COUNTY REGISTER, Jan. 5, 2013, http://www.ocregister.com/opinion/inflation-382532-comic-geithner.html

*Blaming Hollywood for Gun Violence Doesn't Work*, WASHINGTON TIMES, Feb. 20, 2013, http://www.washingtontimes.com/news/2013/feb/20/blaming-hollywood-for-gun-violence-doesnt-work/

*Exporting American Freedoms*, in MODEL, RESOURCE, OR OUTLIER? WHAT EFFECT HAS THE U.S. CONSTITUTION HAD ON THE RECENTLY ADOPTED CONSTITUTIONS OF OTHER NATIONS?, at 12 (Heritage Foundation, May 17, 2013), http://www.heritage.org/research/lecture/2013/05/model-resource-or-outlier-what-effect-has-the-us-constitution-had-on-the-recently-adopted-constitutions-of-other-nations

'*What* did he know, and when did he know it?', WASHINGTON TIMES, June 5, 2013, http://www.washingtontimes.com/news/2013/jun/5/what-did-he-know-and-when-did-he-know-it/?utm_source=RSS_Feed&utm_medium=RSS

*Egypt's Constitutional Do-Over*: *This Time Around, Take a Closer Look at America's Bill of Rights*, WALL STREET JOURNAL, JULY 17, 2013, at p. A13, http://online.wsj.com/article/SB10001424127887323740804578601383340547860.html?mod=WSJ_Opinion_LEFTTopOpinion#articleTabs%3Darticle

*On the Health-Care Mandate, Obama Reaches Beyond the Law*, WASHINGTON POST, July 18, 2013, http://www.washingtonpost.com/opinions/on-the-health-care-mandate-obama-reaches-beyond-the-law/2013/07/18/d442aefc-efb4-11e2-a1f9-ea873b7e0424_story.html

*The Boston Strangler, the Classroom and Me*, WALL STREET JOURNAL, JULY 26, 2013, http://online.wsj.com/article/SB10001424127887324783204578623714232084132.html?KEYWORDS=rotunda

Ronald D. Rotunda

*Generous Pensions Give New Meaning to 'If It's too Good to Be True,'* FORBES MAGAZINE, Sept. 27, 2013, http://www.forbes.com/sites/realspin/2013/09/27/generous-pensions-give-new-meaning-to-if-its-too-good-to-be-true/

*Applying the Revised ABA Model Rules in the Age of the Internet: The Problem of Metadata*, 52 HOFSTRA LAW REVIEW 175 (2013).

*On Deep Background 41 Years Later: Roe v. Wade*, CHICAGO TRIBUNE, Jan. 22, 2014.

*Congress Cannot Stop the Exporting of American Oil*, THE HILL: THE HILL'S FORUM FOR LAWMAKERS AND POLICY PROFESSIONALS, Jan. 27, 2014.

*Congress and Lois Lerner in Contempt,* DAILY CALLER, April 10, 2014.

*Using the State to Bully Dissidents*, VERDICT: LEGAL ANALYSIS AND COMMENTARY FROM JUSTIA, April 24, 2014.

*Endangering Jurors in a Terror Trial*, WALL STREET JOURNAL, May 2, 2014, at p. A13.

- 40 -                                          Ronald D. Rotunda

**Other Activities:**

March-April, 1984, Expert Witness for State of Nebraska on Legal Ethics at the Impeachment Trial of Nebraska Attorney General Paul L. Douglas (tried before the State Supreme Court; the first impeachment trial in nearly a century).

July 1985, Assistant Chief Counsel, State of Alaska, Senate Impeachment Inquiry of Governor William Sheffield, (presented before the Alaskan Senate).

Speaker at various ABA sponsored conferences on Legal Ethics; Speaker at AALS workshop on Legal Ethics; Speaker on ABA videotape series, "Dilemmas in Legal Ethics."

Interviewed at various times on Radio and Television shows, such as MacNeil/Lehrer News Hour, Firing Line, CNN News, CNN Burden of Proof, ABC's Nightline, National Public Radio, News Hour with Jim Lehrer, Fox News, etc.

1985--1986, Reporter for Illinois Judicial Conference, Committee on Judicial Ethics.

1981-1986, Radio commentator (weekly comments on legal issues in the news), WILL-AM Public Radio.

1986-87, Reporter of Illinois State Bar Association Committee on Professionalism.

1987-2000, Member of Consultant Group of American Law Institute's RESTATEMENT OF THE LAW GOVERNING LAWYERS.

1986-1994, Consultant, Administrative Conference of the United States (on various issues relating to conflicts of interest and legal ethics).

1989-1992, Member, Bar Admissions Committee of the Association of American Law Schools.

1990-1991, Member, Joint Illinois State Bar Association & Chicago Bar Association Committee on Professional Conduct.

1991-1997, Member, American Bar Association Standing Committee on Professional Discipline.
CHAIR, Subcommittee on Model Rules Review (1992-1997). [The subcommittee that I chaired drafted the MODEL RULES FOR LAWYER DISCIPLINARY ENFORCEMENT that the ABA House of Delegates approved on August 11, 1993.]

1992, Member, Illinois State Bar Association [ISBA] Special Committee on Professionalism; CHAIR, Subcommittee on Celebration of the Legal Profession.

Spring 1993, Constitutional Law Adviser, SUPREME NATIONAL COUNCIL OF CAMBODIA.  I traveled to Cambodia and worked with officials of UNTAC (the United Nations Transitional Authority in Cambodia) and Cambodian political leaders, who were

charged with drafting a new Constitution to govern that nation after the United Nations troop withdrawal.

1994-1997, LIAISON, ABA Standing Committee on Ethics and Professional Responsibility.

1994-1996, Member, Illinois State Bar Association [ISBA] Standing Committee on the Attorney Registration and Disciplinary Commission.

Winter 1996, Constitutional Law Adviser, SUPREME CONSTITUTIONAL COURT OF MOLDOVA.

Under the auspices of the United States Agency for International Development, I consulted with the six-member Supreme Constitutional Court of Moldova in connection with that Court's efforts to create an independent judiciary. The Court came into existence on January 1, 1996.

Spring 1996, Consultant, CHAMBER OF ADVOCATES, of the CZECH REPUBLIC.

Under the auspices of the United States Agency for International Development, I spent the month of May 1996, in Prague, drafting Rules of Professional Responsibility for all lawyers in the Czech Republic. I also drafted the first Bar Examination on Professional Responsibility, and consulted with the Czech Supreme Court in connection with the Court's proposed Rules of Judicial Ethics and the efforts of the Court to create an independent judiciary.

Consulted with (and traveled to) various counties on constitutional and judicial issues (*e.g.*, Romania, Moldova, Ukraine, Cambodia) in connection with their move to democracy.

1997-1999, Special Counsel, Office of Independent Counsel (Whitewater Investigation).

Lecturer on issues relating to Constitutional Law, Federalism, Nation-Building, and the Legal Profession, throughout the United States as well as Canada, Cambodia, Czech Republic, England, Italy, Mexico, Moldova, Romania, Scotland, Turkey, Ukraine, and Venezuela.

1998-2002, Member, ADVISORY COUNCIL TO ETHICS 2000, the ABA Commission considering revisions to the ABA Model Rules of Professional Conduct.

2000-2002, Member, ADVISORY BOARD TO THE INTERNATIONAL BROTHERHOOD OF TEAMSTERS (This Board was charged with removing any remaining vestiges of organized crime to influence the Union, its officers, or its members.) This Board was part of "Project RISE" ("Respect, Integrity, Strength, Ethics").

2001-2008, Member, Editorial Board, CATO SUPREME COURT REVIEW.

2005-2006, Member of the Task Force on Judicial Functions of the Commission on Virginia Courts in the 21st Century: To Benefit All, to Exclude None

July, 2007, Riga, Latvia, International Judicial Conference hosted by the United States Embassy, the Supreme Court of Latvia, and the Latvian Ministry of Justice. I was one of the main speakers along with Justice Samuel Alito, the President of Latvia, the Prime Minister of Latvia, the Chief Justice of Latvia, and the Minister of Justice of Latvia

Since 1994, Member, Publications Board of the ABA Center for Professional Responsibility; vice chair, 1997-2001.

Since 1996, Member, Executive Committee of the Professional Responsibility, Legal Ethics & Legal Education Practice Group of the Federalist Society; Chair-elect, 1999; Chair, 2000

Since 2003, Member, Advisory Board, the Center for Judicial Process, an interdisciplinary research center (an interdisciplinary research center connected to Albany Law School studying courts and judges)

Since 2012, *Distinguished International Research Fellow* at the World Engagement Institute, a non-profit, multidisciplinary and academically-based non-governmental organization with the mission to facilitate professional global engagement for international development and poverty reduction, http://www.weinstitute.org/fellows.html

Since 2014, *Associate Editor* of the Editorial Board, THE INTERNATIONAL JOURNAL OF SUSTAINABLE HUMAN SECURITY (IJSHS), a peer-reviewed publication of the World Engagement Institute (WEI)

Since 2014, Member, Board of Directors of the Harvard Law School Association of Orange County

Since 2014, Member, Editorial Board of THE JOURNAL OF LEGAL EDUCATION (2014 to 2016).

EXHIBIT 2

2011 - 0028
HCS

OFFICE OF BAR COUNSEL

**OFFICE OF BAR COUNSEL**
THE BOARD ON PROFESSIONAL RESPONSIBILITY
DISTRICT OF COLUMBIA COURT OF APPEALS

OCT 2 4 2011

**RECEIVED**

409 E Street, NW
Building B, Room 228
Washington, D.C. 20001
(202)638-1501    Fax (202)638-0862

*(Please print or type.)*

Date: 10-20-2011

A.  Your Name: (Dr.)
                (Mr.)
                (Ms.)
                (Mrs.)      Elham                                    Sataki
                           (First)              (Initial)            (Last)
    Address:  23785 El Toro Road
                (Street)
              Lake Forest              CA                  92630
                (City)                (State)              (Zip)
    Business Telephone: _____ Home Telephone: 818-800-1441  Cell: _____
    (NOTE: It is very important that we have your telephone number(s) and that you inform our office if you have a change of address.)

B.  Attorney Complained Of:

    Name:  Larry              E.                  Klayman
            (First)          (Initial)            (Last)
    Address:  2000 Pennsylvania Avenue, NW        # 345
            (Street)                              (Apt. #)
            Washington              DC            20006
            (City)                (State)        (Zip)
    Telephone No. : _____  Attorney's Bar No., if known: 334581

C.  Have you filed a complaint about this matter anywhere else? If yes, please give details. _____
    Complaint also filed in Pennsylvania and Florida.

D.  Do you have a written retainer agreement with the attorney? If yes, please attach a copy.
    No.

E.  Where applicable, state the name of the court where the underlying case was filed, and the case name and number.
    U.S. District Court for the District of Columbia - See attached.

F.  Do you have other documents that are relevant? If yes, please give details and provide copies.  See attached.

SEE REVERSE SIDE FOR REQUIRED DETAILS & SIGNATURE

G.  DETAILS OF COMPLAINT: See attached.

SCANNED

OCT 2 4 2011

23-2

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

The Undersigned hereby certifies to the Office of Bar Counsel
that the statements in the foregoing Complaint are
true and correct to the best of my knowledge.

_____
SIGNATURE

23-3

G.    Details of the Complaint:

I believe Larry Klayman ignored my wishes and best interests in the cases where he represented me, failed to competently and diligently work on those cases causing them to be dismissed, used my cases to promote himself at my expense, failed to explain the terms of his fee to me and unilaterally changed the amount of his fee, and behaved so unprofessionally towards me that I feared for my safety. Also, Mr. Klayman refuses to acknowledge my efforts to terminate him as my attorney, and continues to contact me and file pleadings in my cases.

I was employed by Voice of America, which is funded by the United States government and falls under the Department of State, as a reporter. Through my job, I met Larry Klayman in December 2009. Mr. Klayman began contacting me regarding Iranian issues and stories that he wanted me to cover.

In December 2009, I was experiencing sexual harassment from individuals at Voice of America. I had complained to my employers and had exhausted Voice of America's internal procedures for addressing sexual harassment complaints. However, I had not made a decision about whether I should pursue a lawsuit against Voice of America.

I spoke to Mr. Klayman regarding the harassment and Voice of America's response to my complaints. He offered to help me with my case. He told me that I needed an attorney that knew the government and that he knew the government. He also told me that my case would be easy and that I would win. Mr. Klayman told me that he would represent me on a contingency basis, but he did not tell me what his fee would be or how it would be calculated. I asked him for an agreement, but he did not provide one to me. Four or five months after the cases were filed, Mr. Klayman told me that his fee would be 40%. Later, Mr. Klayman demanded 50% of any recovery. (See May 31, 2010 email attached as Exhibit 1).

Mr. Klayman filed two cases on my behalf in the U.S. District Court for the District of Columbia. The first case was filed on March 19, 2010 (Sataki v. Falahati, Case # 1:10-cv-00466-CKK). The second case was filed April 2, 2010 (Sataki v. Broadcasting Board of Governors et al, Case # 1:10-cv-00534-CKK). I asked Mr. Klayman to keep the cases simple and as quiet as possible. Because of my job as a reporter, I was concerned that publicity regarding my cases could negatively affect my career. I was also concerned about how I would be viewed in the Iranian community because of my sexual harassment complaints. Mr. Klayman completely ignored my requests and instructions so he could promote his own interests and career.

Although I asked him to involve only the three individuals at Voice of America responsible for my harassment, in the second case Mr. Klayman sued everyone associated with Voice of America, including Secretary of State Hillary Clinton. After the case was filed, he allowed it to drag and refused to focus on the case itself, and failed to do work necessary to advance my case and interests. Mr. Klayman was more interested in using my case to obtain meetings with Congressmen and to obtain publicity for himself.

**23-4**

Both cases were dismissed. The first case, <u>Sataki v. Falahati</u>, was dismissed on July 12, 2010. Mr. Klayman failed to file a response to Defendant's Motion to Dismiss despite having obtained a two week extension to file the response. The second case, <u>Sataki v. Broadcasting Board of Governors, et al.</u>, was dismissed on October 22, 2010. The court granted Defendants' Motion to Dismiss or in the Alternative for Summary Judgment as conceded after Mr. Klayman failed to file any opposition on my behalf despite obtaining several extensions of time to file the response. Throughout both cases, Mr. Klayman refused to focus on the cases and ignored my pleas for him to concentrate on investigating and preparing my claims against the people actually involved in the harassment. Apparently, I was required to pursue certain administrative remedies first, but Mr. Klayman failed to follow the correct procedures, opting instead for a path that he could use to promote his name.

Instead of working on the merits of my case, Mr. Klayman focused his energy on obtaining publicity for his role as counsel in the case. He fully ignored my requests to keep the case as quiet as possible. Over my objections, Mr. Klayman used my identity, the facts of my case and my political views to promote his self interest in press conferences, press interviews, Facebook posts and in at least ten articles he wrote (Exhibit 2). As recently as Christmas of 2010, Mr. Klayman continued to refer to my case in articles he wrote. That article, like the others written by Mr. Klayman that I have attached to this complaint (Exhibit 2), are intended to promote Mr. Klayman's interests and did not help my case. His publication of my personal political views was in direct contravention of express instructions to keep my political views confidential because exposing them would harm my career. Mr. Klayman's publicity did not help my case at all. Instead, he destroyed my credibility as a journalist. I firmly believe Mr. Klayman ignored my requests to keep the case quiet in order to obtain notoriety for himself at my expense.

To add insult to injury, not only did Mr. Klayman disregard his obligations as an attorney for me, but he used the professional relationship as an opportunity to pursue a personal relationship with me. Although I made it completely clear that such a relationship would not occur, he continued to pursue such a relationship by showing up unannounced at my residence, purchasing gifts for me and interrogating me about my personal life. Mr. Klayman became very angry about my position that our relationship be professional only. He began to send strange and inappropriate emails to me, including an email from his email account informing me that Mr. Klayman had died, and one containing a "top ten" list of "ways not to treat a person who cares for you." (Exhibits 3 and 4). In addition, he sent several text messages to me that I consider inappropriate. (Exhibit 5).

While I have tried to fire Mr. Klayman several times, he continues to refer to me as his client and to file pleadings as my attorney. On several occasions, Mr. Klayman was told that I do not want him to represent me anymore. I even sent his a letter on November 15, 2010 asking him to acknowledge my request and to stop acting as my attorney. (Exhibit 6). He ignored that request, did not notify the court that he no longer represents me, and filed additional pleadings on my behalf. Last week I was informed that he filed a lawsuit in Washington DC against the Judge who dismissed my case, once again referring to me as his client. (Exhibit 7).

At one point, I had my brother speak to him, but he ignored my brother's request. Rather than acknowledge and accept my request, Mr. Klayman had my family and friends investigated and

2

**23-5**

accused them of influencing me and interfering with his relationship with me. (Exhibit 8). In addition, he threatened to take legal action against my friends to recover costs expended on my behalf if I did not "proceed to protect [his] interests." (Exhibit 9).

I agreed to have Larry Klayman represent me because he stated he knew how to handle the government. As an attorney, I anticipated that Mr. Klayman would listen to my requests and pursue my goals in the litigation. Instead, the idea that I was being represented is a ruse. Mr. Klayman is a charlatan who preys on his clients, exploiting them for his own purposes. I am convinced that Mr. Klayman violated the Rules of Professional Conduct during his representation of me as follows:

Rule 1.1: Mr. Klayman was not competent to handle my case. He used incorrect procedure and failed to make filings by the deadline. As a result, my case was dismissed.

Rule 1.3: Mr. Klayman intentionally plotted a course during the case that would maximize his public exposure, completely ignoring the harm that caused me.

Rule 1.5: Mr. Klayman did not disclose his fee to me until four or five months after the case was commenced. Later, he arbitrarily changed the contingency terms of the case. At no time did he commit his fee to writing for my signature. He just dictated the terms.

Rule 1.6: Mr. Klayman used my personal, confidential information, such as my private political views, in his public marketing to promote attention for himself and ignored the harm it caused me.

Rule 1.7: Mr. Klayman had a conflict of interest because he used my case for his own purposes and not for my goals and rights.

Rule 3.3: Mr. Klayman is dishonestly representing that he is my attorney even though I fired him.

I strongly believe that the District of Columbia Bar should investigate Mr. Klayman's handling of my case.

3

EXHIBIT 3

## DISTRICT OF COLUMBIA COURT OF APPEALS
## BOARD ON PROFESSIONAL RESPONSIBILITY

In the Matter of
:
:
LARRY E. KLAYMAN, ESQUIRE,      :        **Bar Docket No.  2011-D028**
:
Respondent                      :
:
A Member of the Bar of the District of   :
  Columbia Court of Appeals     :
Bar Number:  334581             :
Date of Admission:  December 22, 1980  :
:



RECEIVED

JUL 2 0 2017

Board on Professional Responsibility

### SPECIFICATION OF CHARGES

The disciplinary proceedings instituted by this petition are based upon conduct that violates

the standards governing the practice of law in the District of Columbia as prescribed by D.C. Bar

Rule X and D.C. Bar Rule XI, § 2(b).

Jurisdiction for this disciplinary proceeding is prescribed by D.C. Bar Rule XI.  Pursuant

to D.C. Bar Rule XI, § 1(a), jurisdiction is found because:

1.      Respondent is a member of the Bar of the District of Columbia Court of Appeals,

having been admitted by exam on December 22, 1980, and assigned Bar number 334581.

The conduct and standards that Respondent has violated are as follows:

### COUNT I

2.      In or about January 2010, Respondent undertook to represent Ms. Elham Sataki in

connection with her claims of sexual harassment by a co-worker, Mr. Mehdi Falahati, while

employed with the Persian News Network (PNN) of Voice of America (VOA).  PNN-VOA is

managed by the Broadcasting Board of Governors (BBG), a federal agency responsible for the

United States Government's international broadcasting.   Respondent had not previously represented Ms. Sataki in a legal matter.

3.    Respondent told Ms. Sataki that he would represent her on a contingent fee basis and that he would take 40% of any recovery.  Respondent did not provide his client a writing setting forth the scope of the representation or how his fee would be calculated.  Respondent also did not explain to his client, in writing, whether or how expenses would be deducted from any recovery in the case.

4.    Ms. Sataki requested that Respondent prosecute her case simply and quietly, out of her concerns for her future career in the media and in light of cultural issues due to the nature of her sexual harassment claim.

5.    During the course of the representation, Respondent told Ms. Sataki about his desire to establish a romantic relationship with her.

6.    Ms. Sataki declined Respondent's entreaties to establish a romantic relationship.

7.    In or about May 2010, Respondent sent correspondence to Ms. Sataki acknowledging her decision not to become romantically involved with him.  Respondent also informed Ms. Sataki that he would change the terms of their contingent fee arrangement, and require 50% of any recovery she may receive.

8.    Respondent's conduct violated the following District of Columbia Rules of Professional Conduct ("Rules"):

a.    Rule 1.5(b), in that Respondent had not regularly represented his client and failed to provide her with a writing setting forth the scope of the representation, the basis or rate of his fee, and the expenses for which she would be responsible;

b.    Rule 1.5(c), in that Respondent undertook to represent his client on a

2

contingent fee basis, but failed to provide her with a writing that stated the method by which the fee would be determined, including the percentages that would accrue to the lawyer and whether or how expenses would be deducted from the recovery; and

c.     Rule 1.7(b)(4), in that Respondent had a conflict of interest with the client because his professional judgment on behalf of his client was or reasonably may have been adversely affected by Respondent's own personal interests.

<p align="center">**COUNT II**<br>**[Sataki v. Falahati – CA. No. 10-466 (CKK)]**</p>

9.     Disciplinary Counsel incorporates the factual allegations set forth in paragraphs 1-7, as if fully set forth herein, and further alleges:

10.     On March 1, 2010, Respondent filed in the Superior Court for the District of Columbia, a lawsuit on behalf of Ms. Sataki, styled *Sataki v. Falahati*, CA No. 0001169-10.  The lawsuit alleged:  assault, battery, false light, defamation, tortious interference with business relations, and intentional infliction of emotional distress.

11.     On March 19, 2010, Ms. Sataki's case was removed from the Superior Court for the District of Columbia to the United States District Court for the District of Columbia, and was styled *Sataki v. Falahati*, CA No. 10-466 (CKK).

12.     On July 12, 2010, the court issued an order dismissing Ms. Sataki's case, without prejudice.

13.     On July 26, 2010, Respondent filed in the United States District Court for the District of Columbia, a motion to disqualify the judge presiding over Ms. Sataki's case.  As grounds for the motion, Respondent alleged that the presiding judge, Colleen Kollar-Kotelly, who had been appointed by United States President William Jefferson Clinton, was biased against him

<p align="center">3</p>

because he had filed several lawsuits against the former President and the former First Lady, Hillary Rodham Clinton. Respondent filed the motion under the caption of three cases pending in that court styled: (1) *Klayman v. Judicial Watch*, CA No. 06-cv-00670 (CKK); (2) *Sataki v. BBG*, CA No. 10-0534 (CKK); and (3) *Sataki v. Falahati*, CA No. 10-cv-00466 (CKK).

14.   Respondent's filing of the motion to disqualify was inconsistent with Ms. Sataki's request that Respondent pursue her case simply and quietly, and served no purpose to advance his client's case. Instead, the motion to disqualify served Respondent's own personal interests. Ms. Sataki did not know Respondent would file a motion to disqualify and did not authorize Respondent to file it.

15.   On August 2, 2010, the court denied Respondent's motion to disqualify as untimely, inasmuch as the case had been dismissed on July 12, 2010.

16.   Respondent's conduct violated the following Rules:

   a.   Rule 1.7(b)(4), in that Respondent had a conflict of interest with the client because his professional judgment on behalf of the client was or reasonably may have been adversely affected by Respondent's own personal interests;

   b.   Rule 1.2(a), in that Respondent failed to abide by his client's decisions concerning the objectives of his representation; and

   c.   Rule 1.4(b) in that Respondent failed to reasonably explain a matter to his client to permit her to make an informed decision regarding the representation.

## COUNT III
### *[Sataki v. BGG – CA No. 10-534 (CKK)]*

17.   Disciplinary Counsel incorporates the factual allegations set forth in paragraphs 1-7 and 10-15, as if fully set forth herein, and further alleges:

18.     On April 2, 2010, Respondent filed in the United States District Court for the District of Columbia, a lawsuit on behalf of Ms. Sataki against fourteen defendants, including the BBG, four of the governors of the BBG, the Chief of Staff to the BBG, the Acting General Counsel of the BBG, the acting chief of PNN/VOA, the senior manager of PNN/VOA, the executive producers of PNN/VOA, a supervisor of human resources at PNN/VOA and Hillary Rodham Clinton as Secretary of State Ex-Officio Member of the BBG, alleging that defendants infringed upon Ms. Sataki's constitutional right to freedom of speech, and violated her rights to due process and to equal protection under the law.   Respondent also alleged that defendants discriminated against Ms. Sataki in violation of the Rehabilitation Act on the basis of her physical or mental disabilities and that defendants violated the Privacy Act by failing to produce documents to her from to her personnel file.  That matter was styled *Sataki v. BBG*, CA No. 10-534 (CKK).  In connection with this lawsuit, Respondent sought affirmative injunctive relief to require PNN/VOA to reassign Ms. Sataki from her job in Washington, D.C. to a position with PNN/VOA in Los Angeles, California.

19.     The only defendant required to be named in the lawsuit was the Chief or Acting Chief of the Voice of America.  Hillary Rodham Clinton was not a necessary defendant in the *Sataki* v. BBG lawsuit.

20.     On June 1, 2010, the Court issued an order denying Plaintiff's motion for a temporary restraining order that sought the affirmative injunctive relief of reassigning Ms. Sataki from her job in Washington, D.C., to a position with PNN-VOA in Los Angeles, California.

21.     On June 9, 2010, Respondent filed a motion with the court requesting that Ms. Sataki's case be reassigned to another judge. As grounds for the motion, Respondent alleged that the current trial judge, Colleen Kollar-Kotelly "harbors an animus" towards him because of her

association with former President William Jefferson Clinton and former First Lady Hillary Rodham Clinton, and because of certain lawsuits Respondent had filed against the Clintons.

22.     Respondent's filing of the motion to reassign was inconsistent with Ms. Sataki's request that Respondent pursue her case simply and quietly, and served no purpose to advance his client's case. Instead, the motion to reassign served Respondent's own personal interests. Ms. Sataki did not know that Respondent would file the motion to reassign her case to another trial judge and did not authorize Respondent to file it.

23.     On July 7, 2010, the court issued an order denying Respondent's motion to reassign.

24.     In or about August, 2010, Ms. Sataki terminated Respondent as her lawyer.

25.     On October 22, 2010, the court issued an order granting defendants' motion to dismiss and dismissed Ms. Sataki's case, without prejudice.

26.     On October 31, 2010, after having been terminated by Ms. Sataki in August, 2010, Respondent filed with the Court a motion to reconsider the order dismissing her case.

27.     On November 15, 2010, Ms. Sataki sent correspondence to Respondent reiterating that she had terminated his services, and directed him to immediately withdraw.

28.     On December 9, 2010, Respondent, filed with the Court, a motion for extension of time to reply to the government's opposition to plaintiff's motion for reconsideration.

29.     On December 17, 2010, Respondent filed with the Court a reply to defendants' opposition to plaintiff's motion for reconsideration of its order of dismissal.

30.     On December 20, 2010, Respondent filed with the Court a supplemental memorandum to the reply to the defendants' opposition to plaintiff's motion to reconsider the order of dismissal.

31.     On December 21, 2010, the Court issued an order denying plaintiff's motion to

reconsider the dismissal of her case.

32.     On January 10, 2011, Respondent filed with the court a "Notice of Praecipe by Elham Sataki".

33.     On January 19, 2011, Respondent filed a notice of appeal.

34.     Respondent's conduct violated the following Rules:

        a.      Rule 1.7(b)(4), in that Respondent had a conflict of interest with the client because his professional judgment on behalf of the client was or reasonably may have been adversely affected by Respondent's own personal interests;

        b.      Rule 1.4(b), in that Respondent failed to reasonably explain a matter to his client to permit her to make an informed decision about the representation;

        c.      Rule 1.2(a), in that Respondent failed to abide by his client's decisions concerning the objectives of his representation; and

        d.      Rule 1.16(a)(3), in that Respondent failed to withdraw from the representation after he had been discharged by his client.

## COUNT IV

35.     Disciplinary Counsel incorporates the factual allegations set forth in paragraphs 1-7, 10-15, 17-33, as if fully set forth herein, and further alleges:

36.     WorldNetDaily is a periodical that can be accessed on the world-wide web. According to its own website, dated February 19, 2015, "WND currently attracts nearly 5 million unique visitors per month and more than 40 million page views, according to its own internal monitoring software."

37.     On or about April 30, 2010, Respondent authored an article that was published by WorldNetDaily that described, in part, his representation of Ms. Sataki and her claims against

7

VOA. Ms. Sataki did not know that Respondent would author an article concerning her case that would be published. Ms. Sataki did not consent to the publication of Respondent's article. Ms. Sataki was embarrassed by Respondent's disclosure of facts that he gained during the course of the representation.

38.    On or about May 11, 2010, Respondent contributed to another article that was published by the WorldNetDaily describing, in detail, the lawsuit Respondent filed on behalf of Ms. Sataki against VOA. Ms. Sataki did not know that Respondent would contribute to an article about her case that would be published. Ms. Sataki did not consent to the publication of the article. Ms. Sataki was embarrassed by Respondent's disclosure of facts that he gained during the course of the representation.

39.    On or about May 14, 2010, Respondent authored another article that was published by WorldNetDaily describing, in detail, the lawsuit he filed on behalf of Ms. Sataki against VOA. Ms. Sataki did not know that Respondent would author an article concerning her case that would be published. Ms. Sataki did not consent to the publication of Respondent's article. Ms. Sataki was embarrassed by Respondent's disclosure of facts that he gained during the course of the representation.

40.    On May 21, 2010, Respondent authored another article that was published in the WorldNetDaily that referenced his representation of Ms. Sataki against VOA. Ms. Sataki did not know that Respondent would author an article concerning her case that would be published. Ms. Sataki did not consent to the publication of Respondent's article. Ms. Sataki was embarrassed by Respondent's disclosure of facts that he gained during the course of the representation. Respondent's article, included an advertisement for his book titled "Whores: Why and How I Came to Fight the Establishment."

8

41.     On May 28, 2010, Respondent authored another article that was published in the WorldNetDaily that referenced his representation of Ms. Sataki against VOA. Ms. Sataki did not know that Respondent would author an article concerning her case that would be published. Ms. Sataki did not consent to the publication of Respondent's article. Ms. Sataki was embarrassed by Respondent's disclosure of facts that he gained during the course of the representation. Respondent's article included an advertisement for his book titled "Whores: Why and How I Came to Fight the Establishment."

42.     On June 11, 2010, Respondent authored another article that was published in the WorldNetDaily that referenced his representation of Ms. Sataki against VOA. Ms. Sataki did not know that Respondent would author an article concerning her case that would be published. Ms. Sataki did not consent to the publication of Respondent's article. Ms. Sataki was embarrassed by Respondent's disclosure of facts that he gained during the course of the representation. Respondent's article included an advertisement for his book titled "Whores: Why and How I Came to Fight the Establishment."

43.     On or about July 2, 2010, Respondent authored another article that was published in the WorldNetDaily that referenced his representation of Ms. Sataki. Ms. Sataki did not know that Respondent would author the article about the representation that would be published. Ms. Sataki did not consent to the publication of Respondent's article. Ms. Sataki was embarrassed by Respondent's disclosure of facts that he gained during the course of the representation. Respondent's article, included an advertisement for his book titled "Whores: Why and How I Came to Fight the Establishment."

44.     On or about October 1, 2010, Respondent authored another article that was published in the WorldNetDaily that discussed details of his representation of Ms. Sataki against

9

VOA. Ms. Sataki did not know that Respondent would author an article concerning her case that would be published. Ms. Sataki did not consent to the publication of Respondent's article. Ms. Sataki was embarrassed by Respondent's disclosure of facts that he gained during the course of the representation.

45.    On or about October 15, 2010, Respondent authored another article that was published in the WorldNetDaily that discussed Ms. Sataki's claims against VOA. Ms. Sataki did not know that Respondent would author an article concerning her case that would be published. Ms. Sataki did not consent to the publication of Respondent's article. Ms. Sataki was embarrassed by Respondent's disclosure of facts that he gained during the course of the representation. Respondent's article, included an advertisement for his book titled "Whores: Why and How I Came to Fight the Establishment."

46.    On or about October 29, 2010, Respondent authored another article that was published in the WorldNetDaily that discussed Ms. Sataki's claims against VOA. Ms. Sataki did not know that Respondent would author an article concerning her case that would be published. Ms. Sataki did not consent to the publication of Respondent's article. Ms. Sataki was embarrassed by Respondent's disclosure of facts that he gained during the course of the representation. Respondent's article, included an advertisement for his book titled "Whores: Why and How I Came to Fight the Establishment."

47.    On or about December 25, 2010, Respondent authored another article that was published in the WorldNetDaily that discussed the litigation of Ms. Sataki's claims against VOA. In the article, Respondent, *inter alia,* falsely reported that the presiding judge had "dishonestly denied, without factual or legal bases (sic), my request for Elham to be put back at work at the Los Angeles office VOA, as she rehabilitated from the harm done to her." In fact, the presiding judge

issued an order dated June 1, 2010 in the matter styled *Sataki v. BGG*, CA No. 10-0534 (CKK), describing the factual and legal basis for the decision not to grant the relief Respondent sought for Ms. Sataki. Ms. Sataki did not know that Respondent would author an article about her case that would be published. Ms. Sataki did not consent to the publication of Respondent's article. Ms. Sataki was embarrassed by Respondent's disclosure of facts that he gained during the course of the representation. Respondent's article, included an advertisement for his book titled "Whores: Why and How I Came to Fight the Establishment."

48.     Respondent's conduct violated the following Rules:

a.     Rule 1.2(a), in that Respondent failed to abide by a client's decisions concerning the objectives of the representation;

b.     Rule 1.6(a)(1), in that Respondent revealed a confidence or secret of the client;

c.     Rule 1.6(a)(3), in that Respondent revealed a confidence or secret of the client for his own advantage;

d.     Rule 1.7(b)(4), in that Respondent had a conflict of interest with his client because his professional judgment on behalf of his client was or reasonably may have been adversely affected by Respondent's own personal interests; and

e.     Rule 8.4(c), in that Respondent engaged in conduct involving dishonesty and/or misrepresentation.

Respectfully submitted,

Elizabeth A. Herman
Deputy Disciplinary Counsel

11

H. Clay Smith, III
Assistant Disciplinary Counsel

OFFICE OF DISCIPLINARY COUNSEL
515 Fifth Street, N.W.
Building A, Room 117
Washington, D.C.  20001
(202) 638-1501

## VERIFICATION

I do affirm that I verily believe the facts stated in the Specification of Charges to be true.

H. Clay Smith, III
Assistant Disciplinary Counsel

Subscribed and affirmed before me in the District of Columbia this 30th day of June, 2017.

My Commission Expires:

Notary Public

12



EXHIBIT 4

# IN THE DISTRICT OF COLUMBIA COURT OF APPEALS

_____

**In the Matter of:**

    **LARRY E. KLAYMAN, ESQ.**

**Respondent.**

**A Member of the Bar of the District of Columbia Court of Appeals (Bar Registration No. 334581)**

**No. 20-BG-583**
**Board Docket No: 17-BD-063**
**BDN: 2011-D028**

---

## RESPONDENT LARRY KLAYMAN'S PETITION FOR REHEARING EN BANC
_____

Dated:  September 29, 2022

    Respectfully submitted,

    /s/ Melissa Isaak
    Melissa Isaak, Esq.
    2815-B Zelda Road
    Montgomery, AL 36106
    Tel: 334-262-8200
    Melissa@protectingmen.com

    Counsel for Respondent

    /s/ Larry Klayman
    Larry Klayman. Esq.
    7050 W. Palmetto Park Road
    Boca Raton, FL, 33433
    Tel: 561-558-5336
    leklayman@gmail.com

    Co-Counsel Pro Se

**INTRODUCTION**

On September 15, 2022, the three-judge panel (hereafter "the Panel") who presided over this case since October 2020, nearly 24 months ago, issued an order (the "Order"), devoid of even one actual record cite, suspending Respondent Larry Klayman ("Mr. Klayman") for another 18 months with a reinstatement requirement despite the fact that Mr. Klayman had already been temporarily suspended, without due process as set forth in prior pleadings, for 20 months. Altogether, this would make a grand total of 38 months, plus a reinstatement requirement that could take years to adjudicate, given the bias and past practices of the Office of Disciplinary Counsel ("ODC"), the Board on Professional Responsibility ("Board"). This unconscionable conduct creates more than a strong inference that the Panel acted to effectively end Mr. Klayman's legal career in the District of Columbia, a clear violation of the Panel's judicial oath of office. 28 U.S.C. § 453.

Perhaps most egregious is the fact that the Panel essentially adopted wholesale and rubber stamped the Report and Recommendation ("Report") of the Board, writing that "[w]e accept the Board's conclusion that Mr. Klayman violated the Rules of Professional Conduct, and we adopt the Board's recommended sanction," "[w]e 'accept the findings of fact made by the Board unless they are unsupported by substantial evidence of record,'" "[o]ur cases do not appear to make clear whether our review on this issue is deferential or de novo…We need

1

not decide the issue, because we agree with the Board's conclusion," and "[w]e conclude that the Hearing Committee and the Board acted reasonably by choosing to largely credit E.S.'s testimony over that of Mr. Klayman. Order at 2, 13, 18, 20. If the Panel was going to ignore Mr. Klayman's facts, witnesses, and arguments, then why did it take nearly 20 months to issue a decision? If its intention was to rubber stamp the Report, it could have done so immediately. The only explanation is that the Panel was acting punitively and wanted to extend Mr. Klayman's "temporary suspension" period. Even more, the Order is also factually and legally deficient, and does not contain **one record cite** to even attempt to justify its findings. This shows that there was no bona fide review of the record, which is the same as when Mr. Klayman opposed temporary suspension and moved for rehearing. The Order is wholly conclusory, which is the by-product of the Panel deciding to ignore Mr. Klayman's facts, witnesses, and unrefuted testimony.

Evidencing its pre-determined mindset, the Panel writes at page 2 of the Order that "the evidence largely consisted of E.S.'s testimony but also included numerous documents, including written communications between E.S. and Mr. Klayman." Completely omitted is the fact that Mr. Klayman presented 7 distinguished and well-respected independent material witnesses, including himself, at the initial hearing, albeit before a biased and skewed Ad Hoc Hearing Committee (hereafter "AHHC"), in contrast to only Ms. Elham Sataki's

consistently false and impeached testimony. One witness in particular, Tim Shamble ("Mr. Shamble"), the president and representative of complainant Ms. Elham Sataki's ("Ms. Sataki") union at Voice of America, gave unimpeached and weighty testimony that Mr. Sataki had at every step of the legal representation been fully informed, had approved the use of publicity to try to coax a settlement with VOA, and then when that failed, approved of all of the litigation and publicity that had ensued. PFF 11, 53, 128. He also testified that he had never seen someone work as diligently for any client as Mr. Klayman, and he had recommended him to other VOA employees who needed legal representation concerning what has been ranked the worst agency in the federal government. PFF 6.

Even more, the Panel imposed a reinstatement requirement even though in a recent earlier case this court had found, "**we are not left with "[s]erious doubt" or "real skepticism" that Mr. Klayman can practice ethically…. Accordingly, we decline to impose a fitness requirement.**" *In re Klayman*, 228 A.3d 713, 719 (D.C. 2020). Given that this case was over 12 years old at the time of the final suspension order, the Panel's finding that somehow Mr. Klayman should be subject to reinstatement now, after an earlier recent finding that he was fit to practice law – and never a finding of any dishonesty - makes no sense substantively, other than pure retaliation and an intention to effectively remove him from the practice of law in D.C. Finally, the icing of the cake of the bias that

emanates from this case is that Ms. Sataki's identity is protected with reference to her as only E.S., while Mr. Klayman's name and reputation are dragged through the proverbial mud, underscoring gender and ideological bias as discussed below.

In light of how this Court has recently dealt with far more serious alleged violations of the District of Columbia Rules of Professional Conduct, and in particular the Kevin Clinesmith ("Clinesmith") matter – a Trump hater and Justice Department lawyer who pled guilty to a felony of falsifying an FBI affidavit which gave rise to the Russian collusion investigation of Trump but who "got off" with a slap on the wrist with no reinstatement requirement - it is clear that the Panel has condoned and engaged in selective prosecution of someone who has been a public advocate for conservative causes. *In re Clinesmith*, 258 A.3d 161 (D.C. 2021). In sum, the Order must be subject to a bona fide *en banc* review, not only for the benefit of Mr. Klayman, but to uphold the integrity of this Court, which has been called into serious question by the conduct of the Panel, as set forth above.

## **LEGAL ARGUMENT**

## A.   **THE PANEL'S FACTUAL BACKGROUND IS UNSUPPORTED**

There are at least two prominent factual and egregious errors in the recitation of facts by the panel. *First* involves that finding that Ms. Sataki "… explained her concerns about publicity to Mr. Klayman, he initially respected her wishes." Order at 3. This is completely untrue, as the record shows that Mr.

Klayman and Mr. Shamble, on Ms. Sataki's behalf, tried long and hard to settle Ms. Sataki's case with VOA management and only when the case did not quickly settle, did Ms. Sataki, along with Mr. Shamble and Mr. Klayman all agreed that adverse publicity for VOA could coax a settlement. PFF 170, Tr. 775, PFF 91, PFF 24 Thus, at all material times, Ms. Sataki agreed to the use of publicity and even herself distributed materials in this regard. PFF 24.  As the final "nail in the coffin," Ms. Sataki even went on Iranian television in Los Angeles, revealing intimate facts about herself and her legal efforts with VOA and in the courts. App. 0119 – 0122. Unsurprisingly, Ms. Sataki did not disclose this to the AHHC and Mr. Klayman's defense team had to find this themselves. This clearly fraudulent conduct was obviously done in concert with ODC, who must have known about this crucial evidence and chose not to disclose it. That the Panel refused a motion to remand this matter back to the Board to open the record to review this video shows its inherent bias on this and other issues. *See* Board Order of Oct. 2, 2020.

*Second*, with regard to allegations of Mr. Klayman wanting a romantic relationship - which demonstrably is not in the record and in fact he told her the contrary, PFF 79 - when it appeared to him that the attorney client relationship was suffering, he referred Ms. Sataki to famed woman's rights lawyer and friend Gloria Allred as well as a VOA experienced lawyer Tim Shea. PFF 78. But Ms. Sataki did not want other counsel and asked Mr. Klayman to remain her counsel. PFF 78.

5

This omission that Mr. Klayman told Ms. Sataki get other representation shows that the record was ignored by the Panel. PFF 36.

These falsities are exacerbated by the Panel's baseless assertion the Mr. Klayman "encouraged" Ms. Sataki to move to Los Angeles. The record – including Ms. Sataki's own testimony – shows Ms. Sataki demanded that Mr. Klayman get her to Los Angeles, under the threat of committing suicide. PFF 109. Tr. 981-92.

What also was ignored was Ms. Sataki's abusive behavior toward Mr. Klayman, even disparaging his religious beliefs as a messianic Jew, and accusing him of taking bribes to throw her case. PFF 163, BCSX 38. It was behavior such as this which caused Mr. Klayman sadness as he did care for Ms. Sataki and why he referred her to other legal counsel. In addition to this, Ms. Sataki, attempting to take advantage of Mr. Klayman, asked him to buy her a new Mercedes. PFF 62.

Finally, the panel dismisses the testimony of the Honorable Stanley Sporkin, who while being in bad health, took it upon himself to travel and testify on Mr. Klayman's behalf. He testified under oath that Mr. Klayman had appeared in cases before him, and he came to see Mr. Klayman as an honest and ethical person that had no reason to doubt Mr. Klayman's character. PFF 188. And, as importantly, Judge Sporkin testified that had discussed Mr. Klayman's case strategy with Mr. Klayman and agreed with it. PFF 191. While the Panel was forced to concede this, they gave it zero weight, showing their outcome determinative  mindset.

**B.    THE PANEL'S PROCEDURAL BACKGROUND AND SECTION ON DELAY IS UNSUPPORTED BY THE RECORD**

While having to admit that the ODC sat on a Complaint for 7 years, it still throws the book at Mr. Klayman despite the fact that under the policy of ODC, Ms. Sataki's complaint had long since been abandoned. PFF 169. Indeed, during the interim 7 years, both Florida and Pennsylvania had dismissed Ms. Sataki's identical complaint, PFF 43, and thus Mr. Klayman believed that the matter was no longer pending before ODC. As a result, he discarded records of the dismissals. It is well established that case records need only be kept for five years.[1] Importantly both Florida and Pennsylvania purge their filed after 5 years, and thus Mr. Klayman submitted proof of no disciplinary record as a result of Ms. Sataki's complaint, supporting the fact that the complaint was dismissed by these state bars. And, in this regard, laches is disregarded by the Panel, but it must be addressed since every other reputable bar association enforces this fundamental principle. It is unconscionable that a Complaint can sit for literally 7 years and be resurrected at ODC's pleasure to attempt to remove Mr. Klayman from the practice of law when it decides that his conservative public interest advocacy is not to its liking.

**C.    THE DELAY DID CAUSE SEVERE PREJUDICE**

Summarily dismissing the prejudice caused by 12-year delay in this case, however wrongly, the Panel cavalierly wrote "[w]e agree that the delay in this case

---

[1] https://www.dcbar.org/For-Lawyers/Legal-Ethics/Ethics-Opinions-210-Present/Ethics-Opinion-283#footnote11

was very unfortunate." To brush off this delay again speaks volumes about the Panel's outcome determinative mindset and failure to adhere to its oath of office.

*First*, over the 7-year delay, thinking that the matter was over particularly given dismissals by state bars in Florida and Pennsylvania, Mr. Klayman discarded case records, including letters dismissing identical Sataki complaints.

*Second*, during the protracted saga, Professor Ronald Rotunda, the most renowned professional ethics expert, sadly passed away and only an initial letter he wrote to ODC arguing against an investigation, came into the record. RX 5. This letter was not, contrary to the false characterization of the panel, a formal expert opinion. Professor Rotunda's non-presence at the hearing before the AHHC prevented him from rebutting the testimony of ODC's "expert," Joel Bennett, among other relevant issues. Dr. Aviera, had she been able to testify and produce records, would have shown that Mr. Klayman, who himself paid for Ms. Sataki's consultations, was well intentioned and diligent in his legal representation, among other key issues.   But when Mr. Klayman had moved to depose Dr. Aviera early on in the case after it was instituted, the AHHC denied this reasonable request, along with a motion to depose Ms. Sataki. *See* Motion to Notice and Have Issued Subpoenas Duces Tecum to Take the Depositions of Elham Sataki and Arlene Aviera [Dkt. 33]. The AHHC, then stated that Mr. Klayman could renew his motion at the hearing, and despite ODC showing up at the twelfth hour on the day

of the hearing with "new" documents from Ms. Sataki and Dr. Aviera, PFF 84, Mr. Klayman's renewed motion was quickly denied by a hostile AHHC. Tr. 18.

**D.      THERE WERE NO SERIOUS ETHICAL VIOLATIONS**

The expressed modus operandi inherent in these proceedings is that a Respondent must confess to ethics violations to get a lesser sentence.  But when Mr. Klayman is only guilty of deeply caring about and loving his client and does everything in his power to try to help her and seeks along with her union representative, as a team, to protect and preserve her legal rights when she goes "AWOL," no good deed goes unturned. As for the Panel's "rubber stamped," unsupported, conclusory findings—with incredibly no record cites— Mr. Klayman attaches his proposed findings of fact and conclusions of law. Exhibit 1.

**1.      Ms. Sataki Has No Credibility Based on Her Own Admissions and Impeached Testimony, and  OCR Investigative Findings that She Lied About Alleged Sexual Harassment and Workplace Retaliation.**

The Panel egregiously erred by not giving any weight to the countless times that Ms. Sataki lied and  was thoroughly impeached, including but not limited to (1) her claims of sexual harassment and workplace retaliation being found by the Office of Civil Rights ("OCR") to be outright false—thereby evidencing that she fraudulently induced Mr. Klayman into representing her, PFF 155; (2) lying about wanting Mr. Klayman to drop her cases, and then filing a notice of appeal and asking ODC to prosecute her claims, PFF 67, 155; (3) being forced to admit that

she approved of publicizing her case, and personally participating in doing so, and fraudulently concealing the fact that she went on Iranian television and gave an intimate interview about her and her case! PFF 170, Tr. 775, PFF 91, PFF 24, App. 0119 – 0122. These are just a few of the countless examples in the record.

## 2.   Alleged Specific Rules Violations Are Manufactured Without Factual or Legal Bases

### i.   Alleged Conflict of Interest

The panel writes, in an overt effort to smear Mr. Klayman, injecting the non-existent premise of sexual harassment which was never even alleged or testified to by Ms. Sataki, that "[w]hether or not his feelings were sexual or romantic in nature, Mr. Klayman had strong feeling for E.S. For example, he wrote that he had 'fallen in love with (E.S.). would always love her and was feeling real pain," because she did not share his feelings. Order at 20. The last part of this statement is totally false and made up, as Mr. Klayman never wrote that he was feeling real pain "because she did not share his feelings." The record clearly reflects that when Ms. Sataki, who had become more than self-centered and abusive, while at the same time asking Mr. Klayman to buy her a car, PFF 62, that it was ethical and prudent for him to suggest that she find other counsel, as legal representation became untenable. Indeed, Mr. Klayman realized that both parties needed to move on and that is why he took Ms. Sataki to lawyers Gloria Allred and Tim Shea. PFF 78. In any event, "emotional interest," and caring for a client is irrefutably **not** an

10

ethics violation under the District of Columbia Rules of Professional Conduct. Otherwise, a lawyer could not represent his spouse in a legal proceeding. This alleged violation is no more than biased, contrived, and completely manufactured rubbish, to be most diplomatic! Thus, there was no violation of Rule 1.7!

### ii.    Mr. Klayman Did Not Fail to Abide Ms. Sataki's Wishes

As the record confirms, Ms. Sataki's so-called wishes were adhered to at every step of the representation, including publicity. Things were handled quietly initially was because it was agreed that attempted settlement was the best course of action. Only when that failed was the use publicity discussed, and irrefutably agreed to by Ms. Sataki. PFF 170, Tr. 775, PFF 91, PFF 24. So too was the decision to file suit against VOA's Board of Governors, which included a friend of Mr. Klayman, Blanquita Collum, as well as Hillary Clinton. PFF 95. The AHHC made much of the fact that she was sued along with the rest of the Board under *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388 (1971), thus underscoring their leftist anti-conservative bias. And, as set forth above, there is no clear and convincing evidence in the  record that Mr. Klayman knew that Ms. Sataki allegedly wanted to dismiss her cases, which is clearly shown in the record. PFF 67 – 71. Most telling is that many years later, 7 to be exact, after ODC sent out its private investigator to hunt down Ms. Sataki she asked ODC if they could continue to litigate her claims! PFF 155. Thus, there was no violation of Rule 1.2.

11

### iii.    Mr. Klayman Did Not Reveal Client Confidences

Notwithstanding that Ms. Sataki was forced to admit that she approved the publicity and participated directly in distributing it, PFF 170, Tr. 775, PFF 91, PFF 24, is that she herself went on Iranian television to broadcast the same alleged confidential facts. App. 0119 – 0122. Thus, there was no violation of Rule 1.6.

### iv.    Mr. Klayman Did Explain Matters to Ms. Sataki

One of the most non-sensical and bizarre findings of the Panel is that Mr. Klayman violated Rule 1.4(b) by filing a motion to disqualify Judge Kotelly. Not only is a lawyer permitted some discretion in litigation, but the record also clearly reflects that Ms. Sataki was fully informed of this motion and did not object. PFF 66. There was no violation of Rule 1.4

### v.    Absence of a Written Fee Agreement

The panel chose to sidestep this issue, probably because a myriad of emails from Mr. Klayman stated that he was representing Ms. Sataki free of charge. PFF 47, 74. The issue of the contingency only arose when Ms. Sataki became more abusive, rejected other counsel to represent her, but wanted to continue with Mr. Klayman as her lawyer. PFF 152. Thus, there was no violation of Rule 1.5(b).

### vi.    There Was No Failure to Cease Representation

As set forth above, Mr. Klayman simply chose to protect Ms. Sataki's legal rights, as she had a right of appeal from the OCR's findings that she had

manufactured her sexual harassment and workplace retaliation claims. PFF 72. This was the ethical thing to do, and thus, there was no violation of Rule 1.2.

## E.    SANCTION

As set forth above, it is irrefutable that Mr. Klayman has already egregiously served a "temporary" suspension of 20 months –longer than the ordered suspension of 18 months by the Panel. And, there was absolutely no reason for the Panel to take 20 months to issue its fatally flawed and completely conclusory Opinion if it was just going to adopt wholesale and rubber stamp the Board's Report in any event. This was just an intentional act to lengthen Mr. Klayman's suspension.

Furthermore, with regard to Mr. Klayman not filing an affidavit under D.C. Bar R. XI, § 9(g)(4), he made it clear that he was challenging the unconstitutional temporary suspension by the panel and indeed had instituted suit this regard as to its illegality. *Klayman v. Blackburne Rigsby et al*, 21-cv-409 (D.D.C.)   Most crucially, the Panel chose to overlook sworn statements by Mr. Klayman he had 100% complied with the temporary suspension order and did not represent clients in D.C. during this period, as he respected the temporary suspension order, however unconstitutional it was. *See* Post Hearing Brief, Ex. 10, <u>Exhibit 2</u>. The Panel thus puts form over substance, while this Court looked the other way when Clinesmith, a convicted lying felon and admitted leftist Trump hater, did not comply with this rule. *In re Clinesmith*, 258 A.3d 161 (D.C. 2021). In that case,

Clinesmith—the former senior FBI lawyer who dishonestly falsified a surveillance document in the Trump-Russia investigation and who pled guilty to felony charges—also did not submit any affidavit under Rule 14(g) for five (5) months after he was suspended. Despite this, not only did the D.C. Bar Disciplinary apparatus including this Court fast-track if not whitewash his case—clearly in order to minimize his temporary suspension period, in stark contrast to the nearly 20 months that Mr. Klayman was "temporarily suspended"—the Court let Clinesmith off with "time served" in just seven (7) months, and of course with no reinstatement requirement.  In doing so, the Court adopted wholesale the skewed findings of the Board and Hearing Committee. This is particularly egregious in that "[t]he Committee determined this was a serious crime in violation of D.C. Bar R. XI, § 10(d), but not one involving moral turpitude, either per se or on the specific facts." *Id*. This is completely non-sensical - how can a "serious crime" of falsifying evidence not involve moral turpitude? Of course, it appears the Court knew full well what it was doing, writing that "[t]his decision is non-precedential." *Id*. The Court would not want this preferential selective treatment to be afforded to those who hold differing political beliefs. Attached hereto is an article which discloses the Clinesmith whitewash by ODC, the Board, and ultimately this Court. Exhibit 3. The key difference, other than the fact that Clinesmith committed a felony over doctoring a false affidavit, which offense would ordinarily result in total

14

disbarment, is that Mr. Klayman is pro-Trump and a conservative activist, while Clinesmith is ideologically akin to the leftist and Democrat leadership of the DC Bar disciplinary apparatus. And, Mr. Klayman, unlike Clinesmith, has never been found to have been dishonest.

Lastly, a reinstatement provision is unjustified where in a recent case this Court found, "**we are not left with "[s]erious doubt" or "real skepticism" that Mr. Klayman can practice ethically.**" *In re Klayman,* 228 A.3d 713, 719 (D.C. 2020). Then there is the  testimony of Judge Sporkin. And the acts complained of here are now over 12 years old, so to conjure up reinstatement in a case which any other reputable bar would have dismissed for laches is a travesty of justice.

## <u>CONCLUSION</u>

Based on the foregoing, there must be a full, bona fide *en banc* review of this case, as there has been a gross miscarriage of justice and fundamental fairness by the Panel. **Notwithstanding no clear and convincing evidence of serious ethics violations, Mr. Klayman should have been found to have done "time served," a more worthy "sentence" for him than occurred with the dishonest convicted felon Clinesmith**.  In the interim, the Court must stay the patently flawed Order of the Panel. If this bona fide review does not occur, this matter will not end here, as Mr. Klayman will be forced to seek relief under D.C. Sup. Ct. Rule 60 and a petition for writ of mandamus before the Supreme Court.

Dated:  September 29, 2022                          Respectfully submitted,

/s/ Melissa Isaak
Melissa Isaak, Esq.
2815-B Zelda Road
Montgomery, AL 36106
Tel: 334-262-8200
Melissa@protectingmen.com

Counsel for Respondent

/s/ Larry Klayman
Larry Klayman. Esq.
7050 W. Palmetto Park Road
Boca Raton, FL, 33433
Tel: 561-558-5336
leklayman@gmail.com

Co-Counsel Pro Se


## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing was filed

electronically and served through the court's ECF system to all counsel of record

or parties listed below on September 29, 2022.

/s/ Larry Klayman

EXHIBIT 1

## APPENDIX – PROPOSED FINDINGS OF FACT

### Tim Shamble

1.      Mr. Shamble has been with VOA since 1996, and he is currently the local union president, AFG Local 1812, a title he has held since 2000. Tr. 881.

2.      Mr. Shamble was the union representative who was consulted by Ms. Sataki and Mr. Klayman with regard to Ms. Sataki's claims of workplace sexual harassment and workplace retaliation at VOA. RX 1, RX 5.

3.      Mr. Shamble declared under oath that Mr. Klayman was very diligent in attempting to represent Ms. Sataki, putting in many hours, and Mr. Klayman did not, to his knowledge, compromise any of Ms. Sataki's rights. RX 1, RX 5.

4.      Mr. Shamble declared under oath that communication became very difficult and nearly non-existent with Ms. Sataki. When he and Mr. Klayman would try to contact Ms. Sataki, we usually got no response, even for months.  RX 1, RX 5.

5.      Mr. Shamble declared under oath that during these periods of no communication from Ms. Sataki, Mr. Klayman attempted to protect Ms. Sataki's rights so that they would not be forfeited. It is Mr. Shamble's opinion that Mr. Klayman acted professionally and ethically by trying to protect Ms. Sataki's rights even after she would not communicate with him. RX 1, RX 5. Ms. Sataki admits that she knew Mr. Klayman and Mr. Shamble tried to reach her. Tr. 539.

6.      Mr. Shamble declared under oath that he had given Mr. Klayman's name and number as a reference to at least one other aggrieved VOA employees who requested the name of an aggressive attorney, as he was impressed by Mr. Klayman's willingness to doggedly defend Ms. Sataki under difficult circumstances. RX 1, RX 5. Tr. 902.

7.     Mr. Shamble declared under oath that the BBG, of which VOA is a subcomponent has been ranked the worst agency in government, and is very difficult to negotiate any settlement with because of its management's attitude and approach to employees. RX 1, RX 5.

8.     Mr. Shamble declared under oath that it did not appear to him that Mr. Klayman was representing Ms. Sataki to promote his own interests, but rather to protect Ms. Sataki's. Mr. Klayman appeared very dedicated to Ms. Sataki's interests. RX 1, RX 5. "I've had several employees that have hired attorneys, and they have asked for the union to cooperate with them and to, you know, help them with their cases. But, in all honesty, I've never seen one go as far and as dedicated as Mr. Klayman was towards Ms. Sataki. I felt like he went above and beyond." Tr. 903-04.

9.     Mr. Shamble declared under oath that he was aware that public relations avenues were used to try to prod VOA into a settlement. RX 5. Tr. 892.

10.    Mr. Shamble declared under oath that he was present at at least one meeting between Mr. Klayman and Ms. Sataki where the use of public relations, such as press articles and news stories to describe and publicize the alleged harassment that Ms. Sataki had experienced at VOA was discussed.  The idea was that public relations could push BBG into a settlement given their track record of being difficult to settle with. RX 5.

11.     There is an email between Mr. Klayman, Ms. Sataki and two other VOA broadcasters who Mr. Klayman was also seeking to help, about an interview with the Los Angeles Times. RX 5. Tr. 906-07. Ms. Sataki admits she never sent anything back to Mr. Klayman or Ms. Shamble saying that she did not want to do the interview. Tr. 403.

12.    Mr. Shamble declared under oath that he was not aware that any public relations about Ms. Sataki's situation were anything but positive and complimentary about her. RX 5. Tr. 895.

13.     Mr. Shamble, in the course of his duties and responsibilities as local union president, met Ms. Sataki around 2009. Tr. 882-82. Ms. Sataki alleged to Mr. Shamble that her harasser was Mehdi Falahati ("Mr. Falahati"), who was the co-host. Tr. 883.

14.     At that time, Mr. Shamble observed that there were at least two factions at VOA – those who supported the Shah and those who support the mullahs – and that Ms. Sataki seemed to be with the pro-Shah faction. Tr. 883-84.

15.     VOA had a very difficult reputation for negotiating. Ms. Sataki knew this. Tr. 368.

> They are very hard-edged. We've won -- matter of fact, we've won several cases and they still don't knowledge it. If fact, we won a case where they have been illegally hiring non-citizens. We won that arbitration. They appealed that up to the FRA. They lost the FRA, then they appealed it to the Court of Appeals, and eventually had to withdraw their appeal, and they still won't abide by that decision. That's just an example of the type of management they are Tr. 884.

16.     A 2009 articled by Joe Davidson in The Washington Post discussing the Open-Ended Survey showed that "the Broadcasting Board of Governors is at the very bottom. Employees don't rank them very high." Tr. 885-86, RSX 3. They have "consistently been worst or next to worst throughout the federal government." Tr. 886-87.

17.     After meeting with Ms. Sataki, Mr. Shamble discussed how to proceed on her case, including filing a grievance or an EEO (aka OCR) complaint. Mr. Shamble contacted Labor Relations, but they were not willing to reach a fair settlement. Tr. 887. This was consistent with Mr. Shamble's experience dealing with VOA.

18.     Ms. Sataki wanted to move to Los Angeles to work. "One of the solutions that [Ms. Sataki] had filed was possibly working out of the Los Angeles Bureau, bureau of broadcasting." Tr. 888. Ms. Sataki felt a good solution was to work out of Los Angeles. "Yeah, she wanted to -- she thought that was a good solution to work out of Los Angeles." Tr. 892.

19.     Ms. Sataki, Mr. Klayman, and Mr. Shamble met on several occasions. Tr. 890.

20.     Mr. Shamble, Mr. Klayman, and Ms. Sataki agreed to try to settle Ms. Sataki's claims first before pursing litigation. Tr. 890.

21.     In attempting settlement, Mr. Shamble and Mr. Klayman met with the BBG and their general counsel, and the response was very negative. Tr. 891. This was consistent with Mr. Shamble's previous experience with them.

22.     The BBG offered to put Ms. Sataki in the Persian service or in Central News, but Ms. Sataki told them that she wasn't comfortable being around her alleged harasser or working strictly in English. Tr. 891-92. Tr. 916-17. RX25. Ms. Sataki declined this offer. Tr. 917.

23.     Based on Mr. Shamble's extensive experience, publicity was a helpful tool in dealing with an agency as notoriously difficult as VOA. "We've done it. It's something that you can use to pressure managers, if they're intractable, you know, to try to get them to come to some sort of agreement. We have our own website, so we use it, too." Tr. 893.

24.     Mr. Shamble and Ms. Sataki went together on one occasion to publicize her situation. "I remember one time. The VOA was on the mall here in Washington, some kind of public -- it might have been a recruitment fair or something. But we had an article and both her and I were distributing it to people in the vicinity, tried to let people know and to let the agency know that, you know, we were going to publicize this." Tr. 893. The article that both Mr. Shamble and Ms. Sataki distributed was called ""Government War on a Freedom Loving Beauty. Exclusive, Larry Klayman Goes to Bat for Harassed Broadcaster Fighting for a Free Iran." Tr. 894. RX 1.

25.     During the course of attempted settlement, Mr. Klayman and Mr. Shamble learned that "we were trying to settle it through a member of the Board of Governors by the name of Blanquita Collum." ("Ms. Collum"). Tr. 911. Ms. Collum was a friend of Mr. Klayman, and Mr. Shamble and Ms. Sataki were aware of this fact. Tr. 911, Tr. 389.

26.     Then Secretary of State Hillary Clinton was on the BBG at the time that Mr. Klayman and Mr. Shamble were trying to reach a settlement. Tr. 912, 388. Ms. Sataki admits that she was aware that Secretary of State Hillary Clinton was included as a defendant in the BBG *Bivens* action because Mrs. Clinton was at the time "the number one governor sitting over that board." Tr. 479, 481.

27.     Ms. Sataki was aware that Mr. Klayman and Mr. Shamble took actions with regard to congressmen and senators to try to get them to intercede. Tr. 454. They include John Boehner, Tom Coburn of Oklahoma, who was on the Foreign Affairs Committee at VOA, and John McCain. Tr. 912-14. During meetings with these Senators, Mr. Klayman and Mr. Shamble took press materials to give to them and Ms. Sataki did not object to this publicizing, even though she was aware that they were taking those meetings. Tr. 913-14.

28.     Mr. Shamble was aware of the fact that " when Ms. Sataki went out on leave to Los Angeles that she had a nervous breakdown, for lack of a better word, and went to see doctors?" Tr. 915. RX 24. Mr. Shamble asked for reasonable medical accommodation on behalf of Ms. Sataki, RX 26, which the agency denied. Tr. 916.

29.     Mr. Shamble was aware that Mr. Klayman filed a complaint with OCR on behalf of Ms. Sataki. Tr. 918. Mr. Shamble was troubled by the investigation conducted by OCR. Tr. 919, RX 17. "They seemed to be stalling coming to some sort of resolution, and that was blocking any further progress in the case… that there were witnesses [on Ms. Sataki's behalf] that were claiming they were being harassed." Tr. 919-20.

30.     Mr. Shamble wrote a letter to Lanny Breuer, Assistant Attorney General, Criminal Division of the Department of Justice about witness tampering. Tr. 920, RX 17. In response, Mr. Breuer referred Mr. Shamble to the Federal Bureau of Investigation. Tr. 921, RX 17.

31.     Mr. Shamble wrote a letter dated January 4, 2011 to Ms. Delia Johnson, the director of OCR asking that OCR some to some kind of conclusion and reach a final decision. Tr. 922, RX 18.  Ms. Johnson responded on January 5, 2011 informing that Mr. Shamble could proceed, before issuing a final finding denying Ms. Sataki relief. Tr. 922, RX 18.

32.     After a negative final decision from OCR, a complainant has the option to pursue a Title VII action in the courts. Tr. 923. RX 18.

33.     Upon receiving the final decision from OCR, Mr. Shamble and Mr. Klayman tried to contact Ms. Sataki to inform her that she had the option to pursue legal action in the courts and that none of her legal rights were forfeited. Tr. 924-27.

34.     Mr. Shamble testified that Ms. Sataki had his contact information and she could always contact him at any time. Tr. 927.

35.     Mr. Shamble was copied, but Mr. Klayman was not, on a letter from Ms. Sataki to Mr. Danforth Austin dated August 4, 2010. Tr. 928. RX 21. Mr. Shamble was not consulted by Ms. Sataki before the letter was sent to Mr. Austin. Tr. 928.

36.     Mr. Klayman asked Mr. Shamble for the name of another lawyer that might be able to help Ms. Sataki. Tr. 929. Mr. Shamble provided Mr. Klayman with Tim Shea's name. Tr. 929.

37.     Ms. Sataki did not contact Mr. Shamble until well after Mr. Klayman and Mr. Shamble had tried to contact her, and well after the January 23, 2011 email that was sent to her. Tr. 932.

38.     Mr. Shamble testified that the signature on the OCR Complaint appeared to be Ms. Sataki's signature. RX 20, Tr. 933.

39.     Mr. Shamble and Mr. Klayman had discussed being assigned Judge Kotelly in the court case against BBG and that Judge Kotelly "didn't have a very favorable opinion of [Mr. Klayman] or your politics or the way that you conduct your business." Tr. 934. Mr. Klayman informed Mr. Shamble that Judge Kotelly could be a problem in the case. Tr. 934-35.

**Larry Klayman**

40.     Mr. Klayman, a former lawyer at the Department of Justice, and the founder of both Judicial Watch and Freedom Watch and a private practitioner, has considerable experience in administrative law and litigation, such as OCR cases, and has handled employment cases throughout his career and in his private practice.  Tr. 947-963.

41.     Mr. Klayman has continuously been a member of good standing of The Florida Bar (for 41 years) as well as the District of Columbia Bar (36 years) and is presently inactive in Pennsylvania. Tr. 964. RX 22.

42.     The supplemental complaint of Ms. Sataki represents at paragraph C that identical complaints were filed in Pennsylvania and Florida. Tr. 968. BCX 23.

43.     Pennsylvania and Florida disciplinary records show that these identical complaints were dismissed by these bars many years ago, as Mr. Klayman has no disciplinary record in this regard. Tr. 969-971. RX23 (Florida); RX 30 (Pennsylvania).

44.     Mr. Klayman, thinking that the identical DC complaint had also dismissed, his records of the representation of Ms. Sataki were either discarded or lost, as Mr. Klayman was only notified six years after the supplemental complaint's filing that this matter was still active. Tr. 971.

45.     Mr. Klayman met Ms. Sataki in the fall of 2009 on the Capitol Mall. He was there with an Iranian client to attend a rally in support of Iranian freedom. Ms. Sataki was there broadcasting for VOA. After Mr. Klayman introduced himself, Ms. Sataki ran over to him and gave him her card with her personal cell phone number on it and asked him to call her. Tr. 323, 974-975.

46.     Mr. Klayman called Ms. Sataki and left a message. Eventually Ms. Sataki called back and they arranged to meet at Clyde's restaurant in Georgetown. Mr. Klayman got there first and when Ms. Sataki arrived she kissed Mr. Klayman on the cheek at the bar. Tr. 326. Mr. Klayman had asked Ms. Sataki to dinner in a personal capacity. Tr. 325, 976.

47.     After about five to ten minutes of getting personally acquainted, Mr. Sataki "broke down in tears and grabbed my hand and said, 'Larry, I really have big problems. I've been sexually harassed by my co-anchor, … she described it, Mehdi Falahati and before that I was unfairly criticized for my abilities and I need help. And, I said, well I will try to help you, and you know, I'll do it out of friendship. We're now friends."  Mr. Klayman told Ms. Sataki he would legally represent her *pro bono*. Tr.  326-27, 976-977.

48.     Ms. Sataki admits that during their dinner she said that she wanted to be transferred to Los Angeles because she had spent a number of years there was was more comfortable there. Tr. 335.

49.     Mr. Klayman sympathized with Ms. Sataki as he too was going through a hard time in his life, both personally and financially. Tr. 978.

50.     Ms. Sataki then introduced Mr. Klayman to her union president and representative at VOA, Tim Shamble. He advised that VOA was very difficult to settle claims with, but that we would try. RX 1. Using publicity to try to coax a settlement was also discussed, and Ms. Sataki, Mr. Shamble and Mr. Klayman agreed up front to this. Tr. 979-980. RX 2.

51.     When settlement did not prove possible, Ms. Sataki authorized Mr. Klayman to file legal actions. Tr. 981.

52.     It was agreed that the objective of the legal actions would be to have Ms. Sataki detailed to the Los Angeles ("LA") Bureau of VOA, where there is a strong Persian component. She wanted to be out of the presence of the harasser and the managers who had retaliated against her and to be with family and friends in LA. Tr. 336.

53.     Mr. Klayman continued to try to settle for Ms. Sataki and along with Tim Shamble lobbied senators and congressmen to intervene. Tr. 983-986. He prepared complaints when settlement proved impossible. RX 2, RX 3.

54.     Mr. Klayman did not expect to ever be compensated for his time and expense, as the objective was to get Ms. Sataki detailed to LA and the complaint which he filed against the harasser, who had no money, was on principle.  Tr. 336. The *Bivens* case versus the Board of Governors ("BBG") of VOA was designed also to get Ms. Sataki to LA and by seeking to hold the governors, whose head was Secretary of State Hillary Clinton, personally and legally accountable to put pressure on them to agree. The employment complaint before OCR was also calculated for this purpose as well. A money recovery was not the goal, as even if successful it would be five to ten years down the line. Tr. 986-999. Ms. Sataki gratuitously "offered" 40% to Mr. Klayman via email on May 30, 2010, but this was never agreed to, and in any event not important to Mr. Klayman. BCSX 11.

55.     The case against the BBG was ultimately assigned to Judge Colleen Kollar Kotelly ("Judge Kotelly"), who was a Clinton appointee that Mr. Klayman had had difficulty with in the past. As Mr. Klayman had been a strong legal advocate in cases he brought against the Clintons at Judicial Watch, Judge Kotelly had demonstrated bias toward and against him and his conservative clients in the past, and both Ms. Sataki and he were conservatives. Judge Kotelly's confirmation had been strongly opposed by conservative interests.  Mr. Klayman advised Ms. Sataki and Mr. Shamble that this was potentially a problem. Tr. 1000-1002.

56.     Ms. Sataki while on leave to LA for a vacation, Tr. 338-39, got word that VOA would not transfer her there.

57.     Having Ms. Sataki in LA was also strategically necessary, as she had been living with a co-worker in the DC area, and had a reputation for affairs and promiscuity. It was thought that this could be used against her, however unfairly, since she was pursuing sexual harassment and retaliation complaints against co-workers at VOA. Tr. 1003-1004. Ms. Sataki admits that Mr. Klayman advised her in this regard.

47

58.     As predicted, Judge Kotelly given her dislike of Mr. Klayman, despite the compelling evidence of that Ms. Sataki needed a reasonable medical accommodation, without even a hearing, denied the motions for a temporary restraining order and preliminary injunction to put her back to work in LA away from the harasser. RX 3. At the time, Mr. Klayman had consulted with retired federal judge Stanley Sporkin who told him that he would have granted the relief to preserve the status quo if he had been the jurist on the case. He described the relief as a "chip shot." Tr. 1009-1010.

59.     Mr. Klayman then moved for reconsideration, as in his opinion there was no basis in fact or law for Judge Kotelly to deny preliminary relief. RX 3.

> And consequently there is no basis. And that just my opinion. I'm entitled to my opinion. There is no basis in law or fact. The Bar tries to make an issue of that, Bar Disciplinary Counsel. But lawyers say that all the time, there was no basis for the court to make a ruling. And there wasn't a hearing. Because without a hearing and just simply not considering her affidavits and considering the government, particularly when I had a polygraph that she passed and all that medical information, to me was exemplary of bias and prejudice. There was no other way to explain it in my mind, and there was no basis in law or fact. So that's what happened. Tr. 1011.

60.     Ms. Sataki was kept informed of Mr. Klayman's strategy and actions on her behalf every step of the way. Tr. 1011.

61.     Ms. Sataki blamed Mr. Klayman for Judge Kotelly's decision. She disparaged Mr. Klayman. Tr. 1020 to 1021.

62.     Ms. Sataki admits that she asked Mr. Klayman to buy her a cheaper car, as she had no credit. Tr. 429, 432-435. Ms. Sataki also asked Mr. Klayman to find her friend Kaveh a bankruptcy attorney and then berated him over who he found. Tr. 1021-22. Mr. Klayman paid for Ms. Sataki's moving expenses, including her car.

63.     Mr. Klayman had also tried to get Ms. Sataki a good paying and prestigious job as a broadcaster in LA. He took her to seek his friend, the chairman of Movieguide, Ted Baehr, who

tried to get her a job a CBN, which has a bureau in LA and which broadcasts in Farsi into Iran. She was introduced to Mark Woodland, and executive of CBN and an interview was set up.  Tr. 1026-27, 713-714.

64.     But at that point, Ms. Sataki's (convicted felon) cousin, BCSX 36, with several different alias names including Sam Razavi intervened and …

> (a)pparently spoke to Mark Woodland and scared him off and said 'You know she's a Muslim? I don't have a problem with her working for you, but she has certain conditions' … that have to be met. You don't do that before you get an interview. It was clear that Sam didn't want her to be there, so Woodland got cold feet and backed off. Tr. 1027. BCSX 37. Tr. 721-724.

65.     Mr. Klayman filed a motion to disqualify Judge Kotelly to get her orders vacated once disqualified. In the motion to disqualify Judge Kotelly, Mr. Klayman attached about 14 pages of her factual errors as proof of her bias toward Ms. Sataki and Mr. Klayman. Tr. 1034. RX 3.

66.     Ms. Sataki knew about the motion to disqualify. Tr. 1166, 1170.

67.     While at the same time she was allegedly telling Mr. Klayman to drop all cases, Ms. Sataki sent in a notice of appeal to Judge Kotelly. RSX 4. Tr. 1031.

68.     Mr. Klayman, on July 28, 2018 filed a notice of voluntary dismissal dismissing all but two of Ms. Sataki's claims.[4] The only two remaining claims at that point were for a Privacy Act claim, and for *Wagner* injunctive relief. This occurred before Ms. Sataki's purported July 30 email which only asked Mr. Klayman to "withdraw all the pending lawsuits that are on my behalf and/or in my name." BCSX 21. Ms. Sataki asks Mr. Klayman to continue to pursue the "sexual harassment case against Medhi Falahati…and Ali Sajjadi and Susan Jackson…." BCSX 21. This email does not discuss publicity. Consistent with what was purported to be Ms. Sataki's wishes, Mr. Klayman filed no opposition to the pending motion for summary judgment as to the Privacy Act Claim, and

---

[4] *Sataki v. BBG*, 1:10-cv-00534, ECF No. 67. For clarification, the notice of voluntary dismiss filed on July 28, 2010 dismissed all but one of Ms. Sataki's claims, but that was done in error, which was corrected on August 6, 2010. ECF No. 68.

Judge Kotelly had at that point already ruled against Ms. Sataki with regards to the *Wagner* injunctive relief, and therefore dismissed the action entirely.

69.    Ms. Sataki's purported "termination" letter of August 4, 2010 was sent to VOA's Dan Austin and Mr. Shamble, but not to Mr. Klayman. Tr. 1038. RX 21.

70.    The August 4, 2010 'termination" letter was not in Ms. Sataki's English. "That's why [Mr. Klayman] needed to be able to talk to her (before I dismissed cases)." Tr. 1041. RX 21.

71.    Another "termination" letter of November 15, 2010 was incorrectly sent to the wrong address at 2000 Pennsylvania Ave, which Mr. Klayman never received from her. RX 8. Tr. 1042-43. Ms. Sataki admits this. "So that was a mistake." Tr. 540. RX 8.

72.     Mr. Klayman filed a notice of appeal in the BBG case in the meantime to ensure that Ms. Sataki's legal rights were preserved. Tr. 1043-1044.

73.    Around this time a lot of mail was not getting to Mr. Klayman because he was moving around a lot and in "very bad financial shape." Tr. 1050-1051.

74.    With regard to the email of May 31, 2010, Mr. Klayman did not have a contingency fee arrangement with Ms. Sataki. He was clear that he was representing her pro bono. Mr. Klayman was only trying to impress on her the time that he had put in for her. Tr. 1056-1057; BCSX 12.

75.    Mr. Klayman only asked for 50% if the matter proceeded any further after realizing that he was getting used by Ms. Sataki, but no agreement was ever reached, and has to this day never asked Ms. Sataki to pay him back a single dollar. Tr. 1057.

76.     Mr. Klayman testified that there here was no money in getting Ms. Sataki back to work in LA.  BCSX 19. Tr. 1061

In fact, working as hard as I have to try to get you back at PNN, Persia News Network, gets me nothing, assuming I ever wanted a percentage of the damages we cold have won in court, which I never asked for." Tr. 1058-1059; Tr. 1063

77.     Mr. Klayman assured Ms. Sataki in email of November 21, 2010, that her rent was paid for as they both moved on. Mr. Klayman reiterated that Ms. Sataki did not owe him anything going into the future. Tr. 1075; BCX 29. "So I never asked to paid back, and to this day I wish her well. I pray to God that she has a good life, but I'm not the cause of her problems." Tr. 1066.

78.     When Mr. Klayman realized that there could be the potential for a conflict of interest, he advised Ms. Sataki to get other legal counsel, such as Tim Shea, Gloria Allred or someone else. This comes out in a number of different communications. Tr. 1079-1080.

79.     Mr. Klayman testifies that he never wanted a sexual relationship with Ms. Sataki and never touched her. He told Ms. Sataki "I'm not your boyfriend. I don't want to be your boyfriend." Tr. 1080-1081.

80.     During a moment of emotional clarity, Ms. Sataki admits that Mr. Klayman is not her problem. Tr.  1083-1084; BCSX 3.

81.     Ms. Sataki's speaking falsely that she never wanted to do anything in court and implied that she did not want to be in LA and that was all Mr. Klayman's idea is likely what caused Kathleen Staunton to prepare the supplemental bar complaint, not that Ms. Staunton perceived that Ms. Sataki was scared of Mr. Klayman, as Ms. Sataki presented through uncorroborated hearsay testimony. Tr. 1086; BCSX 20.

82.     Mr. Klayman informed Ms. Sataki in an email that she has a right of appeal of Judge Kotelly's decision and Ms. Sataki responded by accusing Mr. Klayman of having been bribed and disparaged his Judeo-Christian beliefs and religion. She ended by saying, as is her victim's mentality, "I am nobody. Just a little girl that was retaliated against and harassment by some VOA employee, and you seed (sic) that you can help me. Not only did you not help me, but destroyed my life." Tr. 1090-1091; BCSX 38.

83.     Mr. Klayman identified all the articles that he wrote, all of which were complementary of Ms. Sataki and which she approved. The articles did not reveal confidential information. The articles as Ms. Sataki agreed were intended to coax settlement and influence Senators to lobby for her and Mr. Klayman did not use them to promote himself or to sell books. Tr. 455-56. The ad which www.wnd.com inserted into the articles was for WND to sell books it had purchased. Mr. Klayman made no money on the articles which he wrote to help Ms. Sataki. Only one article was written and published after Ms. Sataki claims to have "terminated" his representation on November 15, 2010.  Tr. 1199-1230. BCX 23-12, 23-14, 23-19, 23-22, 23-25, 23-27, 23-30, 23-33, 23-36, 23-41.

84.     Ms. Sataki had no credible explanation for her last minute production of emails, (including an email to Ms. Allred which Mr. Klayman had to later get from her), which was not timely pursuant to the Board's rules. Tr. 330.

85.     Chairman Fitch stated that the AHC will do a report to the Board "that will include a subsection that informs the Board if any prejudicial delay that we find…and why we recommend to the Board a finding of no prejudicial delay or no prejudicial delay." Tr. 1259-1259.

### Keya Dash

86.     Mr. Dash declared under oath that he had personal knowledge of Mr. Klayman's efforts to represent Ms. Sataki with regard to her sexual harassment claims against VOA. RX 5.

87.     Mr. Klayman asked Mr. Dash as a friend to attempt to assist Ms. Sataki, as Mr. Dash had a family member who worked at VOA and Mr. Klayman was attempting to settle the sexual harassment claims before having to file an EEO and federal court complaint. RX 5.

88.     Mr. Dash declared under oath that he was present when Mr. Klayman and Ms. Sataki later met then Speaker of the House, John Boehner, and asked him to intervene on Ms. Sataki's behalf.

Mr. Boehner offered to help and Mr. Klayman and Ms. Sataki met with his staff in the Speaker's House Office to discuss this matter. RX 5.

89.   Mr. Dash declared that Mr. Klayman lobbied others on Capitol Hill for help. RX 5.

90.   Mr. Dash declared under oath that Mr. Klayman is a friend and that he has consulted with Mr. Klayman for his own legal matters. Mr. Dash was present with Mr. Klayman and Ms. Sataki on more than one occasion to discuss her case, and observed that Mr. Klayman always treated Ms. Sataki with respect and was not in any way involved in a romantic relationship with her, nor did he seek one. RX 5.

91.   Mr. Dash declared under oath that he was present when the use of publicity to coax the BBG into settlement was discussed with Ms. Sataki, and that Ms. Sataki approved of its use. RX 5.

92.   Mr. Dash's brother worked for VOA at the time that he and Mr. Klayman met. Tr. 1342.

93.   Based on his personal knowledge of VOA, Mr. Dash testified that it was very difficult to deal with in terms of settlement because it was "very bureaucratic, cavernous." Tr. 1344.

94.   Mr. Dash met Ms. Sataki on or around February of 2010. Tr. 1345.

95.   Mr. Dash met with Mr. Klayman and Ms. Sataki on another occasion at a French restaurant in Virginia. During the two meetings, Ms. Sataki publicized her situation to Mr. Dash and asked him for help. "Yes. She told me in depth her issues and she sought my assistance in talking to Blanquita Cullum, in particular, Richard Miniter, also, who is a journalist friend, and others whom I might know." Tr. 1348.

96.   Mr. Dash had reservations about helping Ms. Sataki based on her reputation.

Well, her reputation was something of an opportunist who advances herself, and when she reaches the point of no return, alleges sexual discrimination, sexual harassment. This was something I had told [Mr. Klayman] at the time." Tr. 1348.

97.     The Persian community is very close-knit, so this kind of information is of the kind that one learns about families in Washington, D.C. Tr. 1349. Furthermore, Mr. Dash's family is a very prominent Persian family in the Washington, D.C. area. Tr. 1342.

98.     Despite these reservations, Mr. Dash decided to help Ms. Sataki, for the most part due to Mr. Klayman's urging him to do so. Tr. 1349-50.  Mr. Dash attempted to enlist the help of Ms. Cullum, a member of the BBG at VOA, and who employed his brother at VOA. Tr. 1350-51.

99.     Mr. Dash testified that in January, February, and March of 2010, he had observed that Ms. Sataki was "very distraught, very nervous, easily agitated, very concerned." Tr. 1357.

100.    Mr. Dash was aware that Mr. Klayman was "trying to get Mr. Miniter (a friend of both) to write a positive article, too, for settlement…." Tr. 1360.

101.    Mr. Dash received an email from Ms. Sataki on February 21, 2010 thanking him for his efforts. "This is Ellie Sataki. Thanks for the push with Blanquita." Tr. 1359.

102.    In terms of Mr. Klayman's efforts to to help Ms. Sataki, Mr. Dash believed that Mr. Klayman worked very hard for her and that Mr. Klayman had "always been very concerned with your own affairs, and you've always been very passionate about the Iranian freedom movement. And so you've always been known to support the Iranian community, and I took it as just another example of that." Tr. 1362.

**Elham Sataki**

103.    Ms. Sataki had never met Mr. Klayman before, except on the Capitol Mall. Tr. 328.

104.    Ms. Sataki admits that she had shared intimate details about her situation with everyone, including Mr. Klayman that night. "… I explained to you my problem with VOA. … So I don't know why this conversation was so intimate to you (about her alleged harassment and workplace retaliation), because it was definitely not intimate to me. **Everybody knew. In that case, I had an intimate conversation with everybody.**" Tr. 329 (emphasis added).

105.    Ms. Sataki concedes that in the eight years since she filed her bar complaint, she never filed a sexual harassment case against Mr. Klayman. Tr. 331.

106.    Ms. Sataki told Mr. Klayman that she had no money to pay for a lawyer and backs off  a a claim that she discussed offering him 40% of any recovery. Tr. 332-33.

107.    Ms. Sataki admits that the objective of Mr. Klayman's representation would be have her detailed or transferred to the LA Bureau of PNN to get out of the presence of her harasser and managers in DC.  "I said that I have written a proposal, yes, I'm trying to transfer myself to Los Angeles." Tr. 334.

108.    Ms. Sataki admits that the response of VOA was very negative in response to Mr. Shamble's and Mr. Klayman's request to have her transferred to LA. Tr. 343. Ms. Sataki then admits that she would not accept employment in the Central News Division at VOA Washington, D.C. Tr. 345.  Ms. Sataki admits that VOA threatened her if she did not go to the Central News Division and that if she did not show up they were going to cut off her salary and leave. Tr. 347.

109.    Ms. Sataki admits that "at that point" she got "very, very emotional and started crying uncontrollably." Tr. 347. Ms. Sataki threatened to commit suicide if she had to stay in Washington. Tr. 981-92. Ms. Sataki instructed Mr. Klayman to "get [her] back to LA." Tr. 346

110.    Mr. Klayman then suggested that Ms. Sataki see a psychologist and he then took her to two. Tr. 348. Mr. Klayman found Dr. Arlene Aviera for Ms. Sataki, who she began to see. Mr. Klayman paid for these sessions. Tr. 350. When Ms. Sataki sat down with Dr. Aviera and Mr. Klayman she began sobbing again when both explained her situation Tr. 350. Mr. Klayman was not present during those counseling sessions. Tr. 350.

111.    In and around this time period, Ms. Sataki admits that she, Mr. Shamble and Mr. Klayman discussed what should be done not to get her back to work at VOA in LA. Tr. 351.

112.    Ms. Sataki admits that it was decided by the three that if she could qualify to get a reasonable medical accommodation to be in LA, that Ms. Sataki could be detailed and move to LA. They submitted documentation from Dr. Aviera. Tr. 351-352.

113.    There are over 1 million Iranians in LA. Tr. 352.

114.    Ms. Sataki also admits that she needed to be detailed to LA because she was having a nervous breakdown. Tr. 354.

115.    Ms. Sataki also wanted to be in LA to escape alleged unfair and harsh criticism of her by her supervisors, such as Joy Wagner and Susan Jackson, who said that she had to work harder because she was beautiful and also criticized her for using, Kaveh, a man she cohabitated with, to do her packages, which gave her a bleeding ulcer. Tr. 342, 356-357.

116.    At this time Ms. Sataki was staying with her friends Nella and Abdi, a married couple, in LA. Tr. 360. She was only staying there temporarily and could not stay there forever. Tr. 361.

117.    Ms. Sataki found an apartment in LA and it was brand new and that Mr. Klayman paid for it because Ms. Sataki had no credit. Tr. 364. She was very comfortable anywhere in LA. *Id*.

118.    Mr. Klayman leased and prepaid the apartment for her. Tr. 365, Tr. 502-504. RX 16.

119.    Ms. Sataki admits that around that time we had to do something stronger than just sending documentation to VOA for a reasonable medical accommodation, particularly because Mr. Shamble was saying that these people are not reasonable. Tr. 366.

120.    One reason that VOA would not agree to the transfer to LA was because many of its Iranian broadcasters wanted to move there too.  Tr. 367.

121.    Ms. Sataki admits that at that point she, Mr. Klayman and Mr. Shamble sat down and discussed legal strategy, and that they collectively decided that they would have to bring lawsuits. Tr. 369.

122.   Ms. Sataki admits that Mr. Klayman expressed concerns about her cohabitating with Kaveh and rumors that she had had an affair with, Zia, the owner of NITV, an Iranian network in LA, when she worked there as a broadcaster before joining VOA, and that this could come up in discovery. Ms. Sataki admits that this was "out there" in the Iranian community. Tr. 371. Mr. Keya Dash corroborates this. Tr. 1348-49

123.   Another later concern of Mr. Klayman was that a former husband of Ms. Sataki had filed a sworn affidavit in his divorce case against her for having had cheated and had sex with another man in their apartment just weeks after they were married. Tr. 377-382.

124.   Before Mr. Klayman agreed to represent Ms. Sataki, she, with Mr. Shamble's assistance, had filed a complaint with VOA internally in the human resources department about the alleged harassment and retaliation by her managers. Tr. 384-385.

125.   The politics at VOA were taken into account in fashioning legal strategy. Tr.392. Mr. Falahati and Ms. Sataki's supervisor had been Mr. Sajadi, whose was in the pro-regime anti-Shah faction of VOA and his father a mullah who was an adviser to the Supreme leader Ayatollah Khomeini. Tr. 390. Mr. Klayman had represented other broadcasters at VOA who were retaliated against because they were in the pro-Shah faction. Tr. 391.

126.   Ms. Sataki admits that she sat down for many hours with Mr. Klayman to prepare legal complaints against Mr. Falahati and VOA. Tr. 393.

127.   Ms. Sataki and Mr. Klayman and Mr. Shamble also prepared an administrative complaint with the EEO, which is also known as OCR.  Tr. 394.

128.   Ms. Sataki admits that it was agreed in front of Mr. Shamble and with him that "we would get some positive publicity here to try to coerce VOA into a favorable settlement so you could be in LA. Tr. 397. Ms. Sataki testified that she was aware and was informed that Mr. Klayman had written articles that were very favorable to her. Tr. 398.

129.   At that time, Ms. Sataki did not put anything in writing to Mr. Klayman not to write these favorable articles. Tr. 400.

130.   Ms. Sataki admits that Mr. Klayman advised her that Judge Kotelly "was a very difficult judge and that he had problem(s) with that judge. Tr. 408.

131.   Ms. Sataki admits that she was aware that Judge Kotelly ruled against her for a reasonable medical accommodation to LA. Tr. 415; RX 3. Ms. Sataki admits that Mr. Klayman sent Judge Kotelly's ruling to her but she can say whether she read it. Tr. 416, 418-19.

132.   Ms. Sataki admits that Mr. Klayman told her that we only lost the first phase of the case and that it was not over. Tr. 421-422.

133.   Ms. Sataki and Mr. Klayman met with Congressman Rohrabacher ("Mr. Rohrabacher") and his chief of staff, Kathleen Staunton ("Ms. Staunton") in their office. They said that he would help resolve matters with VOA to get her detailed to LA. Tr. 458, 462. This was the only time Mr. Klayman met Ms. Staunton. Tr. 467.

134.   Ms. Sataki never had any legal training and does not know how to cite cases. Tr. 461.

135.   After this initial meeting, Ms. Sataki had further contact with Ms. Staunton, but they met in restaurants and not in Mr. Rohrabacher's office. The meetings were not of a professional nature, implying that Ms. Staunton did not have authority from Mr. Rohrabacher to meet. Tr. 464

136.   The idea of the supplemental complaint, BCX 23, came from Ms. Staunton and her cousin Sam Razavi ("Mr. Razavi"). Tr. 468-469. Neither of them are lawyers. Ms. Sataki admits that Ms. Staunton and Mr. Razavi prepared the supplemental complaint. Tr. 469. Tr. 301, 307, 317, 468-72, 474-75, 544.

137.   Ms. Sataki claims to have no knowledge where the supplemental complaint was prepared. Tr. 469-470.

138.    Ms. Sataki admits that Mr. Razavi helped prepare the supplemental complaint. *Id*. Ms. Sataki claims not to remember if Ms. Staunton and/or Sam Razavi advised her to get another lawyer at the time. Tr. 470-471.

139.    Ms. Sataki admits she never read the alleged rule violations cited in the supplemental complaint, and that she did not know who cited these alleged violations. Tr. 472-474.

140.    Ms. Sataki admits not knowing what she gave Ms. Staunton and Mr. Razavi to prepare the supplemental complaint. Tr. 475.

141.    Ms. Sataki has never talked to any of Mr. Klayman's clients. Tr. 481.

142.    After Ms. Sataki claims that after she "terminated" Mr. Klayman, she is forced to admit that "maybe six, seven, eight months later" she sought the assistance of other counsel. Tr. 484.

143.    An email sent by Mr. Shamble on Jan. 27, 2011 told Ms. Sataki that she should contact Mr. Klayman so she does not lose any of her legal rights due to the passage of time to appeal and move other cases forward. Tr. 485-486.

144.    Ms. Sataki admits that she did not see another lawyer in time to bring a Title VII sexual discrimination complaint in court after the ODC ruled against her. Tr. 487.

145.    Ms. Sataki admits that Mr. Klayman advised and told her to get another lawyer and that he recommended Tim Shea and Gloria Allred. Tr. 493. Tr. 546-548. Mr. Shamble also recommended Tim Shea. Tr. 549-550.

146.    Ms. Sataki admits to encountering Mr. Klayman and his chief of staff in LA about a year ago. Tr. 496.  She denies (falsely) having yelled this man ruined my life and he is a terrible person. Tr. 497. To the contrary, Mr. Klayman testified that Ms. Sataki screamed, ""This man ruined my life. This man's a terrible person," defaming Mr. Klayman before his staff. Tr. 1065.

147.    Ms. Sataki filed a complaint in Los Angeles Superior Court against the manager of the apartment, Dean Proper, and accused him of sexual harassment of her friend Jessica who was

staying in the apartment in the second bedroom, as well as stealing Ms. Sataki's diamond ring. Tr. 506-512. RX 12. The Court ruled against her. Tr. 519.

148.    Ms. Sataki falsely tries to justify the court's judgment against her by untruthfully claiming that the complaint was only meant to escape the payment of rent for the apartment. Tr. 520.

149.    In fact, the truth is that the court documents show "Judgment was entered, as stated below, on Day: 8/23/2011. Defendant does not owe plaintiff any money on plaintiffs' claim. And below it says contested. Tr. 521. RX 12.

150.    Ms. Sataki also filed a complaint in Los Angeles Superior Court against the wife of Zia Atabay, who she was accused of having an affair, over Mrs. Atabay having allegedly keyed her car. However, Ms. Sataki also falsely testified that the court ruling proved she was not having an affair with Zia Atabay, the owner of NITV. Tr. 525-526. The Chair, Mr. Fitch, acknowledges that Mr. Klayman's elicited testimony goes to Ms. Sataki's overall credibility. Tr. 527-528.

151.    Ms. Sataki admits that the handwriting on the original ODC complaint is not hers. Tr. 538.

152.    Ms. Sataki effectively admits that a contingency fee would only be put into effect if Mr. Klayman moved forward and stayed on as her counsel after he told her he wanted off the case for personality reasons. Tr. 557. "Q: But what I was talking about Ms. Sataki, is if I continued on, given the difficulty in our relationship, regardless of what the cause was, then I'm saying then I want 50 percent going forward, correct?" "A: Correct." Tr. 557.

153.    Ms. Sataki admits to being gainfully employed and continuing with her broadcasting career since she and Mr. Klayman parted ways. Tr. 561-568. Ms. Sataki makes $62,000 per year plus health insurance benefits. Tr. 620-21.

154.    The OCR final determination was sent to Ms. Sataki's address.  Tr. 635. RX 18.

155.   The final determination finds that Ms. Sataki's factual claims of sexual harassment and workplace retaliation were not meritorious and thus false, as OCR had interviewed a number of witnesses. Tr. 635-640. RX 18.

156.   Ms. Sataki is forced to admit that at all times she could have contacted Mr. Shamble and asked what was happening and that at all times she could have talked to Mr. Shamble about her cases if she did not want to communicate with Mr. Klayman. But she did not contact either of them. She only finally contacted Mr. Shamble later. Tr. 662.

157.   There is mail from Mr. Klayman to Ms. Sataki where Ms. Sataki is forced to admit that Mr. Klayman offered to pay and did pay her salary when she was cut off by VOA as she would not return to DC. The email asks for her account number so Mr. Klayman could wire funds to her. Tr. 663-664. BCSX 9.

158.   An email from Mr. Klayman to Ms. Sataki dated May 19, 2010 said, "You don't owe me money and I did what I did from my heart." Tr. 665-666. BCSX 10.

159.   An email was sent on August 5, 2010 from Mr. Klayman to Ms. Sataki referring to the letter prepared by Kathleen Staunton that was sent to VOA's Dan Austin. BCSX 26.  In this email, Mr. Klayman stresses that this letter to Austin is counterproductive (to dismiss her cases and that she was foolishly giving up.). Tr. 697-699

160.   Mr. Klayman wrote to Ms. Sataki in an email at Christmas on December 25, 2010 and wished her and her family well. Mr. Klayman wrote:

> Good morning. … This is my Christmas message of you and my friends Ellie. I wish you the very best. So does God. The column (wnd.com) explains how you are part of the most profound experience in my life. … Someone called me today and threatened me. I know you would not do this. Keep yourself well and believe, as this is stronger than any psychologist. God bless you and your family. Larry" BCSX 32. Tr. 729-730

161.   An email by Mr. Klayman was sent to Ms. Sataki on Jan. 14, 2011, in response to something that Mr. Klayman received that was sent by someone other than Ms. Sataki because it

was written in perfect English reads in part: "However, whatever your legal status, you must be in contact with Ms. Sataki. Please tell her to contact me or the union president … Tim Shamble, to bring her up to date on the legal matters." Tr. 733.  BCSX 34.

162.    Mr. Razavi was the person who threatened Mr. Klayman and it was discovered that he had pled guilty to and was convicted by the 2nd District Court of the State of Nevada, Washoe County, for conspiracy to commit fraudulent acts involving gaming. BCSX 36, 37; Tr. 737-39.

163.    On September 11, 2011, Ms. Sataki sent an email to Mr. Klayman saying:

> Mr. Klayman are you happy now that you've completely destroyed and lost my case? A case with so many evidence and witnesses. Only a very bad and clueless attorney could lose it, or lost it on purps (sic) because you made a dill (sic), with the other party.'" BCSX 38.

164.    Ms. Sataki had no evidence that Mr. Klayman was bribed. Tr. 741-742.

165.    Ms. Sataki disparages and mocks Mr. Klayman's Judeo-Christian beliefs and religion. BCSX 38.

166.    Ms. Sataki is forced to admit that she, Mr. Shamble and Mr. Klayman discussed the article "The Government War on a Freedom Loving Beauty. BCX 23-33. Further it was discussed that publicity would be used to further settlement. Tr. 758-759. Ms. Sataki conceded that "We talked about that, the fact that publicity always is going to help everybody. You always said that. Tr. 759.

167.    Ms. Sataki never told Mr. Shamble not to use publicity. Tr. 761-62.

168.    After Ms. Sataki filed her complaint, for three and one half years, she never had any contact with ODC. Tr.766.

169.    Ms. Sataki had abandoned her complaint, but it was resurrected by ODC, despite two other bars having dismissed it many years earlier. In fact, internal correspondence of ODC reveals that it had to use private investigator Kevin O'Connell to try to hunt down Ms. Sataki. RX 27. The internal correspondence of ODC admits:

I am trying to locate a complainant that has dropped off the map. Ms. Elham Sataki.…
She filed a complaint vs. Larry Klayman in 2011. Her only correspondence with us was
the ethical complaint that she filed. My letter to her dated 7/7/11 was not responded to,
but was not returned by the USPS either. I recently tried to contact her by telephone, but
her number is not in service. I'll appreciate your efforts to locate her and to provide some
reliable contact information.

170.     Importantly, even on questioning from ODC, Ms. Sataki admits that she agreed to the use
of publicity to coax a settlement so she could be detailed to the LA bureau of VOA. "Q: Did you
ultimately agree with Mr. Klayman about the publicity?" "A: I did." Tr. 775.

171.     Ms. Sataki is still seeing a doctor to this day and is still on anxiety medication, eight years
after Mr. Klayman's representation. This shows that her mental and other problems are not the
result of Mr. Klayman, but of her own. Tr. 201.

## Gloria Allred

172.     Ms. Gloria Allred's law firm, Allred Maroko and Goldberg "has been the leading private
women's rights law firm in the United States for 42 years." Tr. 1098-99.

173.     On June 15, 2010, Mr. Klayman sent an email to Ms. Allred's to discuss her taking over
Ms. Sataki's case. Tr. 1100, RSX 1.

174.     Ms. Allred testified that there may have been discussions prior to the June 15, 2010 email
regarding her firm representing Ms. Sataki, "because you didn't give her last name" in the email.
Tr. 1101. Ms. Allred testified that she believed there was a conference call between Mr. Klayman,
Ms. Sataki, and herself to discuss whether she would represent Ms. Sataki. Tr. 1101.

175.     Ms. Allred's firm did not end up representing Ms. Sataki. Tr. 1103.

176.     On March 23, 2012, Ms. Sataki, playing the victim to again induce someone to help her,
sent Ms. Allred an email that read:

Hi Gloria. My name is Elham Sataki. I'm watching you on CNN now. All my hope
regarding my case died, and I'm on medication and go to my therapist every week just so
I can stay alive for my mom. And I love my mom, the same way that you (sic) daughter
loves you. My mom is a strong mom like you. I'm in LA and hope that I can have a

meeting with you regarding my Voice of America case. Larry Klayman was representing me in this case but completely destroyed it. You can Google and YouTube me. I just want you to know, if there is any hope left, I have emailed women's rights groups, but no answer." Tr. 1105-06. RSX 2.

177.   Ms. Allred sent an email on the same day responding to Ms. Sataki saying that her firm could not represent her. Tr. 1107, RSX 2.

**Joshua Ashley Klayman**

178.   Joshua Ashley Klayman ("Ms. Klayman") is Mr. Klayman's sister. Tr. 1521.

179.   Ms. Klayman met Ms.  Sataki multiple times. "At the time I was dating someone in Los Angeles, so I was frequently flying over the weekend from Los Angeles to New York. [Mr. Klayman] lived in Pacific Palisades, and I met her at his house." Tr. 1524.

180.   Ms. Sataki openly discussed the VOA case with Ms. Klayman many times. "Yes, quite openly. And I met her multiple times. It wasn't that I just met her one time. Yes, she was quite open with what the circumstances of her challenges were…. an, she was very, very open, which -- I'm not a litigator. I don't really know anything about litigations, but I was surprised that she was so open." Tr. 1524.

181.   Ms. Klayman testified that Ms. Sataki

…was very interested in trying to get a positive result and to pressure people into, you know, giving her that result. She certainly was publicizing everything to my then boyfriend and me, but I don't recall her explicitly saying, like, 'Yes, I,' you know -- however she was actively publicizing it to me. And she seemed very onboard with whatever the strategy was." Tr. 1525-26

182.   Mr. Klayman mentioned the strategy of trying to get publicity for Ms. Sataki's claims against VOA in front of Ms. Sataki and Ms. Klayman, and Ms. Sataki did not object to the strategy. Tr. 1526.

183.   Ms. Klayman believed that Mr. Klayman and Ms. Sataki were friends:

Not sure offhand how many in-person times, however she and Larry were friends. I mean, they were -- that's why she was over my boyfriend's house there. So, I frequently

had conversations either directly with her or through Larry and her saying hi to me or something like that. It wasn't that -- they were friends." Tr. 1526-27.

184.    During their numerous meetings between Mr. Klayman, Ms. Klayman, and Ms. Sataki, Mr. Klayman always discussed publicizing Ms. Sataki's case, and Ms. Sataki never objected. Tr. 1527.

185.    Ms. Klayman was unsure of what to think about Ms. Sataki, but thought that Ms. Sataki was using Mr. Klayman. "I mean, I vacillated between kind of liking her and being suspicious of her, quite frankly, as your sister…she was very forward in terms of requesting different things for her personally." Tr. 1527-28.

186.    Ms. Klayman testified that she did not believe that Mr. Klayman was in love with Ms. Sataki." Tr. 1529.

### The Honorable Stanley Sporkin

187.    The Honorable Stanley Sporkin ("Judge Sporkin") received and undergraduate degree from Pennsylvania State University and a law degree from Yale Law School. He is a member of the District of Columbia Bar and is also a CPA. Tr. 1171.

188.    Mr. Klayman has appeared before Judge Sporkin on several occasions and has found Mr. Klayman to be honest and ethical. Tr. 1172.

189.    Judge Sporkin got to know Mr. Klayman even better after Mr. Klayman no longer had cases before him and he retired from the bench. Tr. 1173.

190.    Judge Sporkin, based on the facts of the case found it reasonable under *Wagner vs. Taylor* to have put her to work for VOA in LA. Tr. 1174, 1175.

191.    Judge Sporkin would have also accorded Ms. Sataki a preliminary injunction hearing before ruling on the *Wagner vs. Taylor* preliminary injunction motion to put Ms. Sataki back to work for VOA in LA. That would have been the fairest thing to do for all parties. *Id*.

### Legal Ethics Expert Professor Ronald Rotunda

65

192.     The late legal ethics expert Professor Ronald Rotunda ("Mr. Rotunda"), former Doy &
Dee Henley Chair and Distinguished Professor of Law at Chapman University School of Law
reviewed the instant complaint against Mr. Klayman.

193.     Despite the fact that the Complaint is dated October 20, 2011, Mr. Klayman only received
in on or around December 19, 2016, likely because ODC sent it to the wrong address (2000
Pennsylvania vs. the correct 2020 Pennsylvania). RX 5.

194.     Mr. Rotunda found that it was "very surprising" that the Complaint was filed in October of
2011 over alleged events that occurred in December of 2009 and shortly thereafter. Ms. Sataki had
made similar complaint to the Pennsylvania Bar and The Florida Bar, both of which were
dismissed years ago. RX 5.

195.     Mr. Rotunda found that established case lase shows that ODC is subject to the principle of
laches. Mr. Rotunda wrote:

> In *Florida Bar v. Rubin*, 362 So.2d 12 (Fla. Sup. Ct. 1 1978) (per curiam), the Florida
> supreme court threw out charges because the prosecutor because of the Bar's delay in
> violation of the Florida rules… One can summarize this case as the Bar delaying
> finalization of two cases (where the Bar was disappointed with the recommended
> discipline) because it was confident it would secure a conviction in a third case still in the
> pipeline in the hope of securing greater overall disc line. The Court said, 'Whatever other
> objects the rule may seek to achieve, it obviously contemplates that *the Bar should not be
> free to withhold a referee 's report which it finds loo lenient until additional cases can be
> developed* against the affected attorney, in an effort to justify the more severe discipline
> which might be warranted by cumulative misconduct. The Bar's violation of the prompt
> filing requirement in this case, to allow a second grievance proceeding against Rubin to
> mature, is directly antithetical to the spirit and intent of the rule. In addition, it has
> inflicted upon Rubin the 'agonizing ordeal' of having to live under a cloud of
> uncertainties, suspicions, and accusations for a period in excess of that which the rules
> were designed to tolerate. RX 5.

196.     Mr. Rotunda found numerous other cases that held that ODC should be subject to the
principle of laches. They include *The Florida Bar v. Walter*, 784 So.2d 1085 (Fla. Sup. Ct. 2001);
*In re Grigsby*, 815 N.W.2d 836 (Minn. 2012); *In Matter of Joseph*, 60 V.I. 540, 558- 59 (V.I. Feb.
11, 2014); *Hayes v. Alabama State Bar;* 719 So 2d 787, 791 (Ala. 1998). RX 5.

197.     Mr. Rotunda found that in Indiana Bar expressly limits the time to complete a disciplinary

investigation in its own rules:

> *Limitation on time to complete investigation*. Unless the Supreme Court permits
> additional time, any investigation into a grievance shall be completed and action on the
> grievance shall be taken within twelve (12) months from the date the grievance is
> received…. If the Disciplinary Commission does no file a Disciplinary Complaint within
> this time, the grievance shall be deemed dismissed." RX 5.

198.     Mr. Rotunda wrote that it was his opinion that Mr. Klayman did not violate Rule 1.3. In

this regard, Mr. Rotunda wrote:

> Mr. Klayman told me that when he wrote to talked about the case it was only after his
> client's permission. She and Mr. Shamble thought that publicity would help her case by
> encouraging the Voice of America to settle rather than suffer bad publicity. RX 5.

199.     Mr. Rotunda wrote that it was his opinion that Mr. Klayman did not violate Rule 1.5. In

this regard, Mr. Rotunda wrote:

> Mr. Klayman tells me that he did disclose the fee when they first talked about the case.
> The fee was zero - he did it as a pro bono matter. Several months later, when the case got
> more difficult than either of them expected, he told the client that he would have charge a
> fee. Or, of course, she would retain another lawyer and he could transfer the files to that
> other lawyer. She chose not to hire a new lawyer and he proposed a contingent fee. She
> never signed a fee agreement because she was hard to contact and the case ended at her
> request. He never charged her any fee. RX 5.

200.     Mr. Rotunda wrote that it was his opinion that Mr. Klayman did not violate Rule 1.6. In

this regard, Mr. Rotunda wrote

> Mr. Klayman has told me that he had her permission before he disclosed anything. She
> and her Union Representative, Mr. Shamble, thought that publicity would help her case,
> and she was probably right – although not pursuing an appeal undercut her case." RX 5.

201.     Mr. Rotunda wrote that it was his opinion that Mr. Klayman did not violate Rule 1.7. In

this regard, Mr. Rotunda wrote:

> Leaving aside the rather vague nature of those charges, Mr. Klayman says that his only
> motivation was to help her as a friend because she was in trouble and had other problems.
> He would be willing to disclose these other problems to you if Ms. Sataki waives her
> attorney-client privilege. After all; we do not want a situation where the OBC seeks to
> discipline Mr. Klayman in this case because he used what the OBC later claims is

information protected by Rule 1.6. Since Mr. Klayman will not be talking to Ms. Sataki about this case, the OBC should ask for this waiver. RX 5.

202.    Mr. Rotunda wrote that it was his opinion that Mr. Klayman did not violate Rule 3.3. In this regard, Mr. Rotunda wrote:

> Mr. Klayman has told me that he never told people he was her lawyer after she discharged him. He (and her union representative) tried to contact her unsuccessfully to ask her if she wanted to appeal. Her complaint says that her brother told Mr. Klayman to terminate the representation, but the caller did not identify himself as her brother, Mr. Klayman would not recognize the brother's voice, and her brother did not represent that he was her agent with authority. RX 5.

203.    Mr. Rotunda wrote, "I am troubled that the OBC [ODC] has sat on this case for nearly six years and another one involving Mr. Klayman for nearly eight years. In my view, the complaint of Oct. 20, 2011 should be dismissed, particularly under these circumstances.  The OBC has not even asserted that it learned something in the intervening years to justify reopening." RX 5.

## Joel Bennett

204.    Joel Bennett was proffered as an expert by ODC on employment matters. Tr. 793-800. Mr. Bennett has never testified for a respondent in a Board disciplinary proceeding. Tr.801,807. Instead, he is the paid "hired gun" of ODC. *Id*. He is paid by ODC at an hourly rate of $475.00. per hour. Tr. 808. In his 45 years of practice, he may have had only one case in any way related to VOA. It concerned Radio Free Europe. Tr. 804. Mr. Bennett has not had any contact with or proceedings with VOA's Office of Civil Rights for at least the last 10 years. Tr. 807.

205.    Mr. Bennett spent little time reviewing the voluminous pleadings in the cases which Mr. Klayman brought for Ms. Sataki. Tr. 812-813.

206.    Mr. Bennett's alleged focus was simply whether it was necessary to name Secretary of State Hillary Clinton in the *Bivens* complaint Mr. Klayman brought for Ms. Sataki against the Board of Governors of VOA. Tr. 813-814.

207.   Mr. Bennett on questioning from AHC member Mr. Tigar is forced to admit that it is reasonable judgment in a *Bivens*-type action to name agency employees or officials as defendants. Tr. 820.

> Q: MR. TIGAR: Alright. Would that be a reasonable judgment of a lawyer? Not necessarily you?
> A: Right.  Tr. 820.
> Q: MR. TIGAR: No, I'm talking about the individual harasser. I'm talking about individuals connected with the decision-making process?
> A: Oh, I've never seen that done. You could always sue the head of the agency.

208.   Mr. Bennett admits that when the head of an agency receives notice of misconduct and fails to take action, that one would be able to name that individual in a *Bivens* claim. He testifies, "I would think you'd have to show notice and failure to take action…." Tr. 825-826.

209.   Mr. Bennett admits that Mr. Klayman did not attack Mrs. Clinton in naming her in the *Bivens* action. Mr. Bennett testifies, "[i]n all of the hundreds of pages of exhibits, I do not recall any individual attack on Mrs. Clinton." Tr. 827.

210.   Mr. Bennett testifies that he was unaware that the Honorable Ellen Huvell had such a *Bivens* case concerning Voice of America and ruled that that case could proceed against the board of governors.  He admits that "[t]here are many different ways that lawyers litigate cases." Tr. 830- 832.

211.   Mr. Bennett was retained by ODC before this proceeding was even instituted by a Board member. Tr. 833, 835. The draft specification of charges sent to Mr. Bennett before Mr. Klayman was even notified by ODC that it was considering bringing charges against him, is different than the one which ultimately became operative in this proceeding. Tr. 835.

212.   Mr. Bennett was aware of neither the Supreme Court's position in *Ziglar vs*. *Abbasi* where John Ashcroft was named as a defendant, Tr. 839-840, nor the Fourth Circuit's ruling that former FBI Director Louis Freeh could be named as a defendant in a *Bivens* lawsuit. Tr. 840.

**DISTRICT OF COLUMBIA COURT OF APPEALS**
**BOARD ON PROFESSIONAL RESPONSIBILITY**
**AD HOC HEARING COMMITTEE**

_____

In the Matter of:
     **LARRY E. KLAYMAN, ESQ.**

                                      **Board Docket No. 17- BD-063**

**Respondent.**                           **Bar Docket No. 2011-D028**

**A Member of the Bar of the District of**
  **Columbia Court of Appeals**

**(Bar Registration No. 334581)**

---

### MOTION FOR LEAVE TO FILE SUPPLEMENT TO RESPONDENT LARRY KLAYMAN'S POST-HEARING BRIEF AND PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
_____

      Respondent Larry Klayman ("Mr. Klayman") hereby moves for leave and submits the following supplement to his post hearing brief, given the Ad Hoc Hearing Committee ("AHC") order of October 29, 2018 where Mr. Klayman it asked him to "admit or deny, with explanation, with each of [ODC's] PFF's…."   In conjunction with this, Respondent Larry Klayman respectfully requests that the AHC also carefully review the findings of fact included in Respondent's post hearing brief and findings of fact and conclusions of law as they accurately set forth the hearing testimony and exhibits which show that there is "no clear and convincing" evidence to warrant a finding of an ethics violation and sanctions.

      This supplement was prepared as suggested by the AHC's order of October 29, 2018, to aid the AHC in its analysis of the evidence.

      Any proposed finding of fact by ODC which is not otherwise listed below is not subject to being admitted by Respondent.

### RESPONSE TO ODC'S PROPOSED FINDINGS OF FACT

OPF #6 – Respondent introduced himself as a lawyer, and proposed that she cover another story involving Iran…They exchanged business cards **OPPOSED.**

Respondent's Fact -  After Mr. Klayman introduced himself, Ms. Sataki ran over to him and gave him her card with her personal cell phone number on it and asked him to call her. PPF 45.

OPF #8 –  Respondent invited Ms. Sataki to dinner to further discuss her problems at work. There, he also offered to help her career in the media and suggested she consider hiring Gloria Allred to represent her in connection with the VOA matter. **OPPOSED.**

Respondent's Fact - Mr. Klayman had asked Ms. Sataki to dinner in a personal capacity. Tr. 325, 976. PPF 46.  About five to ten minutes of getting personally acquainted, Mr. Sataki "broke down in tears and grabbed my hand and said, 'Larry, I really have big problems. I've been sexually harassed by my co-anchor, … she described it, Mehdi Falahati and before that I was unfairly criticized for my abilities and I need help. And, I said, well I will try to help you, and you know, I'll do it out of friendship. We're now friends.'"  Mr. Klayman told Ms. Sataki he would legally represent her *pro bono*. Tr.  326-27, 332-33, 976-977. PPF 47.

OPF #9 – They agreed that Respondent would receive 40 percent of any recovery. **OPPOSED**

Respondent's Fact - Mr. Klayman told Ms. Sataki he would legally represent her *pro bono*. Tr. 326-27, 332-33, 976-977. PPF 47, 74. Ms. Sataki told Mr. Klayman that she had no money to pay for a lawyer and backs off a claim that she discussed offering him 40% of any recovery. Tr. 332-33. PPF 106.

OPF #9 - They later agreed that Respondent would pay Ms. Sataki ' s expenses in connection with her move to Los Angeles, for which he would be reimbursed from any recovery over and above his contingency fee…. Respondent did not provide Ms. Sataki a written retainer agreement or any other document setting forth the basis of his fee, the expenses for which she would be responsible, or the scope of his representation. **OPPOSED.**

<u>Respondent's Fact</u> - Mr. Klayman reiterated that Ms. Sataki did not owe him anything going into the future. Tr. 1075; BCX 29. "So I never asked to paid back, and to this day I wish her well. I pray to God that she has a good life, but I'm not the cause of her problems." Tr. 1066." PPF 77. An email from Mr. Klayman to Ms. Sataki dated May 19, 2010 said, "You don't owe me money and I did what I did from my heart." Tr. 665-666. BCSX 10." PPF 158.  Mr. Klayman only asked for 50% if the matter proceeded any further after realizing that he was getting used by Ms. Sataki, but no agreement was ever reached, and has to this day never asked Ms. Sataki to pay him back a single dollar. Tr. 1057. PPF 75.

<u>OPF # 10</u> - Ms. Sataki told Respondent that she wanted her case to be handled very quietly because she did not want anyone to know about the sexual harassment.... Respondent initially agreed to respect his client's wishes. **OPPOSED**.

<u>Respondent's Fact</u> – Ms. Sataki admits agreed to the use of publicity and even engaged in garnering and distributing publicity for her cases herself, along with Mr. Shamble. This is corroborated by numerous witnesses, including but not limited to Tim Shamble, Keya Dash, and Joshua Ashley Klayman. PPF 9- 11, 24, 91, 170, 182.

<u>OPF # 13</u> - Without a place to live or any income, Ms. Sataki was not prepared to move. Id. at 361. Nevertheless, she agreed to pursue Respondent's legal strategy of attempting to force the VOA to transfer her to Los Angeles. because Respondent assured her that it would be easy and could be accomplished within two weeks. **OPPOSED**.

<u>Respondent' Fact</u> - Ms. Sataki was the one who wanted to move to LA, her home town, and where her friends, family and physicians were located. It was mutually agreed that the goal of the representation was to have Ms. Sataki detailed to work in LA.  PPF 18, 48, 54, 76, 107.

3

OPF #14 - Respondent thereafter discussed with Ms. Sataki a strategy for publicizing her case. Tr. 772 (Sataki). Ms. Sataki told him she did not favor publicizing her case. Tr. 397 - 405. Respondent did not discuss the specific type of publicity he contemplated. **OPPOSED**,

Respondent's Fact - Ms. Sataki admits to having agreed to the use of publicity and even engaged in garnering and distributing publicity for her case herself, along with Mr. Shamble. This is corroborated by numerous witnesses, including but not limited to Tim Shamble, Keya Dash, and Joshua Ashley Klayman. PPF 9- 11, 24, 91, 170, 182. Ms. Sataki was kept informed of Mr. Klayman's strategy and actions on her behalf every step of the way. Tr. 1011. PPF 60.

OPF # 18 - Ms. Sataki resisted adding Ms. Clinton and other defendants because she believed it would "hurt [her] case "and she told Respondent the case was "getting too big." **OPPOSED**.

Respondent's Fact – Then Secretary of State Hillary Clinton was on the BBG at the time that Mr. Klayman and Mr. Shamble were trying to reach a settlement. Tr. 912, 388. Ms. Sataki admits that she was aware that Secretary of State Hillary Clinton was included as a defendant in the BBG *Bivens* action because Mrs. Clinton was at the time "the number one governor sitting over that board." Tr. 479, 481. PPF 26.

OPF # 18 – Proceeding against the PNS and VOA on behalf of Ms. Sataki did not require suing Ms. Clinton and the other members of the BBG. **OPPOSED**.

Respondent's Fact – ODC's own "expert" admits that it was within the reasonable judgment of the attorney to sue agency officials as defendants. PPF 207.

OPF # 19 – In April 20 10, Ms. Sataki became aware that Respondent was pursuing a romantic relations hip with her. **OPPOSED**.

Respondent's Fact – Respondent did not pursue a romantic relationship with Ms. Sataki. For instance, there is no evidence that Mr. Klayman claimed to be anything more than close friends with Ms. Sataki. Mr. Klayman has offered testimony by Mr. Dash that states that Mr. Klayman

never sought a romantic relationship with Ms. Sataki, and he did not seek a sexual relationship! RFF 90. Indeed, the testimony clearly supports this, as Mr. Klayman told Ms. Sataki, "I'm not your boyfriend. I don't want to be your boyfriend." RFF 79. This is corroborated by numerous material witnesses. PFF 79, 90, 186. Documents submitted by ODC where Mr. Klayman purportedly professes his "love" for Ms. Sataki could just as easily show platonic love. For instance, as set forth in ODC's FF 24, Mr. Klayman listed seven attributes of <u>friendship</u>, not romantic relationships. Bar Counsel Supplemental Exhibit ("BCSX") 1.

<u>OPF #32</u> - The article quoted Respondent discussing his client' s sexual harassment case and disclosing that she "suffers serious health problems" because of the stress created by the conflict. The article also promoted Respondent's autobiography '·WHORES: Why and How I Came to Fight the Establishment." DX 23 at 23-36. **OPPOSED**.

<u>Respondent's Fact</u> - The articles as Ms. Sataki agreed were intended to coax settlement and influence Senators to lobby for her and Mr. Klayman did not use them to promote himself or to sell books. Tr. 455-56. The ad which www.wnd.com inserted into the articles was for WND to sell books it had purchased. Tr. 1202. Mr. Klayman made no money on the articles which he wrote to help Ms. Sataki with her consent.  Tr. 1199-1230. BCX 23-12, 23-14, 23-19, 23-22, 23-25, 23-27, 23-30, 23-33, 23-36, 23-41. PFF 83.

<u>OPF# 33</u> – Respondent recommended Ms. Sataki not accept the government's offer of accommodation. **OPPOSED**.

<u>Respondent's Fact</u> – Ms. Sataki herself admits that she would not accept employment at Central News. Ms. Sataki threatened to commit suicide if she had to stay in Washington. Tr. 981-92. Ms. Sataki instructed Mr. Klayman to "get [her] back to LA." Tr. 346. PFF 108. In addition, Ms. Sataki believed that she was being set up to be fired, as her English was poor and the Central News Division broadcast in English to other countries that she had no interest in as an Iranian.

PFF 22.

OPF# 41 – It also included a promotion for Respondent's autobiography. **OPPOSED**.

Respondent's Fact - The articles as Ms. Sataki agreed were intended to coax settlement and influence Senators to lobby for her and Mr. Klayman did not use them to promote himself or to sell books. Tr. 455-56. The ad which www.wnd.com inserted into the articles was for WND to sell books it had purchased. Tr. 1202. Mr. Klayman made no money on the articles which he wrote to help Ms. Sataki.  Tr. 1199-1230. PFF 83.

OPF # 42-43. Ms. Sataki also reminded Respondent, "PLEASE always remember YOU WILL GET 40% WHEN YOU FINISH THE CASE…." Respondent wrote back to Ms. Sataki the next day, describing the time and expenses he had put into the representation and then escalating his demand for compensation: "So at this point I think 50 percent of any recovery is fair and that is what I require. " He also promised to send her a written retainer agreement.  **OPPOSED**.

Respondent's Fact: Ms. Sataki gratuitously "offered" 40% to Mr. Klayman via email on May 30, 2010, but this was never agreed to, and in any event not important to Mr. Klayman. BCSX 11. Mr. Klayman only asked for 50% if the matter proceeded any further after realizing that he was getting used by Ms. Sataki, but no agreement was ever reached, and has to this day never asked Ms. Sataki to pay him back a single dollar. Tr. 1057. PFF 75.

OPF # 44 – Despite his previous promise to continue with financial support, on June I, 2010, Respondent wrote Ms. Sataki that he would have no further financial involvement in leasing her apartment.... **OPPOSED**.

Respondent's Fact - Mr. Klayman assured Ms. Sataki in email of November 21, 2010, that her rent was paid for as they both moved on. Mr. Klayman reiterated that Ms. Sataki did not owe him anything going into the future. Tr. 1075; BCX 29. "So I never asked to paid back, and to this day I

wish her well. I pray to God that she has a good life, but I'm not the cause of her problems." Tr. 1066. PFF 77.

OPF # 48 – Respondent's autobiography was promoted within the article. **OPPOSED**.

Respondent's Fact - The articles as Ms. Sataki agreed were intended to coax settlement and influence Senators to lobby for her and Mr. Klayman did not use them to promote himself or to sell books. Tr. 455-56. The ad which www.wnd.com inserted into the articles was for WND to sell books it had purchased. Tr. 1202. Mr. Klayman made no money on the articles which he wrote to help Ms. Sataki.  Tr. 1199-1230. PFF 83.

OPF # 53 - Ms. Stanton asked Ms. Sataki if s he was "o.k. with [Respondent] because we get the vibe that you re afraid of him." Tr. 115. Ms. Sataki explained to Ms. Stanton that she was not o.k. because "by then [she] was completely mentally destroyed because of the rollercoaster [Respondent] was putting [her] through." **OPPOSED**.

Respondent's Fact - Ms. Sataki's speaking falsely that she never wanted to do anything in court and implied that she did not want to be in LA and that was all Mr. Klayman's idea is likely what caused Kathleen Staunton to prepare the supplemental bar complaint, not that Ms. Staunton perceived that Ms. Sataki was scared of Mr. Klayman, as Ms. Sataki stated through rank uncorroborated and unreliable hearsay testimony. Tr. 1086-88; BCSX 20. PFF 81.

OPF # 57 - The next day, Respondent again wrote Ms. Sataki, reporting that he had followed her instructions by dismissing all cases against VOA, but that he did not dismiss the case before Judge Koller-Kotelly involving her relocation to work in Los Angeles. **OPPOSED**.

Respondent's Fact - Mr. Klayman, on July 28, 2018 filed a notice of voluntary dismissal

dismissing all but two of Ms. Sataki's claims.[1] The only two remaining claims at that point were for a Privacy Act claim, and for *Wagner* injunctive relief. This occurred before Ms. Sataki's purported July 30 email which only asked Mr. Klayman to "withdraw all the pending lawsuits that are on my behalf and/or in my name." BCSX 21. Ms. Sataki asks Mr. Klayman to continue to pursue the "sexual harassment case against Medhi Falahati…and Ali Sajjadi and Susan Jackson…." BCSX 21. This email does not discuss publicity. Consistent with what was purported to be Ms. Sataki's wishes, Mr. Klayman filed no opposition to the pending motion for summary judgment as to the Privacy Act Claim, and Judge Kotelly had at that point already ruled against Ms. Sataki with regards to the *Wagner* injunctive relief, and therefore dismissed the action entirely. PFF 68.

OPF # 59 – The next day, Respondent wrote Ms. Sataki, acknowledging he had received a copy of her August 4, 2010 letter to Mr. Austin. **OPPOSED**.

Respondent's Fact – The August 4, 2010 letter to Mr. Austin was written in perfect English, in contrast to Ms. Sataki's poor written English. "The August 4, 2010 'termination' letter was not in Ms. Sataki's English. "That's why [Mr. Klayman] needed to be able to talk to her (before I dismissed cases)." Tr. 1041. RX 21. PFF 70.

OPF # 62 - Rather than answering Respondent's messages, Ms. Sataki filed a disciplinary complaint, reporting that she had terminated him as her attorney and wanted him to stop attempting to communicate with her. **OPPOSED**,

Respondent's Fact - Ms. Sataki admits that the handwriting on the original ODC complaint is not hers and thus does not appear to have come from her. Tr. 538. PFF 151.

OPF # 63 - Throughout October, 20 10, WND published further articles written by Respondent

---

[1] *Sataki v. BBG*, 1:10-cv-00534, ECF No. 67. For clarification, the notice of voluntary dismissal filed on July 28, 2010 dismissed all but one of Ms. Sataki's claims, but that was done in error, which was corrected on August 6, 2010. ECF No. 68.

that described his representation of Ms. Sataki, linked to his previous articles, and promoted his autobiography. **OPPOSED**.

Respondent's Fact - The articles as Ms. Sataki agreed were intended to coax settlement and influence Senators to lobby for her and Mr. Klayman did not use them to promote himself or to sell books. Tr. 455-56. The ad which www.wnd.com inserted into the articles was for WND to sell books it had purchased. Tr. 1202. Mr. Klayman made no money on the articles which he wrote to help Ms. Sataki.  Tr. 1199-1230. PFF 83.

OPF # 65 – Despite having been terminated by Ms. Sataki and directed to voluntarily dismiss the *Sataki v. BBG* civil action…. **OPPOSED.**

Respondent's Fact - Ms. Sataki's purported "termination" letter of August 4, 2010 was sent to VOA's Dan Austin and Mr. Shamble, but not to Mr. Klayman. Tr. 1038-39. RX 21. PFF 69. The August 4, 2010 'termination" letter was not in Ms. Sataki's English. "That's why [Mr. Klayman] needed to be able to talk to her (before I dismissed cases)." Tr. 1041. RX 21. PFF 70.  Another "termination" letter of November 15, 2010 was incorrectly sent to the wrong addresses at 2000 Pennsylvania Ave, and another incorrect location, 2001 Massachusetts Ave, which Mr. Klayman never received from her. RX 8. Tr. 1042-43, 1046. Ms. Sataki admits this. "So that was a mistake." Tr. 540. RX 8. PFF 71.

OPF # 68 - On December 25, 20I0, WND published Respondent's article, which discussed his representation of his former client, Ms. Sataki, and falsely claimed, "[a]n ultra-leftist, pro-Clinton and ethically corrupt federal judge - Colleen Kollar-Kotelly - had just dishonestly denied, without factual or legal bases, my request for Elham to be put back to work at the Los Angeles office of VOA." DX 23 at 23 - 12. **OPPOSED**.

Respondent's Fact - Mr. Klayman providing his opinion about a jurist that he as counsel actually appeared before, was supported by about 14 pages of her factual errors. PFF 65.  That Judge

Kotelly would simply ignore her grave errors, despite the fact that they were meticulously laid out for her in detail, clearly evidences the extrajudicial bias and prejudice against Mr. Klayman (and Ms. Sataki) that he had experienced from Judge Kotelly again and again. Mr. Klayman, upon being assigned Judge Kotelly, warned both Mr. Shamble and Ms. Sataki that the assignment could raise serious problems. PFF 39, 130 Furthermore, Judge Sporkin told Mr. Klayman that it would have been a "chip shot" to grant the relief sought by Ms. Sataki in order to preserve the status quo, and that he personally would have ruled to put Ms. Sataki to work in LA. PFF 191.

OPF # 69 –He filed a Notice of Appeal on January 19, 2011, despite having been terminated by his client. **OPPOSED**.

Respondent's Fact - Ms. Sataki's purported "termination" letter of August 4, 2010 was sent to VOA's Dan Austin and Mr. Shamble, but not to Mr. Klayman. Tr. 1038. RX 21. PFF 69. The August 4, 2010 'termination" letter was not in Ms. Sataki's English. "That's why [Mr. Klayman] needed to be able to talk to her (before I dismissed cases)." Tr. 1041. RX 21. PFF 70.  Another "termination" letter of November 15, 2010 was incorrectly sent to the wrong addresses at 2000 Pennsylvania Ave, and another incorrect location, 2001 Massachusetts Ave, which Mr. Klayman never received from her. RX 8. Tr. 1042-43, 1046. Ms. Sataki admits this. "So that was a mistake." Tr. 540. RX 8. PFF 71. Mr. Klayman filed a notice of appeal in the BBG case in the meantime to ensure that Ms. Sataki's legal rights were preserved. Tr. 1043-1044. PFF 72. Ms. Sataki herself filed a notice of appeal, mooting out the false claim that she wanted the case dismissed.  RSX 4. Tr. 1031. Tr. 1031.

OPF # 70 – Ms. Sataki continued to suffer harm from the publicity Respondent inflicted on her through his legal strategy and public pronouncements. **OPPOSED**.

Respondent's Facts - Ms. Sataki admits to being gainfully employed and continuing with her broadcasting career since she and Mr. Klayman parted ways. Tr. 561-568. Ms. Sataki makes

$62,000 per year plus health insurance benefits. Tr. 620-21. PFF 153. Ms. Sataki is still seeing a doctor to this day and is still on anxiety medication, eight years after Mr. Klayman's representation. This shows that her mental and other problems are not the result of Mr. Klayman, but of her own. Tr. 201. PFF 171.

Dated:  October 31, 2018

Respectfully submitted,

Larry Klayman, Esq.
c/o 2020 Pennsylvania Avenue #800
Washington, D.C. 20006
Tel: 310-595-0800
leklayman@gmail.com
D.C. Bar No.:  334581

Frederick J. Sujat, Esq.
1525 Windjammer Way
Hollywood, FL, 33019
Tel: 954-815-5221
fsujat@yahoo.com
D.C. Bar No: 214650

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true copy of the foregoing was served by email and Federal Express on October 31, 2018, on H. Clay Smith, III, Assistant Bar Disciplinary Counsel at 515 5ᵗʰ Street, N.W., Building A, Room 117, Washington, D.C. 20001 and filed with the Board of Professional Responsibility on that same date.

Larry Klayman, Esq.

EXHIBIT 2

# IN THE DISTRICT OF COLUMBIA COURT OF APPEALS

In the Matter of:

    **LARRY E. KLAYMAN, ESQ.**

**Respondent.**

**A Member of the Bar of the District of
Columbia Court of Appeals
(Bar Registration No. 334581)**

**No. 20-BG-583
Board Docket No: 17-BD-063
BDN: 2011-D028**

## DECLARATION AND AFFIDAVIT OF LARRY KLAYMAN

    I, Larry Klayman, being over eighteen years of age and duly competent to testify, hereby

swear and affirm as follows:

    1.    I have not practiced law in the District of Columbia since the January 7, 2021

order of this Court issuing a temporary suspension.

SWORN TO UNDER PENALTY OF PERJURY JUNE 23, 2022

Larry Klayman

# EXHIBIT 3

# RealClear Investigations



# DC Bar Restores Convicted FBI Russiagate Forger to 'Good Standing' Amid Irregularities and Leniency

**By Paul Sperry, RealClearInvestigations**
**December 16, 2021**

DC Bar

A former senior FBI lawyer who falsified a surveillance document in the Trump-Russia investigation has been restored as a member in "good standing" by the District of Columbia Bar Association even though he has yet to finish serving out his probation as a convicted felon, according to disciplinary records obtained by RealClearInvestigations.



Kevin Clinesmith, convicted ex-FBI lawyer: Allowed to negotiate a light sentence.

**YouTube/Fox News**

The move is the latest in a series of exceptions the bar has made for Kevin Clinesmith, who pleaded guilty in August 2020 to doctoring an email used to justify a surveillance warrant targeting former Trump campaign adviser Carter Page.

Clinesmith was sentenced to 12 months probation last January. But the D.C. Bar did not seek his disbarment, as is customary after lawyers are convicted of serious crimes involving the administration of justice. In this case, it did not even initiate disciplinary proceedings against him until February of this year — five months after he pleaded guilty and four days after RealClearInvestigations first reported he had not been disciplined. After the negative publicity, the bar temporarily suspended Clinesmith pending a review and

temporarily suspended Clinesmith pending a review and hearing. Then in September, the court that oversees the bar and imposes sanctions agreed with its recommendation to let Clinesmith off suspension with time served; the bar, in turn, restored his status to "active member" in "good standing."

Before quietly making that decision, however, records indicate the bar did not check with his probation officer to see if he had violated the terms of his sentence or if he had completed the community service requirement of volunteering 400 hours.

To fulfill the terms of his probation, Clinesmith volunteered at Street Sense Media in Washington but stopped working at the nonprofit group last summer, which has not been previously reported. "I can confirm he was a volunteer here," Street Sense editorial director Eric Falquero told RCI, without elaborating about how many hours he worked. Clinesmith had helped edit and research articles for the weekly newspaper, which coaches the homeless on how to "sleep on the streets" and calls for a "universal living wage" and prison reform.

From the records, it also appears bar officials did not consult with the FBI's Inspection Division, which has been debriefing Clinesmith to determine if he was involved in any other surveillance abuses tied to Foreign Intelligence Surveillance Act warrants, in addition to the one used against Page. Clinesmith's cooperation was one of the conditions of the plea deal he struck with Special Counsel John Durham. If he fails to fully cooperate, including turning over any relevant materials or records in his possession, he could be subject to perjury or obstruction charges.

Clinesmith — who was assigned to some of the FBI's most sensitive and high-profile investigations — may still be in Durham's sights regarding others areas of his wide-ranging probe.



The scope of his mandate as special counsel is broader than commonly understood: In addition to examining the legal justification for the FBI's "Russiagate" probe, it also includes examining the bureau's handling of the inquiry into Hillary Clinton's use of an unsecured email server, which she set up in her basement to send and receive classified information, and her destruction of more than 30,000 subpoenaed emails she generated while running the State Department. As assistant FBI general counsel in the bureau's national security branch, Clinesmith played an instrumental role in that investigation, which was widely criticized by FBI and Justice Department veterans, along with ethics watchdogs, as fraught with suspicious irregularities.

John Durham, Trump-Russia special counsel: He may still have Clinesmith in his sights.
**Department of Justice via AP**

Clinesmith also worked on former Special Counsel Robert Mueller's probe into the 2016 Trump campaign as the key attorney linking his office to the FBI. He was the only headquarters lawyer assigned to Mueller. Durham's investigators are said to be looking into the Mueller team's actions as well.

The D.C. Bar's treatment of Clinesmith, a registered Democrat who sent anti-Trump rants to FBI colleagues after the Republican was elected, has raised questions from the start. Normally the bar automatically suspends the license of members who plead guilty to a felony. But in Clinesmith's case, it delayed suspending him on even an interim basis for several months and only acted after RCI revealed the break Clinesmith was given, records confirm.



It then allowed him to negotiate his fate, which is rarely done in any misconduct investigation, let alone one



involving a serious crime, according to a review of past
cases. It also overlooked violations of its own rules:
Clinesmith apparently broke the bar's rule requiring
reporting his guilty plea "promptly" to the court — within
10 days of entering it — and failed to do so for five
months, reveal transcripts of a July disciplinary hearing
obtained by RCI.

"I did not see evidence that you informed the court,"
Rebecca Smith, the chairwoman of the D.C. Bar
panel conducting the hearing, admonished Clinesmith.

Hamilton "Phil" Fox: Disciplinary
counsel who handled Clinesmith is a
major donor to Democrats.
**Facebook/D.C. Bar**

"[T]hat was frankly just an error," Clinesmith's lawyer
stepped in to explain.

Smith also scolded the bar's Office of Disciplinary
Counsel for the "delay" in reporting the offense, since
it negotiated the deal with Clinesmith, pointing out:
"Disciplinary counsel did not report the plea to the court
and initiate a disciplinary proceeding." Bill Ross, the
assistant disciplinary counsel who represented the office
at the hearing, argued Clinesmith shouldn't be held responsible and blamed the oversight on the COVID
pandemic.

The Democrat-controlled panel, known as the Board on Professional Responsibility, nonetheless gave
Clinesmith a pass, rubberstamping the light sentence he negotiated with the bar's chief prosecutor,
Disciplinary Counsel Hamilton "Phil" Fox, while admitting it was "unusual." Federal Election Commission
records show Fox, a former Watergate prosecutor, is a major donor to Democrats, including former
President Obama. All three members of the board also are Democratic donors, FEC data reveal.

While the D.C. Bar delayed taking any action against Clinesmith, the Michigan Bar, where he is also
licensed, automatically suspended him the day he pleaded guilty. And on Sept. 30, records show,
the Michigan Bar's attorney discipline board suspended Clinesmith for two years, from the date of his
guilty plea through Aug. 19, 2022, and fined him $1,037.

"[T]he panel found that respondent engaged in conduct that was prejudicial to the proper administration
of justice [and] exposed the legal profession or the courts to obloquy, contempt, censure or reproach," the
board ruled against Clinesmith, adding that his misconduct "was contrary to justice, ethics, honesty or
good morals; violated the standards or rules of professional conduct adopted by the Supreme Court; and
violated a criminal law of the United States."

Normally, bars arrange what's called "reciprocal discipline" for unethical attorneys licensed in their
jurisdictions. But this was not done in the case of Clinesmith. The D.C. Bar decided to go much easier on
the former FBI attorney, further raising suspicions the anti-Trump felon was given favorable treatment.

In making the bar's case not to strip Clinesmith of his
license or effectively punish him going forward, Fox
disregarded key findings by Durham about Clinesmith's
intent to deceive the FISA court as a government
attorney who held a position of trust.



Clinesmith confessed to creating a false document by
changing the wording in a June 2017 CIA email to state
Page was "not a source" for the CIA when in fact the
agency had told Clinesmith and the FBI on multiple
occasions Page had been providing information about
Russia to it for years — a revelation that, if disclosed to
the Foreign Intelligence Surveillance Court, would have
undercut the FBI's case for electronically monitoring

Carter Page: FBI lawyer Clinesmith

undercut the FBI's case for electronically monitoring Page as a supposed Russian agent and something that Durham noted Clinesmith understood all too well.

Bar records show Fox simply took Clinesmith's word that he believed the change in wording was accurate and that in making it, he mistakenly took a "shortcut" to save time and had no intent to deceive the court or the case agents preparing the application for the warrant.

Carter Page. FBI lawyer Clinesmith misled the surveillance court when he falsified a document to say Page was "not a source" who had helped the CIA, when in fact he was.

**FNC**

Durham demonstrated that Clinesmith certainly did intend to mislead the FISA court. "By his own words, it appears that the defendant falsified the email in order to conceal [Page's] former status as a source and to avoid making an embarrassing disclosure to the FISC," the special prosecutor asserted in his 20-page memo to the sentencing judge, in which he urged a prison term of up to six months for Clinesmith. "Such a disclosure would have drawn a strong and hostile response from the FISC for not disclosing it sooner [in earlier warrant applications]."

As proof of Clinesmith's intent to deceive, Durham cited an internal message Clinesmith sent the FBI agent preparing the application, who relied on Clinesmith to tell him what the CIA said about Page. "At least we don't have to have a terrible footnote" explaining that Page was a source for the CIA in the application, Clinesmith wrote.

The FBI lawyer also removed the initial email he sent to the CIA inquiring about Page's status as a source before forwarding the CIA email to another FBI agent, blinding him to the context of the exchange about Page.

Durham also noted that Clinesmith repeatedly changed his story after the Justice Department's watchdog first confronted him with the altered email during an internal 2019 investigation. What's more, he falsely claimed his CIA contact told him in phone calls that Page was not a source, conversations the contact swore never happened.

Fox also maintained that Clinesmith had no personal motive in forging the document. But Durham cited virulently anti-Trump political messages Clinesmith sent to other FBI employees after Trump won in 2016 – including a battle cry to "fight" Trump and his policies – and argued that his clear political bias may have led to his criminal misconduct.

"It is plausible that his strong political views and/or personal dislike of [Trump] made him more willing to engage in the fraudulent and unethical conduct to which he has pled guilty," Durham told U.S. District Judge Jeb Boasberg.



Boasberg, a Democrat appointed by President Obama, spared Clinesmith jail time and let him serve out his probation from home. Fox and the D.C. Bar sided with Boasberg, who accepted Clinesmith's claim he did not intentionally deceive the FISA court, which Boasberg happens to preside over, and even offered an excuse for his criminal conduct.

"My view of the evidence is that Mr. Clinesmith likely believed that what he said about Mr. Page was true," Boasberg said. "By altering the email, he was saving himself some work and taking an inappropriate shortcut."

Fox echoed the judge's reasoning in essentially letting Clinesmith off the hook. (The deal they struck, which the U.S. District Court of Appeals that oversees the bar

5/2/22, 5:43 PM    DC Bar lets convicted FBI Russiagate lawyer back in good standing as court cuts him more slack | Real Clear Investigations

Case 3:22-mc-00014-JRK   Document 5   Filed 01/27/23   Page 182 of 410 PageID 830



James E. "Jeb" Boasberg: Obama
appointee spared Clinesmith jail time.
**DC District Court**

approved in September, called for a one-year
suspension, but the suspension began retroactively in
August 2020, which made it meaningless.)
Boasberg opined that Clinesmith had "already suffered"
punishment by losing his FBI job and $150,000 salary.

But, Boasberg assumed, wrongly as it turned out, that
Clinesmith also faced possible disbarment. "And who
knows where his earnings go now," the judge
sympathized. "He may be disbarred or suspended from
the practice of law."

Anticipating such a punishment, Boasberg waived a
recommended fine of up to $10,000, arguing that
Clinesmith couldn't afford it. He also waived the regular
drug testing usually required during probation, while
returning Clinesmith's passport. And he gave his blessing
to Clinesmith's request to serve out his probation as a volunteer journalist, before wishing him well: "Mr.
Clinesmith, best of luck to you."

Fox did not respond to requests for comment. But he argued in a petition to the board that his deal with
Clinesmith was "not unduly lenient," because it was comparable to sanctions imposed in similar cases.
However, none of the cases he cited involved the FBI, Justice Department or FISA court. One case
involved a lawyer who made false statements to obtain construction permits, while another made false
statements to help a client become a naturalized citizen – a far cry from falsifying evidence to spy on an
American citizen.

Durham noted that in providing the legal support for a warrant application to the secret FISA court,
Clinesmith had "a heightened duty of candor," since FISA targets do not have legal representation before
the court.

He argued Clinesmith's offense was "a very serious crime with significant repercussions" and suggested it
made him unfit to practice law.

"An attorney – particularly an attorney in the FBI's Office of General Counsel – is the last person that FBI
agents or this court should expect to create a false document," Durham said.

The warrant Clinesmith helped obtain has since been deemed invalid and the surveillance of Page illegal.
Never charged with a crime, Page is now suing the FBI and Justice Department for $75 million for
violating his constitutional rights against improper searches and seizures.





Rudolph Giuliani, Trump lawyer:
Facing bar discipline, even though he's
not charged with a crime.



Michael Sussmann, ex-Hillary Clinton lawyer: Not facing bar discipline, despite being charged with a crime.

**perkinscoie.com**

PBS

Explaining the D.C. Bar's disciplinary process in a 2019 interview with Washington Lawyer magazine, Fox said that "the lawyer has the burden of proving they are fit to practice again. Have they accepted responsibility for their conduct?" His office's website said a core function is to "deter attorneys from engaging in misconduct."

In the same interview, Fox maintained that he tries to insulate his investigative decisions from political bias. "I try to make sure our office is not used as a political tool," he said. "We don't want to be a political tool for the Democrats or Republicans."

Bar records from the Clinesmith case show Fox suggested the now-discredited Trump-Russia "collusion" investigation was "a legitimate and highly important investigation."

One longstanding member of the D.C. Bar with direct knowledge of Clinesmith's case before the bar suspects its predominantly Democratic board went soft on him due to partisan politics. "The District of Columbia is a very liberal bar," he said. "Basically, they went light on the him because he's also a Democrat who hated Trump."

Meanwhile, the D.C. Bar has not initiated disciplinary proceedings against Michael Sussmann, another Washington attorney charged by Durham. Records show Sussmann remains an "active member" of the bar in "good standing," which also has not been previously reported. The former Hillary Clinton campaign lawyer, who recently resigned from Washington-based Perkins Coie LLP, is accused of lying to federal investigators about his client while passing off a report falsely linking Trump to the Kremlin.

While Sussmann has pleaded not guilty and has yet to face trial, criminal grand jury indictments usually prompt disciplinary proceedings and interim suspensions.

Paul Kamenar of the National Legal and Policy Center, a government ethics watchdog, has called for the disbarment of both Clinesmith and Sussmann. He noted that the D.C. Court of Appeals must automatically disbar an attorney who commits a crime of moral turpitude, which includes crimes involving the "administration of justice."

"Clinesmith pled guilty to a felony. The only appropriate sanction for committing a serious felony that also interfered with the proper administration of justice and constituted misrepresentation, fraud and moral turpitude, is disbarment," he said. "Anything less would minimize the seriousness of the misconduct" and fail to deter other offenders.

Disciplinary Counsel Fox appears to go tougher on Republican bar members. For example, he recently opened a formal investigation of former Trump attorney Rudy Giuliani, who records show Fox put under "temporary disciplinary suspension" pending the outcome of the ethics probe, which is separate from the one being conducted by the New York bar. In July, the New York Bar also suspended the former GOP mayor on an interim basis.

Giuliani has not been convicted of a crime or even charged with one.

*This and all other original articles created by RealClearInvestigations may be republished for free with attribution. (These terms do not apply to outside articles linked on the site.)*

DC bar lets convicted FBI russiagate lawyer back in good standing as court cuts him more slack | RealClearInvestigations

free with attribution. (These terms do not apply to outside articles linked on the site.)

*We provide our stories for free but they are expensive to produce. Help us continue to publish distinctive journalism by making a contribution today to RealClearInvestigations.*

**Support RealClearInvestigations →**    

# In re Clinesmith

District of Columbia Court of Appeals

September 2, 2021, Decided

No. 21-BG-18

**Reporter**

2021 D.C. App. LEXIS 253 *; 258 A.3d 161; 2021 WL 4074424

IN RE KEVIN E. CLINESMITH, RESPONDENT. A Suspended Member of the Bar of the District of Columbia Court of Appeals (Bar Registration No. 984265).

**Notice:** THIS OPINION IS SUBJECT TO FORMAL REVISION BEFORE PUBLICATION IN THE ATLANTIC AND MARYLAND REPORTERS. USERS ARE REQUESTED TO NOTIFY THE CLERK OF THE COURT OF ANY FORMAL ERRORS SO THAT CORRECTIONS MAY BE MADE BEFORE THE BOUND VOLUMES GO TO PRESS.

**Prior History:  [*1]** (DDN 305-19).

**Judges:** Before GLICKMAN and DEAHL, Associate Judges, and NEBEKER, Senior Judge.

# Opinion

On Report and Recommendation of the Board on Professional Responsibility Hearing Committee Number Four Approving Petition for Negotiated Discipline

PER CURIAM: This decision is non-precedential. Please refer to D.C. Bar R. XI, § 12.1(d) regarding the appropriate citation of this opinion.

In this disciplinary matter, Hearing Committee Number Four (the Committee) recommends approval of an amended petition for negotiated attorney discipline. *See* D.C. Bar R. XI, § 12.1(c). The amended petition is based on Respondent's guilty plea to one count of making a false statement in violation of 18 U.S.C. § 1001(a)(3) for his actions in modifying a document while employed by the Federal Bureau of Investigation (FBI) as Assistant General Counsel in the National Security and Cyber Law Branch of the FBI's Office of General Counsel. The Committee determined this was a serious crime in violation of D.C. Bar R. XI, § 10(d), but not one involving moral turpitude, either per se or on the specific facts. The Committee concluded that Respondent's misconduct violated Rule 8.4(b) and (c) of the District of

Columbia Rules of Professional Conduct. The Committee determined that the negotiated discipline of a one-year suspension nunc pro tunc to August 25, 2020—the date he self-reported his conviction **[*2]** to Disciplinary Counsel—was not unduly lenient.

Having reviewed the Committee's recommendation in accordance with our procedures in uncontested disciplinary cases, *see* D.C. Bar R. XI, § 12.1(d), we agree this case is appropriate for negotiated discipline and the proposed sanction is not unduly lenient or inconsistent with dispositions imposed for comparable professional misconduct. Accordingly, it is

ORDERED that Respondent Kevin E. Clinesmith is hereby suspended from the practice of law in the District of Columbia for one year nunc pro tunc to August 25, 2020.

*So ordered.*

---

**End of Document**

EXHIBIT 5



# The Florida Bar

**651 East Jefferson Street**
**Tallahassee, FL 32399-2300**

**Joshua E. Doyle**
**Executive Director**

**850/561-5600**
**www.FLORIDABAR.org**

State of Florida      )

County of Leon      )            In Re:  0246220
Larry Elliot Klayman
Klayman Law Group, PA
7050 W Palmetto Park Rd
Boca Raton, FL 33433-3426

I CERTIFY THE FOLLOWING:

I am the custodian of membership records of The Florida Bar.

Membership records of The Florida Bar indicate that The Florida Bar member listed above was admitted to practice law in the state of Florida on **December 7, 1977**.

The Florida Bar member above is an active member in good standing of The Florida Bar who is eligible to practice law in the state of Florida.

Dated this 18th day of **October**, **2022**.

*Cynthia B. Jackson*

Cynthia B. Jackson, CFO
Administration Division
The Florida Bar

PG:R10
CTM-202781

EXHIBIT 6

*Notice:  This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters.  Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

## DISTRICT OF COLUMBIA COURT OF APPEALS

No. 20-BG-583

IN RE LARRY E. KLAYMAN, RESPONDENT.

A Suspended Member of the Bar
of the District of Columbia Court of Appeals
(Bar Registration No. 334581)

On Report and Recommendation
of the Board on Professional Responsibility

(17-BD-063; DDN-028-11)

FILED 09/15/2022
District of Columbia
Court of Appeals

Julio Castillo
Julio Castillo
Clerk of Court

(Argued June 16, 2022                    Decided September 15, 2022)

*Melissa Isaak* for respondent.

*Myles V. Lynk*, Senior Assistant Disciplinary Counsel, with whom *Hamilton P. Fox, III*, Disciplinary Counsel, was on the brief, for petitioner.

Before BLACKBURNE-RIGSBY, *Chief Judge*, and BECKWITH and MCLEESE, *Associate Judges.*

PER CURIAM:  The Board on Professional Responsibility concluded that respondent Larry E. Klayman violated numerous District of Columbia Rules of Professional Conduct during his representation of former client E.S.  The Board recommended that Mr. Klayman be suspended for eighteen months, with a requirement that he show fitness before being permitted to return to the practice of

law.  We accept the Board's conclusion that Mr. Klayman violated the Rules of Professional Conduct, and we adopt the Board's recommended sanction.

## I.  Factual Background

In sum, the evidence presented by Disciplinary Counsel to the Hearing Committee was as follows.  The evidence largely consisted of E.S.'s testimony but also included numerous documents, including written correspondence between E.S. and Mr. Klayman.

E.S. met Mr. Klayman in 2009, while she was covering a story for Voice of America (VOA).  E.S. told Mr. Klayman that she was being sexually harassed by her cohost and that after she reported the harassment to her supervisor, she was transferred to a different position.  Early in 2010, Mr. Klayman and E.S. agreed that he would represent her in a case against VOA.  E.S. did not believe that Mr. Klayman provided her with a written document setting out the scope and nature of the representation.  Mr. Klayman and E.S. agreed that Mr. Klayman would work on a contingent basis, receiving forty percent of any award E.S. won.  Mr. Klayman later unilaterally increased his fee to fifty percent.

Mr. Klayman initially attempted to negotiate a settlement with VOA.  After the negotiations were unsuccessful, Mr. Klayman encouraged E.S. to move from the District of Columbia to Los Angeles, assuring her that he could get her transferred to the VOA office in Los Angeles.  Mr. Klayman paid for the move and for E.S.'s living expenses in Los Angeles.  E.S. and Mr. Klayman agreed that the money Mr. Klayman was providing would be paid out of any award E.S. won, in addition to the contingency fee.  VOA denied E.S.'s request for a transfer, at which point Mr. Klayman filed a civil suit against E.S.'s alleged harasser and supervisors.

E.S. had wanted her case to be "very quietly handled," with as few people as possible finding out about the harassment.  She explained her concerns about publicity to Mr. Klayman, and he initially respected her wishes.  Mr. Klayman later began to pursue a strategy designed to draw attention to E.S.'s case.  For example, shortly after filing suit against E.S.'s harasser and supervisors, Mr. Klayman filed suit against the members of VOA's governing board, the Broadcasting Board of Governors (BBG).  The BBG included prominent public figures, particularly then-Secretary of State Hillary Rodham Clinton.  E.S. did not agree to the BBG suit, worrying that the case "was getting too big" and preferring to focus on her harasser and supervisors.  Mr. Klayman subsequently filed motions to disqualify the district-court judge who had been assigned to both of E.S.'s cases, arguing that the judge

was politically biased against him.  Mr. Klayman also wrote numerous articles mentioning E.S.'s case and providing confidential information about E.S.  Although E.S. was initially "completely against" the articles, she ultimately agreed to the publicity after Mr. Klayman explained that it would help her case.

In April 2010, Mr. Klayman began to repeatedly express romantic feelings towards E.S.  Mr. Klayman told E.S. that he loved her, and E.S. replied that he was her attorney and they could only be friends.  For months thereafter, Mr. Klayman kept saying that "he wanted to have a relationship with [E.S.] and [E.S. kept] saying no, and it was ongoing and ongoing and it wouldn't stop . . . it was very, very, very uncomfortable" for E.S.  For example, Mr. Klayman sent an email to E.S. saying "You are . . . the only woman I've ever really loved.  . . .  [W]hen I walk down the street . . . and see an attractive woman, my thoughts immediately flip to you.  I see no one else.  . . .  My loving you has given me true meaning in my life."

E.S. believed that Mr. Klayman's feelings for her were causing him to act unprofessionally in his representation, which Mr. Klayman himself acknowledged in writing several times.  For example, in one letter, Mr. Klayman said that "I do truly love [E.S.].  . . .  [A]nd my own emotions have rendered me non-functional even as a lawyer."  In an email, Mr. Klayman said "It[']s very hard to be a lawyer and feel

so much for your client." In a second email, Mr. Klayman said that he had "not been able to function lately, because [he was] out there so far emotionally and got nothing back," and that E.S. would "get better legal representation with someone else . . . who does not have an emotional conflict and can keep his mind clear."

In July 2010, E.S. wrote to Mr. Klayman and directed him to withdraw the case against the BBG, which was by then the only active case. Several days later, E.S. wrote to an executive at VOA stating that she had "instructed Larry Klayman to withdraw any and all civil actions that he may have filed in my name and that he is no longer representing me." This letter was not sent directly to Mr. Klayman, but by the next day he had received a copy. Mr. Klayman, however, did not dismiss the entirety of the case against the BBG. He also continued to act on E.S.'s behalf. For example, after the trial court granted defendants' motion to dismiss the BBG case, Mr. Klayman filed a motion to reconsider.

In November 2010, because Mr. Klayman continued to contact her about her case, E.S wrote another letter to him reiterating his termination. That letter was incorrectly addressed, and Mr. Klayman testified that he did not receive it. E.S. wrote to Mr. Klayman a third time in January 2011, stating that he was "not representing [her] in any way or shape." Mr. Klayman replied to E.S., implying that

she had not written the email and explaining that he "[could not] allow her legal rights and obligations to be compromised or lost altogether."  Several days later, Mr. Klayman filed a notice of appeal in the BBG case, despite not having had any communication with E.S. about filing the appeal.  E.S. later personally filed a notice of appeal in that case.

Mr. Klayman's testimony was contrary to E.S.'s in many respects.  Generally, Mr. Klayman testified that E.S. was seeking revenge against him because she was angry that her case had not gone well.  Mr. Klayman denied having any romantic intentions toward E.S.  To the extent he did have feelings for E.S., they "actually made [him] work harder" on her behalf.  Mr. Klayman also contested the existence of a contingent fee agreement.  Mr. Klayman testified that he consulted with E.S. about his actions in the case, such as filing the disqualification motion.  Finally, he acknowledged E.S.'s initial reluctance to pursue publicity but testified that she later agreed to do so.  He denied pressuring E.S. on the issue.

Mr. Klayman offered testimony from several other witnesses.  Gloria Allred, a women's rights attorney, testified that she and Mr. Klayman had discussed E.S.'s case and that she had twice declined to take E.S.'s case.  Former Judge Stanley Sporkin testified that he had found Mr. Klayman to be an honest and ethical lawyer

and had no reason to doubt Mr. Klayman's character.  Former Judge Sporkin also testified that he and Mr. Klayman had discussed E.S.'s case and that he had agreed with aspects of Mr. Klayman's litigation strategy.  Timothy Shamble, who was E.S.'s union representative at VOA, testified, among other things, that E.S. had agreed to publicize her case and had herself distributed one of the articles Mr. Klayman wrote about her case at a VOA event.  Keya Dash, a family friend, testified that Mr. Klayman did not seek a romantic relationship with E.S., although Mr. Dash was unaware of the emails that Mr. Klayman had sent E.S. stating that he loved her. Finally, Joshua Ashley Klayman, Mr. Klayman's sister, testified that E.S. agreed with Mr. Klayman's publicity strategy and that Mr. Klayman was not in love with E.S.

## II.  Procedural Background

In 2010, E.S. filed a complaint with Disciplinary Counsel, alleging that Mr. Klayman was harassing her even though she had terminated his representation of her.  Disciplinary counsel notified Mr. Klayman of the complaint and began to investigate, but apparently lost contact with E.S. for several years.  Counsel brought charges in 2017.

8

After the evidentiary hearing, the Hearing Committee issued a lengthy report and recommendation.  The Hearing Committee largely credited E.S.'s testimony over that of Mr. Klayman.  The Hearing Committee concluded that Mr. Klayman had committed numerous disciplinary violations.  Specifically, the Hearing Committee concluded that Mr. Klayman violated: (1) D.C. R. Prof. Cond. 1.2(a) (lawyer shall abide by client's decisions as to objectives of representation and shall consult with client as to means used) and 1.4(b) (lawyer shall appropriately explain matter to client), by, among other things, failing to inform E.S. before taking important steps in the litigation, including the filing of the motion to disqualify, and refusing to dismiss the BBG suit as E.S. had directed; (2) D.C. R. Prof. Cond. 1.5(b) (requiring written agreement regarding representation) and (c) (contingent fee agreement shall be in writing), by not entering into a written fee agreement with E.S.; (3) D.C. R. Prof. Cond. 1.6(a)(1) and (a)(3) (lawyer shall not reveal client confidence or secret for lawyer's advantage), by disclosing E.S.'s secrets, without her informed consent, in the articles he wrote, and making these disclosures for personal gain; (4) D.C. R. Prof. Cond. 1.7(b)(4) (lawyer shall not represent client if lawyer's professional judgment will be or reasonably may be adversely affected by personal interest), by, among other things, representing E.S. without informing her about the conflicts of interest created by his feelings for her, his animus towards the Clinton family and the district-court judge, and his desire for publicity; and (5) D.C.

9

R. Prof. Cond. 1.16(a)(3) (discharged lawyer shall withdraw from representation), by continuing to act on E.S.'s behalf after she terminated the representation. The Hearing Committee recommended that Mr. Klayman be suspended for thirty-three months and that he be required to demonstrate fitness to practice law before being reinstated.

The Board largely adopted the findings and recommendations of the Hearing Committee, with several exceptions. First, the Board's analysis of the Rule 1.4(b) violation differed from the Hearing Committee's. The Board concluded that Mr. Klayman had violated that rule because his communications with E.S. about his feelings for her were not "the kind of communication . . . that a client ought to receive from her lawyer" and had "drowned out" any legitimate communications about E.S.'s case. Second, the Board noted that Mr. Klayman appeared to concede a violation of Rule 1.5(b), but the Board did not explicitly find a violation of that Rule. Third, the Board concluded that Mr. Klayman's personal interest in E.S., not his animosity towards the Clintons and the trial judge or his interest in publicity, provided the sole basis for the conflict-of-interest violation. Fourth, the Board recommended an eighteen-month suspension with a fitness requirement.

After the Board issued its Report and Recommendation, this court issued an order to show cause why Mr. Klayman should not be temporarily suspended pending final action by this court. *See* D.C. Bar R. XI, § 9(g)(1) (if Board recommends suspension of one year or more, court will issue order to show cause why attorney should not be temporarily suspended pending final action by court); *id.* (to avoid temporary suspension, attorney bears burden of showing substantial likelihood of success on merits). Mr. Klayman opposed the temporary suspension, but this court ordered a temporary suspension in January 2021. The court also denied Mr. Klayman's motion to reconsider. Mr. Klayman subsequently filed additional challenges in this court to his temporary suspension. By separate order, we deny those challenges as moot in light of this decision adopting the sanction of suspension recommended by the Board.

Mr. Klayman also filed a federal lawsuit challenging his temporary suspension. *Klayman v. Blackburne-Rigsby*, No. 21-0409, 2021 WL 2652335, at *1 (D.D.C. June 28, 2021). The federal district court denied relief, and the United States Court of Appeals for the District of Columbia Circuit summarily affirmed. *Id.* at *3; *Klayman v. Blackburne-Rigsby*, No. 21-7069, 2022 WL 298933, at *1 (D.C. Cir. Jan. 20, 2022) (per curiam).

Under D.C. Bar R. XI, § 9(g)(4), an attorney who is temporarily suspended pending final action by this court is required to comply with the requirements of D.C. Bar R. XI, § 14.  Among other things, § 14 requires suspended attorneys (1) to notify clients and adverse parties of the suspension; and (2) to file an affidavit with the court, the Board, and Disciplinary Counsel stating that the attorney has complied with the order of suspension and the requirements of § 14.  D.C. Bar R. XI, § 14(a)-(c), (g).  The order temporarily suspending Mr. Klayman directed Mr. Klayman's attention to those requirements.  The temporary suspension order also advised Mr. Klayman that his eligibility for reinstatement after suspension was tied to compliance with the requirements of § 14.  *See* D.C. Bar R. XI, § 16(c) ("[A] suspended attorney shall not be eligible for reinstatement until a period of time equal to the period of suspension shall have elapsed following the attorney's compliance with section 14 . . . .").  In February 2021, Disciplinary Counsel advised the court that Mr. Klayman had failed to file the required affidavit.  As of the date of this opinion, Mr. Klayman apparently still has not submitted the required affidavit.

## III.  Delay

Mr. Klayman argues that the court should dismiss this matter because of the seven-year delay in bringing charges.  We agree that the delay in this case was very

unfortunate.  We have held, however, that "mere delay in the disciplinary process generally does not provide a legitimate ground for dismissal of the complaint," because "[t]he public interest in regulating members of the bar takes precedence over the attorney's interest in having claims speedily resolved."  *In re Morrell*, 684 A.2d 361, 368 (D.C. 1996); *see also, e.g.*, *In re Pearson*, 228 A.3d 417, 427 n.13 (D.C. 2020) (per curiam) ("It clearly is not an ideal practice to delay prosecutions for seven years, but even troubling and inexcusable delays, without more, will not rise to a due process violation that requires dismissal.") (brackets and internal quotation marks omitted).  Rather, undue delay "must be coupled with actual prejudice in order to justify dismissal."  *In re Pearson*, 228 A.3d at 427 n.13 (internal quotation marks omitted).  To warrant dismissal, the undue delay must have "substantially impaired" Mr. Klayman's ability to defend against the charges filed by Disciplinary Counsel. *In re Fay*, 111 A.3d 1025, 1032 (D.C. 2015) (per curiam).

The Board denied Mr. Klayman's request for dismissal, concluding that Mr. Klayman had failed to show prejudice sufficient to warrant dismissal.  Our cases do not appear to make clear whether our review on this issue is deferential or de novo, and the parties have not addressed that issue.  We need not decide the issue, because we agree with the Board's conclusion.

Mr. Klayman alleges that he was prejudiced in four ways.  First, he points to an intended expert witness, Professor Ronald Rotunda, who passed away before the hearing.  As the Board explained, however, Professor Rotunda's expert report was admitted into evidence.  Moreover, as the Board further explained, Professor Rotunda's expected testimony was focused primarily on legal issues, such as when delay in disciplinary prosecution warrants dismissal.  The proper function of such testimony would have been limited at best.  *See Steele v. D.C. Tiger Mkt.*, 854 A.2d 175, 181 (D.C. 2004) ("[A]n expert may not state [an] opinion as to legal standards nor may [the expert] state legal conclusions drawn by applying the law to the facts.") (internal quotations marks omitted).  Finally, Mr. Klayman provided no information about any efforts he may have made to obtain a replacement expert.

Second, Mr. Klayman notes that E.S.'s psychologist, Dr. Arlene Aviera, became unavailable to testify due to illness.  The record contains written documentation from Dr. Aviera about E.S.'s condition and correspondence from Mr. Klayman to Dr. Aviera.  The availability of those materials mitigates the effect of Dr. Aviera's unavailability.  Mr. Klayman also testified about his communications with Dr. Aviera.  Mr. Klayman accurately points out that he attempted to take a deposition of Dr. Aviera in advance of the hearing, but the Hearing Committee denied that request.  The Hearing Committee reasonably denied the request,

14

however, because Mr. Klayman had failed to concretely describe what additional information Mr. Klayman would seek in a deposition. Moreover, the evidence that Mr. Klayman now claims he would have sought to elicit from Dr. Aviera – such as that E.S. was a difficult client and that E.S.'s psychological problems were not caused by Mr. Klayman – does not appear to be of substantial importance.

Third, Mr. Klayman asserts that his memory had faded over the years, as had E.S.'s. We agree with the Hearing Committee, however, that neither E.S. nor Mr. Klayman displayed significant gaps in their memory of material facts.

Finally, Mr. Klayman claims that he lost or discarded documents that would have been helpful to his defense. We note that Mr. Klayman was on notice of the disciplinary complaint by 2011, and he therefore could have been expected to retain any relevant documents until that matter was explicitly resolved. *Cf. In re Ekekwe-Kauffman*, 210 A.3d 775, 786 (D.C. 2019) (per curiam) (attorney's claim of lost documents "is unpersuasive in light of the fact that [the attorney] was aware of the potential for misconduct charges"). In any event, Mr. Klayman has not in this court identified specific lost documents or their relevance.

15

In sum, we conclude that Mr. Klayman has failed to show that the delay in this case caused him substantial prejudice warranting dismissal.  To the extent Mr. Klayman suggests that this court should not require such a showing, we are bound by the contrary holdings of our prior cases.  *See, e.g.*, *In re Ekekwe-Kauffman*, 210 A.3d at 785 n.12 (declining to apply doctrine of laches in disciplinary proceedings, in light of prior precedent applying due-process framework to determine when dismissal is warranted on basis of delay).

## IV.  Alleged Bias

Mr. Klayman argues that the Office of Disciplinary Counsel, the Hearing Committee, the Board, this court, and others are all biased against him.  For example, Mr. Klayman argues that (1) the district-court judge who handled the federal suits Mr. Klayman filed on E.S.'s behalf is "highly partisan and to the far left"; (2) the Office of Disciplinary Counsel and the Board are "managed by leftist pro-Clinton Democrats"; (3) one member of the Hearing Committee is a "communist" and another is a "deferential ultra-leftist"; (4) the entire disciplinary proceeding has been "highly partisan"; (5) the Office of Disciplinary Counsel is engaged in a "dogmatic and unrelenting . . . jihad" to remove Mr. Klayman from the practice of law; (6) members of the Hearing Committee "exhibited great vitriol toward Mr. Klayman";

16

(7) the Board "exhibited . . . open animus and bias against Mr. Klayman"; (8) "men are frequently disbelieved but women more often than not get off scot free when they lie to tribunals"; and (9) this court has prejudged this matter, suffers from a conflict of interest in the matter, and temporarily suspended Mr. Klayman "strategically to harm Mr. Klayman's reputation."  The record, however, does not support Mr. Klayman's repeated assertions of bias.

## V.  Other Disciplinary Proceedings

Mr. Klayman repeatedly argues that it was inappropriate for Disciplinary Counsel to move forward with charges in this case, because disciplinary authorities in Pennsylvania and Florida long ago dismissed the claims of misconduct in this case as baseless.  We are not persuaded by that argument.

First, the record provides no direct information about the resolution of any disciplinary proceedings in Pennsylvania and Florida regarding the allegations in this case.  There is some evidence that E.S. brought complaints to those authorities. Mr. Klayman also presented evidence that he has not been disciplined in those jurisdictions.  It is unclear, however, whether complaints actually were brought in those jurisdictions, and if so, how those matters were resolved.  For example, it may

be that those jurisdictions choose to await resolution of the complaint in the District of Columbia, where the conduct at issue appears to have primarily occurred.  *Cf., e.g.*, *In re Krapacs*, 245 A.3d 959, 959 (D.C. 2021) (per curiam) (noting that District of Columbia disciplinary proceeding had been stayed pending final resolution of disciplinary proceeding in Florida).

Second, in any event, it is unclear whether the District of Columbia disciplinary authorities or this court would be required to give binding effect to any determination that might have been reached in another jurisdiction as to the propriety of Mr. Klayman's conduct.  *Cf., e.g.*, *In re Robbins*, 192 A.3d 558, 565-66 & n.7 (D.C. 2018) (per curiam) (declining to give preclusive effect in disciplinary proceedings to determination of Virginia court in Virginia disciplinary proceeding, because, among other things, disciplinary counsel did not participate in Virginia proceeding and Virginia court relied on inferior record).

## VI.  Disciplinary Violations

Mr. Klayman challenges the Board's conclusion that he committed numerous disciplinary violations.  We agree with the Board that each of the violations at issue was supported by the record.

We "accept the findings of fact made by the Board unless they are unsupported by substantial evidence of record."  D.C. Bar R. XI, § 9(h)(1).  We review legal conclusions de novo.  *In re Cleaver-Bascombe*, 892 A.2d 396, 401-02 (D.C. 2006).

## A.  Credibility

Most broadly, Mr. Klayman takes issue with the decision of the Hearing Committee and the Board to largely credit E.S.'s testimony rather than that of Mr. Klayman.  We are required, however, to "place great weight on credibility determinations made by the Board and the Hearing Committee because of the Hearing Committee's unique opportunity to observe the witnesses and assess their demeanor."  *In re Pearson*, 228 A.3d at 423 (internal quotation marks omitted).  We see no adequate basis upon which to overturn the credibility determinations made by the Hearing Committee and the Board.

It is true that E.S.'s testimony on various issues was impeached or contradicted by other evidence.  For example, although E.S. testified that she wanted to limit the publicity surrounding her case, there was evidence that she ultimately

agreed to publicity and even in one instance publicly distributed information about the case.  E.S. also testified that she was opposed to the suit against the BBG, which is arguably inconsistent with her later decision to personally file a notice of appeal after the case was dismissed.  It is also true, however, that Mr. Klayman's testimony was impeached and contradicted on critical points.  For example, Mr. Klayman testified that he had no romantic intentions toward E.S., but the record contains numerous emails from him where he declared that he was in love with E.S., going so far as to state that she was "the only woman [he had] ever really loved."  Similarly, Mr. Klayman testified that he was representing E.S. pro bono and did not have a fee arrangement with her.  In an email to E.S., however, Mr. Klayman said that "50 percent of any recovery is fair and that is what I require."

We conclude that the Hearing Committee and the Board acted reasonably by choosing to largely credit E.S.'s testimony over that of Mr. Klayman.

## B.  Specific Rule Violations

Many of Mr. Klayman's challenges to the findings of specific rule violations rest on Mr. Klayman's version of the facts.  As we have explained, however, we must accept the factual findings of the Hearing Committee and the Board if those

20

findings are "supported by substantial evidence in the record as a whole." *In re Godette*, 919 A.2d 1157, 1163 (D.C. 2007). That is true even if "there might also be substantial evidence to support a contrary finding." *Id.* (internal quotation marks omitted). Having reviewed the record, we conclude that substantial evidence supports the Board's conclusion that Mr. Klayman violated the rules at issue.

## 1.  Conflict of Interest

The Board concluded that Mr. Klayman violated D.C. R. Prof. Cond. 1.7(b)(4) by representing E.S. when his professional judgment was adversely affected by his personal interest in E.S. The record amply supports that conclusion.

Whether or not his feelings for E.S. were sexual or romantic in nature, Mr. Klayman indisputably had strong feelings for E.S. For example, he wrote that he had "fall[en] in love with [E.S.]," would always love her, and was "feeling real pain" because she did not share his feelings. Additionally, Mr. Klayman sent emails acknowledging that his feelings for E.S. interfered with his ability to represent her. For example, he wrote that his own "emotions [had] rendered [him] non-functional even as a lawyer." The record thus supports the Hearing Committee's conclusion,

echoed by the Board, that Mr. Klayman had strong feelings for E.S. and that those feelings created a conflict of interest in violation of Rule 1.7(b)(4).

As Mr. Klayman suggests, some potential conflicts of interest can be waived if the client provides informed consent.  D.C. R. Prof. Cond. 1.7(c)(1).  Even if the client consents, however, the lawyer must "reasonably believe[] that the lawyer will be able to provide competent and diligent representation" to the client.  D.C. R. Prof. Cond. 1.7(c)(2).  In light of his own statements, Mr. Klayman could not have reasonably believed that his professional judgment was unimpaired and that he could provide competent and diligent representation.  Moreover, the record supports the conclusion that Mr. Klayman's feelings for E.S. did adversely affect his representation of E.S.  For example, E.S. testified that she terminated Mr. Klayman's representation in part because he was not able to act professionally towards her and his contacts with her had become abusive.  We therefore agree with the Board that Mr. Klayman's representation of E.S. while he had strong personal feelings towards her violated the rule.

### 2.  Failure to Abide by Client's Wishes

D.C. R. Prof. Cond. Rule 1.2(a) requires a lawyer to "abide by a client's decisions concerning the objectives of representation" and to "consult with the client as to the means by which they are to be pursued."  The Board concluded that Mr. Klayman violated this rule in two ways: by seeking publicity contrary to E.S.'s wishes and by refusing to dismiss the BBG lawsuit as E.S. directed.  We agree with the Board's conclusion on the latter point and therefore see no need to address the first.

Mr. Klayman argues that by not dismissing the entirety of the suit against BBG he was abiding by E.S.'s stated wishes.  That argument is contradicted, however, by the plain language of E.S.'s July 2010 email, which directed Mr. Klayman to "withdraw all the pending lawsuits that are on my behalf and/or in my name."  Mr. Klayman also argues that he did not believe the letters instructing him to dismiss the BBG case and cease representation of E.S. reflected E.S.'s true wishes, pointing to the fact that E.S. ultimately appealed the trial court's decision in the BBG case.  E.S.'s later appeal is not necessarily inconsistent with her desiring to dismiss the case at the time she instructed Mr. Klayman to do so.  Moreover, the Hearing

Committee reasonably did not credit Mr. Klayman's claim that he did not believe that the direction to dismiss the case was from E.S.

### 3.  Revealing and Using Client Secrets

The Board concluded that Mr. Klayman violated D.C. R. Prof. Cond. 1.6(a)(1) (revealing client confidence or secret) and (a)(3) (using client confidence or secret for advantage of lawyer).  Specifically, the Board concluded that Mr. Klayman's publicity campaign resulted in the public disclosure of confidential information about E.S. and that Mr. Klayman had not obtained informed consent from E.S.  The Hearing Committee concluded that those disclosures were for Mr. Klayman's own advantage because the publicity lauded Mr. Klayman's own actions in handling E.S.'s cases, raising Mr. Klayman's professional profile.

Mr. Klayman argues that E.S. eventually consented to the publicity about her cases and her personal life.  *See* D.C. R. Prof. Cond. 1.6(e)(1) (permitting disclosure of client confidence or secret with client's informed consent).  Even assuming that is true, the Hearing Committee and the Board both concluded that E.S. did not give informed consent, but rather acquiesced in Mr. Klayman's views on the topic

without having the benefit of adequate advice from Mr. Klayman. We conclude that the record supports those conclusions. *See generally* D.C. R. Prof. Cond. R. 1.0(e) ("'Informed Consent' denotes the agreement by a person to a proposed course of conduct after the lawyer has communicated adequate information and explanation about the material risks of and reasonably available alternatives to the proposed course of conduct."). We also note that several of the articles that Mr. Klayman wrote were published after July 2010, when E.S. terminated Mr. Klayman's representation. We agree with the Hearing Committee that Mr. Klayman did not have E.S.'s informed consent to such publication, because E.S. had by that point terminated Mr. Klayman's representation of her.

Mr. Klayman notes that he attempted to provide the Board with a video that he contends showed that E.S. was trying to publicize her claims. The Board refused to consider that video, because the motion bringing the video to the Board's attention was received after the Board's recommendation was pending in this court. Although Mr. Klayman argues in passing that the Board's ruling on this issue was incorrect, he does not address the Board's reasoning or provide a specific argument as to why the Board's ruling was incorrect under applicable principles of law. Because this issue has not been adequately presented for our review, we decline to address it. *See PHCDC1, LLC v. Evans & Joyce Willoughby Trust*, 257 A.3d 1039, 1043 (D.C.

25

2021) ("[Appellant], however, has not briefed that issue with adequate specificity, having failed to identify specific disputes of fact or issues of law that support reversal of the trial court's ruling.").

### 4. Explaining Matters to Client

The Board concluded that Mr. Klayman violated D.C. R. Prof. Cond. 1.4(b), which requires a lawyer to "explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation."  As previously noted, the Board reasoned that Mr. Klayman's barrage of communications with E.S. about his feelings for her were not "the kind of communication . . . that a client ought to receive from her lawyer" and "drowned out" any legitimate communications about E.S.'s case.

Mr. Klayman challenges the Board's reasoning, but we need not resolve that issue.  The Hearing Committee based its conclusion of a Rule 1.4(b) violation on specific instances in which the Hearing Committee found that Mr. Klayman did not consult with E.S. before taking important steps in the litigation, including filing the motion to disqualify the district-court judge.  The record supports that conclusion.

## 5.  Absence of Written Fee Agreement

The Board concluded that Mr. Klayman violated D.C. R. Prof. Cond. 1.5(c) (requiring written fee agreement in contingent-fee case).  Specifically, the Board credited E.S.'s testimony that there was a contingent fee agreement between Mr. Klayman and E.S.

Mr. Klayman disputes the existence of a contingent fee agreement, relying on his own testimony.  The Board, however, reasonably credited E.S.'s testimony over Mr. Klayman's on this point, particularly given the email that Mr. Klayman sent demanding a contingent fee.

The Board noted that Mr. Klayman did not appear to contest the Hearing Committee's determination that Mr. Klayman violated D.C. R. Prof. Cond. 1.5(b), by failing to obtain a written agreement memorializing the terms of the representation.  The Board, however, did not explicitly state its own conclusion on that issue.  Although Mr. Klayman does not appear to specifically dispute in this court that he violated R. 1.5(b), we see no need to address that issue given the other violations that we uphold.

### 6. Failure to Cease Representation

Finally, the Board concluded that Mr. Klayman violated D.C. R. Prof. Cond. 1.16(a)(3) (lawyer shall withdraw when discharged).  Mr. Klayman himself acknowledges that he continued to take action in E.S.'s case even after she discharged him as her lawyer.  Mr. Klayman argues that he did not receive some of the communications in which E.S. terminated his representation, but he concededly received at least one.  Mr. Klayman also argues that he did not believe that E.S. actually wanted him to stop representing her, and instead believed that the communication at issue was actually sent by someone else.  The Hearing Committee reasonably declined to credit this argument, finding that Mr. Klayman was aware of his termination by August 5, 2010, at the latest.

In sum, we accept the Board's conclusions that Mr. Klayman violated Rules 1.2(a), 1.4(b), 1.5(c), 1.6(a)(1), 1.6(a)(3), 1.7(b)(4), and 1.16(a)(3).

## VII.  Sanction

Mr. Klayman challenges the Board's recommended sanction of an eighteen-month suspension with a fitness requirement.  When determining the appropriate

sanction, we "adopt the recommended disposition of the Board unless to do so would foster a tendency toward inconsistent dispositions for comparable conduct or would otherwise be unwarranted." D.C. Bar R. XI, § 9(h)(1) (internal quotation marks omitted). "The Board's recommended sanction comes to us with a strong presumption in favor of its imposition." *In re McClure*, 144 A.3d 570, 572 (D.C. 2016) (per curiam) (internal quotation marks omitted). "To require proof of fitness as a condition of reinstatement after suspension, the record in the disciplinary proceeding must contain clear and convincing evidence that casts a serious doubt upon the attorney's continuing fitness to practice law." *In re Peters*, 149 A.3 253, 260 (D.C. 2016) (per curiam) (internal quotation marks omitted).

Mr. Klayman challenges the proposed sanction in two ways. First, he argues that the record does not support the proposed sanction because the record does not support the findings of misconduct. For the reasons we have already given, we conclude to the contrary.

Second, Mr. Klayman argues that the imposition of a fitness requirement would be at odds with our decision in *In re Klayman*, 228 A.3d 713 (D.C. 2020) (per curiam). In that case, this court concluded that Mr. Klayman violated D.C. R. Prof. Cond. 1.9, which generally prohibits conflicts of interest involving former clients.

*In re Klayman*, 228 A.3d at 715-19.   Specifically, the court concluded that Mr. Klayman acted impermissibly, and vindictively, by representing parties in suits brought against an organization where Mr. Klayman had previously served as general counsel.  *Id.*  The court imposed a ninety-day suspension but accepted the Board's recommendation against imposition of a fitness requirement.  *Id.* at 719. The court explained that the disciplinary violations in that case, though serious, did not leave the court "with serious doubt or real skepticism that Mr. Klayman can practice ethically." *Id.* (brackets and internal quotation marks omitted).  The court's holding in that case rested on the record and disciplinary violations in that case.  That conclusion sheds no significant light on the question of whether the record and disciplinary violations in this case warrant a fitness requirement.  We agree with the Board that Mr. Klayman's many serious disciplinary violations in this case warrant the imposition of a fitness requirement.

## VIII.  Failure to File § 14(g) Affidavit

Finally, Mr. Klayman argues that he had no duty to file an affidavit attesting to his compliance with the rules governing suspended attorneys.  D.C. Bar R. XI, § 14(g).  Specifically, Mr. Klayman contends that a § 14(g) affidavit is only required after a final disciplinary order.  We disagree.  As previously noted, D.C. Bar R. XI,

§ 9(g)(4) explicitly states that an attorney temporarily suspended pending final action by the court must comply with the requirements of § 14.

 

For the foregoing reasons, respondent Larry E. Klayman is hereby suspended from the practice of law in the District of Columbia for eighteen months, with reinstatement conditioned on demonstrating fitness to practice law.  We note that Mr. Klayman could not be reinstated until eighteen months after he "files an affidavit that fully complies with the requirements of D.C. Bar R. XI, § 14(g)."  *In re Moats*, 275 A.3d 890, 891 (D.C. 2022) (per curiam); D.C. Bar R. XI, § 16(c) ("[A] suspended attorney shall not be eligible for reinstatement until a period of time equal to the period of suspension shall have elapsed following the attorney's compliance with section 14 . . . .").

*So ordered.*

# EXHIBIT D

**IN THE SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION**

LARRY KLAYMAN, an individual
7050 W. Palmetto Park Road
Boca Raton, FL, 33433

        Plaintiff,

v.

ELHAM SATAKI
4141 Crisp Canyon Road #317
Sherman Oaks, CA, 91403

  And

HAMILTON FOX III
c/o 515 Fifth Street NW
Building A, Suite 117
Washington, DC 20001

  And

ELIZABETH HERMAN
c/o 515 Fifth Street NW
Building A, Suite 117
Washington, DC 20001

  And

H. CLAY SMITH, III
c/o 515 Fifth Street NW
Building A, Suite 117
Washington, DC 20001

  And

JULIA PORTER
c/o 515 Fifth Street NW
Building A, Suite 117
Washington, DC 20001

  And

OFFICE OF DISCIPLINARY COUNSEL
515 Fifth Street NW
Building A, Suite 117
Washington, DC, 20001

  And

MATTHEW KAISER
1099 14th St NW

Case No.:


**COMPLAINT**

1

Washington DC 20005

  And

MICHAEL E. TIGAR
601 W Rosemary St #317
Chapel Hill, NC, 27516

   And

WARREN ANTHONY FITCH
3930 Georgetown Court NW #602
Washington DC 20007

                    Defendants.

## I.      INTRODUCTION

1.      Plaintiff Larry Klayman ("Mr. Klayman") brings this action against individual Defendants Hamilton Fox ("Defendant Fox"), Elizabeth Herman ("Defendant Herman"), H. Clay Smith III ("Defendant Smith"), Julia Porter ("Defendant Porter"), Office of Disciplinary Counsel ("ODC"), Matthew Kaiser ("Defendant Kaiser), Michael Tigar ("Tigar"), and Warren Anthony Fitch ("Fitch") pursuant to D.C. Superior Court Civil Rule 60(d) which states that "[t]his rule does not limit a court's power to: (1) entertain an independent action to relieve a party from a judgment, order, or proceeding; or (2) set aside a judgment for fraud on the court." (hereinafter "Rule 60").

## II.     PARTIES

2.      Plaintiff Larry Klayman is an individual, a natural person. Mr. Klayman is at all relevant times a citizen and resident of the state of Florida.

3.      Defendant Sataki is an individual, a natural person.  Defendants Sataki is a citizen and resident of California.

4.      Defendant Hamilton Fox is an individual, a natural person. At all material times, Defendant Fox was employed by ODC as Bar Disciplinary Counsel. Defendant Fox is a citizen and resident of the District of Columbia.

5.      Defendant Elizabeth Herman is an individual, a natural person. At all material times, Defendant Herman was employed by ODC. Defendant Herman as a Deputy Bar Disciplinary Counsel and  is a citizen and resident of the District of Columbia

6.      Defendant H. Clay Smith III is an individual, a natural person. At all material times, Defendant Smith was employed by ODC as Assistant Bar Disciplinary Counsel Defendant Smith is a citizen and resident of the District of Columbia

7.      Defendant Julia Porter is an individual, a natural person. At all material times, Defendant Porter was employed by ODC as Deputy Bar Disciplinary Counsel. Defendant Porter is a citizen and resident of the District of Columbia

8.      Defendant Office of Bar Disciplinary Counsel serves as the chief prosecutor for attorney disciplinary matters, and purports to have a dual function: "to protect the public and the courts from unethical conduct by members of the D.C. Bar and to protect members of the D.C. Bar from unfounded complaints."

9.      Defendant Tigar is an individual, natural person. Defendant Tigar was at all material times a member of the Ad Hoc Hearing Committee ("AHHC") in the disciplinary proceeding styled *In re Klayman*, 20-BG-583 (D.C.C.A.) (the "Sataki Matter"). Defendant Tigar is a citizen and resident of North Carolina.

10.     Defendant Fitch is an individual, natural person. Defendant Fitch was at all material times a member and chairperson of the AHHC in the Sataki Matter. Defendant Fitch is a citizen and resident of Washington D.C.

11.     Defendant Kaiser is an individual, natural person. Defendant Kaiser was at all material times the chairperson of the District of Columbia Board on Professional Responsibility ("Board."), which oversees ODC and the AHHC. Defendant Kaiser is a citizen and resident of the District of Columbia

## III.   STANDING

12.     Mr. Klayman has standing to bring this action because he has been directly affected by the unlawful conduct complained herein.  His injuries are proximately related to the conduct of Defendants. Mr. Klayman has standing under Rule 60 to challenge the Suspension Order and Judgment of September 15, 2022 issued by the District of Columbia Court of Appeals.

## IV.   FACTS

13.     On September 15, 2022, the District of Columbia Court of Appeals ("DCCA") suspended Mr. Klayman for a period of eighteen (18) months with a reinstatement provision (the "Suspension Order" or "Judgment") - notwithstanding the fact that Mr. Klayman had already been serving an unwarranted and unconstitutional "temporary suspension" for the twenty (20) prior months – stemming from his representation of Defendant Sataki back in 2010. This Suspension Order and Judgment was the direct and proximate result of fraud by Defendant Sataki and the ODC Defendants – Defendants ODC, Fox, Porter, Herman, and Smith – at every single level of this disciplinary proceeding that mandate action under Rule 60. This fraud was furthered by Defendants Tigar, Fitch, and Kaiser. Defendants were driven by an extrajudicial bias and animus based on both ideology, politics and gender and their singular and admitted goal to remove Mr. Klayman from the practice of law.

14.     This instant action is therefore a continuation of *In re Klayman*, 20-BG-583 (D.C.C.A), as Mr. Klayman is simply seeking relief from judgment under Rule 60, and is therefore not a new action.

15.     Notwithstanding the egregious fraud that has infected this proceeding that mandate vacatur under Rule 60, it is also important for the Court to understand that the completely frivolous and meritless nature of Defendant Sataki's Complaint.

16.     *First,* Defendant Sataki had filed identical bar complaints in Florida and Pennsylvania in or around October of 2011, and both of these jurisdictions summarily dismissed the complaints as entirely frivolous and meritless.

17.     *Second*, Mr. Klayman provided ODC with an opinion from one of the preeminent legal scholars and experts on the subject of legal ethics, the late Ronald Rotunda, that clearly showed (1) that Defendant Sataki's allegations were frivolous and meritless, and (2) that in any event, the extreme delay from ODC in instituting this matter – the Specification of Charges was filed on July 20, 2017, approximately seven years after the events in question – ODC was time barred from pursuing Defendant Sataki's Complaint against Mr. Klayman. Exhibit 1; *Opinion of Ronald Rotunda*.

### Facts Pertaining to Mr. Klayman's Representation of Defendant Sataki

18.     On November 2, 2010, exactly 12 years ago, a Complaint was filed against Mr. Klayman with the ODC, styled *In re: Klayman*, Bar Docket No. 2011-D028. (the "Sataki Complaint").

19.     The Sataki Complaint was implemented as the result of a complaint  prepared and filed by non-lawyers on by or on behalf, one of which was a convicted felon by the name of Sam Razavi.

20.     Defendant Sataki did not identify who prepared and filed her operative complaint, but later it was disclosed that it was filed by Sam Razavi, her cousin, who uses many aliases and is a convicted felon over gambling fraud in Las Vegas, Nevada.

21.     The Sataki Complaint was based on Mr. Klayman's representation of Defendant Sataki's interests in an alleged sexual harassment and workplace retaliation action against her former employer, Voice of America ("VOA Lawsuit") in case styled *Sataki v. Broadcasting Board of Governors, et al*, 1:10-cv-00534 (D.D.C). This was a lawsuit brought pursuant to *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388 (1971), against the governors of the Broadcasting Board of Governors ("BBG").

22.     The scope of Mr. Klayman's services, performed along with Defendant Sataki's union representative and president, Mr. Tim Shamble ("Mr. Shamble") included, *inter alia*, attempted settlement discussions,  the filing of an administrative EEO/VOA Office of Civil Rights ("OCR") complaint, lobbying congressmen and senators to intervene on Defendant Sataki's behalf, engaging in approved publicity by Defendant Sataki to try to coax a settlement, and filing the VOA Lawsuit in the U.S. District Court for the District of Columbia ("District Court") to preserve the "status-quo" while the EEO/OCR complaint proceeded administratively.

23.     The VOA Lawsuit, which was also filed with Defendant Sataki's knowledge and consent, and which sought to ask the District Court to put Defendant Sataki to work at another VOA office in Los Angeles - away from her alleged harasser – was eventually improperly dismissed by the District Court, without even providing an evidentiary hearing.

24.     Furthermore, the EEO/OCR administrative complaint was ultimately not successful, as after a thorough investigation, the OCR found that Defendant Sataki's allegations of sexual harassment and workplace retaliation never actually occurred. Of course, Mr. Klayman did not know this at the time, and therefore believed her and agreed to represent her.

25.     Prior to and during the course of Mr. Klayman's representation of Defendant Sataki, he developed a close friendship with her, within the bounds of the relevant rules of professional responsibility and ethics.

26.     At the time, Mr. Klayman sympathized with Defendant Sataki's apparent plight, as she had claimed to be destitute and stuck in an untenable work situation. Mr. Klayman was himself going through a difficult time in his life, and therefore identified with Defendant Sataki's alleged problems. This motivated Mr. Klayman to work extremely diligently on Defendant Sataki's behalf, pro bono.

27.     As a close friendship developed further during the course of the legal representation, Mr. Klayman took it upon himself to help Defendant Sataki, including moving her out to Los Angeles to escape her alleged harasser, paying for her apartment, and other expenses, at a personal cost of about $ 30,000, and even finding psychologists for her and paying for some of her psychological counseling, for which she was otherwise insured.

28.     Defendant Sataki, however, began to exploit and take advantage of her close friendship with Mr. Klayman, at one point asking Mr. Klayman to purchase a car for her. Mr. Klayman declined to do so.

29.     Specifically, as a "final straw," Defendant Sataki's requested that Mr. Klayman purchase a car for her and her other actions led Mr. Klayman to realize that he could not continue legal representation of Defendant Sataki. Mr. Klayman thus suggested that it would be best if Defendant Sataki found new counsel to represent her in her claims against VOA.

30.     Mr. Klayman even referred Defendant Sataki to his personal friend, Gloria Allred, Esq., a famous, accomplished and highly successful women's rights legal advocate, as well as

Tim Shea, Esq., legal specialist in VOA matters, who had come suggested by Mr. Shamble. Defendant Sataki however insisted that Mr. Klayman continue to represent her.

31.     When Defendant Sataki's complaints against VOA did not yield immediate results, Defendant Sataki became more difficult, demanding, belligerent, frequently disrespectful, and hard to reach.

32.     Due to this, Mr. Klayman suggested that they memorialize their attorney-client relationship with a contingent fee agreement, but no agreement was ever reached in this regard, meaning that at all times, Mr. Klayman represented Defendant Sataki *pro bono*.

33.     Mr. Klayman and Mr. Shamble were unable to reach Defendant Sataki after this point, and in an abundance of caution, Mr. Klayman filed at his further expense on Defendant Sataki's behalf, an appeal to the U.S. Court of Appeals to the District of Columbia Circuit, regarding the District Court's dismissal of the VOA Lawsuit in order to ensure that Defendant Sataki's right of appeal was protected and not lost.

34.     At the end of the day, Defendant Sataki was not able to obtain relief through either the EEO/OCR process or the District Court, but not due to lack of effort from Mr. Klayman, who worked extremely diligently on her behalf, even on a *pro bono* basis.

35.     Ultimately, OCR, which did a thorough investigation of Defendant Sataki's sexual harassment and workplace retaliation claims, made the finding that this alleged sexual harassment and workplace retaliation never occurred, and therefore was simply made up by Defendant Sataki – the first in a series of proven false statements by Defendant Sataki.

*Facts Pertaining to Defendant Sataki's Complaint Against Mr. Klayman*

36.     On November 2, 2010, exactly twelve years ago, Defendant Sataki filed and later supplemented with ODC a complaint against Mr. Klayman – as set forth previously - regarding the VOA lawsuit ("Sataki Complaint") pertaining to his other pro bono representation.

37.     Again, of great import, Defendant Sataki filed her bar complaint in November 2010 which was later supplemented by non-lawyers, with identical corresponding complaints sent to The Florida Bar and the Pennsylvania Bar at that time, both of which were summarily dismissed about eleven years ago because they were not based upon fact or law, much less the clear and convincing evidence required to substantiate these types of claims.

38.     Nevertheless, ODC sent Defendant Sataki a letter dated July 7, 2011 containing Mr. Klayman's response, with explicit instructions that "[i]f we do not hear from you promptly, we may assume that you are satisfied with the attorney's explanations."

39.     Afterwards, Defendant Sataki abandoned the Sataki Complaint, as evidenced by ODC's own internal correspondence, admissions and policy.

40.     On January 15, 2014, Defendant Smith sent an email to ODC investigators Chuck Anderson and Kevin O'Connell, stating, "I am trying to locate a complainant [Defendant Sataki] that has dropped off the map…She filed a complaint vs. Larry Klayman in 2011. Her only correspondence with us was the ethical complaint that she filed."

41.     Then, Defendants, for their own unethical, unconstitutional, illegal, and tactical reasons, outrageously and incredibly resurrected Defendant Sataki's complaint seven (7) years later, waiting until July 20, 2017 to file the Specification of Charges in this case. During this time period, believing that the Complaints before ODC had also been dismissed, as they had been in Florida and Pennsylvania, Mr. Klayman understandably did not retain the files necessary to

defend himself. In addition, during this interim time period, relevant documents were discarded, witnesses moved, and memories faded.

42. A draft of the Specification of Charges was prepared even before Mr. Klayman was given an opportunity to file a supplemental response, which evidence ODC's punitive and biased mindset and improper, unethical, unconstitutional and illegal motivations, all in violation of accepted norms concerning statutes of limitations, laches, and other laws.

43. Before the Specification of Charges was filed on July 20, 2017, Mr. Klayman received a phone call from Defendant Smith where Defendant Smith informed him that ODC was likely be going to institute the Sataki Complaint. Mr. Klayman was shocked, as he believed that ODC had dismissed the Sataki Complaint, much like what The Florida Bar and Pennsylvania Bar had done since he had not heard from them in the intervening seven year period. Mr. Klayman had already discarded crucial documents pertaining to his representation of Defendant Sataki, as he believed the matter was behind him.

44. Defendant Smith was sympathetic to Mr. Klayman and said that pursuing the Sataki Complaint was "out of his hands," and therefore appeared to be doing the bidding of his superiors at ODC, which Mr. Klayman at the time believed to be Deputy Disciplinary Counsel, Defendant Herman. Mr. Klayman therefore set a meeting with Defendant Herman and Mr. Smith in order to discuss the Sataki Complaint.

45. On July 28, 2017, Mr. Klayman met with Defendant Herman and Defendant Smith in order to try to explain his position in a polite and civil manner. However, he was met with an extremely hostile and disrespectful demeanor by Defendant Herman, who clearly had no interest in resolving the issues. Defendant Herman abruptly and in a hostile voice refused to say

whether she had had contact and/or met with Ms. Sataki. In fact, she told Mr. Klayman that this was "none of his business."

46.    Furthermore, Defendant Herman's brazenly and openly admitted her bias and animus against Mr. Klayman due to his political beliefs, activism, free speech, and gender, which explains her participation in her baseless prosecution against him, when she curtly and in a hostile manner, on more than one occasion, stated to Mr. Klayman, "I [we] don't like the way you practice law."

47.    Furthermore, when Mr. Klayman advised Defendant Herman at the same meeting that The Florida Bar and the Pennsylvania Bar had summarily dismissed Ms. Sataki's claims, she on behalf of Defendants stated that "we could care less."

48.    Pursuant to the District of Columbia's one-party consent laws, Mr. Klayman recorded this meeting with Defendant Herman. Seeing that he was not going to be able to get anywhere by speaking with Defendant Herman, Mr. Klayman then sought a meeting with Disciplinary Counsel, Defendant Fox, who was Defendant Herman's superior. Mr. Klayman believed at the time that Defendant Herman was solely behind the baseless resurrection of Defendant Sataki's Complaint, and that by speaking with Defendant Fox he would be able to resolve the issues.

49.    On September 29, 2017, Mr. Klayman was finally able to meet with Defendant Fox, where Defendant Fox set the tone of the meeting by refusing to hear from Mr. Klayman why the Sataki complaint should not be instituted.

50.    Then, in a subsequent meeting on May 11, 2018 to discuss the Sataki Complaint, which Mr. Klayman had asked for to disclose evidence of bias and misconduct by Deputy Bar

Counsel Herman Defendant Fox acted with extremely hostility towards Mr. Klayman and shouted that he had no interest in discussing anything.

51.     Mr. Klayman was surprised to find that both Defendant Deputy Bar Counsel, Defendant Porter, and ODC's described investigator, Kevin O'Connell would be present in the meeting, which had not been disclosed previously.

52.     From the outset, Defendant Fox immediately and belligerently stated that he was not going to hear anything about or discuss dismissal of the Specification of Charges

53.     Mr. Klayman calmly responded that he would not be dictated to as to what he could discuss. This prompted Defendant Fox to stand up threateningly and scream "this meeting is over" and that Mr. Klayman "should leave [his] office."

54.     When Mr. Klayman got up from his chair, he indicated that this gross prosecutorial misconduct would leave him no recourse but to resort to legal action.

55.      Defendant Fox then charged at Mr. Klayman at the door of his office as Mr. Klayman was leaving, as if to physically assault him  and screamed, "I welcome your complaint," adding in a hostile voice, "do you seriously believe that I would not welcome the opportunity through discovery to show how you practice law."

56.     This more than confirmed to Mr. Klayman that each and every ODC Defendant, acting at the direction of Defendant Fox, harbored improper motivations towards Mr. Klayman and that they had decided that they were going to try to unlawfully attempt to remove Mr. Klayman from the practice of law, by whatever unprofessional, unethical, unconstitutional, and illegal means are used to "justify" these ends.

### *Facts Pertaining to Defendants' Highly Politicized Motivations*

57.     ODC had previously been run by Bar Disciplinary Counsel Wallace "Gene" Shipp prior to his retirement in 2017. During Mr. Shipp's tenure, ODC had been what it was supposed to be – a fair, unbiased, and neutral body. Once Defendant Fox took over, everything changed, and ODC became weaponized ad morphed into a highly politicized tool to remove conservative and Republican activist attorneys like Mr. Klayman from the practice of law.

58.     This explains why Defendant Sataki's Complaint sat dormant and thus abandoned for seven years until Defendant Fox took over. It is clear that Defendant Fox ordered ODC and his deputies Herman and Porter, as well as Assistant Bar Disciplinary Counsel Clay Smith, to revive the abandoned Sataki Complaint in order to try to remove Mr. Klayman from the practice of law.

59.     The ODC Defendants, since Defendant Fox arrived, have engaged in a pattern and practice of abusing and exceeding their position of authority, which is granted under state law, which authority is not to act outside the scope of their official duties and intentionally to violate the constitutional and other rights of bar members such as Mr. Klayman by selectively prosecuting them because of their political activism and free speech as well as other bases such as gender.

60.     Mr. Klayman is a prominent conservative and non-partisan attorney and public interest activist who has brought lawsuits against Hillary Clinton, Barack Obama, George W. Bush, and other politicians and government officials. He conceived of and founded the prominent public interest watchdogs, Judicial Watch, Inc. and Freedom Watch, Inc., and is a former U.S. Department of Justice federal prosecutor, having been on the trial team which broke up the AT&T monopoly during the Reagan administration. In 2003-2004, he ran for the U.S. Senate in the Florida Republican Primary. Mr. Klayman is also the only lawyer to ever have a

court rule that a president,  former President Bill Clinton, had committed a crime, when he illegally released the Privacy Act protected White House government file of a woman he had allegedly sexually abused and harassed in the Oval Office. Her name is Kathleen Willey. Mr. Klayman has also represented Juanita Broaddrick, Gennifer Flowers, Paula Jones, Dolly Kyle Browning, and other Bill Clinton female victims, who Hillary Clinton is alleged to have retaliated against and tried to destroy to advance her and her husband's political interests. Mr. Klayman is a supporter of and legal advocate for women's rights. At Freedom Watch, which he founded, he successfully enjoined the National Security Agency during the Obama administration over its unconstitutional mass surveillance and later played a prominent role in invalidating President Obama's illegal executive order granting amnesty to over 5 million illegal aliens. This latter case went all the way to the U.S. Supreme Court. In sum, Mr. Klayman has had a very successful career as a public interest legal advocate.

61.    On the other hand, even a quick search of FEC records shows that Defendant Fox, as well as Defendant Herman both donated significant sums of monies to Hillary Clinton and Barack Obama as well as other liberal Democrats, many of whom Mr. Klayman brought suit against as a public interest advocate.

62.    ODC, especially during the Trump years and thereafter in the wake of the 2020 presidential election in particular, filed, accepted and initiated ethics complaints against Trump White House Counsellor Kellyanne Conway[1] over remarks she made on cable news, against former Trump Attorney General William Barr[2] (this partisan complaint was incredibly filed by all four (4) prior presidents of the District of Columbia Bar as well as a former Senior Bar

---

[1] https://www.washingtonpost.com/politics/law-professors-file-misconduct-complaint-against-kellyanne-conway/2017/02/23/442b02c8-f9e3-11e6-bf01-d47f8cf9b643_story.html

[2] https://thehill.com/regulation/court-battles/508489-more-than-two-dozen-dc-bar-members-urge-disciplinary-probe-of-ag

Counsel) for withdrawing the indictment of General Mike Flynn and for remarks he made on Fox News, Senators Ted Cruz[3] and Josh Hawley[4] over their role in advocating for President Trump in the last election, and of course former U.S. Attorney Rudy Giuliani, who was temporarily suspended without even a hearing,[5] over his representation of President Trump, to name just a few. And, Defendant Fox himself personally charged former Justice Department attorney Jeffrey Clark with disciplinary action stemming from his relationship with Donald Trump. Exhibit 7. To the contrary, and as just one of many examples of selective prosecution, when an ethics complaint was filed against Defendants counsel, Mark MacDougall, for making false statements in court pleadings, and  fellow leftist Democrat lawyer David Kendall of Williams & Connolly over his admitted involvement in the destruction of Hillary Clinton's 33,000 emails illegally retained on a private server, which complicity is not even in dispute, the ODC, under the "leadership" of Defendant Fox,  turned a blind eye toward their ideological "soul brothers."   The MacDougall complaint and the Kendall complaints thus were characteristically dismissed. Most notably and telling,  the ODC summarily and quickly rejected the complaint filed by conservative lawyer and public interest advocate Ty Clevenger against Hillary Clinton.  The ODC then sought to disbar Mr. Clevenger – that is until they drove him into submission due to the cost of defending himself, and he simply resigned.[6]

---

[3] https://www.texasstandard.org/stories/lawyers-law-students-officially-file-grievances-seeking-to-disbar-senator-ted-cruz/

[4] https://thehill.com/homenews/state-watch/534783-attorneys-urge-missouri-supreme-court-to-probe-hawleys-actions

[5] https://www.law.com/newyorklawjournal/2021/03/03/nyc-bar-details-complaints-calling-for-full-attorney-discipline-investigation-of-giuliani/#:~:text=Under%20the%20New%20York%20state,censured%20or%20receive%20no%20punishment.

[6] Ty Clevenger, State bar prosecutors are flouting the law, protecting Hillary Clinton and her lawyers, LawFlog, available at: https://lawflog.com/?p=1389

63.     The highly politicized nature of ODC lends itself to only one possible conclusion; that Defendants  "packed" the Ad Hoc Hearing Committee with persons that were ideological foes to Mr. Klayman. This included Defendant Tigar – a proud and avowed communist, Exhibit 2 – and Defendant Fitch, was openly deferential to Defendant Tigar and himself highly politicized and leftist.

64.     Bob Woodward wrote in his book about the Supreme Court, titled *The Brethren,* that Defendant Tigar in his early career had been fired, at the urging of J. Edgar Hoover, from his High Court clerkship by Justice William Brennan for his subversive communist ties. Exhibit 2.

65.      Defendant Tigar's book, *Mythologies of State and Monopoly Power*, a Marxist rant against capitalist law, relishes his time with Fidel and the Castro brothers. His proud thank you letters from Fidel and a photo with his revolutionary brother Ramon is even housed in the archives of the University of Texas School of Law. Exhibit 2.

66.     Then after ensuring that Mr. Klayman stood no chance at the AHHC level, the Sataki Complaint went to the Board, whose president, Defendant Kaiser, has openly publicized his political beliefs, having penned articles for the leftist legal publication "Above the Law," extolling the virtues of Hillary Clinton and trashing Donald Trump.[7]

67.     As conclusive evidence of the fact that the Defendants are driven by their political ideology and affiliations, the Report and Recommendation of the Board was hyper-fixated on and incredibly angered and offended by the fact that the lawsuit that Mr. Klayman filed on behalf of Defendant Sataki named Hillary Clinton as a Defendant, despite the fact that it was a *Bivens* Complaint against all of governors of the BBG, and also included a conservative and Mr. Klayman's personal friend, Blanquita Collum, as a Defendant. Thus, it was clear that

---

[7] https://abovethelaw.com/2016/08/hillary-clinton-truthfulness-and-bias-in-white-collar-cases/; https://abovethelaw.com/2016/07/trump-and-tyranny/

Clinton was not included for political purposes, but out of necessity. This did not stop the Defendants from taking great umbrage, however.

68.     Furthermore, as the as the final "nail in the coffin," confirming the Defendants' politically motivated bias and prejudice, the Court need not look any further than the completely disparate "selective prosecutorial" treatment afforded by the Defendants to one Kevin Clinesmith in handling *In Matter of Kevin E. Clinesmith*, 21-BG-018 (D.C. App.).

69.     In that case, Kevin Clinesmith—the former senior FBI lawyer who dishonestly falsified a surveillance document which helped trigger the Trump-Russia investigation and who pled guilty to felony charges—was completely ignored by ODC, and only temporarily suspended for <u>five months</u> after he pled guilty, and only after ODC's "blind eye" was uncovered and subjected to negative publicity. Clinesmith also did not submit any affidavit under Rule 14(g) for five (5) months after he was suspended. Despite this, not only did the D.C. attorney disciplinary apparatus fast-track if not whitewash his case—clearly in order to minimize his temporary suspension period —the D.C. Court of Appeals let Clinesmith off with "time served" in just seven (7) months. And importantly, the Court imposed no reinstatement provision on Clinesmith, despite him literally being a convicted felon. Attached hereto as <u>Exhibit 3</u> is an article detailing this cover-up and the D.C. Court of Appeals' opinion in *In Matter of Kevin E. Clinesmith*, 21-BG-018 (D.C. App.). Had Clinesmith been treated in an unbiased and non-preferential fashion by the D.C. Bar disciplinary apparatus, run by Defendant Fox at ODC, and Defendant Kaiser of the Board of Professional Responsibility, he would have surely been permanently disbarred as the convicted dishonest felon was convicted to be.

***Facts Pertaining to Fraudulent Misconduct***

70.     At the disciplinary hearing in the Sataki Matter, the ODC Defendants and Defendant Sataki conspired and worked together in concert to suppress material evidence and suborned and provided perjurious testimony to the AHHC.

71.     These fraudulent actions tainted and infected the entire disciplinary proceeding, as they were allowed to remain on the record due to the actions of Defendants Tigar, Fitch, and Kaiser.  These fraudulent actions therefore directly and proximately caused the entire Suspension Order and Judgment, and therefore the only possible remedy is to "throw the baby out with the bathwater," or in other words, to vacate the Suspension Order and Judgment in its entirety.

72.     This was furthered by Defendants Tigar and Fitch on the AHHC, as they repeatedly denied Mr. Klayman leave to conduct discovery, which allowed the ODC Defendants and Defendant Sataki to suppress material evidence and provide perjurious testimony, as Mr. Klayman did not have the benefit of discovery to uncover suppressed evidence and obtain the truth.

73.     Then, when exculpatory material evidence was independently discovered by Mr. Klayman's legal team after the disciplinary hearing, the head of the Board on Professional Responsibility, Defendant Kaiser played his part by refusing to reopen the record or to even consider the newly discovered exculpatory evidence in order to ensure that the ODC Defendants and Defendant Sataki would not be held accountable for their illegal and unethical conduct.

74.     The suppression of exculpatory material evidence and perjurious testimony is set forth herein.

75.     *First*, Ms. Sataki gave the fraudulent testimony that she had not approved of engaging in publicity. On May 31, 2018, Ms. Sataki gave the following fraudulent testimony to the AHHC (Exhibit 4) :

Mr. Klayman: And that we agreed we would get some positive publicity here to

18

try to coerce VOA into a favorable settlement so you could be in LA, correct?
Defendant Sataki: Correct.
Mr. Klayman: And –
Defendant Sataki: **But I didn't agree to do it. You explained all this to me.** Ex

Chairman Fitch: Did he send you copies of some articles that he had written?
Defendant Sataki: Yes, he did.
Mr. Klayman: At that time you did not tell me, "Don't write any more."
Defendant Sataki: **I did.**
Mr. Klayman: There's nothing in writing that you presented to that effect at that time, did you?
Defendant Sataki:. **We talked to each other. I explained to you on the phone why I don't want articles out there.**

76.    Defendant Sataki further fraudulently testified that she did not approve of publicity because of how sexual harassment was perceived in the Persian community:

Defendant Sataki: So sexual harassment, in the Persian community, is rape. It's the actual act of intercourse and rape. So to this day I have to answer all those questions
....
That I want this to be handled as quiet as possible, so nobody finds out. And I did this complaint because I -- I still wanted to keep my image. My image was just this person that – I didn't want it to change and I didn't want too much talk regarding about my personal life. I wanted people to look at the Sataki that is covering the stories and not know about my private life. Because I was not open about my private life in front of the camera. People would ask me, I would never answer. I would always leave it without answer when they asked me about my private life. Exhibit 4.

77.    However this conflicts with the testimony of numerous material witnesses who testified on Mr. Klayman's behalf, including Mr. Shamble, as set forth above, that Ms. Sataki personally participated in publicizing her case!

78.    The record clearly showed that Defendant Sataki agreed to this publicity, with Mr. Klayman writing positive and complimentary articles and arranging for interviews with major publications, such as the Los Angeles Times. Indeed, a crucial piece of evidence is an email which Mr. Klayman sent to the LA Times, copying both Defendant Sataki and Mr. Shamble, attempting to arrange such an interview. Exhibit 5.

79.     This was consistent with Defendant Sataki being provided contemporaneously with all the articles and publicity that Mr. Klayman, who along with Mr. Shamble, he had generated for her. At no time did Defendant Sataki object and instead approved, and there is no contemporaneous written record of any objection.

80.     In fact, Defendant Sataki personally engaged in the publicizing of her case by personally handing out copies of one the articles written by Mr. Klayman on Capitol Hill. Extensive efforts to lobby politicians were made, often with Defendant Sataki present, but always with her informed consent.

81.     And, as the final "nail in the coffin," Mr. Klayman uncovered evidence that was fraudulently hidden by Ms. Sataki and ODC in September of 2019—after the AHHC hearing had concluded—that Ms. Sataki had even participated in making a widely aired and publicized public video broadcast on Persian television about her case, with intimate personal details about her personal life, discussing her sexual harassment and workplace retaliation complaint against VOA and others, which further undercuts and totally refutes any possible false claim that Ms. Sataki did not agree to publicize her case.[8] The video, which is in Ms. Sataki's native language Farsi, was translated by one of Mr. Klayman's witnesses, Keya Dash, as well as a respected Farsi certified translator who used to work for VOA. Exhibit 6. To be certain of and confirm the content, Mr. Klayman had the documentary translated by Mohammad Moslehi, a certified translator who did translations for VOA. Exhibit 6. Mr. Moslehi translates this "smoking gun" as follows:

> Whenever I am at my desk and I am not paying attention, he allows himself, to touch me under variety of pretexts.
> (displaying Elham [Sataki]'s photo) former broadcaster of VOA.

_____

[8] https://www.youtube.com/watch?v=e3g5f61muZ4

Mr. Falahati, Asal has written this for us, Well: let us answer the first caller (by the name of - Translator) Hossain from Kerman. Hello, go ahead please.

(displaying photo of Mehdi Falahati) broadcaster for the VOA network VOA: Voice of America

Voice of America has been recognized as the worst entity of American government. Therefore, lots of such coteries and issues exist there. Everybody says that the atmosphere is of a security one. Nobody can talk with anybody. Everybody makes insinuations against one another. The environment is very dirty. This week is second evening of being online with the subject of presidential elections in Iran and it's outcome, with your phone calls, emails and online weblogs and websites that Elham [Sataki] will introduce to you.

Regarding Mr. Falahati: He repeatedly asked me to go out with him. I didn't want to do it. Mr. Falahati and I started the ONLINE show together and we were performing it together. Aside from other aspects, it was very unprofessional.

When two individuals appear on camera and conduct a show, going out on a date, since it can directly affect the show is not right. They may fight with each other and that will affect the show, and vice-versa. He was not the type of person that I would accept his offer, and say that, all right let's go on a date.

The problem was, he did not know how to take a no. After a while I reached to the point that I was always calling sick and did not go to work. Since I wanted to start working, and Mr. Falahati wanted to come to my desk and again ask me let's go have a coffee or have dinner·. And this no, and saying no to him repeatedly had become exhausting for me, had made me very tired. I went to Suzanne who was our executive producer and told her the situation, that he (Mr. Falahati) does so. and I (Elham [Sataki]) don't know what to do at this point. Personally, I am not able to handle it.

The situation will go over the board of the status of going out for dinner, and he will come to my desk and while I am not paying attention, under various excuses touch me. Since I was afraid, I told her (Suzanne) that, can you handle it without anybody to know?? That day she told me that "Legally I cannot do it and you must formally file a complaint."

Mr. Falahati wanted to take revenge, since I complained and stated that the situation was so. As I was behind my desk, twice he came to my desk (audio censored) the dress that I had on and my bra-cord. I hollered at him (audio censored) he laughed and said "don't tell anybody." I was not feeling well. I was seeing psychiatrist. I was seeing psychologist. I was not feeling well. All the documents are available. Everything related (to this matter) exists. I was seeing doctor and the doctor was prescribing relaxing pills for me to take.

At this point, I am just saying, Mr. Falahati is a sick person that has not done so just with me, but the system of VOA has problem. Jamshid Chalangi testified for me. Look what happened? Mahmonir, another lady testified for me. She suffered a lot. Mr. Ali Sajjadi and Mr. Falahati were friends. At that time Mr. Sajjadi was very powerful there. They all got together. And even Suzanne who was my executive producer and was mad from this incident, she teamed up with them. And this caused the problem to be difficult for me, and no attorney was taking my case, because this case had become very big. And when the case became so big, then the Board of Governors had to defend itself, and defending itself caused the case to become against me. And they say that Elham left, Falahati stayed. When they fired me, I was not the only girl. There are a number of others.

Caption displaying Falahati and [Sataki] with written scripts.

The law suit against Mehdi Falahati due to the VOA influence did not get to anywhere, and El ham Sattaki was fired from this network .. After a short period of time Jamshid Chalangi and Ms. Mahmonir Rahimi were fired from this

network.

Display of Mehdi Falahati laughing loud.

82.     Unsurprisingly, Ms. Sataki and ODC Defendants – which on information and belief knew about this video - did not disclose this to the AHHC and Mr. Klayman's defense team had to find this themselves. This clearly fraudulent conduct was obviously done in concert with the ODC Defendants, who must have known about this crucial evidence and chose not to disclose it in order to further their goal to attempt to remove Mr. Klayman from the practice of law. This clear fraud grossly prejudiced Mr. Klayman because it was not part of the record at the Hearing Committee or the Board level. That the D.C. Court of Appeals denied a motion to remand this matter back to the Board to open the record to review this video shows its inherent bias on this and other issues – a clear violation of Mr. Klayman's due process and other rights. Thus, Mr. Klayman was never even given a chance to use this clearly relevant evidence that completely undercut any possible assertion that Defendant Sataki did not agree to use publicity and herself publicize detailed personal details about her case—one of the key "violations" found by the D.C. Court of Appeals in suspending him for eighteen months.

83.     Because Mr. Klayman knew that Defendant Sataki had a propensity for untruthfulness, he prior to the disciplinary hearing moved to take discovery and depositions of Defendant Sataki as well as her psychiatrist, Arlene Aviera ("Dr. Aviera") on February 15, 2018.

84.     Even this simple request was tellingly vehemently opposed by the ODC Defendants, and then denied by the AHHC (Defendants Tigar and Fitch), despite discovery clearly being allowed and an integral part of the attorney discipline process, particularly in a case such as this one where ODC delayed seven years to even file a Specification of Charges, resulting in passage of time causing memories to fade, documents to be discarded and lost, and witnesses to become unavailable. *See* Board on Professional Responsibility Rules, Chapter 3.

85.     Then, the ODC Defendants – on the first day of the hearing (!) – sought to and was allowed to introduce into evidence a slew of "new" emails into evidence that they clearly coached Defendant Sataki into perjuriously stating that she had just "discovered."

86.     Even then, when Mr. Klayman renewed his request to take discovery, he was still denied by Defendants Tigar and Fitch. This allowed the ODC Defendants and Defendant Sataki to put perjurious testimony onto the record and suppress the exculpatory evidence of Defendant Sataki's video interview publicizing her case without being caught.

87.     This is especially important as the AHHC had said prior to the hearing that Mr. Klayman would be able to renew his request for discovery at the hearing if necessary. Discovery was clearly necessary, as Mr. Klayman would have been able to (1) discover the fraudulently withheld exculpatory video evidence had he been able to depose Defendant Sataki, and (2) would have been able to elicit testimony from Dr. Aviera that Mr. Klayman had competently and diligently represented Defendant Sataki to the best of his abilities, as she had contemporaneous personal knowledge and records of the details of Mr. Klayman's representation of Defendant Sataki.

88.     As set forth above, only after the disciplinary hearing, once the matter was before the Board, did Mr. Klayman's legal team independently discover and unearth Defendant Sataki's video interview publicizing her case – clearly exculpatory material evidence. However, despite being faced with this clear illegal, unethical and fraudulent conduct by the ODC Defendants and Defendant Sataki, Defendant Kaiser still without any bases, refused to open the record or even consider this new exculpatory evidence, thereby ensuring that the ODC Defendants and Defendant Sataki were allowed to suppress exculpatory material evidence and give perjurious testimony without repercussions.

89.     *Second*, on May 31, 2018, Ms. Sataki gave further perjurious and fraudulent testimony, at the instruction of the ODC Defendants, that she never wanted to move to Los Angeles, and that somehow Mr. Klayman had made the decision for her and forced her to move out to Los Angeles – in order fraudulently and falsely create the impression that Mr. Klayman was controlling her:

> Ms. Sataki: Well, in the beginning when he – when  I moved -- **he moved me to Los Angeles** and he paid for everything. Exhibit 4 at 83:17-19

90.     However, this false and fraudulent testimony was also exposed by numerous other witnesses, including Mr. Shamble, as well as Ms. Sataki herself being forced to admit that it was false.

91.     On May 31, 2018, Mr. Klayman was able to show that the decision to move to Los Angeles was collective, and part of a legal strategy to have her assigned there due to having a medical exemption:

> Mr. Klayman: And we decided that, if we could show that you had a medical reason why you had to be in  Los Angeles, that we could qualify for a reasonable medical accommodation move to Los Angeles.
>
> Defendant Sataki: Yes.
>
> Mr. Klayman: And therefore we submitted documentation from Dr. Aviera, from the prior psychologist that you saw, and also from a doctor  named Long, an internist, to Voice of America with various documentation arguing that you needed to be in Los Angeles because those were where your  physicians were, that's where your family was,  that's where your friends were, and besides, you could do your work out of the Persia News Network on Wilshire Boulevard at the federal building, which was run by Voice of America. Do you remember that?
>
> Defendant Sataki: Yes. Exhibit 4 at 351.

92.     *Third*, Defendant Sataki, at the direction of the ODC Defendants, perpetuated the fraudulent notion that she had wanted Mr. Klayman to dismiss her cases, which was completely contradicted by her own actions where she (1) filed *pro se* a notice of appeal after the fact and (2) when ODC hunted her down years after the fact, she even asked them if they could still

prosecute her sexual harassment and workplace retaliation claims for her, despite the fact that the

Office of Civil Rights had thoroughly investigated her claims and found them to be meritless:

> Mr: Klayman: That you wanted Bar Counsel to file a sexual harassment case for
> you. You asked them that within the last year, against VOA.
> Defendant Sataki: I asked if it's doable.
> Mr. Klayman: And you asked Bar Counsel to do it for you, correct?
> Defendant Sataki: I asked if it's doable…. Exhibit 4 at 489:3-10 (May 31, 2018).

93.     The actions of Defendants Tigar, Fitch, and Kaiser, the ODC Defendants and

Defendant Sataki, resulted in fraud on the court, with imperviousness and without and

repercussions. This fraud on the court directly and proximately led to the Suspension Order and

Judgment at the DCCA.

### FIRST CAUSE OF ACTION
*Relief from Judgment Pursuant D.C. Superior Court Rule 60(d)*

94.     Mr. Klayman repeats and re-alleges all of the previous allegations of the entirety

of this Complaint, including, but not limited to, the Introduction and the exhibits to this

Complaint, with the same force and effect, as if fully set forth herein again at length.

95.     D.C. Superior Court Civil Rule 60(d) states that "[t]his rule does not limit a

court's power to: (1) entertain an independent action to relieve a party from a judgment, order, or

proceeding; or (2) set aside a judgment for fraud on the court."

96.     The ODC Defendants and Defendant Sataki have committed a fraud on the court

by willfully suppressing exculpatory evidence and suborning and committing perjury at the

disciplinary hearing.

97.     These fraudulent statements include:

> Mr. Klayman: And that we agreed we would get some positive publicity here to
> try to coerce VOA into a favorable settlement so you could be in LA, correct?
> Defendant Sataki: Correct.
> Mr. Klayman*:* And –
> Defendant Sataki: **But I didn't agree to do it. You explained all this to me.** Ex

> Chairman Fitch: Did he send you copies of some articles that he had written?

<u>Defendant Sataki</u>: Yes, he did.

<u>Mr. Klayman</u>: At that time you did not tell me, "Don't write any more."

<u>Defendant Sataki</u>:  **I did.**

<u>Mr. Klayman:</u> There's nothing in writing that you presented to that effect at that time, did you?

<u>Defendant Sataki:</u>. **We talked to each other. I explained to you on the phone why I don't want articles out there.**

<u>Defendant Sataki:</u> So sexual harassment, in the Persian community, is rape. It's the actual act of  intercourse and rape. So to this day I have to answer all those questions

….

That I want this to be handled as quiet as possible, so nobody finds out. And I did this complaint because I -- I still wanted to keep my image. My image was just this person that – I didn't want it to change and I didn't want too much talk regarding about my personal life. I wanted people to look at the Sataki that is covering the stories and not know about my private life. Because I was not open about my private life in front of the camera. People would ask me, I would never answer. I would always leave it without answer when they asked me about my private life. <u>Exhibit 4</u>.

<u>Ms. Sataki</u>: Well, in the beginning when he – when  I moved -- **he moved me to Los Angeles** and he paid for everything. <u>Exhibit 3</u> at 83:17-19

98.     Also included are fraudulent statements that Defendant Sataki wanted Mr. Klayman to drop and dismiss her cases.

99.     Defendants Tigar and Fitch furthered this fraud on the court by refusing to allow Mr. Klayman leave to conduct discovery which clearly would have unearthed this exculpatory material evidence and prevented perjurious statements from being put on the record, which directly and proximately resulted in the September 15, 2022 Suspension Order and Judgment in its entirety.

100.     Defendant Kaiser and the Board then furthered this fraud on the court by refusing to open the record and refusing to even consider the buried exculpatory evidence when it was independently discovered by Mr. Klayman's legal team, which directly and proximately resulted in the September 15, 2022 Suspension Order and Judgment  in its entirety.

101.     As a direct and proximate result of Defendants' fraud, misrepresentations and misconduct, including but not limited to perjury and subornation of perjury, Rule 60's requirement for relief from a judgment or order come into play.

102.     Plaintiff prays that this Court set aside and vacate the DCCA's Suspension Order and Judgment as it was a direct and proximate result of fraud on the court.

## SECOND CAUSE OF ACTION
### *Civil Conspiracy*

103.     Mr. Klayman repeats and re-alleges all of the previous allegations of the entirety of this Complaint, including, but not limited to, the Introduction and the exhibits to this Complaint, with the same force and effect, as if fully set forth herein again at length.

104.     Each and every one of the Defendants conspired to enter into an agreement to participate in committing fraud on the court in the Sataki Matter.

105.     The Defendants did, in fact, commit a fraud on the court. The ODC Defendants and Defendant Sataki buried and suppressed exculpatory evidence and suborned and committed perjury. Defendants Tigar, Fitch, and Kaiser then furthered this fraud by refusing to hold the ODC Defendants and Defendant Sataki accountable for their fraud, allowing for routine discovery under the circumstances of extreme delay in the prosecution which would have disclosed the fraud in full detail, and ensuring that the fraud remained  on the record when presented to the DCCA, which then directly and proximately caused the issuance of the September 15, 2022 Suspension Order and Judgment.

106.     As a direct and proximate result of this, Mr. Klayman has suffered an injury in the form of being suspended from the practice of law in the District of Columbia for eighteen (18) months with a reinstatement provision as well as the possibility of reciprocal discipline, however unwarranted,  in other jurisdictions.

## THIRD CAUSE OF ACTION
### *Laches*

107.    Mr. Klayman repeats and re-alleges all of the previous allegations of the entirety of this Complaint, including, but not limited to, the Introduction and the exhibits to this Complaint, with the same force and effect, as if fully set forth herein again at length.

108.    There was an undue, egregious and highly prejudicial delay of seven years by the ODC Defendants in instituting the Specification of Charges on July 20, 2017, approximately seven (7) years after the underlying events in question – Mr. Klayman's representation of Defendant Sataki – had occurred.

109.    Mr. Klayman was grossly and severely prejudiced by this undue, egregious delay because (1) he believed that this matter had been dismissed and therefore destroyed records pertaining to his representation of Defendant Sataki, (2) memories had faded, and (3) witnesses were unavailable to testify, as material witnesses Professor Rotunda passed away in the interim period and Dr. Aviera was diagnosed with cancer, among other areas of fatal prejudice resulting from this delay.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Klayman prays that the DCCA's September 15, 2022 Suspension Order and Judgment be vacated pursuant to Rule 60 for the Defendants' fraud and related egregious misconduct, including but not limited to perjury and the suborning of perjury, before and on the court.  Mr. Klayman also seeks attorney fees and costs for having to defend the meritless Sataki Complaint and for having to bring this instant action.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all counts, as to all issues so triable.

DATED: November 4, 2022                              Respectfully submitted,

/s/ Larry Klayman

---

Larry Klayman
7050     W.Palmetto     Park     Road
Boca Raton, FL 33433
Email: leklayman@gmail.com
Tel: 561-558-5336
*Plaintiff Pro Se*

# EXHIBIT 1 INTENTIONALLY OMITTED. *See* EXHIBIT C-1

EXHIBIT 2



The #1
*New York Times*
Bestseller

# THE
# BRETHREN
## INSIDE THE SUPREME COURT

# BOB WOODWARD
# SCOTT ARMSTRONG

"Explosive. . . . The most controversial book on the Supreme Court yet written."
—*Los Angeles Times Book Review*

...mentation for a rebuttal. Douglas called his close friend, Clark ..... a former Secretary of Defense under President Johnson. .... has sicked his gorillas on me," he told him. It was the work ... Nixon and Mitchell, and Ford was the front man. Douglas knew .. administration was willing to play politics with the Court and .. it had used "friendly persuasion" to get Fortas off the bench. ... asked Clifford to lead the defense. Clifford declined. He rea- .... d that he was too closely identified with the Democratic Party; .. whole thing would look too much like a political brawl. ... finally engaged Simon Rifkind, a onetime classmate at ... Law School. Rifkind was also a Democrat, but had ... ed as a federal judge for years.

The attacks and investigations preoccupied Douglas. He was ... determined to outlast the Nixon presidency. But since there ... no forum for him as a Supreme Court Justice to defend him- ... he declined public comment. He turned inward and brooded, .... ling friends late at night. If they succeeded in impeaching and ... victing him, what would be left of all the values and freedoms .. had fought for all his life? How could the Court remain inde- ... dent? His "side," already damaged by the departure of Warren .. Fortas, would be irreparably weakened. The liberals were in ... trouble. Black, old and slowing up, had good and bad days. His ... memory problems cropped up at unpredictable times. Even ... , as Black aged he was becoming more conservative. He was ... longer a certain liberal vote.

Marshall was weak—a correct vote, a follower, but no leader, no ... fighter. He was not one to speak up articulately or forcefully. That ... Brennan. "Bill's not a troublemaker," Douglas told an associate. ... Brennan was indeed a true friend, another correct vote, but really ... man of the center, an organizer for the moderate-liberal position. ... Brennan was too willing to compromise. When things got tough, ... Douglas felt, Brennan did not stand up for his principles. In 1966, ... Brennan hired a University of California at Berkeley law gradu- ... Michael Tigar, as a clerk. Tigar had been a leading radical ac- ... tivist. When conservative columnists attacked Brennan, it became ... a political issue. Brennan fired Tigar the week he arrived to start ... work. As Douglas saw it, Brennan sacrificed the clerk to protect his

90   BOB WOODWARD & SCOTT ARMSTRONG

personal position and his relationships with the moderate and conservative Justices. Douglas called it "scandalous," a "shocking cave-in."

During the impeachment investigation, friends and advisers from the old days would come to have lunch with Douglas, to help develop strategy and to offer suggestions. Douglas was often near tears of outrage. He felt powerless. Always suspicious, he was sure that the investigators would resort to any tactic, no matter how low or even illegal. He was more than ever convinced that his phone was tapped, that his office and perhaps even the conference room were bugged. (Even before Nixon's arrival, he had persuaded Earl Warren to have the conference room checked for listening devices. None was found.)

"Let's take a walk in the hall," Douglas told a friend who had come to discuss strategy. Many times during that year, Douglas came to Brennan's chambers and asked him to walk in the halls to discuss something privately. "I've got to go meet Bill out in the hall," Brennan would say to his clerks, his eyes twinkling. None of the other Justices seemed to take the investigation seriously enough, Douglas thought. Everyone seemed unconcerned.

Nixon wasn't sure that impeachment of Douglas was a very good idea. The evidence was thin, and Burger had signaled him that the attack was not good for the Court. Also, the President was more concerned with foreign affairs, particularly with the military escalation in Southeast Asia.

Later, when Nixon called Mitchell and said Ford should be told to "turn it off," Mitchell indicated that it would be difficult, since he himself had supplied Ford with some ammunition.* But he could put some distance between the administration and the impeachment move in a speech he was about to give to the Bar Association of the District of Columbia.

Mitchell's draft, condemning "irresponsible and malicious" criticism of the Court, was sent to Nixon, who forwarded it to Burger. Burger found it perfectly appropriate. When Burger tried to call

_____
* See William Safire: *Before the Fall: An Inside View of the Pre-Watergate White House.*



REPUBLICA DE CUBA

PRESIDENTE DEL CONSEJO DE ESTADO Y DEL GOBIERNO

Ciudad de la Habana,
6 de diciembre de 1979

Sr. Michael Tigar
Washington, D.C.

Muy estimado amigo Tigar:

Me siento verdaderamente apenado con usted. Hubiese deseado escribirle de inmediato para expresarle mi más profundo agradecimiento por su gesto amistoso y sincero de enviar a nuestro país un magnífico ejemplar Santa Gertrudis. Puedo asegurarle que múltiples obligaciones y responsabilidades han ocupado mi atención y todo mi tiempo durante estos meses, lo que impidió expresarle de manera personal mi mayor reconocimiento ¿Podré pedirle aún la generosidad de que nos disculpe por esta demora involuntaria?

Como ya conocerá, el toro "Phoenix", que nos envió, llegó a Cuba con buenas condiciones, después de varios largos e inevitables períodos de cuarentena. Su estado de salud es satisfactorio, se adapta favorablemente, y pensamos que pronto estará en condiciones de entrar en producción. Creo que será un aporte de gran valor al desarrollo de nuestra masa de Santa Gertrudis, que cuidamos con esmero, y padre de animales de gran calidad. Estoy informado de todo el esfuerzo y las preocupaciones que le ocasionó el hacer llegar a nuestro país a este semental tan selecto. Por eso, aunque su obsequio es valiosísimo, todavía más valioso y más importante es para nosotros su gesto de amistad y de simpatía. Créame que me siento en una deuda de profunda y sincera gratitud hacia usted.

Habría deseado saludarle personalmente, junto a otros distinguidos amigos, en mi reciente visita a Nueva York, pero, como sabe, las circunstancias no fueron entonces las más propicias. Confío en que hallaremos la oportunidad para sostener este encuentro. Quizás sea en su propio país. ¿Y por qué no en Cuba?

Reciba el más cordial saludo de su amigo,

Fidel Castro Ruz

Sr. Michel Tigar
Esq. 1308 18 St. N.W.
Washington, D.C.
EE. UU.

REPUBLICA DE CUBA
PRESIDENTE DEL CONSEJO DE ESTADO Y DEL GOBIERNO

# 'Free speech' advocate works to silence Larry Klayman

**Exclusive: Jack Cashill exposes radical ideology of lawyer pushing punishment**

 **By Jack Cashill**

**Published January 1, 2020 at 5:38pm**

In July of 2019, a hearing committee of the District of Columbia Bar Board of Professional Responsibility made a recommendation that Judicial Watch founder Larry Klayman be suspended, a recommendation now under appeal, from the practice of law in the district for 33 months.

The three-person committee strangely and inexplicably included only two attorneys, both of whom are of the left, and one of whom, Michael Tigar, is proudly far left.

How far left? Consider the following review on the jacket of Tigar's most recent book: "'An incisive, unsparing, creative, brilliant critique of capitalist law and its dire human consequences.' – BERNARDINE DOHRN, co-editor with Bill Ayers, Race Discourse: Against White Supremacy."

In the book, "Mythologies of State and Monopoly Power," Tigar emphasizes the Marxist notion that "the law is not what is says but what it does." Not liking the "dire human consequences" of the law as it exists, Tigar is not above twisting the law to his own ends.

Klayman suspects that Tigar, something of a superstar in Marxist circles, was recruited by the committee chairman, Anthony Fitch to sit on the committee with him. The two appeared chummy throughout the proceeding, and Fitch seemed downright deferential.

Throughout the proceeding, Tigar could barely conceal his disdain for the conservative, pro-capitalist, pro-Israel, pro-Trump activist Klayman.

In testifying as to why he founded Judicial Watch, Klayman explained his objections to the fact that federal judges were often chosen on the basis of political contributions by their law firms, labor unions or corporations.

As a result, said Klayman, "the best and the brightest" do not always make their way onto the bench. At this, Tigar grew visibly angry and shot back that his son, Jon Tigar, also a graduate of Berkeley Law School, was a federal judge.

President Barack Obama had appointed young Tigar to the federal bench in San Francisco. Klayman said he did not mean to impugn Tigar's son, but Judge Tigar deserved impugning. Tigar is the same federal judge who willy-nilly enjoined President Trump's asylum policy for illegal immigrants.

In its article on Klayman's recommended suspension, the Washington Post observed, that the "conservative" Klayman "is a notably combative litigant whose no-holds-barred tactics and robust use of the Freedom of Information Act have made him a dreaded – and sometimes loathed – inquisitor."

The Post also noted that Klayman writes for "WorldNetDaily, a right-wing news aggregator site." As to the left-wing politics of Fitch and Tigar, the Post predictably made no mention at all and failed to take seriously Klayman's claim that "It was a very politicized hearing committee."

The case itself has little to do with politics. It involves Klayman's pro-bono defense of a female Persian broadcaster at Voice of America. When she did not get the result she wanted, she turned on Klayman.

Both the Florida and Pennsylvania Bars dismissed identical complaints six years earlier. Following Trump's election, the head of the D.C. Bar Disciplinary Counsel resurrected the complaint six years after the woman had abandoned it.

Klayman believes that it was his high-profile legal advocacy on Trump's behalf that awakened legal radicals to the political potential of what is now a 10-year-old case.

"For Tigar, I am a conservative scalp," says Klayman, who is still able to practice law in D.C. during the appeal, "and one that he obviously harbors an animus toward, particularly given my support of Trump."

The 78-year-old Tigar has been an unapologetic disciple of the hard left from his student days. In his memoir, he boasts of his fond feelings for the brothers Castro and his attendance at the notorious Soviet-sponsored World Festival of Youth and Students in Helsinki in 1962.



Tigar's radicalism alarmed even liberal Supreme Court Chief Justice Earl Warren. According to Tigar, in 1965 Warren ordered Justice William Brennan to fire Tigar, then clerking for Brennan, and Brennan did just that.

Michael Tigar with Ramon Castro, the oldest of the Castro brothers, in 1978.

Tigar has not mellowed as he has grown older.
In fact, he has turned as the larger progressive movement has from defending free speech to suppressing it.

"Of all the remarkable developments of the past decade," argues British author Frank Furedi, "none has been more sinister than the West's gradual surrender of mankind's most important values: the twin ideals of freedom of speech and expression."

In Washington, that "surrender" has been imposed almost exclusively on the political right. Enforcing it are attorneys like Tigar and Fitch, the Democrats in Congress, federal judges of the Jon Tigar mold, and the intel agencies, all with the indispensable support of an increasingly leftist media.

The same Michael Tigar who supported the free speech movement while a law student at Berkeley in the 1960s is now working actively to silence Larry Klayman. It is hard to interpret Tigar's behavior otherwise.

EXHIBIT 3

5/2/22, 5:43 PM
Case 3:22-mc-00014-JRK Document 5 Filed 01/27/23 Page 261 of 410 PageID 999
DC Bar Restores Convicted FBI Russiagate Forger to 'Good Standing' Amid Irregularities and Leniency | RealClearInvestigations

# RealClear Investigations



# DC Bar Restores Convicted FBI Russiagate Forger to 'Good Standing' Amid Irregularities and Leniency

**By Paul Sperry, RealClearInvestigations**
**December 16, 2021**

DC Bar

A former senior FBI lawyer who falsified a surveillance document in the Trump-Russia investigation has been restored as a member in "good standing" by the District of Columbia Bar Association even though he has yet to finish serving out his probation as a convicted felon, according to disciplinary records obtained by RealClearInvestigations.



Kevin Clinesmith, convicted ex-FBI lawyer: Allowed to negotiate a light sentence.

**YouTube/Fox News**

The move is the latest in a series of exceptions the bar has made for Kevin Clinesmith, who pleaded guilty in August 2020 to doctoring an email used to justify a surveillance warrant targeting former Trump campaign adviser Carter Page.

Clinesmith was sentenced to 12 months probation last January. But the D.C. Bar did not seek his disbarment, as is customary after lawyers are convicted of serious crimes involving the administration of justice. In this case, it did not even initiate disciplinary proceedings against him until February of this year — five months after he pleaded guilty and four days after RealClearInvestigations first reported he had not been disciplined. After the negative publicity, the bar temporarily suspended Clinesmith pending a review and

temporarily suspended Clinesmith pending a review and hearing. Then in September, the court that oversees the bar and imposes sanctions agreed with its recommendation to let Clinesmith off suspension with time served; the bar, in turn, restored his status to "active member" in "good standing."

Before quietly making that decision, however, records indicate the bar did not check with his probation officer to see if he had violated the terms of his sentence or if he had completed the community service requirement of volunteering 400 hours.

To fulfill the terms of his probation, Clinesmith volunteered at Street Sense Media in Washington but stopped working at the nonprofit group last summer, which has not been previously reported. "I can confirm he was a volunteer here," Street Sense editorial director Eric Falquero told RCI, without elaborating about how many hours he worked. Clinesmith had helped edit and research articles for the weekly newspaper, which coaches the homeless on how to "sleep on the streets" and calls for a "universal living wage" and prison reform.

From the records, it also appears bar officials did not consult with the FBI's Inspection Division, which has been debriefing Clinesmith to determine if he was involved in any other surveillance abuses tied to Foreign Intelligence Surveillance Act warrants, in addition to the one used against Page. Clinesmith's cooperation was one of the conditions of the plea deal he struck with Special Counsel John Durham. If he fails to fully cooperate, including turning over any relevant materials or records in his possession, he could be subject to perjury or obstruction charges.

Clinesmith — who was assigned to some of the FBI's most sensitive and high-profile investigations — may still be in Durham's sights regarding others areas of his wide-ranging probe.

The scope of his mandate as special counsel is broader than commonly understood: In addition to examining the legal justification for the FBI's "Russiagate" probe, it also includes examining the bureau's handling of the inquiry into Hillary Clinton's use of an unsecured email server, which she set up in her basement to send and receive classified information, and her destruction of more than 30,000 subpoenaed emails she generated while running the State Department. As assistant FBI general counsel in the bureau's national security branch, Clinesmith played an instrumental role in that investigation, which was widely criticized by FBI and Justice Department veterans, along with ethics watchdogs, as fraught with suspicious irregularities.



John Durham, Trump-Russia special counsel: He may still have Clinesmith in his sights.

**Department of Justice via AP**

Clinesmith also worked on former Special Counsel Robert Mueller's probe into the 2016 Trump campaign as the key attorney linking his office to the FBI. He was the only headquarters lawyer assigned to Mueller. Durham's investigators are said to be looking into the Mueller team's actions as well.

The D.C. Bar's treatment of Clinesmith, a registered Democrat who sent anti-Trump rants to FBI colleagues after the Republican was elected, has raised questions from the start. Normally the bar automatically suspends the license of members who plead guilty to a felony. But in Clinesmith's case, it delayed suspending him on even an interim basis for several months and only acted after RCI revealed the break Clinesmith was given, records confirm.



It then allowed him to negotiate his fate, which is rarely done in any misconduct investigation, let alone one

5/2/22, 5:43 PM    DC Bar Lets Convicted FBI Russiagate Lawyer Back in Good Standing as Court Cuts Him More Slack | RealClearInvestigations

Case 3:22-mc-00014-JRK   Document 5   Filed 01/27/23   Page 263 of 410   PageID 911



Hamilton "Phil" Fox: Disciplinary
counsel who handled Clinesmith is a
major donor to Democrats.
**Facebook/D.C. Bar**

involving a serious crime, according to a review of past
cases. It also overlooked violations of its own rules:
Clinesmith apparently broke the bar's rule requiring
reporting his guilty plea "promptly" to the court — within
10 days of entering it — and failed to do so for five
months, reveal transcripts of a July disciplinary hearing
obtained by RCI.

"I did not see evidence that you informed the court,"
Rebecca Smith, the chairwoman of the D.C. Bar
panel conducting the hearing, admonished Clinesmith.

"[T]hat was frankly just an error," Clinesmith's lawyer
stepped in to explain.

Smith also scolded the bar's Office of Disciplinary
Counsel for the "delay" in reporting the offense, since
it negotiated the deal with Clinesmith, pointing out:
"Disciplinary counsel did not report the plea to the court
and initiate a disciplinary proceeding." Bill Ross, the
assistant disciplinary counsel who represented the office
at the hearing, argued Clinesmith shouldn't be held responsible and blamed the oversight on the COVID
pandemic.

The Democrat-controlled panel, known as the Board on Professional Responsibility, nonetheless gave
Clinesmith a pass, rubberstamping the light sentence he negotiated with the bar's chief prosecutor,
Disciplinary Counsel Hamilton "Phil" Fox, while admitting it was "unusual." Federal Election Commission
records show Fox, a former Watergate prosecutor, is a major donor to Democrats, including former
President Obama. All three members of the board also are Democratic donors, FEC data reveal.

While the D.C. Bar delayed taking any action against Clinesmith, the Michigan Bar, where he is also
licensed, automatically suspended him the day he pleaded guilty. And on Sept. 30, records show,
the Michigan Bar's attorney discipline board suspended Clinesmith for two years, from the date of his
guilty plea through Aug. 19, 2022, and fined him $1,037.

"[T]he panel found that respondent engaged in conduct that was prejudicial to the proper administration
of justice [and] exposed the legal profession or the courts to obloquy, contempt, censure or reproach," the
board ruled against Clinesmith, adding that his misconduct "was contrary to justice, ethics, honesty or
good morals; violated the standards or rules of professional conduct adopted by the Supreme Court; and
violated a criminal law of the United States."

Normally, bars arrange what's called "reciprocal discipline" for unethical attorneys licensed in their
jurisdictions. But this was not done in the case of Clinesmith. The D.C. Bar decided to go much easier on
the former FBI attorney, further raising suspicions the anti-Trump felon was given favorable treatment.

In making the bar's case not to strip Clinesmith of his
license or effectively punish him going forward, Fox
disregarded key findings by Durham about Clinesmith's
intent to deceive the FISA court as a government
attorney who held a position of trust.

Clinesmith confessed to creating a false document by
changing the wording in a June 2017 CIA email to state
Page was "not a source" for the CIA when in fact the
agency had told Clinesmith and the FBI on multiple
occasions Page had been providing information about
Russia to it for years — a revelation that, if disclosed to
the Foreign Intelligence Surveillance Court, would have
undercut the FBI's case for electronically monitoring



Carter Page: FBI lawyer Clinesmith

undercut the FBI's case for electronically monitoring Page as a supposed Russian agent and something that Durham noted Clinesmith understood all too well.

Carter Page: FBI lawyer Clinesmith misled the surveillance court when he falsified a document to say Page was "not a source" who had helped the CIA, when in fact he was.
**FNC**

Bar records show Fox simply took Clinesmith's word that he believed the change in wording was accurate and that in making it, he mistakenly took a "shortcut" to save time and had no intent to deceive the court or the case agents preparing the application for the warrant.

Durham demonstrated that Clinesmith certainly did intend to mislead the FISA court. "By his own words, it appears that the defendant falsified the email in order to conceal [Page's] former status as a source and to avoid making an embarrassing disclosure to the FISC," the special prosecutor asserted in his 20-page memo to the sentencing judge, in which he urged a prison term of up to six months for Clinesmith. "Such a disclosure would have drawn a strong and hostile response from the FISC for not disclosing it sooner [in earlier warrant applications]."

As proof of Clinesmith's intent to deceive, Durham cited an internal message Clinesmith sent the FBI agent preparing the application, who relied on Clinesmith to tell him what the CIA said about Page. "At least we don't have to have a terrible footnote" explaining that Page was a source for the CIA in the application, Clinesmith wrote.

The FBI lawyer also removed the initial email he sent to the CIA inquiring about Page's status as a source before forwarding the CIA email to another FBI agent, blinding him to the context of the exchange about Page.

Durham also noted that Clinesmith repeatedly changed his story after the Justice Department's watchdog first confronted him with the altered email during an internal 2019 investigation. What's more, he falsely claimed his CIA contact told him in phone calls that Page was not a source, conversations the contact swore never happened.

Fox also maintained that Clinesmith had no personal motive in forging the document. But Durham cited virulently anti-Trump political messages Clinesmith sent to other FBI employees after Trump won in 2016 – including a battle cry to "fight" Trump and his policies – and argued that his clear political bias may have led to his criminal misconduct.

"It is plausible that his strong political views and/or personal dislike of [Trump] made him more willing to engage in the fraudulent and unethical conduct to which he has pled guilty," Durham told U.S. District Judge Jeb Boasberg.

Boasberg, a Democrat appointed by President Obama, spared Clinesmith jail time and let him serve out his probation from home. Fox and the D.C. Bar sided with Boasberg, who accepted Clinesmith's claim he did not intentionally deceive the FISA court, which Boasberg happens to preside over, and even offered an excuse for his criminal conduct.

"My view of the evidence is that Mr. Clinesmith likely believed that what he said about Mr. Page was true," Boasberg said. "By altering the email, he was saving himself some work and taking an inappropriate shortcut."

Fox echoed the judge's reasoning in essentially letting Clinesmith off the hook. (The deal they struck, which the U.S. District Court of Appeals that oversees the bar

Case 3:22-mc-00014-JRK   Document 5   Filed 01/27/23   Page 265 of 410 PageID 913



James E. "Jeb" Boasberg: Obama appointee spared Clinesmith jail time.
**DC District Court**

approved in September, called for a one-year suspension, but the suspension began retroactively in August 2020, which made it meaningless.)
Boasberg opined that Clinesmith had "already suffered" punishment by losing his FBI job and $150,000 salary.

But, Boasberg assumed, wrongly as it turned out, that Clinesmith also faced possible disbarment. "And who knows where his earnings go now," the judge sympathized. "He may be disbarred or suspended from the practice of law."

Anticipating such a punishment, Boasberg waived a recommended fine of up to $10,000, arguing that Clinesmith couldn't afford it. He also waived the regular drug testing usually required during probation, while returning Clinesmith's passport. And he gave his blessing to Clinesmith's request to serve out his probation as a volunteer journalist, before wishing him well: "Mr. Clinesmith, best of luck to you."

Fox did not respond to requests for comment. But he argued in a petition to the board that his deal with Clinesmith was "not unduly lenient," because it was comparable to sanctions imposed in similar cases. However, none of the cases he cited involved the FBI, Justice Department or FISA court. One case involved a lawyer who made false statements to obtain construction permits, while another made false statements to help a client become a naturalized citizen – a far cry from falsifying evidence to spy on an American citizen.

Durham noted that in providing the legal support for a warrant application to the secret FISA court, Clinesmith had "a heightened duty of candor," since FISA targets do not have legal representation before the court.

He argued Clinesmith's offense was "a very serious crime with significant repercussions" and suggested it made him unfit to practice law.

"An attorney – particularly an attorney in the FBI's Office of General Counsel – is the last person that FBI agents or this court should expect to create a false document," Durham said.

The warrant Clinesmith helped obtain has since been deemed invalid and the surveillance of Page illegal. Never charged with a crime, Page is now suing the FBI and Justice Department for $75 million for violating his constitutional rights against improper searches and seizures.





Rudolph Giuliani, Trump lawyer: Facing bar discipline, even though he's not charged with a crime.



Michael Sussmann, ex-Hillary Clinton
lawyer: Not facing bar discipline,
despite being charged with a crime.

**perkinscoie.com**

PBS

Explaining the D.C. Bar's disciplinary process in a 2019
interview with Washington Lawyer magazine, Fox said
that "the lawyer has the burden of proving they are fit to
practice again. Have they accepted responsibility for
their conduct?" His office's website said a core function is
to "deter attorneys from engaging in misconduct."

In the same interview, Fox maintained that he tries to insulate his investigative decisions from political
bias. "I try to make sure our office is not used as a political tool," he said. "We don't want to be a political
tool for the Democrats or Republicans."

Bar records from the Clinesmith case show Fox suggested the now-discredited Trump-Russia "collusion"
investigation was "a legitimate and highly important investigation."

One longstanding member of the D.C. Bar with direct knowledge of Clinesmith's case before the bar
suspects its predominantly Democratic board went soft on him due to partisan politics. "The District of
Columbia is a very liberal bar," he said. "Basically, they went light on the him because he's also a
Democrat who hated Trump."

Meanwhile, the D.C. Bar has not initiated disciplinary proceedings against Michael Sussmann,
another Washington attorney charged by Durham. Records show Sussmann remains an "active member"
of the bar in "good standing," which also has not been previously reported. The former Hillary Clinton
campaign lawyer, who recently resigned from Washington-based Perkins Coie LLP, is accused of lying to
federal investigators about his client while passing off a report falsely linking Trump to the Kremlin.

While Sussmann has pleaded not guilty and has yet to face trial, criminal grand jury indictments usually
prompt disciplinary proceedings and interim suspensions.

Paul Kamenar of the National Legal and Policy Center, a government ethics watchdog, has called for the
disbarment of both Clinesmith and Sussmann. He noted that the D.C. Court of Appeals must
automatically disbar an attorney who commits a crime of moral turpitude, which includes crimes involving
the "administration of justice."

"Clinesmith pled guilty to a felony. The only appropriate sanction for committing a serious felony that also
interfered with the proper administration of justice and constituted misrepresentation, fraud and moral
turpitude, is disbarment," he said. "Anything less would minimize the seriousness of the misconduct" and
fail to deter other offenders.

Disciplinary Counsel Fox appears to go tougher on Republican bar members. For example, he recently
opened a formal investigation of former Trump attorney Rudy Giuliani, who records show Fox put under
"temporary disciplinary suspension" pending the outcome of the ethics probe, which is separate from the
one being conducted by the New York bar. In July, the New York Bar also suspended the former GOP
mayor on an interim basis.

Giuliani has not been convicted of a crime or even charged with one.

*This and all other original articles created by RealClearInvestigations may be republished for
free with attribution. (These terms do not apply to outside articles linked on the site.)*

5/2/22, 5:43 PM    DC Bar Lets Convicted FBI Russiagate Lawyer Back in Good Standing as Court Cuts Him More Slack | RealClearInvestigations

Case 3:22-mc-00014-JRK   Document 5   Filed 01/27/23   Page 267 of 410   PageID 915

free with attribution. (These terms do not apply to outside articles linked on the site.)

*We provide our stories for free but they are expensive to produce. Help us continue to publish distinctive journalism by making a contribution today to RealClearInvestigations.*

**Support RealClearInvestigations →**    

# In re Clinesmith

District of Columbia Court of Appeals

September 2, 2021, Decided

No. 21-BG-18

**Reporter**

2021 D.C. App. LEXIS 253 *; 258 A.3d 161; 2021 WL 4074424

IN RE KEVIN E. CLINESMITH, RESPONDENT. A Suspended Member of the Bar of the District of Columbia Court of Appeals (Bar Registration No. 984265).

**Notice:** THIS OPINION IS SUBJECT TO FORMAL REVISION BEFORE PUBLICATION IN THE ATLANTIC AND MARYLAND REPORTERS. USERS ARE REQUESTED TO NOTIFY THE CLERK OF THE COURT OF ANY FORMAL ERRORS SO THAT CORRECTIONS MAY BE MADE BEFORE THE BOUND VOLUMES GO TO PRESS.

**Prior History:  [*1]** (DDN 305-19).

**Judges:** Before GLICKMAN and DEAHL, Associate Judges, and NEBEKER, Senior Judge.

# Opinion

On Report and Recommendation of the Board on Professional Responsibility Hearing Committee Number Four Approving Petition for Negotiated Discipline

PER CURIAM: This decision is non-precedential. Please refer to D.C. Bar R. XI, § 12.1(d) regarding the appropriate citation of this opinion.

In this disciplinary matter, Hearing Committee Number Four (the Committee) recommends approval of an amended petition for negotiated attorney discipline. *See* D.C. Bar R. XI, § 12.1(c). The amended petition is based on Respondent's guilty plea to one count of making a false statement in violation of 18 U.S.C. § 1001(a)(3) for his actions in modifying a document while employed by the Federal Bureau of Investigation (FBI) as Assistant General Counsel in the National Security and Cyber Law Branch of the FBI's Office of General Counsel. The Committee determined this was a serious crime in violation of D.C. Bar R. XI, § 10(d), but not one involving moral turpitude, either per se or on the specific facts. The Committee concluded that Respondent's misconduct violated Rule 8.4(b) and (c) of the District of

Columbia Rules of Professional Conduct. The Committee determined that the negotiated discipline of a one-year suspension nunc pro tunc to August 25, 2020—the date he self-reported his conviction **[*2]** to Disciplinary Counsel—was not unduly lenient.

Having reviewed the Committee's recommendation in accordance with our procedures in uncontested disciplinary cases, *see* D.C. Bar R. XI, § 12.1(d), we agree this case is appropriate for negotiated discipline and the proposed sanction is not unduly lenient or inconsistent with dispositions imposed for comparable professional misconduct. Accordingly, it is

ORDERED that Respondent Kevin E. Clinesmith is hereby suspended from the practice of law in the District of Columbia for one year nunc pro tunc to August 25, 2020.

*So ordered.*

---

**End of Document**

EXHIBIT 4

In The Matter Of:  Larry E. Klayman
May 31, 2018

Page 489

1    MR. KLAYMAN:  Ok.
2    BY MR. KLAYMAN:
3        Q.   That you wanted Bar Counsel to file a
4    sexual harassment case for you.  You asked them
5    that within the last year, against VOA.
6        A.  I asked if it's doable.
7        Q.   And you asked Bar Counsel to do it for
8    you, correct?
9        A.  I asked if it's doable.
10        I asked, once this is over, can I
11    take -- once I prove --
12       THE WITNESS:  Can I say exactly what
13    I -- I don't know.
14        Is it just yes or no, or I can say what
15    I asked?
16    I asked, once this is over, and so we
17    can prove and show why I couldn't have him as my
18    attorney any more, that he was not capable to work
19    as my attorney any more because he had more
20    interest, so, then is there any way that I can
21    pick the VOA case up, because then we can show
22    that I didn't fail to apply.  It was that I had

Page 490

1    this problem that I had to resolve before I go
2    back to VOA.
3    BY MR. KLAYMAN:
4        Q.   What did Bar Counsel tell you?
5        A.   He said he doesn't know.  He can't
6    advise me on that.
7        Q.   So you think that this case right now
8    that you're here on today is going to somehow
9    revive your sexual harassment claim against VOA?
10       A.   No, I don't think that.  It was just
11    asking I asked.  That's not why I'm here.
12       Q.   You also told Bar Counsel that you
13    wanted to pursue the case now because you wanted
14    to be able to say to future employers, or explain
15    to them, why your career had not gone as well as
16    you had wanted, correct?
17       A.   Correct.
18       Q.   So basically you want, as you testified
19    yesterday, revenge against me and Mr. Falahati to
20    explain why you're unhappy with your professional
21    and personal life?
22       A.   No, I did not say that.

Page 491

1        I said, when I was in a bad state of
2    mind, in a hole eight years ago, I was so angry
3    and hurt for what Mr. Klayman did and before.
4        So, in that state of mind, I was going
5    to take my life and then everybody would find out
6    what happened.
7        Because, to this day, I haven't been
8    able to tell anyone that -- anyone what Mr.
9    Klayman did to me and why I couldn't have him
10    represent me any more.
11        To this day, everybody's asking me,
12    "Did you wrongly accuse your coworker for sexual
13    harassment?  How come that he's still working
14    there and you're not?"  People are still wondering
15    why.
16        But I cannot go and say that my own
17    attorney that's representing me for a sexual
18    harassment case is suddenly falling in love with
19    me and cannot at all, as you said yourself,
20    several times, that "a car cannot run on empty
21    fuel" and you cannot represent me because you're
22    too in love with me and you're feelings are coming

Page 492

1    in the middle of this.
2        I can't say that, because it's -- I
3    always think what people are going to think and
4    say that, "So, her own lawyer now?"
5        So therefore, I wanted this to be
6    resolved here.
7    BY MR. KLAYMAN:
8        Q.   Over the lunch break you talked about
9    your testimony, not with Mr. Smith, but with some
10    other people, didn't you?
11       A.   Over what?
12       Q.   Over our lunch today, you talked about
13    your testimony, not with Mr. Smith, but with some
14    other people.
15        You talked with Sam?
16       A.   No, I didn't.
17       Q.   You talked with Kathleen?
18       A.   No, I didn't.
19       Q.   Now, assuming what you say is correct,
20    you're aware that I advised you --
21       A.   I didn't.  That is correct.
22       Q.   That's your opinion.

In The Matter Of:  Larry E. Klayman
May 31, 2018

Page 349

1  sir.
2      Q.   And we decided not to use -- you
3  decided not to use that psychologist, and then I
4  found the name of another psychologist through a
5  former client of mine, Alice Elise.
6          Do you remember that?
7      A.   I don't remember.
8      Q.   You did meet Alice, though?  You
9  remember her?
10     A.   I remember my two -- at that point I
11 was very sick, so, I remember that I saw a few
12 doctors, yes.
13     Q.   Yes.  And I took you to see -- I got
14 the name of a psychologist from Alice, you
15 remember that, and then that psychologist, because
16 she was representing Alice -- because Alice had
17 been a sexual harassment victim, as well, I had
18 represented her -- represented that someone else
19 could perhaps help, you and that person was Arlene
20 Aviera.
21         Do you remember that?
22     A.   Yes.

Page 350

1      Q.   And then I took you to Arlene Aviera?
2      A.   Yes.
3      Q.   I believe that we sat down with Arlene,
4  we'll call her Arlene, and you explained your
5  situation and started crying and sobbing again?
6      A.   Yes.
7      Q.   You remember that?
8      A.   Yes.
9      Q.   And I asked Arlene in front of you,
10 "Can you please help Elham."
11         Do you remember that?
12     A.   Yes.
13     Q.   And I said, "If she can't pay the fees,
14 Dr. Aviera, don't worry about it, I'll pay them."
15     A.   Yes.
16     Q.   You then began to see Dr. Aviera?
17     A.   I'm sorry, what?
18     Q.   You then set up a schedule to be
19 counseled by Dr. Aviera?
20     A.   Yes.
21     Q.   And I was not present during those
22 counseling sessions.  That was with you and Dr.

Page 351

1  Aviera?
2      A.   You "were" present or "not present"?
3      Q.   Not.
4      A.   Not, yes.
5      Q.   And in and around this time period we
6  had discussions with Tim Shamble, your union
7  represent, president for the AFL-CIO, Voice of
8  America, as to what we now could do to get you
9  back to work in Los Angeles at the Persia News
10 Network.
11     A.   Yes.
12     Q.   And we decided that, if we could show
13 that you had a medical reason why you had to be in
14 Los Angeles, that we could qualify for a
15 reasonable medical accommodation move to Los
16 Angeles.
17     A.   Yes.
18     Q.   And therefore we submitted
19 documentation from Dr. Aviera, from the prior
20 psychologist that you saw, and also from a doctor
21 named Long, an internist, to Voice of America with
22 various documentation arguing that you needed to

Page 352

1  be in Los Angeles because those were where your
2  physicians were, that's where your family was,
3  that's where your friends were, and besides, you
4  could do your work out of the Persia News Network
5  on Wilshire Boulevard at the federal building,
6  which was run by Voice of America.
7          Do you remember that?
8      A.   Yes.
9      Q.   One of the reasons why there is a
10 Persia News Network division in Los Angeles is
11 because Los Angeles has a very big Persian
12 population, correct?
13     A.   Correct.
14     Q.   You're aware of that, there's over one
15 million Persians, or Iranians, however you want to
16 say it?
17     A.   Yes.
18     Q.   Los Angeles.  And sometimes people joke
19 about it, they call Los Angeles "Tehrangeles"
20 rather than Los Angeles, because it's so heavily
21 populated.
22     A.   Correct.

24  (Pages 349 to 352)

In The Matter Of:  Larry E. Klayman
May 30, 2018

Page 82

1  helped me to send -- to send her an email.  I'm
2  trying to remember her name now.  She's always on
3  TV with this kind of cases.
4        I can't remember her name now.
5        Q.  Ok.  So, at this dinner that you --
6        A.  Gloria Allred.
7        Q.  Ok.  So at this dinner that you had
8  with Mr. Klayman, you discussed your case but you
9  did not hire him at that time?
10       A.  Right.
11          MR. KLAYMAN:  Leading, objection,
12  leading.  You gave her testimony.
13          CHAIRMAN FITCH:  I would be careful of
14  that, Mr. Smith.
15  BY MR. SMITH:
16       Q.  Did there come a time that you did hire
17  Mr. Klayman to be your lawyer in this matter?
18       A.  I think it was sometime in the
19  beginning of 2010, I want to say in January that
20  we talked about this and I started seriously
21  working on, yes, me hiring him.
22          In February I sent an email to Mr.

Page 83

1  Shamble with information about Mr. Klayman, that
2  he's going to be representing me.
3        Q.  Did you have a fee agreement with Mr.
4  Klayman?
5        A.  I'm sorry?
6        Q.  Did you have a fee agreement or
7  arrangement with Mr. Klayman?
8        A.  Well, we talked about that, at the end,
9  whatever it is, that it's going to be 40 percent
10  goes to him.
11       Q.  Ok, were --
12       A.  Which he later changed it to 50
13  percent.
14       Q.  Were there any other arrangements you
15  had with respect to the representation, financial
16  arrangements?
17       A.  Well, in the beginning when he -- when
18  I moved -- he moved me to Los Angeles and he paid
19  for everything.
20       Q.  Ok.  Was that part of the
21  representation agreement?
22       A.  Well, that's what he said, that he --

Page 84

1  because I told him that I can't afford moving to
2  LA, and he said he's going to pay for everything,
3  but then he gets his money back when he gets his
4  40 percent.  All that's going to be included
5  there, on top of that.
6        Q.  Did you ever have a writing from Mr.
7  Klayman reflecting the terms of this
8  attorney/client relationship?
9        A.  I don't understand the question.
10       Q.  Did Mr. Klayman give you a written
11  agreement, representation agreement?
12       A.  I don't believe so.  I don't know.  I
13  really don't know.
14          I know we had emails going back and
15  forth later regarding this, but I don't remember
16  that now.  I don't know.
17          In my mind I don't remember.
18       Q.  Let me ask you to look at what has been
19  marked in Bar Counsel's book of exhibits as
20  Exhibit Number 1.  It is the blue book before you.
21  I'll come over.
22

Page 85

1          CHAIRMAN FITCH:  What exhibit number?
2          MR. SMITH:  Bar Exhibit Number 1.  For
3  the record it is an Office of Bar Counsel
4  complaint form dated November 2nd, 2010.
5          (Witness peruses document.)
6  BY MR. SMITH:
7        Q.  Have you had a chance to look at this?
8        A.  Yes.
9        Q.  Did you mail this correspondence to the
10  Office of Disciplinary Counsel at or about --
11          MR. SUJAT:  A leading question.  I
12  object, your Honor.
13          MR. SMITH:  I'm laying a foundation to
14  introduce the document.
15          CHAIRMAN FITCH:  Overruled.
16  BY MR. SMITH:
17       Q.  Did you mail this letter to the Office
18  of Bar Counsel on or about November 2nd, 2010?
19       A.  Yes.
20       Q.  Was this your handwriting on the second
21  page of this document?
22       A.  No.

22  (Pages 82 to 85)

In The Matter Of:  Larry E. Klayman
May 31, 2018

## Page 397

1  because people in administrative agencies and
2  judges tend to react to cases that are known and
3  are out there for the public to know about."
4  BY MR. KLAYMAN:
5      Q.  I told you that, right?
6      A.  You told me that and I responded that I
7  don't want it to be --
8      CHAIRMAN FITCH:  Ma'am --
9      THE WITNESS:  Yes?
10     CHAIRMAN FITCH:  I asked did he tell
11 you that.
12     THE WITNESS:  Yes, he told me that.
13     CHAIRMAN FITCH:  You said yes.
14     THE WITNESS:  Yes, he told me that.
15 BY MR. KLAYMAN:
16     Q.  And we talked about that in the
17 presence of Mr. Shamble as well, correct?
18     A.  Correct.
19     Q.  And that we agreed we would get some
20 positive publicity here to try to coerce VOA into
21 a favorable settlement so you could be in LA,
22 correct?

## Page 398

1      A.  Correct.
2      Q.  And --
3      A.  But I didn't agree to do it.  You
4  explained all this to me.
5      CHAIRMAN FITCH:  Ok, that's his only
6  question.
7      THE WITNESS:  Ok.  Sorry.  I'm sorry.
8  BY MR. KLAYMAN:
9      Q.  You are aware that, and you testified
10 to this yesterday, that I believed that you had
11 agreed to that and I wrote articles that were very
12 favorable to you.
13     You're aware of that?
14     A.  Yes.
15     Q.  And I sent you copies of them at the
16 time.
17     A.  Yes.
18     Q.  Emailed them to you.
19     A.  Yes, you did.
20     Q.  And there's nothing in writing that
21 ever tells me at the time that you didn't want me
22 to do that, correct?

## Page 399

1      A.  Not correct.
2      Q.  The only time that comes up --
3      CHAIRMAN FITCH:  Wait a minute.  The
4  problem with the question is "at that time" is
5  unclear.
6      Are you talking about before you filed
7  the superior court complaint on March 1, if that's
8  when it was filed?
9      MR. KLAYMAN:  Yes.
10     CHAIRMAN FITCH:  Or are you talking
11 about --
12     MR. KLAYMAN:  Yes, around the time
13 period of these filings of these complaints.
14     CHAIRMAN FITCH:  Ok.  And your
15 question is...
16 BY MR. KLAYMAN:
17     Q.  That I sent you copies of some of the
18 columns I had written that were very favorable to
19 you and you did not tell me that you didn't like
20 them or I shouldn't have done it.
21     CHAIRMAN FITCH:  Well, that's a
22 compound question.

## Page 400

1      Did he send you copies of some articles
2  that he had written?
3      THE WITNESS:  Yes, he did.
4      CHAIRMAN FITCH:  Ok.  Go ahead.
5  BY MR. KLAYMAN:
6      Q.  At that time you did not tell me,
7  "Don't write any more."
8      A.  I did.
9      Q.  There's nothing in writing that you
10 presented to that effect at that time, did you?
11     A.  We talked to each other.  I explained
12 to you on the phone why I don't want articles out
13 there.
14     Q.  But you are aware that I copied you on
15 an email to Los Angeles Times where I was trying
16 to get an interview for you?
17     You're aware of that, I copied you on
18 that email with Mr. Shamble?
19     A.  I don't remember it, but, yes.  If you
20 say so, then that's correct.
21     Q.  Turn to Exhibit D, in the beginning of
22 your counsel's -- not your counsel's, but Bar

36 (Pages 397 to 400)

In The Matter Of:  Larry E. Klayman
May 30, 2018

Page 86

1    Q.   Whose handwriting is that?
2    A.   The person who helped me writing this.
3    Q.   Who is that person?
4    A.   I don't remember now.
5    Q.   Before you sent this letter in --
6         CHAIRMAN FITCH:  What was the answer of
7    that question?
8         MR. SMITH:  She does not remember.
9         THE WITNESS:  I don't remember who
10   helped me writing it.
11   BY MR. SMITH:
12   Q.   Before you mailed this letter in, did
13   you read what was written here?
14   A.   Yes.
15   Q.   Did you talk to the person who was
16   writing this to tell them what was going on in
17   your case?
18   A.   Yes.
19   Q.   And you agree with everything that's
20   written down in here?
21   A.   Yes.
22   Q.   In the first sentence of the letter it

Page 87

1    says, "He does not represent me and he keeps
2    calling me and texting me."
3         Would you tell the hearing committee
4    briefly what you're referring to there.
5    A.   Well, I asked him, I told him that I
6    don't want to -- I don't want him to represent me
7    any more, but after I -- after I asked him not to
8    represent me any more, I don't want him to
9    represent me any more, he wouldn't stop calling,
10   texting and emailing me.  He would still calling,
11   texting, emailing me regarding the case, or
12   regarding other things.
13   Q.   I'd like to go back to the
14   representation when you first hired Mr. Klayman to
15   represent you in the matter.
16        What discussions did you have with Mr.
17   Klayman about how he was going to pursue your case
18   against Voice of America?
19   A.   Well, there was -- he told me that he's
20   going to try to settle with them and talk to them.
21        You know, I mean, it was so much legal
22   stuff that he would tell me that "I'm going to

Page 88

1    talk to this person and talk to that person," and,
2    you know, it was letters that he was sending in.
3    Q.   Have you ever had any legal training?
4    Have you ever had any legal training in the law?
5    A.   No.
6    Q.   Did you understand any of the legal
7    terms or conversations that Mr. Klayman was
8    telling you about how he was proceeding with your
9    case?
10        CHAIRMAN FITCH:  I'm going to strike
11   that question.  No foundation yet for that.
12        There is no foundation for -- there
13   hadn't been a discussion.
14        MR. SMITH:  Ok.
15   BY MR. SMITH:
16   Q.   What did you tell Mr. Klayman about how
17   you wanted to proceed in this case?
18   A.   Well, because it was a sexual
19   harassment case, and because of the community and
20   my background, I wanted it to be very quietly
21   handled.  I even, the first time when I went to my
22   executive producer and I told my executive

Page 89

1    producer what my co-host did to me, I asked him to
2    keep it off the record, because I didn't want
3    anybody to know.  I just needed help.
4         Because just -- the way it is, the
5    sexual harassment is just something that it's not
6    fun to be out there and everybody find out about
7    it, so.
8    Q.   Tell me about your community and how
9    they perceive, in the context of what you were
10   saying -- what is the --
11   A.   Well, regarding the sexual harassment
12   case, to this day they're still asking me "Was I
13   raped by Mr. Falahati"?  "How was I raped by Mr.
14   Falahati?"  "Where was I raped by Mr. Falahati?"
15   "What did he do?"
16        So sexual harassment, in the Persian
17   community, is rape.  It's the actual act of
18   intercourse and rape.
19        So to this day I have to answer all
20   those questions.
21   Q.   So describe for the committee the
22   conversation you had with Mr. Klayman about these

23  (Pages 86 to 89)

In The Matter Of:  Larry E. Klayman
May 30, 2018

---

**Page 90**

1    concerns.

2        A.   That I want this to be handled as quiet

3    as possible, so nobody finds out.  And I did this

4    complaint because I -- I still wanted to keep my

5    image.  My image was just this person that -- I

6    didn't want it to change and I didn't want too

7    much talk regarding about my personal life.  I

8    wanted people to look at the Sataki that is

9    covering the stories and not know about my private

10   life.

11       Because I was not open about my private

12   life in front of the camera.  People would ask me,

13   I would never answer.  I would always leave it

14   without answer when they asked me about my private

15   life.

16       Q.   Did Mr. Klayman respond to you when you

17   said that you wanted to proceed with the case

18   quietly?

19       A.   Yes.  He did.  I mean, that's what he

20   was supposed to do in the beginning, yes.

21       Q.   He --

22       A.   But then it changed later.

---

**Page 91**

1        Q.   How did it change?

2        A.   He started writing articles, and so it

3    came out in the internet regarding the case.

4        Q.   Did you ever have conversations with

5    Mr. Klayman about publicizing your case?

6        A.   I did.  I asked him not to do it, but

7    then later I -- when he explained to me how much

8    it's going to help my case -- because he was going

9    back and forth with the people, the VOA management

10   and the stuff that he said that, "It's going to

11   take, say, no-brainer.  It's very easy.  It's only

12   going to take two weeks," or whatever, and it's

13   going to be easy, a task, like you said to me, he

14   said how easy it's going to be to transfer me from

15   DC to LA and work out of the LA office.

16       All of those stuff that I listen to him

17   because he's the attorney, he knows best, and none

18   of that happened.

19       So then he -- I mean, the complaint

20   from the person, the person -- the sexual

21   harassment person, my boss, his boss and all that,

22   it went up to Board of Governors and suing

---

**Page 92**

1    everybody, and the case got so big that all this

2    he said that it's just in my benefit.

3        So, I started listening to him.

4        May I add something?

5        Q.   Please.

6        CHAIRMAN FITCH:  Wait a minute.  With

7    respect to what?

8        MR. SMITH:  To the last question I

9    would imagine.

10       CHAIRMAN FITCH:  Do you have something

11   to add to your last answer?

12       THE WITNESS:  Yes.

13       CHAIRMAN FITCH:  That relates to that

14   question?

15       THE WITNESS:  Yes.

16       CHAIRMAN FITCH:  Go ahead.

17       THE WITNESS:  That the reason that I

18   didn't want this to get so huge and so public is

19   just the Persian community and how they react to

20   it.

21       Just to give you an example, after that

22   it got so public and everybody found out, they

---

**Page 93**

1    opened Facebook pages, fake Facebook pages under

2    my name with pornographic pictures in it, which,

3    together, with Mr. Klayman, we went to FBI to shut

4    it down.  But in there they were threatening me,

5    threatening my life and all that.

6        So that was one of the reasons that I

7    didn't -- I wanted to keep this case so private,

8    because I didn't want all this to get so huge and

9    so big and hit everywhere.

10       MR. KLAYMAN:  Objection, your Honor.  A

11   lot of that was hearsay.  No foundation.

12       MR. SMITH:  So, just --

13       CHAIRMAN FITCH:  Wait a minute.  Mr.

14   Klayman raises a perfectly good question.  I'm

15   trying to decide how to deal with this.

16       Give us a moment.

17       (Off-the-record discussion amongst

18   hearing committee members.)

19       CHAIRMAN FITCH:  I think that we are

20   going to strike that answer as hearsay.  That's

21   too far removed.

22       If you want to ask a different question

---

EXHIBIT 5

Page 1 of 1

Print

*verizon*

Subject **LA Times**
From:   **Larry Klayman <leklayman@gmail.com>**
Sent:   **Jun 10, 2010 01:53:38 PM**
To:     *tshamble@verizon.net*
CC:     **elliesataki@yahoo.com, mahmonirrahimi@gmail.com, jamshidch@gmail.com**

Tim:

Please call Paul Richter of the LA Times, DC Bureau. He is the top Iran reporter for the newspaper.

His number is 202 824 8300 and his email address is paul.richter@latimes.com.

If we can get one national story, this can help move things along.

Thanks

Larry

EXHIBIT 6

 Gmail

**Oliver Peer <oliver.peerfw@gmail.com>**

## Fwd: Sataki Documentary

**Larry Klayman** <klaymanlaw@gmail.com>                    Mon, Oct 12, 2020 at 9:35 AM
To: Oliver Peer <oliver.peerfw@gmail.com>

---------- Forwarded message ---------
From: **Keya Dash** <keyadash@gmail.com>
Date: Sat, Aug 24, 2019 at 6:20 AM
Subject: Re: Sataki Documentary
To: Larry Klayman <leklayman@gmail.com>

Hi Larry,

It jumps right into some clips in Ellie's voice referring to VOA. They are kind of disjointed. The format is like an interview but you don't hear the questions, you only hear the answers. She never names you or refers to you. The only time she talks about lawyers she says no lawyer would take her case. It could be there are more parts that aren't included in this edit. Clearly this is heavily edited. I think the intended audience is the general Iranian public.

Following are the things she says.

She says when she's behind her desk and not posting attention she's getting harrassed. She says VOA is known to be the worst American government agencies, that the people there protect each other and they is a dirty setting.

She says that the show on VOA that she shared with Falahati was created by both of them but he often tried to make her go out with him which she didn't want to do. To go out with him would have been unprofessional because they were doing the show together and the relationship would affect the show. What if they'd argued one day and it was obvious to viewers they were going out?

The problem is that he didn't know how to accept no for an answer. She says she stopped showing up to work because each time he'd say tonight let's have coffee or tonight let's have dinner. She was exhausted for having to say no to him.

She says she complained to Susan, their executive producer, she told Susan that she doesn't know what more to do at this point, that he's taking liberties with her when she's behind the desk not paying attention. She asked Susan to privately handle the issue and Susan said that she couldn't, that Ellie needed to file a public complaint.

Two times, Fallahati came to her when she was behind the desk not paying attention and, she says the clothes that she was wearing and her bra strap--and then everything is bleeped out. She says she yelled at him--and it's bleeped again. She then says "unfortunately..."--and an echo effect is used before the sentence can be continued.

After a clip of her holding her head in her hand with music playing, she then resumes talking, dug that she laughed that no one saw, that she was seeing a psychiatrist, that she was not feeling good, and that is all documented. She was going to a doctor and taking mood stabilizers.

Fallahati is a sick man and he didn't only harass Ellie. The system in VOA has problems. James d Chalangi supported her story, and he beared witness as to what happened. Another lady named Mahmunir also beared witness in her favor and incurred problems. Mr. Sajadi and Mr. Falahati were friends and at the time Sajadi had a lot of authority there. They were holding each other's hands (a Persian expression meaning helping each other, conspiring, working together in an effort) and Susan fell into their team.

No attorney would accept her case because her case had gotten very big. When the case for very big, when the issue became the board of governors, the board had to cover for itself. In defending themselves, they said Elham left and Fallahati stayed. As for Fallahati, she wasn't the only girl and there are a number of others.

I'm sorry for the delay. I've been traveling and didn't see the email.

Best,

App.0119

Keya

Thank you,

**Keya Dash**

 +1 (703) 963-7531

 +1 (703) 962-1707

 +1 (703) 962-1726

 keyadash@gmail.com

Sent from my iPhone

On Aug 21, 2019, at 1:40 PM, Larry Klayman <leklayman@gmail.com> wrote:

This is the video. Thanks Keya

---------- Forwarded message ---------
From: **Barbara Nichols** <ban@bogoradrichards.com>
Date: Wed, Aug 21, 2019 at 10:25 AM
Subject: Sataki Documentary
To: Larry Klayman <leklayman@gmail.com>

Larry,

The YouTube video at the link below is some kind of documentary about Ms. Sataki's case which was uploaded 11/5/2016, around the time you were gathering files and providing them to Bar Counsel. From the comments, I can see that she is discussing her case and from what I can tell she never mentions you but who knows. We were just wondering if you had a friend who could watch this and let us know what this is saying and if anything she said might be a "smoking gun" since the video is not in English.

https://www.youtube.com/watch?v=e3g5f61muZ4

<image002.png>

[Quoted text hidden]

Whenever I am at my desk and I am not paying attention, he allows himself, to touch me under variety of pretexts.

(displaying Elham Sattaki's photo)
former broadcaster of VOA

Mr. Falahati, Asal has written this for us,
Well: let us answer the first caller (by the name of - Translator) Hossein from Kerman. Hello, go ahead please.

(displaying photo of Mehdi Falahati)
broadcaster for the VOA network
VOA: Voice of America

Voice of America has been recognized as the worst entity of American government. Therefore, lots of such coteries and issues exist there. Everybody says that the atmosphere is of a security one.   Nobody can talk with anybody. Everybody makes insinuations against one another.   The environment is very dirty.
This week is second evening of being online with the subject of presidential elections in Iran and it's outcome, with your phone calls, emails and online weblogs and websites that Elham Sattaki will introduce to you.

Regarding Mr. Falahati: He repeatedly asked me to go out with him. I didn't want to do it. Mr. Falahati and I started the ONLINE show together and we were performing it together. Aside from other aspects, it was very unprofessional.

When two individuals appear on camera and conduct a show, going out on a date, since it can directly affect the show is not right. They may fight with each other and that will affect the show, and vice-versa. He was not the type of person that I would accept his offer, and say that, all right let's go on a date.

The problem was, he did not know how to take a no. After a while I reached to the point that I was always calling sick and did not go to work. Since I wanted to start working, and Mr. Falahati wanted to come to my desk and again ask me let's go have a coffee or have dinner.   And this no, and saying no to him repeatedly had become exhausting for me, had made me very tired.   I went to Suzanne who was our executive producer and told her the situation, that he (Mr. Falahati) does so. and I (Elham Sattaki) don't know what to do at this point.   Personally, I am not able to handle it.

The situation will go over the board of the status of going out for dinner, and he will come to my desk and while I am not paying attention, under various excuses touch me. Since I was afraid, I told her (Suzanne) that, can you handle it without anybody to know??   That day she told me that "Legally I cannot do it and you must formally file a complaint."

2

Mr. Falahati wanted to take revenge, since I complained and stated that the situation was so.   As I was behind my desk, twice he came to my desk (audio censored) the dress that I had on and my bra-cord.   I hollered at him (audio censored) he laughed and said "don't tell anybody."   I was not feeling well.

I was seeing psychiatrist. I was seeing psychologist. I was not feeling well. All the documents are available. Everything related (to this matter) exists. I was seeing doctor and the doctor was prescribing relaxing pills for me to take.

At this point, I am just saying, Mr. Falahati is a sick person that has not done so just with me, but the system of VOA has problem. Jamshid Chalangi testified for me. Look what happened? Mahmonir, another lady testified for me. She suffered a lot.   Mr. Ali Sajjadi and Mr. Falahati were friends.   At that time Mr. Sajjadi was very powerful there.   They all got together. And even Suzanne who was my executive producer and was mad from this incident, she teamed up with them.   And this caused the problem to be difficult for me, and no attorney was taking my case, because this case had become very big.   And when the case became so big, then the Board of Governors had to defend itself, and defending itself caused the case to become against me.   And they say that Elham left, Falahati stayed.   When they fired me, I was not the only girl. There are a number of others.                    Caption dispalying Falahati and Sattaki with written scripts.

The law suit against Mehdi Falahati due to the VOA influence did not get to anywhere, and Elham Sattaki was fired from this network..

After a short period of time Jamshid Chalangi and Ms. Mahmonir Rahimi were fired from this network.

Display of Mehdi Falahati laughing loud.

Certified to be a true translation from the Farsi video and audio original

_____
Mohammad T Moslehi

State of MD    County of Montgomery
Subscribed and sworn before me on 9/12/209
_____     _____ (Date)
(Notary Signature)

EXHIBIT 7



POLITICS

# Jeffrey Clark, ex-Trump DOJ official, faces disciplinary charges for election misstatements



**Erin Mansfield**
USA TODAY

Published 12:24 p.m. ET July 22, 2022 | **Updated 1:44 p.m. ET July 22, 2022**

Former Justice Department lawyer Jeffrey Clark, a central player in Donald Trump's effort to overturn the 2020 presidential election, faces disciplinary proceedings from the District of Columbia's chief investigator of attorney misconduct.

Hamilton P. Fox, III, the disciplinary counsel for the District of Columbia Bar, has charged Clark with attempting to engage in dishonest conduct and "conduct that would seriously interfere with the administration of justice," according to a copy of July 19 filing.

Fox said Clark was served Friday morning. Clark's attorney did not immediately respond to a request for comment.

Rachel Semmel, a spokesperson for the conservative Center for Renewing America, where Clark is a senior fellow, said Clark was "one of the only lawyers at the DOJ who had the interests of the American people at heart."

The charges center around a letter Clark drafted that urged officials in Georgia to convene a special session in the state legislature relating to the 2020 election. Clark sought to get deputy attorney general Jeffrey Rosen and colleague Richard Donoghue to sign the letter, according to the filing.

That letter, called a proof of concept letter, claimed the Department of Justice had "identified significant concerns that may have impacted the outcome of the election in multiple states, including the state of Georgia," according to the filing.

In truth, the Justice Department was not aware of any election fraud allegations in Georgia that would have affected the results of the presidential election, the filing said.

Feds search home of Jeffrey Clark, ex-DOJ official at center of Trump's effort to overturn election

After then-Attorney General William Barr resigned from his position, Trump sought to install Clark as acting attorney general, an idea that many Department of Justice employees opposed. At one point, according to the filing, Clark sought in a private meeting to get Donoghue to sign the letter, and in the same meeting offered Donoghue a position as his deputy. Donoghue refused.

An environmental lawyer in the Department of Justice's Civil Division, Clark briefly oversaw the division during the final days of the Trump administration because of a vacancy. Lawmakers on the House committee investigating the Jan. 6, 2021 attack on the U.S. Capitol say Clark repeatedly attempted to use his position to try to overturn the 2020 election and "interrupt the peaceful transfer of power."

The Jan. 6 committee also aired testimony from three former top Justice officials, including Rosen, about Clark's efforts surrounding the proof of concept letter.

During a recorded video interview with the Jan. 6 committee, Clark declined to answer questions.

Asked about the letter intended for Georgia officials, Clark invoked his Fifth Amendment protection against self incrimination.

"Fifth," he said.

In June, federal authorities searched Clark's suburban Virginia home.

*Contributing: Kevin Johnson*

Jan. 6 committee subpoenas former DOJ official Jeffrey Clark, accused of attempting to overturn 2020 election

# EXHIBIT E

# *United States Court of Appeals*
### FIFTH CIRCUIT
### OFFICE OF THE CLERK

**LYLE W. CAYCE**
**CLERK**

**TEL.  504-310-7799**
**600 S. MAESTRI PLACE**
**NEW ORLEANS, LA  70130**

December 8, 2022

Larry Klayman
7050 W. Palmetto Park Road
Boca Raton, FL 33433

Dear Mr. Klayman:

Further to your response to this Court's Order to Show Cause, please be advised that the order of suspension became final on December 7, 2022. However, the Court has chosen to withdraw the suspension order and hold this Court's reciprocal disciplinary proceeding against you in abeyance pending final disposition of your Superior Court Rule 60 complaint and writ of mandamus or certiorari petition proceedings.

Please advise this Court when the above-referenced proceedings are concluded. Failure to keep this Court informed of the status of the proceedings may result in the imposition of reciprocal discipline without further notice.

Please find enclosed a copy of an order withdrawing the order of suspension.

Very truly yours,

LYLE W. CAYCE, Clerk

By _____
   Melissa Shanklin, Deputy Clerk

Enclosure

𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 𝔆𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰
𝔣𝔬𝔯 𝔱𝔥𝔢 𝔉𝔦𝔣𝔱𝔥 𝔆𝔦𝔯𝔠𝔲𝔦𝔱

United States Court of Appeals
Fifth Circuit

**FILED**

December 8, 2022

Lyle W. Cayce
Clerk

### ORDER

On November 2, 2022 this Court issued an order directing Larry E. Klayman to show cause why his right to practice before this Court should not be suspended reciprocal to a September 15, 2022 order of suspension issued by the District of Columbia Court of Appeals. This Court's self-executing show cause suspension order became effective December 7, 2022.

At the direction of the Chief Judge, IT IS ORDERED that the order of suspension hereby is WITHDRAWN.

LYLE W. CAYCE, Clerk
United States Court of Appeals for the Fifth Circuit

By *Melissa Shanklin*

Melissa Shanklin, Deputy Clerk

**A True Copy**
**Certified Dec 08, 2022**

*Lyle W. Cayce*

**Clerk, U.S. Court of Appeals, Fifth Circuit**

FOR THE COURT - BY DIRECTION
Address:
Clerk of Court,
U.S. Court of Appeals for the Fifth Circuit
F. Edward Hebert Building
600 S. Maestri Place
New Orleans, LA 70130

# EXHIBIT F

**DISTRICT OF COLUMBIA COURT OF APPEALS**
**BOARD ON PROFESSIONAL RESPONSIBILITY**

In the Matter of                :

                                  :

      **LARRY E. KLAYMAN, ESQUIRE,**    :      **Bar Docket No. 2011-D028**

                                  :

      **Respondent**                    :

                                  :

**A Member of the Bar of the District of**    :
    **Columbia Court of Appeals**           :
**Bar Number: 334581**                   :
**Date of Admission: December 22, 1980**  :



RECEIVED

JUL 2 0 2017

Board on Professional Responsibility

### SPECIFICATION OF CHARGES

The disciplinary proceedings instituted by this petition are based upon conduct that violates the standards governing the practice of law in the District of Columbia as prescribed by D.C. Bar Rule X and D.C. Bar Rule XI, § 2(b).

Jurisdiction for this disciplinary proceeding is prescribed by D.C. Bar Rule XI. Pursuant to D.C. Bar Rule XI, § 1(a), jurisdiction is found because:

1.     Respondent is a member of the Bar of the District of Columbia Court of Appeals, having been admitted by exam on December 22, 1980, and assigned Bar number 334581.

The conduct and standards that Respondent has violated are as follows:

### COUNT I

2.     In or about January 2010, Respondent undertook to represent Ms. Elham Sataki in connection with her claims of sexual harassment by a co-worker, Mr. Mehdi Falahati, while employed with the Persian News Network (PNN) of Voice of America (VOA). PNN-VOA is managed by the Broadcasting Board of Governors (BBG), a federal agency responsible for the

United States Government's international broadcasting.   Respondent had not previously represented Ms. Sataki in a legal matter.

3.     Respondent told Ms. Sataki that he would represent her on a contingent fee basis and that he would take 40% of any recovery.  Respondent did not provide his client a writing setting forth the scope of the representation or how his fee would be calculated.  Respondent also did not explain to his client, in writing, whether or how expenses would be deducted from any recovery in the case.

4.     Ms. Sataki requested that Respondent prosecute her case simply and quietly, out of her concerns for her future career in the media and in light of cultural issues due to the nature of her sexual harassment claim.

5.     During the course of the representation, Respondent told Ms. Sataki about his desire to establish a romantic relationship with her.

6.     Ms. Sataki declined Respondent's entreaties to establish a romantic relationship.

7.     In or about May 2010, Respondent sent correspondence to Ms. Sataki acknowledging her decision not to become romantically involved with him.  Respondent also informed Ms. Sataki that he would change the terms of their contingent fee arrangement, and require 50% of any recovery she may receive.

8.     Respondent's conduct violated the following District of Columbia Rules of Professional Conduct ("Rules"):

a.     Rule 1.5(b), in that Respondent had not regularly represented his client and failed to provide her with a writing setting forth the scope of the representation, the basis or rate of his fee, and the expenses for which she would be responsible;

b.     Rule 1.5(c), in that Respondent undertook to represent his client on a

2

contingent fee basis, but failed to provide her with a writing that stated the method by which the fee would be determined, including the percentages that would accrue to the lawyer and whether or how expenses would be deducted from the recovery; and

        c.     Rule 1.7(b)(4), in that Respondent had a conflict of interest with the client because his professional judgment on behalf of his client was or reasonably may have been adversely affected by Respondent's own personal interests.

<div align="center">

**COUNT II**
**[Sataki v. Falahati – CA. No. 10-466 (CKK)]**

</div>

      9.     Disciplinary Counsel incorporates the factual allegations set forth in paragraphs 1-7, as if fully set forth herein, and further alleges:

      10.    On March 1, 2010, Respondent filed in the Superior Court for the District of Columbia, a lawsuit on behalf of Ms. Sataki, styled *Sataki v. Falahati*, CA No. 0001169-10. The lawsuit alleged: assault, battery, false light, defamation, tortious interference with business relations, and intentional infliction of emotional distress.

      11.    On March 19, 2010, Ms. Sataki's case was removed from the Superior Court for the District of Columbia to the United States District Court for the District of Columbia, and was styled *Sataki v. Falahati*, CA No. 10-466 (CKK).

      12.    On July 12, 2010, the court issued an order dismissing Ms. Sataki's case, without prejudice.

      13.    On July 26, 2010, Respondent filed in the United States District Court for the District of Columbia, a motion to disqualify the judge presiding over Ms. Sataki's case. As grounds for the motion, Respondent alleged that the presiding judge, Colleen Kollar-Kotelly, who had been appointed by United States President William Jefferson Clinton, was biased against him

<div align="center">3</div>

because he had filed several lawsuits against the former President and the former First Lady, Hillary Rodham Clinton. Respondent filed the motion under the caption of three cases pending in that court styled: (1) *Klayman v. Judicial Watch*, CA No. 06-cv-00670 (CKK); (2) *Sataki v. BBG*, CA No. 10-0534 (CKK); and (3) *Sataki v. Falahati*, CA No. 10-cv-00466 (CKK).

14.     Respondent's filing of the motion to disqualify was inconsistent with Ms. Sataki's request that Respondent pursue her case simply and quietly, and served no purpose to advance his client's case. Instead, the motion to disqualify served Respondent's own personal interests. Ms. Sataki did not know Respondent would file a motion to disqualify and did not authorize Respondent to file it.

15.     On August 2, 2010, the court denied Respondent's motion to disqualify as untimely, inasmuch as the case had been dismissed on July 12, 2010.

16.     Respondent's conduct violated the following Rules:

    a.     Rule 1.7(b)(4), in that Respondent had a conflict of interest with the client because his professional judgment on behalf of the client was or reasonably may have been adversely affected by Respondent's own personal interests;

    b.     Rule 1.2(a), in that Respondent failed to abide by his client's decisions concerning the objectives of his representation; and

    c.     Rule 1.4(b) in that Respondent failed to reasonably explain a matter to his client to permit her to make an informed decision regarding the representation.

<div align="center">

**COUNT III**
*[Sataki v. BGG – CA No. 10-534 (CKK)]*

</div>

17.     Disciplinary Counsel incorporates the factual allegations set forth in paragraphs 1-7 and 10-15, as if fully set forth herein, and further alleges:

<div align="center">4</div>

18.     On April 2, 2010, Respondent filed in the United States District Court for the District of Columbia, a lawsuit on behalf of Ms. Sataki against fourteen defendants, including the BBG, four of the governors of the BBG, the Chief of Staff to the BBG, the Acting General Counsel of the BBG, the acting chief of PNN/VOA, the senior manager of PNN/VOA, the executive producers of PNN/VOA, a supervisor of human resources at PNN/VOA and Hillary Rodham Clinton as Secretary of State Ex-Officio Member of the BBG, alleging that defendants infringed upon Ms. Sataki's constitutional right to freedom of speech, and violated her rights to due process and to equal protection under the law.   Respondent also alleged that defendants discriminated against Ms. Sataki in violation of the Rehabilitation Act on the basis of her physical or mental disabilities and that defendants violated the Privacy Act by failing to produce documents to her from to her personnel file.   That matter was styled *Sataki v. BBG*, CA No. 10-534 (CKK).   In connection with this lawsuit, Respondent sought affirmative injunctive relief to require PNN/VOA to reassign Ms. Sataki from her job in Washington, D.C. to a position with PNN/VOA in Los Angeles, California.

19.     The only defendant required to be named in the lawsuit was the Chief or Acting Chief of the Voice of America.   Hillary Rodham Clinton was not a necessary defendant in the *Sataki* v. BBG lawsuit.

20.     On June 1, 2010, the Court issued an order denying Plaintiff's motion for a temporary restraining order that sought the affirmative injunctive relief of reassigning Ms. Sataki from her job in Washington, D.C., to a position with PNN-VOA in Los Angeles, California.

21.     On June 9, 2010, Respondent filed a motion with the court requesting that Ms. Sataki's case be reassigned to another judge. As grounds for the motion, Respondent alleged that the current trial judge, Colleen Kollar-Kotelly "harbors an animus" towards him because of her

association with former President William Jefferson Clinton and former First Lady Hillary Rodham Clinton, and because of certain lawsuits Respondent had filed against the Clintons.

22.     Respondent's filing of the motion to reassign was inconsistent with Ms. Sataki's request that Respondent pursue her case simply and quietly, and served no purpose to advance his client's case. Instead, the motion to reassign served Respondent's own personal interests. Ms. Sataki did not know that Respondent would file the motion to reassign her case to another trial judge and did not authorize Respondent to file it.

23.     On July 7, 2010, the court issued an order denying Respondent's motion to reassign.

24.     In or about August, 2010, Ms. Sataki terminated Respondent as her lawyer.

25.     On October 22, 2010, the court issued an order granting defendants' motion to dismiss and dismissed Ms. Sataki's case, without prejudice.

26.     On October 31, 2010, after having been terminated by Ms. Sataki in August, 2010, Respondent filed with the Court a motion to reconsider the order dismissing her case.

27.     On November 15, 2010, Ms. Sataki sent correspondence to Respondent reiterating that she had terminated his services, and directed him to immediately withdraw.

28.     On December 9, 2010, Respondent, filed with the Court, a motion for extension of time to reply to the government's opposition to plaintiff's motion for reconsideration.

29.     On December 17, 2010, Respondent filed with the Court a reply to defendants' opposition to plaintiff's motion for reconsideration of its order of dismissal.

30.     On December 20, 2010, Respondent filed with the Court a supplemental memorandum to the reply to the defendants' opposition to plaintiff's motion to reconsider the order of dismissal.

31.     On December 21, 2010, the Court issued an order denying plaintiff's motion to

reconsider the dismissal of her case.

32.      On January 10, 2011, Respondent filed with the court a "Notice of Praecipe by Elham Sataki".

33.      On January 19, 2011, Respondent filed a notice of appeal.

34.      Respondent's conduct violated the following Rules:

a.      Rule 1.7(b)(4), in that Respondent had a conflict of interest with the client because his professional judgment on behalf of the client was or reasonably may have been adversely affected by Respondent's own personal interests;

b.      Rule 1.4(b), in that Respondent failed to reasonably explain a matter to his client to permit her to make an informed decision about the representation;

c.      Rule 1.2(a), in that Respondent failed to abide by his client's decisions concerning the objectives of his representation; and

d.      Rule 1.16(a)(3), in that Respondent failed to withdraw from the representation after he had been discharged by his client.

## COUNT IV

35.      Disciplinary Counsel incorporates the factual allegations set forth in paragraphs 1-7, 10-15, 17-33, as if fully set forth herein, and further alleges:

36.      WorldNetDaily is a periodical that can be accessed on the world-wide web. According to its own website, dated February 19, 2015, "WND currently attracts nearly 5 million unique visitors per month and more than 40 million page views, according to its own internal monitoring software."

37.      On or about April 30, 2010, Respondent authored an article that was published by WorldNetDaily that described, in part, his representation of Ms. Sataki and her claims against

7

VOA. Ms. Sataki did not know that Respondent would author an article concerning her case that would be published. Ms. Sataki did not consent to the publication of Respondent's article. Ms. Sataki was embarrassed by Respondent's disclosure of facts that he gained during the course of the representation.

38.    On or about May 11, 2010, Respondent contributed to another article that was published by the WorldNetDaily describing, in detail, the lawsuit Respondent filed on behalf of Ms. Sataki against VOA. Ms. Sataki did not know that Respondent would contribute to an article about her case that would be published. Ms. Sataki did not consent to the publication of the article. Ms. Sataki was embarrassed by Respondent's disclosure of facts that he gained during the course of the representation.

39.    On or about May 14, 2010, Respondent authored another article that was published by WorldNetDaily describing, in detail, the lawsuit he filed on behalf of Ms. Sataki against VOA. Ms. Sataki did not know that Respondent would author an article concerning her case that would be published. Ms. Sataki did not consent to the publication of Respondent's article. Ms. Sataki was embarrassed by Respondent's disclosure of facts that he gained during the course of the representation.

40.    On May 21, 2010, Respondent authored another article that was published in the WorldNetDaily that referenced his representation of Ms. Sataki against VOA. Ms. Sataki did not know that Respondent would author an article concerning her case that would be published. Ms. Sataki did not consent to the publication of Respondent's article. Ms. Sataki was embarrassed by Respondent's disclosure of facts that he gained during the course of the representation. Respondent's article, included an advertisement for his book titled "Whores: Why and How I Came to Fight the Establishment."

8

41.     On May 28, 2010, Respondent authored another article that was published in the WorldNetDaily that referenced his representation of Ms. Sataki against VOA. Ms. Sataki did not know that Respondent would author an article concerning her case that would be published. Ms. Sataki did not consent to the publication of Respondent's article. Ms. Sataki was embarrassed by Respondent's disclosure of facts that he gained during the course of the representation. Respondent's article included an advertisement for his book titled "Whores: Why and How I Came to Fight the Establishment."

42.     On June 11, 2010, Respondent authored another article that was published in the WorldNetDaily that referenced his representation of Ms. Sataki against VOA. Ms. Sataki did not know that Respondent would author an article concerning her case that would be published. Ms. Sataki did not consent to the publication of Respondent's article. Ms. Sataki was embarrassed by Respondent's disclosure of facts that he gained during the course of the representation. Respondent's article included an advertisement for his book titled "Whores: Why and How I Came to Fight the Establishment."

43.     On or about July 2, 2010, Respondent authored another article that was published in the WorldNetDaily that referenced his representation of Ms. Sataki. Ms. Sataki did not know that Respondent would author the article about the representation that would be published. Ms. Sataki did not consent to the publication of Respondent's article. Ms. Sataki was embarrassed by Respondent's disclosure of facts that he gained during the course of the representation. Respondent's article, included an advertisement for his book titled "Whores: Why and How I Came to Fight the Establishment."

44.     On or about October 1, 2010, Respondent authored another article that was published in the WorldNetDaily that discussed details of his representation of Ms. Sataki against

9

VOA. Ms. Sataki did not know that Respondent would author an article concerning her case that would be published. Ms. Sataki did not consent to the publication of Respondent's article. Ms. Sataki was embarrassed by Respondent's disclosure of facts that he gained during the course of the representation.

45.    On or about October 15, 2010, Respondent authored another article that was published in the WorldNetDaily that discussed Ms. Sataki's claims against VOA. Ms. Sataki did not know that Respondent would author an article concerning her case that would be published. Ms. Sataki did not consent to the publication of Respondent's article. Ms. Sataki was embarrassed by Respondent's disclosure of facts that he gained during the course of the representation. Respondent's article, included an advertisement for his book titled "Whores: Why and How I Came to Fight the Establishment."

46.    On or about October 29, 2010, Respondent authored another article that was published in the WorldNetDaily that discussed Ms. Sataki's claims against VOA. Ms. Sataki did not know that Respondent would author an article concerning her case that would be published. Ms. Sataki did not consent to the publication of Respondent's article. Ms. Sataki was embarrassed by Respondent's disclosure of facts that he gained during the course of the representation. Respondent's article, included an advertisement for his book titled "Whores: Why and How I Came to Fight the Establishment."

47.    On or about December 25, 2010, Respondent authored another article that was published in the WorldNetDaily that discussed the litigation of Ms. Sataki's claims against VOA. In the article, Respondent, *inter alia,* falsely reported that the presiding judge had "dishonestly denied, without factual or legal bases (sic), my request for Elham to be put back at work at the Los Angeles office VOA, as she rehabilitated from the harm done to her." In fact, the presiding judge

issued an order dated June 1, 2010 in the matter styled *Sataki v. BGG*, CA No. 10-0534 (CKK), describing the factual and legal basis for the decision not to grant the relief Respondent sought for Ms. Sataki. Ms. Sataki did not know that Respondent would author an article about her case that would be published. Ms. Sataki did not consent to the publication of Respondent's article. Ms. Sataki was embarrassed by Respondent's disclosure of facts that he gained during the course of the representation. Respondent's article, included an advertisement for his book titled "Whores: Why and How I Came to Fight the Establishment."

48.     Respondent's conduct violated the following Rules:

a.     Rule 1.2(a), in that Respondent failed to abide by a client's decisions concerning the objectives of the representation;

b.     Rule 1.6(a)(1), in that Respondent revealed a confidence or secret of the client;

c.     Rule 1.6(a)(3), in that Respondent revealed a confidence or secret of the client for his own advantage;

d.     Rule 1.7(b)(4), in that Respondent had a conflict of interest with his client because his professional judgment on behalf of his client was or reasonably may have been adversely affected by Respondent's own personal interests; and

e.     Rule 8.4(c), in that Respondent engaged in conduct involving dishonesty and/or misrepresentation.

Respectfully submitted,

Elizabeth A. Herman
Deputy Disciplinary Counsel

11

H. Clay Smith, III
Assistant Disciplinary Counsel


OFFICE OF DISCIPLINARY COUNSEL
515 Fifth Street, N.W.
Building A, Room 117
Washington, D.C.  20001
(202) 638-1501


## VERIFICATION

I do affirm that I verily believe the facts stated in the Specification of Charges to be true.

H. Clay Smith, III
Assistant Disciplinary Counsel


Subscribed and affirmed before me in the District of Columbia this 30th day of June, 2017.

My Commission Expires:

Notary Public

12

**OFFICE OF BAR COUNSEL**
THE BOARD ON PROFESSIONAL RESPONSIBILITY
DISTRICT OF COLUMBIA COURT OF APPEALS

515 5th Street, NW
Building A, Room 117
Washington, D.C. 20001
(202)638-1501 Fax (202)638-0862

DEC - 3

<u>COMPLAINT FORM FOR INCARCERATED COMPLAINANT</u>
*(Please print or type.)*

Date: 11/2/2010

A. Your Name:  (Dr.) (Mr.) (Ms.) (Mrs.)

ELHAM (First) (Initial)     SATAKI (Last)

DCDC #: _____     Location: _____

Fed. I.D. #: _____     Date of Birth: 11/20/1970

Other Address: _____ (Street)     (Apt. #)

_____ (City)     (State)     (Zip)

Court where case is pending: _____     Case No(s).: 06-CV-00670, 00534, 00446

Date of next court appearance: N/A     Before Judge: _____

Superior Court ( )     U.S. District Court (✓)     Other ( ) _____

B. Attorney Complained Of:

Name: LARRY (First) E (Initial) KLAYMAN (Last)

Address: 2000 Pennsylvania AVE NW Suite #345 (Street) (Apt. #)
WASHINGTON DC 20006

Telephone No.: (310) 595-0800     Attorney's Bar No., if known: DC Bar 334581

C. Have you filed a complaint about this matter anywhere else? If yes, please give details. NO

D. Do you have a written retainer agreement with the attorney? If yes, please attach a copy.
NO

E. Do you have other documents that are relevant? If yes, please give details and provide copies. NONE

SEE REVERSE SIDE FOR REQUIRED DETAILS & SIGNATURE

F. DETAILS OF COMPLAINT: ___ DOES NOT REPRESENT ME AND HE KEEDS CALLING ME AND TEXT ME. HE HAS CALLED ME MANY TIMES OFF THE HOURS AND I KEPT TELLING ME NOT TO CALL ME, TEXT ME ETC. I HAVE TOLD HIM I HAVE TERMINATED MY ACCEPTANCE OF MY REPRESENTATION. I HAVE ASKED HIM TO STOP COMMUNICATING WITH ME AND ALL MY REFERENCES. I ASKED HIM NOT TO REPRESENT ME ON ANY INTERVIEWS IN ANY AND ALL MEANS. I ASKED HIM NOT TO FAX ME, NOT TO EMAIL ME, HE KEEDS CALLING, TEXTING, AND EMAILING ME. I WANT HIM TO STOP.

The Undersigned hereby certifies to the Office of Bar Counsel
that the statements in the foregoing Complaint are
true and correct to the best of my knowledge.

SIGNATURE

2011 - 0028
HCS

OFFICE OF BAR COUNSEL

OCT 2 4 2011

RECEIVED

# OFFICE OF BAR COUNSEL
## THE BOARD ON PROFESSIONAL RESPONSIBILITY
## DISTRICT OF COLUMBIA COURT OF APPEALS

409 E Street, NW
Building B, Room 228
Washington, D.C. 20001
(202)638-1501   Fax (202)638-0862

*(Please print or type.)*

Date: 10-20-2011

A. Your Name: (Dr.)
   (Mr.)
   (Ms.)
   (Mrs.)   Elham                              Sataki
            _____           _____
            (First)              (Initial)          (Last)
   Address: 23785 El Toro Road
            _____
            (Street)
            Lake Forest          CA                92630
            _____
            (City)               (State)            (Zip)
   Business Telephone: _____ Home Telephone: 818-800-1441  Cell: _____
   (NOTE: It is very important that we have your telephone number(s) and that you inform our office if you have a change of address.)

B. Attorney Complained Of:

   Name:    Larry                E.                Klayman
            _____
            (First)              (Initial)          (Last)
   Address: 2000 Pennsylvania Avenue, NW           # 345
            _____
            (Street)                               (Apt. #)
            Washington           DC                20006
            _____
            (City)               (State)            (Zip)
   Telephone No.: _____ Attorney's Bar No., if known: 334581

C. Have you filed a complaint about this matter anywhere else? If yes, please give details. _____
   Complaint also filed in Pennsylvania and Florida.
   _____

D. Do you have a written retainer agreement with the attorney? If yes, please attach a copy.
   No.
   _____

E. Where applicable, state the name of the court where the underlying case was filed, and the case name and number.
   U.S. District Court for the District of Columbia - See attached.
   _____

F. Do you have other documents that are relevant? If yes, please give details and provide copies. See attached.
   _____

SEE REVERSE SIDE FOR REQUIRED DETAILS & SIGNATURE

G. DETAILS OF COMPLAINT: See attached.

SCANNED

OCT 2 4 2011

23-2

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

**The Undersigned hereby certifies to the Office of Bar Counsel
that the statements in the foregoing Complaint are
true and correct to the best of my knowledge.**

_____
SIGNATURE

# EXHIBIT G

 Gmail

Oliver Peer <oliver.peerfw@gmail.com>

---

## Fwd: Matter of Larry Elliot Klayman, No. 2918 DD3

**Larry Klayman** <klaymanlaw@gmail.com>                                    Fri, Nov 4, 2022 at 11:19 AM
To: Oliver Peer <oliver.peerfw@gmail.com>

---------- Forwarded message ---------
From: **Anthony Sodroski** <Anthony.Sodroski@pacourts.us>
Date: Fri, Nov 4, 2022 at 11:12 AM
Subject: Matter of Larry Elliot Klayman, No. 2918 DD3
To: leklayman@gmail.com <leklayman@gmail.com>, Larry Klayman <klaymanlaw@gmail.com>

Mr. Klayman,


While the issue is irrelevant to the reciprocal discipline proceeding against you, as a courtesy I checked our records to determine if there was any complaint against you by E_____ S_____ ("E.S."). A complaint was submitted in October 2011 by E.S. and closed that month by ODC without any adjudication. The closing of this matter does not represent any adjudication on the merits. We destroyed the file in 2013 and do not have a copy of the complaint.


Anthony P. Sodroski


**Anthony P. Sodroski**

**Counsel-in-Charge, Special Projects**

**Office of Disciplinary Counsel**

**1601 Market Street**

**Suite 3320**

**Philadelphia, PA 19103**

**(215) 560-6296 – Ext. 4937**

**Fax: (215) 560-4528**

**anthony.sodroski@pacourts.us**


**WARNING! This e-mail is covered by the Electronic Communications Privacy Act, 18 U.S.C. 2510-2521 and is legally privileged. It contains information from the Office of Disciplinary Counsel which may be privileged, confidential and exempt from disclosure under applicable law. Dissemination or copying of this by anyone other than the addressee or the addressee's agent is strictly prohibited. If this electronic mail transmission is received in error, please notify the Office of Disciplinary Counsel, 215-560-6296. Thank you.**

# EXHIBIT H

*R Supp 2 & 6*



# OFFICE OF BAR COUNSEL
July 7, 2011

Wallace E. Shipp, Jr
*Bar Counsel*

Elizabeth A. Herman
*Deputy Bar Counsel*

Senior Assistant Bar Counsel
Judith Hetherton
Gene Porter

H. Clay Smith III
William R. Ross
...
...
Elizabeth L. ...
...
William R. Ross
H. Clay Smith, III
Traci M. Tait

*Senior Staff Attorney*
Lawrence K. Bloom
Dolores Dorsainvil
Joseph C. Perry
Mary-Helen Perry

**CONFIDENTIAL**

Ms. Elham Sataki
16110 Ventura Boulevard
Encino, California 91436

> Re:   Klayman/Sataki
>        Bar Docket No. 2011-D028
>        Response due:  July 15, 2011

Dear Ms. Sataki:

Enclosed is a copy of the attorney's answer to your complaint in the above-referenced matter.

If you disagree with any of the statements made by the attorney, or if you have any additional evidence, please provide us with your written reply on or before July 15, 2011.

If we do not hear from you promptly, we may assume that you are satisfied with the attorney's explanations. If you have a question or need assistance in preparing your response, please call the undersigned at (202) 638-1501. Please refer to the above docket number in all correspondence and telephone calls.

Sincerely,

H. Clay Smith
Assistant Bar Counsel

Enclosure

HCS:act

**Clay Smith**

| | |
|---|---|
| **From:** | Kevin O'Connell |
| **Sent:** | Thursday, January 16, 2014 9:47 AM |
| **To:** | Clay Smith; Chuck Anderson |
| **Subject:** | RE: Project |

Stand by......

**From:** Clay Smith
**Sent:** Wednesday, January 15, 2014 3:10 PM
**To:** Chuck Anderson; Kevin O'Connell
**Subject:** Project

Gentlemen:

I am trying to locate a complainant that has dropped off the map.

Ms. Elham Sataki
16110 Ventura Blvd.
Encino, CA 91436
(818) 800-1441

She filed a complaint vs. Larry Klayman in 2011. Her only correspondence with us was the ethical complaint that she filed. My letter to her dated 7/7/11 was not responded to, but was not returned by the USPS either. I recently tried to contact her by telephone, but her number above is not in service. I'll appreciate your efforts to locate her and to provide some reliable contact information.

Thanks,

H. Clay Smith, III
Assistant Bar Counsel
Office of Bar Counsel
515 5th Street, N.W.
Room 117, Bldg. A
Washington, D.C. 20001

(202) 638-1501



i

# EXHIBIT I

# DISTRICT OF COLUMBIA COURT OF APPEALS

BOARD ON PROFESSIONAL RESPONSIBILITY
AD HOC HEARING COMMITTEE

In the Matter of:

RECEIVED

FEB 15 2018

LARRY E. KLAYMAN,

Bar Docket No. 2011-D028 Professional Responsibility

Respondent,

A Member of the Bar of the District of Columbia Court of Appeals
(Bar Registration No. 334581)

RESPONDENT'S MOTION TO NOTICE AND HAVE ISSUED SUBPOENAS DUCES TECUM TO TAKE
THE DEPOSITONS OF ELHAM SATAKI AND ARLENE AVIERA

Respondent, Larry Klayman, moves the Honorable Committee Chair for leave to notice, serve
subpoenas duces tecum and take the depositions of Elham Sataki and Arlene Aviera. For the
reasons set forth below pursuant to Chapter 3 and other applicable provisions of the Board
Rules Adopted and Effective September 14, 2016, Respondent has a compelling need for this
discovery in preparation of his defense, particularly in light of the long passage of time since
Ms. Sataki and an anonymous person helping her filed the complaint, and such discovery will
not be an undue burden on the complainant and other persons.

> The Compelling Need for the Issuance of Notices and Subpoenas Duces Tecum To
> Take the Depositions of Elham Sataki and Arlene Aviera

Specifically, Respondent requires the deposition of Elham Sataki with all documents produced
that relate or refer in any way to her representation by Larry Klayman, and her history of
making allegations of improper conduct against him and any other person, including but not
limited to a number of prior persons who she allege sexually harassed her, of which
Respondent learned about several after he ceased legal representation of her.

There is a compelling need to issue a subpoena duces tecum to take her deposition,
particularly since this matter is now over 7 years old, files have been discarded over and lost
over time, memories faded and discovery of Ms. Sataki will show that the complaint and
supplement which she filed against Respondent were non-meritorious and the result of her
unhappiness with her own life and her prospects of career advancement, and that she made

Respondent a scapegoat if not the "whipping boy" to rationalize her unhappiness. This was also reflected in the last months when Ms. Sataki seeing Mr. Klayman sitting at a Café in Los Angeles ran over screaming hysterically in front of Respondent' employee and chief of staff that that Mr. Klayman had somehow ruined her life. She later, after having left, ran back again screaming violently that Mr. Klayman is a terrible person and that Respondent's employee should contact her to learn more. Ms. Sataki obviously and unfairly blames her status in life on Mr. Klayman.

Indeed, in supplemental submissions to Bar Disciplinary Counsel before this proceeding was commenced, as set forth in the letters to Bar Disciplinary Counsel attached to the Respondent's answer and affirmative defenses to the specification of charges, Ms. Sataki expressed her inability to get the job she wants in the broadcast industry and told Bar Disciplinary Counsel that having Respondent disciplined by the Board would allow her to explain to prospective employers that it is not her fault that she has not met the success she envisioned for herself. She even asked Bar Disciplinary Counsel to legally represent her with regard to her sexual harassment claims at Voice of America, many years after she on her own abandoned them, as also testified to in affidavits of her union representative Tim Shamble, the President of the AFL-CIO chapter at Voice of America, which are also attached to Respondents letters to Bar Disciplinary Counsel. These affidavits of Tim Shamble are also attached to Respondent's answer and affirmative defenses and are incorporated by reference in them.

Moreover, the supplemental bar complaint filed against Mr. Klayman, as also set for in the letters to Bar Disciplinary Counsel attached to answer and affirmative defenses to the specification of charges, was clearly not written by Ms. Sataki, but clearly someone who had knowledge of the claims as related to him or her by Ms. Sataki and which appear to be manufactured. It is important for Respondent to learn who this is, since he or she may need to be interviewed or deposed, as Ms. Sataki may have made admissions against interest to him or her.

In addition, Ms. Sataki needs to be deposed and documents produced about her psychological frame of mind and condition, both during the time that Respondent represented her and thereafter. She had been consulting with a Los Angeles psychologist found by Respondent to help her, Arlene Aviera, and only partial records of her treatment were selectively given to Bar Disciplinary Counsel. One of these records confirms that Respondent advised Ms. Aviera and Ms Sataki that Ms. Sataki needed to find other counsel. An alleged conflict of interest is the gravamen of Bar Counsel's specification of charges and the interrelationship, interactions and admissions by and between Ms. Sataki and Ms. Aviera are crucial. Ms. Sataki's counseling by Ms. Aviera, her written treatment records including notes and her communications with Ms. Aviera will provide crucial exculpatory evidence necessary for Respondents defense. Thus, there is a compelling need for this discovery.

Neither Ms. Sataki nor Ms. Aviera can claim a doctor patient privilege as none exists in the state of California where Ms. Sataki underwent counseling by Ms. Aviera, who is not an MD in any

event.  Any such privilege, even were it to exist, was waived by Ms. Sataki's submission of Ms. Aviera's selective records to Bar Disciplinary Counsel.

It is thus believed that the deposition testimony of Ms. Sataki and Ms. Aviera will disclose crucial exculpatory evidence necessary for Respondent's defense, and reveal that he acted properly at all times and even sought to get Ms. Sataki other counsel. This occurred before and after, as reflected in materials submitted by Ms. Aviera to Bar Disciplinary Counsel with Ms.Sataki's consent, Ms. Sataki attempted to take advantage of her friendship with Mr. Klayman by asking him to buy her a Mercedes. Ms. Klayman had previously, as a friend and as someone who had compassion for her situation, paid for her lodging in Los Angeles (away from the alleged harasser at Voice of America) while she was awaiting the results of her legal proceedings and undergoing counseling by Ms. Aviera.

These and other troubling contradictions in Ms. Sataki's complaints against Respondent, which gave rise to these proceeding, represent a compelling need for discovery. There is no undue burden on any party in the compelling need to get to the truth in this sad matter.

Conclusion.

Thus, the issuance of notices and subpoenas duces tecum are particulary important to gather evidence necessary, as a matter of due process, for Respondent to be able to wage a full and complete defense to the non-meritorious charges of Ms. Sataki and the anonymous person who worked with her to fashion the supplemental  complaint.  This anonymous person had also threatened Mr. Klayman in a voicemail left on his cell phone many years ago, and at present, given the passage of time, Mr. Klayman, having moved around quite a bit in the interim years, cannot locate this cell phone.

Given that Ms. Sataki's second complaint makes reference to her having filed identical complaints with The Florida Bar and Pennsylvania Bar, which complaints were dismissed summarily many years ago, and Respondent believing that the District of Columbia Bar Disciplinary Counsel had also dismissed this matter long ago, that is until Respondent was was surprised to learn and notified to the contrary many years later, the passage of time and missing evidence underscores the compelling need to take this testamentary discovery and require the production of relevant documents and that which may lead to relevant evidence.

Thus, there is a compelling need for these depositions and the production of documents in the possession, custody and control of Ms. Sataki and Ms. Aviera and this discovery is likely to not only bring forth exculpatory evidence, but may lead to other exculpatory evidence necessary for the defense at this late date over 7 years after Ms. Sataki's complaints were lodged with Bar Disciplinary Counsel. In the case of Ms. Aviera this will also preserve and create a record of this evidence for the evidentiary hearing, as she is located in Los Angeles and is likely be unavailable for live testimony at trial.

Respondent, due to the high cost of legal representation, is still in the process of seeking to retain suitable counsel in this proceeding and thus is filing this motion pro se. Respondent has consulted with Assistant Bar Counsel H. Clay Smith, III to seek his consent to this motion and he advised that he would consider it and respond once it is filed and reviewed.

WHEREFORE, Respondent Larry Klayman respectfully requests to notice and have issued subpoenas duces tecum to produce documents and take the oral testimony of Elham Sataki and Arlene Aviera.

Respectfully submitted,

Larry Klayman, Esq.
(Bar Registration Number 3345810)
c/o 2020 Pennsylvania Avenue, N.W.
Suite 800
Washington, D.C. 20006

Tel: 310-595-0800
leklayman@gmail.com

## CERTIFICATE OF SERVICE

I Larry Klayman hereby certify the the foregoing was served on  Assistant Bar Disciplinary Counsel H. Clay Smith, III, Esq., by email and mail this 15 day of February 2018 at the below address and filed with the Board of Professional Responsibility on this same date:

H. Clay Smith, III, Esquire
Assistant Disciplinary Counsel
Office of Disciplinary Counsel
515 5th Street, N.W.
Building A, Room 117
Washington, D.C. 20001

# EXHIBIT J

In The Matter Of:  Larry E. Klayman
May 30, 2018

---

Page 130

1   Alright, that's probably better.
2        MR. SMITH:  Ok.
3        MR. TIGAR:  Sorry.
4        MR. SMITH:  And we will get back to the
5   emails in 23 as well, but thank you for that.
6        MR. TIGAR:  Mm-hmm.
7   BY MR. SMITH:
8        Q.  For the record, Bar Exhibit 24 is a
9   letter addressed to Arlene, and it is CC'd to
10  "Ellie" and it's dated April 7, 2010.
11       Have you seen this document prior to
12  today?
13       A.  Yes.
14       Q.  When did you first see this document,
15  if you recall?
16       A.  It was about the same time that he
17  emailed it to Dr. Aviera.
18       Q.  Who showed you a copy of this letter?
19       A.  Dr. Aviera.
20       Q.  Look at Bar Exhibit Number 25.
21       For the record it is a letter dated May
22  9th, 2010, and again addressed to "Arlene."

Page 131

1        Have you had a chance to look at that?
2        A.  Yes.
3        Q.  Other than today, do you recall the
4   first time you saw this letter?
5        A.  Probably about the same time, but I
6   didn't pay much attention because I knew about all
7   this.
8        But Dr. Aviera showed me the letter.
9        Q.  Ok, Dr. Aviera showed you the letter.
10       Did you have a conversation with Dr.
11  Aviera about either of the two letters, the April
12  letter or the May letter?
13       A.  I had conversation -- yes.
14       Q.  Ok.
15       A.  And emails.
16       Q.  With respect to the April letter, Bar
17  Exhibit Number 24 --
18       MR. KLAYMAN:  Your Honor I would object
19  to any testimony that gets into about what Dr.
20  Aviera said.
21       CHAIRMAN FITCH:  That gets into what?
22       MR. KLAYMAN:  That gets into what Dr.

Page 132

1   Aviera might have said.
2        CHAIRMAN FITCH:  Well, we have to take
3   it step by step I think.
4        I guess the pending question is --
5   BY MR. SMITH:
6        Q.  Did you have a conversation with Dr.
7   Aviera?
8        CHAIRMAN FITCH:  About?  The April
9   letter.
10       MR. SMITH:  About the April letter.
11       CHAIRMAN FITCH:  Or the letter that has
12  an April date at the top.  Ok.
13       THE WITNESS:  Yes.
14  BY MR. SMITH:
15       Q.  Can you tell the hearing committee
16  about that conversation.
17       MR. KLAYMAN:  Your Honor, objection,
18  hearsay.
19       She can testify what she said, but she
20  can't testify what Dr. Aviera said.  That would be
21  hearsay.
22       CHAIRMAN FITCH:  Well, given the

Page 133

1   relaxed rules of evidence, and because at least
2   she is here to be cross-examined, let's go down
3   that road and see what happens.
4        Overruled --
5        MR. KLAYMAN:  At this point, for the
6   record, as your Honor may recall, I had requested
7   to be able to depose Dr. Aviera.  That would have
8   alleviated this issue, and I was denied.
9        That's why I also needed her file,
10  because this is just selective things that are
11  being produced by Bar Counsel from her file, not
12  the whole file.
13       So this is a highly prejudicial area of
14  testimony for her to be testifying, A, without my
15  having discovery, which I requested early on, and
16  B without Dr. Aviera to testify.
17       MR. SMITH:  Disciplinary Counsel does
18  not have Dr. Aviera's file.  What we have is what
19  we have produced.
20       We have established that Dr. Aviera is
21  unavailable because of serious health concerns and
22  that's why she's not testifying here today, even

34  (Pages 130 to 133)

In The Matter Of:  Larry E. Klayman
May 31, 2018

Page 489

1    MR. KLAYMAN:  Ok.
2   BY MR. KLAYMAN:
3       Q.   That you wanted Bar Counsel to file a
4   sexual harassment case for you.  You asked them
5   that within the last year, against VOA.
6       A.   I asked if it's doable.
7       Q.   And you asked Bar Counsel to do it for
8   you, correct?
9       A.   I asked if it's doable.
10          I asked, once this is over, can I
11  take -- once I prove --
12      THE WITNESS:  Can I say exactly what
13  I -- I don't know.
14          Is it just yes or no, or I can say what
15  I asked?
16      I asked, once this is over, and so we
17  can prove and show why I couldn't have him as my
18  attorney any more, that he was not capable to work
19  as my attorney any more because he had more
20  interest, so, then is there any way that I can
21  pick the VOA case up, because then we can show
22  that I didn't fail to apply.  It was that I had

Page 490

1   this problem that I had to resolve before I go
2   back to VOA.
3   BY MR. KLAYMAN:
4       Q.   What did Bar Counsel tell you?
5       A.   He said he doesn't know.  He can't
6   advise me on that.
7       Q.   So you think that this case right now
8   that you're here on today is going to somehow
9   revive your sexual harassment claim against VOA?
10      A.   No, I don't think that.  It was just
11  asking I asked.  That's not why I'm here.
12      Q.   You also told Bar Counsel that you
13  wanted to pursue the case now because you wanted
14  to be able to say to future employers, or explain
15  to them, why your career had not gone as well as
16  you had wanted, correct?
17      A.   Correct.
18      Q.   So basically you want, as you testified
19  yesterday, revenge against me and Mr. Falahati to
20  explain why you're unhappy with your professional
21  and personal life?
22      A.   No, I did not say that.

Page 491

1       I said, when I was in a bad state of
2   mind, in a hole eight years ago, I was so angry
3   and hurt for what Mr. Klayman did and before.
4       So, in that state of mind, I was going
5   to take my life and then everybody would find out
6   what happened.
7       Because, to this day, I haven't been
8   able to tell anyone that -- anyone what Mr.
9   Klayman did to me and why I couldn't have him
10  represent me any more.
11      To this day, everybody's asking me,
12  "Did you wrongly accuse your coworker for sexual
13  harassment?  How come that he's still working
14  there and you're not?"  People are still wondering
15  why.
16      But I cannot go and say that my own
17  attorney that's representing me for a sexual
18  harassment case is suddenly falling in love with
19  me and cannot at all, as you said yourself,
20  several times, that "a car cannot run on empty
21  fuel" and you cannot represent me because you're
22  too in love with me and you're feelings are coming

Page 492

1   in the middle of this.
2       I can't say that, because it's -- I
3   always think what people are going to think and
4   say that, "So, her own lawyer now?"
5       So therefore, I wanted this to be
6   resolved here.
7   BY MR. KLAYMAN:
8       Q.   Over the lunch break you talked about
9   your testimony, not with Mr. Smith, but with some
10  other people, didn't you?
11      A.   Over what?
12      Q.   Over our lunch today, you talked about
13  your testimony, not with Mr. Smith, but with some
14  other people.
15          You talked with Sam?
16      A.   No, I didn't.
17      Q.   You talked with Kathleen?
18      A.   No, I didn't.
19      Q.   Now, assuming what you say is correct,
20  you're aware that I advised you --
21      A.   I didn't.  That is correct.
22      Q.   That's your opinion.

59  (Pages 489 to 492)

App.0277

In Re:  Larry E. Klayman
June 1, 2018

Page 772

1   Larry Klayman to T. Shamble.
2        Are we all on the same exhibit now?
3        MR. KLAYMAN:  I have it.
4   BY MR. SMITH:
5        Q.   Ms. Sataki, it suggests that a courtesy
6   copy of this email was sent to you.
7        Do you remember receiving it?
8        A.   Yes, yes.  That's just I probably
9   received it, but I don't remember --
10       Q.   Ok.
11       A.   -- exactly that moment that I wrote
12  this.
13       MR. TIGAR:  I'm sorry, Mr. Smith.
14  Could I ask you to move the microphone down.
15  She's a broadcaster, she knows.  Yes.
16       THE WITNESS:  I'm sorry.
17       MR. TIGAR:  Ok.
18  BY MR. SMITH:
19       Q.   Do you recall having conversations with
20  Mr. Klayman about publicity in your case?
21       A.   Yes.
22       Q.   At what point in the representation, if

Page 773

1   you recall, did you have those conversations?
2        A.   Maybe after two months.  So say we
3   started about in February, so sometime March,
4   sometime there probably.  I don't know exactly.
5        Q.   And so looking at this date of June
6   10th, you had had conversations with Mr. Klayman
7   prior to June 10th, 2010?
8        A.   Yes.
9        Q.   Could you tell the committee what it
10  was that you told Mr. Klayman with respect to your
11  views about publicity?
12       A.   Well, I thought that the publicity is
13  going to --
14       To start with, I didn't want the case
15  to go out and have everybody find out, and
16  especially publicity with everybody.  So, then
17  everybody is going to question me, "What's going
18  on?  What happened?"
19       And it was a sexual harassment case.
20  It wasn't something -- it's not something that a
21  woman is comfortable to be asked about all the
22  time.  Especially someone like me or, then people

Page 774

1   nonstop start asking about that, how -- what the
2   sexual harassment, how it was, and they want me to
3   describe it.  And also they think that sexual
4   harassment means rape.  So they asked me, and
5   still ask me to this day, how I was raped and
6   where I was raped.
7        Q.   And did you --
8        A.   So that was my concern.
9        Q.   Did you express this concern to Mr.
10  Klayman?
11       A.   Yes, I did.
12       Q.   Did he respond to those concerns?
13       A.   He did, but he believed that publicity
14  is going to help our case.
15       Q.   How many times did you have this
16  conversation about publicity?
17       A.   Several times --
18       MR. KLAYMAN:  Objection, that's leading
19  and it presumes number of times.  He's giving the
20  witness --
21       CHAIRMAN FITCH:  Let's rephrase it.
22       MR. SMITH:  I asked how many times did

Page 775

1   you --
2        CHAIRMAN FITCH:  No, "Did you have such
3   a conversation one time or more than one time?"
4   BY MR. SMITH:
5        Q.   Did you have such a conversation with
6   Mr. Klayman more than one time?
7        A.   Yes.
8        Q.   How many times did you have one?
9        A.   I don't know, a few times.  I can't
10  recall exactly how many times.
11       It was a conversation back and forth
12  until --
13       Q.   Ok.  Did you ultimately agree with Mr.
14  Klayman about publicity?
15       A.   I did.
16       Q.   Ok.  Could you tell the committee what
17  it was that persuaded you to ultimately agree to
18  the publicity?
19       A.   Because he was my attorney, and as an
20  attorney I thought he was best and that's going to
21  probably help my case and help me out.
22       So he basically convinced me that

41  (Pages 772 to 775)

In Re: Larry E. Klayman
June 25, 2018

Page 891

1  Governors for one thing, and the general counsel.
2      Q.   What was the response of our attempts
3  to settle and their attitude?
4      A.   The agency was very negative.  They
5  just seemed to be determined and stubborn that
6  they weren't going to do anything in regard for
7  Elham.
8      Q.   Was that consistent with your previous
9  experience about them?
10     A.   Yeah, it's pretty typical of them.
11     Q.   What was their response in terms of our
12  settlement negotiations?  What did they offer?
13  Was it what you just said?
14     A.   What they offered was to have her go
15  back and work in the Persian service.  They
16  weren't going to give her an anchor position.  Or
17  she could go to the central newsroom, and she told
18  them that she didn't feel comfortable around this
19  person and she would be in close proximity with
20  him.  But they would not bump.
21     Q.   Did her decision not to go to -- she
22  decided not to go to the Central News Bureau.  Is

Page 892

1  that correct?
2      A.   Yes.
3      Q.   Did that hinge on her language in part,
4  based on what she told you?
5      A.   I don't think she was very comfortable
6  working strictly in English, and I think the major
7  part was that she didn't want to be in the
8  proximity of Falahati.
9      Q.   So she was adamant about going to Los
10  Angeles?
11     A.   Yeah, she wanted to -- she thought that
12  was a good solution to work out of Los Angeles.
13     Q.   Did there come a time when she had
14  discussions, you, me and her, about using
15  publicity to try to coax the agency into
16  settlement or a reasonable solution?
17     A.   Yes.
18     Q.   Was she present at the time?
19     A.   Yes.  It was in my office.
20     Q.   Why is publicity helpful based, on your
21  experience, in trying to get a solution with this
22  very difficult agency?

Page 893

1      A.   We've done it.  It's something that you
2  can use to pressure managers, if they're
3  intractable, you know, to try to get them to come
4  to some sort of agreement.  We have our own
5  website, so we use it, too.
6      Q.   Is it your experience, based upon being
7  in Washington, that publicity sometimes coaxes
8  people to do the right thing?
9      A.   Sometimes, yes.
10     Q.   And did there come a point in time when
11  you actually went with her and distributed
12  publicity?
13     A.   I remember one time.  The VOA was on
14  the mall here in Washington, some kind of
15  public -- it might have been a recruitment fair or
16  something.  But we had an article and both her and
17  I were distributing it to people in the vicinity,
18  tried to let people know and to let the agency
19  know that, you know, we were going to publicize
20  this.
21     Q.   I'm going to turn your attention to
22  Exhibit 23 of Bar Counsel's exhibits.

Page 894

1      MR. KLAYMAN:  And Mr. Sujat, please
2  turn to Page 23-33 for Mr. Shamble, 23-33.
3  BY MR. KLAYMAN:
4      Q.   Ok, great.  Is that the article that
5  you distributed in Ms. Sataki's presence?
6      A.   Yes, I believe it is.  Yes.
7      Q.   It's called: "Government War on a
8  Freedom Loving Beauty.  Exclusive, Larry Klayman
9  Goes to Bat for Harassed Broadcaster Fighting for
10  a Free Iran."
11     That's it?
12     A.   Yes.
13     Q.   And was she there when she gave it out
14  and she approved of that?
15     A.   Yes.  We were both on the mall handing
16  that out.
17     Q.   Now you saw other articles that I have
18  written on her behalf?
19     A.   I have seen other articles, yes.
20     Q.   And I provided them to you, correct?
21     A.   I've seen some, yeah, that you had
22  given me.

7  (Pages 891 to 894)

In Re:  Larry E. Klayman
June 25, 2018

Page 979

1    that she had met with him over this.  I met Mr.
2    Shamble.  I was very impressed with him.  He's a
3    very honest and good person.  And, you know,
4    that's when we had the meetings that he testified
5    to a few minutes ago, where we discussed trying to
6    settle this thing, to settle the case.  He told me
7    how difficult Voice of America was to work with.
8           He was aware, to some extent, of my
9    background, that I take on difficult causes that
10   other people don't take on, and that he needed a
11   strong lawyer to take VOA on.
12          So we set out -- if I may just do a
13   little narrative here, we can break it up, but I
14   can move it along quickly, if the panel indulges
15   me...
16          We decided to try to set up some
17   meetings with VOA, and we did that, and we got
18   this resistance.  We got this hostility, and I
19   couldn't figure out why we were getting hostility.
20   But later Mr. Shamble explained to me, "That's the
21   way they are."  And we decided we needed to try to
22   coax them into a settlement.  That was the reason

Page 980

1    for the publicity.
2           Because I knew over the years that
3    publicity drives legal cases and other matters in
4    Washington, D.C.  No place in the world is
5    publicity more important to trying -- to move a
6    case.  Not just with agencies, but with judges.  I
7    saw that at Judicial Watch judges would take an
8    interest in the case if they read about it in the
9    newspaper or they saw it on TV.  Everybody wants a
10   sexy case, you know, so to speak, quote unquote.
11          So that was the reason for that.
12          And these people were so difficult that
13   I was basically saying to them, and in fact I told
14   them this in advance, you know, "This is not good.
15   It's not going to be good for VOA.  Let's settle
16   this thing."  And they just dug in their heels.
17          So that was the reason for the
18   publicity.  She agreed to it, Tim agreed to it,
19   and there will be other witness that will testify
20   in this proceeding that she agreed to the
21   publicity, and that to me was the way things could
22   be moved along.  And she accepted that.

Page 981

1           So at that point, when we couldn't
2    settle it, I then fashioned lawsuits, and perhaps
3    you'll show me those lawsuits, Mr. Sujat, that
4    also would try to put pressure on them, because
5    the publicity was not producing exactly what we
6    needed at that time.  And she had wanted me to sue
7    the harasser, Falahati, and two of her managers,
8    Susan Jackson and another one.  Because when she
9    complained to Mr. Shambles, she was -- she told me
10   she was retaliated against.
11          So we filed that lawsuit, and then I
12   did one against the Board of Governors, and you
13   know, they were named.  You know, it was a Bivens
14   case, but it was also a case that was fashioned,
15   later amended under a case called Wagner vs.
16   Taylor, and we also had filed -- we identified
17   that this morning -- an Office of Civil Rights
18   complaint, an administrative complaint.
19          Wagner v. Taylor stands for the
20   proposition that, while a civil rights complaint
21   is ongoing, administratively, that you can go to a
22   federal district court and ask them to preserve

Page 982

1    the status quo, which in this case would be --
2    because this is what she wanted.  She wanted to be
3    in LA.  That's where the Persian community is.
4    That's where her friends were.  She told me she
5    didn't like Washington, D.C.  She was only here
6    because of Voice of America.  And she didn't feel
7    comfortable in that environment in Washington,
8    D.C.  She told me -- in fact it's in her
9    testimony -- "Larry, if I stay here, I'll kill
10   myself.  I'll commit suicide.  And I don't want to
11   be in this presence, and I don't speak English
12   that well."  That was one of the criticisms of her
13   and her Farsi at VOA, and "I won't -- I'll get
14   fired in the Central News Agency, because my
15   English isn't good enough.  So they're setting me
16   up.  And I don't want to be there because of -- I
17   don't want to have to walk past my former
18   co-anchor, Falahati, every morning."
19          And she was very emotional and would
20   break down, and you know, apparently eight years
21   later, it's not changed that much, from what I
22   could see, you know, when she was on the witness

In Re:  Larry E. Klayman
June 25, 2018

---

Page 1039

1  Q.  So, it was sent to just Danforth
2  Austin?
3  A.  That's what it says, yeah.
4  Q.  No other person received a copy from
5  what you know?
6  A.  I'm testifying as to myself.  I don't
7  know who else received it.  I didn't receive it.
8  Q.  Thank you.
9  A.  From Ms. Sataki.
10  Let me point out, and it's something
11  that will come out later, and it's in the
12  supplemental exhibits --
13  MR. SMITH:  Objection.
14  CHAIRMAN FITCH:  Let's let counsel ask
15  his next question.
16  THE WITNESS:  I'm allowed to explain
17  the letter.
18  CHAIRMAN FITCH:  Well, it sounds like
19  you were explaining something else.
20  Counsel, where do you want to take Mr.
21  Klayman?  You can jump around.  Ask him a
22  question.

---

Page 1040

BY MR. SUJAT:
2  Q.  Yeah, well, I mean, my question here
3  is, when did you become aware of this?  Did you
4  ever receive this?
5  A.  Yeah, I testified to that.
6  What I wanted to add was that in this
7  letter, even though it wasn't sent to me, she's
8  instructing to get rid of all the civil actions,
9  ok, yet she did file a Notice of Appeal in her
10  case involving the Board of Governors of BBG, and
11  that Notice of Appeal is one of our supplemental
12  exhibits.
13  Q.  Right.
14  A.  So that's inconsistent.
15  Q.  Right.  So this inconsistency shown by
16  Respondent's Supplemental Exhibit 4 --
17  MR. SMITH:  Objection.  I mean, that's
18  a narrative.  I think we need a question, not a
19  narrative.
20  THE WITNESS:  Just ask me the question.
21
22  BY MR. SUJAT:

---

Page 1041

1  Q.  Ok, Mr. Klayman, can you take a look at
2  Respondent's Supplemental Exhibit Number 4.
3  A.  Can you give me a copy of that, please.
4  Q.  Yes.
5  A.  This is the Notice of Appeal that I'm
6  referring to, and the way I was able to get a copy
7  of this, this actually came out of Bar Counsel's
8  files, but I had a copy too, because it appeared
9  on the court's docket that, at the same time
10  she's telling Mr. Austin -- or actually before
11  that -- excuse me, later than that, and she's
12  telling Mr. Austin that she wants all cases to be
13  dismissed.  She's appealing the action.
14  So this is part and parcel to the
15  problems that I was having during that period in
16  time.  That's why I wanted to contact her.
17  Because I was getting communications that didn't
18  appear to come to her.  It wasn't in her way of
19  speaking.  It wasn't in her English.  It was in
20  virtually perfect English, as the letter to Mr.
21  Austin demonstrates.  That's why I needed to be
22  able to talk to her, and that's why the first

---

Page 1042

1  document in this exhibit, sent by Mr. Shamble, was
2  important, because we were trying to reach her --
3  MR. SMITH:  Objection.  Not responsive
4  to the question.
5  THE WITNESS:  I'm explaining the
6  context of the document.
7  CHAIRMAN FITCH:  No, overruled.
8  THE WITNESS:  Because I needed to find
9  out, you know, what she really wanted to do.  And
10  apparently, whatever advice she was getting, we
11  learned in her testimony, was from non-lawyers, it
12  was contradictory and in my view not in her best
13  interest.
14  BY MR. SUJAT:
15  Q.  Mr. Klayman, there were also other
16  letters that were sent regarding termination.
17  A.  Just show me the letters.
18  Q.  That would be Exhibit 8, Respondent's
19  Exhibit 8.  One dated November 15th, 2010,
20  addressed to the Klayman Law Firm at 2000
21  Pennsylvania Avenue, and then another one the same
22  date addressed to Klayman Law Firm, 201

---

44  (Pages 1039 to 1042)

App.0457

In Re: Larry Klayman
June 27, 2018

## Page 1521

1  given witness testimony before, so if there is
2  something I should be doing, please let me know.
3  Whereupon,
4  JOSHUA ASHLEY KLAYMAN
5  called as a witness on behalf of Respondent, and
6  after having been first duly sworn, was examined
7  and testified as follows:
8  EXAMINATION ON BEHALF OF THE RESPONDENT:
9  BY MR. KLAYMAN:
10  Q.  Please state your name.
11  A.  My name is Joshua Ashley Klayman.
12  Q.  Are we related, Ms. Klayman?
13  A.  Yes, you're my brother.
14  Q.  And how old are you?
15  A.  I'm 41.
16  Q.  Run us through briefly your educational
17  background.
18  A.  Sure.  I got a Bachelor's degree from
19  the University of Pennsylvania in 1999.  I
20  graduated summa cum laude.  I went to Temple Law
21  School.  I was a law faculty scholar and I was on
22  Law Review and I graduated in 2006.

## Page 1522

1  CHAIRMAN FITCH:  Really I'm having
2  trouble hearing you.
3  THE WITNESS:  Oh, sorry.  I'll speak
4  up.
5  Do you want me to repeat that?
6  CHAIRMAN FITCH:  Mm-hmm.
7  THE WITNESS:  Ok, sure.
8  So I graduated in '99 from University
9  of Pennsylvania, summa cum laude with a Bachelor's
10  in arts.  I went to Temple Law School as a law
11  faculty scholar.  I graduated in 2006 cum laude on
12  the Law Review.
13  BY MR. KLAYMAN:
14  Q.  Can you run us through your employment
15  history after law school.
16  A.  Sure.
17  Q.  Take your time.
18  A.  Ok.  So after law school I initially
19  practiced for four years in Pennsylvania, at
20  Pepper Hamilton.  I then went to Cahill Gordon and
21  Reindel, in New York City, to do leverage finance.
22  I left there when some partners left

## Page 1523

1  and went to Paul Hastings.  I then went --
2  CHAIRMAN FITCH:  It's the way of the
3  world these days.
4  THE WITNESS:  Yes, exactly.
5  I then went to Allen Overy.  My partner
6  there left and took us to Morrison Foerster where
7  I had a practice for five years.
8  I left on Friday and I just launched my
9  own law firm and consulting firm, and I'm now a
10  consultant to Shearman Sterling, as well.
11  BY MR. SMITH:
12  Q.  What is your legal specialty?  What is
13  your specialty, your expertise?
14  A.  So traditionally it was leveraging
15  finance and corporate, but I have in the past few
16  years been working on block chain and crypto
17  matters, and I actually founded Morrison
18  Foerster's global block chain and contracts group.
19  That's where I've taken this next step so that I
20  can do that all the time.
21  Q.  Did there come a point in time when you
22  met a Ms. Elham Sataki?

## Page 1524

1  A.  Yes.
2  Q.  What was the circumstances of that?
3  A.  At the time I was dating someone in Los
4  Angeles, so I was frequently flying over the
5  weekend from Los Angeles to New York.
6  My brother lived in Pacific Palisades,
7  and I met her at his house.
8  Q.  During the meeting with Ms. Sataki, did
9  she discuss the issue of her case and what was
10  being done?
11  A.  Yes, quite openly.  And I met her
12  multiple times.  It wasn't that I just met her one
13  time.
14  Yes, she was quite open with what the
15  circumstances of her challenges were.
16  Q.  Did she discuss the issue of publicity
17  in her case?
18  A.  She did.  I mean, she was very, very
19  open, which -- I'm not a litigator.  I don't
20  really know anything about litigations, but I was
21  surprised that she was so open.
22  Q.  And did she say that she was approving

29 (Pages 1521 to 1524)

In Re:  Larry Klayman
June 27, 2018

## Page 1525

1 of publicity of her case in trying to get a
2 settlement of her claims?
3          MR. SMITH:  Objection.  That's a
4 leading question.
5          THE WITNESS:  Ok, so --
6          MR. SMITH:  Objection.  That's a
7 leading question.
8          CHAIRMAN FITCH:  Rephrase the question.
9 BY MR. KLAYMAN:
10     Q.  Did she make reference to using
11 publicity to try to get a positive result for her?
12          MR. SMITH:  Objection.  It's a leading
13 question.
14 BY MR. KLAYMAN:
15     Q.  Ok, what did she say?
16     A.  She was very interested in trying to
17 get a positive result and to pressure people into,
18 you know, giving her that result.
19          She certainly was publicizing
20 everything to my then boyfriend and me, but I
21 don't recall her explicitly saying, like, "Yes,
22 I," you know -- however she was actively

## Page 1526

1 publicizing it to me.  And she seemed very onboard
2 with whatever the strategy was.
3     Q.  But I also mentioned, did I not, the
4 publicity?
5     A.  Yeah.
6     Q.  Yes.
7     A.  Yeah.
8     Q.  She didn't object?
9          MR. SMITH:  Objection.
10          THE WITNESS:  I think --
11          CHAIRMAN FITCH:  Wait, wait.
12          Did there come a time when you had
13 conversations, one or more conversations with Mr.
14 Klayman and Ms. Sataki.
15          THE WITNESS:  Yes.  Yes.
16          CHAIRMAN FITCH:  On approximately how
17 many occasions would you say.
18          THE WITNESS:  I'm not sure offhand how
19 many in-person times, however she and Larry were
20 friends.  I mean, they were -- that's why she was
21 over my boyfriend's house there.
22          So, I frequently had conversations

## Page 1527

1 either directly with her or through Larry and her
2 saying hi to me or something like that.  It wasn't
3 that -- they were friends.
4          CHAIRMAN FITCH:  Now ask a question,
5 Mr. Klayman.
6          MR. KLAYMAN:  Ok.
7          CHAIRMAN FITCH:  You've got the
8 foundation.
9 BY MR. KLAYMAN:
10     Q.  During the times that you met with her,
11 I discussed publicizing her case?
12     A.  Yes.  I think you always discussed
13 publicizing cases.
14     Q.  And she didn't object?
15     A.  No.
16     Q.  What was your impression of Ms. Sataki
17 interacting with me?
18     A.  A few things: I thought she was
19 beautiful, right.  I thought she seemed -- I
20 thought she was using you, which I said to you on
21 multiple occasions.  And she definitely seemed to
22 be in a very unstable sort of way.

## Page 1528

1          But I -- I mean, I vacillated between
2 kind of liking her and being suspicious of her,
3 quite frankly, as your sister.
4          MR. KLAYMAN:  I have no further
5 questions.
6          MR. SMITH:  I have no questions.
7          MR. TIGAR:  I have a couple, if I may.
8          CHAIRMAN FITCH:  Go ahead, Mr. Tigar.
9          MR. TIGAR:  I'm not sure I heard the
10 word.  You thought that Ms. Sataki was using Mr.
11 Klayman?
12          THE WITNESS:  Yes.
13          MR. TIGAR:  What do you mean by that?
14          THE WITNESS:  Well, she was -- I don't
15 know what she looks like now, but she was very
16 beautiful and she was just very forward in her
17 demands.  I guess -- I shouldn't say demands.
18          But I believe at one point she asked
19 him to buy her a car, like, just -- she was very
20 forward in terms of requesting different things
21 for her personally.
22          MR. TIGAR:  Were you aware of expenses,

30 (Pages 1525 to 1528)

# EXHIBIT K

*Notice:  This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters.  Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

## DISTRICT OF COLUMBIA COURT OF APPEALS

No. 20-BG-583

IN RE LARRY E. KLAYMAN, RESPONDENT.

FILED 09/15/2022
District of Columbia
Court of Appeals

Julio a. Castillo

Julio Castillo
Clerk of Court

A Suspended Member of the Bar
of the District of Columbia Court of Appeals
(Bar Registration No. 334581)

On Report and Recommendation
of the Board on Professional Responsibility

(17-BD-063; DDN-028-11)

(Argued June 16, 2022                        Decided September 15, 2022)

*Melissa Isaak* for respondent.

*Myles V. Lynk*, Senior Assistant Disciplinary Counsel, with whom *Hamilton P. Fox, III*, Disciplinary Counsel, was on the brief, for petitioner.

Before BLACKBURNE-RIGSBY, *Chief Judge*, and BECKWITH and MCLEESE, *Associate Judges*.

PER CURIAM:   The Board on Professional Responsibility concluded that respondent Larry E. Klayman violated numerous District of Columbia Rules of Professional Conduct during his representation of former client E.S.  The Board recommended that Mr. Klayman be suspended for eighteen months, with a requirement that he show fitness before being permitted to return to the practice of

2

law.  We accept the Board's conclusion that Mr. Klayman violated the Rules of Professional Conduct, and we adopt the Board's recommended sanction.

## I.  Factual Background

In sum, the evidence presented by Disciplinary Counsel to the Hearing Committee was as follows.  The evidence largely consisted of E.S.'s testimony but also included numerous documents, including written correspondence between E.S. and Mr. Klayman.

E.S. met Mr. Klayman in 2009, while she was covering a story for Voice of America (VOA).  E.S. told Mr. Klayman that she was being sexually harassed by her cohost and that after she reported the harassment to her supervisor, she was transferred to a different position.  Early in 2010, Mr. Klayman and E.S. agreed that he would represent her in a case against VOA.  E.S. did not believe that Mr. Klayman provided her with a written document setting out the scope and nature of the representation.  Mr. Klayman and E.S. agreed that Mr. Klayman would work on a contingent basis, receiving forty percent of any award E.S. won.  Mr. Klayman later unilaterally increased his fee to fifty percent.

Mr. Klayman initially attempted to negotiate a settlement with VOA. After the negotiations were unsuccessful, Mr. Klayman encouraged E.S. to move from the District of Columbia to Los Angeles, assuring her that he could get her transferred to the VOA office in Los Angeles. Mr. Klayman paid for the move and for E.S.'s living expenses in Los Angeles. E.S. and Mr. Klayman agreed that the money Mr. Klayman was providing would be paid out of any award E.S. won, in addition to the contingency fee. VOA denied E.S.'s request for a transfer, at which point Mr. Klayman filed a civil suit against E.S.'s alleged harasser and supervisors.

E.S. had wanted her case to be "very quietly handled," with as few people as possible finding out about the harassment. She explained her concerns about publicity to Mr. Klayman, and he initially respected her wishes. Mr. Klayman later began to pursue a strategy designed to draw attention to E.S.'s case. For example, shortly after filing suit against E.S.'s harasser and supervisors, Mr. Klayman filed suit against the members of VOA's governing board, the Broadcasting Board of Governors (BBG). The BBG included prominent public figures, particularly then-Secretary of State Hillary Rodham Clinton. E.S. did not agree to the BBG suit, worrying that the case "was getting too big" and preferring to focus on her harasser and supervisors. Mr. Klayman subsequently filed motions to disqualify the district-court judge who had been assigned to both of E.S.'s cases, arguing that the judge

was politically biased against him.   Mr. Klayman also wrote numerous articles mentioning E.S.'s case and providing confidential information about E.S.  Although E.S. was initially "completely against" the articles, she ultimately agreed to the publicity after Mr. Klayman explained that it would help her case.

In April 2010, Mr. Klayman began to repeatedly express romantic feelings towards E.S.  Mr. Klayman told E.S. that he loved her, and E.S. replied that he was her attorney and they could only be friends.  For months thereafter, Mr. Klayman kept saying that "he wanted to have a relationship with [E.S.] and [E.S. kept] saying no, and it was ongoing and ongoing and it wouldn't stop . . . it was very, very, very uncomfortable" for E.S.  For example, Mr. Klayman sent an email to E.S. saying "You are . . . the only woman I've ever really loved.  . . .  [W]hen I walk down the street . . . and see an attractive woman, my thoughts immediately flip to you.  I see no one else.  . . .  My loving you has given me true meaning in my life."

E.S. believed that Mr. Klayman's feelings for her were causing him to act unprofessionally in his representation, which Mr. Klayman himself acknowledged in writing several times.  For example, in one letter, Mr. Klayman said that "I do truly love [E.S.].  . . .  [A]nd my own emotions have rendered me non-functional even as a lawyer."  In an email, Mr. Klayman said "It[']s very hard to be a lawyer and feel

so much for your client."  In a second email, Mr. Klayman said that he had "not been able to function lately, because [he was] out there so far emotionally and got nothing back," and that E.S. would "get better legal representation with someone else . . . who does not have an emotional conflict and can keep his mind clear."

In July 2010, E.S. wrote to Mr. Klayman and directed him to withdraw the case against the BBG, which was by then the only active case.  Several days later, E.S. wrote to an executive at VOA stating that she had "instructed Larry Klayman to withdraw any and all civil actions that he may have filed in my name and that he is no longer representing me."  This letter was not sent directly to Mr. Klayman, but by the next day he had received a copy.  Mr. Klayman, however, did not dismiss the entirety of the case against the BBG.  He also continued to act on E.S.'s behalf.  For example, after the trial court granted defendants' motion to dismiss the BBG case, Mr. Klayman filed a motion to reconsider.

In November 2010, because Mr. Klayman continued to contact her about her case, E.S wrote another letter to him reiterating his termination.  That letter was incorrectly addressed, and Mr. Klayman testified that he did not receive it.  E.S. wrote to Mr. Klayman a third time in January 2011, stating that he was "not representing [her] in any way or shape."  Mr. Klayman replied to E.S., implying that

she had not written the email and explaining that he "[could not] allow her legal rights and obligations to be compromised or lost altogether." Several days later, Mr. Klayman filed a notice of appeal in the BBG case, despite not having had any communication with E.S. about filing the appeal. E.S. later personally filed a notice of appeal in that case.

Mr. Klayman's testimony was contrary to E.S.'s in many respects. Generally, Mr. Klayman testified that E.S. was seeking revenge against him because she was angry that her case had not gone well. Mr. Klayman denied having any romantic intentions toward E.S. To the extent he did have feelings for E.S., they "actually made [him] work harder" on her behalf. Mr. Klayman also contested the existence of a contingent fee agreement. Mr. Klayman testified that he consulted with E.S. about his actions in the case, such as filing the disqualification motion. Finally, he acknowledged E.S.'s initial reluctance to pursue publicity but testified that she later agreed to do so. He denied pressuring E.S. on the issue.

Mr. Klayman offered testimony from several other witnesses. Gloria Allred, a women's rights attorney, testified that she and Mr. Klayman had discussed E.S.'s case and that she had twice declined to take E.S.'s case. Former Judge Stanley Sporkin testified that he had found Mr. Klayman to be an honest and ethical lawyer

and had no reason to doubt Mr. Klayman's character.  Former Judge Sporkin also testified that he and Mr. Klayman had discussed E.S.'s case and that he had agreed with aspects of Mr. Klayman's litigation strategy.  Timothy Shamble, who was E.S.'s union representative at VOA, testified, among other things, that E.S. had agreed to publicize her case and had herself distributed one of the articles Mr. Klayman wrote about her case at a VOA event.  Keya Dash, a family friend, testified that Mr. Klayman did not seek a romantic relationship with E.S., although Mr. Dash was unaware of the emails that Mr. Klayman had sent E.S. stating that he loved her. Finally, Joshua Ashley Klayman, Mr. Klayman's sister, testified that E.S. agreed with Mr. Klayman's publicity strategy and that Mr. Klayman was not in love with E.S.

## II.  Procedural Background

In 2010, E.S. filed a complaint with Disciplinary Counsel, alleging that Mr. Klayman was harassing her even though she had terminated his representation of her.  Disciplinary counsel notified Mr. Klayman of the complaint and began to investigate, but apparently lost contact with E.S. for several years.  Counsel brought charges in 2017.

After the evidentiary hearing, the Hearing Committee issued a lengthy report and recommendation.  The Hearing Committee largely credited E.S.'s testimony over that of Mr. Klayman.  The Hearing Committee concluded that Mr. Klayman had committed numerous disciplinary violations.  Specifically, the Hearing Committee concluded that Mr. Klayman violated: (1) D.C. R. Prof. Cond. 1.2(a) (lawyer shall abide by client's decisions as to objectives of representation and shall consult with client as to means used) and 1.4(b) (lawyer shall appropriately explain matter to client), by, among other things, failing to inform E.S. before taking important steps in the litigation, including the filing of the motion to disqualify, and refusing to dismiss the BBG suit as E.S. had directed; (2) D.C. R. Prof. Cond. 1.5(b) (requiring written agreement regarding representation) and (c) (contingent fee agreement shall be in writing), by not entering into a written fee agreement with E.S.; (3) D.C. R. Prof. Cond. 1.6(a)(1) and (a)(3) (lawyer shall not reveal client confidence or secret for lawyer's advantage), by disclosing E.S.'s secrets, without her informed consent, in the articles he wrote, and making these disclosures for personal gain; (4) D.C. R. Prof. Cond. 1.7(b)(4) (lawyer shall not represent client if lawyer's professional judgment will be or reasonably may be adversely affected by personal interest), by, among other things, representing E.S. without informing her about the conflicts of interest created by his feelings for her, his animus towards the Clinton family and the district-court judge, and his desire for publicity; and (5) D.C.

R. Prof. Cond. 1.16(a)(3) (discharged lawyer shall withdraw from representation), by continuing to act on E.S.'s behalf after she terminated the representation. The Hearing Committee recommended that Mr. Klayman be suspended for thirty-three months and that he be required to demonstrate fitness to practice law before being reinstated.

The Board largely adopted the findings and recommendations of the Hearing Committee, with several exceptions. First, the Board's analysis of the Rule 1.4(b) violation differed from the Hearing Committee's. The Board concluded that Mr. Klayman had violated that rule because his communications with E.S. about his feelings for her were not "the kind of communication . . . that a client ought to receive from her lawyer" and had "drowned out" any legitimate communications about E.S.'s case. Second, the Board noted that Mr. Klayman appeared to concede a violation of Rule 1.5(b), but the Board did not explicitly find a violation of that Rule. Third, the Board concluded that Mr. Klayman's personal interest in E.S., not his animosity towards the Clintons and the trial judge or his interest in publicity, provided the sole basis for the conflict-of-interest violation. Fourth, the Board recommended an eighteen-month suspension with a fitness requirement.

10

After the Board issued its Report and Recommendation, this court issued an order to show cause why Mr. Klayman should not be temporarily suspended pending final action by this court.  *See* D.C. Bar R. XI, § 9(g)(1) (if Board recommends suspension of one year or more, court will issue order to show cause why attorney should not be temporarily suspended pending final action by court); *id.* (to avoid temporary suspension, attorney bears burden of showing substantial likelihood of success on merits).  Mr. Klayman opposed the temporary suspension, but this court ordered a temporary suspension in January 2021.  The court also denied Mr. Klayman's motion to reconsider.  Mr. Klayman subsequently filed additional challenges in this court to his temporary suspension.  By separate order, we deny those challenges as moot in light of this decision adopting the sanction of suspension recommended by the Board.

Mr. Klayman also filed a federal lawsuit challenging his temporary suspension.  *Klayman v. Blackburne-Rigsby*, No. 21-0409, 2021 WL 2652335, at *1 (D.D.C. June 28, 2021).  The federal district court denied relief, and the United States Court of Appeals for the District of Columbia Circuit summarily affirmed. *Id.* at *3; *Klayman v. Blackburne-Rigsby*, No. 21-7069, 2022 WL 298933, at *1 (D.C. Cir. Jan. 20, 2022) (per curiam).

Under D.C. Bar R. XI, § 9(g)(4), an attorney who is temporarily suspended pending final action by this court is required to comply with the requirements of D.C. Bar R. XI, § 14.  Among other things, § 14 requires suspended attorneys (1) to notify clients and adverse parties of the suspension; and (2) to file an affidavit with the court, the Board, and Disciplinary Counsel stating that the attorney has complied with the order of suspension and the requirements of § 14.  D.C. Bar R. XI, § 14(a)-(c), (g).  The order temporarily suspending Mr. Klayman directed Mr. Klayman's attention to those requirements.  The temporary suspension order also advised Mr. Klayman that his eligibility for reinstatement after suspension was tied to compliance with the requirements of § 14.  *See* D.C. Bar R. XI, § 16(c) ("[A] suspended attorney shall not be eligible for reinstatement until a period of time equal to the period of suspension shall have elapsed following the attorney's compliance with section 14 . . . .").  In February 2021, Disciplinary Counsel advised the court that Mr. Klayman had failed to file the required affidavit.  As of the date of this opinion, Mr. Klayman apparently still has not submitted the required affidavit.

## III.  Delay

Mr. Klayman argues that the court should dismiss this matter because of the seven-year delay in bringing charges.  We agree that the delay in this case was very

unfortunate.  We have held, however, that "mere delay in the disciplinary process generally does not provide a legitimate ground for dismissal of the complaint," because "[t]he public interest in regulating members of the bar takes precedence over the attorney's interest in having claims speedily resolved."  *In re Morrell*, 684 A.2d 361, 368 (D.C. 1996); *see also, e.g.*, *In re Pearson*, 228 A.3d 417, 427 n.13 (D.C. 2020) (per curiam) ("It clearly is not an ideal practice to delay prosecutions for seven years, but even troubling and inexcusable delays, without more, will not rise to a due process violation that requires dismissal.") (brackets and internal quotation marks omitted).  Rather, undue delay "must be coupled with actual prejudice in order to justify dismissal."  *In re Pearson*, 228 A.3d at 427 n.13 (internal quotation marks omitted).  To warrant dismissal, the undue delay must have "substantially impaired" Mr. Klayman's ability to defend against the charges filed by Disciplinary Counsel. *In re Fay*, 111 A.3d 1025, 1032 (D.C. 2015) (per curiam).

The Board denied Mr. Klayman's request for dismissal, concluding that Mr. Klayman had failed to show prejudice sufficient to warrant dismissal.  Our cases do not appear to make clear whether our review on this issue is deferential or de novo, and the parties have not addressed that issue.  We need not decide the issue, because we agree with the Board's conclusion.

Mr. Klayman alleges that he was prejudiced in four ways.  First, he points to an intended expert witness, Professor Ronald Rotunda, who passed away before the hearing.  As the Board explained, however, Professor Rotunda's expert report was admitted into evidence.  Moreover, as the Board further explained, Professor Rotunda's expected testimony was focused primarily on legal issues, such as when delay in disciplinary prosecution warrants dismissal.  The proper function of such testimony would have been limited at best.  *See Steele v. D.C. Tiger Mkt.*, 854 A.2d 175, 181 (D.C. 2004) ("[A]n expert may not state [an] opinion as to legal standards nor may [the expert] state legal conclusions drawn by applying the law to the facts.") (internal quotations marks omitted).  Finally, Mr. Klayman provided no information about any efforts he may have made to obtain a replacement expert.

Second, Mr. Klayman notes that E.S.'s psychologist, Dr. Arlene Aviera, became unavailable to testify due to illness.  The record contains written documentation from Dr. Aviera about E.S.'s condition and correspondence from Mr. Klayman to Dr. Aviera.  The availability of those materials mitigates the effect of Dr. Aviera's unavailability.  Mr. Klayman also testified about his communications with Dr. Aviera.  Mr. Klayman accurately points out that he attempted to take a deposition of Dr. Aviera in advance of the hearing, but the Hearing Committee denied that request.  The Hearing Committee reasonably denied the request,

however, because Mr. Klayman had failed to concretely describe what additional information Mr. Klayman would seek in a deposition.  Moreover, the evidence that Mr. Klayman now claims he would have sought to elicit from Dr. Aviera – such as that E.S. was a difficult client and that E.S.'s psychological problems were not caused by Mr. Klayman – does not appear to be of substantial importance.

Third, Mr. Klayman asserts that his memory had faded over the years, as had E.S.'s.  We agree with the Hearing Committee, however, that neither E.S. nor Mr. Klayman displayed significant gaps in their memory of material facts.

Finally, Mr. Klayman claims that he lost or discarded documents that would have been helpful to his defense.  We note that Mr. Klayman was on notice of the disciplinary complaint by 2011, and he therefore could have been expected to retain any relevant documents until that matter was explicitly resolved.  *Cf. In re Ekekwe-Kauffman*, 210 A.3d 775, 786 (D.C. 2019) (per curiam) (attorney's claim of lost documents "is unpersuasive in light of the fact that [the attorney] was aware of the potential for misconduct charges").  In any event, Mr. Klayman has not in this court identified specific lost documents or their relevance.

15

In sum, we conclude that Mr. Klayman has failed to show that the delay in this case caused him substantial prejudice warranting dismissal.  To the extent Mr. Klayman suggests that this court should not require such a showing, we are bound by the contrary holdings of our prior cases.  *See, e.g.*, *In re Ekekwe-Kauffman*, 210 A.3d at 785 n.12 (declining to apply doctrine of laches in disciplinary proceedings, in light of prior precedent applying due-process framework to determine when dismissal is warranted on basis of delay).

## IV.  Alleged Bias

Mr. Klayman argues that the Office of Disciplinary Counsel, the Hearing Committee, the Board, this court, and others are all biased against him.  For example, Mr. Klayman argues that (1) the district-court judge who handled the federal suits Mr. Klayman filed on E.S.'s behalf is "highly partisan and to the far left"; (2) the Office of Disciplinary Counsel and the Board are "managed by leftist pro-Clinton Democrats"; (3) one member of the Hearing Committee is a "communist" and another is a "deferential ultra-leftist"; (4) the entire disciplinary proceeding has been "highly partisan"; (5) the Office of Disciplinary Counsel is engaged in a "dogmatic and unrelenting . . . jihad" to remove Mr. Klayman from the practice of law; (6) members of the Hearing Committee "exhibited great vitriol toward Mr. Klayman";

(7) the Board "exhibited . . . open animus and bias against Mr. Klayman"; (8) "men are frequently disbelieved but women more often than not get off scot free when they lie to tribunals"; and (9) this court has prejudged this matter, suffers from a conflict of interest in the matter, and temporarily suspended Mr. Klayman "strategically to harm Mr. Klayman's reputation."   The record, however, does not support Mr. Klayman's repeated assertions of bias.

## V.  Other Disciplinary Proceedings

Mr. Klayman repeatedly argues that it was inappropriate for Disciplinary Counsel to move forward with charges in this case, because disciplinary authorities in Pennsylvania and Florida long ago dismissed the claims of misconduct in this case as baseless.   We are not persuaded by that argument.

First, the record provides no direct information about the resolution of any disciplinary proceedings in Pennsylvania and Florida regarding the allegations in this case.   There is some evidence that E.S. brought complaints to those authorities. Mr. Klayman also presented evidence that he has not been disciplined in those jurisdictions.   It is unclear, however, whether complaints actually were brought in those jurisdictions, and if so, how those matters were resolved.   For example, it may

be that those jurisdictions choose to await resolution of the complaint in the District of Columbia, where the conduct at issue appears to have primarily occurred. *Cf., e.g.*, *In re Krapacs*, 245 A.3d 959, 959 (D.C. 2021) (per curiam) (noting that District of Columbia disciplinary proceeding had been stayed pending final resolution of disciplinary proceeding in Florida).

Second, in any event, it is unclear whether the District of Columbia disciplinary authorities or this court would be required to give binding effect to any determination that might have been reached in another jurisdiction as to the propriety of Mr. Klayman's conduct. *Cf., e.g.*, *In re Robbins*, 192 A.3d 558, 565-66 & n.7 (D.C. 2018) (per curiam) (declining to give preclusive effect in disciplinary proceedings to determination of Virginia court in Virginia disciplinary proceeding, because, among other things, disciplinary counsel did not participate in Virginia proceeding and Virginia court relied on inferior record).

## VI. Disciplinary Violations

Mr. Klayman challenges the Board's conclusion that he committed numerous disciplinary violations. We agree with the Board that each of the violations at issue was supported by the record.

We "accept the findings of fact made by the Board unless they are unsupported by substantial evidence of record." D.C. Bar R. XI, § 9(h)(1). We review legal conclusions de novo. *In re Cleaver-Bascombe*, 892 A.2d 396, 401-02 (D.C. 2006).

## A.  Credibility

Most broadly, Mr. Klayman takes issue with the decision of the Hearing Committee and the Board to largely credit E.S.'s testimony rather than that of Mr. Klayman. We are required, however, to "place great weight on credibility determinations made by the Board and the Hearing Committee because of the Hearing Committee's unique opportunity to observe the witnesses and assess their demeanor." *In re Pearson*, 228 A.3d at 423 (internal quotation marks omitted). We see no adequate basis upon which to overturn the credibility determinations made by the Hearing Committee and the Board.

It is true that E.S.'s testimony on various issues was impeached or contradicted by other evidence. For example, although E.S. testified that she wanted to limit the publicity surrounding her case, there was evidence that she ultimately

agreed to publicity and even in one instance publicly distributed information about the case.  E.S. also testified that she was opposed to the suit against the BBG, which is arguably inconsistent with her later decision to personally file a notice of appeal after the case was dismissed.  It is also true, however, that Mr. Klayman's testimony was impeached and contradicted on critical points.  For example, Mr. Klayman testified that he had no romantic intentions toward E.S., but the record contains numerous emails from him where he declared that he was in love with E.S., going so far as to state that she was "the only woman [he had] ever really loved."  Similarly, Mr. Klayman testified that he was representing E.S. pro bono and did not have a fee arrangement with her.  In an email to E.S., however, Mr. Klayman said that "50 percent of any recovery is fair and that is what I require."

We conclude that the Hearing Committee and the Board acted reasonably by choosing to largely credit E.S.'s testimony over that of Mr. Klayman.

## B.  Specific Rule Violations

Many of Mr. Klayman's challenges to the findings of specific rule violations rest on Mr. Klayman's version of the facts.  As we have explained, however, we must accept the factual findings of the Hearing Committee and the Board if those

20

findings are "supported by substantial evidence in the record as a whole." *In re Godette*, 919 A.2d 1157, 1163 (D.C. 2007). That is true even if "there might also be substantial evidence to support a contrary finding." *Id.* (internal quotation marks omitted). Having reviewed the record, we conclude that substantial evidence supports the Board's conclusion that Mr. Klayman violated the rules at issue.

## 1. Conflict of Interest

The Board concluded that Mr. Klayman violated D.C. R. Prof. Cond. 1.7(b)(4) by representing E.S. when his professional judgment was adversely affected by his personal interest in E.S. The record amply supports that conclusion.

Whether or not his feelings for E.S. were sexual or romantic in nature, Mr. Klayman indisputably had strong feelings for E.S. For example, he wrote that he had "fall[en] in love with [E.S.]," would always love her, and was "feeling real pain" because she did not share his feelings. Additionally, Mr. Klayman sent emails acknowledging that his feelings for E.S. interfered with his ability to represent her. For example, he wrote that his own "emotions [had] rendered [him] non-functional even as a lawyer." The record thus supports the Hearing Committee's conclusion,

echoed by the Board, that Mr. Klayman had strong feelings for E.S. and that those feelings created a conflict of interest in violation of Rule 1.7(b)(4).

As Mr. Klayman suggests, some potential conflicts of interest can be waived if the client provides informed consent.  D.C. R. Prof. Cond. 1.7(c)(1).  Even if the client consents, however, the lawyer must "reasonably believe[] that the lawyer will be able to provide competent and diligent representation" to the client.  D.C. R. Prof. Cond. 1.7(c)(2).  In light of his own statements, Mr. Klayman could not have reasonably believed that his professional judgment was unimpaired and that he could provide competent and diligent representation.  Moreover, the record supports the conclusion that Mr. Klayman's feelings for E.S. did adversely affect his representation of E.S.  For example, E.S. testified that she terminated Mr. Klayman's representation in part because he was not able to act professionally towards her and his contacts with her had become abusive.  We therefore agree with the Board that Mr. Klayman's representation of E.S. while he had strong personal feelings towards her violated the rule.

## 2.  Failure to Abide by Client's Wishes

D.C. R. Prof. Cond. Rule 1.2(a) requires a lawyer to "abide by a client's decisions concerning the objectives of representation" and to "consult with the client as to the means by which they are to be pursued."  The Board concluded that Mr. Klayman violated this rule in two ways: by seeking publicity contrary to E.S.'s wishes and by refusing to dismiss the BBG lawsuit as E.S. directed.  We agree with the Board's conclusion on the latter point and therefore see no need to address the first.

Mr. Klayman argues that by not dismissing the entirety of the suit against BBG he was abiding by E.S.'s stated wishes.  That argument is contradicted, however, by the plain language of E.S.'s July 2010 email, which directed Mr. Klayman to "withdraw all the pending lawsuits that are on my behalf and/or in my name."  Mr. Klayman also argues that he did not believe the letters instructing him to dismiss the BBG case and cease representation of E.S. reflected E.S.'s true wishes, pointing to the fact that E.S. ultimately appealed the trial court's decision in the BBG case.  E.S.'s later appeal is not necessarily inconsistent with her desiring to dismiss the case at the time she instructed Mr. Klayman to do so.  Moreover, the Hearing

Committee reasonably did not credit Mr. Klayman's claim that he did not believe

that the direction to dismiss the case was from E.S.

### 3.  Revealing and Using Client Secrets

The Board concluded that Mr. Klayman violated D.C. R. Prof. Cond. 1.6(a)(1)

(revealing client confidence or secret) and (a)(3) (using client confidence or secret

for advantage of lawyer).  Specifically, the Board concluded that Mr. Klayman's

publicity campaign resulted in the public disclosure of confidential information

about E.S. and that Mr. Klayman had not obtained informed consent from E.S.  The

Hearing Committee concluded that those disclosures were for Mr. Klayman's own

advantage because the publicity lauded Mr. Klayman's own actions in handling

E.S.'s cases, raising Mr. Klayman's professional profile.

Mr. Klayman argues that E.S. eventually consented to the publicity about her

cases and her personal life.  *See* D.C. R. Prof. Cond. 1.6(e)(1) (permitting disclosure

of client confidence or secret with client's informed consent).  Even assuming that

is true, the Hearing Committee and the Board both concluded that E.S. did not give

informed consent, but rather acquiesced in Mr. Klayman's views on the topic

24

without having the benefit of adequate advice from Mr. Klayman. We conclude that the record supports those conclusions. *See generally* D.C. R. Prof. Cond. R. 1.0(e) ("'Informed Consent' denotes the agreement by a person to a proposed course of conduct after the lawyer has communicated adequate information and explanation about the material risks of and reasonably available alternatives to the proposed course of conduct."). We also note that several of the articles that Mr. Klayman wrote were published after July 2010, when E.S. terminated Mr. Klayman's representation. We agree with the Hearing Committee that Mr. Klayman did not have E.S.'s informed consent to such publication, because E.S. had by that point terminated Mr. Klayman's representation of her.

Mr. Klayman notes that he attempted to provide the Board with a video that he contends showed that E.S. was trying to publicize her claims. The Board refused to consider that video, because the motion bringing the video to the Board's attention was received after the Board's recommendation was pending in this court. Although Mr. Klayman argues in passing that the Board's ruling on this issue was incorrect, he does not address the Board's reasoning or provide a specific argument as to why the Board's ruling was incorrect under applicable principles of law. Because this issue has not been adequately presented for our review, we decline to address it. *See PHCDC1, LLC v. Evans & Joyce Willoughby Trust*, 257 A.3d 1039, 1043 (D.C.

25

2021) ("[Appellant], however, has not briefed that issue with adequate specificity, having failed to identify specific disputes of fact or issues of law that support reversal of the trial court's ruling.").

### 4.  Explaining Matters to Client

The Board concluded that Mr. Klayman violated D.C. R. Prof. Cond. 1.4(b), which requires a lawyer to "explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation."  As previously noted, the Board reasoned that Mr. Klayman's barrage of communications with E.S. about his feelings for her were not "the kind of communication . . . that a client ought to receive from her lawyer" and "drowned out" any legitimate communications about E.S.'s case.

Mr. Klayman challenges the Board's reasoning, but we need not resolve that issue.  The Hearing Committee based its conclusion of a Rule 1.4(b) violation on specific instances in which the Hearing Committee found that Mr. Klayman did not consult with E.S. before taking important steps in the litigation, including filing the motion to disqualify the district-court judge.  The record supports that conclusion.

## 5.  Absence of Written Fee Agreement

The Board concluded that Mr. Klayman violated D.C. R. Prof. Cond. 1.5(c) (requiring written fee agreement in contingent-fee case).  Specifically, the Board credited E.S.'s testimony that there was a contingent fee agreement between Mr. Klayman and E.S.

Mr. Klayman disputes the existence of a contingent fee agreement, relying on his own testimony.  The Board, however, reasonably credited E.S.'s testimony over Mr. Klayman's on this point, particularly given the email that Mr. Klayman sent demanding a contingent fee.

The Board noted that Mr. Klayman did not appear to contest the Hearing Committee's determination that Mr. Klayman violated D.C. R. Prof. Cond. 1.5(b), by failing to obtain a written agreement memorializing the terms of the representation.  The Board, however, did not explicitly state its own conclusion on that issue.  Although Mr. Klayman does not appear to specifically dispute in this court that he violated R. 1.5(b), we see no need to address that issue given the other violations that we uphold.

### 6. Failure to Cease Representation

Finally, the Board concluded that Mr. Klayman violated D.C. R. Prof. Cond. 1.16(a)(3) (lawyer shall withdraw when discharged). Mr. Klayman himself acknowledges that he continued to take action in E.S.'s case even after she discharged him as her lawyer. Mr. Klayman argues that he did not receive some of the communications in which E.S. terminated his representation, but he concededly received at least one. Mr. Klayman also argues that he did not believe that E.S. actually wanted him to stop representing her, and instead believed that the communication at issue was actually sent by someone else. The Hearing Committee reasonably declined to credit this argument, finding that Mr. Klayman was aware of his termination by August 5, 2010, at the latest.

In sum, we accept the Board's conclusions that Mr. Klayman violated Rules 1.2(a), 1.4(b), 1.5(c), 1.6(a)(1), 1.6(a)(3), 1.7(b)(4), and 1.16(a)(3).

### VII. Sanction

Mr. Klayman challenges the Board's recommended sanction of an eighteen-month suspension with a fitness requirement. When determining the appropriate

28

sanction, we "adopt the recommended disposition of the Board unless to do so would foster a tendency toward inconsistent dispositions for comparable conduct or would otherwise be unwarranted." D.C. Bar R. XI, § 9(h)(1) (internal quotation marks omitted). "The Board's recommended sanction comes to us with a strong presumption in favor of its imposition." *In re McClure*, 144 A.3d 570, 572 (D.C. 2016) (per curiam) (internal quotation marks omitted). "To require proof of fitness as a condition of reinstatement after suspension, the record in the disciplinary proceeding must contain clear and convincing evidence that casts a serious doubt upon the attorney's continuing fitness to practice law." *In re Peters*, 149 A.3 253, 260 (D.C. 2016) (per curiam) (internal quotation marks omitted).

Mr. Klayman challenges the proposed sanction in two ways. First, he argues that the record does not support the proposed sanction because the record does not support the findings of misconduct. For the reasons we have already given, we conclude to the contrary.

Second, Mr. Klayman argues that the imposition of a fitness requirement would be at odds with our decision in *In re Klayman*, 228 A.3d 713 (D.C. 2020) (per curiam). In that case, this court concluded that Mr. Klayman violated D.C. R. Prof. Cond. 1.9, which generally prohibits conflicts of interest involving former clients.

*In re Klayman*, 228 A.3d at 715-19.  Specifically, the court concluded that Mr. Klayman acted impermissibly, and vindictively, by representing parties in suits brought against an organization where Mr. Klayman had previously served as general counsel.  *Id.*  The court imposed a ninety-day suspension but accepted the Board's recommendation against imposition of a fitness requirement.  *Id.* at 719. The court explained that the disciplinary violations in that case, though serious, did not leave the court "with serious doubt or real skepticism that Mr. Klayman can practice ethically."  *Id.* (brackets and internal quotation marks omitted).  The court's holding in that case rested on the record and disciplinary violations in that case.  That conclusion sheds no significant light on the question of whether the record and disciplinary violations in this case warrant a fitness requirement.  We agree with the Board that Mr. Klayman's many serious disciplinary violations in this case warrant the imposition of a fitness requirement.

## VIII.  Failure to File § 14(g) Affidavit

Finally, Mr. Klayman argues that he had no duty to file an affidavit attesting to his compliance with the rules governing suspended attorneys.  D.C. Bar R. XI, § 14(g).  Specifically, Mr. Klayman contends that a § 14(g) affidavit is only required after a final disciplinary order.  We disagree.  As previously noted, D.C. Bar R. XI,

§ 9(g)(4) explicitly states that an attorney temporarily suspended pending final action by the court must comply with the requirements of § 14.

For the foregoing reasons, respondent Larry E. Klayman is hereby suspended from the practice of law in the District of Columbia for eighteen months, with reinstatement conditioned on demonstrating fitness to practice law.  We note that Mr. Klayman could not be reinstated until eighteen months after he "files an affidavit that fully complies with the requirements of D.C. Bar R. XI, § 14(g)."  *In re Moats*, 275 A.3d 890, 891 (D.C. 2022) (per curiam); D.C. Bar R. XI, § 16(c) ("[A] suspended attorney shall not be eligible for reinstatement until a period of time equal to the period of suspension shall have elapsed following the attorney's compliance with section 14 . . . .").

*So ordered.*

# EXHIBIT L



# GEORGETOWN LAW

**Abbe Smith**
Professor of Law

February 20, 2017

Office of Disciplinary Counsel
Board on Professional Responsibility
District of Columbia Court of Appeals
515 5th Street NW
Building A, Suite 117
Washington, DC 20001

To the Office of Disciplinary Counsel:

Please be advised that the below signed law professors, all of whom teach courses relating to legal ethics, are hereby filing a disciplinary complaint against District of Columbia bar member Kellyanne Conway, currently listed as a member of the bar under her name before marriage, Kellyanne E. Fitzpatrick,[1] under DC Rule of Professional Conduct 8.4(c) [hereinafter DC Rules].

As Rule 8.4(c) states, "It is professional misconduct for a lawyer to [e]ngage in conduct involving dishonesty, fraud, deceit, or misrepresentation." This is an admittedly broad rule, as it includes conduct outside the practice of law and, unlike 8.4(b), the conduct need not be criminal. We are mindful of the Rule's breadth and aware that disciplinary proceedings under this Rule could lead to mischief and worse. Generally speaking, we do not believe that lawyers should face discipline under this Rule for public or private dishonesty or misrepresentations unless the

---

[1] Ms. Conway, née Fitzpatrick, was admitted to the DC bar on January 19, 1995 and is currently suspended for nonpayment of dues. Presumably, if she resumes payment she would be readmitted.

lawyer's conduct calls into serious question his or her "fitness for the practice of law," DC Rule 8.4, Comment 1, or indicates that the lawyer "lacks the character required for bar membership." DC Bar, Ethics Opinion 323, *Misrepresentation by an Attorney Employed by a Government Agency as Part of Official Duties*, at https://www.dcbar.org/bar-resources/legal-ethics/opinions/opinion323.cfm.

However, we believe that lawyers in public office—Ms. Conway is Counselor to the President—have a higher obligation to avoid conduct involving dishonest, fraud, deceit, or misrepresentation than other lawyers.  Although the DC Rules contain no Comment specifically relating to 8.4(c), the American Bar Association's Model Rules of Professional Conduct (MR) make this point. MR 8.4(c), Comment 7 states that "Lawyers holding public office assume legal responsibilities going beyond those of other citizens.  A lawyer's abuse of public office can suggest an inability to fulfill the professional role of lawyers."  *Cf.* DC Rule 1.11 (on the special conflict of interest rules for lawyers who have served in government).

It is not surprising that the Model Rules distinguish lawyers in public office from other lawyers. The ABA knows well the history of professional responsibility as an academic requirement in American law schools: following the Watergate scandal, which involved questionable conduct by a number of high-ranking lawyers in the Nixon administration, the ABA mandated that law students take such a course in order to graduate.

Some of the signers of this complaint practice in the District of Columbia and/or are members of the DC Bar.  We feel compelled to file such a complaint under DC Rule 8.3(a), which states that "A lawyer who knows that another lawyer has committed a violation of the Rules of Professional Conduct that raises a substantial question as to that lawyer's honesty, trustworthiness or fitness as a lawyer in other respects, shall inform the appropriate professional authority."

Those of us who do not practice in DC are members of other state and federal bars.  We all believe it is critically important that lawyers in public office—especially those who act as spokespersons for the highest levels of government—be truthful.

The DC Bar has issued an Ethics Opinion on lawyers working in government in a non-representational capacity that supports this complaint.  *See generally* Ethics Opinion 323, *Misrepresentation by an Attorney Employed by a Government Agency as Part of Official Duties*, https://www.dcbar.org/bar-resources/legal-ethics/opinions/opinion323.cfm.  In addressing an inquiry about attorneys employed by an intelligence or national security agency who engage in clandestine activities, the Opinion distinguishes those government officials whose official duties require them to "act deceitfully" from other lawyers in government.  Though the Opinion finds lawyers "whose duties require the making of misrepresentations as authorized by law as part of their official duties" do not violate Rule 8.4(c), the drafters emphasize the Opinion's narrow scope: it applies "only to misrepresentations made in the course of official conduct when the employee…reasonably believes that applicable law authorizes the misrepresentations."

Significantly, for purposes of this complaint, Ethics Opinion 323 makes plain that its conclusion in the above narrow context does not provide "*blanket permission for an attorney employed by government agencies to misrepresent themselves*." [Emphasis added]  The drafters further explain:

> Nor does [the Opinion] authorize misrepresentation when a countervailing legal duty to give truthful answers applies…. And, of course, this opinion does not authorize deceit for non-official reasons, or where an attorney could not, objectively have a reasonable belief that applicable law authorizes the actions in question.

Ms. Conway's misconduct under DC Rule 8.4(c) is as follows:

- On several occasions, including in an interview on MSNBC in early February, 2017, Ms. Conway referred to the "Bowling Green Massacre" to justify President Donald Trump's executive order banning immigrants from seven overwhelmingly Muslim countries.  Not only was there no "massacre" in Bowling Green, Kentucky (or Bowling Green, New York, for that matter), but Ms. Conway knew there was no massacre.  Although Ms. Conway claimed it was a slip of the tongue and apologized, her actual words belie her having misspoken: "I bet it's brand-new information to people that President Obama had a six-month ban on the Iraqi refugee program after two Iraqis came here to this country, were radicalized, and were the masterminds behind the Bowling Green Massacre.  Most people don't know that because it didn't get covered."  *See generally* Clare Foran, *The Bowling Green Massacre that Wasn't*, THE ATLANTIC, February 3, 2017, at https://www.theatlantic.com/politics/archive/2017/02/kellyanne-conway-bowling-green-massacre-alternative-facts/515619/.  Moreover, she cited the nonexistent massacre to media outlets on at least two other occasions.  *See* Aaron Blake, *The Fix: Kellyanne Conway's 'Bowling Green Massacre' wasn't a slip of the tongue. She has said it before*. WASH. POST, February 6, 2017, at https://www.washingtonpost.com/news/the-fix/wp/2017/02/06/kellyanne-conways-bowling-green-massacre-wasnt-a-slip-of-the-tongue-shes-said-it-before/?utm_term=.b2de9c3f0582.

- Compounding this false statement, in that same MSNBC interview Ms. Conway also made a false statement that President Barack Obama had "banned" Iraqi refugees from coming into the United States for six months following the "Bowling Green Massacre." *Id.*  However, President Obama did not impose a formal six-month ban on Iraqi refugees.  He ordered enhanced screening procedures following what actually happened in Bowling Green—the arrest and prosecution of two Iraqis for attempting to send weapons and money to al-Qaeda in Iraq.  The two men subsequently pled guilty to federal terrorism charges and were sentenced to substantial prison terms.  *See* Glenn Kessler, *Fact Checker: Trump's facile claim that his refugee policy is similar to Obama's in 2011*, WASH. POST, January 29, 2017, at https://www.washingtonpost.com/news/fact-checker/wp/2017/01/29/trumps-facile-claim-that-his-refugee-policy-is-similar-to-obama-in-2011/?utm_term=.87f35b046de2.

- This was not the first time Ms. Conway had engaged in conduct involving "dishonesty, fraud, deceit, or misrepresentation." On January 22, 2017, on the NBC television show *Meet the Press*, Ms. Conway said that the White House had put forth "alternative facts" to what the news media reported about the size of Mr. Trump's inauguration crowd. She made this assertion the day after Mr. Trump and White House press secretary Sean Spicer accused the news media of reporting falsehoods about the inauguration and Mr. Trump's relationship with intelligence agencies. *See* Nicholas Fandos, *White House Pushes 'Alternative Facts.' Here are the Real Ones.* N.Y. TIMES, January 22, 2017, at https://www.nytimes.com/2017/01/22/us/politics/president-trump-inauguration-crowd-white-house.html. As many prominent commentators have pointed out, the phrase "alternative facts" is especially dangerous when offered by the President's counselor. Moreover, "alternative facts' are not facts at all; they are *lies*. Charles M. Blow, *A Lie by Any Other Name*, N.Y. TIMES, January 26, 2017, at https://www.nytimes.com/2017/01/26/opinion/a-lie-by-any-other-name.html.

- Ms. Conway has also misused her position to endorse Ivanka Trump products on February 9, 2017 in an interview on Fox News from the White House briefing room with the White House insignia visible behind her. While this conduct does not fall within DC Rule 8.4, it is a clear violation of government ethics rules, about which a *lawyer* and member of the Bar should surely know. Federal rules on conflicts of interest specifically prohibit using public office "for the endorsement of any product, service or enterprise, or for the private gain of friends, relatives or persons with whom the employee is affiliated in a nongovernmental capacity." The government's chief ethics watchdog denounced Conway's conduct in a letter to the White House. Richard Perez Pena, *Ethics Watchdog Denounces Conway's Endorsement of Ivanka Trump Products*, N.Y. TIMES, February 14, 2017, at https://www.nytimes.com/2017/02/14/us/politics/Kellyanne-Conway-ivanka-trump-ethics.html. *See also* DC Rule 1.11, Comment 2 (noting that, in addition to ethical rules, lawyers are subject to statutes and regulations concerning conflict of interest and suggesting that, given the many lawyers who work in the federal or local government in the District of Columbia, "particular heed must be paid to the federal conflict-of interest statutes.")

We do not file this complaint lightly. In addition to being a member of the DC Bar, Ms. Conway is a graduate of the George Washington University Law School, one of the District's premier law schools. We believe that, at one time, Ms. Conway, understood her ethical responsibilities as a lawyer and abided by them. But she is currently acting in a way that brings shame upon the legal profession. As the Preamble to the Model Rules states, a lawyer plays an important role as a "public citizen" in addition to our other roles.

If Ms. Conway were not a lawyer and was "only" engaging in politics, there would be few limits on her conduct outside of the political process itself.  She could say and do what she wished and still call herself a politician.  But she is a lawyer.  And her conduct, clearly intentionally violative of the rules that regulate her professional status, cries out for sanctioning by the DC Bar.

Respectfully submitted,

John Bickers
Professor of Law
Northern Kentucky University

Susan Brooks
Professor of Law
Drexel University

Lawrence Fox
Visiting Lecturer in Law
Yale Law School

Bennett Gershman
Professor of Law
Pace University

Justin Hansford
Associate Professor of Law
Saint Louis University

Vida Johnson
Visiting Professor of Law
Georgetown University

Jennifer Kinsley
Associate Professor of Law
Northern Kentucky University

Catherine Klein
Professor of Law
Catholic University

William Montross
Visiting Professor of Law
University of the District of Columbia

Russell Pearce
Professor of Law
Fordham University

Ilene Seidman
Professor of Law
Suffolk University

David Singleton
Associate Professor of Law
Northern Kentucky University

Abbe Smith
Professor of Law
Georgetown University

Michael Tigar
Professor of Law Emeritus
American University
Duke University

Ellen Yaroshefsky
Professor of Law
Hofstra University

# EXHIBIT M

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SANDRA GARZA, individually and as<br>the personal representative<br>of THE ESTATE OF BRIAN SICKNICK[1] | )<br>)<br>) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| DONALD J. TRUMP | ) |
| (in his personal capacity) | ) |
| The Mar-A-Lago Club | ) |
| 1100 S. Ocean Blvd. | ) Case No. 23-_____ |
| Palm Beach, Florida 33480 | ) |
| | ) |
| and | ) |
| | ) |
| JULIAN ELIE KHATER | ) |
| [Address withheld] | ) |
| | ) |
| and | ) |
| | ) |
| GEORGE PIERRE TANIOS | ) |
| [Address withheld] | ) |
| | ) |
| Defendants. | ) |
| | ) |

## COMPLAINT
### (JURY TRIAL DEMANDED)

1.      The peaceful transfer of power is a sacrament of American democracy.

Defendant Donald Trump ("Trump"), together with other co-conspirators, defiled that orderly

transition through a campaign of lies and incendiary rhetoric which led to the ransacking of the

United States Capitol as part of an insurrectionist effort on January 6, 2021 by Defendants Julian

---

[1] Pursuant to LCvR 5.1(c)(1), as revised March 23, 2022, the Plaintiff's address, as well as the two individual criminal defendants, is being filed under seal with the Court in a separate Notice of Filing.

Khater ("Khater") and George Tanios ("Tanios"), and many others. That attack on the United States Capitol cost U.S. Capitol Officer Brian Sicknick ("Officer Sicknick"), who was bravely defending the cradle of American Democracy, his life.

2.     Although it is beyond question Defendant Trump lost the 2020 presidential election, he still remains unwilling to accept defeat. He lied to his followers by, among other things, telling them that the certification of Joe Biden's election was a "coup" and that their country was being stolen from them. He filed dozens of frivolous lawsuits, all of which substantively failed. And he tried to intimidate state officials, none of whom caved to the pressure. Out of options and out of time, Defendant Trump finally called his supporters to Washington, D.C. on the day Congress met to certify President-elect Biden's win, telling them to "Stop the Steal" and that the day "will be wild." Tens of thousands of his supporters came to the District in response, including Defendants Khater and Tanios. Some, including Defendants Khater and Tanios, planned violence at the U.S. Capitol in advance; some were stirred to violence by Defendant Trump's words on that day.

3.     Defendant Trump implored the crowd to "fight like hell" and "walk down Pennsylvania Avenue . . . to the Capitol." According to an analysis of cell phone location data, approximately 40% of the rally attendees did just that.[2]

4.     As a direct and foreseeable consequence of Defendant Trump's false and incendiary allegations of fraud and theft, and in direct response to Defendant Trump's express calls for violence at the rally, a violent mob attacked the U.S. Capitol. Many participants in the attack have since revealed that they were acting on what they believed to be Defendant Trump's direct orders in service of their country.

---

[2] *https://www.nytimes.com/2021/02/05/opinion/capitol-attack-cellphone-data.html*.

5.      The mob temporarily disrupted the certification of the vote in the Electoral College.  Rioters threatened to hang Vice President Mike Pence and kill the Speaker of the House, Nancy Pelosi, and they terrorized and injured scores of others, including Officer Sicknick.

6.      As Officer Sicknick and hundreds of others—including other police officers, elected officials, and rank-and-file workers at the U.S. Capitol—were put in mortal danger, and as the seat of American Democracy was desecrated by the insurgent mob, Defendant Trump watched the events unfold on live television from the safety of the White House.  Those with knowledge claimed that during this moment of national horror, Defendant Trump was "delighted" and was "confused about why other people on his team weren't as excited as he was."  Others described Defendant Trump as "borderline enthusiastic" about the unfolding violence.

7.      The horrific events of January 6, 2021, including Officer Sicknick's tragic, wrongful death, were a direct and foreseeable consequence of the Defendants' unlawful actions.  As such, the Defendants are responsible for the injury and destruction that followed.

## I.
## PARTIES

8.      Plaintiff Sandra Garza is the personal representative for the Estate of Brian Sicknick.

9.      Defendant Trump was the 45th President of the United States.  He has a lengthy history of normalizing violence through his rhetoric and social media communications.  After losing the 2020 presidential election to now-President Biden, Defendant Trump and others conspired to undermine the election results by alleging, without evidence, that the election had

been rigged and by pressuring elected officials, courts, and ultimately Congress to reject the results.

10.     Defendant Trump also promoted and spoke at the January 6, 2021 ("January 6th"), rally outside the White House— the culmination of a coordinated effort to subvert the certification vote.  He called upon his followers—including Defendants Khater and Tanios—to come to Washington, D.C. on January 6th, and he encouraged them to then go to the U.S. Capitol to "fight like hell."  Defendant Trump directly incited the violence at the U.S. Capitol that followed and then watched approvingly as the building was overrun.

11.     Defendant Trump did all these things solely in his personal capacity for his own personal benefit and/or his own partisan aims.

12.     Defendants Khater and Tanios live in Somerset, New Jersey and Morgantown, West Virginia, respectively.

13.     On July 20, 2022, Defendant Tanios pled guilty to Entering and Remaining in a Restricted Building or Grounds in violation of 18 U.S.C. § 1752(a)(2) and (b)(2).  In his factual proffer, Defendant Tanios admitted to accompanying Defendant Khater to the January 6th rally in D.C. and admitted to purchasing and carrying the bear spray Defendant Khater used on Officer Sicknick. Per his plea agreement, Defendant Tanios faces a recommended sentence of 0 – 6months in prison.

14.     On August 26, 2022, Defendant Khater pled guilty to Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon (namely, bear spray), in violation of 18 U.S.C. § 111(a)(1) and (b).  Officer Sicknick was one of the officers Defendant Khater admitted he assaulted as a part of his guilty plea. Per his plea agreement, Defendant Khater likely faces between 78 – 97 months in prison.

15.     Both men are scheduled to be sentenced by the end of January 2023 or February 2023.

## II.
## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction over this case because the Plaintiff's federal conspiracy claim arises under the laws of the United States.  It has jurisdiction over the Plaintiff's state law claims because they are so closely related to the federal claims as to form part of the same case or controversy.  *See* 28 U.S.C. §§ 1331, 1367; 42 U.S.C. § 1985.

17.     This Court has personal jurisdiction over all the Defendants because their actions were committed in the District of Columbia.  *See* Fed. R. Civ. P. 4(k)(1)(A); D.C. Code § 13-423.

18.     Venue is proper in this Court because a substantial part of the conduct giving rise to the claims in the case, including the violent attack on the U.S. Capitol occurred in the District of Columbia. *See* 28 U.S.C. § 1391(b)(2).

## III.
## RELEVANT FACTUAL BACKGROUND

19.     Officer Sicknick joined the U.S, Capitol Police in July 2008 and was a member of that Department's First Responder's Unit.  Before joining the U.S. Capitol Police, Officer Sicknick served in the New Jersey Air National Guard and had deployed overseas in support of U.S. military missions.

20.     On January 5, 2021, Defendant Khater contacted Defendant Tanios just prior to Tanios' purchase of Frontiersman brand bear spray and pepper spray.  Defendant Tanios gave some of the pepper spray to Defendant Khater, which Defendant Khater then carried with him as the two travelled from Morgantown, West Virginia, to Washington, D.C. the next day.

21.     On January 6, 2021, Officer Sicknick was part of a police line guarding the perimeter of the Lower West Terrace of the U.S. Capitol.

22.     Defendants Khater and Tanios were among the people who stormed the U.S. Capitol on January 6, 2021.  In an effort to gain entrance to the building, they confronted law-enforcement officers guarding the Lower West Terrace, including Officer Brian Sicknick. Defendants Khater and Tanios assaulted officers with their hands and feet.  From less than 8 feet away, Defendant Khater sprayed Officer Sicknick in the face with the bear spray provided by Defendant Tanios.

**Defendant Trump's Deliberate Efforts to Undermine the Election Results**

23.     Months before a single poll had opened for the 2020 election, Defendant Trump began accusing Democrats of trying to "steal the election," calling the lawful state decisions about how to conduct an election in the midst of a world-wide pandemic—supervised, where appropriate, by the courts—"the scandal of our times":



24.     Democrats more so than Republicans chose to vote by mail given the starkly partisan views of the Covid-19 pandemic.  Where most Republican leaders urged supporters to vote in person, Democratic leaders sought to prioritize safety and social-distancing and encouraged people to vote by mail.  Mail-in ballots were often counted much later than in-person ballots.  Of the battleground states that largely decided the 2020 election—Pennsylvania, Wisconsin, Michigan, Ohio, Georgia, Nevada, and Arizona—Pennsylvania and Wisconsin do

not begin *processing* mail-in ballots until election day, and only Arizona and Nevada began

*counting* mail-in ballots earlier than election day.

     25.    While Defendant Trump led in the early returns on election day, toward the end of

that day, the returns moved in Biden's direction, as most pundits and analysts had predicted, and

Defendant Trump's lead substantially dwindled.  As his outlook soured over this news,

Defendant Trump renewed his claims of voter fraud.

     26.    At 12:49 a.m., on November 4, Defendant Trump took to Twitter to accuse

unnamed individuals from attempting to steal his victory.



     27.    A little more than an hour later, in televised remarks from the East Room of the

White House, Defendant Trump accused a "very sad group of people" of "trying to

disenfranchise" the millions of people who had voted for him.

     28.    Later in the day, Defendant Trump doubled down on his claims of fraud, falsely

declaring victory in the battlegrounds of Pennsylvania, Georgia, North Carolina, and Michigan,

even as hundreds of thousands of votes in those states were still being counted and the polls were

showing an increasing advantage for Biden, who eventually won three of these four states

(Pennsylvania, Michigan, and Georgia).

     29.    The following morning, November 5, less than 48 hours after the polls had closed,

Defendant Trump tweeted "Stop the Count" and "Stop the Fraud,"; slogans that were frequently

repeated throughout the day on January 6th prior to and during the attack on the U.S. Capitol.



30.     Defendant Trump gave his first prime-time speech after the election from the White House in the evening of November 4.  He opened his remarks to the nation with the false assertion "If you count the legal votes, I easily win.  If you count the illegal votes, they can try to steal the election from us."  He echoed that sentiment on Twitter shortly thereafter:

Donald J. Trump
@realdonaldtrump

*I easily WIN the Presidency of the United States with LEGAL VOTES CAST. The OBSERVERS were not allowed, in any way, shape, or form, to do their job and therefore, votes accepted during this period must be determined to be ILLEGAL VOTES. U.S. Supreme Court should decide!*

Nov 6th 2020 - 2:22:47 AM EST · Twitter for iPhone · View on Twitter

31.     Defendant Trump's allegations of wrongdoing in those first days after the election

sparked confrontations nationwide between his supporters and election officials:



32.     It did not take long for Defendant Trump to begin directing his criticisms at

individual elected officials.  His supporters, in turn, began targeting those officials for

harassment and threats.  For example, armed supporters of Defendant Trump who were

encouraged by him actually surrounded the home of the Michigan Secretary of State, while

Trump-supporting militias demanded a "citizen tribunal" at the Georgia Capitol.

33.     President Biden won the states of Arizona and Georgia.  Yet, in the first half of

December, Defendant Trump attacked the Republican governors of these states and accused

9

them of "fight[ing] harder against us than do the Radical Left Dems." He lamented their lack of

fealty to him, stating if these governors "were with us, we would already have won both Arizona

and Georgia":



34.     Defendant Trump also attempted to pressure state electors to improperly overturn

the election results in their states. He directed particular attention to officials in Michigan,

Pennsylvania, and Georgia. He personally attempted to cajole these officials to overturn the

election results and directed his followers to intimidate these perceived adversaries.

**Michigan**

35.     In November 2020, bipartisan election officials in Wayne County, Michigan

unanimously certified the election results for President Biden. Defendant Trump then tried to

pressure two Republican members of that board to change their minds. In response, these two

officials in fact tried—unsuccessfully—to rescind their votes certifying the election results for Biden.

36.     Defendant Trump next contacted Michigan Senate Majority Leader Mike Shirkey and Speaker of the Michigan House of Representatives Lee Chatfield.  Defendant Trump likewise pressured them to overturn Michigan's election results, even inviting them to the White House to discuss Defendant Trump's plans.  Those efforts, too, proved unsuccessful.

37.     Undeterred, Defendant Trump falsely declared on December 5, 2021, "You know I won almost every county in Michigan, almost every district.  We should have won that state very easily.  We have a similar type of governor I think but I'll let you know that in about a week."

38.     In what should have been an obvious sign of the risk inflammatory language could pose, some of Defendant Trump's followers heard his claims as a directive to act.  And they responded.  A large group of armed protestors convened at the home of the Michigan Secretary of State chanting, "Stop the steal!" and, "You're a threat to our democracy!" and, "You're a threat to a free and honest election!"  The protestors made explicit demands that she overturn the state's election results.

39.     Defendant Trump's efforts to overturn the election results in Michigan were unsuccessful.

40.     There were no election irregularities in Michigan sufficient to change the final Presidential vote count in that state.  Joe Biden won the Presidential vote in Michigan.

### Pennsylvania

41.     Defendant Trump also attempted to interfere with officials in Pennsylvania. Defendant Trump contacted Pennsylvania State Senate Majority Leader Kim Ward and

Pennsylvania Speaker of the House of Representatives Brian Cutler.  Defendant Trump directly and falsely told Senator Ward "There was fraud in the voting."

42.     On November 25, 2020, Defendant Trump participated by phone in a Pennsylvania State Republican Senate policy hearing and attempted to convince the state legislators that there had been massive fraud in the Commonwealth's voting.  Defendant Trump spoke directly to the lawmakers, telling them, "This election has to be turned around."  He further falsely claimed that he had won Pennsylvania and other swing states "by a lot."

43.     As he had in Michigan, Defendant Trump invited Republican members of the Pennsylvania legislature to the White House to pressure them to overturn the Commonwealth's election results.

44.     Defendant Trump's efforts to overturn the results in Pennsylvania were unsuccessful.

45.     There were no election irregularities in Pennsylvania sufficient to change the final Presidential vote tally.  Joe Biden won the Presidential vote in Pennsylvania.

### **Georgia**

46.     Defendant Trump went to extraordinary lengths to overturn the election results in Georgia, a reliably Republican stronghold for decades that Defendant Trump believed was in unprecedented jeopardy.  After Secretary of State Bradford Raffensperger ("Raffensperger") stated his belief that the state's election results in favor of President Biden were accurate, Defendant Trump lashed out at him.  He called Raffensperger an "enemy of the people" and directed at least 17 tweets at him, referring to him as a "disaster," "obstinate," and a "so-called 'Republican[].'"

12

47.     In what should have been another warning to Defendant Trump about the impact of his words, some of Defendant Trump's followers responded to the claims of fraud and Defendant Trump's personal attacks on Raffensperger by targeting the Secretary and his family with violent threats.  His wife was told, "Your husband deserves to face a firing squad." Raffensperger was told, "You better not botch this recount . . . your life depends on it" and that he and his family "should be put on trial for treason and face execution."

48.     In December 2020, Defendant Trump pressured Georgia Governor Brian Kemp to hold a special session of the legislature to appoint electors who would cast electoral votes for Defendant Trump.

49.     That same month, Defendant Trump called the Chief Investigator for the Georgia Bureau of Investigations, which was conducting an audit of signatures on absentee ballots. Defendant Trump implored the investigator to "find the fraud" and told him that he would be a "national hero" if he was successful in doing so.

50.     On January 2, 2021, just days before Congress was set to certify the Electoral College votes, Defendant Trump initiated a conversation with Raffensperger about the alleged massive voter fraud in Georgia.  The next day, Defendant Trump made many misrepresentations about that conversation to sway public opinion, including that Raffensperger had "no clue" about a number of alleged voting irregularities in the state.  The media, however, obtained and released an audio recording of that call.  It showed Defendant Trump browbeating Raffensperger to find enough evidence of fraud to change the state's election result.  Defendant Trump claimed that Raffensperger was aware of election fraud—telling him "you know what they did and you're not reporting it."  Defendant Trump told Raffensperger that he had won the state of Georgia.

Defendant Trump made an explicit request to Raffensperger: "I just want to find 11,780 votes, which is one more than we have."

51.     There were no election irregularities in Georgia sufficient to change the election outcome. Joe Biden won the Presidential vote in Georgia.

**Defendant Trump's Attempts to Challenge the Results in Other States**

52.     In addition to Michigan, Pennsylvania, and Georgia, Defendant Trump took aim at officials in other Republican-led jurisdictions for the same reasons.

53.     Defendant Trump's claims of widespread fraud and election-rigging were rebuked by numerous executive agencies, including the Federal Bureau of Investigation, the Department of Justice, and the Department of Homeland Security. Defendant Trump lashed out at them as well, berating them for their refusal to address "the biggest SCAM in our nation's history." Defendant Trump coupled this message with a call to action on January 6th:



54.     On January 5, 2021, the night before the rally, Defendant Trump tweeted about the thousands of people flooding D.C. who did not want to see the country "stolen" by "Radical Left Democrats:



55.    Then, less than 10 minutes later, he attacked "the weak and ineffective RINO [Republican In Name Only] section of the Republican Party," threatening that the "thousands of people pouring into D.C. … won't stand for a landslide election victory to be stolen":



56.    Defendant Trump's close advisors spearheaded another arm of Defendant Trump's efforts to subvert the election: the numerous challenges in the courts.  On Defendant Trump's behalf, his lawyers eventually filed 62 lawsuits seeking to undo the election results, all in key battleground states.

57.    All but one of those lawsuits were rejected outright.  Judges appointed by Republicans and Democrats—including judges appointed by Defendant Trump himself—determined the claims were baseless.  Judges derided the allegations in these suits as "without merit" and "flat-out wrong."  One judge opined that what would "undermine the public's trust in the election" was not the alleged massive fraud Defendant Trump alleged, but the Court

15

overturning the results of a landslide election based on no evidence of systemic wrongdoing at all:



58.     Focusing on the Defendants' final means of subverting the election—blocking certification of President Biden's victory—Defendant Trump's advisors advanced the argument that Vice President Pence could unilaterally block certification of the Electrical College vote, a position almost universally rejected by legal scholars, and by Vice President Pence himself.

59.     At 6:34 p.m. on January 5, 2021, Defendant Trump's advisor and lawyer Rudolph Giuliani ("Giuliani") tweeted a link to a YouTube video from his show "Common Sense" entitled, "Watch this Before January 6th."  The video purported to explain why it was permissible for Vice President Pence to block certification of the Electoral College vote the next day. Giuliani tweeted a retweet of that post later that night and again the following morning, shortly before Defendant Trump spoke at the rally.

**Defendant Trump's Call to "Be There, will be wild!"**
**Is Understood To Be A Call To Violence**

60.     On December 19, 2020, Defendant Trump promoted a "[b]ig protest on January

6." He told his followers to "Be there, will be wild!":



61.     Particularly considering Defendant Trump's prior directive to a white supremacist

group—the Proud Boys—to "stand by," Defendant Trump's tweet was understood by his

followers to be a call to violence.

62.     For example, within minutes of Defendant Trump's "be wild" tweet, it was shared

on *TheDonald.win* with the title: "Trump Tweet. Daddy Says Be in DC on Jan 6." One user

"EvilGuy," said, in response to Trump's call to action, "I will be open carrying and so will my

friends. We have been waiting for Trump to say the word. There is [sic] not enough cops in DC

to stop what is coming."



63.     Other responses were in a similar vein.  MrMcGreenGenes wrote "Well, shit.

We've got marching orders bois."  ("Bois" is likely a reference to the "Bugaloo Bois" a right-

wing extremist group.)  Buttfart88 similarly understood Defendant Trump's tweet as "marching

orders."

> **- Buttfart88** 25 points 2 hours ago +25 / -0
>
> Trump just finally dropped the marching order at 1:00 in the morning. Holy shit lmao

NamelessKing understood Defendant Trump's tweet as a call to bring weapons to D.C. on the same day Congress was to certify the Electoral College vote:

> **- NamelessKing** 34 points 2 hours ago +35 / -1
>
> "Will Be Wild" is a hidden message for us to be prepared ....as in armed.
>
> could also mean he's posted military in certain places while they all wait for the results to be handed down.

PepeVsCommies took this as signal to use "any means necessary":

> **Protest in DC on Jan 6!!! Let's all turn up and show them they can't steal the election!!! Trump tweets: "Be there, will be wild"**
> posted 1 hour ago by **PepeVsCommies** +118 / -0
>
> WE NEED TO MAKE OUR VOICES HEARD, using any means necessary!!!

Perhaps most tellingly, SWORDofLIBERTY and justinkayz understood Defendant Trump's tweet as a call to do exactly what the rioters did—"burst into [the Capitol] by the thousands."

> **- SWORDofLIBERTY** 2 points 9 hours ago +2 / -0
>
> doesn't matter if they steal the election, if patriots burst into the building by the thousands and cut the heads off the hydra.
>
> They make the wrong choice with thousands of armed pissed patriots outside, they made their choice, and you have to make yours.

> **- justinkayz** 1 point 5 hours ago +1 / -0
>
> Storm the People's House and retake it from the fuckin' commies

Others discussed shooting police officers and bringing weapons.

> – loveshock 3 points 1 hour ago +7 / -4
>
> Cops don't have "standing" if they are laying on the ground in a pool of their own blood.

> – BathouseBarry 2 points 18 minutes ago +2 / -0
>
> And we will be armed, and we won't leave.

64.     Defendant Trump knew that his supporters had interpreted his "will be wild" tweet as a call to violence.

65.     Some of Defendant Trump's supporters engaged with the former president on Twitter about their plans to be a part of his "Cavalry."



66.     Similarly, on Facebook, many people suggested or planned violence on January 6th in response to Defendant Trump's tweet.  For example, one California group built on "Trust, Dedication, and Survival" promoted "Operation Occupy the Capitol" on January 6th and tagged the post #wearethestorm and #1776Rebels:



67.     One conspiracy theorist, also a supporter of Defendant Trump, tweeted that he was ready to die for the former president.  The Arizona Republican Party actually retweeted his message, asking its followers "He is [ready to die for Trump.  Are you?" In response to Defendant Trump's tweets calling people to Washington, D.C. on January 6th, militia groups, including the Oath Keepers and Proud Boys, strategized an assault on the U.S. Capitol by sharing maps of the building and coordinating supplies and outfits to wear.

**Defendant Trump Incites Violence at the Rally**

68.     At 10:00 p.m. on January 5, 2021, Defendant Trump put down his final marker, declaring that Vice President Mike Pence had the authority to overturn the election results and hand him a victory:



69.    Defendant Trump's tweet was intended to convince the tens of thousands of supporters who had traveled to D.C. for the rally that Vice President Pence was uniquely situated to save Defendant Trump's presidency.

70.    By the morning of January 6th, thousands of Trump supporters—including Defendants Khater and Tanios—had flooded Washington, D.C. Many were prepared for violence and had plans to attack the U.S. Capitol. Many more were there for a political rally. The extremists who had been plotting the attack breached the U.S. Capitol as planned. Defendant Trump incited the other attendees to violence, whipping them into a frenzy and turning them into a violent mob that participated in the attack.

71.    The rally began at 7:00 a.m. on January 6, 2021.

72.    The United States Secret Service had erected security checkpoints, including metal detectors, at the entrance points to the rally. Some of Defendant Trump's supporters attempted to bring firearms—specifically AR-15 assault rifles—into the rally with them but were turned away at the checkpoints. When Defendant Trump learned this was happening, he became irate and said "Take the effing [magnetometers] away; I don't care if they have weapons, they're not here to hurt me."

73.     From the time the rally began until shortly after 1:00 p.m., a series of speakers took the stage to lash out against the election results and to demand action by lawmakers.  Each speaker rallied the crowd with incendiary language, telling the crowd that President Biden "did not win this election!"; that "America is at risk unlike it has been in decades, maybe centuries; that "our ancestors sacrificed their blood, their sweat, their tears, their fortunes, and sometimes their lives, to give us, their descendants, an America that is the greatest nation in world history. So I have a question for you:  Are you willing to do the same?  My answer is yes."; and that it was time for "trial by combat."

74.     Defendant Trump, standing backstage, heard each speaker say all those things to the crowd, and heard the crowd cheer in response.

75.     Defendant Trump was the final speaker at the rally.  He began his remarks at approximately 12:00 p.m. and concluded around 1:15 p.m., just after the first coordinated skirmishes between members of the militia groups and U.S. Capitol Police officers were breaking out at the U.S. Capitol.

76.     In his remarks, Defendant Trump said "We took them by surprise and this year, they rigged an election. They rigged it like they've never rigged an election before."

77.     Defendant Trump continued that "Hundreds of thousands of American patriots are committed to the honesty of our elections and the integrity of our glorious Republic.  All of us here today do not want to see our election victory stolen by emboldened radical left Democrats, which is what they're doing and stolen by the fake news media.  That's what they've done and what they're doing. We will never give up."

78.     Defendant Trump also said "We will never concede, it doesn't happen. You don't concede when there's theft involved.  Our country has had enough. We will not take it anymore

23

and that's what this is all about.  To use a favorite term that all of you people really came up with, we will stop the steal."  In referring to "the steal," Defendant Trump meant the certification of Joe Biden as President, which was underway at the U.S. Capitol.

79.      As the crowd chanted "Fight for Trump," Defendant Trump responded, "we will not let them silence your voices.  We're not gonna let it happen."

80.      Defendant Trump gave the people—some of whom he knew had brought firearms and other weapons with them—permission to break the rules; he told them that "[w]hen you catch somebody in a fraud, you're allowed to go by very different rules."

81.      While Defendant Trump was speaking, at around 12:45 p.m., a pipe bomb was found in front of the Republican National Committee headquarters.  A second pipe bomb was found at the Democratic National Committee headquarters about thirty minutes later.  The perpetrator(s) remain at large.

82.      Defendant Trump continued to incite the crowd and concluded his speech by reminding the crowd that they'll "never take back our country with weakness.  You have to show strength, and you have to be strong."  He told the crowd to "walk down Pennsylvania Avenue.  I love Pennsylvania Avenue.  And we're going to the Capitol … But we're going to try and give our Republicans, the weak ones because the strong ones don't need any of our help.  We're going to try and give them the kind of pride and boldness that they need to take back our country."  The crowd cheered in response.



**Violence Starts At The U.S. Capitol**

83.     Defendant Trump put out a clear call to action, and the crowd—including Defendants Khater and Tanios—responded.  As Defendant Trump was instructing them to go to the U.S. Capitol, an early flank of insurgents had already forced their way through barricades and attempted to breach the building, while blasting Defendant Trump's speech on a bullhorn.

84.     The violence escalated quickly after that.  After Defendant Trump's speech ended, insurgents charged the hill surrounding the U.S. Capitol and began scaling the building's outer walls.  Officers reported rioters were attacking them with metal poles.  Law enforcement and local leaders put out calls for help.  Officers called for reinforcements as the mob pulled down the gates erected to protect the U.S. Capitol and attacked officers.

85.      At 1:34 p.m., the House Sergeant at Arms and D.C. Mayor Muriel Bowser both asked for the National Guard's assistance in protecting the U.S. Capitol.

86.     At around 1:45 p.m., frenzied Trump supporters surged past U.S. Capitol police officers who were protecting the U.S. Capitol's West steps.  One officer declared, "We're going to give riot warnings.  We're going to try to get compliance.  But this is now effectively a riot."

25

87. Meanwhile, sitting in the White House, Defendant Trump did nothing to stop what was occurring and instead encouraged the mob to continue the violence. At the same time the mob was declared a riot, Defendant Trump tweeted his speech from the rally:



88. About half an hour later, at 2:12 p.m., insurgents breached the U.S. Capitol: they broke windows using riot shields and poles, climbed into the building, and opened the doors for the mob to storm the interior of the building. Some of those insurgents were wearing military helmets and full tactical gear; others carried baseball bats, Trump flags, hockey sticks, and crutches; they had flex cuffs and climbing gear; some were equipped with their own radio system; others had stun guns and other weapons:



89.     As the mob was running rampant through the U.S. Capitol, Secret Service Agents ushered Vice President Pence off the Senate floor.  The mob chanted, "Hang Mike Pence!" Insurgents outside the U.S. Capitol erected a noose and gallows:



90.     At approximately 2:09 p.m., Defendants Khater and Tanios walked on restricted grounds and proceeded from the south grassy area of the U.S. Capitol toward the Lower West Terrace.

91.     After separating briefly, Defendants Khater and Tanios reunited at approximately 2:14 p.m. near the police barricade on the steps of the south side of the Lower West Terrace. Defendant Khater told Defendant Tanios, "Give me that bear shit," and then reached his hand into Defendant Tanios' backpack and retrieved a white canister of bear spray.

92.     While still trespassing in the restricted grounds of the U.S. Capitol, Defendant Tanios encouraged other rioters to do the same, and videotaped the rioters assaulting police.

93.     By 2:20 p.m., U.S. Capitol Police announced the U.S. Capitol had been breached and was on full lockdown.

94.     Around that same time, Defendants Khater and Tanios were engaged in a confrontation with law-enforcement officers, including Officer Sicknick, who were guarding the Lower West Terrace of the U.S. Capitol.  They and others began pulling down barriers and

assaulting and attacking officers with their hands and feet and other objects. From less than 8 feet away, Defendant Khater sprayed Officer Sicknick in the face with the bear spray Defendant Tanios had brought with them.






95.     Officer Sicknick turned his head away and retreated from the police line, incapacitated by the bear spray. Defendant Khater continued to deploy the spray, now advancing towards at least two other officers, and sprayed them directly in their faces from only a few feet away.

96.     At 2:24 p.m., almost an hour after rioters descended on the U.S. Capitol, and as they were storming the hallways, Defendant Trump sent out a tweet with the clear intent to further inflame the mayhem, and which directly imperiled his Vice President: "Mike Pence

didn't have the courage to do what should have been done to protect our Country and our Constitution."



97.    This tweet was repeated in real time by rioters at the U.S. Capitol on megaphones as it was clear they understood Defendant Trump's tweet to be encouragement for further violence.

98.    In response to this tweet, members of the mob continued to chant "Hang Mike Pence!" and "Mike Pence is a Bitch!" as they continued their siege.

99.    In a phone call between Defendant Trump and House Minority Leader Kevin McCarthy (R-CA), McCarthy begged Defendant Trump to call off the rioters, pleading with Defendant Trump that the rioters were all his supporters.  In response, Defendant Trump told McCarthy, "Well, Kevin, I guess these people are more upset about the election than you are."

100.   While the wild mob grew more violent, climbed over balconies, and erected nooses in front of the U.S. Capitol, Defendant Trump's staff and advisors were pleading with him to address the nation and put an end to the violence.  At 2:38 p.m., an hour after the first breach, Defendant Trump obliged, but stopped far short of calling off the mob or condemning the assault that was still underway:



101.    By 3:00 p.m., the District of Columbia issued notice of an emergency citywide

curfew to begin at 6 p.m.

102.    Meanwhile, the mob inside the U.S. Capitol shouted, "We want Trump!"  The

mob continued attacking officers with a variety of munitions—rocks, bottles, metal poles, bear

spray, and pepper spray.  Officers reported being "flanked" and "los[ing] the line."  For hours,

officers were forced into hand-to-hand combat to prevent more rioters from entering the U.S.

Capitol.

103.    All these events were widely reported in print, television, and online media

outlets, and Defendant Trump and the other Defendants were aware of this coverage.

104.    At 4:17 p.m., Defendant Trump tweeted a recorded video directed to his

supporters as they continued to ransack the U.S. Capitol:



30

In the video, Defendant Trump told the mob, "I know your pain, I know you're hurt," and repeated his lies about a stolen election that had driven the insurgents to the U.S. Capitol in the first place. In the same breath he told the mob to go home, he also said, "We love you. You're very special."

105. Predictably, just as Defendant Trump had intended, the mayhem continued.

106. At around 5:40 p.m. the police began to clear the U.S. Capitol and Congressional leaders announced they would proceed with the certification of the Electoral Votes. By that time, the mob had thoroughly pillaged the premises: they had shattered windows, damaged statues, broken doors, vandalized offices, stolen laptops, desecrated the Speaker's office, shattered a mirror, and stolen the Speaker's lectern. In total, six people—including Officer Sicknick—lost their lives directly because of the riot, 140 officers were injured, and scores of people were left emotionally and/or physically damaged.

107. At 6:01 p.m., five hours after rioters had begun their siege on the U.S. Capitol and had threatened to kill Vice President Pence and others, Defendant Trump finally released a statement that directly addressed the violence. Once again, the message fell well short of a forceful condemnation or rebuke. In another recorded video, Defendant Trump chided that "These are the things and events that happen when a sacred landslide victory is so unceremoniously & viciously stripped away from great patriots who have been badly & unfairly treated for so long." He then told the members of the violent mob, who continued to occupy the U.S. Capitol and terrorize Plaintiffs and other members to "Go home with love & in peace. Remember this day forever!"



Donald J. Trump ✔
@realDonaldTrump                                    ○○○

These are the things and events that happen when a
sacred landslide election victory is so unceremoniously &
viciously stripped away from great patriots who have been
badly & unfairly treated for so long. Go home with love &
in peace. Remember this day forever!

6:01 PM · Jan 6, 2021

108.    Many of the rioters cited Defendant Trump himself as the inspiration for their

violent actions.  For example, the "QAnon Shaman" Jacob Anthony's attorney explained that "he

came as a part of a group effort, with other 'patriots' from Arizona, at the request of the

President that all 'patriots' come to D.C. on January 6, 2021."

109.    Around 10:00 p.m. on January 6, 2021, Officer Sicknick, who was still at the U.S.

Capitol, collapsed and was rushed to a nearby hospital for treatment.  Around 9:30 p.m. the next

day, Officer Sicknick died.

110.    According to the District of Columbia's Chief Medical Examiner, Officer

Sicknick died of "natural causes"—specifically, a series of strokes.  The Medical Examiner

further stated that "all that transpired on [January 6] played a role in his condition" that led to his

death.

111.    In a preceding lawsuit arising out of the events of January 6th, the Honorable Amit

Mehta of this Court ruled on February 18, 2022, that Defendant Trump's statements to his

supporters before the riot "is the essence of civil conspiracy," because Defendant Trump

spoke about himself and rallygoers working "towards a common goal" of fighting and

walking down Pennsylvania Avenue. Judge Mehta also noted that "The President's January

6 Rally Speech can reasonably be viewed as a call for collective action."

112.    On March 28, 2022, the Honorable David Carter of the United States District Court for the Central District of California ruled in a subpoena dispute between the House of Representatives committee investigating the January 6th attack and John Eastman, one of Defendant Trump's close advisors in his efforts to overturn the election results, that certain documents were not protected by the attorney-client privilege under the crime-fraud exception because Defendant Trump's actions leading up to January 6th "more likely than not constitute[d] attempts to obstruct an official proceeding" and that Eastman and others had conspired with him to do just that.

113.    In July and August 2022, Defendants Khater and Tanios signed factual proffers as part of their plea agreements, in which they admitted to their crimes that day. Defendant Tanios' signed proffer admits to trespass and disorderly conduct; Defendant Khater's proffer admits to "assaulting, resisting, or impeding [Officer Sicknick] using a dangerous weapon." Both men are awaiting sentencing.

114.    On November 29, 2022, Oath Keepers leader Stuart Rhodes and his associate, Kelly Meggs, were convicted in this Court of seditious conspiracy for their actions on January 6th.

115.    On December 28, 2022, the Honorable John Bates from this District ruled in a criminal case of one of the January 6th defendants that Defendant Trump's incendiary rhetoric — especially telling his supporters to "fight like hell" — may suggest Trump was asking them to break the law. Judge Bates noted that Defendant Trump's words "could signal to protesters that entering the Capitol and stopping the certification would be unlawful."

116.    On June 30, 2021, the House of Representatives passed House Resolution 503, which established the bipartisan Select Committee to Investigate the January 6th Attack on the

33

United States Capitol ("Select Committee"). The Select Committee interviewed more than a thousand witnesses—many of whom were members of Defendant Trump's administration and inner circle of advisors—and held 9 public hearings to present its key findings to the American public.

117. After 18 months of investigation, the Select Committee released a final report in December 2022 totaling almost 900 pages that contained specific findings about Defendant Trump's efforts to overturn the 2020 election results, including the following key takeaways:

    a. "[The] evidence has led to an overriding and straight-forward conclusion: the central cause of January 6th was one man, former President Donald Trump, who many others followed. None of the events of January 6th would have happened without him";

    b. "Beginning election night and continuing through January 6th and thereafter, Donald Trump purposely disseminated false allegations of fraud related to the 2020 Presidential election in order to aid his effort to overturn the election and for purposes of soliciting contributions. These claims provoked his supporters to violence on January 6th";

    c. "Based on false allegations that the election was Stolen, Donald Trump summoned tens of thousands of supporters to Washington for January 6th. Although these supporters were angry and some were armed, Donald Trump instructed them to march to the Capitol on January 6th to 'take back' their country"; and,

    d. "Each of these actions by Donald Trump was taken in support of a multi-part conspiracy to overturn the lawful results of the 2020 Presidential election."

118.    The Select Committee also made a number of criminal referrals as to Defendant Trump to the Department of Justice's Special Counsel based on its finding of "sufficient evidence of one or more potential violations" of the following statutes (among others):

  e. **Obstruction of an Official Proceeding (18 U.S.C. § 1512(c)).** The Select Committee found that Defendant Trump "knew that his actions were likely to 'obstruct, influence, or impede'" the joint session of Congress on January 6th and because he acted with a "corrupt" purpose in seeking to pressure Vice President Mike Pence to prevent certification of the electoral votes that day. The Select Committee also found that Defendant Trump was "also responsible for recruiting tens of thousands of his supporters to Washington" that day, and that "knowing they were angry and some were armed, instructing them to march to the Capitol and 'fight like hell.'"

  f. **Incite, Assist, or Aid and Comfort an Insurrection (18 U.S.C. § 2383).** The Select Committee found that Defendant Trump was "directly responsible" for summoning "what became a violent mob to Washington, D.C." and then "further provoking the already violent and lawless crowd with his 2:24 p.m. tweet about the Vice President." The Select Committee further found that Defendant Trump "refused to condemn the violence or encourage the crowd to disperse" once the attack on the U.S. Capitol was underway. Ultimately, the Select Committee concluded that "[b]oth the purpose and the effect of [Defendant Trump's] actions were to mobilize a large crowd to descend on the Capitol" and that there was "significant evidence that President Trump intended to disrupt the peaceful transition of power" on January 6th.

g. **Other Conspiracy Statutes (18 U.S.C. § 372 and 2384).** The Select Committee found that Defendant Trump's "actions with the knowledge of the risk of violence" could also constitute conspiracy "'to prevent, by force, intimidation, or threat, any person from accepting or holding office, trust, or place of confidence under the United States, or from discharging any duties thereof …'" and/or conspiracy "'to overthrow, put down, or to destroy by force the Government of the United States ….'"

**IV.**
**CLAIMS FOR RELIEF**

**COUNT 1**
**Wrongful Death**
**D.C. Code § 16-2701**
**(Against all Defendants)**

119.    The Plaintiff re-alleges and incorporates by reference paragraphs 27 – 118 above, inclusive.

120.    A violation of D.C. Code § 16-2701 occurs when

a.    By an injury done or happening within the limits of the District;

b.    The death of a person is caused;

c.    By the wrongful act, neglect, or default of a person or corporation.

121.    As described more fully in this Complaint, on January 6, 2021, a mob of individuals incited by Defendant Trump and others, including Defendants Khater and Tanios, stormed the U.S. Capitol.

122.    Before directing the mob to the U.S. Capitol, Defendant Trump instructed them to "fight like hell" and declared that "you're allowed to go by very different rules" and "you have to show strength."  Defendant Trump intended these words to be taken literally.

123. For several hours after the mob had stormed the U.S. Capitol, Defendant Trump refused to communicate anything to the mob that might discourage continued unlawful action, and thus ratified and approved of its actions.

124. Defendant Trump intentionally riled up the crowd and directed and encouraged a mob to attack the U.S. Capitol and attack those who opposed them. The violence that followed, and the injuries that violence caused, including the injuries sustained by Officer Sicknick and his eventual death, were reasonable and foreseeable consequences of Defendant Trump's words and conduct.

125. Officer Sicknick was inside the U.S. Capitol as the mob gathered outside. The mob, including Defendants Khater and Tanios, attacked Officer Sicknick and other law enforcement officers protecting the U.S. Capitol and intentionally and unlawfully forced its way inside the building.

126. Many individuals in the mob, including Defendants Khater and Tanios, either carried weapons or used objects such as poles and fire extinguishers as weapons before and after entering the building. Some individuals in the mob also carried restraints such as plastic handcuffs and rope.

127. The mob, including Defendants Khater and Tanios, also unlawfully and intentionally entered non-public areas of the U.S. Capitol building, including Members' private offices. It damaged and vandalized personal and public property and stole documents, electronics, and other items from some members' offices.

128. As the mob made its way through the U.S. Capitol, participants threatened to kill numerous individuals, including, but not limited to, law enforcement officers, Vice President

Mike Pence, and Speaker of the House Nancy Pelosi. The mob terrorized and injured scores of people inside and outside of the U.S. Capitol, including Officer Sicknick.

129. After rioters broke through the police line where he was stationed, individuals in the mob, including Defendants Khater and Tanios, intentionally and forcibly assaulted Officer Sicknick and others. Defendant Khater sprayed Officer Sicknick in the face with bear spray, which incapacitated Officer Sicknick and left him unable to defend himself from the mob.

130. As a direct result of the attack by Defendants Khater and Tanios and others—which Defendant Trump instigated—Officer Sicknick suffered physical injuries.

131. The following day, on January 7, 2021, Officer Sicknick tragically died.

132. All that transpired on January 6th—including the actions taken by Defendants Trump, Khater, and Tanios—played a significant role in the medical condition that led to Officer Sicknick's death the following day.

133. Defendant Trump was aware that his actions prior to and on January 6, 2021 promoted and encouraged the mob to violently storm the U.S. Capitol.

134. Officer Sicknick's death was a reasonable and foreseeable consequence of Defendants' intentional words and actions.

135. For all these reasons, the Defendants are directly and vicariously liable to the Plaintiff for the wrongful death of Officer Sicknick and for all damages arising therefrom.

**COUNT 2**
**Conspiracy to Violate Civil Rights (Interference with Official Duties)**
**42 U.S.C. § 1985(1)**
**(Against all Defendants)**

136. The Plaintiff re-alleges and incorporates by reference paragraphs 27 – 135 above, inclusive.

38

137.    A violation of 42 U.S.C. § 1985(1) occurs when two or more persons conspire to do any one or more of the following:

        a.  "prevent by force, intimidation, or threat, any person from accepting or holding any office, trust, or place of confidence under the United States";

        b.  "[prevent an official by force, intimidation, or threat] from discharging any duties thereof";

        c.  "induce by like means any officer of the United States to leave any State, district, or place, where his duties as an officer are required to be performed";

        d.  "injure [an official] in [their] person or property on account of [their] lawful discharge of the duties of [their] office, or while engaged in the lawful discharge thereof"; and/or

        e.  "injure [an official's] property so as to molest, interrupt, hinder, or impede [them] in the discharge of [their] official duties."

138.    As described more fully in this Complaint, the Defendants, by force, intimidation, or threat, agreed and conspired with one another and others to undertake a course of action to prevent Congress and Vice President Mike Pence from discharging their duties to count the Electoral College Vote and certify President Biden and Vice President Harris as the winners of the 2020 presidential election.  In this effort the Defendants induced Congress and Vice President Pence to leave the U.S. Capitol while they were performing their official duties, as required by the 12th Amendment and federal law, by interrupting, hindering, and impeding the performance of those duties.

139.    As described more fully in this Complaint, Defendant Trump and others made public statements knowingly designed to undermine public confidence in the election. Such statements included falsely claiming that the election had been "rigged" and that fraudulent voting had been widespread enough to affect the outcome. These statements were intended to have the effect, and did have the effect, of communicating strategies of for accomplishing the aims of the illegal conspiracy to other members of the conspiracy, including Defendants Khater and Tanios and other people who took violent action on January 6, 2021.

140.    Defendant Trump encouraged, directed, and incited others to confront state and local officials to build public support for Defendant Trump's false claims of election-rigging and fraud. These statements were intended to have the effect, and did have the effect, of communicating strategies of for accomplishing the aims of the illegal conspiracy to other members of the conspiracy, including Defendants Khater and Tanios and other persons who took violent action on January 6, 2021.

141.    Defendant Trump promoted, supported, and endorsed a rally near the White House on January 6, 2021, the very same day lawmakers participated in a joint session of Congress to count and certify the Electoral College votes from the 2020 presidential election.

142.    Among other purposes, the purpose of the rally was to gather a crowd in an effort to incite them to disrupt the certification of the Electoral College votes by Congress and to deny President Biden and Vice President Harris their respective offices.

143.    Defendant Trump tweeted to his supporters that the January 6th rally "will be wild!" and in fact tens of thousands of his supporters made the trip to the District to participate in the event. Many of those supporters, including Defendants Khater and Tanios, understood Defendant Trump's tweet to be a call to violent action to stop Congress from certifying the

40

Electoral College vote. Defendant Trump's tweets were, in essence, an offer to join a conspiracy to disrupt Congress. By answering his call, conspirators indicated their agreement to his unlawful conspiracy to disrupt Congress and deny office to President Biden and Vice President Harris.

144. Defendant Trump addressed the large crowd at the January 6 rally. He said "they rigged an election. They rigged it like they've never rigged an election before." He said "We will never concede, it doesn't happen. You don't concede when there's theft involved. Our country has had enough. We will not take it anymore and that's what this is all about." Right before turning the crowd loose on the U.S. Capitol, Defendant Trump exclaimed, "You'll never take back our country with weakness. You have to show strength, and you have to be strong." Defendant Trump intended these words as a threat of violence or intimidation to coerce Congress to disregard the results of the election. The other Defendants were aware of Defendant Trump's remarks and endorsed and supported them as part of, and in furtherance of, the conspiracy.

145. Through his words and conduct, Defendant Trump endorsed and ratified the violent actions of the mob that attacked the U.S. Capitol, including Defendants Khater and Tanios.

146. Under § 1985, any "party so injured or deprived" as a result of acts committed in furtherance of the conspiracy "may have an action for the recovery of damages occasioned by such injury or deprivation against any one or more of the conspirators."

147. Officer Sicknick (through his personal representative, Plaintiff Sandra Garza) is a "party so injured or deprived" by acts committed by Defendants in furtherance of the conspiracy.

### COUNT 3
### Common-Law Assault
### (Against Defendants Khater and Tanios)

148.    The Plaintiff re-alleges and incorporates by reference paragraphs 27 – 147 above, inclusive.

149.    As described more fully in this Complaint, on January 6, 2021, a mob of individuals incited by Defendant Trump and others, including Defendants Khater and Tanios, stormed the U.S. Capitol.

150.    Officer Brian Sicknick was inside the U.S. Capitol as the mob gathered outside. The mob, including Defendants Khater and Tanios, attacked Officer Sicknick and other law enforcement officers protecting the U.S. Capitol and intentionally and unlawfully forced its way inside the building.

151.    On or about August 26, 2022, Defendant Khater pleaded guilty in the United States District Court for the District of Columbia to assaulting, resisting, or impeding Officer Sicknick and other officers while using a deadly weapon (bear spray) provided to him by Defendant Tanios.

152.    Having already pleaded guilty to assaulting, resisting, or impeding Officer Sicknick, Defendant Khater is liable to the Plaintiff for common-law assault for the same conduct.  Defendant Tanios is liable for his role in those same acts.

### COUNT 4
### Negligence *Per Se*
### (Violation of D.C. Code §§ 22-1322 – Rioting or Inciting to Riot)
### (Against all Defendants)

153.    The Plaintiff re-alleges and incorporates by reference paragraphs 27 – 152  above, inclusive.

154.    D.C. Code § 22-1322 makes it a criminal offense to "willfully engage in a riot" and to "willfully incite[] or urge[] other persons to engage in a riot." D.C. Code § 22-1322(b), (c). The statute defines a "riot" as "a public disturbance involving an assemblage of 5 or more persons which by tumultuous and violent conduct or the threat thereof creates grave danger of damage or injury to property or persons." D.C. Code § 22-1322(a).

155.    Section 22-1322, on its face, is a statute designed to promote public safety.

156.    Defendant Trump violated that statute through his willful conduct by, among other things:

a.    insisting for several weeks that the country was no longer a functioning republic, but instead was literally being seized in a massive, coordinated act of fraud;

b.    repeating those same falsehoods to the assembled crowd on January 6;

c.    then—while knowing the propensity of some of Defendant Trump's supporters to engage in political violence and knowing that some of his supporters had brought weapons with them to the rally—saying the following highly inflammatory things, among others:

i.    "you have to fight like hell";

ii.    "you're allowed to go by very different rules"; and

iii.    "you have to show strength."

157.    Defendant Trump, in short, convinced the mob that something was occurring that—if actually true—might indeed justify violence, and then sent that mob, including

Defendants Khater and Tanios, to the U.S. Capitol with violence-laced calls for immediate action.

158.    Defendant Trump further demonstrated his willfulness in inciting the riot by refusing to call it off for hours as it wreaked havoc, even telling House Minority Leader Kevin McCarthy that their actions proved they simply cared more about the election that McCarthy did. When Defendant Trump did finally address the mob, he did so intentionally in highly equivocal language that largely praised them and blamed the riot on the alleged election fraud.

159.    Defendants Khater and Tanios violated D.C. Code § 22-1322 by actively participating in a riot, including, among other things, physically assaulting Officer Sicknick.

160.    Officer Sicknick was directly harmed by the actions of Defendants Khater and Tanios and others and died as a result of that harm.

161.    The Defendants are therefore directly and vicariously liable to the Plaintiff for negligence *per se*, and for all damages arising therefrom.

<div align="center">

**COUNT 5**
**Aiding and Abetting Common-Law Assault**
**(Against Defendant Trump)**

</div>

162.    The Plaintiff re-alleges and incorporates by reference paragraphs 27 – 161 above, inclusive.

163.    On January 6, 2021, a mob of individuals, incited by Trump, stormed the U.S. Capitol.

164.    The mob attacked law enforcement protecting the entrance, including Officer Sicknick, and intentionally and unlawfully forced its way inside the building.

165.    Many individuals in the mob, including Defendants Khater and Tanios, either carried weapons or used objects such as poles and fire extinguishers as weapons before and after

entering the building. Some individuals in the mob also carried restraints such as plastic handcuffs and rope.

166.    The mob also unlawfully and intentionally entered non-public areas of the U.S. Capitol building, including the members' private offices. It damaged and vandalized personal and public property and stole documents, electronics, and other items from some members' offices.

167.    As the mob made its way through the U.S. Capitol, participants threatened to kill numerous individuals, including, but not limited to, Vice President Mike Pence and Speaker of the House Nancy Pelosi. The mob terrorized and injured scores of people inside and outside of the U.S. Capitol, including Officer Sicknick.

168.    As described above, Officer Sicknick was harmed by the rioting mob Defendant Trump incited—specifically by the actions of Defendants Khater and Tanios.

169.    The mob's intentional and unlawful entry into the U.S. Capitol, and the words and actions of its participants before and after entry, caused Officer Sicknick to suffer direct physical harm.

170.    Officer Sicknick in fact suffered harm because of the assault.

171.    All of the events of January 6th, which Officer Sicknick was a part of and injured by, played a role in the condition that led to Officer Sicknick's death the following day.

172.    Defendant Trump aided and abetted the mob of individuals—including Defendants Khater and Tanios—that stormed the U.S. Capitol and assaulted Officer Sicknick.

173.    Defendant Trump was aware that his actions prior to and on January 6, 2021 promoted and encouraged the mob to storm the U.S. Capitol and assault Officer Sicknick.

174.    Before directing the mob to the U.S. Capitol, Defendant Trump instructed them to "fight like hell," intending these words to be taken literally.

175.    For several hours after the mob had stormed the U.S. Capitol, Defendant Trump refused to communicate anything to the mob that might discourage continued unlawful action.

176.    Defendant Trump knowingly and substantially assisted in the assault that was perpetrated upon Officer Sicknick.  Defendant Trump riled up the crowd and directed and encouraged the mob to attack the U.S. Capitol and perpetrate violence on those they encountered.  And Defendant Trump ratified, endorsed, and encouraged this violent conduct after it began.

177.    For all these reasons, Defendant Trump is liable to Officer Sicknick (through his personal representative, Plaintiff Sandra Garza) for assault and for all damages arising therefrom.

## V.
## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff respectfully requests this Court to enter a judgment in her favor and grant relief against the Defendants as follows:

(1)    Order each of the Defendants to individually pay actual money damages of not less than $10,000,000 to the Plaintiff, the specific amount to be determined at trial;

(2)    Order the Defendants to each pay punitive damages to the Plaintiff in an amount to be determined at trial;

(3)    Award the Plaintiff reasonable attorneys' fees and costs for the investigation and prosecution of this action; and

(4)    Grant any such additional relief as the Court deems just and proper.

## JURY DEMAND

The Plaintiff demands a trial by jury by the maximum number of jurors permitted by law.

Dated: January 5, 2023               Respectfully submitted,

*s/Matthew Kaiser*

_____

KAISERDILLON PLLC
Matthew Kaiser (D.C. Bar No. 486272)
Noah Brozinsky (D.C. Bar No. 1655789)
1099 Fourteenth Street, N.W., 8th Fl.
Washington, D.C. 20005
Tel: (202) 640-2850
Email: mkaiser@kaiserdillon.com
           nbrozinksy@kaiserdillon.com

*s/Philip Andonian*

_____

CALEBANDONIAN PLLC
Philip Andonian (D.C. Bar No. 490792)
Joseph Caleb (D.C. Bar No. 495383)
1100 H Street, N.W. – Ste. 315
Washington, D.C. 20005
Tel: (202) 953-9850
Email:  phil@calebandonian.com
           joe@calebandonian.com

*s/Mark S. Zaid*

_____

Mark S. Zaid, Esq. (D.C. Bar #440532)
Bradley P. Moss, Esq. (D.C. Bar #975905)
Mark S. Zaid, P.C.
1250 Connecticut Avenue, N.W.
Suite 700
Washington, D.C. 20036
(202) 454-2809
(202) 330-5610 fax
Mark@MarkZaid.com
Brad@MarkZaid.com

*Attorneys for Plaintiff*