**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

IN RE: LARRY KLAYMAN　　　　　　　　}
　　　　　　　　　　　　　　　　　　}
　　　　　　　　　　　　　　　　　　}
　　　　　　Petitioner　　　　　　　　}　　**Case Number:**
　　　　　　　　　　　　　　　　　　}
　　　　　　　　　　　　　　　　　　}
　　　　　　　　　　　　　　　　　　}
　　　　　　　　　　　　　　　　　　}

**PETITION PURSUANT TO LOCAL RULE 2.04  OF LARRY ELLIOT KLAYMAN TO THE CHIEF JUDGE  CONCERNING SUSPENSION ORDER OF THE DISTRICT OF <u>COLUMBIA BAR</u>**

Dated: September 22, 2025　　　　　　　Respectfully submitted,

　　　　　　　　　　　　　　　　　By: *<u>/s/ Larry Klayman</u>*
　　　　　　　　　　　　　　　　　Larry Klayman, Esq.
　　　　　　　　　　　　　　　　　Klayman Law Group P.A.
　　　　　　　　　　　　　　　　　7050 W. Palmetto Park Rd
　　　　　　　　　　　　　　　　　Boca Raton, FL, 33433
　　　　　　　　　　　　　　　　　Tel: 561-558-5536 cell
　　　　　　　　　　　　　　　　　leklayman@gmail.com

　　　　　　　　　　　　　　　　　*Pro Se*

1

## <u>TABLE OF CONTENTS</u>

<u>EMERGENCY INTRODUCTION</u> ................................................................................1

<u>PROCEDURAL HISTORY AND BACKGROUND</u>....................................................3

    Facts Pertaining to the Bundy Trial ......................................................................4

    Facts Pertaining to Proceedings in the District of Columbia ...............................8

    Facts Pertaining To Collateral Challenge to Disciplinary Proceeding ................9

<u>THERE RESPECTFULLY ARE NO FACTUAL AND LEGAL BASES TO IMPOSE
RECIPROCAL DISCIPLINE ON MR. KLAYMAN</u> ..................................................14

<u>THERE WAS A SIGNIFICANT DEPRIVATION OF DUE PROCESS</u> ....................15

    The Rules of Statutory Construction Require a Finding that the Rules Create a Mandatory
Duty of Compliance ............................................................................................16

    The DCCA's Reasoning That Where a Statute Fails to Provide a Sanction, it is
"Directory" Creates an Unworkable and Untenable Precedent ..........................17

    It Is Well Settled That a Regulatory Agency Must Abide By the Time Limits Prescribed
to Them ...............................................................................................................18

    "Court Rules" Are Mandatory and Not Discretionary......................................19

    Mr. Klayman Has Been Severely Prejudiced Because the Delay in the Bundy Matter Was
Intentionally Manufactured to Punitively "Stack" Disciplinary Proceedings ..................19

<u>THE IMPOSITION OF RECIPROCAL DISCIPLINE WOULD RESULT IN A GRAVE AND
MANIFEST INJUSTICE</u>..........................................................................................22

<u>THERE IS CLEARLY INADEQUATE MUCH MORE CLEAR AND CONVINCING
EVIDENCE OF ANY MISCONDUCT, WHICH IF ANY, WARRANTS SIGNIFICANTLY
DIFFERENT DISCIPLINE</u> ......................................................................................25

    There is No Clear and Convincing Evidence that Respondent Knowingly Made False
Statements and Was Dishonest ...........................................................................27

        Statements Regarding Mr. Klayman's Pending D.C. Disciplinary Matter............28

        Truthful Statements Pertaining to Criminal Experience........................................31

        Statements Regarding Mr. Bundy's Trial Date......................................................34

        Statements Regarding Solitary Confinement and Contempt .................................35

        Statements Regarding Judge Gould's Findings ....................................................37

        Statements that Mr. Klayman's Pro Hac Vice Application Was "Pending" .........38

    No Clear and Convincing Evidence That Mr. Klayman Made Frivolous Filings ............39

    No Clear and Convincing Evidence of Conduct Prejudicial to the Administration of
Justice..................................................................................................................42

<u>CONCLUSION</u> .........................................................................................................44

## I.    EMERGENCY INTRODUCTION

This Petition of Larry Klayman Concerning Suspension by the District of Columbia Bar is being timely filed before the Honorable Marcia Morales Howard, Chief Judge of this Honorable Court ("the Court"), pursuant to Local Rule 2.04(b).

Under Local Rule 2.04(b)(1), a "lawyer must inform the clerk within fourteen days after the lawyer is convicted of a felony or loses good standing with, is publicly disciplined by, is disbarred on consent from, or has resigned from, any bar." Petitioner Larry Klayman ("Mr. Klayman") satisfied this requirement through his August 12, 2025 submission to the Court, Exhibit 1, which notified the Court of the August 7, 2025 Suspension Order of the District of Columbia Court of Appeals ("DCCA"). This  August 12, 2025 submission was confirmed to be received in the attached letter of September 19, 2025, from the Honorable Elizabeth Warren, Clerk of the Court. Exhibit 2. Accordingly, Mr. Klayman satisfied Rule 2.04(b)(1).

Furthermore, under Local Rule 2.04(b)(2): "[t]wenty-one days after an event listed in (b)(1), a lawyer is automatically suspended. **But automatic suspension under this rule is stayed if, before the automatic suspension, the lawyer petitions the chief judge for relief**. If the lawyer is a member of the Middle District bar, the chief judge or one or more judges designated by the chief judge determines the petition." (emphasis added). D.C. Bar Rule XI, Section 14(f) states: "*Effective date of discipline*. Except as provided in sections 10, 11, and 13 of this rule, and in subsection (e) of this section, **an order of disbarment or suspension shall be effective thirty days after entry unless the Court directs otherwise**." (emphasis added). Accordingly, the DCCA Suspension Order did not take effect until September 8, 2025 when it

was final.[1] Thus, under Local Rule 2.04(b)(2), Mr. Klayman has until September 29. 2025 to Petition the Chief Judge. Here, he has done so on September 22, 2025, well before the deadline[2] provided under the rules.

Moreover, and as important, in Mr. Klayman's later submission of September 5, 2025 with regard to paying his court dues, which was sent to the Clerk of The Court for filing and to respond to, he asked, in the event there were any issues with regard to his paying his dues timely to remain a member of the Court, or if more information was needed:

> Please be so kind as to advise who I may communicate with if necessary, including but not limited to the Chief Judge, or any other pertinent Court authority, to resolve this important matter for the benefit of my clients and me as soon as possible before my current membership may otherwise expire." (which was slated to occur on September 30, 2025).

> "Thank you for your professional courtesy and consideration. And many thanks as well to Susanna of the Court who contacted me at my request to advise me how to proceed. Exhibit 3.

It was not until September 19, 2025, two weeks (that is 14 days) later, that Mr. Klayman was surprised to get the Clerk's letter denying his payment of dues to remain a member and effectively ending his membership with no stated recourse. By the Clerk waiting this period of time to respond, Mr. .Klayman was left with only a week to try to resolve this very serious matter before he is removed as member of this Court with several cases pending with upcoming

---

[1] Thirty days from August 7, 2025—the date that the DCCA Suspension Order was issued—is September 6, 2025, which is a Saturday. Thus, the actual effective days then rolled over to the following Monday, September 8, 2025, which is the date that the DCCA Suspension Order took effect and was thus final. During this period, Mr. Klayman had filed a Petition for Rehearing En Banc and continues to challenge the DCCA Suspension Order in other cases and fora.

[2] Alternatively, even if the Court finds that Mr. Klayman's August 12, 2025 letter did not satisfy the notice requirements of Local Rule 2.04(b)(1), this instant Petition is being filed within fourteen (14) days of the effective date of the DCCA's Suspension Order when it became final, September 8, 2025. Thus, under any interpretation of Local Rule 2.04, Mr. Klayman has timely complied with all requirements and no automatic suspension is respectfully warranted.

hearings, one of which is on November 5, 2025, concerning a case dispositive motion to dismiss. *ROKiT World, Inc  et al v. Rocket Ball LTD et al*, 3:24-cv-00879 (M.D. Fla.) ECF No. 60.

As set forth and explained below, Mr.  Klayman respectfully requests that the Chief Judge stay any consideration of reciprocal discipline as he has filed his Petition timely, or if the Chief Judge feels differently for any reason that he be granted leave *nunc pro tunc* in the interest of principles of due process and fundamental fairness, that it be permitted to be filed at this time, and that he also be permitted to pay his bar dues so that he can continue to be a member in good standing, which he has been for over forty-six (46) years – almost half a century -- without being either sanctioned or disciplined, not only for the good of himself but to represent the important interests of his clients who have several time sensitive and important matters before The Court. Exhibit 4.

In this regard, it is hoped that the Chief Judge, the Honorable Marcia Morales Howard, will step in, as Mr. Klayman had suggested could be helpful, to resolve this matter for the benefit of the Court, Respondent Klayman and his clients.

Finally, as shown below, Mr. Klayman does not warrant reciprocal discipline and respectfully requests a hearing before any such determination is considered or made. *See* Local Rule 2.04(a) ("In addition to a judge's sanction or use of another grievance mechanism, the court can — **after a hearing and for good cause** — disbar, suspend, reprimand, or otherwise discipline a member of the Middle District bar or a lawyer appearing by special admission."

## II.    PROCEDURAL HISTORY AND BACKGROUND

Put simply, this is a matter which should never have even been initiated by the District of Columbia attorney discipline apparatus. This entire disciplinary proceeding involves Mr. Klayman's attempts to gain *pro hac vice* admission in the U.S. District Court for the District of

Nevada ("Nevada Court") and his subsequent appeals to the U.S. Court of Appeals for the Ninth Circuit ("Ninth Circuit"). The District of Columbia was entirely uninvolved.

*Crucially*, Mr. Klayman was never sanctioned or even reprimanded by the Nevada Court or the Ninth Circuit, nor was he even referred to the Nevada Bar of internal ethics committees of these courts, for his efforts to enter into the Bundy Trial. Instead, this disciplinary proceeding was initiated by District of Columbia Office of Disciplinary Counsel ("ODC"), which had no connection whatsoever to the Bundy Trial, and which is widely known to be highly partisan in selectively targeting conservative and Republican activist pro-Trump attorneys for removal from the practice of law, which is the subject of highly meritorious ongoing collateral litigation as set forth below in *supra* section I(c). Put simply, the conduct at issue did not in any way even involve the practice of law in the District of Columbia, and as such, by way of strong analogy to choice of law jurisprudence, this Court should weigh heavily the fact that Mr. Klayman did not face any type of sanction in the Ninth Circuit and its lower courts where the events took place.

For the Court's convenience, Mr. Klayman attaches hereto his briefs filed before the Board on Professional Responsibility ("Board") containing his Proposed Findings of Facts which cites the record ("PFF"), Exhibit 5, as well as the transcript of proceedings before the Ad Hoc Hearing Committee ("AHHC"), Exhibit 6. A zip drive with the entire record is also being sent timely.

### a.  Facts Pertaining to the Bundy Trial

This disciplinary proceeding stems from events which occurred in or around 2017 – about 9 years ago -- when Mr. Klayman was retained by Cliven Bundy ("Mr. Bundy") to represent him in his criminal trial in the Nevada Court stemming from a 2016 standoff with

federal agents on Mr. Bundy's land, and his attempts to gain *pro hac vice* entry into this trial where Mr. Bundy was facing the possibility of life imprisonment (the "Bundy Trial").

Presiding over the Bundy Trial was the Honorable Gloria Navarro ("Judge Navarro"). Because Mr. Klayman was not a member of the Nevada Bar, he moved for admission *pro hac vice* in the Bundy Trial. Judge Navarro inexplicably  denied Mr. Klayman's motion and Mr. Klayman appealed that decision to the U.S. Court of Appeals for the Ninth Circuit ("Ninth Circuit").  Ultimately, there were multiple appeals and motions filed by Mr. Klayman to try to gain entrance into the Bundy Trial given that Mr. Klayman felt duty bound to zealously represent his client, Mr. Bundy, who he believed was innocent of the criminal charges but faced the potential for life imprisonment if convicted.

This was a truly unique and unprecedented widely high profile criminal prosecution because  it was observed that there was an enormous amount of prosecutorial misconduct by the U.S. Attorney of the District of Nevada ("USAO") occurring, and that Judge Navarro herself more than appeared to be condoning and, in fact, furthering this prosecutorial misconduct. This even caused the mainstream non-partisan local newspaper, the Las Vegas Review-Journal, to publish an article titled <u>EDITORIAL: Judge bans defense arguments in Bundy retrial</u>[3] which stated the following:

> **Government prosecutors have a friend in U.S. District Judge Gloria Navarro**.
>
> The judge is presiding over the retrial of four defendants charged with various crimes stemming from their participation in the 2014 Bunkerville standoff near Cliven Bundy's ranch. The first trial ended in April with the jury deadlocked on all counts involving the four men.

---

[3] *Judge bans defense arguments in Bundy retrial*, Las Vegas Review Journal, Jul. 13, 2017, available at: https://www.reviewjournal.com/opinion/editorials/editorial-judge-bans-defense-arguments-in-bundy-retrial/.

On Monday, the judge eviscerated the defense's legal strategy, putting off limits a whole host of issues that might make it more difficult for the government to win convictions. The defendants will be forbidden from arguing that they were exercising their constitutional rights to peaceably assemble and bear arms. They may not highlight the actions of BLM agents in the days leading up to the incident or mention federal gaffes such as the ill-advised "First Amendment" zone created for protesters.

And if imposing these restrictions on the defense wasn't enough, Judge Navarro ruled that prosecutors may introduce testimony about the four accused men and their associations with so-called militia groups.

Judge Navarro made a similar ruling before the first trial. She is going to extraordinary lengths to address prosecution fears of "jury nullification," in which jurors refuse to convict based on a belief that the law or potential punishment is unjust. The practice dates to 1734, when a jury ignored statutes and acquitted publisher John Peter Zenger on charges of criticizing New York's new colonial governor, accepting arguments from Mr. Zenger's attorney, Alexander Hamilton, that the newspaper had simply published the truth.

Federal prosecutors have encountered unexpected difficulty — both here and in Oregon — in securing convictions against those protesting federal control of Western public lands. But the issue here isn't whether one believes the Bundy defendants are courageous freedom fighters or zealous lunatics. Rather it's whether a judge should usurp the rights of the defendants to have a jury of their peers consider their arguments alongside the law, evidence and other testimony.

**Judge Navarro's sweeping order reflects a deep mistrust of the American jury system**. (emphasis added).

This flagrant prosecutorial and judicial misconduct, which drove Mr. Klayman to zealously seek *pro hac vice* entry into the Bundy Trial to protect the rights of his client, was more than confirmed when in January of 2018 it had become so egregious that Judge Navarro - after Mr. Bundy had already served two (2) years in prison, including time in solitary confinement - had no choice but to dismiss the charges against Mr. Bundy with prejudice, apparently in order to insulate herself from more criticism in public media and other ridicule for her previous conduct in violation of constitutional and other legal rights. This order was appealed to the Ninth Circuit by the USAO and Mr. Klayman successfully represented Mr. Bundy at the

Ninth Circuit during the pendency of this appeal. The Ninth Circuit affirmed Judge Navarro's dismissal while issuing a blistering opinion lambasting the egregious misconduct of the USAO. A unanimous finding of the three judge panel consisting of Hon. William A. Fletcher, Jay S. Bybee and Paul J. Watford held:

> The prosecution withheld facially exculpatory evidence that directly negated the government's theory that the defendants lied about fearing snipers. The deliberate choices to withhold these documents were not cases of simple misjudgment, especially given that doubt about the helpfulness of evidence should be resolved in favor of disclosure. *United States v. Bundy*, 968 F.3d 1019, 1042 (9th Cir. 2020).

> We note the government's failure to acknowledge and confess any wrongdoing during the course of this case—especially as to material misrepresentations to the district court about the presence of snipers. Rather than accepting responsibility, the government blamed the defense for not requesting more specific information. *Id*. at 1044.

Thus, Mr. Klayman's actions throughout this entire process were driven singularly by his desire and responsibility as a lawyer to zealously protect Mr. Bundy's interests  - and not for personal gain as he was representing Mr. Bundy  *pro bono* - as he believed, based on facts available to him at the time, that aggressive, zealous representation would be the only way to help ensure that Mr. Bundy did not spend the rest of his life in prison given the egregious prosecutorial, judicial and other misconduct that was openly and flagrantly being committed.

In fact, the Honorable Ronald M. Gould of the Ninth Circuit held the following with regard to his *pro hac vice* application:

> Klayman properly disclosed the ongoing disciplinary proceeding in his initial application for pro hac vice admission, saying that the proceeding had not yet been resolved. This disclosure was accurate…. I agree with Klayman that he was not obligated to re-litigate the D.C. proceeding before the district court and that he did not have to provide the district court with the entire record from D.C. And if his disclosures were selective, still he is an advocate, an advocate representing defendant Cliven Bundy, **and after submitting a compliant response to the questions in the pro hac vice application, he had no greater duty to disclose any possible blemish on his career or reputation beyond responding to the**

**district court's further direct requests.** *In re: Cliven D. Bundy*, 16-72275 (9th Cir. Oct. 28, 2016). (emphasis added).

**b. Facts Pertaining to Proceedings in the District of Columbia**

In July of 2019 and September of 2019, Mr. Klayman appeared before the AHHC for a hearing, where not only did Mr. Klayman testify in depth, but he also produced numerous material and character witnesses who testified strongly in favor of him and his character and ethics, including Professor Erwin Chemerinsky ("Dean Chemerinsky"), dean of the prestigious University of California at Berkeley's Boalt Hall. Dean Chemerinsky testified as an expert that he did not believe that Mr. Klayman did anything unethical and that Mr. Klayman's actions were reasonable:

> Yes, I do. I think that [the number of pleadings] was reasonable under the circumstances of the case… This is about the ability of a criminal defendant to have counsel of choice; that the district court had refused to allow the pro hac vice status; and the defendant wanted to have Mr. Klayman represent him. And the only way of having the district court decision reviewed was through these writs of mandamus.

Dean Chemerinsky also concurred with Judge Gould's finding that Respondent Klayman had fulfilled his duty of candor in filling out the *pro hac vice* application and that Respondent had answered all the questions that he was required to answer in his *pro hac vice* application:

> MR. KLAYMAN: What I asked him was, based upon your review of the pro hoc vice applications,  Exhibit 1 and 5, Respondent's Exhibits 1 and 5, and your experience and expertise in pro hac vice and federal procedure, did I answer all the questions that I was required to answer by those applications.

> WITNESS CHEMERINSKY: Yes. Tr. 680-681; RX 0851–0852. PFF # 6

To the contrary, ODC did not have a single material witness, with only it's biased prosecutor, Julia Porter, serving as both prosecutor and witness. It is therefore no surprise that at the conclusion of first three-day hearing before the AHHC on July 18, 2019, its chairperson, Buffy Mims ("Chairperson Mims"), ruled on the record that "the Hearing Committee has been

unable to reach a non-binding determination" and ordered additional briefing. Then, for over four (4) years, the AHHC did not issue its Report, leaving Mr. Klayman to very reasonably that this matter had been concluded without discipline because of Board on Professional Responsibility Rule 12.2 and District of Columbia Bar Rule XI(9)(a) (collectively the "Rules"), which are identical in effect. Rule 12.2 unequivocally provides and mandates:

> The Hearing Committee's report shall be filed with the Board not later than 120 days following the conclusion of the hearing. The 120 days provided for by the Court's rules for the preparation of the Hearing Committee's report shall start to run at the conclusion of the hearing.

Yet, on September 20, 2023 – **over four (4) years after the AHHC Hearing concluded** - the AHHC incredibly without factual, legal and other bases reversed course 180 degrees and issued an AHHC Report and instead recommended a one-year suspension with a potentially career ending reinstatement provision, as Mr. Klayman is 74 years old.

As set forth below in *supra* section II(A), this egregious violation of the Rules constitutes a clear due process violation, resulting in severe harm and prejudice to Mr. Klayman, particularly given the fact that this delay was intentionally calculated and manufactured to allow the illegal and unethical "stacking" of disciplinary proceedings against Mr. Klayman, as explained below.

### c.  Facts Pertaining To Collateral Challenge to Disciplinary Proceeding

There is currently pending a lawsuit brought by Mr. Klayman styled *Klayman v. District of Columbia Court of Appeals et al*, 1:24-cv-2997 (D.C.D.)(the "*Douglass* Case") where Mr. Klayman has sought relief pursuant to recent landmark decision of the U.S. Court of Appeals for the District of Columbia Circuit in *Frederick Douglass Found., Inc. v. District of Columbia*, 82 F.4th 1122 (D.C. Cir. 2023), which expressly found that selective prosecutorial First and Fifth Amendment viewpoint discrimination, which is entirely analogous to what Mr. Klayman has

suffered and continues to suffer, *supra* section II(B)(5),  is unconstitutional and illegal. As set forth below, numerous other Courts have applied *Douglass'* reasoning.

*Douglass* involved the Frederick Douglass Foundation ("Foundation"), a pro-life foundation, which had its advocates arrested for writing with chalk "Black Pre-Born Lives Matter." *Id*. at 1131. The Foundation sued the District of Columbia, alleging among other causes of action, First Amendment free speech selective enforcement. As evidence of disparate discriminatory treatment, the Foundation pointed to the fact that in the summer of 2020, "thousands of protesters flooded the streets of the District to proclaim 'Black Lives Matter.' Over several weeks, the protesters covered streets, sidewalks, and storefronts with paint and chalk. The markings were ubiquitous and in open violation of the District's defacement ordinance, yet none of the protesters were arrested." *Id*.  The D.C. Circuit found that both the Foundation and the BLM protestors were similarly situated and that the Foundation had adequately alleged that the District of Columbia had engaged in viewpoint selective prosecutorial discrimination in violation of the First Amendment:

> In particular, the District permitted individuals expressing the "Black Lives Matter" message to violate the defacement ordinance, as evidenced by the widespread painting, graffiti, and other defacement on public sidewalks, streets, and buildings, and on private property. By making no arrests, the police effectively exempted advocates of the "Black Lives Matter" message from the requirements of the ordinance. In contrast, the police showed up in force to the Foundation's small rally and arrested individuals who chalked "Black Pre-Born Lives Matter" on the sidewalk. *Id*. at 1142.

The D.C. Circuit reasoned and ruled that: "It is fundamental to our free speech rights that the government cannot pick and choose between speakers, not when regulating and not when enforcing the laws." *Id*. at 1141. "[T]he government has no authority to license one side to fight freestyle, while forbidding the other to fight at all." *Id*. at 1142. "The government may not enforce the laws in a manner that picks winners and losers in public debates. It would undermine

the First Amendment's protections for free speech if the government could enact a content-neutral law and then discriminate against disfavored viewpoints under the cover of prosecutorial discretion." *Id*. at 1142.

This was confirmed and followed by the Honorable Trevor McFadden ("Judge McFadden") in *Associated Press*. *Associated Press* refers to Judge McFadden's memorandum opinion granting a motion for preliminary injunction filed by the Associated Press ("AP") against the Trump administration for First Amendment viewpoint discrimination. Judge McFadden unequivocally held, "if the Government opens its doors to some journalists—be it to the Oval Office, the East Room, or elsewhere—it cannot then shut those doors to other journalists because of their viewpoints. **The Constitution requires no less**." *Associated Press* at 2. In *Associated Press*, the AP moved for preliminary injunction relief on the grounds that they had been excluded from both the press pool and larger pre-credentialed media events at the White House after refusing to comply with the Trump administration's changing of the name of the Gulf of Mexico to the Gulf of America. *Associated Press* at 1. At the evidentiary hearing – a hearing which Appellant Klayman was improperly denied by the Honorable Reggie Walton ("Judge Walton") in the *Douglass* Case, as set forth below - the AP was able to show through unrefuted testimony and evidence that "the AP's witnesses made clear that its text reporters have been systematically and almost completely excluded from events open to the broader White House press corps since February 13, while its photographers have suffered curtailed access." *Associated Press* at 9. Furthermore, the Trump administration "conceded that the record reveals viewpoint-discriminatory motives, so all indicators point to retaliation.." *Associated Press* at 33. Under these circumstances and facts, Judge McFadden found that "AP has shown that it is likely to succeed on the merits of its First Amendment and retaliation claims, both for its exclusion

from eligibility for press pool and limited-access events." *Associated Press* at 36. Judge McFadden therefore ordered that the Trump administration "put the AP on an equal playing field as similarly situated outlets, despite the AP's use of disfavored terminology" and declared that "the AP's exclusion has been contrary to the First Amendment and it enjoins the Government from continuing down that unlawful path." *Associated Press* at 40 – 41.

This same principle has been confirmed again in *Susman Godfrey LLP v. Exec. Office of the President,* 2025 U.S. Dist. LEXIS 123029 (D.D.C. June 27, 2025) where the Honorable Loren AliKhan granted Susman Godfrey's Motion for Summary Judgment against the Trump administration and issued a permanent injunction enjoining the Trump administration from "implementing, enforcing, or giving effect to Executive Order 14,263 in any way." In her accompanying memorandum opinion, Judge AliKhan found that the Trump Administration had engaged in impermissible First Amendment viewpoint discrimination against Susman Godfrey: "The court concludes that the [Trump Administration] Order constitutes unlawful retaliation against Susman for activities that are protected by the First Amendment, including its representation of certain clients, its donations to certain causes, and its expression of its beliefs regarding diversity. Susman is therefore entitled to summary judgment...." *See also* the Honorable Richard Leon ("Judge Leon") in *Wilmer Cutler Pickering Hale and Dorr LLP v. Executive Office of the President et al*, 25-cv-917 (D.D.C.); Honorable Beryl Howell in *Perkins Coie LLP v. U.S. Department of Justice et al*, 1:25-cv-716 (D.D.C.)

Given all of this landmark precedent, Mr. Klayman moved the U.S. District Court for the District of Columbia in the *Douglass* Case for a preliminary injunction enjoining the Bundy Matter, among other relief, which was denied by the Honorable Reggie Walton ("Judge Walton"), and which is currently on appeal in an appeal styled *Klayman v. D.C. Court of Appeals*

et al, 25-7079 (D.C. Cir.). Not only did Judge Walton fail to provide the required evidentiary

hearing on Mr. Klayman's preliminary injunction motion, he appeared uninterested in holding

even a bona fide oral argument at the May 27, 2025 hearing, as shown in the attached transcript.

Exhibit 9. This resulted in Judge Walton instead making the clearly wrong snap prejudgment that

Mr. Klayman was not entitled to a preliminary injunction, and when Mr. Klayman expressly

asked Judge Walton what authority he had to make his off the cuff prejudgment ruling, Judge

Walton simply had no real answer:

> THE COURT: It has nothing to do with the merits of your First Amendment
> claim. My position is that, as I said before -- maybe you don't understand what I'm
> saying -- you had a right to raise it over in the Superior Court. You didn't raise it.
> MR. KLAYMAN: Do you have any authority for that?
> THE COURT: Yes, there's plenty of authority that says --
> MR. KLAYMAN: What authority do you have? You haven't cited any.
> THE COURT: -- I can't tell you --
> MR. KLAYMAN: Other than you felt like making that ruling, because you have
> no authority to cite that. Exhibit 9 at 57:8-21

Judge Walton then severely compounded the irreparable harm caused by his snap

prejudgment by denying Mr. Klayman his right to an evidentiary hearing. The transcript shows

that Mr. Klayman pleaded with Judge Walton to allow him to  even proffer evidence of the

unconstitutional viewpoint discrimination for the benefit of an appeal, which was quickly filed:

> MR. KLAYMAN: So I would respectfully request that I be able to testify here
> today and put evidence on the record to that effect because this issue will go up to
> the D.C. Circuit right away. Exhibit 9 at 49.

> MR. KLAYMAN: I would like to -- I would respectfully request that I be able to
> proffer my exhibits into evidence and authenticate them. They're self-
> authenticating, in any event. I would like them on the record before I take this up.
> Exhibit 9 at 50.

Judge Walton, without any valid basis in fact or law, refused:

> THE COURT: No, I'm not going to entertain all those documents because, as I
> said, until I'm told by the Court of Appeals that you have a right to appear before
> me and raise these issues, which in my view you don't because of the reasons I

previously indicated, and until I'm told otherwise, that information, in my view, is irrelevant. Exhibit 9 at 56.

All of these clear errors strongly evidence the fact that Mr. Klayman has a significant likelihood of success on the merits on this appeal in the *Douglass* Case and a preliminary injunction therefore entered. Not coincidentally, this would not be the first time that Judge Walton has been overruled by the D.C. Circuit, as the higher court recently on June 11, 2024 reversed his finding that Mr. Klayman was a "vexatious litigant" and reversed his dismissal of collateral litigation. *Klayman v. Porter et al*, 22-7123.

Furthermore, Mr. Klayman sought a stay of the Bundy Matter from the DCCA pending the *Douglass* Case both before it issued its August 7, 2025 and again after pending his Petition for Rehearing En Banc, which motions were both denied, further evidencing not only a lack of respect for the authority D.C. Circuit, but also the selective prosecutorial First and Fifth Amendment viewpoint discrimination that Mr. Klayman has suffered and continues to suffer in the very partisan venue of the District of Columbia, as set forth in detail below in *supra* section II(B).

Accordingly, at a minimum, if this Court does not summarily reject reciprocal discipline, this matter should be stayed pending the resolution of the *Douglass* Case, which would moot out the entire Bundy Matter, and by extension, any reciprocal disciplinary proceeding. This landmark decision in *Douglass* is being asserted by both sides of the political spectrum to counteract First Amendment selective viewpoint discrimination and is therefore an issue that will likely go up to the Supreme Court. Thus, a stay pending the resolution of the *Douglass* Case is more than warranted.

**III.    THERE RESPECTFULLY ARE NO FACTUAL AND LEGAL BASES TO IMPOSE RECIPROCAL DISCIPLINE ON MR. KLAYMAN.**

In deciding whether reciprocal discipline is warranted, courts under the U.S. Court of Appeals for the Eleventh Circuit have adopted the *Selling v. Radford*, 243 U.S. 46 (1917) factors. These factors are whether (1) the state proceeding lacked due process; (2) the proof in the state proceeding was so infirm "as to give rise to a clear conviction on our part that we could not, consistently with our duty, accept as final the conclusion" of the state court; or (3) "some other grave reason existed which should convince us that to allow the natural consequences of the judgment to have their effect would conflict with the duty which rests upon us not to disbar except upon the  conviction that, under principles of right and justice, we were constrained so to do." *In re Calvo*, 88 F.3d 962, 966-67 (11th Cir. 1996). This Court, the U.S. District Court for the Middle District of Florida has applied these same factors as well. In re Henry, No. 6:18-mc-26-Orl-23, 2018 U.S. Dist. LEXIS 223135 (M.D. Fla. Dec. 11, 2018)

 As set forth conclusively below, each of these factors weigh strongly against imposition of any reciprocal discipline, and as such, the conduct of Mr. Klayman warrants no reciprocal discipline in this Court.

### A.    THERE WAS A SIGNIFICANT DEPRIVATION OF DUE PROCESS

This case involved an extreme and unprecedented four-year[4] delay from the conclusion of the AHHC hearing in September of 2019 to September of 2023 when the AHHC finally issued its Report. This is indisputably an egregious violation of the Rules, which are identical in effect. Board Rule 12.2 provides:

> The Hearing Committee's report shall be filed with the Board not later than 120 days following the conclusion of the hearing. The 120 days provided for by the Court's rules for the preparation of the Hearing Committee's report shall start to run at the conclusion of the hearing. Board Rule 12.2.

---

[4] The calculation of four (4) years starts from the conclusion of the AHHC hearing as the trigger date. If going by the date that post-hearing briefing and the mitigation and aggravation hearing occurred, then the delay is still an egregious three (3) years.

The DCCA was forced to admit this delay, and in its order of suspension, disingenuously called the delay "regrettable," Suspension Order at 17. However, the DCCA still went out of its way to insert, *ex post facto*, "discretion" into the Rules to provide the Board with an excuse for its patent failure to abide by the Rules. This further shows the highly politicized nature of the entire District of Columbia attorney discipline apparatus. It is obvious to any outside observer that if Mr. Klayman were not a pro-Trump conservative public interest activist attorney, this matter would have been dismissed immediately given the delay. This is the exact type of First Amendment selective viewpoint discrimination that has been found to be illegal and unconstitutional in *Douglass*. *See* supra section II(B).

Put simply, rules are rules. Every bar association is governed by rules. Rules ensure equal treatment and serve as safeguards to natural biases and prejudices from taking over. The rules govern the conduct of every bar member, and thus, every bar member needs to be able to rely on the fact that the promulgated and published rules will be enforced as promulgated as written, without regard for the individual(s) involved. This is the only way that any bar can function by meting out justice in a non-discriminatory way.  Here, there is no possible dispute that the Report is in clear, direct violation of the Rules. For the reasons set forth herein, the Rules create a mandatory duty to comply, and accordingly, this Court must decline to impose reciprocal discipline as a result.

### 1. The Rules of Statutory Construction Require a Finding that the Rules Create a Mandatory Duty of Compliance

The plain language of the Rules use the term "shall" and not "may" and therefore do not include any language that would indicate there is discretion involved, meaning that there is no ambiguity and thus the plain language must be adhered to. *Johnson v. D.C. Dep't of Emp't Servs.*,

111 A.3d 9-10 (D.C. 2015)  states "…we begin with an examination of the plain language of the statute,… which we assume best reflects the intent of the legislature…If the meaning of the statute is plain on its face, resort to legislative history or other extrinsic aids to assist in its interpretation is not necessary."( internal citations omitted)

Of paramount importance, this exact question has already been decided by this very DCCA, which then refused to comply with its own legal precedent in the Bundy Matter. "In this case there is no ambiguity at all in the statutory language, which clearly provides that the applicable assessments "shall" be imposed. It is well established that the word "shall" is "a term which creates a duty, not an option." *Parrish*, 718 A.2d at 136 (D.C. 1998). The Rules say "shall," not "may." There is no wiggle room. This creates a duty, not a discretionary option, as already found by this same Court, and this alone is sufficient grounds for this Court to terminate this reciprocal discipline  proceeding, particularly given the fact that this was not a case of the AHHC missing the deadline by a few days, weeks, or even months.

### 2. The DCCA's Reasoning That Where a Statute Fails to Provide a Sanction, it is "Directory" Creates an Unworkable and Untenable Precedent

The DCCA's Suspension Order chiefly, strangely and  inexplicably relies on argument that when a statute fails to provide a sanction, it is "directory rather than mandatory" and "statutory deadlines for court (or other official) action are presumptively not mandatory if the statute 'imposes a time limit within which a public official must act but does not specify the consequences of noncompliance." Suspension Order at 17 – 18.

By way of strong relevant analogy, this interpretation, however, would render moot and obsolete the Code of the District of Columbia § 12-301 titled "Limitation of time for bringing actions," which states in pertinent part: "[e]xcept as otherwise specifically provided by law,

actions for the following purposes may not be brought after the expiration of the period specified below from the time the right to maintain the action accrues…." Notably absent from this code is any sanction for bringing an action after the expiration of the specified period. The code does not expressly say that such actions shall be dismissed, and thus, there is no explicit "sanction" written into this code. The interpretation by the DCCA would mean that the District of Columbia's statute of limitations statute is merely "directory," and that individuals can file cases outside of these specified time limitations, which is, of course, simply untrue. Thus, in the same vein, the DCCA's reasoning that the Rules are not mandatory also must fail.

### 3. It Is Well Settled That a Regulatory Agency Must Abide By the Time Limits Prescribed to Them

Courts have held that an agency must abide by the time limitations imposed upon it, just like the Board here must abide by the Rules, promulgated by this Court.

This fundamental principle is convincingly found in *Am. Tower Corp. v. City of San Diego*, 763 F.3d 1035 (9th Cir. 2014), as case where the U.S. Court of Appeals for the Ninth Circuit ("Ninth Circuit") analyzed Cal. Gov't Code § 65950, which stated in pertinent part, "Any public agency that is the lead agency for a development project **shall approve or disapprove the project** within . . . [s]ixty days from the determination by the lead agency that the project is exempt from the [CEQA]." *Am. Tower Corp.*, 763 at 1044 (emphasis added). Just like the Rules, the word "shall" is used. Despite this, the Ninth Circuit held that "[t]his is a mandatory time limit." *Id*.

Similarly*, Nat'l Wildlife Fed'n v. Cosgriffe*, 21 F. Supp. 2d 1211 (D. Or. 1998) involved a lawsuit claiming that the Bureau of Land Management ("BLM") had violated the Wildlife and Scenic River Act of 1968 ("WSRA") in part because it had failed to meet the deadline under the WSRA to prepare a comprehensive management plan. *Id*. at 1217.  Under the statute, BLM had

18

three (3) years to do so, but it had failed to do so and was almost six years past the deadline. *Id*. at 1219. Given this enormous delay, the magistrate judge in *Cosgriffe* correctly found that the Plaintiff was entitled to injunctive relief under both the Administrative Procedure Act as well as mandamus standards. *Id*. at 1220.

### 4. "Court Rules" Are Mandatory and Not Discretionary

Furthermore, it cannot be disputed that the Rules are "court rules." The Board Rules are promulgated pursuant Section 4(e)(10) of Rule XI of the Rules Governing the District of Columbia Bar states that the Board may "**adopt rules**, procedures, and policies **not inconsistent** with this rule **or any other rules of this Court**." (emphasis added). In *Liadov v. Mukasey*, 518 F.3d 1003, 1007 (8th Cir. 2008), the Eighth Circuit Court of Appeals held that "[f]ederal courts have often said that statutes and **court rules** establishing time limits are 'mandatory and jurisdictional.'" (emphasis added). The District of Columbia Court of Appeals has also followed this rule. "The Supreme Court has made clear in recent years that time limits codified only in court-made rules…are non-jurisdictional "claim-processing" prescriptions." *Deloatch v. Sessoms-Deloatch*, 229 A.3d 486, 487 (D.C. 2020). Thus, under these cases, the Rules, as a "court rules" are also mandatory and not discretionary.

### 5. Mr. Klayman Has Been Severely Prejudiced Because the Delay in the Bundy Matter Was Intentionally Manufactured to Punitively "Stack" Disciplinary Proceedings

It has become evident, based on the facts and circumstances, that unprecedented delay of the AHHC in issuing its Report in the Bundy Matter, which the DCCA incredibly condoned, was not accidental but instead obviously calculated to allow the "stacking" of this disciplinary proceeding with the another disciplinary proceeding, *In re Klayman*, 20-BG-583 (D.C. Ct. App.) (the "Sataki Matter"), which suspension in the District of Columbia concluded on April 17,

19

2024, and which order of suspension is still being challenged. *Klayman v. Sataki et al*, 24-cv-0226 (D.C. Ct. App.).

Without this "stacking," any period of suspension in the Bundy Matter would have run concurrently with the suspension in the Sataki Matter and would have already been concluded by now. The timeline of events evidences this obvious "stacking":

> July 18, 2019 – The AHHC Hearing in the Bundy Matter concludes, the AHHC finds that ODC failed to prove any ethical violations.
> September 15, 2020 – The AHHC's mitigation and aggravation hearing in the Bundy Matter concludes.
> January 14, 2021 – The Court "temporarily" suspends Mr. Klayman in the Sataki Matter pending final disposition.
> September 15, 2022 – The Court, after twenty (20) months of "temporary" suspension, issues its order suspending Mr. Klayman for eighteen (18) additional months in the Sataki Matter, resulting in a thirty-eight ("38") month total suspension.
> September 11, 2023 – Over four (4) years later, near the end of Mr. Klayman's suspension in the Sataki Matter, the AHHC issues its Report and Recommendation to the Board in the Bundy Matter recommending a twelve (12) month suspension.
> April 17, 2024 – Mr. Klayman's suspension period ends in the Sataki Matter and he becomes eligible to petition for reinstatement.
> July 30, 2024 – The Board issues a Report and Recommendation in the Bundy Matter, sua sponte inexplicably increasing the recommended suspension to eighteen (18) months.
> August 6, 2024 – Mr. Klayman petition for reinstatement in the Sataki Matter.
> August 13, 2024 – The Court issues an order to show cause in the Bundy Matter directing Mr. Klayman to show cause why he should not be temporarily suspended in the Bundy Matter.
> August 7, 2025 – The Court orders an eighteen (18) months suspension in the Bundy Matter.

This "stacking," which based on the facts and circumstances, was obviously intended to inflict maximum harm and work undue prejudice on Mr. Klayman, should not be countenanced. This is the conclusion also reached by the highly respected Supreme Court of Florida. In *Fla. Bar v. Rubin*, 362 So. 2d 12 (Fla. 1978) in dismissing the disciplinary complaint against the respondent attorney:

20

> Whatever other objects the rule may seek to achieve, it obviously contemplates that the Bar should not be free to withhold a referee 's report which it finds loo lenient until additional cases can be developed against the affected attorney, in an effort to justify the more severe discipline which might be warranted by cumulative misconduct. The Bar's violation of the prompt filing requirement in this case, to allow a second grievance proceeding against Rubin to mature, is directly antithetical to the spirit and intent of the rule. In addition, it has inflicted upon Rubin the 'agonizing ordeal' … in excess of that which the rules were designed to tolerate.

*See also Fl. Bar v. D'Ambrosio*, 25 So. 3d 1209 (Fla. 2010)(referring to the practice of "stacking" disciplinary proceedings as "unfair.").  Also, in *Noojin v. Ala. State Bar*, 577 So. 2d 420 (Ala. 1990), the Supreme Court of Alabama reached this same conclusion in enforcing Alabama Rule 11 of the Rules of Disciplinary Enforcement, which states, "disciplinary proceedings shall not be deferred or abated because of substantial similarity to the material allegations of pending criminal or civil litigation, unless authorized by the Disciplinary Board, in its discretion, for good cause shown." *Id*. at 421. In *Noojin* the disciplinary board delayed and deferred disciplinary proceeding against him until he had served a period of probation imposed by the U.S. District Court for the Southern District of Alabama, which prohibited from practicing law for one year. *Id*. Under these facts, the Supreme Court of Alabama overturned Noojin's order of suspension, reasoning, "[t]he delay by the State Bar, however, worked to Noojin's disadvantage. Noojin received the official charges only three to four weeks before the completion of his one-year probation imposed by the court." *Id*. at 424.

Without this stacking, the suspension in this case and the suspension in the Sataki Matter, notwithstanding that neither were warranted, would have run concurrently and have expired by now. Thus, this stacking was  obviously done intentionally to inflict maximum harm and work significantly more prejudice to Mr. Klayman. It is, respectfully, imperative that this Court adopt the principles set forth in *Rubin* and *D'Ambrosio* and *Noojin* as a matter of fundamental fairness

and substantial justice and create precedent to that effect. This is important for all members of the bar, not just Mr. Klayman.

Thus, for all of these reasons set forth above, the DCCA had no basis in fact or law to find that the Rules were "discretionary." Furthermore, Mr. Klayman was severely prejudiced by this delay because it allowed the highly politicized District of Columbia attorney discipline apparatus to illegally and unethically "stack" disciplinary proceedings against him. Taking all of this into consideration, it is abundantly clear that "the procedure [in the District of Columbia] was so lacking in notice or opportunity to be heard as to constitute a deprivation of due process" and thus, this factor weighs heavily in favor of rejecting reciprocal discipline.

### B.    THE IMPOSITION OF RECIPROCAL DISCIPLINE WOULD RESULT IN A GRAVE AND MANIFEST INJUSTICE.

As alluded to above, the imposition of reciprocal discipline in this Court would result in a grave and manifest injustice because the underlying Suspension Order emanated from the highly politicized District of Columbia attorney discipline apparatus. It has regrettably become widely known that the District of Columbia attorney discipline apparatus has become highly politicized and partisan, which  politicization has been compounded and thus increased significantly  in the second Trump presidency. This has resulted in a District of Columbia attorney discipline apparatus that has selectively targeted attorneys who are conservative and Republican activists for removal from the practice of law. The fact that Mr. Klayman and numerous other prominent Republican and conservative activist attorneys have become targeted for legal removal in the District of Columbia has even been observed by liberal Harvard law professor emeritus Alan Dershowitz's book, "Get Trump," which compared the state of affairs to the "kind of ridicule that suspected communists faced during the era of Sen. Joe McCarthy in the 1950s." Exhibit 7, ¶ 30. This is underscored by the fact that during the Trump years in particular, ethics complaints

were filed, accepted and initiated against Trump White House Counsellor Kellyanne Conway[5] over remarks she made on cable news, against former Trump Attorney General William Barr[6] (the complaint was outrageously and incredibly filed by all prior presidents of the District of Columbia Bar as well as a former senior bar counsel) for withdrawing the indictment of General Mike Flynn and for remarks he made on Fox News, Senators Ted Cruz[7] and Josh Hawley[8] over their role in advocating for President Trump in the 2020 presidential election, Professor John Eastman[9] who served as a legal counsel for President Trump, and of course former U.S. Attorney and New York City Mayor Rudy Giuliani[10]  over his representation of President Trump, to name just a few.  Indeed, Giuliani was just recently disbarred by the D.C. Bar over his association with and legal representation of President Trump. And, as the most recent example, Trump Department of Justice Acting Assistant Attorney General for the Civil Division Jeffrey Clark has been recommended to be disbarred by the D.C. Board.[11]

On the other hand, when a complaint was filed against leftist Democrat lawyer David Kendall of Williams & Connolly over his admitted involvement in the destruction of Hillary

---

[5]    https://www.washingtonpost.com/politics/law-professors-file-misconduct-complaint-against-kellyanne-conway/2017/02/23/442b02c8-f9e3-11e6-bf01-d47f8cf9b643_story.html

[6]    https://thehill.com/regulation/court-battles/508489-more-than-two-dozen-dc-bar-members-urge-disciplinary-probe-of-ag

[7]  https://www.texasstandard.org/stories/lawyers-law-students-officially-file-grievances-seeking-to-disbar-senator-ted-cruz/

[8]    https://thehill.com/homenews/state-watch/534783-attorneys-urge-missouri-supreme-court-to-probe-hawleys-actions

[9]    https://www.reuters.com/legal/ex-top-justice-dept-officials-testimony-sought-ethics-hearing-trump-ally-clark-2022-10-06/

[10]   https://www.law.com/newyorklawjournal/2021/03/03/nyc-bar-details-complaints-calling-for-full-attorney-discipline-investigation-of-giuliani/#:~:text=Under%20the%20New%20York%20state,censured%20or%20receive%20no%20punishment.

[11] It is therefore no coincidence that during the second Trump presidency, the Board issued its Report *sua sponte* increasing the recommended sanction to a completely unsupportable eighteen (18) months, an additional six (6) months from the original already baseless twelve (12) months recommended by the AHHC.

23

Clinton's 33,000 emails, many classified, and illegally retained on a private server, which complicity is not even in dispute, ODC summarily and quickly rejected a complaint filed by former Justice Department lawyer and conservative lawyer and public interest advocate Ty Clevenger, who was also pursued by ODC with the goal of disbarring him as well. Comp. ¶ 35. Furthermore, Kevin Clinesmith, the former senior FBI lawyer and admittedly anti-Trump partisan who dishonestly falsified a surveillance document in the Trump-Russia investigation and who pled guilty to felony charges—was completely ignored by ODC and only temporarily suspended for only <u>five (5) months</u> after he pled guilty, and only after ODC's "blind eye" was uncovered and subjected to negative publicity. <u>Exhibit 7 ¶ 36</u>. In stark contrast, the Michigan Bar automatically suspended Clinesmith immediately upon his felony conviction, and then ordered a suspension period of two (2) years. *Id*. And lastly, as set forth in the *Douglass* Case Complaint is a reference to a report written by Paul Sperry titled "Trump's Toughest Foe Could Be Harris Lawyer Marc Elias" (the "Elias Article"). The Elias Article details how Marc Elias' ("Elias") efforts to use the court system to prevent Donald Trump from being elected president. The Elias Article discloses in pertinent part:

> The longtime Democratic Party lawyer has already filed more than 60 preelection lawsuits to stop Trump from becoming president again by combatting what he calls Republican "voter suppression" efforts such as requiring voters to provide identification at the polls.
>
> …
>
> At the same time, Elias has been sending letters to election officials in Georgia and other key swing states threatening legal action if they uphold challenges to voter rolls to remove noncitizens and other ineligible registrants.
>
> …
>
> As general counsel to Hillary Clinton's 2016 presidential campaign, he helped lead the effort to manufacture and leak spurious "opposition research" claiming to reveal illicit ties between Trump and Russia. Elias later testified that he was

worried – then as now – that Trump was a threat to democracy: "I received information that was troubling as someone who cares about democracy." That "information" turned out to be a fictitious "dossier" linking Trump to the Kremlin crafted by former British spook and FBI informant Christopher Steele, who huddled with Elias in his Washington office.

…

But Elias has since taken on other clients – including Kamala Harris – who have more than made up for the loss in revenue. So far in this election cycle, the latest FEC filings show the Elias Law Group has received a total of more than $22 million in disbursements from a host of major Democratic and anti-Trump clients.

Concerning Elias' efforts with regard to the 2016 election, "[s]pecial Counsel John Durham found Elias intentionally sought to conceal Clinton's role in the dossier. According to court records, Elias acted as a cutout for more than $1 million in campaign payments for the dossier." As the Elias Article set forth, the Durham probe as disclosed by Paul Sperry "**raised ethical issues with the D.C. Bar**" and Elias' former law firm, Perkins Coie, reportedly leading to their breakup in August 2021…." Given that Elias was never disciplined by the D.C. Bar, the only conclusion is that this was also covered up and buried by the D.C. attorney discipline apparatus. Exhibit 7 ¶¶ 38 – 39.

The above shows a clear-cut pattern and practice of First Amendment viewpoint discrimination and selective prosecution that would clearly constitute a "grave and manifest injustice" if adopted by the Court.

### C. THERE IS CLEARLY INADEQUATE MUCH MORE CLEAR AND CONVINCING EVIDENCE OF ANY MISCONDUCT, WHICH IF ANY, WARRANTS SIGNIFICANTLY DIFFERENT DISCIPLINE.

The DCCA's Suspension Order notably and incredibly does not contain a single record cite. To the contrary, Mr. Klayman's briefs contained a litany of cites to the record supporting each and every one of his arguments. The reason for this disparity is that the DCCA adopted wholesale the Board's strategy of taking ODCs' unproven and biased arguments and treating

them as evidence, thereby bypassing ODC's duty under Board Rule 11.5 to actually prove ethical violations by "clear and convincing" evidence. At the AHHC hearing, ODC did not call a single substantive material witness, despite there being numerous witnesses who had contemporaneous knowledge of the events at issue, as set forth below. Whether this decision was (1) a result of a tactical error by ODC, (2) driven by ODC's arrogance in believing that they did not have to prove anything for the AHHC and the Board to adopt her arguments as factual finding, or (3) the obvious scenario being that there were simply no witnesses that would support ODC's fabricated allegations, the bottom line is ODC did not even attempt to actually prove anything with independent material witnesses, as opposed to only its biased prosecutor, Julia Porter. To the contrary, Mr. Klayman testified under oath, refuting each of ODC's fabricated allegations, along with a multitude of witnesses, including Dean Chemerinsky of the University of California at Berkeley's Boalt Hall.

Yet, time and time again, the underline evidence and underline testimony placed on the record by Mr. Klayman was simply ignored in favor of mere allegations by ODC, which were essentially adopted wholesale by the DCCA. This has been the *modus operandi* of the entire District of Columbia attorney discipline apparatus, where there will be a cascading series of errors with the AHHC making a clearly erroneous finding which is first adopted wholesale without bona fide review by the Board and then next almost slavishly adopted wholesale without bona fide review by the DCCA. This is underscored by the incredible lack of record cites in the DCCA's Suspension Order!  The actual record was apparently of little concern to the DCCA.

This fundamental, egregious error is clear. The DCCA ignored the duty and burden of ODC to prove Mr. Klayman's guilt by the requisite "clear and convincing evidence" pursuant Board Rule 11.5 and instead improperly imposed on Mr. Klayman the burden to prove himself

26

innocent. This is completely backwards, and therefore in direct contravention of perhaps the most basic legal tenet in our nation – innocent until proven guilty. *Coffin v. United States,* 156 U.S. 432 (1895).

### 1. There is No Clear and Convincing Evidence that Respondent Knowingly Made False Statements and Was Dishonest

Tellingly, none of the purported "misrepresentations" manufactured by ODC to try to create out of whole cloth ethical violations, which were four (4) years late, and adopted wholesale by the DCCA, having cascaded without much thought from the Board and AHHC, stem from any statements where Mr. Klayman had a duty to provide certain information and subsequently failed to do so. Instead, ODC imposed its own arbitrary set of "requirements" on Mr. Klayman that far exceed what Mr. Klayman was actually ethically obligated to comply with. This is consistent with ODC's strategy of manufacturing *ex post facto* a number of small, petty "ethical violations" against Mr. Klayman – the majority of which are simply false, but the remaining small number based on unintentional, inadvertent and good faith errors made during an extremely complex and highly charged criminal prosecution – to conjure up a case for disciplining Mr. Klayman.

The key point here is that Mr. Klayman was never sanctioned by any of the courts actually involved in his pro hac vice applications or even referred to any bar association or court regulatory authority by any of the parties involved. PFF # 7. Mr. Klayman simply answered the questions that he was asked, and properly gave his opinion where appropriate. He also rightfully engaged in zealous representation of a client who faced life imprisonment. These are not even remotely sanctionable actions, which is the conclusion that expert Dean Chemerinsky reached. PFF # 2, 6. Thus, there was no violation of Rules 3.3(a), 8.1(a), or 8.4(c).

i.    **Statements Regarding Mr. Klayman's Pending D.C. Disciplinary Matter**

The DCCA and the Board both appear to concede that Mr. Klayman's statements concerning the status of the at that time ongoing disciplinary proceeding in the District of Columbia involving his representation of clients against Judicial Watch, *In re Klayman*, 18-BG-100 (D.C. Ct. App.) (the "Judicial Watch Matter"), were "technically accurate," Board Report at 40, Suspension Order at 28, yet still strained to assert that while Mr. Klayman's statements were "technically accurate," they did not meet the arbitrary, nebulous, and undisclosed level of disclosure created by ODC to ironically itself unethically manufacture an ethical violation against Mr. Klayman.

This is conclusively shown in the dissenting opinion of Judge Gould - which negates any possible showing of clear and convincing evidence of any ethics violations - and who actually presided over the appeals in the Bundy Trial, and therefore had firsthand knowledge of the facts at issue, in stark contrast to ODC who reached into Nevada ex post facto to initiate these proceedings. And, regardless of how the Board and then the DCCA tried in vain to conveniently and disingenuously minimize the impact and effectively challenge the integrity of Judge Gould, it is indisputable that his opinion was based on <u>factual findings</u> that Mr. Klayman disclosed all he was required to:

> …[Mr. Klayman] had no greater duty to disclose any possible blemish on his career or reputation beyond responding to the district court's further direct requests. (emphasis added). PFF#5.

ODC does not possess the authority to override the jurisdiction of judges and the courts and impose their own heightened duties to disclose information, and accordingly, the DCCA therefore should not have given deference to the AHHC's outrageously belated findings

28

contained in its Report and instead should have under the extreme circumstances here with the egregious passage of time in particular conducted a *de novo* review.

This is particularly true given, again, the egregious four (4) year delay by the AHHC in even issuing its Report, when memories of what happened at the hearing had long faded, causing the AHHC to conveniently "rubber stamp" what ODC and Porter had submitted in their briefs nearly a half decade earlier. Regrettably, this necessary *de novo* review did not occur, and the Board and then the DCCA instead gave great undue deference to the AHHC and in effect adopted its Report wholesale, leading to the unjustified situation that is present today.

It is also crucial for this Court to carefully consider and affirmatively answer the question that Mr. Klayman was responding to in his pro hac vice application. The application was asking Mr. Klayman to represent:

> [t]hat there are or have been no disciplinary proceedings instituted against petitioner, nor any suspension of any license, certification, or privilege to appear before any judicial, regulatory, or administrative body, or any resignation or termination to avoid disciplinary or disbarment proceedings, except as described in detail below. PFF # 23.

In response, Mr. Klayman accurately disclosed [12] : (1) there was a pending disciplinary proceeding in the District of Columbia, (2) there had been no disciplinary action taken at that

---

[12] **Mr. Klayman's full response**: There is a disciplinary proceeding pending before the District of Columbia Board of Professional Responsibility that was filed almost 8 years ago over a claim by Judicial Watch, my former public interest group that I founded and was Chairman and General Counsel, after I left Judicial Watch to run for the U.S. Senate in Florida in 2003-04, that by representing a former client, employee and donor that it had abandoned, sexually harassed and defrauded that I was in conflict of interest. I represented these persons pro bono, did not breach any confidences with Judicial Watch, and did so only to protect their interests in an ethical fashion. I did not seek to break any agreements with Judicial Watch but rather to have them enforced to help these persons. The matter is likely to be resolved in my favor and there has been no disciplinary action. I recently obtained a jury verdict and court judgment in the U.S. District Court for the Southern District of Florida against Judicial Watch for having maliciously defamed me in the amount of $181,000 USD, including punitive damages. The current directors feel competitive with Mr. Klayman attempted to harm his reputation.

time as it was still pending, and (3) that he believed that it was "likely to be resolved in [Mr. Klayman's] favor." PFF #29. This is a direct, compliant response to the question posed by Judge Navarro and Mr. Klayman was entitled to and did give his opinion about the likely outcome of the disciplinary proceeding. As Judge Gould and Dean Chemerinsky correctly found, the *pro hac vice* application does not ask the applicant to provide intricate details of every single event that occurred during the disciplinary proceeding and no jurist in the middle of a complex criminal trial would even reasonably want all of that information.

However, as a result of Judge Navarro's pattern of clearly favoring the USAO, she inexplicably required that Mr. Klayman provide "verification that the matter in the District of Columbia disciplinary case…has be resolved with no disciplinary action," creating an impossible catch-22, as Judge Navarro was well aware that disciplinary proceedings take a long time to conclude. Tellingly, the Judicial Watch Matter was not resolved until 2020, well after the Bundy Trial had concluded. RX0019. PFF # 35. Judge Navarro denied Mr. Klayman's application on the false premise of a defunct Affidavit of Negotiated Discipline, which, as Mr. Klayman explained in his Supplement to and Renewed Verified Petition, never went into effect because it was withdrawn <u>by both sides</u>. PFF # 33. Mr. Klayman did not disclose this in his initial application because (1) the District Court's pro hac vice application does not ask for it, and (2) pursuant to Board Rule 17.10, it is of no force and effect, except for impeachment purposes. PFF #32. Mr. Klayman also made it clear that he was not bound by the any claimed admissions made in the affidavit because it was clearly only part of negotiation process, which is not admissible under Federal Rule of Evidence 408(2).[13] By way of analogy, even a criminal defendant who is innocent may often take a plea to simply put the matter behind him and not risk trial. And, lastly,

---

[13] "Evidence of the following is not admissible…conduct or a statement made during compromise negotiations about the claim…."

in any event, Mr. Klayman ultimately overrode the affidavit in an email by Mr. Klayman on July 18, 2015 where he clearly withdrew from negotiated discipline. RX0788, Tr.517; PFF 33.

Similarly, Mr. Klayman had no duty to disclose the existence of a non-binding Hearing Committee Report that was issued by the AHHC in the Judicial Watch Matter, as it is not binding on anyone and merely a recommendation to the Board. PFF # 31. ODC provided no basis to claim that Mr. Klayman had any ethical duty to disclose each non-binding, preliminary development in the Judicial Watch Matter. As part of their *modus operandi* and pattern of misconduct, this was another *ex post facto* manufactured heightened standard of disclosure, far beyond what was asked for by the Nevada District Court.

### ii.    Truthful Statements Pertaining to Criminal Experience

The DCCA disregarded the record and adopted the finding by the AHHC that Mr. Klayman somehow "made knowing false statements about his own criminal experience." Mr. Klayman was more than entitled to express his subjective opinion about his criminal defense experience, which was supported by sworn testimony on the record.

During the AHHC hearing, Mr. Klayman gave significant testimony in this regard, leading to the AHHC concluding that ODC had failed to prove any ethical violation. This included testimony that he worked as a trial attorney and prosecutor at the U.S. Department of Justice ("USDOJ") in the Consumer Affairs Section in the Antitrust Division, which "represented…government agencies both in a (criminal) prosecutorial and a defense posture." Tr.391. The Consumer Affairs Section had "significant criminal authority and we had a number of cases with regard to the FDA." Tr.182. PFF 12. Mr. Klayman further testified that while at the USDOJ he worked on Troxler case, a criminal matter, where he partnered with the assistant chief, John Fleder, to seek to indict Troxler. Tr.184. Furthermore, while at the USDOJ, Mr.

Klayman joined team that break up the monopoly of AT&T. Tr.393. Mr. Klayman worked closely under the lead counsel and was assigned to work with the top brass of MCI. Tr.393. He was a trial counsel on the AT&T case, which has a criminal element to it, from about four to six months before he left to go back into private practice. Tr.180. While Mr. Klayman's name did not appear on the filings of these cases, due to his status as a junior member of the trial teams, Chairperson Mims herself recognized that it was not unusual for young attorneys to not appear on filings. Tr.756.

Then, Mr. Klayman testified further that beyond his significant experience at the USDOJ, he has spent approximately 400-600 hours on criminal defense cases where he is listed as counsel of record. Tr.412, PFF # 16. These matters include representing (1) Margarita Pouchkareva in a massive criminal case involving a racketeering enterprise by the Russian Mafia to bring in illegal immigrants from primarily Chechnya where he negotiated a cooperation agreement for Ms. Pouchkareva, and spent 100 – 200 hours handling this case. Tr.404, Tr.202, PFF #17; (2) Natalia Humm in a criminal case after she had jumped bail and went to Belize after she had negotiated a plea agreement with a former lawyer, Tr. 407, where he did a lot of work trying to put the prior plea agreement back in place and was attorney of record for approximately two to four months before the case was transferred to Orlando from Miami, Florida. Tr. 408– 409, PFF # 19; (3) Jose Basulto as a witness in a criminal case involving Cuban spies and a shoot down of four brothers rescue planes by Fidel Castro's Air Force, Tr.203, where he was handling the crux of the representation, along with the assistance of the ACLU. Tr.206, PFF #20; (4) clients in the BCCI criminal case that was a liquidation commission for BCCI's Macau branch. Tr.194; and (5) a three-month trial of alleged criminal contempt against the Clinton Administration in the case of *Alexander v. FBI* in the U.S. District Court through the District of

Columbia. RSX0252–0263. Although Alexander began as a civil case, Mr. Klayman testified, "[b]ecause a criminal case, if you commit the criminal act in the context of the civil case, it can be converted into a criminal contempt proceeding." Tr.719.

With all of this experience presented to the AHHC - none of which was refuted by ODC, as they did not see fit to call a single substantive material witness - Mr. Klayman's subjective opinion, to which he was entitled, that he had "extensive experience" in complex federal criminal litigation was certainly not dishonest. Mr. Klayman was entitled to his subjective opinion. As even further evidence of Mr. Klayman's experience and qualification, he represented Mr. Bundy at the Ninth Circuit, where he is a member, after Judge Navarro dismissed charges against him and the USAO appealed and was hugely successful there.

Furthermore, Mr. Klayman properly provided his subjective opinion, to which he was also entitled, regarding the criminal defense experience of Mr. Bundy's local counsel, Mr. Hansen and Mr. Whipple. PFF#46-48. With regard to Mr. Hansen, he signed and filed the *pro hac vice* application seeking Mr. Klayman's admission into the Bundy Trial, clearly showing that he personally saw the need for Mr. Klayman to be a part of the trial team.

With regard to Mr. Whipple, Mr. Klayman testified at the AHHC hearing his subjective opinion regarding Mr. Whipple's experience was based on:

> "my own analysis as I said in talking to him that he didn't seem to have a great depth of federal criminal practice because he didn't even know what a petition for a writ of mandamus was -- I had to send him a copy of it -- and for other discussions in terms of his strategy, what he was planning to do." Tr. 135.

Chairperson Mims herself recognized:

> "Well, if it's true that Mr. Whipple made a statement that he didn't know what a writ of mandamus was or whatever -- I don't remember exactly which pleading he was referring to. If that's true, is it fair that he would not have had pause about his level of expertise to defend Mr. Bundy?" PFF#48.

Indeed, as strong evidence of this, Mr. Bundy himself attempted to terminate Mr. Whipple as his attorney. On September 21, 2017, Mr. Whipple, having had his representation terminated by Petitioner Bundy, filed a Motion to Withdraw as counsel, which would have left Bundy without counsel and representing himself pro se at the upcoming trial. *United States of American v. Cliven D. Bundy*, 2:16-cr-46 (D. Nev) (Transcript of September 27, 2017 Motion Hearing). The Honorable Magistrate Judge Peggy Leen ("Judge Leen") of the U.S. District Court for the District of Nevada ("District Court"), who worked under Judge Navarro, held a hearing on Mr. Whipple's motion on September 27, 2017. At the hearing, Mr. Whipple openly admitted that he incredibly was not prepared for trial on October 10, 2017. *Id*. Furthermore, when Mr. Bundy was questioned, he informed the Court that Mr. Whipple had not yet explained to him the possible consequences of the numerous charges against him, nor had he gone over discovery with him. *Id*.

Lastly, the final, crucial point that the DCCA failed to adequately consider is that all of Mr. Klayman's actions were driven by Mr. Bundy's compelling desire under a Sixth Amendment right to counsel to have Mr. Klayman represent him and his dissatisfaction with Mr. Whipple, who showed a cavalier attitude and lazy approach to a case that could have landed Mr. Bundy in prison for the rest of his life, after already having done two years, some in solitary confinement, without bail. Mr. Bundy had a Sixth Amendment right to counsel of choice and he was attempting to exercise that right through having Mr. Klayman represent him initially as part of his legal team. Thus, Mr. Klayman's actions were zealously driven solely in the interest of protecting Mr. Bundy's sacrosanct constitutional rights.

### iii.    Statements Regarding Mr. Bundy's Trial Date

As shown in PFF#50, Mr. Klayman's January 17, 2017 Petition for Writ of Mandamus to the Supreme Court represented that the order by Judge Navarro setting Mr. Bundy's trial date

was "currently in dispute." PFF#50. Mr. Klayman wrote that "[t]he lower court's order concerning the trial sequence will be subject to further legal proceedings and contested before the U.S. Court of Appeals for the Ninth Circuit prior to February 6, 2017." PFF#50. This is what Mr. Klayman believed at the moment of filing and it is clearly not a misrepresentation of the facts at the time. In any event, Respondent testified that "my ultimate fundamental concern was that I be present at any of these trials in the capacity as counsel, that would let me communicate with the lawyers who were representing the other defendants. I could sit inside the well. It would give me access to information that was under seal and things like that." PFF#50. In any event, as this Court is aware, trial dates are fluid and especially so in the Bundy Trial, where Judge Navarro was constantly compromising  the Bundy Matter defendants' constitutional rights and moving and in effect engaging in "musical chairs" coordinating trial sequences and  dates, as there were scores of defendants and the sequence of the trials and their dates were postponed and frequently reset for obvious prejudicial pre-trial publicity reasons triggered by the display of firearms during a period after the infamous Las Vegas massacre at the Mandalay Bay Hotel and Casino.[14] In any event, at worst, this was an unintentional error and certainly not any type of intentional misstatement by Mr. Klayman which does not justify discipline.

### iv.    Statements Regarding Solitary Confinement and Contempt

The DCCA next erroneously adopted the Board's incorrect finding that Mr. Klayman's statement that Judge Navarro had ordered Mr. Bundy into solitary confinement was "recklessly dishonest." Suspension Order at 38, 39.  However, this is not supported by Mr. Klayman's uncontroverted testimony:

> "That is not what Cliven Bundy told me, and with regard to the solitary
> confinement, he was immediately thrown in there, and then after the fact, to the

---

[14] https://www.nbcnews.com/las-vegas-shooting

extent there's any truth to this with regard to Mr. Hansen, that occurred later, but he was originally thrown into solitary confinement. He did not ask to be thrown into solitary confinement." Tr.158.

The DCCA presents no authority that an attorney is not allowed to rely on representations made by his client in pleadings, especially where the representations are based on the firsthand experience of that client. What better possible source is there than the individual who was himself personally experiencing solitary confinement along with his sons? Tellingly, ODC made no attempt to refute Mr. Klayman's testimony. Mr. Bundy was not called as a witness by ODC, which clearly has the burden of proving its allegations. The Board and the AHHC therefore fatally erred by completely ignoring Mr. Klayman's unrefuted sworn testimony despite no contrary evidence to the contrary being placed on the record by ODC. The AHHC incorrectly asserted "Respondent's only "evidence" that Judge Navarro ordered Mr. Bundy to be held in solitary confinement was the fact that Mr. Bundy was held in solitary confinement." AHHC Report at 65. This is simply untrue, as shown by Mr. Klayman's testimony above, but this was not addressed by the Board and then adequately so by the DCCA.

The same applies with regard to Mr. Klayman's assertions that Judge Navarro had threatened Mr. Whipple with contempt. Mr. Klayman's uncontroverted testimony shows:

 "And that's accurate. That's what Bret Whipple told me. And to this day nobody sees the transcript of this sealed hearing that dealt with her husband that she didn't want the public to know about. That's what Mr. Whipple told me. If he was lying, that's Mr. Whipple's problem, but not me, not my problem." Tr.163.

The record shows that Mr. Whipple told Mr. Klayman this. ODC did not attempt to dispute this by calling Mr. Whipple as a witness, and Mr. Whipple has never retracted this statement on any public record. Instead, the AHHC relies solely on Judge Navarro's Answer, where she self-servingly claimed to have never threatened Mr. Whipple with contempt. However, Judge Navarro was also not called as a witness and put under oath in that regard. To the contrary, Mr.

Klayman <u>was</u> under oath at the AHHC hearing. Witness oaths exist for a reason, and testimony given under oath, in person at a hearing must take precedence over unsworn statements written on paper. At most, Judge Navarro's Answer creates conflicting claims, and Mr. Klayman chose to believe Mr. Whipple particularly given Judge Navarro's widely observed favoritism towards the USAO prosecuting the Bundy Trial, as set forth above. This is not a breach of any ethical duty and there is patently no clear and convincing evidence to the contrary.

### V.  Statements Regarding Judge Gould's Findings

Perhaps the most clearly erroneous and bizarre finding of all is that Mr. Klayman somehow was dishonest in literally quoting from a legal opinion, without any assertion much more proof that Mr. Klayman had somehow edited the quote or misquoted the opinion. The DCCA adopted Porter of ODC's unsupported and strange position that Mr. Klayman committed an ethical violation because he took relevant and compelling excerpts of Judge Gould's opinion and placing them into his briefs, *i.e.,* engaged in legal research and writing. This is a truly "interstellar" alleged ethical "violation" that underscores the inherent biases involved. It is not the DCCA's, Board's, AHHC's or ODC's role to dictate Mr. Klayman's legal strategy in writing his briefs and how he advocates for his clients and himself, so long as he accurately quotes portions of the legal opinion he is relying upon. There is not a single piece of legal authority that states that a lawyer may be sanctioned - despite quoting an opinion correctly – for simply not quoting enough of that opinion to satisfy some arbitrary, nebulous, undefined, and undisclosed standard. Doing so would create an incredibly slippery and dangerous slope. Any lawyer writing any brief could be sanctioned when quoting a legal opinion, and the only way around that would be to quote the entire opinion, lest a vindictive counsel attempt to sanction him for not meeting

their arbitrary, manufactured standard of how much quoting is appropriate. This is theatre of the absurd!

In any event, the opinions of the Ninth Circuit panel regarding this matter are publicly available public records available to all parties and were cited in the briefs meaning that Mr. Klayman could not possibly conceal them, even if he had any reason to. Mr. Klayman made no representation that Judge Gould's dissenting opinions were limited to the excerpted portions contained in his briefs.

> **vi.    Statements that Mr. Klayman's Pro Hac Vice Application Was "Pending"**

The DCCA next adopted wholesale the Board's flawed finding that certain pleadings filed by Mr. Hansen which indicated that Mr. Klayman was "of counsel" and that his pro hac vice application was pending somehow constitutes an ethical violation. Even assuming, arguendo, that this is an ethical violation, which is clearly is not as set forth below, wouldn't the responsible party be the attorney of record who signed the pleadings, Mr. Hansen? Yet, Mr. Hansen has not been subject to any discipline in any jurisdiction by a bar or a court.

In sum, the DCCA strained to find an ethical violation regarding Mr. Klayman's statement that his pro hac vice application was "pending." However, this completely ignores the fact that Mr. Klayman was, in fact, at all times, up until the Bundy Trial was concluded by Judge Navarro, attempting to gain pro hac vice admission, not only through the District Court, but also through the Ninth Circuit and Supreme Court. This is the textbook definition of "pending" as it was not <u>finally</u> decided and an accurate description of the circumstances based on the definition

of "pending" provided by Black's Law Dictionary: "Begun, but not yet completed; unsettled; undetermined; in process of settlement or adjustment."[15]

### 2. No Clear and Convincing Evidence That Mr. Klayman Made Frivolous Filings

The DCCA adopts wholesale the false contention that Mr. Klayman violated Rules 3.1, 8.4(a), and engaged in "conduct unbecoming of a member of the bar" by allegedly filing frivolous pleadings, namely the *Bivens* action and the Motion to Disqualify.

With regard to the *Bivens* Complaint, it is undeniable that Mr. Klayman's name does not appear in any signature blocks in either the *Bivens* Complaint or the Amended *Bivens* Complaint. PFF#37. Only Mr. Hansen is listed as counsel of record on these pleadings. PFF#37. Mr. Klayman also testified, "I did not file a *Bivens* action. Mr. Hansen filed it." PFF#37. Mr. Klayman testified that he did help in preparing the *Bivens* action, but that he ultimately did not sign it – only Mr. Hansen did. PFF#37. Despite this avalanche of evidence to the contrary, Porter of ODC has repeatedly and falsely accused Mr. Klayman of filing the *Bivens* Complaint, which in a bit of an ironic turn, is clearly in violation of Rules 8.4 and 3.3 as a blatantly false statement.

The AHHC appeared to concede this, but still strained to fit a square peg into a round hole by using Rule 8.4(a), which states that "[i]t is professional misconduct for a lawyer to . . . [v]iolate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another." Thus, the AHHC, manufactured an ethical violation by saying that Mr. Klayman's limited involvement in helping to prepare the *Bivens* action, despite him again not filing it, is an ethical violation. The problems with this argument are so obvious, yet despite this, the DCCA still erroneously chose to adopt the AHHC's findings wholesale.

---

[15] https://thelawdictionary.org/pending/

*First*, Rule 8.4(a) applies only when an attorney "knowingly assist[s] or induce[s] another to [violate the Rules of Professional Conduct]." Here, Mr. Hansen – the <u>actual</u> counsel who filed the *Bivens* complaint – has not been sanctioned by any Court or Bar authority for the filing of the *Bivens* action, much more subject to disciplinary action by the Nevada Bar or other disciplinary authority and found to have committed an ethical violation. Rule 8.4(a) therefore cannot apply. This is actually illustrated by the case that the DCCA, Board and the AHHC advance in "support" of their position, *In re Asher*, 772 A.2d 1161 (D.C. 2001). In *Asher*, the Respondent fraudulently concealed the fact that his prior associate who had entered an appearance on a case had left to take another job. *Id.* at 1169. Before the Court, the Respondent fabricated the story that his prior associate had fallen ill and was in California. *Id.* When the prior associate found out, Respondent "encouraged" her to back up his fraudulent story, and then dictated a fraudulent letter for the former associate's mother to send to the Court from California. *Id.* The Respondent did this a second time, directing his prior associate to send out a second fraudulent letter to the Court. The prior associate ultimately came clean to the Court. *Id.* Under these facts, this Court found that the Respondent had violated Rule 8.4(a), among other rules. This is because, of course, the Respondent directed his prior associate to remit fraudulent letters to the Court, a clear ethical violation by both the Respondent and the prior associate. These facts are nowhere near similar to here, where the purported conduct at issue is the filing of a *Bivens* complaint for which Mr. Hansen was never sanctioned, reprimanded, or subject to disciplinary action.

*Second*, it must be repeated and emphasized that ODC, for obvious reasons, did not see fit to call Mr. Hansen as a witness, so the record is devoid of any detail as to the extent of Mr. Klayman's participation in the preparation of the *Bivens* action. Yet, despite this lack of evidence, DCCA has omnisciently divined that Mr. Klayman must have been the mastermind

behind everything, and that Mr. Hansen was no more than his pawn. The problem with this is patently clear. It improperly excuses ODC's <u>duty to prove</u> ethical violations by clear and convincing evidence no less. The DCCA was limited to the record and because ODC choose not to, or could not, develop a record that showed any wrongdoing by Mr. Klayman, this cannot be held against Mr. Klayman.

*Third,* assuming arguendo that Mr. Klayman personally filed the *Bivens* action, which is again completely unsupported by the record, the record showed that a *Bivens* Complaint could be filed against judges.[16] PFF#39.Mr. Klayman testified and provided legal authority that a *Bivens* action could possibly be brought against judges. PFF#40.  All of this is strongly supported by the testimony of *pro bono* expert Dean Chemerinsky. Dean Chemerinsky is the nation's preeminent constitutional and ethics law expert, who quite literally wrote the book on constitutional law. Dean Chemerinsky, while not being ideological kin to Mr. Klayman, took time out of his busy schedule to testify on Mr. Klayman's behalf pro bono, Tr. 693, as he clearly saw the critical issues involved. For instance, Dean Chemerinsky confirmed that a *Bivens* action is possible against judges: "In answer to the case, you say there are some cases that are allowed injunctive suits against judges…." Tr.684; PFF#39. He further testified that a lawyer may "attempt to expand on the law by filing legal proceedings, in a case-by-case analysis" so long as it is "within the constraints of the rules of ethics." Tr. 685-86. Then, in response to a direct question from Chairperson Mims regarding whether the filing of five writs was reasonable, Dean Chemerinsky testified:

> "Yes, I do. I think that it was reasonable under the circumstances of this case. This is about the ability of a criminal defendant to have counsel of choice; that the district court had refused to allow the pro hoc vice status; and the defendant

---

[16] *Trump v. United States,* 23-939 (Sup. Ct. 2024), which found that even a president does not have absolute immunity for unofficial and unauthorized acts.

> wanted to have Mr. Klayman represent him. And the only way of having the district court decision reviewed was through these writs of mandamus." Tr. 691.

Thus, all in all, there simply is no ethics violation even if Mr. Klayman personally participated in filing the *Bivens* Complaint, which again, the record clearly shows he did not file. There is therefore no violation of Rule 8.4 with regard to the *Bivens* action. Again, it would be theater of the absurd to discipline Mr. Klayman for trying too hard to uphold Cliven Bundy's Sixth Amendment right to counsel of his choice, no less in a criminal prosecution that could have landed him in a federal maximum security penitentiary for life!

### 3. No Clear and Convincing Evidence of Conduct Prejudicial to the Administration of Justice

The DCCA largely adopts the Board's erroneous finding that Mr. Klayman Rule 8.4(d)'s prohibition against "in conduct that seriously interferes with the administration of justice," erroneous finding that (1) Mr. Klayman of made false and misleading statements, and (2) that Mr. Klayman had "filed" the *Bivens* action.

The DCCA also found a violation based on the number of pleadings that Mr. Klayman filed to try to gain admission pro hac vice to represent Mr. Bundy, in a case with extremely high stakes where he was facing the possibility of life imprisonment. The record reflects that this was conclusively rebutted by the finding of pro bono expert Dean Chemerinsky that number of filings that Mr. Klayman made were reasonable, particularly under the circumstances of the case. PFF#3. In doing so, the DCCA, for whatever reason, grossly minimized to the expert and compelling testimony and opinion of Dean Chemerinsky, who swore under oath in his affidavit that he had "carefully reviewed the documents including but not limited to… Mr. Klayman's pro hac vice applications and supplements thereto…[and] Mr. Klayman's Petition for Writ of Mandamus to the Supreme Court." Exhibit 8. Thus, after having thoroughly read and reviewed

these pleadings, Dean Chemerinsky still found Mr. Klayman's efforts to have been reasonable under the circumstances and thus not frivolous.

This plainly exposes the fact that the DCCA did not review the record, as it adopted without question the Board's false argument that "the number of filings is not the source of an independent charge during these proceedings. Rather, it is the frivolous nature of the filings that constituted misconduct." In a footnote, the DCCA further writes, "even if Dean Chemerinsky had testified that he reviewed the filings…." Suspension Order at fn 25. Had the DCCA simply read Dean Chemerinsky's affidavit, it would have known that their statement was simply false.

Lastly, the DCCA finds that Mr. Klayman violated 8.4 by alleging bias and prejudice with regard to Judge Navarro and the Honorable Jay S. Bybee ("Judge Bybee") of the Ninth Circuit. With regard to Judge Navarro, her bias and prejudice was not even a secret, as observed and revealed and in the Las Vegas Review Journal's article "Editorial - Judge bans defense arguments in Bundy retrial.". With regard to Judge Bybee, once again, there was nothing in the record to disprove Mr. Klayman's subjective opinion that he had exhibited extrajudicial bias and prejudice. ODC chose not to call Judge Bybee as a witness and Mr. Klayman was not allowed discovery in that regard. ODC PFF#69. Mr. Klayman criticism of Judge Bybee's "lack of appreciation and sensitivity" to criminal defendants' Sixth Amendment rights was based on evidence. Mr. Klayman laid out the fact that Judge Bybee's dissent in *Nordstrom v. Ryan*, 762 F.3d 903 (9th Cir. 2014) found that prison officials reading correspondence between a prisoner and his attorney did not constitute a violation of his Sixth Amendment rights, despite the majority holding that it did. Mr. Klayman also cited the fact that Judge Bybee authored supervised legal memoranda working as the head of the Executive Office of the President under George W. Bush defending the harsh and illegal torture of battlefield detainees suspected of

terrorist-related activities. RX0460–0461. PFF # 51. Finally, Judge Bybee is from the tight knit legal community in Las Vegas and is likely friendly with Judge Navarro and sought to deflect from and insulate her inappropriate actions with regard to Mr. Bundy and his hoped-for counsel, Mr. Klayman, and any unintentional error in this regard was due to an inadvertent mistake by Mr. Klayman's associate, which was corrected on the record. Tr. 593.

## III.    CONCLUSION

Based on the foregoing, it is abundantly clear that no reciprocal discipline is respectfully warranted. However, should the Court not summarily decline to impose reciprocal discipline for the compelling reasons set forth herein, this matter respectfully  should be stayed pending resolution of the *Douglass* Complaint and other forthcoming challenges to the Bundy Matter, including to the Supreme Court, in interests of justice and judicial economy.

Mr. Klayman has been a member in good standing with this Court for over forty-six (46) years – almost half a century -- and has never been sanctioned during his years of practice. Mr. Klayman highly cherishes being a member of this Court and he has numerous pending cases representing clients in this Court, for which his clients are counting on his representation. These cases include:

(1) *Loomer v. Maher et al*, 5:24-cv-625 (M.D. Fl.) [Defamation case brought by Plaintiff Laura Loomer against Defendants Bill Maher and Home Box Office, Inc.]
(2) *ROKiT World Inc et al v. Rocketball LTD et al*, 3:24-cv-879 (M.D. Fla.) [ Case brought by the Plaintiffs against the Houston Rockets and their legal counsel for RICO violations, fraud, and assault]
(3) *Able Events et al v. Rocket Ball Ltd et al*, 3:24-cv-1041 (M.D. Fla.) [ Case brought by the Plaintiffs against the Houston Rockets and their legal counsel for RICO violations, fraud, and assault]
(4) *ROKit World Inc et al  v. Williams Grand Prix Engineering Limited et al*, 3:25-cv-0167 (M.D. Fla.) [Case brought by the Plaintiff against Williams Grand Prix Engineering and its agents for fraud ].

Mr. Klayman also has three cases which originated in this Court and are now up on appeal and

could, if successful with petitions for rehearing en banc, would be remanded back to this Court for further proceedings This must also respectfully weigh heavily on this Court's decision-making based not just on the facts and  law, but also the equities, in the interests of justice. This will prevent a manifest injustice.

DATED: September 22, 2025                    Respectfully submitted,


/s/ Larry Klayman
Larry Klayman, Esq.
7050 W. Palmetto Park Road
Boca Raton, FL 33433
Email: leklayman@gmail.com
Tel: 561-558-5336

*Pro Se*

# EXHIBIT 1

# KLAYMAN LAW GROUP, P.A.

7050 W Palmetto Park Rd, Boca Raton, FL 33433 • Ph (561) 449-0808 | leklayman@gmail.com

Via Federal Express (Priority Delivery)

August 12, 2025

United States District Court for the Middle District of Florida
300 North Hogan Street
Jacksonville, Florida 32202

Re: Letter of August 8, 2025 from DC Bar Counsel Concerning Larry Klayman.

Dear Ladies and Gentlemen:

On August 8, the District of Columbia Office of  Bar Counsel ("ODC"), which has become highly partisan if not weaponized under its Bar Counsel Hamilton Fox and his Deputy Julia Porter, sent to you a letter informing you of an opinion of the District of Columbia Court of Appeals  ("DCCA") which purports to sanction me over my representation of Cliven Bundy several years ago.

The conduct of ODC, in sending this letter before I even had a chance to move for rehearing en banc, and before the suspension order is even in effect, underscores their improper if not unethical partisan conduct. This is set forth in the enclosed Respondent Larry E. Klayman's Emergency Motion to Stay Implementation of August 7, 2025 Order.

In addition, this matter, as explained in this motion, is being challenged in the following court proceedings, all of which are active and seek to remedy the unethical and illegal conduct of ODC, the Board of Responsibility and the DCCA, all of which have engaged in First Amendment Viewpoint Discrimination such that the DCCA opinion is subject to being enjoined and vacated as violative of the Constitution and based on the long prejudicial delay violative of the DCCA's own rules. Notwithstanding the lack of factual or legal merit of the Bundy disciplinary proceeding, the prejudicial delay was obviously designed to stack a sanction on me, as a prior one, which is also under legal challenge, had expired. *See Fla. Bar v. Rubin*, 362 So. 2d 12 (Fla. 1978) (holding that "the Bar should not be free to withhold a referee 's report which it finds loo lenient until additional cases can be developed against the affected attorney, in an effort to justify the more severe discipline which might be warranted by cumulative misconduct.")

Ongoing legal proceedings pertaining to by representation of Cliven Bundy are: (1) *In re Klayman*, 24-BG-689 (D.C. Ct. App.)[The ongoing disciplinary proceeding where I will be filing a Petition for Rehearing En Banc and other relief] and (2) *Klayman v. D.C. Court of Appeals et al*, 1:24-cv-2997 (D.D.C.)[a case based on compelling precedent from the U.S. Court of Appeals for the District of Columbia Circuit in *Frederick Douglass Found., Inc. v. District of Columbia*, 82 F.4th 1122 (D.C. Cir. 2023) finding that First Amendment Viewpoint Discrimination similar to what the D.C. Bar has engaged in is impermissible and unconstitutional.

As a result, I respectfully request that any consideration of reciprocal proceeding be postponed for consideration until I file a petition for rehearing as set forth in my enclosed motion to stay and these legal challenges run their course as a matter of due process and fundamental fairness.

There is little dispute that ODC, its Board and very pliant DCCA have become highly partisan if not unhinged during the Trump years, with a myriad of ethics proceedings against conservative and Republican pro- Trump lawyers. In my case I am a target as the founder of both Judicial Watch and Freedom Watch, two conservative government watchdogs who support the president. Of the many examples of others singled out are William Barr, Jeff Clark, John Eastman, Ken Paxton, Kari Lake, Kellyanne Conway, Ted Cruz, Josh Hawley, and Rudy Giuliani.

Please feel free to contact me with any questions.

Sincerely,

Larry Klayman, Esq.

Cc: Robert Klein, Esq.
    Freeman Mathis & Gary, LLP

# EXHIBIT A



# OFFICE OF DISCIPLINARY COUNSEL

August 8, 2025

**Hamilton P. Fox, III**
*Disciplinary Counsel*

**Julia L. Porter**
*Deputy Disciplinary Counsel*

*Senior Assistant Disciplinary Counsel*
Jack Metzler
Becky Neal

*Assistant Disciplinary Counsel*
Hendrik R. deBoer
Caroll G. Donayre
Jerri U. Dunston
Lisa M. Fishelman
Dru M. Foster
Jason R. Horrell
Ebtehaj Kalantar
Jelani C. Lowery
Sean P. O'Brien
Melissa J. Rolffot
William R. Ross
Mariah K. Shaver
Traci M. Tait
Cynthia G. Wright

*Investigative Attorney*
Arquimides R. Leon
Azadeh Matinpour

*Senior Staff Attorney*
Lawrence K. Bloom

*Staff Attorney*
Angela M. Walker

*Manager, Forensic Investigations*
Charles M. Anderson

United States District Court for the Middle District of Florida
300 North Hogan Street
Jacksonville, Florida 32202

     **Re:**  ***In re Larry E. Klayman***
        **DCCA No. 24-BG-0689**
        **Disciplinary Docket No. 2017-D051**
        <u>**NOTICE OF SUSPENSION**</u>

To Whom It May Concern:

   Enclosed please find a copy of an order of the District of Columbia Court of Appeals disciplining the above-named Respondent. Our records reflect that Respondent is also licensed to practice law in your jurisdiction.

   If you require additional documents regarding this disciplinary matter, please do not hesitate to contact me at (202) 638-1501 or at odcinfo@dcodc.org, and I will forward your inquiry to the attorney assigned to this matter.

   In order to receive a certified copy of D.C. Court of Appeals disciplinary order, please make the request to the following e-mail address and include the matter's BG or BS number:

    E-mail: BarGovernanceFilings@dcappeals.gov
    With a copy to Omolola Oluyemi: OOluyemi@dcappeals.gov

        Sincerely,

        s/Lawrence K. Bloom
        Lawrence K. Bloom
        Senior Staff Attorney

LKB/act

cc: Larry E. Klayman, via email to leklayman@gmail.com

Enclosure:  DCCA Court Order for *In re Larry E. Klayman*
       *Disciplinary Docket No. 2017-D051*

# EXHIBIT B

# IN THE DISTRICT OF COLUMBIA COURT OF APPEALS

_____

**In the Matter of:**

**LARRY E. KLAYMAN, ESQ.**

**Respondent.**

                               **No. 24-BG-689**
                               **Board Docket No: 18-BD-070**
                               **BDN: 2017-D051**

**A Member of the Bar of the District of
Columbia Court of Appeals
(Bar Registration No. 334581)**

## RESPONDENT LARRY E. KLAYMAN'S  EMERGENCY MOTION TO STAY IMPLEMENTATION OF AUGUST 7,  2025 ORDER

Respondent Larry Klayman ("Mr. Klayman") hereby moves the Court for an order staying implementation of the Panel's August 7, 2025 order (the "Order") suspending Mr. Klayman from the practice of law for eighteen (18) months pending the resolution of his forthcoming timely Petition for Rehearing En Banc (the "Petition"). In the Order, the panel expressly noted that one of Mr. Klayman's chief arguments—that Board Rule 12.2 ("Rule 12.2") required—without providing for any "discretion"—the Ad Hoc Hearing Committee ("AHHC") to issue its Report and Recommendation within 120 days could only be considered when the Court sat en banc. The panel specifically held, "this court may overrule prior precedent only when it sits en banc." Order at fn. 14. Accordingly, Mr. Klayman will be filing a Petition, and this matter must respectfully at a minimum be stayed pending resolution, as the Office of Disciplinary Counsel ("ODC"), despite being put on notice that the Petition and other challenges to the Order were forthcoming, already rushed to send out letters to foreign jurisdictions, state

1

bars ,and courts where Mr. Klayman is licensed practice law  in order to try to maliciously harm him and his clients and try to trigger reciprocal discipline which is extremely time consuming and costly. <u>Exhibit A</u>. Incredibly, the suspension order does not even take effect for 30 days, as the Office of Bar Disciplinary Counsel admitted just today, in its letter of August 11, 2025, where it stated, "Attached please find a copy of the Court's decision and order of August 7, 2025. **The Court ordered that you be suspended effective in 30 days, in accordance with D.C. Bar R. XI, § 14(f)**." <u>Exhibit B</u> (emphasis added).  ODC acted similarly in the past, as notification of discipline in the District of Columbia is to be by self-reporting, and there is no rule that requires ODC to take this notification into their hands, particularly in this matter where the suspension order has yet to even go into effect. This underscores the "weaponization" and malevolence by ODC, which even advocated for Mr. Klayman's disbarment, which was not warranted to say the least. Litigation remains pending concerning these unethical and unnecessary acts by ODC. *Klayman v. Porter et al*, 20-cv-3109 (D.D.C.).

Notwithstanding the considerable and compelling equities in granting a stay, the Court must can also take into account four factors: (1) whether the movant is likely to succeed on the merits, (2) whether denial of the stay would cause irreparable injury, (3) whether granting  the stay would harm other parties, and (4) whether the public interest favors granting a stay." *Doyle v. Barilla USA Int'l*, 2017 D.C. Super. LEXIS 25, 13-14 (D.C. 2017). As shown herein, each and every one of these elements are satisfied here and, accordingly, the stay requested by Mr. Klayman must respectfully  be granted.

*First*, Mr. Klayman will suffer irreparable harm absent a stay. This is shown through ODC's premature and unauthorized rush to issue letters to foreign jurisdictions where Mr.

2

Klayman is licensed to practice law just one (1) day after the issuance of the Order, despite being on notice of his forthcoming Petition and other challenges to the Order. This was done in order to prematurely trigger reciprocal discipline in those jurisdictions, harm Mr. Klayman's ability to practice in those jurisdictions where he currently represents numerous clients, and to destroy his reputation and standing in those foreign jurisdictions. And, when Mr. Klayman emailed ODC asking them to rescind these premature letters when he discovered what had been done, ODC did not even give Mr. Klayman the courtesy of a response. Exhibit B. This has caused Mr. Klayman irreparable harm, and in order to mitigate this harm, a stay must be issued so that Mr. Klayman can inform these foreign jurisdictions, bars and courts that this matter has been stayed pending his forthcoming Petition and other challenges to the Order to avoid further harm at this time.

*Second*, Mr. Klayman is likely to succeed on the merits, as shown in his attached initial brief to this Court, Exhibit C. There are numerous factual and legal inaccuracies contained in the Order that will be addressed in full in Mr. Klayman's forthcoming Petition[1] and which show his likelihood of success on the merits.  A stay of the Order is also more than warranted pending resolution of Mr. Klayman's forthcoming Petition on the grounds that Board on Professional Responsibility Rule 12.2 has been egregiously and prejudicially violated by the Ad Hoc Hearing

---

[1] For instance, as just one example, the Order inaccurately states that a currently ongoing case styled in *Klayman v. District of Columbia Court of Appeals, et al*, 1:24-cv-2997 (D.D.C.) (the "*Douglass* Case"), where Mr. Klayman has sought relief for First Amendment viewpoint discrimination and which this Court has been named as a Defendant, had been "dismissed." Order at fn 29. This is not true, as it is currently pending before the Honorable Reggie Walton ("Judge Walton") in the U.S. District Court for the District of Columbia. Judge Walton only denied Mr. Klayman's Motion for Temporary Injunction, which is currently on appeal to the U.S. Court of Appeals for the District of Columbia Circuit, and for which Mr. Klayman sought an expedited appeal.

Committee ("AHHC") and later the Board of Professional Responsibility , resulting in severe prejudice to Mr. Klayman. Rule 12.2 provides unequivocally that "[t]he Hearing Committee's report shall (not may)  be filed with the Board not later than 120 days following the conclusion of the hearing…."

Here, the AHHC delayed issuing their report for **over four years**[2] without any justification or even an attempt at providing a reason for such a delay. This conspicuous silence is due to the fact that this delay was a tactical and intentional attempt to "stack" disciplinary proceedings against Mr. Klayman, a practice which has been found to be both illegal and unethical by courts and jurisdictions. *See e.g. Fla. Bar v. Rubin*, 362 So. 2d 12 (Fla. 1978), *Fl. Bar v. D'Ambrosio*, 25 So. 3d 1209 (Fla. 2010). The delay was intentionally calculated to coincide with the conclusion of Mr. Klayman's suspension in another matter, *In re Klayman*, 18-BG-100 (D.C. Ct. App.), to ensure that Mr. Klayman remain suspended from the practice of law for the longest possible period of time. At age 74, the eighteen months suspension could end his career in the District of Columbia, which has been distinguished if not unparalleled and preeminent  in the field of public interest government watchdog law in particular.

In the Order, the panel concedes that this delay was "regrettable" – which is more than a an understatement --  but claims that there is nothing that they could do because "this court may overrule prior precedent only when it sits en banc." Order at fn. 14.

---

[2] This is another factual inaccuracy contained in the  panel's Order, where it misstates the length of delay as only being three (3) years: "And while we recognize that a three-year delay is frustratingly long, Mr. Klayman has offered no reason why the length of the delay alone requires us to diverge from our prior case law." Order at 19. There are many more factual and legal errors at issue.

Mr. Klayman will therefore comply with the panel's suggestion and with no lack of respect it's dodge of this important issue,  and file his timely Petition, which will further demonstrate ample case authority that shows that the AHHC had no "discretion" to intentionally and egregiously violate Rule 12.2, particularly under the extreme facts of this case. The panel's apparent reasoning that "where the statute fails to provide for a "sanction," it is not mandatory falls flat, given just even one analogous example.  Statutes of limitations  do not provide a "sanction" when it they are not met and adhered to. It simply informs what the deadline is. Rule 12.2 is, in effect, a statute of limitations and must be interpreted as such. It is notable that the Ad Hoc Hearing Committee never even moved the Board for an extension of this deadline.

*Third*, a brief stay would not impact any other parties. ODC would be suffer no prejudice from a brief stay while his Petition and other challenges to the Order are decided. And, on the other hand, as set forth above, absent this stay, Mr. Klayman will suffer extreme harm and prejudice given that ODC has shown that it will, in bad faith, prematurely attempt to irreparably harm Mr. Klayman's ability to practice in foreign jurisdictions, bars, courts and otherwise.

 In this regard, Mr. Klayman had previously moved for sought a stay of this disciplinary action pending the outcome of the *Douglass* Case, *Klayman v. District of Columbia Court of Appeals, et al*, 1:24-cv-2997 (D.D.C.), which motion was apparently signed and denied by the clerk of this Court, without any apparent consideration from any judges. As set forth above, the *Douglass* case sought relief for violations of Mr. Klayman's constitutional rights as a result of the Defendants' illegal First Amendment viewpoint discrimination evidenced by their refusal to enforce Rule 12.2. This matter, which is currently pending before Judge Walton, is currently on appeal as well to the U.S. Court of Appeals for the District of Columbia Circuit with regard to

Judge Walton having improperly denied Mr. Klayman's Motion for Temporary Injunction. Mr. Klayman has sought expedited review of this appeal. Exhibit C. *Klayman v. District of Columbia Court of Appeals et al*, 25-7079 (D.C. Cir.). Given that the Court has already refused to stay the disciplinary proceeding pending this ongoing *Douglass* matter, which would moot out this entire disciplinary proceeding, at a minimum it must at this time respectively grant a staying pending Mr. Klayman's forthcoming Petition and other challenges to the Order.[3]

*Fourth*, the public interest favors a stay, particularly since there is an issue of exceptional importance involving Rule 12.2 that seriously implicates the constitutional and other rights of not just Mr. Klayman, but each and every member of the District of Columbia Bar. Attorneys who are licensed to practice in the District of Columbia need to know that they can count on the rules being enforced equally and without regard to the person(s) involved, and that the rules will be enforced as written, without *ex post facto* subtext being inserted to avoid enforcement. In and of itself, given the exceptional importance of this case, the suspension order should be stayed pending full court review, not just as a matter of law but of the equities involved.

WHEREFORE, the Order must at a minimum be stayed pending the resolution of Mr. Klayman's forthcoming Petition for Rehearing En Banc given the importance of adjudicating

---

[3] It is "regrettable," to use the panel's language, that this Court did not defer in issuing its suspension order pending resolution before the D.C. Circuit of Mr. Klayman's motion for preliminary injunction in the Douglass case. Given the long delay in this case not caused by Mr. Klayman and prima facie violation of Rule 12.2, such deference would have been the just and fair thing to do, before issuing  issue a suspension order before the D.C. Circuit could rule on Mr. Klayman's motion for an expedited appeal. The Court is a party to this case and thus the panel was on notice of it and the Court even appeared through counsel before Judge Walton. In addition, Mr. Klayman brought it to the attention of the Court and also the panel on a number of occasions. Thus, the precipitous issuance of a suspension order was unnecessary, unjust and unfair at this time. Now Mr. Klayman should at least be granted a stay of the suspension order to allow him to seek en banc review.

this inherent egregious delay in violation of the Court's own rule, which has also severely prejudiced Mr. Klayman through the illegal practice of "stacking" disciplinary proceedings and otherwise, as well as its exceptional importance to the each and every member of the District of Columbia Bar.

Mr. Klayman sought consent from ODC but received not even the professional courtesy of a response. Exhibit B.

Mr. Klayman respectfully requests a hearing on this urgent matter before the judges of the court.[4]

Date: August 12, 2025                                      Respectfully submitted,

                                                      /s/ Larry Klayman
                                                      Larry Klayman
                                                      Klayman Law Group, P.A.
                                                      7050 W. Palmetto Park Rd
                                                      Boca Raton, FL, 33433
                                                      Tel: (561)-558-5336
                                                      Email: leklayman@gmail.com

                                                      Respondent Pro Se


## CERTIFICATE OF SERVICE

I, Larry Klayman, hereby certify that on this day, August 12, 2025 a copy of the foregoing was filed using the Court's ECF system and served on counsel for all parties via the Court's ECF system.

                                                      /s/ Larry Klayman

---

[4] Previous motions to stay were signed by the Clerk of the Court and there is no indication that judges were involved in deny stay orders. Given the exceptional importance of this case, the en banc panoply of judges should consider  and rule on this motion to stay.

7

# EXHIBIT A



# OFFICE OF DISCIPLINARY COUNSEL

August 8, 2025

**Hamilton P. Fox, III**
*Disciplinary Counsel*

**Julia L. Porter**
*Deputy Disciplinary Counsel*

*Senior Assistant Disciplinary Counsel*
Jack Metzler
Becky Neal

*Assistant Disciplinary Counsel*
Hendrik R. deBoer
Caroll G. Donayre
Jerri U. Dunston
Lisa M. Fishelman
Dru M. Foster
Jason R. Horrell
Ebtehaj Kalantar
Jelani C. Lowery
Sean P. O'Brien
Melissa J. Rolffot
William R. Ross
Mariah K. Shaver
Traci M. Tait
Cynthia G. Wright

*Investigative Attorney*
Arquimides R. Leon
Azadeh Matinpour

*Senior Staff Attorney*
Lawrence K. Bloom

*Staff Attorney*
Angela M. Walker

*Manager, Forensic Investigations*
Charles M. Anderson

United States District Court for the Middle District of Florida
300 North Hogan Street
Jacksonville, Florida 32202

**Re:**    ***In re Larry E. Klayman***
**DCCA No. 24-BG-0689**
**Disciplinary Docket No. 2017-D051**
**<u>NOTICE OF SUSPENSION</u>**

To Whom It May Concern:

Enclosed please find a copy of an order of the District of Columbia Court of Appeals disciplining the above-named Respondent. Our records reflect that Respondent is also licensed to practice law in your jurisdiction.

If you require additional documents regarding this disciplinary matter, please do not hesitate to contact me at (202) 638-1501 or at odcinfo@dcodc.org, and I will forward your inquiry to the attorney assigned to this matter.

In order to receive a certified copy of D.C. Court of Appeals disciplinary order, please make the request to the following e-mail address and include the matter's BG or BS number:

E-mail: BarGovernanceFilings@dcappeals.gov
With a copy to Omolola Oluyemi: OOluyemi@dcappeals.gov

Sincerely,

s/Lawrence K. Bloom
Lawrence K. Bloom
Senior Staff Attorney

LKB/act

cc: Larry E. Klayman, via email to leklayman@gmail.com

Enclosure:     DCCA Court Order for *In re Larry E. Klayman*
*Disciplinary Docket No. 2017-D051*



# OFFICE OF DISCIPLINARY COUNSEL

August 8, 2025

**Hamilton P. Fox, III**
*Disciplinary Counsel*

**Julia L. Porter**
*Deputy Disciplinary Counsel*

*Senior Assistant Disciplinary Counsel*
Jack Metzler
Becky Neal

*Assistant Disciplinary Counsel*
Hendrik R. deBoer
Caroll G. Donayre
Jerri U. Dunston
Lisa M. Fishelman
Dru M. Foster
Jason R. Horrell
Ebtehaj Kalantar
Jelani C. Lowery
Sean P. O'Brien
Melissa J. Rolffot
William R. Ross
Mariah K. Shaver
Traci M. Tait
Cynthia G. Wright

*Investigative Attorney*
Arquimides R. Leon
Azadeh Matinpour

*Senior Staff Attorney*
Lawrence K. Bloom

*Staff Attorney*
Angela M. Walker

*Manager, Forensic Investigations*
Charles M. Anderson

United States District Court for the Northern District of Florida
United States Courthouse
111 N. Adams Street
Suite 322
Tallahassee, Florida 32301

> **Re:**   ***In re Larry E. Klayman***
> **DCCA No. 24-BG-0689**
> **Disciplinary Docket No. 2017-D051**
> **<u>NOTICE OF SUSPENSION</u>**

To Whom It May Concern:

Enclosed please find a copy of an order of the District of Columbia Court of Appeals disciplining the above-named Respondent. Our records reflect that Respondent is also licensed to practice law in your jurisdiction.

If you require additional documents regarding this disciplinary matter, please do not hesitate to contact me at (202) 638-1501 or at odcinfo@dcodc.org, and I will forward your inquiry to the attorney assigned to this matter.

In order to receive a certified copy of D.C. Court of Appeals disciplinary order, please make the request to the following e-mail address and include the matter's BG or BS number:

E-mail: BarGovernanceFilings@dcappeals.gov
With a copy to Omolola Oluyemi: OOluyemi@dcappeals.gov

Sincerely,

s/Lawrence K. Bloom
Lawrence K. Bloom
Senior Staff Attorney

LKB/act

cc: Larry E. Klayman, via email to leklayman@gmail.com

Enclosure:    DCCA Court Order for *In re Larry E. Klayman*
              *Disciplinary Docket No. 2017-D051*



# OFFICE OF DISCIPLINARY COUNSEL

August 8, 2025

Hamilton P. Fox, III
*Disciplinary Counsel*

Julia L. Porter
*Deputy Disciplinary Counsel*

*Senior Assistant Disciplinary Counsel*
Jack Metzler
Becky Neal

*Assistant Disciplinary Counsel*
Hendrik R. deBoer
Caroll G. Donayre
Jerri U. Dunston
Lisa M. Fishelman
Dru M. Foster
Jason R. Horrell
Ebtehaj Kalantar
Jelani C. Lowery
Sean P. O'Brien
Melissa J. Rolffot
William R. Ross
Mariah K. Shaver
Traci M. Tait
Cynthia G. Wright

*Investigative Attorney*
Arquimides R. Leon
Azadeh Matinpour

*Senior Staff Attorney*
Lawrence K. Bloom

*Staff Attorney*
Angela M. Walker

*Manager, Forensic Investigations*
Charles M. Anderson

United States District Court for the Northern District of Texas
1100 Commerce Street
Room 1452
Dallas, TX  75242

Re:    ***In re Larry E. Klayman***
       **DCCA No. 24-BG-0689**
       **Disciplinary Docket No. 2017-D051**
       **<u>NOTICE OF SUSPENSION</u>**

To Whom It May Concern:

Enclosed please find a copy of an order of the District of Columbia Court of Appeals disciplining the above-named Respondent. Our records reflect that Respondent is also licensed to practice law in your jurisdiction.

If you require additional documents regarding this disciplinary matter, please do not hesitate to contact me at (202) 638-1501 or at odcinfo@dcodc.org, and I will forward your inquiry to the attorney assigned to this matter.

In order to receive a certified copy of D.C. Court of Appeals disciplinary order, please make the request to the following e-mail address and include the matter's BG or BS number:

E-mail: BarGovernanceFilings@dcappeals.gov
With a copy to Omolola Oluyemi: OOluyemi@dcappeals.gov

Sincerely,

s/Lawrence K. Bloom
Lawrence K. Bloom
Senior Staff Attorney

LKB/act

cc: Larry E. Klayman, via email to leklayman@gmail.com

Enclosure:    DCCA Court Order for *In re Larry E. Klayman*
              *Disciplinary Docket No. 2017-D051*



# OFFICE OF DISCIPLINARY COUNSEL

August 8, 2025

**Hamilton P. Fox, III**
*Disciplinary Counsel*

**Julia L. Porter**
*Deputy Disciplinary Counsel*

*Senior Assistant Disciplinary Counsel*
Jack Metzler
Becky Neal

*Assistant Disciplinary Counsel*
Hendrik R. deBoer
Caroll G. Donayre
Jerri U. Dunston
Lisa M. Fishelman
Dru M. Foster
Jason R. Horrell
Ebtehaj Kalantar
Jelani C. Lowery
Sean P. O'Brien
Melissa J. Rolffot
William R. Ross
Mariah K. Shaver
Traci M. Tait
Cynthia G. Wright

*Investigative Attorney*
Arquimides R. Leon
Azadeh Matinpour

*Senior Staff Attorney*
Lawrence K. Bloom

*Staff Attorney*
Angela M. Walker

*Manager, Forensic Investigations*
Charles M. Anderson

Anthony T. Sodroski, Counsel-in-Charge
The Disciplinary Board of the Supreme Court of Pennsylvania
Office of Disciplinary Counsel
District I Office
1601 Market Street, Suite 3320
Philadelphia, PA 19103-2337
E-mail: anthony.sodroski@pacourts.us

> Re:     ***In re Larry E. Klayman***
> **DCCA No. 24-BG-0689**
> **Disciplinary Docket No. 2017-D051**
> <u>**NOTICE OF SUSPENSION**</u>

Dear Mr. Sodroski:

Enclosed please find a copy of an order of the District of Columbia Court of Appeals disciplining the above-named Respondent. Our records reflect that Respondent is also licensed to practice law in your jurisdiction.

If you require additional documents regarding this disciplinary matter, please do not hesitate to contact me at (202) 638-1501 or at odcinfo@dcodc.org, and I will forward your inquiry to the attorney assigned to this matter.

In order to receive a certified copy of D.C. Court of Appeals disciplinary order, please make the request to the following e-mail address and include the matter's BG or BS number:

E-mail: BarGovernanceFilings@dcappeals.gov
With a copy to Omolola Oluyemi: OOluyemi@dcappeals.gov

Sincerely,

s/Lawrence K. Bloom
Lawrence K. Bloom
Senior Staff Attorney

LKB/act

cc: Larry E. Klayman, via email to leklayman@gmail.com

Enclosure:     DCCA Court Order for *In re Larry E. Klayman*
*Disciplinary Docket No. 2017-D051*



# OFFICE OF DISCIPLINARY COUNSEL

August 8, 2025

Hamilton P. Fox, III
*Disciplinary Counsel*

Julia L. Porter
*Deputy Disciplinary Counsel*

*Senior Assistant Disciplinary Counsel*
Jack Metzler
Becky Neal

*Assistant Disciplinary Counsel*
Hendrik R. deBoer
Caroll G. Donayre
Jerri U. Dunston
Lisa M. Fishelman
Dru M. Foster
Jason R. Horrell
Ebtehaj Kalantar
Jelani C. Lowery
Sean P. O'Brien
Melissa J. Rolffot
William R. Ross
Mariah K. Shaver
Traci M. Tait
Cynthia G. Wright

*Investigative Attorney*
Arquimides R. Leon
Azadeh Matinpour

*Senior Staff Attorney*
Lawrence K. Bloom

*Staff Attorney*
Angela M. Walker

*Manager, Forensic Investigations*
Charles M. Anderson

United States District Court for the Southern District of Florida
Wilkie D. Ferguson, Jr.
U.S. Courthouse
400 North Miami Avenue
Miami, FL 33128

Re:     *In re Larry E. Klayman*
        **DCCA No. 24-BG-0689**
        **Disciplinary Docket No. 2017-D051**
        **<u>NOTICE OF SUSPENSION</u>**

To Whom It May Concern:

Enclosed please find a copy of an order of the District of Columbia Court of Appeals disciplining the above-named Respondent. Our records reflect that Respondent is also licensed to practice law in your jurisdiction.

If you require additional documents regarding this disciplinary matter, please do not hesitate to contact me at (202) 638-1501 or at odcinfo@dcodc.org, and I will forward your inquiry to the attorney assigned to this matter.

In order to receive a certified copy of D.C. Court of Appeals disciplinary order, please make the request to the following e-mail address and include the matter's BG or BS number:

E-mail: BarGovernanceFilings@dcappeals.gov
With a copy to Omolola Oluyemi: OOluyemi@dcappeals.gov

Sincerely,

s/Lawrence K. Bloom
Lawrence K. Bloom
Senior Staff Attorney

LKB/act

cc: Larry E. Klayman, via email to leklayman@gmail.com

Enclosure:     DCCA Court Order for *In re Larry E. Klayman*
               *Disciplinary Docket No. 2017-D051*

# OFFICE OF DISCIPLINARY COUNSEL

August 8, 2025

Hamilton P. Fox, III
*Disciplinary Counsel*

Julia L. Porter
*Deputy Disciplinary Counsel*

*Senior Assistant Disciplinary Counsel*
Jack Metzler
Becky Neal

*Assistant Disciplinary Counsel*
Hendrik R. deBoer
Caroll G. Donayre
Jerri U. Dunston
Lisa M. Fishelman
Dru M. Foster
Jason R. Horrell
Ebtehaj Kalantar
Jelani C. Lowery
Sean P. O'Brien
Melissa J. Rolffot
William R. Ross
Mariah K. Shaver
Traci M. Tait
Cynthia G. Wright

*Investigative Attorney*
Arquimides R. Leon
Azadeh Matinpour

*Senior Staff Attorney*
Lawrence K. Bloom

*Staff Attorney*
Angela M. Walker

*Manager, Forensic Investigations*
Charles M. Anderson

United States Supreme Court
Perry Thompson
Director of Bar Admissions
United States Supreme Court
1 First Street, N.E.
Washington, DC  20543-0001
E-mail: troyal@supremecourt.gov

> **Re:**   ***In re Larry E. Klayman***
> **DCCA No. 24-BG-0689**
> **Disciplinary Docket No. 2017-D051**
> **<u>NOTICE OF SUSPENSION</u>**

Dear Mr. Thompson:

Enclosed please find a copy of an order of the District of Columbia Court of Appeals disciplining the above-named Respondent. Our records reflect that Respondent is also licensed to practice law in your jurisdiction.

If you require additional documents regarding this disciplinary matter, please do not hesitate to contact me at (202) 638-1501 or at odcinfo@dcodc.org, and I will forward your inquiry to the attorney assigned to this matter.

In order to receive a certified copy of D.C. Court of Appeals disciplinary order, please make the request to the following e-mail address and include the matter's BG or BS number:

E-mail: BarGovernanceFilings@dcappeals.gov
With a copy to Omolola Oluyemi: OOluyemi@dcappeals.gov

Sincerely,

s/Lawrence K. Bloom
Lawrence K. Bloom
Senior Staff Attorney

LKB/act

cc:  Larry E. Klayman, via email to leklayman@gmail.com

Enclosure:        DCCA Court Order for *In re Larry E. Klayman*
                  *Disciplinary Docket No. 2017-D051*



# OFFICE OF DISCIPLINARY COUNSEL

August 8, 2025

Hamilton P. Fox, III
*Disciplinary Counsel*

Julia L. Porter
*Deputy Disciplinary Counsel*

*Senior Assistant Disciplinary Counsel*
Jack Metzler
Becky Neal

*Assistant Disciplinary Counsel*
Hendrik R. deBoer
Caroll G. Donayre
Jerri U. Dunston
Lisa M. Fishelman
Dru M. Foster
Jason R. Horrell
Ebtehaj Kalantar
Jelani C. Lowery
Sean P. O'Brien
Melissa J. Rolffot
William R. Ross
Mariah K. Shaver
Traci M. Tait
Cynthia G. Wright

*Investigative Attorney*
Arquimides R. Leon
Azadeh Matinpour

*Senior Staff Attorney*
Lawrence K. Bloom

*Staff Attorney*
Angela M. Walker

*Manager, Forensic Investigations*
Charles M. Anderson

United States Court of Appeals for the Fifth Circuit
600 South Maestri Place
Suite 115
New Orleans, LA 70130

Re:    ***In re Larry E. Klayman***
***DCCA No. 24-BG-0689***
***Disciplinary Docket No. 2017-D051***
***<u>NOTICE OF SUSPENSION</u>***

To Whom It May Concern:

Enclosed please find a copy of an order of the District of Columbia Court of Appeals disciplining the above-named Respondent. Our records reflect that Respondent is also licensed to practice law in your jurisdiction.

If you require additional documents regarding this disciplinary matter, please do not hesitate to contact me at (202) 638-1501 or at odcinfo@dcodc.org, and I will forward your inquiry to the attorney assigned to this matter.

In order to receive a certified copy of D.C. Court of Appeals disciplinary order, please make the request to the following e-mail address and include the matter's BG or BS number:

E-mail: BarGovernanceFilings@dcappeals.gov
With a copy to Omolola Oluyemi: OOluyemi@dcappeals.gov

Sincerely,

s/Lawrence K. Bloom
Lawrence K. Bloom
Senior Staff Attorney

LKB/act

cc: Larry E. Klayman, via email to leklayman@gmail.com

Enclosure:    DCCA Court Order for *In re Larry E. Klayman*
*Disciplinary Docket No. 2017-D051*

*Serving the District of Columbia Court of Appeals and its Board on Professional Responsibility*

*515 5th Street NW, Building A, Room 117, Washington, DC 20001 ▪ 202-638-1501, FAX 202-638-0862*

# OFFICE OF DISCIPLINARY COUNSEL

August 8, 2025

**Hamilton P. Fox, III**
*Disciplinary Counsel*

**Julia L. Porter**
*Deputy Disciplinary Counsel*

*Senior Assistant Disciplinary Counsel*
Jack Metzler
Becky Neal

*Assistant Disciplinary Counsel*
Hendrik R. deBoer
Caroll G. Donayre
Jerri U. Dunston
Lisa M. Fishelman
Dru M. Foster
Jason R. Horrell
Ebtehaj Kalantar
Jelani C. Lowery
Sean P. O'Brien
Melissa J. Rolffot
William R. Ross
Mariah K. Shaver
Traci M. Tait
Cynthia G. Wright

*Investigative Attorney*
Arquimides R. Leon
Azadeh Matinpour

*Senior Staff Attorney*
Lawrence K. Bloom

*Staff Attorney*
Angela M. Walker

*Manager, Forensic Investigations*
Charles M. Anderson

United States Court of Appeals for the Ninth Circuit
P.O. Box 193939
San Francisco, CA  94119-3939

**Re:**     *In re Larry E. Klayman*
**DCCA No. 24-BG-0689**
**Disciplinary Docket No. 2017-D051**
**<u>NOTICE OF SUSPENSION</u>**

To Whom It May Concern:

  Enclosed please find a copy of an order of the District of Columbia Court of Appeals disciplining the above-named Respondent. Our records reflect that Respondent is also licensed to practice law in your jurisdiction.

If you require additional documents regarding this disciplinary matter, please do not hesitate to contact me at (202) 638-1501 or at odcinfo@dcodc.org, and I will forward your inquiry to the attorney assigned to this matter.

  In order to receive a certified copy of D.C. Court of Appeals disciplinary order, please make the request to the following e-mail address and include the matter's BG or BS number:

  E-mail: BarGovernanceFilings@dcappeals.gov
  With a copy to Omolola Oluyemi: OOluyemi@dcappeals.gov

       Sincerely,

       s/Lawrence K. Bloom
       Lawrence K. Bloom
       Senior Staff Attorney

LKB/act

cc: Larry E. Klayman, via email to leklayman@gmail.com

Enclosure:  DCCA Court Order for *In re Larry E. Klayman*
       *Disciplinary Docket No. 2017-D051*



# OFFICE OF DISCIPLINARY COUNSEL

August 8, 2025

Hamilton P. Fox, III
*Disciplinary Counsel*

Julia L. Porter
*Deputy Disciplinary Counsel*

*Senior Assistant Disciplinary Counsel*
Jack Metzler
Becky Neal

*Assistant Disciplinary Counsel*
Hendrik R. deBoer
Caroll G. Donayre
Jerri U. Dunston
Lisa M. Fishelman
Dru M. Foster
Jason R. Horrell
Ebtehaj Kalantar
Jelani C. Lowery
Sean P. O'Brien
Melissa J. Rolffot
William R. Ross
Mariah K. Shaver
Traci M. Tait
Cynthia G. Wright

*Investigative Attorney*
Arquimides R. Leon
Azadeh Matinpour

*Senior Staff Attorney*
Lawrence K. Bloom

*Staff Attorney*
Angela M. Walker

*Manager, Forensic Investigations*
Charles M. Anderson

United States Court of Appeals for the District of Columbia Circuit
Office of the Clerk
333 Constitution Avenue N.W.
Washington DC  20001
E-mail: Nancy_Dunn@cadc.uscourts.gov

     **Re:**   ***In re Larry E. Klayman***
        **DCCA No. 24-BG-0689**
        **Disciplinary Docket No. 2017-D051**
        **<u>NOTICE OF SUSPENSION</u>**

To Whom It May Concern:

  Enclosed please find a copy of an order of the District of Columbia Court of Appeals disciplining the above-named Respondent. Our records reflect that Respondent is also licensed to practice law in your jurisdiction.

  If you require additional documents regarding this disciplinary matter, please do not hesitate to contact me at (202) 638-1501 or at odcinfo@dcodc.org, and I will forward your inquiry to the attorney assigned to this matter.

  In order to receive a certified copy of D.C. Court of Appeals disciplinary order, please make the request to the following e-mail address and include the matter's BG or BS number:

  E-mail: BarGovernanceFilings@dcappeals.gov
  With a copy to Omolola Oluyemi: OOluyemi@dcappeals.gov

      Sincerely,

      s/Lawrence K. Bloom
      Lawrence K. Bloom
      Senior Staff Attorney

LKB/act

cc: Larry E. Klayman, via email to leklayman@gmail.com

Enclosure:  DCCA Court Order for *In re Larry E. Klayman*
       *Disciplinary Docket No. 2017-D051*



# OFFICE OF DISCIPLINARY COUNSEL

August 8, 2025

Hamilton P. Fox, III
*Disciplinary Counsel*

Julia L. Porter
*Deputy Disciplinary Counsel*

*Senior Assistant Disciplinary Counsel*
Jack Metzler
Becky Neal

*Assistant Disciplinary Counsel*
Hendrik R. deBoer
Caroll G. Donayre
Jerri U. Dunston
Lisa M. Fishelman
Dru M. Foster
Jason R. Horrell
Ebtehaj Kalantar
Jelani C. Lowery
Sean P. O'Brien
Melissa J. Rolffot
William R. Ross
Mariah K. Shaver
Traci M. Tait
Cynthia G. Wright

*Investigative Attorney*
Arquimides R. Leon
Azadeh Matinpour

*Senior Staff Attorney*
Lawrence K. Bloom

*Staff Attorney*
Angela M. Walker

*Manager, Forensic Investigations*
Charles M. Anderson

The Florida Bar
651 East Jefferson Street
Tallahassee, FL  32399-2300
E-mail: psavitz@floridabar.org

Re:    ***In re Larry E. Klayman***
**DCCA No. 24-BG-0689**
**Disciplinary Docket No. 2017-D051**
**<u>NOTICE OF SUSPENSION</u>**

To Whom It May Concern:

Enclosed please find a copy of an order of the District of Columbia Court of Appeals disciplining the above-named Respondent. Our records reflect that Respondent is also licensed to practice law in your jurisdiction.

If you require additional documents regarding this disciplinary matter, please do not hesitate to contact me at (202) 638-1501 or at odcinfo@dcodc.org, and I will forward your inquiry to the attorney assigned to this matter.

In order to receive a certified copy of D.C. Court of Appeals disciplinary order, please make the request to the following e-mail address and include the matter's BG or BS number:

E-mail: BarGovernanceFilings@dcappeals.gov
With a copy to Omolola Oluyemi: OOluyemi@dcappeals.gov

Sincerely,

<u>s/Lawrence K. Bloom</u>
Lawrence K. Bloom
Senior Staff Attorney

LKB/act

cc: Larry E. Klayman, via email to leklayman@gmail.com

Enclosure:    DCCA Court Order for *In re Larry E. Klayman*
*Disciplinary Docket No. 2017-D051*



# OFFICE OF DISCIPLINARY COUNSEL

August 8, 2025

Hamilton P. Fox, III
*Disciplinary Counsel*

Julia L. Porter
*Deputy Disciplinary Counsel*

*Senior Assistant Disciplinary Counsel*
Jack Metzler
Becky Neal

*Assistant Disciplinary Counsel*
Hendrik R. deBoer
Caroll G. Donayre
Jerri U. Dunston
Lisa M. Fishelman
Dru M. Foster
Jason R. Horrell
Ebtehaj Kalantar
Jelani C. Lowery
Sean P. O'Brien
Melissa J. Rolffot
William R. Ross
Mariah K. Shaver
Traci M. Tait
Cynthia G. Wright

*Investigative Attorney*
Arquimides R. Leon
Azadeh Matinpour

*Senior Staff Attorney*
Lawrence K. Bloom

*Staff Attorney*
Angela M. Walker

*Manager, Forensic Investigations*
Charles M. Anderson

United States District Court for the District of Columbia
Office of the Clerk
333 Constitution Avenue N.W.
Washington, DC  20001
E-mail: dcdml_intake@dcd.uscourts.gov

**Re:**     ***In re Larry E. Klayman***
**DCCA No. 24-BG-0689**
**Disciplinary Docket No. 2017-D051**
**<u>NOTICE OF SUSPENSION</u>**

To Whom It May Concern:

Enclosed please find a copy of an order of the District of Columbia Court of Appeals disciplining the above-named Respondent. Our records reflect that Respondent is also licensed to practice law in your jurisdiction.

If you require additional documents regarding this disciplinary matter, please do not hesitate to contact me at (202) 638-1501 or at odcinfo@dcodc.org, and I will forward your inquiry to the attorney assigned to this matter.

In order to receive a certified copy of D.C. Court of Appeals disciplinary order, please make the request to the following e-mail address and include the matter's BG or BS number:

E-mail: BarGovernanceFilings@dcappeals.gov
With a copy to Omolola Oluyemi: OOluyemi@dcappeals.gov

Sincerely,

s/Lawrence K. Bloom
Lawrence K. Bloom
Senior Staff Attorney

LKB/act

cc: Larry E. Klayman, via email to leklayman@gmail.com

Enclosure:     DCCA Court Order for *In re Larry E. Klayman*
*Disciplinary Docket No. 2017-D051*

# EXHIBIT B

 Gmail

**Oliver Peer <oliver.peerfw@gmail.com>**

---

## Re: In re Larry Klayman - Disciplinary Docket No. 2017-D051

**Larry Klayman** <leklayman@gmail.com>                                   Sat, Aug 9, 2025 at 9:21 AM
To: Angela Thornton <thorntona@dcodc.org>
Cc: "Julia L. Porter" <porterj@dcodc.org>, Lawrence Bloom <blooml@dcodc.org>, Oliver Peer <oliverpeerfw@gmail.com>

Attn Hamilton Fox, Julia Porter and Lawrence Bloom and Office of Bar Disciplnary Counsel

Your having prepared these notices to courts and jurisdictions where I am admitted before I can even file a petition for rehearing and move to stay the suspension order in the interim demonstrates not just the unethical and illegal pattern and practice of your actions, but to also do so as I am contesting the Bundy matter in the U.S. Court of Appeals for the District of Columbia Circuit with regard to a preliminary injunction over the Board of Professional Responsibility and the District of Columbia Court of Appeals, is actionable.

There is also the related case that remains before Judge Reggie Walton, as well as other pending litigation, that concerns this conduct.

I suggest that mailing or sending by other means these notices be held in abeyance while I litigate the petition for rehearing at a minimum (I also have right to seek redress by the D.C. Circuit and the U.S. Supreme Court), as matter not just of professional ethics but again as to the illegality of your vindictive actions in terms of viewpoint discrimination and other causes of action.

That you would rush to  jump the gun before I could even seek redress with a petition for rehearing, and the D.C. Court of Appeals itself ruled that the full court must litigate the egregious delay and stacking issues, the panel claiming falsely that it could not abide by and enforce the court's own promulgated rules, underscores  how your collective intent and actions are only designed to harm me, my colleagues and family, before I can even exercise my due process rights.

My motion to stay will be forthcoming Monday. Please defer to it and either not send or withdraw these notices at this time. If you do not do so, you all can expect further otherwise unnecessary litigation as I have no choice but to protect our rights.

Please confirm Immediately that you will not send these notices at this time as I contest the suspension order with a petition for rehearing.  There is no need to run up time and expense for me until I can petition for rehearing as the D.C. of Appeals suggested that I do, at a minimum.

Govern yourselves accordingly.

Larry Klayman
Respondent and Plaintiff

On Fri, Aug 8, 2025 at 12:47 PM Angela Thornton <thorntona@dcodc.org> wrote:

> Dear Mr. Klayman, please see attached.
>
>
> Angela C Thornton
>
> Office of Disciplinary Counsel

 Gmail

**Oliver Peer <oliver.peerfw@gmail.com>**

---

## Fwd: in re Larry Klayman - Disciplinary Docket No. 2017-D051

**Larry Klayman** <leklayman@gmail.com>                                      Mon, Aug 11, 2025 at 11:52 AM
To: Oliver Peer <oliverpeerfw@gmail.com>

Use this

---------- Forwarded message ---------
From: **Angela Thornton** <thorntona@dcodc.org>
Date: Mon, Aug 11, 2025, 11:40 AM
Subject: in re Larry Klayman - Disciplinary Docket No. 2017-D051
To: Larry Klayman <leklayman@gmail.com>
Cc: Julia L. Porter <porterj@dcodc.org>, Lawrence Bloom <blooml@dcodc.org>


Dear Mr. Klayman,  Attached please find a copy of the Court's decision and order of August 7, 2025. The Court ordered that you be suspended effective in 30 days, in accordance with D.C. Bar R. XI, § 14(f). The Court decision and order, as well as the Court rules, specifically D.C. Bar R. XI, § 14(g), require you to file with the Court and the Board on Professional Responsibility and serve on Disciplinary Counsel an affidavit demonstrating your compliance with the provisions of the Court order and D.C. Bar R. XI, § 14. Your affidavit should be filed with the Court and the Board and served on Disciplinary Counsel.


Angela C Thornton

---

 **Respondent Ltr notifying of DCCA Decision.pdf**
1003K

# EXHIBIT C

## IN THE DISTRICT OF COLUMBIA COURT OF APPEALS

_____

In the Matter of:

    **LARRY E. KLAYMAN, ESQ.**

**Respondent.**

**A Member of the Bar of the District of Columbia Court of Appeals (Bar Registration No. 334581)**

**ORAL ARGUMENT REQUESTED**

  **No. 24-BG-689**
  **Board Docket No: 18-BD-070**
  **BDN: 2017-D051**

---

## RESPONDENT LARRY KLAYMAN'S PRINCIPAL BRIEF

---

Date: November 22, 2024

Larry Klayman, Esq.
Klayman Law Group, P.A.
7050 W. Palmetto Park Rd
Boca Raton, FL, 33433
Tel: (561)-558-5336
Email: leklayman@gmail.com

*Respondent Pro Se*

1

## TABLE OF CONTENTS

STATEMENT OF ISSUES ............................................................................1

STATEMENT OF THE CASE AND FACTS ...............................................1

    Facts Pertaining to Mr. Klayman's Representation of Cliven Bundy ..........................2

    Facts Pertaining to the Disciplinary Proceeding ...........................................7

SUMMARY OF THE ARGUMENT ...........................................................11

LEGAL ARGUMENT ..............................................................................12

    This Court Must Enforce The Rules Which It Has Promulgated, Including Rule 12.2, Equally And Without Regard To The Individual(s) Involved .....................................12

    This Disciplinary Proceeding Constitutes Selective Prosecution in Violation of Mr. Klayman's Constitutional First Amendment Rights As Prohibited By The D.C. Circuit In Douglass.................................................................................16

    ODC Failed To Show Any Ethical Violations ...............................................17

        There is No Clear and Convincing Evidence that Respondent Knowingly Made False Statements and was Dishonest ..................................................19

            Statements Regarding Mr. Klayman's Pending D.C. Disciplinary Matter .........................................................................20

            Truthful Statements Pertaining to Criminal Practice and Defense Experience ....................................................................24

            Statements Regarding Mr. Bundy's Trial Date....................................28

            Statements Regarding Solitary Confinement and Contempt .............29

            Statements Regarding Judge Gould's Findings..................................31

            Correct Statements that Mr. Klayman's Pro Hac Vice Application Was "Pending"................................................................33

        There is No Clear and Convincing Evidence that Mr. Klayman Made Frivolous Filings ..........................................................................34

        There is No Clear and Convincing Evidence of Conduct Prejudicial to the Administration of Justice ................................................................38

    The Sanction Recommended By The Board Is Unsupported By The Facts and Law ....................................................................................42

CONCLUSION .......................................................................................50

## <u>TABLE OF AUTHORITIES</u>

### <u>STATUTES AND RULES</u>

Board Rule 12.2 ................................................................................................. 1, 9 - 16

### <u>CASES</u>

*ABM Onsite Servs.-West, Inc. v. NLRB*, 428 U.S. App. D.C. 63 (2017) ............................... 14

*Ariz. Grocery Co. v. Atchison, T. & S. F. R. Co.*, 284 U.S. 370 (1932) .................................. 15

*Bundy v. United States Dist. Court*, 840 F.3d 1034 (9th Cir. 2016) ................................. 6, 33

*Bridges v. Wixon*, 326 U.S. 135 (1945) ................................................................................ 15

*Coffin v. United States*, 156 U.S. 432 (1895) ....................................................................... 19

*Dep't of Revenue v. Race*, 743 So. 2d 169 (Fla. Dist. Ct. App. 1999). ................................ 15

*Frederick Douglass Found., Inc. v. District of Columbia*, 82 F.4th 1122
(D.C. Cir. 2023) ............................................................................................ 1, 12, 17, 50

*In re Asher*, 772 A.2d 1161 (D.C. 2001) ........................................................................ 35, 36

*In re Barber*, 128 A.3d 637 (D.C. 2015) ............................................................................. 42

*In re Bradley*, 70 A.3d 1189 (D.C. 2013) ....................................................................... 43, 44

*In re Edwards*, 278 A.3d 1171 (D.C. 2022) ................................................................... 42, 43

*In re Morrell*, 684 A.2d 361 (D.C. 1996) ........................................................................ 15, 16

*In re Orci,* 974 A.2d 891 (D.C. 2009) ................................................................................. 42

*In re Shieh*, 738 A.2d 814 (D.C. 1999) ............................................................................... 42

*In re Ukwu*, 926 A.2d 1106 (D.C. 2007) ......................................................................... 44, 45

*Johnson v. D.C. Dep't of Emp't Servs.*, 111 A.3d 9 (D.C. 2015) .................................... 11, 13

*Klayman v. Board on Professional Responsibility*, 24-CV-366 (D.C. Ct. App.) .................... 11

*Loper Bright Enterprises et al v. Raimondo, Secretary of Commerce, et al,* 22-451, (U.S.
2024) ................................................................................................................................ 14

*Nordstrom v. Ryan*, 762 F.3d 903 (9th Cir. 2014) ............................................................... 41

*O'Bryan v. Joe Taylor Restoration, Inc.*, 2021 U.S. Dist. LEXIS 1710
(S.D. Fla. Jan. 6, 2021) .................................................................................................... 47

*Office of Lawyer Regulation v. Napierala (In re Napierala)*,384 Wis. 2d 273 ...................... 46

*Office of Lawyer Regulation v. Podell (In re Podell),* 828 N.W.2d 549 ...........................46, 47

*Parrish v. District of Columbia*, 718 A.2d 133 (D.C. 1989................................................13, 14

*United States v. Bundy*, 968 F.3d 1019 (9th Cir. 2020). ..........................................................4

*Varela v. Hi-Lo Powered Stirrups, Inc.,* 424 A.2d 61 (D.C. 1980).........................................13

*Willis v. Villa Piana Corp.*, 2022 U.S. Dist. LEXIS 215372 (N.D. Tex. Nov. 29, 2022)..........48

## STATEMENT OF ISSUES

Whether there is any basis to impose discipline on Respondent Larry Klayman ("Mr. Klayman") for his zealous advocacy to obtain pro hac vice admission in the criminal prosecution of Cliven Bundy ("Mr. Bundy") in the U.S. District Court for the District of Nevada ("Nevada Court") where the disciplinary proceeding is (1) plainly time-barred pursuant to Board on Professional Responsibility ("Board") Rule 12.2 ("Rule 12.2"), (2) is a textbook example of First Amendment viewpoint and selective prosecution discrimination found to be illegal in *Frederick Douglass Found., Inc. v. District of Columbia*, 82 F.4th 1122 (D.C. Cir. 2023) ("*Douglass*"), and (3) Office of Disciplinary Counsel ("ODC") has failed to, and in fact did not even attempt to, fulfill its duty to actually prove any ethical violations by any measure, much more the applicable "clear and convincing evidence" standard?

## STATEMENT OF THE CASE AND FACTS

Mr. Klayman is a prominent conservative and Republican public interest litigator, activist and advocate who has been a member of the District of Columbia Bar since December 22, 1980; that is nearly forty-five years, almost half a century. Mr. Klayman cherishes the privilege of practicing law in the District of Columbia and this jurisdiction is where he has brought many of his public interest and private practice cases, and his ability to practice law in here is critical to his, his family's, and his colleagues' livelihoods. Mr. Klayman firmly believes in the importance of ethics in the legal profession, which is why he founded first Judicial Watch in 1994 and subsequently Freedom Watch in 2004. In addition

1

to founding these organizations, Mr. Klayman has also had a distinguished career as both a conservative and Republican activist public interest and private attorney. Mr. Klayman respectfully refers this Court to his abbreviated biography, App. 176.

The bottom line is that Mr. Klayman's highly distinguished career is now at stake given that he is now seventy-three (73) years old, and the Board has recommended an eighteen (18) month suspension and reinstatement. Given the unprecedented and extraordinary series of events that have occurred to this point, it would be manifestly unjust to, in effect, end Mr. Klayman's career practicing law in the District of Columbia.

### a. Facts Pertaining to Mr. Klayman's Representation of Cliven Bundy

In or around 2017, Mr. Klayman was retained by Mr. Bundy to represent him in his criminal trial in the Nevada Court stemming from a 2016 standoff with federal agents on Mr. Bundy's land (the "Bundy Trial"). The stakes of the Bundy Trial were extremely high, as Mr. Bundy was facing the possibility of life imprisonment. PFF #3.

Presiding over the Bundy Trial was the Honorable Gloria Navarro ("Judge Navarro"). Because Mr. Klayman was not a member of the Nevada Bar, he moved for admission pro hac vice. Judge Navarro inexplicably denied Mr. Klayman's motion, PFF # 35, and Mr. Klayman appealed that decision to the U.S. Court of Appeals for the Ninth Circuit ("Ninth Circuit"). Ultimately, there were multiple appeals and motions filed by Mr. Klayman to try to gain entrance into the Bundy Trial given that Mr. Klayman felt duty bound to zealously represent his client, Mr. Bundy, who he believed was innocent of the criminal charges.

This was a truly unique and unprecedented high profile criminal prosecution because it was widely observed that there was an enormous amount of prosecutorial misconduct by the U.S. Attorney of the District of Nevada ("USAO") occurring, and that Judge Navarro herself more than appeared to be condoning and, in fact, furthering this prosecutorial misconduct. This even caused the mainstream non-partisan local newspaper, the Las Vegas Review-Journal, to publish an article titled <u>EDITORIAL: Judge bans defense arguments in Bundy retrial</u> which strongly criticized Judge Navarro's apparent favoritism towards the USAO, going so far as to state, "**Judge Navarro's sweeping order reflects a deep mistrust of the American jury system**." Supp. App. 001 – 004.

This flagrant prosecutorial misconduct, which drove Mr. Klayman to zealously seek pro hac vice entry into the Bundy Trial to protect the rights of his client, was more than confirmed when in January of 2018 it had become so egregious that Judge Navarro - after Mr. Bundy had already served two (2) years in prison, including time in solitary confinement - had no choice but to dismiss the charges against Mr. Bundy with prejudice, apparently in order to insulate herself from more criticism in public media and other ridicule for her previous conduct in violation of constitutional and other legal rights. PFF #54. This order was appealed to the Ninth Circuit by the USAO and Mr. Klayman represented Mr. Bundy at the Ninth Circuit during the pendency of this appeal. The Ninth Circuit affirmed Judge Navarro's dismissal while issuing a blistering opinion excoriating the egregious misconduct

of the USAO. A unanimous finding of the three judge panel consisting of Hon. William A. Fletcher, Jay S. Bybee and Paul J. Watford held:

> The prosecution withheld facially exculpatory evidence that directly negated the government's theory that the defendants lied about fearing snipers. The deliberate choices to withhold these documents were not cases of simple misjudgment, especially given that doubt about the helpfulness of evidence should be resolved in favor of disclosure. *United States v. Bundy*, 968 F.3d 1019, 1042 (9th Cir. 2020).

> We note the government's failure to acknowledge and confess any wrongdoing during the course of this case—especially as to material misrepresentations to the district court about the presence of snipers. Rather than accepting responsibility, the government blamed the defense for not requesting more specific information. *Id.* at 1044.

Thus, Mr. Klayman's actions throughout this entire process were driven singularly by his desire and responsibility as a lawyer to zealously protect Mr. Bundy's interests  - and not for personal gain as he was representing Mr. Bundy  pro bono - as he believed, based on facts available to him at the time, that aggressive, zealous representation would be the only way to help ensure that Mr. Bundy did not spend the rest of his life in prison given the egregious prosecutorial and other misconduct that was openly and flagrantly being committed.

Furthermore, Mr. Klayman and Mr. Bundy both observed and agreed that a strong, aggressive counsel from outside of the Las Vegas, Nevada area would be necessary, as those who routinely practiced in that jurisdiction would be fearful of retribution from Judge Navarro, who was the chief judge, the USAO, as well as former Senator Harry Reid, who with President Barack Obama, had nominated Judge Navarro to the federal bench. They

both branded Mr. Bundy and his supporters as "domestic terrorists.[1]" President Barack Obama even appeared to threaten Mr. Bundy with prosecution at the 2014 White House Correspondents' Dinner, where he was quoted as saying[2]:

> I haven't seen anybody pull a 180 that fast since Rand Paul disinvited that Nevada rancher to this dinner. As a general rules, things don't end will if the sentence starts, "Let me tell you something I know about the Negro." You don't really need to hear the rest of it. Just a tip for you. Don't start your sentence that way.

It became   apparent that Mr. Bundy was being politically targeted by Sen. Reid and President Obama's nominated judge, Gloria Navarro[3], and that Mr. Bundy therefore absolutely needed a strong advocate from outside of the Las Vegas legal community who was not afraid to zealously defend each and every one of Mr. Bundy's rights to ensure that he did not spend the rest of his life in prison.

In addition, and importantly, Mr. Bundy and Mr. Klayman both believed that Mr. Bundy's counsel, initially Joel Hanson, Esq. and subsequently Bret Whipple, Esq., were ill equipped to alone handle a defense of this complexity and magnitude on their own, PFF # 46, which is one of the primary reasons that Mr. Klayman tried so hard and zealously  to obtain pro hac vice admission. Judge Navarro, however, regrettably and predictably denied Mr. Bundy and Mr. Klayman's entreaties at every turn, leading to appeals to the Ninth

---

[1] https://www.politico.com/story/2014/04/cliven-bundy-nevada-ranch-harry-reid-105811
[2] https://www.msnbc.com/msnbc/president-obama-mocks-bundy-republicans-white-house-correspondents-dinner-msna321501.
[3] https://thisisreno.com/2010/02/reid-testifies-in-support-of-gloria-navarro-at-senate-judiciary-hearing/

Circuit, where the Honorable Ronald M. Gould ("Judge Gould") was an integral jurist on the panel overseeing the appeals at issue. Judge Gould, a distinguished and honest liberal jurist who is far from Mr. Klayman's ideological kin, recognized what was occurring and made clear factual findings that Mr. Klayman had fulfilled his duty of candor:

> Klayman properly disclosed the ongoing disciplinary proceeding in his initial application for pro hac vice admission, saying that the proceeding had not yet been resolved. This disclosure was accurate…. I agree with Klayman that he was not obligated to re-litigate the D.C. proceeding before the district court and that he did not have to provide the district court with the entire record from D.C. And if his disclosures were selective, still he is an advocate, an advocate representing defendant Cliven Bundy, and after submitting a compliant response to the questions in the pro hac vice application, he had no greater duty to disclose any possible blemish on his career or reputation beyond responding to the district court's further direct requests. *In re: Cliven D. Bundy*, 16-72275 (9th Cir. Oct. 28, 2016). PFF #5. (emphasis added).

Judge Gould  proved himself to be a principled judge who carefully considered the facts at issue regardless of the person(s) involved as a judge's oath of office mandates. In doing so Judge Gould made the following findings: First, that Mr. Klayman submitted "a compliant response to the questions in the pro hac vice application." Second, that he "had no greater duty to disclose any possible blemish on his career or reputation beyond responding to the district court's further direct requests." PFF # 5.

Tellingly Mr. Klayman was never sanctioned or even reprimanded by the Nevada Court or the Ninth Circuit, nor was he even referred to the Nevada Bar or any other bar, nor any court's internal disciplinary committees, for his efforts to gain admission into the Bundy Trial. No party with even a remote connection to the Bundy Trial made any complaint about

Mr. Klayman's actions. Instead, the complaint was submitted, likely on request by ODC by Thomas Fitton, the head of Judicial Watch, the organization that Mr. Klayman founded but later left to run for U.S. Senate in 2003. Fitton, a non-lawyer, apparently seized on an opportunity to try to have Mr. Klayman eliminated as a competitor. One can only conclude that the insecure Fitton viewed Mr. Klayman and his organization Freedom Watch as a threat to "his Judicial Watch," since the two non-profit watchdogs competed for donations and prestige from the same donor base.

**b.    Facts Pertaining to the Disciplinary Proceeding**

Mr. Klayman was therefore summoned before the AHHC in July of 2019 and September of 2019 for disciplinary hearings by ODC. Not only did Mr. Klayman testify in depth, but he also produced numerous character and other material witnesses who testified strongly in favor of him and his character and ethics. Important is the *pro bono* testimony of Professor Erwin Chemerinsky ("Dean Chemerinsky"), dean of the prestigious University of California at Berkeley's Boalt Hall. Dean Chemerinsky is certainly not Mr. Klayman's ideological kin either, but much like Judge Gould, proved to be a principled and honest man, which has clearly contributed to him being one of the most respected and preeminent legal scholars in America. Dean Chemerinsky testified as an expert that he did not believe that Mr. Klayman did anything unethical and that Mr. Klayman's actions were reasonable:

> Yes, I do. I think that [the number of pleadings] was reasonable under the circumstances of the case… This is about the ability of a criminal defendant to have counsel of choice; that the district court had refused to allow the pro hac vice status; and the defendant wanted to have Mr. Klayman represent

him. And the only way of having the district court decision reviewed was through these writs of mandamus. PFF # 3.

Dean Chemerinsky also concurred with Judge Gould's finding that Respondent had fulfilled his duty of candor in filling out the pro hac vice application and that Respondent had answered all the questions that he was required to answer in his pro hac vice application:

> **MR. KLAYMAN**: What I asked him was, based upon your review of the pro hoc vice applications, Exhibit 1 and 5, Respondent's Exhibits 1 and 5, and your experience and expertise in pro hac vice and federal procedure, did I answer all the questions that I was required to answer by those applications.

> **WITNESS CHEMERINSKY**: Yes. Tr. 680-681; RX 0851–0852. PFF # 6.

To the contrary, ODC did not have a single material witness, with only it's biased prosecutor, Julia Porter, serving as both prosecutor and witness – a clear conflict of interest in violation of D.C. Rule of Professional Conduct 3.7. Porter herself has been credibly accused of having engaged in dishonest prosecutorial misconduct, which caused the Board to commit to do a rare internal review.[4]

---

[4] On occasion, some members of ODC, such as Deputy Bar Counsel Porter have engaged in unethical and dishonest conduct themselves, as evidenced by her crusade to have a father and son law firm of J.P. and John Szymkowicz – not coincidentally with J.P. being the only conservative Republican member of the D.C. city government – removed from the practice of law on a contrived and fraudulent Bar disciplinary proceeding involving an alleged female victim that lasted thirteen (13) years which drove them to the brink of bankruptcy by causing them to lose clients and causing extreme emotional distress. When Porter ultimately failed to obtain disbarment or any sanction at all, she then had former Senior Assistant Bar Disciplinary Counsel Michael Frisch, now professor at Georgetown Law School and, like Porter, a leftist Democrat, to defame them in his public blog postings, a tactic that she also used with Mr. Klayman. *See Klayman v. Porter et al*, 1:21-cv-727 (D.D.C.). This gave rise to the Board committing to do an internal review of Porter's conduct when the former chairman of the Board Richard Bernius wrote: "The Board, however, may

It is therefore no surprise that at the conclusion of first three-day hearing before the AHHC on July 18, 2019, its chairperson, Buffy Mims ("Chairperson Mims") ruled on the record, when, importantly, the facts and evidence were fresh in the committee's minds, that "the Hearing Committee has been unable to reach a non-binding determination." PFF # 2. This finding, coming at this preliminary stage, is extremely rare and almost unheard of, as hearing committees usually provisionally issue non-binding rulings which then permit them to take evidence on factors involving mitigation and/or aggravation. This was memorialized in stone by the AHHC through its August 8, 2019 order.

Then, for over four (4) years – almost an egregious and unbelievable half a decade - the AHHC went silent, leaving Mr. Klayman to very reasonably and rightly conclude that this matter had been laid to rest and thus disposed of, given the AHHC's finding after the hearing that ODC had failed to prove any ethical violations, as well as because of Board Rule 12.2, which was promulgated by this Court:

> The Hearing Committee's report shall be filed with the Board not later than 120 days following the conclusion of the hearing. The 120 days provided for by the Court's rules for the preparation of the Hearing Committee's report shall start to run at the conclusion of the hearing.

---

conduct an administrative review of allegations of misconduct against members of the Office of Disciplinary Counsel. We will undertake such a review in this case." App. 243. This was however later deep sixed when the new chairman, Matthew Kaiser ("Kaiser"), took over. This can be explained by the fact that Kaiser has proven to be a leftist Democrat who was who was associated with the leftist legal publication "Above the Law," and wrote complementary columns extolling the virtues of an "honest" Hillary Clinton, but trashing Donald Trump, who Mr. Klayman had supported. Like Mr. Klayman, J.P. and his father were not ideological kin to Kaiser.

Yet, on September 20, 2023 – **over four (4) years after the AHHC Hearing concluded** - the AHHC incredibly without factual, legal and other bases reversed course 180 degrees and issued an AHHC Report and instead recommended a one-year suspension with a potentially career ending reinstatement provision, as Mr. Klayman is 73 years old.

Rule 12.2 is the equivalent of a statute of limitations and thus the fact that the AHHC let this limitations period run means that this matter must be summarily dismissed. However, even under the improper and erroneous interpretation of Rule 12.2 as not being the equivalent of a statute of limitations, the AHHC chose not to ask this Court – which promulgated Rule 12.2 – for an extension of time to submit their Report, and thus, any such request would therefore be waived, particularly given the egregious four (4) year delay.

It more than appears that given this still unexplained passage of time, the AHHC simply forgot or ignored everything that occurred at the hearing back in 2019 and thus made the decision to simply "rubber stamp" what was presented to them back in 2019 by ODC and Porter, who again have been more than credibly accused of having engaged in unethical misconduct to the point where the Board had promised to do an internal review. This is improper for a litany of reasons, none more compelling than the fact that ODC and Porter already made all of their arguments at the 2019 AHHC hearing. Absolutely nothing new was put into the record in the interim four (4) year period of delay. Thus, the only explanation for the AHHC reversing course nearly half of a decade later is that they simply

copied and adopted wholesale the briefs of Porter and ODC from 2019 given that the four (4) year delay caused them to forget or ignore what happened at the AHHC hearing.

The AHHC Report is in direct and flagrant violation of Board Rule 12.2, which is unequivocal and has no "wiggle room," and thus, the Board therefore lacked any authority to proceed. This can be gleaned and confirmed from the language of the rule itself, which uses to word "shall" and not some other word with more flexibility built in, such as "may." Under these circumstances, the plain language of the rule must be enforced. *Johnson v. D.C. Dep't of Emp't Servs.*, 111 A.3d 9 (D.C. 2015). *Infra* section IV(a).

When Mr. Klayman informed the Board of this, the Board inexplicably informed Mr. Klayman that they were refusing to enforce Rule 12.2 of this Court, necessitating Mr. Klayman filing a case in the District of Columbia Superior Court styled *Klayman v. Board on Professional Responsibility,* 24-CV-366 (D.C. Ct. App.) (the "Bundy Litigation") to enjoin the Board from proceeding any further given the express language of Rule 12.2, which was summarily dismissed on specious grounds for lack of subject matter jurisdiction by the D.C. Superior Court, but is currently pending appeal before this Court, and which the Board has been on notice of at all times. But the Board plowed ahead regardless, refusing to allow Mr. Klayman's appeal to be heard by this Court before prematurely issuing its Report.

## SUMMARY OF THE ARGUMENT

This matter must be summarily dismissed because Board Rule 12.2, which was promulgated by this Court, has been clearly, unequivocally and egregiously  violated.

11

Furthermore, this prosecution is an example of selective prosecutorial viewpoint discrimination that has been ruled violative of the First Amendment by the D.C. Circuit in *Douglass*. Lastly, ODC has failed to put forth any actual clear and convincing <u>evidence</u> of misconduct by Mr. Klayman, whereas Mr. Klayman has put onto the record sworn testimony of both substantive and character material witnesses who conclusively rebutted ODC's manufactured allegations.

## <u>LEGAL ARGUMENT</u>

As set forth herein, this Court should not and cannot as a matter of the facts, the law, good faith and fundamental fairness impose any discipline on Mr. Klayman given the truly extraordinary facts and circumstances involved, including egregious violations of the rules promulgated by this Court, by the same entity that has been entrusted by this Court to enforce these same rules, the Board.

### a.    **This Court Must Enforce The Rules Which It Has Promulgated, Including Rule 12.2, Equally And Without Regard To The Individual(s) Involved**

Put simply, rules are rules. Every bar association is governed by rules. Rules ensure equal treatment and serve as safeguards against an individual's natural biases and prejudices from taking over. The rules inform and govern the conduct of every bar association's member, and thus, every bar association's member need to be able to rely on the fact that the published rules will be enforced as promulgated as written, without regard for the individual(s) involved. This is the only way that any association, much more a bar association, can function healthily and thrive. To the contrary, a refusal to do so would

create a disastrous precedent and signal to the members of the District of Columbia Bar ("Bar") and the public at large that the rules that have been promulgated by this Court to govern the Bar are simply meaningless and can and will be enforced selectively depending on who is involved as a respondent. Here, there is no possible dispute that the AHHC Report is in clear, direct violation of Board Rule 12.2. This is found in the Board <u>Rules</u>. It is not the Board suggestions or the Board recommendations. It is the Board <u>Rules</u>.

Contrary to ODC's arguments to the contrary which the Board then conveniently rubber stamped, there is no discretion involved as to whether the Board is beholden to and must enforce the <u>Rules</u>. As even further conclusive evidence, the plain language of Rule 12.2 uses the term "shall" and not "may" and therefore does not include any language that would indicate there is discretion involved, meaning that there is no ambiguity and thus the plain language must be adhered to. Johnson 111 A.3d 9 ("…we begin with an examination of the plain language of the statute, *Parrish v. District of Colum*bia, 718 A.2d 133, 136 (D.C. 1989), which we assume best reflects the intent of the legislature. *Varela v. Hi-Lo Powered Stirrups, Inc*., 424 A.2d 61, 64-65 (D.C. 1980)." Id. at 9-10. "If the meaning of the statute is plain on its face, resort to legislative history or other extrinsic aids to assist in its interpretation is not necessary." *Id.*

Of paramount importance, this exact question has already been decided by this very Court. "In this case there is no ambiguity at all in the statutory language, which clearly provides that the applicable assessments "shall" be imposed. <u>It is well established that the</u>

word "shall" is "<u>a term which creates a duty, not an option</u>." *Parrish*, 718 A.2d at 136 (D.C. 1998). Rule 12.2 says "shall," not "may." This creates a duty, not a discretionary option, as already found by this same Court, and this alone is sufficient grounds for this Court to terminate this disciplinary proceeding, particularly given the fact that this was not a simple case of the AHHC missing the deadline by a few days, weeks, or even months. This is an egregious, unprecedented, unheard of mindboggling four (4) year almost half a decade delay!

This is further underscored by the plethora of binding, precedential authority, by none other than the Supreme Court, that agencies such as the Board do not have the authority to ignore the rules which have been promulgated and imposed on them by a higher legislative authority, in this case, this Court, under which authority the Board is permitted to function. This fundamental principle was confirmed by the Supreme Court in June of this year in *Loper Bright Enterprises et al v. Raimondo, Secretary of Commerce, et al*, 22-451, (U.S. 2024), which held by way of analogy, that the Administrative Procedure Act "requires courts to 'hold unlawful and set aside agency action, findings, and conclusions found to be . . . not in accordance with law.'"

Furthermore, the D.C. Circuit has found that there is a "fundamental principle that an agency may not act in a manner that is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *ABM Onsite Servs.-West, Inc. v. NLRB*, 428 U.S. App. D.C. 63, 68 (2017). "It is well-settled that… any…agency—cannot 'turn[] its back on its

own precedent and policy without reasoned explanation.'" *Id.* at 72. "An agency may not, for example, depart from a prior policy sub silentio or simply disregard rules that are still on the books." *Id.* Furthermore, "It is well established that an agency may not ignore its own rules." *Dep't of Revenue v. Race*, 743 So. 2d 169, 171 (Fla. Dist. Ct. App. 1999).

This fundamental, black letter, well-settled principle has been upheld by the Supreme Court in *Ariz. Grocery Co. v. Atchison, T. & S. F. R. Co.*, 284 U.S. 370 (1932), which legal sacrosanct principle has been in effect for nearly a century now. In *Ariz. Grocery*, the Supreme Court was tasked with deciding "the power of the Interstate Commerce Commission to award reparations with respect to shipments which moved under rates approved or prescribed by it." *Id.* at 381. In other words, the ICC, which had been granted authority to set maximum and minimum rates for public carriers, lowered the maximum rate and found that reparations were due to shippers that had paid the higher rate. The Supreme Court stepped in and found that the ICC did not have the ability to ignore its own rules and previously published rates. *Id.* at 390. This is keenly analogous to the facts and law here, where Rule 12.2 was promulgated by this Court, a higher controlling authority. *See also Bridges v. Wixon*, 326 U.S. 135 (1945).

Despite this uncontroverted controlling authority that the Board simply has no authority to refuse to adhere to and enforce this Court's promulgated Rule 12.2, it has adopted ODC's bizarre and fatally flawed argument that this duty is somehow "discretionary" under *In re Morrell*, 684 A.2d 361 (D.C. 1996). However, *Morrell* is

completely distinguishable. In *Morrell*, a case from 1996 where the time limit for the AHHC to issue its Report was governed by the D.C. Bar Rules and not the Board Rules as is the case here, *id*. at 370, the AHHC only exceeded the deadline by approximately four (4) <u>months</u>, not four (4) <u>years</u>. A delay of four (4) years - forty-four (44) months more than in *Morrell* – is truly an unprecedented situation if not an outright outrage.

Given all of this compelling, controlling authority that the Board has simply no authority to refuse to adhere to and enforce Rule 12.2, this Court is therefore now duty-bound to ensure that its rules are enforced. This entire disciplinary proceeding must therefore be dismissed on this basis alone, notwithstanding other compelling grounds.

**b.     This Proceeding Is First Amendment Viewpoint Selective Prosecution**

As set forth in full in Mr. Klayman's contemporaneously filed Motion for Temporary Restraining Order and/or Preliminary Injunction and Motion for Reconsideration, which are incorporated herein, the weaponization of elements of our legal system – particularly against those who supported or continue to support our 45th and now 47th President of the United States, Donald J. Trump, can no longer be called into question, even by card-carrying members of the Democratic and leftist legal and government establishments in the District of Columbia and throughout the nation. That the American voters delivered a landslide to President Trump in the recent presidential election shows that the American people took "judicial notice" of and rejected this weaponization against Donald Trump and his supporters such as Mr. Klayman. It is time for this Court to take judicial notice of this as

well. This Court must recognize reality and not itself be influenced by backlash in the District of Columbia against persons such as Mr. Klayman now that President Trump has trounced his Democrat opponents and reassumed the presidency. Mr. Klayman has sent a letter titled *Weaponization of District of Columbia and New York Bars Against Pro-Trump Conservative and Republican Activist Attorneys* to Hon. Pam Bondi, Hon. Lindsey Graham, Hon. Jim Jordan, and Hon. Mike Johnson requesting investigations. Supp. App. 117 - 120.

Mr. Klayman, like many other prominent Republican and conservative public interest activist attorneys, has been targeted by the weaponized District of Columbia attorney discipline apparatus. This is the exact type of conduct that the D.C. Circuit has found to be impermissible First Amendment selective viewpoint prosecution in *Douglass*. This First Amendment selective viewpoint prosecution has severely harmed Mr. Klayman, as ODC has illegally and unethically "stacked" meritless disciplinary proceeding after meritless disciplinary proceeding against Mr. Klayman in order to not only try to bankrupt him, but also force him and his small staff to devote all of their attention to defending these proceedings and thus taking away Mr. Klayman's ability to actually engage in his conservative and Republican public interest advocacy. Thus, even when ODC does not succeed in obtaining discipline against Mr. Klayman, they will still have effectively silenced his conservative and Republican public interest advocacy by draining all of his time and financial resources.

**c.    ODC Failed To Prove Any Ethical Violations**

The Board's Report is fatally flawed for numerous reasons as also demonstrated below. However, the most prominent error which infects the Report in every single aspect is that it takes ODC's <u>unproven and biased arguments, rubber stamps them</u> and then treats them as <u>evidence</u>, thereby bypassing ODC's duty under Board Rule 11.5 to actually <u>prove</u> ethical violations by "clear and convincing" evidence.

ODC did not call a single substantive material witness, despite there being numerous witnesses who had contemporaneous knowledge of the events at issue, as set forth below. Whether this decision was (1) a result of a tactical error by ODC, (2) driven by ODC's Porter's arrogance in believing that they did not have to prove anything for the AHHC and the Board to adopt her arguments as factual finding, or (3) the obvious scenario being that there were simply no witnesses that would support ODC's fabricated allegations, the bottom line is ODC did not even attempt to actually <u>prove</u> anything with independent material witnesses, as opposed to only Ms. Porter. To the contrary, Mr. Klayman testified under oath, refuting each of ODC's fabricated allegations, along with a multitude of witnesses, including Dean Chemerinsky of the University of California at Berkeley's Boalt Hall.

Yet, time and time again, the <u>evidence</u> and <u>testimony</u> placed on the record by Mr. Klayman was simply ignored in favor of mere allegations by ODC, which were essentially adopted wholesale by the AHHC and Board. This fundamental, egregious error is clear. The Board ignored the duty and burden of ODC to <u>prove</u> Mr. Klayman's guilt by the requisite "clear and convincing evidence" pursuant Board Rule 11.5 and instead improperly imposed

on Mr. Klayman the burden to prove himself innocent. This is completely backwards, and therefore in direct contravention of perhaps the most basic legal tenet in our nation – innocent until proven guilty. *Coffin v. United States,* 156 U.S. 432 (1895).

Thus, in sum, there is just one question that this Court really needs to answer. What should be given more weight: (1) the sworn testimony of Mr. Klayman and his witnesses, including Dean Chemerinsky, who conclusively rebut any and all of ODC's manufactured allegations, or (2) the conflicted "testimony" of ODC's Porter - who was never under oath - as a result of ODC and Porter's decision not to call a single material witness with contemporaneous and actual knowledge of the facts at issue? The answer should be clear.

i. **There is No Clear and Convincing Evidence that Respondent Knowingly Made False Statements and Was Dishonest**

Tellingly, none of the purported "misrepresentations" manufactured by ODC to try to create out of whole cloth ethical violations, which were four (4)years late, and adopted wholesale by the Board and AHHC stem from any statements where Mr. Klayman had a duty to provide certain information and subsequently failed to do so. Instead, ODC imposed its own arbitrary set of "requirements" on Mr. Klayman that far exceed what Mr. Klayman was actually ethically obligated to comply with. This is consistent with ODC's strategy of manufacturing *ex post facto* a number of small, petty "ethical violations" against Mr. Klayman – the majority of which are simply false, but the remaining small number based on unintentional, inadvertent and good faith errors made during an extremely complex and highly charged criminal prosecution – to conjure up a case for disciplining Mr. Klayman.

19

The key point here is that Mr. Klayman was never sanctioned by any of the courts actually involved in his pro hac vice applications or even referred to any bar association or court regulatory authority by any of the parties involved. PFF # 7. Instead, this matter was initiated through an insecure and vindictive competitor, non-lawyer Fitton of Judicial Watch. Mr. Klayman simply answered the questions that he was asked, and properly gave his opinion where appropriate. He also rightfully engaged in zealous representation of a client who faced life imprisonment. These are not even remotely sanctionable actions, which is the conclusion that expert Dean Chemerinsky reached. PFF # 2, 6. Thus, there was no violation of Rules 3.3(a), 8.1(a), or 8.4(c).

### 1.  Statements Regarding Mr. Klayman's Pending D.C. Disciplinary Matter

The Board concedes that  Mr. Klayman's statements concerning the status of the at that time ongoing disciplinary proceeding in the District of Columbia involving his representation of clients against Judicial Watch, *In re Klayman*, 18-BG-100 (D.C. Ct. App.). (the "Judicial Watch Matter"), were "technically accurate," Board Report at 40, yet still strained to assert that while Mr. Klayman's statements were "technically accurate," they did not meet the arbitrary, nebulous, and undisclosed level of disclosure created by ODC to ironically itself unethically manufacture an ethical violation against Mr. Klayman.

This is conclusively shown in the dissenting opinion of Judge Gould - which negates any possible showing of clear and convincing evidence of any ethics violations - and who actually presided over the appeals in the Bundy Trial, and therefore had firsthand

knowledge of the facts at issue, in stark contrast to ODC who reached into Nevada ex post facto to initiate these proceedings. And, regardless of how the Board tries in vain to conveniently and disingenuously minimize the impact and effectively challenge the integrity of Judge Gould, it is indisputable that his opinion was based on <u>factual findings</u> that Mr. Klayman disclosed all he was required to:

> …[Mr. Klayman] had no greater duty to disclose any possible blemish on his career or reputation beyond responding to the district court's further direct requests. (emphasis added). PFF#5.

ODC and the AHHC do not possess the authority to override the jurisdiction of judges and the courts and impose their own heightened duties to disclose information, and accordingly, the Board therefore should not have given deference to the AHHC's outrageously belated findings contained in its Report and instead should have under the extreme circumstances here with the egregious passage of time in particular conducted a *de novo* review.

This is particularly true given, again, the egregious four (4) year delay by the AHHC in even issuing its Report, when memories of what happened at the hearing had long faded, causing the AHHC to conveniently "rubber stamp" what ODC and Porter had submitted in their briefs nearly a half decade earlier. Regrettably, this necessary *de novo* review did not occur, and the Board instead gave great undue deference to the AHHC and in effect adopted its Report wholesale, leading to the unjustified situation that is present today.

It is also crucial for this Court to carefully consider and affirmatively answer the question that Mr. Klayman was responding to in his pro hac vice application. The application was asking Mr. Klayman to represent:

> [t]hat there are or have been no disciplinary proceedings instituted against petitioner, nor any suspension of any license, certification, or privilege to appear before any judicial, regulatory, or administrative body, or any resignation or termination to avoid disciplinary or disbarment proceedings, except as described in detail below. PFF # 23.

In response, Mr. Klayman accurately disclosed[5]: (1) there was a pending disciplinary proceeding in the District of Columbia, (2) there had been no disciplinary action taken at that time as it was still pending, and (3) that he believed that it was "likely to be resolved in [Mr. Klayman's] favor." PFF #29. This is a direct, compliant response to the question posed by Judge Navarro and Mr. Klayman was entitled to and did give his opinion about the likely outcome of the disciplinary proceeding. As Judge Gould and Dean Chemerinsky correctly found, the *pro hac vice* application does not ask the applicant to provide intricate details of

---

[5] **Mr. Klayman's full response**: There is a disciplinary proceeding pending before the District of Columbia Board of Professional Responsibility that was filed almost 8 years ago over a claim by Judicial Watch, my former public interest group that I founded and was Chairman and General Counsel, after I left Judicial Watch to run for the U.S. Senate in Florida in 2003-04, that by representing a former client, employee and donor that it had abandoned, sexually harassed and defrauded that I was in conflict of interest. I represented these persons pro bono, did not breach any confidences with Judicial Watch, and did so only to protect their interests in an ethical fashion. I did not seek to break any agreements with Judicial Watch but rather to have them enforced to help these persons. The matter is likely to be resolved in my favor and there has been no disciplinary action. I recently obtained a jury verdict and court judgment in the U.S. District Court for the Southern District of Florida against Judicial Watch for having maliciously defamed me in the amount of $181,000 USD, including punitive damages. The current directors feel competitive with Mr. Klayman attempted to harm his reputation.

every single event that occurred during the disciplinary proceeding and no jurist in the middle of a complex criminal trial would even reasonably want all of that information.

However, as a result of Judge Navarro's pattern of clearly favoring the USAO, she inexplicably required that Mr. Klayman provided "verification that the matter in the District of Columbia disciplinary case…has be resolved with no disciplinary action," creating an impossible catch-22, as Judge Navarro was well aware that disciplinary proceedings take a long time to conclude. Tellingly, the Judicial Watch Matter was not resolved until 2020, well after the Bundy Trial had concluded. RX0019. PFF # 35. Judge Navarro denied Mr. Klayman's application on the false premise of a defunct Affidavit of Negotiated Discipline, which, as Mr. Klayman explained in his Supplement to and Renewed Verified Petition, never went into effect because it was withdrawn by both sides. PFF # 33. Mr. Klayman did not disclose this in his initial application because (1) the District Court's pro hac vice application does not ask for it, and (2) pursuant to Board Rule 17.10, it is of no force and effect, except for impeachment purposes. PFF #32. Mr. Klayman also made it clear that he was not bound by the any claimed admissions made in the affidavit because it was clearly only part of negotiation process, which is not admissible under Federal Rule of Evidence 408(2).[6] By way of analogy, even a criminal defendant who is innocent may often take a plea to simply put the matter behind him and not risk trial. And, lastly, in any event, Mr. Klayman ultimately

---

[6] "Evidence of the following is not admissible…conduct or a statement made during compromise negotiations about the claim…."

overrode the affidavit in an email by Mr. Klayman on July 18, 2015 where he clearly withdrew from negotiated discipline. RX0788, Tr.517; PFF 33.

Similarly, Mr. Klayman had no duty to disclose the existence of a non-binding Hearing Committee Report that was issued by the AHHC in the Judicial Watch Matter, as it is not binding on anyone and merely a recommendation to the Board. PFF # 31. ODC provided no basis to claim that Mr. Klayman had any ethical duty to disclose each non-binding, preliminary development in the Judicial Watch Matter. As part of their *modus operandi* and pattern of misconduct, this was another *ex post facto* manufactured heightened standard of disclosure, far beyond what was asked for by the District Court.

### 2. Truthful Statements Pertaining to Criminal Experience

The Board disregarded the record and adopted wholesale the AHHC's finding that Mr. Klayman somehow "made knowing false statements about his own criminal experience." Mr. Klayman was more than entitled to express his subjective opinion about his criminal defense experience, which was supported by sworn testimony on the record.

During the AHHC hearing, Mr. Klayman gave significant testimony in this regard, leading to the AHHC concluding that ODC had failed to prove any ethical violation. This included testimony that he worked as a trial attorney and prosecutor at the U.S. Department of Justice ("USDOJ") in the Consumer Affairs Section in the Antitrust Division, which "represented…government agencies both in a (criminal) prosecutorial and a defense posture." Tr.391. The Consumer Affairs Section had "significant criminal authority and we

had a number of cases with regard to the FDA." Tr.182. PFF 12. Mr. Klayman further testified that while at the USDOJ he worked on Troxler case, a criminal matter, where he partnered with the assistant chief, John Fleder, to seek to indict Troxler. Tr.184. Furthermore, while at the USDOJ, Mr. Klayman joined team that break up the monopoly of AT&T. Tr.393. Mr. Klayman worked closely under the lead counsel and was assigned to work with the top brass of MCI. Tr.393. He was a trial counsel on the AT&T case, which has a criminal element to it, from about four to six months before he left to go back into private practice. Tr.180. While Mr. Klayman's name did not appear on the filings of these cases, due to his status as a junior member of the trial teams, Chairperson Mims herself recognized that it was not unusual for young attorneys to not appear on filings. Tr.756.

Then, Mr. Klayman testified further that beyond his significant experience at the USDOJ, he has spent approximately 400-600 hours on criminal defense cases where he is listed as counsel of record. Tr.412, PFF # 16. These matters include representing (1) Margarita Pouchkareva in a massive criminal case involving a racketeering enterprise by the Russian Mafia to bring in illegal immigrants from primarily Chechnya where he negotiated a cooperation agreement for Ms. Pouchkareva, and spent 100 – 200 hours handling this case. Tr.404, Tr.202, PFF#17; (2) Natalia Humm in a criminal case after she had jumped bail and went to Belize after she had negotiated a plea agreement with a former lawyer, Tr. 407, where he did a lot of work trying to put the prior plea agreement back in place and was attorney of record for approximately two to four months before the case was

transferred to Orlando from Miami, Florida. Tr. 408–409, PFF # 19; (3) Jose Basulto as a witness in a criminal case involving Cuban spies and a shoot down of four brothers rescue planes by Fidel Castro's Air Force, Tr.203, where he was handling the crux of the representation, along with the assistance of the ACLU. Tr.206, PFF #20; (4) clients in the BCCI criminal case that was a liquidation commission for BCCI's Macau branch. Tr.194; and (5) a three-month trial of alleged criminal contempt against the Clinton Administration in the case of Alexander v. FBI in the U.S. District Court through the District of Columbia. RSX0252–0263. Although Alexander began as a civil case, Mr. Klayman testified, "[b]ecause a criminal case, if you commit the criminal act in the context of the civil case, it can be converted into a criminal contempt proceeding." Tr.719.

With all of this experience presented to the AHHC - none of which was refuted by ODC, as they did not see fit to call a single substantive material witness - Mr. Klayman's subjective opinion, to which he was entitled, that he had "extensive experience" in complex federal criminal litigation was certainly not dishonest. Mr. Klayman was entitled to his subjective opinion. As even further evidence of Mr. Klayman's experience and qualification, he represented Mr. Bundy at the Ninth Circuit, where he is a member, after Judge Navarro dismissed charges against him and the USAO appealed and was hugely successful there.

Furthermore, Mr. Klayman properly provided his subjective opinion, to which he was also entitled, regarding the criminal defense experience of Mr. Bundy's local counsel, Mr. Hansen and Mr. Whipple. PFF#46-48. With regard to Mr. Hansen, he signed and filed the

*pro hac vice* application seeking Mr. Klayman's admission into the Bundy Trial, clearly showing that he personally saw the need for Mr. Klayman to be a part of the trial team.

With regard to Mr. Whipple, Mr. Klayman testified at the AHHC hearing his subjective opinion regarding Mr. Whipple's experience was based on:

> "my own analysis as I said in talking to him that he didn't seem to have a great depth of federal criminal practice because he didn't even know what a petition for a writ of mandamus was -- I had to send him a copy of it -- and for other discussions in terms of his strategy, what he was planning to do." Tr. 135.

Chairperson Mims herself recognized:

> "Well, if it's true that Mr. Whipple made a statement that he didn't know what a writ of mandamus was or whatever -- I don't remember exactly which pleading he was referring to. If that's true, is it fair that he would not have had pause about his level of expertise to defend Mr. Bundy?" PFF#48.

Indeed, as strong evidence of this, Mr. Bundy himself attempted to terminate Mr. Whipple as his attorney. On September 21, 2017, Mr. Whipple, having had his representation terminated by Petitioner Bundy, filed a Motion to Withdraw as counsel, which would have left Bundy without counsel and representing himself pro se at the upcoming trial. App. 192 - 240. The Honorable Magistrate Judge Peggy Leen ("Judge Leen") of the U.S. District Court for the District of Nevada ("District Court"), who worked under Judge Navarro, held a hearing on Mr. Whipple's motion on September 27, 2017. At the hearing, Mr. Whipple openly admitted that he incredibly was not prepared for trial on October 10, 2017. App. 204. Furthermore, when Mr. Bundy was questioned, he informed the Court that Mr. Whipple had

not yet explained to him the possible consequences of the numerous charges against him, nor had he gone over discovery with him. App. 208 - 210.

Lastly, the final, crucial point that the Board and the AHHC completely disregard is that all of Mr. Klayman's actions were driven by Mr. Bundy's compelling desire under a Sixth Amendment right to counsel to have Mr. Klayman represent him and his dissatisfaction with Mr. Whipple, who showed a cavalier attitude and lazy approach to a case that could have landed Mr. Bundy in prison for the rest of his life, after already having done two years, some in solitary confinement, without bail. Mr. Bundy had a Sixth Amendment right to counsel of choice and he was attempting to exercise that right through having Mr. Klayman represent him initially as part of his legal team. Thus, Mr. Klayman's actions were zealously driven solely in the interest of protecting Mr. Bundy's sacrosanct constitutional rights.

### 3.  Statements Regarding Mr. Bundy's Trial Date

As shown in PFF#50, Respondent's January 17, 2017 Petition for Writ of Mandamus to the Supreme Court represented that the order by Judge Navarro setting Mr. Bundy's trial date was "currently in dispute." PFF#50. Respondent wrote that "[t]he lower court's order concerning the trial sequence will be subject to further legal proceedings and contested before the U.S. Court of Appeals for the Ninth Circuit prior to February 6, 2017." PFF#50. This is what Respondent believed at the moment of filing and it is clearly not a misrepresentation of the facts at the time. In any event, Respondent testified that "my ultimate fundamental concern was that I be present at any of these trials in the capacity as

counsel, that would let me communicate with the lawyers who were representing the other defendants. I could sit inside the well. It would give me access to information that was under seal and things like that." PFF#50. In any event, as this Court is aware, trial dates are fluid and especially so in the Bundy Trial, where Judge Navarro was constantly compromising the Bundy Matter defendants' constitutional rights and moving and in effect engaging in "musical chairs" coordinating trial sequences and  dates, as there were scores of defendants and the sequence of the trials and their dates were postponed and frequently reset for obvious prejudicial pre-trial publicity reasons triggered by the display of  firearms during a period after the infamous Las Vegas massacre at the Mandalay Bay Hotel and Casino.[7] In any event, at worst, this was an unintentional error and certainly not any type of intentional misstatement by Mr. Klayman which does not justify discipline. *Infra* section V.

### 4. Statements Regarding Solitary Confinement and Contempt

The Board next claims that Mr. Klayman's statement that Judge Navarro had ordered Mr. Bundy into solitary confinement was "recklessly dishonest." Board Report at 57. However, this is not supported by Mr. Klayman's uncontroverted testimony:

> "That is not what Cliven Bundy told me, and with regard to the solitary confinement, he was immediately thrown in there, and then after the fact, to the extent there's any truth to this with regard to Mr. Hansen, that occurred later, but he was originally thrown into solitary confinement. He did not ask to be thrown into solitary confinement." Tr.158.

---

[7] https://www.nbcnews.com/las-vegas-shooting

The Board presents no authority that an attorney is not allowed to rely on representations made by his client in pleadings, especially where the representations are based on the firsthand experience of that client. What better possible source is there than the individual who was himself personally experiencing solitary confinement along with his sons? Tellingly, ODC made no attempt to refute Mr. Klayman's testimony. Mr. Bundy was not called as a witness by ODC, who clearly has the burden of proving its allegations. The Board and the AHHC therefore fatally erred by completely ignoring Mr. Klayman's unrefuted sworn testimony despite no contrary evidence to the contrary being placed on the record by ODC. The AHHC incorrectly asserted "Respondent's only "evidence" that Judge Navarro ordered Mr. Bundy to be held in solitary confinement was the fact that Mr. Bundy was held in solitary confinement." AHHC Report at 65. This is simply untrue, as shown by Mr. Klayman's testimony above, but this was not addressed by the Board.

The same applies with regard to Mr. Klayman's assertions that Judge Navarro had threatened Mr. Whipple with contempt. Mr. Klayman's uncontroverted testimony shows:

> "And that's accurate. That's what Bret Whipple told me. And to this day nobody sees the transcript of this sealed hearing that dealt with her husband that she didn't want the public to know about. That's what Mr. Whipple told me. If he was lying, that's Mr. Whipple's problem, but not me, not my problem." Tr.163.

The record shows that Mr. Whipple told Mr. Klayman this. ODC did not attempt to dispute this by calling Mr. Whipple as a witness, and Mr. Whipple has never retracted this statement on any public record. Instead, the AHHC relies solely on Judge Navarro's Answer, where

she self-servingly claimed to have never threatened Mr. Whipple with contempt. However, Judge Navarro was also not called as a witness, and put under oath in that regard. To the contrary, Mr. Klayman <u>was</u> under oath at the AHHC hearing. Witness oaths exist for a reason, and testimony given under oath, in person at a hearing must take precedence over unsworn statements written on paper. At most, Judge Navarro's Answer creates conflicting claims, and Mr. Klayman chose to believe Mr. Whipple particularly given Judge Navarro's widely observed favoritism towards the USAO prosecuting the Bundy Trial, as set forth above. This is not a breach of any ethical duty and there is patently no clear and convincing evidence to the contrary.

### 5. Statements Regarding Judge Gould's Findings

Perhaps the most clearly erroneous and bizarre finding of all is that Mr. Klayman somehow was dishonest in literally quoting from a legal opinion, without any assertion much more proof that Mr. Klayman had somehow edited the quote or misquoted the opinion. The Board and AHHC instead wholesale adopted Porter of ODC's unsupported and strange position that Mr. Klayman committed an ethical violation because he took relevant and compelling excerpts of Judge Gould's opinion and placing them into his briefs, *i.e.,* engaged in legal research and writing. This is a truly "interstellar" alleged ethical "violation" that underscores the inherent biases involved.  It is not the Board, the AHHC's or ODC's role to dictate Mr. Klayman's legal strategy in writing his briefs and how he advocates for his clients and himself, so long as he accurately quotes portions of the legal opinion he is relying upon.

31

The Board provides not a single case that states that a lawyer may be sanctioned - despite quoting an opinion correctly – for simply not quoting enough of that opinion to satisfy some arbitrary, nebulous, undefined, and undisclosed standard. Doing so would create an incredibly slippery and dangerous slope. Any lawyer writing any brief could be sanctioned when quoting a legal opinion, and the only way around that would be to quote the entire opinion, lest a vindictive counsel attempt to sanction him for not meeting their arbitrary, manufactured standard of how much quoting is appropriate. This is theatre of the absurd!

In any event, the opinions of the Ninth Circuit panel regarding this matter are publicly available public records available to all parties and were cited in the briefs meaning that Mr. Klayman could not possibly conceal them, even if he had any reason to. Mr. Klayman made no representation that Judge Gould's dissenting opinions were limited to the excerpted portions contained in his briefs.

Indeed, the Board reveals here the apparent fact that it almost certainly did not even read Mr. Klayman's briefs before simply "rubber stamping" the AHHC's Report, which in turn "rubber stamped" ODC and Porter's materially false and misleading briefs. The Board incredibly wrote "There is no express, or even implied statement, in this [Judge Gould's] dissent that could be construed reasonably as an 'emphatic' finding that Respondent had been truthful." Board Report at 54. If the Board had even read Mr. Klayman's briefs it would has seen that on no fewer than three (3) occasions Mr. Klayman provided the exact

statement where Judge Gould found that Mr. Klayman's disclosures were "accurate," and thus "truthful":

> Klayman properly disclosed the ongoing disciplinary proceeding in his initial application for pro hac vice admission, saying that the proceeding had not yet been resolved. <u>This disclosure was accurate</u>.... I agree with Klayman that he was not obligated to re-litigate the D.C. proceeding before the district court and that he did not have to provide the district court with the entire record from D.C. And if his disclosures were selective, still he is an advocate, an advocate representing defendant Cliven Bundy, and after submitting a compliant response to the questions in the pro hac vice application, he had no greater duty to disclose any possible blemish on his career or reputation beyond responding to the district court's further direct requests. *In re: Cliven D. Bundy*, 16-72275 (9th Cir. Oct. 28, 2016) (emphasis added).

Thus, it is perhaps a little ironic that the Board is the entity that is actually guilty of the ethical violation that it has tried to impose on Mr. Klayman of allegedly mischaracterizing Judge Gould's dissent.

### 6.  Statements that Mr. Klayman's Pro Hac Vice Application Was "Pending"

The Board next adopts wholesale the AHHC's flawed finding that certain pleadings filed by Mr. Hansen which indicated that Mr. Klayman was "of counsel" and that his pro hac vice application was pending somehow constitutes an ethical violation. Even assuming, arguendo, that this is an ethical violation, which is clearly is not as set forth below, wouldn't the responsible party be the attorney of record who signed the pleadings, Mr. Hansen? Yet, Mr. Hansen has not been subject to any discipline.

Furthermore, the Board strained to find an ethical violation regarding Mr. Klayman's statement that his pro hac vice application was "pending." However, this completely ignores

the fact that Mr. Klayman was, in fact, at all times, up until the Bundy Trial was concluded by Judge Navarro, attempting to gain pro hac vice admission, not only through the District Court, but also through the Ninth Circuit and Supreme Court. This is the textbook definition of "pending" as it was not <u>finally</u> decided and an accurate description of the circumstances based on the definition of "pending" provided by Black's Law Dictionary: "Begun, but not yet completed; unsettled; undetermined; in process of settlement or adjustment."[8]

ii.    **No Clear and Convincing Evidence That Mr. Klayman Made Frivolous Filings**

The Board adopts wholesale the AHHC and ODC's contention that Mr. Klayman violated Rules 3.1, 8.4(a), and engaged in "conduct unbecoming of a member of the bar" by allegedly filing frivolous pleadings, namely the *Bivens* action and the Motion to Disqualify.

With regard to the *Bivens* Complaint, it is undeniable that Mr. Klayman's name does not appear in any signature blocks in either the *Bivens* Complaint or the Amended *Bivens* Complaint. PFF#37. Only Mr. Hansen is listed as counsel of record on these pleadings. PFF#37. Mr. Klayman also testified, "I did not file a *Bivens* action. Mr. Hansen filed it." PFF#37. Mr. Klayman testified that he did help in preparing the *Bivens* action, but that he ultimately did not sign it – only Mr. Hansen did. PFF#37. Despite this avalanche of evidence to the contrary, Porter of ODC has repeatedly and falsely accused Mr. Klayman of filing the *Bivens* Complaint, which in a bit of an ironic turn, is clearly in violation of Rules 8.4 and 3.3 as a blatantly false statement.

---

[8] https://thelawdictionary.org/pending/

The AHHC appeared to concede this, but still strained to fit a square peg into a round hole by using Rule 8.4(a), which states that "[i]t is professional misconduct for a lawyer to . . . [v]iolate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another." Thus, the AHHC, manufactured an ethical violation by saying that Mr. Klayman's limited involvement in helping to prepare the *Bivens* action, despite him again not filing it, is an ethical violation. The problems with this argument are so obvious, yet despite this, the Board still erroneously chose to adopt the AHHC's findings wholesale.

*First*, Rule 8.4(a) applies only when an attorney "knowingly assist[s] or induce[s] another to [violate the Rules of Professional Conduct]." Here, Mr. Hansen – the <u>actual</u> counsel who filed the *Bivens* complaint – has not been sanctioned by any Court or Bar authority for the filing of the *Bivens* action, much more subject to disciplinary action by the Nevada Bar or other disciplinary authority and found to have committed an ethical violation. Rule 8.4(a) therefore cannot apply. This is actually illustrated by the case that the Board and the AHHC advance in "support" of their position, *In re Asher*, 772 A.2d 1161 (D.C. 2001). In *Asher*, the Respondent fraudulently concealed the fact that his prior associate who had entered an appearance on a case had left to take another job. *Id.* at 1169. Before the Court, the Respondent fabricated the story that his prior associate had fallen ill and was in California. *Id.* When the prior associate found out, Respondent "encouraged" her to back up his fraudulent story, and then dictated a fraudulent letter for the former associate's mother to

send to the Court from California. *Id.* The Respondent did this a second time, directing his prior associate to send out a second fraudulent letter to the Court. The prior associate ultimately came clean to the Court. *Id.* Under these facts, this Court found that the Respondent had violated Rule 8.4(a), among other rules. This is because, of course, the Respondent directed his prior associate to remit fraudulent letters to the Court, a clear ethical violation by both the Respondent and the prior associate. These facts are nowhere near similar to here, where the purported conduct at issue is the filing of a *Bivens* complaint for which Mr. Hansen was never sanctioned, reprimanded, or subject to disciplinary action.

*Second*, it must be repeated and emphasized that ODC, for obvious reasons, did not see fit to call Mr. Hansen as a witness, so the record is devoid of any detail as to the extent of Mr. Klayman's participation in the preparation of the *Bivens* action. Yet, despite this lack of evidence, the Board and AHHC have omnisciently divined that Mr. Klayman must have been the mastermind behind everything, and that Mr. Hansen was no more than his pawn. The problem with this is patently clear. It improperly excuses ODC's <u>duty to prove</u> ethical violations by clear and convincing evidence no less. This Court is limited to the record. Because ODC choose not to, or could not, develop a record that showed any wrongdoing by Mr. Klayman, this cannot be held against Mr. Klayman.

*Third,* assuming arguendo that Mr. Klayman personally filed the *Bivens* action, which is again completely unsupported by the record, what the AHHC fails to mention is that a

B*ivens* complaint can apply to judges.[9] PFF#39. Mr. Klayman testified and provided legal authority t that a *Bivens* action could possibly be brought against judges. PFF#40.  All of this is strongly supported by the testimony of *pro bono* expert Dean Chemerinsky. Dean Chemerinsky is the nation's preeminent constitutional and ethics law expert, who quite literally wrote the book on constitutional law. Dean Chemerinsky, while not being ideological kin to Mr. Klayman, took time out of his busy schedule to testify on Mr. Klayman's behalf pro bono, Tr. 693, as he clearly saw the critical issues involved. For instance, Dean Chemerinsky confirmed that a *Bivens* action is possible against judges: "In answer to the case, you say there are some cases that are allowed injunctive suits against judges…." Tr.684; PFF#39. He further testified that a lawyer may "attempt to expand on the law by filing legal proceedings, in a case-by-case analysis" so long as it is "within the constraints of the rules of ethics." Tr. 685-86. Then, in response to a direct question from Chairperson Mims regarding whether the filing of five writs was reasonable, Dean Chemerinsky testified:

> "Yes, I do. I think that it was reasonable under the circumstances of this case. This is about the ability of a criminal defendant to have counsel of choice; that the district court had refused to allow the pro hoc vice status; and the defendant wanted to have Mr. Klayman represent him. And the only way of having the district court decision reviewed was through these writs of mandamus." Tr. 691.

Thus, all in all, there simply is no ethics violation even if Mr. Klayman personally participated in filing the *Bivens* Complaint, which again, the record clearly shows he did not file. There is

---

[9] *Trump v. United States,* 23-939 (Sup. Ct. 2024), which found that even a president does not have absolute immunity for unofficial and unauthorized acts.

therefore no violation of Rule 8.4 with regard to the *Bivens* action. Again, it would be theater of the absurd to discipline Mr. Klayman for trying too hard to uphold Cliven Bundy's Sixth Amendment right to counsel of his choice, no less in a criminal prosecution that could have landed him in a federal maximum security penitentiary for life!

The same applies to the Board's finding that Mr. Klayman violated Rule 8.4(a) because of Mr. Hansen's Motion to Disqualify Judge Navarro. This finding ignores the only evidence on the record, which indisputably shows that Mr. Klayman was not to be included as counsel on this filing. The record shows that Mr. Klayman's name was included on the Motion to Disqualify as a result of a clerical error by Joel Hansen. Mr. Klayman testified:

> He's filing an errata, Joel Hansen, the local counsel, that he inadvertently put an electronic signature on the motion to disqualify Judge Navarro on my behalf. He's withdrawing that electronic signature saying it was a mistake." PFF#42, Tr. 583.

This is the only pertinent testimony on the record, as once again, ODC made the decision not to call Mr. Hansen as a witness. In any event, even if Mr. Klayman had intended to and did file the motion to disqualify, there would still be no violation of Rule 8.4, because not only was Mr. Hansen not subject to any discipline, Judge Navarro herself did even not see it fit to sanction Mr. Hansen for his filing. Accordingly, there is no violation of Rule 8.4 with regard to Mr. Hansen's motion to disqualify either.

### iii.   No Clear and Convincing Evidence of Conduct Prejudicial to the Administration of Justice

The Board adopts wholesale the throw away omnibus catch all and Hail Mary contention that the AHHC's clearly erroneous finding that Mr. Klayman violated Rule 8.4(d)'s prohibition against "in conduct that seriously interferes with the administration of justice." In doing so, the AHHC largely recycles the same flawed assertions above, including (1) accusing Mr. Klayman of making false and misleading statements, (2) accusing Mr. Klayman of "filing" the Bivens action and the Motion to Disqualify Judge Navarro. These have been addressed, and Mr. Klayman adopts and incorporates those arguments herein.

Porter of ODC also attempted to manufacture an ethical violation *ex post facto* solely on the number of pleadings that Mr. Klayman filed to try to gain admission pro hac vice to represent Mr. Bundy, in a case with extremely high stakes where he was facing the possibility of life imprisonment. The record reflects that this was conclusively rebutted by the finding of pro bono expert Dean Chemerinsky that number of filings that Mr. Klayman made were reasonable, particularly under the circumstances of the case. PFF#3.

The Board tellingly gave no weight to the expert and compelling testimony and opinion of Dean Chemerinsky, and in fact tries to minimize it when it wrote:

> Respondent relies on the testimony of his expert witness, Dean Erwin Chemerinsky, for the proposition that the number of filings (over a dozen) was reasonable under the circumstances. See Resp. Br. at 11, 53-54, 56. But the number of filings is not the source of an independent charge during these proceedings. Rather, it is the frivolous nature of the filings that constituted misconduct. Board Report at fn. 34.

This, however, is easily disproven by the fact that Dean Chemerinsky swore under oath in his affidavit that he had "carefully reviewed the documents including but not limited to... Mr.

Klayman's pro hac vice applications and supplements thereto…[and] Mr. Klayman's Petition for Writ of Mandamus to the Supreme Court." App. 311 - 315. Thus,  after having thoroughly read and reviewed these pleadings, Dean Chemerinsky still found Mr. Klayman's efforts to have been reasonable under the circumstances and thus not frivolous. Again, had the Board simply read Mr. Klayman's briefs, it surely would have picked up on this, but instead the Board revealed itself once again to have simply "rubber stamped" the AHHC's Report and once again improperly adopted Porter of ODC's <u>arguments</u> as <u>evidence</u> of wrongdoing. Arguments are not evidence. They are arguments. This was a truly unique case, with literal life-or-death stakes. Mr. Bundy, given his age, would almost certainly have died in prison. This is why Mr. Klayman pressed so hard to obtain pro hac vice entry. He was trying to zealously serve a client he believed in, who at all times wanted to be represented by Mr. Klayman, which is a Sixth Amendment right.  If this was just some run of the mill civil case, Mr. Klayman clearly would not have had to make so many attempts to gain entry. This is what expert Dean Chemerinsky was referring to, where he stated that Mr. Klayman's action were "reasonable under the circumstances of the case." PFF #3. This is clearly why neither the Ninth Circuit nor the Supreme Court sanctioned Mr. Klayman for his allegedly "frivolous" pleadings, as while they did not rule in Mr. Klayman's favor, they also did not expressly find his efforts to be unreasonable. PFF#9. Context is key, and tellingly, the context of Mr. Klayman's actions is not even mentioned by the AHHC or the Board.

Lastly, the Board finds that Mr. Klayman violated Rule 3.1 by alleging bias and prejudice with regard to Judge Navarro and the Honorable Jay S. Bybee ("Judge Bybee") of the Ninth Circuit. With regard to Judge Navarro, her bias and prejudice was not even a secret, as observed and revealed and in the Las Vegas Review Journal's article "Editorial - Judge bans defense arguments in Bundy retrial." Supp. App. 001. With regard to Judge Bybee, once again, there was nothing in the record to disprove Mr. Klayman's subjective opinion that he had exhibited extrajudicial bias and prejudice. ODC chose not to call Judge Bybee as a witness and Mr. Klayman was not allowed discovery in that regard. ODC PFF#69. Mr. Klayman criticism of Judge Bybee's "lack of appreciation and sensitivity" to criminal defendants' Sixth Amendment rights was based on evidence. Mr. Klayman laid out the fact that Judge Bybee's dissent in *Nordstrom v. Ryan*, 762 F.3d 903 (9th Cir. 2014) found that prison officials reading correspondence between a prisoner and his attorney did not constitute a violation of his Sixth Amendment rights, despite the majority holding that it did. Mr. Klayman also cited the fact that Judge Bybee authored supervised legal memoranda working as the head of the Executive Office of the President under George W. Bush defending the harsh and illegal torture of battlefield detainees suspected of terrorist-related activities. RX0460–0461. PFF # 51. Finally, Judge Bybee is from the tight knit legal community in Las Vegas and is likely friendly with Judge Navarro and sought to deflect from and insulate her inappropriate actions with regard to Mr. Bundy and his hoped-for counsel,

Mr. Klayman, and any unintentional error in this regard was due to an inadvertent mistake by Mr. Klayman's associate, which was corrected on the record. Tr. 593.

d.  **The Sanction Recommended By The Board Is Unsupported By The Facts and Law**

The Board has recommended an eighteen (18) months suspension period with a reinstatement provision, a *sua sponte* increase of the previously recommended twelve (12) month suspension recommended by the AHHC which was already totally unwarranted. Notably, the Board correctly struck down the completely outrageous and hateful requested sanction of disbarment by Porter of ODC, finding that contrary to ODC's misrepresentations, "[t]his matter involves neither misappropriation, nor flagrant dishonesty." Board Report at 70. The Board further correctly found that:

> "[t]he three cases to which Disciplinary Counsel has directed the Board's attention – *In re Barber*, 128 A.3d 637 (D.C. 2015) (per curiam), *In re Orci*, 974 A.2d 891 (D.C. 2009) (per curiam), and *In re Shieh*, 738 A.2d 814 (D.C. 1999) – involve misconduct that is considerably more egregious than that at issue [alleged] here." *Id.*

It is extremely telling that ODC would pull a requested "death penalty" of disbarment "out of a hat" and then fail to provide ANY case law that justifies their position. This has been Porter dishonest *modus operandi* and even the Board felt the need to call it out. However, the cases that the Board puts forth to try to justify their recommended eighteen (18) month suspension are also completely distinguishable from the facts here and totally irrelevant.

*In re Edwards*, 278 A.3d 1171 (D.C. 2022) involved a two-year suspension period with reinstatement. The attorney, Clarissa Edwards ("Edwards"), was censured in 2009 for

commingling funds and failing to keep complete records of client funds. *Id.* at 1172. Just two years later, in 2011, Edwards once again began to commingle client funds and failed to maintain records of client funds. Indeed, the Court found that Edwards' "records were so deficient that it was not possible for Disciplinary Counsel to determine whether Ms. Edwards had misappropriated any funds." *Id.* Furthermore, in two separate pro hac vice applications, Edwards completely failed to disclose her 2009 censure. Under these facts, a two year suspension with reinstatement was ordered.

The facts of Edwards are completely distinguishable. *First,* there is not even an allegation of financial impropriety in this instant matter, and indeed, Mr. Klayman represented Mr. Bundy *pro bono*. *Second*, whereas Edwards completely omitted the fact that she had been disciplined in her pro hac vice applications, Mr. Klayman made "accurate" disclosures, as found by Judge Gould. Thus, Edwards holds no precedential or even analogous persuasive effect on this case.

*In re Bradley,* 70 A.3d 1189 (D.C. 2013) incredibly has even less applicability than Edwards. Bradley also involved a two year suspension with a fitness requirement for an attorney who was "appointed… to serve as the guardian for… [Mr. Beard] with developmental disabilities who was also the victim of a severe head trauma that left him hospitalized for several months." *Id.* at 1191. The attorney arranged a transfer for Mr. Beard to a nursing home and then, for the next <u>ten years</u> "almost completely abandoned" him. *Id.* Then, when Mr. Beard, who had been homeless at the time, was independently located by

his family, the attorney then completely ignored the family and failed to facilitate a requested move closer to Mr. Beard's family.  Then, with regard to another client, an elderly and infirm woman who had been a victim of embezzlement over whom the attorney had been appointed guardian and conservator, the attorney allowed embezzlement of her funds to continue and failed to take any action in the client's interests. *Id.* at 1192. At the hearing committee hearing, the attorney gave  intentionally false testimony as well. *Id.* at 1194.

*Bradley* thus has no applicability to this case, and it is extremely telling that the Board chose to even try to use this case to justify their requested sanction, in effect admitting that there are no cases that justify their recommendation. In this case, there are absolutely no allegations of failure to provide zealous representation against Mr. Klayman. To the contrary, the only reason that Mr. Klayman is in this unfortunate situation right now is that he did everything in his power to try to help and defend his client, Mr. Bundy, from life imprisonment. Mr. Klayman certainly did not abandon a victim of severe head trauma in a nursing home for ten years while ignoring the victim's family who was trying to locate him. *Bradley* involved conduct that was not only highly unethical, but also morally reprehensible. This simply does not exist here, and even more, Mr. Klayman also has not been found to have given false testimony under oath either.

*In re Ukwu*, 926 A.2d 1106 (D.C. 2007) is similarly inapplicable. Ukwu involved a two year suspension with reinstatement for an attorney whose practice consisted of the representation of foreign nationals in immigration matters. *Id.* at 1109. The attorney was

charged with misconduct for his representation of five clients and was found to have committed a litany of dishonest, deceitful actions in the process. For instance, it was found that the attorney had lied about having not received payment for his services given witness testimony that the attorney had counted the money in the client's presence. *Id.* The attorney had also drafted and directed a client to submit a false letter to the Immigration and Naturalization Service regarding her employment status. *Id.* at 1112. In addition, Ukwu had egregiously failed to represent his clients with zealousness and competence. *Id.* at 1115.

Once again, this case does not even remotely apply to the facts here. Mr. Klayman has not been alleged to have failed to service his clients with competence and zealousness. Mr. Klayman has not lied about receiving payments. Mr. Klayman also did not draft letters that he knew or "demonstrably should have known," *id.* at 1113, were false.

Thus, in sum, the Board has not provided a single case with even remotely comparable factual circumstances to try justify their requested sanction of eighteen (18) months. Indeed, as set forth above, after excising the alleged "ethical violations" which were conjured up by Porter of ODC ex post facto by attempting to hold Mr. Klayman to their own heightened unrealistic standard of disclosure - and which constitutes a vast majority of the alleged "ethical violations" at issue and are simply not violations of the D.C. Rules of Professional Conduct – at most Mr. Klayman and his associate made a few inadvertent, unintentional, good faith errors in the middle of a long and highly charged and complex criminal prosecution which should not subject him to any sanction.

In *In Office of Lawyer Regulation v. Napierala*, 384 Wis. 2d 273, the Supreme Court of Wisconsin imposed only a public reprimand on an attorney who had engaged in "serious misconduct," i*d.* at 278, by overbilling a client with cognitive impairment, which the attorney was aware of. *Id.* at 276 – 77. Despite this, the Supreme Court of Wisconsin found that the attorney's misconduct "was not intentional, but resulted from a lack of attention to detail and failure to clearly delineate the various interests of the actors involved." *Id.* at 279. Thus, the Supreme Court of Wisconsin only issued a public reprimand.

Here, Mr. Klayman has not been accused of overbilling anyone, much less a client with a cognitive impairment. Like in *Napierala*, there was simply no intentional misconduct involved and any inadvertent, unintentional, good faith error by Mr. Klayman and his associate certainly did not financially harm or prejudice his client. Thus, under the facts of *Napierala*, while not warranted as set forth in detail, at most this Court can consider a public reprimand or analogously no discipline at all given that there was no financial misconduct and other egregious conduct involved here.

Similarly, *Office of Lawyer Regulation v. Podell* 828 N.W.2d 549 involved a disciplinary proceeding based around a violation of Rule 8.4's prohibition on "dishonesty, fraud, deceit, misrepresentation." In *Podell,* the attorney had submitted duplicate expense reports to the ABA, resulting in an overpayment of about $1155.80. The referee found that the attorney had committed an unintentional error: "Podell's actions in this matter were not done knowingly, recklessly, consciously or intentionally for the purpose of getting a larger

reimbursement from the ABA than he was entitled to for the meeting." *Id.* at 551. Thus, despite Podell's actions, the referee actually recommended that the charges against him be dismissed, and the Supreme Court of Wisconsin agreed and adopted the referee's recommendation. In doing so, the Supreme Court of Wisconsin actually opined that the Office of Disciplinary Counsel attorney appeared to have a grudge against the attorney.

The facts of this case mirror *Podell.* Like *Podell,* at most Mr. Klayman made unintentional, inadvertent good faith errors that were not done intentionally. Even more, Mr. Klayman did not benefit financially from his errors, as his representation of Mr. Bundy was pro bono. And, like *Podell,* Mr. Klayman has also been subjected to an ODC, run by Porter and Fox, who have a grudge against Mr. Klayman for him have brought suit to protect his due process and other constitutional and legal rights.  ODC under Porter and Fox have more than rushed to judgment, and in fact, have attempted to conjure up and manufacture, after Judge Gould had exonerated him of dishonesty with regard to the pro hac vice application,  ex post facto ethical violations against him to try to have him removed from the practice of law. Thus, under the facts of *Podell*, importantly as well as what is set forth herein, the fair and just result is dismissal of all charges against Mr. Klayman.

*O'Bryan v. Joe Taylor Restoration, Inc.,* 2021 U.S. Dist. LEXIS 1710 (S.D. Fla. Jan. 6, 2021) ("*O'Bryan*") involved a case where Fed. R. Civ. P. 11 sanctions were sought against a Plaintiff's counsel who had erred in citing the Family and Medical Leave Act ("FMLA") instead of the correct Emergency Paid Sick Leave Act ("EPSLA") in seeking

damages for violations of the Families First Coronavirus Response Act ("FFCRA"). Id. at 3. It was found that as a matter of law that no claim pursuant to the FMLA existed and that therefore the Plaintiff's counsel has committed an error in citing the FMLA yet failed to completely retract the erroneous claims during the 21-day Rule 11 safe harbor period. Id. However, the Court found that sanctions against the Plaintiff's counsel were clearly unwarranted. In doing so, the Court found:

> Although the Court expects counsel to be diligent and accurate in filing pleadings, simple mistakes do occur at times. This Court does not impose harsh Rule 11 sanctions for simple mistakes by counsel, especially where, as here, Defendants have suffered no prejudice. *Id.* at 5.

This case is analogous to this matter and in fact no one can allege any prejudice to the client, Mr. Bundy, ODC, the Board, or any organ of the Bar. The only prejudice would result to Mr. Klayman to unfairly impose disciplinary sanctions on him.

Similarly, in *Willis v. Villa Piana Corp.*, 2022 U.S. Dist. LEXIS 215372 (N.D. Tex. Nov. 29, 2022) the Court found that Rule 11 sanctions against Defendants' counsel was unwarranted where the Defendants' counsel had mistakenly represented to the Court in a Notice of Removal that the Plaintiff did not demand a jury trial. *Id.* at 1. It was not disputed that this was a false statement, however, the Court found "[t]his error did not result in any delay, prejudice, or harm to Plaintiff and appears to have been an unintentional error. Defense counsel's mistake does not merit the imposition of sanctions." *Id.* at 4. Thus, where Courts have found that not even Rule 11 bad faith sanctions are not warranted for

inadvertent errors in pleadings, such rulings can certainly be applied to firmly support the position that attorney discipline is even more unwarranted.

Furthermore, as recently as June 11, 2020, this Court found in *In re Klayman*, 18-BG-100 (D.C. Ct. App.) that "that "we [the Court] are not left with 'serious doubt' or 'real skepticism' that M. Klayman can practice ethically." This finding was from 2020, shortly after the AHHC hearing and during the interim four (4) year period of delay, nothing has changed.

Even further evidence that a finding of no sanction is warranted is found in the multitude of character witnesses who testified to Mr. Klayman's strong character. These witnesses include Dallas Police Sergeant Demetrick Pennie (Tr. at 865), Carol Bundy (Tr. at 885), Cliven Bundy (Tr. at 894), Ammon Bundy (Tr. at 908), Steven Stewart (Tr. at 920), Ambassador Alan Keyes (Tr. at 933), Jerome Corsi (Tr. at 949), Ryan Bundy (Tr. at 973), Former Congressman and U.S. Attorney for the Northern District of Georgia Bob Barr (Tr. at 1014) and Armstrong Williams (Tr. at 1031). Supp. App. 005 - 116. Furthermore, Mr. Klayman has provided character reference letters and testimony from the Hon. Royce Lamberth of the U.S. District Court for the District of Columbia, App. 241, and the Honorable Stanley Sporkin as well. App. 309 – 310. Lastly, there are a number of factors that serve as mitigating factors, chief of which are (1) the significant delay in this matter, (2) the stacking of disciplinary matters and that (3) Mr. Klayman had previously been a member continuously in good standing with the District of Columbia Bar for over forty (40) years until Hamilton Fox took over as Disciplinary Counsel. On the other hand, ODC and Porter

attempt to argue that past instances where Mr. Klayman has been forced to sue them for violations of his constitutional and other legal rights are aggravating factors, but the fact remains that these lawsuits were necessitated by ODC and Porter's and Fox's conduct and Mr. Klayman cannot be punished simply because he chose to defend himself to protect his constitutional due process and other legal rights.

## CONCLUSION

As set forth conclusively herein, absolutely no discipline in warranted under the facts and law here where this disciplinary proceeding is (1) plainly time-barred pursuant to Board Rule 12.2, (2) is a textbook example of First Amendment viewpoint and selective prosecution discrimination found to be illegal in *Douglass*, and (3) ODC has failed to, and in fact did not even attempt to, fulfill its duty to actually prove any ethical violations by any measure, much more the applicable "clear and convincing evidence" standard.

It is hoped that this Court will not again circle the wagons and ignore the obvious; namely that partisan political anti-Trump, conservative and Republican activist bias does exist in its ranks and at the Board. The American people, who spoke loudly on November 5, 2024 in voting for President Donald J. Trump, obviously took into account the weaponization that has infected our legal system as a whole, particularly in the District of Columbia. Finally, Mr. Klayman respectfully requests oral argument and specific factual findings and conclusions of law by the Court in adjudicating this matter and related motions and pleadings being filed herewith.

Date: November 22, 2024                          Respectfully submitted,

                                                  /s/ Larry Klayman
                                                 Larry Klayman, Esq.
                                                 Klayman Law Group, P.A.
                                                 7050 W. Palmetto Park Rd
                                                 Boca Raton, FL, 33433
                                                 Tel: (561)-558-5336
                                                 Email: leklayman@gmail.com

                                                 *Respondent Pro Se*


### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true copy of the foregoing was served through the

Court's eservice procedures on November 22, 2024.


                                                  /s/ Larry Klayman
                                                 Larry Klayman, Esq.

## IN THE U.S. COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

LARRY KLAYMAN

                    Appellant,

v.

DISTRICT OF COLUMBIA
COURT OF APPEALS, et al

                    Appellees.

**Appeal No: 25-7079**
**Lower Court Case No: 1:24-cv-02997**

## APPELLANT LARRY KLAYMAN'S  MOTION TO EXPEDITE APPEAL

Appellant Larry Klayman ("Mr. Klayman") hereby moves, pursuant to D.C. Circuit Rule 47(a)(the "Rules") and D.C. Circuit Internal Procedure VIII(B)("IOP"), for an order expediting this appeal, abbreviating the briefing schedule, and expediting oral argument. Not only is expediting this appeal required by statute, Mr. Klayman has also demonstrated good cause for an expedited briefing schedule and oral argument.

This appeal is a challenge of the Honorable Reggie Walton's ("Judge Walton") oral rulings at the May 27, 2025 hearing and subsequent May 27, 2025 minute order on Mr. Klayman's Motion for Preliminary Injunction ("Injunction Motion"), Exhibit 1, where Mr. Klayman sought to enjoin the Appellee-Defendants' selective prosecutorial discriminatory treatment that the this Court has

found to be unconstitutional and illegal in *Frederick Douglass Found., Inc. v. District of Columbia*, 82 F.4th 1122 (D.C. Cir. 2023) ("*Douglass*") and which has been confirmed very recently on April 8, 2025 by the Honorable Trevor McFadden—an appointee of President Trump no less—*Associated Press v. Budowich*, 1:12-cv-00532 (D.D.C.) ECF No. 46 ("*Associated Press*").[1]

A review of the attached transcript of the May 27, 2025 oral argument, Exhibit 2, will show that Judge Walton off the cuff with no bona fide legal authority prejudged this matter right away and appeared to be uninterested in holding a bona fide oral argument, instead made the clearly wrong snap judgment that Mr. Klayman was precluded under the *Rooker-Feldman* doctrine on the not relevant pretext that he could have raised in another matter Mr. Klayman where forced to sue the Board on Professional Responsibility ("Board") to seek injunctive relief only in the form of an order requiring that Board on Professional Responsibility Rule 12.2 ("Rule 12.2") be enforced. *Klayman v. Board on Professional Responsibility*, 2024-CAB-000048 (D.C. Sup. Ct.) (the "Bundy Litigation"). As set forth below, this off the cuff prejudgment by Judge Walton was flat-out wrong for a multitude of reasons, including but not limited to the plain fact that the *Rooker-Feldman* doctrine cannot apply here where Mr. Klayman has

---

[1] This was later reversed by the U.S. Court of Appeals for the District of Columbia Circuit on a technicality, but the legal reasoning of Judge McFadden is still sound and applies here.

sought damages.

At the hearing, Mr. Klayman expressly asked Judge Walton what authority he had to make his off the cuff prejudgment decision, and Judge Walton simply had no answer beyond merely the fact that he had filed the Bundy Litigation:

> THE COURT: It has nothing to do with the merits of your First Amendment claim. My position is that, as I said before -- maybe you don't understand what I'm saying -- you had a right to raise it over in the Superior Court. You didn't raise it.
> MR. KLAYMAN: Do you have any authority for that?
> THE COURT: Yes, there's plenty of authority that says --
> MR. KLAYMAN: What authority do you have? You haven't cited any.
> THE COURT: -- I can't tell you --
> MR. KLAYMAN: Other than you felt like making that ruling, because you have no authority to cite that. Exhibit 2 at 57:8-21.

This off the cuff unreasoned prejudgment is further evidence of Judge Walton's extrajudicial bias and prejudice against Mr. Klayman, which has forced Mr. Klayman in the past to seek his recusal in other matters. *Klayman v. Porter et al*, 21-cv-3109 (D.D.C.)[2].

Immediately after the oral argument of May 27, 2025, Judge Walton memorialized his oral rulings in a minute order without any further legal reasoning and denied the Injunction Motion. Mr. Klayman immediately appealed this. The following day, after Mr. Klayman had already appealed, Judge Walton appears to

---

[2] In a related case styled *Klayman v. Porter et al*, 22-7123, this Court was highly critical of and reversed Judge Walton's erroneous rulings but did not order him disqualified. Given his continuing conduct which shows bias, Plaintiff renewed his request to Judge Walton to recuse himself.

have thought better of his minute order and in an attempt to cover himself, issued a memorandum opinion and order again denying the Injunction Motion. This ex post facto and strained attempt to try to incorrectly justify the Court's erroneous order on May 27, 2025, is thus of no force or effect as it was entered after jurisdiction had already been removed from the Lower Court, and in fact effectively admits the factual and legal errors committed at the hearing on May 27, 2025, which prejudicially deprived Mr. Klayman of due process of law and his other legal rights.

## I. This Appeal is Required By Statute to be Expedited

As a threshold matter, this appeal is required by statute to be expedited. The Court's IOP states:

> Circuit Rule 47.2(a) lists many of those statutory provisions that mandate expedited appellate review…. **28 U.S.C. §§ 1657**….. See supra Part III.J. Whenever a party takes an appeal pursuant to one of these provisions, the district court Clerk must transmit the notice of appeal and certified docket entries forthwith to this Court, so that the appeal can be docketed and an appropriate schedule set. Counsel must advise the Clerk of this Court in writing of counsel's arrangements to order any necessary portions of the transcript on an expedited basis, and make arrangements with the district court Clerk to send the record promptly to this Court. A party desiring a more expedited schedule than that entered by the Clerk, or expedited oral argument, must file a motion. (emphasis added).

Under 28 U.S.C. § 1657, "…the court shall expedite the consideration of….any action for temporary or preliminary injunctive relief…."

Accordingly, because Mr. Klayman's instant appeal seeks review and reversal of Judge Walton's May 27, 2025 minute order denying his Motion for

Preliminary Injunction, which was entered before the of appeal was filed removing

jurisdiction from Judge Walton, this appeal is required, by statute, to be given

"expedited appellate review."

## II.    Mr. Klayman Has More Than Shown Good Cause for an Expedited Briefing Schedule and Oral Argument

Due to the highly time-sensitive and exigent nature of this appeal, Mr.

Klayman also respectfully requests "a more expedited schedule… [and] expedited

oral argument" and therefore moves the Court in this regard, as set forth in the

Court's IOP, which states "[t]he movant must demonstrate that the delay will cause

irreparable injury and that the decision under review is subject to substantial

challenge." As set forth in the attached Motion for Preliminary Injunction, Exhibit

1, which is attached hereto and incorporated by reference, Mr. Klayman has more

than shown that he will suffer an irreparable injury and that the decision under

review is subject to substantial challenge.

### A. Mr. Klayman Will Suffer Irreparable Harm

At issue is an ongoing attorney discipline proceeding styled *In re Klayman*,

24-BG-689 (the "Bundy Matter") where the Ad Hoc Hearing Committee

("AHHC") egregiously violated Board on Professional Responsibility ("Board")

Rule 12.2. ("Rule 12.2") by failing to issue it Report and Recommendation for

**over four (4) years** – almost half a decade – well past the required and mandated

120 days permitted by Rule 12.2. When Mr. Klayman asked the Board to simply

enforce its own Rule 12.2, which was promulgated by the District of Columbia Court of Appeals ("DCCA"),  the Board refused to do so. Mr. Klayman then was forced to sue the Board to seek injunctive relief in the form of an order requiring that Rule 12.2 be enforced. *Klayman v. Board on Professional Responsibility*, 2024-CAB-000048 (D.C. Sup. Ct.) (the "Bundy Litigation"). The Bundy Litigation ended up being before the DCCA on appeal, and only very recently, on April 17, 2025, the DCCA affirmed the Lower Court's order of dismissal in the Bundy Litigation. Thus, the DCCA has already signaled to Mr. Klayman that it will allow the Board unbridled license to violate the Court's rules, and in this case Rule 12.2.

As set forth in Mr. Klayman's Motion for Preliminary Injunction, the conduct of the Defendants-Appellees violates unconstitutionally this Court's ruling in *Douglass* because it also constitutes impermissible First Amendment selective prosecution and viewpoint discrimination. The Defendants-Appellees are part of the District of Columbia attorney disciplinary apparatus that has disparately and selectively targeted attorneys who are conservative and Republican activists such as Mr. Klayman for removal from the practice of law. *See* Motion for Preliminary Injunction; Exhibit 1 at 9 -13.

Under *Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009), it is well-settled that a constitutional injury, for even a brief period of time, unquestionably constitutes irreparable injury. Mr. Klayman here has more than

shown a violation of his First Amendment rights, and thus, irreparable injury and harm under *Mills*.

Furthermore, Mr. Klayman will suffer irreparable harm because a decision that is not likely to be  favorable to Mr. Klayman will likely come down shortly thereafter as a result of the DCCA giving undue deference to the other Defendants-Appellees actions in the Bundy Matter. As intended by design by the Defendants-Appellees, this would then be used to effectively remove Mr. Klayman from the practice of law both in the District of Columbia as well as severely affect his practice of law in other, foreign jurisdictions and courts where he is licensed to practice, since unjustified discipline as recommended by Defendants-Appellees in the District of Columbia will likely trigger reciprocal disciplinary proceedings. Any such reciprocal disciplinary proceedings are extremely time consuming and very costly, also preventing Mr. Klayman from fully representing on-going and potentially new clients in both his public interest and private law practice capacity, as well as severely harming him, his family, and colleagues financially.

Absent exigent action from this Court, prior to the DCCA issuing any final order in the Bundy Matter, Mr. Klayman will therefore suffer irreparable harm under *Mills*, 571 F.3d at 1312  and in fact. Thus, Mr. Klayman respectfully requests that the Court expedite this appeal as mandated by statute under 28 U.S.C. § 1657 as well as for the good cause shown herein.

### B. Judge Walton's May 27, 2025 Minute Order is Subject to "Substantial Challenge"

On May 27, 2025 Judge Walton held a hearing on Mr. Klayman's Motion for Preliminary Injunction, the transcript of which is attached hereto as Exhibit 2. At the hearing, Judge Walton erroneously found that Mr. Klayman was bound to have raised his First Amendment viewpoint discrimination claims under *Douglass* in the state court Bundy Litigation and erroneously attempted, however unjustified without legal authority , to apply the *Rooker-Feldman* doctrine as his basis for denying Mr. Klayman's Motion for Preliminary Injunction:

> Well, I'm prepared to rule. And as I was indicating when we were here previously, before we took the recess, I just don't see how a litigant can pursue a matter before the equivalent of a state court, raise some issues before the state court, lose before that court, could have raised other arguments before that court but did not, but then seek to raise those same issues before a federal court. I just don't see how you can do that. And I think that's the problem.
>
> And I think the Rooker-Feldman doctrine also is an impediment to me addressing this matter in light of the fact that the Court of Appeals -- I mean, the Superior Court made its ruling.
>
> Subsequently, that was appealed to the Court of Appeals. The Court of Appeals affirmed the Superior Court. And I just don't see how I have the authority to make a decision now inconsistent with issues that were raised before the Court of Appeals, at least in reference to the rule issue. But as I said, in reference to the constitutional issue that's being raised, that could have been raised before, before the state court. It was not raised. And I don't see how it can now be raised in the first instance before this Court. Exhibit 2 at 49 – 50.

*First*, as explained by Mr. Klayman at the May 27, 2025 hearing, the *Rooker-Feldman* doctrine does not apply here because Mr. Klayman is seeking relief for a violation of his First Amendment rights. The Supreme Court has explained that the purpose of the *Rooker-Feldman* doctrine is to effectuate 28 U.S.C. § 1257, which "'vests authority to review a state court's judgment solely in [the Supreme] Court.'" *D.C. Healthcare Sys. v. District of Columbia*, 441 U.S. App. D.C. 126, 131 (2019). "The Supreme Court has repeatedly described the *Rooker-Feldman* doctrine as a 'narrow' one." *Id*. "Indeed, the Court has found it applicable only twice." *Id*. Importantly, "if "a federal plaintiff present[s] [an] *independent* claim, it is not an impediment to the exercise of federal jurisdiction that the same or a related question was earlier aired between the parties in state court." *Id*. at 132 (emphasis in original). The Bundy Litigation was a state court action that solely sought injunctive relief and declaratory relief that the Board must enforce Rule 12.2. This instant matter brings claims under 42 U.S.C. § 1983 for violations of Mr. Klayman's First and Fifth Amendment rights, and seeks damages from the Defendants in that regard in addition to seeking injunctive and equitable relief. These claims could not be more different and this instant matter clearly presents the Court with an "independent claim" that falls outside of the Bundy Litigation. *D.C. Healthcare Sys*, 441 U.S. App. D.C. at 131. Thus, particularly given the extremely narrow application of the *Rooker-Feldman*

doctrine, *id.*, it is clear that the *Rooker-Feldman* doctrine does not preclude this matter.

*Second*, it is indisputable that Mr. Klayman is seeking damages in this instant matter, and thus, the *Rooker Feldman* doctrine cannot apply.

*Third*, the *Younger* abstention doctrine does not apply either. In the main, federal courts are obliged to decide cases within the scope of federal jurisdiction. Abstention is not in order simply because a pending state-court proceeding involves the same subject matter." *Sprint Communs., Inc. v. Jacobs*, 571 U.S. 69, 72 (2013). Circumstances fitting within the *Younger* doctrine, we have stressed, are "exceptional"; they include… "state criminal prosecutions," "civil enforcement proceedings," and "civil proceedings involving certain orders that are uniquely in furtherance of the state courts' ability to perform their judicial functions." *Id*. Given the very limited nature of this doctrine, it is clear that Courts should not strain to find that it is applicable.

*Bridges v. Kelly*, 84 F.3d. 470 (1996) shows exactly how and why the *Younger* abstention doctrine does not apply to this case. In *Bridges*, the Plaintiff brought federal suit under, among other counts, 42 U.S.C. § 1983 after an alleged wrongful termination from his position as attorney-advisor in the District of Columbia's Department of Administrative Services. *Id*. at 471. Prior to filing suit, the Plaintiff had exercised his right of appeal of his termination to the Office of

Employee Appeals—an administrative appeal. *Id*. On the grounds that the administrative appeal was still pending, the lower court in *Bridges* exercised the *Younger* abstention doctrine with regard to Plaintiff's federal lawsuit. The U.S. Court of Appeals for the District of Columbia Circuit ("D.C. Circuit") reversed on the grounds that  "appellant could not receive from the D.C. system the full panoply of remedies available to him from the District Court in connection with his federal claims." *Id*. Specifically, the D.C. Circuit reasoned that the fact that Plaintiff had sought millions in damages in the federal suit rendered *Younger* clearly inapplicable because "[w]e find nothing in the D.C. Code, and appellees cite nothing, authorizing the OEA to grant relief such as punitive damages and compensatory damages (in excess of back pay and benefits) for harms flowing from tortious conduct." *Id*. at 477. The exact same situation is present here. Mr. Klayman has also sought damages under 42 U.S.C. § 1983. Even if the District of Columbia Superior Court ultimately dismisses the Bundy Matter or finds that no discipline is warranted, it certainly cannot grant damages. Thus, *Younger* is inapplicable here as well.

Furthermore, it is indisputable that there exists a "bad-faith" exception to the *Younger* doctrine, which this Court has defined as "where 'the pending state action was brought in bad faith or for the purpose of harassing' the federal plaintiff…."

11

*JMM Corp. v. District of Columbia*, 363 U.S. App. D.C. 160, 170 (2004).

Furthermore, other courts have found:

> A showing that a prosecution was brought in retaliation for or to discourage the exercise of constitutional rights "will justify an injunction regardless of whether valid convictions conceivably could be obtained." *Fitzgerald v. Peek*, 636 F.2d 943, 945 (5th Cir.1981). The state does not have any legitimate interest in pursuing such a prosecution; "[p]erhaps the most important comity rationale of *Younger* deference—that of respect for the State's legitimate pursuit of its substantive interests—is therefore inapplicable." *Wilson v. Thompson*, 593 F.2d 1375, 1383 (5th Cir.1979).

*Lewellen v. Raff*, 843 F.2d 1103, 1109–10 (8th Cir. 1988). "When, however, a state bar acts in bad faith or to retaliate against First Amendment protected activity, the courts should not abstain." *Hensler v. District Four Grievance Committee*, 790 F.2d 390, 391 (5th Cir.1986). "Abstention would serve no purpose because a state cannot have a legitimate interest in discouraging the exercise of constitutional rights, or, equally, in continuing actions otherwise brought in bad faith, thereby reducing the need for deference to state proceedings." *Cullen v. Fliegner*, 18 F.3d 96, 104 (2d Cir. 1994).

The egregious over four year delay constitutes prima facie bad faith, particularly given that the Complaint has detailed how this delay constitutes the illegal practice of "stacking" disciplinary proceedings. Comp. ¶ 53. Specifically, the Bundy Matter has been used to "stack" disciplinary proceedings against Mr. Klayman to ensure that he remains ineligible to practice law in the District of

Columbia given that he had only recently on August 6, 2024 petitioned for reinstatement to practice following the conclusion of the suspension period in *In re Klayman*, 20-BG-583 (D.C.C.A.) (the "Sataki Matter"). Stacking has been ruled unethical and illegal by reputable state bars, *Fla. Bar v. Rubin*, 362 So. 2d 12 (Fla. 1978), which reasoning must be followed here given that the harm to Mr. Klayman is amplified by the fact that these illegally "stacked" disciplinary proceedings are meant to trigger reciprocal discipline proceedings to harm Mr. Klayman not only in the District of Columbia but in every other foreign jurisdiction as well.  QUOTE RUBIN

Thus, assuming *arguendo* that *Younger* could apply, it is clear that the bad faith exception would apply. This is because Mr. Klayman has clearly alleged retaliation against First Amendment protected activity. *Hensler* 790 F.2d at 391. Thus, "[a]bstention would serve no purpose because a state cannot have a legitimate interest in discouraging the exercise of constitutional rights, or, equally, in continuing actions otherwise brought in bad faith, thereby reducing the need for deference to state proceedings." *Cullen* 18 F.3d at 104

*Fourth*, there is simply no legal authority presented by Judge Walton that Mr. Klayman waived bringing a constitutional  claim for damages for First Amendment viewpoint discrimination by having filed the Bundy Litigation, where he only sought injunctive relief against the Board. This is not "piecemeal" litigation. This

is an entirely new and independent claim against new Defendants. This is particularly true given that the First Amendment viewpoint discrimination alleged in the Complaint is based in part on the conduct of the Defendants-Appellees resulting from the Bundy Litigation! For instance:

> Mr. Klayman also asked the Defendant DCCA to stay the Bundy Matter pending the Bundy Litigation, as the Bundy Litigation would moot out the Bundy Matter, but the Defendant DCCA refused to even grant this stay, which would be in the interests of judicial economy and fundamental fairness and justice, particularly since Mr. Klayman's financial resources will be severely taxed by having to defend a time-barred and non-meritorious disciplinary proceeding. This refusal to stay the Bundy Matter regrettably necessitated this instant litigation. Comp. ¶ 55.

It is not for Judge Walton to decide how Mr. Klayman litigates his claims. Because it is clear that neither the *Rooker-Feldman* doctrine nor the *Younger* abstention doctrine apply, Judge Walton had no basis to deny Mr. Klayman's motion for preliminary injunction on the basis that Mr. Klayman "could have" sought monetary damages from the DCCA. And indeed ,Judge Walton could not, when asked by Mr. Klayman, cite any legal authority for what he ruled effectively from the proverbial "seat of his pants."

*Fifth*, the DCCA was served through its clerk who accepted service prior to the hearing of May 27, 2025 as shown in the attached affidavit of service, Exhibit 3, and indeed had notice, and an opportunity to argue the Injunction Motion at the May 27, 2025 hearing. Furthermore, the District of Columbia Office of the

Attorney General was served through its email address at oagserviceofprocess@dc.gov on May 27, 2025. In any event, there is no issue as the other Defendants were timely served well before the May 27, 2025 hearing, namely the members of the Board.

## III. Conclusion

Based on the foregoing, not only is this instant appeal required by statute to be expedited, Mr. Klayman has also more than shown good cause for an expedited briefing schedule and expedited oral argument. The bad precedent caused by Judge Walton's off the cuff prejudged ruling has broad ramifications far beyond this case.

Accordingly, Mr. Klayman respectfully requests that the Court issue, as soon as practicable, an expedited briefing schedule and expedited oral argument, with the sole times that Mr. Klayman is unavailable being the week of July 17 – July 20, 2025 on a client matter.

Date: June 12, 2025                    Respectfully submitted,

                                       */s/ Larry Klayman*
                                       Larry Klayman
                                       Klayman Law Group P.A.
                                       7050 W. Palmetto Park Rd
                                       Boca Raton, FL, 33433
                                       Tel: (561)-558-5336
                                       Email: leklayman@gmail.com

                                       *Pro Se*

## **CERTIFICATE OF SERVICE**

I, Larry Klayman, hereby certify that on this day, June 12, 2025 a copy of

the foregoing was served counsel for all parties via the Court's ECF procedures.

*/s/ Larry Klayman*

# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

LARRY KLAYMAN

               Plaintiff,

v.

DISTRICT OF COLUMBIA COURT OF
APPEALS, et al

               Defendants.

**Case No.: 1:24-cv-02997**

<u>**PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**</u>

Date: May 14, 2025

                             Respectfully submitted,

                             <u>*/s/ Larry Klayman*</u>
                             Larry Klayman
                             Klayman Law Group P.A.
                             7050 W. Palmetto Park Rd
                             Boca Raton, FL, 33433
                             Tel: (561)-558-5336
                             Email: leklayman@gmail.com

                             *Pro Se*

## <u>TABLE OF CONTENTS</u>

<u>INTROUCTION AND STATEMENT OF RELEVANT FACTS</u> .................................................2

    Facts Pertaining to Cliven Bundy's Trial............................................................................5

    Facts Pertaining to the Bundy Matter ................................................................................6

    Facts Pertaining to the Defendants' First Amendment Viewpoint Discrimination ............9

<u>LEGAL STANDARD</u>.............................................................................................................13

<u>THE LAW</u>..............................................................................................................................13

    Mr. Klayman Has Shown a Substantial Likelihood of Success on the Merits .................13

    Mr. Klayman Has Shown Irreparable Harm ....................................................................15

    A Preliminary Injunction Would Not Substantially Injury Any Other Interested Parties .20

    A Preliminary Injunction is in the Public's Interest.........................................................20

<u>CONCLUSION</u> ......................................................................................................................21

## Table of Authorities

**STATUTES**

Board on Professional Responsibility Rule 12.2 ..................................................................1, 3, 8, 9

U.S. District Court for the District of Columbia Local Civil Rule 65 ............................................2

**CASES**

*Am. Freedom Def. Initiative v. Wash. Metro. Area Transit Auth.*, 898 F.Supp.2d 73 (D.D.C. 2012) ..................................................................................................................................20

*Associated Press v. Budowich*, 1:12-cv-00532 (D.D.C.) ........................................................1, 14

*Elite Entm't, Inc. v. Reshammiya*, 2008 U.S. Dist. LEXIS 31580 (D.D.C. Apr. 18, 2008). ...................................................................................................13, 15, 19

*Fl. Bar v. D'Ambrosio*, 25 So. 3d 1209 (Fla. 2010) ....................................................... 18

*Fla. Bar v. Rubin*, 362 So. 2d 12 (Fla. 1978) ....................................................... 17, 18

*Frederick Douglass Found., Inc. v. District of Columbia*, 82 F.4th 1122 (D.C. Cir. 2023) .................................................................................................................1, 14

*Gordon v. Holder*, 632 F.3d 722 (2011) ...................................................................13

*In re Cliven D. Bundy*, 16-72275 (9th Cir. Oct. 28, 2016) .............................................6

*In re Klayman*, 20-BG-583 (D.C.C.A.) ...................................................................16

*Mills v. District of Columbia*, 571 F.3d 1304 (D.C. Cir. 2009)...............................19, 20

*Nat'l Fed'n of Fed. Emps. v. Carlucci*, 680 F. Supp. 416 (D.D.C. 1988) .....................20

Plaintiff Larry Kayman ("Mr. Klayman") moves the Court for a Preliminary Injunction with regard to the unconstitutional and unlawful conduct of Defendants Board on Professional Responsibility ("Board"), Sara Blumenthal, Margaret Cassidy, Thomas Gilbertsen, William Hindle, Sharon Rice-Hicks, Bernadette Sargeant, Leslie Spiegel, Michael E. Tigar, Robert Walker's (collectively "Board Defendants"), Robin Bell, Buffy Mims, Christian White's (collectively the "AHHC Defendants") and the District of Columbia Court of Appeals ("DCCA"). The Defendants' discriminatory selective prosecutorial discriminatory treatment that the U.S. Court of Appeals for the District of Columbia Circuit has found to be unconstitutional and illegal in *Frederick Douglass Found., Inc. v. District of Columbia*, 82 F.4th 1122 (D.C. Cir. 2023) ("*Douglass*") and which has been confirmed very recently on April 8, 2025 by the Honorable Trevor McFadden, an appointee of President Trump no less, in *Associated Press v. Budowich*, 1:12-cv-00532 (D.D.C.) ECF No. 46 ("*Associated Press*").

This matter is urgent and ripe for immediate consideration because of the irreparable harm that will follow immediately from the Defendant DCCA having currently scheduled oral argument the subject ongoing disciplinary action against Mr. Klayman (the "Bundy Matter") for May 28, 2025 and the likely adverse events harming Plaintiff that will flow shortly therefrom. Defendant DCCA has signaled to Mr. Klayman that it will allow the Board unbridled license to violate the Court's rules, and in this case Rule 12.2. This goes far beyond exercising any reasonable discretion. Thus, action is required now to avoid irreparable harm to Mr. Klayman because, as set forth in detail below, a decision that is not likely to be  favorable to Mr. Klayman will likely come down shortly thereafter as a result of the Defendant DCCA giving undue deference to the other Defendants actions. As intended by design by the other Defendants, this

1

would then be used to effectively remove Mr. Klayman from the practice of law both in the District of Columbia as well as severely affect his practice of law in other, foreign jurisdictions and courts where he is licensed to practice, since unjustified discipline as recommended by Defendants in the District of Columbia will likely trigger reciprocal disciplinary proceedings. Any such reciprocal disciplinary proceedings are extremely time consuming and very costly, also preventing Mr. Klayman from fully representing on-going and potentially new clients in both his public interest and private law practice capacity, as well as severely harming him, his family, and colleagues financially.

Mr. Klayman therefore has no choice but to seek a preliminary injunction pursuant to District of Columbia Local Civil Rule ("LCvR") 65.1(c). Specifically, Mr. Klayman seeks relief in the form of an order finding that the AHHC Report and Board Report in the Bundy Matter are void *ab initio* and vacated and thus preliminarily enjoined from further consideration. Furthermore, pursuant to LCvR 65.1(d), a hearing must be set by this Court no later than twenty-one (21) days from the filing of this motion. Mr. Klayman, during the time it takes this Court to adjudicate fully this matter, will contemporaneously move the DCCA to stay its proceeding.

## <u>INTRODUCTION AND STATEMENT OF RELEVANT FACTS</u>

Mr. Klayman is a prominent conservative and Republican activist and attorney who engages in public speech furthering his conservative and Republican activist views and associates with other conservative and Republican activists and attorneys. Mr. Klayman brings in the public interest lawsuits furthering conservative and true Republican ideals and engages in public speech through weekly radio show and other fora furthering his conservative and Republican ideals. Comp. ¶ 20.

2

The Board is appointed by Defendant DCCA and serves as its disciplinary arm, responsible for the adjudication of disciplinary cases and the administration of the attorney discipline system. The Ad Hoc Hearing Committee ("AHHC") presides over disciplinary hearings and are appointed by the Board. Comp. ¶ 5.

This is an extremely simple and straightforward case. The Board Defendants have refused to apply Board on Professional Responsibility Rule 12.2 ("Rule 12.2") - which rule was promulgated by the Defendant DCCA and assigned and relegated to Defendant Board to enforce – to dismiss the Bundy Matter. Comp. ¶ 19. This is despite the fact that Rule 12.2 has been unequivocally and egregiously violated by the AHHC Defendants, who withheld their Report and Recommendation in the Bundy Matter for **over four (4) years** – almost half a decade -- hugely past the required and mandated 120 days. Comp. ¶ 19. Because the Board refused to enforce its own Rule 12.2, Mr. Klayman was forced to sue the Board to seek injunctive relief in the form of an order requiring that Rule 12.2 be enforced (the "Bundy Litigation"), which would have mooted out the entire disciplinary proceeding. Mr. Klayman asked Defendant DCCA to either dismiss the disciplinary action on the basis of Rule 12.2 or to stay this disciplinary proceeding pending the outcome of the Bundy Litigation, but Defendant DCCA refused to do so, which necessitated this instant litigation.

Only very recently, on April 17, 2025, Defendant DCCA affirmed the Lower Court's order of dismissal in the Bundy Litigation. On May 1, 2025, Mr. Klayman timely filed a Petition for Rehearing En Banc, which is currently pending.

Urgent action is required now to avoid irreparable harm to Mr. Klayman because, as set forth in detail below, a decision that is not likely to be favorable to Mr. Klayman will likely

come down shortly after the currently scheduled May 28, 2025 oral argument as a result of the Defendant DCCA giving undue deference to the other Defendants actions. As intended by design by the other Defendants, this would then be used to effectively remove Mr. Klayman from the practice of law both in the District of Columbia as well as severely affect his practice of law in other, foreign jurisdictions and courts where he is licensed to practice, since unjustified discipline as recommended by Defendants in the District of Columbia will likely trigger reciprocal disciplinary proceedings, which are extremely time consuming and very costly, also preventing Mr. Klayman from fully representing on-going and potentially new clients in both his public interest and private law practice capacity, as well as severely harming him, his family and colleagues financially.

To make matters worse, the Board Defendants precipitously issued a Report and Recommendation while the Bundy Litigation was still pending, therefore creating the likelihood of a "temporary suspension" condition for Mr. Klayman, which in and of itself will cause him, his colleagues, his clients, and his family irreparable harm. In sum, the Defendants—persons and entities of D.C. Attorney Discipline Apparatus—as alleged herein are working together closely in concert to try to inflict as much harm as possible on Mr. Klayman to try to have him removed from the practice of law because he is a prominent conservative and Republican activist and attorney and supporter of Donald Trump who, in particular they desire to silence contrary to his First Amendment rights. This was confirmed at the conclusion of the AHHC hearing in the Bundy Matter where Office of Disciplinary Counsel's ("ODC") prosecutor Julia Porter ("Porter") revealed that their goal is to disbar Mr. Klayman when she blurted out that Mr. Klayman "should not continue to have the privilege of being a lawyer." Comp. ¶ 57. Thus, this is

4

not speculation but documented based on a pattern and practice of widely recognized "weaponized behavior" by the Defendants toward not just Mr. Klayman but also many other prominent pro-Trump conservative and Republican activist attorneys.

## I.    Facts Pertaining to Cliven Bundy's Trial

In or around 2017, Mr. Klayman was retained by Cliven Bundy ("Mr. Bundy") to represent him in his criminal trial in the U.S. District Court for the District of Nevada ("Nevada Court") stemming from a 2016 standoff with federal agents on Mr. Bundy's land (the "Bundy Trial"). The stakes of the Bundy Trial were extremely high, as Mr. Bundy was facing the possibility of life imprisonment. Comp. ¶ 21. Presiding over the Bundy Trial was the Honorable Gloria Navarro ("Judge Navarro"). Comp. ¶ 22. Because Mr. Klayman was not a member of the Nevada Bar, he moved for admission *pro hac vice* in the Bundy Trial. Judge Navarro denied Mr. Klayman's motion, and Mr. Klayman appealed that decision to the U.S. Court of Appeals for the Ninth Circuit ("Ninth Circuit"). Comp. ¶ 23. Ultimately, there were multiple appeals and motions filed by Mr. Klayman to try to gain entry as counsel into the Bundy Trial due to the fact that Mr. Klayman was trying to zealously represent his client, Mr. Bundy. Mr. Klayman and Mr. Bundy saw that there was an enormous amount of gross prosecutorial misconduct going on in the Bundy Trial, which caused Mr. Klayman to push even harder to get into the case in order to zealously defend Mr. Bundy's rights within the bounds of ethics and the law. Comp. ¶ 24. Mr. Klayman and Mr. Bundy's suspicions were more than confirmed when ultimately in January of 2018, Judge Navarro was forced to dismiss the charges against Mr. Bundy with prejudice as a result of gross prosecutorial misconduct in failing to turn over exculpatory documents and lying to the Court. Mr. Klayman never was able to gain admission into the Bundy Trial. Comp. ¶ 25.

5

Despite Mr. Klayman having never been sanctioned by the Nevada Court or the Ninth Circuit, any judge or other  entity,  for his efforts to gain admission into the Bundy Trial, ODC still initiated a disciplinary complaint against Mr. Klayman for simply trying to represent his client in a life-or death criminal trial, alleging among other entirely frivolous and manufactured, contrived allegations, that Mr. Klayman had been dishonest and that his repeated attempts to gain *pro hac vice* admission into the Bundy Trial were somehow unethical. Comp. ¶ 26. This was despite the fact that the Honorable Ronald Gould ("Judge Gould") of the Ninth Circuit, who was an integral jurist of the panel overseeing the appeals at issue, made factual findings that Mr. Klayman had fulfilled his duty of candor and thus committed no ethics violation:

> Klayman properly disclosed the ongoing disciplinary proceeding in his initial application for pro hac vice admission, saying that the proceeding had not yet been resolved. This disclosure was accurate…. I agree with Klayman that he was not obligated to re-litigate the D.C. proceeding before the district court and that he did not have to provide the district court with the entire record from D.C. And if his disclosures were selective, still he is an advocate, an advocate representing defendant Cliven Bundy, **and after submitting a compliant response to the questions in the pro hac vice application, he had no greater duty to disclose any possible blemish on his career or reputation beyond responding to the district court's further direct requests.** *In re: Cliven D. Bundy*, 16-72275 (9th Cir. Oct. 28, 2016). Comp. ¶ 27.

## II.     Facts Pertaining to the Bundy Matter

Despite Judge Gould's clear and convincing findings, which ipso facto negated any claim of clear and convincing evidence of an ethical infraction,  Mr. Klayman was summoned before the AHHC comprised of Defendants Mims, Bell, and White in July of 2019 and September of 2019 for disciplinary proceedings initiated by ODC for his efforts to gain entry into the Bundy Trial *pro hac vice*. Comp. ¶ 44.  At this hearing Mr. Klayman  proffered Professor Erwin Chemerinsky ("Dean Chemerinsky") of the University of California at Berkeley's Boalt Hall

6

testify pro bono on his behalf. Dean Chemerinsky testified that he did not believe that Mr. Klayman did anything unethical and that Mr. Klayman's actions were reasonable. Comp. ¶ 45. To the contrary, ODC did not have a single witness, and instead had its incredibly conflicted prosecutor, Julia Porter ("Porter"), improperly and unethically serve as both prosecutor and witness. Comp. ¶ 46. It is therefore no surprise that at the conclusion of first three-day hearing before the AHHC on July 18, 2019, when the facts and evidence were fresh in the committee members' minds,  the chairperson, Defendant Mims, stated on the record that "the Hearing Committee has been unable to reach a non-binding determination." Comp. ¶ 47. This finding, coming at this preliminary stage, is rare and unique, as hearing committees almost always provisionally issue non-binding rulings which then permit them to take evidence on factors involving mitigation and/or aggravation. This was memorialized in the AHHC's August 8, 2019 order which found:

> Following the conclusion of the evidentiary portion of the hearing and the parties' respective closing arguments, the Hearing Committee went into executive session and determined that it could not make a preliminary finding that Disciplinary Counsel had proven any disciplinary rule violation. *Id.*

Notably, this aligns with the testimony of, and the conclusions reached by, both Judge Gould and Dean Chemerinsky, as set forth above. While neither was Mr. Klayman's ideological kin, both of these renowned legal scholars took the time to analyze the facts and law and concluded that Mr. Klayman did not commit any ethical violations.

Then, for over four (4) years – almost an egregious and unbelievable almost half a decade - the AHHC went silent, leaving Mr. Klayman to very reasonably to rightly conclude that this matter had been laid to rest and thus disposed of, given the AHHC's finding after the hearing that

ODC had failed to prove any ethical violations as well as because of Board Rule 12.2 ("Rule 12.2), which was promulgated by Defendant DCCA, which unequivocally mandates:

> The Hearing Committee's report shall be filed with the Board **not later than 120 days following the conclusion of the hearing.** The 120 days provided for by the Court's rules for the preparation of the Hearing Committee's report shall start to run at the conclusion of the hearing. Comp. ¶ 48.

Yet, incredibly on September 20, 2023 – over four (4) years after the AHHC Hearing concluded - nearly half of a decade later -  the AHHC outrageously, without factual, legal and other bases, reversed course 180 degrees and issued an AHHC Report and instead recommended a one-year suspension with a reinstatement provision. Comp. ¶ 49.

It more than appears that given this egregious and violative passage of time, the Defendants Mims, Bell, and White appear to have taken the easy and politically convenient way out during this highly partisan divisive period in history. This occurred during the reemergence of Donald Trump in particular who Mr. Klayman supports, and thus, Defendants Mims, Bell and White made the decision to simply "rubber stamp" what was presented to them back in 2019 by ODC. This is improper for a litany of reasons, none more compelling than the fact that ODC and Porter already made all of their same arguments at the 2019 AHHC hearing and were found to have failed to have proven any ethical violation. Absolutely nothing new was put into the record in the interim over four (4) year period of delay. Thus, the only explanation for the AHHC reversing course nearly half of a decade later is that they simply copied and adopted wholesale the briefs of Porter and ODC from 2019.

When Mr. Klayman brought the egregious violation of Rule 12.2 to the Board's attention, the Board and the Board Defendants incredibly refused to enforce Rule 12.2 with regard to Mr.

Klayman. This led to the Bundy Litigation where Mr. Klayman sought injunctive relief in the form of an order directing the Board to enforce Rule 12.2, which the Defendant DCCA even recently refused to act upon. Mr. Klayman also asked the Defendant DCCA to stay the Bundy Matter pending the Bundy Litigation, as the Bundy Litigation would moot out the Bundy Matter, but the Defendant DCCA refused to even grant this stay, which would be in the interests of due process, judicial economy and fundamental fairness and justice, particularly since Mr. Klayman's time and financial resources will be  even more severely taxed by having to defend a time-barred and non-meritorious disciplinary proceeding now scheduled for oral argument on May 28, 2025. This refusal to stay the Bundy Matter regrettably necessitated this instant litigation, among other compelling reasons such as due process in the interest of justice and fundamental fairness.

### III.    Facts Pertaining to the Defendants' First Amendment Viewpoint Discrimination

The bizarre  and unprecedented events of the Bundy Matter can only be explained by the highly politicized and partisan environment in the District of Columbia and its attorney discipline apparatus, which is reflected in an attorney discipline apparatus that has disparately and selectively targeted attorneys who are conservative and Republican activists for removal from the practice of law. The fact that Mr. Klayman and numerous other prominent Republican and conservative activist attorneys have become targeted for legal removal in the District of Columbia has even been observed by Harvard law professor emeritus Alan Dershowitz's latest book, "Get Trump," which compared the state of affairs to the "kind of ridicule that suspected communists faced during the era of Sen. Joe McCarthy in the 1950s." Comp. ¶ 30. This is underscored by the fact that during the Trump years in particular, ethics complaints were filed,

accepted and initiated against Trump White House Counsellor Kellyanne Conway[1] over remarks she made on cable news, against former Trump Attorney General William Barr[2] (the complaint was outrageously and incredibly filed by all prior presidents of the District of Columbia Bar as well as a former senior bar counsel) for withdrawing the indictment of General Mike Flynn and for remarks he made on Fox News, Senators Ted Cruz[3] and Josh Hawley[4] over their role in advocating for President Trump in the last presidential election, Professor John Eastman[5] who served as a legal counsel for President Trump, and of course former U.S. Attorney Rudy Giuliani[6] over his representation of President Trump, to name just a few. Indeed, Giuliani was just recently disbarred by the Bar over his association with and legal representation of President Trump. Comp. ¶ 33. And, perhaps the most telling of this discriminatory mindset is the fact that Bar Disciplinary Counsel Hamilton Fox III ("Fox") has personally gone after other Trump affiliated Republican legal counsel, such as Jeffrey Clark and Rudy Giuliani, often gloating to the media about his personal involvement. This is incredibly telling because it is almost unheard of for Bar Disciplinary Counsel to personally handle, try and litigate cases himself and not

---

[1]    https://www.washingtonpost.com/politics/law-professors-file-misconduct-complaint-against-kellyanne-conway/2017/02/23/442b02c8-f9e3-11e6-bf01-d47f8cf9b643_story.html

[2]    https://thehill.com/regulation/court-battles/508489-more-than-two-dozen-dc-bar-members-urge-disciplinary-probe-of-ag

[3]    https://www.texasstandard.org/stories/lawyers-law-students-officially-file-grievances-seeking-to-disbar-senator-ted-cruz/

[4]    https://thehill.com/homenews/state-watch/534783-attorneys-urge-missouri-supreme-court-to-probe-hawleys-actions

[5]    https://www.reuters.com/legal/ex-top-justice-dept-officials-testimony-sought-ethics-hearing-trump-ally-clark-2022-10-06/

[6]    https://www.law.com/newyorklawjournal/2021/03/03/nyc-bar-details-complaints-calling-for-full-attorney-discipline-investigation-of-giuliani/#:~:text=Under%20the%20New%20York%20state,censured%20or%20receive%20no%20punishment.

10

delegate them to his Deputy or Assistant Bar Disciplinary Counsel, so the fact that he chose to personally take on these matters shows conclusively what Fox's motivation is about, since it is nearly unheard of for Bar Disciplinary Counsel to take on and litigate these matters himself. With regard to Jeffrey Clark, the DCCA had step in and stop Fox and ODC's attempts to strip away Mr. Clark's constitutional Fifth Amendment rights, and Fox responded by saying "I'm not going to push that hearing back unless somebody cuts off one of my arms." Comp. ¶ 32.[7]

On the other hand, when a complaint was filed against leftist Democrat lawyer David Kendall of Williams & Connolly over his admitted involvement in the destruction of Hillary Clinton's 33,000 emails, many classified, and illegally retained on a private server, which complicity is not even in dispute, ODC summarily and quickly rejected a complaint filed by former Justice Department lawyer and conservative lawyer and public interest advocate Ty Clevenger, who was also pursued by ODC with the goal of disbarring him as well. Comp. ¶ 35. Furthermore, Kevin Clinesmith, the former senior FBI lawyer and admittedly anti-Trump partisan who dishonestly falsified a surveillance document in the Trump-Russia investigation

---

[7] Mr. Klayman's assertion is not just based on their actions, but also buttressed by publicly available Federal Election Commission FEC donation records, among many other indicia, which reflect that Mr. Hora has donated to the Democratic National Committee, Biden Fight Fund, Actblue. Even more, the chairperson of the Board, Ms. Bernadette Sargeant has made donations to Hillary Clinton for President and Glen Ivey for Congress. Mr. William Hindle also has donated to ActBlue as well. Mr. Thomas E. Gilbertsen donated to Glenn Ivey for Congress. Mr. Robert Walker (has donated extensively to ActBlue). Ms. Sara Blumenthal has donated to ActBlue. These are all highly partisan, Democrat leftist organizations and political candidates, many of which Mr. Klayman has sued in his public interest legal practice, including ActBlue, which is now under investigation for unlawful conduct. https://www.whitehouse.gov/presidential-actions/2025/04/investigation-into-unlawful-straw-donor-and-foreign-contributions-in-american-elections/

Notably not a single Defendant has donated money to any conservative politicians or organizations.

11

and who pled guilty to felony charges—was completely ignored by ODC and only temporarily suspended for only <u>five months</u> after he pled guilty, and only after ODC's "blind eye" was uncovered and subjected to negative publicity. Comp. ¶ 36. In stark contrast, the Michigan Bar automatically suspended Clinesmith immediately upon his felony conviction, and then ordered a suspension period of two (2) years. *Id*. And lastly, as set forth in the Complaint, is reference to a report written by Paul Sperry titled "Trump's Toughest Foe Could Be Harris Lawyer Marc Elias" (the "Elias Article"). The Elias Article details how Marc Elias' ("Elias") efforts to use the court system to prevent Donald Trump from being elected president. The Elias Article discloses in pertinent part:

> The longtime Democratic Party lawyer has already filed more than 60 preelection lawsuits to stop Trump from becoming president again by combatting what he calls Republican "voter suppression" efforts such as requiring voters to provide identification at the polls.
>
> …
>
> At the same time, Elias has been sending letters to election officials in Georgia and other key swing states threatening legal action if they uphold challenges to voter rolls to remove noncitizens and other ineligible registrants.
>
> …
>
> As general counsel to Hillary Clinton's 2016 presidential campaign, he helped lead the effort to manufacture and leak spurious "opposition research" claiming to reveal illicit ties between Trump and Russia. Elias later testified that he was worried – then as now – that Trump was a threat to democracy: "I received information that was troubling as someone who cares about democracy." That "information" turned out to be a fictitious "dossier" linking Trump to the Kremlin crafted by former British spook and FBI informant Christopher Steele, who huddled with Elias in his Washington office.
>
> …

12

> But Elias has since taken on other clients – including Kamala Harris – who have more than made up for the loss in revenue. So far in this election cycle, the latest FEC filings show the Elias Law Group has received a total of more than $22 million in disbursements from a host of major Democratic and anti-Trump clients.

Elias' efforts with regard to the 2016 election, "[s]pecial Counsel John Durham found Elias intentionally sought to conceal Clinton's role in the dossier. According to court records, Elias acted as a cutout for more than $1 million in campaign payments for the dossier." As the Elias Article set forth, the Durham probe as disclosed by Paul Sperry "**raised ethical issues with the D.C. Bar** and Elias' former law firm, Perkins Coie, reportedly leading to their breakup in August 2021…." Given that Elias was never disciplined by the D.C. bar, the only conclusion is that this was also covered up and buried by the D.C. attorney discipline apparatus. Comp. ¶¶ 38 – 39..

## LEGAL STANDARD

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities  tips in his favor, and that an injunction is in the public interest." *Gordon v. Holder*, 632 F.3d 722, 724 (2011). "The district court must balance the strengths of the moving party's arguments on each of the four factors….These factors interrelate on a sliding scale and must be balanced against each other." *Elite Entm't, Inc. v. Reshammiya*, 2008 U.S. Dist. LEXIS 31580 at 4 (D.D.C. Apr. 18, 2008).

## THE LAW

**I.    MR. KLAYMAN HAS SHOWN A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS**

"It is particularly important for the movant to demonstrate a substantial likelihood of success on the merits." *Id*. at 5. Mr. Klayman has more than shown a substantial likelihood of

13

success on the merits, as set forth in detail in his Response in Opposition to Defendants' Motion to Dismiss, which is adopted herein and incorporated herein by reference. Exhibit A. This is further shown by Mr. Klayman's affidavit in support. Exhibit B.

This is a unique case where the D.C. Circuit has already found that the First Amendment viewpoint discriminatory conduct of the Defendants is unconstitutional and illegal in *Douglass*. This holding has been heeded by other jurists in this Court, with Judge McFadden's recent holding in *Associated Press*. Thus, given that the D.C. Circuit has already found nearly identical conduct to be illegal and unconstitutional in *Douglass*—where the Frederick Douglass Foundation experienced vastly different treatment from District of Columbia law enforcement than Black Lives Matter due simply to their viewpoints—a "substantial likelihood of success" in this case can be inferred where Mr. Klayman has more than shown that he has been treated differently and in a discriminatory fashion as a result of his First Amendment protected speech in favor of conservative causes and President Trump in contrast to his leftist and liberal counterparts. *See* Exhibit A, Exhibit B.

None of the Defendants' arguments to the contrary have any merit either. As show in in Mr. Klayman's Response in Opposition to Defendants' Motion to Dismiss, neither the *Rooker-Feldman* Doctrine nor the *Younger* abstention doctrine have any applicability to this case. Furthermore, Defendants enjoy no immunity, whether absolute or qualified where their conduct falls far outside the scope of the official duties and they have violated a clearly established right. And, Mr. Klayman has more than sufficiently pled First Amendment viewpoint discrimination and Fifth Amendment violations.

Accordingly, this factor weighs strongly in favor of granting a preliminary injunction.

14

## II.    MR. KLAYMAN HAS SHOWN IRREPARABLE HARM

"Moreover, the other salient factor in the injunctive relief analysis is irreparable injury. A movant must "demonstrate at least 'some injury'" to warrant the granting of an injunction. *Elite Entm't, Inc. v. Reshammiya*, 2008 U.S. Dist. LEXIS 31580 at 5 (D.D.C. Apr. 18, 2008). "In the business context… if the potential harm could threaten the very existence of the business, a court may deem such harm irreparable." *Id*. at 6.

Mr. Klayman has shown irreparable harm based on what will certainly occur shortly after the DCCA's scheduled oral argument in the Bundy Matter for May 28, 2025, less than three (3) weeks from today. Defendant DCCA has signaled to Mr. Klayman that it will allow the Board license to violate the Court's rules, and in this case Rule 12.2. This goes far beyond exercising any reasonable discretion. The DCCA has also signaled to Mr. Klayman that conservative and Republican public interest advocate attorneys will be treated far differently than their leftist/liberal counterparts, such as Kevin Clinesmith, and with Marc Elias and David Kendall never even having had disciplinary proceedings initiated against them despite their clearly unethical conduct.

A decision that is likely to be unfavorable to Mr. Klayman will likely come down shortly after the May 28, 2025 oral argument as a result of the Defendant DCCA having telegraphed that it will give undue if not total deference to the other Defendants actions. As intended by design by the other Defendants, this would then be used to effectively remove Mr. Klayman from the practice of law both in the District of Columbia as well as severely affect his practice of law in other, foreign jurisdictions and courts where he is licensed to practice, since unjustified discipline as recommended by Defendants in the District of Columbia will likely trigger

15

reciprocal disciplinary proceedings. Any such reciprocal disciplinary proceedings are extremely time consuming and very costly, also preventing Mr. Klayman from fully representing on-going and potentially new clients in both his public interest and private law practice capacity, as well as severely harming him, his family and colleagues financially.

The irreparable harm is exponentially amplified by the fact that the Bundy Matter has been used as a tool to "stack" disciplinary proceedings against Mr. Klayman to ensure that he remains ineligible to practice law in the District of Columbia given that he has only recently on August 6, 2024 petitioned for reinstatement to practice following the conclusion of the suspension period in *In re Klayman*, 20-BG-583 (D.C.C.A.) (the "Sataki Matter"), which order is still being challenged and currently on appeal and under review by this Court. *Klayman v. Sataki et al*, 24-cv-0226 (D.C. Ct. App.). Comp. ¶ 52.

The timeline of events can only lead to the conclusion that illegal "stacking" has occurred.

<u>July 18, 2019</u> – The AHHC Hearing in the Bundy Matter concludes, the AHHC finds that ODC failed to prove any ethical violations.

<u>September 15, 2020</u> – The AHHC's mitigation and aggravation hearing in the Bundy Matter concludes.

<u>January 14, 2021</u> – The Court "temporarily" suspends Mr. Klayman in the Sataki Matter pending final disposition.

<u>September 15, 2022</u> – The Court, after twenty (20) months of "temporary" suspension, issues its order suspending Mr. Klayman for eighteen (18) additional months in the Sataki Matter, resulting in a thirty-eight ("38") month total suspension.

<u>September 11, 2023</u> – Over four (4) years later, near the end of Mr. Klayman's suspension in the Sataki Matter, the AHHC issues its Report and Recommendation to the Board in the Bundy Matter recommending a twelve (12)

16

month suspension

<u>April 17, 2024</u> – Mr. Klayman's suspension period ends in the Sataki Matter and he becomes eligible to petition for reinstatement.

<u>July 30, 2024</u> – The Board issues a Report and Recommendation in the Bundy Matter, *sua sponte* increasing the recommended suspension to eighteen (18) months.

<u>August 6, 2024</u> – Mr. Klayman petition for reinstatement in the Sataki Matter.

<u>August 13, 2024</u> – The Court issues an order to show cause in the Bundy Matter directing Mr. Klayman to show cause why he should not be temporarily suspended in the Bundy Matter.

This sequence and timing of events is no mere coincidence. It now is abundantly clear that everything – including the egregious **over four (4) year delay** by the AHHC in issuing its Report and Recommendation – was an attempt to ensure that Mr. Klayman remain suspended from the practice of law for the longest possible period of time, thus effectively ending his legal career in the District of Columbia, as he is now nearly seventy-four  74 years old. It simply cannot be a coincidence that the Board rushed to issue its Report to attempt to trigger a "temporary suspension" just as Mr. Klayman was about to petition for reinstatement in the Sataki Matter.

This type of "stacking" of disciplinary proceedings has been found to be illegal and unethical in jurisdictions such as Florida. *Fla. Bar v. Rubin*, 362 So. 2d 12 (Fla. 1978). Here the Supreme Court of Florida, which is the highest authority in Florida just as this Court is here in the District of Columbia, in dismissing the disciplinary complaint against the respondent attorney, Ellis Rubin, held:

Whatever other objects the rule may seek to achieve, it obviously contemplates that *the Bar should not be free to withhold a referee 's report which it finds loo*

17

*lenient until additional cases can be developed* against the affected attorney, in an effort to justify the more severe discipline which might be warranted by cumulative misconduct. The Bar's violation of the prompt filing requirement in this case, to allow a second grievance proceeding against Rubin to mature, is directly antithetical to the spirit and intent of the rule. In addition, it has inflicted upon Rubin the 'agonizing ordeal' of having to live under a cloud of uncertainties, suspicions, and accusations for a period in excess of that which the rules were designed to tolerate. (emphasis added).

*See also Fl. Bar v. D'Ambrosio*, 25 So. 3d 1209 (Fla. 2010)(referring to the practice of "stacking" disciplinary proceedings as "unfair."). Comp. ¶ 53.

Part and parcel to the illegal and unethical "stacking" strategy, is the fact that there is likely, based on past experience, to be tacked on a wholly unwarranted reinstatement provision in any order in the Bundy Matter, and like they did in the Sataki Matter, which would then be assigned to a highly partisan and rabidly anti-conservative ODC, which includes its prosecutor Julia Porter who openly displayed her animus towards Mr. Klayman as at the conclusion of the AHHC hearing in the Bundy Matter, where she couldn't help but to blurt out that Mr. Klayman "should not continue to have the privilege of being a lawyer." Comp. ¶ 57. Presiding over Porter, of course, is Fox, who has personally gone after other Trump affiliated activist conservative and Republican legal counsel, such as Jeffrey Clark and Rudy Giuliani, often gloating to the media about his personal involvement and with regard to Jeffrey Clark, the DCCA had step in and stop Fox and ODC's attempts to strip away Mr. Clark's constitutional Fifth Amendment rights, and Fox responded by saying "I'm not going to push that hearing back unless somebody cuts off one

18

of my arms."[8] Comp. ¶ 32. This ensures that Mr. Klayman will almost certainly never be reinstated, thus evidencing further irreparable harm.

And, finally, any order of discipline is intended certainly trigger reciprocal actions in other jurisdictions where Mr. Klayman is licensed to practice, which is another part of the District of Columbia's attempts to remove Mr. Klayman, as well as other activist conservative and Republican attorneys from the practice of law. ODC has also illegally and unethically sent out *ex parte* letters to foreign jurisdictions and courts where Mr. Klayman is licensed to practice, which gave rise to collateral litigation before this Court, *Klayman v. Porter et al*, 20-cv-3109 (D.D.C) (the *"Porter* Case") and which conduct they have now repeated in sending out copies of the non-binding Board Report in the Bundy Matter in order to maliciously harm Mr. Klayman's standing in foreign jurisdictions and courts. *Klayman v. Porter et al*, 1:24-cv-2853 (D.D.C.)("*Porter II*").

Given that Mr. Klayman is a solo practitioner and now almost seventy-four (74) years old, allowing the Bundy Matter to proceed and will likely trigger the effective end of his legal career and profession and thus his business, as he will be unable both financially and emotionally to withstand the concerted attack by the Defendants to remove him from the practice of law. Under *Elite Entm't, Inc.*, this constitutes irreparable harm.

Lastly, Mr. Klayman has also shown irreparable harm pursuant to *Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) where it is well-settled that a constitutional injury, for even a brief period of time, unquestionably constitutes irreparable injury. Mr.

---

[8]     https://www.politico.com/news/2024/02/26/jeff-clark-subpoena-trump-bar-investigation-00143469.

Klayman here has more than shown a violation of his First Amendment rights, and thus, irreparable injury and harm under *Mills*.

Accordingly, this factor also weighs heavily in favor of granting a preliminary injunction.

## III.    A   PRELIMINARY  INJUNCTION  WOULD  NOT  SUBSTANTIALLY  INJURE ANY OTHER INTERESTED PARTIES

In stark contrast to the clear irreparable harm that would be suffered by Mr. Klayman, there is absolutely no prejudice or harm to the Defendants if the TRO is granted. This would simply result in the Defendants following and applying the Rules as written, and therefore an order in that regard would simply maintain the *status quo*.

## IV.    A PRELIMINARY INJUNCTION FURTHERS THE PUBLIC INTEREST

"[I]t is always in the public interest to prevent the violation of a party's constitutional rights.'" *Am. Freedom Def. Initiative v. Wash. Metro. Area Transit Auth*., 898 F.Supp.2d 73, 84 (D.D.C. 2012) (internal quotations and citations omitted); *see also Nat'l Fed'n of Fed. Emps. v. Carlucci*, 680 F. Supp. 416 (D.D.C. 1988) ("[T]he public interest lies in enjoining unconstitutional searches."). Here, Mr. Klayman's constitutional due process rights are clearly being implicated, and therefore it is in the public's interest for the Court to step in and intervene immediately.

Even more importantly, the members of the District of Columbia bar deserve to know that and rely upon the Board  enforcing its own rules on **everyone** and not just selectively, as doing the latter completely erodes the integrity of the entire attorney discipline system. The members of the District of Columbia bar deserve to know that they can count on the Rules as written and not be subject to some arbitrary and capricious interpretation that changes depending

20

on who is involved. It is clear that, absent the relief sought by Mr. Klayman, the integrity of the District of Columbia Attorney Discipline Apparatus will be completely eroded, and everyone will know that it can be used at whim as a political weapon. The Court cannot allow this to occur, not only for Mr. Klayman's sake, but for the sake of the entire District of Columbia.

## CONCLUSION

Based on the foregoing, the Court must grant Mr. Klayman's motion for preliminary injunction. Mr. Klayman has shown all of the requisite factors, and in  particular that he has a substantial likelihood of success on the merits and that he will suffer irreparable harm.

Furthermore, Mr. Klayman respectfully requests that the Court issue a ruling with findings of fact and conclusions of law, and this this ruling be made without undue delay, which delay has regrettably occurred in the past in the *Porter* Case regarding the Defendants' so-called "Motion for Clarification," which the Court allowed to sit for nine (9) months, rendering moot Mr. Klayman's challenge to the Sataki Matter pursuant to D.C. Super. Ct. Rule 60 due to the passage of time. This is to give Mr. Klayman a chance to expeditiously  appeal to the D.C. Circuit in the Bundy Matter, which appeal will likely be required given this Court's history of bias towards Mr. Klayman, as evidenced by its having held that Mr. Klayman was a "vexatious litigant" and which finding was  reversed by the D.C. Circuit on June 11, 2024 where it held in pertinent part:

> …we agree that a pre-filing injunction was not warranted on this record. The handful of lawsuits on which the district court based its pre-filing injunction were not sufficiently prolific, frivolous, or harassing to warrant broadly restricting Klayman's constitutional right of access to all courts and forums, state and federal.

In this case, the record does not support the exceptional remedy of a pre-filing injunction even within the courts of the D.C. Circuit, and so it necessarily falls far short of warranting the nationwide pre-filing injunction the district court entered.

Yet, in this case, the district court neither tried alternative means of addressing any perceived improper litigation tactics nor explained why nothing else would work. There is no need to haul out a sledgehammer if a tack hammer will suffice.

Nonetheless, Younger abstention was not warranted in this case for the straightforward reason that there was no relevant pending state proceeding at the time of the district court's decision. The disciplinary proceeding resulting in the ninety-day suspension order concluded on June 11, 2020…. For that reason, we reverse the district court's dismissal of Klayman's claims for injunctive relief as to all of the ODC Employees other than Kaiser. *Klayman v. Porter et al*, 22-7123.

As a result of the D.C. Circuit's June 11, 2024 opinion, this Court's order of dismissal was reversed and remanded to this Court for further proceedings, where it has now been pending for over eleven (11) months – again running off the clock - further evidencing why Mr. Klayman is respectfully requesting that the Court act expeditiously here or perhaps consider removing itself from this case so that it can be assigned to another jurist who will move this matter along.

Mr. Klayman seeks relief in the form of an order finding that the AHHC Report and Board Report in the Bundy Matter are void *ab initio* and vacated and thus preliminarily enjoined from further consideration and he therefore respectfully requests that the Court will issue an expeditious ruling and allow Mr. Klayman the opportunity to seek further redress from the D.C. Circuit if needed.

Counsel for Defendants have not consented to this motion.

Date: May 14, 2025                              Respectfully submitted,

                                                */s/ Larry Klayman*
                                                Larry Klayman
                                                Klayman Law Group P.A.
                                                7050 W. Palmetto Park Rd

Boca Raton, FL, 33433
Tel: (561)-558-5336
Email: leklayman@gmail.com

Plaintiff Pro Se

**<u>CERTIFICATE OF SERVICE</u>**

I, Larry Klayman, hereby certify that on this day, May 14, 2025  a copy of the foregoing

was served counsel for all parties via the Court's ECF procedures.

*/s/ Larry Klayman*

23

# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

LARRY KLAYMAN

              Plaintiff,

v.

DISTRICT OF COLUMBIA COURT OF
APPEALS, et al

           Defendants.

**Case No.: 1:24-cv-02997**

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO
<u>DISMISS</u>**

## <u>TABLE OF CONTENTS</u>

<u>INTROCUTION AND STATEMENT OF RELEVANT FACTS</u> ..................................................1

    Facts Pertaining to Cliven Bundy's Trial.............................................................................3

    Facts Pertaining to the Bundy Matter ................................................................................5

    Facts Pertaining to the Defendants' First Amendment Viewpoint Discrimination ............7

<u>LEGAL STANDARD</u>.........................................................................................................11

<u>THE LAW</u>...........................................................................................................................12

    The Rooker-Feldman Doctrine Does Not Preclude This Matter .......................................15

    The Younger Abstention Doctrine Does Not Preclude This Matter...................................16

    The Individual Defendants Do Not Have Immunity Against Mr. Klayman's
    Claims For Damages, Which Go Far Beyond A Mere "Delay in Proceedings ................18

    Mr. Klayman Has More Than Sufficiently Pled Causes of Action ...................................24

        Mr. Klayman Has More Than Sufficiently Pled First Amendment Viewpoint
        Discrimination and Fifth Amendment Violation ...................................................25

        The Defendants Do Not Have Qualified Immunity.............................................28

<u>CONCLUSION</u> .................................................................................................................29

<u>**Table of Authorities**</u>

<u>**STATUTES**</u>

Board on Professional Responsibility Rule 12.2 ...........1, 2, 6, 7, 15, 19, 20, 22, 23, 25, 26, 28, 29

Fed. R. Civ. P. 65 .....................................................................................................29

42 U.S.C. § 1983 .........................................................................................15, 16, 17, 23

<u>**CASES**</u>

*ABM Onsite Servs.-West, Inc. v. NLRB*, 428 U.S. App. D.C. 63 (2017) ........................................21

*Ashcroft v. al-Kidd*, 563 U.S. 731 (2011) ........................................................................28

*Ashcroft v. Iqbal*, 556 U.S. 662 (U.S. 2009.)...............................................................12, 25

*Associated Press v. Budowich*, 1:12-cv-00532 (D.D.C.) ...................................... 1, 11, 13 - 15

*Ariz. Grocery Co. v. Atchison, T. & S. F. R. Co.*, 284 U.S. 370 (1932) ........................................21

*Bridges v. Wixon*, 326 U.S. 135 (1945) ..........................................................................22

*Bridges v. Kelly*, 84 F.3d. 470 (1996). ..........................................................................16

*Cullen v. Fliegner*, 18 F.3d 96 (2d Cir. 1994). ...................................................................18

*D.C. Healthcare Sys. v. District of Columbia*, 441 U.S. App. D.C. 126 (2019)....................15, 16

*Dep't of Revenue v. Race*, 743 So. 2d 169 (Fla. Dist. Ct. App. 1999))........................................ 21

*District of Columbia v. Jones*, 919 A.2d 604 (D.C. 2007) ........................................ 19

*Frederick Douglass Found., Inc. v. District of Columbia*, 82 F.4th 1122
(D.C. Cir. 2023) ................................................................................1, 11, 12, 14, 15

*Gordon v. United States Capitol Police*, 778 F.3d 158 (D.C. Cir. 2015) ........................................12

*Harlow v. Fitzgerald*, 457 U.S. 800 (1982) ......................................................................28

*Hensler v. District Four Grievance Committee*, 790 F.2d 390 (5th Cir.1986)........................17, 18

*In re Cliven D. Bundy*, 16-72275 (9th Cir. Oct. 28, 2016) .........................................................4, 5

*In re Green*, 136 A.3d 699 (D.C. 2016)..........................................................................24

*In re Morrell*, 684 A.2d 361 (D.C. 1996) ...................................................................22, 23

*In re Thyden*, 877 A.2d 129 (D.C. 2005) ....................................................................23, 24

*JMM Corp. v. District of Columbia*, 363 U.S. App. D.C. 160 (2004)..........................................17

*Johnson v. D.C. Dep't of Emp't Servs.*, 111 A.3d 9 (D.C. 2015) ..................................................20

*Lewellen v. Raff*, 843 F.2d 1103 (8th Cir. 1988)...............................................................17

*Loper Bright Enterprises et al v. Raimondo, Secretary of Commerce, et al*, 22-451, (U.S. 2024)21

*Pearson v. Callahan*, 555 U.S. 223 (2009)......................................................................28

*Parrish v. District of Columbia*, 718 A.2d 133 (D.C. 1989......................................................20

*Pulliam v. Allen*, 466 U.S. 522 (1984)......................................................................................19

*Saucier v. Katz*, 533 U.S. 194  (2001) ......................................................................................28

*Smith v. Scalia*, 44 F. Supp. 3d 28 (D.D.C. 2014) ..................................................................19

*Sprint Communs., Inc. v. Jacobs*, 571 U.S. 69  (2013)...........................................................16

*United States v. Goldenberg*, 168 U.S. 95( 1897) ...................................................................20

*Varela v. Hi-Lo Powered Stirrups, Inc.*, 424 A.2d 61 (D.C. 1980)........................................20

*Wagshal v. Foster*, 307 U.S. App. D.C. 382, 28 F.3d 1249 (1994)........................................19

Plaintiff Larry Klayman ("Plaintiff") hereby submits the following in response to Defendants Board on Professional Responsibility ("Board"), Sara Blumenthal, Margaret Cassidy, Thomas Gilbertsen, William Hindle, Sharon Rice-Hicks, Bernadette Sargeant, Leslie Spiegel, Michael E. Tigar, Robert Walker's (collectively " Board Defendants"), Robin Bell, Buffy Mims, Christian White's (collectively the "AHHC Defendants") Motion to Dismiss.

The Defendants predictably rely upon their familiar arguments of immunity and abstention, but in a case as egregious as this one—where the AHHC Defendants have egregiously violated Board on Professional Responsibility Rule 12.2 ("Rule 12.2") and the Board Defendants have then refused to enforce Rule 12.2, which rule was promulgated by Defendant District of Columbia Court of Appeals ("DCCA"), in a discriminatory manner—such arguments must fail. This is particularly true given that this is the exact type of discriminatory selective prosecutorial discriminatory treatment that the U.S. Court of Appeals for the District of Columbia Circuit has found to be unconstitutional and illegal in *Frederick Douglass Found., Inc. v. District of Columbia*, 82 F.4th 1122 (D.C. Cir. 2023) ("*Douglass*") and which has been confirmed very recently on April 8, 2025 by the Honorable Trevor McFadden, an appointee of President Trump no less, in *Associated Press v. Budowich*, 1:12-cv-00532 (D.D.C.) ECF No. 46 ("*Associated Press*").

## INTRODUCTION AND STATEMENT OF RELEVANT FACTS

Mr. Klayman is a prominent conservative and Republican activist and attorney who engages in public speech furthering his conservative and Republican activist views and associates with other conservative and Republican activists and attorneys. Mr. Klayman brings in the public interest lawsuits furthering conservative and  true Republican ideals and engages in

1

public speech through his weekly radio show and other fora furthering his conservative and Republican ideals. Comp. ¶ 20.

The Board is appointed by Defendant DCCA and serves as its disciplinary arm, responsible for the adjudication of disciplinary cases and the administration of the attorney discipline system. The Ad Hoc Hearing Committee ("AHHC") preside over disciplinary hearings and are appointed by the Board. Comp. ¶ 5.

This is an extremely simple and straightforward case. The Board Defendants have refused to apply Board on Professional Responsibility Rule 12.2 ("Rules 12.2") - which rule was promulgated by the Defendant DCCA and assigned to Defendant Board to enforce – to dismiss an ongoing disciplinary action against Mr. Klayman (the "Bundy Matter"). Comp. ¶ 19. This is despite the fact that Rule 12.2 has been unequivocally and egregiously violated by the AHHC Defendants, who withheld their Report and Recommendation in the Bundy Matter for **over four (4) years**, hugely  past the required and mandated 120 days. Comp. ¶ 19. Because the Board refused to enforce Rule 12.2, Mr. Klayman was forced to sue the Board to seek injunctive relief in the form of an order requiring that Rule 12.2 be enforced (the "Bundy Litigation"), which would have mooted out the entire disciplinary proceeding. Mr. Klayman asked Defendant DCCA to either dismiss the disciplinary action on the basis of Rule 12.2 or to stay this disciplinary proceeding pending the outcome of the Bundy Litigation, but Defendant DCCA refused to do so, which necessitated this instant litigation.  Oral argument for the Bundy Matter is currently scheduled for May 28, 2025, and with the Defendant DCCA's judgment of April 17, 2025 affirming the erroneous dismissal by the Lower Court in Bundy Litigation, Mr. Klayman will suffer an irreparable injury and therefore necessitate, among other grounds,  the forthcoming

filing of his Motion for Temporary Restraining Order and/or Preliminary Injunction in this matter.

To make matters worse, the Board Defendants precipitously issued a Report and Recommendation while the Bundy Litigation was still pending, therefore creating the potential for a "temporary suspension" condition for Mr. Klayman, which in and of itself will cause him, his colleagues, his clients, and his family irreparable harm. In sum, the Defendants—persons and entities of D.C. Attorney Discipline Apparatus—as alleged herein are working together closely in concert to try to inflict as much harm as possible on Mr. Klayman to try to have him removed from the practice of law because he is a prominent conservative and Republican activist and attorney who they desire to silence contrary to his First Amendment rights. This is not speculation, but documented based on a pattern and practice of widely recognized "weaponized behavior" by the Defendants toward not just Mr. Klayman but also other prominent pro-Trump conservative and Republican activist attorneys.

## I.    Facts Pertaining to Cliven Bundy' Trial

In or around 2017, Mr. Klayman was retained by Cliven Bundy ("Mr. Bundy") to represent him in his criminal trial in the U.S. District Court for the District of Nevada ("Nevada Court") stemming from a 2016 standoff with federal agents on Mr. Bundy's land (the "Bundy Trial"). The stakes of the Bundy Trial were extremely high, as Mr. Bundy was facing the possibility of life imprisonment. Comp. ¶ 21. Presiding over the Bundy Trial was the Honorable Gloria Navarro ("Judge Navarro"). Comp. ¶ 22. Because Mr. Klayman was not a member of the Nevada Bar, he moved for admission *pro hac vice* in the Bundy Trial. Judge Navarro denied Mr. Klayman's motion, and Mr. Klayman appealed that decision to the U.S. Court of Appeals for the

Ninth Circuit ("Ninth Circuit"). Comp. ¶ 23. Ultimately, there were multiple appeals and motions filed by Mr. Klayman to try to gain entry as counsel into the Bundy Trial due to the fact that Mr. Klayman was trying to zealously represent his client, Mr. Bundy. Mr. Klayman and Mr. Bundy saw that there was an enormous amount of prosecutorial misconduct going on in the Bundy Trial, which caused Mr. Klayman to push even harder to get into the case in order to zealously defend Mr. Bundy's rights within the bounds of ethics and the law. Comp. ¶ 24. Mr. Klayman and Mr. Bundy's suspicions were more than confirmed when ultimately in January of 2018, Judge Navarro dismissed the charges against Mr. Bundy with prejudice as a result of gross prosecutorial misconduct in failing to turn over exculpatory documents and lying to the Court. Mr. Klayman never was able to gain admission into the Bundy Trial. Comp. ¶ 25.

Despite Mr. Klayman having never been sanctioned by the Nevada Court or the Ninth Circuit, any judge or other  entity,  for his efforts to gain admission into the Bundy Trial, the District of Columbia Office of Disciplinary Counsel ("ODC") still initiated a disciplinary complaint against Mr. Klayman for simply trying to represent his client in a life-or death criminal trial, alleging among other entirely frivolous and manufactured, contrived allegations, that Mr. Klayman had been dishonest and that his repeated attempts to gain *pro hac vice* admission into the Bundy Trial were somehow unethical. Comp. ¶ 26. This was despite the fact that the Honorable Ronald Gould ("Judge Gould") of the Ninth Circuit, who was a part of the panel overseeing the appeals at issue, made factual findings that Mr. Klayman had fulfilled his duty of candor:

> Klayman properly disclosed the ongoing disciplinary proceeding in his initial application for pro hac vice admission, saying that the proceeding had not yet been resolved. This disclosure was accurate…. I agree with Klayman that he was not

4

obligated to re-litigate the D.C. proceeding before the district court and that he did not have to provide the district court with the entire record from D.C. And if his disclosures were selective, still he is an advocate, an advocate representing defendant Cliven Bundy, **and after submitting a compliant response to the questions in the pro hac vice application, he had no greater duty to disclose any possible blemish on his career or reputation beyond responding to the district court's further direct requests.** *In re: Cliven D. Bundy*, 16-72275 (9th Cir. Oct. 28, 2016). Comp. ¶ 27.

## II.    Facts Pertaining to the Bundy Matter

Despite Judge Gould's clear findings, which negated any claim of clear and convinving evidence of an ethical infraction,  Mr. Klayman was summoned before the AHHC comprised of Defendants Mims, Bell, and White in July of 2019 and September of 2019 for disciplinary proceedings initiated by ODC for his efforts to gain entry into the Bundy Trial *pro hac vice*. Comp. ¶ 44.  At this hearing Mr. Klayman  had Professor Erwin Chemerinsky ("Dean Chemerinsky") of the University of California at Berkeley's Boalt Hall testify pro bono on his behalf. Dean Chemerinsky testified that he did not believe that Mr. Klayman did anything unethical and that Mr. Klayman's actions were reasonable. Comp. ¶ 45. To the contrary, ODC did not have a single witness, and instead had its incredibly conflicted prosecutor, Julia Porter ("Porter") serving as both prosecutor and witness. Comp. ¶ 46. It is therefore no surprise that at the conclusion of first three-day hearing before the AHHC on July 18, 2019, when the facts and evidence were fresh in the committee members' minds,  the chairperson, Defendant Mims stated on the record that "the Hearing Committee has been unable to reach a non-binding determination." Comp. ¶ 47. This finding, coming at this preliminary stage, is rare and unique, as hearing committee usually provisionally issues non-binding rulings which then permit them to take evidence on factors involving mitigation and/or aggravation. This was memorialized in the AHHC's August 8, 2019 order which stated:

Following the conclusion of the evidentiary portion of the hearing and the parties' respective closing arguments, the Hearing Committee went into executive session and determined that it could not make a preliminary finding that Disciplinary Counsel had proven any disciplinary rule violation. *Id*.

Then, for over four (4) years – almost an egregious and unbelievable almost half a decade - the AHHC went silent, leaving Mr. Klayman to very reasonably to rightly conclude that this matter had been laid to rest and thus disposed of, given the AHHC's finding after the hearing that ODC had failed to prove any ethical violations as well as because of Board Rule 12.2 ("Rule 12.2), which was promulgated by Defendant DCCA:

The Hearing Committee's report shall be filed with the Board **not later than 120 days following the conclusion of the hearing.** The 120 days provided for by the Court's rules for the preparation of the Hearing Committee's report shall start to run at the conclusion of the hearing. Comp. ¶ 48.

Yet, on September 20, 2023 – over four (4) years after the AHHC Hearing concluded - nearly half of a decade later -  the AHHC incredibly without factual, legal and other bases reversed course 180 degrees and issued an AHHC Report and instead recommended a one-year suspension with a reinstatement provision. Comp. ¶ 49.

It more than appears that given this egregious and violative passage of time, the Defendants Mims, Bell, and White appear to have simply intentionally forgotten or simply ignored, during this highly partisan divisive period in history during the reemergence of Donald Trump in particular who Mr. Klayman supports, everything that occurred at the hearing back in 2019 and thus made the decision to simply "rubber stamp" what was presented to them back in 2019 by ODC. This is improper for a litany of reasons, none more compelling than the fact that ODC and Porter already made all of their same arguments at the 2019 AHHC hearing and were found to have failed to have proven any ethical violation. Absolutely nothing new was put into

6

the record in the interim over four (4) year period of delay. Thus, the only explanation for the AHHC reversing course nearly half of a decade later is that they simply copied and adopted wholesale the briefs of Porter and ODC from 2019 given that the four (4) year delay has caused them to either forget everything that happened at the AHHC hearing, or simply wanted to harm Mr. Klayman, his family and his colleagues given his support of Donald Trump, who was at that time running for President again in the 2024 presidential election. Comp. ¶ 51.

When Mr. Klayman brought the egregious violation of Rule 12.2 to the Board's attention, the Board and the Board Defendants incredibly refused to enforce Rule 12.2 with regard to Mr. Klayman. This led to the Bundy Litigation where Mr. Klayman sought injunctive relief in the form of an order directing the Board to enforce Rule 12.2, which the Defendant DCCA unsurprisingly refused to act upon. Mr. Klayman also asked the Defendant DCCA to stay the Bundy Matter pending the Bundy Litigation, as the Bundy Litigation would moot out the Bundy Matter, but the Defendant DCCA refused to even grant this stay, which would be in the interests of judicial economy and fundamental fairness and justice, particularly since Mr. Klayman's financial resources will be  even more severely taxed by having to defend a time-barred and non-meritorious disciplinary proceeding now scheduled for oral argument on May 28, 2025. This refusal to stay the Bundy Matter regrettably necessitated this instant litigation.

**III.    Facts Pertaining to the Defendants' First Amendment Viewpoint Discrimination**

The bizarre  and unprecedented events of the Bundy Matter can only be explained by the highly politicized and partisan environment in the District of Columbia and its attorney discipline apparatus, which is reflected an attorney discipline apparatus that has disparately and selectively targeted attorneys who are conservative and Republican activists for removal from

the practice of law. The fact that Mr. Klayman and numerous prominent Republican and conservative activist attorneys have become targeted for legal removal in the District of Columbia has even been observed by Harvard law professor emeritus Alan Dershowitz's latest book, "Get Trump," which compared the state of affairs to the "kind of ridicule that suspected communists faced during the era of Sen. Joe McCarthy in the 1950s." Comp. ¶ 30. This is underscored by the fact that during the Trump years in particular, ethics complaints were filed, accepted and initiated against Trump White House Counsellor Kellyanne Conway[1] over remarks she made on cable news, against former Trump Attorney General William Barr[2] (the complaint was outrageously and incredibly filed by all prior presidents of the District of Columbia Bar as well as a former senior bar counsel) for withdrawing the indictment of General Mike Flynn and for remarks he made on Fox News, Senators Ted Cruz[3] and Josh Hawley[4] over their role in advocating for President Trump in the last presidential election, Professor John Eastman[5] who served as a legal counsel for President Trump, and of course former U.S. Attorney Rudy Giuliani[6] over his representation of President Trump, to name just a few. Indeed, Giuliani was

---

[1]    https://www.washingtonpost.com/politics/law-professors-file-misconduct-complaint-against-kellyanne-conway/2017/02/23/442b02c8-f9e3-11e6-bf01-d47f8cf9b643_story.html

[2]    https://thehill.com/regulation/court-battles/508489-more-than-two-dozen-dc-bar-members-urge-disciplinary-probe-of-ag

[3]    https://www.texasstandard.org/stories/lawyers-law-students-officially-file-grievances-seeking-to-disbar-senator-ted-cruz/

[4]    https://thehill.com/homenews/state-watch/534783-attorneys-urge-missouri-supreme-court-to-probe-hawleys-actions

[5]    https://www.reuters.com/legal/ex-top-justice-dept-officials-testimony-sought-ethics-hearing-trump-ally-clark-2022-10-06/

[6]    https://www.law.com/newyorklawjournal/2021/03/03/nyc-bar-details-complaints-calling-for-full-attorney-discipline-investigation-of-giuliani/#:~:text=Under%20the%20New%20York%20state,censured%20or%20receive%20no%20punishment.

just recently disbarred by the Bar over his association with and legal representation of President Trump.  Comp. ¶ 33. And, perhaps the most telling of this discriminatory mindset is the fact that Bar Disciplinary Counsel Hamilton Fox III ("Fox") has personally gone after other Trump affiliated Republican legal counsel, such as Jeffrey Clark and Rudy Giuliani, often gloating to the media about his personal involvement. This is incredibly telling because it is almost unheard of for Bar Disciplinary Counsel to personally handle, try and litigate cases himself and not delegate them to his Deputy or Assistant Bar Disciplinary Counsel, so the fact that he chose to personally take on these matters shows conclusively what Fox's motivation is about, since it is nearly unheard of for Bar Disciplinary Counsel to take on and litigate these matters himself. With regard to Jeffrey Clark, the DCCA had step in and stop Fox and ODC's attempts to strip away Mr. Clark's constitutional Fifth Amendment rights, and Fox responded by saying "I'm not going to push that hearing back unless somebody cuts off one of my arms." Comp. ¶ 32.[7]

On the other hand, when a complaint was filed against leftist Democrat lawyer David Kendall of Williams & Connolly over his admitted involvement in the destruction of Hillary

---

[7] Mr. Klayman's assertion is not just based on their actions, but also on publicly available Federal Election Commission FEC donation records, among many other indicia, which reflect that Mr. Hora has donated to the Democratic National Committee, Biden Fight Fund, Actblue. Even more, the chairperson of the Board, Ms. Bernadette Sargeant has made donations to Hillary Clinton for President and Glen Ivey for Congress. Mr. William Hindle also has donated to ActBlue as well. Mr. Thomas E. Gilbertsen donated to Glenn Ivey for Congress. Mr. Robert Walker (has donated extensively to ActBlue.  Ms. Sara Blumenthal has donated to ActBlue. These are all highly partisan, Democrat leftist organizations and political candidates, many of which Mr. Klayman has sued in his public interest legal practice, including ActBlue, which is now under investigation for unlawful conduct. https://www.whitehouse.gov/presidential-actions/2025/04/investigation-into-unlawful-straw-donor-and-foreign-contributions-in-american-elections/

Notably not a single Defendant has donated money to any conservative politicians or organizations.

Clinton's 33,000 emails, many classified, and illegally retained on a private server, which complicity is not even in dispute, ODC summarily and quickly rejected a complaint filed by former Justice Department lawyer and conservative lawyer and public interest advocate Ty Clevenger, who was also pursued by ODC with the goal of disbarring him as well. Comp. ¶ 35. Furthermore, Kevin Clinesmith, the former senior FBI lawyer and admittedly anti-Trump partisan who dishonestly falsified a surveillance document in the Trump-Russia investigation and who pled guilty to felony charges—was completely ignored by ODC and only temporarily suspended for only five months after he pled guilty, and only after ODC's "blind eye" was uncovered and subjected to negative publicity. Comp. ¶ 36. In stark contrast, the Michigan Bar automatically suspended Clinesmith immediately upon his felony conviction, and then ordered a suspension period of two (2) years. *Id*. And lastly, as set forth in the Complaint, is reference is a report written by Paul Sperry titled "Trump's Toughest Foe Could Be Harris Lawyer Marc Elias" (the "Elias Article"). The Elias Article details how Marc Elias' ("Elias") efforts to use the court system to prevent Donald Trump from being elected president. The Elias Article details in pertinent part:

> The longtime Democratic Party lawyer has already filed more than 60 preelection lawsuits to stop Trump from becoming president again by combatting what he calls Republican "voter suppression" efforts such as requiring voters to provide identification at the polls.

> …

> At the same time, Elias has been sending letters to election officials in Georgia and other key swing states threatening legal action if they uphold challenges to voter rolls to remove noncitizens and other ineligible registrants.

> …

10

As general counsel to Hillary Clinton's 2016 presidential campaign, he helped lead the effort to manufacture and leak spurious "opposition research" claiming to reveal illicit ties between Trump and Russia. Elias later testified that he was worried – then as now – that Trump was a threat to democracy: "I received information that was troubling as someone who cares about democracy." That "information" turned out to be a fictitious "dossier" linking Trump to the Kremlin crafted by former British spook and FBI informant Christopher Steele, who huddled with Elias in his Washington office.

…

But Elias has since taken on other clients – including Kamala Harris – who have more than made up for the loss in revenue. So far in this election cycle, the latest FEC filings show the Elias Law Group has received a total of more than $22 million in disbursements from a host of major Democratic and anti-Trump clients.

Elias' efforts with regard to the 2016 election, "[s]pecial Counsel John Durham found Elias intentionally sought to conceal Clinton's role in the dossier. According to court records, Elias acted as a cutout for more than $1 million in campaign payments for the dossier." As the Elias Article set forth, the Durham probe as disclosed by Paul Sperry "**raised ethical issues with the D.C. Bar** and Elias' former law firm, Perkins Coie, reportedly leading to their breakup in August 2021…." Given that Elias was never disciplined by the D.C. bar, the only conclusion is that this was also covered up and buried by the D.C. attorney discipline apparatus. Comp. ¶¶ 38 – 39.

As set forth herein below, this is the exact type of selective prosecutorial discriminatory treatment that the U.S. Court of Appeals for the District of Columbia Circuit has found to be unconstitutional and illegal *Douglass* and which Judge McFadden recently confirmed in *Associated Press*.

## LEGAL STANDARD

Fed. R. Civ. P. 8(a)(2) states that a pleading need only include "a short and plain statement of the claim showing that the pleader is entitled to relief." When reviewing a Fed. R.

Civ. P. 12(b)(6) motion to dismiss, the court must "accept the complaint's allegations as true and draw all reasonable inferences in favor of the non-moving party*." Gordon v. United States Capitol Police*, 778 F.3d 158, 163-164 (D.C. Cir. 2015).

A complaint "does not require detailed factual allegations." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (U.S. 2009) (internal quotations omitted). To survive a motion to dismiss, a complaint need only "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id*. (internal quotations omitted). As such, a motion to dismiss at this stage must be decided solely on what Mr. Klayman has plead in his complaint, taken as true.

## **THE LAW**

This case is being brought pursuant to ground-breaking precedential case law from the D.C. Circuit in *Douglass*. *Douglass* involved the Frederick Douglass Foundation ("Foundation"), a pro-life foundation, which had its advocates arrested for writing with chalk "Black Pre-Born Lives Matter." *Id*. at 1131. The Foundation sued the District of Columbia, alleging among other causes of action, First Amendment free speech selective enforcement. As evidence of disparate treatment, the Foundation pointed to the fact that in the summer of 2020, "thousands of protesters flooded the streets of the District to proclaim 'Black Lives Matter.' Over several weeks, the protesters covered streets, sidewalks, and storefronts with paint and chalk. The markings were ubiquitous and in open violation of the District's defacement ordinance, yet none of the protesters were arrested." *Id*.  The D.C. Circuit found that both the Foundation and the BLM protestors were similarly situated and that the Foundation had adequately alleged that the District of Columbia had engaged in viewpoint selective prosecutorial discrimination in violation of the First Amendment:

In particular, the District permitted individuals expressing the "Black Lives Matter" message to violate the defacement ordinance, as evidenced by the widespread painting, graffiti, and other defacement on public sidewalks, streets, and buildings, and on private property. By making no arrests, the police effectively exempted advocates of the "Black Lives Matter" message from the requirements of the ordinance. In contrast, the police showed up in force to the Foundation's small rally and arrested individuals who chalked "Black Pre-Born Lives Matter" on the sidewalk. *Id*. at 1142.

The D.C. Circuit reasoned and ruled: "It is fundamental to our free speech rights that the government cannot pick and choose between speakers, not when regulating and not when enforcing the laws." *Id*. at 1141. "[T]he government has no authority to license one side to fight freestyle, while forbidding the other to fight at all." *Id.* at 1142. "The government may not enforce the laws in a manner that picks winners and losers in public debates. It would undermine the First Amendment's protections for free speech if the government could enact a content-neutral law and then discriminate against disfavored viewpoints under the cover of prosecutorial discretion." *Id*. at 1142.

This was recently confirmed and followed by Judge McFadden in *Associated Press*. *Associated Press* refers to Judge McFadden's memorandum opinion granting a motion for preliminary injunction filed by the Associated Press ("AP") against the Trump administration for First Amendment viewpoint discrimination. Judge McFadden unequivocally held, "if the Government opens its doors to some journalists—be it to the Oval Office, the East Room, or elsewhere—it cannot then shut those doors to other journalists because of their viewpoints. **The Constitution requires no less**." *Associated Press* at 2. In *Associated Press*, the AP moved for preliminary injunction relief on the grounds that they had been excluded from both the press pool and larger pre-credentialed media events at the White House after refusing to comply with the

Trump administration's changing of the name of the Gulf of Mexico to the Gulf of America. *Associated Press* at 1. At the evidentiary hearing, the AP was able to show through unrefuted testimony and evidence that "the AP's witnesses made clear that its text reporters have been systematically and almost completely excluded from events open to the broader White House press corps since February 13, while its photographers have suffered curtailed access." *Associated Press* at 9. Furthermore the Trump administration "conceded that the record reveals viewpoint-discriminatory motives, so all indicators point to retaliation.." *Associated Press* at 33. Under these circumstances and facts, Judge McFadden found that "AP has shown that it is likely to succeed on the merits of its First Amendment and retaliation claims, both for its exclusion from eligibility for press pool and limited-access events." *Associated Press* at 36. Judge McFadden therefore ordered that the Trump administration "put the AP on an equal playing field as similarly situated outlets, despite the AP's use of disfavored terminology" and declared that "the AP's exclusion has been contrary to the First Amendment and it enjoins the Government from continuing down that unlawful path." *Associated Press* at 40 – 41.

It is clear to see how *Douglass* and *Associated Press* both apply to this instant case. Conservative and Republican activist public interest and other attorneys have been prosecuted and targeted the Defendants—to the extent that they would willfully ignore the rules which were promulgated by Defendant DCCA—while convicted felons such as Clinesmith who has committed egregious ethics violations involving dishonesty are barely given a "slap on the wrist" simply because they were Democrats adverse to Trump and employed as counsel the insider influential former Chairman of the Board Eric Yaffe – consistent with the overarching goal of silencing and abridging the First Amendment rights of activist conservative and Republican

14

attorneys, such as Mr. Klayman. Other Democrat attorney such as David Kendall and Marc Elais have their egregious misconduct completely ignored. The only difference between who gets punished and who gets ignored is their First Amendment political viewpoints and beliefs. This is illegal, unconstitutional and improper under both *Douglass* and *Associated Press*, and none of the Defendants' arguments to the contrary can change this fact.

**I.    The *Rooker-Feldman* Doctrine Does Not Preclude This Matter**

Defendants attempt to argue that the District of Columbia Superior Court' dismissal of the Bundy Litigation bars Mr. Klayman from seeking relief for a violation of his First Amendment rights under the *Rooker Feldman* doctrine. This argument has zero merit.

"The Supreme Court has explained that the purpose of the *Rooker-Feldman* doctrine is to effectuate 28 U.S.C. § 1257, which "'vests authority to review a state court's judgment solely in [the Supreme] Court.'" *D.C. Healthcare Sys. v. District of Columbia*, 441 U.S. App. D.C. 126, 131 (2019). "The Supreme Court has repeatedly described the *Rooker-Feldman* doctrine as a 'narrow' one." *Id*. "Indeed, the Court has found it applicable only twice." *Id*. Importantly, "if "a federal plaintiff present[s] [an] *independent* claim, it is not an impediment to the exercise of federal jurisdiction that the same or a related question was earlier aired between the parties in state court." *Id*. at 132 (emphasis in original).

The Bundy Litigation was a state court action that solely sought injunctive relief and declaratory relief that the Board must enforce Rule 12.2. This instant matter brings claims under 42 U.S.C. § 1983 for violations of Mr. Klayman's First and Fifth Amendment rights, and seeks damages from the Defendants in that regard in addition to seeking injunctive and equitable relief. These claims could not be more different and this instant matter clearly presents the Court with

15

an "independent claim" that falls outside of the Bundy Litigation. *D.C. Healthcare Sys*, 441 U.S. App. D.C. at 131. Thus, particularly given the extremely narrow application of the *Rooker-Feldman* doctrine, *id*., it is clear that the *Rooker-Feldman* doctrine does not preclude this instant action.

**II.    The *Younger* Abstention Doctrine Does Not Preclude This Matter**

Defendants next present an equally meritless argument that this matter is precluded by the *Younger* abstention doctrine. "In the main, federal courts are obliged to decide cases within the scope of federal jurisdiction. Abstention is not in order simply because a pending state-court proceeding involves the same subject matter." *Sprint Communs., Inc. v. Jacobs*, 571 U.S. 69, 72 (2013). Circumstances fitting within the *Younger* doctrine, we have stressed, are "exceptional"; they include… "state criminal prosecutions," "civil enforcement proceedings," and "civil proceedings involving certain orders that are uniquely in furtherance of the state courts' ability to perform their judicial functions." *Id*. Given the very limited nature of this doctrine, it is clear that Courts should not strain to find that it is applicable.

*Bridges v. Kelly*, 84 F.3d. 470 (1996) shows exactly how and why the *Younger* abstention doctrine does not apply to this case. In *Bridges*, the Plaintiff brought federal suit under, among other counts, 42 U.S.C. § 1983 after an alleged wrongful termination from his position as attorney-advisor in the District of Columbia's Department of Administrative Services. *Id*. at 471. Prior to filing suit, the Plaintiff had exercised his right of appeal of his termination to the Office of Employee Appeals—an administrative appeal. *Id*. On the grounds that the administrative appeal was still pending, the lower court in *Bridges* exercised the *Younger* abstention doctrine with regard to Plaintiff's federal lawsuit. The U.S. Court of Appeals for the District of Columbia

16

Circuit ("D.C. Circuit") reversed on the grounds that "appellant could not receive from the D.C. system the full panoply of remedies available to him from the District Court in connection with his federal claims." *Id*. Specifically, the D.C. Circuit reasoned that the fact that Plaintiff had sought millions in damages in the federal suit rendered *Younger* clearly inapplicable because "[w]e find nothing in the D.C. Code, and appellees cite nothing, authorizing the OEA to grant relief such as punitive damages and compensatory damages (in excess of back pay and benefits) for harms flowing from tortious conduct." *Id*. at 477. The exact same situation is present here. Mr. Klayman has also sought damages under 42 U.S.C. § 1983. Even if the District of Columbia Superior Court ultimately dismisses the Bundy Matter or finds that no discipline is warranted, it certainly cannot grant damages. Thus, *Younger* is inapplicable here as well.

Furthermore, it is indisputable that there exists a "bad-faith" exception to the *Younger* doctrine, which this Court has defined as "where 'the pending state action was brought in bad faith or for the purpose of harassing' the federal plaintiff…." *JMM Corp. v. District of Columbia*, 363 U.S. App. D.C. 160, 170 (2004). Furthermore, other courts have found:

> A showing that a prosecution was brought in retaliation for or to discourage the exercise of constitutional rights "will justify an injunction regardless of whether valid convictions conceivably could be obtained." *Fitzgerald v. Peek*, 636 F.2d 943, 945 (5th Cir.1981). The state does not have any legitimate interest in pursuing such a prosecution; "[p]erhaps the most important comity rationale of Younger deference—that of respect for the State's legitimate pursuit of its substantive interests—is therefore inapplicable." *Wilson v. Thompson*, 593 F.2d 1375, 1383 (5th Cir.1979).

*Lewellen v. Raff*, 843 F.2d 1103, 1109–10 (8th Cir. 1988). "When, however, a state bar acts in bad faith or to retaliate against First Amendment protected activity, the courts should not abstain." *Hensler v. District Four Grievance Committee*, 790 F.2d 390, 391 (5th Cir.1986).

17

"Abstention would serve no purpose because a state cannot have a legitimate interest in discouraging the exercise of constitutional rights, or, equally, in continuing actions otherwise brought in bad faith, thereby reducing the need for deference to state proceedings." *Cullen v. Fliegner*, 18 F.3d 96, 104 (2d Cir. 1994).

**The egregious four year delay constitutes prima facie bad faith, particularly given that the Complaint has detailed how this delay constitutes the illegal practice of "stacking" disciplinary proceedings. Comp. ¶ 53. Specifically, the Bundy Matter has been used to "stack" disciplinary proceedings against Mr. Klayman to ensure that he remains ineligible to practice law in the District of Columbia given that he had only recently on August 6, 2024 petitioned for reinstatement to practice following the conclusion of the suspension period in *In re Klayman*, 20-BG-583 (D.C.C.A.) (the "Sataki Matter"). Stacking has been ruled unethical and illegal by state bars. *Fla. Bar v. Rubin*, 362 So. 2d 12 (Fla. 1978).**

Thus, assuming *arguendo* that *Younger* could apply, it is clear that the bad faith exception would apply. This is because Mr. Klayman has clearly alleged retaliation against First Amendment protected activity. *Hensler* 790 F.2d at 391. Thus, "[a]bstention would serve no purpose because a state cannot have a legitimate interest in discouraging the exercise of constitutional rights, or, equally, in continuing actions otherwise brought in bad faith, thereby reducing the need for deference to state proceedings." *Cullen* 18 F.3d at 104.

### III. The Individual Defendants Do Not Have Immunity Against Mr. Klayman's Claims For Damages, Which Go Far Beyond A Mere "Delay in Proceedings"

The Individual Defendants next attempt to advance the argument that they are somehow immune from Mr. Klayman's claims for damages. Notably, they do no attempt to argue that such

immunity applies to Mr. Klayman's claims for injunctive relief, nor could they under well-established precedent in *Pulliam v. Allen*, 466 U.S. 522, 536-543 (1984), *Wagshal v. Foster*, , 28 F.3d 1249, 1251 (1994) and *Smith v. Scalia*, 44 F. Supp. 3d 28, 43 (D.D.C. 2014). Unfortunately for the Defendants, however, their assertion of "absolute immunity" against Mr. Klayman's damages claims also fails.

"In the District of Columbia, the standard for conferring absolute immunity is set forth in *Moss v. Stockard*, 580 A.2d 1011 (D.C. 1990). Absolute immunity applies when conduct is (1) within the "outer perimeter" of official duties, and (2) the governmental function at issue was "discretionary" rather than "ministerial." *District of Columbia v. Jones*, 919 A.2d 604, 608 (D.C. 2007)." A review of the allegations of the Complaint show exactly why the Defendants' assertions of "absolute immunity" must fail. This case involves the AHHC Defendants' flagrant violation of Rule 12.2 and the Board Defendants' refusal to enforce Rule 12.2. Rule 12.2 clearly states:

> The Hearing Committee's report shall be filed with the Board **not later than 120 days following the conclusion of the hearing.** The 120 days provided for by the Court's rules for the preparation of the Hearing Committee's report shall start to run at the conclusion of the hearing. Comp. ¶ 48.

Defendants attempt to *ex post facto* inject "discretion" into Rule 12.2 and disingenuously and dishonestly mischaracterize their conduct as merely a "delay in proceedings," but the language of the rule as well as established case law make it clear that these assertions are meritless.

*First*, the plain language of Rule 12.2 is unequivocal. There is not even an inkling of so-called "discretion" written into the plain language of Rule 12.2. This can be gleaned and confirmed from the language of the rule itself, which uses to word "shall" and not some other

19

word with more flexibility built in, such as "may." Under these circumstances, the plain language of the rule must be enforced. *Johnson v. D.C. Dep't of Emp't Servs.*, 111 A.3d 9 (D.C. 2015). ("…we begin with an examination of the plain language of the statute, *Parrish v. District of Columbia*, 718 A.2d 133, 136 (D.C. 1989), which we assume best reflects the intent of the legislature. *Varela v. Hi-Lo Powered Stirrups, Inc*., 424 A.2d 61, 64-65 (D.C. 1980)." *Id*. at 9-10. "If the meaning of the statute is plain on its face, resort to legislative history or other extrinsic aids to assist in its interpretation is not necessary." *Id*.

> The primary and general rule of statutory construction is that the intent of the lawmaker is to be found in the language that he has used. He is presumed to know the meaning of words and the rules of grammar. The courts have no function of legislation, and simply seek to ascertain the will of the legislator. It is true there are cases in which the letter of the statute is not deemed controlling, but the cases are few and exceptional, and only arise when there are cogent reasons for believing that the letter does not fully and accurately disclose the intent. No mere omission, no mere failure to provide for contingencies, which it may seem wise to have specifically provided for, justify any judicial addition to the language of the statute. *United States v. Goldenberg*, 168 U.S. 95, 102-03, 18 S. Ct. 3, 4 (1897)

Crucially, this exact situation has already been decided by this Court. "In this case there is no ambiguity at all in the statutory language, which clearly states that the applicable assessments "shall" be imposed. **It is well established that the word "shall" is "a term which creates a duty, not an option**." *Parrish v. District of Columbia*, 718 A.2d 133, 136 (D.C. 1998) (emphasis added). Rule 12.2 says "shall," not "may." This creates a duty, not a discretionary option, as already found by the D.C. Court of Appeals. This Court holding otherwise would create a conflict of law with established precedent.

*Second*, there is a litany of well-established case law, including from the Supreme Court, that that an agency (such as the Board and AHHC) must comply with rules promulgated and

legislated by the higher authority (sch as the DCCA) and does not have "discretion" to ignore these rules at its own whim. This fundamental principle was confirmed by the Supreme Court in June of this year in *Loper Bright Enterprises et al v. Raimondo, Secretary of Commerce, et al*, 22-451, (U.S. 2024), which held by way of analogy, that the Administrative Procedure Act "requires courts to 'hold unlawful and set aside agency action, findings, and conclusions found to be . . . not in accordance with law.'"

Furthermore, the U.S Court of Appeals for the District of Columbia Circuit has found that there is a "fundamental principle that an agency may not act in a manner that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *ABM Onsite Servs.-West, Inc. v. NLRB*, 428 U.S. App. D.C. 63, 68 (2017). "It is well-settled that… any…agency—cannot 'turn[] its back on its own precedent and policy without reasoned explanation.'" *Id.* at 72. "An agency may not, for example, depart from a prior policy *sub silentio* or simply disregard rules that are still on the books." *Id.* Furthermore,  "It is well established that an agency may not ignore its own rules." *Dep't of Revenue v. Race*, 743 So. 2d 169, 171 (Fla. Dist. Ct. App. 1999).

This fundamental, black letter, well-settled principle has been found to be true by the Supreme Court in *Ariz. Grocery Co. v. Atchison, T. & S. F. R. Co.*, 284 U.S. 370 (1932) for nearly one century now. In *Ariz. Grocery*, the Supreme Court was tasked with deciding "the power of the Interstate Commerce Commission to award reparations with respect to shipments which moved under rates approved or prescribed by it." *Id.* at 381. In other words, the ICC, which had been granted authority to set maximum and minimum rates for public carriers, lowered the maximum rate and found that reparations were due shippers that had paid the higher

rate. The Supreme Court stepped in and found that the ICC did not have the ability to ignore its

own rules and previously published rates:

> Where the Commission has, upon complaint and after hearing, declared what is
> the maximum reasonable rate to be charged by a carrier, it may not at a later time,
> and upon the same or additional evidence as to the fact situation existing when its
> previous order was promulgated, by declaring its own finding as to
> reasonableness erroneous, subject a carrier which conformed thereto to the
> payment of reparation measured by what the Commission now holds it should
> have decided in the earlier proceeding to be a reasonable rates. *Id*. at 390.

This is analogous to here, where the subject rule was promulgated by this Court, a higher

controlling authority.

Then, in *Bridges v. Wixon*, 326 U.S. 135 (1945), the Supreme Court "doubled down" on

this fundamental principle in a case involving the deportation proceedings of an alien who was

alleged to have been affiliated with the Communist Party. The Supreme Court found that the INS

did not have authority to ignore its own promulgated rules and introduce "evidence" outside of

what was allowable under its own rules to try to prove the alien's alleged Communist affiliation

and membership. The Supreme Court held, "[t]he rules are designed to protect the interests of the

alien and to afford him due process of law." *Id*. at 152.

On the other hand, the one case that Defendants rely upon to claim "discretion," *In re

Morrell*, 684 A.2d 361 (D.C. 1996) is completely inapplicable. Indeed, even if *Morrell*'s

"discretion" was valid—which it clearly is not—such alleged "discretion" cannot be used to

justify an unprecedented huge **four-year** delay. This is flat-out wrong.

*Morrell* is a case from 1996 where the time limit for the AHHC to issue its Report was

governed by the D.C. Bar Rules and not Rule 12.2 as is the case here. *Id*. at 370. In *Morrell*, the

AHHC only missed the deadline by approximately four (4) <u>months</u>, not four (4) <u>years – nearly</u>

half a decade -- as is the case here. Furthermore, *Morrell* involved an incredibly complex case involving the attorney's representation of a corporation between 1983 and 1990 and misappropriation of client funds involving multiple firms and different corporate entities. Only under these analogous facts, this Court held:

> Although the record was complete as of January 5, 1995, the Hearing Committee did not submit its report and recommendations until July 26, 1995, substantially after the sixty-day time frame envisioned by the Bar Rules. Nothing in the text of the rules, however, specifies the result of a Hearing Committee's failure to adhere to the time limit, so **we presume** that the rule is directory, rather than mandatory… It would hardly serve the integrity of the bar, moreover, to allow Morrell to avoid the imposition of discipline for his serious ethical violations merely because the Hearing Committee took a long time carefully evaluating the substantial, complex evidence in his case." *Id.*

Thus, *Morrell* is entirely distinguishable and inapposite on numerous grounds. *First*, *Morrell* involved a different set of rules. *Second*, the length of delay was four (4) months, versus an unconscionable and egregious four (4) years here. *Third*, *Morrell* was incredibly complex, which the Court used to justify the brief four-month delay, in contrast to here, where ODC did not call a single witness. *Fourth*, in *Morrell* the Court was not tasked with interpreting Rule 12.2 as it is here. *Fifth,* under the incredibly distinct facts of *Morrell*, this Court only half-heartedly "presumed," that the time limit was discretionary – hardly language that constitutes a definitive finding of precedent.

None of the other cases cited by the Defendants are analogous either. *In re Thyden*, 877 A.2d 129 (D.C. 2005) also did not invoke Rule 12.2, and like *Morrell*, was governed by the D.C. Bar Rules. The delay in *Thyden* was only approximately two (2) years, half of the egregious **four year delay** at issue here. And, the attorney in *Thyden* did not show prejudice resulting from the delay. Here, Mr. Klayman more than showed the prejudice given the fact that at the conclusion

of the AHHC hearing in 2019, the AHHC found that ODC had failed to prove any disciplinary violation, but then reversed course **four years later** after their recollection of the events had clearly diminished.

*In re Gree*n, 136 A.3d 699 (D.C. 2016) does not even specify the amount of delay that the attorney suffered, so it cannot be used as a point of comparison to this case. Furthermore, in *Green*, the attorney did not even address his delay in earnest, as it was only brought up in his "motion to the Board for extra time to file exceptions" and "never identified any prejudice in his motion to the Board…." *Id.* at 700. On the other hand, Mr. Klayman has suffered a clear **four year delay** and clearly identified the severe prejudice which has resulted.

Thus, the bottom line is that there is simply no "discretion" involved here. Without "discretion," there can be no absolute immunity. This far more than a mere "delay in proceedings[8]." Defendants' predictably disingenuous attempts to minimize the severe harm cause by the egregious **four year delay** must be swiftly rejected by the Court. Not only does the well-established case law demand this, so do the essential notions of fairness and justice.

## IV.    Mr. Klayman Has More Than Sufficiently Pled Causes of Action

---

[8] Defendants' attempt to argue that the egregious delay in proceedings suffered by Mr. Klayman in another disciplinary matter, *In re Klayman*, 282 A.3d 584, 591 (D.C. 2022) (the "Sataki Matter"), serves to preclude his arguments here. This is an intentional mischaracterization of the facts. In the Sataki Matter, Mr. Klayman suffered a seven (7) year delay from between when the complainant filed a bar complaint against him to when ODC filed their specification of charges. The District of Columbia claims not  have a statute of limitations for situations like this, and thus under these circumstances the doctrine of laches would apply. On the other hand, the delay here was by the AHHC in issuing is Report. The Board Rules expressly address this delay in Rule 12.2. These situations are therefore not even remotely comparable and it is frankly intellectually dishonest for counsel to Defendants to argue such.

Finally, the Defendants turn to the meritless argument that Mr. Klayman has failed to sufficiently allege causes of action in his Complaint. Defendants argue that Mr. Klayman has failed to plead that he was subjected to First Amendment viewpoint discrimination and that the Defendants enjoy qualified immunity. Neither of the assertions have any merit.

### a. Mr. Klayman Has More Than Sufficiently Pled First Amendment Viewpoint Discrimination and Fifth Amendment Violation

Defendants attempt to argue that Mr. Klayman's claims are insufficiently pled because (1) he did not plead facts to show that the Board interpreted Rule 12.2 differently from others similarly situated, (2) he did not plead facts showing he was singled out for enforcement among others similarly situated, and (3) he did not plead that his treatment was "motivated by invidious discrimination." As shown herein, none of these arguments have any merit.

*First*, Mr. Klayman did, in fact, plead that the Board interpreted Rule 12.2 differently from others similarly situated:

> On information and belief, and which will be borne out in discovery, the refusal to enforce Rule 12.2 to dismiss the Bundy Matter is due to Mr. Klayman's conservative and Republican activism, speech, association, and beliefs. On information and belief, there are many other examples of the Defendants selectively enforcing the Board Rules to the benefit of leftist and Democrat attorneys and to the detriment of conservative and Republican activist attorneys. Comp. ¶ 56.

At this initial motion to dismiss stage, prior to any discovery, it is clear that the Court must take Mr. Klayman's allegations as true. *Iqbal*, 556 U.S. at 678. The Defendants attempt to inject their own misleading facts here, claiming that the Board has regularly held that a violation of Rule 12.2 does not justify a dismissal as to a "variety of attorneys." Without any discovery, it is improper for the Court to take this factual interjection by the Defendants at face value. How do

the Defendants know the political beliefs of the attorneys who the Board allegedly refused to apply Rule 12.2 to? This can only be answered through the internal records from the Board, as well as deposition testimony of other instances where Rule 12.2 was allegedly ignored as well, along with information about the length of delay at involved. Thus, this is a purely factual question that can only be developed in discovery. At this stage, Mr. Klayman has more than sufficiently pled what he needs to

*Second*, should the Court take the inquiry further, it is clear that Mr. Klayman's allegations are far from conclusory, as he has pled and provided multiple examples of conservative attorneys being treated differently from democrat attorneys simply due to their political beliefs and ideology. Mr. Klayman has pled that David Kendall, Kevin Clinesmith, and Marc Elais—all prominent democrat attorneys—have had their egregious unethical misconduct ignored by the District of Columbia Attorney Discipline Apparatus, to which the Defendants all belong. Comp. ¶¶ 35 – 39. On the other hand, prominent conservative attorneys such as Trump White House Counsellor Kellyanne Conway, former Trump Attorney General William Barr, Senators Ted Cruz and Josh Hawley, Professor John Eastman who served as a legal counsel for President Trump, former U.S. Attorney Rudy Giuliani, and Trump-affiliated Republican legal counsel, Jeffrey Clark have all been targeted for elimination with Mr. Giuliani having recently been disbarred. Comp. ¶¶ 32- 33. Furthermore, Mr. Klayman has more than sufficiently alleged that his First Amendment right to freedom of speech and expression have been severely curtailed by the Defendants' conduct:

> The Defendants' selective and discriminatory prosecution of conservative and Republican activist attorneys chills, deters, and restricts Mr. Klayman from

26

> participating in activities organized around his conservative and Republican activist views. Comp. ¶ 68.
>
> The Defendants' selective and discriminatory prosecution of conservative and Republican activist attorneys impermissibly infringes on Mr. Klayman's right to associate on the basis of his conservative and Republican activist beliefs. Comp. ¶ 70.

At the motion to dismiss stage, this is more than sufficient. It logically follows that if Mr. Klayman's livelihood as an attorney and public interest advocate is being threatened by his public advocacy for conservative interests, his ability to speak freely and engage in such public conservative advocacy would be severely harmed. In sum, Mr. Klayman has clearly pled the pattern and practice of disparate, viewpoint-based discriminatory treatment that conservative and Republican activist attorneys have been subjected to by the Defendants, and at the motion to dismiss stage, more than sufficiently supports Mr. Klayman's causes of action.

*Third*, Mr. Klayman has more than sufficiently pled that the Defendants' actions were motivated by "invidious discrimination." Indeed, Porter ODC's motivation is no secret, as at the conclusion of the AHHC hearing in the Bundy Matter, Defendant Porter couldn't help but to blurt out that Mr. Klayman "should not continue to have the privilege of being a lawyer," evidencing that she was being driven by a personal animus and dislike for Mr. Klayman. Comp. ¶ 57. With regard to Jeffrey Clark, the DCCA had step in and stop Fox and ODC's attempts to strip away Mr. Clark's constitutional Fifth Amendment rights, and Fox responded by saying "I'm not going to push that hearing back unless somebody cuts off one of my arms." Comp. ¶ 32. These few quotes are evident of the mindset of not only ODC, but the District of Columbia Attorney Discipline Apparatus at large. The Defendants are clearly motivated by "invidious

discrimination," and indeed hatred and animus towards conservative attorneys such as Mr. Klayman.

### b.  The Defendants Do Not Have Qualified Immunity

Qualified immunity does not shield "the plainly incompetent or those who knowingly violate the law." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011). Qualified immunity protects public officials from personal liability only if the alleged misconduct did not violate clearly established statutory or constitutional law of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800 (1982). It is similar to a good faith defense, but focuses on objective reasonableness, not subject belief. *Id*. at 818. It balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably. *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). To determine whether qualified immunity applies, a court looks to (1) whether a plaintiff's allegations, taken as true, show that the official's conduct violated a constitutional or statutory right, and (2) whether that right was "clearly established" at the time of the defendant's alleged misconduct. *Saucier v. Katz*, 533 U.S. 194, 201 (2001).

The Defendants have no real argument that qualified immunity applies. They take a disingenuous and intentionally deceptive and myopic view of Mr. Klayman's allegations and try to frame the "constitutional right" that was violated as the "interpretation of Rule 12.2." For the purposes of qualified immunity, this is not the "constitutional right" that is being violated. The constitutional rights that are being violated are Mr. Klayman's First and Fifth Amendment rights. Comp. ¶¶ 65 – 90. There is no possible debate that a person's First and Fifth Amendment

constitutional rights are not "clearly established." Thus, qualified immunity does not apply here.

## **CONCLUSION**

Accordingly,  the Defendants' motion to dismiss must be swiftly denied in its entirety. Put simply, there is simply no "discretion" for the Defendants to refuse to comply with and implement Rule 12.2, which their entire purpose is to enforce the Board Rules. Mr. Klayman has provided the Court with a litany of binding precedential authority that an agency such as the Board may not simply disregard this Court's rules, and that court intervention is proper where an agency, such as the Board, refuses to comply. Thus, there is simply no question of immunity invoked or raised, given that the only issue is the Defendants' refusal to comply with the rules which have been promulgated by the Court.

Mr. Klayman has already suffered severe harm as a result of the Defendants' actions, and this harm will not stop without timely intervention from the Court. This unconstitutional First Amendment viewpoint discrimination and vindictive and retaliatory conduct cannot be permitted to  occur because Mr. Klayman does not share the same ideological and political beliefs as those in charge of the District of Columbia Attorney Discipline Apparatus. This is manifestly unjust and fundamentally wrong and must be seriously addressed and remedied by this Court.

Mr. Klayman respectfully requests that this matter be ruled upon expeditiously as this is an extremely time-sensitive issue. Mr. Klayman respectfully requests a decision within twenty (20) days of completion of briefing on the Defendants' motion to dismiss.

**In addition, Mr. Klayman will be filing shortly a motion for temporary restraining order and preliminary injunction under Fed. R. Civ. P. 65, as the harm to him is exponentially increasing based on recent events. This meritorious pleading will require this**

**Court to act quickly to prevent further harm to Mr. Klayman, as in the past in alleged related proceedings for which it was assigned, it respectfully has not ruled in a timely fashion, compounding the harm to Plaintiff. Now is the time to further the interests of justice without delay**.[9]

Date: April 28, 2025                              Respectfully submitted,

                                                  */s/ Larry Klayman*
                                                  Larry Klayman
                                                  Klayman Law Group P.A.
                                                  7050 W. Palmetto Park Rd
                                                  Boca Raton, FL, 33433
                                                  Tel: (561)-558-5336
                                                  Email: leklayman@gmail.com

                                                  Plaintiff Pro Se

### CERTIFICATE OF SERVICE

I, Larry Klayman, hereby certify that on this day, April 28, 2025 a copy of the foregoing was served counsel for all parties via the Court's ECF procedures.

                                                  */s/ Larry Klayman*

---

[9] In *Klayman v. Porter et al*, 21-cv-3109 (D.D.C.), this Court failed to rule on time sensitive pending matters for over nine (9) months during the pendency of Mr. Klayman's suspension in the Sataki <atter, running off of the time clock for his eighteen (18) month suspension and rendering the case essentially moot, necessitating an appeal and motion for recusal or disqualification from this or further proceedings. *Klayman v. Porter et al*, 23-7034 (D.C. Cir.).

# EXHIBIT B

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

LARRY KLAYMAN

               Plaintiff,

v.

DISTRICT OF COLUMBIA COURT OF
APPEALS, et al

            Defendants.

**Case No.: 1:24-cv-02997**

---

### AFFIDAVIT OF LARRY KLAYMAN

1.     I, LARRY KLAYMAN hereby declare and attest that the following is true and correct and based on my personal knowledge and belief.

2.     I am over the age of 18 and mentally and legally competent to make this affidavit, sworn under oath.

3.     I hereby move the Court for a Preliminary Injunction with regard to the unconstitutional and unlawful conduct of Defendants Board on Professional Responsibility ("Board"), Sara Blumenthal, Margaret Cassidy, Thomas Gilbertsen, William Hindle, Sharon Rice-Hicks, Bernadette Sargeant, Leslie Spiegel, Michael E. Tigar, Robert Walker's (collectively "Board Defendants"), Robin Bell, Buffy Mims, Christian White's (collectively the "AHHC Defendants") and the District of Columbia Court of Appeals ("DCCA").

4.     I seek an order finding that the AHHC Report and Board Report in the Bundy Matter are void *ab initio* and vacated and thus preliminarily enjoined from further consideration.

5.     The Defendants' discriminatory selective prosecutorial discriminatory treatment

that the U.S. Court of Appeals for the District of Columbia Circuit has found to be unconstitutional and illegal in *Frederick Douglass Found., Inc. v. District of Columbia*, 82 F.4th 1122 (D.C. Cir. 2023) ("*Douglass*") and which has been confirmed very recently on April 8, 2025 by the Honorable Trevor McFadden, an appointee of President Trump no less, in *Associated Press v. Budowich*, 1:12-cv-00532 (D.D.C.) ECF No. 46 ("*Associated Press*").

6.    This matter is urgent and ripe for immediate consideration because of the irreparable harm that will follow immediately from the Defendant DCCA having currently scheduled oral argument the subject ongoing disciplinary action against me (the "Bundy Matter") for May 28, 2025 and the likely adverse events harming me that will flow therefrom.

7.    Defendant DCCA has signaled that it will allow the Board license to violate the Court's rules, and in this case Rule 12.2. This goes far beyond exercising any reasonable and non-capricious and non-arbitrary discretion. Thus, urgent action is required now to avoid irreparable harm to me because, as set forth in detail below, a decision that is not likely to be favorable to me will likely come down shortly thereafter as a result of the Defendant DCCA giving undue deference to the other Defendants actions.

8.    As intended by design by the other Defendants, this would then be used to effectively remove me from the practice of law both in the District of Columbia as well as severely affect his practice of law in other, foreign jurisdictions and courts where I am licensed to practice, since unjustified discipline as recommended by Defendants in the District of Columbia will likely trigger reciprocal disciplinary proceedings.

9.    Any such reciprocal disciplinary proceedings are extremely time consuming and very costly, also preventing me from fully representing on-going and potentially new clients in both my public interest and private law practice capacity, as well as severely harming me, my

2

family, and colleagues financially.

10.     In that regard, I have filed a Motion for Preliminary Injunction (the "Injunction Motion") and adopt herein by reference into this affidavit the Introduction and Statement of Relevant Facts section of the Injunction Motion.

11.     I have shown all of the relevant factors that the Court must consider when ruling on an injunction motion. "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities  tips in his favor, and that an injunction is in the public interest." *Gordon v. Holder*, 632 F.3d 722, 724 (2011).

12.     I have shown a substantial likelihood of success on the merits as shown in my Response in Opposition to Defendants' Motion to Dismiss, which is attached to the Injunction Motion as Exhibit A.

13.     I have shown a likelihood of irreparable harm based on what will certainly occur shortly after the DCCA's scheduled oral argument in the Bundy Matter for May 28, 2025, less than three (3) weeks from today. Defendant DCCA has signaled to me that it will allow the Board license to violate the Court's rules, and in this case Rule 12.2. This goes far beyond exercising any reasonable discretion.. The DCCA has shown and signaled that conservative and Republican public interest advocate attorneys will be treated far differently than their leftist/liberal counterparts, such as Kevin Clinesmith, and with Marc Elias and David Kendall never even having had disciplinary proceedings initiated against them despite their clearly unethical conduct.

14.     The irreparable harm is exponentially amplified by the fact that the Bundy Matter has been used as a tool to "stack" disciplinary proceedings against me to ensure that I remain

ineligible to practice law in the District of Columbia given that I only recently on August 6, 2024

petitioned for reinstatement to practice following the conclusion of the suspension period in *In re*

*Klayman*, 20-BG-583 (D.C.C.A.) (the "Sataki Matter"), which order is still being challenged and

currently on appeal and under review by this Court. *Klayman v. Sataki et al*, 24-cv-0226 (D.C.

Ct. App.).

      15.    The timeline of events can only lead to the conclusion that illegal "stacking" has

occurred.

> <u>July 18, 2019</u> – The AHHC Hearing in the Bundy Matter concludes, the AHHC finds that ODC failed to prove any ethical violations.

> <u>September 15, 2020</u> – The AHHC's mitigation and aggravation hearing in the Bundy Matter concludes.

> <u>January 14, 2021</u> – The Court "temporarily" suspends me in the Sataki Matter pending final disposition.

> <u>September 15, 2022</u> – The Court, after twenty (20) months of "temporary" suspension, issues its order suspending me for eighteen (18) additional months in the Sataki Matter, resulting in a thirty-eight ("38") month total suspension.

> <u>September 11, 2023</u> – Over four (4) years later, near the end of my suspension in the Sataki Matter, the AHHC issues its Report and Recommendation to the Board in the Bundy Matter recommending a twelve (12) month suspension

> <u>April 17, 2024</u> – My suspension period ends in the Sataki Matter and I becomes eligible to petition for reinstatement.

> <u>July 30, 2024</u> – The Board issues a Report and Recommendation in the Bundy Matter, *sua sponte* increasing the recommended suspension to eighteen (18) months.

> <u>August 6, 2024</u> – I petition for reinstatement in the Sataki Matter.

> <u>August 13, 2024</u> – The Court issues an order to show cause in the Bundy Matter directing me to show cause why I should not be temporarily suspended in the Bundy Matter.

      16.    This sequence and timing of events is no mere coincidence. It now is abundantly

clear that everything – including the egregious **over four (4) year delay** by the AHHC in issuing its Report and Recommendation – was an attempt to ensure that I remain suspended from the practice of law for the longest possible period of time, thus effectively ending my legal career in the District of Columbia, as I am now almost seventy-four (74) years old. It simply cannot be a coincidence that the Board rushed to issue its Report to attempt to trigger a "temporary suspension" just as I was about to petition for reinstatement in the Sataki Matter.

17.     This type of "stacking" of disciplinary proceedings has been found to be illegal and unethical in well respected jurisdictions such as Florida. *Fla. Bar v. Rubin*, 362 So. 2d 12 (Fla. 1978). *See also Fl. Bar v. D'Ambrosio*, 25 So. 3d 1209 (Fla. 2010)(referring to the practice of "stacking" disciplinary proceedings as "unfair.").

18.     Part and parcel to the illegal and unethical "stacking" strategy, is the fact that there is likely, based on past experience, to be tacked on a wholly unwarranted reinstatement provision in any order in the Bundy Matter, and like they did in the Sataki Matter, which would then be assigned to a highly partisan and rabidly anti-conservative ODC, which includes its prosecutor Julia Porter who openly displayed her animus towards me as at the conclusion of the AHHC hearing in the Bundy Matter, where she couldn't help but to blurt out that Mr. Klayman "should not continue to have the privilege of being a lawyer." Comp. ¶ 57.

19.     Presiding over Porter, of course, is Fox, who has personally gone after other Trump affiliated activist conservative and Republican legal counsel, such as Jeffrey Clark and Rudy Giuliani, often gloating to the media about his personal involvement and with regard to Jeffrey Clark, the DCCA had step in and stop Fox and ODC's attempts to strip away Mr. Clark's constitutional Fifth Amendment rights, and Fox responded by saying "I'm not going to push that

hearing back unless somebody cuts off one of my arms."[1] Comp. ¶ 32.

20.    This ensures that I will almost certainly never be reinstated, thus evidencing further irreparable harm.

21.    And, finally, any order of discipline is intended certainly trigger reciprocal actions in other jurisdictions where I am licensed to practice, which is another part of the District of Columbia's attempts to remove me, as well as other activist conservative and Republican attorneys from the practice of law.

22.    Given that I am a solo practitioner and now almost seventy-four (74) years old, allowing the Bundy Matter to proceed and will likely trigger the effective end of my legal career and profession and thus my business, as I will be unable both financially and emotionally to withstand the concerted attack by the Defendants to remove me from the practice of law.

23.    In stark contrast to the clear irreparable harm that would be suffered by me, there is absolutely no prejudice or harm to the Defendants if the TRO is granted. This would simply result in the Defendants following and applying the Rules as written, and therefore an order in that regard would simply maintain the *status quo*.

24.    Even more importantly, the members of the District of Columbia bar deserve to know that and rely upon the Board  enforcing its own rules on **everyone** and not just selectively, as doing the latter completely erodes the integrity of the entire attorney discipline system. The members of the District of Columbia bar deserve to know that they can count on the Rules as written and not be subject to some arbitrary and capricious interpretation that changes depending on who is involved. It is clear that, absent the relief sought by me, the integrity of the District of Columbia Attorney Discipline Apparatus will be completely eroded, and everyone will know

---

[1]    https://www.politico.com/news/2024/02/26/jeff-clark-subpoena-trump-bar-investigation-00143469.

that it is nothing more than a political weapon. The Court cannot allow this to occur, not only for my sake, but for the sake of the entire District of Columbia.

25.    I respectfully request that the Court issue a ruling with findings of fact and conclusions of law, and this this ruling be made without undue delay, which delay has regrettably occurred in the past in the *Porter* Case regarding the Defendants' so-called "Motion for Clarification," which the Court allowed to sit for nine (9) months, rendering moot my challenge to the Sataki Matter pursuant to D.C. Super. Ct. Rule 60 due to the passage of time.

26.    This is to give me a chance to expeditiously appeal to the D.C. Circuit in the Bundy Matter, which appeal will likely be required given this Court's history of bias towards me, as evidenced by its having held that I was a "vexatious litigant" and which finding was reversed by the D.C. Circuit on June 11, 2024 where it held in pertinent part:

> …we agree that a pre-filing injunction was not warranted on this record. The handful of lawsuits on which the district court based its pre-filing injunction were not sufficiently prolific, frivolous, or harassing to warrant broadly restricting Klayman's constitutional right of access to all courts and forums, state and federal.
>
> In this case, the record does not support the exceptional remedy of a pre-filing injunction even within the courts of the D.C. Circuit, and so it necessarily falls far short of warranting the nationwide pre-filing injunction the district court entered.
>
> Yet, in this case, the district court neither tried alternative means of addressing any perceived improper litigation tactics nor explained why nothing else would work. There is no need to haul out a sledgehammer if a tack hammer will suffice.
>
> Nonetheless, Younger abstention was not warranted in this case for the straightforward reason that there was no relevant pending state proceeding at the time of the district court's decision. The disciplinary proceeding resulting in the ninety-day suspension order concluded on June 11, 2020…. For that reason, we reverse the district court's dismissal of Klayman's claims for injunctive relief as to all of the ODC Employees other than Kaiser. *Klayman v. Porter et al*, 22-7123.

27.    As a result of the D.C. Circuit's June 11, 2024 opinion, this Court's order of dismissal was reversed and remanded to this Court for further proceedings, where it has now

been pending for over eleven (11) months – again running off the clock - further evidencing why I am respectfully requesting that the Court act expeditiously here or consider removing itself from this case so that it can be assigned to another judge who will act expeditiously.

28.    I therefore respectfully requests that the Court will issue an expeditious ruling and allow me the opportunity to seek further redress from the D.C. Circuit if needed.

FURTHER AFFIANT SAYETH NAUGHT

I hereby swear under oath and penalty of perjury that the foregoing facts are true and correct to the best of my knowledge and belief.

Executed on: May 14, 2025

_____ */s/ Larry Klayman*_____
Larry Klayman

EXHIBIT 2

```
1                 IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLUMBIA
2
                                ---
3
     LARRY ELLIOT KLAYMAN,          )
4                                   )
                                    )
5         Plaintiff,                )  CIVIL ACTION 24-2997
                                    )
6    v.                             )
                                    )  Tuesday, May 27, 2025
7    DISTRICT OF COLUMBIA COURT     )
     OF APPEALS, et al.,            )
8                                   )
                                    )
9         Defendants.               )
     _____ )
10

11          TRANSCRIPT OF PRELIMINARY INJUNCTION HEARING

12         BEFORE THE HONORABLE REGGIE B. WALTON
                  UNITED STATES DISTRICT JUDGE
13

14
     APPEARANCES:        KLAYMAN LAW GROUP P.A.
15                       BY:  LARRY ELLIOT KLAYMAN
                         7050 W. Palmetto Park Road
16                       Boca Raton, Florida 33433
                         310-595-0800
17                       Email:  Leklayman@gmail.com

18                       For the Plaintiff

19                                ---

20

21

22

23
     COURT REPORTER:     CHANDRA R. KEAN, RMR
24                       Official Court Reporter
                         333 Constitution Avenue, NW
25                       Washington, DC 20001
```

```
 1     APPEARANCES (CONT'D):

 2
                       OFFICE OF ATTORNEY GENERAL FOR DC
 3                     BY:  JESSICA N. KRUPKE
                       400 6th Street NW, Suite 10100
 4                     Washington, DC 20001
                       202-727-2125
 5                     Email:  Jessica.krupke@dc.gov

 6                     For DCCA

 7                     O'HAGAN MEYER, PLLC
                       BY:  LESLIE PAUL MACHADO
 8                     2560 Huntington Avenue, Suite 204
                       Alexandria, Virginia 22303
 9                     703-775-8607
                       Email:  Lmachado@ohaganmeyer.com
10
                       For the Defendants BPR
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

| | |
|---|---|
| 1 | **PROCEEDINGS** |
| 2 | (Court called to order at 10:06 a.m.) |
| 10:06:13  3 | DEPUTY COURTROOM CLERK:  This is civil action |
| 10:06:15  4 | 24-2997, *Larry Elliot Klayman v. District of Columbia* |
| 10:06:22  5 | *Court of Appeals, et al.* |
| 10:06:23  6 | May I have the parties approach the lectern, state |
| 10:06:26  7 | your appearance for the record, beginning with the |
| 10:06:28  8 | plaintiff. |
| 10:06:29  9 | MR. KLAYMAN:  Good morning, Your Honor.  Larry |
| 10:06:31  10 | Klayman for myself, pro se. |
| 10:06:37  11 | THE COURT:  Good morning. |
| 10:06:39  12 | MR. MACHADO:  Good morning, Your Honor.  Les |
| 10:06:41  13 | Machado on behalf of the Board on Profession |
| 10:06:44  14 | Responsibility, the nine board members, and the three |
| 10:06:46  15 | Hearing Committee members who have been sued as |
| 10:06:49  16 | defendants. |
| 10:06:49  17 | THE COURT:  Good morning. |
| 10:06:52  18 | MS. KRUPKE:  Good morning.  Jessica Krupke on |
| 10:06:54  19 | behalf of the District of Columbia Court of Appeals in a |
| 10:07:00  20 | limited capacity as the District of Columbia Court of |
| 10:07:02  21 | Appeals has not been served properly. |
| 10:07:03  22 | Thank you. |
| 10:07:03  23 | THE COURT:  Good morning.  Mr. Klayman, this |
| 10:07:06  24 | matter is before the Court today on your motion for a |
| 10:07:08  25 | preliminary injunction.  You may proceed. |

10:07:11   1          MR. KLAYMAN:  Your Honor, may I address some

10:07:13   2     preliminary matters --

10:07:14   3          THE COURT:  Yes.

           4          MR. KLAYMAN:  -- with you?

10:07:35   5     Your Honor, first of all, it's my intention to take

10:07:37   6     the witness stand to testify here today.  There are

10:07:40   7     factual issues involved in this case with regard to

10:07:46   8     viewpoint discrimination and selective prosecution.

10:07:48   9     I do note that I submitted an affidavit.  There was

10:07:52  10     no contrary affidavit.  It was not -- anything that I

10:07:57  11     said rebutted, consequently it's admitted.  But there

10:08:00  12     are other factual issues that I want to bring in front

10:08:03  13     of the Court.  The pattern and practice of

10:08:06  14     discriminatory viewpoint discrimination against

10:08:08  15     conservative and Republican activist lawyers such as

10:08:13  16     myself, and of course, those issues in terms of

10:08:16  17     substantial similarity of what's been going on.  So it's

10:08:20  18     absolutely required that I be able to testify and

10:08:22  19     present evidence to this Court.

10:08:25  20          The briefs are very thorough, and I wanted to point

10:08:29  21     out, because Your Honor didn't pick up on it the first

10:08:34  22     time, is that attached to the preliminary injunction

10:08:36  23     motion is also our motion -- excuse me, our opposition

10:08:41  24     to the motion to dismiss in this case.  And that lays

10:08:44  25     out specifically a lot of the legal arguments, and it's

10:08:50 1   incorporated into the preliminary injunction motion by

10:08:52 2   reference.  And I'm going to make reference to some of

10:08:54 3   them today.

10:08:55 4       The issues in this case are very, very important

10:08:58 5   because this Court in particular and others throughout

10:09:03 6   the country have been enforcing the First and Fifth

10:09:09 7   Amendment with regard to discriminatory viewpoint

10:09:12 8   discrimination.

10:09:12 9       The *Douglass* case, of course, is a good example,

10:09:15 10  and I'm sure Your Honor is familiar with that, but also

10:09:18 11  we have recent cases that came down by Judge McFadden,

10:09:24 12  Judge Bates, and others with regards to viewpoint

10:09:27 13  discrimination as allegedly practiced by President Trump

10:09:30 14  and his administration.  And in those cases, actions

10:09:33 15  were enjoined as a result.

10:09:38 16      So the case law cuts both ways.  And although

10:09:41 17  *Douglass* deals with Black Lives Matter and a Black Lives

10:09:46 18  Matter pro-life group, it equally applies to

10:09:47 19  conservatives and Republican activist lawyers under our

10:09:50 20  Constitution.  So it's extremely important that we go

10:09:52 21  through these various issues with the Court.

10:09:54 22      I might also add, in *Douglass*, there was a motion

10:09:57 23  to dismiss that had been filed by the government at the

10:10:06 24  time and it was denied ultimately.  It was granted by

10:10:10 25  Judge Boasberg, but it went up to the D.C. Circuit.  And

10:10:15  1    there's a very strong opinion in *Douglass* that reversed

10:10:18  2    that, and it came back.  And that case is currently in

10:10:22  3    discovery.

10:10:22  4         In terms of the motion to dismiss which is in front

10:10:24  5    of you, Your Honor, it's 12(b)(6).  And it's not a high

10:10:30  6    standard to get over a 12(b)(6); there just has to be

10:10:33  7    some plausibility under the *Twombly* case and its progeny

10:10:38  8    and to what's being alleged here.  So this case is going

10:10:42  9    to have to go into discovery just like *Douglass*, but

10:10:46  10   today, for purposes of a preliminary injunction, it's

10:10:50  11   important that I be able to testify and go through

10:10:53  12   various factual matters for Your Honor.

10:10:56  13        At the end of this proceeding, under our local

10:11:01  14   rules and the Rules of Civil Procedure, Your Honor has

10:11:04  15   to do findings of fact and conclusions of law.  We had a

10:11:09  16   previous case in front of Your Honor where that didn't

10:11:11  17   occur, and -- respectfully, the D.C. Circuit reversed

10:11:16  18   you on that, found that there were not adequate grounds

10:11:18  19   for you to declare me a vexatious litigant, not being

10:11:23  20   able to pursue my constitutional rights, particularly

10:11:25  21   under the Sixth Amendment.

10:11:27  22        So consequently, I just ask Your Honor,

10:11:30  23   respectfully, to weigh the evidence very carefully, as

10:11:34  24   well as the law, and issue findings of fact and

10:11:37  25   conclusions of law, because that is very important,

10:11:41  1    because this preliminary injunction proceeding,

10:11:42  2    whichever which way it goes, and I'm confident it will

10:11:46  3    go in my behalf, is appealable to the D.C. Circuit.  And

10:11:51  4    of course the D.C. Circuit has set this precedent in the

10:11:54  5    *Douglass* case.

10:11:56  6        So it's important that it have a record of how Your

10:11:59  7    Honor is making the decision, not the cursory proposed

10:12:02  8    order that was given to you by the defendants.

10:12:07  9        This is important, Your Honor, for --

10:12:09  10        THE COURT:  Well, you know, Mr. Klayman, there

10:12:11  11    are some matters I think we have to address before we

10:12:14  12    even get to where you want to go.  And that is, first of

10:12:17  13    all, that D.C. Court of Appeals says it has not been

10:12:22  14    appropriately served, so they're saying I don't have

10:12:24  15    jurisdiction because of that.  And then there's the

10:12:27  16    other issue regarding the fact that this issue, as I

10:12:32  17    understand it, has already been litigated over in

10:12:34  18    Superior Court, went up to the Court of Appeals, and the

10:12:38  19    appeal was denied.

10:12:40  20        And, you know, with the current state of the law,

10:12:43  21    what would be the basis for this Court to, in a sense,

10:12:47  22    act as an appellate court regarding a decision made by

10:12:53  23    the equivalent of a state court system?

10:12:57  24        MR. KLAYMAN:  You're not acting as an appellate

10:12:59  25    court, Your Honor, because as we pointed out in the

10:13:03  1    briefs, under the *Rooker* case and also under the *Younger*

10:13:06  2    case, the remedies which are being sought here, in

10:13:08  3    particular, are different than what were being sought

10:13:11  4    before the Superior Court and before the D.C. Court of

10:13:15  5    Appeals.  We're asking --

10:13:15  6          THE COURT:  The legal issue is the same.

10:13:18  7          MR. KLAYMAN:  -- for damages --

10:13:19  8          THE COURT:  You're asking me to take a position

10:13:21  9    contrary to what's already been ruled over in Superior

10:13:28  10   Court.

10:13:28  11         MR. KLAYMAN:  I'm not, because this is a

10:13:30  12   constitutional issue.  We did not litigate the

10:13:34  13   constitutional issues in front of the Superior Court or

10:13:37  14   the D.C. Court of Appeals.  This is a serious

10:13:43  15   constitutional issue that Your Honor must address.  And,

10:13:46  16   you know, whether you do it or not is another question,

10:13:48  17   but it's going to go up to the D.C. Circuit again --

10:13:50  18         THE COURT:  I'm not afraid of that, sir.  You

10:13:53  19   keep raising that.  I mean, I've been a judge for

10:13:56  20   43 years, and that comes with the territory.

10:13:58  21         MR. KLAYMAN:  Your Honor, I don't think you

10:13:59  22   need to take that personally.  I'm just making arguments

10:14:01  23   here --

10:14:01  24         THE COURT:  I'm not taking it personally.  I'm

10:14:03  25   just saying you don't have to bring up the fact that

| | | |
|---|---|---|
| 10:14:07 | 1 | it's going to go to the Court of Appeals.  I assume |
| 10:14:09 | 2 | every case I rule on is going to go to the Court of |
| 10:14:11 | 3 | Appeals -- |
| 10:14:11 | 4 | MR. KLAYMAN:  Well, of course, but here's the |
| 10:14:13 | 5 | problem, Your Honor, is that by making your ruling as |
| 10:14:15 | 6 | you make it, you delay what's going on here.  What in |
| 10:14:17 | 7 | effect happened was that this is a stacking proceeding. |
| 10:14:23 | 8 | As Your Honor is aware, I was challenging a prior |
| 10:14:28 | 9 | disciplinary order, and that was in front of Your Honor, |
| 10:14:30 | 10 | in part.  And in that matter, there was a motion for |
| 10:14:35 | 11 | clarification.  There was a delay of nine months.  It |
| 10:14:40 | 12 | virtually mooted out the entire case. |
| 10:14:42 | 13 | When you were reversed by the D.C. Circuit, it went |
| 10:14:45 | 14 | back to you, and you have sat on that for 11 months, |
| 10:14:47 | 15 | okay.  As the same thing happened again in this context, |
| 10:14:51 | 16 | the D.C. Office of Disciplinary Counsel sent out the |
| 10:14:56 | 17 | Board's recommendation -- it wasn't a final order -- to |
| 10:14:59 | 18 | my other -- courts where I'm a member of those courts |
| 10:15:04 | 19 | and those jurisdictions.  They sent it out in a |
| 10:15:08 | 20 | retaliatory, vindictive way. |
| 10:15:11 | 21 | This has taken up time and expense.  It has created |
| 10:15:14 | 22 | uncertainty with my clients, being able to practice law. |
| 10:15:19 | 23 | So time is of the essence.  It's important that we get |
| 10:15:22 | 24 | to the decisions quickly and to make a reasoned |
| 10:15:25 | 25 | decision.  I mean no disrespect for you, Your Honor.  I |

10:15:29  1    do not.  But I have to protect myself.

10:15:31  2         And when I'm talking about stacking, as they waited

10:15:34  3    for the *Sataki* order to come off, to no longer be in

10:15:39  4    effect, and they held back for over four years in

10:15:43  5    issuing a recommendation.  While that case over there in

10:15:48  6    the Superior Court and the Court of Appeals was pending,

10:15:51  7    they didn't have to do that.  They rushed to do that.

10:15:53  8    Because they wanted to institute temporary suspension

10:15:56  9    against me to make sure that I wouldn't have any ability

10:15:58  10   to continue to practice in the District of Columbia, so

10:16:05  11   they stacked it.

10:16:05  12        In a landmark case by the Florida Supreme Court,

10:16:09  13   which is a well-respected bar -- it wins the award every

10:16:11  14   year along with Texas for the way it administers the

10:16:14  15   cases -- *Florida Bar v. Rubin*, they held that that is

10:16:18  16   unethical, illegal, and unfair to a bar -- to a lawyer

10:16:23  17   as a member of the bar.

10:16:25  18        So they're stacking here.  And what they're

10:16:29  19   attempting to do is not only to continue to exclude me

10:16:33  20   in the District of Columbia but to trigger reciprocal

10:16:35  21   proceedings in other courts and jurisdictions where I'm

10:16:38  22   a member of the court and the bar.  That's extremely

10:16:42  23   costly and time-consuming, and it, again, prevents me

10:16:48  24   from practicing law.  Given what the D.C. Bar has done

10:16:52  25   over these years, it takes up -- and I'm going to

10:16:55  1    testify to this -- approximately 60 percent of my time

10:16:58  2    and my associate's time -- and I'm a sole practitioner

10:17:03  3    with one associate -- in dealing with these issues to

10:17:08  4    preserve my right to practice law.

10:17:09  5        I have been a member in good standing of the

10:17:11  6    Florida Bar for well over 48 years -- going on 48 years.

10:17:18  7    I was a member in good standing of this bar for many,

10:17:22  8    many years as well, and still am a member of this bar,

10:17:26  9    and I deserve to have my rights fully litigated and

10:17:30 10    respected.

10:17:31 11        And this is why I want to be able to take the

10:17:35 12    witness stand, and I deserve and have the right to take

10:17:38 13    the witness stand to take Your Honor through those facts

10:17:46 14    and law which apply to this case.

10:17:48 15        Now, let me deal with something specifically that

10:17:50 16    you're mentioning.  It's not, again, in all due respect,

10:17:58 17    a way out, to shorten this proceeding.  However, it

10:18:00 18    needs -- it would need to proceed expeditiously by

10:18:04 19    saying the issue was decided in another court.  That

10:18:07 20    issue was dealing with Rule 1.2, which is --

10:18:12 21        THE COURT:  You had the opportunity to raise

10:18:13 22    the issue that you seek to raise here in that proceeding

10:18:17 23    also.

10:18:19 24        MR. KLAYMAN:  Well, I raised it here because

10:18:21 25    this Court is under the jurisdiction of the D.C.

10:18:23    1    Circuit.

10:18:23    2            THE COURT:  Yeah, but you could have raised it

10:18:25    3    over there.

10:18:26    4            MR. KLAYMAN:  The fact that I could have done

10:18:27    5    something --

10:18:28    6            THE COURT:  It seems to me you can't piecemeal

10:18:30    7    your litigation by only raising certain issues before a

10:18:34    8    state court and then -- when you had the ability to

10:18:36    9    raise those issues in that court also, and then come

10:18:40    10   over here after you don't prevail in state court and

10:18:43    11   then raise an issue that you could have raised over

10:18:46    12   there.

10:18:46    13           MR. KLAYMAN:  No, that's not accurate, Your

10:18:48    14   Honor.  I have the right to be in front of this Court.

10:18:50    15   I have an absolute right to be in front of this Court.

10:18:53    16   And I did it timely.  And -- let me give you the

10:18:55    17   timeline for that.

10:18:57    18      This Court is under the jurisdiction of D.C.

10:18:59    19   Circuit.  Over there, they're dealing with a court

10:19:03    20   system which is inherently compromised because you're

10:19:07    21   asking the D.C. Court of Appeals to rule on its own

10:19:10    22   conduct, which has already refused to stay this action

10:19:15    23   pending the other case in state court.  They would not

10:19:19    24   stay it.  And they wouldn't stay it with regard to this

10:19:21    25   case either.  I asked them to stay it.  They wouldn't.

10:19:25  1        They predetermined their decision.  They don't

10:19:27  2    believe that their rules need to be enforced.  Their

10:19:34  3    rules are enforced depending on who the litigant is in

10:19:38  4    front of them.  We're talking about almost half a

10:19:41  5    decade.  And the prejudice to me constitutionally is

10:19:45  6    that I have now been subjected to this proceeding when

10:19:50  7    in fact the statute is clear.

10:19:54  8        The statute is clear because it states the Hearing

10:19:58  9    Committee's report should be filed with the Board not

10:20:00  10   later than 120 days following the conclusion of this

10:20:04  11   hearing.

10:20:05  12       "Shall," not "may."  Shall, not may.

10:20:08  13       And we cite a number of cases in our briefs, and I

10:20:11  14   hope Your Honor has an opportunity to look --

10:20:14  15           THE COURT:  I have looked at it.  The Court of

10:20:17  16   Appeals said that -- contrary to your position, that

10:20:18  17   that is not a mandatory requirement.  That's what

10:20:21  18   they --

10:20:23  19           MR. KLAYMAN:  They said that in other cases.

10:20:25  20   First of all, the first case --

10:20:25  21           THE COURT:  Those other cases are still

10:20:27  22   controlling.

10:20:27  23           MR. KLAYMAN:  They're not controlling at all.

10:20:29  24   Let me tell you why.  *Morrell*, which was only a

10:20:33  25   four-month delay, occurred with a rule that was

10:20:35  1    promulgated by the Board itself.

10:20:39  2          Then, the Court of Appeals, to allow for more time,

10:20:44  3    changed the rule and promulgated itself and made it

10:20:47  4    120 days.  Didn't say "may."  It said "shall."  Under

10:20:52  5    the rules of statutory construction, and we cite a lot

10:20:54  6    of cases, that governs when the language is clear.

10:20:58  7    There was no ambiguity to that.

10:21:00  8          And that's also true of the other cases.  They were

10:21:03  9    all under the old rule, not the new rule of the D.C.

10:21:07  10   Court of Appeals.

10:21:08  11         You're not telling me, Your Honor, that the D.C.

10:21:10  12   Court of Appeals doesn't have to enforce its own rules.

10:21:13  13   And the fact that it won't --

10:21:15  14         THE COURT:  I'm not saying that, but what I'm

10:21:17  15   saying is that I don't see how I, as a federal judge,

10:21:21  16   have authority to usurp the authority of the local court

10:21:30  17   system to control the practice of law in the District of

10:21:36  18   Columbia.

10:21:36  19         MR. KLAYMAN:  You're not controlling -- you're

10:21:40  20   not --

10:21:40  21         THE COURT:  I mean, I don't know of any

10:21:42  22   situation where a federal court has basically taken over

10:21:47  23   and -- the responsibility of policing lawyers who

10:21:52  24   practice and who are authorized to practice in a

10:21:57  25   particular jurisdiction.

10:21:58  1          MR. KLAYMAN:  When there's a constitutional

10:22:00  2     violation involved --

10:22:00  3          THE COURT:  But you had the opportunity --

          4          MR. KLAYMAN:  -- the *Rooker* --

10:22:01  5          THE COURT:  -- to raise that constitutional

10:22:04  6     violation over there.  And a state court is just as

10:22:08  7     classified to address constitutional issues as are

10:22:10  8     appellate --

10:22:12  9          MR. KLAYMAN:  And I have the right to

10:22:14  10    exhaust -- I have the right to exhaust my remedies over

10:22:16  11    there, but this Court is -- the D.C. Court of Appeals is

10:22:20  12    conflicted in this case because -- and it's evidenced by

10:22:22  13    the fact that they wouldn't even grant a stay while

10:22:26  14    litigation over in the state court was pending.

10:22:29  15       Why not?  What was the harm to the Court, Your

10:22:32  16    Honor?  There was no harm in that.

10:22:34  17       Here's the hard fact, Your Honor, and I'll just be

10:22:37  18    blunt, okay?  The District of Columbia -- and you can

10:22:40  19    look at the composition of the Board on Professional

10:22:45  20    Responsibility.  You can look at the composition of the

10:22:48  21    Court.  They are all of a political and ideological

10:22:51  22    bent, which is 180 degrees from mine and many other

10:22:55  23    lawyers that have been subject to disciplinary

10:22:57  24    proceedings.

10:22:57  25       And I'm going to present evidence to that effect.

10:23:00 1    I'm talking about Kellyanne Conway.  I'm talking

10:23:02 2    about former Attorney General Bill Barr.  I'm talking

10:23:06 3    about former Deputy Attorney General and Mayor of New

10:23:12 4    York City, Rudy Giuliani, who has been disbarred.  I'm

10:23:13 5    talking about Jeffrey Clark.  I'm talking about Senators

10:23:17 6    Josh Hawley and Ted Cruz.

10:23:20 7    This system here, to be direct, has been

10:23:24 8    weaponized, which is exactly why now there's a new

10:23:26 9    division created at the Department of Justice to look

10:23:29 10    into that, which will be headed by Ed Martin in that

10:23:34 11    regard.  And he, himself, has been retaliated against

10:23:39 12    with two bar complaints by this disciplinary counsel.

10:23:44 13    Let me also be direct.  This used to be a fair

10:23:46 14    disciplinary counsel when it was under Wallace "Gene"

10:23:51 15    Shipp.  Everything changed when Hamilton Fox became the

10:23:55 16    Bar counsel; highly partisan.  There is not one person

10:23:59 17    in the D.C. Bar disciplinary apparatus -- not that they

10:24:04 18    have to -- has given one cent to a Republican candidate

10:24:10 19    yet.

10:24:11 20    Most of them had given -- in fact, all of them have

10:24:13 21    given -- nearly all of them have given to Democrat

10:24:17 22    candidates, including people that I have sued in my

10:24:20 23    public interest capacity, including President Clinton,

10:24:23 24    President Obama, and President Biden.

10:24:26 25    This is a weaponized system, Your Honor.  And when

10:24:30  1    that happens and when there's selective prosecution and

10:24:34  2    viewpoint discrimination, I have a right to come to a

10:24:37  3    federal court.  A federal court is in control in

10:24:41  4    determining what the Constitution requires, particularly

10:24:44  5    when it's under and you are under, Your Honor, the arm

10:24:46  6    of the D.C. Circuit, which has made it clear in *Douglass*

10:24:49  7    that this is not tolerated.

10:24:51  8        So while I was timely in coming to this Court

10:24:53  9    because I tried to exhaust remedies at the lower court,

10:24:56  10   but that wasn't possible, I couldn't even get a stay, I

10:24:59  11   have a right to be here now.  And there's about ready to

10:25:03  12   be damage -- significant damage done to me.

10:25:06  13       I have shown a likelihood of success with regard to

10:25:12  14   Rule 1.2, going over by half a decade, causing prejudice

10:25:21  15   to me, which is not just the stacking, but what's going

10:25:25  16   to happen in terms of cascading effect and what has

10:25:28  17   happened to damage my law practice, my colleagues, and

10:25:30  18   my family, is significant irreparable injury.  But even

10:25:35  19   more important than that, you have *United States v.*

10:25:37  20   *Mills* [sic], which says when there's an abridgement of

10:25:41  21   constitutional rights for even one minute, that is

10:25:43  22   irreparable harm per se, in and of itself.  So I've

10:25:47  23   demonstrated that.

10:25:49  24       Public interest, there's a public interest here

10:25:50  25   because members of this Bar, of which I remain a proud

| | | |
|---|---|---|
| 10:25:55 | 1 | member, notwithstanding my views about disciplinary |
| 10:25:59 | 2 | counsel and the way they have behaved is -- public |
| 10:26:04 | 3 | interest is ripe for Bar members to feel that the rules |
| 10:26:08 | 4 | promulgated by the Court of Appeals have meaning, that |
| 10:26:12 | 5 | they just can't be changed depending on who you are. |
| 10:26:15 | 6 | They have a right to rely on them. |
| 10:26:17 | 7 | There's no harm to the Bar in terms of granting the |
| 10:26:20 | 8 | preliminary injunction allowing this matter to be fully |
| 10:26:23 | 9 | litigated, but there's significant harm to me, not just |
| 10:26:26 | 10 | under *Mills* but actual harm. |
| 10:26:29 | 11 | And they rest on the *Rooker-Feldman* doctrine, which |
| 10:26:33 | 12 | is a very, very limited doctrine and does not preclude |
| 10:26:37 | 13 | an action by a federal court to enjoin a state court if |
| 10:26:42 | 14 | it's violating a federal court order. |
| 10:26:44 | 15 | And here's the bottom line: *Douglass* is a federal |
| 10:26:47 | 16 | court order. *Douglass* comes from the D.C. Circuit. You |
| 10:26:52 | 17 | have a duty to enforce what the D.C. Circuit has said |
| 10:26:57 | 18 | and has ruled. And that duty cannot be shirked. That |
| 10:27:03 | 19 | duty has to be addressed. |
| 10:27:04 | 20 | So that is a very, very important aspect of what's |
| 10:27:08 | 21 | going on. And I would ask -- it's not just me -- yes, |
| 10:27:15 | 22 | I've submitted an affidavit. I want to testify. I want |
| 10:27:18 | 23 | to put forth on the record the facts as to why there's |
| 10:27:22 | 24 | viewpoint discrimination here, but I would also ask for |
| 10:27:24 | 25 | leave to submit an affidavit from Professor Alan |

08:40:48  1    Dershowitz, who is a constitutional scholar, as Your

10:27:31  2    Honor knows.  He's not of the same ideological bent as

10:27:33  3    me, but he has a high degree of integrity and honesty,

10:27:37  4    so I would ask to be able to submit that affidavit as

10:27:39  5    well.

10:27:39  6        I had hoped that he could be here today, but he

10:27:42  7    could not for various reasons.  But that's what I'm

10:27:47  8    seeking to do, Your Honor.

10:27:48  9        What happened to me and is happening to me is

10:27:51  10   substantially similar to what happened to others in

10:27:56  11   front of this Court who are not in my ideological and

10:28:00  12   political bent.  Let me give you three examples.  It's

10:28:03  13   in the pleadings.

10:28:05  14       Number one, Kevin Clinesmith.  Kevin Clinesmith,

10:28:09  15   who just happened to be represented cleverly by the

10:28:12  16   former member of the board, Board on Professional

10:28:17  17   Responsibility, was able to not even be sanctioned to

10:28:24  18   any great degree -- time served, seven months.  Having

10:28:27  19   been convicted of a felony, of lying in an affidavit

10:28:31  20   which triggered the Russian collusion investigation in

10:28:34  21   large part, he gets off with a slap of a wrist.

10:28:39  22       No reinstatement provision.  Seven months.  Time

10:28:42  23   served.  He didn't even file an affidavit.  They gave

10:28:45  24   him the right to be -- not to be temporarily suspended.

10:28:49  25   That's a fact.

10:28:50  1        Then we have the situation with Marc Elias.  Marc

10:28:56  2   Elias, who is found by Special Counsel Durham to have

10:29:03  3   participated in a money laundering scheme to money

10:29:08  4   launder to Christopher Steele, which also -- on behalf

10:29:10  5   of Hillary Clinton, and then lying about it.  He lied

10:29:14  6   about it.

10:29:15  7        The D.C. Bar doesn't take that up at all.  It was

10:29:18  8   all over the news.  But that's fine because he's a

10:29:21  9   Democrat and a leftist.  It's okay for them.  They can

10:29:24  10  do whatever they want.  No consequence.

10:29:26  11       Then you have the situation of David Kendall, who

10:29:33  12  admittedly helped Hillary Clinton destroy 33,000 emails

10:29:39  13  on her private server.

10:29:40  14       A lawyer, Ty Clevinger, files a complaint, a public

10:29:45  15  advocate, and that's thrown in the trash, literally.  No

10:29:48  16  action at all.  Kendall happens to represent the

10:29:51  17  Clintons and Democrats and leftist clients.

10:29:55  18       So there is a huge dichotomy here, Your Honor, in

10:29:58  19  the way the law is enforced, and Your Honor has to

10:30:02  20  address it.  And you can't just say, okay, it was in

10:30:05  21  front of another court because Your Honor has a duty to

10:30:09  22  seriously review this matter here.

10:30:13  23       THE COURT:  Okay.  I think I understand your

10:30:14  24  position.  Let me --

10:30:14  25       MR. KLAYMAN:  I would like to take the witness

10:30:16  1    stand.

10:30:16  2           THE COURT:  Let me hear from the defendants.

10:30:22  3           MR. KLAYMAN:  By the way, let me give you

10:30:24  4    this --

10:30:24  5           THE COURT:  First I'll hear from counsel for --

10:30:28  6           MR. KLAYMAN:  They were served, and I'll

10:30:30  7    present that as evidence.

10:30:31  8           THE COURT:  -- counsel for the Court of Appeals

10:30:32  9    who says that --

10:30:34  10           MR. KLAYMAN:  And that was the --

10:30:35  11           THE COURT:  Counsel, I'm talking, please.  I

10:30:37  12    gave you the respect of listening to you.  When I start

10:30:40  13    talking, please.

10:30:41  14       I'll hear from counsel for the Court of Appeals who

10:30:45  15    says that the Court was not appropriately served with

10:30:48  16    process.

10:30:49  17           MS. KRUPKE:  Good morning, Your Honor.

10:30:54  18       Plaintiff Klayman has filed an affidavit of service

10:30:58  19    stating that an A. Jefferson was served on May 15, 2025.

10:31:05  20    It's my understanding that the attempted service in this

10:31:09  21    case was brought to the public office of the D.C. Court

10:31:13  22    of Appeals.

10:31:13  23           THE COURT:  Who is that person?

10:31:16  24           MS. KRUPKE:  A. Jefferson.  I don't actually

10:31:18  25    know this person's first name, but it's my understanding

10:31:20  1    they work in the public office of the District of

10:31:24  2    Columbia Court of Appeals.  And that this person is not

10:31:26  3    authorized to accept service, that the Office of --

10:31:28  4            THE COURT:  Who is authorized to accept service

10:31:30  5    on behalf of the Court?

10:31:32  6            MS. KRUPKE:  The Office of General Counsel at

10:31:33  7    the Court.

10:31:35  8            THE COURT:  And is there something in writing

10:31:37  9    to that effect?

10:31:39  10           MS. KRUPKE:  Not that I have in front of me.

10:31:42  11   I've -- that's my understanding --

10:31:43  12           THE COURT:  How would I know that that's the

10:31:45  13   appropriate -- that that's the person who has to be

10:31:48  14   served?

10:31:49  15           MS. KRUPKE:  I don't have anything to submit,

10:31:51  16   Your Honor, on that regard.

10:31:55  17           THE COURT:  Then I don't know how I can rule in

10:31:57  18   your favor, then.  I mean, if it was given to somebody

10:31:59  19   at the Court and you can't tell me that there's somebody

10:32:02  20   else who it should have been given to because they're

10:32:04  21   the person who appropriately has to be served, I don't

10:32:08  22   see how I conclude that there was an appropriate

10:32:11  23   service.

10:32:11  24           MS. KRUPKE:  Well, here, Your Honor, it's not

10:32:13  25   even an entire time.  As Your Honor has just stated,

10:32:15  1    it's just A. Jefferson, and so I'm at this hour trying

10:32:19  2    to determine who A. Jefferson is and --

10:32:21  3         THE COURT:  I thought you said somebody by that

10:32:24  4    name does work somewhere in the Court of Appeals.

10:32:27  5         MS. KRUPKE:  I have been in contact with the

10:32:29  6    Court of Appeals, and there does appear to be someone

10:32:32  7    who has that initial and last name who works at the

10:32:35  8    Court of Appeals but that that person -- that the actual

10:32:39  9    document was received by the public office rather than

10:32:43  10   the general counsel.

10:32:45  11        THE COURT:  Yeah, but you're not showing me

10:32:47  12   anything that says it has to be the general counsel who

10:32:50  13   has to be served in order for the Court to be

10:32:52  14   appropriately served.

10:32:54  15        MS. KRUPKE:  No, Your Honor, I don't at this

10:32:56  16   time.  When we filed the opposition, this affidavit of

10:32:59  17   service had not been on the record, and so we didn't

10:33:01  18   have the opportunity to explore and -- then it was filed

10:33:03  19   after the close of business on Friday.

10:33:05  20       So this morning we've been trying to explore this

10:33:07  21   affidavit of service, but given that it was just filed

10:33:11  22   on a holiday weekend, we were not able to do so before

10:33:15  23   coming before Your Honor other than to confirm, as best

10:33:19  24   I could, that this person appears to work in the public

10:33:22  25   office.

| | | |
|---|---|---|
| 10:33:23 | 1 | I do also want to note, Your Honor -- |
| 10:33:25 | 2 | THE COURT:  There's some discrepancy as to when |
| 10:33:28 | 3 | the Court of Appeals is going to hear Mr. Klayman's |
| 10:33:32 | 4 | case, whether it's the 28th or the 29th. |
| 10:33:35 | 5 | Which day is it? |
| 10:33:37 | 6 | MS. KRUPKE:  I believe it was the 28th, but -- |
| 10:33:40 | 7 | THE COURT:  Mr. Klayman, which -- |
| 10:33:41 | 8 | MR. KLAYMAN:  The 29th, Your Honor.  Initially, |
| 10:33:43 | 9 | it was the 28th. |
| | 10 | THE COURT:  Okay. |
| 10:33:44 | 11 | MR. KLAYMAN:  And they changed it to the 29th. |
| 10:33:46 | 12 | MS. KRUPKE:  I do also want to note, Your |
| 10:33:48 | 13 | Honor, that the Court of Appeals is non sui juris, so at |
| 10:33:51 | 14 | this point even if service was effective, that has been |
| 10:33:54 | 15 | brought against a party that is not able to be served. |
| 10:33:57 | 16 | THE COURT:  So it should have been the City. |
| 10:34:00 | 17 | MS. KRUPKE:  The District of Columbia -- |
| 10:34:01 | 18 | THE COURT:  Right. |
| 10:34:04 | 19 | MS. KRUPKE:  -- should not be substituted here. |
| 10:34:07 | 20 | That is our position.  But that would be the |
| 10:34:08 | 21 | appropriate -- at least an appropriate party to sue. |
| 10:34:11 | 22 | The District of Columbia Court of Appeals just |
| 10:34:14 | 23 | cannot be sued in its individual capacity as a |
| 10:34:17 | 24 | corporation. |
| 10:34:19 | 25 | THE COURT:  But if the Court of Appeals |

| | | |
|---|---|---|
| 10:34:21 | 1 | theoretically was found liable for damages, for example, |
| 10:34:25 | 2 | would it be the city that would pay those damages? |
| 10:34:28 | 3 | MS. KRUPKE:  So the Court of Appeals typically |
| 10:34:32 | 4 | would be dismissed as a party if there was proper |
| 10:34:35 | 5 | service.  And the District of Columbia is an appropriate |
| 10:34:39 | 6 | entity to sue here, but in order to do that, to make out |
| 10:34:43 | 7 | a Section 1983 violation, the plaintiff would have to |
| 10:34:46 | 8 | make a Monell claim for liability because, of course, |
| 10:34:49 | 9 | the District of Columbia cannot just generally be sued |
| 10:34:53 | 10 | for its actions. |
| 10:34:57 | 11 | THE COURT:  Okay. |
| 10:34:58 | 12 | MR. KLAYMAN:  May I address that briefly, Your |
| 10:35:00 | 13 | Honor? |
| 10:35:00 | 14 | THE COURT:  One moment.  Let me -- is that your |
| 10:35:02 | 15 | argument?  You're finished, on the issue of service? |
| 10:35:05 | 16 | MS. KRUPKE:  On the issue of service, yes. |
| 10:35:08 | 17 | THE COURT:  Yes. |
| 10:35:09 | 18 | MR. KLAYMAN:  If I may.  I made several |
| 10:35:14 | 19 | attempts prior to that to get the Court to accept |
| 10:35:17 | 20 | service of process.  In any event -- and I'm going to |
| 10:35:23 | 21 | ask that this be admitted as Exhibit 1. |
| 10:35:26 | 22 | May I approach the bench and give it to you, or |
| 10:35:29 | 23 | give it to your assistant? |
| | 24 | (Document tendered) |
| 10:35:39 | 25 | MR. KLAYMAN:  Attached is an affidavit of |

10:35:40  1    service and emails showing attempted service amicably by

10:35:44  2    accepting service, which the Court wouldn't do -- or

10:35:47  3    couldn't do, or whatever their excuse was at the time.

10:35:50  4        And it's hard to understand that a Court would not

10:35:52  5    accept responsibility to accept service of process.  But

10:35:56  6    in any event, Michael Weaver, the private process

10:36:02  7    server, his affidavit, states that:

10:36:04  8        "Being duly sworn, deposed, and say that I have

10:36:06  9    been duly authorized to make service of the summons,

10:36:09  10   notice, consent, and reference of the civil action to a

10:36:12  11   magistrate judge, notice of right to consent to trial

10:36:15  12   before a United States magistrate judge.  And also

10:36:18  13   importantly, plaintiff's motion for preliminary

10:36:21  14   injunction and exhibits and complaint and exhibits in

10:36:23  15   the above-entitled case, that I am over 18 years of age,

10:36:27  16   and not a party or otherwise interested in this action;

10:36:30  17       "That on May 15th, 2025 -- that's a week ago -- I

10:36:35  18   served District of Columbia Court of Appeals at 430 E

10:36:39  19   Street Northwest, Washington, D.C., with a summons,

10:36:41  20   notice, consent in reference of a civil action to a

10:36:45  21   magistrate judge, notice of right to consent to trial

10:36:48  22   before a United States magistrate judge, and

10:36:51  23   importantly, plaintiff's motion for preliminary

10:36:53  24   injunction with exhibits and complaint by serving A.

10:36:57  25   Jefferson, Clerk -- Clerk -- authorized to accept

10:37:00  1    service" --

10:37:01  2            THE COURT:  Counsel for the government wasn't

10:37:03  3    able to tell me what authority says who has to be served

10:37:08  4    in order for the Court of Appeals to be appropriately

10:37:12  5    served.

10:37:12  6        Do you know something in the law that says where

10:37:16  7    service has to be effected in order to appropriately --

10:37:19  8            MR. KLAYMAN:  Not with regard to the Court, no.

10:37:21  9    And, again, this says that the Clerk of the Court -- she

10:37:26  10   obviously had to get permission to accept service -- was

10:37:29  11   authorized to accept service; the Clerk of the Court.

10:37:29  12       That can't -- you can't get better than that.

10:37:31  13           THE COURT:  Was the Clerk served?

10:37:33  14           MR. KLAYMAN:  Yes, that's what it says.

10:37:35  15       "A. Jefferson, Clerk, authorized to accept

10:37:40  16   service."

10:37:40  17       You can't get more direct than that, Your Honor.

10:37:46  18       Right at the bottom.  And then he describes the

10:37:50  19   physical appearance of Ms. Jefferson, "signed under

10:37:55  20   penalty of perjury."

10:38:15  21           THE COURT:  I'm sorry, but I'm missing where

10:38:18  22   you're saying somebody in the Clerk's Office was served.

10:38:21  23           MR. KLAYMAN:  Yeah, look at the fourth -- where

10:38:23  24   it says Michael Weaver up top:  "I, Michael Weaver,"

10:38:27  25   second paragraph.  Third paragraph, "I'm over the age of

10:38:30  1    18."  And, Your Honor, please read the third paragraph

10:38:32  2    there, that "on May 15th, 2025."

10:38:40  3         THE COURT:  Michael Weaver is the process

10:38:43  4    server.

10:38:45  5         MR. KLAYMAN:  Correct.

10:38:45  6         THE COURT:  I'm asking about who in the Clerk's

10:38:49  7    Office, if you're saying it was somebody in the Clerk's

         8    Office --

         9         MR. KLAYMAN:  Yes.

10:38:51  10        THE COURT:  -- was served.

10:38:52  11        MR. KLAYMAN:  Yes, in the third paragraph.

10:38:53  12    The Clerk -- "A. Jefferson, Clerk, was authorized

10:38:56  13    to accept service."  That says that in the next

10:38:59  14    paragraph.  I'll read it again.

10:39:00  15    "That on May 15th, 2025, at 2:59 p.m., I served the

10:39:06  16    District of Columbia Court of Appeals at 430 E Street

10:39:10  17    Northwest, Washington, D.C., 20001, with a summons,

10:39:14  18    notice, consent in reference of the civil action to --

10:39:17  19        THE COURT:  How do I know that this A.

10:39:19  20    Jefferson was in fact authorized to accept service on

10:39:23  21    behalf of the Court?

10:39:25  22        MR. KLAYMAN:  Because she told the process

10:39:27  23    server to that effect, and he's saying he went to the

10:39:30  24    Court and he served it upon her, and she told him that

10:39:33  25    she was authorized to accept service.

10:39:36    1                    THE COURT:  Where does it say that?

10:39:38    2                    MR. KLAYMAN:  At the bottom.

10:39:41    3            It says served with all these things, including the

10:39:44    4      preliminary injunction motion by serving -- last line of

10:39:47    5      that paragraph -- "A. Jefferson, Clerk, authorized to

10:39:50    6      accept service."

10:39:57    7                    THE COURT:  How do I know that she was

10:39:58    8      authorized to accept service?

10:40:01    9                    MR. KLAYMAN:  Because she told the process

10:40:03   10      server that.

10:40:03   11                    THE COURT:  This doesn't say that.

10:40:05   12                    MR. KLAYMAN:  Yes, it does.

10:40:10   13                    THE COURT:  It says -- it doesn't say that she

10:40:14   14      was authorized to accept.

10:40:15   15                    MR. KLAYMAN:  Your Honor, we can play semantics

10:40:17   16      here but the fact is --

10:40:19   17                    THE COURT:  I'm not trying to play semantics,

10:40:21   18      sir.  I'm just saying there's nothing here that says

10:40:24   19      that she said that she was authorized to accept service

10:40:27   20      on behalf of the Court.  That doesn't say that here.

10:40:30   21                    MR. KLAYMAN:  What it says is -- well, process

10:40:32   22      servers in the ordinary course ask if you're able to

10:40:36   23      accept service.  He went there --

10:40:37   24                    THE COURT:  That doesn't say that.

10:40:38   25                    MR. KLAYMAN:  And he didn't --

10:40:40  1          THE COURT:  That does not say that here.

10:40:42  2   You're asking me to read something into the document

10:40:45  3   that's not here.

10:40:46  4          MR. KLAYMAN:  Well, two reasons why, Your

10:40:48  5   Honor.  With or without acceptance of service, the Court

10:40:50  6   was served.  And that's clear right here, that he went

10:40:52  7   to the courthouse and went to the Clerk's Office --

10:40:54  8          THE COURT:  He just can't serve anybody.  You

10:40:55  9   couldn't go there, for example, and serve a janitor and

10:40:58  10  say that the Court was appropriately served.

10:41:00  11      I have no idea who this person --

10:41:02  12         MR. KLAYMAN:  One way or the other, whether

10:41:04  13  authorization or not -- and I would disagree with you on

10:41:06  14  that -- the Clerk was served.  There's the name of the

10:41:08  15  person, she was given the complaint, and importantly,

10:41:10  16  she was given the preliminary injunction motion.  The

10:41:12  17  Clerk was given the preliminary injunction motion

10:41:15  18  because -- and they had notice of it.  And that's all

10:41:19  19  that's required at this stage is notice, to be here and

10:41:22  20  to argue.

10:41:23  21      But let me also point out in terms of the relief.

10:41:25  22  The relief is requesting you, in addition to enjoining

10:41:29  23  the Court, which you have the authority to do, by the

10:41:31  24  way, if you look at the *Douglass* case --

10:41:34  25         THE COURT:  That's -- you're going off on a --

10:41:36  1   I've already heard this.  I'm only asking about --

10:41:38  2             MR. KLAYMAN:  We're asking you for --

10:41:39  3             THE COURT:  I'm only asking about whether the

10:41:41  4   Court was appropriately served.  That has nothing to do

10:41:44  5   with service.

10:41:46  6             MR. KLAYMAN:  If I may just add one thing, is

10:41:48  7   that we're asking you to vacate the report and

10:41:50  8   recommendation of the Board and also of the Ad Hoc

10:41:53  9   Hearing Committee because it's unconstitutional.

10:41:56  10            THE COURT:  Counsel, I've heard that.  You can

10:41:57  11  be seated.

10:41:58  12            MR. KLAYMAN:  I wanted to get it on the record,

10:42:00  13  Your Honor.  You know, we can --

10:42:01  14            THE COURT:  I don't know who this person is.

10:42:03  15  The government doesn't seem to know who this person is.

10:42:05  16  So I don't know how I can make a determination that

10:42:08  17  there was appropriate service.

10:42:09  18      The government can't even tell me who can accept

10:42:15  19  service.

10:42:16  20            MR. KLAYMAN:  What I would suggest, Your Honor,

10:42:18  21  as a matter of due process and equity, is that we allow

10:42:21  22  the matter to proceed with the Court right now and Your

10:42:23  23  Honor can order that this issue be clarified to your --

10:42:27  24            THE COURT:  Well, we've got some time.  I

10:42:31  25  mean -- so we could do this later today, but I think I

10:42:34  1    need to know, because I don't have anything before me.

10:42:37  2    I don't know who has to be appropriately served in order

10:42:41  3    for there to be appropriate service.  And clearly, there

10:42:43  4    has to be someone authorized to receive service who

10:42:45  5    received it in order for me to have jurisdiction.

10:42:48  6         So --

10:42:49  7              MR. KLAYMAN:  We made an attempt before that to

10:42:51  8    do that and they just bobbed and weaved and wouldn't

10:42:55  9    accept earlier --

10:42:56  10             THE COURT:  I understand.

10:42:57  11             MR. KLAYMAN:  -- so I had to send the process

10:42:59  12   server.

10:42:59  13             THE COURT:  I understand, but I'm going to be

10:43:01  14   instructing counsel to find out who it is who has to be

10:43:03  15   appropriately served.  I don't know.

10:43:07  16             MR. KLAYMAN:  I think you have to instruct them

10:43:09  17   as well as to whether Ms. Jefferson told the process

10:43:14  18   server that she was authorized to accept.

10:43:16  19             THE COURT:  Well, merely because she says that

10:43:17  20   doesn't make it so.

10:43:19  21             MR. KLAYMAN:  She's not going to do that

10:43:20  22   without getting authorization.  She's the Clerk.

10:43:23  23             THE COURT:  I don't know if that's -- I don't

10:43:24  24   know if she's the Clerk or not.

10:43:26  25        Is she the Clerk?

10:43:28  1          MR. KLAYMAN:  That's what it says.

10:43:29  2          THE COURT:  Well, the government -- I mean,

10:43:30  3  counsel for the -- did you check and see whether this A.

10:43:33  4  Jefferson is the Clerk for the Court of Appeals?

10:43:36  5          MS. KRUPKE:  Your Honor, I --

10:43:39  6          THE COURT:  Come up.  You have to talk from the

10:43:42  7  podium.

10:43:43  8          MS. KRUPKE:  Your Honor, I've made inquiries,

10:43:46  9  and I apologize.  That's why I've been checking my phone

10:43:49  10  so much to see if I've received a response yet as to who

10:43:53  11  A. Jefferson is and if that person would have been

10:43:55  12  authorized to accept service, notwithstanding my prior

10:43:58  13  understanding that the Office of General Counsel is the

10:43:59  14  appropriate entity to serve in order to have service

10:44:02  15  effectuated on the Court of Appeals.

10:44:04  16      And so I --

10:44:05  17          THE COURT:  Is there a general counsel?  Again,

10:44:07  18  I don't know what the structure is for the Court of

10:44:11  19  Appeals.

10:44:11  20          MS. KRUPKE:  Yes --

10:44:11  21          THE COURT:  But there's a general counsel who

10:44:14  22  is a part of the Court of Appeals?

10:44:16  23          MS. KRUPKE:  Yes, there's an Office of General

10:44:18  24  Counsel at the Court that is authorized to accept

10:44:20  25  service.

10:44:20  1        So I have made inquiries, specifically as to A.

10:44:23  2   Jefferson, and I've only been told by one person that

10:44:27  3   that person is not authorized to accept service, but

10:44:29  4   they were going to make additional inquiries to make

10:44:32  5   sure that we weren't making misrepresentations to the

10:44:34  6   Court.

10:44:34  7        I do also just want to point out, though, that

10:44:37  8   under Rule 4(m) of -- I'm sorry, 4(j) of how service is

10:44:41  9   to be effectuated on a state or local government, that

10:44:45  10  the two provisions that it has are 4(j)(A) delivering to

10:44:49  11  the chief executive, which obviously this affidavit of

10:44:53  12  service does not allege that has been done, or 4(j)(B),

10:44:57  13  serving in a manner consistent with the state's local

10:44:59  14  law.

10:45:00  15       Now, under the Superior Court Rules of Procedure of

10:45:02  16  how service would be effectuated on an entity within the

10:45:07  17  District of Columbia government, the entity would need

10:45:10  18  to be served and the Office of the Attorney General

10:45:12  19  would need to be served.  There's been no representation

10:45:14  20  that that service has been made.

10:45:16  21       And so under this kind of amalgamation of the two

10:45:22  22  Rules of Civil Procedure, service would not be proper

10:45:25  23  even if the Clerk was authorized to accept service.

10:45:33  24            THE COURT:  What provision of the D.C. rules

10:45:35  25  are you referencing -- or the rules?

10:45:38  1                    MS. KRUPKE:  I believe it's also 4(j).

          2                    THE COURT:  Of the local --

10:45:42  3                    MS. KRUPKE:  Of the Superior Court Rules of

          4     Civil Procedure.

10:45:46  5                    THE COURT:  Okay.  We'll look at that.

10:45:46  6                    MR. KLAYMAN:  May I add one thing, Your Honor?

10:45:48  7                    THE COURT:  Yes.

10:45:52  8                    MR. KLAYMAN:  Your Honor, I've listened to that

10:45:52  9     argument, and I would submit that does not apply to the

10:45:54  10    Court.  The Court is an independent entity, is that

10:45:56  11    they've had notice of this for a long time.  And we

10:45:59  12    attempted service before; they wouldn't accept.  They

10:46:03  13    were served with a preliminary injunction motion.  They

10:46:06  14    had a duty to come forward with their argument.  They

10:46:09  15    can make their argument today.  Nobody is preventing

10:46:11  16    them from doing it.

10:46:12  17                   THE COURT:  Well, do you have authority that

10:46:14  18    supports what you said, that it's a separate entity and

10:46:18  19    therefore all you need do is serve somebody at the

10:46:22  20    Court?

10:46:24  21                   MR. KLAYMAN:  I'm making the argument that what

10:46:25  22    she cited was dealing mostly with cases against the

10:46:28  23    government itself, not the Court.  And I'm making an

10:46:31  24    argument that they had notice -- they had notice of

10:46:33  25    this.  So they can certainly defend -- you know, they're

10:46:35  1    a public agency that owes a duty to everybody in the

10:46:38  2    District of Columbia and elsewhere.  And the fact that

10:46:41  3    they would make an issue even with service of process

10:46:46  4    frankly underscores my point --

10:46:48  5         THE COURT:  I don't -- Counsel, come on.  I

10:46:50  6    don't buy that.  I mean, the rules are the rules.  And

10:46:51  7    you can't say that just because of the circumstances of

10:46:54  8    a particular case that you can abdicate the rules and do

10:46:57  9    whatever you want.  I mean, if service has to be

10:47:00  10   effected in a certain way, it has to be done in the

10:47:02  11   context of this case just like any other case.

10:47:04  12        So we'll check the rules and we'll get back on that

10:47:08  13   in a minute.

10:47:09  14        Other counsel?

10:47:20  15        MR. MACHADO:  Good morning, Your Honor.  Again,

10:47:21  16   Les Machado on behalf of the Board defendants.

10:47:24  17        I'm just going to be very brief because I think

10:47:26  18   this has been fully fleshed out in the papers.

10:47:29  19        Your Honor has picked up on exactly the right issue

10:47:33  20   from the *Rooker-Feldman* doctrine.  Mr. Klayman went to

10:47:36  21   the Superior Court and he asked that Superior Court for

10:47:38  22   the exact relief that he's seeking from this Court.

10:47:40  23        He said to that court, the Board issued -- the

10:47:42  24   Board Hearing Committee issued the report and

10:47:45  25   recommendation beyond the time frames required by the

10:47:47   1    rules and therefore you need to sort of set it aside.

10:47:50   2          THE COURT:  But he says the issue he wants to

10:47:51   3    raise here is a constitutional issue based upon the

10:47:54   4    First Amendment.  He did not raise it over there, but

10:47:58   5    he's saying he should have a right to raise it here even

10:48:01   6    though he clearly could have raised it there because

10:48:04   7    case authority clearly says that a constitutional issue

10:48:07   8    can be raised both in state court and in the federal

10:48:11   9    court.

10:48:12   10         MR. MACHADO:  I understand his argument, Your

10:48:14   11   Honor, but you're exactly right, which is that is an

10:48:16   12   argument that could have been raised in the federal

10:48:18   13   court and should have been raised in the federal court.

10:48:21   14         THE COURT:  You mean in the --

10:48:23   15         MR. MACHADO:  Excuse me, in the state court.  I

          16   apologize.

10:48:26   17      And in fact, the *Rooker-Feldman* doctrine speaks

10:48:29   18   exactly to this topic.  It says, essentially -- and let

10:48:32   19   me find the right citation here, Your Honor -- "it

10:48:36   20   precludes a party in state court from seeking what is in

10:48:39   21   substance an appellate review of the state court

10:48:42   22   judgment in a United States District Court based on the

10:48:45   23   losing party's claim that the state judgment itself

10:48:48   24   violates the loser's federal rights.

10:48:51   25      That's *Johnson v. De Grande*, Supreme Court case

38

10:48:56  1    from 1994 that we cited in our motion to dismiss.

10:48:58  2        It prevents courts from hearing suits, quote,

10:49:00  3    "brought by state court losers complaining of injuries

10:49:05  4    caused by state court judgments rendered before the

10:49:06  5    District Court proceedings commenced and inviting the

10:49:09  6    District Court review and rejection of those

10:49:11  7    judgments."  That's the *Exxon Mobile* case from 2005,

10:49:14  8    Supreme Court.

10:49:14  9        It's exactly what's going on here.  He went to the

10:49:18  10   Superior Court, he said set aside the Board's Hearing

10:49:21  11   Committee because it was issued beyond these time

10:49:23  12   frames.  He lost that.  He appealed that.  He lost

10:49:26  13   again.  And in the interim, he came to this court

10:49:29  14   repackaging it as a violation of my federal rights.

10:49:32  15       You can't do that.  It would mean every plaintiff

10:49:35  16   who lost in state court could come to federal court and

10:49:38  17   say, "My First Amendment rights are being violated," and

10:49:41  18   "My Fifth Amendment rights are being violated," and you

10:49:43  19   get another bite of the apple.

10:49:45  20       And so whether you look at it as claim spinning,

10:49:47  21   which is I think what Your Honor was alluding to, which

10:49:49  22   is, you know, I'm going to bring some arguments there

10:49:51  23   and preserve other arguments for federal court --

10:49:53  24   whether you look at it as a second bite of the apple,

10:49:56  25   the fact at the end of the day is that the

39

10:49:59  1    *Rooker-Feldman* doctrine prevents him from doing exactly

10:50:02  2    what he wants to do here.  And try as he might to say,

10:50:05  3    well, this is really about my federal constitutional

10:50:07  4    rights, we're here today because he's seeking the

10:50:10  5    identical relief he sought in the state court.

10:50:13  6         He said to the state court, "Stop the disciplinary

10:50:17  7    proceeding from -- the *Bundy* disciplinary proceeding

10:50:21  8    from going on because the Hearing Committee report and

10:50:23  9    recommendation was issued beyond the 120 days.  It is

10:50:27  10   exactly the same relief he is seeking from you.  And try

10:50:30  11   as he might to dance around the topic, *Rooker-Feldman*

10:50:33  12   bars that.

10:50:34  13        Setting that --

10:50:34  14             THE COURT:  As I understand, that issue did go

10:50:37  15   up to the Court of Appeals?

10:50:38  16             MR. MACHADO:  It did, Your Honor.  It was

10:50:40  17   appealed to the D.C. Court of Appeals.  And then last

10:50:42  18   month they issued an order affirming the dismissal of

10:50:44  19   the Superior Court decision.  But, notably, for purpose

10:50:47  20   of what we're doing today, acknowledging that

10:50:50  21   Mr. Klayman has raised issues about that 12(b)(2) rule.

10:50:55  22        Is it mandatory?  Is it discretionary?  What

10:50:58  23   happens if it's violated?

10:50:59  24        And they essentially said, "We're going to take

10:51:01  25   these up when we -- when we take up the Bundy

10:51:07  1    disciplinary matter."  They acknowledged he had brought

10:51:09  2    up these arguments.  They acknowledged that those

10:51:10  3    arguments had been fully fleshed out in the briefing at

10:51:13  4    that disciplinary matter.

10:51:14  5        He's regurgitated all of those arguments in his

10:51:18  6    briefing to the D.C. Court of Appeals, and they

10:51:19  7    essentially said, this is all going to be a part of the

10:51:21  8    argument that's going to happen on the 29th.

10:51:23  9        And so for him to come to this Court and say,

10:51:26  10   without any factual support, "Well, the D.C. Court of

10:51:29  11   Appeals has prejudged the outcome," it just -- he has

10:51:35  12   not come close to satisfying the standard for a

10:51:37  13   preliminary injunction.

10:51:37  14       THE COURT:  What did -- the Court of Appeals,

10:51:42  15   you're saying, said that they were going to consider the

10:51:44  16   rule and whether that was violated by the delay in a

10:51:47  17   proceeding with his disciplinary matter, but I assume

10:51:51  18   they didn't because it wasn't raised, say that they were

10:51:53  19   going to take up the constitutional issue.

10:51:56  20       MR. MACHADO:  I don't -- I don't -- they

10:52:00  21   certainly did not say that in the opinion affirming the

10:52:03  22   Superior Court's denial.  So I don't know how broad that

10:52:08  23   consideration of that issue is going to be.  What I know

10:52:10  24   is what the -- what I know is what the D.C. Court of

10:52:16  25   Appeals' opinion said, and -- what the D.C. Court of

10:52:24  1    Appeals' opinion said.

10:52:27  2            THE COURT:  Okay.  Anything else?  I'm going to

10:52:30  3    go look at this rule that was referenced.

10:52:32  4            MR. MACHADO:  Yeah, I understand, Your Honor,

10:52:33  5    that, you know, there's obviously four factors.  We

10:52:35  6    know -- there's a likelihood of success.  We don't think

10:52:38  7    he can satisfy that.  There's the irreparable harm.  We

10:52:40  8    don't think they can satisfy that.

10:52:41  9        Again, just briefly on that, Mr. Klayman is

10:52:43  10   essentially saying without any factual support, the D.C.

10:52:48  11   Court of Appeals has prejudged his arguments.  They've

10:52:51  12   not.  There's no evidence of that.

10:52:52  13       He said, Well, it's going to cause me time and

10:52:57  14   energy and money to have to deal with this discipline in

10:53:00  15   other jurisdictions.  In our opposition to his motion

10:53:03  16   for a PI we, of course, cited cases saying that's not

10:53:07  17   enough to show irreparable harm.

10:53:08  18       And then finally, those final two factors, Your

10:53:10  19   Honor:  The balancing of the equities and the public

10:53:13  20   interest.  There's nothing that would suggest that this

10:53:15  21   Court stopping a state court -- as Your Honor said, a

10:53:19  22   state court that is responsible for overseeing

10:53:24  23   discipline of attorneys in the jurisdiction, for this

10:53:26  24   Court to sort of say to that state court, "You should

10:53:29  25   stop what you're doing."  Again, we don't think the

10:53:31  1    public interest supports that dramatic and extraordinary

10:53:33  2    remedy.

10:53:36  3              THE COURT:  Okay.

10:53:37  4              MR. KLAYMAN:  Your Honor, in all due respect,

10:53:43  5    that was a shell game argument.  What I mean by that is

10:53:47  6    that the only issue in front of the D.C. Superior Court

10:53:51  7    and the Court of Appeals was whether 12.2 was violated.

10:53:56  8              THE COURT:  Yeah, but you did have the

10:53:59  9    opportunity to raise the constitutional challenge that

10:54:02  10   you're making here in that court, right?

10:54:05  11       You could have raised that.

10:54:07  12             MR. KLAYMAN:  I have -- yes, I could have, but

10:54:09  13   I have also the option to exercise my rights in front of

10:54:13  14   this Court.

10:54:13  15             THE COURT:  I don't agree with that.  I don't

10:54:15  16   think a litigant can go to state court, raise issues

10:54:19  17   before the state court, omit some issues, lose, and then

10:54:22  18   come to federal court and raise issues that they could

10:54:25  19   have raised in the state court before the federal --

10:54:28  20             MR. KLAYMAN:  I respectfully disagree with

10:54:30  21   that, Your Honor.

10:54:30  22             THE COURT:  What authority --

10:54:31  23             MR. KLAYMAN:  Let me --

10:54:32  24             THE COURT:  Hold -- Mr. Klayman, please, I'm

10:54:35  25   trying to be understanding that you're upset about this.

10:54:38    1    But when I talk, you have to -- I let you talk.  When I

10:54:41    2    talk, you have to be quiet, okay?

10:54:43    3         Can we agree on that?

10:54:44    4              MR. KLAYMAN:  Yes.

10:54:45    5              THE COURT:  Okay.  What authority says that you

10:54:48    6    can piecemeal your litigation by pursuing only some

10:54:51    7    claims in the state court, which you could have raised

10:54:54    8    but didn't, and then when you lose, come to federal

10:54:57    9    court and raise those issues that you didn't raise in

10:55:00    10   state court that you could have?

10:55:02    11             MR. KLAYMAN:  Number one, the D.C. Court of

10:55:04    12   Appeals is conflicted, okay?  It's making rulings that

10:55:07    13   would pertain against itself.  It refused to do that,

10:55:12    14   refused to even stay.  So there's a huge conflict of

10:55:14    15   interest there.

10:55:15    16        They have taken the position consistently that it

10:55:18    17   doesn't matter what they promulgated as a rule, that the

10:55:21    18   Board can do whatever it wants.  As long as the litigant

10:55:24    19   is someone like Larry Klayman, we'll let it proceed.

10:55:28    20        In our briefs we set forth with particularity how

10:55:32    21   that was under a prior rule of the Board, okay?  The new

10:55:35    22   rule of the Court gave it 120 days.  "Shall," not "may."

10:55:40    23   That's not discretionary.

10:55:41    24        We set forth a number of cases --

10:55:43    25             THE COURT:  But isn't your remedy -- if you're

10:55:45  1    saying that the Court -- that the Superior Court and the

10:55:47  2    Court of Appeals both got it wrong, isn't it your remedy

10:55:50  3    to go to the Supreme Court?

10:55:52  4             MR. KLAYMAN:  You know how hard it is to go up

10:55:54  5    to the Supreme Court, Your Honor?

10:55:55  6             THE COURT:  Yeah, but I mean -- again, I don't

10:55:57  7    know of any authority that says because it's difficult

10:55:59  8    to get before the Supreme Court that you can circumvent

10:56:02  9    that and therefore bring it to a lower federal court.

10:56:06  10             MR. KLAYMAN:  That's our right, Your Honor.

10:56:07  11    But let me read to you why the *Rooker-Feldman* doctrine

10:56:10  12    does not apply, and it's a short but succinct portion of

10:56:14  13    our brief on the preliminary injunction.

10:56:17  14             Defendant's attempt to argue that the District of

10:56:20  15    Columbia Superior Court dismissal of the Bundy

10:56:23  16    litigation bars Mr. Klayman from seeking relief for a

10:56:27  17    violation of his First Amendment rights under the

10:56:29  18    *Rooker-Feldman* doctrine.  This argument has no merit.

10:56:33  19             Quote, "the Supreme Court has explained that the

10:56:35  20    purpose of the *Rooker-Feldman* doctrine is to effectuate

10:56:39  21    28 U.S.C. Section 1257," which, quote, "vests authority

10:56:45  22    to review a state court's judgment solely in the Supreme

10:56:49  23    Court," unquote.

10:56:50  24             *D.C. Healthcare Systems v. District of Columbia*,

10:56:54  25    441, U.S. Appeals, D.C., 126, 131, 2019.  Quote, "the

10:57:03  1    Supreme Court has repeatedly described the

10:57:05  2    *Rooker-Feldman* doctrine as a narrow one," unquote.

10:57:09  3        Quote, "Indeed the Court has found it applicable

10:57:12  4    only twice," unquote.

10:57:14  5        Importantly, quote, "if," unquote, the federal

10:57:18  6    plaintiff presents an independent claim, it is not an

10:57:22  7    impediment to exercise -- to the exercise of federal

10:57:25  8    jurisdiction that the same or related question was

10:57:28  9    earlier aired between the parties in the state court; id

10:57:33 10    at 132.  There you go.

10:57:35 11        The *Bundy* litigation was a state court action that

10:57:38 12    solely sought injunctive relief and declaratory relief

10:57:42 13    that the Board must enforce under Rule 12.2.

10:57:46 14        The instant matter brings claims under 42 U.S.C.

10:57:49 15    1920 -- 1983 -- I'll repeat that -- 42 U.S.C. 1983, for

10:57:55 16    violation of Mr. Klayman's First and Fifth Amendment

10:57:58 17    rights and seeks damages from the defendants in that

10:58:01 18    regard, in addition to seeking injunctive and equitable

10:58:04 19    relief.  These claims could not be more different, and

10:58:08 20    this instant matter clearly presents the Court with an

10:58:11 21    independent claim, quote-unquote, "that falls outside of

10:58:15 22    the *Bundy* litigation," citing *D.C. Healthcare Systems*

10:58:19 23    441 U.S. Appeals D.C., at 131.

10:58:24 24        "Thus, particularly given the extremely narrow

10:58:27 25    application of the *Rooker-Feldman* doctrine, id, it is

10:58:32  1    clear that the *Rooker-Feldman* doctrine does not preclude

10:58:35  2    this instant action."

10:58:37  3         THE COURT:  I have an 11:00 motions hearing I

10:58:41  4    have to hear, so I'm going to have to take a recess in

10:58:44  5    this case.  We'll look at the rule that was referenced

10:58:46  6    regarding service of process, and I'll get back with

10:58:49  7    this matter as soon as I can deal with this other

10:58:53  8    matter.

10:58:53  9         And counsel for the Court needs to try and find out

10:58:58  10   who this person is and find out some authority as to

10:59:02  11   what it says about who has to be served in order for the

10:59:06  12   Court to be appropriately served with process.

10:59:09  13        MR. KLAYMAN:  Is there some time frame, Your

10:59:12  14   Honor, that you think you'll need for this other motion?

10:59:14  15        THE COURT:  I have no idea.  It shouldn't take

10:59:17  16   too long, but we'll get back to this as soon as we can.

10:59:22  17        I'll give the court reporter a five-minute recess.

10:59:27  18        (Court in recess from 10:59 a.m. to 11:20 a.m.)

11:20:01  19        THE COURT:  We can recall the case.

11:20:03  20        DEPUTY COURTROOM CLERK:  Yes, Your Honor.

11:20:05  21        Recalling civil action 24-2997, *Larry Elliot*

11:20:11  22   *Klayman v. District of Columbia Court of Appeals,* et

11:20:15  23   *al.*  All parties are present.

11:20:17  24        THE COURT:  Okay.  We have looked at the

11:20:20  25   Superior Court rule regarding service of process on a

11:20:25  1    component of the City, and the rule seemingly

11:20:30  2    provides -- or requires that the chief executive officer

11:20:33  3    of the component itself has to be served.  And I would

11:20:40  4    conclude that that would be the Clerk of the Court, who

11:20:45  5    I assume would be the chief executive officer of the

11:20:48  6    Court of Appeals for D.C.

11:20:49  7         And it also does require, as counsel indicated,

11:20:54  8    that the Attorney General Office also be served since,

11:21:01  9    if there was some type of financial liability that would

11:21:06  10   lie, obviously it would be the City since the Court of

11:21:09  11   Appeals for D.C. is a part of the City, would be the

11:21:11  12   entity that would be responsible.

11:21:14  13        So besides the fact that -- I think it's

11:21:17  14   questionable as to whether the Court of Appeals itself

11:21:19  15   can be sued as compared to the City being sued.  As far

11:21:23  16   as service of process is concerned on the Court of

11:21:25  17   Appeals, I would have to conclude that the rule does

11:21:27  18   require that there be dual service both on the chief

11:21:30  19   executive officer of the Court but also on the Attorney

11:21:35  20   General's Office.  And there's no indication that there

11:21:38  21   was service on the Attorney General's Office, so I would

11:21:39  22   have to conclude that at this -- at least at this point,

11:21:43  23   without proper service, I don't have jurisdiction over

11:21:46  24   the Court of Appeals.

11:21:49  25        Anything?

11:21:55  1          MR. KLAYMAN:  Assuming that that applies, Your

11:21:58  2    Honor, we would ask that the matter proceed in any

11:22:00  3    event.  They adopted the arguments of the court -- of

11:22:03  4    the Board, so the same arguments --

11:22:04  5          THE COURT:  How can I proceed if there hasn't

11:22:06  6    been appropriate service?  If there hasn't been

11:22:08  7    appropriate service, I don't have jurisdiction.

11:22:11  8          MR. KLAYMAN:  Well, you certainly can proceed

11:22:12  9    with the Board, okay?  They were served and they

11:22:14  10   accepted service.

11:22:15  11         THE COURT:  What good would that do?  Because

11:22:19  12   the Board can't tell the Court of Appeals not to act.

11:22:25  13   And now the case is before the Court of Appeals, so the

11:22:27  14   Court of Appeals will either go forward or not go

11:22:29  15   forward.  And if the Board is restrained, that would

11:22:34  16   have no impact on whether the Court of Appeals --

11:22:37  17         MR. KLAYMAN:  The relief I requested, Your

11:22:39  18   Honor, was that Your Honor order that for purposes of

11:22:45  19   preliminary injunction that the Board's report is void

11:22:51  20   ab initio and cannot be enforced by the Court.  The

11:22:54  21   Board is a defendant here, and they have been served.

11:22:58  22   We can go forward at least to that extent with regard to

11:23:01  23   the equitable relief.

11:23:02  24         The other relief with regard to damages -- we're

11:23:04  25   not having a trial here today on damages.  We're having

11:23:08    1    a hearing with regard to equitable relief and an

11:23:11    2    injunctive relief and a declaratory ruling, and

11:23:15    3    therefore, you can make a ruling that the Board's ruling

11:23:18    4    here -- the Board's report and recommendation is of no

11:23:21    5    force and effect because of viewpoint discrimination.

11:23:25    6         So I would respectfully request that I be able to

11:23:29    7    testify here today and put evidence on the record to

11:23:31    8    that effect because this issue will go up to the D.C.

11:23:35    9    Circuit right away.

11:23:36   10         THE COURT:  Well, I'm prepared to rule.  And as

11:23:41   11    I was indicating when we were here previously, before we

11:23:44   12    took the recess, I just don't see how a litigant can

11:23:51   13    pursue a matter before the equivalent of a state court,

11:23:55   14    raise some issues before the state court, lose before

11:24:00   15    that court, could have raised other arguments before

11:24:03   16    that court but did not, but then seek to raise those

11:24:07   17    same issues before a federal court.  I just don't see

11:24:12   18    how you can do that.  And I think that's the problem.

11:24:16   19         And I think the *Rooker-Feldman* doctrine also is an

11:24:24   20    impediment to me addressing this matter in light of the

11:24:30   21    fact that the Court of Appeals -- I mean, the Superior

11:24:33   22    Court made its ruling.

11:24:36   23         Subsequently, that was appealed to the Court of

11:24:38   24    Appeals.  The Court of Appeals affirmed the Superior

11:24:41   25    Court.  And I just don't see how I have the authority to

11:24:44  1    make a decision now inconsistent with issues that were

11:24:49  2    raised before the Court of Appeals, at least in

11:24:52  3    reference to the rule issue.  But as I said, in

11:24:54  4    reference to the constitutional issue that's being

11:24:57  5    raised, that could have been raised before, before the

11:25:00  6    state court.  It was not raised.  And I don't see how it

11:25:03  7    can now be raised in the first instance before this

11:25:06  8    Court.

11:25:08  9          MR. KLAYMAN:  Your Honor, I gave you the

11:25:09  10   authority when I read --

11:25:10  11          THE COURT:  And if I'm wrong, the Court of

11:25:12  12   Appeals will tell me that.

11:25:13  13          MR. KLAYMAN:  I would like to -- I would

11:25:14  14   respectfully request that I be able to proffer my

11:25:16  15   exhibits into evidence and authenticate them.  They're

11:25:22  16   self-authenticating, in any event.  I would like them on

11:25:27  17   the record before I take this up.

11:25:27  18          THE COURT:  Very well.

11:25:30  19          MR. KLAYMAN:  Thank you.

11:25:30  20       Can I take the stand, please?

11:25:34  21          THE COURT:  Yes?

          22          MR. MACHADO:  Your Honor --

11:25:41  23          THE COURT:  What exhibits are you seeking to

11:25:43  24   try and present?

11:25:47  25          MR. KLAYMAN:  I'm seeking to present exhibits

11:25:48  1    that show the pattern and practice of viewpoint

11:25:52  2    discrimination against me and against other

11:25:54  3    conservative --

11:25:54  4          THE COURT:  But if I don't have the authority

11:25:56  5    to entertain the issue because of the current state of

11:25:58  6    the law, i.e., you had the opportunity to raise the

11:26:01  7    issue previously and you didn't, how can I then let you

11:26:05  8    introduce that into the record?

11:26:06  9          MR. KLAYMAN:  Well, I'm proffering it, Your

11:26:08  10   Honor, proffering it so the Court of Appeals will have

11:26:10  11   it as part of its record.  It's a proffer.

11:26:16  12         THE COURT:  Yes.

11:26:18  13         MR. MACHADO:  Your Honor, just briefly --

11:26:22  14         THE COURT:  Number one -- I mean, I just don't

11:26:24  15   see how I get to the issue of whether there was a First

11:26:30  16   Amendment violation, and I don't see how the Court of

11:26:33  17   Appeals gets that issue.  They may see it differently in

11:26:38  18   light of the fact that, as I said, this was an issue

11:26:41  19   that could have been raised in the Superior Court.  It

11:26:44  20   was not raised, and therefore, I don't see how in the

11:26:47  21   first instance it can be raised here.

11:26:50  22      If I'm right on that, then all of these exhibits

11:26:52  23   are really irrelevant to the issue as to whether you had

11:26:56  24   a right to proceed before this Court.

11:26:59  25         MR. MACHADO:  We understand, Your Honor, and we

11:27:01   1    absolutely agree.  I just want to make one point because

11:27:04   2    Mr. Klayman has been very clear about his intent to take

11:27:08   3    this up.

11:27:08   4        If he's going to get on the stand for the pure and

11:27:11   5    narrow purpose of introducing these exhibits, and we

11:27:15   6    share the Court's concern or wonderment as to how -- why

11:27:21   7    it would even be relevant.  But if he's going to get on

11:27:23   8    the stand for that limited purpose, you know, that's one

11:27:26   9    issue.

11:27:26   10       If, on the other hand, he's going to get on the

11:27:29   11   stand and provide testimony, which is what he started

11:27:31   12   off this morning saying his intent was, we do note that

11:27:33   13   the local rules of which Mr. Klayman has repeatedly

11:27:40   14   cited to this Court and referenced in court -- in the

11:27:41   15   course of his 40 years of practice before this court

11:27:45   16   provide that the practice is to decide preliminary

11:27:48   17   injunction motions without live testimony.  And that if

11:27:50   18   a party intends to provide live testimony, they need to

11:27:54   19   give 72 hours' notice, which did not happen here.  And

11:27:57   20   that the Court may decline witnesses where the need for

11:27:59   21   live testimony is outweighed by considerations of undue

11:28:02   22   delay, waste of time, or needless presentation of

11:28:08   23   cumulative evidence.

11:28:08   24       I know the Court -- I know several judges on this

11:28:11   25   court.  I know the D.C. Circuit is intimately familiar

11:28:12  1    with Mr. Klayman's views about viewpoint discrimination.

11:28:16  2    And so if he's going to get on the stand and just

11:28:18  3    regurgitate that again, we would object for these

11:28:22  4    reasons, Your Honor.

11:28:28  5            MR. KLAYMAN:  Well, first of all, I don't need

11:28:29  6    to regurgitate that at this phase.  I can regurgitate

11:28:32  7    that when -- so to speak, when this case comes back to

11:28:34  8    this Court.

          9            Secondly --

11:28:36  10           THE COURT:  That's presumptuous on your part,

11:28:38  11   but go ahead.

11:28:41  12           MR. KLAYMAN:  Well, it's happened before.

11:28:41  13           THE COURT:  But I don't get reversed that

          14   much --

          15           MR. KLAYMAN:  So --

11:28:42  16           THE COURT:  I've been a judge for 43 years.

11:28:43  17   I've probably been reversed ten times in my history.

          18           MR. KLAYMAN:  No, but you can --

11:28:46  19           THE COURT:  But -- it does happen, but I don't

11:28:47  20   think it's going to happen here --

11:28:47  21           MR. KLAYMAN:  Secondly --

11:28:48  22           THE COURT:  -- but go ahead.

11:28:49  23           MR. KLAYMAN:  Secondly, I submitted a detailed

11:28:52  24   affidavit, which also incorporated by reference in the

11:28:55  25   brief that I filed in opposition to the motion to

11:28:57  1    dismiss as well as other documents, I submitted

11:29:01  2    testimony.  They submitted none.  They've therefore

11:29:05  3    conceded --

11:29:07  4            THE COURT:  But you see, Mr. Klayman, what

11:29:09  5    you're raising doesn't deal with the reason that I

11:29:12  6    conclude I can't go forward in this case.  And that is

11:29:15  7    because, as I said before, you could have raised this

11:29:18  8    issue in the Superior Court.  You didn't.  And I don't

11:29:21  9    think you can piecemeal your litigation, as I said, by

11:29:24  10   raising some issues over there, had the opportunity to

11:29:26  11   raise it there but didn't, and then come to this Court

11:29:28  12   and ask this Court to consider an issue that you could

11:29:30  13   have raised there.

11:29:33  14       Maybe I'm wrong.  If I'm wrong, the Court of

11:29:35  15   Appeals will tell me.

11:29:37  16           MR. KLAYMAN:  Respectfully, you're wrong, Your

11:29:39  17   Honor.

11:29:39  18           THE COURT:  Okay.

11:29:40  19           MR. KLAYMAN:  In any event, I'm just proffering

11:29:42  20   these documents into the record.  That's all I'm doing

11:29:44  21   right now.

          22           THE COURT:  What relevance do they have at this

          23   point?

11:29:45  24           MR. KLAYMAN:  You're preventing me from doing

11:29:46  25   that?

| | | |
|---|---|---|
| 11:29:46 | 1 | THE COURT: If the Court of Appeals tells me |
| 11:29:47 | 2 | that you have a right to proceed, yes, then I'll let -- |
| 11:29:50 | 3 | MR. KLAYMAN: Well, you're -- you're just |
| 11:29:51 | 4 | trying to slow this thing down -- |
| | 5 | THE COURT: I'm not trying to slow -- |
| | 6 | MR. KLAYMAN: -- is what you're doing. Then I |
| | 7 | ask again -- |
| 11:29:53 | 8 | THE COURT: Don't make allegations against me |
| 11:29:54 | 9 | that aren't fact-based. I've not done anything to slow |
| 11:29:58 | 10 | this matter down. In fact, I've speeded it up so we can |
| 11:30:01 | 11 | do this matter today before your hearing is scheduled |
| 11:30:04 | 12 | before the Court of Appeals. |
| 11:30:05 | 13 | MR. KLAYMAN: You speeded it up after we lost |
| 11:30:07 | 14 | seven days because Your Honor erroneously, for whatever |
| 11:30:10 | 15 | reason, and I believe it was not unintentional, found |
| 11:30:12 | 16 | that I had not complied with the rule for the -- |
| 11:30:16 | 17 | THE COURT: And I still am of the opinion that |
| 11:30:18 | 18 | you didn't comply with the rule, for the reason I |
| 11:30:20 | 19 | indicated in the order. But nonetheless, giving you the |
| 11:30:23 | 20 | benefit of the doubt, I overlooked that and held this |
| 11:30:26 | 21 | hearing. |
| 11:30:26 | 22 | MR. KLAYMAN: I disagree, Your Honor, and I |
| 11:30:28 | 23 | respectfully request -- |
| 11:30:28 | 24 | THE COURT: You have a right to disagree, but I |
| 11:30:30 | 25 | think I was still right. |

11:30:31  1          MR. KLAYMAN:  We've asked for your
11:30:33  2    disqualification before.  I renew that motion --
11:30:34  3          THE COURT:  And that was denied previously by
11:30:36  4    the Court of Appeals.
          5          MR. KLAYMAN:  Not in this context.
11:30:37  6          THE COURT:  I have nothing against you, sir.  I
11:30:39  7    don't know of -- I don't know you.  I have nothing
11:30:42  8    against you whatsoever.  My ruling is based upon my
11:30:45  9    impression of what the law says.
11:30:48  10          MR. KLAYMAN:  Well, I -- can I make a proffer
11:30:50  11    of these documents?
11:30:51  12          THE COURT:  Briefly, sir.
11:30:52  13          MR. KLAYMAN:  Well, I want to go through them.
11:30:54  14    I have 20 --
11:30:54  15          THE COURT:  No, I'm not going to entertain all
11:30:56  16    those documents because, as I said, until I'm told by
11:30:59  17    the Court of Appeals that you have a right to appear
11:31:01  18    before me and raise these issues, which in my view you
11:31:05  19    don't because of the reasons I previously indicated, and
11:31:08  20    until I'm told otherwise, that information, in my view,
11:31:11  21    is irrelevant.
11:31:14  22          MR. KLAYMAN:  Can I identify what these
11:31:16  23    exhibits are?
11:31:16  24          THE COURT:  Why?  If I don't have the authority
11:31:18  25    to hear about what you want to raise regarding the First

11:31:22  1    Amendment, how is that relevant?

11:31:25  2            MR. KLAYMAN:  Because a proffer is a normal way

11:31:27  3    to see what it is that you fail to consider, Your

        4    Honor --

        5            THE COURT:  Because I --

11:31:29  6            MR. KLAYMAN:  -- which would be a ground for

11:31:30  7    reversal.

11:31:31  8            THE COURT:  It has nothing to do with the

11:31:32  9    merits of your First Amendment claim.  My position is

11:31:35 10    that, as I said before -- maybe you don't understand

11:31:37 11    what I'm saying -- you had a right to raise it over in

11:31:40 12    the Superior Court.  You didn't raise it.

11:31:43 13            MR. KLAYMAN:  Do you have any authority for

11:31:44 14    that?

11:31:45 15            THE COURT:  Yes, there's plenty of authority

11:31:47 16    that says --

11:31:47 17            MR. KLAYMAN:  What authority do you have?  You

11:31:47 18    haven't cited any.

        19            THE COURT:  -- I can't tell you --

11:31:49 20            MR. KLAYMAN:  Other than you felt like making

11:31:50 21    that ruling, because you have no authority to cite that.

11:31:53 22            THE COURT:  There is clear authority that says

11:31:54 23    you can't raise certain issues in one court which you

11:31:58 24    had the opportunity to raise and then raise it in

11:32:00 25    another court.

11:32:01  1          MR. KLAYMAN:  I suggest, Your Honor, that you

11:32:02  2     read --

11:32:03  3          THE COURT:  Sir, if I'm wrong, the Court of

11:32:05  4     Appeals will tell me.  Thank you.

11:32:11  5          (Court adjourned, 11:32 a.m.)

11:32:24  6                         - - -

          7

          8

          9

         10               CERTIFICATE

         11

         12     I, Chandra Kean, RMR, hereby certify that the

         13  foregoing transcript is a true and correct transcription

         14  of the proceedings held in the above-titled matter.

         15

         16  _____        May 27, 2025
                                             _____
         17     Chandra Kean, RMR               DATE

         18

         19

         20

         21

         22

         23

         24

         25

## 1

**1** [1] - 25:21
**1.2** [2] - 11:20, 17:14
**10100** [1] - 2:3
**10:06** [1] - 3:2
**10:59** [1] - 46:18
**11** [1] - 9:14
**11:00** [1] - 46:3
**11:20** [1] - 46:18
**11:32** [1] - 58:5
**12(b)(2** [1] - 39:21
**12(b)(6** [1] - 6:14
**12(b)(6)** [1] - 6:5
**12.2** [2] - 42:7, 45:13
**120** [4] - 13:10, 14:4, 39:9, 43:22
**1257** [1] - 44:21
**126** [1] - 44:25
**131** [2] - 44:25, 45:23
**132** [1] - 45:10
**15** [1] - 21:19
**15th** [3] - 26:17, 28:2, 28:15
**18** [2] - 26:15, 28:1
**180** [1] - 15:22
**1920** [1] - 45:15
**1983** [3] - 37:5, 45:15
**1994** [1] - 38:1

## 2

**20** [1] - 56:14
**20001** [2] - 2:4, 28:17
**2005** [1] - 38:7
**2019** [1] - 44:25
**202-727-2125** [1] - 2:4
**2025** [5] - 21:19, 26:17, 28:2, 28:15, 58:16
**204** [1] - 2:8
**22303** [1] - 2:8
**24-2997** [2] - 3:4, 46:21
**2560** [1] - 2:8
**27** [1] - 58:16
**28** [1] - 44:21
**28th** [3] - 24:4, 24:6, 24:9
**29th** [4] - 24:4, 24:8, 24:11, 40:8
**2:59** [1] - 28:15

## 3

**33,000** [1] - 20:12

## 4

**4(j** [1] - 34:8
**4(j)** [1] - 35:1

**4(j)(A** [1] - 34:10
**4(j)(B** [1] - 34:12
**4(m** [1] - 34:8
**40** [1] - 52:15
**400** [1] - 2:3
**42** [2] - 45:14, 45:15
**43** [2] - 8:20, 53:16
**430** [2] - 26:18, 28:16
**441** [2] - 44:25, 45:23
**48** [2] - 11:6

## 6

**60** [1] - 11:1
**6th** [1] - 2:3

## 7

**703-775-8607** [1] - 2:9
**72** [1] - 52:19

## A

**a.m** [4] - 3:2, 46:18, 58:5
**ab** [1] - 48:20
**abdicate** [1] - 36:8
**ability** [2] - 10:9, 12:8
**able** [13] - 4:18, 6:11, 6:20, 9:22, 11:11, 19:4, 19:17, 23:22, 24:15, 27:3, 29:22, 49:6, 50:14
**above-entitled** [1] - 26:15
**above-titled** [1] - 58:14
**abridgement** [1] - 17:20
**absolute** [1] - 12:15
**absolutely** [2] - 4:18, 52:1
**accept** [25] - 22:3, 22:4, 25:19, 26:5, 26:25, 27:10, 27:11, 27:15, 28:13, 28:20, 28:25, 29:6, 29:8, 29:14, 29:19, 29:23, 31:18, 32:19, 32:18, 33:12, 33:24, 34:3, 34:23, 35:12
**acceptance** [1] - 30:5
**accepted** [1] - 48:10
**accepting** [1] - 26:2
**accurate** [1] - 12:13
**acknowledged** [2] - 40:1, 40:2
**acknowledging** [1] - 39:20
**act** [2] - 7:22, 48:12
**acting** [1] - 7:24

**action** [11] - 3:3, 12:22, 18:13, 20:16, 26:10, 26:16, 26:20, 28:18, 45:11, 46:2, 46:21
**actions** [2] - 5:14, 25:10
**activist** [2] - 4:15, 5:19
**actual** [2] - 18:10, 23:8
**Ad** [1] - 31:8
**add** [3] - 5:22, 31:6, 35:6
**addition** [2] - 30:22, 45:18
**additional** [1] - 34:4
**address** [6] - 4:1, 7:11, 8:15, 15:7, 20:20, 25:12
**addressed** [1] - 18:19
**addressing** [1] - 49:20
**adequate** [1] - 6:18
**adjourned** [1] - 58:5
**administers** [1] - 10:14
**administration** [1] - 5:14
**admitted** [2] - 4:11, 25:21
**admittedly** [1] - 20:12
**adopted** [1] - 48:3
**advocate** [1] - 20:15
**affidavit** [14] - 4:9, 4:10, 18:22, 18:25, 19:4, 19:19, 19:23, 21:18, 23:16, 23:21, 25:25, 26:7, 34:11, 53:24
**affirmed** [1] - 49:24
**affirming** [2] - 39:18, 40:21
**afraid** [1] - 8:18
**age** [2] - 26:15, 27:25
**agency** [1] - 36:1
**ago** [1] - 26:17
**agree** [3] - 42:15, 43:3, 52:1
**ahead** [2] - 53:13, 53:22
**aired** [1] - 45:9
**al** [2] - 3:5, 46:23
**Alan** [1] - 18:25
**Alexandria** [1] - 2:8
**allegations** [1] - 55:8
**allege** [1] - 34:12
**alleged** [1] - 6:8
**allegedly** [1] - 5:13
**allow** [2] - 14:2, 31:21
**allowing** [1] - 18:8
**alluding** [1] - 38:21
**almost** [1] - 13:4

**amalgamation** [1] - 34:21
**ambiguity** [1] - 14:7
**Amendment** [10] - 5:7, 6:21, 37:4, 38:17, 38:18, 44:17, 45:16, 51:16, 57:1, 57:9
**amicably** [1] - 26:1
**apologize** [2] - 33:9, 37:16
**apparatus** [1] - 16:17
**appeal** [1] - 7:19
**appealable** [1] - 7:3
**appealed** [2] - 38:12, 39:17, 49:23
**Appeals** [70] - 3:5, 3:19, 3:21, 7:13, 7:18, 8:5, 8:14, 9:1, 9:3, 10:6, 12:21, 13:16, 14:2, 14:10, 14:12, 15:11, 18:4, 21:8, 21:14, 21:22, 22:2, 23:4, 23:6, 23:8, 24:3, 24:13, 24:22, 24:25, 25:3, 26:18, 27:4, 28:16, 33:4, 33:15, 33:19, 33:22, 39:15, 39:17, 40:6, 40:11, 40:14, 41:11, 42:7, 43:12, 44:2, 44:25, 45:23, 46:22, 47:6, 47:11, 47:14, 47:17, 47:24, 48:12, 48:13, 48:14, 48:16, 49:21, 49:24, 50:2, 50:12, 51:10, 51:17, 54:15, 55:1, 55:12, 56:4, 56:17, 58:4
**Appeals'** [2] - 40:25, 41:1
**appear** [2] - 23:6, 56:17
**appearance** [2] - 3:7, 27:19
**APPEARANCES** [1] - 2:1
**appellate** [4] - 7:22, 7:24, 15:8, 37:21
**apple** [2] - 38:19, 38:24
**applicable** [1] - 45:3
**application** [1] - 45:25
**applies** [2] - 5:18, 48:1
**apply** [1] - 11:14, 35:9, 44:12
**approach** [2] - 3:6, 25:22
**appropriate** [10] - 22:13, 22:22, 24:21,

**25:5, 31:17, 32:3, 33:14, 48:6, 48:7**
**appropriately** [11] - 7:14, 21:15, 22:21, 23:14, 27:4, 27:7, 30:10, 31:4, 32:2, 32:15, 46:12
**argue** [2] - 30:20, 44:14
**argument** [11] - 25:15, 35:9, 35:14, 35:15, 35:21, 35:24, 37:10, 37:12, 40:8, 42:5, 44:18
**arguments** [11] - 4:25, 8:22, 38:22, 38:23, 40:2, 40:3, 40:5, 41:11, 48:3, 48:4, 49:15
**arm** [1] - 17:5
**aside** [2] - 37:1, 38:10
**aspect** [1] - 18:20
**assistant** [1] - 25:23
**associate** [1] - 11:3
**associate's** [1] - 11:2
**assume** [3] - 9:1, 40:17, 47:5
**assuming** [1] - 48:1
**attached** [2] - 4:22, 25:25
**attempt** [2] - 32:7, 44:14
**attempted** [3] - 21:20, 26:1, 35:12
**attempting** [1] - 10:19
**attempts** [1] - 25:19
**Attorney** [6] - 16:2, 16:3, 34:18, 47:8, 47:19, 47:21
**ATTORNEY** [1] - 2:2
**attorneys** [1] - 41:23
**authenticate** [1] - 50:15
**authenticating** [1] - 50:16
**authority** [20] - 14:16, 27:3, 30:23, 35:17, 37:7, 42:22, 43:5, 44:7, 44:21, 46:10, 49:25, 50:10, 51:4, 56:24, 57:13, 57:15, 57:17, 57:21, 57:22
**authorization** [2] - 30:13, 32:22
**authorized** [20] - 14:24, 22:3, 22:4, 26:9, 26:25, 27:11, 27:15, 28:12, 28:20, 28:25, 29:5, 29:8, 29:14, 29:19, 32:4,

32:18, 33:12, 33:24,
34:3, 34:23
**Avenue** [1] - 2:8
**award** [1] - 10:13
**aware** [1] - 9:8

## B

**balancing** [1] - 41:19
**bar** [7] - 10:13, 10:16,
10:17, 10:22, 11:7,
11:8, 16:12
**Bar** [9] - 10:15, 10:24,
11:6, 16:16, 16:17,
17:25, 18:3, 18:7,
20:7
**Barr** [1] - 16:2
**bars** [2] - 39:12, 44:16
**based** [4] - 37:3,
37:22, 55:9, 56:8
**basis** [1] - 7:21
**Bates** [1] - 5:12
**became** [1] - 16:15
**beginning** [1] - 3:7
**behalf** [8] - 3:13, 3:19,
7:3, 20:4, 22:5,
28:21, 29:20, 36:16
**behaved** [1] - 18:2
**bench** [1] - 25:22
**benefit** [1] - 55:20
**bent** [3] - 15:22, 19:2,
19:12
**best** [1] - 23:23
**better** [1] - 27:12
**between** [1] - 45:9
**beyond** [3] - 36:25,
38:11, 39:9
**Biden** [1] - 16:24
**Bill** [1] - 16:2
**bite** [2] - 38:19, 38:24
**Black** [1] - 5:17
**blunt** [1] - 15:18
**Board** [17] - 3:13,
13:9, 14:1, 15:19,
19:16, 31:8, 36:16,
36:23, 36:24, 43:18,
43:21, 45:13, 48:4,
48:9, 48:12, 48:15,
48:21
**board** [2] - 3:14, 19:16
**Board's** [5] - 9:17,
38:10, 48:19, 49:3,
49:4
**Boasberg** [1] - 5:25
**bobbed** [1] - 32:8
**bottom** [3] - 18:15,
27:18, 29:2
**BPR** [1] - 2:10
**brief** [3] - 36:17,
44:13, 53:25

**briefing** [2] - 40:3,
40:6
**briefly** [4] - 25:12,
41:9, 51:13, 56:12
**briefs** [4] - 4:20, 8:1,
13:13, 43:20
**bring** [4] - 4:12, 8:25,
38:22, 44:9
**brings** [1] - 45:14
**broad** [1] - 40:22
**brought** [4] - 21:21,
24:15, 38:3, 40:1
**Bundy** [5] - 39:7,
39:25, 44:15, 45:11,
45:22
**business** [1] - 23:19
**buy** [1] - 36:6
**BY** [2] - 2:3, 2:7

## C

**candidate** [1] - 16:18
**candidates** [1] - 16:22
**cannot** [4] - 18:18,
24:23, 25:9, 48:20
**capacity** [3] - 3:20,
16:23, 24:23
**carefully** [1] - 6:23
**cascading** [1] - 17:16
**case** [36] - 4:7, 4:24,
5:4, 5:9, 5:16, 6:2,
6:7, 6:8, 6:16, 7:5,
8:1, 8:2, 9:2, 9:12,
10:5, 10:12, 11:14,
12:23, 12:25, 13:20,
15:12, 21:21, 24:4,
26:15, 30:24, 36:8,
36:11, 37:7, 37:25,
38:7, 46:5, 46:19,
48:13, 53:7, 54:6
**cases** [11] - 5:11, 5:14,
10:15, 13:13, 13:19,
13:21, 14:6, 14:8,
35:22, 41:16, 43:24
**caused** [1] - 38:4
**causing** [1] - 17:14
**cent** [1] - 16:18
**certain** [3] - 12:7,
36:10, 57:23
**certainly** [3] - 35:25,
40:21, 48:8
**CERTIFICATE** [1] -
58:10
**certify** [1] - 58:12
**challenge** [1] - 42:9
**challenging** [1] - 9:8
**Chandra** [2] - 58:12,
58:16
**changed** [4] - 14:3,
16:15, 18:5, 24:11

**check** [2] - 33:3, 36:12
**checking** [1] - 33:9
**chief** [4] - 34:11, 47:2,
47:5, 47:18
**Christopher** [1] - 20:4
**Circuit** [13] - 5:25,
6:17, 7:3, 7:4, 8:17,
9:13, 12:1, 12:19,
17:6, 18:16, 18:17,
49:9, 52:25
**circumstances** [1] -
36:7
**circumvent** [1] - 44:8
**citation** [1] - 37:19
**cite** [3] - 13:13, 14:5,
57:21
**cited** [5] - 35:22, 38:1,
41:16, 52:14, 57:18
**citing** [1] - 45:22
**City** [6] - 16:4, 24:16,
47:1, 47:10, 47:11,
47:15
**city** [1] - 25:2
**civil** [5] - 3:3, 26:10,
26:20, 28:18, 46:21
**Civil** [3] - 6:14, 34:22,
35:4
**claim** [6] - 25:8, 37:23,
38:20, 45:6, 45:21,
57:9
**claims** [3] - 43:7,
45:14, 45:19
**clarification** [1] - 9:11
**clarified** [1] - 31:23
**Clark** [1] - 16:5
**classified** [1] - 15:7
**clear** [8] - 13:7, 13:8,
14:6, 17:6, 30:6,
46:1, 52:2, 57:22
**clearly** [4] - 32:3, 37:6,
37:7, 45:20
**CLERK** [2] - 3:3, 46:20
**Clerk** [17] - 26:25,
27:9, 27:11, 27:13,
27:15, 28:12, 29:5,
30:14, 30:17, 32:22,
32:24, 32:25, 33:4,
34:23, 47:4
**Clerk's** [4] - 27:22,
28:6, 28:7, 30:7
**cleverly** [1] - 19:15
**Clevinger** [1] - 20:14
**clients** [2] - 9:22,
20:17
**Clinesmith** [2] - 19:14
**Clinton** [3] - 16:23,
20:5, 20:12
**Clintons** [1] - 20:17
**close** [2] - 23:19,
40:12

**colleagues** [1] - 17:17
**collusion** [1] - 19:20
**Columbia** [19] - 3:4,
3:19, 3:20, 10:10,
10:20, 14:18, 15:18,
22:2, 24:17, 24:22,
25:5, 25:9, 26:18,
28:16, 34:17, 36:2,
44:15, 44:24, 46:22
**coming** [2] - 17:8,
23:23
**commenced** [1] - 38:5
**Committee** [5] - 3:15,
31:9, 36:24, 38:11,
39:8
**Committee's** [1] - 13:9
**compared** [1] - 47:15
**complaining** [1] - 38:3
**complaint** [4] - 20:14,
26:14, 26:24, 30:15
**complaints** [1] - 16:12
**complied** [1] - 55:16
**comply** [1] - 55:18
**component** [2] - 47:1,
47:3
**composition** [2] -
15:19, 15:20
**compromised** [1] -
12:20
**conceded** [1] - 54:3
**concern** [1] - 52:6
**concerned** [1] - 47:16
**conclude** [5] - 22:22,
47:4, 47:17, 47:22,
54:6
**conclusion** [1] - 13:10
**conclusions** [2] -
6:15, 6:25
**conduct** [1] - 12:22
**confident** [1] - 7:2
**confirm** [1] - 23:23
**conflict** [1] - 43:14
**conflicted** [2] - 15:12,
43:12
**consent** [5] - 26:10,
26:11, 26:20, 26:21,
28:18
**consequence** [1] -
20:10
**consequently** [2] -
4:11, 6:22
**conservative** [2] -
4:15, 51:3
**conservatives** [1] -
5:19
**consider** [3] - 40:15,
54:12, 57:3
**consideration** [1] -
40:23
**considerations** [1] -

52:21
**consistent** [1] - 34:13
**consistently** [1] -
43:16
**Constitution** [2] -
5:20, 17:4
**constitutional** [15] -
6:20, 8:12, 8:13,
8:15, 15:1, 15:5,
15:7, 17:21, 19:1,
37:3, 37:7, 39:3,
40:19, 42:9, 50:4
**constitutionally** [1] -
13:5
**construction** [1] -
14:5
**consuming** [1] - 10:23
**CONT'D** [1] - 2:1
**contact** [1] - 23:5
**context** [3] - 9:15,
36:11, 56:5
**continue** [2] - 10:10,
10:19
**contrary** [3] - 4:10,
8:9, 13:16
**control** [2] - 14:17,
17:3
**controlling** [1] -
13:22, 13:23, 14:19
**convicted** [1] - 19:19
**Conway** [1] - 16:1
**corporation** [1] -
24:24
**correct** [2] - 28:5,
58:13
**costly** [1] - 10:23
**counsel** [19] - 16:12,
16:14, 16:16, 18:2,
21:5, 21:8, 21:11,
21:14, 23:10, 23:12,
27:2, 31:10, 32:14,
33:3, 33:17, 33:21,
36:14, 46:9, 47:7
**Counsel** [6] - 9:16,
20:2, 22:6, 33:13,
33:24, 36:5
**country** [1] - 5:6
**course** [8] - 4:16, 5:9,
7:4, 9:4, 25:8, 29:22,
41:16, 52:15
**Court** [167] - 3:2, 3:5,
3:19, 3:20, 3:24,
4:13, 4:19, 5:5, 5:21,
7:13, 7:18, 7:21, 8:4,
8:10, 8:13, 8:14, 9:1,
9:2, 10:6, 10:12,
11:25, 12:14, 12:15,
12:18, 12:21, 13:15,
14:2, 14:10, 14:12,
15:11, 15:15, 15:21,

17:8, 18:4, 19:11, 21:8, 21:14, 21:15, 21:21, 22:2, 22:5, 22:7, 22:19, 23:4, 23:6, 23:8, 23:13, 24:3, 24:13, 24:22, 24:25, 25:3, 25:19, 26:2, 26:4, 26:18, 27:4, 27:8, 27:9, 27:11, 28:16, 28:21, 28:24, 29:20, 30:5, 30:10, 30:23, 31:4, 31:22, 33:4, 33:15, 33:18, 33:22, 33:24, 34:6, 34:15, 35:3, 35:10, 35:20, 35:23, 36:21, 36:22, 37:22, 37:25, 38:5, 38:6, 38:8, 38:10, 39:15, 39:17, 39:19, 40:6, 40:9, 40:10, 40:14, 40:24, 40:25, 41:11, 41:21, 41:24, 42:6, 42:7, 42:14, 43:11, 43:22, 44:1, 44:2, 44:3, 44:5, 44:8, 44:15, 44:19, 44:23, 45:1, 45:3, 45:20, 46:9, 46:12, 46:18, 46:22, 46:25, 47:4, 47:6, 47:10, 47:14, 47:16, 47:19, 47:24, 48:12, 48:13, 48:14, 48:16, 48:20, 49:21, 49:22, 49:23, 49:24, 49:25, 50:2, 50:8, 50:11, 51:10, 51:16, 51:19, 51:24, 52:14, 52:20, 52:24, 53:8, 54:8, 54:11, 54:12, 54:14, 55:1, 55:12, 56:4, 56:17, 57:12, 58:3, 58:5

**COURT** [124] - 3:11, 3:17, 3:23, 4:3, 7:10, 8:6, 8:8, 8:18, 8:24, 11:21, 12:2, 12:6, 13:15, 13:21, 14:14, 14:21, 15:3, 15:5, 20:23, 21:2, 21:5, 21:8, 21:11, 21:23, 22:4, 22:8, 22:12, 22:17, 23:3, 23:11, 24:2, 24:7, 24:10, 24:16, 24:18, 24:25, 25:11, 25:14, 25:17, 27:2, 27:13, 27:21, 28:3, 28:6, 28:10, 28:19, 29:1, 29:7, 29:11, 29:13, 29:17, 29:24, 30:1, 30:8,

30:25, 31:3, 31:10, 31:14, 31:24, 32:10, 32:13, 32:19, 32:23, 33:2, 33:6, 33:17, 33:21, 34:24, 35:2, 35:5, 35:7, 35:17, 36:5, 37:2, 37:14, 39:14, 40:14, 41:2, 42:3, 42:8, 42:15, 42:22, 42:24, 43:5, 43:25, 44:6, 46:3, 46:15, 46:19, 46:24, 48:5, 48:11, 49:10, 50:11, 50:18, 50:21, 50:23, 51:4, 51:12, 51:14, 53:10, 53:13, 53:16, 53:19, 53:22, 54:4, 54:18, 54:22, 55:1, 55:5, 55:8, 55:17, 55:24, 56:3, 56:6, 56:12, 56:15, 56:24, 57:5, 57:8, 57:15, 57:19, 57:22, 58:3

**court** [65] - 7:22, 7:23, 7:25, 10:22, 11:19, 12:8, 12:9, 12:10, 12:19, 12:23, 14:16, 14:22, 15:6, 15:14, 17:3, 17:9, 18:13, 18:14, 18:16, 20:21, 36:23, 37:8, 37:9, 37:13, 37:15, 37:20, 37:21, 38:3, 38:4, 38:13, 38:16, 38:23, 39:5, 39:6, 41:21, 41:22, 41:24, 42:10, 42:16, 42:17, 42:18, 42:19, 43:7, 43:9, 43:10, 44:9, 45:9, 45:11, 46:17, 48:3, 49:13, 49:14, 49:15, 49:16, 49:17, 50:6, 52:14, 52:15, 52:25, 57:23, 57:25

**court's** [1] - 44:22
**Court's** [2] - 40:22, 52:6
**courthouse** [1] - 30:7
**COURTROOM** [2] - 3:3, 46:20
**courts** [4] - 9:18, 10:21, 38:2
**created** [2] - 9:21, 16:9
**Cruz** [1] - 16:6
**cumulative** [1] - 52:23
**current** [2] - 7:20, 51:5
**cursory** [1] - 7:7
**cuts** [1] - 5:16

**D**

**D.C** [42] - 5:25, 6:17, 7:3, 7:4, 7:13, 8:4, 8:14, 8:17, 9:13, 9:16, 10:24, 11:25, 12:18, 12:21, 14:9, 14:11, 15:11, 16:17, 17:6, 18:16, 18:17, 20:7, 21:21, 26:19, 28:17, 34:24, 39:17, 40:6, 40:10, 40:24, 40:25, 41:10, 42:6, 43:11, 44:24, 44:25, 45:22, 45:23, 47:6, 47:11, 49:8, 52:25
**damage** [3] - 17:12, 17:17
**damages** [6] - 8:7, 25:1, 25:2, 45:17, 48:24, 48:25
**dance** [1] - 39:11
**DATE** [1] - 58:16
**David** [1] - 20:11
**days** [5] - 13:10, 14:4, 39:9, 43:22, 55:14
**DC** [2] - 2:2, 2:4
**DCCA** [1] - 2:6
**de** [1] - 37:25
**deal** [4] - 11:15, 41:14, 46:7, 54:5
**dealing** [4] - 11:3, 11:20, 12:19, 35:22
**deals** [1] - 5:17
**decade** [2] - 13:5, 17:14
**decide** [1] - 52:16
**decided** [1] - 11:19
**decision** [6] - 7:7, 7:22, 9:25, 13:1, 39:19, 50:1
**decisions** [1] - 9:24
**declaratory** [2] - 45:12, 49:2
**declare** [1] - 19:3
**decline** [1] - 52:20
**defend** [1] - 35:25
**defendant** [1] - 48:21
**defendant's** [1] - 44:14
**defendants** [5] - 3:16, 7:8, 21:2, 36:16, 45:17
**Defendants** [1] - 2:10
**degree** [2] - 19:3, 19:18
**degrees** [1] - 15:22
**delay** [5] - 9:6, 9:11, 13:25, 40:16, 52:22
**delivering** [1] - 34:10

**Democrat** [2] - 16:21, 20:9
**Democrats** [1] - 20:17
**demonstrated** [1] - 17:23
**denial** [1] - 40:22
**denied** [3] - 5:24, 7:19, 56:3
**Department** [1] - 16:9
**deposed** [1] - 26:8
**DEPUTY** [2] - 3:3, 46:20
**Deputy** [1] - 16:3
**Dershowitz** [1] - 19:1
**described** [1] - 45:1
**describes** [1] - 27:18
**deserve** [2] - 11:9, 11:12
**destroy** [1] - 20:12
**detailed** [1] - 53:23
**determination** [1] - 31:16
**determine** [1] - 23:2
**determining** [1] - 17:4
**dichotomy** [1] - 20:18
**different** [2] - 8:3, 45:19
**differently** [1] - 51:17
**difficult** [1] - 44:7
**direct** [3] - 16:7, 16:13, 27:17
**disagree** [4] - 30:13, 42:20, 55:22, 55:24
**disbarred** [1] - 16:4
**disciplinary** [11] - 9:9, 15:23, 16:12, 16:14, 16:17, 18:1, 39:6, 39:7, 40:1, 40:4, 40:17
**Disciplinary** [1] - 9:16
**discipline** [2] - 41:14, 41:23
**discovery** [2] - 6:3, 6:9
**discrepancy** [1] - 24:2
**discretionary** [2] - 39:22, 43:23
**discrimination** [9] - 4:8, 4:14, 5:8, 5:13, 17:2, 18:24, 49:5, 51:2, 53:1
**discriminatory** [2] - 4:14, 5:7
**dismiss** [5] - 4:24, 5:23, 6:4, 38:1, 54:1
**dismissal** [2] - 39:18, 44:15
**dismissed** [1] - 25:4
**disqualification** [1] - 56:2

**disrespect** [1] - 9:25
**District** [22] - 3:4, 3:19, 3:20, 10:10, 10:20, 14:17, 15:18, 22:1, 24:17, 24:22, 25:5, 25:9, 26:18, 28:16, 34:17, 36:2, 37:22, 38:5, 38:6, 44:14, 44:24, 46:22
**division** [1] - 16:9
**doctrine** [12] - 18:11, 18:12, 36:20, 37:17, 39:1, 44:11, 44:18, 44:20, 45:2, 45:25, 46:1, 49:19
**document** [2] - 23:9, 30:2
**Document** [1] - 25:24
**documents** [4] - 54:1, 54:20, 56:11, 56:16
**done** [6] - 10:24, 12:4, 17:12, 34:12, 36:10, 55:9
**doubt** [1] - 55:20
**Douglass** [10] - 5:9, 5:17, 5:22, 6:1, 6:9, 7:5, 17:6, 18:15, 18:16, 30:24
**down** [3] - 5:11, 55:4, 55:10
**dramatic** [1] - 42:1
**dual** [1] - 47:18
**due** [3] - 11:16, 31:21, 42:4
**duly** [2] - 26:8, 26:9
**Durham** [1] - 20:2
**duty** [6] - 18:17, 18:18, 18:19, 20:21, 35:14, 36:1

**E**

**Ed** [1] - 16:10
**effect** [8] - 9:7, 10:4, 15:25, 17:16, 22:9, 28:23, 49:5, 49:8
**effected** [2] - 27:7, 36:10
**effective** [1] - 24:14
**effectuate** [1] - 44:20
**effectuated** [3] - 33:15, 34:9, 34:16
**either** [2] - 12:25, 48:14
**Elias** [2] - 20:1, 20:2
**Elliot** [2] - 3:4, 46:21
**elsewhere** [1] - 36:2
**Email** [2] - 2:5, 2:9
**emails** [2] - 20:12, 26:1

**end** [2] - 6:13, 38:25
**energy** [1] - 41:14
**enforce** [3] - 14:12, 18:17, 45:13
**enforced** [4] - 13:2, 13:3, 20:19, 48:20
**enforcing** [1] - 5:6
**enjoin** [1] - 18:13
**enjoined** [1] - 5:15
**enjoining** [1] - 30:22
**entertain** [2] - 51:5, 56:15
**entire** [2] - 9:12, 22:25
**entitled** [1] - 26:15
**entity** [7] - 25:6, 33:14, 34:16, 34:17, 35:10, 35:18, 47:12
**equally** [1] - 5:18
**equitable** [3] - 45:18, 48:23, 49:1
**equities** [1] - 41:19
**equity** [1] - 31:21
**equivalent** [2] - 7:23, 49:13
**erroneously** [1] - 55:14
**essence** [1] - 9:23
**essentially** [4] - 37:18, 39:24, 40:7, 41:10
**et** [2] - 3:5, 46:22
**event** [5] - 25:20, 26:6, 48:3, 50:16, 54:19
**evidence** [8] - 4:19, 6:23, 15:25, 21:7, 41:12, 49:7, 50:15, 52:23
**evidenced** [1] - 15:12
**exact** [1] - 36:22
**exactly** [7] - 16:8, 36:19, 37:11, 37:18, 38:9, 39:1, 39:10
**example** [3] - 5:9, 25:1, 30:9
**examples** [1] - 19:12
**exclude** [1] - 10:19
**excuse** [3] - 4:23, 26:3, 37:15
**executive** [4] - 34:11, 47:2, 47:5, 47:19
**exercise** [3] - 42:13, 45:7
**exhaust** [3] - 15:10, 17:9
**Exhibit** [1] - 25:21
**exhibits** [9] - 26:14, 26:24, 50:15, 50:23, 50:25, 51:22, 52:5, 56:23
**expeditiously** [1] - 11:18

**expense** [1] - 9:21
**explained** [1] - 44:19
**explore** [2] - 23:18, 23:20
**extent** [1] - 48:22
**extraordinary** [1] - 42:1
**extremely** [1] - 5:20, 10:22, 45:24
**Exxon** [1] - 38:7

## F

**fact** [21] - 6:15, 6:24, 7:16, 8:25, 12:4, 13:7, 14:13, 15:13, 15:17, 16:20, 19:25, 28:20, 29:16, 36:2, 37:17, 38:25, 47:13, 49:21, 51:18, 55:9, 55:10
**fact-based** [1] - 55:9
**factors** [2] - 41:5, 41:18
**facts** [2] - 11:13, 18:23
**factual** [5] - 4:7, 4:12, 6:12, 40:10, 41:10
**fail** [1] - 37:3
**fair** [1] - 16:13
**falls** [1] - 45:21
**familiar** [2] - 5:10, 52:25
**family** [1] - 17:18
**far** [1] - 47:15
**favor** [1] - 22:18
**federal** [22] - 14:15, 14:22, 17:3, 18:13, 18:14, 18:15, 37:8, 37:12, 37:13, 37:24, 38:14, 38:16, 38:23, 39:3, 42:18, 42:19, 43:8, 44:9, 45:5, 45:7, 49:17
**Feldman** [12] - 18:11, 36:20, 37:17, 39:1, 39:11, 44:11, 44:18, 44:20, 45:2, 45:25, 46:1, 49:19
**felony** [1] - 19:19
**felt** [1] - 57:20
**Fifth** [3] - 5:6, 38:18, 45:16
**file** [1] - 19:23
**filed** [7] - 5:23, 13:9, 21:18, 23:16, 23:18, 23:21, 53:25
**files** [1] - 20:14
**final** [2] - 9:17, 41:18
**finally** [1] - 41:18
**financial** [1] - 47:9

**findings** [2] - 6:15, 6:24
**fine** [1] - 20:8
**finished** [1] - 25:15
**first** [10] - 4:5, 4:21, 7:12, 13:20, 21:5, 21:25, 50:7, 51:21, 53:5
**First** [8] - 5:6, 37:4, 38:17, 44:17, 45:16, 51:15, 56:25, 57:9
**five** [1] - 46:17
**five-minute** [1] - 46:17
**fleshed** [2] - 36:18, 40:3
**Florida** [3] - 10:12, 10:15, 11:6
**following** [1] - 13:10
**FOR** [1] - 2:2
**force** [1] - 49:5
**foregoing** [1] - 58:13
**former** [3] - 16:2, 16:3, 19:16
**forth** [3] - 18:23, 43:20, 43:24
**forward** [5] - 35:14, 48:14, 48:15, 48:22, 54:6
**four** [3] - 10:4, 13:25, 41:5
**four-month** [1] - 13:25
**fourth** [1] - 27:23
**Fox** [1] - 16:15
**frame** [1] - 46:13
**frames** [2] - 36:25, 38:12
**frankly** [1] - 36:4
**Friday** [1] - 23:19
**front** [13] - 4:12, 6:4, 6:16, 8:13, 9:9, 12:14, 12:15, 13:4, 19:11, 20:21, 22:10, 42:6, 42:13
**fully** [4] - 11:9, 18:8, 36:18, 40:3

## G

**game** [1] - 42:5
**Gene** [1] - 16:14
**General** [7] - 16:2, 16:3, 22:6, 33:13, 33:23, 34:18, 47:8
**general** [4] - 23:10, 23:12, 33:17, 33:21
**GENERAL** [1] - 2:2
**General's** [2] - 47:20, 47:21
**generally** [1] - 25:9
**Giuliani** [1] - 16:4

**given** [13] - 7:8, 10:24, 16:18, 16:20, 16:21, 22:18, 22:20, 23:21, 30:15, 30:16, 30:17, 45:24
**government** [8] - 5:23, 27:2, 31:15, 31:18, 33:2, 34:9, 34:17, 35:23
**governs** [1] - 14:6
**Grande** [1] - 37:25
**grant** [1] - 15:13
**granted** [1] - 5:24
**granting** [1] - 18:7
**great** [1] - 19:18
**ground** [1] - 57:6
**grounds** [1] - 6:18
**group** [1] - 5:18

## H

**half** [2] - 13:4, 17:14
**Hamilton** [1] - 16:15
**hand** [1] - 52:10
**hard** [3] - 15:17, 26:4, 44:4
**harm** [8] - 15:15, 15:16, 17:22, 18:7, 18:9, 18:10, 41:7, 41:17
**Hawley** [1] - 16:6
**headed** [1] - 16:10
**Healthcare** [2] - 44:24, 45:22
**hear** [6] - 21:2, 21:5, 21:14, 24:3, 46:4, 56:25
**heard** [2] - 31:1, 31:10
**hearing** [6] - 13:11, 38:2, 46:3, 49:1, 55:11, 55:21
**Hearing** [6] - 3:15, 13:8, 31:9, 36:24, 38:10, 39:8
**held** [4] - 10:4, 10:15, 55:20, 58:14
**helped** [1] - 20:12
**hereby** [1] - 58:12
**high** [2] - 6:5, 19:3
**highly** [1] - 16:16
**Hillary** [2] - 20:5, 20:12
**himself** [1] - 16:11
**history** [1] - 53:17
**Hoc** [1] - 31:8
**hold** [1] - 42:24
**holiday** [1] - 23:22
**honesty** [1] - 19:3
**Honor** [83] - 3:9, 3:12, 4:1, 4:5, 4:21, 5:10,

**6:5, 6:12, 6:14, 6:16, 6:22, 7:7, 7:9, 7:25, 8:15, 8:21, 9:5, 9:8, 9:9, 9:25, 11:13, 12:14, 13:14, 14:11, 15:16, 15:17, 16:25, 17:5, 19:2, 19:8, 20:18, 20:19, 20:21, 21:17, 22:16, 22:24, 22:25, 23:15, 23:23, 24:1, 24:8, 24:13, 25:13, 27:17, 28:1, 29:15, 30:5, 31:13, 31:20, 31:23, 33:5, 33:8, 35:6, 35:8, 36:15, 36:19, 37:11, 37:19, 38:21, 39:16, 41:4, 41:19, 41:21, 42:4, 42:21, 44:5, 44:10, 46:14, 46:20, 48:2, 48:18, 50:9, 50:22, 51:10, 51:13, 51:25, 53:4, 54:17, 55:14, 55:22, 57:4, 58:1**
**hope** [1] - 13:14
**hoped** [1] - 19:6
**hour** [1] - 23:1
**hours'** [1] - 52:19
**huge** [2] - 20:18, 43:14
**Huntington** [1] - 2:8

## I

**i.e** [1] - 51:6
**id** [2] - 45:9, 45:25
**idea** [2] - 30:11, 46:15
**identical** [1] - 39:5
**identify** [1] - 56:22
**ideological** [3] - 15:21, 19:2, 19:11
**illegal** [1] - 10:16
**impact** [1] - 48:16
**impediment** [2] - 45:7, 49:20
**important** [9] - 5:4, 5:20, 6:11, 6:25, 7:6, 7:9, 9:23, 17:19, 18:20
**importantly** [4] - 26:13, 26:23, 30:15, 45:5
**impression** [1] - 56:9
**including** [3] - 16:22, 16:23, 29:3
**inconsistent** [1] - 50:1
**incorporated** [2] - 5:1, 53:24
**Indeed** [1] - 45:3

**independent** [3] - 35:10, 45:6, 45:21
**indicated** [3] - 47:7, 55:19, 56:19
**indicating** [1] - 49:11
**indication** [1] - 47:20
**individual** [1] - 24:23
**information** [1] - 56:20
**inherently** [1] - 12:20
**initial** [1] - 23:7
**initio** [1] - 48:20
**injunction** [16] - 3:25, 4:22, 5:1, 6:10, 7:1, 18:8, 26:14, 26:24, 29:4, 30:16, 30:17, 35:13, 40:13, 44:13, 48:19, 52:17
**injunctive** [3] - 45:12, 45:18, 49:2
**injuries** [1] - 38:2
**injury** [1] - 17:18
**inquiries** [3] - 33:8, 34:1, 34:4
**instance** [2] - 50:7, 51:21
**instant** [3] - 45:14, 45:20, 46:2
**institute** [1] - 10:8
**instruct** [1] - 32:16
**instructing** [1] - 32:14
**integrity** [1] - 19:3
**intends** [1] - 52:18
**intent** [2] - 52:2, 52:12
**intention** [1] - 4:5
**interest** [7] - 16:23, 17:24, 18:3, 41:20, 42:1, 43:15
**interested** [1] - 26:16
**interim** [1] - 38:13
**intimately** [1] - 52:25
**introduce** [1] - 51:8
**introducing** [1] - 52:5
**investigation** [1] - 19:20
**inviting** [1] - 38:5
**involved** [2] - 4:7, 15:2
**irrelevant** [2] - 51:23, 56:21
**irreparable** [4] - 17:18, 17:22, 41:7, 41:17
**issue** [34] - 6:24, 7:16, 8:6, 8:12, 8:15, 11:19, 11:20, 11:22, 12:11, 25:15, 25:16, 31:23, 36:3, 36:19, 37:2, 37:3, 37:7, 39:14, 40:19, 40:23, 42:6, 49:8, 50:3,

50:4, 51:5, 51:7, 51:15, 51:17, 51:18, 51:23, 52:9, 54:8, 54:12
**issued** [5] - 36:23, 36:24, 38:11, 39:9, 39:18
**issues** [21] - 4:7, 4:12, 4:16, 5:4, 5:21, 8:13, 11:3, 12:7, 12:9, 15:7, 39:21, 42:16, 42:17, 42:18, 43:9, 49:14, 49:17, 50:1, 54:10, 56:18, 57:23
**issuing** [1] - 10:5
**itself** [8] - 14:1, 14:3, 17:22, 35:23, 37:23, 43:13, 47:3, 47:14

**J**

**janitor** [1] - 30:9
**Jefferson** [14] - 21:19, 21:24, 23:1, 23:2, 26:25, 27:15, 27:19, 28:12, 28:20, 29:5, 32:17, 33:4, 33:11, 34:2
**Jeffrey** [1] - 16:5
**JESSICA** [1] - 2:3
**Jessica** [1] - 3:18
**jessica.krupke@dc. gov** [1] - 2:5
**Johnson** [1] - 37:25
**Josh** [1] - 16:6
**judge** [7] - 8:19, 14:15, 26:11, 26:12, 26:21, 26:22, 53:16
**Judge** [3] - 5:11, 5:12, 5:25
**judges** [1] - 52:24
**judgment** [3] - 37:22, 37:23, 44:22
**judgments** [2] - 38:4, 38:7
**juris** [1] - 24:13
**jurisdiction** [9] - 7:15, 11:25, 12:18, 14:25, 32:5, 41:23, 45:8, 47:23, 48:7
**jurisdictions** [3] - 9:19, 10:21, 41:15
**Justice** [1] - 16:9

**K**

**Kean** [2] - 58:12, 58:16
**keep** [1] - 8:19
**Kellyanne** [1] - 16:1
**Kendall** [2] - 20:11,

20:16
**Kevin** [2] - 19:14
**kind** [1] - 34:21
**Klayman** [16] - 3:4, 3:10, 3:23, 7:10, 21:18, 24:7, 36:20, 39:21, 41:9, 42:24, 43:19, 44:16, 46:22, 52:2, 52:13, 54:4
**KLAYMAN** [94] - 3:9, 4:1, 4:4, 7:24, 8:7, 8:11, 8:21, 9:4, 11:24, 12:4, 12:13, 13:19, 13:23, 14:19, 15:1, 15:4, 15:9, 20:25, 21:3, 21:6, 21:10, 24:8, 24:11, 25:12, 25:18, 25:25, 27:8, 27:14, 27:23, 28:5, 28:9, 28:11, 28:22, 29:2, 29:9, 29:12, 29:15, 29:21, 29:25, 30:4, 30:12, 31:2, 31:6, 31:12, 31:20, 32:7, 32:11, 32:16, 32:21, 33:1, 35:6, 35:8, 35:21, 42:4, 42:12, 42:20, 42:23, 43:4, 43:11, 44:4, 44:10, 46:13, 48:1, 48:8, 48:17, 50:9, 50:13, 50:19, 50:25, 51:9, 53:5, 53:12, 53:15, 53:18, 53:21, 53:23, 54:14, 54:19, 54:24, 55:3, 55:6, 55:13, 55:22, 56:1, 56:5, 56:10, 56:13, 56:22, 57:2, 57:6, 57:13, 57:17, 57:20, 58:1
**Klayman's** [3] - 24:3, 45:16, 53:1
**knows** [1] - 19:2
**KRUPKE** [22] - 2:3, 3:18, 21:17, 21:24, 22:6, 22:10, 22:15, 22:24, 23:5, 23:15, 24:6, 24:12, 24:17, 24:19, 25:3, 25:16, 33:5, 33:8, 33:20, 33:23, 35:1, 35:3
**Krupke** [1] - 3:18

**L**

**landmark** [1] - 10:12
**language** [1] - 14:6
**large** [1] - 19:21
**Larry** [4] - 3:4, 3:9, 43:19, 46:21

**last** [3] - 23:7, 29:4, 39:17
**launder** [1] - 20:4
**laundering** [1] - 20:3
**law** [16] - 5:16, 6:15, 6:24, 6:25, 7:20, 9:22, 10:24, 11:4, 11:14, 14:17, 17:17, 20:19, 27:6, 34:14, 51:6, 56:9
**lawyer** [2] - 10:16, 20:14
**lawyers** [4] - 4:15, 5:19, 14:23, 15:23
**lays** [1] - 4:24
**least** [4] - 24:21, 47:22, 48:22, 50:2
**leave** [1] - 18:25
**lectern** [1] - 3:6
**leftist** [2] - 20:9, 20:17
**legal** [2] - 4:25, 8:6
**Les** [2] - 3:12, 36:16
**LESLIE** [1] - 2:7
**liability** [2] - 25:8, 47:9
**liable** [1] - 25:1
**lie** [1] - 47:10
**lied** [1] - 20:5
**life** [1] - 5:18
**light** [2] - 49:20, 51:18
**likelihood** [2] - 17:13, 41:6
**limited** [3] - 3:20, 18:12, 52:8
**line** [2] - 18:15, 29:4
**listened** [1] - 35:8
**listening** [1] - 21:12
**literally** [1] - 20:15
**litigant** [5] - 6:19, 13:3, 42:16, 43:18, 49:12
**litigate** [1] - 8:12
**litigated** [3] - 7:17, 11:9, 18:9
**litigation** [7] - 12:7, 15:14, 43:6, 44:16, 45:11, 45:22, 54:9
**live** [3] - 52:17, 52:18, 52:21
**Lives** [2] - 5:17
**lmachado@ ohaganmeyer.com** [1] - 2:9
**local** [6] - 6:13, 14:16, 34:9, 34:13, 35:2, 52:13
**look** [11] - 13:14, 15:19, 15:20, 16:9, 27:23, 30:24, 35:5, 38:20, 38:24, 41:3, 46:5

**looked** [2] - 13:15, 46:24
**lose** [3] - 42:17, 43:8, 49:14
**loser's** [1] - 37:24
**losers** [1] - 38:3
**losing** [1] - 37:23
**lost** [4] - 38:12, 38:16, 55:13
**lower** [2] - 17:9, 44:9
**lying** [2] - 19:19, 20:5

**M**

**MACHADO** [11] - 2:7, 3:12, 36:15, 37:10, 37:15, 39:16, 40:20, 41:4, 50:22, 51:13, 51:25
**Machado** [2] - 3:13, 36:16
**magistrate** [4] - 26:11, 26:12, 26:21, 26:22
**mandatory** [2] - 13:17, 39:22
**manner** [1] - 34:13
**Marc** [2] - 20:1
**Martin** [1] - 16:10
**matter** [20] - 3:24, 9:10, 18:8, 20:22, 31:21, 31:22, 40:1, 40:4, 40:17, 43:17, 45:14, 45:20, 46:7, 46:8, 48:2, 49:13, 49:20, 55:10, 55:11, 58:14
**Matter** [2] - 5:17, 5:18
**matters** [3] - 4:2, 6:12, 7:11
**Mayor** [1] - 16:3
**McFadden** [1] - 5:11
**mean** [14] - 8:19, 9:25, 14:21, 22:18, 31:25, 33:2, 36:6, 36:9, 37:14, 38:15, 42:5, 44:6, 49:21, 51:14
**meaning** [1] - 18:4
**member** [8] - 9:18, 10:17, 10:22, 11:5, 11:7, 11:8, 18:1, 19:16
**members** [4] - 3:14, 3:15, 17:25, 18:3
**mentioning** [1] - 11:16
**merely** [1] - 32:19
**merit** [1] - 44:18
**merits** [1] - 57:9
**MEYER** [1] - 2:7
**Michael** [4] - 26:6, 27:24, 28:3

**might** [3] - 5:22, 39:2, 39:11
**Mills** [2] - 17:20, 18:10
**mine** [1] - 15:22
**minute** [3] - 17:21, 36:13, 46:17
**misrepresentations** [1] - 34:5
**missing** [1] - 27:21
**Mobile** [1] - 38:7
**moment** [1] - 25:14
**Monell** [1] - 25:8
**money** [2] - 20:3, 41:14
**month** [2] - 13:25, 39:18
**months** [4] - 9:11, 9:14, 19:18, 19:22
**mooted** [1] - 9:12
**morning** [10] - 3:9, 3:11, 3:12, 3:17, 3:18, 3:23, 21:17, 23:20, 36:15, 52:12
**Morrell** [1] - 13:24
**most** [1] - 16:20
**mostly** [1] - 35:22
**motion** [19] - 3:24, 4:23, 4:24, 5:1, 5:22, 6:4, 9:10, 26:13, 26:23, 29:4, 30:16, 30:17, 35:13, 38:1, 41:15, 46:14, 53:25, 56:2
**motions** [2] - 46:3, 52:17
**MR** [104] - 3:9, 3:12, 4:1, 4:4, 7:24, 8:7, 8:11, 8:21, 9:4, 11:24, 12:4, 12:13, 13:19, 13:23, 14:19, 15:1, 15:4, 15:9, 20:25, 21:3, 21:6, 21:10, 24:8, 24:11, 25:12, 25:18, 25:25, 27:8, 27:14, 27:23, 28:5, 28:9, 28:11, 28:22, 29:2, 29:9, 29:12, 29:15, 29:21, 29:25, 30:4, 30:12, 31:2, 31:6, 31:12, 31:20, 32:7, 32:11, 32:16, 32:21, 33:1, 35:6, 35:8, 35:21, 36:15, 37:10, 37:15, 39:16, 40:20, 41:4, 42:4, 42:12, 42:20, 42:23, 43:4, 43:11, 44:4, 44:10, 46:13, 48:1, 48:8, 48:17, 50:9, 50:13, 50:19,

50:22, 50:25, 51:9, 51:13, 51:25, 53:5, 53:12, 53:15, 53:18, 53:21, 53:23, 54:16, 54:19, 54:24, 55:3, 56:1, 56:5, 56:10, 56:13, 56:22, 57:2, 57:6, 57:13, 57:17, 57:20, 58:1
**MS** [21] - 3:18, 21:17, 21:24, 22:6, 22:10, 22:15, 22:24, 23:5, 23:15, 24:6, 24:12, 24:17, 24:19, 25:3, 25:16, 33:5, 33:8, 33:20, 33:23, 35:1, 35:3
**must** [2] - 8:15, 45:13

**N**

**name** [4] - 21:25, 23:4, 23:7, 30:14
**narrow** [3] - 45:2, 45:24, 52:5
**nearly** [1] - 16:21
**need** [12] - 8:22, 11:18, 13:2, 32:1, 34:17, 34:19, 35:19, 37:1, 46:14, 52:18, 52:20, 53:5
**needless** [1] - 52:22
**needs** [2] - 11:18, 46:9
**new** [3] - 14:9, 16:8, 43:21
**New** [1] - 16:3
**news** [1] - 20:8
**next** [1] - 28:13
**nine** [2] - 3:14, 9:11
**nobody** [1] - 35:15
**non** [1] - 24:13
**none** [1] - 54:2
**nonetheless** [1] - 55:19
**normal** [1] - 57:2
**Northwest** [2] - 26:19, 28:17
**notably** [1] - 39:19
**note** [4] - 4:9, 24:1, 24:12, 52:12
**nothing** [6] - 29:18, 31:4, 41:20, 56:6, 56:7, 57:8
**notice** [11] - 26:10, 26:11, 26:20, 26:21, 28:18, 30:18, 30:19, 35:11, 35:24, 52:19
**notwithstanding** [2] - 18:1, 33:12

**number** [5] - 13:13, 19:14, 43:11, 43:24, 51:14
**NW** [1] - 2:3

**O**

**O'HAGAN** [1] - 2:7
**Obama** [1] - 16:24
**object** [1] - 53:3
**obviously** [4] - 27:10, 34:11, 41:5, 47:10
**occur** [1] - 6:17
**occurred** [1] - 13:25
**OF** [1] - 2:2
**office** [4] - 21:21, 22:1, 23:9, 23:25
**Office** [13] - 9:16, 22:3, 22:6, 27:22, 28:7, 28:8, 30:7, 33:13, 33:23, 34:18, 47:8, 47:20, 47:21
**OFFICE** [1] - 2:2
**officer** [3] - 47:2, 47:5, 47:19
**old** [1] - 14:9
**omit** [1] - 42:17
**one** [16] - 11:3, 16:16, 16:18, 17:21, 19:14, 25:14, 30:12, 31:6, 34:2, 35:6, 43:11, 45:2, 51:14, 52:1, 52:8, 57:23
**opinion** [5] - 6:1, 40:21, 40:25, 41:1, 55:17
**opportunity** [8] - 11:21, 13:14, 15:3, 23:18, 42:9, 51:6, 54:10, 57:24
**opposition** [4] - 4:23, 23:16, 41:15, 53:25
**option** [1] - 42:13
**order** [19] - 3:2, 7:8, 9:9, 9:17, 10:3, 18:14, 18:16, 23:13, 25:6, 27:4, 27:7, 31:23, 32:2, 32:5, 33:14, 39:18, 46:11, 48:18, 55:19
**ordinary** [1] - 29:22
**otherwise** [2] - 26:16, 56:20
**outcome** [1] - 40:11
**outside** [1] - 45:21
**outweighed** [1] - 52:21
**overlooked** [1] - 55:20
**overseeing** [1] - 41:22
**owes** [1] - 36:1

**own** [2] - 12:21, 14:12

**P**

**p.m** [1] - 28:15
**papers** [1] - 36:18
**paragraph** [6] - 27:25, 28:1, 28:11, 28:14, 29:5
**part** [7] - 9:10, 19:21, 33:22, 40:7, 47:11, 51:11, 53:10
**participated** [1] - 20:3
**particular** [4] - 5:5, 8:3, 14:25, 36:8
**particularity** [1] - 43:20
**particularly** [3] - 6:20, 17:4, 45:24
**parties** [3] - 3:6, 45:9, 46:23
**partisan** [1] - 16:16
**party** [6] - 24:15, 24:21, 25:4, 26:16, 37:20, 52:18
**party's** [1] - 37:23
**pattern** [2] - 4:13, 51:1
**PAUL** [1] - 2:7
**pay** [1] - 25:2
**penalty** [1] - 27:20
**pending** [3] - 10:6, 12:23, 15:14
**people** [1] - 16:22
**per** [1] - 17:22
**percent** [1] - 11:1
**perjury** [1] - 27:20
**permission** [1] - 27:10
**person** [15] - 16:16, 21:23, 22:2, 22:13, 22:21, 23:8, 23:24, 30:11, 30:15, 31:14, 31:15, 33:11, 34:2, 34:3, 46:10
**person's** [1] - 21:25
**personally** [2] - 8:22, 8:24
**pertain** [1] - 43:13
**phase** [1] - 53:6
**phone** [1] - 33:9
**physical** [1] - 27:19
**PI** [1] - 41:16
**pick** [1] - 4:21
**picked** [1] - 36:19
**piecemeal** [3] - 12:6, 43:6, 54:9
**plaintiff** [5] - 3:8, 21:18, 25:7, 38:15, 45:6
**plaintiff's** [2] - 26:13, 26:23

**plausibility** [1] - 6:7
**play** [2] - 29:15, 29:17
**pleadings** [1] - 19:13
**plenty** [1] - 57:15
**PLLC** [1] - 2:7
**podium** [1] - 33:7
**point** [8] - 4:20, 24:14, 30:21, 34:7, 36:4, 47:22, 52:1, 54:23
**pointed** [1] - 7:25
**policing** [1] - 14:23
**political** [2] - 15:21, 19:12
**portion** [1] - 44:12
**position** [6] - 8:8, 13:16, 20:24, 24:20, 43:16, 57:9
**possible** [1] - 17:10
**practice** [11] - 4:13, 9:22, 10:10, 11:4, 14:17, 14:24, 17:17, 51:1, 52:15, 52:16
**practiced** [1] - 5:13
**practicing** [1] - 10:24
**practitioner** [1] - 11:2
**precedent** [1] - 7:4
**preclude** [2] - 18:12, 46:1
**precludes** [1] - 37:20
**predetermined** [1] - 13:1
**prejudged** [2] - 40:11, 41:11
**prejudice** [2] - 13:5, 17:14
**preliminary** [17] - 3:25, 4:2, 4:22, 5:1, 6:10, 7:1, 18:8, 26:13, 26:23, 29:4, 30:16, 30:17, 35:13, 40:13, 44:13, 48:19, 52:16
**prepared** [1] - 49:10
**present** [6] - 4:19, 15:25, 21:7, 46:23, 50:24, 50:25
**presentation** [1] - 52:22
**presents** [2] - 45:6, 45:20
**preserve** [2] - 11:4, 38:23
**President** [4] - 5:13, 16:23, 16:24
**presumptuous** [1] - 53:10
**prevail** [1] - 12:10
**preventing** [2] - 35:15, 54:24
**prevents** [1] - 10:23,

38:2, 39:1
**previous** [1] - 6:16
**previously** [4] - 49:11, 51:7, 56:3, 56:19
**private** [2] - 20:13, 26:6
**pro** [2] - 3:10, 5:18
**pro-life** [1] - 5:18
**problem** [2] - 9:5, 49:18
**Procedure** [4] - 6:14, 34:15, 34:22, 35:4
**proceed** [9] - 3:25, 11:18, 31:22, 43:19, 48:2, 48:5, 48:8, 51:24, 55:2
**proceeding** [9] - 6:13, 7:1, 9:7, 11:17, 11:22, 13:6, 39:7, 40:17
**proceedings** [4] - 10:21, 15:24, 38:5, 58:14
**PROCEEDINGS** [1] - 3:1
**process** [16] - 21:16, 25:20, 26:5, 26:6, 28:3, 28:22, 29:9, 29:21, 31:21, 32:11, 32:17, 36:3, 46:6, 46:12, 46:25, 47:16
**Profession** [1] - 3:13
**Professional** [2] - 15:19, 19:16
**Professor** [1] - 18:25
**proffer** [4] - 50:14, 51:11, 56:10, 57:2
**proffering** [3] - 51:9, 51:10, 54:19
**progeny** [1] - 6:7
**promulgated** [4] - 14:1, 14:3, 18:4, 43:17
**proper** [2] - 25:4, 34:22, 47:23
**properly** [1] - 3:21
**proposed** [1] - 7:7
**prosecution** [2] - 4:8, 17:1
**protect** [1] - 10:1
**proud** [1] - 17:25
**provide** [3] - 52:11, 52:16, 52:18
**provides** [1] - 47:2
**provision** [2] - 19:22, 34:24
**provisions** [1] - 34:10
**public** [12] - 16:23, 17:24, 18:2, 20:14, 21:21, 22:1, 23:9,

23:24, 36:1, 41:19, 42:1
**pure** [1] - 52:4
**purpose** [4] - 39:19, 44:20, 52:5, 52:8
**purposes** [2] - 6:10, 48:18
**pursue** [2] - 6:20, 49:13
**pursuing** [1] - 43:6
**put** [2] - 18:23, 49:7

**Q**

**questionable** [1] - 47:14
**quickly** [1] - 9:24
**quiet** [1] - 43:2
**quote** [7] - 38:2, 44:19, 44:21, 44:25, 45:3, 45:5, 45:21
**quote-unquote** [1] - 45:21

**R**

**raise** [24] - 11:21, 11:22, 12:9, 12:11, 15:5, 37:3, 37:4, 37:5, 42:9, 42:16, 42:18, 43:9, 49:14, 49:16, 51:6, 54:11, 56:18, 56:25, 57:11, 57:12, 57:23, 57:24
**raised** [23] - 11:24, 12:2, 12:11, 37:6, 37:8, 37:12, 37:13, 39:21, 40:18, 42:11, 42:19, 43:7, 49:15, 50:2, 50:5, 50:6, 50:7, 51:19, 51:20, 51:21, 54:7, 54:13
**raising** [4] - 8:19, 12:7, 54:5, 54:10
**rather** [1] - 23:9
**read** [6] - 28:1, 28:14, 30:2, 44:11, 50:10, 58:2
**ready** [1] - 17:11
**really** [2] - 39:3, 51:23
**reason** [3] - 54:5, 55:15, 55:18
**reasoned** [1] - 9:24
**reasons** [4] - 19:7, 30:4, 53:4, 56:19
**rebutted** [1] - 4:11
**recalling** [1] - 46:21
**receive** [1] - 32:4
**received** [3] - 23:9, 32:5, 33:10
**recent** [1] - 5:11

**recess** [4] - 46:4, 46:17, 46:18, 49:12
**reciprocal** [1] - 10:20
**recommendation** [6] - 9:17, 10:5, 31:8, 36:25, 39:9, 49:4
**record** [10] - 3:7, 7:6, 18:23, 23:17, 31:12, 49:7, 50:17, 51:8, 51:11, 54:20
**reference** [8] - 5:2, 26:10, 26:20, 28:18, 50:3, 50:4, 53:24
**referenced** [3] - 41:3, 46:5, 52:14
**referencing** [1] - 34:25
**refused** [3] - 12:22, 43:13, 43:14
**regard** [11] - 4:7, 5:7, 12:24, 16:11, 17:13, 22:16, 27:8, 45:18, 48:22, 48:24, 49:1
**regarding** [5] - 7:16, 7:22, 46:6, 46:25, 56:25
**regards** [1] - 5:12
**regurgitate** [3] - 53:3, 53:6
**regurgitated** [1] - 40:5
**reinstatement** [1] - 19:22
**rejection** [1] - 38:6
**related** [1] - 45:8
**relevance** [1] - 54:22
**relevant** [2] - 52:7, 57:1
**relief** [14] - 30:21, 30:22, 36:22, 39:5, 39:10, 44:16, 45:12, 45:19, 48:17, 48:23, 48:24, 49:1, 49:2
**rely** [1] - 18:6
**remain** [1] - 17:25
**remedies** [3] - 8:2, 15:10, 17:9
**remedy** [3] - 42:2, 43:25, 44:2
**rendered** [1] - 38:4
**renew** [1] - 56:2
**repackaging** [1] - 38:14
**repeat** [1] - 45:15
**repeatedly** [2] - 45:1, 52:13
**report** [6] - 13:9, 31:7, 36:24, 39:8, 48:19, 49:4
**reporter** [1] - 46:17
**represent** [1] - 20:16
**representation** [1] -

34:19
**represented** [1] - 19:15
**Republican** [3] - 4:15, 5:19, 16:18
**request** [4] - 49:6, 50:14, 55:23
**requested** [1] - 48:17
**requesting** [1] - 30:22
**require** [2] - 47:7, 47:18
**required** [3] - 4:18, 30:19, 36:25
**requirement** [1] - 13:17
**requires** [2] - 17:4, 47:2
**respect** [3] - 11:16, 21:12, 42:4
**respected** [2] - 10:13, 11:10
**respectfully** [7] - 6:17, 6:23, 42:20, 49:6, 50:14, 54:16, 55:23
**response** [1] - 33:10
**responsibility** [2] - 14:23, 26:5
**Responsibility** [3] - 3:14, 15:20, 19:17
**responsible** [2] - 41:22, 47:12
**rest** [1] - 18:11
**restrained** [1] - 48:15
**result** [1] - 5:15
**retaliated** [1] - 16:11
**retaliatory** [1] - 9:20
**reversal** [1] - 57:7
**reversed** [5] - 6:1, 6:17, 9:13, 53:13, 53:17
**review** [4] - 20:22, 37:21, 38:6, 44:22
**rights** [11] - 6:20, 11:9, 17:21, 37:24, 38:14, 38:17, 38:18, 39:4, 42:13, 44:17, 45:17
**ripe** [1] - 18:3
**RMR** [2] - 58:12, 58:16
**Rooker** [14] - 8:1, 15:4, 18:11, 36:20, 37:17, 39:1, 39:11, 44:11, 44:18, 44:20, 45:2, 45:25, 46:1, 49:19
**Rooker-Feldman** [12] - 18:11, 36:20, 37:17, 39:1, 39:11, 44:11, 44:18, 44:20, 45:2, 45:25, 46:1, 49:19

**Rubin** [1] - 10:15
**Rudy** [1] - 16:4
**Rule** [4] - 11:20, 17:14, 34:8, 45:13
**rule** [21] - 9:2, 12:21, 13:25, 14:3, 14:9, 22:17, 39:21, 40:16, 41:3, 43:17, 43:21, 43:22, 46:5, 46:25, 47:1, 47:17, 49:10, 50:3, 55:16, 55:18
**ruled** [2] - 8:9, 18:18
**rules** [14] - 6:14, 13:2, 13:3, 14:5, 14:12, 18:3, 34:24, 34:25, 36:6, 36:8, 36:12, 37:1, 52:13
**Rules** [4] - 6:14, 34:15, 34:22, 35:3
**ruling** [7] - 9:5, 49:2, 49:3, 49:22, 56:8, 57:21
**rulings** [1] - 43:12
**rushed** [1] - 10:7
**Russian** [1] - 19:20

**S**

**sanctioned** [1] - 19:17
**sat** [1] - 9:14
**Sataki** [1] - 10:3
**satisfy** [2] - 41:7, 41:8
**satisfying** [1] - 40:12
**scheduled** [1] - 55:11
**scheme** [1] - 20:3
**scholar** [1] - 19:1
**se** [2] - 3:10, 17:22
**seated** [1] - 3:11
**second** [2] - 27:25, 38:24
**secondly** [3] - 53:9, 53:21, 53:23
**Section** [2] - 25:7, 44:21
**see** [14] - 14:15, 22:22, 33:3, 33:10, 49:12, 49:17, 49:25, 50:6, 51:15, 51:16, 51:17, 51:20, 54:4, 57:3
**seek** [2] - 11:22, 49:16
**seeking** [9] - 19:8, 36:22, 37:20, 39:4, 39:10, 44:16, 45:18, 50:23, 50:25
**seeks** [1] - 45:17
**seem** [1] - 31:15
**seemingly** [1] - 47:1
**selective** [2] - 4:8, 17:1
**self** [1] - 50:16

**self-authenticating** [1] - 50:16

**semantics** [2] - 29:15, 29:17

**Senators** [1] - 16:5

**send** [1] - 32:11

**sense** [1] - 7:21

**sent** [2] - 9:16, 9:19

**separate** [1] - 35:18

**serious** [1] - 8:14

**seriously** [1] - 20:22

**serve** [4] - 30:8, 30:9, 33:14, 35:19

**served** [36] - 3:21, 7:14, 19:18, 19:23, 21:6, 21:15, 21:19, 22:14, 22:21, 23:13, 23:14, 24:15, 26:18, 27:3, 27:5, 27:13, 27:22, 28:10, 28:15, 28:24, 29:3, 30:6, 30:10, 30:14, 31:4, 32:2, 32:15, 34:18, 34:19, 35:13, 46:11, 46:12, 47:3, 47:8, 48:9, 48:21

**server** [7] - 20:13, 26:7, 28:4, 28:23, 29:10, 32:12, 32:18

**servers** [1] - 29:22

**service** [57] - 21:18, 21:20, 22:3, 22:4, 22:23, 23:17, 23:21, 24:14, 25:5, 25:15, 25:16, 25:20, 26:1, 26:2, 26:5, 26:9, 27:1, 27:7, 27:10, 27:11, 27:16, 28:13, 28:20, 28:25, 29:6, 29:8, 29:19, 29:23, 30:5, 31:5, 31:17, 31:19, 32:3, 32:4, 33:12, 33:14, 33:25, 34:3, 34:8, 34:12, 34:16, 34:20, 34:22, 34:23, 35:12, 36:3, 36:9, 46:6, 46:25, 47:16, 47:18, 47:21, 47:23, 48:6, 48:7, 48:10

**serving** [3] - 26:24, 29:4, 34:13

**set** [5] - 7:4, 37:1, 38:10, 43:20, 43:24

**setting** [1] - 39:13

**seven** [3] - 19:18, 19:22, 55:14

**several** [2] - 25:18, 52:24

**shall** [4] - 13:12, 14:4,

43:22

**share** [1] - 52:6

**shell** [1] - 42:5

**Shipp** [1] - 16:15

**shirked** [1] - 18:18

**short** [1] - 44:12

**shorten** [1] - 11:17

**show** [2] - 41:17, 51:1

**showing** [2] - 23:11, 26:1

**shown** [1] - 17:13

**sic** [1] - 17:20

**signed** [1] - 27:19

**significant** [3] - 17:12, 17:18, 18:9

**similar** [1] - 19:10

**similarity** [1] - 4:17

**situation** [3] - 14:22, 20:1, 20:11

**Sixth** [1] - 6:21

**slap** [1] - 19:4

**slow** [3] - 55:4, 55:5, 55:9

**sole** [1] - 11:2

**solely** [2] - 44:22, 45:12

**someone** [3] - 23:6, 32:4, 43:19

**somewhere** [1] - 23:4

**soon** [2] - 46:7, 46:16

**sorry** [2] - 27:21, 34:8

**sort** [2] - 37:1, 41:24

**sought** [4] - 8:2, 8:3, 39:5, 45:12

**speaks** [1] - 37:17

**Special** [1] - 20:2

**specifically** [3] - 4:25, 11:15, 34:1

**speeded** [2] - 55:10, 55:13

**spinning** [1] - 38:20

**stacked** [1] - 10:11

**stacking** [4] - 9:7, 10:2, 10:18, 17:15

**stage** [1] - 30:19

**stand** [9] - 4:6, 11:12, 11:13, 21:1, 50:20, 52:4, 52:8, 52:11, 53:2

**standard** [2] - 6:6, 40:12

**standing** [2] - 11:5, 11:7

**start** [1] - 21:12

**started** [1] - 52:11

**state** [5] - 3:6, 7:20, 7:23, 12:8, 12:10, 12:23, 15:6, 15:14, 18:13, 34:9, 37:8, 37:15, 37:20, 37:21,

37:23, 38:3, 38:4, 38:16, 39:5, 39:6, 41:21, 41:22, 41:24, 42:16, 42:17, 42:19, 43:7, 43:10, 44:22, 45:9, 45:11, 49:13, 49:14, 50:6, 51:5

**state's** [1] - 34:13

**States** [4] - 17:19, 26:12, 26:22, 37:22

**states** [2] - 13:8, 26:7

**stating** [1] - 21:19

**statute** [2] - 13:7, 13:8

**statutory** [1] - 14:5

**stay** [7] - 12:22, 12:24, 12:25, 15:13, 17:10, 43:14

**Steele** [1] - 20:4

**still** [4] - 11:8, 13:21, 55:17, 55:25

**Stop** [1] - 39:6

**stop** [1] - 41:25

**stopping** [1] - 41:21

**Street** [3] - 2:3, 26:19, 28:16

**strong** [1] - 6:1

**structure** [1] - 33:18

**subject** [1] - 15:23

**subjected** [1] - 13:6

**submit** [4] - 18:25, 19:4, 22:15, 35:9

**submitted** [5] - 4:9, 18:22, 53:23, 54:1, 54:2

**subsequently** [1] - 49:23

**substance** [1] - 37:21

**substantial** [1] - 4:17

**substantially** [1] - 19:10

**substituted** [1] - 24:19

**success** [2] - 17:13, 41:6

**succinct** [1] - 44:12

**sue** [2] - 24:21, 25:6

**sued** [6] - 3:15, 16:22, 24:23, 25:9, 47:15

**suggest** [3] - 31:20, 41:20, 58:1

**sui** [1] - 24:13

**Suite** [2] - 2:3, 2:8

**suits** [1] - 38:2

**summons** [3] - 26:9, 26:19, 28:17

**Superior** [21] - 7:18, 8:4, 8:9, 8:13, 10:6, 34:15, 35:3, 36:21, 38:10, 39:19, 40:22, 42:6, 44:1, 44:15, 46:25, 49:21, 49:24,

51:19, 54:8, 57:12

**support** [2] - 40:10, 41:10

**supports** [2] - 35:18, 42:1

**Supreme** [9] - 10:12, 37:25, 38:8, 44:3, 44:5, 44:8, 44:19, 44:22, 45:1

**suspended** [1] - 19:24

**suspension** [1] - 10:8

**sworn** [1] - 26:8

**system** [5] - 7:23, 12:20, 14:17, 16:7, 16:25

**Systems** [2] - 44:24, 45:22

---

**T**

**Ted** [1] - 16:6

**temporarily** [1] - 19:24

**temporary** [1] - 10:8

**ten** [1] - 53:17

**tendered** [1] - 25:24

**terms** [5] - 4:16, 6:4, 17:16, 18:7, 30:21

**territory** [1] - 8:20

**testify** [6] - 4:6, 4:18, 6:11, 11:1, 18:22, 49:7

**testimony** [5] - 52:11, 52:17, 52:18, 52:21, 54:2

**Texas** [1] - 50:14

**THE** [124] - 3:11, 3:17, 3:23, 4:3, 7:10, 8:6, 8:8, 8:18, 8:24, 11:21, 12:2, 12:6, 13:15, 13:21, 14:14, 14:21, 15:3, 15:5, 20:23, 21:2, 21:5, 21:8, 21:11, 21:23, 22:4, 22:8, 22:12, 22:17, 23:3, 23:11, 24:2, 24:7, 24:10, 24:16, 24:18, 24:25, 25:11, 25:14, 25:17, 27:2, 27:13, 27:21, 28:3, 28:6, 28:10, 28:19, 29:1, 29:7, 29:11, 29:13, 29:17, 29:24, 30:1, 30:8, 30:25, 31:3, 31:10, 31:14, 31:24, 32:10, 32:13, 32:19, 32:23, 33:2, 33:6, 33:17, 33:21, 34:24, 35:2, 35:5, 35:7, 35:17, 36:5, 37:2, 37:14, 39:14, 40:14, 41:2,

42:3, 42:8, 42:15, 42:22, 42:24, 43:5, 43:25, 44:6, 46:3, 46:15, 46:19, 46:24, 48:5, 48:11, 49:10, 50:11, 50:18, 50:21, 50:23, 51:4, 51:12, 51:14, 53:10, 53:13, 53:16, 53:19, 53:22, 54:4, 54:18, 54:22, 55:1, 55:5, 55:8, 55:17, 55:24, 56:3, 56:6, 56:12, 56:15, 56:24, 57:5, 57:8, 57:15, 57:19, 57:22, 58:3

**theoretically** [1] - 25:1

**therefore** [6] - 35:19, 37:1, 44:9, 49:3, 51:20, 54:2

**they've** [3] - 35:11, 41:11, 54:2

**third** [3] - 27:25, 28:1, 28:11

**thorough** [1] - 4:20

**three** [2] - 3:14, 19:12

**throughout** [1] - 5:5

**thrown** [1] - 20:15

**time-consuming** [1] - 10:23

**timeline** [1] - 12:17

**timely** [2] - 12:16, 17:8

**titled** [1] - 58:14

**today** [12] - 3:24, 4:6, 5:3, 6:10, 19:6, 31:25, 35:15, 39:4, 39:20, 48:25, 49:7, 55:11

**tolerated** [1] - 17:7

**took** [1] - 49:12

**top** [1] - 27:24

**topic** [2] - 37:18, 39:11

**transcript** [1] - 58:13

**transcription** [1] - 58:13

**trash** [1] - 20:15

**trial** [3] - 26:11, 26:21, 48:25

**tried** [1] - 17:9

**trigger** [1] - 10:20

**triggered** [1] - 19:20

**true** [2] - 14:8, 58:13

**Trump** [1] - 5:13

**try** [4] - 39:2, 39:10, 46:9, 50:24

**trying** [6] - 23:1, 23:20, 29:17, 42:25, 55:4, 55:5

**twice** [1] - 45:4

**two** [5] - 16:12, 30:4, 34:10, 34:21, 41:18
**Twombly** [1] - 6:7
**Ty** [1] - 20:14
**type** [1] - 47:9
**typically** [1] - 25:3

**U**

**U.S** [2] - 44:25, 45:23
**U.S.C** [3] - 44:21, 45:14, 45:15
**ultimately** [1] - 5:24
**uncertainty** [1] - 9:22
**unconstitutional** [1] - 31:9
**under** [22] - 5:19, 6:7, 6:13, 6:21, 8:1, 11:25, 12:18, 14:4, 14:9, 16:14, 17:5, 18:10, 27:19, 34:8, 34:15, 34:21, 43:21, 44:17, 45:13, 45:14
**underscores** [1] - 36:4
**undue** [1] - 52:21
**unethical** [1] - 10:16
**unfair** [1] - 10:16
**unintentional** [1] - 55:15
**United** [4] - 17:19, 26:12, 26:22, 37:22
**unquote** [5] - 44:23, 45:2, 45:4, 45:5, 45:21
**up** [22] - 4:21, 5:25, 7:18, 8:17, 8:25, 9:21, 10:25, 20:7, 27:24, 33:6, 36:19, 39:15, 39:25, 40:2, 40:19, 44:4, 49:8, 50:17, 52:3, 55:10, 55:13
**upset** [1] - 42:25
**usurp** [1] - 14:16

**V**

**vacate** [1] - 31:7
**various** [3] - 5:21, 6:12, 19:7
**vests** [1] - 44:21
**vexatious** [1] - 6:19
**view** [2] - 56:18, 56:20
**viewpoint** [9] - 4:8, 4:14, 5:7, 5:12, 17:2, 18:24, 49:5, 51:1, 53:1
**views** [2] - 18:1, 53:1
**vindictive** [1] - 9:20
**violated** [5] - 38:17, 38:18, 39:23, 40:16,

42:7
**violates** [1] - 37:24
**violating** [1] - 18:14
**violation** [7] - 15:2, 15:6, 25:7, 38:14, 44:17, 45:16, 51:16
**Virginia** [1] - 2:8
**virtually** [1] - 9:12
**void** [1] - 48:19

**W**

**waited** [1] - 10:2
**Wallace** [1] - 16:14
**wants** [3] - 37:2, 39:2, 43:18
**Washington** [3] - 2:4, 26:19, 28:17
**waste** [1] - 52:22
**ways** [1] - 5:16
**weaponized** [2] - 16:8, 16:25
**weaved** [1] - 32:8
**Weaver** [4] - 26:6, 27:24, 28:3
**week** [1] - 26:17
**weekend** [1] - 23:22
**weigh** [1] - 6:23
**well-respected** [1] - 10:13
**whatsoever** [1] - 56:8
**whichever** [1] - 7:2
**wins** [1] - 10:13
**witness** [4] - 4:6, 11:12, 11:13, 20:25
**witnesses** [1] - 52:20
**wonderment** [1] - 52:6
**works** [1] - 23:7
**wrist** [1] - 19:21
**writing** [1] - 22:8

**Y**

**year** [1] - 10:14
**years** [9] - 8:20, 10:4, 10:25, 11:6, 11:8, 26:15, 52:15, 53:16
**York** [1] - 16:4
**Younger** [1] - 8:1

EXHIBIT 3

*IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA*

---

**Larry Klayman**

*Plaintiff*

vs.                          Case No.: 1:24-cv-02997-RBW

**District of Columbia Court of Appeals, et al.**
*Defendants*

---

## AFFIDAVIT OF SERVICE

I, Michael Weaver, a Private Process Server, being duly sworn, depose and say:

That I have been duly authorized to make service of the Summons; Notice, Consent, and Reference of a Civil Action to a Magistrate Judge; Notice of Right to Consent to Trial before a United States Magistrate Judge; Plaintiff's Motion for Preliminary Injunction with Exhibits; and Complaint with Exhibits in the above entitled case.

That I am over the age of eighteen years and not a party to or otherwise interested in this action.

That on 05/15/2025 at 2:59 PM, I served District of Columbia Court of Appeals at 430 E Street, NW, Washington, DC 20001 with the Summons; Notice, Consent, and Reference of a Civil Action to a Magistrate Judge; Notice of Right to Consent to Trial before a United States Magistrate Judge; Plaintiff's Motion for Preliminary Injunction with Exhibits; and Complaint with Exhibits by serving A. Jefferson, Clerk, authorized to accept service.

A. Jefferson is described herein as:

Gender:   Female        Ethnicity:   Black        Age:   49        Weight:   195        Height:   5'7"        Hair:   Black

I solemnly affirm under the penalties of perjury that the contents of this document are true to the best of my knowledge, information, and belief.

Executed on <u>05/15/2025</u>

_____
Michael Weaver

Client Ref Number:
Job #:13326646

---

*Capitol Process Services, Inc. | 7500 Greenway Center Drive, Suite 420, Greenbelt, Maryland 20770 | (202) 667-0050*

# EXHIBIT 2

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
401 West Central Boulevard
Orlando, Florida 32801

Elizabeth M. Warren                                              Tel.: 407-835-4200
Clerk of Court                                                   Fax: 407-835-4228


September 19, 2025


Mr. Larry E. Klayman, Esq.
Klayman Law Group, PA
7050 W Palmetto Park Rd
Boca Raton, FL 33433-3426

Via email only

        Re:     District of Columbia Court of Appeals Suspension

Dear Mr. Klayman,

        I am in receipt of your August 12, 2025 letter regarding an August 7, 2025 District
of Columbia Court of Appeals order suspending your District of Columbia bar
membership for 18 months.  In the letter, you request "that any consideration of
reciprocal proceeding be postponed for consideration until I file and have adjudicated a
petition for rehearing . . . and these enumerated legal challenges run their course as a
matter of due process and fundamental fairness."

        I am also in receipt of your September 8, 2025 letter regarding your recent attempt
to renew your bar membership with the Middle District of Florida. In the September 8
letter, you state that you answered "yes" to the following question on the online
membership renewal form: "Since the 2020 renewal period, have you been disbarred,
censured, or denied admission by the Supreme Court of Florida, or by another court of
competent jurisdiction?"  You explain that you answered "yes" because of a separate,
October 17, 2022 District of Columbia Court of Appeals suspension order, which you have
challenged in the District of Columbia court.  In addition, you point out that you
previously petitioned this Court not to impose reciprocal discipline based on the October
17, 2022 suspension order in accordance with Rule 2.04(b)(2), Local Rules of the United
States District Court for the Middle District of Florida Local.  See In re: Larry Klayman,
Case No. 3:22-mc-14-JRK.  In the September 8 letter, citing pending cases in this court,[1]
you request that you be permitted to pay your renewal dues "at least pending resolution
of the matter which is currently stayed in this Court with regard to my continued legal
challenge of this District of Columbia matter as set forth in [case number 3:22-mc-14]."
The September 8 letter does not reference the more recent August 7 order of suspension.

---

        [1] See Loomer v. Maher et al., 5:24-cv-625-JSM-PRL; ROKiT World Inc et al. v. Rocketball
LTD et al., 3:24-cv-879-WGY-PDB; Able Events et al v. Rocket Ball Ltd et al, 3:25-cv-1041-
WWB-LLL.

Under Rule 2.04(b)(1), "[a] lawyer must inform the clerk within fourteen days after the lawyer is convicted of a felony or loses good standing with, is publicly disciplined by, is disbarred on consent from, or has resigned from, any bar." Further, Rule 2.04(b)(2) states that "[t]wenty-one days after an event listed in (b)(1), a lawyer is automatically suspended. But automatic suspension under this rule is stayed if, before the automatic suspension, the lawyer petitions the chief judge for relief."

The August 12, 2025 letter is not a petition to the chief judge requesting to stay the automatic suspension in this Court under Rule 2.04(b)(2), a process with which you are familiar as evidenced by the petition you filed in case number 3:22-mc-14. As such, the Court will take no action on your letter. Pursuant to Rule 2.04(b)(2), your membership in the Middle District of Florida bar is due to be automatically suspended 21 days after the effective date of the August 7 order of suspension from the District of Columbia Court of Appeals. The August 7 order of suspension's effective date is September 8, 2025. Thus, your membership in this court's bar will be suspended on September 29, 2025, 21 days after that effective date.[2] The Clerk's Office will update your CM/ECF membership record accordingly. As a result, your Middle District of Florida e-filing privileges will be removed from your PACER account, and you will not be permitted to renew your membership at this time.

Sincerely,

*Elizabeth Warren*

Elizabeth M. Warren

Copies to:
Honorable Marcia Morales Howard, Chief United States District Judge
Honorable Wendy Williams Berger, United States District Judge
Honorable William G. Young, United States District Judge
Honorable James S. Moody, Jr., United States District Judge
Honorable Philip R. Lammens, United States Magistrate Judge
Honorable Patricia D. Barksdale, United States Magistrate Judge
Honorable Laura Lothman Lambert, United States Magistrate Judge
Honorable Samual J. Horovitz, United States Magistrate Judge

---

[2] Because the August 7 Order of Suspension is a public discipline, it appears that your automatic suspension actually occurred as early as August 28, 2025.

EXHIBIT 3

 Gmail

Oliver Peer <oliver.peerfw@gmail.com>

## Letter Concerning Payment of Membership Dues

**Larry Klayman** <leklayman@gmail.com>                                    Sun, Sep 21, 2025 at 9:54 AM
To: Oliver Peer <oliver.peerfw@gmail.com>, Larry Klayman <leklayman@gmail.com>

---------- Forwarded message ---------
From: **Larry Klayman** <leklayman@gmail.com>
Date: Fri, Sep 5, 2025 at 11:33 AM
Subject: Fwd: Letter Concerning Payment of Membership Dues
To: <attorney_admissions_orl@flmd.uscourts.gov>
Cc: Larry Klayman <leklayman@gmail.com>


Please kindly see the attached letter concerning my payment of membership dues.

Sincerely,

Larry Klayman, Esq.

---------- Forwarded message ---------
From: **Oliver Peer** <oliver.peerfw@gmail.com>
Date: Fri, Sep 5, 2025 at 11:26 AM
Subject: Letter Concerning Payment of Membership Dues
To: Larry Klayman <leklayman@gmail.com>

---

📄 **2025.09.05 - L. to Ct. Concerning Dues.pdf**
283K

# KLAYMAN LAW GROUP

## A PROFESSIONAL ASSOCIATION

Larry Klayman, Esq.
leklayman@gmail.com

7050 W. Palmetto Park Rd. Ste. 284
Boca Raton, FL 33433

Tel: 561-558-5336
Fax: 202-379-9289

## STATUS OF ADMISSION TO MIDDLE DISTRICT OF FLORIDA OF LARRY ELLIOT KLAYMAN

I, Larry Elliot Klayman, Florida Bar No. 246220, have been a member in good standing continuously with The Florida Bar since December 7, 1977—that is nearly 48 years—and a member in good standing continuously with the U.S. District Court for the Middle District of Florida since December 14, 1978 – that is nearly 47 years.  In this nearly half a century, I have never been sanctioned, reprimanded or censured by any member of this honorable Court. *See* Attachments 1 and 2 – Certificates of Good Standing with The Florida Bar and this Court respectfully.

I currently have pending before this Court the following cases, with clients who have significant and very important interests:

(1) *Loomer v. Maher et al*, 5:24-cv-625 (M.D. Fl.) [Defamation case brought by Plaintiff Laura Loomer against Defendants Bill Maher and Home Box Office, Inc.]
(2) *ROKiT World Inc v. Williams Grand Prix Engineering Limited et al*, 3:24-cv-878 (M.D. Fla.) [ Case brought by the Plaintiff against Williams Grand Prix Engineering and its agents for fraud]
(3) *ROKiT World Inc et al v. Rocketball LTD et al*, 3:24-cv-879 (M.D. Fla.) [ Case brought by the Plaintiffs against the Houston Rockets and their legal counsel for RICO violations, fraud, and assault]

I also have two cases which originated in this Court and are now up on appeal and could, if successful with petitions for rehearing en banc, be remanded back to this Court for further proceedings.

On September 3, 2025, in response to the ECF notification from this Court regarding membership dues, I attempted to pay the fee to continue to be a member of this Court and checked a box which asked: "Since the 2020 renewal period, have you been disbarred, censured, or denied admission by the Supreme Court of Florida, or by another court of competent jurisdiction?"

I checked this box because in 2021 I had applied for admission with the U.S. Court of Appeals for the Eleventh Circuit and was denied admission at that time pending resolution of a disciplinary matter that arose in the District of Columbia,

not in Florida or this Court. And the reason for admission later became moot as my client, Dr. Jerome Corsi, retained appellate counsel to represent him at the Eleventh Circuit. I therefore did not reapply.

Currently, another matter arising in the District of Columbia, which is before this Court, *In re Klayman et al*, 18-BG-100 (D.C. Ct. App.), had been and continues to be stayed pending my legal challenges to this suspension order. This is reflected in Attachment 3. It is common knowledge that the District of Columbia disciplinary apparatus has become very partisan. I am the founder of Judicial Watch and Freedom Watch, both conservative non-profit legal watchdog groups. But notwithstanding this, even more importantly there are strong valid factual and legal bases to challenge this suspension order on the merits. And again, this matter does not concern any alleged conduct originating either before this Court or Florida in general.

In sum, I currently have no final disciplinary matter in Florida and have at all material times, that is for almost half a century, been a member in good standing with this Court and The Florida Bar and Florida Supreme Court.

Given the important interests of my clients and me, I respectfully request that I be permitted to pay my dues to remain a member of this honorable Court at least pending resolution of the matter which is currently stayed in this Court with regard to my continued legal challenge of this District of Columbia matter as set forth in Attachment 3.

Please be so kind as to advise who I may communicate with if necessary, including but not limited to the Chief Judge, or any other pertinent Court authority, to resolve this important matter for the benefit to my clients and me as soon as possible before my current membership may otherwise expire.

Thank you for your professional courtesy and consideration. And many thanks as well to Susanna of the Court who contacted me at my request to advise me how to proceed.

Sincerely,

Larry Klayman, Esq.

# EXHIBIT 1



# The Florida Bar

**651 East Jefferson Street**
**Tallahassee, FL 32399-2300**

**Joshua E. Doyle**
**Executive Director**

**850/561-5600**
**www.FLORIDABAR.org**

State of Florida      )

County of Leon      )

In Re:   0246220
Larry Elliot Klayman
Klayman Law Group, PA
7050 W Palmetto Park Rd
Boca Raton, FL 33433-3426

I CERTIFY THE FOLLOWING:

I am the custodian of membership records of The Florida Bar.

Membership records of The Florida Bar indicate that The Florida Bar member listed above was admitted to practice law in the state of Florida on **December 7, 1977**.

The Florida Bar member above is an active member in good standing of The Florida Bar who is eligible to practice law in the state of Florida.

Dated this  5th  day of **September, 2025**.



Cynthia B. Jackson, CFO
Administration Division
The Florida Bar

PG:R10
CTM-367212

EXHIBIT 2

AO 136 (Rev. 10/13) Certificate of Good Standing



# UNITED STATES DISTRICT COURT
for the
## Middle District of Florida

**CERTIFICATE OF GOOD STANDING**

I, **Elizabeth M. Warren**, Clerk of this Court, do hereby certify that

**Larry Elliot Klayman**, Florida Bar # **0246220**, was duly admitted to practice

in this Court on **December 14, 1978**, and is in good standing as a member of

the Bar of this Court.

Dated at: **Orlando, Florida** on September 04, 2025.



**Elizabeth M. Warren**

*Clerk of Court*

EXHIBIT 3

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

IN RE: LARRY KLAYMAN                        Case No. 3:22-mc-14-JRK

_____

# O R D E R

In response to this Court's Order entered January 13, 2023 (Doc. No. 3), Mr. Klayman filed an interim response (Doc. No. 4), and then an updated petition (Doc. No. 5), and also submitted a USB drive containing the record of the prior disciplinary proceedings in the District of Columbia. That record needs to be made part of this record. **The Clerk** is directed to **file** in the above-captioned matter all documents included in the USB drive submitted by Mr. Klayman on about January 27, 2023.

Mr. Klayman also filed a "Motion to the Chief Judge, the Honorable Timothy J. Corrigan, to Stay" (Doc. No. 6; "Motion"), on February 3, 2023. At Judge Corrigan's request, the undersigned is designated to decide the Motion. Upon review of the Motion and Mr. Klayman's other filings, the Motion is **GRANTED** to the extent that this matter is **STAYED pending further Order**.

Mr. Klayman is **DIRECTED** to immediately provide this Court with copies of any materials he provides to the United States Court of Appeals for the Fifth Circuit in response to the Clerk of that Court's December 8, 2022 letter to him directing that he advise that Court when the proceedings in the District of Columbia Superior Court are concluded and when the writ of mandamus or certiorari proceedings are concluded. **Mr. Klayman is advised that the failure to keep this Court informed of the status of those proceedings or any material change in circumstance may result in the imposition of reciprocal discipline without further notice.**

**DONE AND ORDERED** in Jacksonville, Florida on February 6, 2023.

_James R. Klindt_
JAMES R. KLINDT
United States Magistrate Judge

kaw
Copies to:
     Hon. Timothy J. Corrigan
     Chief U.S. District Judge
     Middle District of Florida

     Larry Klayman, Esquire

# EXHIBIT 4

AO 136 (Rev. 10/13) Certificate of Good Standing



# UNITED STATES DISTRICT COURT

for the

## Middle District of Florida

**CERTIFICATE OF GOOD STANDING**

I, **Elizabeth M. Warren**, Clerk of this Court, do hereby certify that

**Larry Elliot Klayman**, Florida Bar # **0246220**, was duly admitted to practice

in this Court on **December 14, 1978**, and is in good standing as a member of

the Bar of this Court.

Dated at: **Orlando, Florida** on September 04, 2025.



**Elizabeth M. Warren**

*Clerk of Court*

# EXHIBIT 5

## DISTRICT OF COLUMBIA COURT OF APPEALS
## BOARD ON PROFESSIONAL RESPONSIBILITY
## AD HOC HEARING COMMITTEE

_____

**In the Matter of:**

    **LARRY E. KLAYMAN, ESQ.**

**Respondent.**               **Bar Docket No.  DDN 2017-D051**
                                        **Board Docket No 18-BD-070**

**A Member of the Bar of the District of**
  **Columbia Court of Appeals**

**(Bar Registration No. 334581)**

---

### RESPONDENT'S POST HEARING BRIEF

---

### INTRODUCTION

    Between July 15th and 18th, 2019, this honorable Ad Hoc Hearing Committee ("AHC") held a hearing and, at its conclusion, could not find any clear and convincing evidence that Respondent Larry Klayman had violated any of the allegations contained in the Specification of Charges. This finding, coming at this preliminary stage, is rare and unique, as hearing committees usually provisionally issue non-binding rulings which then permit them to take evidence on factors involving mitigation and/or aggravation.

    Specifically, as stated by the honorable chair of the AHC at the end of the hearing, it was "unable to reach a non-binding determination" as to whether

1

Respondent had committed any ethical violations. Tr.807. Later in her scheduling order, which issued on August 8, 2019, the honorable chair reiterated its finding that, "the Hearing Committee went into executive session and determined that it could not make a preliminary finding that Disciplinary Counsel had proven any disciplinary rule violation." Under Rule 12 of the Board of Professional Responsibility ("Board Rules"), as a matter of course, the chair ordered briefing of the contested issues of fact and law.

After attempting to pile on by arguing for complete disbarment of Respondent in its closing argument at the hearing, Disciplinary Counsel ("ODC"), now recognizing that there was no demonstrable violation of the District of Columbia Rules of Professional Responsibility ("Bar Rules"), has conspicuously and not surprisingly tactically retreated and now shamelessly and conveniently asks for a year suspension with a reinstatement provision. However, even this proposed "Hail Mary" sanction is not warranted, and in any event a reinstatement provision could in practice become the equivalent to disbarment and thus forced retirement, as it is well known that this procedure usually takes years to play itself out. Respondent turned 68 on July 20 of this year. Ms. Julia Porter, on behalf of ODC, argued at the close of her closing argument that Respondent "should not continue to have the privilege of being a lawyer...." Tr.772. However, misplaced and inappropriate, this regrettably is the ultimate heavy-handed goal.

In analyzing the briefs of the parties, and in particular ODC's, which itself ironically makes several misstatements and in apparent desperation pursues a myriad of allegations not even in its Specification of Charges, it is important to recognize that ODC did not present one substantive witness of its own, much less an expert witness, at the hearing, whereas Respondent, in addition to the findings of Judge Ronald Gould ("Judge Gould"), who found that Respondent had not lied to the Honorable Gloria Navarro (the "District Court" or "Judge Navarro")  or the U.S. Court of Appeals for the Ninth Circuit ("Ninth Circuit"), himself testified at great length, supported by the distinguished expert testimony of the dean of one of the most prestigious universities and law schools in the United States, Professor Erwin Chemirinsky ("Dean Chemerinsky") of the University of California at Berkeley's Boalt Hall. As the testimony demonstrated, Respondent was truthful in his *pro hac vice* application, which application is the crux of the failed charged against him. Judge Gould found and held:

> Klayman properly disclosed the ongoing disciplinary proceeding in his initial application for pro hac vice admission, saying that the proceeding had not yet been resolved. This disclosure was accurate…. I agree with Klayman that he was not obligated to re-litigate the D.C. proceeding before the district court and that he did not have to provide the district court with the entire record from D.C. And if his disclosures were selective, still he is an advocate, an advocate representing defendant Cliven Bundy, and after submitting a compliant response to the questions in the pro hac vice application, he had no greater duty to disclose any possible blemish on his career or reputation beyond responding to the district court's further direct requests. RX0427-0428

Importantly, Dean Chemirinsky agreed by testifying both in a sworn affidavit and at the hearing. PFF#6, Tr.680-681.

Importantly, Dean Chemerinsky, volunteered to testify and did not even ask for or take remuneration from the Respondent. Tr.693. Although Dean Chemerinsky is of a different ideological background than Respondent, he and Judge Gould are men of integrity and fine jurists and ethics and constitutional law experts. They clearly rendered and gave honest findings and opinions concerning Respondent's conduct, particularly in the context of having to zealously attempt to defend a client who faced the prospect of life imprisonment if convicted on 16 alleged felony counts, and who wanted Respondent at all times to be his criminal defense counsel. And, to support this is the simple hard fact, which ODC cannot refute and thus surmount, that Respondent was tellingly was never sanctioned for his advocacy by either the District Court or the Ninth Circuit.

Indeed, when queried by the Chair about the reasons for filing renewed petitions for writs of mandamus, so that Respondent's client could have his constitutionally protected counsel of choice represent him, Respondent pointed out truthfully:

> MR. KLAYMAN: Not in this case because they were changed circumstances every step of the way. Your Honor asked some very good questions about that. There were changed circumstances. Things were happening that changed the equation, and you heard Dean Chemerinsky

say that he felt that what I did was reasonable. Tr.802-803. *See also* Tr.484-492.

In this context, ODC would try to have the Committee believe that neither Respondent nor his client Cliven Bundy ("Mr. Bundy") had the right to zealously pursue *pro hac vice* entry, much more defend themselves in the underlying criminal proceeding and this disciplinary proceeding, which not coincidentally was triggered by Thomas Fitton ("Mr. Fitton"), the non-lawyer president of Judicial Watch, who sent the initial Ninth Circuit ruling to ODC, which ODC then seized upon. Respondent and Mr. Fitton have been at odds for the last 16 years, after Respondent left Judicial Watch, which he conceived of and founded, to run for the U.S. Senate in Florida. As found by Judge Gould, lawyers who zealously defend their clients are often necessary in such high-profile and highly charged criminal prosecutions like Mr. Bundy's:

> It may be that Klayman is not an attorney whom all district court judges would favor making an appearance in their courtroom. It seems he has been, and may continue to be, a thorn in the side. Still, concerns about trial judge irritation pale in comparison to a criminal defendant's need for robust defense. In providing a full and fair defense to every criminal defendant, there will by necessity be occasions when the difficult nature of the case evokes sharply confrontational lawyering. In tough cases with skilled prosecutors, aggressive positions by defense lawyers are sometimes an unavoidable part of strong advocacy, and contribute to making the proceeding an ultimately fair one for the defendant. RX0430.

At all times during the hearing, Respondent testified and answered questions fully and truthfully, and both the facts and the law support a finding of no clear and

convincing evidence of any Bar Rule violation. No matter how hard ODC may now try to mischaracterize the facts and go way beyond its Specifications of Charges, as set forth in the proposed findings and counterfindings below, or now conveniently retreat from its proposed sanction of disbarment, it cannot prevail any more than it did at the hearing, where its demeanor and that of Respondent were put before and on display before the honorable committee. A reading of the closing arguments found at pages 774-806 of the transcript bears this out, in addition to what the facts and legal argument compellingly show, as set forth below.[1]

## **RESPONDENT'S PROPOSED FINDINGS OF FACT**

## **I.    There is No Clear and Convincing Evidence of Any Ethical Violation**

1.     ODC has the burden of proving alleged violations of disciplinary rules by clear and convincing evidence. Board Rule 11.6, Tr.807.

2.     The AHC was "unable to reach a non-binding determination" as to whether Respondent had committed any ethical violations. Tr.807. In is August 8, 2019 order, the AHC wrote "the Hearing Committee went into executive session and determined that it could not make a preliminary finding that Disciplinary Counsel had proven any disciplinary rule violation."

---

[1] Respondent would have included many more affirmative findings of fact, but for the fact that he had to operate under the 14,000-word limit and was forced to use much of this word allotment to refute ODC's frequently irrelevant and false and misleading proposed findings of fact and law in its post hearing brief.

3.    The number of filings that Respondent made with the Ninth Circuit and the Supreme Court were reasonable, particularly under the circumstances of the case. Given the enormous stakes for Mr. Bundy, who was facing the possibility of life imprisonment, Respondent owed it to his client to explore and pursue every possible avenue to protect his interests. Dean Chemerinsky, one of the most renowned legal scholars and current Dean of the U.C. Berkeley School of Law at Boalt Hall, found that the amount of filings made by Respondent were reasonable. Tr.671. "Yes, I do. I think that it was reasonable under the circumstances of the case… This is about the ability of a criminal defendant to have counsel of choice; that the district court had refused to allow the pro hoc vice status; and the defendant wanted to have Mr. Klayman represent him. And the only way of having the district court decision reviewed was through these writs of mandamus." Tr.691. RX0849-0853.

4.    Respondent properly answered the questions presented to him in his application to be admitted *pro hac vice* in the District of Nevada, and had no duty to provide any additional information beyond what was asked of him. RX0427-0428. Tr.680-681; RX 0851–0852.

5.    Judge Gould found that Respondent provided Judge Navarro with compliant responses to the *pro hac vice* application, and had no duty to disclose anything further that was not asked of him:

Klayman properly disclosed the ongoing disciplinary proceeding in his initial application for pro hac vice admission, saying that the proceeding had not yet been resolved. This disclosure was accurate…. I agree with Klayman that he was not obligated to re-litigate the D.C. proceeding before the district court and that he did not have to provide the district court with the entire record from D.C. And if his disclosures were selective, still he is an advocate, an advocate representing defendant Cliven Bundy, and after submitting a compliant response to the questions in the pro hac vice application, he had no greater duty to disclose any possible blemish on his career or reputation beyond responding to the district court's further direct requests. RX0427-0428.

6.    Dean Chemerinsky also concurred with Judge Gould's finding that Respondent had fulfilled his duty of candor in filling out the *pro hac vice* application and that Respondent had answered all the questions that he was required to answer in his *pro hac vice* application. Tr.680-681; RX 0851–0852.

7.    Respondent has not been sanctioned by Judge Navarro, the Ninth Circuit, or the Supreme Court for any of the filings related to his efforts to obtain *pro hac vice* admission in Mr. Bundy's criminal defense trial. Tr.31.

8.    Respondent has never been sanctioned by any bar association for his conduct before a judge, as there have been no final, binding findings to that effect. Tr.26.

9.    Judge Gould found, "[i]n providing a full and fair defense to every criminal defendant, there will by necessity be occasions when the difficult nature of the case evokes sharply confrontational lawyering." RX0430.

## II.    Respondent's Background and Criminal Defense Experience

8

10.    Respondent has been a member continuously in good standing of the District of Columbia Bar since 1980. Respondent has been a member continuously in good standing of The Florida Bar since 1977. RX0002.

11.    Respondent attended Duke University for his undergraduate degree and then Emory Law School. Tr. 386–387.

12.    After law school and time at a large litigation law firm in Miami, Respondent accepted a job at the U.S. Department of Justice ("DOJ") as a lawyer in the Consumer Affairs Section in the Antitrust Division, which "represented…government agencies both in a prosecutorial and a defense posture." Tr.391. The Consumer Affairs Section had "significant criminal authority and we had a number of cases with regards to the FDA." Tr.182.

13.    During Respondent's tenure in the Consumer Affairs Section, Respondent significantly worked on the *Troxler* case, a criminal matter, where Respondent assisted the assistant chief, John Fleder to seek to indict Troxler. Tr.184.

14.    During his tenure at DOJ, Respondent joined team that break up the monopoly of AT&T. Tr.393. Respondent worked closely under the lead counsel, and was assigned to work with the top brass of MCI, which was the precursor to Verizon. Tr.393. Respondent was on the AT&T case from about four to six months before he left to go back into private practice. Tr.180.

9

15.    Respondent worked substantially on both the *Troxler criminal* case as well as the AT&T case, despite the fact that his name did not appear on the filings. The Honorable Chair recognized that it was not unusual for young attorneys to not appear on filings., "During that time, he was a very young attorney in terms of his years of experience, I think, or had only -- he had been at Justice for a limited number of years. It's not unusual not to be on filings. I mean I have areas of my practice that I might not be on a single filing and I've worked up the whole case." Tr.756.

16.    Respondent spent approximately 400-600 hours on criminal defense cases where he is listed as counsel of record. Tr.412.

17.    Respondent represented Margarita Pouchkareva in a massive criminal case involving a racketeering enterprise by the Russian Mafia to bring in illegal immigrants from primarily Chechnya. Respondent negotiated a cooperation agreement for Ms. Pouchkareva, and spent 100 – 200 hours handling this case. Tr.404, Tr.202.

18.    Attorney Craig Gillen got involved solely to litigate the issue of the payment of Respondent's attorney's fees, Tr. 201–202, and not regarding Ms. Pouchkareva's criminal defense in any fashion.

19.    Respondent represented Natalia Humm in a criminal case after she had jumped bail and went to Belize after she had negotiated a plea agreement with

a former lawyer. Tr. 407. Respondent did a lot of work trying to put the prior plea agreement back in place and was attorney of record for approximately two to four months before the case was transferred to Orland from Miami, Florida. Tr. 408–409.

20.    Respondent represented Jose Basulto as a witness in a criminal case involving Cuban spies and a shoot down of four brothers rescue planes by Fidel Castro's air force. Tr.203. Respondent testified that he was handling the crux of the representation, along with the assistance of the ACLU. Tr.206. Respondent spent at least 100 hours representing Mr. Basulto. Tr.206.

21.    Respondent represented clients in the *BCCI* criminal case that was a liquidation commission for BCCI's Macau branch. TR.194. Respondent testified that the case was "very active." Tr.199.

22.    Respondent went through a three-month trial of alleged criminal contempt against the Clinton Administration in the case of *Alexander v. FBI* in the U.S. District Court through the District of Columbia. RSX0252–0263. Although *Alexander* began as a civil case, Respondent testified, "[b]ecause a criminal case, if you commit the criminal act in the context of the civil case, it can be converted into a criminal contempt proceeding." Tr.719.

## III.    Respondent's *Pro Hac Vice* Applications

23.     The *pro hac vice* application for the District of Nevada asks the applicant to certify, in relevant part, that "[t]here are or have been no disciplinary proceedings instituted against petitioner, nor any suspension of any license, certificate, or privilege to appear before any judicial, regulatory or administrative body, or any resignation or termination in order to avoid disciplinary or disbarment proceedings, except as described in detail below." RX0002.

24.     In response, Respondent truthfully disclosed that he could not practice before Judge William D. Keller of the Central District of California and Judge Denny Chin of the Southern District of New York. RX0007–0008.

25.     The District of Nevada *pro hac* vice application does not ask the applicant to disclose whether he or she had appealed any of the decisions by judges to prevent applicant from appearing in their courtrooms to the appellate courts. The Honorable Chair even recognized this when Ms. Porter tried to bring this non-issue up in closing by asking Ms. Porter, "[w]here does it say that he has -- he disclosed that he was barred from practicing before them? That's in his statement, but where does it say that he has to go into details about the reasons why?" Ms. Porter was forced to admit, "[i]t doesn't say that he has to go into details…" Tr.748.

26.     In his *pro hac vice* application, Respondent stated that the bars of the District of Columbia and Florida reviewed these rulings and found that he did not act unethically. RX0008.

27.    The September 4, 1998 letter from Michael Frisch of ODC clears Respondent of any ethical violation for his conduct before Judge Keller. Such a letter simply cannot be expected to say, "you did nothing wrong." Mr. Frisch's letter <u>does</u> state that "[w]e do not find such evidence in our investigation and therefore, we must dismiss the matter." BCX26-080.

28.    Judge Chin "found [Respondent] in contempt for asking the question and ordered that this -- Chin's order be given to every court that I had a case in, that he was going to send it to them and courts where I was admitted to practice, which would be DC, Florida and Pennsylvania at the time." Tr.443. Respondent has faced no discipline from any bar association for his conduct before Judge Chin. Tr.445.

29.    In his *pro hac vice* application, Respondent gave his opinion that the pending disciplinary proceeding, *In re: Larry Klayman*, Bar Docket No 2008-D048 (the "Judicial Watch Proceeding") was "likely to be resolved in [his] favor" and he truthfully stated that "there has been no disciplinary action." RX0007.

30.    Indeed, there is <u>still</u> no final disposition in the Judicial Watch Proceeding, and there is a chance the District of Columbia Court of Appeals may simply dismiss it for laches given how old it is at this point, going on 13 years.

31.    Respondent had no duty to disclose the non-binding finding of the Hearing Committee or ODC's brief in the Judicial Watch Proceeding in his *pro hac vice* application. Respondent was never asked to provide these by Judge

Navarro, and they are not required in the instructions of the *pro hac vice* application. RX0001–0006.

32.    Respondent had no duty to disclose the withdrawn negotiated discipline in the Judicial Watch Proceeding because it was withdrawn and is of no force and effect and can only be used for impeachment purposes. Board Rule 17.10; Tr.457.

33.    The record shows that both sides withdrew from negotiated discipline in the Judicial Watch Proceeding. In an email by Respondent on July 18, 2015, he clearly withdrew from negotiated discipline, stating: "Gene and Clay, I feel strongly that I did not ethically do anything wrong, but I am not going to get down on my knees here. Its a matter of principle for me, among other considerations, particularly given that this entire affair is going on 11 years." RX0788, Tr.517. ODC also filed "Motion of Bar Counsel to Withdraw Petition for Negotiated Discipline," Bar Counsel Exhibit ("BCX") 12, which shows that ODC also withdrew.

34.    Judge Gould found, with regard to Respondent's *pro hac vice* application, "[a]nd if his disclosures were selective, still he is an advocate, an advocate representing defendant Cliven Bundy, and after submitting a compliant response to the questions in the pro hac vice application, he had no greater duty to

disclose any possible blemish on his career or reputation beyond responding to the district court's further direct requests." RX0428.

35.     After denying Respondent's initial application to be admitted *pro hac vice*, Judge Navarro set forth six requirements that Respondent had to fulfill in order to gain admission *pro hac vice* in her March 31, 2016 order. RX0018–0019. Respondent submitted a compliant application on April 7, 2016. RX5[2]. However, Judge Navarro's sixth requirement, that Respondent provide "verification that the matter in the District of Columbia disciplinary case…has be resolved with no disciplinary action" created an impossible catch-22, as Judge Navarro was well aware that these proceedings take a long time to conclude, and the one referenced by Judge Navarro is still pending, over three years later. RX0019. These *ex-post facto* justifications that Judge Navarro came up with were just that - an *ex post facto* attempt to justify her denial to the Ninth Circuit.

## IV.    Respondent Did Not File the *Bivens* Complaint or the Motion to Disqualify Judge Navarro

36.     Respondent did not file the *Bivens* Complaint or the Amended *Bivens* Complaint against Judge Navarro, Harry Reid, Rory Reid, Barack Obama, and Kristen Orthman, despite ODC's continued misleading assertions to the contrary.

37.     Respondent's name does not appear in any signature blocks in either the *Bivens* Complaint or the Amended *Bivens* Complaint. Only Joel Hansen ("Mr.

_____

[2] Respondent's Exhibit 5, in whole.

Hansen"), who was Mr. Bundy's local counsel at the time, is listed as counsel of record on these pleadings. BCX 44,45.[3] Respondent also testified, "I did not file a Bivens action. Mr. Hansen filed it." Tr.92. Respondent testified that he did help in preparing the Bivens action, but that he ultimately did not sign it – only Mr. Hansen did. Tr.93.

38.    Mr. Hansen has not been subject to any disciplinary action as the counsel of record on the *Bivens* action. Tr.85.  Nor was he sanctioned.

39.    The *Bivens* complaint stated *Bivens* claims against persons other than Judge Navarro, who do not have absolute immunity. BCX 44,45. The *Bivens* Complaint also contained a request for injunctive relief, to which Dean Chemerinsky testified, "[i]n answer to the case, you say there are some cases that are allowed injunctive suits against judges…." Tr.684.

40.    At the hearing, Respondent argued:

Number two -- there is authority that says that you can sue a judge under Bivens, and I call your attention to Catholic University Law Review, here in this city, Volume 29, Issue 4, Article 4, The Judge Needs a Lawyer by Frank Q. Nebeker, N-e-b-e-c-k-e r, and I did site a case in the Northern District of Texas, Hagan v. Coggins, 2000  U.S. District Dist. Lexus, 2006 at page 11, Northern District of Texas, April 26, 2000. Tr.788.

41.    Respondent did not approve of Mr. Hansen's request for Judge Navarro to recuse herself due to the *Bivens* action. Respondent testified: I was

---

[3] ODC's position is that, at least when it comes to Respondent's criminal experience, an attorney is only involved if he or she is listed as counsel of record.

present in the court, but I have to tell you I don't approve of that statement. Joel Hansen was not someone who had a lot of experience in these matters. He was a local lawyer handling issues with the management, whatever. In my view the Bivens action was not filed to remove Judge Navarro. It was filed to get relief from the court to have her removed. And so, that being said, she wasn't -- in my view, my understanding, she wasn't being put in to create a conflict of interest or anything like that. Tr.102.

42.    Respondent's name was included on the Motion to Disqualify as a result of a clerical error by Joel Hansen. "He's filing an errata, Joel Hansen, the local counsel, that he inadvertently put an electronic signature on the motion to disqualify Judge Navarro on my behalf. He's withdrawing that electronic signature saying it was a mistake." Tr.583, BCX 3.

## V.    Respondent's Filings to the Ninth Circuit and Supreme Court

43.    Respondent was never sanctioned by the Ninth Circuit or the Supreme Court for any of his filings. Tr.784.

44.    Respondent represented to the Ninth Circuit and/or Supreme Court that Mr. Bundy had been thrown into solitary confinement because he had heard from Cliven Bundy directly that he had been thrown in solitary confinement against his wishes. Respondent testified: "That is not what Cliven Bundy told me, and with regard to the solitary confinement, he was immediately thrown in there,

17

and then after the fact, to the extent there's any truth to this with regard to Mr. Hansen, that occurred later, but he was originally thrown into solitary confinement. He did not ask to be thrown into solitary confinement. Tr.158. Respondent testified, "I met with him 30 times plus in the prison and Mr. Hansen only met with him once or twice. So that is not what Cliven Bundy wanted." Tr.158

45.     Respondent represented to the Ninth Circuit and/or Supreme Court that he had "not committed any ethical violation" regarding the Judicial Watch Proceeding based on the expert opinion of late Professor Ronald Rotunda's ("Professor Rotunda") letter. RX0597–0601. Professor Rotunda was one of the preeminent legal experts on attorney ethics and constitutional law, and had served as the Doy & Dee Henley Chair and Distinguished Professor of Jurisprudence at Chapman University School of Law.   Professor Rotunda's opinion letter clearly states that "I have reviewed the facts of the above referenced bar complaint against Larry Klayman. It is my expert opinion that in the present situation Mr. Klayman has not committed any offense that merits discipline." RX0597. In the context of a disciplinary proceeding, this is the same as a finding that Mr. Klayman had "not committed any ethical violation."

46.     Respondent is entitled to, and did in fact, give his opinion about Mr. Hansen's and Mr.  Bret Whipple's ("Mr. Whipple") – who later served as Mr.

Bundy's counsel after Mr. Hansen withdrew due to health reasons - federal criminal defense experience to the Ninth Circuit and/or the Supreme Court.

47.    There is nothing on the record concerning Mr. Hansen's federal criminal defense experience, outside of one-line in his affidavit in support of motion to withdraw that he had been through "many" federal criminal jury trials, which is entirely subjective. BCX56. ODC has not put on the record any evidence regarding the actual number of federal criminal defense trials that Mr. Hansen had been involved in. Respondent testified that his opinion of Mr. Hansen's experience was based on his "personal interaction with him, like I was with Mr. Whipple, and it appeared to me, in talking to him, that he did not have extensive criminal background. He was looking to me for advice constantly." Tr.277. In any event, Mr. Bundy wanted Respondent as his counsel of choice. Tr.525.

48.    Respondent's opinion regarding Mr. Whipple's experience was based on "my own analysis as I said in talking to him that he didn't seem to have a great depth of federal criminal practice because he didn't even know what a petition for a writ of mandamus was -- I had to send him a copy of it -- and for other discussions in terms of his strategy, what he was planning to do." Tr.135. The Honorable Chair herself recognized: Well, if it's true that Mr. Whipple made a statement that he didn't know what a writ of mandamus was or whatever -- I don't remember exactly

which pleading he was referring to. If that's true, is it fair that he would not have had pause about his level of expertise to defend Mr. Bundy?" Tr.759.

49.    Respondent was never asked to and never had any duty to enumerate and outline his entire federal criminal defense experience in his petitions to the Ninth Circuit and Supreme Court.

50.    In his January 17, 2017 Petition for Writ of Mandamus to the Supreme Court, Respondent wrote that:

> Currently in dispute is the lower court's order of December 29, 2016, which affirms a prior ruling of Magistrate Judge Peggy Leen ordering three trials seriatum for the 19 Defendants, including Petitioner. From the order, it is clear that the motive of the government is to try the ones more "easily convicted" first so that this will prejudice, through publicity and otherwise, the trial of Petitioner and the other Defendants. The Government previously maintained that all 19 of the Defendants should be tried together, beginning February 6, 2017. This disingenuous "two faced" prejudicial "bait & switch" is similar to the Obama Justice Department's conduct with regard to Larry Klayman's pro hac vice applications, where it claimed it did not oppose, but in fact, strongly opposed Klayman's pro hac vice applications in order to deny Petitioner his constitutional right to counsel and to make conviction "easier." The lower court's order concerning the trial sequence will be subject to further legal proceedings and contested before the U.S. Court of Appeals for the Ninth Circuit prior to February 6, 2017. RX0439.

At the hearing, Respondent testified that he had reason to believe that whether Mr. Bundy would remain in the first tier of Defendants was still up in the air at that time of the filing of the Supreme Court petition, and subject to motions being filed. Respondent testified, "the judge was trying to figure out whether she wanted to try them first now, to get rid of that before she got to Cliven Bundy, and

he wound up ultimately being tried in the second tier. And they still couldn't even convict the second time they tried these other defendants. So everything was getting jumbled and confused in terms of how this matter was going to be tried. So these issues were all up in the air. There were a number of pleadings on this." Tr.150. Respondent further testified: "But my ultimate fundamental concern was that I be present at any of these trials in the capacity as counsel, that would let me communicate with the lawyers who were representing the other defendants. I could sit inside the well. It would give me access to information that was under seal and things like that."

51.     Respondent's criticism of Judge Bybee's "lack of appreciation and sensitivity" to criminal defendants' Sixth Amendment rights was based on evidence. Respondent laid out the fact that Judge Bybee's dissent in *Nordstrom v. Ryan*, 762 F.3d 903 (9th Cir. 2014) found that prison officials reading correspondence between a prisoner and his attorney did not constitute a violation of his Sixth Amendment rights, despite the majority holding that it did. Respondent also cited the fact that Judge Bybee authored supervised legal memoranda working as the head of the Executive Office of the President under President George W. Bush defending the harsh and illegal torture of battlefield detainees suspected of terrorist-related activities. RX0460–0461.

52.    Respondent represented to the Ninth Circuit and/or the Supreme Court that Mr. Whipple had been threatened with contempt by Judge Navarro based on their direct conversations. Respondent testified that Mr. Whipple had directly told him that Judge Navarro had threatened him with contempt. "And that's accurate. That's what Bret Whipple told me. And to this day nobody sees the transcript of this sealed hearing that dealt with her husband that she didn't want the public to know about. That's what Mr. Whipple told me. If he was lying, that's Mr. Whipple's problem, but not me, not my problem." Tr.163.

53.    Respondent also testified, regarding the existence of a docket entry for the contempt hearing, "I don't know what it says. I don't remember, but I remember that there was an issue at the time. I don't know if it would necessarily say "contempt hearing". She was taking up the issue to hold him in contempt for citing her husband as a witness. And the reason why he was put down as a witness was because Carol Bundy and others had asked for an investigation by the district attorney of what went on at the ranch at Bunker Hill [sic]. Tr.164–165.

54.    Respondent's March 9, 2017 Petition does set forth the fundamentally changed circumstances that warranted its filing. These included the release of an Office of the Inspector General ("OIG") report titled "Investigative Report of Ethical Violations and Misconduct by Bureau of Land Management Officials" that detailed how the BLM agent in charge of the raid on Mr. Bundy's ranch had

repeatedly abused his position of authority to illegally extort and gain benefits and criminally obstruct justice by threatening those who might speak out and testify against him. BCX73-010. At the time, Mr. Bundy's co-Defendant filed a motion to dismiss on the grounds that prosecutors had engaged in prosecutorial misconduct by withholding *Brady* material necessary to impeach Agent Love, a key witness for the U.S. Attorney. BCX73-011. As it turned out, this prosecutorial misconduct was part of a larger pattern and practice that led to the dismissal of Mr. Bundy's indictment.

55.    Respondent had reason to refer to the government's reply to his March 9, 2017 Petition as "unethical and dishonest" because they had taken "no position" regarding Respondent's admission *pro hac vice*. The government was talking out of both sides of its mouth by trying to appear neutral and not against Mr. Bundy's Sixth Amendment rights, but then opposing Respondent's entry *pro hac vice* on appeal.

56.    Respondent had no duty to inform the Ninth Circuit or the Supreme Court of the non-binding reports and recommendation of the Hearing Committee and Board in the Judicial Watch Proceeding, since there had been (and still is) no final decision. "I wasn't obligated to. It wasn't a final decision. In fact it's of no force and effect until it goes through the process in the DC Bar. And in fact to this

day, there is no final decision, as of today. And we're talking over two years later." Tr.216.

57.    Respondent referred to Mr. Whipple as local counsel to the Ninth Circuit and/or the Supreme Court because the client, Mr. Bundy, viewed him as such. Mr. Bundy wanted a legal defense team with Mr. Whipple serving as local counsel and Respondent serving as counsel *pro hac vice*. As Respondent testified, "[a]nd Cliven wanted it resubmitted, the pro hac vice application, that perhaps now Judge Navarro would reconsider and let me in, since she had now seen how the government had hid evidence, suborned false testimony." Tr.525.

58.    Respondent made the claim that Mr. Whipple was not prepared to go to trial to the Ninth Circuit and/or the Supreme Court because Mr. Whipple himself had made that representation to Magistrate Judge Peggy Leen, at the September 27, 2017 *Faretta* hearing, which was held at the request of Judge Navarro. RX28. The Court asked Mr. Whipple, "Are you prepared to -- for trial on October 10th as currently scheduled?" RX 28,13:8-9. Mr. Whipple replied, "No." RX 28,13:10. The record shows that Mr. Bundy tried to fire Mr. Whipple. At the September 27, 2017 hearing, Judge Navarro asked Mr. Bundy, "And one is, is it your intention, absolutely, to terminate Mr. Whipple as your counsel of record?" RX 28,17:6-8, to which Mr. Bundy replied, "Yes." RX 28,17:9. Mr. Bundy further testified that Mr. Whipple and his staff had gone through "[m]aybe one percent" of the discovery

with him. RX 28,18:9. He further testified that Mr. Whipple had "not really"

discussed possible defenses to the crimes that he was being accused of with him.

RX 28,18:21. Lastly, Mr. Bundy testified that Mr. Whipple had seen him in prison

"maybe five" times. RX 28,19:11. Respondent testified that even though Mr.

Bundy had testified that he wanted to represent himself, "he also wanted me to

come in for him, and his wife wanted me to come in for him. We didn't want to

leave him vulnerable." Tr.492.

59.    In his February 6, 2018 Petition for Writ of Mandamus to the Ninth

Circuit, Respondent properly argued that the denial of his *pro hac vice* application

should be vacated for mootness. Judge Gould concurred with Respondent's

argument that Respondent's *pro hac vice* application was moot. "I dissent also

based on the Supreme Court's authority in *United States v. Munsingwear, Inc.*, 340

U.S. 36 (1950), because at this stage the district court has dismissed the criminal

claims against Cliven Bundy, based on alleged government misconduct, and so the

matter of Mr. Klayman's desired *pro hac vice* application to represent Bundy is

currently and effectively moot." RX0736.

60.    Much of Judge Wilken's rationale for revoking Respondent's *pro hac*

*vice* admission in *Robles v. ANTIFA* were based on false representations of

opposing counsel, which Respondent tried to correct on the record. RSX0142–

0175. Respondent pointed out to Judge Wilken that the recommendation of the

25

hearing committee in the Judicial Watch Proceeding was not a final determination, and was presently pending before the D.C. Court of Appeals. RSX0142. Respondent also clarified that the Plaintiff, Kiara Robles, had never filed a motion to disqualify Judge Wilken, but simply a request for voluntary recusal. RSX0144-0145. Despite being presented with these corrections, Judge Wilken still revoked Respondent's *pro hac vice* admission. Respondent thus has reason to believe that the fundamental issue that Judge Wilken had with Respondent's admission *pro hac vice* was Judge Navarro's denial.

## VI.    Miscellaneous Findings

61.    Respondent's representation of Ms. Humm resulted in disciplinary proceedings in Florida, which were based on Respondent's failure to timely pay back a negotiated sum during a period of severe financial hardship. There was no showing of dishonesty:

So, Humm wanted her $25,000 back from me, just like she did from the first lawyer, and you'll see this in the consent judgment in Florida, which I -- I just settled to settle it, that her lawyer, which she obtained in Orlando said to me, I'm paraphrasing, you know, "I don't think that you would have to return the $25,000. I don't suspect you would consider doing that." Because he had known about what happened with the other lawyer, too, and what I did. He knew the amount of work I had done and he had the file. So, what happened was that, to reach a settlement, I agreed to pay $5,000 back, just to get rid of it. The mediator of the Florida Bar suggested that. I said ok. And I made a mistake. I should not have agreed to a public reprimand. But I did. There was no showing of dishonesty. There was no reference to that in any of the consent forms. And it was because that it occurred in and around 2008, and I was going through a lot of personal issues and it was also the time of the stock market crash. Things weren't

going real well. I didn't pay it back as timely as I had hoped to. And then I was moving around a lot, and there were notices sent to me by the Florida Bar, and I didn't see them, and all of a sudden a proceeding started, and then I just decided to settle it, which I did. But there was no showing of dishonesty or anything to that effect. I just didn't pay it back in time and I didn't have the money to do it. Tr. 417-418.

## RESPONDENT'S RESPONSE TO ODC'S PROPOSED FINDINGS OF FACT

**ODC PFF#1** – Admit

**ODC PFF#2** – Admit

**ODC PFF#3** – Deny. This mischaracterizes the record. ODC has no basis to make a characterization of Respondent's role in the AT&T civil divesture case outside of what is on the record. *See* PFF#14-15.

**ODC PFF#4** – Deny. This mischaracterizes the record. ODC has no basis to make a mischaracterize Respondent's role in the *Troxler* case as "minimal" based on what is on the record. *See* PFF#13,15.

**ODC PFF#5** – Admit.

**ODC PFF#6** – Deny. This mischaracterizes the record. ODC has no basis to mischaracterize the record by claiming that Respondent was "involved with just a few criminal matters." Between 1983 and 2016, after leaving the Justice Department, Respondent was listed as counsel of record via PACER on four criminal cases: *BCCI*, *Khashoggi*, *Hernandez*, and *Humm*. Tr.190. Respondent also

27

testified that he had three or four criminal cases assigned to him when he was running The Law Office of Larry E. Klayman. Tr.192.

**ODC PFF#7** – Deny. ODC is inserting its own false testimony into the record. Respondent testified that he spent somewhere between 400 – 600 hours on these four cases. Tr.412. *See* PFF#16.

**ODC PFF#8** – Deny. This does not give the full context of the Florida disciplinary proceedings. There was no showing of dishonesty. Tr. 418. *See* PFF#61.

**ODC PFF#9** – Deny as irrelevant. These prior cases are irrelevant to the proceedings, and not even a part of the Specification of Charges. In its March 23, 2019 order denying Respondent discovery, the Honorable Chair stated, "[t]he Specification of Charges in this matter do not contain any reference to the seven prior cases cited by Respondent. Thus, the record does not seem to support Respondent's argument that they have 'been included in the Specification of Charges." Thus, ODC cannot now be allowed to introduce these cases to prejudice Respondent when they are not a part of the Specification of Charges, and Respondent was not granted leave to take discovery on them, as they are all exceedingly old.

**ODC PFF#10** – Admit

**ODC PFF#11–15** – Deny as irrelevant. The negotiated discipline affidavit is of no force and effect, and can only be used for impeachment purposes. Board Rule

17.10. Tr.457. Respondent gave the full context of the negotiated discipline in his

testimony:

> But in the course of that case, and I shouldn't have done it, but I entered
> into a negotiated discipline and I signed an affidavit, and that negotiated
> discipline ultimately, to make a long story short -- I'm trying to keep it
> short -- was not accepted by the committee that was assigned for that. What
> was recommended by Bar Counsel was a public censure. I accepted it. I
> wanted to get it behind me. But I shouldn't have, because I'm somebody
> who stands on principal. When it wasn't accepted, Bar Counsel came back
> to me and said, "Let's try to negotiate another one." And I listened to them
> and I said, "No, I can't accept that because I haven't done anything wrong. I
> don't feel that I did anything wrong." I felt that I was actually being ethical
> in trying to defend these people who had been harmed by my former group,
> Judicial Watch, under Tom Fitton, who actually is not a lawyer. And so
> consequently, even Bar Counsel withdrew. There's a document in the
> record where they withdrew the negotiated discipline, and that was the
> basis of my saying that we were starting from square one. Tr.20-21.

The record shows that both sides withdrew from negotiated discipline. *See*

PFF#33.

**ODC PFF#16** – Admit.

**ODC PFF#17** – Admit.

**ODC PFF#18** – Admit.

**ODC PFF#19** – Deny in part as irrelevant. The fact that Respondent used a

Washington D.C. address is completely irrelevant. Respondent is licensed to

practice in Washington D.C. and continuously has been a member in good standing

for going on 40 years, as evidenced by these proceedings and DC Bar records.

**ODC PFF#20** – Admit.

**ODC PFF#21** – Admit.

**ODC PFF#22** – Admit.

**ODC PFF#23** – Deny as irrelevant and prejudicial. As set forth in Respondent's response to ODC PFF#15, the negotiated discipline was withdrawn, and could therefore only be used for impeachment purposes. *See* ODC PFF#15. There was no duty to disclose information that was not asked of him.  *See* PFF#6-7. Dean Chemerinsky also concurred with Judge Gould's finding that Respondent had fulfilled his duty of candor in filling out the *pro hac vice* application and that Respondent had answered all the questions that he was required to answer in his *pro hac vice* application. Tr.680 –681; RX0851–0852.

**ODC PFF#24** – Deny as vague, unclear and a distortion of the record. It is unclear what ODC means by "Respondent did not disclose the other violations to which he admitted." If Respondent admitted any violations – which he did not - then he must have disclosed them. In any event, Respondent properly answered the questions that he was asked on the *pro hac vice* application, and had no duty to disclose anything further, as found by both Judge Gould and Dean Chemerinsky. *See* ODC PFF#23.

**ODC PFF#25** – Admit

**ODC PFF#26** – Deny as irrelevant and highly prejudicial. Respondent properly answered the questions that he was asked on the *pro hac vice* application, and had

no duty to disclose anything further, as found by both Judge Gould and Dean Chemerinsky. *See* ODC PFF#23. Whether Respondent appealed Judge Keller's findings or the specific details leading up to the ban is completely irrelevant, as his response truthfully and properly stated that he was presently banned from practicing before him.

**ODC PFF#27** - Deny as irrelevant and highly prejudicial. Respondent properly answered the questions that he was asked on the *pro hac vice* application, and had no duty to disclose anything further, as found by both Judge Gould and Dean Chemerinsky. *See* ODC PFF#23. Whether Respondent appealed Judge Chin's findings or the specific details leading up to the ban is completely irrelevant, as his response truthfully and properly stated that he was presently banned from practicing before him. *See* PFF#25.

**ODC PFF#28** – Deny. ODC's assertion is disingenuous and misleading, at best. The September 4, 1998 letter from ODC's Michael Frisch, BCX26-080–26-082, clears Respondent of any ethical violation for his conduct before Judge Keller. Such a letter simply cannot be expected to say, "you did nothing wrong." Mr. Frisch's letter <u>does</u> state that "[w]e do not find such evidence in our investigation and therefore, we must dismiss the matter." BCX26-080. In this type of situation, this is clearly the equivalent of a finding that Respondent did nothing wrong. ODC

is simply trying to twist Respondent's and their own words to find a violation that simply does not exist.

ODC has no basis to claim that "Respondent never presented any evidence that Disciplinary Counsel had investigated his conduct before Judge Chin." *See* PFF#28.

**ODC PFF#29** – Deny as irrelevant and prejudicial. The Honorable Chair has already held that these old matters are not part of the Specification of Charges in denying Respondent discovery on these matters. *See* ODC PFF#9. Thus, ODC's attempts to use these cases to prejudice Respondent must be stricken. Furthermore, Respondent properly answered the questions that he was asked on the *pro hac vice* application, and had no duty to disclose anything further, as found by both Judge Gould and Dean Chemerinsky. *See* ODC PFF#23.

**ODC PFF#30** – Deny as it mischaracterizes and twists and distorts the record. Respondent properly answered the questions that he was asked on the *pro hac vice* application, and had no duty to disclose anything further, as found by both Judge Gould and Dean Chemerinsky. *See* ODC PFF#23. With regard to the negotiated discipline, it was clearly withdrawn, and could therefore only be used for impeachment purposes. *See* ODC PFF#15. Lastly, Respondent was entitled to give his opinion that the disciplinary proceeding was "likely to be resolved in [his] favor" and he truthfully stated that "there has been no disciplinary action."

RX0007. Indeed, there is <u>still</u> no final disposition in this matter, and there is a chance the District of Columbia Court of Appeals may simply dismiss it given how old it is at this point.

**ODC PFF#31** – Admit, and the fact that the pro hac vice application was denied without prejudice shows that Respondent was presented with a catch-22 that was disingenuous, as the DC Bar disciplinary proceeding would not be concluded for several years and in fact is still not concluded.

**ODC PFF#32** – Admit.

**ODC PFF#33-34** – Deny as irrelevant and prejudicial. Respondent properly answered the questions that he was asked on the *pro hac vice* application, and had no duty to disclose anything further, as found by both Judge Gould and Dean Chemerinsky. *See* ODC PFF#23. With regard to the negotiated discipline, it was clearly withdrawn by both sides, and could therefore only be used for impeachment purposes. *See* ODC PFF#15. As to the fact that Respondent did not disclose the "non-binding finding of the Hearing Committee" or "include Disciplinary Counsel's brief," these assertions are clearly irrelevant. Respondent was never asked to provide these by Judge Navarro.

**ODC PFF#35** – Admit with explanation. The fact that Judge Navarro ordered that Respondent's petition would remain denied <u>without prejudice</u> until he could provide proof that the disciplinary proceeding had been resolved in his favor"

33

shows the bias and prejudice that Respondent had alluded to, as she presented the untenable catch-22 set forth above.

**ODC PFF#36** – Deny. The record clearly shows that Respondent did not file the *Bivens* Complaint against Judge Navarro, Harry Reid, Rory Reid, Barack Obama, and Kristen Orthman, despite ODC's continued assertions to the contrary. *See* PFF#36-37.

**ODC PFF#37** – Deny. The record clearly shows that Respondent did not file the *Bivens* Complaint, despite ODC's continued assertions to the contrary. *See* ODC PFF#36.

**ODC PFF#38** – Deny. The record clearly shows that Respondent did not file the *Bivens* Complaint, despite ODC's continued assertions to the contrary. *See* ODC PFF#36.

**ODC PFF#39** – Deny. The record clearly shows that Respondent did not file the *Bivens* Complaint, despite ODC's continued assertions to the contrary. *See* ODC PFF#36.

**ODC PFF#40** – Deny. This mischaracterizes the record and is irrelevant. The record clearly shows that Respondent did not file the *Bivens* Complaint, despite ODC's continued assertions to the contrary. *See* ODC PFF#36. Whether Respondent "consented" to the filing of the *Bivens* complaint is irrelevant and only meant to prejudice Respondent, as this is not relevant. The only "consent" that

matters is that of the client, Cliven Bundy, and the attorney who filed the *Bivens* complaint, Joel Hansen. The *Bivens* complaint stated *Bivens* claims against persons other than Judge Navarro, who do not have absolute immunity. BCX44,45. The *Bivens* Complaint also contained a request for injunctive relief, to which Dean Chemerinsky testified, "[i]n answer to the case, you say there are some cases that are allowed injunctive suits against judges…." Tr. 684.

**ODC PFF#41** – Deny. This mischaracterizes the record and is irrelevant. Respondent's attendance at the May 10, 2016 hearing in the gallery is not an ethical violation. With regard to the *Bivens* action, Respondent testified that he did not approve of Mr. Hansen's request for Judge Navarro to recuse herself due to the *Bivens* action. Tr. 102. *See* PFF#41. With regard to Mr. Bundy's solitary confinement, Respondent went off what he was told by Mr. Bundy directly, and the fact that he had visited Mr. Bundy in prison over 30 times and observed his client's confinement. *See* PFF#44.

**ODC PFF#42** – Deny. This mischaracterizes the record. Respondent did not file the amended or original *Bivens* Complaint, *see* ODC PFF#36, nor the Motion to Disqualify Judge Navarro. Respondent testified that his name was included on the Motion to Disqualify as a result of a clerical error by Joel Hansen. *See* PFF#42. With regard to the Ninth Circuit and Supreme Court, Respondent testified that his assertion that Judge Navarro had ordered Mr. Bundy into solitary confinement was

based on what Mr. Bundy had told him. *See* ODC PFF#41. "I met with him 30 times plus in the prison and Mr. Hansen only met with him once or twice. So that is not what Cliven Bundy wanted." Tr. 158.

**ODC PFF#43** - Deny. The record clearly shows that Respondent did not file the Amended *Bivens* Complaint against Judge Navarro, Harry Reid, Rory Reid, Barack Obama, and Kristen Orthman, despite ODC's continued assertions to the contrary. *See* PFF#36,37. Testimony that Respondent was aware of and agreed with certain statements made in the *Bivens* Complaint does not mean that Respondent himself participated in its drafting or preparation.

**ODC PFF#44** – Deny. This mischaracterizes the record. Respondent did not file the Motion to Disqualify Judge Navarro. His name being included on the motion was due to a clerical error by Mr. Hansen, which was expeditiously corrected. *See* ODC PFF#42. None of the documents cited by ODC, BCX33–36, indicate that Respondent participated in preparing the motion. They are all dated May 24, 2019, one day before Mr. Hansen corrected the record with his errata. BCX38.

**ODC PFF#45** – Deny. This mischaracterizes the record, as Respondent did not file the *Bivens* action, *see* ODC PFF#36, nor the Motion to Disqualify. *See* ODC PFF#42.

**ODC PFF#46** – Deny. Mr. Hansen dismissed the *Bivens* action, as Mr. Hansen was the only counsel of record. He did so without Mr. Bundy's consent. Tr.106.

**ODC PFF#47** – Deny. This mischaracterizes the record. ODC has no grounds for asserting that the claims included in Respondent's July 6, 2016 Petition for Writ of Mandamus "had no basis." Respondent was never sanctioned by the Ninth Circuit for any of his filings. Tr.784. ODC has no insight into the political nature of the Bundy prosecution, and therefore has no basis to dismiss Respondent's claims as baseless. With regard to Mr. Bundy being thrown into solitary confinement, Respondent relied on what Mr. Bundy had told him, and that he had visited and seen Mr. Bundy in prison over 30 times. *See* ODC PFF#41, Tr.158. Furthermore, as found by Judge Gould and Dean Chemerinsky, Respondent had no duty to disclose information that was not asked of him. *See* ODC PFF#23. ODC's characterization of the late Professor Rotunda's letter is also plainly false. *See* PFF#45.

**ODC PFF#48** – Deny. This mischaracterizes the record. Respondent is entitled to, and did in fact, give his opinion about Mr. Hansen's and Mr. Whipple's federal criminal defense experience. There is nothing on the record concerning Mr. Hansen's federal criminal defense experience, outside of one-line in his affidavit in support of motion to withdraw that he had been through "many" federal criminal jury trials, which is entirely subjective. BCX56. ODC has not put on the record any evidence regarding the actual number of federal criminal defense trials that Mr. Hansen had been involved in. Respondent testified that his opinion of Mr.

Hansen's experience was based on his "personal interaction with him, like I was with Mr. Whipple, and it appeared to me, in talking to him, that he did not have extensive criminal background. He was looking to me for advice constantly." Tr.277.

**ODC PFF#49** - Deny. This mischaracterizes the record. Respondent is entitled to, and did in fact, give his opinion about Mr. Whipple's federal criminal defense experience. *See* PFF#48. With regard to Respondent's own federal criminal defense experience, *see* ODC PFF#1-9. Respondent was never asked to, and never had any duty to, outline his entire federal criminal defense experience in his Petitions to the Ninth Circuit and Supreme Court.

**ODC PFF#50** – Deny. This mischaracterizes the record. *See* PFF#35.

**ODC PFF#51** – Deny. This is taken out of context, as it does not include much of Judge Gould's findings. *See* PFF#5,9.

**ODC PFF#52** – Deny. Judge Gould made the <u>factual finding</u> that Respondent had submitted a "compliant response to the questions in the pro hac vice application." RX0428 *See* PFF#5. Dean Chemerinsky also concurred with Judge Gould's finding that Respondent had fulfilled his duty of candor in filling out the *pro hac vice* application and that Respondent had answered all the questions that he was required to answer in his *pro hac vice* application. Tr. 680–681; RX0851-0852.

**ODC PFF#53** – Admit with explanation. Courts rarely grant rehearing *en banc*, so this does not speak to the merits of Respondent's petition.

**ODC PFF#54** – Deny. This mischaracterizes the record. Respondent testified that he believed that whether Mr. Bundy would remain in the first tier of Defendants was still up in the air at that time, and subject to motions being filed. *See* PFF#50.

**ODC PFF#55** – Deny. Respondent's criticism of Judge Bybee's "lack of appreciation and sensitivity" to criminal defendants' Sixth Amendment rights was based on evidence. *See* PFF#51.

**ODC PFF#56** – Admit.

**ODC PFF#57** – Deny. This grossly mischaracterizes the record. With regard to the contempt hearing and Mr. Whipple, Respondent testified that Mr. Whipple had directly told him that Judge Navarro had threatened him with contempt. *See* PFF#52.  With regard to Mr. Whipple's federal criminal defense experience, Respondent properly gave his opinion. *See* ODC PFF#49.

**ODC PFF#58** – Deny. This mischaracterizes the record. Respondent's claims about Mr. Whipple being threatened with criminal contempt came directly from Mr. Whipple himself. *See* ODC PFF#57. With regard to Mr. Whipple's federal criminal defense experience, Respondent properly gave his opinion. *See* ODC PFF#49.

**ODC PFF#59** - Deny. This mischaracterizes the record. Respondent's claims about Mr. Whipple being threatened with criminal contempt came directly from Mr. Whipple himself. *See* ODC PFF#57. With regard to Mr. Whipple's federal criminal defense experience, Respondent properly gave his opinion. *See* ODC PFF#49. Respondent's March 9, 2017 Petition does set forth the fundamentally changed circumstances that warranted its filing. These included the release of an Office of the Inspector General ("OIG") report titled "Investigative Report of Ethical Violations and Misconduct by Bureau of Land Management Officials." BCX73-010. At the time, Mr. Bundy's co-Defendant filed a motion to dismiss on the grounds that prosecutors had engaged in prosecutorial misconduct by withholding *Brady* material necessary to impeach Agent Love, a key witness for the U.S. Attorney. BCX73-011. As it turned out, this prosecutorial misconduct was part of a larger pattern and practice that led to the dismissal of Mr. Bundy's indictment.

**ODC PFF#60** – Deny. This mischaracterizes the record and is incomplete and thus misleading. Respondent called the government's reply "unethical and dishonest" because it claimed to have taken "no position" regarding Respondent's admission *pro hac vice*, but then argued against it later. BCX80.

**ODC PFF#61** – Admit.

**ODC PFF#62** – Admit with explanation. It was denied by a panel that included Judge Bybee.

**ODC PFF#63** – Admit.

**ODC PFF#64** – Deny. This mischaracterizes the record. As Respondent testified, he had no duty to disclose this, as there had been (and still is) no final decision. "I wasn't obligated to. It wasn't a final decision. In fact it's of no force and effect until it goes through the process in the DC Bar. And in fact to this day, there is no final decision, as of today. And we're talking over two years later." Tr.216.

**ODC PFF#65** -  Deny. This mischaracterizes the record. Respondent referred to Mr. Whipple as local counsel because the client, Mr. Bundy, viewed him as such. Mr. Bundy wanted a legal defense team with Mr. Whipple serving as local counsel and Respondent serving as counsel *pro hac vice*. Respondent claimed that Mr. Whipple was incredibly not prepared to go to trial on the eve of trial because Mr. Whipple himself had made that representation to Magistrate Judge Leen at the September 27, 2017 hearing. *See* PFF#58.

**ODC PFF#66** – Admit

**ODC PFF#67** – Admit

**ODC PFF#68** – Deny. This mischaracterizes the record. Respondent had no duty to disclose the Board's report because it was not a final decision. This matter still remains pending to this day at the D.C. Court of Appeals. *See* ODC PFF#64.

Furthermore, Judge Gould concurred with Respondent's argument that Respondent's *pro hac vice* application was moot. "I dissent also based on the Supreme Court's authority in *United States v. Munsingwear, Inc.*, 340 U.S. 36 (1950), because at this stage the district court has dismissed the criminal claims against Cliven Bundy, based on alleged government misconduct, and so the matter of Mr. Klayman's desired *pro hac vice* application to represent Bundy is currently and effectively moot." RX0736.

**ODC PFF#69** – Deny. This grossly mischaracterizes the record. With regard to mistakenly attributing questions from Judge Fletcher to Judge Bybee, Respondent testified, "I made a mistake on that. I thought it was him. I thought he was the one that did it. But having read the opinion, because he's the one that ground it in the opinion. That was the majority opinion. It actually turns out it was Judge Fletcher. But I thought he did. But he was the one that made reference to it in his majority opinion and really went after me for that." Tr.260. With regard to mistakenly stating the he was a "plaintiff" in the *Bivens* action, it is clear that Respondent simply misspoke, which is not an ethical violation. Respondent did not file the *Bivens* complaint. *See* ODC PFF#36. With regard to the the personal relationships between Judge Bybee, Judge Navarro, and Sen. Reid, it is not ODC's role to deem them as "speculation." There is nothing on the record that disproves these claims, especially since Respondent was not allowed to conduct discovery.

**ODC PFF#70** – Deny. This mischaracterizes the record. ODC has no basis to testify that there was no research presented to Respondent. As set forth in the testimony of Mr. Peer, "Yeah, I just -- he was --I looked it up and then I think I jotted it down as them being husband and wife, which is obviously not true, but it's just something I linked in my head I think, probably because they had the same last name. I was very confident at the time when I told Mr. Klayman and I ultimately found out it was incorrect." Tr.593. In any event, this error was corrected on the record expeditiously in Respondent's reply brief. BCX104.

**ODC PFF#71** – Deny. ODC's representations are false. As set forth previously, Respondent has never been found to have acted unethically by any bar association for his conduct before a judge, as there have been no final binding decisions. *See* ODC PFF#64. Furthermore, the record is clear that Judge Gould made the <u>factual finding</u> that Respondent had submitted a "compliant response to the questions in the pro hac vice application." RX0428. *See* ODC PFF#52.

**ODC PFF#72** – Admit

**ODC PFF#73** – Admit

**ODC PFF#74** – Deny. This mischaracterizes the record. Respondent's October 9, 2018 Petition was based on the fact that the denial of his *pro hac vice* admission was now harming the interests of his clients, namely Kiara Robles in the Northern District of California ("NDCA"). BCX109. The NDCA Court used Judge

Navarro's decision as grounds to revoke Respondent's *pro hac vice* status in her court. Furthermore, with regard to the number of filings made before the Ninth Circuit and the Supreme Court, it is telling that Respondent was never sanctioned by either of those courts. Tr.784. Respondent owed it to his client, who faced the possibility of life imprisonment, to explore and pursue every possible avenue to protect his interests.

**ODC PFF#75** – Deny. This mischaracterizes the record. The fact is that much of Judge Wilken's rationale for revoking Respondent's *pro hac vice* admission were based on false representations of opposing counsel, which Respondent tried to correct on the record. RSX0142–0175. *See* PFF#60.

**ODC PFF#76** – Admit.

## CONCLUSIONS OF LAW

Pursuant to the Board Rules, the burden is on ODC to prove violations of disciplinary rules by clear and convincing evidence. PFF#1; Board Rule 11.6. ODC has fallen far short of this standard, trying to manufacture an ethical violation where none exists. Nowhere is this more telling than when the AHC itself was unable to reach a preliminary non-binding decision as to whether Respondent had committed any ethical violations at the conclusion of the hearing on this matter.

**I.    There is No Clear and Convincing Evidence that Respondent Knowingly Made False Statements and was Dishonest**

Tellingly, none of the purported "misrepresentations" cited by ODC in its brief stem from any statements where Respondent had a duty to provide certain information and subsequently failed to do so. Instead, ODC has imposed its own arbitrary set of "requirements" on Respondent that far exceed what Respondent was actually ethically obligated to comply with, going far beyond even its own strained Specifications of Charges and thus the relevant scope of the proceeding. ODC apparently believes that its authority far exceeds that of the Nevada District Court, the Ninth Circuit, or even the Supreme Court – none of whom have sanctioned Respondent for any alleged "misconduct." PFF#8.

As set forth below, the absence of any sanction from any of the courts that Respondent appeared before and/or filed pleadings with was for good reason. Respondent simply answered the questions that he was asked, and properly gave his opinion where appropriate. He also rightfully engaged in zealous representation of a client who faced life imprisonment. These are not even remotely sanctionable actions. ***Thus, there was no violation of Rules 3.3(a), 8.1(a), or 8.4(c).***

## A.    Statements Regarding the Judicial Watch Proceeding

As found by Judge Gould, Respondent submitted compliant responses to the District of Nevada's *pro hac vice* application, and had no further duty to provide information that he was not expressly asked. PFF#5. This factual finding, made by

a well-respected jurist who sits on the Ninth Circuit, definitively shows that Respondent disclosed what he was required to disclose. As found by Judge Gould:

> Klayman properly disclosed the ongoing disciplinary proceeding in his initial application for pro hac vice admission, saying that the proceeding had not yet been resolved. This disclosure was accurate…. I agree with Klayman that he was not obligated to re-litigate the D.C. proceeding before the district court and that he did not have to provide the district court with the entire record from D.C. And if his disclosures were selective, still he is an advocate, an advocate representing defendant Cliven Bundy, and after submitting a compliant response to the questions in the pro hac vice application, he had no greater duty to disclose any possible blemish on his career or reputation beyond responding to the district court's further direct requests. PFF#5.

Despite ODC's apparent disingenuous argument to the contrary, it simply does not have the authority to override the jurisdiction of judges and the courts in order to impose its own heightened duties to disclose information on the members of the bar that it chooses to target.

ODC baselessly and repeatedly argues that Respondent did not disclose the withdrawn affidavit of negotiated discipline in the Judicial Watch Proceeding as evidence of "misconduct." However, the record clearly shows that the affidavit was withdrawn by both sides, and is clearly of no force and effect, except for impeachment purposes. Board Rule 17.10; PFF#32. This is based on the express language of the Board Rules. PFF#32. It is telling that ODC apparently believes it does not have a duty to abide by the Board Rules in their efforts to create an ethical violation.

Furthermore, it is undisputed that there has still, to this day, not been a final, binding decision rendered in the Judicial Watch Proceeding, despite the fact that it is well over a decade old - 13 years old be exact. PFF#30. ODC provides no basis to claim that Respondent had any ethical duty to disclose each and every non-binding, preliminary development in the Judicial Watch Proceeding, nor could they.

Lastly, ODC disingenuously claims that Respondent "misdescribes" Professor Rotunda's opinion. Professor Rotunda's letter clearly states that "I have reviewed the facts of the above referenced bar complaint against Larry Klayman. It is my expert opinion that in the present situation Mr. Klayman has not committed any offense that merits discipline." PFF#45. In the context of a disciplinary proceeding, this is clearly the same as a finding that Mr. Klayman had "not committed any ethical violation."

### B.    Statements Concerning Judge Keller and Judge Chin

ODC next baselessly asserts that Respondent committed an ethical violation because he did not inform Judge Navarro that he had appealed Judge Keller and Judge Chin's decisions to prevent him from appearing before them. It is indisputable that District of Nevada *pro hac* vice application does not ask the applicant to disclose whether he or she had appealed any of the decisions by judges to bar the applicant from their courtrooms to the appellate courts. The Honorable

47

Chair herself even recognized this when Ms. Porter tried to bring this "issue" up in closing by asking Ms. Porter, "[w]here does it say that he has -- he disclosed that he was barred from practicing before them? That's in his statement, but where does it say that he has to go into details about the reasons why?" Tr. 748. Ms. Porter was forced to admit, "[i]t doesn't say that he has to go into details…" Tr. 748.

### C.    Statements Pertaining to Criminal Defense Experience

ODC has gone to great lengths to try to minimize Respondent's considerable criminal defense experience in order to try to fabricate an ethical violation. For the sake of brevity, Respondent will not repeat his criminal defense experience here, but it is set forth in Respondent's proposed findings of fact. PFF#10-22. Respondent was entitled to, and did, characterize his own criminal defense experience for the courts, as well as provide his opinion regarding the criminal defense experience of Mr. Bundy's local counsel, Mr. Hansen and Mr. Whipple. PFF#46-48. Indeed, Respondent properly gave his opinion regarding Mr. Whipple's experience was based on "my own analysis as I said in talking to him that he didn't seem to have a great depth of federal criminal practice because he didn't even know what a petition for a writ of mandamus was -- I had to send him a copy of it -- and for other discussions in terms of his strategy, what he was planning to do." Tr. 135. The Honorable Chair herself recognized: Well, if it's true that Mr. Whipple made a statement that he didn't know what a writ of mandamus

was or whatever -- I don't remember exactly which pleading he was referring to. If that's true, is it fair that he would not have had pause about his level of expertise to defend Mr. Bundy?" PFF#48.

### D.    Statements Regarding Mr. Bundy's Trial Date

As set forth in PFF#50, Respondent's January 17, 2017 Petition for Writ of Mandamus to the Supreme Court represented that the order by Judge Navarro setting Mr. Bundy's trial date was "currently in dispute." PFF#50. Respondent wrote that "[t]he lower court's order concerning the trial sequence will be subject to further legal proceedings and contested before the U.S. Court of Appeals for the Ninth Circuit prior to February 6, 2017." PFF#50. This is what Respondent believed at the moment of filing and it is clearly not a misrepresentation of the facts at the time. In any event, Respondent testified that "my ultimate fundamental concern was that I be present at any of these trials in the capacity as counsel, that would let me communicate with the lawyers who were representing the other defendants. I could sit inside the well. It would give me access to information that was under seal and things like that." PFF#50.

### E.    Statements Regarding Solitary Confinement and Contempt

Without any basis from the record, ODC somehow claims that Respondent knowingly made the false claims that Mr. Bundy had been ordered into solitary confinement and that Judge Navarro had threatened Mr. Whipple with contempt.

What the record actually shows is that Respondent made both of these statements based on what Mr. Bundy and Mr. Whipple had directly told him, and the fact that Respondent had visited Mr. Bundy in prison over 30 times and thus observed his incarceration. PFF#44.

## F.    Statements Regarding the Absence of Prior Sanctions

It is indisputable that Respondent has never been subject to any final, binding sanction by any bar association for his conduct before a judge. PFF#9. Recognizing this, ODC instead tries to manufacture a heightened duty to disclose upon Respondent in order to create an ethical violation. Indeed, Judge Navarro's March 31, 2016 order required Respondent to provide "verification that the matter in the District of Columbia disciplinary case…has be **resolved** with no disciplinary action." PFF#35 (emphasis added). The key word being resolved; it is clear that Judge Navarro herself only wanted updates regarding a final resolution of the Judicial Watch Proceeding. Judge Navarro never asked for constant updates on preliminary non-binding findings. It is not ODC's role to create such a duty where none existed.

## G.    Statements Regarding Judge Gould's Findings

Notably absent from ODC's brief is any allegation that Respondent misquoted Judge Gould in any way. Indeed, ODC's position appears to be that Respondent committed an ethical violation because he took relevant excerpts of

Judge Gould's opinion and placing them into his briefs. This is a patently ridiculous position. It is not ODC's role to dictate Respondent's legal strategy in writing his briefs and how he advocates for his clients and himself. The opinions of the Ninth Circuit panel regarding this matter are publicly available and were cited in the briefs. Respondent could not possibly conceal them, even if he had any reason to. Respondent made no representation that Judge Gould's dissenting opinions were limited to the excerpted portions contained in his briefs. This is just another example of ODC manufacturing a duty of disclosure to fit its agenda where clearly none exists.

### H.    Statements Regarding Judge Bybee and Sen. Reid

With regard to the the personal relationships between Judge Bybee, Judge Navarro, and Sen. Reid, it is not ODC's role to deem them as "speculation." There is nothing on the record that disproves these claims, especially since Respondent was not allowed to conduct discovery. ODC PFF#69. As conceded by ODC, Respondent is "entitled to express his opinions about the competency and integrity of the courts and judges before whom he appeared." ODC Br. at 44. Respondent did make an inadvertent error based on information given to him by his associate by writing that Shannon Bybee was Judge Bybee's wife, but this was immediately corrected on the record. ODC PFF#70. This was an honest, good faith mistake that was corrected, and clearly does not warrant sanction.

*Thus there was no violation of Rules 3.3(a), 8.1(a), or 8.4(c for any of the statements referenced by ODC.*

## II.    There is No Clear and Convincing Evidence that Respondent Made Frivolous Filings

ODC next alleges that Respondent violated Rule 3.1 by filing frivolous pleadings. The main problem with this assertion? The two documents[4] cited by ODC as allegedly being "frivolous" – the *Bivens* action and the Motion to Disqualify Judge Navarro – were not filed by Respondent. PFF#36-42.

ODC's desperation to manufacture an ethical violation perhaps most clearly evidenced by their repeated knowingly false allegation that Respondent filed the *Bivens* complaint. The record clearly shows that this is not true, but this has not deterred ODC from repeating this false statement, ironically, in violation of Rules 8.4 and 3.3. It is undeniable that Respondent's name does not appear in any signature blocks in either the *Bivens* Complaint or the Amended *Bivens* Complaint. PFF#37. Only Mr. Hansen is listed as counsel of record on these pleadings. PFF#37. Respondent also testified, "I did not file a Bivens action. Mr. Hansen filed it." PFF#37. Respondent testified that he did help in preparing the Bivens action, but that he ultimately did not sign it – only Mr. Hansen did. PFF#37. Tellingly, Mr.

---

[4] To the extent that ODC bases this allegation on Respondents "misstatements," this is addressed in full in the preceding section.

Hansen – the <u>actual</u> counsel who filed the *Bivens* complaint – has been been subject to any sanction.

This is for good reason. What ODC fails to mention is the the *Bivens* complaint did not only name judges and presidents, but also other individuals who do not typically enjoy absolute immunity. PFF#39. Furthermore, the *Bivens* complaint contained a request for injunctive relief, which Dean Chemerinsky confirmed was possible against judges. PFF#39. Lastly, Respondent even provided case law that stated that a *Bivens* action could possibly be brought against judges:

> Number two -- there is authority that says that you can sue a judge under Bivens, and I call your attention to Catholic University Law Review, here in this city, Volume 29, Issue 4, Article 4, The Judge Needs a Lawyer by Frank Q. Nebeker, N-e-b-e-c-k-e r, and I did site a case in the Northern District of Texas, Hagan v. Coggins, 2000  U.S. District Dist. Lexus, 2006 at page 11, Northern District of Texas, April 26, 2000. PFF#40.

***All of this together clearly shows that Respondent is not liable for any violation of Rule 3.1 with regard the Mr. Hansen's Bivens complaint***.

Even more egregious is ODC's assertion that Respondent violated Rule 3.1 because of Mr. Hansen's Motion to Disqualify Judge Navarro. As the record clearly shows, Respondent had absolutely no intent to be included on this filing. Respondent's name was included on the Motion to Disqualify as a result of a clerical error by Joel Hansen. "He's filing an errata, Joel Hansen, the local counsel, that he inadvertently put an electronic signature on the motion to disqualify Judge

Navarro on my behalf. He's withdrawing that electronic signature saying it was a mistake. PFF#42. ODC position appears to be that it is an ethical violation to be a victim of someone else's clerical error. In any event, even if Respondent had intended to and did file the motion to disqualify, there would still be no ethical violation. Indeed, Judge Navarro herself did not see it fit to sanction Mr. Hansen for his filing. ***Accordingly, there is no violation of Rule 3.1 with regard to Mr. Hansen's motion to disqualify either.***

## III. There is No Clear and Convincing Evidence of Conduct Prejudicial the the Administration of Justice

ODC's last assertion that Respondent violated Rule 8.4(d) by interfering with the administration of justice is just as baseless as its preceding claims. In actuality, ODC's allegation here is based solely on the number of pleadings that Respondent filed to try to gain admission *pro hac vice* to represent Mr. Bundy, who was facing the possibility of life imprisonment. This is conclusively rebutted by the finding of Dean Chemerinsky that number of filings that Respondent made were reasonable, particularly under the circumstances of the case. PFF#3. At the hearing, Dean Chemerinsky testified, "[y]es, I do. I think that it was reasonable under the circumstances of the case… This is about the ability of a criminal defendant to have counsel of choice; that the district court had refused to allow the pro hoc vice status; and the defendant wanted to have Mr. Klayman represent him. And the only way of having the district court decision reviewed was through these

writs of mandamus." PFF#3.  Tellingly, neither the Ninth Circuit nor the Supreme

Court sanctioned Respondent for his allegedly "frivolous" pleadings. PFF#9.[5] *As*

*such, there is no violation of Rule 8.4(d).*

## ODC'S RECOMMENDED SANCTION

The standard under which ODC must show misconduct is clear and

convincing evidence. In *In the Matter of Joseph A. Lopes*, Bar Docket No. 98-00

(Order of the Board of Professional Responsibility) October 31, 2003, the Board

defined "clear and convincing evidence" as a much a higher threshold and standard

than that argued incorrectly by the ODC.  The Board held:

> "Board Rule 11.5 requires that all disciplinary charges brought by Bar
> Counsel be proved by "clear and convincing" evidence. Clear and
> convincing evidence is a standard higher than "preponderance of the
> evidence." Preponderance of the evidence requires evidence which as
> a whole shows that facts sought to be proved are more probable than
> not, while **clear and convincing evidence requires the trier of fact,**
> **in viewing each party's evidence, to reach a firm conviction of the**
> **truth on the evidence about which he or she is certain.** See
> Association of American Physicians & Surgeons, Inc. v. Clinton, 187
> F.3d 655, 660 (D.C. Cir. 1999); U.S. v. Montague, 40 F.3d 1251 (D.C.
> Cir. 1994). Clear and convincing evidence requires a degree of
> persuasion higher than mere preponderance of evidence. Hopkins v.
> Price Waterhouse, 737 F. Supp. 1202, (D.D.C. 1990), aff'd, 920 F.2d
> 967 (D.C. Cir. 1991)." (Emphasis added).

---

[5] ODC repeats its prior arguments here regarding purported "misstatements" and
continues to knowingly misrepresent Respondent's role in the *Bivens* Complaint
and the Motion to Disqualify Judge Navarro. These are addressed in the preceding
sections.

At the hearing, Ms. Porter, on behalf of ODC, argued that Respondent "should not continue to have the privilege of being a lawyer…." Tr.772. Thus, it is clear that ODC's goal from the outset of this proceeding was to have Respondent disbarred. Now, perhaps after seeing just how baseless and meritless their allegations are – yet, still in an act of desperation to manufacture an ethical violation - ODC tactically retreats and now disingenoulsy  recommends suspension of at least a year with a fitness requirement.

The actual facts of the case and the record clearly show why ODC's recommended sanction, or any sanction or that matter, would be beyond reason. ODC's primary contention, it would appear, is that Respondent made "false and misleading" statements to the District of Nevada, the Ninth Circuit, and the Supreme Court. However, none of these courts decided to sanction Respondent. PFF#9. As set forth above, ODC's allegation that Respondent made "false and misleading" statements is based on its own arbitrary heightened "standard" that it has created for Respondent to try to manufacture an ethical violation. According to ODC, it is not enough to truthfully answer the questions that you are asked, which Respondent did, as found by Judge Gould and Dean Chemerinsky. PFF#5-6. This is not, and never has been, the standard followed by any court or bar association.

ODC's reliance in *In re Rosen*, 570 A.2d 728 (D.C. 1989) is entirely misplaced. Whereas in *Rosen*, the attorney failed to disclose <u>new</u> disciplinary

complaints filed against him, here Respondent did properly disclose the existence of a pending disciplinary complaint. Thus, *Rosen* is factually opposite.

ODC also deems Respondent's filings as frivolous, despite the fact that Dean Chemerinsky, one of the preeminent legal scholars of this generation, has found that they were reasonable, particularly under the circumstances. PFF#3. So too did Judge Gould, citing the need for zealous advocacy in a criminal case such as the Bundy one. PFF#9. Respondent's client was facing the possibility of life imprisonment, and he had been denied his Sixth Amendment right to counsel of choice, among other constitutional and other rights. This created an extraordinary set of circumstances that led to Respondent believing that he had to explore and pursue every possible avenue to try to be there for Mr. Bundy and protect his rights.

Indeed, ODC, without any basis, knowingly makes the false assertion that filing "baseless" motions and petitions is part of Respondent's pattern and practice. The actual facts however, to the extent that they matter to ODC, do not bear this out. As just one example, the *Robles* case, which is part of the record, also involved the denial of Respondent's *pro hac vice* status. However, Respondent did not file numerous interlocutory appeals in *Robles*. Why? It's not because Ms. Robles is any less important of a client, but simply because there was no life

imprisonment at stake and this issue could await a regular appeal. Mr. Bundy's criminal case was truly an exigent and extraordinary case.

Lastly, ODC ironically points out that Respondent did not provide any character witnesses. ODC, on the other hand, did not have <u>any</u> material witnesses outside of Respondent and frankly, Ms. Porter, who was not a witness at all, but simply an advocate. And ODC, unlike Respondent, did not proffer an expert, particularly one of the stature as Dean Chemerinsky. It is ODC's burden to show clear and convincing evidence of misconduct, not Respondent's to disprove it. In this regard, ODC has fallen remarkably short.

For all of these compelling reasons, Respondent Larry Klayman respectfully requests that the Committee affirm its correct preliminary finding, based on the relevant record before it, of no ethical violation.

Dated:  September 25, 2019                    Respectfully submitted,


_____
Larry Klayman, Esq.
c/o 2020 Pennsylvania Avenue #800
Washington, D.C. 20006
Tel: 561-558-5536
leklayman@gmail.com
D.C. Bar No.:  334581

Respondent Pro Se

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true copy of the foregoing was served by mail and email on September 25, 2019 on Julia Porter, Assistant Bar Disciplinary Counsel at 515 5th Street, N.W., Building A, Room 117, Washington, D.C. 20001 and filed with the Board of Professional Responsibility on that same date by email and by hard copies to be delivered by FedEx the next day.

_____
Larry Klayman, Esq.

## CERTIFICATE OF COMPLIANCE

This document complies with the length and format requirements of Board Rule 19.8(c) because it contains 13835 words, double-spaced, with one-inch margins, on 8½ by 11-inch paper. I am relying on the word-count function in Microsoft Word in making this representation.

_____
Larry Klayman, Esq.

EXHIBIT 6



**RECEIVED**

July 24, 2019

Board on Professional
Responsibility

**Date:** July 15, 2019

**Case:** In The Matter of:  Larry E. Klayman



ACE·FEDERAL

Ace-Federal Reporters, Inc.
Phone: 202-347-3700
Fax: 202-737-3638
Email: info@acefederal.com
Internet: www.acefederal.com

In The Matter of:  Larry E. Klayman
July 15, 2019

Page 1

DISTRICT OF COLUMBIA COURT OF APPEALS

BOARD ON PROFESSIONAL RESPONSIBILITY

- - - - - - - - - - - - - - - X Board Docket No.

In the Matter of,              :  18-BD-070

LARRY E. KLAYMAN,              : Bar Docket No.

            Respondent.    : DDN 2017-D051

- - - - - - - - - - - - - - - X   VOL. I


Monday, July 15, 2019

Washington, DC


HEARING


Reported by

   Kim M. Brantley, C.S.R.

In The Matter of:  Larry E. Klayman
July 15, 2019

| Page 2 | Page 4 |
|---|---|

**Page 2**

1  Hearing, taken at the Board on Professional
2  Responsibility, 430 E Street, NW, Washington, DC,
3  commencing at 10:00 a.m., before the Ad Hoc Hearing
4  Committee, and before Kim M. Brantley, C.S.R., a
5  Court Reporter and Notary Public in and for the
6  District of Columbia, when were present on behalf
7  of the respective parties:
8  APPEARANCES:
9      AD HOC HEARING COMMITTEE:
10     BUFFY J. MIMS, ESQUIRE
11     Chair
12  MS. ROBIN BELL
13  Public Member
14  CHRISTIAN WHITE, ESQUIRE
15  Attorney Member
16
17  On behalf of the DC Attorney Disciplinary
18  System:
19      JULIA L. PORTER, ESQUIRE
20      Deputy Disciplinary Counsel
21
22

**Page 4**

1          I N D E X
2  OPENING STATEMENTS:              PAGE:
3  By Ms. Porter            9
4  By Mr. Klayman               14
5
6  WITNESSES:       DIRECT:       CROSS:
7  Larry E. Klayman   48, 295       271
8  Christine Chicherio   321        330
9
10
11
12
13
14
15
16
17
18
19
20
21
22

**Page 3**

1  APPEARANCES CONTINUED:
2  ALSO PRESENT:
3      LARRY E. KLAYMAN, ESQUIRE,
4      Respondent
5  and
6      OLIVER PEER, ESQUIRE
7      Assistant to Mr. Klayman
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

**Page 5**

1      P R O C E E D I N G S
2      CHAIRPERSON MIMS:  Good morning,
3  everyone.
4      MS. PORTER:  Morning.
5      MR. KLAYMAN:  Goof morning.
6      CHAIRPERSON MIMS:  This matter is
7  before a hearing committee pursuant to Rule XI of
8  the District of Columbia Court of Appeals governing
9  the District of Columbia.
10     My name is Buffy Mims, chair of the
11  hearing committee Number 18-BD-070, and with me are
12  the other members of the committee: Dr. Robin Bell,
13  who is sitting to my left, and Mr. Christian White,
14  who is sitting to my right.
15     This hearing will be an adversary
16  proceeding to determine whether discipline should
17  be imposed upon the respondent.  All proceedings
18  before the hearing committee shall be open to the
19  public.  In this proceeding the witnesses will be
20  examined under oath or affirmation.
21     I will now swear the court reporter.
22     (Court Reporter sworn.)

2  (Pages 2 to 5)

In The Matter of:  Larry E. Klayman
July 15, 2019

Page 6

1    CHAIRPERSON MIMS:  And so I assume
2  everybody is ready to begin.
3    MR. KLAYMAN:  We are, your Honor.
4    There are some preliminary matters.  If
5  I may raise them when you consider them
6  appropriate.
7    CHAIRPERSON MIMS:  Well, as I
8  understand it, we have a motion pending regarding
9  your associate doing a cross-examination, right?
10    MR. KLAYMAN:  Yes.  I might add I'm
11  representing may self pro se, and Mr. Pearce never
12  questioned anyone before, so if it becomes
13  difficult, then I'll represent myself pro se.
14  We'll see how it goes.  I thought we could give it
15  a try.  It might make things move along easier.
16    But I can also question myself.
17    CHAIRPERSON MIMS:  The only issue I see
18  with it is that he is also listed as a witness, and
19  so, what I would suggest is that, if he ends up
20  being a witness in the case, that he goes before he
21  does your cross-examination, if that doesn't
22  present a problem.

Page 7

1    MR. KLAYMAN:  That may be fine.  And it
2  may come to the point where I decide to just
3  question myself in the appropriate manner on that,
4  maybe -- because he's never questioned anyone
5  before.  He's a little nervous.
6    CHAIRPERSON MIMS:  And actually before
7  we even officially rule, can we have counsel
8  identify themselves for the record.
9    MS. PORTER:  Sure.  Julia Porter on
10  behalf of the Office of Disciplinary Counsel.
11    CHAIRPERSON MIMS:  Good morning, Ms.
12  Porter.
13    MR. KLAYMAN:  Larry Klayman on behalf
14  of myself.
15    CHAIRPERSON MIMS:  Good morning.
16    MR. PEARCE:  Oliver Pearce, Mr.
17  Klayman's associate.
18    CHAIRPERSON MIMS:  Thank you.
19    Do you have any comments with respect
20  to the order --
21    MS. PORTER:  I'm sorry.
22    I guess the only question is if the

Page 8

1  witness you've identified as Mr. Pearce is going to
2  be a witness?  I'm going to call Mr. Klayman as the
3  first witness, and I would like to invoke the rule
4  on witnesses, so I'm not sure exactly how to handle
5  that with Mr. Pearce sitting at counsel table
6  during my examination of Mr. Klayman.
7    CHAIRPERSON MIMS:  You're going to call
8  him as your first witness in the case?
9    MS. PORTER:  Correct.
10    MR. KLAYMAN:  Your Honor, I need him to
11  coordinate with the documents.  He's only here for
12  a very limited purpose, which is his declaration.
13  It's a very, very narrow testimony, very short.  It
14  doesn't deal with the other issues in the case.
15    CHAIRPERSON MIMS:  Ok.
16    MR. KLAYMAN:  So I need him here in a
17  paralegal capacity.
18    CHAIRPERSON MIMS:  Let me talk to the
19  other members, just very briefly.
20    (Off-the-record discussion among the
21  hearing committee members.)
22    MR. KLAYMAN:  If I may just refresh

Page 9

1  everybody's recollection, he's only testifying that
2  an error was made with regard to Shannon Bybee.
3  That's it.
4    CHAIRPERSON MIMS:  I understand.  Your
5  motion is granted.  Thank you.
6    If you're ready to begin, Ms. Porter...
7    MS. PORTER:  Sure.  I have a brief
8  opening statement.
9    OPENING STATEMENT
10    ON BEHALF OF DISCIPLINARY COUNSEL
11    BY MS. PORTER:
12    Again, my name is Julia Porter and I'm
13  representing the Office of Disciplinary Counsel in
14  this matter.
15    Disciplinary Counsel has filed charges
16  against Respondent Larry Klayman for alleged
17  misconduct in connection with his efforts to be
18  admitted pro hac vice as counsel for Cliven Bundy
19  in a high-profile criminal case that was filed in
20  the United States District Court for the District
21  of Nevada, the related litigation and then the
22  successive petitions that Mr. Klayman filed, both

In The Matter of:  Larry E. Klayman
July 15, 2019

Page 10

1  with the 9th Circuit and the supreme court.
2      Just by way of background, Cliven Bundy
3  was one of a number of defendants named in an
4  indictment in connection with an armed standoff
5  with agents of the Bureau of Land Management.  Mr.
6  Bundy and the other codefendants were charged with
7  conspiracy, impeding or injuring federal officers,
8  firearm violations, obstruction of justice and
9  other crimes.
10     Shortly after the government filed the
11  indictment against Mr. Bundy and the other
12  defendants, Mr. Klayman sought to be admitted as
13  his counsel in the United States District Court for
14  the District of Nevada.  That's where the
15  indictment was filed.  That's where the trial would
16  be conducted.
17     Disciplinary Counsel contends and the
18  evidence will show that Mr. Klayman made
19  representations to the court that were false and
20  misleading.  Some of those representations were
21  false and misleading because they omitted material
22  information that concerned, not only the

Page 11

1  disciplinary action that was ongoing when Mr.
2  Klayman filed his pro hac vice application, but
3  also his dealings with other courts where he had
4  been banned or barred from appearing pro hac vice.
5      Some of Mr. Klayman's other
6  misrepresentations were put in the form of
7  affirmative misrepresentations.  This included but
8  was not limited to his claims about the alleged
9  "lack of experience" or qualifications of the
10  lawyers who were representing Mr. Bundy and by
11  comparison his only qualifications or experience.
12     Disciplinary Counsel has also charged
13  Mr. Klayman with making representations that had no
14  basis in fact or law.  These include allegations
15  that he made against the judge who was presiding
16  over the case, Judge Navarro, and also the 9th
17  Circuit judge who authored the majority opinions in
18  the 9th Circuit.
19     Mr. Klayman also made multiple and
20  successive filings.  He filed not only five
21  petitions but additional petitions for rehearing,
22  motions to correct the record with the 9th Circuit,

Page 12

1  and at least three petitions with the supreme
2  court, again supplemented and some asking for
3  rehearing.
4      The evidence established the violations
5  are largely in the documents that Disciplinary
6  Counsel expects to offer in evidence, those three
7  binders of pleadings, the government and the
8  judge's responses and the court orders.
9      I'd note that Mr. Klayman has not
10  objected to the authenticity of any of those
11  documents, however he has objected to almost all of
12  them, including at least 15 pleadings and/or orders
13  that he included in his own exhibits.  The exhibits
14  also included other publicly available records and
15  documents and information that Mr. Klayman knew or
16  should have known about when he made the
17  representations to the court.
18     The pleadings that Mr. Klayman filed
19  and participated in filing bore out the concerns of
20  the federal judge who denied his motion pro hac
21  vice and of the 9th Circuit, and that is in his
22  propensity to engage in intimidation and

Page 13

1  retaliation.  He did that not only in the
2  litigation involving Mr. Bundy but in the present
3  proceeding.  After Judge Navarro denied Mr.
4  Klayman's request to appear pro hac vice, he
5  participated in filing a Bivens action against her,
6  he sought her disqualification and he alleged that
7  she was biased and prejudiced.
8      Similarly, after Judge Bybee offered
9  the 9th Circuit decision affirming Judge Navarro's
10  decision not to admit him pro hac vice, Mr. Klayman
11  sought to prevent Judge Bybee from participating in
12  review of his other petitions with the 9th Circuit.
13  He filed a judge against Judge Bybee and he alleged
14  Judge Bybee was biased and prejudiced.
15     Mr. Klayman has engaged in similar
16  conduct in this disciplinary action.  He's filed
17  two federal actions against members of the staff of
18  the Office of Disciplinary Counsel.  He also filed
19  a motion to disqualify the Board chair after the
20  Board chair ruled that his motion to defer should
21  be denied, claiming that the Board chair was biased
22  and prejudiced against him.

4 (Pages 10 to 13)

In The Matter of:  Larry E. Klayman
July 15, 2019

Page 14

1      The evidence, which consists largely of
2  the documents but also the testimony of the
3  witnesses, will show that Mr. Klayman violated all
4  the rules with which he was charged.
5      Thank you.
6      CHAIRPERSON MIMS:  Thank you.
7      MR. KLAYMAN:  Your Honor, we have moved
8  into the opening statements, but there are some
9  other preliminary matters.  I don't know when you
10  want to take them up, but I could do my opening
11  statement and then perhaps I could raise them at
12  that time, if that's agreeable.
13      CHAIRPERSON MIMS:  Why don't you go
14  ahead and do your opening statement.
15      OPENING STATEMENT
16      ON BEHALF OF RESPONDENT
17      BY MR. KLAYMAN:
18      MR. KLAYMAN:  Yes.
19      I want to point at the outset -- and I
20  respect this committee and I respect the Bar.  I've
21  been a member in good standing now for about 38
22  years, in other jurisdictions even longer.  I am

Page 15

1  the founder of Judicial Watch and Freedom Watch.  I
2  ran for the U.S. Senate.
3      I respect the court and that's why I do
4  what I do and I try to make the system better to
5  work for everybody.  In affect I'm kind of like the
6  public interest, civil rights lawyer in a way,
7  because I represent the little guy.
8      One of the facts that I want you to
9  keep in mind, the legal standard here, is clear and
10  convincing evidence.  I want to go through why
11  there is no clear and convincing evidence.
12      We have a very distinguished jurist.
13  He is not politically like me.  He's liberal.  I'm
14  conservative-libertarian.  Judge Ronald Gould found
15  that I did not make these representations, that I
16  just answered what I had to answer in the pro hac
17  vice application.  He found that the pro hac vice
18  application should have been granted and that in
19  fact it should have been vacated once the
20  supersedeas indictment of Cliven Bundy was
21  dismissed.  Because what counts is the 6th
22  Amendment right to counsel.

Page 16

1      Let me give you just a little
2  background of what this case was about and why
3  there was so much at stake...
4      Cliven Bundy is a rancher in Nevada.
5  He ranches on about 400,000 acres in and around
6  Lake Mead.  His family has ranched there for about
7  150 years.  His grandfather, Lovett Bundy,
8  established the ranch.  An issue arose for grazing
9  fees.  Mr. Bundy in his heart believed that grazing
10  fees were not Constitutionally appropriate to be
11  paid.  A hundred ranchers have been driven out of
12  that area.  He's the only rancher of any substance
13  that is still standing in Nevada, because of the
14  way the Bureau of Land Management manages the land.
15  I'm not going to get into the specifics here.
16      There came a point in time when the
17  federal government came in with agents, some of
18  them mercenaries hired.  His family was threatened.
19  They're life was threatened by an agent called Dan
20  Love, who has since been removed by the Bureau of
21  Land Management.  His sister was thrown to the
22  ground violently.  His sons were tased.  His cows

Page 17

1  were killed, some of the bulls in the herd.  You
2  need bulls in order to be able to trade the herd.
3      People around the country saw this,
4  what was being carried on, and they came, some of
5  them on horseback, some of them exercising their
6  2nd Amendment and 1st Amendment rights to assist
7  him, and he stood up to the federal government.
8  And we can all appreciate that the federal
9  government -- whether you're a democrat,
10  republican, independent, conservative, liberal or
11  moderate, can be heavy handed.  We all know that.
12      CHAIRPERSON MIMS:  Mr. Klayman, I don't
13  want to interrupt you during the openings, but I do
14  want to limit the time on these and stick to what's
15  relevant to this case.
16      MR. KLAYMAN:  Ok.
17      CHAIRPERSON MIMS:  So, yeah, if you
18  can -- I don't think the issues that were at issue
19  in the Bundy case are directly relevant here,   so
20  --
21      MR. KLAYMAN:  Ok.
22      CHAIRPERSON MIMS:  I mean, I'm happy to

5  (Pages 14 to 17)

In The Matter of:  Larry E. Klayman
July 15, 2019

Page 18

1  listen to a general statement about the case,
2  but...
3        MR. KLAYMAN:  I was almost done.  But I
4  wanted to try to give you a feel for it, because
5  it's interesting, too.
6        Mr. Bundy and 18 other defendants were
7  ultimately indicted after a successful standoff.
8  The federal government left.  There was a lot at
9  stake.  He was 71 years old at the time.  If
10  convicted of 17 counts, he could have gone to
11  prison for life, and so could have his sons.  Three
12  of them were indicted along with him and other
13  defendants.
14        That's why it became so important for
15  me to enter into the case, because so much was at
16  stake.  And there are very few lawyers in this
17  country, as judge Gould pointed out, who would
18  actually take the representation.  And I was not
19  being paid fees in terms of the representation, in
20  terms of directly from Mr. Bundy.
21        So I filed a petition for pro hac vice
22  entry, and, as the evidence will show, that

Page 19

1  petition asked me for times that I had been by bar
2  association in affect or otherwise suspended, and I
3  put forward all the information that I needed.  I've
4  never been suspended by the DC Bar or any other
5  bar.  I've been a member in good standing
6  continuously.
7        But I did lock horns with some judges
8  over the years.  Judge Gould made reference to
9  that.  Strong lawyers sometimes do.
10        You all remember the OJ Simpson case
11  where Marcia Clark and Johnnie Cochran and others
12  were sanctioned multiple times in one case,
13  standing up for their clients.  I believe in my
14  client.
15        So I answered truthfully, and Judge
16  Gould recognized that in his dissent.  He said that
17  I provided all the information that I needed to
18  provide, that was asked for.  I also gave an
19  opinion that I thought I would ultimately win on a
20  prior proceeding that was brought before your
21  honorable committees, it was brought by my former
22  group, Judicial Watch, who I've been fighting with

Page 20

1  for 16 years since I left; Tom Fitton.  And I was
2  representing somebody who is like a surrogate mom
3  who he misappropriated money from, and also my
4  office manager in Miami who was sexually harassed,
5  and also a client who was abandoned and wound up
6  doing ten years in prison as a result of Judicial
7  Watch who I had left when I ran for the Senate in
8  Florida.  And I felt I hadn't done anything wrong.
9  I felt I had to step in.  I wasn't their initial
10  lawyer, but they had no money and they needed to
11  continue.  And that proceeding has never been
12  concluded to this day.  It's never been concluded.
13  So I gave my opinion that I thought I ultimately
14  would prevail.  And I'm entitled to my opinion.
15  And as a matter of fact, the matter is up at the DC
16  Court of Appeals right now.  There's no final
17  decision.
18        But in the course of that case, and I
19  shouldn't have done it, but I entered into a
20  negotiated discipline and I signed an affidavit,
21  and that negotiated discipline ultimately, to make
22  a long story short -- I'm trying to keep it

Page 21

1  short -- was not accepted by the committee that was
2  assigned for that.  What was recommended by Bar
3  Counsel was a public censure.  I accepted it.  I
4  wanted to get it behind me.  But I shouldn't have,
5  because I'm somebody who stands on principal.
6        When it wasn't accepted, Bar Counsel
7  came back to me and said, "Let's try to negotiate
8  another one."  And I listened to them and I said,
9  "No, I can't accept that because I haven't done
10  anything wrong.  I don't feel that I did anything
11  wrong."  I felt that I was actually being ethical
12  in trying to defend these people who had been
13  harmed by my former group, Judicial Watch, under
14  Tom Fitton, who actually is not a lawyer.
15        And so consequently, even Bar Counsel
16  withdrew.  There's a document in the record where
17  they withdrew the negotiated discipline, and that
18  was the basis of my saying we were starting
19  from square one.
20        Now, you know under the rules, the only
21  thing you can use the affidavit for is for
22  impeachment, if I ever take the witness stand.  But

6  (Pages 18 to 21)

In The Matter of:  Larry E. Klayman
July 15, 2019

Page 22

1   it doesn't come in for the truth of the matter.
2   And consequently, I did not withhold that
3   information from Judge Navarro.  I did advise her
4   of the negotiated discipline.  And of course it was
5   Judge Gould who said I wasn't required to
6   relitigate the entire DC Bar proceeding to have pro
7   hac vice admission.
8        See, there is 6th Amendment
9   Constitutional right to counsel, particularly in a
10  criminal case, and there's case law that says that,
11  unless the lawyer is at the point of being
12  disbarred for a criminal defendant who faces a
13  potential life in prison in particular, he deserves
14  to have the counsel of his choice.
15       Now one of the other things that Ms.
16  Porter said, which is not accurate, is that I did
17  not technically file the complaint against Judge
18  Navarro.  That was filed after the pro hac vice had
19  been denied, but it was also filed after she had
20  thrown Cliven Bundy in solitary confinement.  He's
21  not a threat to anyone.  He's a very righteous man.
22  His sons were also imprisoned.  They spent two

Page 23

1   years in prison before the indictment was
2   dismissed.
3        And not only that, she overrode the
4   speedy trial rights of Cliven Bundy.  The
5   government came in, very disingenuously, the U.S.
6   Attorney in Nevada, and said, "We have to try all
7   19 at once."  This was a complex case.
8        Well, conveniently, when they got to
9   the point of trying Bundy and some other
10  defendants, all of a sudden they had to divide it
11  up into three parts.  So it was a very insincere
12  and in my view dishonest approach on the part of
13  the District Attorney here, who committed a lot of
14  prosecutorial misconduct.  That was the basis the
15  superseding indictment was thrown out, for
16  prosecutorial misconduct, withholding Brady
17  material, exculpatory evidence, suborning perjury,
18  and you had government witnesses that were caught
19  lying on the stand.  It was a very extreme matter.
20       Now, one other thing I want to point
21  out is that Judge Navarro was recommended to the
22  bench by Harry Reid, and Harry Reid had branded my

Page 24

1   clients "domestic terrorists," and I felt, and
2   other people felt, that that influenced the way she
3   saw the case.  The person who got her in fact her
4   judgeship branded our client a domestic terrorist.
5        In any event, I did not file that
6   complaint, nor did I file a motion to disqualify.
7   There's some minor issues there about names being
8   put on as "of counsel," otherwise we will get into
9   that in the testimony.  But the reality is Ms.
10  Porter did not represent correctly.  I did not file
11  that complaint.
12       Now, even if I did, filing for a Bivens
13  action is appropriate, to ask for injunctive
14  relief, which I was asking for.  Judges are not
15  above the law, not that anybody is against the law.
16  We're all people in this county.  At least they
17  should be.
18       I also had a basis, when I filed the
19  action for pro hac vice, because I thought I would
20  win, because I submitted an opinion by one of the
21  top ethics experts in the country, Ronald
22  Rotunda -- may his soul rest in peace, he died

Page 25

1   about a year ago -- who said that I had not
2   committed any ethical infractions.  I submitted
3   that to Judge Navarro.  So the proceeding was not
4   over.  I had an opinion by a renowned expert who
5   had written a textbook on ethics, and I was
6   entitled to my opinion.
7        Now what did Judge Navarro do?  When
8   she denied me initially, she said, "Go back and
9   provide more information," which I did, and then
10  she denied it again, even though I gave her
11  everything that she asked for, including two judges
12  that I've locked horns with: Judge William Keller
13  and Judge Denny Chin.  In fact those matters were
14  reviewed by bar associations and they found that I
15  didn't do anything unethical.  It didn't rise to
16  the level of doing anything unethical.  So that's
17  very important to remember.
18       But the way she denies the second
19  petition tells you a lot.  She denied it without
20  prejudice.  She said, "Come back to me when the DC
21  Bar proceeding is over."
22       Now we all know how long DC Bar

7 (Pages 22 to 25)

In The Matter of:  Larry E. Klayman
July 15, 2019

Page 26

1  proceedings take.  You have to go through a hearing
2  committee.  You have to go through the Board.  You
3  then have to go through the Court of Appeals.  Many
4  of them take decades.  In fact the Judicial Watch
5  case now is almost 12 years old, maybe longer.  I
6  didn't count it up before I came in.  Before that's
7  over, I may not even be around. Certainly Cliven
8  Bundy could have already been convicted and
9  sentenced to life imprisonment.  And that's what
10  Judge Gould noted.  He said you can't deny somebody
11  his right of counsel.  It's fundamental.  Judge
12  Gould to me is a hero, because it's not easy to
13  stand up against your colleagues in the 9th
14  Circuit.
15      Here's what's important, is that Judge
16  Navarro simply said that I hadn't been forthcoming
17  on a few issues.  She didn't get into all this
18  other stuff that we're talking about, about judges
19  over the years.  I've never been sanctioned -- this
20  is important -- by a bar association for any
21  conduct with a judge.  I've always been respectful,
22  like I will be respectful with you in this

Page 27

1  proceeding, but I do take strong views.  And that's
2  who I am.  There aren't that many lawyers in this
3  country who do that.  Wayne Comfort (phon) was one
4  on the left.  Ramsey Clark, who interestingly
5  represented me with regard to judge Chin, I feel
6  kinship with these people, because they stand up to
7  the establishments, in both political parties.
8  I've always done that.  I'm nonpartisan.  But I
9  then had no choice but to file a petition for writ
10  of certiorari with the 9th Circuit.  That's how
11  these decisions came out.  A majority opinion was
12  written by Judge Bybee and also the dissenting by
13  Judge Gould.
14      It's important for you to consider, how
15  can we be here?  We shouldn't be here today,
16  because Judge Gould's decisions obviously create an
17  issue that there's no clear and convincing evidence
18  -- a very distinguished jurist -- made it a
19  point -- and he's in bad health, MS.  He has
20  multiple sclerosis -- to write very strong opinions
21  saying that I should be admitted.  I responded to
22  what I was asked and I was entitled to my opinion

Page 28

1  and the DC Bar proceedings weren't even over.  And
2  you know about the rules.  Until there is a final
3  decision, there's nothing in affect until it goes
4  through the entire process.
5      Now, with regard to Bret Whipple, he
6  was the local counsel that came in when I was
7  denied pro hac vice entry.  Bret Whipple is someone
8  who -- and you'll get it from my testimony --
9  illogically did not identify with Cliven Bundy.
10  And in fact at some point Cliven Bundy fired him
11  and says, "I want to represent myself.  At that
12  point the magistrate judge who was deciding whether
13  to let Whipple out, because he filed a petition to
14  withdraw, asked him what he had done.  He said, "I
15  wasn't prepared to go to trial."
16      The judge asked Mr. Bundy, "Did he ever
17  go over the discovery with you?"  There was a huge
18  amount of discovery in this case.  It had been
19  going on for years.  And Bundy said, "Oh, once or
20  twice."
21      "How many times have you seen him?"
22      "Couple times."

Page 29

1      So that was the reason why it was so
2  important for me to come into the case.  And I had
3  dealt with Whipple.  I was trying to be diplomatic.
4  I tried to be understanding.  I wanted to work with
5  him.  I felt there was a team.  Judge Gould ruled
6  that he needed a defense team.  OJ Simpson had a
7  team.  Clarence Darrow had a team in the Scopes
8  Monkey trial case.  Other people have had teams of
9  lawyers if the case was complex.  Even if I didn't
10  remain on the case I should have been able to come
11  in too, because I do have experience as a criminal
12  prosecutor; I do have experience as a criminal
13  defense lawyer as well as in a civil context, and
14  you need that kind of a team.  That's what the crux
15  of it is.  It's the 6th Amendment.
16      And it tells you something: the fact
17  that a judge would say, "Pray to Catch 22" -- I
18  don't know if you ever read that book in junior
19  high -- the judge said "I'm not going to deny it
20  with prejudice.  I'll deny it with prejudice.  You
21  come back when the DC Bar proceeding is over."
22  That's all she said basically.  That doesn't make

In The Matter of:  Larry E. Klayman
July 15, 2019

Page 30

1  sense, because Cliven Bundy could have already been
2  convicted and put away, as well as his sons and the
3  others.
4        Now, I was entitled to my opinion, too,
5  whether Whipple had a lot of criminal experience.
6  I didn't check, you know, Pacer, ok, but I had
7  dealt with him and I knew that he didn't have a lot
8  of experience.  Because when they went up on
9  mandamus and I suggested that there were things
10  that he needed to follow up on when I was kept out,
11  and he said, "How do you do a writ of mandamus?
12  Can you send me some sample briefs?"
13        A lawyer that has a lot of experience
14  knows how to do a writ of mandamus to the higher
15  court, an emergency writ.  So that was my opinion,
16  I was entitled to it.  And in fact it bore out as
17  my testimony will show, I sat through trial and saw
18  that Whipple wasn't prepared.  He didn't seen know
19  what he was doing in a federal context.
20        And he had been -- and this is another
21  possible motivation, he had been a colleague of
22  Judge Navarro in the state public defenders office,

Page 31

1  which was one possible motivation why she felt that
2  I didn't need to be in the case, because she knew
3  Whipple, and Whipple got CJA appointments.
4        So the cases that are listed on Pacer,
5  they're very easy cases and it's just plead people
6  out, generally speaking, and you move on.  It's not
7  complex.
8        Nineteen defendants; life imprisonment;
9  in a federal context.
10        So I was entitled to my opinion and I
11  didn't misrepresent it.  In any event, it wasn't
12  intentional on my part.  In the course of heated
13  litigation, lawyers often say things.
14        And it's important to point out that
15  throughout this whole process I was never
16  sanctioned by any court.  I wasn't sanctioned by
17  Judge Navarro.  This is crucial.  I wasn't
18  sanctioned by anyone on the 9th Circuit.  No one
19  said I filed too many pleadings.
20        This is the most offensive part to me
21  of all, in my heart, is to try to say that I should
22  be disciplined because I did my best and filed

Page 32

1  pleadings to get into a case where I believed in my
2  client, who was facing life imprisonment with his
3  sons, and that I filed too many pleadings...
4  that's not what the Bar is supposed to be about.
5  You're supposed to zealously represent your client,
6  and I never gave up, and I'm still not giving up on
7  that.
8        Because the Trump administration --
9  this is important -- the Trump administration took
10  an appeal, believe it or not, and they did it
11  because the prosecutors in Nevada have a record now
12  of committing prosecutorial abuse, that they could
13  be removed as prosecutors, disciplined and possibly
14  be indicted.  So they're hoping the 9th Circuit
15  will somehow change, which Judge Navarro was forced
16  to say at the end.
17        Judge Navarro dismissed it.  I don't
18  believe it was because she wanted to dismiss it,
19  but she was going down with a sinking ship.
20  Because the Las Vegas Review Journal, which is a
21  mainstream newspaper -- it's not one of these crazy
22  right or left publications -- listed in an

Page 33

1  editorial as one of its exhibits all of the times
2  she violated the Constitutional rights of the
3  defendants, and then they said, "The prosecutors
4  have a friend in Judge Gloria Navarro."  So she was
5  forced to dismiss it, because her own reputation
6  was at stake at that point.  And that's what we
7  were dealing with.  We were dealing here with a
8  hostile judge.
9        And then the matter gets up to Judge
10  Bybee.  Judge Bybee is from the Las Vegas
11  community.  He taught at Las Vegas Law School.  He
12  is a friend of Navarro.  It's a very close-knit
13  community.  I've gotten to know Las Vegas and
14  Nevada very well.  I even learned how to pronounce
15  Nevada (ne-VAH-dah).  We on the East Coast say
16  Nevada (ne-VA-dah). But it's like poe-tay-toe or
17  puh-tah-toe or toe-may-toe/tuh-mah-toe.  I actually
18  became like a Nevadian.  I was there thirty-five
19  times I visited Bundy in jail, 35 plus times,
20  preparing for trial.  And Judge Bybee saw it in a
21  certain lens, that somehow we were attacking his
22  friend.  And whether we made a mistake or not in

9  (Pages 30 to 33)

In The Matter of:  Larry E. Klayman
July 15, 2019

Page 34

1    saying that his wife, Shannon, had relationships
2    professionally with Harry Reid -- and we retracted
3    that.  That's what Mr. Peer will testify to, that
4    very limited issue -- is that it's clear that this
5    was a very close-knit legal community.  People
6    stand up for each other.
7         It's also important to know that Judge
8    Bybee was almost himself removed from the Justice
9    Department, ironically, for signing off on
10   waterboarding during the George W. Bush
11   administration.  He also granted minority decision
12   that said it was ok for prisons to open up the
13   mail, of prisoners from their lawyers.
14        He doesn't have a great deal of respect
15   for the 6th Amendment.  This was dealing with the
16   6th Amendment right to counsel.
17        So I made reference to that.  People --
18   I'm allowed to make reference to it.  I'm an
19   advocate and I sought to have the panel -- a
20   different panel rule on this, so hopefully I could
21   be admitted pro hac vice and not have this
22   collegial atmosphere that I perceived with Judge

Page 35

1    Bybee writing the majority of the opinions
2    protecting Judge Navarro.
3         And that's what it's about.  I didn't
4    make any misrepresentations, any material
5    misrepresentations.  It all came from part --
6    things were happening quickly.  I provided what I
7    needed to provide.  I am entitled to my opinion as
8    to whether I would prevail in the proceeding
9    brought by Judicial Watch.
10        I was entitled to my opinion on Bret
11   Whipple, and I made a mistake with regard to
12   Shannon Bybee, and we corrected that on the record.
13   And the bottom line here is that there is no clear
14   and convincing evidence.  How do you find clear and
15   convincing evidence when a distinguished jurist
16   says the opposite of what Judge Bybee wrote?  You
17   know, the burden is on Office of Disciplinary
18   Counsel.  All things being equal, the Respondent
19   wins.  The benefit of the doubt goes to the
20   Respondent.  So, it's a very heavy burden for them
21   to prevail.
22        I'm going to be candid with you right

Page 36

1    now.  This is very inappropriate for her to talk
2    about cases that I brought with Bar Counsel.  I
3    don't feel that I've been treated fairly.  This has
4    nothing to do with this case.
5         Your Honor, Ms. Mims, has ruled that
6    this case is limited to the Specification of
7    Charges.  I would suggest that Ms. Porter said that
8    to prejudice you towards me.
9         I want to be respectful to Ms. Porter,
10   and I want to be respectful to everybody, but
11   that's not right.  And there have been other things
12   that were said and done that were meant to
13   prejudice, but that's not part of this case.
14        I'm entitled to assert my rights in a
15   court of law.  That litigation is still pending.
16   The judge dismissed it back on the reconsideration.
17   You know, there is a tendency to circle the wagons
18   in any community, but if I'm not successful on
19   reconsideration, I'll go up on appeal.  They don't
20   have immunity no more than I have immunity to do
21   anything.  We're all equal in this country, and
22   that's what I stake my career on.

Page 37

1         So I hope we stated the issues, and,
2    you know, I'm not in any way afraid to answer any
3    questions, because I felt that I did what I had to
4    do as a strong advocate.  I believe in my clients.
5    I won't accept clients if I don't believe in them.
6    I won't accept their representation.  I've never
7    did what I did for money, which is why I'm
8    representing myself, because I don't have much
9    money.
10        And these proceedings are very costly
11   and they take up a lot of time.  And even if you're
12   not putting out your own money, you're losing money
13   because you can't bill, because you can't do other
14   things.
15        My life's on the line.  What they want
16   to do here is to remove me from the practice of
17   law.  They have made statements like that to me,
18   even before this case was filed.  They're trying to
19   pile on, hoping they get a good result on the
20   Judicial Watch case and another case and this and
21   that that they have been piling on.  Because Larry
22   Klayman is a thorn in the side of the

10  (Pages 34 to 37)

In The Matter of:  Larry E. Klayman
July 15, 2019

Page 38

1  establishment.
2       I sued even George W. Bush several
3  times for the illegal surveillance of the American
4  people, for his Cheney Energy Task Force going to
5  the supreme court.
6       I don't care who it is.  I don't like
7  government exercising a heavy hand and not being
8  honest.
9       So, that's what it's about, your Honor.
10  So I just wanted you to keep in mind that it's
11  clear and convincing evidence standard.  We
12  shouldn't be here.  This is costing you a lot of
13  time, taxpayer money, me a lot of time.  That's ok.
14       But their goal is to try to pile on
15  right now, and if they can't remove me legally they
16  will do it by bankrupting me, and that's what it's
17  about in my view, in my view.
18       I'll let you make your own decisions on
19  this when you hear all the evidence.
20       Now I do have some preliminary matters
21  that I'd like to raise and I thank you for
22  listening to me and giving me the time to do that

Page 39

1  introduction.
2       CHAIRPERSON MIMS:  Thank you, Mr.
3  Klayman.
4       So I assume by "other preliminary
5  matters," I believe that you filed a motion for a
6  more definite statement?
7       MR. KLAYMAN:  Yes.  It's probably too
8  late at this point.
9       CHAIRPERSON MIMS:  Right.
10       MR. KLAYMAN:  To do anything about it.
11       CHAIRPERSON MIMS:  I'll just say for
12  the record that that motion is denied.
13       MR. KLAYMAN:  Ok.
14       CHAIRPERSON MIMS:  I don't know -- what
15  other preliminary matters?
16       MR. KLAYMAN:  Yes, there are other
17  things.
18       When I was going through the materials
19  and other things, I found some things I want to
20  submit.  So I want to submit and ask the court to
21  accept some supplemental exhibits.  I gave them to
22  Ms. Porter.  One of them is a transcript from

Page 40

1  Cliven Bundy that he had tried to dismiss Bret
2  Whipple in court as his material representation.
3  There's a mean note that I sent to Mr. Whipple.
4  There aere other things where I was filling in, and
5  this is why I want to go through the exhibits with
6  you before we begin, before Ms. Porter has me
7  testify, because a lot of the exhibits are
8  incomplete.  They don't contain attachments that
9  were part of court filings.  So, I included in a
10  lot of the supplemental exhibits the attachments
11  and other matters of court record which were not
12  included.
13       CHAIRPERSON MIMS:  So, you would like
14  to file a supplemental list of exhibits?
15       MR. KLAYMAN:  Yeah, I have it right
16  here.  I can give you a copy of it.
17       CHAIRPERSON MIMS:  How many additional
18  exhibits are on it?
19       MR. KLAYMAN:  Twenty-seven.
20       MS. PORTER:  I'm seeing some of these
21  for the first time, and it's my understanding that
22  while you --

Page 41

1       MR. KLAYMAN:  Oh, there's five
2  additional.
3       CHAIRPERSON MIMS:  Five additional?
4       MR. KLAYMAN:  Five additional.
5       MS. PORTER:  One of them is a
6  transcript, it is a court record, but some of these
7  are not court records and I will reserve the right
8  to object to them if and when they're offered,
9  particularly emails that are one-sided where I am
10  seeing them for the first time, and I don't see any
11  responses from the other party who is receiving the
12  emails, so...
13       MR. KLAYMAN:  What's important in
14  that -- this is with Mr. Whipple -- is my frame of
15  mind, whether I had an ability to reach my opinion.
16  So I'm not in any way trying to say that Mr.
17  Whipple is not a good person or whatever.  It's
18  just my frame of mind the fact that he had no
19  experience, and that's important based upon what I
20  said.
21       CHAIRPERSON MIMS:  I don't think that
22  we have a problem with you actually submitting the

11  (Pages 38 to 41)

In The Matter of:  Larry E. Klayman
July 15, 2019

Page 42

1 supplemental list of exhibits at this time.  When
2 it comes to individual objections to exhibits, and
3 I know that there are objections outstanding, I
4 think it makes sense to rule on the objections as
5 the exhibits come up.
6         MR. KLAYMAN:  That's fine.  That's
7 fine.  Can I give copies to everybody?
8         CHAIRPERSON MIMS:  Sure.
9         MR. KLAYMAN:  It's four copies you
10 need, or five?  Shall I give them to you, your
11 Honor?
12         CHAIRPERSON MIMS:  Sure, that's fine.
13 Is each of these one set?
14         MR. KLAYMAN:  It's one set.
15         Now there's a few other things that I
16 wanted to put everybody on notice of.
17         I would ask that Ms. Porter, with
18 regard to her exhibits, if there's an appendix or
19 attachments, to supplement as well with those
20 attachments.  Because they're incomplete.  Some of
21 these exhibits are incomplete.  It would help your
22 Honors to see the full pleadings.

Page 43

1         There's a rule of completeness.  I
2 don't know what they are, so I don't feel
3 prejudiced by it, so I think you need to see it.
4         CHAIRPERSON MIMS:  Again, as those
5 exhibits come up we can discuss the individual
6 exhibits.
7         MR. KLAYMAN:  Ok.
8         CHAIRPERSON MIMS:  I don't want to go
9 through each exhibit at this point.  As they're
10 used, we can go through them, and if you have a
11 specific objection, you can make it.
12         MR. KLAYMAN:  Yes.
13         And then I just wanted to let you know
14 that Professor Chemerinsky, which we'll consider
15 when he comes up -- our expert, the dean at the
16 University of California at Berkley -- that he is
17 available -- he just came back from Europe, he has
18 a very tight schedule -- at 12:30, Thursday.  And
19 we have set up the time with Mr. Turner to have
20 this testimony come in by remote.
21         CHAIRPERSON MIMS:  12:30 eastern time.
22         MR. KLAYMAN:  Eastern time.  9:30 his

Page 44

1 time.  He tries to do it before the day begins, for
2 the most part.
3         CHAIRPERSON MIMS:  Well, I'm actually
4 glad you brought that up.  Have you had any chance
5 to do any testing of the equipment?
6         MR. KLAYMAN:  Yes, the test.
7         CHAIRPERSON MIMS:  They did?
8         MR. KLAYMAN:  Yes.
9         CHAIRPERSON MIMS:  How long do you
10 expect that testimony to be?
11         MR. KLAYMAN:  I'd say about an hour is
12 my guess, hour, hour and a half, depending on what
13 Ms. Porter asks.
14         CHAIRPERSON MIMS:  Ms. Porter, do you
15 have any issues with 12:30 on Thursday for that
16 witness?
17         MS. PORTER:  No, none with the time.
18         CHAIRPERSON MIMS:  Thank you.
19         MR. KLAYMAN:  Thank you.
20         And last, but not least, I would like
21 to be able to rebut.  I know that the prosecution
22 gets to do a rebuttal.  I'd like to have a brief

Page 45

1 rebuttal after they finish.  It wouldn't take up
2 much time on that.
3         CHAIRPERSON MIMS:  Well, I'll defer
4 ruling on that until the end of the close of all
5 the evidence.
6         MR. KLAYMAN:  Thank you.
7         CHAIRPERSON MIMS:  Thank you.
8         Ms. Porter, are you ready to go?
9         MS. PORTER:  Yes.  I'm calling Mr.
10 Klayman as my first witness.
11         MR. KLAYMAN:  Oh, one other point, I'm
12 sorry, is that we had a snafu with Federal Express
13 in sending some exhibits here, some of my exhibits
14 here and Ms. Porter's.  I'd like to see if we can
15 have an hour and a half at lunch to go back to the
16 hotel and get them.
17         CHAIRPERSON MIMS:  These are exhibits
18 that you're going to use in your case?
19         MR. KLAYMAN:  Some of them, yeah.
20         CHAIRPERSON MIMS:  Well, I don't think
21 you're going to be starting you're case today.
22         MR. KLAYMAN:  The point is she has her

12  (Pages 42 to 45)

In The Matter of:  Larry E. Klayman
July 15, 2019

Page 46

1  exhibits.  I have copies of some of them.

2        MS. PORTER:  There are full sets here

3  and I have an extra full set at my office you can

4  have.

5        MR. KLAYMAN:  Ok.

6        CHAIRPERSON MIMS:  That work for you?

7        MR. KLAYMAN:  Yeah.

8        CHAIRPERSON MIMS:  Great, you can

9  begin.  And Ms. Porter, you're going to be starting

10  with binder one, right?

11        MS. PORTER:  Yes.

12

13        (Respondent Larry Klayman on the

14  witness stand.)

15        MR. KLAYMAN:  Your Honor, just indulge

16  me.  I'm going to take this out.

17        (Brief pause.)

18        CHAIRPERSON MIMS:  Mr. Klayman,

19  whenever you're ready I'll administer the oath.

20        MR. KLAYMAN:  Yeah, sure.

21        CHAIRPERSON MIMS:  Mr. Klayman, do you

22  solemnly swear or affirm that the testimony you

Page 47

1  will give in this proceeding will be the truth, the

2  whole truth and nothing but the truth?

3        MR. KLAYMAN:  I do.

4        CHAIRPERSON MIMS:  You may begin.

5        MS. PORTER:  Thank you.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

Page 48

1  Whereupon,

2        LARRY KLAYMAN

3  called as a witness by Disciplinary Counsel, and

4  after having been first duly sworn, was examined

5  and testified as follows:

6        DIRECT EXAMINATION

7      ON BEHALF OF DISCIPLINARY COUNSEL

8        BY MS. PORTER:

9    Q.  Mr. Klayman, could you start off by

10  giving your full name.

11    A.  Larry Eliot Klayman with one T on the

12  Eliot.

13    Q.  And Mr. Klayman, am I correct that you

14  first met Cliven Bundy in approximately February,

15  2016, around the time that he was indicted?

16    A.  No.

17    Q.  When did you first meet him?

18    A.  I met him at the ranch right after the

19  successful standoff.  Somebody recommended that I

20  represent him, and I met him at that time.

21    Q.  And that was in February of 2016?

22    A.  I don't recollect the exact date,

Page 49

1  but -- no, that was back in 2014, I believe.

2    Q.  And you first talked to him about being

3  his lawyer in February of 2016?

4    A.  I didn't talk to him.  I met him right

5  after the standoff.  I had been recommended by

6  someone to talk to him and they thought if he still

7  needed a lawyer for the land matter and was

8  probably going to be back with the Justice

9  Department and the FBI, and there was a hiatus of a

10  couple years before he was indicted.  At that time

11  it was his wife, Carol Bundy, who contacted me

12  because Cliven was in prison with his sons and

13  said, "Larry, we'd like you to represent Cliven."

14    Q.  And that was in February of 2016?

15    A.  In and around that time.  I don't

16  recollect the exact date.

17    Q.  So it was -- well, let me see if I can

18  refresh your memory.

19        Do you recall the argument before the

20  9th Circuit in October of 2016 when you were asked

21  questions about when you were first retained by Mr.

22  Bundy?

13  (Pages 46 to 49)

In The Matter of:  Larry E. Klayman
July 15, 2019

Page 50

1    A.  I don't recall that.
2    Q.  Let me have you turn to Exhibit Number
3  61.  It's in the second notebook.  And I'm going to
4  refer you, Mr. Klayman, to the Bates number which
5  is the number on the bottom of the page, and it's
6  Bates number four, and you were being asked
7  questions by Judge Fletcher about when Mr. Bundy
8  retained you.  And you responded to Judge Fletcher,
9  and I'm going to read your response, "We first
10  talked in February and I sought through then local
11  counsel Joel Hansen pro hac vice entry shortly
12  thereafter."
13      "Judge Fletcher:  No, I don't want -- I
14  didn't ask you when you first talked with Mr.
15  Bundy.
16      "When did Mr. Bundy first retain you?
17      "Answer:  Around the time that we filed
18  a pro hac vice application."
19    A.  I don't see that.  Where is that?
20    Q.  It's on page four and five on the
21  bottom of the page, Exhibit 61.
22    A.  Yes, I see that I said that.

Page 51

1    Q.  Ok, and was that an accurate statement
2  in response to Judge Fletcher's question?
3    A.  To the best of my knowledge at the time
4  it was.
5      I mean, I wasn't really thinking
6  whether that was material to what was going on or
7  not.  Clearly he retained me before I filed a pro
8  hac vice application.
9    Q.  And according to what you represented
10  to Judge Fletcher, that was a few days before you
11  filed your pro hac vice application?
12    A.  Well, it depends how you call "retain".
13      Somebody can ask you to represent them,
14  but before you firm it up, it may take longer to
15  put that agreement into effect.
16    Q.  Do you have a written retainer
17  agreement with Mr. Bundy?
18    A.  I do.
19    Q.  You filed your first petition or
20  application for pro hac vice on March 22nd, 2016.
21      Is that correct?
22    A.  If you could show me the document, I'd

Page 52

1  appreciate it.
2    Q.  Certainly, Exhibit Number 21.
3      Is that the application that you filed
4  with the federal court in Nevada on March 22nd,
5  2016?
6    A.  It seems to be.  I don't know, because
7  I don't have the original, but it looks like it is.
8    Q.  And you filed another one the next day
9  on March 23rd, which is Exhibit Number 22?
10    A.  I think -- yes, I did, and I think the
11  reason was that Mr. Hansen, who was sponsoring me,
12  forgot to sign it.  His secretary filed it without
13  a signature.
14    Q.  And you filed the supplement on March
15  28th, 2016, which is Exhibit Number 23?
16    A.  It says Second Supplemental Exhibit 28.
17    Q.  I'm on Exhibit 23.  You may be on 24.
18    A.  Ok.
19    Q.  Which I'll ask you about next.
20    A.  All right.
21    Q.  And you filed a supplement --
22    A.  Wait, wait, please.  Let me turn to it.

Page 53

1      See, here's the thing.  I didn't file
2  it.  Mr. Hansen filed these things.  He was local
3  counsel at the time.
4    Q.  But you were aware of the filing of the
5  first --
6    A.  Yes, but they're Mr. Hansen's filings,
7  because I wasn't admitted yet; never was.
8    Q.  And there was a second supplement to
9  your verified petition filed on March 31st, which
10  is marked as Exhibit Number 24?
11    A.  Yes.  That was filed by Mr. Hansen
12  again because -- and it says -- it states that they
13  want to have me come in pro hac vice at a fast pace
14  because Mr. Bundy was placed in solitary
15  confinement and his rights -- the inference was
16  they were being prejudiced, to avoid any prejudice
17  to his rights.
18    Q.  Let me have you go back to the initial
19  petition that you filed.  I think that 21 and 22
20  are very similar.  You signed both of those or
21  acknowledged both of those?
22    A.  Yes.  Mr. Hansen signed them on page

14  (Pages 50 to 53)

In The Matter of:  Larry E. Klayman
July 15, 2019

|  | Page 54 |
|---|---|
| 1 | four.  It says, "The petitioner respectfully |
| 2 | praised the petitioner be admitted to practice |
| 3 | before this court for the purpose of this case |
| 4 | only." |
| 5 | I signed for those portions, and let me |
| 6 | just check 23. |
| 7 | I see no such signature on 23. |
| 8 | Q.  No, I'm talking about 21 and 22. |
| 9 | A.  Ok.  Yes, that's my signature on page |
| 10 | four of 22. |
| 11 | Q.  Why don't you just stay on page 22 for |
| 12 | ease of reference, and if you turn back to the |
| 13 | second page of that document, Mr. Klayman, Exhibit |
| 14 | Number 22 at page two. |
| 15 | Among other things, the form |
| 16 | application asked you about disciplinary |
| 17 | proceedings? |
| 18 | A.  Which paragraph are you referring to? |
| 19 | Q.  Paragraph five on page two of Exhibit |
| 20 | Number 22. |
| 21 | A.  I see that. |
| 22 | Q.  You were aware at the time that there |

|  | Page 55 |
|---|---|
| 1 | were disciplinary proceedings pending against you |
| 2 | in the District of Columbia? |
| 3 | A.  Yes, and I identified them. |
| 4 | Q.  Let me ask you a little bit about those |
| 5 | disciplinary proceedings first before you get to |
| 6 | your representations to the court. |
| 7 | The disciplinary charges, which are |
| 8 | Exhibit Number 8, were filed against you in October |
| 9 | of 2013? |
| 10 | A.  I don't have the date in front of me |
| 11 | right now. |
| 12 | Q.  Well, why don't you look at Exhibit |
| 13 | Number 8.  Do you have any reason to doubt -- |
| 14 | A.  Exhibit number what? |
| 15 | Q.  Eight. |
| 16 | A.  There's nothing in Exhibit Number 8 in |
| 17 | the binder.  I'm sorry, maybe I'm looking at the |
| 18 | wrong one. |
| 19 | Q.  Binder number one.  I think it's in |
| 20 | front of you.  And you were aware of -- |
| 21 | A.  Wait, wait, wait, please.  Ok. |
| 22 | It says filed October 1st, 2013.  But I |

|  | Page 56 |
|---|---|
| 1 | want to preface it by saying that this complaint |
| 2 | that was filed by Tom Fitton of Judicial Watch, it |
| 3 | was sitting with Bar Counsel for many years. |
| 4 | So it actually was -- the matter was |
| 5 | very, very old at that point, and this arose |
| 6 | because, in my view, I had just gotten a judgment |
| 7 | for malicious defamation against Judicial Watch, |
| 8 | and they pushed DC, I believe, to then file this in |
| 9 | retaliation. |
| 10 | Q.  Mr. Klayman, I think it will go a lot |
| 11 | quicker if you just answer my questions and then |
| 12 | you will have a chance to I'm sure testify on your |
| 13 | own behalf. |
| 14 | But you were aware of the charges, the |
| 15 | Specification of Charges that is marked as bar |
| 16 | exhibit -- or Disciplinary Exhibit Number 8? |
| 17 | A.  Yes. |
| 18 | Q.  And in June you entered into a |
| 19 | negotiated discipline with Disciplinary Counsel. |
| 20 | And if you turn to I think we're on number 10. |
| 21 | A.  That's when it was filed apparently, |
| 22 | the petition for negotiated discipline. |

|  | Page 57 |
|---|---|
| 1 | Q.  And you signed that?  If you turn to |
| 2 | page 14 of Exhibit Number 10. |
| 3 | A.  Correct. |
| 4 | Q.  That's your signature? |
| 5 | A.  That's my signature. |
| 6 | Q.  And you also executed an affidavit on |
| 7 | June 23rd, 2014, adopting the statements in the |
| 8 | petition? |
| 9 | A.  That's correct. |
| 10 | Q.  And in your affidavit and in the |
| 11 | petition, you stipulated that you had violated Rule |
| 12 | 1.9 on three occasions? |
| 13 | A.  Where is that? |
| 14 | Q.  Well, if you look at the petition, page |
| 15 | 13. |
| 16 | A.  That's not my affidavit.  You just |
| 17 | represented I thought that that was my affidavit. |
| 18 | Q.  What's not -- you're stating that the |
| 19 | affidavit that appears on Exhibit Number 10, pages |
| 20 | 15 through 17, is not your affidavit? |
| 21 | A.  That's not what I said. |
| 22 | You were referring to page 13 of the |

15  (Pages 54 to 57)

In The Matter of:  Larry E. Klayman
July 15, 2019

Page 58

1  negotiated discipline documentation where you
2  represented that I had an affidavit, said that this
3  is not an affidavit here on page 13.
4      Q.  Ok, this is the petition -- page 13.
5      A.  Yeah, I know what it is.  That's why
6  I'm correcting what you asked me about.
7      Q.  Ok, and in your affidavit you
8  stipulated not only to the facts but the violations
9  set forth in the petition.
10     Isn't that correct?
11     A.  The affidavit speaks for itself.  If
12  you want to refer me to any particular section,
13  that's fine.
14     Q.  All right.
15     A.  I'm not going to characterize
16  affidavit.
17     But the affidavit has been withdrawn.
18  The whole thing was nullified when it was not
19  accepted by the hearing committee and it's of no
20  force and effect.
21     As I said in the opening statement, the
22  affidavit can only be used for impeachment purposes

Page 59

1  in other proceedings concerning this particular
2  matter, by the rules of this Board.
3      Q.  Mr. Klayman, you participated in a
4  hearing in connection with the petition for
5  negotiated discipline to which your affidavit was
6  attached.
7      A.  That's correct.
8      Q.  And in that hearing you were sworn and
9  testified under oath.  Isn't that correct?
10     A.  I believe I was sworn and I also said
11  to the hearing committee -- and that may be one
12  reason why it wasn't accepted -- is that, you know,
13  I felt that at the time I was taking these actions
14  to protect these people, because they had no money,
15  didn't have counsel, counsel had resigned, that I
16  was acting ethically.  And that's probably why they
17  didn't accept the negotiated discipline.  So under
18  oath I said that I had acted ethically at that
19  hearing.
20     Q.  You don't recall testifying under oath
21  that the facts as set forth in the petition were
22  true and accurate?

Page 60

1      A.  I don't have that in front of me right
2  now.  I didn't refute that for sure.  But what I
3  was saying is that -- and this is what I told the
4  hearing committee, or said it some other place, I
5  don't remember at this point -- that, you know, I
6  just wanted to put this behind me, and then I
7  thought the better of it when this matter was not
8  accepted by the hearing committee.
9      Your office came back to me and said,
10  "Let's renegotiate a modification," and I said,
11  "No, I want to proceed with the entire matter."
12     You know very well, Ms. Porter, that
13  under Board rules that you're not to use that
14  negotiated discipline against me in the continued
15  proceeding.  You know that.  But you're trying to
16  do that here and that's not appropriate.
17     Q.  Do you recall testifying at the hearing
18  on the negotiated discipline that you had violated
19  the four rules: three violations of Rule 1.9 and
20  one violation of 8.4(d)?
21     A.  If you want to show me what you put in
22  there.

Page 61

1      The point I'm trying to make is that
2  the matter started over again, that I contested it,
3  and in fact to this day the matter is not
4  concluded.  There is no final decision on anything.
5      I did advise Judge Navarro of that
6  proceeding and the negotiated discipline, and
7  that's all Judge Gould said I was required to do,
8  by the questions that were asked.
9      Q.  You were aware that the hearing
10  committee rejected the negotiated disposition
11  because the sanction was, according to the hearing
12  committee, too lenient?
13     A.  Correct, and I was actually kind of
14  relieved that they did, because I really didn't
15  feel like I did anything wrong at that time.
16     I said at the time I undertook these
17  actions I felt that I was actually fulfilling
18  ethical obligation, and that's what judge -- not
19  judge, that's what the expert Ronald Rotunda said,
20  among other reasons why I hadn't violated ethics,
21  is what he said in his opinion, which was part of
22  the record.

16  (Pages 58 to 61)

In The Matter of:  Larry E. Klayman
July 15, 2019

Page 62

1    Q.  And Exhibit Number 11 is the hearing
2  committee's report.  You had received a copy of
3  that report prior to filling out your pro hac vice
4  application.
5      Isn't that correct?
6    A.  Yes.  And as Judge Gould said, I had no
7  obligation to relitigate the matter in front of
8  Judge Navarro.  I informed her of the situation.
9    Q.  Can you tell me on Exhibit Number 22
10  where you told Judge Navarro about the negotiated
11  disposition.
12      (Witness peruses documents.)
13    A.  It was not in Exhibit 22.  It was in a
14  later filing.
15    Q.  So the two supplements that you've
16  already identified, Exhibit Numbers 23 and 24,
17  there is also no mention of the negotiated
18  disposition in either one of those supplements.
19      Isn't that correct?
20    A.  If these are complete documents.  I
21  don't know that they are.
22      Let me also preface this by saying that

Page 63

1  I advised Judge Navarro that there was a
2  proceedings.  There was no final disposition on
3  this.  Ultimately she was advised that there was a
4  negotiated discipline that was withdrawn, in my
5  view withdrawn, not just by the hearing committee,
6  by the parties, themselves, and because there was
7  no final discipline by the Board's own rules,
8  unless, you know, the person sinks.  I'm not going
9  to disparage people who are overweight.  It was not
10  at the time in force and effect.
11      So she was advised of the proceeding
12  and was entitled to any opinion.
13    Q.  Just so I'm clear, Mr. Klayman, the
14  representations that you made to Judge Navarro in
15  connection with your pro hac vice application, they
16  were all representations that were made in writing,
17  in pleadings.  Is that correct?
18      There was no hearing where you made an
19  oral presentation?
20    A.  Regrettably not, but the pleadings did
21  set forth that ultimately, when the question was
22  asked about the negotiated discipline, I advised

Page 64

1  her of that and I advised her honestly that the
2  negotiated discipline did not go into effect and
3  was of no force and effect.
4    Q.  So we're both on the same page, I just
5  want to confirm, representation that you made to
6  Judge Navarro was in writing.
7      Is that correct?
8    A.  I never had a chance to appear in front
9  of her.  I wish I had.
10    Q.  So that's a yes?
11    A.  Yes.
12    Q.  After the hearing committee rejected
13  the negotiated disposition, the petition, which is
14  Bar Exhibit Number 8, was scheduled for a hearing.
15      You were aware of that?
16    A.  I don't understand your question.
17    Q.  After the hearing committee rejected
18  the petition for negotiated disposition as too
19  lenient, the charges that were pending against you
20  were scheduled for a contested hearing.
21      Is that correct?
22    A.  That's correct.  Also important, and I

Page 65

1  hope that you will show the hearing committee, this
2  was an actual withdrawal by Clay Smith, your
3  colleague, of the negotiated discipline.
4    Q.  And we can identify that as Exhibit
5  Number 12.  And the board ruled on that and that's
6  Exhibit Number 13.
7      Is that correct?
8    A.  I've got to find it first.
9      CHAIRPERSON MIMS:  If you don't mind,
10  before we move on to Exhibit 13, with respect to
11  Exhibit 22, is this the full document?
12      MS. PORTER:  Yes.
13      CHAIRPERSON MIMS:  It is.
14      MS. PORTER:  I mean, you can tell, it's
15  printed off of Pacer.  It says one of 12, and I
16  have all 12 pages included.
17      MR. KLAYMAN:  It may or may not be,
18  your Honor, if I understand what Ms. Porter is
19  saying.
20      CHAIRPERSON MIMS:  I'm going to try to
21  hold my questions, but some of them I'm going to
22  interject so that it doesn't escape us while we're

17 (Pages 62 to 65)

In The Matter of:  Larry E. Klayman
July 15, 2019

Page 66

1  on the document.
2      Mr. Klayman, in response to number
3  five, which is on page two of Exhibit 22, which
4  we've already looked at, the response says, "The
5  only disciplinary case pending is in the District
6  of Columbia disclosed in the attached."
7      What is the attached that is referring
8  to -- oh, I see it, I'm sorry.
9      MR. KLAYMAN:  Yeah, it's page seven and
10  eight.
11      CHAIRPERSON MIMS:  Ok, I'm sorry.
12  BY MS. PORTER:
13      Q.  I think, Mr. Klayman, the last question
14  put to you is I think you identified or you
15  referred to the motion of Disciplinary Counsel to
16  withdraw the negotiated disposition, which is
17  Exhibit Number 12.
18      Is that correct?
19      A.  Correct.
20      Q.  And then Exhibit 13 was the order of
21  the chair of the hearing committee, right?
22      A.  Correct.

Page 67

1      Q.  And there was a hearing on the
2  Specification of Charges that we previously
3  identified as Disciplinary Counsel Exhibit Number
4  8?
5      A.  Yes.
6      Q.  And that hearing was conducted over
7  three days?
8      MR. KLAYMAN:  Your Honor, I'm going to
9  object to this, because it's not relevant. There's
10  been no final determination and in fact that
11  recommendation was rejected in significant part by
12  the Board. It's not a final determination.
13      CHAIRPERSON MIMS:  You're objecting to
14  the disciplinary counsel --
15      MR. KLAYMAN:  I'm objecting to
16  relevance. Yes.
17      CHAIRPERSON MIMS:  Overruled.
18  BY MS. PORTER:
19      Q.  There were three days of hearing and
20  you were in attendance on all three days?
21      A.  I was.
22      Q.  And those days were at a month and a

Page 68

1  half or two months before you filed your pro hac
2  vice application?
3      A.  I don't remember the exact sequence.
4      Q.  If you look at Exhibit Number 15, these
5  are partial transcripts. It's just to show the
6  beginning of the hearing and the end of the
7  hearing.
8      MR. KLAYMAN:  I object if they're
9  partial transcripts, your Honor. I ask that Ms.
10  Porter supplement with the entire transcript; rule
11  of completeness.
12      CHAIRPERSON MIMS:  Overruled.
13  BY MS. PORTER:
14      Q.  So does that help you with your memory
15  about the days of the hearing, Mr. Klayman?
16      A.  Well, it is what it says it is.
17      I haven't lined it up with other
18  filings. I didn't focus on that before coming in
19  here today, but I don't -- Ms. Porter, beyond the
20  relevancy of it, because a hearing is a hearing.
21  There was no final disposition made at that time on
22  anything.

Page 69

1      Even, you know, if you go to your
2  theory of the case, it doesn't matter whether there
3  is a final disposition or not, you're going to use
4  it against me regardless.
5      Q.  You were --
6      A.  There is no final disposition to this
7  day.
8      Q.  Well, let me ask another question and
9  I'll come back.
10      You haven't excepted to the Board's
11  report and recommendations in the matter which is
12  13-DB-084?
13      A.  My lawyers did at the time, but that
14  has not been entered. It's not a final decision.
15      And there's also an issue, as to --
16  given the leapt of time of this proceeding that
17  we're talking about, the first Judicial Watch
18  proceeding, which I believe was retaliatory, that
19  the Court of Appeals could throw the whole thing
20  out in theory for it now being close to 12 to 13
21  years under the various matters that were set forth
22  by expert Rotunda, that the courts can throw the

18  (Pages 66 to 69)

In The Matter of:  Larry E. Klayman
July 15, 2019

Page 70

1  whole thing out.
2      Q.  That wasn't my question, Mr. Klayman.
3          My question to you was, you and your
4  lawyers have not excepted to the Board's report and
5  recommendation in the matter which is Board Docket
6  Number 13-BD-084?
7          It's a yes or no.
8      A.  No, it isn't, to some extent.  They
9  haven't had an argument yet, it hasn't even been
10 scheduled yet, and my lawyers are going to raise
11 arguments with regard to the delay in the
12 proceeding, which is inherently unfair and should
13 be barred by latches.
14     Q.  Did you or your lawyers take an
15 exception based on latches?
16     A.  No, we didn't in writing take an
17 exception.
18         Oral argument has not occurred yet.  We
19 stand by what we did, but the court on its own may
20 decide, sua sponte, to throw the whole thing out,
21 given the age of this proceeding and the misuse of
22 this proceeding in this case.

Page 71

1      Q.  You were present -- again I'm referring
2  to the board 13-BD-084.  You were present on the
3  last day of the hearing where the hearing committee
4  made a preliminary nonbinding finding that you
5  engaged in misconduct?
6      A.  Exactly, it's a nonbinding finding.
7          And they do that, as you know, Ms.
8  Porter, I ask you please to explain -- let me
9  answer a question and explain, is the reason that's
10 done is so they can take into account mitigation
11 and aggravation.  It doesn't mean they made a
12 finding against you.
13     Q.  But you were aware of that finding when
14 you filed your motion for pro hac vice?
15     A.  It's a preliminary finding, with no
16 force or affect.
17         And they said on the record, "This
18 doesn't mean it's the way we're going to find in
19 the end."
20     Q.  And again I think we've gone over
21 this...
22         There was no disclosure in your initial

Page 72

1  pro hac vice application or the two supplements
2  that you filed that there had been a negotiated
3  disposition or that there had been a recent hearing
4  on the contested case.
5      A.  It was put forward in all the filings
6  that were submitted to Judge Navarro.
7          And as Judge Gould said, I had no duty
8  to answer other than what I was asked, and I said
9  there was a proceeding and it's ongoing and it's
10 not final and I was truthful.
11     Q.  Going back to the pro hac vice
12 application, I can refer you to Exhibit 22 again,
13 page two, same paragraph that you were looking at
14 before, which is paragraph five.
15     A.  Where are you referring?
16     Q.  Page two, paragraph five.  Are you
17 there?
18     A.  Yes.
19     Q.  Another inquiry that the form made was
20 about any suspension of any license, certificate or
21 privilege to appear before any judicial regulatory
22 or administrative body.

Page 73

1      A.  Correct.  I'll stand by what paragraph
2  five says since I didn't listen to the way you
3  quoted it.
4      Q.  And the response -- again I'll refer
5  you to your attachment, which I think again begins
6  on page seven and carries over to page eight.  And
7  I'm looking at the last sentence on page seven of
8  Exhibit 22 -- and you talked about, "Two judges
9  vindictively stated I could not practice before
10 them," and then you go on.
11         The two judges that you were referring
12 to were Judge Keller and Judge Chin?
13     A.  Right.  So I answered truthfully.
14     Q.  Well, you had appealed Judge Keller's
15 ruling.  Isn't that correct?
16     A.  Correct.
17     Q.  And you knew that the United States
18 Court of Appeals for the federal circuit had
19 affirmed Judge Chin's order permanently barring you
20 -- excuse me, Judge Keller -- affirmed Judge
21 Keller's order permanently barring you from
22 appearing before --

19  (Pages 70 to 73)

In The Matter of:  Larry E. Klayman
July 15, 2019

Page 74

1      A.  Let me explain that to you, because,
2  first of all, I've never been sanctioned by any bar
3  with regard to anything that ever happened with
4  regard to Judge Keller or Chin.  It was submitted
5  to this bar.  My adversaries are very clever and
6  they want to slow me down so they file these bar
7  complaints.
8      There is a document in the record -- if
9  you don't want to get to it I will in my
10  testimony -- from your colleague Mr. Frisch, who
11  said I had not committed an ethical infraction is
12  one.
13      Number two, it was confirmed by the --
14  are we talking about Chin or are we talking about
15  Keller?
16      Q.  Keller.
17      A.  It was affirmed by the federal circuit,
18  but the transcript of the proceedings went missing,
19  strangely enough, and the basis of my contesting
20  what Keller did is that he made several prejudicial
21  statements about my clients, one of which was
22  Chinese -- Taiwanese, disparaged his nationality,

Page 75

1  disparaged a gay retailer with regard to his sexual
2  preference, and then actually disparaged my
3  national origin, my religious origin, which is
4  Jewish.  I'm a Jewish-Christian, but I take my
5  Jewish heritage very seriously.  And judge Keller
6  was calling me Mr. Smuckler throughout the case.
7      Judge Keller has a very long history
8  with the 9th Circuit and I should have appealed to
9  the 9th Circuit.  Judge Keller has been reversed
10  for prejudicial remarks in the past and in fact
11  there was an inquiry that was done by Judge
12  Kozinski at the time I raised it.  They couldn't
13  find the transcript.
14      CHAIRPERSON MIMS:  I'm sorry, Ms.
15  Porter, can you repeat the question?
16      MS. PORTER:  I don't even remember what
17  it is, but why don't I refer Mr. Klayman to 120.
18  I'm sorry I'm bouncing around in exhibits.
19  BY MS. PORTER:
20      Q.  You were aware that the United States
21  Court of Appeals for the federal circuit affirmed
22  Judge Keller's ruling.

Page 76

1      And if you want to take a look at
2  Exhibit Number 120 to refresh your memory...
3      A.  No, I'm aware of that.  But that's
4  irrelevant to what I was asked on this pro hac vice
5  application.  It wasn't even raised by Judge
6  Navarro or Judge Bybee or any of the others.
7      I mean, you're pulling this out of a
8  hat.  I didn't agree to that.  What I said was that
9  I had been barred from the courtroom, that they
10  were vindictive, the second one dealing with Judge
11  Chin --
12      Q.  Well, if I can get back to my question,
13  Mr. Klayman, I just want to confirm that you were
14  aware that the United States Court of Appeals for
15  the federal circuit had affirmed, affirmed Judge
16  Keller's decision.
17      MR. KLAYMAN:  Objection on relevancy.
18  This has nothing to do with what's asked.  I said
19  that I had been barred by those judges, and I was
20  not found by any bar association to have done
21  anything unethical.
22      You're trying to --

Page 77

1      CHAIRPERSON MIMS:  Mr. Klayman, I'm
2  going to overrule the objection and you are going
3  to be free to add all of this argument or questions
4  in your presentation of the case.  But if you can
5  answer the question that was asked.
6      MR. KLAYMAN:  If I may say this, your
7  Honor.  I respect you and I thank you.
8      But we have Bar Counsel here.  Bar
9  Counsel has an obligation, not just to itself, but
10  to me, to members of the bar, and they're bringing
11  things in here to try to confuse and to prejudice
12  this hearing committee.
13      I answered what I said.  I was barred
14  from those judges.  I'm explaining why I felt it
15  was vindictive when she asked me that.  And this is
16  just to try to color this case in an inappropriate
17  way, and I would hope that she would represent the
18  interest of me as well as everybody else who
19  deserves to have a fair hearing.
20      CHAIRPERSON MIMS:  I do understand your
21  explanations and I understand why you are doing
22  them, which is why I'm being more lenient.

In The Matter of:  Larry E. Klayman
July 15, 2019

Page 78

1    MR. KLAYMAN:  Ok, thank you.
2    CHAIRPERSON MIMS:  But I still do need
3 you to limit your responses to the questions and to
4 answer the questions.
5    MR. KLAYMAN:  Yes, I mean --
6    CHAIRPERSON MIMS:  I will be lenient as
7 much as I can because of the way the setup is
8 today.
9    MR. KLAYMAN:  Thank you, your Honor.
10    CHAIRPERSON MIMS:  That said, I need
11 you to answer the questions.
12    MR. KLAYMAN:  Ok.
13 BY MS. PORTER:
14    Q.   Do you still remember what my question
15 was.  My question was --
16    A.   I answered it, yes.
17    Q.   Well, I don't know if you did, so I
18 will ask again...
19       You were aware when you filled out your
20 application for pro hac vice admission to Judge
21 Navarro's court that you had appealed Judge
22 Keller's ruling and the United States Court of

Page 79

1 Appeals for the federal circuit had affirmed Judge
2 Keller's ruling?
3    A.   Yes.
4    Q.   With respect to Judge Chin, he had also
5 revoked your pro hac vice status.
6       Is that correct?
7    A.   That's correct.
8    Q.   And Judge Chin also denied future
9 applications and directed that any -- in front of
10 him --
11    A.   He -- yes, he followed what Keller did.
12 He had seen that opinion and he did that --
13    MR. KLAYMAN:  May I just give a short
14 explanation, your Honor?
15    CHAIRPERSON MIMS:  What is the question
16 again, I'm sorry?
17    MS. PORTER:  That Judge Chin had also
18 denied him pro hac vice entry or barred him from
19 ever appearing before him again.
20    MR. KLAYMAN:  May I give a short
21 explanation to that?
22    CHAIRPERSON MIMS:  A short one.

Page 80

1    MR. KLAYMAN:  A short one, ok.
2    I was embroiled in a matter called
3 Chinagate.  Some of you may not be old enough to
4 remember that.  I'm older than you are.  It
5 involved Chinese donations to the Clinton
6 administration.  Judge Chin had been appointed to
7 the bench by Bill Clinton and recommended by John
8 Wong, who became a material witness in that
9 investigation.  He was an alleged spy for the
10 communist Chinese.
11    I raised the issue with Judge Chin to
12 say, "Your Honor, have you spoken with John Wong,"
13 because I found the documents that he was
14 recommended to the bench by John Wong.  John Wong
15 was in the commerce department, very influential,
16 and I asked him that question.  He took offense to
17 it, and, to make a long story short, he removed my
18 pro hac vice case.
19    I felt I had a case.  I had to do that
20 for post-trial motions, and he took offense to it
21 and the president of the Anti-Defamation League,
22 when it was anti-defamation --

Page 81

1    CHAIRPERSON MIMS:  Ok, but Mr. Klayman,
2 you're explaining, I think --
3    MR. KLAYMAN:  Yeah.
4    CHAIRPERSON MIMS:  -- why on page seven
5 you wrote the word "vindictively".
6    MR. KLAYMAN:  Yeah, right.
7    CHAIRPERSON MIMS:  You're claiming the
8 reason behind that, and I understand that, but that
9 was not her question.  And you can explain why you
10 wrote it and we can listen to that, but if you
11 could go back and answer her question.
12    Counsel.
13    MR. KLAYMAN:  What was the question?
14 BY MS. PORTER:
15    Q.   Judge Chin had also barred you from
16 ever appearing pro hac vice?
17    A.   Correct, and he said next time I have
18 to appear I have to present a copy of his order if
19 I have to get in.  And I've always obeyed those
20 orders.
21    Q.   And you also appealed Judge Chin's
22 order.  Isn't that correct?

In The Matter of: Larry E. Klayman
July 15, 2019

Page 82

1      A.   That's correct.
2      Q.   And the 2nd Circuit affirmed Judge
3  Chin's sanctioning you?
4      A.   That's correct.
5      Q.   And that's Exhibit Number 121, the 2nd
6  Circuit's opinions. It's in the third binder.
7      A.   Yes.
8         Just for sake of completeness here --
9  yes, the answer is yes.
10        It was not just yours truly that was
11 involved in this but my associate, Paul Orfanedes,
12 who is now the director at Judicial Watch. He was
13 also sanctioned by Judge Chin.
14     Q.   And you were aware of the rulings or
15 the finding of the 2nd Circuit in that opinion?
16 You received a copy of it?
17     A.   Yeah, generally speaking. This is so
18 old, it's 1997, so I don't remember all the
19 specifics.
20        But I responded truthfully to what was
21 asked of me in the pro hac vice application. Judge
22 Gould recognized that.

Page 83

1      Q.   But you were aware or you did remember
2  the 2nd Circuit decision affirming Judge Chin's
3  ruling when you filed your application for pro hac
4  vice?
5      A.   It didn't come to my mind because I
6  simply said that I had been barred by the judge and
7  that was all I was required to do. That subsumed
8  any appeals. It included any appeals. I was
9  barred. I didn't equivocate on it. I just said
10 that I thought it was vindictive, but there was no
11 equivocation. That subsumed any appeals that were
12 not overturned, inclusive.
13     Q.   I'm sorry, you said it subsumed any
14 appeals. Did you make any reference to any one of
15 those appeals in the decisions of the appellate
16 court?
17     A.   The document speaks for itself.
18     Q.   What document?
19     A.   The pro hac vice application.
20     Q.   Ok.
21     A.   As well as Judge Gould's findings.
22        This matter never even came up before

Page 84

1  Judge Navarro or the 9th Circuit. It never came
2  up.
3      Q.   Judge Navarro acted quickly on your
4  application. She ruled on March 31st, 2016. If
5  you want to look at Exhibit 25, that's Judge
6  Navarro's order.
7         And Mr. Klayman, that is a copy of
8  Judge Navarro's order denying your initial
9  application as supplemented twice for pro hac vice
10 admission?
11     A.   At this point I don't know the
12 sequence, but it is a copy of one of her orders.
13     Q.   Ok, well it's dated March 31st, 2016.
14     A.   Correct. I mean, the order speaks for
15 itself.
16     Q.   And it's Judge Navarro who raises or
17 identifies the petition for negotiated disposition.
18     A.   The document says what it says.
19        I believe that it was all subsumed in
20 what I said additionally, that there was an ongoing
21 proceeding, and there is an ongoing proceeding.
22 It's not final, and you know it's not final, Ms.

Page 85

1  Porter. You know that.
2      Q.   Mr. Klayman, you then filed another
3  pleading that has a very long title. I'll just
4  refer to it as Exhibit Number 26. You filed this
5  on April 7th, 2016 in response to Judge Navarro's
6  order?
7      A.   It was filed by Mr. Hansen.
8         I'd appreciate, Ms. Porter, please, I
9  mean, I don't want to have to correct you, but it
10 was filed by Mr. Hansen.
11     Q.   Ok, if you turn to page six --
12     A.   And I might add all, of these pleadings
13 were filed by Mr. Hansen. But he's not party to a
14 bar proceeding.
15     Q.   If you turn to page six, Mr. Klayman,
16 is that your signature above the line that says,
17 "Pro se applicant Larry Klayman attests that the
18 foregoing factual recitations are true and correct
19 and pursuant to court order. He incorporates them
20 by reference into his pro hac vice application
21 filed by the above local counsel"?
22     A.   That's right. But I didn't file the

22  (Pages 82 to 85)

In The Matter of:  Larry E. Klayman
July 15, 2019

Page 86

1  pleading.  And when the lawyer, Mr. Hansen, files
2  it, he's certifying that it's accurate, as well.
3      Q.   And Mr. Hansen did serve as local
4  counsel in the criminal case involving Cliven
5  Bundy?
6      A.   At that time.  He later withdrew for
7  health reasons.
8      Q.   But he was your local counsel?
9      A.   He was Mr. Bundy's local counsel.
10     MR. KLAYMAN:  Your Honor, I ask for an
11 instruction here, because Ms. Porter is very
12 intelligent.  The way she phrases questions, as a
13 lawyer -- if this was a layperson asking these
14 questions, I would understand it.  But then when
15 she says "he's your counsel," she knows Mr. Hansen
16 is not my counsel.  He's Cliven Bundy's counsel.
17 And there is an implication there with statements
18 like, you know, I did the filing and she's trying
19 to write Mr. Hansen out of the whole process, and
20 it's all calculated to prejudice the ad hoc
21 committee.
22     CHAIRPERSON MIMS:  Well, Mr. Klayman,

Page 87

1  you have represented several times that Mr. Hansen
2  did the filings and I do think that we understand
3  that.
4      MR. KLAYMAN:  Yeah, ok, thanks.
5      CHAIRPERSON MIMS:  I would like to ask
6  a question before we move on now.
7      MR. KLAYMAN:  Yeah.
8      CHAIRPERSON MIMS:  As I understand your
9  testimony, in terms of Exhibit 8 and the proceeding
10 that you are representing was pending by the DC
11 Bar, is it your testimony that page seven -- well,
12 back on page two where you say "The only" --
13 paragraph five, page two of Exhibit 22, and the
14 statement appears, "The only disciplinary case
15 pending is in the District of Columbia disclosed in
16 the attached."
17     Then when you go to the attachment on
18 page seven, you go on to describe the proceeding of
19 a claim filed eight years ago by Judicial Watch.
20     So, do I understand your testimony to
21 be that that statement subsumes what is in Exhibit
22 25 that Judge Navarro lists out on page two of

Page 88

1  Exhibit 25?
2      MR. KLAYMAN:  Yes.
3  BY MS. PORTER:
4      Q.   Ok.  I just want to make sure I
5  understand your testimony.
6      MR. KLAYMAN:  Yes, yes.  Because the
7  negotiated discipline was no longer in effect.  It
8  was withdrawn, by both sides.
9      CHAIRPERSON MIMS:  All right.
10     MR. KLAYMAN:  And also rejected by the
11 hearing committee.
12     CHAIRPERSON MIMS:  All right.
13     You may proceed.
14     MS. PORTER:  Thank you.
15 BY MS. PORTER:
16     Q.   Your submission on April 7th, 2016,
17 which is Exhibit Number 26, you appended your
18 post-hearing brief to the hearing committee in the
19 first disciplinary case, but you did not append any
20 of the pleadings by Disciplinary Counsel.
21     Is that correct?
22     A.   That's correct, because I felt that my

Page 89

1  brief more than satisfied anything that was
2  requested by Judge Navarro.  And as Judge Gould
3  said, I did not have a responsibility to be
4  relitigating.  The litigation was already in
5  process to the DC Bar proceedings.  So I put
6  forward the pleading.  The docket has the case
7  number.  You can see the case on Pacer.  And I put
8  forth a very detailed recitation of what this was
9  all about.  I went beyond that, what was required,
10 because I wasn't trying to hide anything from Judge
11 Navarro.
12     Q.   You're not suggesting that the
13 disciplinary pleadings were on Pacer?
14     A.   No, I didn't mean they were on Pacer.
15 But they can get them here.  They are public.
16 That's what I meant.
17     Q.   And you supplemented --
18     A.   It's the same thing, you know,
19 substantively.  They're available.
20     Q.   And you filed two supplements to your
21 pleading of April 7th, 2016, which are 27 and 28 --
22 or Mr. Hansen did on your behalf, I should say,

23  (Pages 86 to 89)

In The Matter of:  Larry E. Klayman
July 15, 2019

Page 90

1  sorry.
2      A.  You're referring to 27 and 28?
3      Q.  Yes.
4          (Witness peruses document.)
5      A.  Yeah, Mr. Hansen filed those.  I don't
6  know if they're complete or not, but, yes.
7          The documents -- the pages that you
8  have, he did file them.
9      Q.  And you were aware of those filings
10 before they were made?
11     A.  Generally speaking.
12     Q.  And you approved the filing with the
13 court?
14     A.  Along with Mr. Hansen, yes.  He
15 obviously agreed with them, as well.
16     Q.  And the judge ruled on your I guess
17 amended or supplemental application to be admitted
18 pro hac vice on April 19th, 2016?  And the order
19 you can find at Exhibit Number 29.
20     A.  You're asking me if that's an order
21 that Judge Navarro issued?
22     Q.  Yes.

Page 91

1      A.  Yes.
2      Q.  And you received a copy of it?
3      A.  Yes.
4      Q.  And you were aware of her ruling?
5      A.  I was, and I was aware that she denied
6  it without prejudice.  The last paragraph is very
7  important for the hearing committee to see:
8  "Accordingly, claimant's verified petition shall be
9  denied without prejudice until such time as
10 claimant can provide proof that the ethical
11 disciplinary proceeding in the District of Columbia
12 was resolved in his favor."
13         And that was the Catch 22 I was talking
14 about in the opening statement.  That's all she
15 ever referenced was the DC proceeding, not all this
16 offer stuff that came in later.  And that doesn't
17 make sense, because by the time -- well, Bundy had
18 been -- the indictment had been thrown out for, you
19 know, well over almost a year and a half at this
20 point.  He could have been convicted and sentenced
21 to life imprisonment by now before the DC
22 proceedings ended.

Page 92

1          It made no sense.
2      Q.  And after Judge Navarro ruled against
3  your admission pro hac vice for a second time, you
4  participated in preparing and filing a Bivens
5  action against her, president Obama and others?
6      A.  I did not file a Bivens action.  Mr.
7  Hansen filed it.
8      Q.  But that wasn't --
9      A.  I didn't disagree with what he did.
10     Q.  Listen to my question.  You
11 participated in preparing that Bivens action.
12         Isn't that correct?
13     A.  I helped with preparing the complaint.
14     Q.  And while we -- I'm going to jump back
15 to the documents in book one, but let's just refer
16 to that as Exhibit Number 44.  It's in the second
17 notebook, Mr. Klayman.
18     A.  Yeah.
19     Q.  And just to confirm, Mr. Klayman, you
20 participated in the preparation of this Bivens
21 action against Judge Navarro and others?
22     A.  My testimony, I just testified that,

Page 93

1  yes, I did help in preparing it, and I would add to
2  this is that judges are not above the law.  Judges
3  have to play by the same rules that we play by.  My
4  client had been thrown in solitary confinement, his
5  speedy trial rights overridden, his 6th Amendment
6  rights denied, as Judge Gould ruled, improperly.
7  And yes, Bivens concerns, violation of
8  Constitutional rights, and judges are as
9  responsible as everybody else.  In the end they
10 have qualified immunity but not absolute immunity,
11 and yes this thing was filed by Joel Hansen.
12     Q.  And there's a lot of discussion about
13 your other activities including your representation
14 of Sheriff Arpaio in Arizona?
15     A.  The document speaks for itself.
16         Here's the relevancy of that is that
17 Judge Navarro went to law school at Arizona State
18 University in Maricopa County, and I believe
19 everybody's deserves representation.  And yes,
20 Judge Arpaio is a client of mine in certain
21 matters, and I felt that influenced her thinking
22 with regard to me.

24  (Pages 90 to 93)

In The Matter of:  Larry E. Klayman
July 15, 2019

---

Page 94

1    If I may say, I never heard Sheriff
2 Arpaio make one prejudicial remark about people of
3 Spanish origin or anything else, but, yes, this was
4 a factor that I felt influenced her decision
5 making, because Judge Arpaio is a lightning rod,
6 and I represented some -- as many people do --
7 people that are controversial.  I'm controversial
8 myself.
9    Q.  Among the allegations that you and Mr.
10 Hansen made in the Bivens action is Judge Navarro
11 had no legal or factual basis to deny your pro hac
12 vice application?
13    A.  Well, let me partially answer --
14    Q.  It's just a yes or no question.
15    A.  I can't answer your question because I
16 didn't file the complaint.  Joel Hansen put his bar
17 membership in Nevada and his reputation on the line
18 and he filed the complaint.
19    Yes, I did assist in preparing the
20 complaint.  So I just want that clear.
21    Q.  Were you aware of the statement that
22 Judge Hansen was making about Judge Navarro's

---

Page 95

1 ruling having no legal or factual basis and would
2 you agree with that?
3    MR. KLAYMAN:  I object on relevancy,
4 your Honor, but yes, I agree with that statement.
5 This has no relevance.  It's just made
6 to prejudice the committee.
7 BY MS. PORTER:
8    Q.  And you are aware that that Bivens
9 motion was made in the statement that you
10 participated in drafting?
11    A.  Where is the statement that you are
12 referring to?
13    Q.  Let me have you turn to page 11 of
14 Exhibit 44.
15    A.  Ok, where is it?
16    Q.  If you look at paragraph 38.
17    A.  What statement are you reading?
18    Q.  "By coming up with factually and
19 legally correct grounds to not grant claimant pro
20 hac vice status as set forth with greater
21 specificity below, defendant Navarro denied"...
22 and then it goes on.

---

Page 96

1    A.  Yes, I agree with that statement, and
2 let me answer why I agree with that statement --
3    Q.  I think my question is were you aware
4 it was being made, and I think you've indicated
5 yes.
6    Is that correct?
7    A.  Yes, I'm aware of it, and my client was
8 facing life imprisonment and I have a duty to
9 represent him zealously within the bounds of the
10 law.
11    For you to be prosecuting me because I
12 exercise legal rights is in my view, in all due
13 respect to you and your office, an ethical
14 violation in and of itself.
15    I've asked for an internal review.
16 I've been unable to get it, on this and a number of
17 grounds, and, you know, your motivation here is to
18 remove me from the practice of law, your colleague,
19 Elizabeth Herman, when she was there said she
20 didn't like the way I practice law.  But that's not
21 a matter of ethics.  You may practice law
22 differently than I practice it, but that doesn't

---

Page 97

1 mean I'm practicing it unethically and that I'm not
2 representing my client within the bounds of ethics
3 and the law zealously.
4    CHAIRPERSON MIMS:  Mr. Klayman, I'm
5 going to ask you again to limit your responses --
6    MR. KLAYMAN:  Ok.
7    CHAIRPERSON MIMS:  -- to her answers.
8    MR. KLAYMAN:  Sorry if I get a little
9 emotional, your Honor.
10    CHAIRPERSON MIMS:  Well, to the extent
11 that you're putting on your case when it's your
12 turn to present a defense, if you've already said
13 these things in the case already, I don't think
14 there's going to be a need for us to rehear
15 everything.
16    MR. KLAYMAN:  Ok.  The record -- I
17 agree with you.  The record is so voluminous that I
18 just felt it was necessary to point that out.  To
19 go through this record will take your Honors weeks.
20 BY MS. PORTER:
21    Q.  Mr. Klayman, you were aware that part
22 of the relief in the Bivens action that was filed

---

25  (Pages 94 to 97)

In The Matter of:  Larry E. Klayman
July 15, 2019

Page 98

1    was to remove Judge Navarro from the Bundy case?
2        I'll refer you to Page 17 of Exhibit
3    Number 44.
4        A.   Yes, it's injunctive relief, and there
5    is case law that says you can bring injunctive
6    relief against judges.
7        Q.   You were aware of and approved the
8    inclusion of this request for relief?
9    I agreed with it, yes.
10       Q.   Were you aware -- and you were aware --
11       A.   Yes, I was aware of it.
12       Q.   And the same with the relief sought in
13   paragraph 64, which was to allow you to appear pro
14   hac vice?
15       A.   Correct.
16       Q.   You were aware of that request for
17   relief when the Bivens action was filed?
18       A.   Correct.  We wanted to get a federal
19   court to rule on it.  We thought they might be
20   neutral, you know, other than Judge Navarro, to get
21   it in through another judge in another court so we
22   wouldn't have to go through petitions for writ and

Page 99

1    that kind of thing.  We hoped that it could all be
2    resolved.
3        Q.   On the day that this Bivens action was
4    filed, you were in Judge Navarro's courtroom.
5        Is that correct?
6        A.   I don't remember whether I was or
7    wasn't.
8        MR. KLAYMAN:  Objection to relevancy.
9    BY MS. PORTER:
10       Q.   Well, let me have you turn to
11   Disciplinary Counsel Exhibit Number 30.
12       CHAIRPERSON MIMS:  The objection is
13   overruled.
14       Before we look at Exhibit 30 --
15       MS. PORTER:  Mm-hmm.
16       CHAIRPERSON MIMS:  I know you
17   referenced this a little bit regarding Mr. Hansen,
18   but can you tell the committee again who Mr. Hansen
19   is in relation to you?
20       MR. KLAYMAN:  Mr. Hansen is a local
21   from Las Vegas, Nevada attorney who knew Cliven
22   Bundy and represented him on other matters, and he

Page 100

1    had a law firm, not a big mega law firm, but a
2    small law firm at the time.  And he didn't really
3    have, much like Mr. Whipple, a lot of experience in
4    these kinds of cases.  But he had been Cliven
5    Bundy's local lawyer.
6        CHAIRPERSON MIMS:  Is it your position
7    that Mr. Hansen was not your attorney.  Is that
8    what you stated earlier.
9        MR. KLAYMAN:  No, he was not my
10   attorney.
11   BY MS. PORTER:
12       Q.   But he was serving as local counsel in
13   order to get you admitted as Mr. Bundy's counsel?
14       A.   He was serving as local counsel to get
15   me admitted on behalf of Mr. Bundy.
16       CHAIRPERSON MIMS:  Ok.  Thank you.
17   BY MS. PORTER:
18       Q.   May 10th, 2016, which is the date that
19   the Bivens action was filed, you were in Judge
20   Navarro's courtroom on that date?
21       A.   I don't recollect off the top of my
22   head.

Page 101

1        Q.   Ok, let me have you turn to Exhibit
2    Number 30.  Tell me when you're there.  And I can
3    refer you to page 24, Mr. Klayman.  I'm looking at
4    lines 12 through 16, and this is Mr. Hansen
5    speaking to the court, on line 15, "He has chosen
6    counsel Larry Klayman who is here with us in the
7    courtroom today to be his lawyer."
8        Does that refresh your memory as to
9    whether or not you were in the courtroom on May
10   10th, 2016?
11       A.   Yes, as far as being in the court on
12   May 10th, 2016.
13       Q.   And you were also present when Mr.
14   Hansen told Judge Navarro that they would move to
15   recuse or disqualify her based in part on the
16   Bivens action?
17       A.   Where is that?
18       Q.   Page 43 of the transcript, and I'm
19   looking at the first line, "And I'm asking you to
20   recuse yourself on account of the fact that you're
21   now a defendant in a case in which my client
22   happens to be suing you for violations of his

In The Matter of:  Larry E. Klayman
July 15, 2019

Page 102

1    rights."
2         You were present in the courtroom when
3    that --
4         A.  Where is that?
5         Q.  On page 43.
6         A.  I'm sorry, I don't see it on page 43.
7              MS. BELL:  It's the very first line.
8              MR. KLAYMAN:  I was present in the
9    court, but I have to tell you I don't approve of
10   that statement.
11        Joel Hansen was not someone who had a
12   lot of experience in these matters.  He was a local
13   lawyer handling issues with the management,
14   whatever.
15        In my view the Bivens action was not
16   filed to remove Judge Navarro.  It was filed to get
17   relief from the court to have her removed.
18        And so, that being said, she wasn't --
19   in my view, my understanding, she wasn't being put
20   in to create a conflict of interest or anything
21   like that.
22   BY MS. PORTER:

Page 103

1         Q.  As far as your participation in the
2    Bivens action, the rest of the pleadings that Mr.
3    Hansen filed also listed you, your DC Bar number,
4    your DC address and listed you of counsel?
5         A.  Some of them did say of counsel, yes,
6    but I didn't sign those pleadings.
7              Let me add this, too...
8              In my testimony, Judge Navarro said I
9    could participate, not of counsel, but I could be
10   like a paralegal or consultant.  So the of-counsel
11   aspect of it was something that she had actually
12   approved of.
13             But it's not the same, because you
14   can't sit inside the well; you can't communicate
15   with your client; you're excluded from the
16   courtroom at breaks.  You really, you know, are
17   hindered from representing him under the
18   circumstances, particularly given the fact that the
19   U.S. Marshal is all over the place with -- they
20   were armed and we had to go through metal detectors
21   just to get him into the courtroom.
22             So it made representation, even in that

Page 104

1    limited capacity as a paralegal, impossible.
2         Q.  But you weren't listed as a paralegal.
3    Let me have you --
4         A.  That's what I'm telling you, what she
5    said.
6         Q.  Well, let me have you go to Exhibit
7    Number 47.  This is an extension of time, but just
8    as an example.
9              Are you at 47?
10        A.  I'm getting it.
11        Q.  So, Mr. Hansen included your name, DC
12   Bar number, Klayman Law Firm, your DC address and
13   listed you of counsel in the Bivens action.
14        A.  Where is that?
15        Q.  On top of page one on Exhibit 47.
16        A.  Oh, ok, yeah.
17        Q.  And you were aware of that?
18        A.  I saw the pleading at the time.
19        Q.  And you --
20        A.  Yeah.
21        Q.  And you approved of Mr. Hansen listing
22   you as of counsel?

Page 105

1         A.  That doesn't mean you're counsel of
2    record.
3         Q.  I didn't ask --
4         A.  No, I didn't have a problem with that.
5              But of counsel is just kind of like
6    advisor, that's what it means, and that's what
7    Judge Navarro said -- limited my participation to
8    be.
9         Q.  Well, are you saying Judge Navarro had
10   any say in your participation in the Bivens action?
11   This is the Bivens action.
12        A.  Obviously I didn't say that.  But I can
13   be of counsel here.
14             In a sense, yes, because if you're
15   going to be an advisor, you're going to advise on
16   all issues.
17             Judge Navarro had denied my client, you
18   know, 6th Amendment rights to counsel, and he was
19   in solitary confinement, even though she claims she
20   didn't, but how does he get there?  He didn't get
21   there by himself.
22        Q.  I'll get back to the solitary

27 (Pages 102 to 105)

In The Matter of:  Larry E. Klayman
July 15, 2019

Page 106

1  confinement application, but I want to get done
2  with the Bivens action right now.
3        Mr. Klayman you were listed on every
4  other pleading that Mr. Hansen filed as of counsel?
5        A.  I don't know that I was listed --
6        Q.  You were aware of that?
7        A.  I don't know that I was listed on every
8  other pleading.  I don't know that that's accurate.
9        Q.  Let's go to Exhibit 48.
10       A.  Maybe every pleading that you
11  submitted.  It doesn't mean that I was listed on
12  every pleading.
13       Because Mr. Hansen -- let me answer
14  your question, because you're distorting the
15  record.
16       Mr. Hansen dismissed this case
17  ultimately when he became ill.  Without consulting
18  with Mr. Bundy or even me, he dismissed it with
19  prejudice.
20       You know, Mr. Bundy, in theory, could
21  bring in a malpractice case against Mr. Hansen for
22  doing that.  No one ever knew that he was

Page 107

1  dismissing it with prejudice.
2        I would be surprised to see my name
3  listed on that stipulation of voluntary dismissal.
4  He was so sick that he just bailed out and he
5  didn't think about what he was doing.  Because Mr.
6  Bundy never gave permission to dismiss the case.
7        CHAIRPERSON MIMS:  Mr. Klayman, I just
8  want to make sure the record is clear.
9        MR. KLAYMAN:  Yes.
10       CHAIRPERSON MIMS:  On the exhibit that
11  we were on previously, 47, were you aware prior to
12  that document being filed that your name was listed
13  on the pleading as of counsel?
14       MR. KLAYMAN:  Most likely.  Most
15  likely.
16  BY MS. PORTER:
17       Q.  I have the same question with respect
18  to 48.  Were you aware of and approved your lifting
19  as of counsel on Exhibit Number 48?
20       A.  Same response.
21       MR. KLAYMAN:  And I object on relevancy
22  grounds.

Page 108

1        CHAIRPERSON MIMS:  Objection overruled.
2  BY MS. PORTER:
3        Q.  Forty-nine, you were aware of this
4  pleading before it was filed, Mr. Klayman?
5        A.  Most likely.  I didn't disagree with
6  the content of it.
7        Q.  Well, you participated in drafting it.
8  Isn't that correct?
9        A.  I did most likely participate in
10  drafting it.  Mr. Hansen was very short staffed.
11       Q.  And you were also aware that you were
12  listed of counsel on this pleading?
13       A.  Yes, and I see nothing wrong with it.
14       Q.  The same with Exhibit Number 50.  You
15  participated -- well, you were aware of this
16  pleading before it was filed?
17       A.  It's most likely.
18       Q.  You participated in preparing it?
19       A.  Most likely.
20       Q.  And you knew that --
21       A.  Not me, but my associates and such, you
22  know.  But, yes, I most likely was aware of it.

Page 109

1        And I just want to preface it by saying
2  briefly there's nothing wrong with exercising legal
3  rights on behalf of the client who is facing life
4  imprisonment.
5        Q.  And you were aware that you were listed
6  of counsel on the pleading that's marked Exhibit
7  50?
8        A.  I was aware it was listed as such.
9        Q.  The same with 51.  I'm going to go
10  through the same litany of questions...
11       You were aware of this pleading before
12  it was filed?
13       A.  Most likely.
14       Q.  You participated in preparing it?
15       A.  Most likely.
16       Q.  And you knew that you were listed as of
17  counsel?
18       A.  Correct.
19       Q.  And when you say that you or your firm,
20  what other -- the Klayman Law Firm, who did it
21  consist of?  What was it composed of, other than
22  you?

28 (Pages 106 to 109)

In The Matter of:  Larry E. Klayman
July 15, 2019

Page 110

1      A.   My paralegal.
2      Q.   So it was you and a paralegal, no other
3  lawyers?
4      A.   Correct.
5      Q.   Exhibit Number 52, same questions...
6          You were aware of this pleading before
7  it was filed?
8      A.   Most likely.
9      Q.   You participated in preparing it?
10      A.   Most likely.
11      Q.   And you knew that you were listed as of
12  counsel?
13      A.   I was.
14      Q.   And I think you referred to the
15  stipulation to the order dismissing it with
16  prejudice, and your name is not on that.  But that
17  was at or around the time the 9th Circuit granted
18  your motion for emergency relief.
19          Isn't that correct?
20      A.   I don't remember the exact date.
21          But I'm glad you made reference to
22  that, because I stand by being able to hold judges

Page 111

1  accountable to the same rule of lawyer that lawyers
2  are held to.  In fact that's why I started Judicial
3  Watch, the name, Judicial Watch, watching judges.
4  That was because of Keller.  He was the final
5  straw, the way he had treated my Chinese client, my
6  gay witness and me.  I said somebody's got to hold
7  these judges up to the same standards, and that's
8  where the name Judicial Watch comes from.
9      Q.   Let me ask you -- I'm going to turn to
10  your first petition for the 9th Circuit, Mr.
11  Klayman.  You were the one who prepared and filed
12  that.
13          Am I correct?
14      A.   Can you show me where it is.
15      Q.   Exhibit Number 55.  I think the first
16  page is actually a court letter, but I think the
17  second page is your petition.
18      A.   I prepared it and Mr. Hansen agreed
19  with it as co-counsel.
20      Q.   But you're the one who --
21      A.   I prepared it.  Yeah, I prepared it.
22      Q.   And among other things in this

Page 112

1  petition, you state, and I'm going to refer you to
2  page 12, 55-12, and I'm looking at the sixth line.
3  You state, "However, Mr. Hansen practices in a
4  small firm, is not by trade a federal, criminal
5  defense lawyer, and lacks resources to defend Mr.
6  Bundy on his own."
7      A.   That's correct.
8      Q.   And I think that, if you look at lines
9  10 and 11, you refer to yourself as "Public
10  Advocate Larry Klayman, a former federal prosecutor
11  at the U.S. Department of Justice and the founder
12  of Judicial Watch," and then you go on.
13      A.   Sounds about right.  I just read the
14  line that you said.  That sounds about right.
15  That's true.  That's what I am.
16      Q.   In fact Mr. Hansen had been through
17  many federal criminal trials?
18      A.   I didn't check his -- I don't know
19  whether he had or he hadn't.  I know what he told
20  me.  He said, "I don't have a lot of experience,
21  Larry.  I need you.  I'm mostly a local lawyer."
22          And to the extent that he was, he was

Page 113

1  in bad health.
2      Q.   Well, let me have you turn to Exhibit
3  Number 56.
4      A.   I don't understand the relevancy of
5  that.
6          MR. KLAYMAN:  I object on relevancy
7  grounds.
8  BY MS. PORTER:
9      Q.   Let me have you turn to Exhibit Number
10  56.  Is this another pleading that you filed with
11  the 9th Circuit, Mr. Klayman?
12      A.   Fifty-six?
13      Q.   Yes.
14      A.   Yes.
15          I don't know that it's complete,
16  because a lot of your exhibits aren't.  I asked you
17  to go back, respectfully, make sure that the
18  exhibits have all the attachments, because you
19  didn't do that frequently.
20      Q.   Is this a pleading that you filed with
21  the 9th Circuit on or about September 26th, 2016,
22  in connection with your first petition?

29 (Pages 110 to 113)

In The Matter of:  Larry E. Klayman
July 15, 2019

Page 114

1      A.  I don't know because I don't know the
2  sequence that it was with the first petition that I
3  did file this.  It may have been with regard to a
4  later petition, but it probably was with the first
5  petition.
6      Q.  And that's your signature on page five,
7  or your electronic signature?
8      A.  Yes.
9      Q.  Ok, and you attached the affidavit of
10  Mr. Hansen, which appears on pages nine through 12?
11      A.  That's correct.
12      Q.  Excuse me, 11.
13      A.  That's correct.
14      Q.  So you were aware, this was an
15  affidavit that you solicited from Mr. Hansen?
16      A.  I rejected the use of the word
17  "solicited".
18          It was an affidavit that was required
19  to show the court that there was a real need for me
20  to step in as pro hac vice counsel, that Mr. Hansen
21  had to withdraw for health reasons, and therefore
22  my client, Mr. Bundy, was left without counsel.

Page 115

1          So, I object to the use of the word
2  "solicited".  It was just simply a material part of
3  this "emergency notice concerning local criminal
4  defense counsel Joel Hansen's motion and intention
5  to withdraw the lower court proceedings and renewed
6  request for this court to issue an expedited
7  decision on petitioner's writ of mandamus."
8      Q.  You did review the claim before you
9  filed it with the court, right, Mr. Klayman?
10      A.  I did, but it was based on what Mr.
11  Hansen said.  He drafted it and swore to it under
12  oath.
13      Q.  And you had no reason to doubt the
14  statements in that affidavit.  Isn't that correct?
15      A.  I don't know whether I doubted them or
16  not.  I don't know whether he actually had health
17  problems or not.  I really don't.  He may have just
18  wanted to bail out of the case.  I don't know.  But
19  that's what he told me and that's what he wrote
20  under -- in this affidavit.
21          You know, for whatever reason -- Mr.
22  Hansen at the time -- this is important -- his law

Page 116

1  firm was purchased by another law firm, a big law
2  firm, and the big law firm wasn't real fond of him
3  continuing with this litigation, and in fact that's
4  something that Judge Gould references.  There
5  aren't many lawyers that would have taken the
6  defense of this case, because of the politics
7  involved in it.
8          So I don't know what his motivations
9  were, but he said he had health problems and I
10  accepted that.
11          Did I, you know, investigate his health
12  problems as he alleged?  No, I didn't.
13      Q.  And among other things, Mr. Hansen also
14  said that he -- and I'm referring to the second
15  paragraph of this affidavit -- that "I have been
16  through many federal criminal trials."
17          You had no reason to doubt that
18  statement?
19      A.  I don't know.  I didn't investigate Mr.
20  Hansen.  I know what he told me, that he didn't
21  have a lot of experience in these kinds of cases.
22          Judge Gould makes reference to that.

Page 117

1  This is a very complex case.  You know, you can do
2  DUIs, that's a criminal case.  You can do other
3  things that are very simple.
4          And in fact that's mostly what Mr.
5  Whipple does; DUIs, and immigration matters.
6      Q.  And you compared I guess the
7  qualifications or experience of Mr. Hansen and
8  later Mr. Whipple with your own qualifications, did
9  you not?
10      A.  I don't know if the word "compare" is
11  correct.  What I would say is that I have
12  experience in very complex cases.
13      Q.  Well, let's get to the representations
14  that you made.
15          Let me have you --
16      A.  Ok, let's do that.
17      Q.  Let me have you go back to Exhibit
18  Number 55.  That's your initial petition of the 9th
19  Circuit.
20          MR. KLAYMAN:  Your Honor, I'm wondering
21  when we're going to take lunch.  We've been going
22  for a couple hours and I'm getting a little bit

30 (Pages 114 to 117)

In The Matter of:  Larry E. Klayman
July 15, 2019

Page 118

1  weary on the stand here.
2         MS. PORTER:  I can stop for a break
3  whenever it's convenient for the committee and Mr.
4  Klayman.
5         CHAIRPERSON MIMS:  How about if we go
6  for another 15 minutes?  Well, 12:15 and then we
7  will break until 1:00.
8         MR. KLAYMAN:  Ok.
9  BY MS. PORTER:
10        Q.  Are you on Exhibit Number 55, Mr.
11  Klayman?
12        A.  Yes.
13        Q.  And let me have you go initially to
14  page 12, and I think I've read this line into the
15  record before, let me read it again and then go to
16  your qualifications.  When you're speaking about
17  Mr. Hansen, beginning on line six, "He practices in
18  a small firm, is not by trade a federal criminal
19  defense lawyer and lacks the resources to defend
20  Mr. Bundy on his own."
21        And then you refer to yourself as a
22  former federal prosecutor at the U.S. Department of

Page 119

1  Justice.
2         Is that correct?
3         A.  Where are you reading initially?
4         Q.  Lines six through seven, kind of
5  halfway in between the numbers, as to Mr. Hansen,
6  and then you referred to yourself as a former
7  federal prosecutor, U.S. Department of Justice, on
8  lines 10, 11 and 12.
9         A.  On what page?
10        Q.  On page 12.
11        A.  My eyes aren't great.  I'm missing
12  this.
13        Q.  Page 12,55, and if you look at line 10,
14  "For these reasons Public Advocate Larry Klayman, a
15  formal federal prosecutor at the U.S. Department of
16  Justice"...
17        A.  Maybe I'm on the wrong page.  I'm on
18  Exhibit 55, page 12.  I see quotations from the
19  court, from United States vs. Lilly.
20        CHAIRPERSON MIMS:  Are you using the
21  Bates numbers or the page number in the middle of
22  the page?

Page 120

1         MR. KLAYMAN:  The page number on the
2  page.  Are you talking about the Bates numbers?
3         CHAIRPERSON MIMS:  I think you should
4  be in the lower right-hand corner.
5  BY MS. PORTER:
6         Q.  55-012.
7         A.  That's why I said I'm getting a little
8  weary.
9         All right, on line 10.
10        I see that.
11        Q.  So you told the 9th Circuit that you
12  were a former federal prosecutor at the United
13  States Department of Justice?
14        A.  Correct, that's accurate.
15        Q.  You also represented to the court that
16  you were a criminal defense lawyer?
17        A.  Correct.
18        Q.  In fact you said you were an
19  experienced criminal defense counsel.
20        A.  Where did I say that?
21        Q.  On page -- I believe it's also on
22  page -- well I know another place it is, Exhibit

Page 121

1  Number 60, which is your reply, at page 12.
2         Line 25, "Experienced criminal defense
3  counsel such as Larry Klayman, who ironically" --
4         A.  Ok, that's accurate, too.  I just
5  wanted to see where you say I said it.
6         Q.  When your first petition was argued to
7  the 9th Circuit, Bret Whipple had already entered
8  his appearance, at least a limited appearance?
9         A.  I don't remember the dates.
10        Q.  Let me have you -- well, can you refer
11  to Exhibit Number 20.  I can make a -- it's
12  actually ECF --
13        Let me just have you, instead, go to
14  Exhibit Number 39.
15        By October 24th, 2016, Mr. Whipple had
16  entered his appearance for all purposes.
17        Isn't that correct?
18        CHAIRPERSON MIMS:  I'm sorry, did you
19  give an exhibit number?
20        MS. PORTER:  Sure, 39.
21        MR. KLAYMAN:  That's what the document
22  says.  I didn't prepare Exhibit 39, but that's what

                                    31 (Pages 118 to 121)

In The Matter of:  Larry E. Klayman
July 15, 2019

Page 122

1   it says.
2   BY MS. PORTER:
3       Q.   And Mr. Whipple never refers to himself
4   as legal counsel, but he's counsel for all
5   purposes?
6       A.   The document speaks for itself.
7       Q.   In the argument that you presented to
8   the 9th Circuit, you did present an argument to the
9   9th Circuit in connection with your first petition?
10      A.   Of course.
11      Q.   And during --
12      A.   You can't present a petition without
13  having an argument, a discussion.
14      Q.   And during that argument you reiterated
15  what you had included in your briefs about being a
16  criminal defense lawyer?
17      A.   You can show me, but yes, I admit to
18  having been a criminal defense lawyer.
19      Q.   Page 3, Exhibit Number 61, if you want
20  to just confirm.
21      A.   I admit it.
22      Q.   Lines eight and nine, you say, "I am a

Page 123

1   criminal" --
2       A.   Wait, wait, wait.  Sixty-one you're
3   saying?
4       Q.   Sixty-one is the transcript, oral
5   argument before the 9th Circuit on October 21st,
6   2016.
7       A.   Mm-hmm.  Page 61?
8       Q.   No, Exhibit 61, page three.
9       A.   Page three.  Mm-hmm.
10      Q.   And among other things you tell the 9th
11  Circuit that, "I am a criminal defense lawyer in
12  large part."  That's lines eight and nine.
13      A.   Yes.
14      MR. KLAYMAN:  And I object to
15  relevance, but in any event, yes, I said that.
16  BY MS. PORTER:
17      Q.   And Judge Gould actually kind of
18  pressed this point in questioning the government's
19  lawyer about the need for skilled criminal defense
20  counsel?  Page 22 if you want to refer to the
21  question by Judge Gould.
22      A.   His statements speak for themselves.

Page 124

1       Q.   And Judge Gould in fact believed that
2   you were in fact a former federal prosecutor
3   because he included that in his dissenting opinion?
4       MR. KLAYMAN:  That's a compound
5   question.  I object to that.
6       Judge Gould can speak for himself,
7   whenever he wrote this.
8   BY MR. KLAYMAN:
9       Q.   Well, you were aware that in Judge
10  Gould's decision, dissenting decision, he referred
11  to you as a former federal prosecutor?
12      I can refer you to the decision.
13      A.   Yes.
14      MR. KLAYMAN:  In the meantime, I'm
15  going to register an objection, because this is
16  highly irrelevant.
17      We are not relitigating the issue
18  whether I am a criminal defense lawyer or not a
19  criminal defense lawyer, which I am.
20      We're litigating, you know, what is in
21  your Specification of Charges, and this is not in
22  your Specification of Charges, what you're talking

Page 125

1   about right now.
2       CHAIRPERSON MIMS:  Objection overruled.
3   BY MS. PORTER:
4       Q.   And I'll refer you to -- it's Exhibit
5   Number 64, and page 16, Judge Gould's decision.
6       A.   What are you referring to?
7       Q.   Exhibit Number 64.
8       A.   Correct.
9       Q.   Page 16?
10      A.   Mm-hmm.
11      Q.   And if you look at the first column,
12  the very last paragraph, it reads, "Klayman appears
13  ready and qualified to represent Bundy at trial.
14  He is a former federal prosecutor with experience
15  litigating high-profile cases."
16      A.   It's accurate.
17      Q.   And after your petition was denied, you
18  sought rehearing en banc.
19      Is that correct, Mr. Klayman?
20      A.   Can you show me that, please.
21      Q.   Yes, 65.
22      A.   Yes.

32 (Pages 122 to 125)

In The Matter of:  Larry E. Klayman
July 15, 2019

Page 126

1    Q.  And in your emergency petition
2  requesting rehearing en banc, you again
3  reemphasized your experience as a federal criminal
4  defense lawyer and as a federal prosecutor?
5    A.  Show me where that is.
6    Q.  Ok, pages six and seven of 65.
7    A.  That's accurate.
8      MR. KLAYMAN:  Same objection, your
9  Honor, however, as to the prior one.
10  BY MS. PORTER:
11    Q.  Eighteen and 19 of the same exhibit,
12  both at the top of the page of 19 and the bottom of
13  the page of 19.
14    A.  Where are you reading?
15    Q.  Well, 19 I can -- I'll start at 18, the
16  last sentence, or the carryover, "After serving
17  proudly as a federal prosecutor in the United
18  States Department of Justice, Mr. Klayman founded
19  Judicial Watch."
20      And then you keep on going at the
21  bottom of the page, "He deserves a full and
22  complete defense by one criminal defense counsel

Page 127

1  who has the experience and believes in him and his
2  cause."
3    A.  That's accurate.
4    Q.  Ok. --
5      MR. KLAYMAN:  Same objection, your
6  Honor.
7  BY MS. PORTER:
8    Q.  And the 9th Circuit denied your request
9  for rehearing en banc and you filed an emergency
10  petition with the supreme court?
11    A.  Where are you?
12    Q.  Sixty-nine.
13    A.  Where is the denial of en banc?
14    Q.  Well, it's in the docket sheet if
15  nowhere else, and I've included that as part of the
16  exhibits.
17    A.  Well, if you would please show me that.
18    Q.  Ok.  Do you have a memory that your
19  petition for rehearing en banc was granted?
20    A.  That wasn't the question.
21    Q.  The docket sheet, you can find that at
22  Exhibit Number 54, for your first petition.

Page 128

1    A.  Ok, so which entry are you referring
2  to?
3    Q.  Well, I believe 65 -- excuse me, 65 is
4  dated November 10th, 2016, and that is listed as
5  document number 13 in the docket sheet for your
6  first petition.
7      If you look at the docket sheet, if you
8  go down to 16, it appears that on December 13th,
9  2016, the 9th Circuit denied your emergency motion
10  for rehearing en banc.
11    A.  Well, I know that they denied it.  I
12  just didn't remember the date.
13    Q.  And after that you filed your first
14  petition with the supreme court?
15    A.  Appears to be.
16      CHAIRPERSON MIMS:  Is this a good place
17  to take a break?
18      MS. PORTER:  Yeah, that's fine.
19      MR. KLAYMAN:  Yes.
20      CHAIRPERSON MIMS:  We'll break for
21  lunch and resume at 1:00 o'clock, if that works for
22  everyone.

Page 129

1      MR. KLAYMAN:  Can we have an hour, your
2  Honor, perhaps?  I just have to make a couple
3  calls.
4      CHAIRPERSON MIMS:  I would really
5  prefer to do 45 minutes, only because we are not
6  going to sit on Wednesday, as you know.
7      MR. KLAYMAN:  Ok.
8      CHAIRPERSON MIMS:  And we're going to
9  do everything that we can to get this hearing done
10  this week since we're missing a day.
11      MR. KLAYMAN:  Ok.
12      CHAIRPERSON MIMS:  If that works for
13  everyone.
14      In fact, while we're still on the
15  record, I don't know how exactly it became that we
16  started at 10:00, and so, if everyone can start at
17  9:00 a.m., that would be better.
18      MR. KLAYMAN:  That would be fine.
19      MS. PORTER:  That's fine.
20      CHAIRPERSON MIMS:  And I think we'll
21  take it witness by witness at the end of the day.
22  Most days I'm available to stay later except

33 (Pages 126 to 129)

In The Matter of:  Larry E. Klayman
July 15, 2019

Page 130

1  tomorrow probably.  But most days I'm available and
2  we can address that as it goes along, ok?
3      We will resume at 1:00 o'clock after
4  lunch.
5      (Whereupon at 12:17 p.m. a luncheon
6  recess was taken.)
7  A F T E R N O O N   S E S S I O N
8      (Whereupon at 1:00 p.m. the hearing
9  resumed.)
10     CHAIRMAN MIMS:  Afternoon everybody.
11  We are back on the record.
12     I do want to say, Ms. Porter, I know
13  that you have been asking a number of questions
14  about the Respondent's experience as a former
15  federal prosecutor and in criminal cases.  He has
16  objected a few times.
17     I'm being lenient in terms of the
18  admissibility of evidence and testimony with both
19  parties, but we are waiting to get to the point of
20  all this.
21     MS. PORTER:  Sure.  I mean, I can make
22  a proffer.

Page 131

1      One of the part of the Specification of
2  Charges is false statements and frivolous
3  statements and included in that are his allegations
4  against Mr. Whipple and contrasting his own
5  experience with that of Mr. Whipple, who he said to
6  the court had little, and I think in one instance
7  he had no criminal law experience.
8      Also it goes to the credibility of his
9  assertions along those lines about his own
10  credentials as opposed to Mr. Whipple's
11  credentials, and that is part of the Specification
12  of Charges.
13     It was also part of the 9th Circuit's
14  ruling I think in connection with the second
15  petition for a writ of mandamus.
16     CHAIRPERSON MIMS:  Well, since we're on
17  this subject, when you say his only experience,
18  what --
19     MS. PORTER:  Well, I'm going to ask him
20  questions about that, believe me.
21     CHAIRPERSON MIMS:  Ok.
22     MR. KLAYMAN:  Your Honor, this is one

Page 132

1  of the reasons why I asked for greater specificity
2  in the witness statements, because they just simply
3  threw it open and said, look to the exhibits, and
4  there's nothing in the Specification of Charges
5  about that and a lot of other issues that we're
6  probably going to encounter going down the line.
7      So I noticed that that was an issue
8  they were going to be pursuing on that.
9      MS. PORTER:  In response, it is part of
10  the Specification of Charges and I'm not required
11  to give Mr. Klayman a proffer of his own testimony
12  or the questions that I'm going to ask him in
13  advance.
14     And you didn't request that either.  So
15  it would be improper for you to do so and I was
16  under no obligation to give you a list of the
17  questions I was going to ask you in advance.
18     MR. KLAYMAN:  I never asked for that.
19  I just asked for a summary of what the testimony
20  would entail and that's the ordinary practice here,
21  and we gave a summary, you know, of what our
22  testimony was.

Page 133

1      CHAIRPERSON MIMS:  Well, let's move on.
2  Let's go ahead and continue with the questioning.
3      (Respondent Larry Klayman on the
4  witness stand.)
5
6      CONTINUED DIRECT EXAMINATION
7      ON BEHALF OF DISCIPLINARY COUNSEL
8      BY MS. PORTER:
9      Q.  I think, Mr. Klayman, when we left off
10  I was getting to your first petition with the
11  supreme court, which is Disciplinary Counsel's
12  Exhibit Number 69.
13     You filed this emergency petition on
14  January 17th, 2017?
15     A.  Correct.
16     Q.  And again, coming up on our
17  conversation that we just had in the petition,
18  among other things, you made a point to point out
19  to the supreme court that you were a former federal
20  prosecutor and you were a criminal defense lawyer,
21  correct?
22     A.  Among other things, yes.

34  (Pages 130 to 133)

In The Matter of:  Larry E. Klayman
July 15, 2019

Page 134

1    Q.  And in connection with Mr. Whipple I
2  think you referred to him as "local counsel," and
3  I'm referring to page 22 of Exhibit Number 69.
4    A.  Mm-hmm.
5    Q.  That is not how Mr. Whipple ever
6  designated himself.  Isn't that correct?
7    A.  That is changing phraseology, in all
8  due respect, Ms. Porter, to suit your ends, because
9  he is local counsel because he is located in
10  Nevada.  Ok, that's what I meant, that he's located
11  in Nevada.
12      You'll see later on in the various
13  documents that we've submitted that I asked him to
14  submit a petition pro hac vice on behalf of Cliven
15  Bundy.  Cliven Bundy instructed him to do so.
16    Q.  But there is nothing in the court
17  record to indicate that Mr. Whipple ever agreed to
18  act as your local counsel --
19    A.  Nobody --
20    Q.  -- that he was local counsel for you?
21    A.  Nobody ever agreed to act as my local
22  counsel.  They were acting as counsel to the Bundys

Page 135

1  because he is local, a local Las Vegas lawyer.  And
2  in fact his practice is very, very local.  It's
3  mostly DUIs and immigration matters and things like
4  that.
5    Q.  In fact that was one of the claims that
6  you made to the supreme court, that Mr. Whipple had
7  little experience in federal criminal defense?
8    A.  That was based on my own analysis as I
9  said in talking to him that he didn't seem to have
10  a great depth of federal criminal practice because
11  he didn't even know what a petition for a writ of
12  mandamus was -- I had to send him a copy of it --
13  and for other discussions in terms of his strategy,
14  what he was planning to do.
15      And as I said, at some point, Cliven
16  Bundy fired Mr. Whipple and asked to represent
17  himself pro se.  And at that hearing -- and that's
18  a transcript that we supplemented with, it's
19  referenced in pleadings that you provided but you
20  did not give the actual transcript that was
21  attached to some of the pleadings that you had made
22  exhibits, so we copied it off -- is that the court

Page 136

1  asked Mr. Whipple if he had shared discovery with
2  Mr. Bundy, and Mr. Bundy responded he's only seen
3  very little and he's only met with Mr. Whipple a
4  few times.
5      So, there were lots of reasons why I
6  came to the conclusion, that's my opinion, that he
7  didn't have a lot of federal criminal court
8  experience, that, you know, he took cases as a
9  criminal justice attorney but tried them primarily
10  very quickly.
11    Q.  He was retained counsel for Mr. Bundy,
12  was he not?
13    A.  I've already said that.  I mean, that's
14  in the record, yes, and Mr. Bundy fired him at some
15  point and wanted to represent himself.
16    Q.  Let me get to more of the
17  representations that you made to the supreme court.
18      You also, in your first petition to the
19  supreme court, Mr. Klayman, you said that the trial
20  for Cliven Bundy was scheduled for February 6,
21  2017, and you knew that that was not the case.
22    A.  Not so.  If you look at all the

Page 137

1  pleadings, that's a distortion, Ms. Porter.
2      What was being --
3      CHAIRPERSON MIMS:  I'm sorry, can you
4  tell me where it is that you're referring to.
5      MS. PORTER:  Among other places, Bar
6  Exhibit Number 69 on page five, on page 18 and page
7  19.  There may be other places.
8      Mr. Klayman represented that the trial
9  for Cliven Bundy was scheduled for February 6,
10  2017.
11  BY MS. PORTER:
12    Q.  You did make that representation to the
13  supreme court, correct?
14    A.  You show me where it is, Ms. Porter,
15  and again you're distorting the record.  So show me
16  where and what you're referring to.
17    Q.  Ok, if you go to page five of 69.
18    A.  Right.
19    Q.  Second full paragraph, "Petitioner and
20  the other defendants are now scheduled to stand
21  trial beginning on February 6th, 2017."
22      On page 18, you say, at the bottom of

35  (Pages 134 to 137)

In The Matter of:  Larry E. Klayman
July 15, 2019

Page 138

1  the page, "Since petitioner is set for trial to
2  commence on February 6th, 2017, without a legal
3  defense team..." and on page 19 again, "Trial is
4  set to begin on February 6, 2017."
5      Those are your representations to the
6  supreme court?
7      A.  You are reading them so quickly I can't
8  confirm it.
9      Let me get to the heart of the issue
10  here.  Number one, there was a trial scheduled for
11  February 6th.  There was an issue up in the air.
12      Remember I said in my opening statement
13  that the government wanted to try all 19 defendants
14  at the same time, and miraculously, quote unquote,
15  when it came time to get close to trial, they
16  wanted to sever out into three parts.  But it was
17  those 19 defendants that the government used to
18  have the case declared complicated by Judge Navarro
19  which overrode my client, Cliven Bundy's speedy
20  trial rights.  It was a misrepresentation by the
21  government of what their intent was.  They simply
22  said, "We want to try 19," in my view because they

Page 139

1  wanted the case to be declared complicated and
2  override speedy trial.
3      Speedy trial requires trial in 60 days
4  of a defendant.  You can't hold people in prison
5  indefinitely.  That's the reason for it.  It's in
6  our Constitution, the 6th Amendment, along with
7  right of counsel.
8      So that issue was still up in the air,
9  because in fact Mr. Whipple, himself, was filing
10  pleadings on behalf of Bundy that the 19 should be
11  tried together, that it would make sense to get it
12  all over with.
13      And there was another thing --
14      CHAIRPERSON MIMS:  Are you saying, Mr.
15  Klayman, that there was a trial scheduled for the
16  date --
17      MR. KLAYMAN:  Yes, the 6th.
18      CHAIRPERSON MIMS:  It was not up in the
19  air that the 19 defendants would be tried on the
20  6th?
21      MR. KLAYMAN:  Right, or whether you
22  divide it in two parts or three parts.

Page 140

1      CHAIRPERSON MIMS:  And had the court
2  given an actual date for that trial?
3      MR. KLAYMAN:  They had, yes.
4      CHAIRPERSON MIMS:  And that date was
5  February 6th?
6      MR. KLAYMAN:  February 6th, whatever it
7  would have been, whatever it would have been.
8      Here's the intricacy, and if you don't
9  understand what I'm saying, I'd be happy to repeat
10  it...
11      So, therefore Cliven Bundy was taking
12  the position at that time that he wanted everybody
13  to be tried together.  These defendants were being
14  held in prison for almost two years, and therefore,
15  Cliven -- who felt beholden to them, a lot of them
16  were these actual protestors -- wanted everything
17  to be resolved and not go in a series, because that
18  would have dragged it out longer and everybody
19  would have been in prison, because Judge Navarro
20  never granted bail for anyone.  That's the other
21  thing I forgot to mention at the outset.  So...
22      But there was also an issue, and if you

Page 141

1  want further explanation I'll be happy to give it,
2  that in these -- when the trials eventually did go
3  forward and there were some trials before February
4  6th, that Cliven Bundy was being tried in absentia.
5  In other words, they were making reference to him
6  and his wife even as being a coconspirator in this
7  matter.  She was never indicted.  In fact the one
8  time the judge said -- when she tried to sit at
9  counsel table to help her husband, she was trying
10  to be a paralegal --   "Has Carol Bundy been
11  indicted yet?" showing mindset and prejudice.
12  Because he was being in effect tried in absentia,
13  references were being made to legal acts that he
14  did, and he wasn't even there to defend himself,
15  that Bundy was taking the position that everybody
16  should be tried together.  And then if they were
17  tried in series, some of the defendants might not
18  testify until later trials. He was scheduled
19  ultimately to go second.  They would take the Fifth
20  Amendment so as not to incriminate themselves.
21      So there was a big issue as to why they
22  should all be tried together and it was not certain

36  (Pages 138 to 141)

In The Matter of:  Larry E. Klayman
July 15, 2019

---

Page 142

1  at that time that it wouldn't happen on the 6th.
2  He was taking the position that everybody should be
3  tried beginning on the 6th.
4      CHAIRPERSON MIMS:  But if you go to the
5  court record, is there a court record that a first
6  trial was set to begin on February 6th?
7      MR. KLAYMAN:  I don't know about a
8  first trial, but a trial was set to be on February
9  6th, yes.
10     CHAIRPERSON MIMS:  For one or others or
11  all defendants?
12     MR. KLAYMAN:  Yes.
13  BY MS. PORTER:
14     Q.  You filed your petition with the court
15  on January 17, 2017, is that correct?  Exhibit 69.
16     A.  Correct.
17     Q.  And by that time the court had already
18  ruled on the scheduling of the trials.  And you can
19  go to Exhibit Number 20 in the first notebook, the
20  docket for the Bundy case, and if you look at page
21  43, docket number 1098, on December 12th, more than
22  a month before you filed your petition with the

---

Page 143

1  supreme court, the court had already divided the --
2  the magistrate judge had already divided the
3  defendants into three groups: Mr. Bundy -- is that
4  correct?
5      A.  No --
6      Q.  You can look at the court records.
7      A.  No, it's not correct.  Let me tell you
8  why it's not correct.
9      Q.  No, no --
10     A.  Let me finish.  You are distorting the
11  record again.
12         The magistrate judge makes a
13  recommendation.  That was not the decision yet of
14  Judge Navarro, to the best of my recollection.
15     Q.  Well, that was --
16     A.  Let me finish.  That was being
17  contested.  A magistrate judge doesn't get to make
18  that final decision without your being able to file
19  objections.
20     Q.  So you knew that that was objected to
21  and you knew that Judge Navarro ruled on it, didn't
22  you, did you not?

---

Page 144

1      A.  I don't believe she ruled on it at that
2  time.
3      Q.  Were you following the docket of this
4  case when you filed your supreme court petition?
5      A.  I didn't follow the docket.  I was
6  following the pleadings that were being made, ok.
7  I understood that that issue was still up in the
8  air, and the pleadings will reflect the same thing.
9      MR. KLAYMAN:  But I'd also object to
10  this on the basis of relevancy because trials were
11  going to begin.  I had to be present, even at
12  trials of the other defendants, because the
13  government was trying to tar my client with what
14  other defendants had done.
15         Let me explain that --
16  BY MS. PORTER:
17     Q.  You know, Mr. Klayman.
18     A.  Can I -- wait a minute.
19     MS. PORTER:  If I could get the Chair's
20  support on this.  If he could just answer my
21  questions.
22     MR. KLAYMAN:  I am answering them.  I

---

Page 145

1  am answering them.  I'm not giving her the answer
2  she wants, your Honor.
3      CHAIRPERSON MIMS:  Well, Mr. Klayman, I
4  think you are giving a lot of information in your
5  answers that is not necessary at this point.
6      MR. KLAYMAN:  There was a trial
7  scheduled on the 6th, and I answered that.
8         But I want to explain one other thing
9  if I may, and I'll be brief, is that, number one, a
10  magistrate's recommendation is not binding.  It can
11  be challenged.  Number two, even if there were
12  other defendants to be tried first, I had to be
13  there as counsel sitting in the well defending my
14  client because the government was claiming that he
15  had conspired with those other defendants.  So,
16  yes, I had to be present throughout all of the
17  trials to defend my client.
18         That's what they were contending, that
19  there was a conspiracy, and without Cliven having
20  representation there, he was being beaten up.  And
21  his wife was being accused of being a coconspirator
22  of all of this.  She was tending to the ranch.  She

---

37 (Pages 142 to 145)

In The Matter of:  Larry E. Klayman
July 15, 2019

|  | Page 146 |
|---|---|

1   had nobody to help her.
2   BY MS. PORTER:
3       Q.  Let me clarify two things, Mr.
4   Klayman...
5       In fact Mr. Bundy did have
6   representation.  Bret Whipple was his counsel in
7   January of 2017 when you filed your petition with
8   the supreme court.
9       Isn't that correct?
10      A.  You'll have to show me that.  I don't
11  remember the dates.
12      Q.  Well, if you look at Exhibit 29, you
13  have to look at the appearance.
14      MR. KLAYMAN:  Objection on relevancy
15  grounds.  Judge Gould ruled Mr. Bundy should have a
16  defense team.
17  BY MS. PORTER:
18      Q.  With respect to the three defendants,
19  you said that you were following the court orders,
20  I mean, you were reading the court orders as they
21  were being issued?
22      A.  Generally speaking.

|  | Page 147 |
|---|---|

1       Q.  Well, didn't you think that that was an
2   important thing to I guess --
3       A.  I didn't, obviously.
4       Q.  -- bring yourself up to date on before
5   you made representations to the supreme court?
6       A.  I made an accurate representation.
7       Q.  Ok, look at Disciplinary Exhibit Number
8   20, which is the docket sheet.  Look at page 47,
9   docket entry on December 9th, 2016, 1214.
10      A.  Where am I supposed to look?
11      Q.  Twelve fourteen, and if you want to go
12  back to 1098...
13      A.  Wait a minute.  You told me to go to
14  Exhibit Number 20?
15      Q.  Exhibit Number 20 is a docket for the
16  United States versus Cliven Bundy, et. al.  I'll
17  refer you first to the magistrate's order, which is
18  1098, which appears on page 43 of the exhibit.  I
19  think you indicated you knew that there was an
20  appeal and the appeal had been decided by Judge
21  Navarro on December 29th, 2016 where she upheld the
22  decision of the magistrate judge to divide the

|  | Page 148 |
|---|---|

1   defendants into three groups.  And Mr. Cliven Bundy
2   was in the first group.
3       Isn't that correct?  And you knew that.
4   First, isn't that correct?
5       A.  I don't believe he was in the first
6   group.
7       Q.  Ok, look at page 43 of Exhibit Number
8   20.
9       A.  Mm-hmm.
10      Q.  It says, "The trial of 17 defendants
11  awaiting trial shall be severed into three groups
12  with three separate trials consisting of tier one,
13  Cliven Bundy," and then other names.
14      Does that refresh your memory that Mr.
15  Cliven Bundy was in the first tier of defendants?
16      A.  If indeed that's the case at the time,
17  now this is a while back, obviously, and then that
18  would make my point in terms of February 6th.
19      However --
20      Q.  Well --
21      A.  However -- can I finish my response?
22      CHAIRPERSON MIMS:  Well, Mr. Klayman,

|  | Page 149 |
|---|---|

1   I'd like you to respond to her question.
2       MR. KLAYMAN:  Yes, I am.
3   BY MS. PORTER:
4       Q.  And then if you look further down --
5       A.  Wait a second.  Wait a second.
6       CHAIRPERSON MIMS:  Let's go back to
7   your original question.
8       MR. KLAYMAN:  Wait.
9   BY MS. PORTER:
10      Q.  Mr. Cliven Bundy was in the first tier
11  of defendants.  Is that correct?
12      A.  Here's what happened -- can I please
13  explain?
14      Q.  Just say yes or no first.
15      CHAIRPERSON MIMS:  It's a yes or no
16  response.
17      MR. KLAYMAN:  Initially, but here's
18  what happened...
19      There was a mistrial with regard to the
20  other defendants: Richard Lovelien, whom I also
21  represented, Todd Engel and Gregory Burleson, Eric
22  Parker, Scott Stewart and Steve Stewart, who I

38 (Pages 146 to 149)

In The Matter of:  Larry E. Klayman
July 15, 2019

Page 150

1    represent now on matters after this trial occurred.
2    A mistrial was declared with regard to some of
3    those defendants: Todd Engel, Gregory Burleson,
4    Eric Parker, and Scott Drexler, to the best of my
5    recollection at this point.
6         So the judge was trying to figure out
7    whether she wanted to try them first now, to get
8    rid of that before she got to Cliven Bundy, and he
9    wound up ultimately being tried in the second tier.
10   And they still couldn't even convict the second
11   time they tried these other defendants.
12        So everything was getting jumbled and
13   confused in terms of how this matter was going to
14   be tried.  So these issues were all up in the air.
15   There were a number of pleadings on this.
16        But my ultimate fundamental concern was
17   that I be present at any of these trials in the
18   capacity as counsel, that would let me communicate
19   with the lawyers who were representing the other
20   defendants.  I could sit inside the well.  It would
21   give me access to information that was under seal
22   and things like that.

Page 151

1         So, yes, I needed to get in regardless
2    of who was starting.  Because Cliven Bundy was the
3    person whose head on a plate the government wanted,
4    he was the primary focus.  And they divided this
5    into tiers, or tried to at the end, even though
6    they were going to do 19 up front, to get this
7    thing, because it was very complicated.  Because
8    they thought that they could convict the
9    low-hanging fruit first, those that came armed, and
10   then they would move on to other matters, and that
11   could also influence a jury that would be seated
12   later.
13        So it was all together.  I needed to be
14   counsel for all of these trials, wherever they
15   began.
16        CHAIRPERSON MIMS:  That may be your
17   testimony, but it is not an answer to the question,
18   and if we hold this hearing this way, we'll never
19   get out of here.
20        MR. KLAYMAN:  Well, it's --
21        CHAIRPERSON MIMS:  Let me finish.
22        That response is something that your

Page 152

1    associate can ask you on cross-examination.  That's
2    a response as to why the February 6th, 2017 date
3    was in there or why you believe the trial should
4    begin there.
5         That wasn't her question.
6         MR. KLAYMAN:  Ok.
7         CHAIRPERSON MIMS:  And so, if you want
8    to take notes or that's not something that's going
9    to be asked, take a note and he can ask you that
10   question.  But we will not get out of here if the
11   answers continue in that fashion.
12        MR. KLAYMAN:  No, I appreciate that,
13   now that I've got it off my chest, so to speak --
14        CHAIRPERSON MIMS:  Mr. Klayman, if you
15   try and bring that in now on direct examination,
16   I'm going to have to say that we've already heard
17   that testimony.
18        And so, this is up to you --
19        MR. KLAYMAN:  Well, I'm going to show
20   you documents during that --
21        CHAIRPERSON MIMS:  We can't hear
22   testimony twice or we will not get out of here.

Page 153

1         That is why, when you're asked these
2    questions, stick to the answers and you can bring
3    in this information as to what you believe your
4    response is and facts that we want to know about.
5         MR. KLAYMAN:  I understand, I
6    understand.
7         I just ask one thing, that Ms. Porter
8    not be so aggressive with me, is that I'm here to
9    tell the truth.  I feel confident about what I did,
10   that I acted ethically, and that I was representing
11   the client zealously, and I wasn't going to walk
12   away from him without my representations as part of
13   a full defense team.
14        So just don't be so aggressive.
15        CHAIRPERSON MIMS:  Again, this is
16   testimony that can come out on cross-examination,
17   and that's what we're here to hear on cross.
18   BY MS. PORTER:
19   Q.   Are you still on Exhibit 20, page 43,
20   Mr. Klayman?
21   A.   Yes.
22   Q.   And so did you familiarize yourself

39 (Pages 150 to 153)

In The Matter of: Larry E. Klayman
July 15, 2019

Page 154

1  with the court order also stating, paragraph three,
2  "The tier one defendants," which included Cliven
3  Bundy, "will proceed to trial 30 days after the
4  conclusion of the trial of the tier three
5  defendants," and that the tier three defendants
6  were supposed to start on February 6th, 2017?
7      A.  And to the best of my recollection, as
8  I testified, those discussions were still up in the
9  air.
10     Q.  And if you look at page 47, Judge
11 Navarro affirmed that order on December 29th, 2016,
12 and that's docket number 1214.
13     A.  The docket speaks for itself, and
14 without looking at the record I'm going to try to
15 keep my testimony short, is that that was subject
16 to the likelihood of being challenged further,
17 because it would have prejudiced my client's
18 rights.
19         So I needed to be present on February
20 6th whenever it was being tried.
21     Q.  One of the representations that you
22 made to the supreme court, and I'm again referring

Page 155

1  to your emergency petition, which is marked as
2  Exhibit Number 69, is that Mr. Bundy was, quote,
3  "ordered to solitary confinement," and that's on
4  page 21 of Exhibit 69.  You made that
5  representation to the supreme court.
6         Is that correct, Mr. Klayman?
7      A.  Show me where that is.
8      Q.  I said page 21 of Exhibit Number 69.
9      A.  Where is that?
10     Q.  If you look at page eight of your
11 petition, which is Bar Exhibit Number 69, page 21,
12 the first full paragraph on that page, you
13 represented to the supreme court, "Petitioner,"
14 meaning Cliven Bundy, "was ordered to solitary
15 confinement for several weeks by Judge Navarro."
16     A.  That's accurate.
17     Q.  Well, isn't it a fact that Judge
18 Navarro never ordered Cliven Bundy into solitary
19 confinement?
20     MR. KLAYMAN:  Objection, lacks
21 foundation to ask me that question.
22         The fact is my client was in solitary

Page 156

1  confinement.  You don't get there unless the judge
2  plays a role in that, since he wanted bail and bail
3  was denied.
4      CHAIRPERSON MIMS:  Objection overruled.
5  BY MS. PORTER:
6      Q.  You were at the hearing on May 6th,
7  2016.  We've already established that?
8      A.  Yes.
9      Q.  And the transcript for that hearing is
10 Exhibit Number 30.
11     A.  Can you show me where?
12     Q.  Yes, it's in the first notebook,
13 Exhibit 30.
14         And you were there for the entire
15 hearing.  This is the hearing at which Judge
16 Navarro was served with the Bivens action.
17     MR. KLAYMAN:  I object to the
18 characterization on the record of what went on.
19         Your Honor, I object.  I could have put
20 Ms. Porter down at a witness at the Office of
21 Disciplinary Counsel.  I didn't want to turn this
22 into a free-for-all.

Page 157

1         So please, I ask that she be instructed
2  not to testify here.
3      CHAIRPERSON MIMS:  I don't believe Ms.
4  Porter is testifying.
5         You do need to ask these in the form of
6  a question, but that question I believe was already
7  asked.
8  BY MS. PORTER:
9      Q.  You were present for the entire hearing
10 on May 10th, 2016?
11     A.  I was.
12     Q.  So you were present during the exchange
13 between Mr. Hansen and Judge Navarro concerning Mr.
14 Bundy's solitary confinement?
15     A.  Yes.
16     Q.  If you refer to pages 62 to 63 of the
17 transcript, you were present when Mr. Hansen told
18 the court that he was in -- I guess they called it
19 segregation voluntarily because he was fearful of
20 the population in the prison.
21     A.  Where is that?
22     Q.  Bottom of Page 62 onto 63.

40 (Pages 154 to 157)

In The Matter of:  Larry E. Klayman
July 15, 2019

Page 158

1          A.   That is not what Cliven Bundy told me,
2     and with regard to the solitary confinement, he was
3     immediately thrown in there, and then after the
4     fact, to the extent there's any truth to this with
5     regard to Mr. Hansen, that occurred later, but he
6     was originally thrown into solitary confinement.
7     He did not ask to be thrown into solitary
8     confinement.
9          I met with him 30 times plus in the
10    prison and Mr. Hansen only met with him once or
11    twice.
12         So that is not what Cliven Bundy
13    wanted.
14    Q.   You told the supreme court that Judge
15    Navarro order him into solitary confinement.  When
16    was that order issued?
17         A.   You don't have to issue an order.  They
18    can communicate with the marshall's office orally
19    and they can suggest or order that to happen.  It
20    doesn't have to be done in an order.
21         Q.   So are you saying that there was an
22    order?  And I'm asking --

Page 159

1          A.   I'm saying in one manner, shape or form
2     I believe that there was.  You don't wind up in
3     solitary confinement on your own.
4          Q.   Is there any record, evidence in the
5     court record of United States versus Cliven Bundy
6     to support your representation -- not just to the
7     supreme court, but in other briefs -- that Mr.
8     Bundy was ordered into solitary confinement?
9          A.   Yes, there is, and in the sense he
10    wound up in solitary confinement.  He didn't get
11    there on his own.
12         And let me be respectful to Judge
13    Navarro, who I think frankly was very disrespectful
14    to me, I take it with a grain of salt.
15         CHAIRPERSON MIMS:  Are you aware of any
16    written representation, written orders?
17         MR. KLAYMAN:  Not at this time.  I can
18    go back and look.
19    BY MS. PORTER:
20         Q.   After your petition to the supreme
21    court was denied -- I guess before I get there, you
22    did supplement your petition to the supreme court

Page 160

1     twice, Exhibits number 70 and 71.
2          Is that correct?
3          A.   I'm trying to get there.  Give me a
4     second.
5          Q.   Take your time.
6          MR. KLAYMAN:  Your Honor, may I remove
7     my coat?  It's getting a little warm in here.
8          CHAIRPERSON MIMS:  Of course.
9     BY MS. PORTER:
10         Q.   My question, Mr. Klayman, was you
11    supplemented your petition to the supreme court on
12    two occasions and those are 70 and 71, Exhibits 70
13    and 71?
14         A.   Exhibit 17 and 71?
15         Q.   Seventy, seven zero, and 71.  Seventy
16    and 71, your first supplement and your second
17    supplement.
18         A.   Correct.
19         Q.   And the supreme court denied your
20    petition.  Is that correct?
21         A.   That's correct.
22         We know it's discretionary.  They

Page 161

1     accept very few petitions.
2          Q.   And after the supreme court denied your
3     petition, you filed a second petition with the 9th
4     Circuit?
5          A.   Correct, which I had and which I was
6     entitled to do based upon the circumstances
7     existing at that time.
8          Q.   And your second petition, that's
9     Exhibit Number 73?
10         A.   Correct.
11         Q.   And in this petition you again told the
12    court about your extensive experience in complex
13    contentious federal criminal defense?
14         A.   Show me the language rather than
15    characterizing it.
16         Q.   Sure, pages 12 and 13.  And I'll refer
17    you to page 13, Mr. Klayman.  I'm reading below
18    where it says Exhibit G, "Klayman has extensive
19    experience in complex, contentious federal criminal
20    defense and petitioner's local counsel, 'Bret
21    Whipple,'" in parentheses, "has none."
22         MR. KLAYMAN:  Objection, relevancy,

41 (Pages 158 to 161)

In The Matter of:  Larry E. Klayman
July 15, 2019

Page 162

1  your Honor, and again, this is not a part of the
2  Specification of Charges.
3         MS. PORTER:  I believe it is.
4         CHAIRPERSON MIMS:  Objection overruled.
5  BY MS. PORTER:
6     Q.  In your second petition, you also
7  represent to the 9th Circuit that Judge Navarro
8  threatened to hold Mr. Whipple in contempt.
9  I refer you to page -- again same
10 exhibit, Exhibit Number 73 at 13 and 14, and also
11 at page 20.
12    A.  Generally speaking, I'm aware of that
13 Mr. Whipple told me that Judge Navarro wanted to
14 potentially hold him in contempt because he had
15 listed as a witness the judge's husband, Brian
16 Rutledge, who was an Assistant DA of Clark County,
17 Nevada, and he told me that that was the reason
18 that he didn't want to resubmit my pro hac vice
19 application.  I asked him to do that at that time.
20 He said, "Because if I do that it may get her upset
21 may wind up getting me held in contempt."
22        That's what he told me.

Page 163

1     Q.  My question was a little bit different,
2  Mr. Klayman.  I'm sorry you didn't understand.
3        My question is, you represented to the
4  9th Circuit that Judge Navarro had threatened to
5  hold Mr. Whipple in contempt?
6     A.  And that's accurate.  That's what Bret
7  Whipple told me.  And to this day nobody sees the
8  transcript of this sealed hearing that dealt with
9  her husband that she didn't want the public to know
10 about.
11        That's what Mr. Whipple told me.  If he
12 was lying, that's Mr. Whipple's problem, but not
13 me, not my problem.
14    Q.  You never got an affidavit or a
15 declaration from Mr. Whipple to support that?
16    A.  I didn't need to.  That's what I was
17 told and I made a representation of what I was
18 told.
19    Q.  And Mr. Whipple never said that to the
20 court?
21    A.  What court?
22    Q.  Judge Navarro.

Page 164

1     A.  I don't know exactly what he said.
2  Because the hearing that Judge Navarro said was
3  going to be a contempt hearing to this day has been
4  sealed.  I don't know what she did there.
5        But I know what Mr. Whipple told me,
6  and that's why he wouldn't resubmit my pro hac vice
7  application.
8         CHAIRPERSON MIMS:  Is there a docket
9  listing for the contempt hearing?
10        MR. KLAYMAN:  Yes.
11        CHAIRPERSON MIMS:  There is a docket
12 entry?
13        MR. KLAYMAN:  Yes.
14        CHAIRPERSON MIMS:  And does that docket
15 entry say "Contempt Hearing"?
16        MR. KLAYMAN:  I don't know what it
17 says.  I don't remember, but I remember that there
18 was an issue at the time.
19        I don't know if it would necessarily
20 say "contempt hearing".  She was taking up the
21 issue to hold him in contempt for citing her
22 husband as a witness.  And the reason why he was

Page 165

1  put down as a witness was because Carol Bundy and
2  others had asked for an investigation by the
3  district attorney of what went on at the ranch at
4  Bunker Hill.
5         CHAIRPERSON MIMS:  Well, I don't
6  think we need to know --
7         MR. KLAYMAN:  I don't remember off the
8  top of my head.
9  BY MS. PORTER:
10    Q.  You're aware that Judge Navarro in
11 answering your second petition denied that she had
12 ever said or indicated that she would hold Mr.
13 Whipple in contempt?
14    A.  In all due respect to Judge Navarro --
15 I respect judges as I respect everybody -- I don't
16 believe much of what Judge Navarro said,
17 particularly given the fact that she did a Catch
18 22, which was very dishonest, comes back to me
19 years from now after Cliven is already tried.
20        That to me is the ultimate act of
21 dishonesty.
22    Q.  You're aware that the government

42 (Pages 162 to 165)

In The Matter of:  Larry E. Klayman
July 15, 2019

Page 166

1  counsel also denied that there was any record
2  evidence of the judge threatening to hold Mr.
3  Whipple in contempt?
4      A.  I don't remember whether they did or
5  they didn't, but the government wanted to keep me
6  out because they knew I was a strong advocate.
7  That's my belief.  And they didn't want Mr. Bundy
8  to have a defense team.
9          Let's remember the government had a
10  supersedeas indictment thrown out that rose to
11  prosecutorial abuse including suborning of perjury,
12  lying to the judge, hiding Brady material and
13  exculpatory evidence, and then threatening the
14  whistle-blower that came forth from the BOM, and a
15  supervisor, that he was on the kill list, a witness
16  for Mr. Bundy.
17      Q.  And let me refresh your memory if you
18  have no memory of what the government counsel said.
19  If you turn to Exhibit 75.
20      A.  I didn't say I had no memory.  I said
21  they were trying to exclude me.
22      Q.  Ok, so you do have a memory that the

Page 167

1  government counsel also denied that Judge Navarro
2  ever threatened to hold Mr. Whipple in contempt?
3      A.  I have to see exactly what they said.
4      Q.  Seventy-five at page six, 75 at page 16
5  and 17.
6          See if that refreshes your memory, Mr.
7  Klayman.
8          (Witness reads document.)
9      A.  Show me what you're referring to,
10  please.
11      Q.  On Exhibit Number 75, page six, I'm
12  looking at the carryover paragraph, and it says,
13  "His assertion," meaning your assertion, "that
14  Whipple has no federal criminal experience is
15  simply not true and the fact that Judge Navarro has
16  threatened to hold Mr. Whipple in contempt is
17  unsupported by the record."
18          And I believe you make a similar
19  statement on --
20      A.  Yeah, the reason I said that the
21  representation is not necessarily accurate is that
22  nobody has had access to that sealed hearing.

Page 168

1          Actually at one point I tried to get
2  access, because it was under the protective order
3  and I couldn't get access to it, but that's what
4  Mr. Whipple told me.  He said that's why he was not
5  going to submit my pro hac vice application.  He
6  didn't want to be held in contempt.
7          Maybe Mr. Whipple was lying.  Maybe he
8  wasn't telling the truth.  But that's not my
9  problem.  Maybe that was an excuse not to submit my
10  pro hac vice application.
11      Q.  Am I correct that the proceeding which
12  you couldn't get the transcript for, was that
13  before you filed the motion on March 20th, 2017?
14      A.  I don't recollect the date.
15      Q.  Well, based on what you represented,
16  that there was some secret or a sealed hearing,
17  that was the basis for your claim that Judge
18  Navarro had threatened to hold Mr. Whipple --
19      A.  No.
20      Q.  -- in contempt?
21      MR. KLAYMAN:  Please, your Honor, I ask
22  for an instruction.  She knows what my testimony

Page 169

1  is.
2          My testimony is that -- and she's
3  trying to then change it with her own testimony --
4  is that Mr. Whipple told me that was the case.  He
5  told me that he'd be held in contempt if he
6  submitted my pro hac vice application.  Mr. Whipple
7  is a friend of Judge Navarro.  He gets appointments
8  by the court.  His practice in large part depends
9  on those appointments by the court.  He did not
10  want to risk his standing with Judge Navarro by
11  resubmitting my pro hac vice application, given
12  what was going on at that time.
13          He said "I can't, Larry.  I won't do
14  it."
15          I had to get Cliven at one point to do
16  it.  And that's in the record.  Cliven instructed
17  him to resubmit my pro hac vice applications.  By
18  that time the case was dismissed.  It never was
19  ruled on.
20      Q.  I'm just trying to get a date on this,
21  Mr. Klayman.
22          Was this conversation that you say

43 (Pages 166 to 169)

In The Matter of:  Larry E. Klayman
July 15, 2019

|  | Page 170 |
|---|---|

1  occurred between you and Mr. Whipple, about the
2  judge holding him in contempt, was that before or
3  after March 20th, 2017 when you filed your second
4  petition?
5      A.  It was before I made any
6  representations about contempt I had talked to Mr.
7  Whipple.
8      Q.  Ok.
9      A.  And by the way, I might add I tried to
10  get along with Mr. Whipple.  I didn't fight with
11  him.
12          Remember that Cliven himself fired him
13  for not following instructions, among other
14  matters.
15      Q.  And in your reply in connection with
16  your second petition, which is Exhibit Number 77,
17  you submitted an affidavit to the court, which is
18  on pages 27 through 33.
19          That's your signature on page 33, Mr.
20  Klayman?
21      A.  Yes, it is.
22      Q.  You prepared the affidavit that begins

|  | Page 171 |
|---|---|

1  on page 27?
2      A.  Yes, I did.
3      Q.  How many active federal cases did you
4  have going on in March of 2017 when you filed this
5  affidavit?
6      A.  I had a lot.
7      Q.  More than a dozen?
8      A.  Probably.  I mean a lot of them were
9  Freedom of Information Act, complex litigation. But
10  not everything occurs at the same time.
11      Q.  And am I correct you testified I think
12  this morning that at the time the Klayman Law Group
13  consisted of you and a paralegal?
14      A.  I work 16 hours a day, and --
15      CHAIRPERSON MIMS:  That's not the
16  question, Mr. Klayman.
17      MR. KLAYMAN:  Ok, yeah.  I also have
18  contract attorneys.
19  BY MS. PORTER:
20      Q.  Did you have any contract attorneys
21  working for you in March of 2017?
22      A.  Yes.

|  | Page 172 |
|---|---|

1      Q.  Who?
2      A.  John Mosely.
3      Q.  John?
4      A.  Mosely.
5      Q.  And where was he working?
6      A.  He works here in the Washington, D.C.
7  area.
8      Q.  Was he assisting at all with the Bundy
9  representation?
10      A.  Sometimes.  On various matters I would
11  ask him to research things.
12      Q.  Was he a member of the Nevada bar?
13      A.  No, he was helping me.
14      CHAIRPERSON MIMS:  When you say you had
15  a contract attorney, did you employ him
16  specifically or did you hire him through an agency?
17      MR. KLAYMAN:  No, he worked with me at
18  Judicial Watch.  I knew him.  So whenever I need a
19  little Hamburger Helper in extra work, I'll ask
20  him.
21      CHAIRPERSON MIMS:  And he's an
22  attorney?

|  | Page 173 |
|---|---|

1      MR. KLAYMAN:  He's an attorney.
2  BY MS. PORTER:
3      Q.  Again, drawing your attention back to
4  the affidavit on paragraph two, you repeat your
5  statements about your experience as a former
6  prosecutor with the U.S. Department of Justice or
7  state that you have extensive experience in complex
8  criminal litigation.  You also state that you were
9  an instrumental part of the team that helped break
10  up AT&T while you were at the Department of
11  Justice.
12          Those were representations --
13      A.  Whatever I said in my affidavit are my
14  representations.
15      Q.  I want to ask you some questions about
16  your background at this point, Mr. Klayman.
17          You received your law degree and became
18  a member of the Florida bar in December of 1977?
19      A.  Right.
20      Q.  Prior to that you hadn't been admitted
21  to any other bar?
22      A.  Correct.

44 (Pages 170 to 173)

In The Matter of:  Larry E. Klayman
July 15, 2019

Page 174

1  Q.  And when you were first admitted to the
2  bar in Florida, you took a job with the Florida
3  firm Blackwell Walker and Gray?
4  A.  Correct.
5  Q.  And they had a civil practice?
6  A.  Civil practice.  They did some criminal
7  things, too.
8  Q.  Ok, but your practice was medical
9  malpractice, product liability and commercial
10  litigation?
11  A.  Yes, and corporate matters.
12  Q.  And you worked there as an associate?
13  A.  Correct.
14  Q.  At some point in 1980 you moved to the
15  District of Columbia?
16  A.  End of 1979.
17  Q.  So you were with that firm for just two
18  years?
19  A.  About two years, and I moved to the
20  antitrust division of the Department of Justice.
21  Q.  Approximately when in connection with
22  your move to DC did you apply to become a member of

Page 175

1  the DC Bar?
2  A.  Well, of course when you are a member
3  of the Department of Justice you don't have to be a
4  member.  You only have to be a member of one bar.
5  You can get in anywhere that you're practicing.
6  So when I decided to go back out into
7  private practice, I applied for the DC Bar, I took
8  the exam and passed it.
9  I'm one of the few lawyers who actually
10  took the DC Bar exam.  Usually you're waived in
11  after five years, but the rules were different
12  then.
13  CHAIRPERSON MIMS:  What year was that?
14  MR. KLAYMAN:  That was 1982.  I was a
15  member of the DC Bar.
16  BY MS. PORTER:
17  Q.  Let me have you turn to Exhibit Number
18  1.
19  A.  Exhibit 1?
20  Q.  Yes, Exhibit 1.  Is that your signature
21  on the registration statement at the bottom?
22  A.  It is.

Page 176

1  Q.  With the date December 22nd, 1980?
2  A.  Yes.  I guess I must have applied
3  earlier than I remembered.
4  Q.  Ok.  When you applied, how long had you
5  been working at the Department of Justice?
6  A.  About -- I would say, what is this
7  November?
8  Q.  This is December --
9  A.  Yeah, I came in in the Department of
10  Justice in 1979, I believe, or maybe it was '78.  I
11  don't remember exactly.  But that was a year, year
12  and a half.  I was with the Department about two
13  years.
14  Q.  Ok, so let me get this straight.
15  You were with the Blackwell Walker and
16  Gray firm for two years, and you hadn't been
17  admitted to the Florida Bar until December of 1977?
18  A.  December 7th.
19  Q.  So approximately two years later you
20  moved to the District of Columbia --
21  A.  Correct.
22  Q.  -- and took the job at the Department

Page 177

1  of Justice?
2  A.  And I must have applied in anticipation
3  of later going out into private practice earlier
4  than I remembered.
5  Q.  Ok.  And in December of 1980 when you
6  filled out this application, you were working for
7  the Consumer Affairs Bureau.
8  Isn't that correct?
9  A.  Consumer Affairs Litigation Section.
10  Q.  Consumer Affairs Litigation Section.
11  That's where you were employed.  That's
12  the address that you provided in your registration
13  statement in December --
14  A.  Right.
15  Q.  -- of 1980.
16  A.  That's part of the antitrust division
17  of the Department of Justice.
18  Q.  Ok.
19  A.  At the time.
20  Q.  That was part of the antitrust
21  division?
22  A.  Correct.

45 (Pages 174 to 177)

In The Matter of:  Larry E. Klayman
July 15, 2019

Page 178

1    Q.  How long did you work for the Consumer
2  Affairs section after December of 1980?
3    A.  About a year and a half, after I joined
4  the Justice Department.
5    And let me just put on the record that
6  they represent the Federal Trade Commission, the
7  Consumer Product Safety Commission, the Food and
8  Drug Administration, the Federal Reserve Board, the
9  National Highway Traffic Safety Administration,
10 parts of the Department of Agriculture and other
11 groups.
12    I took that job because I thought it
13 would give me an excellent experience in the
14 Washington, D.C. practice.
15    Q.  So the Consumer Affairs section, you
16 were with that section for a year and a half?
17    A.  About a year and a half.
18    Q.  So through like mid 1981?
19    A.  Roughly speaking, best of my
20 recollection.
21    Q.  Ok, so mid 1981 you were with the
22 Consumer Affairs Bureau.

Page 179

1    Am I correct that you never -- did I
2  say 1981?  You never filed any criminal cases, you,
3  at the Consumer Affairs section?
4    A.  That's not true.
5    They had a number of criminal cases,
6  particularly for FDA.  Now I was a young lawyer.
7  FDA has criminal penalties involved, and in fact
8  one of those cases I write about in my book dealt
9  with Andy Troxler who had broken bond with regard
10 to children's sleepwear that had Tris, which was
11 carcinogenic.  He broke the bond and sent the Tris
12 wear to Venezuela so that Venezuelan kids could get
13 cancer.
14    Q.  It's your testimony that that was a
15 criminal case or a civil case?
16    A.  No, that was criminal case.
17    Q.  Were you of counsel in that case?
18    A.  Whether I was counsel of record I don't
19 remember but I was working with John Fleder, who
20 was my assistant chief on that case.
21    Q.  You said that you later went to the
22 antitrust division.  I guess that would have been

Page 180

1  sometime after mid --
2    A.  No, that's not what I said.
3    Q.  -- mid -- ok, I'm sorry.
4    CHAIRPERSON MIMS:  Let's make sure you
5  let her finish.
6    MR. KLAYMAN:  Consumer Affairs was part
7  of the antitrust division, and we represented the
8  FTC, so we also did antitrust matters.
9  BY MS. PORTER:
10    Q.  So when then did you begin work on the
11 AT&T case?  Sometime after mid 1981?
12    A.  That was -- I was on the AT&T case
13 probably for about four to six months towards the
14 end of my tenure at the Justice Department.
15    Q.  So after your work on the AT&T case,
16 you left the Department of Justice?
17    A.  I took a job with a law firm named
18 Busby, Rehm and Leonard that did international
19 trade matters.
20    Q.  Just so I'm clear, Mr. Klayman, I just
21 want to get your government experience down.
22    You were with the Consumer Affairs

Page 181

1  section, which you say is part of the antitrust
2  division, and then the last four or five months at
3  your stint at the Department of Justice you worked
4  on the AT&T case.
5    Is that correct?
6    A.  That's about right.
7    Q.  Ok, and when did you leave the
8  Department of Justice again?
9    A.  The end of 1981.
10    Q.  The end of 1981.  So, from
11 approximately mid '81 to the end of '81 --
12    A.  No, it was actually '82, I believe.
13 Somewhere in that timeframe, end of '81, early '82.
14    Q.  And the United States versus AT&T case,
15 the domestic case, that was a civil case?
16    A.  Correct, but it had criminal
17 ramifications.  But, no, it was a civil case.  I'm
18 not --
19    Why are you laughing at me?  Am I
20 entitled to some respect?
21    Q.  I'm not laughing, Mr. Klayman.  I
22 just -- I'm sorry, I sighed.  I just want a yes or

46  (Pages 178 to 181)

In The Matter of:  Larry E. Klayman
July 15, 2019

Page 182

1    no.
2         MR. KLAYMAN:  Your Honor, I've been
3    noticing it throughout.  I haven't said anything.
4    But I really want some respect paid by -- she
5    represents me as well as everybody else here.
6         CHAIRPERSON MIMS:  I apologize.  I have
7    not seen her laughing.  But I was actually focused
8    on you.
9         MR. KLAYMAN:  Unfortunately I'm
10   watching.  I'm the victim.
11        CHAIRPERSON MIMS:  But let me ask a
12   question.
13        The Consumer Affairs section of DOJ,
14   does that still exist as Consumer Affairs?
15        MR. KLAYMAN:  I don't think they do.  I
16   think they merged it in, but I'm not sure it still
17   does.
18        One thing I want to emphasize is the
19   FDA has significant criminal authority and we had a
20   number of cases with regards to the FDA.
21        I was the young lawyer there and I
22   worked with my assistant chief, John Fleder.

Page 183

1         CHAIRPERSON MIMS:  Well, that was my
2    next question.
3         So your testimony is that you worked on
4    criminal cases in the Consumer Affairs section.
5         MR. KLAYMAN:  Correct.
6         CHAIRPERSON MIMS:  As a part of
7    representing the FDA.
8         MR. KLAYMAN:  Yes.
9         CHAIRPERSON MIMS:  Cases brought
10   against the FDA.
11        MR. KLAYMAN:  Yes.
12   BY MS. PORTER:
13        Q.  Can you name one of them?
14        A.  The Troxler case.
15        Q.  Can you spell that?
16        A.  T-r-o-x-l-e-r.
17        Q.  T-r-o-x --
18        A.  -- l-e-r.
19        Q.  -- l-e-r.  And when were you involved
20   in the Troxler case?
21        A.  When I was in Consumer Affairs.
22        Q.  What was your role?

Page 184

1         A.  I was assisting the assistant chief,
2    John Fleder, and we were working together on that
3    case and we sought to have an indictment of
4    Troxler, which ultimately occurred.
5         Interestingly enough, it was difficult
6    getting it before the board because Troxler knew
7    the U.S. Attorney in North Carolina and had a lot
8    of political pull, so this is something that we put
9    a lot of work into.
10        CHAIRPERSON MIMS:  Ok, again, Mr.
11   Klayman, the last part of that --
12        MR. KLAYMAN:  Ok.
13        CHAIRPERSON MIMS:  I think you can see
14   where we're going.  It's all very interesting, but
15   we would be here all month.
16        MR. KLAYMAN:  Ok, got it.  Thanks, your
17   Honor.
18        CHAIRPERSON MIMS:  Thank you.
19   BY MS. PORTER:
20        Q.  Was your actual trial in the Troxler
21   matter a criminal matter?
22        A.  I wasn't involved in the trial but I

Page 185

1    was involved in events -- actually, it ultimately
2    occurred after I left.
3         Q.  So there was no criminal trial in the
4    Troxler matter while you were at the Department of
5    Justice?
6         A.  I believe we did get a -- I don't
7    recollect completely.  It was a long time ago -- a
8    conviction against the company but not against the
9    individual.
10        Q.  But that was after you left.  You were
11   not involved in the process?
12        A.  I don't remember whether it was before
13   or after I left.
14        Q.  Well, were you involved in a trial or
15   not?
16        A.  I wasn't involved in a trial.
17        Q.  You were not?
18        A.  No.
19        Q.  And the AT&T trial, you weren't
20   involved in the trial in the sense that you weren't
21   putting on witnesses or cross examining witnesses.
22        A.  No, I wasn't involved with witnesses.

47 (Pages 182 to 185)

In The Matter of:  Larry E. Klayman
July 15, 2019

Page 186

1      I actually was assigned to the MCI part
2  of the case.  I actually dealt with the higher
3  brass of MCI who got a higher verdict, and I dealt
4  with their CEO and I prepped witnesses and they did
5  stipulations and I was involved in that.
6      Q.  My question is, did you question any
7  witnesses at the AT&T trial?
8      A.  The AT&T case was settled ultimately.
9      Q.  I know that.  It started in January of
10 1981.
11     My question is, during the year-long
12 trial, did you put on a single witness?
13     A.  I didn't put on witnesses, but I have a
14 lot of experience with witnesses and trials and
15 things like that.
16     Q.  The Troxler case, which is the one
17 criminal case you said you were involved in, that
18 went to trial after you left the Department of
19 Justice.  The AT&T case was a civil case where you
20 didn't put on a witness.
21     Is there any other case where you were
22 involved as a government lawyer in a trial?

Page 187

1      A.  There may have been.  I don't remember.
2      Q.  When you left the Department of
3  Justice, I think you indicated you went to work for
4  another firm.
5      Is that correct?
6      A.  Another firm compared to what?
7      Q.  Another law firm.
8      A.  I went to work for a law firm.
9      Q.  And the name of that firm was --
10     A.  Busby, Rehm and Leonard.
11     Q.  Thank you.  And you were an associate
12 at that firm, correct?
13     A.  That's correct.
14     Q.  And you were never promoted to partner
15 while you were there?
16     A.  No, I left the firm voluntarily and I
17 started my own law firm.
18     MR. KLAYMAN:  I object to the
19 implication.
20     CHAIRPERSON MIMS:  Objection overruled.
21     MR. KLAYMAN:  It's not necessary to
22 twist things like that, to belittle me.

Page 188

1      CHAIRPERSON MIMS:  Mr. Klayman, if you
2  want to put on testimony as to the reason --
3      I do think that the additional
4  testimony is not necessary.
5      MR. KLAYMAN:  Ok.
6      CHAIRPERSON MIMS:  The committee --
7      MR. KLAYMAN:  I'm just asking that I be
8  paid respect.
9      CHAIRPERSON MIMS:  With due respect I
10 think you're reading into this things that aren't
11 there.
12     I think the committee is intelligent
13 enough to distinguish facts from non facts and
14 implied facts as you may see them from the evidence
15 that's on the record.
16     MR. KLAYMAN:  Ok, maybe I'll put my
17 book on the record.  It will make it simple.
18     CHAIRPERSON MIMS:  Proceed.
19     MR. KLAYMAN:  With your Honor's
20 permission.
21 BY MS. PORTER:
22     Q.  Mr. Klayman, I'm going to have you turn

Page 189

1  to Exhibit Number 115.  This is just a Pacer search
2  that Disciplinary Counsel performed using your name
3  in criminal cases?
4      CHAIRPERSON MIMS:  Is that binder
5  three?
6      MS. PORTER:  Yes, binder three, Exhibit
7  Number 115.
8  BY MS. PORTER:
9      Q.  Mr. Klayman, according to the Pacer
10 search, there's four criminal cases that you may
11 have been involved in.  I'll just refer to them by
12 one of the party's names: BCCI; and the U.S. versus
13 Khashoggi, but I believe you represented a
14 defendant with a different name; U.S. versus
15 Hernandez and U.S. versus Humm.
16     Other than those four cases, have you
17 ever served as counsel in a criminal case that went
18 to verdict?  Not to say that those went to verdict,
19 but have you ever been involved in a criminal case
20 that went to verdict, federal criminal case?
21     CHAIRPERSON MIMS:  Can you repeat the
22 four cases again?

48  (Pages 186 to 189)

In The Matter of:  Larry E. Klayman
July 15, 2019

|  | Page 190 |
|---|---|

1    MS. PORTER:  Sure.  The first one is
2  BCCI.  They're repeated several times, some of
3  them.  Like the BCCI starts on page one and
4  continues to page three.
5        The second one was USA versus
6  Khashoggi, et. al., 1:2004-CR-20631.
7        The third one is U.S. versus Hernandez,
8  et. al.  It's 1:1998-CR-00721.
9        And the fourth one is USA versus Humm,
10  1:2007-NJ-02948.
11        CHAIRPERSON MIMS:  Are those criminal
12  cases?
13        MS. PORTER:  Well, yes they are, and I
14  have documents related each of those four cases
15  that I'll ask Mr. Klayman that follow as Exhibit
16  Numbers 116, 117, 118 and 119.
17        But my first question to Mr. Klayman
18  was had he been involved in any criminal case that
19  went to verdict, federal criminal case that went to
20  verdict.
21        MR. KLAYMAN:  Well, the Troxler case
22  did go to verdict initially.

|  | Page 191 |
|---|---|

1  BY MS. PORTER:
2    Q.  I'm sorry?
3    A.  The Troxler case did go to verdict
4  against the corporation.
5    Q.  I think you discussed that and I think
6  you indicated that that wasn't tried until after
7  you left the Department of Justice.
8        So now I'm looking at your federal
9  criminal defense experience, and my question to you
10  is, have you ever represented a defendant in a
11  federal criminal case that went to verdict?
12    A.  I believe that the ones that you've
13  listed here were resolved by plea agreements or in
14  other manners.
15    Q.  So is the answer to my question no,
16  you've never represented a defendant in a federal
17  criminal case that went to verdict?
18    A.  Correct.  However I did a lot of work
19  leading up to completing the case favorably, and I
20  have tried many cases before juries and won a
21  verdict many times in a number of different
22  settings.

|  | Page 192 |
|---|---|

1    Q.  And those were all civil cases?
2    A.  Most of them were, but I also had cases
3  that were assigned to me as a young lawyer by the
4  DC courts through criminal cases.
5        And, you know --
6        CHAIRPERSON MIMS:  As a young lawyer
7  working for whom?
8        MR. KLAYMAN:  For myself.
9        CHAIRPERSON MIMS:  About how many
10  criminal cases had you worked on -- where are we
11  at?
12        MR. KLAYMAN:  Three or four, assigned
13  to me.
14        CHAIRPERSON MIMS:  Up to what point?
15        MR. KLAYMAN:  When I was running my own
16  law firm.
17        CHAIRPERSON MIMS:  What law firm?
18        MR. KLAYMAN:  The Law Office of Larry
19  E. Klayman.
20        CHAIRPERSON MIMS:  What year was that?
21        MR. KLAYMAN:  1979 to I'd say -- no, I
22  started my own law firm in '83, and so I had some

|  | Page 193 |
|---|---|

1  assignments from the local court here with regard
2  to that law firm.
3        CHAIRPERSON MIMS:  And you believe that
4  was about four cases?
5        MR. KLAYMAN:  About four.
6  BY MS. PORTER:
7    Q.  And that was in the DC Superior Court?
8    A.  Correct, they were assigned to me.
9    Q.  And these were criminal cases?
10    A.  I settled them.  They were criminal.
11    Q.  And you settled them?
12    A.  Yeah, quickly.
13    Q.  So they were all resolved with a plea
14  or --
15    A.  Plea or otherwise, dropped.  Dropped.
16    Q.  I'm sorry?
17    A.  Dropped, some of them.
18    Q.  And some of them went to trial where
19  there was a verdict?
20    A.  I don't remember any going to trial.
21    Q.  Now with respect to the four criminal
22  cases identified in this Pacer printout, the BCCI

49 (Pages 190 to 193)

In The Matter of:  Larry E. Klayman
July 15, 2019

---

Page 194

1  case you were representing a claimant who was
2  seeking funds that had been forfeited.
3       Isn't that correct?
4       A.  I don't remember the exact aspect of
5  it, but I believe that's probably accurate.
6       Q.  And your client --
7       A.  It's a long time ago.
8       Q.  Well, I have the docket sheet if it
9  would be of assistance to you, Mr. Klayman.  It's
10  Exhibit Number 117.  We haven't included all 175
11  pages, but we have included page two which reflects
12  you were representing a liquidation commission for
13  the bank's Macao branch.
14       Does that refresh your memory?
15       A.  Yes.
16       Q.  They had filed a claim in approximately
17  April of 1993?
18       A.  This is going back a long time.  This
19  is going back 16 years.
20       Q.  Well, that's why I have the documents
21  here to help you.  And you entered your
22  appearance --

---

Page 195

1       A.  You don't have a lot of documents here
2  to help me.  All you have is a docket sheet.
3       Q.  Ok, well, hopefully that will help you
4  remember the case.
5       If you look at the tenth page of
6  Exhibit Number 116, Mr. Klayman, and I'm looking at
7  the entry 823, you entered your appearance for the
8  liquidation commission, yours, Mr. Ramos' and Mr.
9  Ho's, on June of 1993.
10       CHAIRPERSON MIMS:  What's the docket
11  entry number, please?
12       MS. PORTER:  Eight twenty-three.
13       MR. KLAYMAN:  Where are we looking?
14  BY MS. PORTER:
15       Q.  Eight twenty-three.  You entered your
16  appearance for the claimants or I guess the
17  liquidation commissioners for the branch in Macao.
18       A.  What exhibit?
19       Q.  I'm sorry, 116.
20       MR. KLAYMAN:  By the way, your Honor, I
21  object to these exhibits on relevancy grounds.
22       CHAIRPERSON MIMS:  Objection overruled.

---

Page 196

1       MR. KLAYMAN:  Where are you looking?
2  BY MS. PORTER:
3       Q.  I'm looking at page 10, docket entry
4  823.
5       A.  I don't see docket entry 823 -- oh, ok,
6  the docket entry, not the date.
7       Well, I suspect if it's listed there I
8  did it.
9       Q.  Ok.
10       A.  But it's a long time ago.  We're
11  looking at sixteen years ago.
12       Q.  If you look at pages 11, 12, the same
13  exhibit --
14       A.  More than sixteen years ago, excuse me.
15  Twenty-three years ago.
16       Q.  And 905 is the entry for the court's
17  order of August 19th, 1993 dismissing your client's
18  petition?
19       A.  Nine O five?
20       Q.  Yes.  It starts on page 11 and carries
21  over to 12.
22       A.  I don't remember what happened 23 years

---

Page 197

1  ago.  Honestly, I don't.  And I don't know whether,
2  you know, the matter was settled or what the case
3  may be.
4       Q.  Well, you would agree with me that two
5  months after you entered your appearance the court
6  dismissed your client's claims?
7       A.  I don't agree with you on that.  I
8  don't remember.
9       CHAIRPERSON MIMS:  Let me ask a
10  question.  I don't understand.
11       Is this case that you're referring to
12  now -- I think it was 823 on the docket -- is that
13  the same as the BCCI case?
14       MS. PORTER:  Yes.
15       CHAIRPERSON MIMS:  All right.
16       Well, Mr. Klayman, going back to
17  Exhibit 115, first let me ask you this: Do you
18  recall the BCCI case?
19       MR. KLAYMAN:  I recall the BCCI case,
20  but I don't recall the specifics 23 years later.
21       CHAIRPERSON MIMS:  Do you know at all
22  what that case was about generally.

---

50 (Pages 194 to 197)

In The Matter of:  Larry E. Klayman
July 15, 2019

Page 198

1    MR. KLAYMAN:  Oh, yeah, it was about
2  the Bank of Commerce and Credit International.  It
3  was a large racketeering scam that was worldwide.
4  In fact some senators were even drawn into it, Oren
5  Hatch and others.  It was a big piece of
6  litigation.  It was complex.
7    I don't remember what happened there 23
8  years ago.  I'm 68 on Saturday, so maybe my memory
9  is impaired by my age.
10    MS. MIMS:  Well, if you look at the
11  docket entry from Exhibit 115, page two, Bates
12  number page two --
13    MR. KLAYMAN:  Mm-hmm.
14    CHAIRPERSON MIMS:  It says the case was
15  closed on June 17, 2009, the first date on the
16  right-hand column that appears.
17    MR. KLAYMAN:  What page is that on,
18  your Honor?
19    CHAIRPERSON MIMS:  Page two, Exhibit
20  115.
21    Did you work on the case for all of
22  those years?

Page 199

1    MR. KLAYMAN:  I don't believe that I
2  did.
3    CHAIRPERSON MIMS:  How active was the
4  case?
5    MR. KLAYMAN:  Oh it was very active,
6  but I don't remember specifically what occurred
7  with regard to my client in that case.  It's 23
8  years ago.
9  BY MS. PORTER:
10    Q.  I'll make a representation to you based
11  on the docket entries, Mr. Klayman, based on   the
12  --
13    A.  I ask that --
14    Q.  Your client filed a claim --
15    MR. KLAYMAN:  Your Honor, I object to
16  this line of questioning.  She's putting testimony
17  in.
18    CHAIRPERSON MIMS:  She's about to ask a
19  question.  Let the question get on the record.
20  BY MS. PORTER:
21    Q.  You entered an appearance in June of
22  1993 on behalf of the claimant, or I guess two

Page 200

1  people that were claimants, and the court dismissed
2  their claim in August of 1993, according to the
3  docket.
4    That was your involvement in the BCCI
5  case, is representing a claimant?
6    A.  I --
7    Q.  Just so I understand your role in the
8  case, you were representing a claimant in the BCCI
9  liquidation?
10    A.  I don't specifically recollect.
11    Q.  You were not involved in --
12    A.  It's 23 years ago.
13    Q.  You were not involved in a criminal
14  trial involving BCCI?
15    A.  I wasn't involved in a criminal trial
16  there.
17    Q.  With respect to the second case
18  identified in the Pacer records, if you can turn to
19  Bar Exhibit Number 117, and this is a case -- turn
20  to page five, there is an entry, 385, on September
21  1st, 2006, and you were representing a defendant by
22  the name of Margarita Pouchkareva.

Page 201

1    I'm sure I'm mispronouncing it,
2  P-o-u-c-h-k-a-r-e-v-a?
3    A.  Pouchkareva.
4    Q.  Pouchkareva.  Thank you, Mr. Klayman.
5    So you were representing her as a
6  defendant in this case?
7    A.  Yes.
8    Q.  And there were two other lawyers who
9  were assisting in the representation of Craig
10  Gillen?
11    A.  Well, Craig Gillen came down -- if I
12  may explain your Honor, briefly...
13    This was a case that involved a
14  racketeering scheme out of Ft. Lauderdale to bring
15  illegal aliens into the country from Chechnya.  It
16  was a national security case.  There were literally
17  tens if not hundreds of defendants.
18    I represented my client, Ms.
19  Pouchkareva, who was alleged to be the mastermind
20  of this racketeering enterprise, and the government
21  challenged her ability to pay me legal fees.
22  Because in Miami they're very strict.  Legal fees

51 (Pages 198 to 201)

In The Matter of:  Larry E. Klayman
July 15, 2019

Page 202

1  can't be paid if they're the fruit of a criminal
2  activity.  It basically denies people the right to
3  counsel.
4          Craig Gillen, who is one of the top
5  criminal defense lawyers in the United States, and
6  my former classmate at Emory, came down to handle a
7  hearing, handle our hearing, dealing with whether
8  the fees could be paid to me.  And he succeeded in
9  every regard.  That was Gillen's involvement.
10         I signed a -- well, I had my client
11  agree to a cooperation agreement and she provided
12  all kinds of evidence to the government to be able
13  to move against this large criminal enterprise that
14  was bringing in illegal aliens.  We thought they
15  could be terrorists a lot of them.  They were
16  coming in boats and unloading them in Ft.
17  Lauderdale.  And I succeeded in that case.  I got
18  her 13 months, time served.
19         CHAIRPERSON MIMS:  About how many hours
20  did you spend working on that case?
21         MR. KLAYMAN:  Probably 100 to 200
22  hours, somewhere in that range.

Page 203

1  BY MS. PORTER:
2      Q.  And your client pled guilty, so there
3  was no trial?
4      A.  She ultimately pled guilty to time
5  served.
6      Q.  The third case that's listed in Pacer
7  involved a case against Mr. Hernandez.  This is
8  Exhibit Number 118.  And in that case you didn't
9  represent a defendant.  You represented a witness
10  in the case.
11         Is that correct?
12     A.  You know, again, this is a long time
13  ago, so I will testify to the best of my
14  recollection.
15         Yes, I remember that case.  I
16  represented Jose Basulto, who was my client, and
17  Brothers to the Rescue, when I was running Judicial
18  Watch, which I founded.  And Mr. Hernandez was a
19  Cuban spy that was placed in Miami by Castro, and
20  Basulto was a material witness in that case.  And
21  this dealt with the shoot-down of four brothers in
22  a rescue plane by Castro's air force.

Page 204

1          CHAIRPERSON MIMS:  Was this a defendant
2  in the case?
3          MR. KLAYMAN:  No, he was a material
4  witness.  But I was present during the trial and
5  had to play a role because Mr. Basulto, himself,
6  was implicated.
7          They were trying to discredit his
8  testimony and allege that he had testified falsely.
9  So I was present throughout that trial.
10  BY MS. PORTER:
11     Q.  You didn't represent a defendant in the
12  trial?
13     A.  No, I did not.
14     Q.  And your representation in the federal
15  court as far as filing pleadings, those were also
16  filed by the ACLU.  In fact they were the lead
17  counsel in filing the pleadings?
18         CHAIRPERSON MIMS:  I'm sorry, can you
19  repeat that question?
20         MS. PORTER:  Sure.
21  BY MS. PORTER:
22     Q.  In filing pleadings in the case, the

Page 205

1  ACLU took the lead as counsel?
2      A.  I don't remember the role of the ACLU.
3          I'd be very surprised, and I've
4  actually been co-counsel with the ACLU in previous
5  cases that I brought against the National Security
6  Agency that I prevailed.  I got two injunctions.
7          So, I don't mean this in a negative
8  way, but I don't think that Basulto would have
9  allowed the ACLU to represent him.
10         He's a former C.I.A. agent and he's
11  very conservative, so I don't think he would allow
12  the ACLU to represent him.
13     Q.  If you turn to Exhibit 118, page 37.
14  If you want to check the signature page, on 37.
15  Mr. Klayman, it's 37.
16     A.  What exhibit is this?
17     Q.  Thirty-seven.  Page 37 on Exhibit 118.
18     A.  Correct.  Well, the ACLU was not
19  representing Basulto.  I was.  So I'm listed as
20  counsel on the right-hand side for Judicial Watch.
21     Q.  This was a pleading --
22     A.  The ACLU was representing the Cuban

52  (Pages 202 to 205)

In The Matter of:  Larry E. Klayman
July 15, 2019

Page 206

1    spies, not Basulto.
2        Q.  I'm sorry, if you look at the caption
3    of the pleading, which is on page 30, and if you
4    look at the first footnote, it appears, or at least
5    according to the pleading, the ACLU is representing
6    Mr. Basulto.
7        A.  I may be mistaken.  But I was handling
8    the crux of it.  He didn't trust the ACLU.  But
9    it's nice to have somebody involved with political
10   persuasiveness.
11       So I didn't remember.  Again this is
12   going way back.
13       Q.  And there Klayman --
14       A.  Wait, wait.  It's going back 18 years.
15       CHAIRPERSON MIMS:  Mr. Klayman, about
16   how many hours did you spend representing the
17   material witness in that case?
18       MR. KLAYMAN:  At least 100 hours.  It
19   was a very complex case, and you can read about it
20   in Miami.  These were Cuban spice.  I think four of
21   them, if I recollect, had participated in the
22   shoot-down of the Basulto Brothers.

Page 207

1        CHAIRPERSON MIMS:  I understand.  About
2    100 hours?
3        MR. KLAYMAN:  Yes.
4        CHAIRPERSON MIMS:  Thank you.
5    BY MS. PORTER:
6        Q.  And the fourth case, the fourth federal
7    criminal case where we could find that you had some
8    involvement involved Natalia Humm, and if you want
9    to look at the dockets for that, it's 119.
10       A.  Right.
11       Q.  Now, Ms. Humm had entered into a plea
12   agreement before you became her counsel?
13       A.  With a different lawyer.
14       Q.  So you did not have any role in
15   negotiating that plea?
16       A.  No.  And that plea had gone by the way
17   side when Ms. Humm jumped bail and went to Belize
18   before I hired her.  They picked her up in Belize
19   and brought her back to Miami.
20       Q.  And you entered your appearance and
21   then the case was transferred to Orlando?
22       A.  Correct.

Page 208

1        Q.  And once it was transferred to Orlando,
2    she got another lawyer, so you weren't involved in
3    the case any more?
4        A.  That's correct.
5        Q.  So other than entering your appearance,
6    you did not represent Ms. Humm at any trial or
7    hearing?
8        A.  Not at trial or hearing, but I did
9    represent her in arraignment proceedings, in
10   discussions about trying to reinstate the plea
11   agreement.  I was dealing with the U.S. Attorney up
12   in Orlando.  I forgot his name again.  It's a while
13   ago.  And I was involved in a number of different
14   matters trying to resolve this issue.  She had been
15   accused of marrying people that were not here
16   legally to get marriage licenses.
17       I spent a lot of time with her and she
18   had actually been referred to me by Ms.
19   Pouchkareva.  They were both in prison together at
20   the time in Miami.
21       Q.  So the four cases that we've gone over
22   are your cases where you were representing either a

Page 209

1    witness or a defendant in a federal criminal case?
2        A.  That's correct.
3        Q.  I'm going to go back now to the Bundy
4    case.
5        The second petition that you filed with
6    the 9th Circuit was denied without argument.
7        Is that correct?
8        A.  That's correct.
9        Q.  And you sought en banc review?
10       A.  Can you show me where?
11       Q.  Sure.
12       A.  There's 125 exhibits.
13       Q.  Eighty.
14       A.  Eighty?
15       Q.  Yes.  Is that the petition for
16   rehearing en banc that you filed in connection with
17   the second petition of the 9th Circuit?
18       A.  I don't know if it was the second
19   petition, but it is a document that I filed and
20   maybe one of the documents where attachments or
21   exhibits were not included.
22       As I said, I requested that you

53 (Pages 206 to 209)

In The Matter of:  Larry E. Klayman
July 15, 2019

| Page 210 | Page 212 |
|---|---|
| 1  supplement your pleadings with the attachments. | 1  Q.  If you turn to the -- |
| 2  Q.  Did you familiarize yourself with the | 2  MR. KLAYMAN:  I object to the exhibit |
| 3  9th Circuit rules about rehearing en banc before | 3  on that basis. |
| 4  filing this? | 4  BY MS. PORTER: |
| 5  A.  I don't remember whether I did or I | 5  Q.  If you turn to 87, Mr. Klayman, that's |
| 6  didn't, but I thought that I had a right to ask for | 6  your motion that denies the motion to correct the |
| 7  a hearing en banc. | 7  record? |
| 8  Q.  And this petition for a rehearing en | 8  A.  Correct. |
| 9  banc was also denied. | 9  Q.  And after that you filed another |
| 10  Is that correct? | 10  petition with the supreme court? |
| 11  A.  Correct. | 11  A.  Correct.  There were changing |
| 12  And one reason was I could never change | 12  circumstances throughout, and I was doing my best |
| 13  the panel.  I had requested that we change the | 13  to try to get full representation for my client, |
| 14  panel.  And it was the same people ruling over and | 14  Cliven Bundy, who was zealously within the bounds |
| 15  over again, and each time Judge Gould would support | 15  of the law. |
| 16  my position and the other judges would simply deny | 16  By the way, I've never been sanctioned |
| 17  it. | 17  by the 9th Circuit for the supreme court |
| 18  Q.  And after your second petition and the | 18  filings that I made. |
| 19  request for rehearing en banc was denied, you filed | 19  Q.  Let me ask you about that. |
| 20  a motion to correct the record, which is 86? | 20  You said that there were changing |
| 21  A.  I don't know if it was immediately | 21  circumstances.  Now when you filed your second |
| 22  after that or not, but it may have been. | 22  petition with the supreme court -- I believe that's |

| Page 211 | Page 213 |
|---|---|
| 1  Q.  Well, do you have any reason to doubt | 1  Exhibit Number 90, and that was filed on July 21st, |
| 2  that you filed it on May 18th, 2017? | 2  2017? |
| 3  A.  No, I have no reason to doubt that. | 3  MR. KLAYMAN:  Again, your Honor, I |
| 4  Q.  Ok. | 4  object to this exhibit because it's not complete. |
| 5  A.  I just don't know the sequence, sitting | 5  Ms. Porter and ODC did not include the |
| 6  here. | 6  appendix, the exhibits.  So it's not a complete |
| 7  Q.  And that motion to correct the record | 7  exhibit.  I ask that she correct that. |
| 8  was also denied by the 9th Circuit? | 8  CHAIRPERSON MIMS:  Objection overruled. |
| 9  A.  It was denied by Judges Bybee and | 9  BY MS. PORTER: |
| 10  Fletcher, but again Judge Gould, I don't know | 10  Q.  Can you confirm, Mr. Klayman, that you |
| 11  whether it manifested itself in an order or not, | 11  filed the second petition with the supreme court on |
| 12  but I know that he disagreed -- | 12  July 21st, 2017? |
| 13  Q.  Well, if you read -- | 13  A.  I did. |
| 14  A.  Could I finish the sentence. | 14  Q.  Ok.  And you referred to changing |
| 15  I know that he disagreed with the | 15  circumstances.  You will recall that the basis |
| 16  reasoning of his colleagues. | 16  for -- the one basis for Judge Navarro denying your |
| 17  Q.  Can you turn to 87. | 17  pro hac vice motion is because you had an |
| 18  MR. KLAYMAN:  By the way, your Honor, | 18  outstanding disciplinary matter in the District of |
| 19  excuse me, there are exhibits in here and I would | 19  Columbia? |
| 20  ask that you attach the exhibits to make this | 20  A.  That was the basis.  That wasn't one |
| 21  complete. | 21  basis.  That was the basis. |
| 22  BY MS. PORTER: | 22  Q.  And by the time you filed the second |

54 (Pages 210 to 213)

In The Matter of:  Larry E. Klayman
July 15, 2019

Page 214

1  petition with the supreme court, the hearing
2  committee had issued its report in that first
3  matter.
4          If you want to refer to Exhibit Number
5  16.
6          MR. KLAYMAN:  Objection, asked and
7  answered.
8  BY MS. PORTER:
9      Q.  I don't think I've ever referred you to
10  Exhibit Number 16.  It's the June 2017 report and
11  recommendation of the hearing committee in the
12  contested case.
13          You can look at it.  It's 16.
14          MR. KLAYMAN:  Objection also on
15  relevancy, your Honor, because it's not a final
16  decision.  It's only a recommendation.
17          CHAIRPERSON MIMS:  I'm going to
18  overrule the objection.
19          MR. KLAYMAN:  If indeed it is what Ms.
20  Porter says it is.
21  BY MS. PORTER:
22      Q.  Well, that's why I'm going to have you

Page 215

1  look at it.  I don't want you to accept anything I
2  say.
3          So you were aware of the hearing
4  committee's decision of June 19th, 2017, on or
5  about the date that it was issued, Mr. Klayman?
6      A.  Let me see when it was issued.
7          Yes, on or about -- it wasn't a
8  decision.  It was a recommendation.
9      Q.  Thank you.  The report and
10  recommendation of the hearing committee that was
11  issued on June 19th, 2017, you were aware of that
12  report and recommendation on or about June 19th,
13  2017?
14      A.  Yes.
15      Q.  And that was approximately a month or a
16  month before you filed your petition with the
17  supreme court?
18      A.  Well, the dates speak for themselves.
19      Q.  Ok, and you talked about changing
20  circumstances.
21          Am I correct that you never notified
22  the supreme court of what had happened before the

Page 216

1  hearing committee, it's report and recommendation?
2      A.  I wasn't obligated to.  It wasn't a
3  final decision.  In fact it's of no force and
4  effect until it goes through the process in the DC
5  Bar.
6          And in fact to this day, there is no
7  final decision, as of today.  And we're talking
8  over two years later.
9      Q.  After the supreme court denied your
10  second petition, you went back and filed a third
11  petition with the 9th Circuit, which is Exhibit
12  Number 95?
13      A.  Yes.
14          I don't remember.  You know, how many
15  at this point, but, yes, I filed a petition on
16  October 2nd, 2017.
17      Q.  And this again was based on what you
18  would call changed circumstances?
19      A.  Well, yes.
20          Mr. Whipple had been -- he attempted to
21  have been fired by Mr. Bundy.  So Mr. Bundy had no
22  legal representation.

Page 217

1      Q.  Well, let me get to that -- I'll ask
2  you a few questions about that.
3          With respect to this third petition
4  that you filed with the 9th Circuit, you again did
5  not alert the 9th Circuit to the hearing
6  committee's report and recommendation?
7      A.  I wasn't required to, and in fact Judge
8  Gould made reference to the fact that I needed to
9  respond to the questions that were asked in my pro
10  hac vice application, and again to this day, over
11  two years later -- or almost two years later, we
12  still don't have a final decision which is binding
13  by the District of Columbia Bar and the court which
14  oversees it.
15      Q.  Which respect to Judge Gould's
16  findings, am I correct that all of Judge Gould's
17  findings are set fourth in written decisions?
18      A.  Well, yes, they would be in his written
19  decisions.  I have asked to have them testify.  You
20  opposed that.  But they are in written decisions.
21      Q.  So anything that Judge Gould has to say
22  about your pro hac vice motion and whether or not

55  (Pages 214 to 217)

In The Matter of:  Larry E. Klayman
July 15, 2019

| Page 218 | Page 220 |
|---|---|

**Page 218**

1   it was truthful or not truthful are in his written
2   decisions?
3       A.   That speaks for itself, obviously,
4   because he couldn't testify.  That's the record
5   that we currently have.
6       Q.   With respect to Mr. Bundy firing -- if
7   that's the term you used -- Mr. Whipple, you were
8   aware when you filed this third petition on October
9   2nd, 2017, that the court had denied Mr. Bundy's
10  request to appear or proceed pro se?
11      A.   What day was the hearing?  I have the
12  transcript as the supplemental exhibit.  If you can
13  show it to me that would be great.
14      Q.   Sure.  Well, actually I can refer you
15  to the docket.  The docket is Bar Exhibit Number
16  20.
17      A.   I'd like to see the transcript, because
18  sometimes errors are made on dockets.
19      Q.   I think it's your exhibit.  It's a new
20  exhibit that you offered for the first time this
21  morning?
22      A.   I don't believe I offered the docket.

**Page 219**

1       Q.   Pardon me?  You didn't offer the
2   docket.  I offered the docket.
3       A.   Right, I offered the transcript.  If
4   you can show me the transcript.
5       Q.   Well, it's your exhibit.  I don't know
6   where it is.
7       MR. KLAYMAN:  My associate is here to
8   help me.  Thank you.
9       (Copies of Respondent's Exhibit 28 were
10  distributed to the parties and the hearing
11  committee.)
12  BY MS. PORTER:
13      Q.   So the transcript indicates that the
14  hearing was September 27th --
15      CHAIRPERSON MIMS:  Which exhibit is
16  this, please?
17      MS. PORTER:  It's Respondent's exhibit,
18  I believe, and I think he's marked this as 28.
19      CHAIRPERSON MIMS:  Twenty-eight.
20  BY MS. PORTER:
21      Q.   Is that correct, Mr. Klayman?
22      A.   That's correct.

**Page 220**

1       Q.   So the hearing on Mr. Bundy's motion
2   was September 27th, 2017?
3       A.   That's correct.
4       Q.   And that was approximately a week
5   before you filed your third petition with the 9th
6   Circuit?
7       A.   That's correct.
8       Q.   And you were aware of the outcome of
9   that hearing on September 27th?
10      A.   Yes.  I was aware that the magistrate
11  had made a recommendation, but again the
12  magistrate's recommendation is just that; it's not
13  the final decision.
14      So I was aware of that.  But I don't
15  think I was -- I may not have been aware of it at
16  that time.  I may have learned of it after the 2nd
17  of October, because I was not in communication, I
18  don't believe, as far as my recollection, with Mr.
19  Whipple at that time.
20      CHAIRPERSON MIMS:  This hearing is for
21  what again, to determine what?
22      MS. PORTER:  Mr. Bundy apparently tried

**Page 221**

1   to -- well, he asked permission to represent
2   himself.  He fired Mr. Whipple, according to Mr.
3   Klayman, and wanted to represent himself.  I
4   believe the September 27th, 2017 transcript is a
5   Faretta hearing where the magistrate judge
6   questioned Mr. Bundy about whether or not it was
7   wise for him to represent himself.
8   BY MS. PORTER:
9       Q.   You understood that Mr. Bundy --
10      Just let me ask you the question, Mr.
11  Klayman.
12      You understood that Mr. Bundy wasn't
13  asking the court to have you as counsel but he was
14  asking to represent himself?
15      A.   At that hearing -- because I learned
16  subsequently from the transcript.  I'm not sure if
17  I had the transcript on October 2nd when this was
18  filed.  I probably didn't.  It would have taken a
19  while to transcribe it.
20      And you just -- you know, I want to
21  correct something on the record.  It's not that I
22  maintained that Mr. Whipple was fired.  Mr. Bundy

In The Matter of:  Larry E. Klayman
July 15, 2019

Page 222

1  fired Mr. Whipple and that is in fact in the
2  transcript, ok.
3      Q.  Mr. Klayman, just to refresh your
4  memory, you actually refer to the docket in your
5  third petition to the 9th Circuit, which is Exhibit
6  Number 95.  On page eight and nine you quote from
7  the transcript.
8          So isn't it a fact that you actually
9  had the transcript?
10     A.  That may be.  Yeah, if I did, then I
11 did.  But I don't remember.
12         Again you're referring to a lot of
13 documents, so I don't refute that.
14         Wait a second.
15     Q.  And you --
16     A.  Please, wait.  If I may have an
17 opportunity to look at it.  If I may have an
18 opportunity to look at it, please.
19         CHAIRPERSON MIMS:  After this line of
20 questioning it seems like it might be a good time
21 to take a quick break.
22         MS. PORTER:  And I'm almost done, but

Page 223

1  that's fine.  A break would be helpful.
2          (Witness peruses document.)
3          MR. KLAYMAN:  I don't see any reference
4  to my having the transcript here.  I may be
5  mistaken.
6  BY MS. PORTER:
7      Q.  I think you're quoting from it, Mr.
8  Klayman, on pages eight and nine of your petition.
9      A.  That's what I'm looking for.  I didn't
10 concede that I didn't.  I said I'm looking.
11     Q.  On the Bates numbers, so you're on the
12 same page, 95-008, you appear to be quoting from
13 the transcript or the hearing on September 27,
14 2017.
15     A.  Where is that?
16     Q.  Well, it begins -- the very first line
17 of that page is September 27th, 2017, "At the
18 hearing Mr. Whipple openly admitted that he was
19 not" -- and then you appear to quote from the
20 transcript of the September 27th --
21     A.  How do I appear to quote from the
22 transcript?  I don't see that.

Page 224

1      Q.  Well, you say "transcript," 13:8,
2  13:24.  If you want to check your exhibit.
3      A.  Where is that?
4      Q.  It's on page eight of Exhibit Number
5  95.
6      A.  It may be missing.  But I don't see
7  where it says "transcript".
8      Q.  Are you looking at the Bates numbers,
9  Mr. Klayman on the bottom right-hand corner of the
10 exhibit.
11     A.  Are you talking about 95?
12
13     Q.  95-008.
14     A.  Ok.  I'm just trying to confirm what I
15 said.
16     Q.  I understand.
17     A.  Yes, it would appear I had the
18 transcript.  That refreshes my recollection.
19     Q.  And you were aware of the ruling after
20 the Faretta hearing where the magistrate judge
21 denied Mr. Bundy's request to proceed pro se?
22     A.  That was a recommendation.  It was not

Page 225

1  a binding ruling.
2      Q.  Did you keep abreast of what was going
3  on in Mr. Bundy's criminal case, not only at the
4  hearing but shortly after that hearing?
5      A.  As best I could, given the fact that I
6  was not counsel, yes.
7      Q.  Yes.  So you were aware, then, that Mr.
8  Whipple filed a series of motions beginning on
9  September 28th, 2017, on behalf of Mr. Bundy?
10     A.  Right now I'm not refuting what you're
11 saying, but I don't know.  I don't recollect right
12 now, right off the top of my head.
13     Q.  You have no reason to doubt the
14 accuracy of the court's docket sheet reflecting a
15 number of motions that Mr. --
16     A.  It may be that he did, but the issue
17 here is that Mr. Bundy wanted a different counsel
18 than Mr. Whipple.
19         If you look at this transcript
20 testimony, Mr. Whipple admits that he's not
21 prepared to go to trial.  He admits that he -- Mr.
22 Bundy says he only met with Whipple a couple of

57 (Pages 222 to 225)

In The Matter of:  Larry E. Klayman
July 15, 2019

Page 226

1  times the entire case over the years and that he
2  wasn't show hardly any of the discovery, which was
3  voluminous, by Mr. Whipple.
4         Plus, I know from talking to Cliven
5  Bundy that Mr. Whipple was not putting fourth
6  defenses Cliven wanted to bring up to the court
7  with regard to jurisdiction.  And at some point
8  Cliven said, "The heck with it.  I'll represent
9  myself pro se."
10        Then when the magistrate asked him if
11  he'll obey all orders of Judge Navarro, Cliven
12  said, "Well, I don't know what they are, so I can't
13  tell you whether or not I will do that or not."
14        And then the judge said, "Ok, well
15  you're not representing yourself."
16        Cliven wanted Mr. Whipple off the case.
17  He didn't trust him.  He wasn't doing his job.  And
18  I don't know what he filed specifically or after
19  all this time.  But whatever he filed Cliven I'm
20  sure did not subscribe to it.
21        MS. PORTER:  Did you want to take a
22  break now?

Page 227

1         CHAIRPERSON MIMS:  I think now is a
2  good time to take a break.
3         MR. KLAYMAN:  How much longer will your
4  testimony be -- I'm sorry, not testimony.
5         CHAIRPERSON MIMS:  Well, with you, Mr.
6  Klayman, it depends on the answer, but not very
7  long.
8         CHAIRPERSON MIMS:  We will resume in 15
9  minutes, at 2:55, just before then.
10        (Recess taken.)
11        CHAIRPERSON MIMS:  Back on the record
12  at 2:54 p.m.  Bar Counsel will continue her
13  questioning of Respondent.
14  BY MS. PORTER:
15    Q.  Mr. Klayman, in connection with your
16  third petition to the 9th Circuit, which I believe
17  is 95, you also filed a complaint, the judicial
18  complaint against Judge Bybee?
19    A.  Correct.
20    Q.  And if you look at 97, that's your
21  motion to seal where you attached your complaint?
22    A.  Correct.

Page 228

1    Q.  You had also sought to have Judge Bybee
2  removed from the panel of the 9th Circuit in
3  connection with your second petition?
4    A.  I asked for a new panel.
5    Q.  I'm going to come back to some of the
6  statements about Judge Bybee, but I'd kind of like
7  to just finish up the rest of the pleadings that
8  you filed in connection with your pro hac vice
9  application.
10        The 9th Circuit denied your third
11  petition?  That is 95.
12    A.  Can you show me the order?
13    Q.  Well, there's one order at 98, but the
14  document sheets have been included for all of them.
15  So 94 is the docket sheet if you want to look at
16  that.
17    A.  No, I'd like to see the actual order,
18  please.  I don't go by docket sheets.  Sometimes
19  they're wrong.
20    Q.  Well, if you look at the order which is
21  98.
22    A.  Yes, well that's dealing with the whole

Page 229

1  issue of sealing the judicial panel complaint.
2    Q.  And in fact your motion for emergency
3  petition for a writ of mandamus was denied on
4  October 4th, according to the docket sheet of 2017?
5    A.  Again, I can't -- I don't go by the
6  accuracy of docket sheets.  I'd like to see the
7  actual order, please.
8    Q.  Ok, 96.
9    A.  Yes, I see that, and it says "Judge
10  Gould respectfully dissents and grants the writ of
11  mandamus giving Cliven Bundy his lawyer of choice."
12    Q.  After the court denies your third
13  petition -- the 9th Circuit denied your petition,
14  Mr. Bundy directed Mr. Whipple to file another
15  motion for reconsideration of your application to
16  appear pro hac vice?  Forty-one, if you want to
17  look at it.
18    A.  Where is that?
19    Q.  Forty-one.
20        CHAIRPERSON MIMS:  While he's looking
21  for 41, for Exhibit 96 --
22        MS. PORTER:  Mm-hmm.

58 (Pages 226 to 229)

In The Matter of:  Larry E. Klayman
July 15, 2019

Page 230

1    CHAIRPERSON MIMS:  Did Judge Gould file
2 an opinion with that or there's just that line?
3    MS. PORTER:  There's just that one
4 page.
5    MR. KLAYMAN:  There is -- your Honor --
6 and we can go over to my testimony.  There is a
7 second opinion by Judge Gould, when I asked that
8 the proceeding be mooted out because the case had
9 been over, and he wrote another opinion in that
10 regard.
11 BY MS. PORTER:
12    Q.  That's included in Disciplinary
13 Counsel's exhibits.  We'll get to it.
14    So my question to you, Mr. Klayman, if
15 you recall, is after the 9th Circuit denied your
16 third petition, Mr. Bundy directed Mr. Whipple to
17 file another motion for reconsideration for -- or a
18 motion for reconsideration of your application to
19 appear pro hac vice?
20    A.  That's Exhibit 41?
21    Q.  Yes.  And am I correct that you
22 prepared the affidavit for Mr. Bundy to sign in

Page 231

1 connection with that --
2    A.  Wait, wait.  Let me get to the exhibit,
3 please.
4    Q.  I'm sorry.
5    (Brief pause.)
6    Q.  Are you waiting for the question, Mr.
7 Klayman?
8    A.  No, I'm just reading.
9    Q.  Ok.
10    (Witness peruses documents.)
11    A.  Yes, I see it.  It's in terms of what
12 Mr. Bundy attests to at 41 --
13 BY MS. PORTER:
14    Q.  Let me ask a question, first.  I didn't
15 want you to just --
16    A.  Well, the question was incorrect.  I'm
17 trying to put it in a proper perspective.
18    This is not an affidavit.  It's a
19 motion for reconsideration which Mr. Bundy then
20 attested to as true and correct under penalty of
21 perjury.
22    CHAIRPERSON MIMS:  Has there been a

Page 232

1 question yet?
2 BY MS. PORTER:
3    Q.  And you prepared this motion for Mr.
4 Bundy to sign?
5    A.  I prepared it in conjunction with Mr.
6 Whipple to sign after Mr. Bundy instructed Mr.
7 Whipple to move for reconsideration.
8    As you see it was filed by Bret
9 Whipple, and we both concurred with it.  But that
10 was after Whipple, as I testified earlier, didn't
11 want to resubmit it.  So I went to back to Cliven,
12 and I said "Cliven, what do you think?  Can you
13 please instruct Mr. Whipple if you think you should
14 have me as your lawyer to file for
15 reconsideration."
16    Q.  You did not provide any verified
17 statement to the court in connection with this
18 motion.
19    Is that correct?
20    A.  What do you mean by "verified
21 statement"?
22    Q.  Well, for instance when you sought pro

Page 233

1 hac vice admission you filed a verified
2 application.
3    My question is, there was no affidavit,
4 verified application that you submitted under your
5 own name in connection with this motion?
6    A.  Well, this motion was filed by Mr.
7 Whipple and it was asking for reconsideration of
8 the pro hac vice applications that have been filed.
9 And that was the basis for it.
10    I didn't submit.  It wasn't submitted
11 on my behalf, a new application, if that's what
12 you're asking.
13    Q.  My question is you did not submit
14 anything under your own name in connection with
15 this motion?
16    A.  I never submitted anything under my own
17 name.  That was submitted by Mr. Hansen.
18    Q.  So the answer to my question is, you
19 did not submit anything under your own name in
20 connection with this motion?
21    A.  I couldn't because I wasn't counsel of
22 record.  I had to go through Mr. Whipple.  So did

In The Matter of:  Larry E. Klayman
July 15, 2019

|  | Page 234 |
|---|---|

1  Mr. Bundy.  I couldn't file anything because I
2  wasn't counsel of record.  I was kept out.  I was
3  never -- I was not allowed pro hac vice entry.  I
4  was asking that it be reconsidered, because Mr.
5  Bundy wanted it to be reconsidered.
6      Q.  You knew, Mr. Klayman, that on December
7  20th, 2018, the court declared a mistrial, Judge
8  Navarro declared a mistrial?
9      A.  Sounds about right.
10         I mean, if you can show me the date,
11  that sounds about right.
12      Q.  If you look at the docket sheet, docket
13  number 20, page 100.
14         CHAIRPERSON MIMS:  What exhibit is that
15  again?
16         MS. PORTER:  The docket sheet is 200 --
17  excuse me, 20, and page 100.
18         MR. KLAYMAN:  And what exhibit is that?
19         MS. PORTER:  Twenty.
20         CHAIRPERSON MIMS:  And what is the
21  docket number we're looking at again?
22         MS. PORTER:  The docket number for the

|  | Page 235 |
|---|---|

1  mistrial is on December 20th and it's 3041, Exhibit
2  16.
3         CHAIRPERSON MIMS:  I believe, Ms.
4  Porter, you said on the record 12/20/2018.
5         MS. PORTER:  I did.  I apologize.
6  You're correct.
7         CHAIRPERSON MIMS:  I was very confused
8  about that when you said it.
9         MS. PORTER:  Yeah, I can understand the
10  confusion.  That was a year off.
11  BY MS. PORTER:
12      Q.  I'm sorry, Mr. Klayman.  The question
13  is December 20th, 2017, not too long after you
14  filed -- or Mr. Bundy with Mr. Whipple's assistance
15  filed a motion, the court declared a mistrial on
16  December 20th, 2017.
17         Is that correct?  Were you aware of
18  that at the time?
19      A.  Wait a second.  Yes, I see on December
20  20th, 2017.
21      Q.  And you were aware of that ruling?
22      A.  Yes.

|  | Page 236 |
|---|---|

1      Q.  At around the time?
2      A.  Yes.
3      Q.  And on January 8th, 2018, a couple
4  weeks later, the court dismissed the superseding
5  indictments against Mr. Bundy, Cliven Bundy, with
6  prejudice?
7      A.  What entry is that?
8      Q.  It's entry number 3116 and 3117 on
9  pages 103 and 104?
10      A.  Yes, I see that on 3116, on January
11  8th, 2018, and a judgment of dismissal on the same
12  date.
13      Q.  And you were aware of those orders and
14  the judgment of dismissal on or about January 8th,
15  2018?
16      A.  Yes.  I was in the courtroom that day.
17      Q.  And at the time that the court
18  dismissed -- Judge Navarro dismissed the
19  indictment, or superseding indictment, Mr. Whipple
20  was acting as Mr. Bundy's counsel?
21      A.  That's correct, because he had not been
22  let out.

|  | Page 237 |
|---|---|

1         Let me add something else here, which I
2  think is important.
3         I see on 12/20/2017, there's a motion
4  for review of magistrate's order, reappointment of
5  counsel, filed by Cliven Bundy and Bret Whipple.
6  You see that the magistrate's recommendation was
7  not in effect the date that you tried to imply that
8  it was, and then on the same day, as the mistrial
9  was declared, Mr. Bundy was seeking to represent
10  himself.
11      Q.  Correct.  You were never representing
12  Mr. Bundy in his criminal case?
13      A.  That goes without saying.  That's what
14  I've been trying to do throughout.
15      Q.  All right.
16      A.  Hopefully it doesn't have to happen
17  again if the dismissal is reversed on appeal.
18      Q.  And Mr. Klayman, after the court
19  dismissed the superseding indictment with
20  prejudice, you filed a fourth petition with the 9th
21  Circuit?  100, Exhibit 100.
22      A.  Yes, and what that's about, when you

In The Matter of:  Larry E. Klayman
July 15, 2019

Page 238

1  look at it --
2      Q.  You don't need to explain it, I --
3      A.  I would like just a short explanation.
4          CHAIRPERSON MIMS:  You can explain it
5  on your cross-examination.
6          MR. KLAYMAN:  Ok.
7          CHAIRPERSON MIMS:  Since there's no
8  question pending.  Let's just turn to the exhibit.
9  BY MS. PORTER:
10     Q.  And you amended that petition on
11  February 7th, 2018, and that is Exhibit Number 101?
12     A.  What date?
13     Q.  February 7th, 2018.
14     A.  I see an amended petition on February
15  26th.  Is that 101?
16     Q.  Yes, February 7th is the date -- well,
17  I'm sorry, February 7th is the date it was filed
18  with the federal court, according to the Pacer
19  legend.
20     A.  All right.  It may have been a day off.
21  Maybe it was filed a day later.
22     Q.  And the court denied that in a decision

Page 239

1  issued on April 28th, 2018, which is Exhibit Number
2  105, which includes Judge Gould's dissent?
3      A.  Correct.
4      Q.  And you filed another petition, a third
5  petition with the supreme court, which is Exhibit
6  Number 107, in July of 2018?
7      A.  On my birthday, is July 20, '18.
8  Correct.
9          CHAIRPERSON MIMS:  Ms. Porter, I'm
10  sorry, is this the fifth petition for writ?
11         MS. PORTER:  Well, this is with the
12  supreme court.  There were five petitions, which
13  don't count the petitions for rehearing and the
14  motions to correct the 9th Circuit.  But there were
15  three petitions filed with the supreme court, and
16  this is the third petition filed with the supreme
17  court, 107.
18         CHAIRPERSON MIMS:  And Exhibit 100 was
19  what?
20         MS. PORTER:  That was the fourth
21  petition to the 9th Circuit.
22         CHAIRPERSON MIMS:  Thank you.

Page 240

1  BY MS. PORTER:
2      Q.  So you filed a third petition with the
3  supreme court on July 20th, 2018, Mr. Klayman?
4      A.  Correct.
5      Q.  And that was denied the first Monday of
6  October, by the supreme court?
7      A.  Where does it reflect that?
8      Q.  One o six is the docket sheet.
9      A.  Yes, they didn't take it up.  The
10  supreme court takes very few things up.  It's their
11  discretion.
12     Q.  And then you went back to the 5th
13  Circuit and filed a fifth petition --
14     A.  The 5th Circuit?
15     Q.  Sorry, the 9th Circuit, the fifth
16  petition with the 9th Circuit, and that is 109?
17     A.  I don't know what number it was, but
18  this was a petition filed on October 19th, 2018.
19     Q.  And --
20     A.  May I just look at it, please?
21     Q.  Yes, you may.
22         (Witness peruses document.)

Page 241

1      A.  Ok.
2      Q.  And you filed that petition after you
3  had been served with the disciplinary charges in
4  that case?
5      A.  Yes, and after another judge had relied
6  upon what had been done by the 9th Circuit by Judge
7  Bybee in denying me pro hac vice admission there.
8          So this was prejudicing the rights of
9  my other client.  This was prejudicing my rights.  I
10  was being subject to disciplinary proceeding.
11         My former group, Judicial Watch, wanted
12  to be vindictive, Mr. Fitton, sent this to the Bar
13  and asked them to start a complaint against me.
14  He's not a lawyer.
15         CHAIRPERSON MIMS:  I'm sorry, can you
16  repeat the question.
17         MS. PORTER:  The question is has he
18  filed this fifth petition with the 9th Circuit
19  after disciplinary charges had been filed by him.
20         MR. KLAYMAN:  That's right, because I
21  wanted it known by the 9th Circuit that the damages
22  that had been caused to me by misstatements that

61 (Pages 238 to 241)

In The Matter of:  Larry E. Klayman
July 15, 2019

Page 242

1  were made in prior orders.
2  BY MS. PORTER:
3      Q.   And the 9th Circuit denied your fifth
4  petition?
5      A.   With the dissent from Judge Gould that
6  said that the matter should be vacated as moot,
7  that the order should be removed, the 9th Circuit
8  orders because it was moot.
9      Q.   And the decision is Exhibit Number 112?
10     A.   Correct.
11     Q.   Is that correct?
12     A.   Correct.
13     Q.   Now going back to Judge Bybee and your
14  allegations against Judge Bybee, I think you had
15  testified earlier that you first sought to remove
16  Judge Bybee or have a new panel in connection with
17  your second petition?
18     A.   At this point there's so many
19  references I don't know if it was the second or
20  third.
21         But, yes, I wanted to have a new panel.
22  I wanted to have an unbiased panel.

Page 243

1      Q.   Well, let me have you go back to that
2  second petition, which is Exhibit Number 73, and
3  I'm going to refer you specifically, Mr. Klayman,
4  to pages 27 and 28.  Those are the Bates numbers,
5  not the page numbers on the petition, but the Bates
6  numbers.
7         Am I correct that one of the reasons
8  that you sought a new panel -- or the reason that
9  you sought a new panel is because you contended
10  Judge Bybee demonstrated an unusual lack of
11  appreciation and sensitivity and was not concerned
12  for the Constitutional rights of criminal
13  defendants?
14     A.   It was among other reasons.
15     Q.   And I think you cited to I guess the
16  examples that you contend supported your
17  contention.  One was his dissent in the Nordstrom
18  case, which was written in 2014.
19     A.   Where is that?
20     Q.   On page 73-028.
21     A.   Correct.  He wrote an opinion that said
22  it was okay for prison officials to open the mail

Page 244

1  from lawyers to their clients and read it.
2      Q.   And the other basis for your claim was
3  the memo that he wrote, Judge Bybee wrote -- he's
4  not a judge, but when he was in the Bush
5  administration with the Department of Justice?
6      A.   Among other reasons.  That was of
7  course dealing with waterboarding and other forms
8  of torture, which he approved of.
9      Q.   Both of these incidents preceded your
10  initial pro hac vice motion by at least two years?
11     A.   Well, the Nordstrom was two years
12  prior, approximately.
13     Q.   And neither of these --
14     A.   I don't know about the other one.
15     Q.   Neither of these examples where Judge
16  Bybee's alleged lack of appreciation and
17  sensitivity were at issue until after Judge Bybee
18  filed his majority decision denying your initial
19  petition with the 9th Circuit?
20     A.   I wasn't aware of it.
21         I went back and researched it.  Judge
22  Bybee, I assumed he would be fair and neutral when

Page 245

1  I read his order.  I realized he wasn't.  I went
2  back and did some research and it turns out he
3  doesn't have much respect for the 6th Amendment in
4  any respect.
5      Q.   And you also contended that Judge Bybee
6  had a conflict of interest, after he denied your
7  first petition?
8      A.   Show me that.
9      Q.   Exhibit 88, pages six --
10     A.   Exhibit 80?
11     Q.   Eighty-eight.
12     A.   Eight-eight.
13     Q.   Eighty-eight.
14         Am I correct, Mr. Klayman, that the
15  conflict of interest that you allege was based on
16  your complaints about Judge Bybee and his alleged
17  biases and partiality and misconduct?
18     A.   The document speaks for itself.
19     Q.   In your fourth petition to the 9th
20  Circuit, which I think you have identified in this
21  part of Exhibit 100 --
22     A.   Where is my fourth petition?

62  (Pages 242 to 245)

In The Matter of:  Larry E. Klayman
July 15, 2019

Page 246

1    Q.  Yes.
2    A.  Where is it?
3    Q.  Exhibit Number 100.
4        You accuse Judge Bybee of having
5    extrajudicial bias and prejudice, among other
6    things.
7        Is that correct?
8    A.  Show me where that is.
9    Q.  Page 11, 100-011.
10   A.  100-011?
11   Q.  Yes.
12   A.  I said "This can only be explained by
13   the appearance of Judge Bybee's extrajudicial bias
14   and prejudice stemming from personal relationships,
15   friendships, associations with Judge Navarro and
16   Senator Reid which Mr. Klayman has now recently
17   discovered in the final days of Cliven Bundy's
18   trial."
19       Like I said, I went back and I just saw
20   that.
21   Q.  And I guess one of the things that you,
22   quote unquote, "recently discovered" was that Judge

Page 247

1    Bybee had "aggressively grilled" you in the first
2    argument, if you look at page 100-012.
3    A.  Yes.
4    Q.  You were present at that argument in
5    October, 2016, were you not, Mr. Klayman?
6    A.  I was.  And it was not just Judge Bybee
7    but Judge Fletcher who also aggressively questioned
8    me.
9    Q.  There is nothing about Judge Fletcher,
10   however, in your fourth petition to the 9th
11   Circuit, is there?
12   A.  Correct.  He didn't handle majority
13   opinions.
14       And Bybee, because of his close
15   association with Senator Reid who recommended him
16   to the bench, who called Cliven Bundy a "domestic
17   terrorist," said he should be locked up for life,
18   said because he came from the Las Vegas community,
19   which was very close-knit community, because of the
20   things he said in his orders, which were so over
21   the top and not even relevant, he was relitigating
22   what Judge Navarro had already ruled on.  He wasn't

Page 248

1    even sticking to what Navarro had ruled.
2        I put it all together and said yes,
3    there is an appearance of extrajudicial bias and
4    prejudice.
5        We did make one mistake, and Mr. Peer,
6    Oliver, my associate there, corrected it.  Oliver
7    had done some research and we thought that his wife
8    had some relationship to sitting on a gaming
9    commission with Judge Bybee.
10   Q.  What did you do with that research that
11   you claim you had about Shannon Bybee?
12   A.  What do you mean "What did you do?"
13   Q.  You said that you had research.  What
14   happened?
15   A.  Well, Mr. Peer will take the stand and
16   he will explain what he did on that.
17       But we thought -- here's where it came
18   from, ok.  I had been told by someone named Shauna
19   Cox, who was trying to help the Bundys in court,
20   that there was this relationship, and therefore, we
21   looked -- I asked Mr. Peer to go out and look at
22   the, you know, Internet and whatever he could find,

Page 249

1    and we thought that Shannon Bybee was related to
2    Judge Bybee.  But we corrected that when we found
3    out that was not the case.
4        But there still are these very close
5    relationships in the Las Vegas community with --
6    Judge Bybee had taught at Las Vegas Law School,
7    University of Las Vegas, Nevada, with Harry Reid.
8        When Judge Bybee was -- he was under a
9    lot of fire for the memo that he wrote on
10   waterboarding, that it was a big push to have him
11   removed from the bench by the Justice Department.
12       Harry Reid, a democrat, came to the
13   defense of Judge Bybee, a republican, and Harry
14   Reid had actually nominated Judge Bybee for the
15   bench.  So there are all these interrelationships.
16       What concerned me from the outset is
17   Harry Reid, who was the most powerful senator at
18   one time -- who is now retired -- he was majority
19   leader and then he was minority leader, was
20   actually locally advocating that my client was a
21   domestic terrorist and should be put away for life,
22   and yet Judge Bybee owed his judgeship Senator

63  (Pages 246 to 249)

In The Matter of: Larry E. Klayman
July 15, 2019

Page 250

1  Reid.
2      So that creates an appearance of
3  extrajudicial bias and prejudice --
4      Q.  And if --
5      A.  Let me finish.
6      If judges are to recuse themselves or
7  get off the case, even if there is an appearance
8  under 28 U.S.C. 455 or 28 U.S.C 144, which are the
9  recusal and disqualification statutes in the
10  federal rules, in the federal statutes.
11      Q.  If you believed that that was the basis
12  for disqualification, why didn't you raise it
13  before the first petition was argued and decided?
14      A.  Because I didn't know of it.  Until I
15  saw what he wrote, I didn't realize how much that
16  had affected him.  He went way beyond the bounds
17  that a judge should go, in my view, and it was not
18  known at that time.
19      I don't investigate every judge.  I
20  didn't investigate anybody on this panel.
21      You know, I assumed he would treat
22  people equally and fairly, including you, Ms.

Page 251

1  Porter, and in that respect I was wrong.  But this
2  is something -- it's my right to raise it, and I
3  raised it.
4      Q.  Just so I'm clear, Shauna Cox is a
5  paralegal for somebody?
6      A.  No.
7      Shauna Cox was -- she was actually a
8  defendant.  There was a prior trial in Oregon with
9  regard to the Bundy sons.  They were acquitted.
10  They represented themselves.  She was a defendant
11  in that case.  She was acquitted as well.
12      Q.  So --
13      A.  Let me finish.
14      She was assisting the Bundys in helping
15  them during the trial as a paralegal.  She was
16  actually working for Bret Whipple and she helped
17  me, and she told me in court one day that Judge
18  Bybee was related to Shannon Bybee and that in fact
19  Judge Bybee was from Las Vegas -- I didn't even
20  know that -- and that he was very close with Judge
21  Reid.
22      Q.  Just so I understand, so it's now

Page 252

1  Shauna Cox who provided you the information about
2  Shannon Bybee, not your associate?
3      A.  That is not what I said.  Please,
4  please.  I asked Oliver to research it.
5      Q.  Ok.
6      A.  Please don't twist my words.
7      Q.  What information was it you asked her
8  to show you?
9      I would assume that this is a serious
10  allegation that you're making against a 9th Circuit
11  judge, that you'd want some proof.
12      What did Mr. Pees show you?
13      MR. KLAYMAN:  Wait a second.  I move to
14  strike, judge.  That colloquy is unnecessary.  This
15  is not Court TV, ok.
16      CHAIRPERSON MIMS:  It is not, but I
17  will tell you, I was confused, as well, by the
18  Shauna Cox statement.
19      MR. KLAYMAN:  Yeah, Shauna Cox said to
20  me in court one day, because she knew that I had
21  been denied pro hac vice entry, and she said, "Did
22  you know that Bybee is related to Shannon Bybee

Page 253

1  that sat on the gaming commission with Harry Reid?
2  They were in the gaming commission hall of fame."
3      Gaming, as you know is the Las Vegas
4  gaming industry.
5      CHAIRPERSON MIMS:  So is your testimony
6  that you initially found out about that through Ms.
7  Cox.
8      MR. KLAYMAN:  Yes.
9      CHAIRPERSON MIMS:  And that led you to
10  ask Mr. -- I'm sorry.
11      MR. KLAYMAN:  Mr. Peer.
12      CHAIRPERSON MIMS:  I didn't want to say
13  Oliver, to go do the research?
14      MR. KLAYMAN:  Yes.
15  BY MS. PORTER:
16      Q.  My question is what research did he
17  show you?
18      A.  Well, he can testimony for himself.
19      Q.  No, I want to know what you saw because
20  you made the representation to the 9th Circuit.
21      A.  He told me -- I trust Oliver.  He's a
22  very honest person.  He told me that Shannon Bybee

64 (Pages 250 to 253)

In The Matter of:  Larry E. Klayman
July 15, 2019

---

Page 254

1  was his wife.
2      Q.  But you said he did some research and
3  I'm trying to understand, did you see any research?
4      A.  I saw what Mr. Peer told me and I
5  believed him to be true because he's the most
6  honest person I've ever worked with and he's the
7  best associate I've ever worked with.
8      CHAIRPERSON MIMS:  Let me just follow
9  up.
10      Did you ask him any questions about how
11  he did --
12      MR. KLAYMAN:  Yeah, I said, "Did you
13  check it out," and did he look on the Internet.
14  "Are they interrelated?"  And he said, "Yeah, it's
15  his wife."
16      So that's what we did and we corrected
17  it when we realized we were wrong.
18      But the whole issue of the appearance
19  goes way beyond Shannon Bybee.  It goes to the
20  relationship with Harry Reid.
21      CHAIRPERSON MIMS:  You have testified
22  to that already.

---

Page 255

1      MR. KLAYMAN:  Yeah, I did.  It was just
2  one little aspect of it.
3  BY MS. PORTER:
4      Q.  So am I correct you never saw any
5  research.  You relied solely on Mr. Peer's
6  statement that they were married, Shannon Bybee and
7  Judge Bybee are married?
8      A.  Yes, because I trust Oliver.  I trust
9  his accuracy and honesty.
10      Q.  What else if anything did Mr. Peer tell
11  you about the relationship between Shannon Bybee
12  and Judge Bybee, other than they were married?
13      A.  I don't recollect.
14      Q.  So he didn't tell you that Shannon
15  Bybee served on the gaming commission?
16      A.  That I was told by Shauna Cox.
17      Q.  What if anything did you do to research
18  that?
19      A.  I asked Mr. Peer to check it out for
20  me.
21      Q.  But you just said that Mr. Peer didn't
22  tell you anything about the gaming commission and

---

Page 256

1  Shannon Bybee?
2      A.  Well, two and two equals four, ok.  And
3  in fact I think -- I'll go back and check when I
4  testified, but it was my understanding there was a
5  Shannon Bybee that sat on the gaming commission
6  with Harry Reid.
7      Q.  Ok, but my question to you is, what was
8  the source of that information?
9      A.  Shauna Cox.
10      Q.  Ok.  And what if anything did you do
11  to --
12      MR. KLAYMAN:  Your Honor, this is
13  badgering the witness.  It's badgering, over and
14  over again.
15      CHAIRPERSON MIMS:  Well, the question
16  is did you attempt to confirm it at all other
17  than --
18      MR. KLAYMAN:  No, I relied on -- on
19  what Shauna Cox said and what Oliver said.
20  BY MS. PORTER:
21      Q.  So let me understand Mr. Peer, what Mr.
22  Peer told you.

---

Page 257

1      Mr. Peer then told you, in addition to
2  being married, Shannon Bybee being married to Judge
3  Bybee, Mr. Peer also provided information about the
4  gaming commission?
5      A.  See, I thought -- initially I thought
6  Mr. Peer told me that it was his wife.  I thought
7  Shannon Bybee was Judge Bybee's father.  That's
8  what I initially thought from Ms. Cox.  But I just
9  asked the whole thing be checked out, because
10  "Bybee" is not a common thing.  I've never heard of
11  somebody named Bybee before.
12      CHAIRPERSON MIMS:  I just don't think
13  the question was answered.
14      MR. KLAYMAN:  Yeah, all right.
15      I mean, the bottom line is this.
16      CHAIRPERSON MIMS:  Where did you learn
17  about the gaming commission allegation?
18      MR. KLAYMAN:  From Shauna Cox.
19      CHAIRPERSON MIMS:  Did you ever hear
20  about that particular allegation from your
21  associate, as well?  Did he confirm that?
22      MR. KLAYMAN:  No, no.

---

65 (Pages 254 to 257)

In The Matter of:  Larry E. Klayman
July 15, 2019

| Page 258 | Page 260 |
|---|---|

**Page 258**

1    I heard from Shauna Cox that Shannon
2  Cox was on the gaming commission with Harry Reid.
3        CHAIRPERSON MIMS:  And only from Shauna
4  Cox.
5        MR. KLAYMAN:  Right.
6  BY MS. PORTER:
7    Q.  And just to clarify the record, you're
8  referring to Shannon Bybee being on the gaming
9  commission, not Shannon Cox?
10    A.  Yes, yes.  I'm getting tired.  I'm on
11  West Coast time right now.  I haven't had much
12  sleep.  I came in yesterday from West Coast.
13    Q.  And am I correct, as far as the
14  relationship between Judge Navarro and Judge Bybee,
15  your basis for believing that they had a close
16  personal friendship or relationship are the reasons
17  that you set forth in your petition, which is
18  Exhibit 11?
19    A.  Among other reasons.
20        One of the things -- you know, again, I
21  founded Judicial Watch, so there are a lot of
22  judges I respect, I've given awards to.  I have

**Page 260**

1    A.  Yes, I made a mistake on that.  I
2  thought it was him.  I thought he was the one that
3  did it.  But having read the opinion, because he's
4  the one that ground it in the opinion.  That was
5  the majority opinion.
6        It actually turns it out it was Judge
7  Fletcher.  But I thought he did.
8        But he was the one that made reference
9  to it in his majority opinion and really went after
10  me for that.
11    Q.  And you had reviewed the transcripts
12  of -- or not the transcripts, excuse me, the
13  recording of that 9th Circuit argument  previously
14  --
15    A.  I actually -- no.  I was going from
16  memory and I thought it was Bybee.
17        It was hard to know who was saying
18  what, because it was a telephone hearing.
19    Q.  Well, you're saying you're going by
20  memory, yet you cite on page 100-0112 the link to
21  the argument.  So you must have listened --
22        I'm assuming, but I'll ask, you didn't

**Page 259**

1  challenged other judges.
2        But one basis for extrajudicial bias
3  and prejudice is it relies on the Liteky case, a
4  court case.  It can only be when a decision by a
5  judge is so wrong it can only be held that it
6  intentionally and recklessly can only be done in a
7  grossly negligent fashion, one can infer and assume
8  an extrajudicial bias and prejudice.
9        His decisions were so off the wall, for
10  use of the collateral federal word, so way out
11  there even beyond Navarro.  It looked like he was
12  grinding an axe against me, because of his
13  closeness in that community with regard to Harry
14  Reid, with regard to Judge Navarro.  It's a very
15  tight-knit legal community.  I was an outsider.
16  And it looked to me as if he was protecting Judge
17  Navarro.
18    Q.  One of the allegations that you've
19  touched on, Mr. Klayman, but I'm not sure if I
20  understood or got your response, is that you also
21  accused Judge Bybee of aggressively grilling you
22  about the Bivens action in that --

**Page 261**

1  listen to it before you made that accusations about
2  Judge Bybee aggressively grilling you?
3    A.  I believed it to be the case at the
4  time that I wrote it.  But in any event he included
5  it as a major issue in his majority opinion, so I
6  believed that he was the one who questioned me
7  about it.
8        He was very aggressive in the order.
9  It's completely irrelevant, in my view, that a
10  Bivens action was filed.
11        Cliven Bundy had a right to do that.  I
12  did not file it myself.  There are misstatements in
13  that order that I was the person that filed it, or
14  at least it was in the oral argument.  I didn't
15  file it.  I've testified to it today.  I'm not
16  going to repeat my testimony for purposes of time.
17  I'm not taking up the time of the committee.
18        But the major thrust of what I was
19  saying is that Bybee really had an axe -- it seemed
20  like he had an axe to grind against me generally.
21    Q.  And this was not the first time that
22  you referred to that oral argument because you had

In The Matter of:  Larry E. Klayman
July 15, 2019

Page 262

1 referred to this -- the recording you had referred
2 to it in a previous brief, and I can refer you to
3 86-011.
4      A.  What are you referring?
5      Q.  86-011, footnote.  You again reference
6 the oral argument tape.
7          So you were aware of it and had
8 listened to it?
9      A.  I had not listened to the oral
10 argument, no I did not.  I'm honestly telling you I
11 did not listen to the oral argument.  I was going
12 from memory.
13      Q.  So am I correct when you said Judge
14 Bybee aggressively grilled you you had no basis to
15 make that statement?
16      A.  He did aggressively grill me but not on
17 that particular issue.  But then he really drove it
18 into me like a stake through my heart in what he
19 wrote.  He was the majority -- he wrote the
20 majority opinion.  That's what caused me to believe
21 that he was the one who had mentioned that.
22          But the basis of the disqualification

Page 263

1 was what he had written.  It was so outrageous that
2 even the fellow jurist, you know, on three
3 occasions, you know, in affect put him down.
4          And, you know, judges are collegial
5 with each other.  They don't generally clash.  But
6 the way I read Judge Gould's rulings, he was
7 clashing with his colleagues on a number of
8 occasions, and Judge Gould was there.
9      Q.  Let me ask you with just one other
10 statement in your petition, which is Exhibit Number
11 100 --
12      A.  And by the way, let me just add this.
13 I was not sanctioned for that.  If they felt I did
14 something wrong, I could have been sanctioned.  They
15 didn't sanction me for writing that in there.
16      CHAIRPERSON MIMS:  Go ahead, Ms.
17 Porter.
18      MS. PORTER:  Thank you.
19 BY MS. PORTER:
20      Q.  I'm still on Exhibit 100.  If you go to
21 Page 17, Mr. Klayman.
22      A.  Sure.

Page 264

1      Q.  And actually I'm going to start reading
2 from the previous page, 16.  It says, "Indeed, the
3 Nevada application expressly asked for instances of
4 disciplinary proceedings instituted against
5 petitioner... any suspension of license,
6 certificate of privilege to appear before any
7 judicial regulatory administrative body, or any
8 resignation or termination in order over
9 disciplinary proceedings."
10          There's some more dots and then you
11 quote Exhibit A, which is your application for
12 admission pro hac.
13          Then you go on to say, "Mr. Klayman
14 truthfully answered that.  He has not and he has
15 never once been found to have acted unethically by
16 any bar association who reviewed his conduct before
17 a judge."  And then you go on.
18          When you filed this petition on
19 February 6, 2018, that was many months after the
20 hearing committee had issued its report and
21 recommendation.
22      MR. KLAYMAN:  Your Honor, I'm trying

Page 265

1 too keep my cool, but she's wasting your time.
2 She's wasting my time.  She's not being
3 intellectually honest.
4          There has not been a finding that I
5 violated anything as of this time from the bar.
6          I asked her to stop harassing me,
7 badgering me and trying to make a point of
8 something that legally is null and void.
9      CHAIRPERSON MIMS:  Mr. Klayman, I don't
10 agree with your interpretation of what's going on.
11          I understand your position with respect
12 to the findings and the finality of findings, as it
13 relates to the hearing committee, to the
14 magistrates, and these are determinations that
15 we'll discuss --
16      MR. KLAYMAN:  I understand.
17      CHAIRPERSON MIMS:  -- with the
18 committee.
19          I do understand your points that you
20 have made, but Ms. Porter can also make her points.
21      MR. KLAYMAN:  No, I understand that.
22 That's why I directed it --

67 (Pages 262 to 265)

In The Matter of:  Larry E. Klayman
July 15, 2019

Page 266

1       CHAIRPERSON MIMS:  I don't believe this
2   specific question has been asked.
3       MR. KLAYMAN:  That's why I directed it
4   to you.  Your Honor asked me not to do that.  This
5   is very repetitive.
6   BY MS. PORTER:
7       Q.  I'm asking you about this affirmative
8   application to the 9th Circuit in February of 2018,
9   many, many months after the hearing committee
10  issued its report and there was no disclosure to
11  the 9th Circuit about this or any subsequent
12  committee about what the hearing committee found?
13      A.  Because there was no force and effect.
14      Q.  And there was no disclosure to the
15  supreme court in the last petition that you   filed
16  --
17      A.  Because there was no force and effect.
18      And in fact the Board later modified
19  that and the matter is now up at the court of
20  appeals.  So there's never been a final decision.
21      MS. PORTER:  I have no further
22  questions, but I would like to introduce or offer a

Page 267

1   number of the exhibits that we've talked about,
2   just so that I can pare down substantially the
3   questions I have for other witnesses.
4       CHAIRPERSON MIMS:  Do you want to give
5   us a list?  Do you want to say the list of
6   exhibits?
7       MS. PORTER:  Sure.  Do you want me to
8   go through them one by one, or?
9       CHAIRPERSON MIMS:  Well why don't we do
10  it at the end of the testimony.
11      MS. PORTER:  Ok, that's fine.
12      CHAIRPERSON MIMS:  Would you still like
13  to break?
14      MR. KLAYMAN:  Yes, thank you.
15      CHAIRPERSON MIMS:  Ten, could you do
16  ten, or do you need the full 15?
17      MR. KLAYMAN:  No, I need 15.  I'm a
18  little tired.
19      CHAIRPERSON MIMS:  We'll give you 15.
20  We'll go off the record at 3:40 and come back on
21  the record at 3:55.
22      MS. PORTER:  This doesn't have to be on

Page 268

1   the record, but I don't know how long Mr. Klayman
2   will go on, but do I need to alert any of my other
3   witnesses that they need to come over and testify
4   today, or will we take them tomorrow morning?
5       CHAIRPERSON MIMS:  Well, let's stay on
6   the record for a minute.  That's good to discuss
7   this now.
8       MR. KLAYMAN:  I need to take stock of
9   what went on to determine how much time I may need.
10      CHAIRPERSON MIMS:  Who is your next
11  witness?
12      MS. PORTER:  Well, I guess it depends
13  on what exhibits are admitted and what ones are not
14  admitted... but Christine Chicherio and Melissa
15  Rolffot, both of whom are law clerks and did some
16  of the Internet and Pacer searches.  Hopefully the
17  testimony is very brief if those exhibits go in.
18      I don't know if there is a reason to
19  call Meghan Borrazas for the Board's two docket
20  sheets, but if I need to, I will have to call her
21  as well.
22      With respect to the disciplinary

Page 269

1   records in the first matter, I think Mr. Klayman
2   has identified or confirmed all of the documents,
3   so I don't think I would need to call Angela
4   Thornton for that purpose.  But I guess it depends
5   on whether or not Mr. Klayman has any objection and
6   what it is.
7       CHAIRPERSON MIMS:  Is there going to be
8   any objection to the entry of the docket sheets,
9   Mr. Klayman?
10      MR. KLAYMAN:  I have to look at them.
11  Probably not.  But can we reserve on that, your
12  Honor?  I'll look at them tonight.  But I would
13  get them over here anyway.
14      I don't know how long I'm going to
15  take, but they're in the building, presumably just
16  across the street, and I will try to adhere to your
17  advice and not go over matters that I may go over
18  in my own direct, in my own case.
19      CHAIRPERSON MIMS:  But two law clerks.
20  I'm sorry, what are they going to testify about
21  again?
22      MS. PORTER:  Court record searches and

68  (Pages 266 to 269)

In The Matter of:  Larry E. Klayman
July 15, 2019

Page 270

1     Internet searches.
2          CHAIRPERSON MIMS:  Are they here today?
3          MS. PORTER:  They're in our offices,
4     yes, but I think one of them has a small child and
5     I just need to let her know so she can go home at
6     5:00.
7          CHAIRPERSON MIMS:  Let's see how far we
8     get, but why don't you -- I don't know which one
9     has the child, but why don't you let -- whoever
10    that is that has the child, you can let them go and
11    if we can get to the other...
12         I imagine we will know before 5:00
13    o'clock whether she can come over.
14         MS. PORTER:  Ok, I'll let her go and we
15    will let the other witness, Christine Chicherio,
16    know if we will be going after 5:00.
17         CHAIRPERSON MIMS:  Thank you.  We will
18    resume at 3:55.
19         (Recess taken.)
20         CHAIRPERSON MIMS:  Ms. Porter, you're
21    ready?
22         MS. PORTER:  Yes.

Page 271

1     CHAIRPERSON MIMS:  We're back on the
2     record at 3:54 p.m., and we'll continue with
3     Respondent questioning himself on
4     cross-examination.
5          DIRECT EXAMINATION ON BEHALF OF RESPONDENT:
6          BY MR. KLAYMAN:
7          Q.  Mr. Klayman, can you tell me whether or
8     not you have been in good standing with the
9     District of Columbia Bar continuously since you
10    were admitted in 1982 on December 7th?
11         A.  Yes.
12         Q.  Have you ever been suspended by the
13    District of Columbia Bar or any other bar
14    association for ethical misconduct?
15         A.  No.
16         Q.  With regard to your criminal defense
17    background, have you recently had participation
18    with regard to the Special Counsel Robert Muller's
19    investigation of alleged Russian collusion and
20    obstruction of justice?
21         A.  Yes.
22         Q.  What occurred in that regard?

Page 272

1          A.  I represented one of the targets of
2     that investigation, Dr. Jerome Corsi, who was
3     accused of perjury and other acts of illegality, at
4     least in terms of what was being investigated.
5          MS. PORTER:  Since this all post dated
6     the Cliven Bundy matter, I don't see how it's
7     relevant.
8          CHAIRPERSON MIMS:  I'm going to allow
9     it in.  You testified extensively about the lack of
10    experience in criminal matters.
11         I'm going to allow it in and we will
12    determine the relevance.
13    BY MR. KLAYMAN:
14         Q.  What was the result of your defense of
15    Dr. Corsi?
16         A.  Despite being a target, he was not
17    indicted by Special Counsel Robert Muller.
18         Q.  Did you put in a lot of hours in his
19    defense?
20         A.  Yes.
21         Q.  Did you actually go with witnesses
22    before Special Counsel Robert Muller's grand jury?

Page 273

1          A.  Yes.  In fact I was there with his
2     stepson, Andrew.
3          Q.  Did you deal with the special counsel's
4     office extensively?
5          A.  Yes.
6          Q.  Who did you deal with?
7          A.  Aaron Zelinsky, in particular.
8          Q.  Did you represent someone else who was
9     subpoenaed in front of that grand jury?
10         A.  Yes.
11         Q.  Who was that?
12         A.  Joel Gilbert.
13         Q.  And what was the interest presumably of
14    the special counsel with Joel Gilbert?
15         A.  His communications with Roger Stone who
16    was indicted and is going to trial in November.
17         Q.  Will you be present at Roger Stone's
18    criminal prosecution?
19         A.  Yes, to protect my client, Dr. Jerome
20    Corsi.
21         CHAIRPERSON MIMS:  How is it that you
22    came to represent Dr. Corsi?

69  (Pages 270 to 273)

In The Matter of:  Larry E. Klayman
July 15, 2019

---

Page 274

1      MR. KLAYMAN:  I have known Dr. Corsi a
2  long time.  He has written a number of books that
3  dealt with some matters that I have been involved
4  in, and he was a friend over the years, and he
5  respected -- I can't speak for him.  He respected
6  my legal ability.
7      MS. BELL:  I didn't hear the last part.
8      MR. KLAYMAN:  He respected my legal
9  ability, yes.
10      Same thing for Joel Gilbert who is a
11  Hollywood filmmaker.
12  BY MR. KLAYMAN:
13      Q.  Now, turn your attention, Mr. Klayman,
14  to Bar Counsel's Exhibit 55 at page 12.
15      A.  Let me add one other thing with regard
16  to Dr. Corsi...
17      It was alleged that if he did not
18  testify in a certain manner by the special counsel,
19  that he would be indicted, and he was offered a
20  sweetheart plea deal.  He turned that down and
21  fought the matter.
22      We pushed back with special counsel

---

Page 275

1  Robert Muller.  We brought a complaint against him,
2  a Bivens complaint, and we brought another
3  complaint with regard to the Office of Professional
4  Responsibility.  And I believe that pushback kept
5  him from getting indicted.
6      That's what Judge Gould was referring
7  to as "aggressive representation."  Every lawyer
8  has his own style, his own way of doing things.
9  But I have always done things based on what I
10  believe was right, and I don't worry about the
11  consequences to myself.  Because if that's the
12  case, I wouldn't do what I do.  I'd rather flip
13  hamburgers at McDonalds, frankly.  I'm being a
14  little facetious, but I believe in what I do.
15      Dr. Corsi trusted me and so did Cliven
16  Bundy.
17      Q.  Turn your attention to Bar Counsel
18  Exhibit 55, page 55-11 -- 12, rather.
19      Excuse me, my apologies, turn to
20  Exhibit 56, the affidavit of Joel Hansen, where he
21  was seeking to withdraw.  This was the local
22  counsel, Joel Hansen.

---

Page 276

1      Mr. Klayman, did you write that
2  affidavit?
3      A.  No.
4      Q.  Did you have any input into that
5  affidavit?
6      A.  No.
7      Q.  Paragraph six, "That Mr. Klayman's
8  petition for pro hac vice has been denied by this
9  court and his petition for writ of mandamus has not
10  yet been ruled upon by the 9th Circuit and I
11  certainly cannot prepare for or try this case
12  alone."
13      CHAIRPERSON MIMS:  I'm sorry, I need to
14  get --
15      MR. KLAYMAN:  Paragraph six.
16      CHAIRPERSON MIMS:  What page?
17      MR. KLAYMAN:  56-009.
18      CHAIRPERSON MIMS:  Oh, 56.  I thought
19  you said 66.  Can you repeat the paragraph, please.
20  BY MR. KLAYMAN:
21      Q.  "That Mr. Klayman's petition for pro
22  hac vice status that been denied by this court and

---

Page 277

1  his petition for written of mandamus has not yet
2  been ruled upon by the 9th Circuit and I cannot
3  prepare for or try this case alone."
4      Is that an accurate statement by Mr.
5  Hansen?
6      A.  Yes, it is.
7      Q.  When you gave your opinion as to Mr.
8  Hansen's background in terms of criminal defense or
9  otherwise, what were you basing that on?
10      A.  I was basing that on my personal
11  interaction with him, like I was with Mr. Whipple,
12  and it appeared to me, in talking to him, that he
13  did not have extensive criminal background.  He was
14  looking to me for advice constantly.  And he was in
15  severe pain with regard to his own physical
16  condition and he was not capable of representing
17  Cliven Bundy.
18      Q.  What was your impression with regard to
19  Mr. Whipple?
20      A.  And without repeating prior testimony I
21  will say it didn't seem to me as if he had
22  extensive background in terms of federal practice

---

70  (Pages 274 to 277)

In The Matter of:  Larry E. Klayman
July 15, 2019

Page 278

1  in particular.  He had been Judge Navarro's
2  colleague in the state public defender's office.
3  And the failure of him to know what a petition for
4  writ of mandamus was and then ask me for a copy of
5  it, because frequently you have to use that in
6  criminal proceedings and civil proceedings, was one
7  of the primary reasons I thought he didn't have
8  experience.
9      But also he was disinterested in the
10  case.  And you will see in the transcript that it
11  appeared, when Mr. Bundy wanted to relieve him,
12  fire him, then there was a hearing before the
13  magistrate, which is Respondent's Exhibit 28, which
14  should have been included in some of the documents
15  that are Bar Counsel's exhibits, for completeness;
16  that he openly admitted that he wasn't prepared,
17  and Cliven Bundy came in and testified.
18      CHAIRPERSON MIMS:  Just give us one
19  second.  Respondent's Exhibit 28, correct?
20      MR. KLAYMAN:  Correct.
21      CHAIRPERSON MIMS:  Is that one of the
22  ones you handed us this morning?

Page 279

1      MR. KLAYMAN:  Yes.
2      And I'm not going to belabor it because
3  I'll get it into it tomorrow in my testimony, or
4  whenever that occurs, my case, but I'm
5  paraphrasing...
6      Is that Cliven Bundy told the court
7  when questioned that he had seen Whipple only on
8  just a few occasions and had never been really
9  shown the discovery in the case.  The case was
10  huge.  This was a long, long investigation.  There
11  was a lot of terabytes of information.  And he
12  really are not been engaged.
13      I was always pushing him to go out and
14  see Cliven with me, and, except on one occasion,
15  that never occurred.  I never actually met with him
16  with Cliven.  I met at a joint defense meeting with
17  him.
18      Cliven also had a problem with him,
19  because Cliven was asking him to raise certain
20  defenses, which he refused to raise.  And that was
21  the basis upon which Bret Whipple was fired.
22      So that transcript's very revealing,

Page 280

1  you know.  You all can read it at your leisure.
2  I'll have it introduced tomorrow.  But that's
3  important to understand that, with due respect to
4  both Mr. Hansen and Mr. Whipple, they just were
5  incapable of handling this case, and that was my
6  impression based on my experience in dealing with
7  them.  They're both very nice people, but you can
8  have nice people and wind up with life imprisonment
9  if they're not really diligent and zealously
10  representing you.
11      I believe in Cliven Bundy.  And that
12  was a big difference, and he knows that.
13  BY MR. KLAYMAN:
14      Q.  With regard to Judge Keller and Judge
15  Chin, I turn your attention to Bar Counsel Exhibit
16  22.  You can see the attachment.
17      A.  I did fully reveal that I had been
18  barred from their courtroom, just their courtroom,
19  not the Southern District of New York and not the
20  Central District of California, and there was no
21  reason for me to mention that that had been held on
22  appeal, because I said unequivocally, "I've been

Page 281

1  barred."
2      And also, in the documentation that
3  ultimately was submitted to Mr. Frisch -- I'll ask
4  Mr. Peer to get this for me to proceed.  That's
5  Respondent's Exhibit 135.  Documentation was
6  submitted to Judge Navarro when she asked for more
7  information.
8      MR. PEER:  Not Exhibit 135.  Page 135.
9  The Bates numbers is not 135.
10      MR. KLAYMAN:  Can you help me find
11  that.
12      MR. PEER:  Yes.
13      MR. KLAYMAN:  Oliver is very good with
14  paper.
15      (Brief pause.)
16      MR. KLAYMAN:  Thank you.
17  BY MR. KLAYMAN:
18      A.  (Answer continuing)  Yes, this is
19  Respondent's Exhibit 5, and it's Sub Exhibit 4, a
20  letter from Office of Bar Counsel, and this is a
21  letter which shows that this was reviewed by Bar
22  Counsel at a time when Bar Counsel had a

71 (Pages 278 to 281)

In The Matter of:  Larry E. Klayman
July 15, 2019

Page 282

1    different -- by Disciplinary Counsel, Wallace
2    Shipp, Gene Shipp, and in reviewing the Keller
3    matter they found that I did not rise to the level
4    of an ethical violation.  It says on page three, We
5    conclude that the instances of misconduct in the
6    present record do not rise to the level of clear
7    and convincing evidence of an ethical violation
8    before Judge Keller."
9         So, that's where my statement comes
10   from.
11        CHAIRPERSON MIMS:  Could we back up for
12   a second.
13        MR. KLAYMAN:  You want me to read it
14   back?
15        CHAIRPERSON MIMS:  Exhibit 5, tell me
16   what this is again, Respondent's Exhibit 5.
17        MR. KLAYMAN:  Exhibit 5 is the pro hac
18   vice petition and applicant's compliance with court
19   order of April 2nd, 2016.
20        CHAIRPERSON MIMS:  What pro hac is this
21   one referring to?
22        MR. KLAYMAN:  The one that was

Page 283

1    initially presented and then Judge Navarro asked
2    for more information.  This is what I filed when
3    she asked for more information about the pro hac
4    vice application, about Keller.
5         CHAIRPERSON MIMS:  Is this in response
6    to the order at Bar Counsel's Exhibit 25?
7         MR. KLAYMAN:  I don't remember.  Let's
8    look at that order.
9         (Brief pause.)
10        MR. KLAYMAN:  Yes.
11        CHAIRPERSON MIMS:  Ok.
12        MR. KLAYMAN:  Yes.  So I submitted this
13   letter that had cleared me of ethical violations
14   with regard to Judge Keller, and this is the basis
15   of my statement that, even to this day, I've never
16   been held to commit an ethical violation for any
17   activity with a judge.
18        CHAIRPERSON MIMS:  While we're on this,
19   I'd like to ask a question.
20        MR. KLAYMAN:  Yes, sure.
21        CHAIRPERSON MIMS:  In the order at
22   Exhibit 25, Judge Navarro, on page 25-002.

Page 284

1         MR. KLAYMAN:  Yes.
2         CHAIRPERSON MIMS:  And looking at the
3    last paragraph where your petition was denied
4    without prejudice, and then Judge Navarro goes on
5    to list a number of things that she wanted more
6    information on.  So number one was the case number
7    for the cases before Judge Keller and Judge Denny
8    Chin.
9         MR. KLAYMAN:  Correct.
10        CHAIRPERSON MIMS:  Are the case numbers
11   in this filing?
12        MR. KLAYMAN:  I believe they are, your
13   Honor.
14        CHAIRPERSON MIMS:  Can you direct us to
15   where those are, please?
16        MR. KLAYMAN:  Oliver, if you can help,
17   as well.
18        MR. PEER:  Can I talk?
19        CHAIRPERSON MIMS:  Do you have the page
20   number for us?
21        MR. PEER:  I can answer your question.
22        CHAIRPERSON MIMS:  Sure.

Page 285

1         MR. PEER:  It's going to be at -- I'm
2    looking for Bates number, but Respondent's Exhibit
3    42.
4         CHAIRPERSON MIMS:  It's 25.
5         Mr. Peer, it's small number five.
6    We're in the white book.  We're in Respondent's
7    exhibits.  So we're looking at Respondent's Exhibit
8    Page 42.  What lines, please.
9         MR. PEER:  The whole sentence is in
10   lines one through four, but the case numbers I
11   guess are three and four.
12        CHAIRPERSON MIMS:  Oh, I see.
13        MR. PEER:  Yeah.
14        CHAIRPERSON MIMS:  Ok, thank you.
15        So I want to follow up.
16        Now, I think you were just directing us
17   to this, but the second thing was verification of
18   the review by the Bar Association of the District
19   of Columbia and Florida finding that Mr. Klayman
20   did not act unethically before Judges Keller and
21   Chin.
22        Is that contained in this?

72 (Pages 282 to 285)

In The Matter of:  Larry E. Klayman
July 15, 2019

Page 286

1   MR. KLAYMAN:  Yeah, that's the letter
2 and the files of Florida were expunged at the time
3 I had to respond to this.  After five years in
4 Florida they expunged the file.
5   CHAIRPERSON MIMS:  And you state that
6 in this filing?
7   MR. KLAYMAN:  I believe I did.  In any
8 event, I couldn't provide it because it was no
9 longer there.
10   CHAIRPERSON MIMS:  Explain that
11 statement.  You couldn't provide --
12   MR. KLAYMAN:  Many bar associations
13 don't keep records past a certain point in time.
14   MR. PEER:  If I may, it's on the page,
15 42, line 11 and 12.
16   MR. KLAYMAN:  Read it --
17   CHAIRPERSON MIMS:  I see.
18   MR. KLAYMAN:  Now, one thing that's
19 really important as well is that in the exhibit
20 that was proffered by Ms. Porter involving
21 Disciplinary Counsel --
22   CHAIRPERSON MIMS:  Mr. Klayman, I'm

Page 287

1 sorry.  I do want to interrupt you because I do
2 want to finish going through Judge Navarro's order.
3   MR. KLAYMAN:  Sure.
4   CHAIRPERSON MIMS:  Number three, and
5 she's asked for like several things: an updated
6 certificate of good standing.
7   Is that attached to Exhibit 5?
8   MR. KLAYMAN:  I believe it is.
9   Oliver?
10   MR. PEER:  I'm looking.  Yeah, so
11 that's going to be at Respondent's Exhibit 139.
12   CHAIRPERSON MIMS:  Respondent's Exhibit
13 139.
14   MR. PEER:  Yeah, the Bates number.
15   CHAIRPERSON MIMS:  The Bates number,
16 ok.
17   MR. PEER:  Yeah, sorry.
18   CHAIRPERSON MIMS:  Thank you.
19   And number five, Judge Navarro
20 requests -- well, that's just the exhibits to the
21 order.
22   What about number six, verification

Page 288

1 that the matter in DC?  "Disciplinary case
2 referenced in the verified petition had been
3 resolved with no disciplinary action"?
4   MR. KLAYMAN:  Your Honor, that was
5 nonexistent because it wasn't resolved.  That was
6 the Catch 22.
7   CHAIRPERSON MIMS:  And did you inform
8 Judge Navarro of that?
9   MR. KLAYMAN:  Yes.  Yes.
10   CHAIRPERSON MIMS:  And where is that?
11 I assume it's in the original file.
12   MR. KLAYMAN:  And in the original
13 application I said it still hadn't been resolved,
14 that I was giving my opinion that I thought I would
15 prevail.
16   That's important, because if you turn
17 to Respondent's Exhibit 5 and Bates Numbers 121
18 through 134, this is a very detailed -- excuse me,
19 121 to 125.  It's a very detailed opinion letter of
20 Professor Ronald Rotunda at Chaplain University,
21 one of the premier ethics experts, may his sole
22 rest in peace, where in his opinion I had not

Page 289

1 committed ethical violations.  That was my basis
2 that I would ultimately prevail, among others.
3 Unfortunately he died about a year ago and he had
4 actually testified in that proceeding.
5   CHAIRPERSON MIMS:  All right.  Thank
6 you.
7   MR. KLAYMAN:  As an expert.
8   MR. PEER:  If I may...
9   You were going through one through
10 seven.  I believe you skipped number four.
11   CHAIRPERSON MIMS:  Did I?
12   MR. PEER:  I can just show you where
13 that is.
14   CHAIRPERSON MIMS:  The Florida bar
15 association's recommendation is verifying that
16 there was no showing of dishonesty.
17   MR. PEER:  Right.
18   CHAIRPERSON MIMS:  In connection with
19 their disciplinary action.
20   MR. PEER:  I had it.
21   MR. KLAYMAN:  Your Honor, one thing
22 that's important --

73 (Pages 286 to 289)

In The Matter of:  Larry E. Klayman
July 15, 2019

Page 290

1          CHAIRPERSON MIMS:  I think we're
2   waiting.
3          MR. KLAYMAN:  Sorry.
4          MR. PEER:  That's going to be the Bates
5   number, Respondent's Exhibit 143 until 151.  One
6   forty-three is a little hard to see.
7          CHAIRPERSON MIMS:  Does it say in this
8   filing somewhere that there was no showing of
9   dishonesty?
10         MR. KLAYMAN:  Yes.
11         CHAIRPERSON MIMS:  Where is that?
12         MR. KLAYMAN:  Oliver, if you can try to
13   find that.
14         MR. PEER:  It's the consent judgment,
15   within Florida.
16         MR. KLAYMAN:  The case was about the
17   ability to pay back a negotiated --
18         CHAIRPERSON MIMS:  I see that.
19         All right, we can move on.
20         MR. KLAYMAN:  Ok.
21         CHAIRPERSON MIMS:  Thank you.
22   BY MR. KLAYMAN:

Page 291

1          A.  (Answer continuing)  The question was
2   asked, why was there no disclosure to the 9th
3   Circuit?
4          As I testified previously, it had been
5   withdrawn and there was no force and effect as the
6   case move on.
7          Now with regard to Exhibit 100 of Bar
8   Counsel's exhibits, this is a petition with regard
9   to seeking to moot-out the court, in fact vacating
10   the order of the 9th Circuit, initially, as well as
11   anything that Navarro did.
12         There is a body of law that says that,
13   when a case is over -- and this was a collateral
14   order.  It wasn't an order that was subject to
15   appeal, which is why mandamus petitions were
16   filed -- that those orders should be vacated.
17         In fact -- I won't belabor it now, your
18   Honor, because I'll get into it in my testimony --
19   Judge Gould issued a very strong dissent and then
20   cemented that later with other dissents and
21   opinions that it should be vacated, and there was
22   no reason not to vacate it.

Page 292

1          What I was trying to do, because this
2   was hurting me -- because my adversaries, and I
3   have very strong adversaries that, you know, we use
4   whatever means they can to win their case, were
5   telling other judges that I had been denied pro hac
6   vice with these very strong orders from the 9th
7   Circuit to keep me out of their case.  And I was
8   representing a woman, a gay lady, in Berkley
9   California who had been assaulted by Antifa.  She
10   had been pepper sprayed and almost blinded by a
11   Kara Robles.  And the judge used that as a reason
12   to keep me off the case.
13         These judges sometimes follow each
14   other and it was hurting my clients.
15         And then of course Mr. Fitton who has,
16   throughout my 16 years since I left Judicial Watch,
17   felt very competitive with me.  He's the head of
18   Judicial Watch now.  He's another lawyer.  He had
19   submitted this bar complaint to Ms. Porter.
20   Actually the initial complaint was assigned to Clay
21   Smith, her colleague.  It was reassigned to Clay
22   Smith.  We'll get to that tomorrow.  That's why it

Page 293

1   was hurting me.
2          Judge Gould made reference in the
3   findings that there was no need for this thing to
4   be out there.  "It was damaging Mr. Klayman and his
5   clients."  And that was another basis to conclude
6   that Judge Bybee had this extrajudicial bias and
7   prejudice, and there was no reason not to vacate
8   that order when in fact there's no proceeding any
9   more because Bundy's indictment had been dismissed.
10         So I turn your attention to that, and
11   Exhibit 101, which was along similar grounds.
12         CHAIRPERSON MIMS:  The dissent that you
13   were referring to was in Exhibit 100?
14         MR. KLAYMAN:  Where is the decent,
15   Oliver?
16         MR. PEER:  I have the number for
17   Respondent's exhibit, if that's ok.
18         CHAIRPERSON MIMS:  That's fine.
19         MR. PEER:  So it's going to go from
20   Respondent's -- this is the Bates number 735
21   until --
22         CHAIRPERSON MIMS:  What's the exhibit

74 (Pages 290 to 293)

In The Matter of:  Larry E. Klayman
July 15, 2019

Page 294

1  number, please?
2         MR. PEER:  Fourteen.
3         MR. KLAYMAN:  Can you show that to me,
4  Oliver.  Can you bring that?
5         I apologize, your Honor.  I went up to
6  a wedding in north California and then left to come
7  here yesterday.  I'm a little bit tired.
8         I won't read it to your Honor.  We'll
9  get into it tomorrow.  This is where Judge Bybee
10 says it should be mooted and then there's another
11 dissent that he files later that --
12        MR. WHITE:  Gould.
13        CHAIRPERSON MIMS:  Judge Gould.  You
14 said Bybee.
15        MR. KLAYMAN:  Judge Gould.
16        CHAIRPERSON MIMS:  I have the page
17 number.
18        MR. KLAYMAN:  Yeah, and there is
19 another one, too, where he made a finding.  But
20 I'll dive into that tomorrow.
21 BY MR. KLAYMAN:
22        A.  (Answer continuing)  And the one thing

Page 295

1  I want to add, your Honor, concluding for today, is
2  that as, Judge Gould ruled, I had no duty to
3  disclose that which I was not asked at the time.  I
4  responded truthfully.  I submitted an application,
5  a supplemental application, as your Honor just went
6  through, and gave the judge everything she wanted.
7  And as I'll get into in tomorrow's testimony, the
8  discretion to deny the right of counsel to a
9  defendant in a criminal case, particularly one that
10 faces the potential for life imprisonment, has to
11 rise to the level that that lawyer's about to be
12 disbarred.
13        I had never at that point in time and
14 even today have been suspended for even one day by
15 any bar association.
16        That concludes my testimony for today,
17 from my standpoint.
18        CHAIRPERSON MIMS:  Thank you.
19        MS. PORTER:  May I just...
20        REDIRECT EXAMINATION
21 ON BEHALF OF DISCIPLINARY COUNSEL
22        BY MS. PORTER:

Page 296

1         Q.  In describing your representation of
2  Dr. Jerome Corsi, you said that you were going to
3  attend the trial of Roger Stone to, I think you
4  said, protect your client, Dr. Corsi?
5         A.  Right.
6         Q.  But isn't it also true, Mr. Klayman,
7  that you have sued Roger Stone in your own name at
8  least twice, once in the federal court and once in
9  the DC Superior Court?
10        A.  Yes, with Dr. Corsi, because one of the
11 things that Roger Stone did, as he did -- Roger
12 Stone was indicted for lying under oath about
13 documentation involving communications over an
14 issue involving Wikileaks.  I'm sure you have all
15 heard of that over and over again.
16        Q.  A little bit.
17        MR. KLAYMAN:  Yeah, a little bit.  And
18 we can turn the TV on again tonight and see it on
19 all stations.
20        He was also indicted for threatening to
21 kill Randy Credico, that's another indictment, and
22 a dog, his service doing.  And Roger Stone's modus

Page 297

1  operandi is to threaten people to coerce their
2  testimony in a particular way.  And he threatened
3  Dr. Corsi, and me as Corsi's lawyer, and defamed us
4  both, publicly.
5         So, yes, I did file defamation lawsuits
6  against him.
7         Q.  I think you also -- and I want to make
8  sure I got the term correctly -- you filed business
9  complaints against Special Counsel Muller?
10        A.  No, Bivens.
11        Q.  Oh I'm sorry, Bivens complaints.
12        How many complaints have you filed
13 against Special Counsel Muller?
14        A.  One in court.  That's proceeding as we
15 speak.
16        Q.  And on whose behalf --
17        A.  And as I testified to, it's my belief
18 that that was material in convincing Special
19 Counsel Muller not to indict Dr. Corsi.
20        Q.  Was that also your intent in filing
21 complaints against the Office of Disciplinary
22 Counsel?

In The Matter of: Larry E. Klayman
July 15, 2019

Page 298

1    A. No. That's because I believe that you
2  should abide by the same rules that everybody else
3  abides by.
4       You know to me, this is something that
5  needs to be changed in the rules  -- and this is an
6  interesting point, is that -- and I'll get into it
7  in my testimony -- I wish you know ill will, Ms.
8  Porter, or anybody in your office, but this case
9  was unwarranted. This case was to pile on. This
10 was a case to have me removed from the practice of
11 law because you don't like what I do in terms of my
12 advocacy. That's my view.
13      But there are a number of reasons, and
14 I did attach that complaint to our exhibits,
15 because I'm not ashamed of filing it.
16      But it was only after I asked the bar
17 itself, Disciplinary Counsel, to investigate my
18 charges, just like they investigated me, and they
19 refused. They said, "Oh, Bar Counsel is mute,"
20 which in effect is saying they can do whatever they
21 want and they're not held accountable.
22      Then I went to the president of the

Page 299

1  bar, and I said, "Would you please review it?" And
2  even the chairman of the board, Mr. Bernice, said,
3  "We can do an internal review." And I said
4  "Please, do an internal review," which they
5  wouldn't do.
6       So it was only as a last resort that I
7  did that, because I want to be able to get
8  discovery to show that this proceeding is
9  unwarranted.
10      You know, your Honor has not granted
11 leave for discovery here, and I want to, you know,
12 frankly, have Disciplinary Counsel play by the same
13 rules that I have to play by, and that should be
14 the case.
15      I hope that that is amended in the way
16 Disciplinary proceedings occur, as not to coerce
17 everybody.
18      In fact, the proceeding had already
19 been commenced so I didn't do it to stop it from
20 happening. I'm not in any way defensive about
21 that. Everybody should have to play by the same
22 rules.

Page 300

1    Q. Mr. Klayman, you identified a letter
2  from Disciplinary Counsel, Respondent's Exhibit
3  Number 5, pages 135 and 136-137.
4       There is no mention of Judge Chin's
5  order or the 2nd Circuit decision affirming that
6  order. That wasn't the subject of this
7  investigation.
8       Am I correct?
9    A. No, that's correct, because those
10 records have been expunged I believe at this point
11 in time, but no disciplinary action was ever taken
12 against me by any bar association.
13      Because one of the things Judge Chin
14 ordered was that he was sending a copy of that
15 order to all bar associations.
16      It's not funny, Ms. Porter.
17   Q. I'm not laughing, Mr. Klayman.
18      My question is do you have any evidence
19 that Disciplinary Counsel in fact ever investigated
20 your conduct before Judge Chin and found that there
21 was no basis to take disciplinary action?
22   A. Yes, I believe they did, because Judge

Page 301

1  Chin sent the order to every court that I was a
2  member of.
3    Q. But if that had been the case and
4  Disciplinary Counsel had opened an investigation,
5  you would have been aware of that.
6       Isn't that correct?
7    A. I can't be aware of something that
8  never happened, and therefore there was no
9  disciplinary action taken.
10   Q. But you would have been aware --
11   A. -- in this action.
12   Q. But you would have been aware of an
13 investigation and the results of an investigation
14 if an investigation in fact had been opened?
15   A. Not necessarily, and I'll explain why.
16      Your colleague, Ms. Herman, Elizabeth
17 Herman, is no longer with your office in this
18 Judicial Watch matter. I asked that that be
19 investigated prior to that by Clay Smith, that they
20 had committed certain ethical infractions in my
21 response to that complaint filed by Mr. Fitton, the
22 one that we have been talking about today. I have

In The Matter of:  Larry E. Klayman
July 15, 2019

---

Page 302

1  never, ever acknowledged that I had requested that.
2        And then, later on, because Judicial
3  Watch -- when I was there, we raised a million and
4  a half dollars to buy a building, as I was leaving
5  in 2003, on September 19th.
6        To this day Judicial Watch has not used
7  that money to buy a building.  The donors that paid
8  for the building, to have naming rights, have never
9  had offices that they wanted in their names.  A lot
10 of them are dead.  The average age of the donor was
11 about 74, and they misappropriated that money.
12       So then I wrote to Ms. Herman or I
13 wrote to the bar and said, "Would you investigate
14 that," because this shows the improper conduct of
15 what I was trying to protect, the donors in this
16 particular case, of what was going on.
17       The Office of Disciplinary Counsel
18 dismissed that case without even telling me that
19 they had gotten a response from Judicial Watch,
20 which apparently they hadn't, as to why they still
21 have a million and a half dollars 16 years later
22 that they didn't use that the donors gave them to

---

Page 303

1  buy a building.
2        I never got notice of that, that there
3  had been any real inquiry that was done.
4        And it would appear to me, in all due
5  respect, that the Disciplinary Counsel is only
6  concerned about trying to have me removed from the
7  practice of law, and that they will bend the rules
8  to accomplish that purpose.
9        Q.  Getting back to my question, Mr.
10 Klayman, you have no document showing that
11 Disciplinary Counsel ever investigated much less
12 dismissed a complaint involving your conduct
13 against Judge Chin?
14       A.  I can't do a negative, but there is a
15 document, if you go back and look at Judge Chin's
16 order, that he informed the bar and every court I
17 was in front of, that's the DC Court of Appeals, of
18 his sanction, and the DC Bar took no action, the DC
19 Disciplinary Counsel.
20       Q.  You refer to Mr. Rotunda's opinion
21 letter.  That opinion letter is dated June 2nd,
22 2014?

---

Page 304

1        A.  That's correct.
2        Q.  And you had that four months before the
3  hearing on your petition for negotiated discipline.
4        Is that right?
5        A.  I don't remember when that petition was
6  signed, but I knew that the complaint from Judicial
7  Watch was pending, and yes I did get this letter.
8        The donor was used to try to dissuade
9  initially Office of Disciplinary Counsel from
10 starting an investigation.
11       Q.  Well, you --
12       Starting a Specification of Charges.
13       Q.  According to the petition for
14 negotiated discipline, you signed that and the
15 affidavit and accompaniments on June 23rd, 2014.
16       Isn't that correct?
17       A.  That's correct, and I testified --
18       Q.  And you had Mr. Rotunda's opinion
19 letter of June 2nd, 2014, at least approximately
20 three weeks before you entered into the petition
21 for negotiated discipline?
22       A.  That's correct, and what I testified

---

Page 305

1  to -- if I just may say briefly, and I will testify
2  tomorrow to, and I just wanted to put it behind me.
3  I had agreed to a public censure, not to a
4  suspension.
5        These proceedings are very costly, and
6  I thought the better of that after, after that was
7  not accepted.  And in fact I told the hearing
8  committee that was sitting on it at the time that I
9  didn't feel like I did anything wrong.
10       So I think that probably was what ended
11 that negotiated discipline in their mind, and they
12 rejected it.
13       Q.  And you referred to Judge Claudia
14 Wilken in the Robles case?
15       A.  Correct.
16       Q.  Well, didn't she revoke your pro hac
17 vice application?
18       A.  Yes, based upon this proceeding
19 primarily.
20       Q.  And after she did that, you moved to
21 disqualify her because you claimed she was biased
22 and prejudiced against you?

---

77 (Pages 302 to 305)

In The Matter of:  Larry E. Klayman
July 15, 2019

|  | Page 306 |
| --- | --- |

1    A.  No, she was biased and prejudiced
2  against me and it showed the harm.
3          She was biased and prejudiced against
4  what Bybee had written, because that's very strong,
5  and judges will use that if they want to keep you
6  out of a proceeding.
7    Q.  And your basis for claiming that she
8  was biased and prejudiced because she was appointed
9  by President Clinton?
10    A.  Well, there are -- we do know this is
11  the case.
12          I know when I walk in -- I'm not saying
13  that that was the primary reason, but we know that
14  when you walk into a lawsuit, I can tell you with
15  almost 100% certainty, based upon who appointed the
16  judge, how they're going to react to a particular
17  issue, unfortunately.  That's why I started
18  Judicial Watch.
19          CHAIRPERSON MIMS:  Is there an exhibit
20  which you're referring to there?
21          MS. PORTER:  I know Mr. Klayman points
22  to a pleading and that's Exhibit 109 at page nine.

|  | Page 308 |
| --- | --- |

1  republican party very much, the establishment.  But
2  I just had a judge, I asked him to get off the case
3  here.  It was a case involving Muller that was
4  reassigned to him.  It turned out he was the
5  partner of Robert Muller, Special Counsel,
6  WilmerHale.
7          CHAIRPERSON MIMS:  I think we
8  understand.  I don't think that has any relevance
9  to this.
10          MR. KLAYMAN:  All right.  I have to
11  represent my client to the full extent of the law
12  and ethics.
13          MS. PORTER:  I have no further
14  questions and I would at this time like to move in
15  a number of exhibits.
16          CHAIRPERSON MIMS:  Ok.  Let's look at
17  the exhibits.
18          MS. PORTER:  Should I go through them
19  one by one?
20          MR. KLAYMAN:  I would prefer that.
21          CHAIRPERSON MIMS:  We can do them one
22  by one.

|  | Page 307 |
| --- | --- |

1          MR. KLAYMAN:  That matter is on appeal,
2  your Honor, by the way.
3  BY MS. PORTER:
4    Q.  But you did after, only after Judge
5  Wilke denied your pro hac vice, or denied your pro
6  hac vice, is when you accused her of being biased
7  and prejudiced?
8    A.  You don't know what's going to happen
9  until it happens.  You don't know that that's the
10  case until you see it happens.  And that's the way
11  it is.
12          And you see again, the reason for
13  Judicial Watch -- look I have to defend the rights
14  of my client.  This is important.  And within the
15  bounds of ethics in the law, I will defend the
16  rights of my client.
17          Judges are imperfect, just like
18  lawyers.  And again I was not sanctioned for filing
19  that motion.  I have a right.
20          There are other cases with republican
21  judges.  I had a republican judge -- I'm a
22  registered republican, although I don't like the

|  | Page 309 |
| --- | --- |

1          MS. PORTER:  Number one is Mr.
2  Klayman's registration statement.
3          CHAIRPERSON MIMS:  I need to get out
4  the exhibit list.  Just a minute.
5          MS. PORTER:  Is there any objection to
6  Exhibit Number 1?
7          MR. KLAYMAN:  Oh, I've got it.
8          CHAIRPERSON MIMS:  Are you ready, Mr.
9  Klayman?
10          MR. KLAYMAN:  I need the book of their
11  exhibits.
12          CHAIRPERSON MIMS:  It's binder one, tab
13  one.
14          MR. KLAYMAN:  Other than my general
15  objection, I have no objection to it, your Honor.
16          CHAIRPERSON MIMS:  Admitted.
17          MS. PORTER:  So that's over objection,
18  I guess.
19          I'm supposed to indicate on the Board's
20  form whether it's over objection.  So if you are
21  objecting, I'm going to put "over objection".
22          MR. KLAYMAN:  It's over objection.

78  (Pages 306 to 309)

In The Matter of:  Larry E. Klayman
July 15, 2019

Page 310

1    MS. PORTER:  Ok.
2    MR. KLAYMAN:  In a technical sense.
3    MS. PORTER:  I'm just going to go
4  through these to eliminate the need to call
5  witnesses if necessary.
6    CHAIRPERSON MIMS:  I think that's ok.
7    MS. PORTER:  Exhibit Number 2 is my
8  cover letter to Mr. Klayman and his responses and
9  follow-up emails.
10    MR. KLAYMAN:  Your Honor, I just make a
11  standing objection in terms of my general
12  objection, but otherwise, there's no specific
13  objection.
14    CHAIRPERSON MIMS:  Well, should we
15  assume that your standing objection is --
16    MR. KLAYMAN:  Yes, this is subject to
17  review.
18    CHAIRPERSON MIMS:  I think for each of
19  them, they're admitted.  You'll do admitted over
20  objection.
21    Admitted.
22    CHAIRPERSON MIMS:  Three is the

Page 311

1  Specification of Charges.  It's relevant to the
2  extent he actually responds to the allegations in
3  this answer, which is Exhibit Number 7.  I'd offer
4  both of those.
5    CHAIRPERSON MIMS:  Let's do it this
6  way...
7    Are you going to be going through all
8  of these?
9    MS. PORTER:  Well, if I need to.
10    I mean, I don't know what he really
11  objects to, other than just his general objection.
12    He hasn't objected to authenticity as
13  to any of them.  Most of them, except the Internet
14  searches, are either court records or records from
15  the prior disciplinary matter.  So I would offer
16  them all in in bulk, one through -- I think we went
17  through the Pacer records.
18    MR. KLAYMAN:  Your Honor, I --
19    CHAIRPERSON MIMS:  Let her finish.
20    MS. PORTER:  I think one through 119.
21    MR. KLAYMAN:  I objected to several on
22  relevancy grounds, and I also objected, as I've put

Page 312

1  on the record, for lack of completeness.  I would
2  like the entire exhibit in.
3    CHAIRPERSON MIMS:  Those were all
4  overruled.
5    To the extent that you objected to
6  anything for lack of completeness, what I would
7  suggest that you do is, during your presentation of
8  your case, if you think that there was something
9  incomplete about the document that substantively
10  applies, then bring it into your case at that
11  point.
12    MR. KLAYMAN:  Ok.
13    CHAIRPERSON MIMS:  For instance, one of
14  them you said lack of completeness and it was a
15  hearing transcript that just had the first and last
16  pages to indicate where it started and where it
17  ended.
18    MR. KLAYMAN:  Ok.
19    CHAIRPERSON MIMS:  If there is
20  something substantive in those transcripts and you
21  want to bring it in, then you can bring it in.
22    MR. KLAYMAN:  Ok.

Page 313

1    CHAIRPERSON MIMS:  But those were
2  overruled.
3    I think, as you are aware, there is
4  very broad discretion here and we can determine the
5  relevance.  So I take that over advisement and
6  we'll look at those objections, but for purposes of
7  this hearing those are overruled.
8    So for purposes of admitting the
9  exhibits now, are there any additional objections
10  that you have?
11    MR. KLAYMAN:  None other than what I
12  have put in writing.
13    MS. PORTER:  And I misspoke.  It goes
14  through 121, 121 being the federal circuit and the
15  2nd Circuit's decisions affirming the rulings of
16  Judge Keller and Judge Chin, which Mr. Klayman also
17  testified about.
18    CHAIRPERSON MIMS:  One through 121?
19    MS. PORTER:  Yes.
20    CHAIRPERSON MIMS:  All right, I'm going
21  to admit those over your objections and over the
22  objections that were voiced today during the

79  (Pages 310 to 313)

In The Matter of:  Larry E. Klayman
July 15, 2019

Page 314

1  testimony.
2      So that said, where are we on
3  witnesses?
4      MS. PORTER:  We just have two --
5      CHAIRPERSON MIMS:  Would you like to
6  move anything into evidence at this point.
7      MR. KLAYMAN:  I'd like to move our
8  supplemental exhibits into evidence.
9      CHAIRPERSON MIMS:  All right, those
10  have already been accepted.
11      MS. PORTER:  I don't have any problem
12  with the transcript and the court records, but the
13  emails, without being able to ask Mr. Klayman
14  questions about them, because they are not court
15  records, I would reserve my right to object.
16      CHAIRPERSON MIMS:  That's fine.  We
17  went over that.
18      MR. PORTER:  Yes.
19      CHAIRPERSON MIMS:  So let's move to
20  witnesses.  Where are we on witnesses?
21      MS. PORTER:  I'm assuming because
22  Exhibit Number 9 and 17 are in that I will not node

Page 315

1  to call Meghan Borrazas, for the board dockets,
2  both with the negotiated and for the contested
3  proceeding.
4      CHAIRPERSON MIMS:  I think that's
5  correct.  That's fair.
6      MS. PORTER:  And Angela Thornton, who
7  was going to testify as to some of the Disciplinary
8  exhibits, or exhibits associated with the first
9  Disciplinary matter.  I don't need to call her any
10  more.
11      The only two witnesses are the two law
12  clerks and basically it's about court searches,
13  court record searches and Internet searches.
14      CHAIRPERSON MIMS:  Is her testimony
15  going to be brief?  I know you said one of them is
16  here.
17      MS. PORTER:  Yeah, I think both of
18  them -- well, their direct will be very brief.  I
19  would imagine maybe ten minutes, max.
20      CHAIRPERSON MIMS:  Are the records in
21  evidence?  They're not testifying specifically as
22  to records and authenticity, correct?

Page 316

1      MS. PORTER:  No.  I can tell you what
2  they will testify about.
3      Christine Chicherio.  She just did the
4  Internet search, and I'm only going to have her
5  identify all the federal court records that she
6  could find where Mr. Klayman was involved in a
7  criminal case.
8      I think he's already testified to that
9  so I will just have her identify that that was the
10  extent -- we couldn't find anything more in the
11  federal records search.
12      She will also testify about the records
13  searches that she did for Mr. Whipple, both as to
14  his federal criminal court experience and his
15  criminal experience in -- we just limited it to
16  Clark County, which is the county where Las Vegas
17  is.  So those two things which are marked as
18  exhibits, I think one --
19      CHAIRPERSON MIMS:  Let me stop you
20  right there.
21      MS. PORTER:  Ok.
22      CHAIRPERSON MIMS:  Mr. Klayman, in

Page 317

1  terms of the federal criminal docket that was
2  reviewed on Ms. Porter's direct, do you assert that
3  there are any other additional federal criminal
4  cases that you worked on that were not represented
5  on that document?
6      MR. KLAYMAN:  I will rack my memory
7  this evening, your Honor.  I don't know.  I didn't
8  really give it much thought.
9      I mean, we're going back 23 years.  So,
10  I don't know whether there are or there aren't.
11      MS. PORTER:  I mean --
12      CHAIRPERSON MIMS:  Is that the person
13  who is available?  I don't know which witness?
14      MS. PORTER:  Yes, Christine is
15  available.  I haven't called her.  It will take her
16  a few minutes to get over here, or we could start
17  at 9:00 o'clock --
18      CHAIRPERSON MIMS:  I think we're all
19  here.  I know everyone is tired but her testimony
20  is going to be quick, I assume.
21      MS. PORTER:  Ok.
22      CHAIRPERSON MIMS:  So I think we should

80  (Pages 314 to 317)

In The Matter of:  Larry E. Klayman
July 15, 2019

Page 318

1   get her out of the way, if everyone can stay.
2        MS. PORTER:  Give me a few minutes to
3   call her and she'll be here in a few minutes.
4        CHAIRPERSON MIMS:  We'll take a
5   five-minute break.
6        MR. KLAYMAN:  Thank you.
7        (Recess taken.)
8        MS. PORTER:  She's on her way.
9        (Recess taken.)
10       CHAIRPERSON MIMS:  Back on the record
11  at 4:54.
12       Mr. Klayman, how long do you expect to
13  go in your case?
14       And I guess my question is directed
15  more at, it seems like we'll have one very brief
16  witness tomorrow by Bar Counsel, and you'll be
17  starting your case, if we come in at 9:00,
18  depending on the questioning, possibly within a
19  half an hour.  So you'll have all day.
20       MR. KLAYMAN:  I expect --
21       CHAIRPERSON MIMS:  So, you'll have all
22  day.  I know you have the professor scheduled for

Page 319

1   Thursday, but I'm wondering if it makes sense to
2   try and move him to tomorrow.
3        MR. KLAYMAN:  It is West Coast time.
4   He can't come.  He's the dean.  But I'll probably
5   take up the day.
6        CHAIRPERSON MIMS:  How many witnesses
7   do you expect to call?
8        MR. KLAYMAN:  Me and Mr. Peer.
9        CHAIRPERSON MIMS:  Do you expect to be
10  on for the full day?
11       MR. KLAYMAN:  Yes.
12       MS. PORTER:  Are we ready?
13       CHAIRPERSON MIMS:  We are ready.
14       (Christine Chicherio on the witness
15  stand.)
16       MS. PORTER:  Bar Counsel's next witness
17  is Christine Chicherio.
18       CHAIRPERSON MIMS:  I'm sorry, can you
19  state your last name again, please.
20       MS. PORTER:  I'll have her do it.
21       THE WITNESS:  It's Christine Chicherio.
22       CHAIRPERSON MIMS:  I'm going to swear

Page 320

1   you in before the testimony begins.
2        Ms. Chicherio, do you solemnly swear or
3   affirm that the testimony you will give in this
4   proceeding will be the truth, the whole truth and
5   nothing but the truth?
6        THE WITNESS:  I do.
7        CHAIRPERSON MIMS:  You may be seated.

Page 321

1   Whereupon,
2        CHRISTINE CHICHERIO
3   called as a witness on behalf of Disciplinary
4   Counsel, and after having been first duly sworn,
5   was examined and testified as follows:
6        DIRECT EXAMINATION
7   ON BEHALF OF DISCIPLINARY COUNSEL
8        BY MS. PORTER:
9        Q.  Can you start by saying your full name
10  again and spelling your name for the court
11  reporter.
12       A.  Certainly.  My first name is Christine,
13  which is spelled C-h-r-i-s-t-i-n-e, and my last
14  name is Chicherio, spelled C-h-i-c-h-e-r-i-o.
15       Q.  And where are you employed?
16       A.  I am currently employed at the Office
17  of Disciplinary Counsel.
18       Q.  And what is your position there?
19       A.  My position there is senior law clerk.
20       Q.  How long have you been employed by the
21  Office of Disciplinary Counsel?
22       A.  I have been employed there since May

81 (Pages 318 to 321)

In The Matter of:  Larry E. Klayman
July 15, 2019

| Page 322 | Page 324 |
|---|---|

**Page 322**

1  2008.

2      Q.  Were you asked to assist Disciplinary

3  Counsel in this case by doing public court record

4  searches?

5      A.  I was.

6      Q.  Let me have you turn to Exhibit Number

7  113.  It's in the third volume of documents.

8        Do you recognize this document, Ms.

9  Chicherio?

10     A.  I do.

11     Q.  And tell the hearing committee what it

12  is.

13     A.  This is a search conducted using Pacer,

14  which stands for Public Access to the Court

15  Electronic Records, and it is the portal through

16  which you can conduct an Internet search to access

17  all federal cases nationwide including bankruptcy

18  matters.

19     Q.  Did you conduct the search which

20  resulted in the document that's marked as Exhibit

21  Number 113?

22     A.  Yes.  I conducted a search.

**Page 323**

1      Q.  Can you tell the hearing committee what

2  you did to conduct the search.

3      A.  Well, you can input certain search

4  criteria, which in this instance is readable at the

5  top of the document under "Party Search Results,"

6  and it says the search criteria, party search last

7  name Whipple, Bret is the first name, and that is

8  the search that was conducted limited to criminal

9  matters.

10     Q.  And there is a designation, "ATY,"

11  after the name Whipple under party name.  What does

12  that signify?

13     A.  That signifies the role of the party in

14  the case.  So in this instance it means he was an

15  attorney.

16     Q.  And for Exhibit Number 114, is that

17  a --

18        CHAIRPERSON MIMS:  Before we move on

19  from that, is there any way to tell whether the

20  attorney, Mr. Whipple, in this case or any other

21  attorney, is the lead attorney in the case, by

22  looking at this document?

**Page 324**

1        THE WITNESS:  Looking at this document,

2  you cannot tell that, but by looking at the actual

3  records themselves I believe at some point it may

4  indicate.

5        CHAIRPERSON MIMS:  Did you do that

6  search.

7        THE WITNESS:  I did a search in Clark

8  County District Court of the actual dockets

9  themselves.

10       CHAIRPERSON MIMS:  Well, so my question

11  is, did you determine for those cases whether Mr.

12  Whipple was the lead attorney or not?

13       MR. KLAYMAN:  Objection.

14       THE WITNESS:  I would have to say no.

15       CHAIRPERSON MIMS:  How far back does

16  Pacer go.

17       THE WITNESS:  It goes back to 1990 in

18  terms of the electronic access, but it goes beyond

19  that in terms of paper archive documents, which I

20  believe are maintained by NARA.  That information

21  is available on the Pacer website.

22

**Page 325**

1  BY MS. PORTER:

2      Q.  You referred to another search that you

3  did for Clark County, and if you could turn to

4  Exhibit Number 114 and identify that for the

5  hearing committee.

6      A.  This was a search done in the 8th -- I

7  think it's the 8th Judicial District of Nevada,

8  Clark County.  The path is obscured, despite

9  numerous attempts to get it clearly to show up on

10  the page.  But the last page.

11       So, to respond to your question, that

12  is a search conducted through their portal.

13     Q.  Can you tell the hearing committee what

14  you did to conduct the search?

15     A.  The search criteria is actually

16  available from pages 114, Bates 007 through 009.

17  So it was a search using Bret Whipple's name and it

18  was in the District Court for Clark County, and for

19  adult criminal cases, which was a case type that

20  was -- that's available on the website.

21     Q.  And how many results did your Internet

22  search come up with?

82 (Pages 322 to 325)

In The Matter of:  Larry E. Klayman
July 15, 2019

Page 326

1          A.  You can tell how many cases are
2    produced by the very top line of the first page of
3    114, Bates page 001, and it says the search
4    returned 171 cases.
5          Q.  I guess in anticipation of the Chair's
6    question about this one, as well, did you check to
7    see whether or not in Whipple was the lead attorney
8    or whether other attorneys were involved in the
9    cases?
10         A.  I did print out a variety of dockets.
11   I can't recall whether he was -- he remained the
12   lead attorney in each instance, however, my
13   recollection is that he was at some point the lead
14   attorney.
15         MR. KLAYMAN:  Objection, vague and
16   ambiguous.  Move to strike.
17         CHAIRPERSON MIMS:  Overruled.
18   BY MS. PORTER:
19         Q.  The next exhibit, 115, if you can
20   identify that or tell the hearing committee whether
21   or not that document's familiar to you and what it
22   is?

Page 327

1          A.  This document is familiar to me and it
2    is a search produced through -- by using Pacer, and
3    I'm using Respondent's name, Larry Klayman, and it
4    was limited to criminal cases.
5          Q.  With respect to the four cases that are
6    listed in Exhibit Number 115, did you also print
7    out, to the extent they were available, documents
8    related to those four cases?
9          A.  I did.
10         Q.  I think you mentioned in your earlier
11   testimony that, while Pacer has documents as of I
12   think a certain year, included in the Pacer
13   documents Pacer docket sheets are available even
14   earlier.
15         Was that true in the case of the BCCI
16   case, docket number --
17         MR. KLAYMAN:  Objection.  I don't think
18   that was her testimony, your Honor.  I don't
19   remember her testifying to that.
20         CHAIRPERSON MIMS:  Well, the testimony
21   was that Pacer I think began in 1999, but there
22   were prior years that were also included.

Page 328

1          I think that's what you're referring
2    to.  But you can get the docket prior to 1990?
3          THE WITNESS:  You can -- in 1999 is
4    when they're electronically available.  I believe
5    you have to make a special request for archives
6    paper documentation for earlier cases.
7          But it's all captured.  I believe it's
8    all captured by Pacer.  And I actually have a copy
9    of the website that names the availability of the
10   documents if it's appropriate to retrieve it.
11         CHAIRPERSON MIMS:  If it's available on
12   the website.
13   BY MS. PORTER:
14         Q.  And I'll ask this globally.  With
15   respect to the documents that you retrieved for
16   each of the four criminal cases, what documents did
17   you retrieve, or what docket entries did you
18   retrieve for each of those four criminal cases?
19         A.  I reviewed the docket, looking for
20   those entries in which Mr. Klayman is mentioned,
21   and I, after reviewing those docket entries, I
22   pulled up the images and I printed those out.

Page 329

1          CHAIRPERSON MIMS:  Reviewing what
2    docket entries?  You mean anything that you saw on
3    the docket that had been filed under Mr. Klayman's
4    name for that particular case?
5          THE WITNESS:  Yes, anything that had
6    been filed by Mr. Klayman.
7          CHAIRPERSON MIMS:  Under each of the
8    four cases?
9          THE WITNESS:  Yes.
10         CHAIRPERSON MIMS:  So are you
11   testifying that you reviewed every single document
12   under those cases filed by him in federal court?
13         THE WITNESS:  "Under those cases"?
14         CHAIRPERSON MIMS:  The four cases.
15         THE WITNESS:  I reviewed the four cases
16   that we're referring to.  I believe they're part of
17   the exhibits.
18   BY MS. PORTER:
19         Q.  And in the case of BCCI cases, those
20   documents weren't, I guess, available
21   electronically?
22         CHAIRPERSON MIMS:  Were not?

In The Matter of:  Larry E. Klayman
July 15, 2019

Page 330

1   MS. PORTER:  Were not, because it's a
2   1991 case.
3       THE WITNESS:  However, if I may, the
4   entries pertaining to Mr. Klayman were quite
5   limited.  Even the documents for the BCCI case,
6   which is 177 pages, it didn't require me reviewing
7   a voluminous record.
8       MS. PORTER:  Those are all my
9   questions, given that we covered a lot of the
10  information it those records with Mr. Klayman.
11      CHAIRPERSON MIMS:  Ok, Mr. Klayman.
12      MR. KLAYMAN:  Yes.
13  CROSS-EXAMINATION ON BEHALF OF RESPONDENT:
14      BY MR. KLAYMAN:
15  Q.  Ms. Chicherio -- am I pronouncing your
16  name correctly?
17  A.  That's fine.  People in my family
18  pronounce it differently.
19  Q.  Isn't it true that you never were able
20  to ascertain whether Mr. Whipple had taken these
21  criminal cases to trial, based upon your search?
22  A.  No.

Page 331

1       CHAIRPERSON MIMS:  It is not?
2       THE WITNESS:  That is not true.
3       I do have some documents -- I do have
4   the underlying -- a variety of dockets printed out
5   that will indicate his role.
6       CHAIRPERSON MIMS:  Were you able to
7   ascertain whether he took any of those cases to
8   trial?
9       THE WITNESS:  I can't recall right now,
10  but I do have the documents in my brief case.
11      I do know one of them was a death
12  penalty case, not that that necessarily goes to
13  trial.
14  BY MS. PORTER:
15  Q.  You never traveled to Clark County
16  Nevada to do your research, did you?
17  A.  No, I didn't.  No.
18  Q.  And you never talked to anybody about
19  Bret Whipple's participation in alleged criminal
20  cases, correct?
21  A.  Well, I can say that I did speak to the
22  clerk's office employees, because I wanted to make

Page 332

1   sure I understood the docket sheets and the
2   procedure of accessing cases, but --
3       That's my response.
4   Q.  You never talked to any other counsels
5   that may have been involved in these criminal cases
6   for other defendants?
7   A.  No, I did not.
8   Q.  You're not telling the court, are you,
9   or the hearing committee that you have every
10  document that was ever filed in the criminal cases
11  that you've identified?
12  A.  Well, what do you mean by that?
13  Q.  You're not telling the court under oath
14  that you had every pleading that I every filed in a
15  criminal case?
16  A.  Every pleading or every case?
17  Q.  Every pleading.
18  A.  Certainly not every pleading.
19      MR. KLAYMAN:  No further questions,
20  your Honor.
21      CHAIRPERSON MIMS:  I just have a couple
22  of quick follow-ups.

Page 333

1       For Mr. Whipple, when you looked at any
2   of the filings that you looked at, do you recall
3   who he was employed by or whether he had his own
4   firm?
5       What do you recall about that?
6       THE WITNESS:  I recall that the docket
7   sheets indicate the address for the practitioners.
8   I believe he maintained his own office, but at the
9   time he was associated with other people.  That's
10  my recollection.  I have documentation in my
11  briefcase that would be more specific.
12      But, the documents that are filed
13  within those cases in Clark County are not
14  accessible electronically.  That would require --
15  well, that was beyond the scope of my task.
16      CHAIRPERSON MIMS:  Ok.  I don't have
17  any further questions.  Thank you.
18      THE WITNESS:  Thank you very much.
19      (Witness is excused.)
20      CHAIRPERSON MIMS:  So I think we're
21  done for the day.  Are we all in agreement that we
22  can start tomorrow at 9:00?

84  (Pages 330 to 333)

In The Matter of:  Larry E. Klayman
July 15, 2019

```
                                            Page 334
 1          MR. KLAYMAN:  Yes, your Honor.
 2          MS. PORTER:  I'm hopeful.  I'll have to
 3    talk to my witness, but if there is a problem I'll
 4    notify the Board office by 5:30 at the latest.
 5          But I don't think it should be a
 6    problem.
 7          CHAIRPERSON MIMS:  All right.  And
 8    after that witness are you then going rest your
 9    case?
10          MS. PORTER:  I will.
11          CHAIRPERSON MIMS:  Ok.  All right.  So
12    you'll be ready to start tomorrow?
13          MR. KLAYMAN:  Yes, your Honor.
14          CHAIRPERSON MIMS:  All right.
15          So we will go ahead and go off the
16    record at 5:09 and we'll see you here tomorrow at
17    9:00 a.m.
18           (Whereupon at 5:09 p.m. the hearing was
19    adjourned until Tuesday, July 16, 2019 at 9:00
20    a.m.)
21
22
```

85  (Page 334)

**A**

**a.m** 2:3 129:17
334:17,20
**Aaron** 273:7
**abandoned** 20:5
**abide** 298:2
**abides** 298:3
**ability** 41:15 201:21
274:6,9 290:17
**able** 17:2 29:10
44:21 110:22
143:18 202:12
299:7 314:13
330:19 331:6
**abreast** 225:2
**absentia** 141:4,12
**absolute** 93:10
**abuse** 32:12 166:11
**accept** 21:9 37:5,6
39:21 59:17 161:1
215:1
**accepted** 21:1,3,6
58:19 59:12 60:8
116:10 305:7
314:10
**access** 150:21
167:22 168:2,3
322:14,16 324:18
**accessible** 333:14
**accessing** 332:2
**accompaniments**
304:15
**accomplish** 303:8
**account** 71:10
101:20
**accountable** 111:1
298:21
**accuracy** 225:14
229:6 255:9
**accurate** 22:16 51:1
59:22 86:2 106:8
120:14 121:4
125:16 126:7
127:3 147:6
155:16 163:6
167:21 194:5
277:4
**accusations** 261:1
**accuse** 246:4
**accused** 145:21
208:15 259:21
272:3 307:6
**acknowledged**
53:21 302:1
**ACLU** 204:16
205:1,2,4,9,12,18

205:22 206:5,8
**acquitted** 251:9,11
**acres** 16:5
**act** 134:18,21
165:20 171:9
285:20
**acted** 59:18 84:3
153:10 264:15
**acting** 59:16 134:22
236:20
**action** 11:1 13:5,16
24:13,19 92:5,6
92:11,21 94:10
97:22 98:17 99:3
100:19 101:16
102:15 103:2
104:13 105:10,11
106:2 156:16
259:22 261:10
288:3 289:19
300:11,21 301:9
301:11 303:18
**actions** 13:17 59:13
61:17
**active** 171:3 199:3,5
**activities** 93:13
**activity** 202:2
283:17
**acts** 141:13 272:3
**actual** 65:2 135:20
140:2,16 184:20
228:17 229:7
324:2,8
**ad** 2:3,9 86:20
**add** 6:10 77:3 85:12
93:1 103:7 170:9
237:1 263:12
274:15 295:1
**addition** 257:1
**additional** 11:21
40:17 41:2,3,4
188:3 313:9 317:3
**additionally** 84:20
**address** 103:4
104:12 130:2
177:12 333:7
**adhere** 269:16
**adjourned** 334:19
**administer** 46:19
**administration**
32:8,9 34:11 80:6
178:8,9 244:5
**administrative**
72:22 264:7
**admissibility**
130:18

**admission** 22:7
78:20 84:10 92:3
233:1 241:7
264:12
**admit** 13:10 122:17
122:21 313:21
**admits** 225:20,21
**admitted** 9:18
10:12 27:21 34:21
53:7 54:2 90:17
100:13,15 173:20
174:1 176:17
223:18 268:13,14
271:10 278:16
309:16 310:19,19
310:21
**admitting** 313:8
**adopting** 57:7
**adult** 325:19
**advance** 132:13,17
**adversaries** 74:5
292:2,3
**adversary** 5:15
**advice** 269:17
277:14
**advise** 22:3 61:5
105:15
**advised** 63:1,3,11
63:22 64:1
**advisement** 313:5
**advisor** 105:6,15
**advocacy** 298:12
**advocate** 34:19 37:4
112:10 119:14
166:6
**advocating** 249:20
**aere** 40:4
**Affairs** 177:7,9,10
178:2,15,22 179:3
180:6,22 182:13
182:14 183:4,21
**affect** 15:5 19:2
28:3 71:16 263:3
**affidavit** 20:20
21:21 57:6,10,16
57:17,19,20 58:2
58:3,7,11,16,17
58:22 59:5 114:9
114:15,18 115:14
115:20 116:15
163:14 170:17,22
171:5 173:4,13
230:22 231:18
233:3 275:20
276:2,5 304:15
**affirm** 46:22 320:3

**affirmation** 5:20
**affirmative** 11:7
266:7
**affirmed** 73:19,20
74:17 75:21 76:15
76:15 79:1 82:2
154:11
**affirming** 13:9 83:2
300:5 313:15
**afraid** 37:2
**Afternoon** 130:10
**age** 70:21 198:9
302:10
**agency** 172:16
205:6
**agent** 16:19 205:10
**agents** 10:5 16:17
**aggravation** 71:11
**aggressive** 153:8,14
261:8 275:7
**aggressively** 247:1
247:7 259:21
261:2 262:14,16
265:10
**agreeable** 14:12
**agreed** 90:15 98:9
111:18 134:17,21
305:3
**agreement** 51:15,17
202:11 207:12
208:11 333:21
**agreements** 191:13
**Agriculture** 178:10
**ahead** 14:14 133:2
263:16 334:15
**air** 138:11 139:8,19
144:8 150:14
154:9 203:22
**al** 147:16 190:6,8
**alert** 217:5 268:2
**aliens** 201:15
202:14
**allegation** 252:10
257:17,20
**allegations** 11:14
94:9 131:3 242:14
259:18 311:2

**affirmation** ... (second column end)

**allege** 204:8 245:15
**alleged** 9:16 11:8
13:6,13 80:9
116:12 201:19
244:16 245:16
271:19 274:17
331:19
**allover** 139:12
**allow** 98:13 205:11
272:8,11
**allowed** 34:18 205:9
234:3
**ambiguous** 326:16
**amended** 90:17
238:10,14 299:15
**Amendment** 15:22
17:6,6 22:8 29:15
34:15,16 93:5
105:18 139:6
141:20 245:3
**American** 38:3
**amount** 28:18
**analysis** 135:8
**and/or** 12:12
**Andrew** 273:2
**Andy** 179:9
**Angela** 269:3 315:6
**answer** 15:16 37:2
50:17 56:11 71:9
72:8 77:5 78:4,11
81:11 82:9 94:13
94:15 96:2 106:13
144:20 145:1
151:17 191:15
227:6 233:18
281:18 284:21
291:1 294:22
311:3
**answered** 15:16
19:15 73:13 77:13
78:16 145:7 214:7
257:13 264:14
**answering** 144:22
145:1 165:11
**answers** 97:7 145:5
152:11 153:2
**anti-defamation**
80:21,22
**anticipation** 177:2
326:5
**Antifa** 292:9
**antitrust** 174:20
177:16,20 179:22
180:7,8 181:1
**anybody** 24:15
250:20 298:8

In The Matter of:  Larry E. Klayman
July 15, 2019

331:18
anyway 269:13
apologies 275:19
apologize 182:6
  235:5 294:5
apparently 56:21
  220:22 302:20
appeal 32:10 36:19
  147:20,20 237:17
  280:22 291:15
  307:1
appealed 73:14
  75:8 78:21 81:21
appeals 1:1 5:8
  20:16 26:3 69:19
  73:18 75:21 76:14
  79:1 83:8,8,11,14
  83:15 266:20
  303:17
appear 13:4 64:8
  72:21 81:18 98:13
  218:10 223:12,19
  223:21 224:17
  229:16 230:19
  264:6 303:4
appearance 121:8,8
  121:16 146:13
  194:22 195:7,16
  197:5 199:21
  207:20 208:5
  246:13 248:3
  250:2,7 254:18
APPEARANCES
  2:8 3:1
appeared 277:12
  278:11
appearing 11:4
  73:22 79:19 81:16
appears 57:19
  87:14 114:10
  125:12 128:8,15
  147:18 198:16
  206:4
appellate 83:15
append 88:19
appended 88:17
appendix 42:18
  213:6
applicant 85:17
applicant's 282:18
application 11:2
  15:17,18 50:18
  51:8,11,20 52:3
  54:16 62:4 63:15
  68:2 72:1,12 76:5
  78:20 82:21 83:3

83:19 84:4,9
85:20 90:17 94:12
106:1 162:19
164:7 168:5,10
169:6,11 177:6
217:10 228:9
229:15 230:18
233:2,4,11 264:3
264:11 266:8
283:4 288:13
295:4,5 305:17
applications 79:9
  169:17 233:8
applied 175:7 176:2
  176:4 177:2
applies 312:10
apply 174:22
appointed 80:6
  306:8,15
appointments 31:3
  169:7,9
appreciate 17:8
  52:1 85:8 152:12
appreciation
  243:11 244:16
approach 23:12
appropriate 6:6 7:3
  16:10 24:13 60:16
  328:10
approve 102:9
approved 90:12
  98:7 103:12
  104:21 107:18
  244:8
approximately
  48:14 174:21
  176:19 181:11
  194:16 215:15
  220:4 244:12
  304:19
April 85:5 88:16
  89:21 90:18
  194:17 239:1
  282:19
archive 324:19
archives 328:5
area 16:12 172:7
argued 121:6
  250:13
argument 49:19
  70:9,18 77:3
  122:7,8,13,14
  123:5 209:6 247:2
  247:4 260:13,21
  261:14,22 262:6
  262:10,11

arguments 70:11
Arizona 93:14,17
armed 10:4 103:20
  151:9
arose 16:8 56:5
Arpaio 93:14,20
  94:2,5
arraignment 208:9
ascertain 330:20
  331:7
ashamed 298:15
asked 19:1,18 25:11
  27:22 28:14,16
  49:20 50:6 54:16
  58:6 61:8 63:22
  72:8 76:4,18 77:5
  77:15 80:16 82:21
  96:15 113:16
  132:1,18,19
  134:13 135:16
  136:1 152:9 153:1
  157:7 162:19
  165:2 214:6 217:9
  217:19 221:1
  226:10 228:4
  230:7 241:13
  248:21 252:4,7
  255:19 257:9
  264:3 265:6 266:2
  266:4 281:6 283:1
  283:3 287:5 291:2
  295:3 298:16
  301:18 308:2
  322:2
asking 12:2 24:14
  86:13 90:20
  101:19 130:13
  158:22 188:7
  221:13,14 233:7
  233:12 234:4
  266:7 279:19
asks 44:13
aspect 103:11 194:4
  255:2
assaulted 292:9
assert 36:14 317:2
assertion 167:13,13
assertions 131:9
assigned 21:2 186:1
  192:3,12 193:8
  292:20
assignments 193:1
assist 17:6 94:19
  322:2
assistance 194:9
  235:14

assistant 3:7 162:16
  179:20 182:22
  184:1
assisting 172:8
  184:1 201:9
  251:14
associate 6:9 7:17
  82:11 152:1
  174:12 187:11
  219:7 248:6 252:2
  254:7 257:21
associated 315:8
  333:9
associates 108:21
association 19:2
  26:20 76:20
  247:15 264:16
  271:14 285:18
  295:15 300:12
association's
  289:15
associations 25:14
  246:15 286:12
  300:15
assume 6:1 39:4
  252:9 259:7
  288:11 310:15
  317:20
assumed 244:22
  250:21
assuming 260:22
  314:21
AT&T 173:10
  180:11,12,15
  181:4,14 185:19
  186:7,8,19
atmosphere 34:22
attach 211:20
  298:14
attached 59:6 66:6
  66:7 87:16 114:9
  135:21 227:21
  287:7
attachment 73:5
  87:17 280:16
attachments 40:8
  40:10 42:19,20
  113:18 209:20
  210:1
attacking 33:21
attempt 256:16
attempted 216:20
attempts 325:9
attend 296:3
attendance 67:20
attention 173:3

274:13 275:17
  280:15 293:10
attested 231:20
attests 85:17 231:12
attorney 2:15,17
  23:6,13 99:21
  100:7,10 136:9
  165:3 172:15,22
  173:1 184:7
  208:11 323:15,20
  323:21,21 324:12
  326:7,12,14
attorneys 171:18,20
  326:8
ATY 323:10
August 196:17
  200:2
authenticity 12:10
  311:12 315:22
authored 11:17
authority 182:19
availability 328:9
available 12:14
  43:17 89:19
  129:22 130:1
  317:13,15 324:21
  325:16,20 327:7
  327:13 328:4,11
  329:20
average 302:10
avoid 53:16
awaiting 148:11
awards 258:22
aware 53:4 54:22
  55:20 56:14 61:9
  64:15 71:13 75:20
  76:3,14 78:19
  82:14 83:1 90:9
  91:4,5 94:21 95:8
  96:3,7 97:21 98:7
  98:10,10,11,16
  104:17 106:6
  107:11,18 108:3
  108:11,15,22
  109:5,8,11 110:6
  114:14 124:9
  159:15 162:12
  165:10,22 215:3
  215:11 218:8
  220:8,10,14,15
  224:19 225:7
  235:17,21 236:13
  244:20 262:7
  301:5,7,10,12
  313:3
axe 259:12 261:19

261:20

**B**

**back** 21:7 25:8,20
29:21 36:16 43:17
45:15 49:1,8
53:18 54:12 60:9
69:9 72:11 76:12
81:11 87:12 92:14
105:22 113:17
117:17 130:11
147:12 148:17
149:6 159:18
165:18 173:3
175:6 194:18,19
197:16 206:12,14
207:19 209:3
216:10 227:11
228:5 232:11
240:12 242:13
243:1 244:21
245:2 246:19
256:3 267:20
271:1 274:22
282:11,14 290:17
303:9,15 317:9
318:10 324:15,17
**background** 10:2
16:2 173:16
271:17 277:8,13
277:22
**bad** 27:19 113:1
**badgering** 256:13
256:13 265:7
**bail** 115:18 140:20
156:2,2 207:17
**bailed** 107:4
**banc** 125:18 126:2
127:9,13,19
128:10 209:9,16
210:3,7,9,19
**Bank** 198:2
**bank's** 194:13
**bankruptcy** 322:17
**bankrupting** 38:16
**banned** 11:4
**bar** 1:5 14:20 19:1,4
19:5 21:2,6,15
22:6 25:14,21,22
26:20 28:1 29:21
32:4 36:2 56:3,15
64:14 74:2,5,6
76:20 77:8,8,10
85:14 87:11 89:5
94:16 103:3
104:12 137:5

155:11 172:12
173:18,21 174:2
175:1,4,7,10,15
176:17 200:19
216:5 217:13
218:15 227:12
241:12 264:16
265:5 271:9,13,13
274:14 275:17
278:15 280:15
281:20,21,22
283:6 285:18
286:12 289:14
291:7 292:19
295:15 298:16,19
299:1 300:12,15
302:13 303:16,18
318:16 319:16
**barred** 11:4 70:13
76:9,19 77:13
79:18 81:15 83:6
83:9 280:18 281:1
**barring** 73:19,21
**based** 41:19 70:15
101:15 115:10
135:8 161:6
168:15 199:10,11
216:17 245:15
275:9 280:6
305:18 306:15
330:21
**basically** 29:22
202:2 315:12
**basing** 277:9,10
**basis** 11:14 21:18
23:14 24:18 74:19
94:11 95:1 144:10
168:17 212:3
213:15,16,20,21
213:21 233:9
244:2 250:11
258:15 259:2
262:14,22 279:21
283:14 289:1
293:5 300:21
306:7
**Basulto** 203:16,20
204:5 205:8,19
206:1,6,22
**Bates** 50:4,6 119:21
120:2 198:11
223:11 224:8
243:4,5 281:9
285:2 287:14,15
288:17 290:4
293:20 325:16

326:3
**BCCI** 189:12 190:2
190:3 193:22
197:13,18,19
200:4,8,14 327:15
329:19 330:5
**beaten** 145:20
**began** 151:15
327:21
**beginning** 68:6
118:17 137:21
142:3 225:8
**begins** 44:1 73:5
170:22 223:16
320:1
**behalf** 2:6,17 7:10
7:13 9:10 14:16
48:7 56:13 89:22
100:15 109:3
133:7 134:14
139:10 199:22
225:9 233:11
271:5 295:21
297:16 321:3,7
330:13
**beholden** 140:15
**belabor** 279:2
291:17
**belief** 166:7 297:17
**believe** 19:13 32:10
32:18 37:4,5 39:5
49:1 56:8 59:10
69:18 84:19 93:18
120:21 128:3
131:20 144:1
148:5 152:3 153:3
157:3,6 159:2
162:3 165:16
167:18 176:10
181:12 185:6
189:13 191:12
193:3 194:5 199:1
212:22 218:22
219:18 220:18
221:4 227:16
235:3 262:20
266:1 275:4,10,14
280:11 284:12
286:7 287:8
289:10 298:1
300:10,22 324:3
324:20 328:4,7
329:16 333:8
**believed** 16:9 32:1
124:1 250:11
254:5 261:3,6

**believes** 127:1
**believing** 258:15
**belittle** 187:22
**Belize** 207:17,18
**Bell** 2:12 5:12 102:7
274:7
**bench** 23:22 80:7
80:14 247:16
249:11,15
**bend** 303:7
**benefit** 35:19
**Berkley** 43:16
292:8
**Bernice** 299:2
**best** 31:22 51:3
143:14 150:4
154:7 178:19
203:13 212:12
225:5 254:7
**better** 15:4 60:7
129:17 305:6
**beyond** 68:19 89:9
250:16 254:19
259:11 324:18
333:15
**bias** 246:5,13 248:3
250:3 259:2,8
293:6
**biased** 13:7,14,21
305:21 306:1,3,8
307:6
**biases** 245:17
**big** 100:1 116:1,2
141:21 198:5
249:10 280:12
**bill** 37:13 80:7
**binder** 46:10 55:17
55:19 82:6 189:4
189:6 309:12
**binders** 12:7
**binding** 145:10
217:12 225:1
**birthday** 239:7
**bit** 55:4 99:17
117:22 163:1
294:7 296:16,17
**Bivens** 13:5 24:12
92:4,6,11,20 93:7
94:10 95:8 97:22
98:17 99:3 100:19
101:16 102:15
103:2 104:13
105:10,11 106:2
156:16 259:22
261:10 275:2
297:10,11

**Blackwell** 174:3
176:15
**blinded** 292:10
**board** 1:2,3 2:1
13:19,20,21 26:2
59:2 60:13 65:5
67:12 70:5 71:2
178:8 184:6
266:18 299:2
315:1 334:4
**Board's** 63:7 69:10
70:4 268:19
309:19
**boats** 202:16
**body** 72:22 264:7
291:12
**BOM** 166:14
**bond** 179:9,11
**book** 29:18 92:15
179:8 188:17
285:6 309:10
**books** 274:2
**bore** 12:19 30:16
**Borrazas** 268:19
315:1
**bottom** 35:13 50:5
50:21 126:12,21
137:22 157:22
175:21 224:9
257:15
**bouncing** 75:18
**bounds** 96:9 97:2
212:14 250:16
307:15
**Brady** 23:16 166:12
**branch** 194:13
195:17
**branded** 23:22 24:4
**Brantley** 1:22 2:4
**brass** 186:3
**break** 118:2,7
128:17,20 173:9
222:21 223:1
226:22 227:2
267:13 318:5
**breaks** 103:16
**Bret** 28:5,7 35:10
40:1 121:7 146:6
161:20 163:6
232:8 237:5
251:16 279:21
323:7 325:17
331:19
**Brian** 162:15
**brief** 9:7 44:22
46:17 88:18 89:1

In The Matter of:  Larry E. Klayman
July 15, 2019

145:9 231:5 262:2
268:17 281:15
283:9 315:15,18
318:15 331:10
**briefcase** 333:11
**briefly** 8:19 109:2
201:12 305:1
**briefs** 30:12 122:15
159:7
**bring** 98:5 106:21
147:4 152:15
153:2 201:14
226:6 294:4
312:10,21,21
**bringing** 77:10
202:14
**broad** 313:4
**broke** 179:11
**broken** 179:9
**brothers** 203:17,21
206:22
**brought** 19:20,21
35:9 36:2 44:4
183:9 205:5
207:19 275:1,2
**Buffy** 2:10 5:10
**building** 269:15
302:4,7,8 303:1
**bulk** 311:16
**bulls** 17:1,2
**Bundy** 9:18 10:2,6
10:11 11:10 13:2
15:20 16:4,7,9
17:19 18:6,20
22:20 23:4,9 26:8
28:9,10,16,19
30:1 33:19 40:1
48:14 49:11,22
50:7,15,16 51:17
53:14 86:5 91:17
98:1 99:22 100:15
106:18,20 107:6
112:6 114:22
118:20 125:13
134:15,15 135:16
136:2,2,11,14,20
137:9 139:10
140:11 141:4,10
141:15 142:20
143:3 146:5,15
147:16 148:1,13
148:15 149:10
150:8 151:2 154:3
155:2,14,18 158:1
158:12 159:5,8
165:1 166:7,16

172:8 209:3
212:14 216:21,21
218:6 220:22
221:6,9,12,22
225:9,17,22 226:5
229:11,14 230:16
230:22 231:12,19
232:4,6 234:1,5
235:14 236:5,5
237:5,9,12 247:16
251:9 261:11
272:6 275:16
277:17 278:11,17
279:6 280:11
**Bundy's** 86:9,16
100:5,13 138:19
157:14 218:9
220:1 224:21
225:3 236:20
246:17 293:9
**Bundys** 134:22
248:19 251:14
**Bunker** 165:4
**burden** 35:17,20
**Bureau** 10:5 16:14
16:20 177:7
178:22
**Burleson** 149:21
150:3
**Busby** 180:18
187:10
**Bush** 34:10 38:2
244:4
**business** 297:8
**buy** 302:4,7 303:1
**Bybee** 9:2 13:8,11
13:13,14 27:12
33:10,10,20 34:8
35:1,12,16 76:6
211:9 227:18
228:1,6 241:7
242:13,14,16
243:10 244:3,17
244:22 245:5,16
246:4 247:1,6,14
248:9,11 249:1,2
249:6,8,13,14,22
251:18,18,19
252:2,22,22
253:22 254:19
255:6,7,11,12,15
256:1,5 257:2,3,7
257:10,11 258:8
258:14 259:21
260:16 261:2,19
262:14 293:6

294:9,14 306:4
**Bybee's** 244:16
246:13 257:7

_____
**C**
_____
**C** 5:1
**C-h-i-c-h-e-r-i-o**
321:14
**C-h-r-i-s-t-i-n-e**
321:13
**C.I.A** 205:10
**C.S.R** 1:22 2:4
**calculated** 86:20
**California** 43:16
280:20 292:9
294:6
**call** 8:2,7 51:12
216:18 268:19,20
269:3 310:4 315:1
315:9 318:3 319:7
**called** 16:19 48:3
80:2 157:18
247:16 317:15
321:3
**calling** 45:9 75:6
**calls** 129:3
**cancer** 179:13
**candid** 35:22
**capable** 277:16
**capacity** 8:17 104:1
150:18
**caption** 206:2
**captured** 328:7,8
**carcinogenic**
179:11
**care** 38:6
**career** 36:22
**Carol** 49:11 141:10
165:1
**Carolina** 184:7
**carried** 17:4
**carries** 73:6 196:20
**carryover** 126:16
167:12
**case** 6:20 8:8,14
9:19 11:16 16:2
17:15,19 18:1,15
19:10,12 20:18
22:10,10 23:7
24:3 26:5 28:18
29:2,8,9,10 31:2
32:1 36:4,6,13
37:18,20,20 45:18
45:21 54:3 66:5
69:2 70:22 72:4
75:6 77:4,16

80:18,19 86:4
87:14 88:19 89:6
89:7 97:11,13
98:1,5 101:21
106:16,21 107:6
115:18 116:6
117:1,2 136:21
138:18 139:1
142:20 144:4
148:16 169:4,18
179:15,15,16,17
179:20 180:11,12
180:15 181:4,14
181:15,15,17
183:14,20 184:3
186:2,8,16,17,19
186:19,21 189:17
189:19,20 190:18
190:19,21 191:3
191:11,17,19
194:1 195:4 197:2
197:11,13,18,19
197:22 198:14,21
199:4,7 200:5,8
200:17,19 201:6
201:13,16 202:17
202:20 203:6,7,8
203:10,15,20
204:2,22 206:17
206:19 207:6,7,21
208:3 209:1,4
214:12 225:3
226:1,16 230:8
237:12 241:4
243:18 249:3
250:7 251:11
259:3,4 261:3
269:18 275:12
276:11 277:3
278:10 279:4,9,9
280:5 284:6,10
285:10 288:1
290:16 291:6,13
292:4,7,12 295:9
298:8,9,10 299:14
301:3 302:16,18
305:14 306:11
307:10 308:2,3
312:8,10 316:7
318:13,17 322:3
323:14,20,21
325:19 327:15,16
329:4,19 330:2,5
331:10,12 332:15
332:16 334:9
**cases** 31:4,5 36:2

100:4 116:21
117:12 125:15
130:15 136:8
171:3 179:2,5,8
182:20 183:4,9
189:3,10,16,22
190:12,14 191:20
192:1,2,4,10
193:4,9,22 205:5
208:21,22 284:7
307:20 317:4
322:17 324:11
325:19 326:1,4,9
327:4,5,8 328:6
328:16,18 329:8
329:12,13,14,15
329:19 330:21
331:7,20 332:2,5
332:10 333:13
**Castro** 203:19
**Castro's** 203:22
**Catch** 29:17 91:13
165:17 288:6
**caught** 23:18
**cause** 127:2
**caused** 241:22
262:20
**cemented** 291:20
**censure** 21:3 305:3
**Central** 280:20
**CEO** 186:4
**certain** 33:21 93:20
141:22 274:18
279:19 286:13
301:20 323:3
327:12
**certainly** 26:7 52:2
276:11 321:12
332:18
**certainty** 306:15
**certificate** 72:20
264:6 287:6
**certifying** 86:2
**certiorari** 27:10
**chair** 2:11 5:10
13:19,20,21 66:21
**Chair's** 144:19
326:5
**chairman** 130:10
299:2
**CHAIRPERSON**
5:2,6 6:1,7,17 7:6
7:11,15,18 8:7,15
8:18 9:4 14:6,13
17:12,17,22 39:2
39:9,11,14 40:13

40:17 41:3,21
42:8,12 43:4,8,21
44:3,7,9,14,18
45:3,7,17,20 46:6
46:8,18,21 47:4
65:9,13,20 66:11
67:13,17 68:12
75:14 77:1,20
78:2,6,10 79:15
79:22 81:1,4,7
86:22 87:5,8 88:9
88:12 97:4,7,10
99:12,16 100:6,16
107:7,10 108:1
118:5 119:20
120:3 121:18
125:2 128:16,20
129:4,8,12,20
131:16,21 133:1
137:3 139:14,18
140:1,4 142:4,10
145:3 148:22
149:6,15 151:16
151:21 152:7,14
152:21 153:15
156:4 157:3
159:15 160:8
162:4 164:8,11,14
165:5 171:15
172:14,21 175:13
180:4 182:6,11
183:1,6,9 184:10
184:13,18 187:20
188:1,6,9,18
189:4,21 190:11
192:6,9,14,17,20
193:3 195:10,22
197:9,15,21
198:14,19 199:3
199:18 202:19
204:1,18 206:15
207:1,4 213:8
214:17 219:15,19
220:20 222:19
227:1,5,8,11
229:20 230:1
231:22 234:14,20
235:3,7 238:4,7
239:9,18,22
241:15 252:16
253:5,9,12 254:8
254:21 256:15
257:12,16,19
258:3 263:16
265:9,17 266:1
267:4,9,12,15,19

268:5,10 269:7,19
270:2,7,17,20
271:1 272:8
273:21 276:13,16
276:18 278:18,21
282:11,15,20
283:5,11,18,21
284:2,10,14,19,22
285:4,12,14 286:5
286:10,17,22
287:4,12,15,18
288:7,10 289:5,11
289:14,18 290:1,7
290:11,18,21
293:12,18,22
294:13,16 295:18
306:19 308:7,16
308:21 309:3,8,12
309:16 310:6,14
310:18,22 311:5
311:19 312:3,13
312:19 313:1,18
313:20 314:5,9,16
314:19 315:4,14
315:20 316:19,22
317:12,18,22
318:4,10,21 319:6
319:9,13,18,22
320:7 323:18
324:5,10,15
326:17 327:20
328:11 329:1,7,10
329:14,22 330:11
331:1,6 332:21
333:16,20 334:7
334:11,14
**challenged** 145:11
154:16 201:21
259:1
**chance** 44:4 56:12
64:8
**change** 32:15 169:3
210:12,13
**changed** 216:18
298:5
**changing** 134:7
212:11,20 213:14
215:19
**Chaplain** 288:20
**characterization**
156:18
**characterize** 58:15
**characterizing**
161:15
**charged** 10:6 11:12
14:4

**charges** 9:15 36:7
55:7 56:14,15
64:19 67:2 124:21
124:22 131:2,12
132:4,10 162:2
241:3,19 298:18
304:12 311:1
**Chechnya** 201:15
**check** 30:6 54:6
112:18 205:14
224:2 254:13
255:19 256:3
326:6
**checked** 257:9
**Chemerinsky** 43:14
**Cheney** 38:4
**chest** 152:13
**Chicherio** 4:8
268:14 270:15
316:3 319:14,17
319:21 320:2
321:2,14 322:9
330:15
**chief** 179:20 182:22
184:1
**child** 270:4,9,10
**children's** 179:10
**Chin** 25:13 27:5
73:12 74:4,14
76:11 79:4,8,17
80:6,11 81:15
82:13 280:15
284:8 285:21
300:13,20 301:1
303:13 313:16
**Chin's** 73:19 81:21
82:3 83:2 300:4
303:15
**Chinagate** 80:3
**Chinese** 74:22 80:5
80:10 111:5
**choice** 22:14 27:9
229:11
**chosen** 101:5
**Christian** 2:14 5:13
**Christine** 4:8
268:14 270:15
316:3 317:14
319:14,17,21
321:2,12
**circle** 36:17
**circuit** 10:1 11:17
11:18,22 12:21
13:9,12 26:14
27:10 31:18 32:14
49:20 73:18 74:17

75:8,9,21 76:15
79:1 82:2,15 83:2
84:1 110:17
111:10 113:11,21
117:19 120:11
121:7 122:8,9
123:5,11 127:8
128:9 161:4 162:7
163:4 209:6,17
210:3 211:8
212:17 216:11
217:4,5 220:6
222:5 227:16
228:2,10 229:13
230:15 237:21
239:14,21 240:13
240:14,15,16
241:6,18,21 242:3
242:7 244:19
245:20 247:11
252:10 253:20
260:13 266:8,11
276:10 277:2
291:3,10 292:7
300:5 313:14
**Circuit's** 82:6
131:13 313:15
**circumstances**
103:18 161:6
212:12,21 213:15
215:20 216:18
**cite** 260:20
**cited** 243:15
**citing** 164:21
**civil** 15:6 29:13
174:5,6 179:15
181:15,17 186:19
192:1 278:6
**CJA** 31:3
**claim** 87:19 115:8
168:17 194:16
199:14 200:2
244:2 248:11
**claimant** 91:10
95:19 194:1
199:22 200:5,8
**claimant's** 91:8
**claimants** 195:16
200:1
**claimed** 305:21
**claiming** 13:21 81:7
145:14 306:7
**claims** 11:8 105:19
135:5 197:6
**Clarence** 29:7
**clarify** 146:3 258:7

**Clark** 19:11 27:4
162:16 316:16
324:7 325:3,8,18
331:15 333:13
**clash** 263:5
**clashing** 263:7
**classmate** 202:6
**Claudia** 305:13
**Clay** 65:2 292:20,21
301:19
**clear** 15:9,11 27:17
34:4 35:13,14
38:11 63:13 94:20
107:8 180:20
251:4 282:6
**cleared** 283:13
**clearly** 51:7 325:9
**clerk** 321:19
**clerk's** 331:22
**clerks** 268:15
269:19 315:12
**clever** 74:5
**client** 19:14 20:5
24:4 32:2,5 93:4
93:20 96:7 97:2
101:21 103:15
105:17 109:3
111:5 114:22
138:19 144:13
145:14,17 153:11
155:22 194:6
199:7,14 201:18
202:10 203:2,16
212:13 241:9
249:20 273:19
296:4 307:14,16
308:11
**client's** 154:17
196:17 197:6
**clients** 19:13 24:1
37:4,5 74:21
244:1 292:14
293:5
**Clinton** 80:5,7
306:9
**Cliven** 9:18 10:2
15:20 16:4 22:20
23:4 26:7 28:9,10
30:1 40:1 48:14
49:12,13 86:4,16
99:21 100:4
134:14,15 135:15
136:20 137:9
138:19 140:11,15
141:4 145:19
147:16 148:1,13

148:15 149:10
150:8 151:2 154:2
155:14,18 158:1
158:12 159:5
165:19 169:15,16
170:12 212:14
226:4,6,8,11,16
226:19 229:11
232:11,12 236:5
237:5 246:17
247:16 261:11
272:6 275:15
277:17 278:17
279:6,14,16,18,19
280:11
**close** 45:4 69:20
138:15 247:14
249:4 251:20
258:15
**close-knit** 33:12
34:5 247:19
**closed** 198:15
**closeness** 259:13
**co-counsel** 111:19
205:4
**Coast** 33:15 258:11
258:12 319:3
**coat** 160:7
**Cochran** 19:11
**coconspirator**
141:6 145:21
**codefendants** 10:6
**coerce** 297:1 299:16
**collateral** 259:10
291:13
**colleague** 30:21
65:3 74:10 96:18
278:2 292:21
301:16
**colleagues** 26:13
211:16 263:7
**collegial** 34:22
263:4
**colloquy** 252:14
**collusion** 271:19
**color** 77:16
**Columbia** 1:1 2:6
5:8,9 55:2 66:6
87:15 91:11
174:15 176:20
213:19 217:13
271:9,13 285:19
**column** 125:11
198:16
**come** 7:2 22:1 25:20
29:2,10,21 42:5

43:5,20 53:13
69:9 83:5 153:16
228:5 267:20
268:3 270:13
294:6 318:17
319:4 325:22
**comes** 42:2 43:15
111:8 165:18
282:9
**Comfort** 27:3
**coming** 68:18 95:18
133:16 202:16
**commence** 138:2
**commenced** 299:19
**commencing** 2:3
**comments** 7:19
**commerce** 80:15
198:2
**commercial** 174:9
**commission** 178:6,7
194:12 195:8
248:9 253:1,2
255:15,22 256:5
257:4,17 258:2,9
**commissioners**
195:17
**commit** 283:16
**committed** 23:13
25:2 74:11 289:1
301:20
**committee** 2:4,9 5:7
5:11,12,18 8:21
14:20 21:1 26:2
58:19 59:11 60:4
60:8 61:10,12
63:5 64:12,17
65:1 66:21 71:3
77:12 86:21 88:11
88:18 91:7 95:6
99:18 118:3 188:6
188:12 214:2,11
215:10 216:1
219:11 261:17
264:20 265:13,18
266:9,12,12 305:8
322:11 323:1
325:5,13 326:20
332:9
**committee's** 62:2
215:4 217:6
**committees** 19:21
**committing** 32:12
**common** 257:10
**communicate**
103:14 150:18
158:18

**communication**
220:17
**communications**
273:15 296:13
**communist** 80:10
**community** 33:11
33:13 34:5 36:18
247:18,19 249:5
259:13,15
**company** 185:8
**compare** 117:10
**compared** 117:6
187:6
**comparison** 11:11
**competitive** 292:17
**complaint** 22:17
24:6,11 56:1
92:13 94:16,18,20
227:17,18,21
229:1 241:13
275:1,2,3 292:19
292:20 298:14
301:21 303:12
304:6
**complaints** 74:7
245:16 297:9,11
297:12,21
**complete** 62:20
90:6 113:15
126:22 211:21
213:4,6
**completely** 185:7
261:9
**completeness** 43:1
68:11 82:8 278:15
312:1,6,14
**completing** 191:19
**complex** 23:7 29:9
31:7 117:1,12
161:12,19 171:9
173:7 198:6
206:19
**compliance** 282:18
**complicated** 138:18
139:1 151:7
**composed** 109:21
**compound** 124:4
**concede** 223:10
**concern** 150:16
**concerned** 10:22
243:11 249:16
303:6
**concerning** 59:1
115:3 157:13
**concerns** 12:19 93:7
**conclude** 282:5

293:5
**concluded** 20:12,12
61:4
**concludes** 295:16
**concluding** 295:1
**conclusion** 136:6
154:4
**concurred** 232:9
**condition** 277:16
**conduct** 13:16
26:21 264:16
300:20 302:14
303:12 322:16,19
323:2 325:14
**conducted** 10:16
67:6 322:13,22
323:8 325:12
**confident** 153:9
**confinement** 22:20
53:15 93:4 105:19
106:1 155:3,15,19
156:1 157:14
158:2,6,8,15
159:3,8,10
**confirm** 64:5 76:13
92:19 122:20
138:8 213:10
224:14 256:16
257:21
**confirmed** 74:13
269:2
**conflict** 102:20
245:6,15
**confuse** 77:11
**confused** 150:13
235:7 252:17
**confusion** 235:10
**conjunction** 232:5
**connection** 9:17
10:4 59:4 63:15
113:22 122:9
131:14 134:1
170:15 174:21
209:16 227:15
228:3,8 231:1
232:17 233:5,14
233:20 242:16
289:18
**consent** 290:14
**consequences**
275:11
**consequently** 21:15
22:2
**conservative** 17:10
205:11
**conservative-libe...**

15:14
**consider** 6:5 27:14
43:14
**consist** 109:21
**consisted** 171:13
**consisting** 148:12
**consists** 14:1
**conspiracy** 10:7
145:19
**conspired** 145:15
**constantly** 277:14
**Constitution** 139:6
**Constitutional** 22:9
33:2 93:8 243:12
**Constitutionally**
16:10
**consultant** 103:10
**consulting** 106:17
**Consumer** 177:7,9
177:10 178:1,7,15
178:22 179:3
180:6,22 182:13
182:14 183:4,21
**contacted** 49:11
**contain** 40:8
**contained** 285:22
**contempt** 162:8,14
162:21 163:5
164:3,9,15,20,21
165:13 166:3
167:2,16 168:6,20
169:5 170:2,6
**contend** 243:16
**contended** 243:9
245:5
**contending** 145:18
**contends** 10:17
**content** 108:6
**contention** 243:17
**contentious** 161:13
161:19
**contested** 61:2
64:20 72:4 143:17
214:12 315:2
**contesting** 74:19
**context** 29:13 30:19
31:9
**continue** 20:11
133:2 152:11
227:12 271:2
**continued** 3:1 60:14
133:6
**continues** 190:4
**continuing** 116:3
281:18 291:1
294:22

**continuously** 19:6
271:9
**contract** 171:18,20
172:15
**contrasting** 131:4
**controversial** 94:7
94:7
**convenient** 118:3
**conveniently** 23:8
**conversation**
133:17 169:22
**convict** 150:10
151:8
**convicted** 18:10
26:8 30:2 91:20
**conviction** 185:8
**convincing** 15:10
15:11 27:17 35:14
35:15 38:11 282:7
297:18
**cool** 265:1
**cooperation** 202:11
**coordinate** 8:11
**copied** 135:22
**copies** 42:7,9 46:1
219:9
**copy** 40:16 62:2
81:18 82:16 84:7
84:12 91:2 135:12
278:4 300:14
328:8
**corner** 120:4 224:9
**corporate** 174:11
**corporation** 191:4
**correct** 8:9 11:22
48:13 51:21 57:3
57:9 58:10 59:7,9
61:13 62:5,19
63:17 64:7,21,22
65:7 66:18,19,22
73:1,15,16 79:6,7
81:17,22 82:1,4
84:14 85:9,18
88:21,22 92:12
95:19 96:6 98:15
98:18 99:5 108:8
109:18 110:4,19
111:13 112:7
114:11,13 115:14
117:11 119:2
120:14,17 121:17
125:8,19 133:15
133:21 134:6
137:13 142:15,16
143:4,7,8 146:9
148:3,4 149:11

155:6 160:2,18,20
160:21 161:5,10
168:11 171:11
173:22 174:4,13
176:21 177:8,22
179:1 181:5,16
183:5 187:5,12,13
191:18 193:8
194:3 203:11
205:18 207:22
208:4 209:2,7,8
210:10,11,20
211:7 212:6,8,11
213:7 215:21
217:16 219:21,22
220:3,7 221:21
227:19,22 230:21
231:20 232:19
235:6,17 236:21
237:11 239:3,8,14
240:4 242:10,11
242:12 243:7,21
245:14 246:7
247:12 255:4
258:13 262:13
278:19,20 284:9
300:8,9 301:6
304:1,16,17,22
305:15 315:5,22
331:20
**corrected** 35:12
248:6 249:2
254:16
**correcting** 58:6
**correctly** 24:10
297:8 330:16
**Corsi** 272:2,15
273:20,22 274:1
274:16 275:15
296:2,4,10 297:3
297:19
**Corsi's** 297:3
**costing** 38:12
**costly** 37:10 305:5
**counsel** 2:20 7:7,10
8:5 9:10,13,15,18
10:13,17 11:12
12:6 13:18 15:22
21:3,6,15 22:9,14
24:8 26:11 28:6
34:16 35:18 36:2
48:3,7 50:11 53:3
56:3,19 59:15,15
66:15 67:3,14
77:8,9 81:12
85:21 86:4,8,9,15

86:16,16 88:20
99:11 100:12,13
100:14 101:6
103:4,5,9 104:13
104:22 105:1,5,13
105:18 106:4
107:13,19 108:12
109:6,17 110:12
114:20,22 115:4
120:19 121:3
122:4,4 123:20
126:22 133:7
134:2,9,18,20,22
134:22 136:11
139:7 141:9
145:13 146:6
150:18 151:14
156:21 161:20
166:1,18 167:1
179:17,18 189:2
189:17 202:3
204:17 205:1,20
207:12 221:13
225:6,17 227:12
233:21 234:2
236:20 237:5
271:18 272:17,22
273:14 274:18,22
275:17,22 280:15
281:20,22,22
282:1 286:21
295:8,21 297:9,13
297:19,22 298:17
298:19 299:12
300:2,19 301:4
302:17 303:5,11
303:19 304:9
308:5 318:16
321:4,7,17,21
322:3
**counsel's** 133:11
230:13 273:3
274:14 278:15
283:6 291:8
319:16
**counsels** 332:4
**count** 26:6 239:13
**country** 17:3 18:17
24:21 27:3 36:21
201:15
**counts** 15:21 18:10
**county** 24:16 93:18
162:16 316:16,16
324:8 325:3,8,18
331:15 333:13
**couple** 28:22 49:10

117:22 129:2
225:22 236:3
332:21
**course** 20:18 22:4
31:12 122:10
160:8 175:2 244:7
292:15
**court** 1:1 2:5 5:8,21
5:22 9:20 10:1,13
10:19 12:2,8,17
15:3 20:16 26:3
30:15 31:16 36:15
38:5 39:20 40:2,9
40:11 41:6,7 52:4
54:3 55:6 69:19
70:19 73:18 75:21
76:14 78:21,22
83:16 85:19 90:13
98:19,21 101:5,11
102:9,17 111:16
114:19 115:5,6,9
119:19 120:15
127:10 128:14
131:6 133:11,19
134:16 135:6,22
136:7,17,19
137:13 138:6
140:1 142:5,5,14
142:17 143:1,1,6
144:4 146:8,19,20
147:5 154:1,22
155:5,13 157:18
158:14 159:5,7,21
159:22 160:11,19
161:2,12 163:20
163:21 169:8,9
170:17 193:1,7
197:5 200:1
204:15 212:10,17
212:22 213:11
214:1 215:17,22
216:9 217:13
218:9 221:13
226:6 229:12
232:17 234:7
235:15 236:4,17
237:18 238:18,22
239:5,12,15,17
240:3,6,10 248:19
251:17 252:15,20
259:4 266:15,19
269:22 276:9,22
279:6 282:18
291:9 296:8,9
297:14 301:1
303:16,17 311:14

314:12,14 315:12
315:13 316:5,14
321:10 322:3,14
324:8 325:18
329:12 332:8,13
**court's** 196:16
225:14
**courtroom** 76:9
99:4 100:20 101:7
101:9 102:2
103:16,21 236:16
280:18,18
**courts** 11:3 69:22
192:4
**cover** 310:8
**covered** 330:9
**cows** 16:22
**Cox** 248:19 251:4,7
252:1,18,19 253:7
255:16 256:9,19
257:8,18 258:1,2
258:4,9
**Craig** 201:9,11
202:4
**crazy** 32:21
**create** 27:16 102:20
**creates** 250:2
**credentials** 131:10
131:11
**credibility** 131:8
**Credico** 296:21
**Credit** 198:2
**crimes** 10:9
**criminal** 9:19 22:10
22:12 29:11,12
30:5 86:4 112:4
112:17 115:3
116:16 117:2
118:18 120:16,19
121:2 122:16,18
123:1,11,19
124:18,19 126:3
126:22 130:15
131:7 133:20
135:7,10 136:7,9
161:13,19 167:14
173:8 174:6 179:2
179:5,7,15,16
181:16 182:19
183:4 184:21
185:3 186:17
189:3,10,17,19,20
190:11,18,19
191:9,11,17 192:4
192:10 193:9,10
193:21 200:13,15

202:1,5,13 207:7
209:1 225:3
237:12 243:12
271:16 272:10
273:18 277:8,13
278:6 295:9 316:7
316:14,15 317:1,3
323:8 325:19
327:4 328:16,18
330:21 331:19
332:5,10,15
criteria 323:4,6
325:15
cross 4:6 153:17
185:21
cross-examination
6:9,21 152:1
153:16 238:5
271:4 330:13
crucial 31:17
crux 29:14 206:8
Cuban 203:19
205:22 206:20
currently 218:5
321:16

_____

D

D 4:1 5:1
D.C 172:6 178:14
DA 162:16
damages 241:21
damaging 293:4
Dan 16:19
Darrow 29:7
date 48:22 49:16
55:10 100:18,20
110:20 128:12
139:16 140:2,4
147:4 152:2
168:14 169:20
176:1 196:6
198:15 215:5
234:10 236:12
237:7 238:12,16
238:17
dated 84:13 128:4
272:5 303:21
dates 121:9 146:11
215:18
day 20:12 44:1 52:8
61:3 69:7 71:3
99:3 129:10,21
163:7 164:3
171:14 216:6
217:10 218:11
236:16 237:8

238:20,21 251:17
252:20 283:15
295:14 302:6
318:19,22 319:5
319:10 333:21
days 51:10 67:7,19
67:20,22 68:15
129:22 130:1
139:3 154:3
246:17
DC 1:10 2:2,17 19:4
20:15 22:6 25:20
25:22 28:1 29:21
56:8 87:10 89:5
91:15,21 103:3,4
104:11,12 174:22
175:1,7,10,15
192:4 193:7 216:4
288:1 296:9
303:17,18,18
DDN 1:6
dead 302:10
deal 8:14 34:14
273:3,6 274:20
dealing 33:7,7
34:15 76:10 202:7
208:11 228:22
244:7 280:6
dealings 11:3
dealt 29:3 30:7
163:8 179:8 186:2
186:3 203:21
274:3
dean 43:15 319:4
death 331:11
decades 26:4
December 128:8
142:21 147:9,21
154:11 173:18
176:1,8,17,18
177:5,13 178:2
234:6 235:1,13,16
235:19 271:10
decent 293:14
decide 7:2 70:20
decided 147:20
175:6 250:13
deciding 28:12
decision 13:9,10
20:17 28:3 34:11
61:4 69:14 76:16
83:2 94:4 115:7
124:10,10,12
125:5 143:13,18
147:22 214:16
215:4,8 216:3,7

217:12 220:13
238:22 242:9
244:18 259:4
266:20 300:5
decisions 27:11,16
38:18 83:15
217:17,19,20
218:2 259:9
313:15
declaration 8:12
163:15
declared 138:18
139:1 150:2 234:7
234:8 235:15
237:9
defamation 56:7
297:5
defamed 297:3
defend 21:12 112:5
118:19 141:14
145:17 307:13,15
defendant 22:12
95:21 101:21
139:4 189:14
191:10,16 200:21
201:6 203:9 204:1
204:11 209:1
251:8,10 295:9
defendants 10:3,12
18:6,13 23:10
31:8 33:3 137:20
138:13,17 139:19
140:13 141:17
142:11 143:3
144:12,14 145:12
145:15 146:18
148:1,10,15
149:11,20 150:3
150:11,20 154:2,5
154:5 201:17
243:13 332:6
defender's 278:2
defenders 30:22
defending 145:13
defense 29:6,13
97:12 112:5 115:4
116:6 118:19
120:16,19 121:2
122:16,18 123:11
123:19 124:18,19
126:4,22,22
133:20 135:7
138:3 146:16
153:13 161:13,20
166:8 191:9 202:5
249:13 271:16

272:14,19 277:8
279:16
defenses 226:6
279:20
defensive 299:20
defer 13:20 45:3
definite 39:6
degree 173:17
delay 70:11
democrat 17:9
249:12
demonstrated
243:10
denial 127:13
denied 12:20 13:3
13:21 22:19 25:8
25:10,19 28:7
39:12 79:8,18
91:5,9 93:6 95:21
105:17 125:17
127:8 128:9,11
156:3 159:21
160:19 161:2
165:11 166:1
167:1 209:6 210:9
210:19 211:8,9
216:9 218:9
224:21 228:10
229:3,13 230:15
238:22 240:5
242:3 245:6
252:21 276:8,22
284:3 292:5 307:5
307:5
denies 25:18 202:2
212:6 229:12
Denny 25:13 284:7
deny 26:10 29:19
29:20 94:11
210:16 295:8
denying 84:8
213:16 241:7
244:18
department 34:9
49:8 80:15 112:11
118:22 119:7,15
120:13 126:18
173:6,10 174:20
175:3 176:5,9,12
176:22 177:17
178:4,10 180:14
180:16 181:3,8
185:4 186:18
187:2 191:7 244:5
249:11
depending 44:12

318:18
depends 51:12
169:8 227:6
268:12 269:4
depth 135:10
Deputy 2:20
describe 87:18
describing 296:1
deserves 22:13
77:19 93:19
126:21
designated 134:6
designation 323:10
despite 272:16
325:8
detailed 89:8
288:18,19
detectors 103:20
determination
67:10,12
determinations
265:14
determine 5:16
220:21 268:9
272:12 313:4
324:11
died 24:22 289:3
difference 280:12
different 34:20
163:1 175:11
189:14 191:21
207:13 208:13
225:17 282:1
differently 96:22
330:18
difficult 6:13 184:5
diligent 280:9
diplomatic 29:3
direct 4:6 48:6
133:6 152:15
269:18 271:5
284:14 315:18
317:2 321:6
directed 79:9
229:14 230:16
265:22 266:3
318:14
directing 285:16
directly 17:19 18:20
director 82:12
disagree 92:9 108:5
disagreed 211:12
211:15
disbarred 22:12
295:12
disciplinary 2:17,20

In The Matter of:  Larry E. Klayman
July 15, 2019

7:10 9:10,13,15
10:17 11:1,12
12:5 13:16,18
35:17 48:3,7
54:16 55:1,5,7
56:16,19 66:5,15
67:3,14 87:14
88:19,20 89:13
91:11 99:11 133:7
133:11 147:7
156:21 189:2
213:18 230:12
241:3,10,19 264:4
264:9 268:22
282:1 286:21
288:1,3 289:19
295:21 297:21
298:17 299:12,16
300:2,11,19,21
301:4,9 302:17
303:5,11,19 304:9
311:15 315:7,9
321:3,7,17,21
322:2
**discipline** 5:16
20:20,21 21:17
22:4 56:19,22
58:1 59:5,17
60:14,18 61:6
63:4,7,22 64:2
65:3 88:7 304:3
304:14,21 305:11
**disciplined** 31:22
32:13
**disclose** 295:3
**disclosed** 66:6
87:15
**disclosure** 71:22
266:10,14 291:2
**discovered** 246:17
246:22
**discovery** 28:17,18
136:1 226:2 279:9
299:8,11
**discredit** 204:7
**discretion** 240:11
295:8 313:4
**discretionary**
160:22
**discuss** 43:5 265:15
268:6
**discussed** 191:5
**discussion** 8:20
93:12 122:13
**discussions** 135:13
154:8 208:10

**dishonest** 23:12
165:18
**dishonesty** 165:21
289:16 290:9
**disingenuously**
23:5
**disinterested** 278:9
**dismiss** 32:18 33:5
40:1 107:6
**dismissal** 107:3
236:11,14 237:17
**dismissed** 15:21
23:2 32:17 36:16
106:16,18 169:18
197:6 200:1 236:4
236:18,18 237:19
293:9 302:18
303:12
**dismissing** 107:1
110:15 196:17
**disparage** 63:9
**disparaged** 74:22
75:1,2
**disposition** 61:10
62:11,18 63:2
64:13,18 66:16
68:21 69:3,6 72:3
84:17
**disqualification**
13:6 250:9,12
262:22
**disqualify** 13:19
24:6 101:15
305:21
**disrespectful**
159:13
**dissent** 19:16 239:2
242:5 243:17
291:19 293:12
294:11
**dissenting** 27:12
124:3,10
**dissents** 229:10
291:20
**dissuade** 304:8
**distinguish** 188:13
**distinguished** 15:12
27:18 35:15
**distorting** 106:14
137:15 143:10
**distortion** 137:1
**distributed** 219:10
**district** 1:1 2:6 5:8
5:9 9:20,20 10:13
10:14 23:13 55:2
66:5 87:15 91:11

165:3 174:15
176:20 213:18
217:13 271:9,13
280:19,20 285:18
324:8 325:7,18
**dive** 294:20
**divide** 23:10 139:22
147:22
**divided** 143:1,2
151:4
**division** 174:20
177:16,21 179:22
180:7 181:2
**docket** 1:3,5 70:5
89:6 127:14,21
128:5,7 142:20,21
144:3,5 147:8,9
147:15 154:12,13
164:8,11,14 194:8
195:2,10 196:3,5
196:6 197:12
198:11 199:11
200:3 218:15,15
218:22 219:2,2
222:4 225:14
228:15,18 229:4,6
234:12,12,16,21
234:22 240:8
268:19 269:8
317:1 327:13,16
328:2,17,19,21
329:2,3 332:1
333:6
**dockets** 207:9
218:18 315:1
324:8 326:10
331:4
**document** 21:16
51:22 54:13 65:11
66:1 74:8 83:17
83:18 84:18 90:4
93:15 107:12
121:21 122:6
128:5 167:8
209:19 223:2
228:14 240:22
245:18 303:10,15
312:9 317:5 322:8
322:20 323:5,22
324:1 327:1
329:11 332:10
**document's** 326:21
**documentation**
58:1 281:2,5
296:13 328:6
333:10

**documents** 8:11
12:5,11,15 14:2
62:12,20 80:13
90:7 92:15 134:13
152:20 190:14
194:20 195:1
209:20 222:13
231:10 269:2
278:14 322:7
324:19 327:7,11
327:13 328:10,15
328:16 329:20
330:5 331:3,10
333:12
**dog** 296:22
**doing** 6:9 20:6
25:16 30:19 77:21
106:22 107:5
212:12 226:17
275:8 296:22
322:3
**DOJ** 182:13
**dollars** 302:4,21
**domestic** 24:1,4
181:15 247:16
249:21
**donations** 80:5
**donor** 302:10 304:8
**donors** 302:7,15,22
**dots** 264:10
**doubt** 35:19 55:13
115:13 116:17
211:1,3 225:13
**doubted** 115:15
**dozen** 171:7
**Dr** 5:12 272:2,15
273:19,22 274:1
274:16 275:15
296:2,4,10 297:3
297:19
**drafted** 115:11
**drafting** 95:10
108:7,10
**dragged** 140:18
**drawing** 173:3
**drawn** 198:4
**Drexler** 150:4
**driven** 16:11
**dropped** 193:15,15
193:17
**drove** 262:17
**Drug** 178:8
**due** 96:12 134:8
165:14 188:9
280:3 303:4
**DUIs** 117:2,5 135:3

**E**

**E** 1:5 2:2 3:3 4:1,7
5:1,1 130:7,7
192:19
**earlier** 100:8 176:3
177:3 232:10
242:15 327:10,14
328:6
**early** 181:13
**ease** 54:12
**easier** 6:15
**East** 33:15
**eastern** 43:21,22
**easy** 26:12 31:5
**ECF** 121:12
**editorial** 33:1
**effect** 51:15 58:20
63:10 64:2,3 88:7
141:12 216:4
237:7 266:13,17
291:5 298:20
**efforts** 9:17
**eight** 55:15 66:10
73:6 87:19 122:22
123:12 155:10
195:12,15 222:6
223:8 224:4
**Eight-eight** 245:12
**Eighteen** 126:11
**Eighty** 209:13,14
**Eighty-eight** 245:11
245:13
**either** 62:18 132:14
208:22 311:14
**electronic** 114:7
322:15 324:18
**electronically** 328:4
329:21 333:14
**eliminate** 310:4
**Eliot** 48:11,12
**Elizabeth** 96:19
301:16
**emails** 41:9,12
310:9 314:13
**embroiled** 80:2
**emergency** 30:15
110:18 115:3
126:1 127:9 128:9
133:13 155:1
229:2
**Emory** 202:6
**emotional** 97:9

In The Matter of:  Larry E. Klayman
July 15, 2019

emphasize 182:18
employ 172:15
employed 177:11
  321:15,16,20,22
  333:3
employees 331:22
en 125:18 126:2
  127:9,13,19
  128:10 209:9,16
  210:3,7,8,19
encounter 132:6
ended 91:22 305:10
  312:17
ends 6:19 134:8
Energy 38:4
engage 12:22
engaged 13:15 71:5
  279:12
Engel 149:21 150:3
entail 132:20
enter 18:15
entered 20:19 56:18
  69:14 121:7,16
  194:21 195:7,15
  197:5 199:21
  207:11,20 304:20
entering 208:5
enterprise 201:20
  202:13
entire 22:6 28:4
  60:11 68:10
  156:14 157:9
  226:1 312:2
entitled 20:14 25:6
  27:22 30:4,16
  31:10 35:7,10
  36:14 63:12 161:6
  181:20
entries 199:11
  328:17,20,21
  329:2 330:4
entry 18:22 28:7
  50:11 79:18 128:1
  147:9 164:12,15
  195:7,11 196:3,5
  196:6,16 198:11
  200:20 234:3
  236:7,8 252:21
  269:8
equal 35:18 36:21
equally 250:22
equals 256:2
equipment 44:5
equivocate 83:9
equivocation 83:11
Eric 149:21 150:4

error 9:2
errors 218:18
escape 65:22
ESQUIRE 2:10,14
  2:19 3:3,6
established 12:4
  16:8 156:7
establishment 38:1
  308:1
establishments 27:7
et 147:16 190:6,8
ethical 21:11 25:2
  61:18 74:11 91:10
  96:13 271:14
  282:4,7 283:13,16
  289:1 301:20
ethically 59:16,18
  153:10
ethics 24:21 25:5
  61:20 96:21 97:2
  288:21 307:15
  308:12
Europe 43:17
evening 317:7
event 24:5 31:11
  123:15 261:4
  286:8
events 185:1
eventually 141:2
everybody 6:2 15:5
  36:10 42:7,16
  77:18 93:9 130:10
  140:12,18 141:15
  142:2 165:15
  182:5 298:2
  299:17,21
everybody's 9:1
  93:19
evidence 10:18 12:4
  12:6 14:1 15:10
  15:11 18:22 23:17
  27:17 35:14,15
  38:11,19 45:5
  130:18 159:4
  166:2,13 188:14
  202:12 282:7
  300:18 314:6,8
  315:21
exact 48:22 49:16
  68:3 110:20 194:4
exactly 8:4 71:6
  129:15 164:1
  167:3 176:11
exam 175:8,10
examination 8:6
  48:6 133:6 152:15

271:5 295:20
  321:6
examined 5:20 48:4
  321:5
examining 185:21
example 104:8
examples 243:16
  244:15
excellent 178:13
excepted 69:10 70:4
exception 70:15,17
exchange 157:12
exclude 166:21
excluded 103:15
exculpatory 23:17
  166:13
excuse 73:20 114:12
  128:3 168:9
  196:14 211:19
  234:17 260:12
  275:19 288:18
excused 333:19
executed 57:6
exercise 96:12
exercising 17:5 38:7
  109:2
exhibit 43:9 50:2,21
  52:2,9,15,16,17
  53:10 54:13,19
  55:8,12,14,16
  56:16,16 57:2,19
  62:1,9,13,16
  64:14 65:4,6,10
  65:11 66:3,17,20
  67:3 68:4 72:12
  73:8 76:2 82:5
  84:5 85:4 87:9,13
  87:21 88:1,17
  90:19 92:16 95:14
  98:2 99:11,14
  101:1 104:6,15
  106:9 107:10,19
  108:14 109:6
  110:5 111:15
  113:2,9 117:17
  118:10 119:18
  120:22 121:11,14
  121:19,22 122:19
  123:8 125:4,7
  126:11 127:22
  133:12 134:3
  137:6 142:15,19
  146:12 147:7,14
  147:15,18 148:7
  153:19 155:2,4,8
  155:11 156:10,13

160:14 161:9,18
  162:10,10 166:19
  167:11 170:16
  175:17,19,20
  189:1,6 190:15
  194:10 195:6,18
  196:13 197:17
  198:11,19 200:19
  203:8 205:13,16
  205:17 212:2
  213:1,4,7 214:4
  214:10 216:11
  218:12,15,19,20
  219:5,9,15,17
  222:5 224:2,4,10
  229:21 230:20
  231:2 234:14,18
  235:1 237:21
  238:8,11 239:1,5
  239:18 242:9
  243:2 245:9,10,21
  246:3 258:18
  263:10,20 264:11
  274:14 275:18,20
  278:13,19 280:15
  281:5,8,19,19
  282:15,16,17
  283:6,22 285:2,7
  286:19 287:7,11
  287:12 288:17
  290:5 291:7
  293:11,13,17,22
  300:2 306:19,22
  309:4,6 310:7
  311:3 312:2
  314:22 322:6,20
  323:16 325:4
  326:19 327:6
exhibits 12:13,13
  33:1 39:21 40:5,7
  40:10,14,18 42:1
  42:2,5,18,21 43:5
  43:6 45:13,13,17
  46:1 75:18 113:16
  113:18 127:16
  132:3 135:22
  160:1,12 195:21
  209:12,21 211:19
  211:20 213:6
  230:13 267:1,6
  268:13,17 278:15
  285:7 287:20
  291:8 298:14
  308:15,17 309:11
  313:9 314:8 315:8
  315:8 316:18

329:17
exist 182:14
existing 161:7
expect 44:10 318:12
  318:20 319:7,9
expects 12:6
expedited 115:6
experience 11:9,11
  29:11,12 30:5,8
  30:13 41:19 100:3
  102:12 112:20
  116:21 117:7,12
  125:14 126:3
  127:1 130:14
  131:5,7,17 135:7
  136:8 161:12,19
  167:14 173:5,7
  178:13 180:21
  186:14 191:9
  272:10 278:8
  280:6 316:14,15
experienced 120:19
  121:2
expert 25:4 43:15
  61:19 69:22 289:7
experts 24:21
  288:21
explain 71:8,9 74:1
  81:9 144:15 145:8
  149:13 201:12
  238:2,4 248:16
  286:10 301:15
explained 246:12
explaining 77:14
  81:2
explanation 79:14
  79:21 141:1 238:3
explanations 77:21
Express 45:12
expressly 264:3
expunged 286:2,4
  300:10
extension 104:7
extensive 161:12,18
  173:7 277:13,22
extensively 272:9
  273:4
extent 70:8 97:10
  112:22 158:4
  308:11 311:2
  312:5 316:10
  327:7
extra 46:3 172:19
extrajudicial 246:5
  246:13 248:3
  250:3 259:2,8

293:6
**extreme** 23:19
**eyes** 119:11

**F**

**F** 130:7
**faces** 22:12 295:10
**facetious** 275:14
**facing** 32:2 96:8
109:3
**fact** 11:14 15:19
20:15 24:3 25:13
26:4 28:10 29:16
30:16 41:18 61:3
67:10 75:10
101:20 103:18
111:2 112:16
116:3 117:4
120:18 124:1,2
129:14 135:2,5
139:9 141:7 146:5
155:17,22 158:4
165:17 167:15
179:7 198:4
204:16 216:3,6
217:7,8 222:1,8
225:5 229:2
251:18 256:3
266:18 273:1
291:9,17 293:8
299:18 300:19
301:14 305:7
**factor** 94:4
**facts** 15:8 58:8
59:21 153:4
188:13,13,14
**factual** 85:18 94:11
95:1
**factually** 95:18
**failure** 278:3
**fair** 77:19 244:22
315:5
**fairly** 36:3 250:22
**false** 10:19,21 131:2
**falsely** 204:8
**fame** 253:2
**familiar** 326:21
327:1
**familiarize** 153:22
210:2
**family** 16:6,18
330:17
**far** 101:11 103:1
204:15 220:18
258:13 270:7
324:15

**Faretta** 221:5
224:20
**fashion** 152:11
259:7
**fast** 53:13
**father** 257:7
**favor** 91:12
**favorably** 191:19
**FBI** 49:9
**FDA** 179:6,7
182:19,20 183:7
183:10
**fearful** 157:19
**February** 48:14,21
49:3,14 50:10
136:20 137:9,21
138:2,4,11 140:5
140:6 141:3 142:6
142:8 148:18
152:2 154:6,19
238:11,13,14,16
238:17 264:19
266:8
**federal** 10:7 12:20
13:17 16:17 17:7
17:8 18:8 30:19
31:9 45:12 52:4
73:18 74:17 75:21
76:15 79:1 98:18
112:4,10,17
116:16 118:18,22
119:7,15 120:12
124:2,11 125:14
126:3,4,17 130:15
133:19 135:7,10
136:7 161:13,19
167:14 171:3
178:6,8 189:20
190:19 191:8,11
191:16 204:14
207:6 209:1
238:18 250:10,10
259:10 277:22
296:8 313:14
316:5,11,14 317:1
317:3 322:17
329:12
**feel** 18:4 21:10 27:5
36:3 43:2 61:15
153:9 305:9
**fees** 16:9,10 18:19
201:21,22 202:8
**fellow** 263:2
**felt** 20:8,9 21:11
24:1,2 29:5 31:1
37:3 59:13 61:17

77:14 80:19 88:22
93:21 94:4 97:18
140:15 263:13
292:17
**fifth** 141:19 239:10
240:13,15 241:18
242:3
**Fifty-six** 113:12
**fight** 170:10
**fighting** 19:22
**figure** 150:6
**file** 22:17 24:5,6,10
27:9 40:14 53:1
56:8 74:6 85:22
90:8 92:6 94:16
114:3 143:18
229:14 230:1,17
232:14 234:1
261:12,15 286:4
288:11 297:5
**filed** 9:15,19,22
10:10,15 11:2,20
12:18 13:13,16,18
18:21 22:18,19
24:18 28:13 31:19
31:22 32:3 37:18
39:5 50:17 51:7
51:11,19 52:3,8
52:12,14,21 53:2
53:9,11,19 55:8
55:22 56:2,21
68:1 71:14 72:2
83:3 85:2,4,7,10
85:13,21 87:19
89:20 90:5 92:7
93:11 94:18 97:22
98:17 99:4 100:19
102:16,16 103:3
106:4 107:12
108:4,16 109:12
110:7 111:11
113:10,20 115:9
127:9 128:13
133:13 142:14,22
144:4 146:7 161:3
168:13 170:3
171:4 179:2
194:16 199:14
204:16 209:5,16
209:19 210:19
211:2 212:9,21
213:1,11,22
215:16 216:10,15
217:4 218:8 220:5
221:18 225:8
226:18,19 227:17

228:8 232:8 233:1
233:6,8 235:14,15
237:5,20 238:17
238:21 239:4,15
239:16 240:2,13
240:18 241:2,18
241:19 244:18
261:10,13 264:18
266:15 283:2
291:16 297:8,12
301:21 329:3,6,12
332:10,14 333:12
**files** 86:1 286:2
294:11
**filing** 12:19 13:5
24:12 53:4 62:14
86:18 90:12 92:4
139:9 204:15,17
204:22 210:4
284:11 286:6
290:8 297:20
298:15 307:18
**filings** 11:20 40:9
53:6 68:18 72:5
87:2 90:9 212:18
333:2
**filled** 78:19 177:6
**filling** 40:4 62:3
**filmmaker** 274:11
**final** 20:16 28:2
61:4 63:2,7 67:10
67:12 68:21 69:3
69:6,14 72:10
84:22,22 111:4
143:18 214:15
216:3,7 217:12
220:13 246:17
266:20
**finality** 265:12
**find** 35:14 65:8
71:18 75:13 90:19
127:21 207:7
248:22 281:10
290:13 316:6,10
**finding** 71:4,6,12,13
71:15 82:15 265:4
285:19 294:19
**findings** 83:21
217:16,17 265:12
265:12 293:3
**fine** 7:1 42:6,7,12
58:13 128:18
129:18,19 223:1
267:11 293:18
314:16 330:17
**finish** 45:1 143:10

143:16 148:21
151:21 180:5
211:14 228:7
250:5 251:13
287:2 311:19
**fire** 249:9 278:12
**firearm** 10:8
**fired** 28:10 135:16
136:14 170:12
216:21 221:2,22
222:1 279:21
**firing** 218:6
**firm** 51:14 100:1,1
100:2 104:12
109:19,20 112:4
116:1,1,2,2
118:18 174:3,17
176:16 180:17
187:4,6,7,8,9,12
187:16,17 192:16
192:17,22 193:2
333:4
**first** 8:3,8 40:21
41:10 45:10 48:4
48:14,17 49:2,21
50:9,14,16 51:19
53:5 55:5 65:8
69:17 74:2 88:19
101:19 102:7
111:10,15 113:22
114:2,4 121:6
122:9 125:11
127:22 128:6,13
133:10 136:18
142:5,8,19 145:12
147:17 148:2,4,5
148:15 149:10,14
150:7 151:9
155:12 156:12
160:16 174:1
190:1,17 197:17
198:15 206:4
214:2 218:20
223:16 231:14
240:5 242:15
245:7 247:1
250:13 261:21
269:1 312:15
315:8 321:4,12
323:7 326:2
**Fitton** 20:1 21:14
56:2 241:12
292:15 301:21
**five** 11:20 41:1,3,4
42:10 50:20 54:19
66:3 72:14,16

In The Matter of:  Larry E. Klayman
July 15, 2019

73:2 87:13 114:6
137:6,17 175:11
181:2 196:19
200:20 239:12
285:5 286:3
287:19
**five-minute** 318:5
**Fleder** 179:19
182:22 184:2
**Fletcher** 50:7,8,13
51:10 211:10
247:7,9 260:7
**Fletcher's** 51:2
**flip** 275:12
**Florida** 20:8 173:18
174:2,2 176:17
285:19 286:2,4
289:14 290:15
**focus** 68:18 151:4
**focused** 182:7
**follow** 30:10 144:5
190:15 254:8
285:15 292:13
**follow-up** 310:9
**follow-ups** 332:22
**followed** 79:11
**following** 144:3,6
146:19 170:13
**follows** 48:5 321:5
**fond** 116:2
**Food** 178:7
**footnote** 206:4
262:5
**force** 38:4 58:20
63:10 64:3 71:16
203:22 216:3
266:13,17 291:5
**forced** 32:15 33:5
**foregoing** 85:18
**forfeited** 194:2
**forgot** 52:12 140:21
208:12
**form** 11:6 54:15
72:19 157:5 159:1
309:20
**formal** 119:15
**former** 19:21 21:13
112:10 118:22
119:6 120:12
124:2,11 125:14
130:14 133:19
173:5 202:6
205:10 241:11
**forms** 244:7
**forth** 58:9 59:21
63:21 69:21 89:8

95:20 166:14
258:17
**forthcoming** 26:16
**Forty-nine** 108:3
**Forty-one** 229:16
229:19
**forty-three** 290:6
**forward** 19:3 72:5
89:6 141:3
**fought** 274:21
**found** 15:14,17
25:14 39:19 76:20
80:13 249:2 253:6
264:15 266:12
282:3 300:20
**foundation** 155:21
**founded** 126:18
203:18 258:21
**founder** 15:1
112:11
**four** 42:9 50:6,20
54:1,10 60:19
180:13 181:2
189:10,16,22
190:14 192:12
193:4,5,21 203:21
206:20 208:21
256:2 285:10,11
289:10 304:2
327:5,8 328:16,18
329:8,14,15
**fourteen** 147:11
294:2
**fourth** 190:9 207:6
207:6 217:17
226:5 237:20
239:20 245:19,22
247:10
**frame** 41:14,18
**frankly** 159:13
275:13 299:12
**free** 77:3
**free-for-all** 156:22
**Freedom** 15:1
171:9
**frequently** 113:19
278:5
**friend** 33:4,12,22
169:7 274:4
**friendship** 258:16
**friendships** 246:15
**Frisch** 74:10 281:3
**frivolous** 131:2
**front** 55:10,20 60:1
62:7 64:8 79:9
151:6 273:9

303:17
**fruit** 151:9 202:1
**Ft** 201:14 202:16
**FTC** 180:8
**fulfilling** 61:17
**full** 42:22 46:2,3
48:10 65:11
126:21 137:19
153:13 155:12
212:13 267:16
308:11 319:10
321:9
**fully** 280:17
**fundamental** 26:11
150:16
**funds** 194:2
**funny** 300:16
**further** 141:1 149:4
154:16 266:21
308:13 332:19
333:17
**future** 79:8

---

## G

**G** 5:1 161:18
**gaming** 248:8 253:1
253:2,3,4 255:15
255:22 256:5
257:4,17 258:2,8
**gay** 75:1 111:6
292:8
**Gene** 282:2
**general** 18:1 309:14
310:11 311:11
**generally** 31:6
82:17 90:11
146:22 162:12
197:22 261:20
263:5
**George** 34:10 38:2
**getting** 100:10
117:22 120:7
133:10 150:12
160:7 162:21
184:6 258:10
275:5 303:9
**Gilbert** 273:12,14
274:10
**Gillen** 201:10,11
202:4
**Gillen's** 202:9
**give** 6:14 16:1 18:4
40:16 42:7,10
47:1 79:13,20
121:19 132:11,16
135:20 141:1

150:21 160:3
178:13 267:4,19
278:18 317:8
318:2 320:3
**given** 69:16 70:21
103:18 140:2
165:17 169:11
225:5 258:22
330:9
**giving** 32:6 38:22
48:10 145:1,4
229:11 288:14
**glad** 44:4 110:21
**globally** 328:14
**Gloria** 33:4
**go** 14:13 15:10 25:8
26:1,2,3 28:15,17
36:19 40:5 43:8
43:10 45:8,15
53:18 56:10 64:2
69:1 73:10 81:11
87:17,18 97:19
98:22 103:20
104:6 106:9 109:9
112:12 113:17
117:17 118:5,13
118:15 121:13
128:8 133:2
137:17 140:17
141:2,19 142:4,19
147:11,13 149:6
159:18 175:6
190:22 191:3
209:3 225:21
228:18 229:5
230:6 233:22
243:1 248:21
250:17 253:13
256:3 263:16,20
264:13,17 267:8
267:20 268:2,17
269:12,17,17
270:5,10,14
272:21 279:13
293:19 303:15
308:18 310:3
318:13 324:16
334:15,15
**goal** 38:14
**goes** 6:14,20 28:3
35:19 95:22 130:2
131:8 216:4
237:13 254:19,19
284:4 313:13
324:17,18 331:12
**going** 8:1,2,7 16:15

28:19 29:19 32:19
35:22 38:4 39:18
45:18,21 46:9,16
49:8 50:3,9 51:6
58:15 63:8 65:20
65:21 67:8 69:3
70:10 71:18 72:11
77:2,2 92:14 97:5
97:14 105:15,15
109:9 111:9 112:1
117:21,21 124:15
126:20 129:6,8
131:19 132:6,6,8
132:12,17 144:11
150:13 151:6
152:8,16,19
153:11 154:14
164:3 168:5
169:12 171:4
177:3 184:14
188:22 193:20
194:18,19 197:16
206:12,14 209:3
214:17,22 225:2
228:5 242:13
243:3 260:15,19
261:16 262:11
264:1 265:10
269:7,14,20
270:16 272:8,11
273:16 279:2
285:1 287:2,11
289:9 290:4
293:19 296:2
302:16 306:16
307:8 309:21
310:3 311:7,7
313:20 315:7,15
316:4 317:9,20
319:22 334:8
**good** 5:2 7:11,15
14:21 19:5 37:19
41:17 128:16
222:20 227:2
268:6 271:8
281:13 287:6
**Goof** 5:5
**gotten** 33:13 56:6
302:19
**Gould** 15:14 18:17
19:8,16 22:5
26:10,12 27:13
29:5 61:7 62:6
72:7 82:22 89:2
93:6 116:4,22
123:17,21 124:1,6

146:15 210:15
211:10 217:8,21
229:10 230:1,7
242:5 263:8 275:6
291:19 293:2
294:12,13,15
295:2
**Gould's** 27:16
83:21 124:10
125:5 217:15,16
239:2 263:6
**governing** 5:8
**government** 10:10
12:7 16:17 17:7,9
18:8 23:5,18 38:7
138:13,17,21
144:13 145:14
151:3 165:22
166:5,9,18 167:1
180:21 186:22
201:20 202:12
**government's**
123:18
**grain** 159:14
**grand** 272:22 273:9
**grandfather** 16:7
**grant** 95:19
**granted** 9:5 15:18
34:11 110:17
127:19 140:20
299:10
**grants** 229:10
**Gray** 174:3 176:16
**grazing** 16:8,9
**great** 34:14 46:8
119:11 135:10
218:13
**greater** 95:20 132:1
**Gregory** 149:21
150:3
**grill** 262:16
**grilled** 247:1 262:14
**grilling** 259:21
261:2
**grind** 261:20
**grinding** 259:12
**grossly** 259:7
**ground** 16:22 260:4
**grounds** 95:19
96:17 107:22
113:7 146:15
195:21 293:11
311:22
**group** 19:22 21:13
148:2,6 171:12
241:11

**groups** 143:3 148:1
148:11 178:11
**guess** 7:22 44:12
90:16 117:6 147:2
157:18 159:21
176:2 179:22
195:16 199:22
243:15 246:21
268:12 269:4
285:11 309:18
318:14 326:5
329:20
**guilty** 203:2,4
**guy** 15:7

___

**H**

**hac** 9:18 11:2,4
12:20 13:4,10
15:16,17 18:21
22:7,18 24:19
28:7 34:21 50:11
50:18 51:8,11,20
53:13 62:3 63:15
68:1 71:14 72:1
72:11 76:4 78:20
79:5,18 80:18
81:16 82:21 83:3
83:19 84:9 85:20
90:18 92:3 94:11
95:20 98:14
114:20 134:14
162:18 164:6
168:5,10 169:6,11
169:17 213:17
217:10,22 228:8
229:16 230:19
233:1,8 234:3
241:7 244:10
252:21 264:12
276:8,22 282:17
282:20 283:3
292:5 305:16
307:5,6
**half** 44:12 45:15
68:1 91:19 176:12
178:3,16,17 302:4
302:21 318:19
**halfway** 119:5
**hall** 253:2
**Hamburger** 172:19
**hamburgers** 275:13
**hand** 38:7
**handed** 17:11
278:22
**handle** 8:4 202:6,7
247:12

**handling** 102:13
206:7 280:5
**Hansen** 50:11 52:11
53:2,11,22 85:7
85:10,13 86:1,3
86:15,19 87:1
89:22 90:5,14
92:7 93:11 94:10
94:16,22 99:17,18
99:20 100:7 101:4
101:14 102:11
103:3 104:11,21
106:4,13,16,21
108:10 111:18
112:3,16 114:10
114:15,20 115:11
115:22 116:13,20
117:7 118:17
119:5 157:13,17
158:5,10 233:17
275:20,22 277:5
280:4
**Hansen's** 53:6
115:4 277:8
**happen** 142:1
158:19 237:16
307:8
**happened** 74:3
149:12,18 196:22
198:7 215:22
248:14 301:8
**happening** 35:6
299:20
**happens** 101:22
307:9,10
**happy** 17:22 140:9
141:1
**harassed** 20:4
**harassing** 265:6
**hard** 260:17 290:6
**harm** 306:2
**harmed** 21:13
**Harry** 23:22,22
34:2 249:7,12,13
249:17 253:1
254:20 256:6
258:2 259:13
**hat** 76:8
**Hatch** 198:5
**he'll** 226:11
**head** 100:22 151:3
165:8 225:12
292:17
**health** 27:19 86:7
113:1 114:21
115:16 116:9,11

**hear** 38:19 152:21
153:17 257:19
274:7
**heard** 94:1 152:16
257:10 258:1
296:15
**hearing** 1:12 2:1,3,9
5:7,11,15,18 8:21
26:1 58:19 59:4,8
59:11,19 60:4,8
60:17 61:9,11
62:1 63:5,18
64:12,14,17,20
65:1 66:21 67:1,6
67:19 68:6,7,15
68:20,20 71:3,3
72:3 77:12,19
88:11,18 91:7
129:9 130:8
135:17 151:18
156:6,9,15,15
157:9 163:8 164:2
164:3,9,15,20
167:22 168:16
202:7,7 208:7,8
210:7 214:1,11
215:3,10 216:1
217:5 218:11
219:10,14 220:1,9
220:20 221:5,15
223:13,18 224:20
225:4,4 260:18
264:20 265:13
266:9,12 278:12
304:3 305:7
312:15 313:7
322:11 323:1
325:5,13 326:20
332:9 334:18
**heart** 16:9 31:21
138:9 262:18
**heated** 31:12
**heavy** 17:11 35:20
38:7
**heck** 226:8
**held** 111:2 140:14
162:21 168:6
169:5 259:5
280:21 283:16
298:21
**help** 42:21 68:14
93:1 141:9 146:1
194:21 195:2,3
219:8 248:19
281:10 284:16
**helped** 92:13 173:9

251:16
**Helper** 172:19
**helpful** 223:1
**helping** 172:13
251:14
**herd** 17:1,2
**heritage** 75:5
**Herman** 96:19
301:16,17 302:12
**Hernandez** 189:15
190:7 203:7,18
**hero** 26:12
**hiatus** 49:9
**hide** 89:10
**hiding** 166:12
**high** 29:19
**high-profile** 9:19
125:15
**higher** 30:14 186:2
186:3
**highly** 124:16
**Highway** 178:9
**Hill** 165:4
**hindered** 103:17
**hire** 172:16
**hired** 16:18 207:18
**history** 75:7
**Ho's** 195:9
**hoc** 2:3,9 86:20
**hold** 65:21 110:22
111:6 139:4
151:18 162:8,14
163:5 164:21
165:12 166:2
167:2,16 168:18
**holding** 170:2
**Hollywood** 274:11
**home** 270:5
**honest** 38:8 253:22
254:6 265:3
**honestly** 64:1 197:1
262:10
**honesty** 255:9
**Honor** 6:3 8:10
14:7 36:5 38:9
42:11 46:15 65:18
67:8 68:9 77:7
78:9 79:14 80:12
86:10 95:4 97:9
117:20 126:9
127:6 129:2
131:22 145:2
156:19 160:6
162:1 168:21
182:2 184:17
195:20 198:18

199:15 201:12
211:18 213:3
214:15 230:5
256:12 264:22
266:4 269:12
284:13 288:4
289:21 291:18
294:5,8 295:1,5
299:10 307:2
309:15 310:10
311:18 317:7
327:18 332:20
334:1,13
**Honor's** 188:19
**honorable** 19:21
**Honors** 42:22 97:19
**hope** 37:1 65:1
77:17 299:15
**hoped** 99:1
**hopeful** 334:2
**hopefully** 34:20
195:3 237:16
268:16
**hoping** 32:14 37:19
**horns** 19:7 25:12
**horseback** 17:5
**hostile** 33:8
**hotel** 45:16
**hour** 44:11,12,12
45:15 129:1
318:19
**hours** 117:22
171:14 202:19,22
206:16,18 207:2
272:18
**huge** 28:17 279:10
**Humm** 189:15
190:9 207:8,11,17
208:6
**hundred** 16:11
**hundreds** 201:17
**hurting** 292:2,14
293:1
**husband** 141:9
162:15 163:9
164:22

————————
**I**
————————
**identified** 8:1 55:3
62:16 66:14 67:3
193:22 200:18
245:20 269:2
300:1 332:11
**identifies** 84:17
**identify** 7:8 28:9
65:4 316:5,9

325:4 326:20
**ill** 106:17 298:7
**illegal** 38:3 201:15
202:14
**illegality** 272:3
**illogically** 28:9
**images** 328:22
**imagine** 270:12
315:19
**immediately** 158:3
210:21
**immigration** 117:5
135:3
**immunity** 36:20,20
93:10,10
**impaired** 198:9
**impeding** 10:7
**imperfect** 307:17
**implicated** 204:6
**implication** 86:17
187:19
**implied** 188:14
**imply** 237:7
**important** 18:14
25:17 26:15,20
27:14 29:2 31:14
32:9 34:7 41:13
41:19 64:22 91:7
115:22 147:2
237:2 280:3
286:19 288:16
289:22 307:14
**imposed** 5:17
**impossible** 104:1
**impression** 277:18
280:6
**imprisoned** 22:22
**imprisonment** 26:9
31:8 32:2 91:21
96:8 109:4 280:8
295:10
**improper** 132:15
302:14
**improperly** 93:6
**inappropriate** 36:1
77:16
**incapable** 280:5
**incidents** 244:9
**include** 11:14 213:5
**included** 11:7 12:13
12:14 40:9,12
65:16 83:8 104:11
122:15 124:3
127:15 131:3

154:2 194:10,11
209:21 228:14
230:12 261:4
278:14 327:12,22
**includes** 239:2
**including** 12:12
25:11 93:13
166:11 250:22
322:17
**inclusion** 98:8
**inclusive** 83:12
**incomplete** 40:8
42:20,21 312:9
**incorporates** 85:19
**incorrect** 231:16
**incriminate** 141:20
**indefinitely** 139:5
**independent** 17:10
**indicate** 134:17
309:19 312:16
324:4 331:5 333:7
**indicated** 96:4
147:19 165:12
187:3 191:6
**indicates** 219:13
**indict** 297:19
**indicted** 18:7,12
32:14 48:15 49:10
141:7,11 272:17
273:16 274:19
275:5 296:12,20
**indictment** 10:4,11
10:15 15:20 23:1
23:15 91:18
166:10 184:3
236:19,19 237:19
293:9 296:21
**indictments** 236:5
**individual** 42:2
43:5 185:9
**indulge** 46:15
**industry** 253:4
**infer** 259:7
**inference** 53:15
**influence** 151:11
**influenced** 24:2
93:21 94:4
**influential** 80:15
**inform** 288:7
**information** 10:22
12:15 19:3,17
22:3 25:9 145:4
150:21 153:3
171:9 252:1,7
256:8 257:3
279:11 281:7

283:2,3 284:6
324:20 330:10
**informed** 62:8
303:16
**infraction** 74:11
**infractions** 25:2
301:20
**inherently** 70:12
**initial** 20:9 53:18
71:22 84:8 117:18
244:10,18 292:20
**initially** 25:8 118:13
119:3 149:17
190:22 253:6
257:5,8 283:1
291:10 304:9
**injunctions** 205:6
**injunctive** 24:13
98:4,5
**injuring** 10:7
**input** 276:4 323:3
**inquiry** 72:19 75:11
303:3
**inside** 103:14
150:20
**insincere** 23:11
**instance** 131:6
232:22 312:13
323:4,14 326:12
**instances** 264:3
282:5
**instituted** 264:4
**instruct** 232:13
**instructed** 134:15
157:1 169:16
232:6
**instruction** 86:11
168:22
**instructions** 170:13
**instrumental** 173:9
**intellectually** 265:3
**intelligent** 86:12
188:12
**intent** 138:21
297:20
**intention** 115:4
**intentional** 31:12
**intentionally** 259:6
**interaction** 277:11
**interest** 15:6 77:18
102:20 245:6,15
273:13
**interesting** 18:5
184:14 298:6
**interestingly** 27:4
184:5

**interject** 65:22
**internal** 96:15
299:3,4
**international**
180:18 198:2
**Internet** 248:22
254:13 268:16
270:1 311:13
315:13 316:4
322:16 325:21
**interpretation**
265:10
**interrelated** 254:14
**interrelationships**
249:15
**interrupt** 17:13
287:1
**intimidation** 12:22
**intricacy** 140:8
**introduce** 266:22
**introduced** 280:2
**introduction** 39:1
**investigate** 116:11
116:19 250:19,20
298:17 302:13
**investigated** 272:4
298:18 300:19
301:19 303:11
**investigation** 80:9
165:2 271:19
272:2 279:10
300:7 301:4,13,13
301:14 304:10
**invoke** 8:3
**involved** 80:5 82:11
116:7 179:7
183:19 184:22
185:1,11,14,16,20
185:22 186:5,17
186:22 189:11,19
190:18 200:11,13
200:15 201:13
203:7 206:9 207:8
208:2,13 274:3
316:6 326:8 332:5
**involvement** 200:4
202:9 207:8
**involving** 13:2 86:4
200:14 286:20
296:13,14 303:12
308:3
**ironically** 34:9
121:3
**irrelevant** 76:4
124:16 261:9
**issue** 6:17 16:8

17:18 27:17 34:4
69:15 80:11 115:6
124:17 132:7
138:9,11 139:8
140:22 141:21
144:7 158:17
164:18,21 208:14
225:16 229:1
244:17 254:18
261:5 262:17
296:14 306:17
**issued** 90:21 146:21
158:16 214:2
215:5,6,11 239:1
264:20 266:10
291:19
**issues** 8:14 17:18
24:7 26:17 37:1
44:15 102:13
105:16 132:5
150:14

**J**

**J** 2:10
**jail** 33:19
**January** 133:14
142:15 146:7
186:9 236:3,10,14
**Jerome** 272:2
273:19 296:2
**Jewish** 75:4,5
**Jewish-Christian**
75:4
**job** 174:2 176:22
178:12 180:17
226:17
**Joel** 50:11 93:11
94:16 102:11
115:4 273:12,14
274:10 275:20,22
**John** 80:7,12,14,14
172:2,3 179:19
182:22 184:2
**Johnnie** 19:11
**joined** 178:3
**joint** 279:16
**Jose** 203:16
**Journal** 32:20
**judge** 11:15,16,17
12:20 13:3,8,9,11
13:13,13,14 15:14
18:17 19:8,15
22:3,5,17 23:21
25:3,7,12,13
26:10,11,15,21
27:5,12,13,16

28:12,16 29:5,17
29:19 30:22 31:17
32:15,17 33:4,8,9
33:10,20 34:7,22
35:2,16 36:16
50:7,8,13 51:2,10
61:5,7,18,19 62:6
62:8,10 63:1,14
64:6 72:6,7 73:12
73:12,14,19,20,20
74:4 75:5,7,9,11
75:22 76:5,6,10
76:15 78:20,21
79:1,4,8,17 80:6
80:11 81:15,21
82:2,13,21 83:2,6
83:21 84:1,3,5,8
84:16 85:5 87:22
89:2,2,10 90:16
90:21 92:2,21
93:6,17,20 94:5
94:10,22,22 98:1
98:20,21 99:4
100:19 101:14
102:16 103:8
105:7,9,17 116:4
116:22 123:17,21
124:1,6,9 125:5
138:18 140:19
141:8 143:2,12,14
143:17,21 146:15
147:20,22 150:6
154:10 155:15,17
156:1,15 157:13
158:14 159:12
162:7,13 163:4,22
164:2 165:10,14
165:16 166:2,12
167:1,15 168:17
169:7,10 170:2
210:15 211:10
213:16 217:7,15
217:16,21 221:5
224:20 226:11,14
227:18 228:1,6
229:9 230:1,7
234:7 236:18
239:2 241:5,6
242:5,13,14,16
243:10 244:3,4,15
244:17,21 245:5
245:16 246:4,13
246:15,22 247:6,7
247:9,22 248:9
249:2,6,8,13,14
249:22 250:17,19

251:17,19,20
252:11,14 255:7
255:12 257:2,7
258:14,14 259:5
259:14,16,21
260:6 261:2
262:13 263:6,8
264:17 275:6
278:1 280:14,14
281:6 282:8 283:1
283:14,17,22
284:4,7,7 287:2
287:19 288:8
291:19 292:11
293:2,6 294:9,13
294:15 295:2,6
300:4,13,20,22
303:13,15 305:13
306:16 307:4,21
308:2 313:16,16
**judge's** 12:8 162:15
**judges** 19:7 24:14
25:11 26:18 73:8
73:11 76:19 77:14
93:2,2,8 98:6
110:22 111:3,7
165:15 210:16
211:9 250:6
258:22 259:1
263:4 285:20
292:5,13 306:5
307:17,21
**judgeship** 24:4
249:22
**judgment** 56:6
236:11,14 290:14
**judicial** 15:1 19:22
20:6 21:13 26:4
35:9 37:20 56:2,7
69:17 72:21 82:12
87:19 111:2,3,8
112:12 126:19
172:18 203:17
205:20 227:17
229:1 241:11
258:21 264:7
292:16,18 301:18
302:2,6,19 304:6
306:18 307:13
325:7
**Julia** 2:19 7:9 9:12
**July** 1:9 213:1,12
239:6,7 240:3
334:19
**jumbled** 150:12
**jump** 92:14

**jumped** 207:17
**June** 56:18 57:7
195:9 198:15
199:21 214:10
215:4,11,12
303:21 304:15,19
**junior** 29:18
**juries** 191:20
**jurisdiction** 226:7
**jurisdictions** 14:22
**jurist** 15:12 27:18
35:15 263:2
**jury** 151:11 272:22
273:9
**justice** 10:8 34:8
49:8 112:11 119:1
119:7,16 120:13
126:18 136:9
173:6,11 174:20
175:3 176:5,10
177:1,17 178:4
180:14,16 181:3,8
185:5 186:19
187:3 191:7 244:5
249:11 271:20

**K**

**Kara** 292:11
**keep** 15:9 20:22
38:10 126:20
154:15 166:5
225:2 265:1
286:13 292:7,12
306:5
**Keller** 25:12 73:12
73:20 74:4,15,16
74:20 75:5,7,9
79:11 111:4
280:14 282:2,8
283:4,14 284:7
285:20 313:16
**Keller's** 73:14,21
75:22 76:16 78:22
79:2
**kept** 30:10 234:2
275:4
**Khashoggi** 189:13
190:6
**kids** 179:12
**kill** 166:15 296:21
**killed** 17:1
**Kim** 1:22 2:4
**kind** 15:5 29:14
61:19 99:1 105:5
119:4 123:17
228:6

**kinds** 100:4 116:21
202:12
**kinship** 27:6
**Klayman** 1:5 3:3,7
4:4,7 5:5 6:3,10
7:1,13,13 8:2,6,10
8:16,22 9:16,22
10:12,18 11:2,13
11:19 12:9,15,18
13:10,15 14:3,7
14:17,18 17:12,16
17:21 18:3 37:22
39:3,7,10,13,16
40:15,19 41:1,4
41:13 42:6,9,14
43:7,12,22 44:6,8
44:11,19 45:6,10
45:11,19,22 46:5
46:7,13,15,18,20
46:21 47:3 48:2,9
48:11,13 50:4
54:13 56:10 59:3
63:13 65:17 66:2
66:9,13 67:8,15
68:8,15 70:2
75:17 76:13,17
77:1,6 78:1,5,9,12
79:13,20 80:1
81:1,3,6,13 84:7
85:2,15,17 86:10
86:22 87:4,7 88:2
88:6,10 92:17,19
95:3 97:4,6,8,16
97:21 99:8,20
100:9 101:3,6
102:8 104:12
106:3 107:7,9,14
107:21 108:4
109:20 111:11
112:10 113:6,11
115:9 117:20
118:4,8,11 119:14
120:1 121:3,21
123:14 124:4,8,14
125:12,19 126:8
126:18 127:5
128:19 129:1,7,11
129:18 131:22
132:11,18 133:3,9
136:19 137:8
139:15,17,21
140:3,6 142:7,12
144:9,17,22 145:3
145:6 146:4,14
148:22 149:2,8,17
151:20 152:6,12

In The Matter of:  Larry E. Klayman
July 15, 2019

Page  350

152:14,19 153:5
153:20 155:6,20
156:17 159:17
160:6,10 161:17
161:18,22 163:2
164:10,13,16
165:7 167:7
168:21 169:21
170:20 171:12,16
171:17 172:17
173:1,16 175:14
180:6,20 181:21
182:2,9,15 183:5
183:8,11 184:11
184:12,16 187:18
187:21 188:1,5,7
188:16,19,22
189:9 190:15,17
190:21 192:8,12
192:15,18,19,21
193:5 194:9 195:6
195:13,20 196:1
197:16,19 198:1
198:13,17 199:1,5
199:11,15 201:4
202:21 204:3
205:15 206:13,15
206:18 207:3
211:18 212:2,5
213:3,10 214:6,14
214:19 215:5
219:7,21 221:3,11
222:3 223:3,8
224:9 227:3,6,15
230:5,14 231:7
234:6,18 235:12
237:18 238:6
240:3 241:20
243:3 245:14
246:16 247:5
252:13,19 253:8
253:11,14 254:12
255:1 256:12,18
257:14,18,22
258:5 259:19
263:21 264:13,22
265:9,16,21 266:3
267:14,17 268:1,8
269:1,5,9,10
271:6,7 272:13
274:1,8,12,13
276:1,15,17,20
278:20 279:1
280:13 281:10,13
281:16,17 282:13
282:17,22 283:7

283:10,12,20
284:1,9,12,16
285:19 286:1,7,12
286:16,18,22
287:3,8 288:4,9
288:12 289:7,21
290:3,10,12,16,20
290:22 293:4,14
294:3,15,18,21
296:6,17 300:1,17
303:10 306:21
307:1 308:10,20
309:7,9,10,14,22
310:2,8,10,16
311:18,21 312:12
312:18,22 313:11
313:16 314:7,13
316:6,22 317:6
318:6,12,20 319:3
319:8,11 324:13
326:15 327:3,17
328:20 329:6
330:4,10,11,12,14
332:19 334:1,13
**Klayman's** 7:17
11:5 13:4 276:7
276:21 309:2
329:3
**knew** 12:15 30:7
31:2 73:17 99:21
106:22 108:20
109:16 110:11
136:21 143:20,21
147:19 148:3
166:6 172:18
184:6 234:6
252:20 304:6
**know** 14:9 17:11
21:20 25:22 28:2
29:18 30:6,18
33:13 34:7 35:17
36:17 37:2 39:14
42:3 43:2,13
44:21 52:6 58:5
59:12 60:5,12,15
62:21 63:8 69:1
71:7 78:17 84:11
84:22 85:1 86:18
89:18 90:6 91:19
96:17 98:20 99:16
103:16 105:18
106:5,7,8,20
108:22 112:18,19
113:15 114:1,1
115:15,16,18,21
116:8,11,19,20

117:1,10 120:22
124:20 128:11
129:6,15 130:12
132:21 135:11
136:8 142:7
144:17 153:4
160:22 163:9
164:1,4,5,16,19
165:6 186:9 192:5
197:1,2,21 203:12
209:18 210:21
211:5,10,12,15
216:14 219:5
221:20 225:11
226:4,12,18
240:17 242:19
244:14 248:22
250:14,21 251:20
252:22 253:3,19
258:20 260:17
263:2,3,4 268:1
268:18 269:14
270:5,8,12,16
278:3 280:1 292:3
298:4,7 299:10,11
306:10,12,13,21
307:8,9 311:10
315:15 317:7,10
317:13,19 318:22
331:11
**knowledge** 51:3
**known** 12:16
241:21 250:18
274:1
**knows** 30:14 86:15
168:22 280:12
**Kozinski** 75:12

_____

**L**

**L** 2:19
**l-e-r** 183:18,19
**lack** 11:9 243:10
244:16 272:9
312:1,6,14
**lacks** 112:5 118:19
155:20
**lady** 292:8
**Lake** 16:6
**land** 10:5 16:14,14
16:21 49:7
**language** 161:14
**large** 123:12 169:8
198:3 202:13
**largely** 12:5 14:1
**Larry** 1:5 3:3 4:7
7:13 9:16 37:21

46:13 48:2,11
49:13 85:17 101:6
112:10,21 119:14
121:3 133:3
169:13 192:18
327:3
**Las** 32:20 33:10,11
33:13 99:21 135:1
247:18 249:5,6,7
251:19 253:3
316:16
**latches** 70:13,15
**late** 39:8
**latest** 334:4
**Lauderdale** 201:14
202:17
**laughing** 181:19,21
182:7 300:17
**law** 11:14 22:10
24:15,15 33:11
36:15 37:17 93:2
93:17 96:10,18,20
96:21 97:3 98:5
100:1,1,2 104:12
109:20 115:22
116:1,1,2 131:7
171:12 173:17
180:17 187:7,8,17
192:16,17,18,22
193:2 212:15
249:6 268:15
269:19 291:12
298:11 303:7
307:15 308:11
315:11 321:19
**lawsuit** 306:14
**lawsuits** 297:5
**lawyer** 15:6 20:10
21:14 22:11 29:13
30:13 49:3,7 86:1
86:13 100:5 101:7
102:13 111:1
112:5,21 118:19
120:16 122:16,18
123:11,19 124:18
124:19 126:4
133:20 135:1
179:6 182:21
186:22 192:3,6
207:13 208:2
229:11 232:14
241:14 275:7
292:18 297:3
**lawyer's** 295:11
**lawyers** 11:10 18:16
19:9 27:2 29:9

31:13 34:13 69:13
70:4,10,14 110:3
111:1 116:5
150:19 175:9
201:8 202:5 244:1
307:18
**layperson** 86:13
**lead** 204:16 205:1
323:21 324:12
326:7,12,13
**leader** 249:19,19
**leading** 191:19
**League** 80:21
**leapt** 69:16
**learn** 257:16
**learned** 33:14
220:16 221:15
**leave** 181:7 299:11
**leaving** 302:4
**led** 253:9
**left** 5:13 18:8 20:1,7
27:4 32:22 114:22
133:9 180:16
185:2,10,13
186:18 187:2,16
191:7 292:16
294:6
**legal** 15:9 34:5
94:11 95:1 96:12
109:2 122:4 138:2
141:13 201:21,22
216:22 259:15
274:6,8
**legally** 38:15 95:19
208:16 265:8
**legend** 238:19
**leisure** 280:1
**lenient** 61:12 64:19
77:22 78:6 130:17
**lens** 33:21
**Leonard** 180:18
187:10
**let's** 21:7 60:10
92:15 106:9
117:13,16 133:1,2
149:6 166:9 180:4
238:8 268:5 270:7
283:7 308:16
311:5 314:19
**letter** 111:16 281:20
281:21 283:13
286:1 288:19
300:1 303:21,21
304:7,19 310:8
**level** 25:16 282:3,6
295:11

In The Matter of:  Larry E. Klayman
July 15, 2019

**liability** 174:9
**liberal** 15:13 17:10
**license** 72:20 264:5
**licenses** 208:16
**life** 16:19 18:11
  22:13 26:9 31:8
  32:2 91:21 96:8
  109:3 247:17
  249:21 280:8
  295:10
**life's** 37:15
**lifting** 107:18
**lightning** 94:5
**likelihood** 154:16
**Lilly** 119:19
**limit** 17:14 78:3
  97:5
**limited** 8:12 11:8
  34:4 36:6 104:1
  105:7 121:8
  316:15 323:8
  327:4 330:5
**line** 35:13 37:15
  85:16 94:17 101:5
  101:19 102:7
  112:2,14 118:14
  118:17 119:13
  120:9 121:2 132:6
  199:16 222:19
  223:16 230:2
  257:15 286:15
  326:2
**lined** 68:17
**lines** 101:4 112:8
  119:4,8 122:22
  123:12 131:9
  285:8,10
**link** 260:20
**liquidation** 194:12
  195:8,17 200:9
**list** 40:14 42:1
  132:16 166:15
  267:5,5 284:5
  309:4
**listed** 6:18 31:4
  32:22 103:3,4
  104:2,13 106:3,5
  106:7,11 107:3,12
  108:12 109:5,8,16
  110:11 128:4
  162:15 191:13
  196:7 203:6
  205:19 327:6
**listen** 18:1 73:2
  81:10 92:10 261:1
  262:11

**listened** 21:8 260:21
  262:8,9
**listening** 38:22
**listing** 104:21 164:9
**lists** 87:22
**litany** 109:10
**Liteky** 259:3
**literally** 201:16
**litigating** 124:20
  125:15
**litigation** 9:21 13:2
  31:13 36:15 89:4
  116:3 171:9 173:8
  174:10 177:9,10
  198:6
**little** 7:5 15:7 16:1
  55:4 97:8 99:17
  117:22 120:7
  131:6 135:7 136:3
  160:7 163:1
  172:19 255:2
  267:18 275:14
  290:6 294:7
  296:16,17
**local** 28:6 50:10
  53:2 85:21 86:3,8
  86:9 99:20 100:5
  100:12,14 102:12
  112:21 115:3
  134:2,9,18,20,21
  135:1,1,2 161:20
  193:1 275:21
**locally** 249:20
**located** 134:9,10
**lock** 19:7
**locked** 25:12 247:17
**locking** 323:22
**long** 20:22 25:22
  44:9 75:7 80:17
  85:3 176:4 178:1
  185:7 194:7,18
  196:10 203:12
  227:7 235:13
  268:1 269:14
  274:2 279:10,10
  318:12 321:20
**longer** 14:22 26:5
  51:14 88:7 140:18
  227:3 286:9
  301:17
**look** 55:12 57:14
  68:4 76:1 84:5
  95:16 99:14 112:8
  119:13 125:11
  128:7 132:3
  136:22 142:20

143:6 146:12,13
  147:7,8,10 148:7
  149:4 154:10
  155:10 159:18
  195:5 196:12
  198:10 206:2,4
  207:9 214:13
  215:1 222:17,18
  225:19 227:20
  228:15,20 229:17
  234:12 238:1
  240:20 247:2
  248:21 254:13
  269:10,12 283:8
  303:15 307:13
  308:16 313:6
**looked** 66:4 248:21
  259:11,16 333:1,2
**looking** 55:17 72:13
  73:7 101:3,19
  112:2 154:14
  167:12 191:8
  195:6,13 196:1,3
  196:11 223:9,10
  224:8 229:20
  234:21 277:14
  284:2 285:2,7
  287:10 324:1,2
  328:19
**looks** 52:7
**losing** 37:12
**lot** 18:8 23:13 25:19
  30:5,7,13 37:11
  38:12,13 40:7,10
  56:10 93:12 100:3
  102:12 112:20
  113:16 116:21
  132:5 136:7
  140:15 145:4
  171:6,8 184:7,9
  186:14 191:18
  195:1 202:15
  208:17 222:12
  249:9 258:21
  272:18 279:11
  302:9 330:9
**lots** 136:5
**Love** 16:20
**Lovelien** 149:20
**Lovett** 16:7
**low-hanging** 151:9
**lower** 115:5 120:4
**lunch** 45:15 117:21
  128:21 130:4
**luncheon** 130:5
**lying** 23:19 163:12

166:12 168:7
  296:12

_____

**M**

**M** 1:22 2:4
**Macao** 194:13
  195:17
**magistrate** 28:12
  143:2,12,17
  147:22 220:10
  221:5 224:20
  226:10 278:13
**magistrate's** 145:10
  147:17 220:12
  237:4,6
**magistrates** 265:14
**mail** 34:13 243:22
**mainstream** 32:21
**maintained** 221:22
  324:20 333:8
**major** 261:5,18
**majority** 11:17
  27:11 35:1 244:18
  247:12 249:18
  260:5,9 261:5
  262:19,20
**making** 11:13 94:5
  94:22 141:5
  252:10
**malicious** 56:7
**malpractice** 106:21
  174:9
**man** 22:21
**management** 10:5
  16:14,21 102:13
**manager** 20:4
**manages** 16:14
**mandamus** 30:9,11
  30:14 115:7
  131:15 135:12
  229:3,11 276:9
  277:1 278:4
  291:15
**manifested** 211:11
**manner** 7:3 159:1
  274:18
**manners** 191:14
**March** 51:20 52:4,9
  52:14 53:9 84:4
  84:13 168:13
  170:3 171:4,21
**Marcia** 19:11
**Margarita** 200:22
**Maricopa** 93:18
**marked** 53:10
  56:15 109:6 155:1

219:18 316:17
  322:20
**marriage** 208:16
**married** 255:6,7,12
  257:2,2
**marrying** 208:15
**Marshal** 103:19
**marshall's** 158:18
**mastermind** 201:19
**material** 10:21
  23:17 35:4 40:2
  51:6 80:8 115:2
  166:12 203:20
  204:3 206:17
  297:18
**materials** 39:18
**matter** 1:4 5:6 9:14
  20:15,15 22:1
  23:19 33:9 49:7
  56:4 59:2 60:7,11
  61:2,3 62:7 69:2
  69:11 70:5 80:2
  83:22 96:21 141:7
  150:13 184:21,21
  185:4 197:2
  213:18 214:3
  242:6 266:19
  269:1 272:6
  274:21 282:3
  288:1 301:18
  307:1 311:15
  315:9
**matters** 6:4 14:9
  25:13 38:20 39:5
  39:15 40:11 69:21
  93:21 99:22
  102:12 117:5
  135:3 150:1
  151:10 170:14
  172:10 174:11
  180:8,19 208:14
  269:17 272:10
  274:3 322:18
  323:9
**max** 315:19
**McDonalds** 275:13
**MCI** 186:1,3
**Mead** 16:6
**mean** 17:22 40:3
  51:5 65:14 71:11
  71:18 76:7 78:5
  84:14 85:9 89:14
  97:1 105:1 106:11
  130:21 136:13
  146:20 171:8
  205:7 232:20

234:10 248:12
257:15 311:10
317:9,11 329:2
332:12
**meaning** 155:14
167:13
**means** 105:6 292:4
323:14
**meant** 36:12 89:16
134:10
**medical** 174:8
**meet** 48:17
**meeting** 279:16
**mega** 100:1
**Meghan** 268:19
315:1
**Melissa** 268:14
**member** 2:13,15
14:21 19:5 172:12
173:18 174:22
175:2,4,4,15
301:2
**members** 5:12 8:19
8:21 13:17 77:10
**membership** 94:17
**memo** 244:3 249:9
**memory** 45:17
68:14 76:2 101:8
127:18 148:14
166:17,18,20,22
167:6 194:14
198:8 222:4
260:16,20 262:12
317:6
**mention** 62:17
140:21 280:21
300:4
**mentioned** 262:21
327:10 328:20
**mercenaries** 16:18
**merged** 182:16
**met** 48:14,18,20
49:4 136:3 158:9
158:10 225:22
279:15,16
**metal** 103:20
**Miami** 20:4 201:22
203:19 206:20
207:19 208:20
**mid** 178:18,21
180:1,3,11 181:11
**middle** 119:21
**million** 302:3,21
**Mims** 2:10 5:2,6,10
6:1,7,17 7:6,11,15
7:18 8:7,15,18 9:4

14:6,13 17:12,17
17:22 36:5 39:2,9
39:11,14 40:13,17
41:3,21 42:8,12
43:4,8,21 44:3,7,9
44:14,18 45:3,7
45:17,20 46:6,8
46:18,21 47:4
65:9,13,20 66:11
67:13,17 68:12
75:14 77:1,20
78:2,6,10 79:15
79:22 81:1,4,7
86:22 87:5,8 88:9
88:12 97:4,7,10
99:12,16 100:6,16
107:7,10 108:1
118:5 119:20
120:3 121:18
125:2 128:16,20
129:4,8,12,20
130:10 131:16,21
133:1 137:3
139:14,18 140:1,4
142:4,10 145:3
148:22 149:6,15
151:16,21 152:7
152:14,21 153:15
156:4 157:3
159:15 160:8
162:4 164:8,11,14
165:5 171:15
172:14,21 175:13
180:4 182:6,11
183:1,6,9 184:10
184:13,18 187:20
188:1,6,9,18
189:4,21 190:11
192:6,9,14,17,20
193:3 195:10,22
197:9,15,21
198:10,14,19
199:3,18 202:19
204:1,18 206:15
207:1,4 213:8
214:17 219:15,19
220:20 222:19
227:1,5,8,11
229:20 230:1
231:22 234:14,20
235:3,7 238:4,7
239:9,18,22
241:15 252:16
253:5,9,12 254:8
254:21 256:15
257:12,16,19

258:3 263:16
265:9,17 266:1
267:4,9,12,15,19
268:5,10 269:7,19
270:2,7,17,20
271:1 272:8
273:21 276:13,16
276:18 278:18,21
282:11,15,20
283:5,11,18,21
284:2,10,14,19,22
285:4,12,14 286:5
286:10,17,22
287:4,12,15,18
288:7,10 289:5,11
289:14,18 290:1,7
290:11,18,21
293:12,18,22
294:13,16 295:18
306:19 308:7,16
308:21 309:3,8,12
309:16 310:6,14
310:18,22 311:5
311:19 312:3,13
312:19 313:1,18
313:20 314:5,9,16
314:19 315:4,14
315:20 316:19,22
317:12,18,22
318:4,10,21 319:6
319:9,13,18,22
320:7 323:18
324:5,10,15
326:17 327:20
328:11 329:1,7,10
329:14,22 330:11
331:1,6 332:21
333:16,20 334:7
334:11,14
**mind** 15:9 38:10
41:15,18 65:9
83:5 305:11
**mindset** 141:11
**mine** 93:20
**minor** 24:7
**minority** 34:11
249:19
**minute** 144:18
147:13 268:6
309:4
**minutes** 118:6
129:5 227:9
315:19 317:16
318:2,3
**miraculously**
138:14

**misappropriated**
20:3 302:11
**misconduct** 9:17
23:14,16 71:5
245:17 271:14
282:5
**misleading** 10:20
10:21
**mispronouncing**
201:1
**misrepresent** 31:11
**misrepresentation**
138:20
**misrepresentations**
11:6,7 35:4,5
**missing** 74:18
119:11 129:10
224:6
**misspoke** 313:13
**misstatements**
241:22 261:12
**mistake** 33:22
35:11 248:5 260:1
**mistaken** 206:7
223:5
**mistrial** 149:19
150:2 234:7,8
235:1,15 237:8
**misuse** 70:21
**mitigation** 71:10
**Mm-hmm** 99:15
123:7,9 125:10
134:4 148:9
198:13 229:22
**moderate** 17:11
**modification** 60:10
**modified** 266:18
**modus** 296:22
**mom** 20:2
**Monday** 1:9 240:5
**money** 20:3,10 37:7
37:9,12,12 38:13
59:14 302:7,11
**Monkey** 29:8
**month** 67:22 142:22
184:15 215:15,16
**months** 68:1 180:13
181:2 197:5
202:18 264:19
266:9 304:2
**moot** 242:6,8
**moot-out** 291:9
**mooted** 230:8
294:10
**morning** 5:2,4,5
7:11,15 171:12

218:21 268:4
278:22
**Mosely** 172:2,4
**motion** 6:8 9:5
12:20 13:19,20
24:6 39:5,12
66:15 71:14 95:9
110:18 115:4
128:9 168:13
210:20 211:7
212:6,6 213:17
217:22 220:1
227:21 229:2,15
230:17,18 231:19
232:3,18 233:5,6
233:15,20 235:15
237:3 244:10
307:19
**motions** 11:22
80:20 225:8,15
239:14
**motivation** 30:21
31:1 96:17
**motivations** 116:8
**move** 6:15 31:6
65:10 87:6 101:14
133:1 151:10
174:22 202:13
232:7 252:13
290:19 291:6
308:14 314:6,7,19
319:2 323:18
326:16
**moved** 14:7 174:14
174:19 176:20
305:20
**Muller** 272:17
275:1 297:9,13,19
308:3,5
**Muller's** 271:18
272:22
**multiple** 11:19
19:12 27:20
**mute** 298:19

───────

**N**

**N** 4:1 5:1 130:7,7,7
**name** 5:10 9:12
48:10 104:11
107:2,12 110:16
111:3,8 183:13
187:9 189:2,14
200:22 208:12
233:5,14,17,19
296:7 319:19
321:9,10,12,14

In The Matter of:  Larry E. Klayman
July 15, 2019

Page 353

323:7,7,11,11
325:17 327:3
329:4 330:16
**named** 10:3 180:17
248:18 257:11
**names** 24:7 148:13
189:12 302:9
328:9
**naming** 302:8
**NARA** 324:20
**narrow** 8:13
**Natalia** 207:8
**national** 75:3 178:9
201:16 205:5
**nationality** 74:22
**nationwide** 322:17
**Navarro** 11:16 13:3
22:3,18 23:21
25:3,7 26:16
30:22 31:17 32:15
32:17 33:4,12
35:2 61:5 62:8,10
63:1,14 64:6 72:6
76:6 84:1,3,16
87:22 89:2,11
90:21 92:2,21
93:17 94:10 95:21
98:1,20 101:14
102:16 103:8
105:7,9,17 138:18
140:19 143:14,21
147:21 154:11
155:15,18 156:16
157:13 158:15
159:13 162:7,13
163:4,22 164:2
165:10,14,16
167:1,15 168:18
169:7,10 213:16
226:11 234:8
236:18 246:15
247:22 248:1
258:14 259:11,14
259:17 281:6
283:1,22 284:4
287:19 288:8
291:11
**Navarro's** 13:9
78:21 84:6,8 85:5
94:22 99:4 100:20
278:1 287:2
**ne-VA-dah** 33:16
**ne-VAH-dah** 33:15
**necessarily** 164:19
167:21 301:15
331:12

**necessary** 97:18
145:5 187:21
188:4 310:5
**need** 8:10,16 17:2
29:14 31:2 42:10
43:3 78:2,10
97:14 112:21
114:19 123:19
157:5 163:16
165:6 172:18
238:2 267:16,17
268:2,3,8,9,20
269:3 270:5
276:13 293:3
309:3,10 310:4
311:9 315:9
**needed** 19:3,17
20:10 29:6 30:10
35:7 49:7 151:1
151:13 154:19
217:8
**needs** 298:5
**negative** 205:7
303:14
**negligent** 259:7
**negotiate** 21:7
**negotiated** 20:20,21
21:17 22:4 56:19
56:22 58:1 59:5
59:17 60:14,18
61:6,10 62:10,17
63:4,22 64:2,13
64:18 65:3 66:16
72:2 84:17 88:7
290:17 304:3,14
304:21 305:11
315:2
**negotiating** 207:15
**neither** 244:13,15
**nervous** 7:5
**neutral** 98:20
244:22
**Nevada** 9:21 10:14
16:4,13 23:6
32:11 33:14,15,16
52:4 94:17 99:21
134:10,11 162:17
172:12 249:7
264:3 325:7
331:16
**Nevadian** 33:18
**never** 6:11 7:4 19:4
20:11,12 26:19
31:15 32:6 37:6
53:7 64:8 74:2
83:22 84:1 94:1

107:6 122:3
132:18 140:20
141:7 151:18
155:18 163:14,19
169:18 179:1,2
187:14 191:16
210:12 212:16
215:21 233:16
234:3 237:11
255:4 257:10
264:15 266:20
279:8,15,15
283:15 295:13
301:8 302:1,8
303:2 330:19
331:15,18 332:4
**new** 218:19 228:4
233:11 242:16,21
243:8,9 280:19
**newspaper** 32:21
**nice** 206:9 280:7,8
**nine** 114:10 122:22
123:12 196:19
222:6 223:8
306:22
**Nineteen** 31:8
**node** 314:22
**nominated** 249:14
**non** 188:13
**nonbinding** 71:4,6
**nonexistent** 288:5
**nonpartisan** 27:8
**Nordstrom** 243:17
244:11
**north** 184:7 294:6
**Notary** 2:5
**note** 12:9 40:3
152:9
**notebook** 50:3
92:17 142:19
156:12
**noted** 26:10
**notes** 152:8
**notice** 42:16 115:3
303:2
**noticed** 132:7
**noticing** 182:3
**notified** 215:21
**notify** 334:4
**November** 128:4
176:7 273:16
**null** 265:8
**nullified** 58:18
**number** 5:11 10:3
50:2,4,5,6 52:2,9
52:15 53:10 54:14

54:20 55:8,13,14
55:16,19 56:16,20
57:2,19 62:1,9
64:14 65:5,6 66:2
66:17 67:3 68:4
70:6 74:13 76:2
82:5 85:4 88:17
89:7 90:19 92:16
96:16 98:3 99:11
101:2 103:3 104:7
104:12 107:19
108:14 110:5
111:15 113:3,9
117:18 118:10
119:21 120:1
121:1,11,14,19
122:19 125:5,7
127:22 128:5
130:13 133:12
134:3 137:6
138:10 142:19,21
145:9,11 147:7,14
147:15 148:7
150:15 154:12
155:2,8,11 156:10
160:1 161:9
162:10 167:11
170:16 175:17
179:5 182:20
189:1,7 191:21
194:10 195:6,11
198:12 200:19
203:8 208:13
213:1 214:4,10
216:12 218:15
222:6 224:4
225:15 234:13,21
234:22 236:8
238:11 239:1,6
240:17 242:9
243:2 246:3 263:7
263:10 267:1
274:2 284:5,6,6
284:20 285:2,5
287:4,14,15,19,22
289:10 290:5
293:16,20 294:1
294:17 298:13
300:3 308:15
309:1,6 310:7
311:3 314:22
322:6,21 323:16
325:4 327:6,16
**numbers** 62:16
119:5,21 120:2
190:16 223:11

224:8 243:4,5,6
281:9 284:10
285:10 288:17
**numerous** 325:9
**NW** 2:2

---

**O**

**o** 5:1 130:7,7,7
196:19 240:8
**o'clock** 128:21
130:3 270:13
317:17
**oath** 5:20 46:19
59:9,18,20 115:12
296:12 332:13
**Obama** 92:5
**obey** 226:11
**obeyed** 81:19
**object** 41:8 67:9
68:8 95:3 107:21
113:6 115:1
123:14 124:5
144:9 156:17,19
187:18 195:21
199:15 212:2
213:4 314:15
**objected** 12:10,11
130:16 143:20
311:12,21,22
312:5
**objecting** 67:13,15
309:21
**objection** 43:11
76:17 77:2 99:8
99:12 108:1
124:15 125:2
126:8 127:5
146:14 155:20
156:4 161:22
162:4 187:20
195:22 213:8
214:6,14,18 269:5
269:8 309:5,15,15
309:17,20,21,22
310:11,12,13,15
310:20 311:11
324:13 326:15
327:17
**objections** 42:2,3,4
143:19 313:6,9,21
313:22
**objects** 311:11
**obligated** 216:2
**obligation** 61:18
62:7 77:9 132:16
**obscured** 325:8

**obstruction** 10:8
  271:20
**obviously** 27:16
  90:15 105:12
  147:3 148:17
  218:3
**occasion** 279:14
**occasions** 57:12
  160:12 263:3,8
  279:8
**occur** 299:16
**occurred** 70:18
  150:1 158:5 170:1
  184:4 185:2 199:6
  271:22 279:15
**occurs** 171:10 279:4
**October** 49:20 55:8
  55:22 121:15
  123:5 216:16
  218:8 220:17
  221:17 229:4
  240:6,18 247:5
**ODC** 213:5
**of-counsel** 103:10
**Off-the-record** 8:20
**offense** 80:16,20
**offensive** 31:20
**offer** 12:6 91:16
  219:1 266:22
  311:3,15
**offered** 13:8 41:8
  218:20,22 219:2,3
  274:19
**office** 7:10 9:13
  13:18 20:4 30:22
  35:17 46:3 60:9
  96:13 156:20
  158:18 192:18
  273:4 275:3 278:2
  281:20 297:21
  298:8 301:17
  302:17 304:9
  321:16,21 331:22
  333:8 334:4
**officers** 10:7
**offices** 270:3 302:9
**officially** 7:7
**officials** 243:22
**oh** 28:19 41:1 45:11
  66:8 104:16 196:5
  198:1 199:5
  276:18 285:12
  297:11 298:19
  309:7
**OJ** 19:10 29:6
**ok** 8:15 17:16,21

30:6 34:12 38:13
  39:13 43:7 46:5
  51:1 52:18 54:9
  55:21 58:4,7
  66:11 78:1,12
  80:1 81:1 83:20
  84:13 85:11 87:4
  88:4 95:15 97:6
  97:16 100:16
  101:1 104:16
  114:9 117:16
  118:8 121:4 126:6
  127:4,18 128:1
  129:7,11 130:2
  131:21 134:10
  137:17 144:6
  147:7 148:7 152:6
  166:22 170:8
  171:17 174:8
  176:4,14 177:5,18
  178:21 180:3
  181:7 184:10,12
  184:16 188:5,16
  195:3 196:5,9
  211:4 213:14
  215:19 222:2
  224:14 226:14
  229:8 231:9 238:6
  241:1 248:18
  252:5,15 256:2,7
  256:10 267:11
  270:14 283:11
  285:14 287:16
  290:20 293:17
  308:16 310:1,6
  312:12,18,22
  316:21 317:21
  330:11 333:16
  334:11
**okay** 243:22
**old** 18:9 26:5 56:5
  80:3 82:18
**older** 80:4
**Oliver** 3:6 7:16
  248:6,6 252:4
  253:13,21 255:8
  256:19 281:13
  284:16 287:9
  290:12 293:15
  294:4
**omitted** 10:21
**once** 15:19 23:7
  28:19 158:10
  208:1 264:15
  296:8,8
**one-sided** 41:9

**ones** 191:12 268:13
  278:22
**ongoing** 11:1 72:9
  84:20,21
**open** 5:18 34:12
  132:3 243:22
**opened** 301:4,14
**opening** 4:2 9:8,9
  14:8,10,14,15
  58:21 91:14
  138:12
**openings** 17:13
**openly** 223:18
  278:16
**operandi** 297:1
**opinion** 19:19 20:13
  20:14 24:20 25:4
  25:6 27:11,22
  30:4,15 31:10
  35:7,10 41:15
  61:21 63:12 79:12
  82:15 124:3 136:6
  230:2,7,9 243:21
  260:3,4,5,9 261:5
  262:20 277:7
  288:14,19,22
  303:20,21 304:18
**opinions** 11:17
  27:20 35:1 82:6
  247:13 291:21
**opportunity** 222:17
  222:18
**opposed** 131:10
  217:20
**opposite** 35:16
**oral** 63:19 70:18
  123:4 261:14,22
  262:6,9,11
**orally** 158:18
**order** 7:20 17:2
  66:20 73:19,21
  81:18,22 84:6,8
  84:14 85:6,19
  90:18,20 100:13
  110:15 147:17
  154:1,11 158:15
  158:16,17,19,20
  158:22 168:2
  196:17 211:11
  228:12,13,17,20
  229:7 237:4 242:7
  245:1 261:8,13
  264:8 282:19
  283:6,8,21 287:2
  287:21 291:10,14
  291:14 293:8

300:5,6,15 301:1
  303:16
**ordered** 155:3,14
  155:18 159:8
  300:14
**orders** 12:8,12
  81:20 84:12
  146:19,20 159:16
  226:11 236:13
  242:1,8 247:20
  291:16 292:6
**ordinary** 132:20
**Oregon** 251:8
**Oren** 198:4
**Orfanedes** 82:11
**origin** 75:3,3 94:3
**original** 52:7 149:7
  288:11,12
**originally** 158:6
**Orlando** 207:21
  208:1,12
**outcome** 220:8
**outrageous** 263:1
**outset** 14:19 140:21
  249:16
**outsider** 259:15
**outstanding** 42:3
  213:18
**overridden** 93:5
**override** 139:2
**overrode** 23:3
  138:19
**overrule** 77:2
  214:18
**overruled** 67:17
  68:12 99:13 108:1
  125:2 156:4 162:4
  187:20 195:22
  213:8 312:4 313:2
  313:7 326:17
**oversees** 217:14
**overturned** 83:12
**overweight** 63:9
**owed** 249:22

―――――――――
          **P**
―――――――――
**P** 5:1
**P-o-u-c-h-k-a-r-e...**
  201:2
**p.m** 130:5,8 227:12
  271:2 334:18
**pace** 53:13
**Pacer** 30:6 31:4
  65:15 89:7,13,14
  189:1,9 193:22
  200:18 203:6

238:18 268:16
  311:17 322:13
  324:16,21 327:2
  327:11,12,13,21
  328:8
**page** 4:2 50:5,20,21
  53:22 54:9,11,13
  54:14,19 57:2,14
  57:22 58:3,4 64:4
  66:3,9 72:13,16
  73:6,6,7 81:4
  85:11,15 87:11,12
  87:13,18,22 95:13
  98:2 101:3,18
  102:5,6 104:15
  111:16,17 112:2
  114:6 118:14
  119:9,10,13,17,18
  119:21,22 120:1,2
  120:21,22 121:1
  122:19 123:7,8,9
  123:20 125:5,9
  126:12,13,21
  134:3 137:6,6,6
  137:17,22 138:1,3
  142:20 147:8,18
  148:7 153:19
  154:10 155:4,8,10
  155:11,12 157:22
  161:17 162:9,11
  167:4,4,11 170:19
  171:1 190:3,4
  194:11 195:5
  196:3,20 198:11
  198:12,17,19
  200:20 205:13,14
  205:17 206:3
  222:6 223:12,17
  224:4 230:4
  234:13,17 243:5
  243:20 246:9
  247:2 260:20
  263:21 264:2
  274:14 275:18
  276:16 281:8
  282:4 283:22
  284:19 285:8
  286:14 294:16
  306:22 325:10,10
  326:2,3
**pages** 57:19 65:16
  90:7 114:10 126:6
  157:16 161:16
  170:18 194:11
  196:12 223:8
  236:9 243:4 245:9

300:3 312:16
325:16 330:6
**paid** 16:11 18:19
182:4 188:8 202:1
202:8 302:7
**pain** 277:15
**panel** 34:19,20
210:13,14 228:2,4
229:1 242:16,21
242:22 243:8,9
250:20
**paper** 281:14
324:19 328:6
**paragraph** 54:18,19
72:13,14,16 73:1
87:13 91:6 95:16
98:13 116:15
125:12 137:19
154:1 155:12
167:12 173:4
276:7,15,19 284:3
**paralegal** 8:17
103:10 104:1,2
110:1,2 141:10
171:13 251:5,15
**paraphrasing** 279:5
**Pardon** 219:1
**pare** 267:2
**parentheses** 161:21
**Parker** 149:22
150:4
**part** 23:12 31:12,20
35:5 36:13 40:9
44:2 61:21 67:11
97:21 101:15
115:2 123:12
127:15 131:1,11
131:13 132:9
153:12 162:1
169:8 173:9
177:16,20 180:6
181:1 183:6
184:11 186:1
245:21 274:7
329:16
**partial** 68:5,9
**partiality** 245:17
**partially** 94:13
**participate** 103:9
108:9
**participated** 12:19
13:5 59:3 92:4,11
92:20 95:10 108:7
108:15,18 109:14
110:9 206:21
**participating** 13:11

**participation** 103:1
105:7,10 271:17
331:19
**particular** 22:13
58:12 59:1 257:20
262:17 273:7
278:1 297:2
302:16 306:16
329:4
**particularly** 22:9
41:9 103:18
165:17 179:6
295:9
**parties** 2:7 27:7
63:6 130:19
219:10
**partner** 187:14
308:5
**parts** 23:11 138:16
139:22,22 178:10
**party** 41:11 85:13
308:1 323:5,6,11
323:13
**party's** 189:12
**passed** 175:8
**path** 325:8
**Paul** 82:11
**pause** 46:17 231:5
281:15 283:9
**pay** 201:21 290:17
**peace** 24:22 288:22
**Pearce** 6:11 7:16,16
8:1,5
**Peer** 3:6 34:3 248:5
248:15,21 253:11
254:4 255:10,19
255:21 256:21,22
257:1,3,6 281:4,8
281:12 284:18,21
285:1,5,9,13
286:14 287:10,14
287:17 289:8,12
289:17,20 290:4
290:14 293:16,19
294:2 319:8
**Peer's** 255:5
**Pees** 252:12
**penalties** 179:7
**penalty** 231:20
331:12
**pending** 6:8 36:15
55:1 64:19 66:5
87:10,15 238:8
304:7
**people** 17:3 21:12
24:2,16 27:6 29:8

31:5 34:5,17 38:4
59:14 63:9 94:2,6
94:7 139:4 200:1
202:2 208:15
210:14 250:22
280:7,8 297:1
330:17 333:9
**pepper** 292:10
**perceived** 34:22
**performed** 189:2
**perjury** 23:17
166:11 231:21
272:3
**permanently** 73:19
73:21
**permission** 107:6
188:20 221:1
**person** 24:3 41:17
63:8 151:3 253:22
254:6 261:13
317:12
**personal** 246:14
258:16 277:10
**perspective** 231:17
**persuasiveness**
206:10
**pertaining** 330:4
**peruses** 62:12 90:4
223:2 231:10
240:22
**petition** 18:21 19:1
25:19 27:9 28:13
51:19 53:9,19
56:22 57:8,11,14
58:4,9 59:4,21
64:13,18 84:17
91:8 111:10,17
112:1 113:22
114:2,4,5 117:18
121:6 122:9,12
125:17 126:1
127:10,19,22
128:6,14 131:15
133:10,13,17
134:14 135:11
136:18 142:14,22
144:4 146:7 155:1
155:11 159:20,22
160:11,20 161:3,3
161:8,11 162:6
165:11 170:4,16
196:18 209:5,15
209:17,19 210:8
210:18 212:10,22
213:11 214:1
215:16 216:10,11

216:15 217:3
218:8 220:5 222:5
223:8 227:16
228:3,11 229:3,13
229:13 230:16
237:20 238:10,14
239:4,5,10,16,21
240:2,13,16,18
241:2,18 242:4,17
243:2,5 244:19
245:7,19,22
247:10 250:13
258:17 263:10
264:18 266:15
276:8,9,21 277:1
278:3 282:18
284:3 288:2 291:8
304:3,5,13,20
**petitioner** 54:1,2
137:19 138:1
155:13 264:5
**petitioner's** 115:7
161:20
**petitions** 9:22 11:21
11:21 12:1 13:12
98:22 161:1
239:12,13,15
291:15
**phon** 27:3
**phraseology** 134:7
**phrases** 86:12
**physical** 277:15
**picked** 207:18
**piece** 198:5
**pile** 37:19 38:14
298:9
**piling** 37:21
**place** 60:4 103:19
120:22 128:16
**placed** 53:14 203:19
**places** 137:5,7
**plane** 203:22
**planning** 135:14
**plate** 151:3
**play** 93:3,3 204:5
299:12,13,21
**plays** 156:2
**plea** 191:13 193:13
193:15 207:11,15
207:16 208:10
274:20
**plead** 31:5
**pleading** 85:3 86:1
89:6,21 104:18
106:4,8,10,12
107:13 108:4,12

108:16 109:6,11
110:6 113:10,20
205:21 206:3,5
306:22 332:14,16
332:17,18
**pleadings** 12:7,12
12:18 31:19 32:1
32:3 42:22 63:17
63:20 85:12 88:20
89:13 103:2,6
135:19,21 137:1
139:10 144:6,8
150:15 204:15,17
204:22 210:1
228:7
**please** 52:22 55:21
71:8 85:8 125:20
127:17 149:12
157:1 167:10
168:21 195:11
219:16 222:16,18
228:18 229:7
231:3 232:13
240:20 252:3,4,6
276:19 284:15
285:8 294:1 299:1
299:4 319:19
**pled** 203:2,4
**plus** 33:19 158:9
226:4
**poe-tay-toe** 33:16
**point** 7:2 14:19
16:16 22:11 23:9
23:20 27:19 28:10
28:12 31:14 33:6
39:8 43:9 45:11
45:22 56:5 60:5
61:1 84:11 91:20
97:18 123:18
130:19 133:18,18
135:15 136:15
145:5 148:18
150:5 168:1
169:15 173:16
174:14 192:14
216:15 226:7
242:18 265:7
286:13 295:13
298:6 300:10
312:11 314:6
324:3 326:13
**pointed** 18:17
**points** 265:19,20
306:21
**political** 27:7 184:8
206:9

politically 15:13
politics 116:6
population 157:20
portal 322:15
  325:12
Porter 2:19 4:3 5:4
  7:9,9,12,21 8:9
  9:6,7,11,12 22:16
  24:10 36:7,9
  39:22 40:6,20
  41:5 42:17 44:13
  44:14,17 45:8,9
  46:2,9,11 47:5
  48:8 60:12 65:12
  65:14,18 66:12
  67:18 68:10,13,19
  71:8 75:15,16,19
  78:13 79:17 81:14
  85:1,8 86:11 88:3
  88:14,15 95:7
  97:20 99:9,15
  100:11,17 102:22
  107:16 108:2
  113:8 118:2,9
  120:5 121:20
  122:2 123:16
  125:3 126:10
  127:7 128:18
  129:19 130:12,21
  131:19 132:9
  133:8 134:8 137:1
  137:5,11,14
  142:13 144:16,19
  146:2,17 149:3,9
  153:7,18 156:5,20
  157:4,8 159:19
  160:9 162:3,5
  165:9 171:19
  173:2 175:16
  180:9 183:12
  184:19 188:21
  189:6,8 190:1,13
  191:1 193:6
  195:12,14 196:2
  197:14 199:9,20
  203:1 204:10,20
  204:21 207:5
  211:22 212:4
  213:5,9 214:8,20
  214:21 219:12,17
  219:20 220:22
  221:8 222:22
  223:6 226:21
  227:14 229:22
  230:3,11 231:13
  232:2 234:16,19

234:22 235:4,5,9
235:11 238:9
239:9,11,20 240:1
241:17 242:2
251:1 253:15
255:3 256:20
258:6 263:17,18
263:19 265:20
266:6,21 267:7,11
267:22 268:12
269:22 270:3,14
270:20,22 272:5
286:20 292:19
295:19,22 298:8
300:16 306:21
307:3 308:13,18
309:1,5,17 310:1
310:3,7 311:9,20
313:13,19 314:4
314:11,18,21
315:6,17 316:1,21
317:11,14,21
318:2,8 319:12,16
319:20 321:8
325:1 326:18
328:13 329:18
330:1,8 331:14
334:2,10
Porter's 45:14
  317:2
portions 54:5
position 100:6
  140:12 141:15
  142:2 210:16
  265:11 321:18,19
possible 30:21 31:1
possibly 32:13
  318:18
post 272:5
post-hearing 88:18
post-trial 80:20
potential 22:13
  295:10
potentially 162:14
Pouchkareva
  200:22 201:3,4,19
  208:19
powerful 249:17
practice 37:16 54:2
  73:9 96:18,20,21
  96:22 132:20
  135:2,10 169:8
  174:5,6,8 175:7
  177:3 178:14
  277:22 298:10
  303:7

practices 112:3
  118:17
practicing 97:1
  175:5
practitioners 333:7
praised 54:2
Pray 29:17
preceded 244:9
preface 56:1 62:22
  109:1
prefer 129:5 308:20
preference 75:2
prejudice 25:20
  29:20,20 36:8,13
  53:16 77:11 86:20
  91:6,9 95:6
  106:19 107:1
  110:16 141:11
  236:6 237:20
  246:5,14 248:4
  250:3 259:3,8
  284:4 293:7
prejudiced 13:7,14
  13:22 43:3 53:16
  154:17 305:22
  306:1,3,8 307:7
prejudicial 74:20
  75:10 94:2
prejudicing 241:8,9
preliminary 6:4
  14:9 38:20 39:4
  39:15 71:4,15
premier 288:21
preparation 92:20
prepare 121:22
  276:11 277:3
prepared 28:15
  30:18 111:11,18
  111:21,21 170:22
  225:21 230:22
  232:3,5 278:16
preparing 33:20
  92:4,11,13 93:1
  94:19 108:18
  109:14 110:9
prepped 186:4
present 2:6 3:2 6:22
  13:2 71:1,2 81:18
  97:12 101:13
  102:2,8 122:8,12
  144:11 145:16
  150:17 154:19
  157:9,12,17 204:4
  204:9 247:4
  273:17 282:6
presentation 63:19

77:4 312:7
presented 122:7
  283:1
president 80:21
  92:5 298:22 306:9
presiding 11:15
pressed 123:18
presumably 269:15
  273:13
prevail 20:14 35:8
  35:21 288:15
  289:2
prevailed 205:6
prevent 13:11
previous 205:4
  262:2 264:2
previously 67:2
  107:11 260:13
  291:4
primarily 136:9
  305:19
primary 151:4
  278:7 306:13
principal 21:5
print 326:10 327:6
printed 65:15
  328:22 331:4
printout 193:22
prior 19:20 62:3
  107:11 126:9
  173:20 242:1
  244:12 251:8
  277:20 301:19
  311:15 327:22
  328:2
prison 18:11 20:6
  22:13 23:1 49:12
  139:4 140:14,19
  157:20 158:10
  208:19 243:22
prisoners 34:13
prisons 34:12
private 175:7 177:3
privilege 72:21
  264:6
pro 6:11,13 9:18
  11:2,4 12:20 13:4
  13:10 15:16,17
  18:21 22:6,18
  24:19 28:7 34:21
  50:11,18 51:7,11
  51:20 53:13 62:3
  63:15 68:1 71:14
  72:1,11 76:4
  78:20 79:5,18
  80:18 81:16 82:21

83:3,19 84:9
85:17,20 90:18
92:3 94:11 95:19
98:13 114:20
134:14 135:17
162:18 164:6
168:5,10 169:6,11
169:17 213:17
217:9,22 218:10
224:21 226:9
228:8 229:16
230:19 232:22
233:8 234:3 241:7
244:10 252:21
264:12 276:8,21
282:17,20 283:3
292:5 305:16
307:5,5
probably 39:7 49:8
  59:16 114:4 130:1
  132:6 171:8
  180:13 194:5
  202:21 221:18
  269:11 305:10
  319:4
problem 6:22 41:22
  105:4 163:12,13
  168:9 279:18
  314:11 334:3,6
problems 115:17
  116:9,12
procedure 332:2
proceed 60:11
  88:13 154:3
  188:18 218:10
  224:21 281:4
proceeding 5:16,19
  13:3 19:20 20:11
  22:6 25:3,21 27:1
  29:21 35:8 47:1
  60:15 61:6 63:11
  69:16,18 70:12,21
  70:22 72:9 84:21
  84:21 85:14 87:9
  87:18 91:11,15
  168:11 230:8
  241:10 289:4
  293:8 297:14
  299:8,18 305:18
  306:6 315:3 320:4
proceedings 5:17
  26:1 28:1 37:10
  54:17 55:1,5 59:1
  63:2 74:18 89:5
  91:22 115:5 208:9
  264:4,9 278:6,6

299:16 305:5
**process** 28:4 31:15
  86:19 89:5 185:11
  216:4
**produced** 326:2
  327:2
**product** 174:9
  178:7
**Professional** 1:2 2:1
  275:3
**professionally** 34:2
**professor** 43:14
  288:20 318:22
**proffer** 130:22
  132:11
**proffered** 286:20
**promoted** 187:14
**pronounce** 33:14
  330:18
**pronouncing**
  330:15
**proof** 91:10 252:11
**propensity** 12:22
**proper** 231:17
**prosecuting** 96:11
**prosecution** 44:21
  273:18
**prosecutor** 29:12
  112:10 118:22
  119:7,15 120:12
  124:2,11 125:14
  126:4,17 130:15
  133:20 173:6
**prosecutorial** 23:14
  23:16 32:12
  166:11
**prosecutors** 32:11
  32:13 33:3
**protect** 59:14
  273:19 296:4
  302:15
**protecting** 35:2
  259:16
**protective** 168:2
**protestors** 140:16
**proudly** 126:17
**provide** 19:18 25:9
  35:7 91:10 232:16
  286:8,11
**provided** 19:17
  35:6 135:19
  177:12 202:11
  252:1 257:3
**public** 2:5,13 5:19
  15:6 21:3 30:22
  89:15 112:9

119:14 163:9
  278:2 305:3 322:3
  322:14
**publications** 32:22
**publicly** 12:14
  297:4
**puh-tah-toe** 33:17
**pull** 184:8
**pulled** 328:22
**pulling** 76:7
**purchased** 116:1
**purpose** 8:12 54:3
  269:4 303:8
**purposes** 58:22
  121:16 122:5
  261:16 313:6,8
**pursuant** 5:7 85:19
**pursuing** 132:8
**push** 249:10
**pushback** 275:4
**pushed** 56:8 274:22
**pushing** 279:13
**put** 11:6 19:3 24:8
  30:2 42:16 51:15
  60:6,21 66:14
  72:5 89:5,7 94:16
  102:19 156:19
  165:1 178:5 184:8
  186:12,13,20
  188:2,16 231:17
  248:2 249:21
  263:3 272:18
  305:2 309:21
  311:22 313:12
**putting** 37:12 97:11
  185:21 199:16
  226:5

_____

**Q**

**qualifications** 11:9
  11:11 117:7,8
  118:16
**qualified** 93:10
  125:13
**question** 6:16 7:3
  7:22 51:2 63:21
  64:16 66:13 69:8
  70:2,3 71:9 75:15
  76:12 77:5 78:14
  78:15 79:15 80:16
  81:9,11,13 87:6
  92:10 94:14,15
  96:3 106:14
  107:17 123:21
  124:5 127:20
  149:1,7 151:17

152:5,10 155:21
  157:6,6 160:10
  163:1,3 171:16
  182:12 183:2
  186:6,6,11 190:17
  191:9,15 197:10
  199:19,19 204:19
  221:10 230:14
  231:6,14,16 232:1
  233:3,13,18
  235:12 238:8
  241:16,17 253:16
  256:7,15 257:13
  266:2 283:19
  284:21 291:1
  300:18 303:9
  318:14 324:10
  325:11 326:6
**questioned** 6:12 7:4
  221:6 247:7 261:6
  279:7
**questioning** 123:18
  133:2 199:16
  222:20 227:13
  271:3 318:18
**questions** 37:3
  49:21 50:7 56:11
  61:8 65:21 77:3
  78:3,4,11 86:12
  86:14 109:10
  110:5 130:13
  131:20 132:12,17
  144:21 153:2
  173:15 217:2,9
  254:10 266:22
  267:3 308:14
  314:14 330:9
  332:19 333:17
**quick** 222:21
  317:20 332:22
**quicker** 56:11
**quickly** 35:6 84:3
  136:10 138:7
  193:12
**quite** 330:4
**quotations** 119:18
**quote** 138:14 155:2
  222:6 223:19,21
  246:22 264:11
**quoted** 73:3
**quoting** 223:7,12

_____

**R**

**R** 5:1 130:7
**rack** 317:6
**racketeering** 198:3

201:14,20
**raise** 6:5 14:11
  38:21 70:10
  250:12 251:2
  279:19,20
**raised** 75:12 76:5
  80:11 251:3 302:3
**raises** 84:16
**ramifications**
  181:17
**Ramos'** 195:8
**Ramsey** 27:4
**ran** 15:2 20:7
**ranch** 16:8 48:18
  145:22 165:3
**ranched** 16:6
**rancher** 16:4,12
**ranchers** 16:11
**ranches** 16:5
**Randy** 296:21
**range** 202:22
**reach** 41:15
**react** 306:16
**read** 29:18 50:9
  112:13 118:14,15
  206:19 211:13
  244:1 245:1 260:3
  263:6 280:1
  282:13 286:16
  294:8
**readable** 323:4
**reading** 95:17 119:3
  126:14 138:7
  146:20 161:17
  188:10 231:8
  264:1
**reads** 125:12 167:8
**ready** 6:2 9:6 45:8
  46:19 125:13
  270:21 309:8
  319:12,13 334:12
**real** 114:19 116:2
  303:3
**reality** 24:9
**realize** 250:15
**realized** 245:1
  254:17
**really** 51:5 61:14
  100:2 103:16
  115:17 129:4
  182:4 260:9
  261:19 262:17
  279:8,12 280:9
  286:19 311:10
  317:8
**reappointment**

237:4
**reason** 29:1 52:11
  55:13 59:12 71:9
  81:8 115:13,21
  116:17 139:5
  162:17 164:22
  167:20 188:2
  210:12 211:1,3
  225:13 243:8
  268:18 280:21
  291:22 292:11
  293:7 306:13
  307:12
**reasoning** 211:16
**reasons** 61:20 86:7
  114:21 119:14
  132:1 136:5 243:7
  243:14 244:6
  258:16,19 278:7
  298:13
**reassigned** 292:21
  308:4
**rebut** 44:21
**rebuttal** 44:22 45:1
**recall** 49:19 50:1
  59:20 60:17
  197:18,19,20
  213:15 230:15
  326:11 331:9
  333:2,5,6
**received** 62:2 82:16
  91:2 173:17
**receiving** 41:11
**recess** 130:6 227:10
  270:19 318:7,9
**recitation** 89:8
**recitations** 85:18
**recklessly** 259:6
**recognize** 322:8
**recognized** 19:16
  82:22
**recollect** 48:22
  49:16 100:21
  168:14 185:7
  200:10 206:21
  225:11 255:13
**recollection** 9:1
  143:14 150:5
  154:7 178:20
  203:14 220:18
  224:18 326:13
  333:10
**recommendation**
  67:11 70:5 143:13
  145:10 214:11,16
  215:8,10,12 216:1

217:6 220:11,12
224:22 237:6
264:21 289:15
**recommendations**
69:11
**recommended** 21:2
23:21 48:19 49:5
80:7,14 247:15
**reconsideration**
36:16,19 229:15
230:17,18 231:19
232:7,15 233:7
**reconsidered** 234:4
234:5
**record** 7:8 11:22
21:16 32:11 35:12
39:12 40:11 41:6
61:22 71:17 74:8
97:16,17,19 105:2
106:15 107:8
118:15 129:15
130:11 134:17
136:14 137:15
142:5,5 143:11
154:14 156:18
159:4,5 166:1
167:17 169:16
178:5 179:18
188:15,17 199:19
210:20 211:7
212:7 218:4
221:21 227:11
233:22 234:2
235:4 258:7
267:20,21 268:1,6
269:22 271:2
282:6 312:1
315:13 318:10
322:3 330:7
334:16
**recording** 260:13
262:1
**records** 12:14 41:7
143:6 200:18
269:1 286:13
300:10 311:14,14
311:17 314:12,15
315:20,22 316:5
316:11,12 322:15
324:3 330:10
**recusal** 250:9
**recuse** 101:15,20
250:6
**REDIRECT** 295:20
**reemphasized**
126:3

**refer** 50:4 58:12
72:12 73:4 75:17
85:4 92:15 98:2
101:3 112:1,9
118:21 121:10
123:20 124:12
125:4 147:17
157:16 161:16
162:9 189:11
214:4 218:14
222:4 243:3 262:2
303:20
**reference** 19:8
34:17,18 54:12
83:14 85:20
110:21 116:22
141:5 217:8 223:3
260:8 262:5 293:2
**referenced** 91:15
99:17 135:19
288:2
**references** 116:4
141:13 242:19
**referred** 66:15
110:14 119:6
124:10 134:2
208:18 213:14
214:9 261:22
262:1,1 305:13
325:2
**referring** 54:18
57:22 66:7 71:1
72:15 73:11 90:2
95:12 116:14
125:6 128:1 134:3
137:4,16 154:22
167:9 197:11
222:12 258:8
262:4 275:6
282:21 293:13
306:20 328:1
329:16
**refers** 122:3
**reflect** 144:8 240:7
**reflecting** 225:14
**reflects** 194:11
**refresh** 8:22 49:18
76:2 101:8 148:14
166:17 194:14
222:3
**refreshes** 167:6
224:18
**refused** 279:20
298:19
**refute** 60:2 222:13
**refuting** 225:10

**regard** 9:2 27:5
28:5 35:11 42:18
70:11 74:3,4 75:1
93:22 114:3
149:19 150:2
158:2,5 179:9
193:1 199:7 202:9
226:7 230:10
251:9 259:13,14
271:16,18,22
274:15 275:3
277:15,18 280:14
283:14 291:7,8
**regarding** 6:8 99:17
**regardless** 69:4
151:1
**regards** 182:20
**register** 124:15
**registered** 307:22
**registration** 175:21
177:12 309:2
**Regrettably** 63:20
**regulatory** 72:21
264:7
**rehear** 97:14
**rehearing** 11:21
12:3 125:18 126:2
127:9,19 128:10
209:16 210:3,8,19
239:13
**Rehm** 180:18
187:10
**Reid** 23:22,22 34:2
246:16 247:15
249:7,12,14,17
250:1 251:21
253:1 254:20
256:6 258:2
259:14
**reinstate** 208:10
**reiterated** 122:14
**rejected** 61:10
64:12,17 67:11
88:10 114:16
305:12
**related** 9:21 190:14
249:1 251:18
252:22 327:8
**relates** 265:13
**relation** 99:19
**relationship** 248:8
248:20 254:20
255:11 258:14,16
**relationships** 34:1
246:14 249:5
**relevance** 67:16

95:5 123:15
272:12 308:8
313:5
**relevancy** 68:20
76:17 93:16 95:3
99:8 107:21 113:4
113:6 144:10
146:14 161:22
195:21 214:15
311:22
**relevant** 17:15,19
67:9 247:21 272:7
311:1
**relied** 241:5 255:5
256:18
**relief** 24:14 97:22
98:4,6,8,12,17
102:17 110:18
**relies** 259:3
**relieve** 278:11
**relieved** 61:14
**religious** 75:3
**relitigate** 22:6 62:7
**relitigating** 89:4
124:17 247:21
**remain** 29:10
**remained** 326:11
**remark** 94:2
**remarks** 75:10
**remember** 19:10
25:17 60:5 68:3
75:16 78:14 80:4
82:18 83:1 99:6
110:20 121:9
128:12 138:12
146:11 164:17,17
165:7 166:4,9
170:12 176:11
179:19 185:12
187:1 193:20
194:4 195:4
196:22 197:8
198:7 199:6
203:15 205:2
206:11 210:5
216:14 222:11
283:7 304:5
327:19
**remembered** 176:3
177:4
**remote** 43:20
**remove** 37:16 38:15
96:18 98:1 102:16
160:6 242:15
**removed** 16:20
32:13 34:8 80:17

102:17 228:2
242:7 249:11
298:10 303:6
**renegotiate** 60:10
**renewed** 115:5
**renowned** 25:4
**repeat** 75:15 140:9
173:4 189:21
204:19 241:16
261:16 276:19
**repeated** 190:2
**repeating** 277:20
**repetitive** 266:5
**reply** 121:1 170:15
**report** 62:2,3 69:11
70:4 214:2,10
215:9,12 216:1
217:6 264:20
266:10
**Reported** 1:21
**reporter** 2:5 5:21
5:22 321:11
**represent** 6:13 15:7
24:10 28:11 32:5
48:20 49:13 51:13
77:17 96:9 125:13
135:16 136:15
150:1 162:7 178:6
203:9 204:11
205:9,12 208:6,9
221:1,3,7,14
226:8 237:9 273:8
273:22 308:11
**representation**
18:18,19 37:6
40:2 64:5 93:13
93:19 103:22
137:12 145:20
146:6 147:6 155:5
159:6,16 163:17
167:21 172:9
199:10 201:9
204:14 212:13
216:22 253:20
275:7 296:1
**representations**
10:19,20 11:13
12:17 15:15 55:6
63:14,16 117:13
136:17 138:5
147:5 153:12
154:21 170:6
173:12,14
**represented** 27:5
51:9 57:17 58:2
87:1 94:6 99:22

In The Matter of:  Larry E. Klayman
July 15, 2019

120:15 137:8
149:21 155:13
163:3 168:15
180:7 189:13
191:10,16 201:18
203:9,16 251:10
272:1 317:4
**representing** 6:11
9:13 11:10 20:2
37:8 87:10 97:2
103:17 150:19
153:10 183:7
194:1,12 200:5,8
200:21 201:5
205:19,22 206:5
206:16 208:22
226:15 237:11
277:16 280:10
292:8
**represents** 182:5
**republican** 17:10
249:13 307:20,21
307:22 308:1
**reputation** 33:5
94:17
**request** 13:4 98:8
98:16 115:6 127:8
132:14 210:19
218:10 224:21
328:5
**requested** 89:2
209:22 210:13
302:1
**requesting** 126:2
**requests** 287:20
**require** 330:6
333:14
**required** 22:5 61:7
83:7 89:9 114:18
132:10 217:7
**requires** 139:3
**rescue** 203:17,22
**research** 172:11
245:2 248:7,10,13
252:4 253:13,16
254:2,3 255:5,17
331:16
**researched** 244:21
**reserve** 41:7 178:8
269:11 314:15
**resignation** 264:8
**resigned** 59:15
**resolve** 208:14
**resolved** 91:12 99:2
140:17 191:13
193:13 288:3,5,13

**resort** 299:6
**resources** 112:5
118:19
**respect** 7:19 14:20
14:20 15:3 34:14
65:10 77:7 79:4
96:13 107:17
134:8 146:18
165:14,15,15
181:20 182:4
188:8,9 193:21
200:17 217:3,15
218:6 245:3,4
251:1 258:22
265:11 268:22
280:3 303:5 327:5
328:15
**respected** 274:5,5,8
**respectful** 26:21,22
36:9,10 159:12
**respectfully** 54:1
113:17 229:10
**respective** 2:7
**respond** 149:1
217:9 286:3
325:11
**responded** 27:21
50:8 82:20 136:2
295:4
**respondent** 1:6 3:4
5:17 9:16 14:16
35:18,20 46:13
133:3 227:13
271:3,5 330:13
**Respondent's**
130:14 219:9,17
278:13,19 281:5
281:19 282:16
285:2,6,7 287:11
287:12 288:17
290:5 293:17,20
300:2 327:3
**responds** 311:2
**response** 50:9 51:2
66:2,4 73:4 85:5
107:20 132:9
148:21 149:16
151:22 152:2
153:4 259:20
283:5 301:21
302:19 332:3
**responses** 12:8
41:11 78:3 97:5
310:8
**responsibility** 1:2
2:2 89:3 275:4

**responsible** 93:9
**rest** 24:22 103:2
228:7 288:22
334:8
**resubmit** 162:18
164:6 169:17
232:11
**resubmitting**
169:11
**result** 20:6 37:19
272:14
**resulted** 322:20
**results** 301:13
323:5 325:21
**resume** 128:21
130:3 227:8
270:18
**resumed** 130:9
**retailer** 75:1
**retain** 50:16 51:12
**retained** 49:21 50:8
51:7 136:11
**retainer** 51:16
**retaliation** 13:1
56:9
**retaliatory** 69:18
**retired** 249:18
**retracted** 34:2
**retrieve** 328:10,17
328:18
**retrieved** 328:15
**returned** 326:4
**reveal** 280:17
**revealing** 279:22
**reversed** 75:9
237:17
**review** 13:12 32:20
96:15 115:8 209:9
237:4 285:18
299:1,3,4 310:17
**reviewed** 25:14
260:11 264:16
281:21 317:2
328:19 329:11,15
**reviewing** 282:2
328:21 329:1
330:6
**revoke** 305:16
**revoked** 79:5
**Richard** 149:20
**rid** 150:8
**right** 5:14 6:9 15:22
20:16 22:9 26:11
32:22 34:16 35:22
36:11 38:15 39:9
40:15 41:7 46:10

48:18 49:4 52:20
55:11 58:14 60:1
66:21 73:13 81:6
85:22 88:9,12
106:2 112:13,14
115:9 120:19 125:1
137:18 139:7,21
173:19 177:14
181:6 197:15
202:2 207:10
210:6 219:3
225:10,11,12
234:9,11 237:15
238:20 241:20
251:2 257:14
258:5,11 261:11
275:10 289:5,17
290:19 295:8
296:5 304:4
307:19 308:10
313:20 314:9,15
316:20 331:9
334:7,11,14
**right-hand** 120:4
198:16 205:20
224:9
**righteous** 22:21
**rights** 15:6 17:6
23:4 33:2 36:14
53:15,17 93:5,6,8
96:12 102:1
105:18 109:3
138:20 154:18
241:8,9 243:12
302:8 307:13,16
**rise** 25:15 282:3,6
295:11
**risk** 169:10
**Robert** 271:18
272:17,22 275:1
308:5
**Robin** 2:12 5:12
**Robles** 292:11
305:14
**rod** 94:5
**Roger** 273:15,17
296:3,7,11,11,22
**role** 156:2 183:22
200:7 204:5 205:2
207:14 323:13
331:5
**Rollfot** 268:15
**Ronald** 15:14 24:21
61:19 288:20
**rose** 166:10
**Rotunda** 24:22

61:19 69:22
288:20
**Rotunda's** 303:20
304:18
**Roughly** 178:19
**rule** 5:7 7:7 8:3
34:20 42:4 43:1
57:11 60:19 68:10
98:19 111:1
**ruled** 13:20 29:5
36:5 65:5 84:4
90:16 92:3 93:6
142:18 143:21
144:1 146:15
169:19 247:22
248:1 276:10
277:2 295:2
**rules** 14:4 21:20
28:2 59:2 60:13
60:19 63:7 93:3
175:11 210:3
250:10 298:2,5
299:13,22 303:7
**ruling** 45:4 73:15
75:22 78:22 79:2
83:3 91:4 95:1
131:14 210:14
224:19 225:1
235:21
**rulings** 82:14 263:6
313:15
**running** 192:15
203:17
**Russian** 271:19
**Rutledge** 162:16

---

**S**

**S** 5:1 130:7,7,7
**Safety** 178:7,9
**sake** 82:8
**salt** 159:14
**sample** 30:12
**sanction** 61:11
263:15 303:18
**sanctioned** 19:12
26:19 31:16,16,18
74:2 82:13 212:16
263:13,14 307:18
**sanctioning** 82:3
**sat** 30:17 253:1
256:5
**satisfied** 89:1
**Saturday** 198:8
**saw** 17:3 24:3 30:17
33:20 104:18
246:19 250:15

In The Matter of:  Larry E. Klayman
July 15, 2019

Page 360

253:19 254:4
255:4 329:2
**saying** 21:18 27:21
34:1 56:1 60:3
62:22 65:19 105:9
109:1 123:3
139:14 140:9
158:21 159:1
225:11 237:13
260:17,19 261:19
298:20 306:12
321:9
**says** 22:10 28:11
35:16 52:16 53:12
54:1 55:22 65:15
66:4 68:16 73:2
84:18,18 85:16
86:15 98:5 121:22
122:1 148:10
161:18 164:17
167:12 198:14
214:20 224:7
225:22 229:9
264:2 282:4
291:12 294:10
323:6 326:3
**scam** 198:3
**schedule** 43:18
**scheduled** 64:14,20
70:10 136:20
137:9,20 138:10
139:15 141:18
145:7 318:22
**scheduling** 142:18
**scheme** 201:14
**school** 33:11 93:17
249:6
**sclerosis** 27:20
**scope** 333:15
**Scopes** 29:7
**Scott** 149:22 150:4
**se** 6:11,13 85:17
135:17 218:10
224:21 226:9
**seal** 150:21 227:21
**sealed** 163:8 164:4
167:22 168:16
**sealing** 229:1
**search** 189:1,10
316:4,11 322:13
322:16,19,22
323:2,3,5,6,6,8
324:6,7 325:2,6
325:12,14,15,17
325:22 326:3
327:2 330:21

**searches** 268:16
269:22 270:1
311:14 315:12,13
315:13 316:13
322:4
**seated** 151:11 320:7
**second** 25:18 50:3
52:16 53:8 54:13
76:10 92:3,16
111:17 116:14
131:14 137:19
141:19 149:5,5
150:9,10 160:4,16
161:3,8 162:6
165:11 170:3,16
190:5 200:17
209:5,17,18
210:18 212:21
213:11,22 216:10
222:14 228:3
230:7 235:19
242:17,19 243:2
252:13 278:19
282:12 285:17
**secret** 168:16
**secretary** 52:12
**section** 58:12 177:9
177:10 178:2,15
178:16 179:3
181:1 182:13
183:4
**security** 201:16
205:5
**see** 6:14,17 22:8
41:10 42:22 43:3
45:14 49:17 50:19
50:22 53:1 54:7
54:21 66:8 89:7
91:7 102:6 107:2
108:13 119:18
120:10 121:5
134:12 167:3,6
184:13 188:14
196:5 215:6
218:17 223:3,22
224:6 228:17
229:6,9 231:11
232:8 235:19
236:10 237:3,6
238:14 254:3
257:5 270:7 272:6
278:10 279:14
280:16 285:12
286:17 290:6,18
296:18 307:10,12
326:7 334:16

**seeing** 40:20 41:10
**seeking** 194:2 237:9
275:21 291:9
**seen** 28:21 30:18
79:12 136:2 182:7
279:7
**sees** 163:7
**segregation** 157:19
**self** 6:11
**Senate** 15:2 20:7
**senator** 246:16
247:15 249:17,22
**senators** 198:4
**send** 30:12 135:12
**sending** 45:13
300:14
**senior** 321:19
**sense** 30:1 42:4
91:17 92:1 105:14
139:11 159:9
185:20 310:2
319:1
**sensitivity** 243:11
244:17
**sent** 40:3 179:11
241:12 301:1
**sentence** 73:7
126:16 211:14
285:9
**sentenced** 26:9
91:20
**separate** 148:12
**September** 113:21
200:20 219:14
220:2,9 221:4
223:13,17,20
225:9 302:5
**sequence** 68:3
84:12 114:2 211:5
**series** 140:17
141:17 225:8
**serious** 252:9
**seriously** 75:5
**serve** 86:3
**served** 156:16
189:17 202:18
203:5 241:3
255:15
**service** 296:22
**serving** 100:12,14
126:16
**set** 42:13,14 43:19
46:3 58:9 59:21
63:21 69:21 95:20
138:1,4 142:6,8
217:17 258:17

**sets** 46:2
**settings** 191:22
**settled** 186:8 193:10
193:11 197:2
**setup** 78:7
**seven** 66:9 73:6,7
81:4 87:11,18
119:4 126:6
160:15 289:10
**Seventy** 160:15,15
**Seventy-five** 167:4
**sever** 138:16
**severe** 277:15
**severed** 148:11
**sexual** 75:1
**sexually** 20:4
**Shannon** 9:2 34:1
35:12 248:11
249:1 251:18
252:2,22 253:22
254:19 255:6,11
255:14 256:1,5
257:2,7 258:1,8,9
**shape** 159:1
**shared** 136:1
**Shauna** 248:18
251:4,7 252:1,18
252:19 255:16
256:9,19 257:18
258:1,3
**she'll** 318:3
**sheet** 127:14,21
128:5,7 147:8
194:8 195:2
225:14 228:15
229:4 234:12,16
240:8
**sheets** 228:14,18
229:6 268:20
269:8 327:13
332:1 333:7
**Sheriff** 93:14 94:1
**ship** 32:19
**Shipp** 282:2,2
**shoot-down** 203:21
206:22
**short** 8:13 20:22
21:1 79:13,20,22
80:1,17 108:10
154:15 238:3
**shortly** 10:10 50:11
225:4
**show** 10:18 14:3
18:22 30:17 51:22
60:21 65:1 68:5
111:14 114:19

122:17 125:20
126:5 127:17
137:14,15 146:10
152:19 155:7
156:11 161:14
167:9 209:10
218:13 219:4
226:2 228:12
234:10 245:8
246:8 252:8,12
253:17 289:12
294:3 299:8 325:9
**showed** 306:2
**showing** 141:11
289:16 290:8
303:10
**shown** 279:9
**shows** 281:21
302:14
**sick** 107:4
**side** 37:22 205:20
207:17
**sides** 88:8
**sighed** 181:22
**sign** 52:12 103:6
230:22 232:4,6
**signature** 52:13
54:7,9 57:4,5
85:16 114:6,7
170:19 175:20
205:14
**signed** 20:20 53:20
53:22 54:5 57:1
202:10 304:6,14
**significant** 67:11
182:19
**signifies** 323:13
**signify** 323:12
**signing** 34:9
**similar** 13:15 53:20
167:18 293:11
**Similarly** 13:8
**simple** 117:3 188:17
**simply** 26:16 83:6
115:2 132:2
138:21 167:15
210:16
**Simpson** 19:10 29:6
**single** 186:12
329:11
**sinking** 32:19
**sinks** 63:8
**sister** 16:21
**sit** 103:14 129:6
141:8 150:20
**sitting** 5:13,14 8:5

56:3 145:13 211:5
248:8 305:8
**situation** 62:8
**six** 85:11,15 118:17
119:4 126:6 167:4
167:11 180:13
240:8 245:9 276:7
276:15 287:22
**sixteen** 196:11,14
**sixth** 112:2
**Sixty-nine** 127:12
**Sixty-one** 123:2,4
**skilled** 123:19
**skipped** 289:10
**sleep** 258:12
**sleepwear** 179:10
**slow** 74:6
**small** 100:2 112:4
118:18 270:4
285:5
**Smith** 65:2 292:21
292:22 301:19
**Smuckler** 75:6
**snafu** 45:12
**sole** 288:21
**solely** 255:5
**solemnly** 46:22
320:2
**solicited** 114:15,17
115:2
**solitary** 22:20 53:14
93:4 105:19,22
155:3,14,18,22
157:14 158:2,6,7
158:15 159:3,8,10
**somebody** 20:2 21:5
26:10 48:19 51:13
206:9 251:5
257:11
**somebody's** 111:6
**sons** 16:22 18:11
22:22 30:2 32:3
49:12 251:9
**sorry** 7:21 45:12
55:17 66:8,11
75:14,18 79:16
83:13 90:1 97:8
102:6 121:18
137:3 163:2 180:3
181:22 191:2
193:16 195:19
204:18 206:2
227:4 231:4
235:12 238:17
239:10 240:15
241:15 253:10

269:20 276:13
287:1,17 290:3
297:11 319:18
**sought** 10:12 13:6
13:11 34:19 50:10
98:12 125:18
184:3 209:9 228:1
232:22 242:15
243:8,9
**soul** 24:22
**sounds** 112:13,14
234:9,11
**source** 256:8
**Southern** 280:19
**Spanish** 94:3
**speak** 123:22 124:6
152:13 215:18
274:5 297:15
331:21
**speaking** 31:6 82:17
90:11 101:5
118:16 146:22
162:12 178:19
**speaks** 58:11 83:17
84:14 93:15 122:6
154:13 218:3
245:18
**special** 271:18
272:17,22 273:3
273:14 274:18,22
297:9,13,18 308:5
328:5
**specific** 43:11 266:2
310:12 333:11
**specifically** 172:16
199:6 200:10
226:18 243:3
315:21
**Specification** 36:6
56:15 67:2 124:21
124:22 131:1,11
132:4,10 162:2
304:12 311:1
**specificity** 95:21
132:1
**specifics** 16:15
82:19 197:20
**speedy** 23:4 93:5
138:19 139:2,3
**spell** 183:15
**spelled** 321:13,14
**spelling** 321:10
**spend** 202:20
206:16
**spent** 22:22 208:17
**spice** 206:20

**spies** 206:1
**spoken** 80:12
**sponsoring** 52:11
**sponte** 70:20
**sprayed** 292:10
**spy** 80:9 203:19
**square** 21:19
**staff** 13:17
**staffed** 108:10
**stake** 16:3 18:9,16
33:6 36:22 262:18
**stand** 21:22 23:19
26:13 27:6 34:6
46:14 70:19 73:1
110:22 118:1
133:4 137:20
248:15 319:15
**standard** 15:9
38:11
**standards** 111:7
**standing** 14:21
16:13 19:5,13
169:10 271:8
287:6 310:11,15
**standoff** 10:4 18:7
48:19 49:5
**standpoint** 295:17
**stands** 21:5 322:14
**start** 48:9 126:15
129:16 154:6
241:13 264:1
317:16 321:9
333:22 334:12
**started** 61:2 111:2
129:16 186:9
187:17 192:22
306:17 312:16
**starting** 21:18
45:21 46:9 151:2
304:10,12 318:17
**starts** 190:3 196:20
**state** 30:22 93:17
112:1,3 173:7,8
278:2 286:5
319:19
**stated** 37:1 73:9
100:8
**statement** 9:8,9
14:11,14,15 18:1
39:6 51:1 58:21
87:14,21 91:14
94:21 95:4,9,11
95:17 96:1,2
102:10 116:18
138:12 167:19
175:21 177:13

232:17,21 252:18
255:6 262:15
263:10 277:4
282:9 283:15
286:11 309:2
**statements** 4:2 14:8
37:17 57:7 74:21
86:17 115:14
123:22 131:2,3
132:2 173:5 228:6
**states** 9:20 10:13
53:12 73:17 75:20
76:14 78:22
119:19 120:13
126:18 147:16
159:5 181:14
202:5
**stating** 57:18 154:1
**stations** 296:19
**status** 79:5 95:20
276:22
**statutes** 250:9,10
**stay** 54:11 129:22
268:5 318:1
**stemming** 246:14
**step** 20:9 114:20
**stepson** 273:2
**Steve** 149:22
**Stewart** 149:22,22
**stick** 17:14 153:2
**sticking** 248:1
**stint** 181:3
**stipulated** 57:11
58:8
**stipulation** 107:3
110:15
**stipulations** 186:5
**stock** 268:8
**Stone** 273:15 296:3
296:7,11,12
**Stone's** 273:17
296:22
**stood** 17:7
**stop** 118:2 265:6
299:19 316:19
**story** 20:22 80:17
**straight** 176:14
**strangely** 74:19
**strategy** 135:13
**straw** 111:5
**street** 2:2 269:16
**strict** 201:22
**strike** 252:14
326:16
**strong** 19:9 27:1,20
37:4 166:6 291:19

292:3,6 306:4
**stuff** 26:18 91:16
**style** 275:8
**sua** 70:20
**Sub** 281:19
**subject** 131:17
154:15 241:10
291:14 300:6
310:16
**submission** 88:16
**submit** 39:20,20
134:14 168:5,9
233:10,13,19
**submitted** 24:20
25:2 72:6 74:4
106:11 134:13
169:6 170:17
233:4,10,16,17
281:3,6 283:12
292:19 295:4
**submitting** 41:22
**suborning** 23:17
166:11
**subpoenaed** 273:9
**subscribe** 226:20
**subsequent** 266:11
**subsequently**
221:16
**substance** 16:12
**substantially** 267:2
**substantive** 312:20
**substantively** 89:19
312:9
**subsumed** 83:7,11
83:13 84:19
**subsumes** 87:21
**succeeded** 202:8,17
**successful** 18:7
36:18 48:19
**successive** 9:22
11:20
**sudden** 23:10
**sued** 38:2 296:7
**suggest** 6:19 36:7
158:19 312:7
**suggested** 30:9
**suggesting** 89:12
**suing** 101:22
**suit** 134:8
**summary** 132:19,21
**Superior** 193:7
296:9
**supersedeas** 15:20
166:10
**superseding** 23:15
236:4,19 237:19

supervisor 166:15
supplement 42:19
  52:14,21 53:8
  68:10 159:22
  160:16,17 210:1
supplemental 39:21
  40:10,14 42:1
  52:16 90:17
  218:12 295:5
  314:8
supplemented 12:2
  84:9 89:17 135:18
  160:11
supplements 62:15
  62:18 72:1 89:20
support 144:20
  159:6 163:15
  210:15
supported 243:16
supposed 32:4,5
  147:10 154:6
  309:19
supreme 10:1 12:1
  38:5 127:10
  128:14 133:11,19
  135:6 136:17,19
  137:13 138:6
  143:1 144:4 146:8
  147:5 154:22
  155:5,13 158:14
  159:7,20,22
  160:11,19 161:2
  212:10,17,22
  213:11 214:1
  215:17,22 216:9
  239:5,12,15,16
  240:3,6,10 266:15
sure 7:9 8:4 9:7
  42:8,12 46:20
  56:12 60:2 88:4
  107:8 113:17
  121:20 130:21
  161:16 180:4
  182:16 190:1
  201:1 204:20
  209:11 218:14
  221:16 226:20
  259:19 263:22
  267:7 283:20
  284:22 287:3
  296:14 297:8
  332:1
surprised 107:2
  205:3
surrogate 20:2
surveillance 38:3

suspect 196:7
suspended 19:2,4
  271:12 295:14
suspension 72:20
  264:5 305:4
swear 5:21 46:22
  319:22 320:2
sweetheart 274:20
swore 115:11
sworn 5:22 48:4
  59:8,10 321:4
system 2:18 15:4

**T**

T 48:11 130:7
T-r-o-x 183:17
T-r-o-x-l-e-r 183:16
tab 309:12
table 8:5 141:9
Taiwanese 74:22
take 14:10 18:18
  21:22 26:1,4 27:1
  37:11 45:1 46:16
  51:14 70:14,16
  71:10 75:4 76:1
  97:19 117:21
  128:17 129:21
  141:19 152:8,9
  159:14 160:5
  222:21 226:21
  227:2 240:9
  248:15 268:4,8
  269:15 300:21
  313:5 317:15
  318:4 319:5
taken 2:1 116:5
  130:6 221:18
  227:10 270:19
  300:11 301:9
  318:7,9 330:20
takes 240:10
talk 8:18 36:1 49:4
  49:6 284:18 334:3
talked 49:2 50:10
  50:14 73:8 170:6
  215:19 267:1
  331:18 332:4
talking 26:18 54:8
  69:17 74:14,14
  91:13 120:2
  124:22 135:9
  216:7 224:11
  226:4 277:12
  301:22
tape 262:6
tar 144:13

target 272:16
targets 272:1
tased 16:22
task 38:4 333:15
taught 33:11 249:6
taxpayer 38:13
team 29:5,6,7,7,14
  138:3 146:16
  153:13 166:8
  173:9
teams 29:8
technical 310:2
technically 22:17
telephone 260:18
tell 62:9 65:14
  99:18 101:2 102:9
  123:10 137:4
  143:7 153:9
  226:13 252:17
  255:10,14,22
  271:7 282:15
  306:14 316:1
  322:11 323:1,19
  324:2 325:13
  326:1,20
telling 104:4 168:8
  262:10 292:5
  302:18 332:8,13
tells 25:19 29:16
ten 20:6 267:15,16
  315:19
tendency 36:17
tending 145:22
tens 201:17
tenth 195:5
tenure 180:14
terabytes 279:11
term 218:7 297:8
termination 264:8
terms 18:19,20 87:9
  130:17 135:13
  148:18 150:13
  231:11 272:4
  277:8,22 298:11
  310:11 317:1
  324:18,19
terrorist 24:4
  247:17 249:21
terrorists 24:1
  202:15
test 44:6
testified 48:5 59:9
  92:22 154:8
  171:11 204:8
  232:10 242:15
  254:21 256:4

261:15 272:9
278:17 289:4
291:4 297:17
304:17,22 313:17
316:8 321:5
testify 34:3 40:7
  56:12 141:18
  157:2 203:13
  217:19 218:4
  268:3 269:20
  274:18 305:1
  315:7 316:2,12
testifying 9:1 59:20
  60:17 157:4
  315:21 327:19
  329:11
testimony 8:13 14:2
  24:9 28:8 30:17
  43:20 44:10 46:22
  74:10 87:9,11,20
  88:5 92:22 103:8
  130:18 132:11,19
  132:22 151:17
  152:17,22 153:16
  154:15 168:22
  169:2,3 179:14
  183:3 188:2,4
  199:16 204:8
  225:20 227:4,4
  230:6 253:5,18
  261:16 267:10
  268:17 277:20
  279:3 291:18
  295:7,16 297:2
  298:7 314:1
  315:14 317:19
  320:1,3 327:11,18
  327:20
testing 44:5
textbook 25:5
thank 7:18 9:5 14:5
  14:6 38:21 39:2
  44:18,19 45:6,7
  47:5 77:7 78:1,9
  88:14 100:16
  184:18 187:11
  201:4 207:4 215:9
  219:8 239:22
  263:18 267:14
  270:17 281:16
  285:14 287:18
  289:5 290:21
  295:18 318:6
  333:17,18
thanks 87:4 184:16
theory 69:2,20

106:20
thing 21:21 23:20
  53:1 58:18 69:19
  70:1,20 89:18
  93:11 99:1 139:13
  140:21 144:8
  145:8 147:2 151:7
  153:7 182:18
  257:9,10 274:10
  274:15 285:17
  286:18 289:21
  293:3 294:22
things 6:15 22:15
  30:9 31:13 35:6
  35:18 36:11 37:14
  39:17,19,19 40:4
  42:15 53:2 54:15
  77:11 97:13
  111:22 116:13
  117:3 123:10
  133:18,22 135:3
  146:3 150:22
  172:11 174:7
  186:15 187:22
  188:10 240:10
  246:6,21 247:20
  258:20 275:8,9
  284:5 287:5
  296:11 300:13
  316:17
think 17:18 41:21
  42:4 43:3 45:20
  52:10,10 53:19
  55:19 56:10,20
  66:13,14 71:20
  73:5 81:2 87:2
  96:3,4 97:13
  107:5 110:14
  111:15,16 112:8
  118:14 120:3
  129:20 131:6,14
  133:9 134:2 145:4
  147:1,19 159:13
  165:6 171:11
  182:15,16 184:13
  187:3 188:3,10,12
  191:5,5 197:12
  205:8,11 206:20
  214:9 218:19
  219:18 220:15
  223:7 227:1
  232:12,13 237:2
  242:14 243:15
  245:20 256:3
  257:12 269:1,3
  270:4 285:16

290:1 296:3 297:7
305:10 308:7,8
310:6,18 311:16
311:20 312:8
313:3 315:4,17
316:8,18 317:18
317:22 325:7
327:10,12,17,21
328:1 333:20
334:5
**thinking** 51:5 93:21
**third** 82:6 190:7
203:6 216:10
217:3 218:8 220:5
222:5 227:16
228:10 229:12
230:16 239:4,16
240:2 242:20
322:7
**thirty-five** 33:18
**Thirty-seven**
205:17
**thorn** 37:22
**Thornton** 269:4
315:6
**thought** 6:14 19:19
20:13 24:19 49:6
57:17 60:7 83:10
98:19 151:8
178:12 202:14
210:6 248:7,17
249:1 257:5,5,6,8
260:2,2,7,16
276:18 278:7
288:14 305:6
317:8
**threat** 22:21
**threaten** 297:1
**threatened** 16:18
16:19 162:8 163:4
167:2,16 168:18
297:2
**threatening** 166:2
166:13 296:20
**three** 12:1,6 18:11
23:11 57:12 60:19
67:7,19,20 123:8
123:9 138:16
139:22 143:3
146:18 148:1,11
148:12 154:1,4,5
189:5,6 190:4
192:12 239:15
263:2 282:4
285:11 287:4
304:20 310:22

**threw** 132:3
**throw** 69:19,22
70:20
**thrown** 16:21 22:20
23:15 91:18 93:4
158:3,6,7 166:10
**thrust** 261:18
**Thursday** 43:18
44:15 319:1
**tier** 148:12,15
149:10 150:9
154:2,4,5
**tiers** 151:5
**tight** 43:18
**tight-knit** 259:15
**time** 14:12 16:16
17:14 18:9 37:11
38:13,13,22 40:21
41:10 42:1 43:19
43:21,22 44:1,17
45:2 48:15,20
49:10,15 50:17
51:3 53:3 54:22
59:13 61:15,16
63:10 68:21 69:13
69:16 75:12 81:17
86:6 91:9,17 92:3
100:2 104:7,18
110:17 115:22
138:14,15 140:12
141:8 142:1,17
144:2 148:16
150:11 159:17
160:5 161:7
162:19 164:18
169:12,18 171:10
171:12 177:19
185:7 194:7,18
196:10 202:18
203:4,12 208:17
208:20 210:15
213:22 218:20
220:16,19 222:20
226:19 227:2
235:18 236:1,17
249:18 250:18
258:11 261:4,16
261:17,21 265:1,2
265:5 268:9 274:2
281:22 286:2,13
295:3,13 300:11
305:8 308:14
319:3 333:9
**timeframe** 181:13
**times** 19:1,12 28:21
28:22 33:1,19,19

38:3 87:1 130:16
136:4 158:9 190:2
191:21 226:1
**tired** 258:10 267:18
294:7 317:19
**title** 85:3
**today** 27:15 45:21
68:19 78:8 101:7
216:7 261:15
268:4 270:2 295:1
295:14,16 301:22
313:22
**Todd** 149:21 150:3
**toe-may-toe/tuh-...**
33:17
**told** 60:3 62:10
101:14 112:19
115:19 116:20
120:11 147:13
157:17 158:1,14
161:11 162:13,17
162:22 163:7,11
163:17,18 164:5
168:4 169:4,5
248:18 251:17
253:21,22 254:4
255:16 256:22
257:1,6 279:6
305:7
**Tom** 20:1 21:14
56:2
**tomorrow** 130:1
268:4 279:3 280:2
292:22 294:9,20
305:2 318:16
319:2 333:22
334:12,16
**tomorrow's** 295:7
**tonight** 269:12
296:18
**top** 24:21 100:21
104:15 126:12
165:8 202:4
225:12 247:21
323:5 326:2
**torture** 244:8
**touched** 259:19
**trade** 17:2 112:4
118:18 178:6
180:19
**Traffic** 178:9
**transcribe** 221:19
**transcript** 39:22
41:6 68:10 74:18
75:13 101:18
123:4 135:18,20

156:9 157:17
163:8 168:12
218:12,17 219:3,4
219:13 221:4,16
221:17 222:2,7,9
223:4,13,20,22
224:1,7,18 225:19
278:10 312:15
314:12
**transcript's** 279:22
**transcripts** 68:5,9
260:11,12 312:20
**transferred** 207:21
208:1
**traveled** 331:15
**treat** 250:21
**treated** 36:3 111:5
**trial** 10:15 23:4
28:15 29:8 30:17
33:20 93:5 125:13
136:19 137:8,21
138:1,3,10,15,20
139:2,3,3,15
140:2 142:6,8,8
145:6 148:10,11
150:1 152:3 154:3
154:4 184:20,22
185:3,14,16,19,20
186:7,12,18,22
193:18,20 200:14
200:15 203:3
204:4,9,12 208:6
208:8 225:21
246:18 251:8,15
273:16 296:3
330:21 331:8,13
**trials** 112:17 116:16
141:2,3,18 142:18
144:10,12 145:17
148:12 150:17
151:14 186:14
**tried** 29:4 40:1
136:9 139:11,19
140:13 141:4,8,12
141:16,17,22
142:3 145:12
150:9,11,14 151:5
154:20 165:19
168:1 170:9 191:6
191:20 220:22
237:7
**tries** 44:1
**Tris** 179:10,11
**Troxler** 179:9
183:14,20 184:4,6
184:20 185:4

186:16 190:21
191:3
**true** 59:22 85:18
112:15 167:15
179:4 231:20
254:5 296:6
327:15 330:19
331:2
**truly** 62:10
**Trump** 32:8,9
**trust** 206:8 226:17
253:21 255:8,8
**trusted** 275:15
**truth** 2:17 47:1,2,2
153:9 158:4 168:8
320:4,4,5
**truthful** 72:10
218:1,1
**truthfully** 19:15
73:13 82:20
264:14 295:4
**try** 6:15 15:4 18:4
21:7 23:6 31:21
38:14 65:20 77:11
77:16 138:13,22
150:7 152:15
154:14 212:13
269:16 276:11
277:3 290:12
304:8 319:2
**trying** 20:22 21:12
23:9 29:3 37:18
41:16 60:15 61:1
76:22 86:18 89:10
141:9 144:13
150:6 160:3
166:21 169:3,20
204:7 208:10,14
224:14 231:17
237:14 248:19
254:3 264:22
265:7 292:1
302:15 303:6
**Tuesday** 334:19
**turn** 50:2 52:22
54:12 56:20 57:1
85:11,15 95:13
97:12 99:10 101:1
111:9 113:2,9
156:21 166:19
175:17 188:22
200:18,19 205:13
211:17 212:1,5
238:8 274:13
275:17,19 280:15
288:16 293:10

296:18 322:6
325:3
**turned** 274:20
308:4
**Turner** 43:19
**turns** 245:2 260:6
**TV** 252:15 296:18
**Twelve** 147:11
**Twenty** 234:19
**Twenty-eight**
219:19
**Twenty-seven**
40:19
**twenty-three**
195:12,15 196:15
**twice** 28:20 84:9
152:22 158:17
160:1 296:8
**twist** 187:22 252:6
**two** 13:17 22:22
25:11 54:14,19
62:15 66:3 68:1
72:1,13,16 73:8
73:11 74:13 87:12
87:13,22 89:20
139:22 140:14
145:11 146:3
160:12 173:4
174:17,19 176:12
176:16,19 194:11
197:4 198:11,12
198:19 199:22
201:8 205:6 216:8
217:11,11 244:10
244:11 256:2,2
268:19 269:19
314:4 315:11,11
316:17
**type** 325:19

_____
U
_____

**U.S** 15:2 23:5
103:19 112:11
118:22 119:7,15
173:6 184:7
189:12,14,15
190:7 208:11
**U.S.C** 250:8,8
**ultimate** 150:16
165:20
**ultimately** 18:7
19:19 20:13,21
63:3,21 106:17
141:19 150:9
184:4 185:1 186:8
203:4 281:3 289:2

**unable** 96:16
**unbiased** 242:22
**underlying** 331:4
**understand** 6:8 9:4
64:16 65:18 77:20
77:21 81:8 86:14
87:2,8,20 88:5
113:4 140:9 153:5
153:6 163:2
197:10 200:7
207:1 224:16
235:9 251:22
254:3 256:21
265:11,16,19,21
280:3 308:8
**understanding** 29:4
40:21 102:19
256:4
**understood** 144:7
221:9,12 259:20
332:1
**undertook** 61:16
**unequivocally**
280:22
**unethical** 25:15,16
76:21
**unethically** 97:1
264:15 285:20
**unfair** 70:12
**unfortunately**
182:9 289:3
306:17
**United** 9:20 10:13
73:17 75:20 76:14
78:22 119:19
120:12 126:17
147:16 159:5
181:14 202:5
**University** 43:16
93:18 249:7
288:20
**unloading** 202:16
**unnecessary** 252:14
**unquote** 138:14
246:22
**unsupported**
167:17
**unusual** 243:10
**unwarranted** 298:9
299:9
**updated** 287:5
**upheld** 147:21
**upset** 162:20
**USA** 190:5,9
**use** 21:21 45:18
60:13 69:3 114:16

115:1 259:10
278:5 292:3
302:22 306:5
**Usually** 175:10

_____
V
_____

**vacate** 291:22 293:7
**vacated** 15:19 242:6
291:16,21
**vacating** 291:9
**vague** 326:15
**variety** 326:10
331:4
**various** 69:21
134:12 172:10
**Vegas** 32:20 33:10
33:11,13 99:21
135:1 247:18
249:5,6,7 251:19
253:3 316:16
**Venezuela** 179:12
**Venezuelan** 179:12
**verdict** 186:3
189:18,18,20
190:19,20,22
191:3,11,17,21
193:19
**verification** 285:17
287:22
**verified** 53:9 91:8
232:16,20 233:1,4
288:2
**verifying** 289:15
**versus** 147:16 159:5
181:14 189:12,14
189:15 190:5,7,9
**vice** 9:18 11:2,4
12:21 13:4,10
15:17,17 18:21
22:7,18 24:19
28:7 34:21 50:11
50:18 51:8,11,20
53:13 62:3 63:15
68:2 71:14 72:1
72:11 76:4 78:20
79:5,18 80:18
81:16 82:21 83:4
83:19 84:9 85:20
90:18 92:3 94:12
95:20 98:14
114:20 134:14
162:18 164:6
168:5,10 169:6,11
169:17 213:17
217:10,22 228:8
229:16 230:19

233:1,8 234:3
241:7 244:10
252:21 276:8,22
282:18 283:4
292:6 305:17
307:5,6
**victim** 182:10
**view** 23:12 38:17,17
56:6 63:5 96:12
102:15,19 138:22
250:17 261:9
298:12
**views** 27:1
**vindictive** 76:10
77:15 83:10
241:12
**vindictively** 73:9
81:5
**violated** 14:3 33:2
57:11 60:18 61:20
265:5
**violation** 60:20 93:7
96:14 282:4,7
283:16
**violations** 10:8 12:4
58:8 60:19 101:22
283:13 289:1
**violently** 16:22
**visited** 33:19
**voiced** 313:22
**void** 265:8
**VOL** 1:7
**volume** 322:7
**voluminous** 97:17
226:3 330:7
**voluntarily** 157:19
187:16
**voluntary** 107:3
**vs** 119:19

_____
W
_____

**W** 34:10 38:2
**wagons** 36:17
**wait** 52:22,22 55:21
55:21,21 123:2,2
123:2 144:18
147:13 149:5,5,8
206:14,14 222:4
222:16 231:2,2
235:19 252:13
**waiting** 130:19
231:6 290:2
**waived** 175:10
**walk** 153:11 306:12
306:14
**Walker** 174:3

176:15
**wall** 259:9
**Wallace** 282:1
**want** 14:10,19 15:8
15:10 17:13,14
23:20 28:11 36:9
36:10 37:15 39:19
39:20 40:5 43:8
50:13 53:13 56:1
58:12 60:11,21
64:5 74:6,9 76:1
76:13 84:5 85:9
88:4 94:20 106:1
107:8 109:1
122:19 123:20
130:12 138:22
141:1 145:8
147:11 152:7
153:4 156:21
162:18 163:9
166:7 168:6
169:10 173:15
180:21 181:22
182:4,18 188:2
205:14 207:8
214:4 215:1
221:20 224:2
226:21 228:15
229:16 231:15
232:11 252:11
253:12,19 267:4,5
267:7 282:13
285:15 287:1,2
295:1 297:7
298:21 299:7,11
306:5 312:21
**wanted** 18:4 21:4
29:4 32:18 38:10
42:16 43:13 60:6
98:18 115:18
121:5 136:15
138:13,16 139:1
140:12,16 150:7
151:3 156:2
158:13 162:13
166:5 221:3
225:17 226:6,16
234:5 241:11,21
242:21,22 278:11
284:5 295:6 302:9
305:2 331:22
**wants** 145:2
**warm** 160:7
**Washington** 1:10
2:2 172:6 178:14
**wasn't** 20:9 21:6

In The Matter of: Larry E. Klayman
July 15, 2019

Page 365

22:5 28:15 30:18
31:11,16,17 51:5
53:7 59:12 70:2
76:5 89:10 92:8
99:7 102:18,19
116:2 127:20
141:14 152:5
153:11 168:8
184:22 185:16,22
191:6 200:15
213:20 215:7
216:2,2 217:7
221:12 226:2,17
233:10,21 234:2
244:20 245:1
247:22 278:16
288:5 291:14
300:6
**wasting** 265:1,2
**Watch** 15:1,1 19:22
20:7 21:13 26:4
35:9 37:20 56:2,7
69:17 82:12 87:19
111:3,3,8 112:12
126:19 172:18
203:18 205:20
241:11 258:21
292:16,18 301:18
302:3,6,19 304:7
306:18 307:13
**watching** 111:3
182:10
**waterboarding**
34:10 244:7
249:10
**way** 10:2 15:6 16:14
24:2 25:18 37:2
41:16 71:18 73:2
77:17 78:7 86:12
96:20 111:5
151:18 170:9
195:20 205:8
206:12 207:16
211:18 212:16
250:16 254:19
259:10 263:6,12
275:8 297:2
299:15,20 307:2
307:10 311:6
318:1,8 323:19
**Wayne** 27:3
**we'll** 6:14 43:14
128:20 129:20
151:18 230:13
265:15 267:19,20
271:2 292:22

294:8 313:6 318:4
318:15 334:16
**we're** 24:16 26:18
36:21 56:20 64:4
65:22 69:17 71:18
117:21 124:20
129:8,10,14
131:16 132:5
153:17 184:14
196:10 216:7
234:21 271:1
283:18 285:6,6,7
290:1 317:9,18
329:16 333:20
**we've** 66:4 71:20
117:21 134:13
152:16 156:7
208:21 267:1
**wear** 179:12
**weary** 118:1 120:8
**website** 324:21
325:20 328:9,12
**wedding** 294:6
**Wednesday** 129:6
**week** 129:10 220:4
**weeks** 97:19 155:15
236:4 304:20
**went** 30:8 74:18
89:9 93:17 156:18
165:3 179:21
186:18 187:3,8
189:17,18,20
190:19,19 191:11
191:17 193:18
207:17 216:10
232:11 240:12
244:21 245:1
246:19 250:16
260:9 268:9 294:5
295:5 298:22
311:16 314:17
**weren't** 28:1 104:2
185:19,20 208:2
329:20
**West** 258:11,12
319:3
**Whipple** 28:5,7,13
29:3 30:5,18 31:3
31:3 35:11 40:2,3
41:14,17 100:3
117:5,8 121:7,15
122:3 131:4,5
134:1,5,17 135:6
135:16 136:1,3
139:9 146:6 162:8
162:13 163:5,7,11

163:15,19 164:5
165:13 166:3
167:2,14,16 168:4
168:7,18 169:4,6
170:1,7,10 216:20
218:7 220:19
221:2,22 222:1
223:18 225:8,18
225:20,22 226:3,5
226:16 229:14
230:16 232:6,7,9
232:10,13 233:7
233:22 236:19
237:5 251:16
277:11,19 279:7
279:21 280:4
316:13 323:7,11
323:20 324:12
326:7 330:20
333:1
**Whipple's** 131:10
163:12 235:14
325:17 331:19
**Whipple,'** 161:21
**whistle-blower**
166:14
**white** 2:14 5:13
285:6 294:12
**wife** 34:1 49:11
141:6 145:21
248:7 254:1,15
257:6
**Wikileaks** 296:14
**Wilke** 307:5
**Wilken** 305:14
**William** 25:12
**WilmerHale** 308:6
**win** 19:19 24:20
292:4
**wind** 159:2 162:21
280:8
**wins** 35:19
**wise** 221:7
**wish** 64:9 298:7
**withdraw** 28:14
66:16 114:21
115:5 275:21
**withdrawal** 65:2
**withdrawn** 58:17
63:4,5 88:8 291:5
**withdrew** 21:16,17
86:6
**withhold** 22:2
**withholding** 23:16
**witness** 6:18,20 8:1
8:2,3,8 21:22

44:16 45:10 46:14
48:3 62:12 80:8
90:4 111:6 129:21
129:21 132:2
133:4 156:20
162:15 164:22
165:1 166:15
167:8 186:12,20
203:9,20 204:4
206:17 209:1
223:2 231:10
240:22 256:13
268:11 270:15
317:13 318:16
319:14,16,21
320:6 321:3 324:1
324:7,14,17 328:3
329:5,9,13,15
330:3 331:2,9
333:6,18,19 334:3
334:8
**witnesses** 4:6 5:19
8:4 14:3 23:18
185:21,21,22
186:4,7,13,14
267:3 268:3
272:21 310:5
314:3,20,20
315:11 319:6
**woman** 292:8
**won** 191:20
**wondering** 117:20
319:1
**Wong** 80:8,12,14,14
**word** 81:5 114:16
115:1 117:10
259:10
**words** 141:5 252:6
**work** 15:5 29:4 46:6
171:14 172:19
178:1 180:10,15
184:9 187:3,8
191:18 198:21
**worked** 172:17
174:12 181:3
182:22 183:3
192:10 254:6,7
317:4
**working** 171:21
172:5 176:5 177:6
179:19 184:2
192:7 202:20
251:16
**works** 128:21
129:12 172:6
**worldwide** 198:3

**worry** 275:10
**wouldn't** 45:1 98:22
142:1 164:6
275:12 299:5
**wound** 20:5 150:9
159:10
**writ** 27:9 30:11,14
30:15 98:22 115:7
131:15 135:11
229:3,10 239:10
276:9 278:4
**write** 27:20 86:19
179:8 276:1
**writing** 35:1 63:16
64:6 70:16 263:15
313:12
**written** 25:5 27:12
51:16 159:16,16
217:17,18,20
218:1 243:18
263:1 274:2 277:1
306:4
**wrong** 20:8 21:10
21:11 55:18 61:15
108:13 109:2
119:17 228:19
251:1 254:17
259:5 263:14
305:9
**wrote** 35:16 81:5,10
115:19 124:7
230:9 243:21
244:3,3 249:9
250:15 261:4
262:19,19 302:12
302:13

**X**

**X** 1:3,7 4:1
**XI** 5:7

**Y**

**yeah** 17:17 40:15
45:19 46:7,20
58:5 66:9 81:3,6
82:17 87:4,7 90:5
92:18 104:16,20
111:21 128:18
167:20 171:17
176:9 193:12
198:1 222:10
235:9 252:19
254:12,14 255:1
257:14 285:13
286:1 287:10,14
287:17 294:18

296:17 315:17
**year** 25:1 91:19
  175:13 176:11,11
  178:3,16,17
  192:20 235:10
  289:3 327:12
**year-long** 186:11
**years** 14:22 16:7
  18:9 19:8 20:1,6
  23:1 26:5,19
  28:19 49:10 56:3
  69:21 87:19
  140:14 165:19
  174:18,19 175:11
  176:13,16,19
  194:19 196:11,14
  196:15,22 197:20
  198:8,22 199:8
  200:12 206:14
  216:8 217:11,11
  226:1 244:10,11
  274:4 286:3
  292:16 302:21
  317:9 327:22
**yesterday** 258:12
  294:7
**York** 280:19
**young** 179:6 182:21
  192:3,6

_____
        **Z**
**zealously** 32:5 96:9
  97:3 153:11
  212:14 280:9
**Zelinsky** 273:7
**zero** 160:15

_____
        **0**
**001** 326:3
**007** 325:16
**009** 325:16

_____
        **1**
**1** 175:18,19,20
  309:6
**1.9** 57:12 60:19
**1:00** 118:7 128:21
  130:3,8
**1:1998-CR-00721**
  190:8
**1:2004-CR-20631**
  190:6
**1:2007-NJ-02948**
  190:10
**10** 56:20 57:2,19
  112:9 119:8,13

120:9 196:3
**10:00** 2:3 129:16
**100** 202:21 206:18
  207:2 234:13,17
  237:21,21 239:18
  245:21 246:3
  263:11,20 291:7
  293:13
**100-011** 246:9,10
**100-0112** 260:20
**100-012** 247:2
**100%** 306:15
**101** 238:11,15
  293:11
**103** 236:9
**104** 236:9
**105** 239:2
**107** 239:6,17
**109** 240:16 306:22
**1098** 142:21 147:12
  147:18
**10th** 100:18 101:10
  101:12 128:4
  157:10
**11** 62:1 95:13 112:9
  114:12 119:8
  196:12,20 246:9
  258:18 286:15
**112** 242:9
**113** 322:7,21
**114** 323:16 325:4,16
  326:3
**115** 189:1,7 197:17
  198:11,20 326:19
  327:6
**116** 190:16 195:6,19
**117** 190:16 194:10
  200:19
**118** 190:16 203:8
  205:13,17
**119** 190:16 207:9
  311:20
**12** 26:5 65:5,15,16
  66:17 69:20 101:4
  112:2 114:10
  118:14 119:8,10
  119:18 121:1
  161:16 196:12,21
  274:14 275:18
  286:15
**12,55** 119:13
**12/20/2017** 237:3
**12/20/2018** 235:4
**12:15** 118:6
**12:17** 130:5
**12:30** 43:18,21

44:15
**120** 75:17 76:2
**121** 82:5 288:17,19
  313:14,14,18
**1214** 147:9 154:12
**125** 209:12 288:19
**12th** 142:21
**13** 57:15,22 58:3,4
  65:6,10 66:20
  69:20 128:5
  161:16,17 162:10
  202:18
**13-BD-084** 70:6
  71:2
**13-DB-084** 69:12
**13:24** 224:2
**13:8** 224:1
**134** 288:18
**135** 281:5,8,8,9
  300:3
**136-137** 300:3
**139** 287:11,13
**13th** 128:8
**14** 4:4 57:2 162:10
**143** 290:5
**144** 250:8
**15** 1:9 12:12 57:20
  68:4 101:5 118:6
  227:8 267:16,17
  267:19
**150** 16:7
**151** 290:5
**16** 20:1 101:4 125:5
  125:9 128:8 167:4
  171:14 194:19
  214:5,10,13 235:2
  264:2 292:16
  302:21 334:19
**17** 18:10 57:20 98:2
  142:15 148:10
  160:14 167:5
  198:15 263:21
  314:22
**171** 326:4
**175** 194:10
**177** 330:6
**17th** 133:14
**18** 18:6 126:15
  137:6,22 206:14
  239:7
**18-BD-070** 1:4 5:11
**18th** 211:2
**19** 23:7 126:11,12
  126:13,15 137:7
  138:3,13,17,22
  139:10,19 151:6

**1977** 173:18 176:17
**1979** 174:16 176:10
  192:21
**1980** 174:14 176:1
  177:5,15 178:2
**1981** 178:18,21
  179:2 180:11
  181:9,10 186:10
**1982** 175:14 271:10
**1990** 324:17 328:2
**1991** 330:2
**1993** 194:17 195:9
  196:17 199:22
  200:2
**1997** 82:18
**1999** 327:21 328:3
**19th** 90:18 196:17
  215:4,11,12
  240:18 302:5
**1st** 17:6 55:22
  200:21

_____
        **2**
**2** 310:7
**2:54** 227:12
**2:55** 227:9
**20** 121:11 142:19
  147:8,14,15 148:8
  153:19 162:11
  218:16 234:13,17
  239:7
**200** 202:21 234:16
**2003** 302:5
**2006** 200:21
**2008** 322:1
**2009** 198:15
**2013** 55:9,22
**2014** 49:1 57:7
  243:18 303:22
  304:15,19
**2016** 48:15,21 49:3
  49:14,20 51:20
  52:5,15 84:4,13
  85:5 88:16 89:21
  90:18 100:18
  101:10,12 113:21
  121:15 123:6
  128:4,9 147:9,21
  154:11 156:7
  157:10 247:5
  282:19
**2017** 133:14 136:21
  137:10,21 138:2,4
  142:15 146:7
  152:2 154:6
  168:13 170:3

171:4,21 211:2
  213:2,12 214:10
  215:4,11,13
  216:16 218:9
  220:2 221:4
  223:14,17 225:9
  229:4 235:13,16
  235:20
**2017-D051** 1:6
**2018** 234:7 236:3,11
  236:15 238:11,13
  239:1,6 240:3,18
  264:19 266:8
**2019** 1:9 334:19
**20th** 168:13 170:3
  234:7 235:1,13,16
  235:20 240:3
**21** 52:2 53:19 54:8
  155:4,8,11
**21st** 123:5 213:1,12
**22** 29:17 52:9 53:19
  54:8,10,11,14,20
  62:9,13 65:11
  66:3 72:12 73:8
  87:13 91:13
  123:20 134:3
  165:18 280:16
  288:6
**22nd** 51:20 52:4
  176:1
**23** 52:15,17 54:6,7
  62:16 196:22
  197:20 198:7
  199:7 200:12
  317:9
**23rd** 52:9 57:7
  304:15
**24** 52:17 53:10
  62:16 101:3
**24th** 121:15
**25** 84:5 87:22 88:1
  121:2 283:6,22
  285:4
**25-002** 283:22
**26** 85:4 88:17
**26th** 113:21 238:15
**27** 89:21 90:2
  170:18 171:1
  223:13 243:4
**271** 4:7
**27th** 219:14 220:2,9
  221:4 223:17,20
**28** 52:16 89:21 90:2
  219:9,18 243:4
  250:8,8 278:13,19
**28th** 52:15 225:9

In The Matter of:  Larry E. Klayman
July 15, 2019

239:1
**29** 90:19 146:12
**295** 4:7
**29th** 147:21 154:11
**2nd** 17:6 82:2,5,15
83:2 216:16 218:9
220:16 221:17
282:19 300:5
303:21 304:19
313:15

_____
**3**
**3** 122:19
**3:40** 267:20
**3:54** 271:2
**3:55** 267:21 270:18
**30** 99:11,14 101:2
154:3 156:10,13
158:9 206:3
**3041** 235:1
**3116** 236:8,10
**3117** 236:8
**31st** 53:9 84:4,13
**321** 4:8
**33** 170:18,19
**330** 4:8
**35** 33:19
**37** 205:13,14,15,17
**38** 14:21 95:16
**385** 200:20
**39** 121:14,20,22

_____
**4**
**4** 281:19
**4:54** 318:11
**400,000** 16:5
**41** 229:21 230:20
231:12
**42** 285:3,8 286:15
**43** 101:18 102:5,6
142:21 147:18
148:7 153:19
**430** 2:2
**44** 92:16 95:14 98:3
**45** 129:5
**455** 250:8
**47** 104:7,9,15
107:11 147:8
154:10
**48** 4:7 106:9 107:18
107:19
**4th** 229:4

_____
**5**
**5** 281:19 282:15,16
282:17 287:7

288:17 300:3
**5:00** 270:6,12,16
**5:09** 334:16,18
**5:30** 334:4
**50** 108:14 109:7
**51** 109:9
**52** 110:5
**54** 127:22
**55** 111:15 117:18
118:10 119:18
274:14 275:18
**55-012** 120:6
**55-11** 275:18
**55-12** 112:2
**56** 113:3,10 275:20
276:18
**56-009** 276:17
**5th** 240:12,14

_____
**6**
**6** 136:20 137:9
138:4 264:19
**60** 121:1 139:3
**61** 50:3,21 122:19
123:7,8
**62** 157:16,22
**63** 157:16,22
**64** 98:13 125:5,7
**65** 125:21 126:6
128:3,3
**66** 276:19
**68** 198:8
**69** 133:12 134:3
137:6,17 142:15
155:2,4,8,11
**6th** 15:21 22:8
29:15 34:15,16
93:5 105:18
137:21 138:2,11
139:6,17,20 140:5
140:6 141:4 142:1
142:3,6,9 145:7
148:18 152:2
154:6,20 156:6
245:3

_____
**7**
**7** 311:3
**70** 160:1,12,12
**71** 18:9 160:1,12,13
160:14,15,16
**73** 161:9 162:10
243:2
**73-028** 243:20
**735** 293:20
**74** 302:11

**75** 166:19 167:4,11
**77** 170:16
**78** 176:10
**7th** 85:5 88:16
89:21 176:18
238:11,13,16,17
271:10

_____
**8**
**8** 55:8,13,16 56:16
64:14 67:4 87:9
**8.4(d)** 60:20
**80** 245:10
**81** 181:11,11,13
**82** 181:12,13
**823** 195:7 196:4,5
197:12
**83** 192:22
**86** 210:20
**86-011** 262:3,5
**87** 211:17 212:5
**88** 245:9
**8th** 236:3,11,14
325:6,7

_____
**9**
**9** 4:3 314:22
**9:00** 129:17 317:17
318:17 333:22
334:17,19
**9:30** 43:22
**90** 213:1
**905** 196:16
**94** 228:15
**95** 216:12 222:6
224:5,11 227:17
228:11
**95-008** 223:12
224:13
**96** 229:8,21
**97** 227:20
**98** 228:13,21
**9th** 10:1 11:16,18
11:22 12:21 13:9
13:12 26:13 27:10
31:18 32:14 49:20
75:8,9 84:1
110:17 111:10
113:11,21 117:18
120:11 121:7
122:8,9 123:5,10
127:8 128:9
131:13 147:9
161:3 162:7 163:4
209:6,17 210:3
211:8 212:17

216:11 217:4,5
220:5 222:5
227:16 228:2,10
229:13 230:15
237:20 239:14,21
240:15,16 241:6
241:18,21 242:3,7
244:19 245:19
247:10 252:10
253:20 260:13
266:8,11 276:10
277:2 291:2,10
292:6



RECEIVED

July 29, 2019

Board on Professional
Responsibility

**Date:** July 16, 2019

**Case:** In The Matter of:  Larry Klayman



ACE·FEDERAL

Ace-Federal Reporters, Inc.
Phone: 202-347-3700
Fax: 202-737-3638
Email: info@acefederal.com
Internet: www.acefederal.com

In The Matter of:  Larry Klayman
July 16, 2019

Page 369

DISTRICT OF COLUMBIA COURT OF APPEALS

BOARD ON PROFESSIONAL RESPONSIBILITY

- - - - - - - - - - - - - - - X Board Docket No.

In the Matter of,              :  18-BD-070

LARRY E. KLAYMAN,              : Bar Docket No.

            Respondent.    : DDN 2017-D051

- - - - - - - - - - - - - - - X   VOL. II

Tuesday, July 16, 2019

Washington, DC

HEARING

Reported by

    Kim M. Brantley, C.S.R.

In The Matter of: Larry Klayman
July 16, 2019

---

Page 370

1  Hearing, taken at the Board on Professional
2  Responsibility, 430 E Street, NW, Washington, DC,
3  commencing at 9:00 a.m., before the Ad Hoc Hearing
4  Committee, and before Kim M. Brantley, C.S.R., a
5  Court Reporter and Notary Public in and for the
6  District of Columbia, when were present on behalf
7  of the respective parties:
8  APPEARANCES:
9     AD HOC HEARING COMMITTEE:
10    BUFFY J. MIMS, ESQUIRE
11    Chair
12    MS. ROBIN BELL
13    Public Member
14    CHRISTIAN WHITE, ESQUIRE
15    Attorney Member
16
17    On behalf of the DC Attorney Disciplinary
18    System:
19       JULIA L. PORTER, ESQUIRE
20       Deputy Disciplinary Counsel
21
22

---

Page 372

1         I N D E X
2  WITNESSES:        DIRECT:        CROSS:
3  Melissa Rolffot      374        383
4  Larry E. Klayman   386, 584      536
5  Oliver Peer       587, 595       591
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

---

Page 371

1  APPEARANCES CONTINUED:
2  ALSO PRESENT:
3       LARRY E. KLAYMAN, ESQUIRE,
4       Respondent
5  and
6       OLIVER PEER, ESQUIRE
7       Assistant to Mr. Klayman
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

---

Page 373

1         P R O C E E D I N G S
2      CHAIRPERSON MIMS: Are we ready to
3  begin?
4      Good morning. We are back on the
5  record at just about 9:00 o'clock.
6      Ms. Porter, are you ready to begin with
7  your first witness?
8      MS. PORTER: Yes, Melissa Rolffot.
9      (Melissa Rolffot on the witness stand.)
10     CHAIRPERSON MIMS: Good morning. Could
11 you state your name for the record, please.
12     MS. Rolffot: Melissa Rolffot.
13     CHAIRPERSON MIMS: Can you spell your
14 last name.
15     THE WITNESS: R-o-l-f-f-o-t.
16     CHAIRPERSON MIMS: Ms. Rolffot, say it
17 again --
18     THE WITNESS: Rolffot.
19     CHAIRPERSON MIMS: Rolffot, yes.
20 Ms. Rolffot, do you solemnly swear or affirm that
21 the testimony you will give in this proceeding will
22 be the truth, the whole truth and nothing but the

---

In The Matter of: Larry Klayman
July 16, 2019

| Page 374 |
|---|

1  truth?
2      THE WITNESS: Yes.
3  Whereupon,
4          MELISSA ROLFFOT,
5  called as a witness on behalf of Disciplinary
6  Counsel, and after having been first duly sworn,
7  was examined and testified as follows:
8      DIRECT EXAMINATION
9      ON BEHALF OF DISCIPLINARY COUNSEL
10     BY MS. PORTER:
11     Q.  I guess you've already done this for
12  the record, so I won't make you do it again, but
13  state your full name.
14     A.  Yes, Melissa Rolffot.
15     Q.  Where do you work, Ms. Rolffot?
16     A.  At the DC Office of Disciplinary
17  Counsel.
18     Q.  What was your position there?
19     A.  I am a senior law clerk.
20     Q.  How long have you been employed as a
21  senior law clerk?
22     A.  A little over two years.

| Page 375 |
|---|

1      Q.  And in connection with the Disciplinary
2  matter that's before this hearing committee, were
3  you asked to do some searches on the Internet and
4  in court records?
5      A.  Yes, I was.
6      Q.  I'm going to have you turn -- it's in
7  the third volume of Disciplinary Counsel's
8  exhibits, Exhibit Number 122.
9      A.  Ok.
10     MR. KLAYMAN:  Your Honor, if I may get
11  those exhibits.  They're up there.
12     CHAIRPERSON MIMS:  Yes.
13  BY MS. PORTER:
14     Q.  Can you identify this exhibit for the
15  hearing committee?
16     A.  Yes.  This is a search I did online,
17  for Google.  It's an obituary for Shannon Bybee.
18     Q.  And the other documents that follow?
19     A.  These are additionally documents that
20  are having to do with the death of Mr. -- they're
21  write-ups having to do with the death of Shannon
22  Bybee.

| Page 376 |
|---|

1      Q.  I'm looking at 122-003.  What is this
2  article and can you tell the hearing committee when
3  this article was published?
4      A.  Yes.  This is an article published by
5  the Las Vegas Sun, and it was published on Monday,
6  September 22nd, 2003.
7      Q.  And the article that appears on page
8  six of Exhibit Number 122.
9      A.  This article was published by the
10  Associated Press and again published on September
11  21st, 2003.
12     Q.  Let me have you go to the next
13  document, which is Exhibit Number 123, and if you
14  could tell the hearing committee what this document
15  is.
16     A.  This is a Wikipedia page.  This is a
17  search that I did on February 6th, 2019, and it was
18  a search regarding Judge Bybee.  This is a result
19  of that search that day.
20     Q.  Are the first eight pages the results
21  of your search on February 6th, 2009?
22     A.  Yes, they are.

| Page 377 |
|---|

1      Q.  And there is additional I guess
2  versions of the Internet search or the Wikipedia
3  search.  Could you explain those to the hearing
4  committee, starting on page nine.
5      A.  So on page nine I was asked to look up
6  the changes, if any, on February 2018.  So I did a
7  search from January 2018 to February 2018 to look
8  up any edits that may have appeared at that time.
9          Between those dates you have the edit
10  having to do with Judge Bybee's federal judicial
11  service, and the only change that occurred during
12  that time was line 124.
13     Q.  I guess I'll have the same question
14  with respect to the version that appears on page 12
15  of Exhibit 123.
16     A.  Ok.  So, page 12 is showing if someone
17  were to look at a Wikipedia page on -- looking at
18  Judge Bybee on January 2018.  This is the same
19  exact information that they would have found, and
20  that would have included that information from line
21  124 that we saw in Exhibit 009.
22     Q.  The same question with respect to the

3  (Pages 374 to 377)

In The Matter of:  Larry Klayman
July 16, 2019

Page 378

1  version that appears on page 21 of Exhibit Number
2  123.
3      A.  Ok.  And the page on 21 is the result
4  of research that you would have done for Judge
5  Bybee on February 2018.  So this is exactly how the
6  page and the information would have looked on that
7  day.
8      Q.  And the information, the personal
9  information about Judge Bybee, which includes the
10  name and the occupation of his wife -- I refer you
11  to page 23-002 -- was that consistent throughout
12  the period that you were asked to do the search?
13      A.  Yes, it was.
14      Q.  Let me have you now go to Exhibit
15  Number 124.
16      CHAIRPERSON MIMS:  I'm sorry, how do we
17  know that this is how it would have looked on that
18  date in 2018?
19      THE WITNESS:  On Wikipedia there is an
20  option.  You go to revisions or history, and you
21  can compare whatever date you want to.
22      So if I wanted to look a day ahead

Page 379

1  even, it doesn't matter, a year or a day, you just
2  put in the date and it shows you what it was on
3  that day.
4      CHAIRPERSON MIMS:  You mean a day
5  behind.
6      THE WITNESS:  Let's say arbitrarily if
7  that's what you wanted.  You could do a day ahead,
8  a year ahead, a week ahead, and they will tell you
9  exactly what if any revisions occurred.
10      CHAIRPERSON MIMS:  I don't understand.
11  Is that a year in advance in the future?
12      MS. PORTER:  No, if you wanted to look
13  at it February 6th.  You can't look into the future
14  I don't think.
15      CHAIRPERSON MIMS:  I'm sorry.  I was
16  like, that's pretty good.
17      THE WITNESS:  I haven't come up with
18  that knowledge yet.  I'm sorry, in the past.
19      If you wanted to look in the past,
20  whatever day you wanted, if it was a day behind or
21  a day -- you know, a year behind.  Apologies.
22      CHAIRPERSON MIMS:  Ok.

Page 380

1  BY MS. PORTER:
2      Q.  Let me have you identify Exhibit Number
3  124 for the hearing committee.
4      A.  Ok, 124 is a Wikipedia search for Judge
5  Navarro.
6      Q.  And with respect to this search, did
7  you also go back and capture what was reflected on
8  January 9th, 2018?
9      A.  Again, I looked from January 2018 and
10  February 2018, and the information was only line 68
11  that it shows changed.  That's Exhibit 4 -- page
12  four.
13      Q.  And one more exhibit and that is
14  Exhibit Number 125.
15      A.  One twenty-five is the result of
16  research I did, a Wikipedia research for William S.
17  Boyd School of Law, and it just shows the basic
18  information where it was established and when it
19  was established.
20      Q.  When was it established?
21      A.  It was established 1998.
22      Q.  Were you also asked to look at the

Page 381

1  public records in the United States versus Western
2  Electric, or the AT&T case?
3      A.  Yes, I was.
4      Q.  Could you describe to the hearing
5  committee what you did as far as researching the
6  records of that case?
7      A.  Besides doing an online search I went
8  to the DC District Court and I spoke to the records
9  clerk.  His name was Julian Brown.  And Mr. Brown
10  informed me that all the records or filings
11  connected with the case were located at the
12  National Archives.  But he was able to provide me
13  with the docket sheet at that time.
14      Q.  Did you review that docket sheet?
15      A.  I did.
16      Q.  How long was that docket sheet?
17      A.  Approximately 211 pages.
18      Q.  Did you look for any indication of Mr.
19  Klayman's involvement in that case?
20      A.  I specifically looked for any
21  appearances that were put in by any attorneys in
22  the government, both sides actually, and I did not

4  (Pages 378 to 381)

In The Matter of:  Larry Klayman
July 16, 2019

| Page 382 |
|---|

1  see Mr. Larry Klayman listed.
2      Q.  Did you see the entry of appearance of
3  other lawyers who were representing the government?
4      A.  Yes.
5      Q.  Was that true for I guess the 1979 to
6  1983 period?
7      A.  Yes.
8      Q.  What if anything else did you do to
9  determine I guess the extent of Mr. Klayman's
10  involvement in that litigation?
11      A.  I looked on Westlaw as well as Pacer to
12  look at the additional filings, and I looked from
13  the period of 1979 to 1983.
14      Again, any filings that I saw, which
15  was probably approximately 10 filings, in those 10
16  filings I did not see Mr. Larry Klayman listed at
17  all.
18      Q.  Ok, and when you talk about filings,
19  these are court --
20      A.  Opinions, yeah, opinions, memorandums.
21      Q.  These were decisions by Judge Alban?
22      A.  Correct.

| Page 383 |
|---|

1      Q.  Did they list the counsel both for the
2  government and for the defendants in the case?
3      A.  They did.
4      Q.  Did Mr. Klayman's name every appear on
5  any of those orders or memorandums?
6      A.  Not that I saw.
7      MS. PORTER:  I have nothing further.
8      CHAIRPERSON MIMS:  Mr. Klayman.
9      MR. KLAYMAN:  Yes.
10  CROSS-EXAMINATION ON BEHALF OF RESPONDENT:
11      BY MR. KLAYMAN:
12      Q.  I apologize for not remembering your
13  last name.
14      A.  It's okay.  Ms. Rolffot.
15      Q.  Noise to meet you.  Larry Klayman.
16      A.  Nice to meet you, too.
17      Q.  When you researched the AT&T case you
18  weren't aware that there were 20 to 30 lawyers
19  working on that case, were you?
20      A.  I saw there were numerous lawyers on
21  the case.
22      Q.  Yes.  You're not aware that there was a

| Page 384 |
|---|

1  trial team with lawyers that participated in that
2  case but were not listed as counsel of record?
3      A.  I only went by what I saw in the
4  docket.
5      Q.  Correct.  So you didn't have that
6  information?
7      A.  I did not have any additional
8  information, correct.
9      MR. KLAYMAN:  No further questions.
10      MS. PORTER:  I would offer Exhibit 122
11  through 125.
12      CHAIRPERSON MIMS:  Let me just ask a
13  couple of questions before we get to that.
14      I know that that case was a while ago.
15  Did you make any attempt to speak to anyone who was
16  listed on the docket as having -- who made an
17  appearance on the case?
18      THE WITNESS:  I didn't.
19      CHAIRPERSON MIMS:  Thank you.
20      (Witness is excused.)
21      CHAIRPERSON MIMS:  I'm sorry, which --
22      MS. PORTER:  One twenty-two through

| Page 385 |
|---|

1  125.
2      CHAIRPERSON MIMS:  Any objections?
3      MR. KLAYMAN:  No, your Honor.
4      CHAIRPERSON MIMS:  It's admitted.
5      MR. KLAYMAN:  Other than my written
6  objection.  Yes.
7      CHAIRPERSON MIMS:  Ok.  Thank you.
8      Mr. Klayman, do you intend to do the
9  direct of yourself?
10      MR. KLAYMAN:  Yes, I think it will be
11  quicker.
12      CHAIRPERSON MIMS:  Ok, thank you.  And
13  you're ready to begin, momentarily?
14      MR. KLAYMAN:  Yes.
15      CHAIRPERSON MIMS:  Are you ready to
16  begin?
17      MR. KLAYMAN:  I've been sworn in
18  already.
19      CHAIRPERSON MIMS:  No, I'm going to
20  swear you in again.
21      Mr. Klayman, do you solemnly swear or
22  affirm that the testimony you will give in this

5  (Pages 382 to 385)

In The Matter of:  Larry Klayman
July 16, 2019

| Page 386 | Page 388 |
|---|---|

**Page 386**

1  proceeding will be the truth, the whole truth and
2  nothing but the truth?
3       MR. KLAYMAN:  I do.
4  Whereupon,
5       LARRY E. KLAYMAN,
6  called as a witness on behalf of himself, the
7  Respondent, and after having been first duly sworn,
8  was examined and testified as follows:
9       DIRECT EXAMINATION ON BEHALF OF RESPONDENT:
10      BY MR. KLAYMAN:
11      Q.  Mr. Klayman, will you please state your
12  name.
13      A.  Larry Eliot Klayman.
14      Q.  When were you born?
15      A.  July 20th, 1951.
16      Q.  Where were you born?
17      A.  Philadelphia, Pennsylvania.
18      Q.  Run us through briefly your educational
19  background.
20      A.  I went to Harriton High School in Lower
21  Merion, Pennsylvania.  I then attended Duke
22  University from 1973 to 1977.  I graduated with

**Page 388**

1  period that you were at Emory?
2      A.  I also studied in the joint program
3  with the University of Georgia Law School and went
4  to Brussels, Belgium.
5       Because I speak French, I ultimately
6  wanted to be an international lawyer and a
7  litigator, both.  It's kind of an interesting mix.
8      Q.  Also during the time that you were at
9  Emory, did you have any internships in Washington,
10  D.C.?
11      A.  Yes.  I worked for the International
12  Trade Commission and I was offered a job there
13  clerking for an administrative law judge, Judge
14  Gloeckner, I believe it was, but I accepted instead
15  the position in Miami, Florida to be an associate
16  in a law firm called Blackwell Walker, Gray,
17  Powers, Flick and Hoehl.
18      Q.  What did you do there?
19      A.  I was in the litigation department with
20  a very fine trial lawyer by the name of Paul
21  Larkin, the best lawyer I've ever worked with in
22  terms of his ability as a litigator.

| Page 387 | Page 389 |
|---|---|

**Page 387**

1  honors in political science and French literature.
2  It was in political science I wrote a thesis about
3  the events of May 1968 when students and labor
4  unions tried to take over the government of France.
5      Q.  What did you do after Duke University?
6      A.  I took a year off.
7       I was accepted to the London School of
8  Economics but decided not to go and worked instead
9  for Senator Dick Schweiker in Pennsylvania, a
10  liberal Republican who was nominated the first time
11  by Ronald Reagan to be his vice president, when
12  Reagan ran in the primary bid but was not
13  successful.
14       I worked in Biggs Camera selling
15  cameras at night and holidays and weekends, make a
16  little extra money, and also because I loved
17  photography.
18      Q.  What did you do after you worked for
19  Senator Schweiker that year?
20      A.  I was admitted into an and attended
21  Emory University School of Law in Atlanta, Georgia.
22      Q.  What if anything did you do during that

**Page 389**

1      Q.  What kind of cases did you handle?
2      A.  Well, we handled a lot of product
3  liability, personal injury, breach of contract
4  cases, those kinds of cases.
5       At the time this was the largest law
6  firm in Miami, a litigation firm almost 90%.
7      Q.  What did you do after Blackwell and
8  Walker?
9      A.  Well, after about a few years I decided
10  I wanted to come back to Washington, and in the
11  summer I -- it was a different day and age.  I
12  literally walked up to the Justice Department, rang
13  the bell and said I would like to go up and speak
14  with the Assistant Attorney General of the
15  antitrust division, John Shenefield.  They let me
16  in.
17       You could never do that today, you
18  know, post 9/11.
19       I went in and I spoke with his chief of
20  staff, Doug Colton.  I told him I wanted to work
21  for the antitrust division in an international
22  capacity, and they had an international antitrust

6  (Pages 386 to 389)

In The Matter of: Larry Klayman
July 16, 2019

Page 390

1  section at the time.
2      Doug Colton called me back about a week
3  later and told me they were offering me positions
4  in three different sections of the antitrust
5  division. I submitted my resume and all these
6  other things.
7      Rather than the international division,
8  I decided I would get better experience as a trial
9  lawyer, because that's what really I wanted to do,
10  mix it with the international. I took a position
11  that he had offered -- that the antitrust division
12  had offered in the Consumer Affairs section of the
13  antitrust division.
14      I won't try to repeat too much
15  testimony that I got into yesterday, just kind of
16  to bring everybody up to date.
17      CHAIRPERSON MIMS: Can you remind me
18  what year that was, please.
19      MR. KLAYMAN: That was 1979.
20  BY MR. KLAYMAN:
21      A. (Answer continuing) I went through a
22  background check with the FBI, which you have to do

Page 391

1  to get a position at the Justice Department, and I
2  entered at the end of 1979, as a lawyer for the
3  Consumer Affairs section.
4      That section represented as government
5  agencies both in a prosecutorial and a defense
6  posture. In other words, they would bring
7  prosecutions, civil and criminal, but they also
8  would defend the agencies of the Federal Trade
9  Commission, which handles antitrust and other types
10  of competition issues, the Food and Drug
11  Administration, which regulates drugs, and the
12  Consumer Product Safety Commission, which is to
13  make sure that consumers have safe products, the
14  Federal Reserve Board, which sets monetary policy,
15  the National Highway Traffic and Safety
16  Administration, which is part of the Department of
17  Transportation, and aspects of the Department of
18  Agriculture.
19      So I felt that I would get a really
20  broad experience there, broader than I would get
21  just limited to international antitrust, although
22  that remained an interest of mine and I read quite

Page 392

1  a bit about antitrust when I was there.
2      While I was there, I also attended
3  seminars. A lot of my colleagues wouldn't want to
4  get up that early, but I'm the son of meet packers
5  from Philadelphia, Pennsylvania. I used to get up
6  at 4:00 o'clock to go to work with my dad and
7  grandfather. So I'm used to getting up early.
8      So I would attend these seminars and
9  the Assistant Attorney General changed from John
10  Shenefield, who had hired me, to Sandy Litvack, who
11  had been a senior partner at Donovan Leisure in New
12  York City. That's a very big firm. And Mr.
13  Litvack would teach those who wished to come to his
14  seminars about litigation, litigation strategy,
15  tactics and that kind of thing. Because that
16  remained my primary interest was litigation. I
17  loved to be in front of courts and proceedings.
18  This one I hoped not to be in front of. But I
19  generally -- that's -- that's me. I like to be an
20  adversary.
21      To make the long story short, I also
22  volunteered for other projects at the department.

Page 393

1  There was a project that Mr. Litvack, the Assistant
2  Attorney General, had to look at the old consent
3  decrees, antitrust consent decrees, to see whether
4  they should be vacated or not, whether they were
5  still applicable. I looked at decrees concerning
6  the movie industry and others and helped analyze
7  whether the department should move to vacate them
8  after many, many years. So this was -- basically
9  when I did it in the Consumer Affairs section.
10      Also there came a point in time when
11  the department was looking for lawyers to add to
12  their antitrust team to break up the monopoly of
13  AT&T. I volunteered for that and I joined that
14  team. I was not the lead counsel, but I worked
15  under the lead counsel. I forget his last name at
16  this point. It was Jerry something and his
17  assistant, and I worked closely with them, and they
18  assigned me -- I was still a young lawyer. I was
19  barely 30, or shortly before 30, and they assigned
20  me to work with the top brass of MCI, which is the
21  precursor to Verizon.
22      MCI had obtained a $1.8B judgment --

7 (Pages 390 to 393)

In The Matter of:  Larry Klayman
July 16, 2019

Page 394

1  small by today's standards -- about the
2  anti-competitive conduct of AT&T, trying to keep it
3  out of the telecommunications market.  And I worked
4  on the case involving services.  There were
5  different portions of that AT&T case, services,
6  equipment, and that kind of thing.
7       I actually had personal contact, which
8  was great, with the heads of MCI, and what we did
9  primarily was to -- as Judge Harold Greene was the
10  judge sitting on this case, the federal judge.  May
11  his sole rest in peace; a very fine federal judge.
12  He wanted the issues narrowed going to trial.  So
13  he ordered the antitrust division and AT&T to meet
14  to reach stipulations of what they could agree on
15  and they couldn't agree on.  That's what I
16  participated in in addition to dealing with the MCI
17  executives and others and those in the antitrust
18  division, and that we would negotiate these
19  stipulations, or lack thereof to go to trial.
20       Around that time, just before it went
21  to trial, I was offered a job with a law firm
22  called Busby, Rehm and Leonard, doing international

Page 395

1  trade, boutique international trade, a free trader.
2  I'm a free trader.  I don't believe in restricting
3  imports unless there's something that's really
4  serious about anti-competition -- anti-competitive
5  impact, because it helps the consumer to have lower
6  prices.  It helps the economy.
7       Busby, Rehm and Leonard represented a
8  lot of different companies from overseas and U.S.
9  importers, the automobile industry, the steel
10  industry from overseas, and other industries.
11       So I took a job with Busby, Rehm and
12  Leonard and I was an associate there.  And they
13  were interested in my background --
14       CHAIRPERSON MIMS:  Before you go on to
15  that law firm.  I want to make sure I understand
16  the sequence.
17       When did you graduate law school?
18       MR. KLAYMAN:  1977.
19       CHAIRPERSON MIMS:  I thought you said
20  you were at Duke from '73 to '77?
21       MR. KLAYMAN:  I may have misspoke.  It
22  was from 1969 to '73.

Page 396

1       CHAIRPERSON MIMS:  Ok.
2       At the first firm in Florida, did you
3  work on any criminal cases there?
4       MR. KLAYMAN:  Didn't work on criminal
5  cases there.
6       CHAIRPERSON MIMS:  Before -- how about
7  when you were at the antitrust Consumer Affairs?
8       MR. KLAYMAN:  Yes, I testified with
9  respect to that yesterday with regard to Troxler.
10       CHAIRPERSON MIMS:  Troxler.
11       MR. KLAYMAN:  And there were several
12  other criminal cases dealing with FDA matters.
13       I was not the lead counsel on that.  I
14  was working under the assistant chief.
15       CHAIRPERSON MIMS:  So at the time that
16  you were at antitrust in Consumer Affairs, what
17  year were you out of law school?
18       MR. KLAYMAN:  I went to Consumer
19  Affairs at the end of 1979, and I was out of law
20  school in 1977.  I graduated in May or June of '77
21  from Emory Law School.
22       CHAIRPERSON MIMS:  Ok, thank you.

Page 397

1  BY MR. KLAYMAN:
2       A.  (Answer continuing)  Ok.  So that was
3  my time at the antitrust division.
4       And then I transferred -- excuse me, I
5  got this job at Busby Rehm and Leonard, and they
6  hired me primarily because of my litigation
7  background.  They weren't litigators, but there
8  were cases, both civil and criminal, dealing with
9  Customs enforcement.  They were Customs lawyers.
10  So I participated in those cases and I was their
11  resident, so-called expert, in litigation.  I
12  stayed with them for about two years.
13       There came a point in time where a
14  client had not submitted correct information to the
15  court, the Commerce Department, and I don't want to
16  get into the particulars of that because of -- I
17  don't want to name the client or whatever because
18  of attorney/client issues, but that was one of the
19  impetuses that I had, because I wanted it
20  corrected.  I believed in ethics.  I believed in
21  being honest with the government.  I also wanted to
22  start my own firm, because when I went to Busby,

8 (Pages 394 to 397)

In The Matter of:  Larry Klayman
July 16, 2019

Page 398

1  Rehm and Leonard, they had a Paris office.  I mean,
2  me speaking French, I thought I could be sent to
3  Paris -- it's not a bad place to be -- but they
4  never made good on that promise that they would put
5  me there.
6        So, although I left amicably, I started
7  my own law office, the Law Office of Larry E.
8  Klayman in 1983.  And as a result I was out there
9  on my own.  I was very fortunate.  I was very
10  aggressive in a positive sense and was able to
11  obtain several clients quickly before I would go
12  bankrupt as a young lawyer.  I was only about 30
13  and I obtained clients from Italy.  I had learned
14  to speak Italian.  My wife was Italian at the time,
15  former wife, and in a number of different products,
16  fire protection products, companies in Belgium,
17  Snauwaert Tennis Racket Company, which was a big
18  tennis racket company at that time, and others.  In
19  the course of doing that, I used my litigation
20  skills to try to keep the government neutral and
21  fair.
22        This is important, because it gets you

Page 399

1  to understand, you know, why sometimes I use Bivens
2  actions and that kind of thing.
3        The Commerce Department, in particular,
4  which handles anti-dumping and countervailing duty
5  cases against U.S. importers and foreign importers,
6  was highly influenced by contributions to whatever
7  administration is in power, political
8  contributions.  At that time it was the Reagan
9  administration, and I saw that results were being
10  skewed, that decision-making on the amount of
11  duties were being manipulated.  Even people in the
12  Commerce Department were complaining to me about
13  it, who I got to know.  And I would let the people
14  in the Commerce Department know that they had to
15  stand by the law, that they had to follow the law,
16  or I would hold them accountable for it.
17        And I did that.  I never actually
18  brought suit, but I was a pretty tough character
19  over there.  I had an excellent reputation for
20  winning cases.  I never lost a case at the Commerce
21  Department.  I have lost cases, so I'm not
22  bragging, in later life, but I had a great record.

Page 400

1        In addition I did a lot of litigation,
2  court trials, breach of contract, trademark
3  infringement, patent infringement.
4        At the International Trade Commission,
5  for instance, you have a section called Section
6  337, which is just like Section 45 of the FTC Act,
7  and you actually go to an administrative trial in
8  front of a judge.  I defended makers of large
9  tennis rackets that had brought a lawsuit against
10  foreign manufacturers.  I defended cases involving
11  JAMS in Belgium.  These are all patent infringement
12  cases.  They were antitrust cases.
13        I won't belabor it too much, but a lot
14  of litigation -- my litigation skills that I
15  learned at Busby, Rehm and Leonard and at the
16  Justice Department served me well.  Because
17  international trade lawyers are generally not
18  litigators.  I felt that I had an advantage because
19  I had learned from the best: from Paul Larkin in
20  Miami and from senior people in the Justice
21  Department.  And I had a very good record of
22  success.

Page 401

1    Q.  So what happened then, Mr. Klayman?
2    A.  Well, I went along and over the years I
3  had seen -- I made reference yesterday that I'm
4  kind of an economic civil rights lawyer in a way.  I
5  saw again that judges and government officials
6  would be highly influenced by who you are, what
7  your race is, what your ethnicity is, what your
8  religion is, and I'm an idealogue.  I believe in
9  the system of justice.  I believe that it should be
10  equal for everybody.  And that offended me.
11        The straw that broke the camel's back
12  was a judge in Los Angeles by the name of William
13  D. Keller, who I appeared in front of on behalf of
14  a Taiwanese/Chinese businessman called Frank Su --
15        CHAIRPERSON MIMS:  Before you move on
16  to Judge Keller...
17        MR. KLAYMAN:  Yeah, sure.
18        CHAIRPERSON MIMS:  What year are we
19  talking about at this point when you were in front
20  of Judge Keller?
21        MR. KLAYMAN:  It was probably around
22  19 -- somewhere between '90 and '92.

9 (Pages 398 to 401)

In The Matter of: Larry Klayman
July 16, 2019

---

Page 402

1    CHAIRPERSON MIMS:  So up to the point
2  where you started your own law firm, you had the
3  one criminal case from Justice Troxler?
4    MR. KLAYMAN:  No, we had other criminal
5  cases in that division.
6    CHAIRPERSON MIMS:  Ok.
7    MR. KLAYMAN:  I just don't recollect
8  the names, because we handled -- and let me explain
9  why...
10    We were an enforcement section of the
11  FDA.  So the FDA has both civil and criminal
12  powers.  When there is a blatant violation of the
13  Food, Drug and Cosmetic Act, an intentional
14  violation, that implicates criminal penalties as
15  well as civil.
16    So, yes, there were criminal cases
17  there.
18    CHAIRPERSON MIMS:  What about criminal
19  cases after you started your own law firm in '83?
20    MR. KLAYMAN:  Well, I continued my own
21  law firm and those are the cases that we identified
22  yesterday that I recollect at this point in time.

---

Page 403

1    CHAIRPERSON MIMS:  Those weren't the
2  ones from the docket sheet?
3    MR. KLAYMAN:  Yes, from the docket
4  sheet.
5    CHAIRPERSON MIMS:  The federal cases
6  from the docket sheet?
7    MR. KLAYMAN:  Yes.  I have different
8  incantations of my law firm.  Sometimes I ended an
9  old law firm and started a new law firm.  But
10  believe me, I was always the principal of it.  I
11  never worked for anybody except on one occasion
12  after that.  And I'll get to that.
13    CHAIRPERSON MIMS:  What would you
14  estimate for those cases?
15    And I believe I only asked you about
16  two of them.  I had asked you how many hours you
17  had put in for I think the last two that were on
18  the sheet.
19    In total for those four cases, what
20  would you estimate the hours you had been on them?
21    MR. KLAYMAN:  I would say between 400
22  and 600 hours.

---

Page 404

1    CHAIRPERSON MIMS:  What types of cases
2  were they?  I know that they were criminal --
3    MR. KLAYMAN:  One was BCCI.  The others
4  were dealing with -- for instance, Pushkareva.  She
5  was involved in a massive case called the Hernandez
6  case involving a racketeering enterprise by the
7  Russian mafia to bring in illegal immigrants from
8  primarily Chechnya, which has a large terrorist
9  component.  Even the Russians, in a heavy-handed
10  way, are very tough in these situations from
11  Chechnya, they have blown up Moscow and other
12  things.
13    CHAIRPERSON MIMS:  Is that the case
14  where your client was out of the case relatively
15  quickly?
16    MR. KLAYMAN:  No.
17    CHAIRPERSON MIMS:  Ok.
18    MR. KLAYMAN:  No.  That case continued
19  on and I negotiated a cooperation agreement for her
20  because she had valuable information with regard to
21  national security about how the Russians were
22  bringing these people in.  They were bringing them

---

Page 405

1  in and loading them off the boats in Ft.
2  Lauderdale, and our Coast Guard wasn't picking up
3  on what was happening.  So there were these people
4  all over South Florida and then they would
5  disburse.
6    CHAIRPERSON MIMS:  And DOJ had brought
7  criminal charges against her?
8    MR. KLAYMAN:  Criminal charges.  It's
9  still going on -- it may still be going on.  That's
10  how big this was.
11    She was alleged to be one of the
12  masterminds behind that.  She has an engineering
13  background.  She is highly intelligent.  She had
14  cooperated -- this was her testimony -- because her
15  son had gotten involved and the Russian mafia had
16  threatened to kill him.  He was in the United
17  States.  So she turned State's evidence, provided
18  information to the FBI.  I worked with the FBI at
19  Justice Department, so I was familiar working with
20  them, particularly since I was also doing judgment
21  enforcement at the Justice Department.  And that
22  was also something I volunteered for.

---

10 (Pages 402 to 405)

In The Matter of:  Larry Klayman
July 16, 2019

Page 406

1  So we did a cooperation agreement and
2  then a plea agreement and she was able to plead
3  guilty to 13 months in prison, with time served.
4  CHAIRPERSON MIMS:  Was she represented
5  by anyone else other than you?
6  MR. KLAYMAN:  No.
7  CHAIRPERSON MIMS:  What about the other
8  clients, the other three cases?
9  MR. KLAYMAN:  I was just going to add
10  just one thing.
11  It was ultimately I tried to prevent
12  her from being deported back from Ukraine.  She
13  didn't want to be separated from her son.  But the
14  Justice Department was insistent as part of the
15  plea agreement that she would have to leave the
16  country.  She voluntarily left the country, went
17  back to Ukraine.
18  The other one I met, Natalia Humm, was
19  her prison mate, also Russian.  And Natalia Humm
20  was -- she was involved in a scheme, allegedly, to
21  marry people to get U.S. citizenship, people --
22  CHAIRPERSON MIMS:  What were the

Page 407

1  charges brought against her?
2  MR. KLAYMAN:  Fraud, wire and mail
3  fraud, immigration fraud.
4  She was also -- there was a lawyer
5  before me that represented her who had negotiated a
6  plea.
7  But Natalia told me -- this is kind of
8  funny.  She ran off -- she was out on her own
9  recognizance -- to Belize with a man.  She told me
10  she liked men.  She went to Belize and they picked
11  her up there and brought her back to Miami and they
12  added the charges of jumping bail for going to
13  Belize and fleeing.
14  So it was much more severe by the time
15  I became counsel, and she had learned of me through
16  Margarita Pushkareva.
17  CHAIRPERSON MIMS:  What was the
18  resolution of that case.
19  MR. KLAYMAN:  Ultimately I think she
20  was convicted, pled out later.
21  But I did a lot of work trying to put
22  back in place the prior plea agreement which she

Page 408

1  had negotiated, which was much better than the one
2  she ultimately had to take.
3  CHAIRPERSON MIMS:  Did you represent
4  her through to the time that she was sentenced?
5  MR. KLAYMAN:  No, I did not, because
6  what happened -- I dealt a lot with the Assistant
7  U.S. Attorney up in Orlando.  The case was
8  transferred.  But I dealt with arraignments.  I
9  dealt with other pretrial hearings in Miami,    and
10  --
11  CHAIRPERSON MIMS:  You attended those
12  hearings yourself?
13  MR. KLAYMAN:  Some of them, yeah.  One
14  was called in and a notice was given to me, I
15  remember.
16  CHAIRPERSON MIMS:  Were you the only
17  attorney on the case at that time?
18  MR. KLAYMAN:  Yes, at that time.  Yes.
19  CHAIRPERSON MIMS:  So how long were you
20  her attorney of record?
21  MR. KLAYMAN:  I'm going from memory.
22  CHAIRPERSON MIMS:  I understand.

Page 409

1  MR. KLAYMAN:  Yeah, it's a long time
2  ago.  I think maybe two, three, four months,
3  somewhere in that range.
4  But I spent a lot of time with her in
5  prison because she was very frightened to be there
6  and -- although it's a nice prison, physically
7  speaking as prisons go -- she hated to be there by
8  herself.  So I literally would have to go there and
9  hold her hand, you know, in a professional way,
10  figuratively speaking, saying everything was going
11  to be all right.
12  You know, I've always felt a
13  responsibility to my clients, the same way I felt
14  with Cliven Bundy, and I visited him 30 times.
15  They can't be isolated.  You have to be
16  able to communicate with them and understand what
17  they want.
18  CHAIRPERSON MIMS:  Let's talk about
19  BCCI.  How long were you the attorney of record in
20  that case?
21  MR. KLAYMAN:  I don't recollect how
22  much it was.

11 (Pages 406 to 409)

In The Matter of: Larry Klayman
July 16, 2019

Page 410

1    CHAIRPERSON MIMS:  Was it months or
2  years?
3    MR. KLAYMAN:  Month, months.  Yeah,
4  months.
5    CHAIRPERSON MIMS:  Describe generally
6  your responsibility in that case.
7    MR. KLAYMAN:  You know, in indicted I
8  don't remember the case very well, but it was
9  making a claim that money had been improperly
10  obtained under BCCI.  That's what it was.
11    But I also want to add that --
12    CHAIRPERSON MIMS:  Well, let me ask
13  this: why did you end up not seeing those cases to
14  the end?  Because it doesn't sound like you did.
15    MR. KLAYMAN:  Because they concluded.
16  They concluded.
17    In Humm's case, it was because the case
18  had moved to Orlando.  And, you know, I can go
19  through this later, as well.
20    But Humm had paid a $25,000 retainer --
21  I want to explain this in this context -- to her
22  prior lawyer, and she later decided she wanted it

Page 411

1  back.
2    The lawyer did quite a bit of work.  He
3  did a good job in getting the plea.  But she jumped
4  bail before it was signed.
5    She filed an ethics complaint against
6  him to get the money back.  This was her technique.
7    When the matter was transferred to
8  Orlando, which is where it had been initially
9  before she fled the country to Belize -- she was
10  brought back to Miami, the Southern District of
11  Florida.  Orlando is the Middle District of Florida
12  -- she tried the same game with me.  She filed an
13  ethics complaint to get her $25,000 back.  It was a
14  nonrefundable retainer.  In Florida you can have
15  nonrefundable retainer.  I did a lot of work, spent
16  a lot of time in her case.
17    CHAIRPERSON MIMS:  What I'm interested
18  in, if it's not clear, is for each of those four
19  cases, I just would like to know what you were
20  doing on those cases, how long you were on those
21  cases and how many hours you put in on those cases.
22    MR. KLAYMAN:  Ok.

Page 412

1    CHAIRPERSON MIMS:  Because those are
2  the ones that we have identified as federal
3  criminal cases that you have worked on, correct?
4    MR. KLAYMAN:  Correct.  And I believe I
5  have testified to that yesterday, but I'm happy to
6  do it again...
7    I estimated somewhere between 400 and
8  600 hours.
9    But I also would add that I would take
10  courses and read books, because criminal defense is
11  always interested -- particularly on prosecution,
12  because I was a prosecutor.  There is no doubt.
13  That's not in dispute that I was, at the Justice
14  Department -- and litigation is something that I
15  spend my time learning about and studying.  I'm
16  still learning and studying about it, 'till this
17  day.
18    Ironically, if I might say, if I had to
19  do it all over again, I would probably be a
20  criminal defense lawyer.  I would not take clients
21  that I don't believe in, their innocence.  But from
22  what I have seen from the government, on both sides

Page 413

1  of the political aisle, spectrum, is that people
2  are railroaded into plea agreements and convictions
3  that don't have the resources to defend themselves.
4    CHAIRPERSON MIMS:  So we talked about
5  three of the cases: BCCI, Humm -- and you're going
6  to have to pronounce the name of the other client.
7    MR. KLAYMAN:  Pushkareva.
8    CHAIRPERSON MIMS:  Pushkareva.
9    MR. KLAYMAN:  I may not be pronouncing
10  it correctly, although I am of Russian origin.
11    CHAIRPERSON MIMS:  What was the fourth
12  case?  Do you recall?
13    We can look at the exhibit --
14    MR. KLAYMAN:  Yeah.  Well, there were
15  three, four -- I don't know.  We can look at it.  I
16  mean, it was so long ago.
17    Let me just take a look.
18    MR. PEER:  USA versus Khashoggi.
19    CHAIRPERSON MIMS:  Khashoggi.  What
20  were the charges brought in that case?
21    MR. KLAYMAN:  The same thing: fraud.
22    CHAIRPERSON MIMS:  How long were you

12 (Pages 410 to 413)

In The Matter of: Larry Klayman
July 16, 2019

## Page 414

1  the attorney of record in that case?
2      MR. KLAYMAN: I don't recollect the
3  exact amount of time. This is going back a long
4  time --
5      CHAIRPERSON MIMS: Was it months or
6  years?
7      MR. KLAYMAN: -- thirty years.
8      I would say many months, yes.
9      MS. PORTER: Just a point of
10 clarification --
11     CHAIRPERSON MIMS: Do you have the
12 exhibit number?
13     MS. PORTER: Yeah, Khashoggi is the
14 same thing as Pushkareva. Those are the same
15 cases.
16     It's my understanding --
17     CHAIRPERSON MIMS: What is the exhibit
18 number?
19     MS. PORTER: One seventeen.
20     MR. KLAYMAN: I don't recollect that is
21 the name of it.
22     CHAIRPERSON MIMS: Could we turn to

## Page 415

1  117, because I think this is important. It's in
2  Bar Counsel's exhibits.
3      MR. KLAYMAN: One seventeen?
4      MS. PORTER: Just a point of
5  clarification, if you look at the four cases
6  printed on the docket, which is 115, on page three
7  of that Khashoggi case is listed as 2004-CR-20631,
8  which is the case number that's listed on 117
9  against Margarita Pushkareva, who was Mr. Klayman's
10 client, according to the Pacer records, not
11 Khashoggi.
12     MR. PEER: I apologize.
13     CHAIRPERSON MIMS: This is actually not
14 the exhibit I was talking about.
15     Oh, one fifteen.
16     MS. PORTER: Yeah, 115 is the docket --
17     CHAIRPERSON MIMS: I'm here. I was at
18 the wrong one.
19     MR. KLAYMAN: You're looking at 115?
20     CHAIRPERSON MIMS: One fifteen.
21     All right, on 115-003, the first case I
22 think after BCCI is Khashoggi. It's the first full

## Page 416

1  line on 003.
2      Do you see that?
3      MR. KLAYMAN: Yes.
4      CHAIRPERSON MIMS: And it looks like is
5  that case was active from 2004 to 2007.
6      So tell me how long you worked on that
7  case? Do you think you worked on that case for a
8  few months during that period?
9      MR. KLAYMAN: No, it was more than a
10 few months. It was at least six to eight months
11 before she was deported. I would visit her in
12 prison when she was moved to Key West.
13     CHAIRPERSON MIMS: What about the
14 Hernandez case? What is that case?
15     MR. KLAYMAN: That case is 21 years
16 old, your Honor.
17     CHAIRPERSON MIMS: If you don't
18 remember, that's fine.
19     MR. KLAYMAN: Yeah, I don't remember
20 specifically, I don't. To be honest, I don't.
21     CHAIRPERSON MIMS: All right, and Humm
22 is the last case, which I think we have already

## Page 417

1  discussed.
2      MR. KLAYMAN: Yes, and I said finishing
3  that.
4      CHAIRPERSON MIMS: Ok.
5      MR. KLAYMAN: Because this is, you
6  know, a matter which has been brought up by Office
7  of Disciplinary Counsel.
8  BY MR. KLAYMAN:
9      A. (Answer continuing) So, Humm wanted
10 her $25,000 back from me, just like she did from
11 the first lawyer, and you'll see this in the
12 consent judgment in Florida, which I -- I just
13 settled to settle it, that her lawyer, which she
14 obtained in Orlando said to me, I'm paraphrasing,
15 you know, "I don't think that you would have to
16 return the $25,000. I don't suspect you would
17 consider doing that." Because he had known about
18 what happened with the other lawyer, too, and what
19 I did. He knew the amount of work I had done and
20 he had the file.
21     So, what happened was that, to reach a
22 settlement, I agreed to pay $5,000 back, just to

13 (Pages 414 to 417)

In The Matter of: Larry Klayman
July 16, 2019

Page 418

1 get rid of it. The mediator of the Florida Bar
2 suggested that. I said ok. And I made a mistake.
3 I should not have agreed to a public reprimand.
4 But I did. There was no showing of dishonesty.
5 There was no reference to that in any of the
6 consent forms.
7        And it was because that it occurred in
8 and around 2008, and I was going through a lot of
9 personal issues and it was also the time of the
10 stock market crash. Things weren't going real
11 well. I didn't pay it back as timely as I had
12 hoped to. And then I was moving around a lot, and
13 there were notices sent to me by the Florida Bar,
14 and I didn't see them, and all of a sudden a
15 proceeding started, and then I just decided to
16 settle it, which I did.
17        But there was no showing of dishonesty
18 or anything to that effect. I just didn't pay it
19 back in time and I didn't have the money to do it.
20        CHAIRPERSON MIMS: I think Dr. Bell has
21 a question.
22        MS. BELL: Excuse me, I have a

Page 419

1 question.
2        MR. KLAYMAN: Sure.
3        MS. BELL: With the notices, you said
4 you were moving around a lot and things were going
5 on and you didn't see them.
6        MR. KLAYMAN: Yeah.
7        MS. BELL: How were they sent to you?
8        MR. KLAYMAN: By mail.
9        MS. BELL: So you didn't have a
10 forwarding address?
11        MR. KLAYMAN: No.
12        You know, I was in a very bad way in my
13 life -- a couple of times in my life, not that --
14 you know, I'm a very religious person.
15        MS. BELL: Ok, so --
16        MR. KLAYMAN: And I testified yesterday
17 that I'm a Jewish-Christian.
18        MS. BELL: Ok.
19        MR. KLAYMAN: And Christ came to me and
20 said, "Larry, straighten yourself out. You are
21 working for me now."
22        But I was really down and out. I was

Page 420

1 having problems with my ex-wife.
2        MS. BELL: I don't mean to cut you off.
3        MR. KLAYMAN: Yeah, I wasn't diligent.
4 I didn't give forwarding addresses.
5        MS. BELL: Thank you, Mr. Klayman.
6        MR. KLAYMAN: Yeah, admittedly I should
7 have been more attentive.
8 BY MR. KLAYMAN:
9        A. (Continuing) So we're now going back
10 to Judge Keller, after years of private practice,
11 and in representing --
12        CHAIRPERSON MIMS: At the time you were
13 in front of Judge Keller, you still were with your
14 own law firm?
15        MR. KLAYMAN: Yes.
16        CHAIRPERSON MIMS: Ok.
17 BY MR. KLAYMAN:
18        A. (Answer continuing) And it was a small
19 law firm of two associates and me. And I appeared
20 in front of him, and for this Taiwanese businessman
21 that the allegations were dealing with patent
22 infringement and trademark infringement and

Page 421

1 bathroom accessories and hardware, the things that
2 you see in your bathroom and towel racks. They all
3 basically look the same.
4        But Baldwin Hardware -- it's a very big
5 company -- had brought a case against the
6 International Trade Commission, where I also
7 represented Frank Su, and we wound up -- I don't
8 recollect exactly, but the effect is that we won
9 the case, whether it was a settlement or whatever
10 the case was or litigated.
11        But the peculiar rules of the
12 International Trade Commission do not preclude
13 bringing a civil suit after you're finished at the
14 International Trade Commission with what would
15 otherwise be what lawyers call "equitable relief".
16 You can't get damages at the International Trade
17 Commission. You could just exclude the import from
18 coming into the United States.
19        The Baldwin suit was in the Central
20 District of California and I represented Frank Su
21 there. It was in the course of that case that
22 Judge Keller made certain remarks early on about

14 (Pages 418 to 421)

In The Matter of:  Larry Klayman
July 16, 2019

| Page 422 | Page 424 |
|---|---|

**Page 422**

1  Chinese people, treated my client with a total lack
2  of respect, like he was a dog, barking at him.  He
3  couldn't come -- he wasn't present on the day of
4  trial, the first day of trial, which he didn't have
5  to be, and, you know, he accused him of suborning
6  the court process.  He had an operation that was
7  for a hernia, so he was delayed.  I was there.
8      We had an importer who was gay and we
9  had a retailer who was gay and an importer who was
10  Jewish, and he made bigoted remarks about all of
11  them really early on.
12      MS. BELL:  Excuse me, Mr. Klayman, what
13  year was this?
14      MR. KLAYMAN:  It's going back to about
15  between 1990 and 1992, in that range.
16      MS. BELL:  All right.
17  BY MR. KLAYMAN:
18      A.  (Answer continuing)  And I was
19  offended.  He was also calling me -- he said there
20  was only one lawyer who has ever been as difficult
21  as you, Mr. Klayman, and that was Mr. Schmuckler.
22  "Schmuckler" is a Jewish Yiddish term, but I don't

**Page 424**

1  was over.
2      At the end of the case he stood me up
3  and he said, "I'm fining you $20,000."
4      I gave an impassioned speech, going all
5  the way back to my grandparents and how I believed
6  in justice and treating people equally -- they were
7  immigrants -- and I walked off, and I later
8  appealed it to the federal circuit.
9      I made a mistake in going to the
10  federal circuit.  You can take cases to either --
11  if it was a patent case to the federal circuit or
12  the circuit in which your court was located.
13      The federal circuit is a very
14  intellectual circuit in the sense that they're very
15  insulated from, in my view, street-level type
16  litigation.  I mean that in a positive way, not a
17  negative.  They're located in Lafayette Square,
18  next to the court of claims.
19      I don't think they could appreciate
20  what went on, because they don't see that in patent
21  cases or trademark cases.  Patent cases or
22  trademark cases are usually pretty docile.

**Page 423**

1  want to get into off-color Jewish remarks here.
2  But that's what he would call me.
3      So I got up, and I said, your Honor,
4  "I've never done this before.  I'm sure you're a
5  man of great integrity" -- I lied -- "but I'm
6  asking you, politely, to recuse yourself from the
7  case, because you've shown that you have prejudged
8  this.  You're making these remarks about my
9  clients."
10      And he looked at me in this very stern
11  way and storms off the bench and says, "I'll deal
12  with you tomorrow."
13      He came tomorrow and he said, "Mr.
14  Klayman, I'm not recusing myself, and when this
15  case is over" -- I'm paraphrasing -- "I'm going to
16  try you for your conduct."
17      We went through a whole case.  The case
18  was simple case.  It was supposed to last maybe a
19  week to ten days.  It took three months.  And I was
20  -- he wouldn't let me go back to DC.  I had to stay
21  there.  He gave me homework assignments on
22  weekends.  I almost went bankrupt at the time it

**Page 425**

1      And they affirmed a decision.  But I
2  never had the transcript of what Keller had said.
3  It went missing, couldn't get it.
4      It later turns out -- you can do a John
5  Grisham novel about this -- that the court reporter
6  turned up dead.  So they didn't know where it was.
7  And I did submit affidavits from my clients -- Mr.
8  Carter, he was the Jewish client, and I forget the
9  name of the gay retailer -- and myself, setting
10  forth the prejudicial remarks that had been made by
11  Judge Keller.  I later asked the 9th Circuit to
12  look into it, well the complaint that I had filed.
13      I had found cases that showed that
14  Judge Keller had made similar remarks about other
15  defendants.  When I was sitting in the courtroom
16  with him -- you know, because during the trial he
17  would hold hearings on other matters.  The case
18  went on three months or so.
19      By the way, I was never paid by Frank
20  Su.  So that's why I almost went bankrupt, after
21  everything I did for him.  He just fled the country
22  after that.

15 (Pages 422 to 425)

In The Matter of: Larry Klayman
July 16, 2019

---

Page 426

1    He would talk about Latino people who
2  had crossed the border and said, "I'm going to make
3  sure that you never do this again, that you're
4  buried," the kind of thing he would say.
5    There were cases out there that I
6  reported that I found that he would accuse a gay
7  witness or defendant of "swimming upstream rather
8  than downstream."
9    And then, to top it all off, I read an
10  article in the Los Angeles Review Journal talking
11  about a lawyer named Steve Yagman, a civil rights
12  lawyer, who had been sanctioned by Judge Keller.
13  He made a remark publicly that he was quoted in the
14  Los Angeles Review Journal that the judge
15  sanctioned the last six Jewish lawyers, so he's not
16  surprised that he was sanctioned, and that the
17  judge is an alcoholic, which appeared to me to be
18  the case, too. He would come in inebriated.
19    CHAIRPERSON MIMS: Mr. Klayman --
20    MR. KLAYMAN: Yes.
21    CHAIRPERSON MIMS: I'm looking through
22  the notes from the testimony yesterday, and my

---

Page 427

1  recollection is that Judge Keller as well as Judge
2  Chin were brought up by Bar Counsel as it related
3  to your pro hac vice application.
4    MR. KLAYMAN: I brought it up.
5    CHAIRPERSON MIMS: And I think --
6    MR. KLAYMAN: I brought it up.
7    CHAIRPERSON MIMS: Ok. But I think the
8  relevance would be to that application.
9    MR. KLAYMAN: Yes, I'm explaining in
10  other words --
11    CHAIRPERSON MIMS: And whether you were
12  required to list it.
13    MR. KLAYMAN: Yeah, and I did, and I
14  thought that -- and we went through that and you
15  asked the questions and Mr. Peer identified that.
16  We gave the case numbers and everything.
17    But I'm trying to let you know why
18  these things happened, ok.
19    CHAIRPERSON MIMS: I don't think it's
20  relevant.
21    MR. KLAYMAN: Ok, that's fine.
22    I want to just finish the thought.

---

Page 428

1    CHAIRPERSON MIMS: I actually think it
2  just distracts us from what we're trying to get to.
3    MR. KLAYMAN: Ok.
4    CHAIRPERSON MIMS: I don't think it
5  helps your case. I think it actually ends up
6  hurting it because then I can't find what --
7    MR. KLAYMAN: Let me finish.
8
9  BY MR. KLAYMAN:
10    A.  (Answer continuing) That was the
11  catalyst of years of fighting what I thought was
12  inequity in the courts, favoring people who were
13  the rich and powerful and had influence and gave
14  political contributions and why I started Judicial
15  Watch, in 1994. So I apologize if I was
16  long-winded.
17    So I started Judicial Watch in 1994. I
18  said after the Keller case I'm going to start an
19  organization that both monitors judges and uses
20  courts to rectify injustice in the legislative and
21  executive branches.
22    And that's what I did.

---

Page 429

1    CHAIRPERSON MIMS: Judicial Watch was
2  1994? Is that what you said?
3    MR. KLAYMAN: 1994. July 20th, 1994.
4  I conceived of it and I founded it.
5    And you know that's why we're here
6  today, because the current person who runs it has
7  felt very competitive with me. He's very, in my
8  view, unethical. He filed this complaint, which
9  has nothing to do with anything. It's just
10  retaliation against me. I don't think the bar
11  would have even picked up on it.
12    But here's the matter, is that I left
13  Judicial Watch in 2003 to run for the U.S. Senate
14  in Florida. I started Freedom Watch. I was
15  unsuccessful, running for the U.S. Senate. And
16  later I also re-instituted my law firm, which is
17  now called the Klayman Law Group, PA. And that's
18  what I've been doing.
19    My practice is I would say 98%
20  litigation. That's what I am. I'm a litigator.
21    CHAIRPERSON MIMS: What type of
22  litigation?

---

16 (Pages 426 to 429)

In The Matter of:  Larry Klayman
July 16, 2019

Page  430

1    MR. KLAYMAN:  Civil, criminal obviously
2  are these new cases that I have to, you know, with
3  Dr. Corsi and Joel Gilbert, dealing with the
4  special counsel.
5    BY MR. KLAYMAN:
6    A.  (Answer continuing)  And, you know, I
7  have continued to educate myself on criminal
8  procedure and criminal law because that is where my
9  heart is today.
10    In terms of Cliven Bundy, which is of
11  course the subject of this whole matter, is that I
12  identify with Cliven Bundy, because -- and I'll be
13  brief, your Honor.
14    I identify with the underdog, I always
15  have, and it offend me to see the government
16  sending in scores of -- I'm trying to be polite,
17  Storm Troopers, in effect, to push the man off his
18  land, to threaten his...
19    CHAIRPERSON MIMS:  I'm listening.
20    BY MR. KLAYMAN:
21    A.  (Answer continuing)  To assault his
22  sister, throw her to the ground -- there's video of

Page  431

1  that; to tase his two sons -- there's evidence of
2  that; to kill the bulls in his heard and to
3  threaten his life.
4    One of the agents, Dan Love, actually
5  threatened the life of the Bundy family.
6    So, I'm kind of a lawyer that you go to
7  when no one else will represent you.
8    There was another lawyer -- I'm not
9  equating myself with him, I'm nowhere near him --
10  but his name is John Adams, a founding father who
11  defended the British troops on Boston Commons that
12  were provoked into shooting colonists and killing
13  them.
14    John Adams defended them successfully
15  and effectively lost his law practice.  He later
16  became a founding father.
17    That is my hero, John Adams.  I'm not
18  John Adams.
19    But that's who I am.  That's in my
20  heart.  So that's how I wound up defending Bundy,
21  or trying to, you know, defend him in whatever
22  capacity I could.  And sure enough, Judge

Page  432

1  Navarro -- we're going to go through that -- was
2  forced to dismiss that indictment because what
3  arose during the trial was massive prosecutorial
4  abuse, lying under oath, hiding exculpatory
5  evidence that goes to potential acquittal.
6    Last but not least -- although not
7  technically part of the record at this point in
8  time in terms of his testimony -- a whistle-blower
9  came forth named Larry Wooten, who wanted to come
10  forward and testify that he had been a BLM
11  supervisor, that there were pictures of the Bundys
12  on the walls of Beerman Management with X's on
13  them, in effect a kill list; that the Assistant
14  U.S. Attorney, number one U.S. Attorney, Steven
15  Myway (phon), had threatened him to be quiet, had
16  demoted him, had moved him out and had suppressed
17  exculpatory evidence.
18    That is why Judge Navarro, even though
19  she tried her best -- and I'll go through that --
20  to convict, to have the clients convicted, had to
21  dismiss the case herself, basically to save her own
22  reputation.

Page  433

1    Now the matter is now up on appeal, and
2  this will tell you something, too.  I've been
3  trying to get Jeff Sessions to review it, because I
4  believe that it was a political prosecution without
5  merit.  He never did.  And -- Jeff Sessions, the
6  former Attorney General under Trump.  And it's the
7  Trump Justice Department through the U.S.
8  Attorney's Office in Nevada, some of the pleadings,
9  you know, have been proffered by the defense -- by
10  Ms. Porter, who is bringing that appeal.  Main
11  justice is not involved.  They're protecting
12  themselves.  They're hoping that the 9th Circuit
13  reverses some of the very strong findings about
14  their prosecutorial misconduct, because they could
15  potentially lose their jobs and be prosecuted
16  themselves, in a perfect world.
17    So that's what the Bundy case is
18  generally about.  It's about a man whose family has
19  been ranching the land for 150 years, and the land
20  is everything.  "This land is our land."  And they
21  tried to drive him off his land, and who was behind
22  that purportedly was Senator Reid, who was with his

17 (Pages 430 to 433)

In The Matter of: Larry Klayman
July 16, 2019

Page 434

1 son Rory, trying to sell the land as a federal
2 government ownership, or so the government claimed,
3 to Chinese environmental interests.
4     That's why Reid, in my view, reacted so
5 much when Bundy was arrested and indicted and
6 called them domestic terrorists and said they
7 should be put away for life.
8     It just so happens that Judge Bybee
9 was -- and Judge Navarro were nominated by, or at
10 least recommended to be judges by Senator Harry
11 Reid. So there's that link there, and I'll get
12 into that later, but that's where we are today.
13     So, as a continuation of the criminal
14 work that I do, I'm representing people with regard
15 to Special Counsel Muller, and I will be present
16 during the trial of Roger Stone on their behalf.
17     That's my background.
18 Q.  Mr. Klayman, turn to Plaintiff's
19 Exhibit Number 1.
20     MR. KLAYMAN:  And your Honor, I'll try
21 not to be duplicative of yesterday.
22     CHAIRPERSON MIMS:  Thank you.

Page 435

1 BY MR. KLAYMAN:
2 Q.  This is the initial pro hac vice
3 application. I turn the hearing committee's
4 attention to the certificates of good standing of
5 the Florida Bar where I was admitted on December
6 7th, 1977 and of the District of Columbia Bar where
7 I was admitted on December 22nd, 1980.
8     CHAIRPERSON MIMS:  Mr. Klayman, for the
9 incident that happened with Judge Keller, where was
10 Judge Keller? Was that Florida?
11     MR. KLAYMAN:  Excuse me?
12     CHAIRPERSON MIMS:  Was Judge Keller in
13 Florida?
14     MR. KLAYMAN:  No, he was in California,
15 in Los Angeles.
16     CHAIRPERSON MIMS:  Oh, ok. Were there
17 any formal charges filed?
18     MR. KLAYMAN:  No.
19     CHAIRPERSON MIMS:  So, what exactly
20 happened in that? Judge Keller told you that you
21 were not to come practice before him again?
22     MR. KLAYMAN:  He stood me up at the end

Page 436

1 of the trial and said, "I don't like your conduct.
2 You're being find $20,000."
3     CHAIRPERSON MIMS:  Right?
4     MR. KLAYMAN:  ..."and as part of your
5 punishment, you will never be able to practice in
6 front of me again."
7     I wanted to say "Thank you, your
8 Honor," but I didn't.
9     And he said, "You will have to submit a
10 copy of my order if you ever wish to enter the
11 court pro hac vice again," you know, the general
12 court you have to submit that order.
13     CHAIRPERSON MIMS:  Is that order in the
14 exhibits?
15     MS. PORTER:  There is a 2nd Circuit
16 decision that talks about the disciplinary order
17 and all the findings of Judge Keller.
18     CHAIRPERSON MIMS:  What exhibit number
19 is that?
20     MS. PORTER:  Exhibit Number 121.
21     MR. KLAYMAN:  And your Honor, I'm going
22 to ask the court to supplement. I know it's in the

Page 437

1 record. But that was what was used by Chin. Chin
2 saw that order and he kind of parroted Judge
3 Keller.
4 BY MR. KLAYMAN:
5 A.  (Answer continuing) Let me explain
6 Chin just a little bit, because you need to put it
7 in context.
8     Back in around 1996, at Judicial Watch,
9 we were the ones who triggered primarily these
10 so-called Chinagate investigation, evidence of
11 money going into the Clinton/Gore campaign and the
12 Democratic National Committee from China. They
13 needed money. They were not doing well in the
14 poles, et cetera.
15     By the way, the republicans were doing
16 the same thing we later found out. Haley Barbour
17 of the RNC was dealing with matters, people from
18 Hong Kong, trying to raise money. It's illegal to
19 take foreign contributions for a political
20 campaign. Both parties were doing it.
21     But in the course of the one dealing
22 with Clinton, an individual came up in the

18 (Pages 434 to 437)

In The Matter of: Larry Klayman
July 16, 2019

Page 438

1  documentation. It was a Freedom of Information Act
2  request I had filed.
3      CHAIRPERSON MIMS: Is this related to
4  Judge Chin?
5      MR. KLAYMAN: Yes, yes.
6      CHAIRPERSON MIMS: Ok.
7      MR. KLAYMAN: I'm just giving you a
8  little background.
9  BY MR. KLAYMAN:
10     A. (Answer continuing) An individual by
11 the name of John Wong appeared in the documents,
12 and we learned that he had been working for the
13 Lippo Bank, which was owned by the Riady family, an
14 Indonesian family of Chinese origin, and close to
15 the Chinese Politburo, which was communist China.
16     In the course of that case I came upon
17 documents -- this is in San Francisco. I was
18 taking a deposition -- that John Wong had been
19 recommended to the bench by Bill Clinton -- excuse
20 me, Denny Chin, Judge Denny Chin in New York had
21 been recommended to the bench by John Wong.
22     These presidents, whether they're

Page 439

1  democratic or republican, have their gatekeepers of
2  people who recommend judges to them.
3      Wong was very, you know, prominent in
4  the Justice and Commerce Department. He had been
5  placed there by Clinton and there was a big issue
6  as to whether he was removing classified
7  information and giving it to the Chinese
8  government.
9      So to make a long story short, I had a
10 private case in front of Judge Chin at the time
11 that I -- around the time that I uncovered this.
12 Judge Chin was the first Asian-American appointee
13 of the Clinton administration to the federal bench.
14 I represented an Italian client in just a simple
15 commercial case. The case went to trial. I come
16 into court that day. The gallery is filled with
17 Chinese. I couldn't figure out why. But I had
18 been -- and this is the irony of the whole thing --
19 when it was uncovered, this scandal with China, the
20 Democratic National Committee accused me and
21 republicans of being anti Chinese.
22     I was never anti Chinese. They were my

Page 440

1  clients. I really liked the Chinese people and
2  I've had many cases there. So that was the irony
3  of the whole thing.
4      But that publicity, and I don't know
5  why, but the entire gallery was nearly -- the
6  entire gallery was filled up with Chinese.
7      This wasn't an interesting case. It
8  was just not being paid a debt.
9      So when I saw these documents
10 afterwards, that Judge Chin had been recommended by
11 Wong, it kind of hit me; two and two equals four.
12 And I asked him a question -- I wrote a letter with
13 my associate, Paul Orfanedes, asking him -- because
14 we lost the case -- "Did you talk to John Wong?
15 You know John Wong is here talking about me. Did
16 you ever talk to him about me or any aspect of that
17 or Judicial Watch?" Because I was doing both. I
18 had both a private law practice, I was doing a
19 private case in front of Judge Chin, and Judicial
20 Watch was doing the Judicial Watch scandal.
21     He refused to answer -- he called me up
22 to New York with Mr. Orfanedes. I went to see

Page 441

1  Ramsey Clark, who I'd gotten to know, because he
2  actually had represented Yagman with Keller, which
3  was going on with Judge Keller, and -- because they
4  tried to remove Yagman's license in the central
5  district.
6      CHAIRPERSON MIMS: Mr. Klayman, I have
7  to say again, I don't see the relevance of this.
8      MR. KLAYMAN: Well, I'm explaining the
9  Chin thing, and I'll get briefer.
10     CHAIRPERSON MIMS: But in this case the
11 merits of what happened in front of Judge Keller
12 and Judge Chin are not at issue.
13     MR. KLAYMAN: Well, you're right, but
14 I'm getting to the point -- I'm sorry, if I'm
15 long-winded.
16     Judge Chin --
17     CHAIRPERSON MIMS: I thought you were
18 focusing on the pro hac vice application and what
19 you wrote in that.
20     MR. KLAYMAN: Yes, yes. And this gets
21 to that. And I apologize.
22 BY MR. KLAYMAN:

19 (Pages 438 to 441)

In The Matter of:  Larry Klayman
July 16, 2019

---

Page 442

1    A.  (Answer continuing) Judge Chin stood
2  me up in court and said, You wouldn't have asked me
3  this question if I wasn't Asian-American."
4        I said "No, your Honor.  I'd ask the
5  question to anybody."
6        And he said "Well, I'm going to
7  consider whether to hold you in contempt."
8        He went on and he held me in contempt,
9  did the same thing that Keller did.  And said,
10  "You're going to send a copy of this order to every
11  bar association" -- he said, "I'm going to send
12  this to every bar association in every court."
13        So according to what Judge Chin said --
14  and I'll try to find that order, your Honor.  It's
15  not on Pacer.  I'm going to have to go into the
16  file -- he ordered that it be sent to all courts
17  that I was a member of, including the DC Court of
18  Appeals.
19        CHAIRPERSON MIMS:  Which order?  Judge
20  Chin's order?
21        MR. KLAYMAN:  Yes, Judge Chin's order.
22        No action was ever taken.  I just heard

---

Page 443

1  about it.
2        CHAIRPERSON MIMS:  To your
3  recollection, what did the order say?
4        MR. KLAYMAN:  It found me in contempt
5  for asking the question and ordered that this --
6  Chin's order be given to every court that I had a
7  case in, that he was going to send it to them and
8  courts where I was admitted to practice, which
9  would be DC, Florida and Pennsylvania at the time.
10        CHAIRPERSON MIMS:  Do you know if that
11  was ever done?
12        MR. KLAYMAN:  I assume it was done,
13  because he said it was done and he didn't have any
14  love lost for me.
15        So, that's where I say there was no
16  disciplinary action taken.
17        CHAIRPERSON MIMS:  When you say in the
18  letter attached to your pro hac -- the statement
19  attached to your pro hac vice application that -- I
20  believe you say somewhere that the DC Court never
21  found that you acted unethically with respect to
22  Keller and Chin.

---

Page 444

1        MR. KLAYMAN:  Correct.  That's a
2  correct statement.  And they never did.  There was
3  no disciplinary proceeding.
4        CHAIRPERSON MIMS:  When you say, "They
5  reviewed these rulings and found that I did not act
6  unethically," what do you mean that those --
7        MR. KLAYMAN:  Well, when you say
8  something to Bar Counsel, they review it and they
9  decide whether they want to proceed.
10        CHAIRPERSON MIMS:  So those rulings --
11        MR. KLAYMAN:  With Keller they actually
12  made an affirmative finding that I didn't commit an
13  ethical violation with clear and convincing
14  evidence, but with Chin --
15        CHAIRPERSON MIMS:  You mean with Bar
16  Counsel?
17        MR. KLAYMAN:  With Bar Counsel.
18  With Chin --
19        CHAIRPERSON MIMS:  Is that in the
20  record?
21        MR. KLAYMAN:  Yes.
22        Where is that, Mr. Peer?

---

Page 445

1        MS. PORTER:  It's in their Exhibit
2  Number 5.
3        CHAIRPERSON MIMS:  I think we looked at
4  that yesterday.  It's in my notes.  I just wanted
5  to make sure.
6        MR. PEER:  It's Respondent's Exhibit 5.
7        MR. KLAYMAN:  Yes, and with Chin it was
8  because of a lack of action by the bar.
9        You know, sometimes, as I testified
10  yesterday, the bar doesn't even tell you whether
11  they got something.
12        CHAIRPERSON MIMS:  Ok.
13        MR. KLAYMAN:  And with Judicial
14  Watch -- and I'd appreciate not hearing sighs from
15  opposing counsel.  It's disrespectful.
16        Your Honor, if you could instruct
17  her...
18        CHAIRPERSON MIMS:  Excuse me?
19        MR. KLAYMAN:  Opposing counsel just,
20  you know, gestured and made a sound --
21        MS. PORTER:  I just moved my stuff from
22  my lap.

---

20  (Pages 442 to 445)

In The Matter of: Larry Klayman
July 16, 2019

Page 446

1    I'm sorry, Mr. Klayman, if that upset
2  you.  I apologize, if that --
3          MR. KLAYMAN:  I accept your apology.
4  It's interrupting me.
5          MS. PORTER:  I apologize.
6          CHAIRPERSON MIMS:  All right, let's
7  move on.
8          So Exhibit 5.
9          Is there anything else in the exhibits
10  that relates to that statement, "The Bars of DC and
11  Florida have reviewed these rulings and found that
12  I did not act unethically"?
13          Is it just Exhibit 5?
14          MR. KLAYMAN:  It's Exhibit 5 and the
15  fact that they took no action.
16          CHAIRPERSON MIMS:  Ok.
17  BY MR. KLAYMAN:
18      Q.   So, going back to Plaintiff's Exhibit
19  1, Mr. Klayman, what's the significance of the
20  certificate of good standing?
21      A.   I have never been suspended for even
22  one day by the Florida Bar Association or in DC,

Page 447

1  that I was a member in good standing and I will add
2  to that testimony continuously, up to the date of
3  the 9th Circuit rulings and rulings regarding pro
4  hac vice of Judge Navarro, that I remain in good
5  standing continuously; that I have never been
6  subject to any final order that I did anything
7  unethical in front of a judge by any bar
8  association, and that, to this day, I remain in
9  good standing with both bars, DC and
10  Pennsylvania -- DC and Florida.
11          Pennsylvania I'm inactive because I
12  didn't continue with CLE.
13          So, that's with regard to that exhibit.
14          And again I'm trying not to be
15  duplicative.  I was long-winded, your Honor, and I
16  apologize for that, but I want the committee to
17  know who I am, professionally and personally.
18      Q.   I turn your attention to Exhibit 4.
19          CHAIRPERSON MIMS:  Just to be clear,
20  Mr. Klayman, I do think that the committee has
21  given you great leeway, and I do think that some of
22  the explanation has been helpful.

Page 448

1    But all of it, I think going back to
2  kind of relitigate than do the merits of some of
3  the actions -- I understand your points, I just
4  don't think it's necessary in this case.
5          MR. KLAYMAN:  Ok.  Your Honor, I --
6          CHAIRPERSON MIMS:  But I do appreciate
7  some of the background that you have provided.
8          MR. KLAYMAN:  Ok.  Yeah, I wanted you
9  to understand the context of it.  So thank you for
10  giving me that leeway.  I appreciate it.
11  BY MR. KLAYMAN:
12      A.   This order was the second order of
13  Judge Navarro.
14          (Brief pause.)
15          No, it was the first order of Judge
16  Navarro.  And you went through that, your Honor,
17  yesterday, and we identified that we did comply
18  with it, on page two.
19          But the important point here is that on
20  26, on page three, "Verification that the matter in
21  the District of Columbia Disciplinary case
22  referenced in the verified petition has been

Page 449

1  resolved with no disciplinary action."
2          Well, Judge Navarro already knew that
3  that was ongoing, that it was going for several
4  years, 12 years about at that point.  And that's a
5  very disingenuous, Catch 22; heads I win, tails you
6  lose, Mr. Klayman, approach.  And in my view it
7  shows a lack of intellectual honesty by Judge
8  Navarro.
9          Because again, Cliven Bundy could be
10  arrested and sentenced to life imprisonment before
11  this thing is over.  In fact it's still going on,
12  that proceeding.  It was started by Judicial Watch,
13  again by Fitton.
14          So that's a very important point in
15  trying to assess, in my view, the credibility of
16  anything that Judge Navarro said in any of her
17  filings.
18          I now turn your attention to the same
19  exhibit, to Bates Number RX0037.  This is part of
20  the so-called negotiated discipline, and it states
21  -- which, you know, both Office of Disciplinary
22  Counsel and I signed.  At that time we had a

21 (Pages 446 to 449)

In The Matter of:  Larry Klayman
July 16, 2019

|  | Page 450 |
|---|---|

1  different Disciplinary Counsel who has since

2  retired, named Wallace.  His nickname was Gene

3  Shipp.  I always found him to be a very fair man.

4  And it was said at RX0037, "Moreover, there's no

5  evidence of dishonesty and Respondent has accepted

6  his responsibility for misconduct.  Accordingly,

7  Respondent may not be suspended for his

8  misconduct."

9        MS. BELL:  I need to find what page

10  it's on.

11        MR. KLAYMAN:  Page 13.

12  BY MR. KLAYMAN:

13     A.  (Answer continuing)  So that's

14  important.

15        Again, as I testified yesterday -- I'm

16  not going to go over old ground -- but the

17  negotiated discipline is null and void.  It was

18  withdrawn.  It has no force and effect under bar

19  rules other than to use for impeachment purposes,

20  the affidavit.

21        But I wanted to see that this is what

22  Bar Counsel had agreed to, that I hadn't engaged in

|  | Page 451 |
|---|---|

1  misconduct and that I shouldn't be suspended.

2        Now going back to page 10, mitigation.

3  Page 10, that's Bates number 34 of Respondent's --

4        CHAIRPERSON MIMS:  Are you still in

5  Exhibit 4?

6        MR. KLAYMAN:  Yes.

7        MS. BELL:  Exhibit 4 starts on page 10.

8        MR. KLAYMAN:  Page 10, you have to flip

9  back a few pages.

10        MS. BELL:  Oh, not Bates number.

11        MR. PEER:  Use the Bates number.

12        MR. KLAYMAN:  Bates number 0034.  It's

13  very small at the bottom there.

14        Your Honor, it states, "Mitigating

15  Factors:  This is the negotiated discipline which

16  is no longer in effect.  It's null and void.  But

17  at the time we agreed, Respondent has cooperated

18  with Bar Counsel's investigation of this matter and

19  has accepted responsibility for his misconduct.

20        "Respondent's misconduct did not

21  involve dishonesty.

22        "Respondent has been a member in good

|  | Page 452 |
|---|---|

1  standing of the District of Columbia Bar

2  continuously for nearly 37 years and has never been

3  disciplined in the District of Columbia in any way

4  or had his license suspended.

5        "In addition, Respondent is a public

6  interest attorney who founded Judicial Watch and

7  now Freedom Watch.

8        (Off-the-record discussion between

9  committee members.)

10        CHAIRPERSON MIMS:  I'm sorry.  I was a

11  little bit confused as to what we were looking at.

12  But I'm on the right page now.  Go ahead.

13        MR. KLAYMAN:  I can reread it again.

14        CHAIRPERSON MIMS:  Yes, if you would.

15  BY MR. KLAYMAN:

16     A.  (Answer continuing)  Yes.  This is

17  mitigation.  "Respondent has cooperated with Bar

18  Counsel's investigation of this matter and has

19  accepted responsibility for his misconduct.

20        "Respondent's misconduct did not

21  involve dishonesty.

22        "Respondent has been a member in good

|  | Page 453 |
|---|---|

1  standing of the District of Columbia Bar

2  continuously for nearly 37 years and has never been

3  disciplined in the District of Columbia in any way

4  or had his license suspended.

5        "In addition, Respondent is a public

6  interest attorney who founded Judicial Watch and

7  now Freedom Watch.

8        "In these matters Respondent stepped in

9  to represent Ms. Cobis and Mr. Paul, counts one and

10  three, when their original attorneys no longer

11  represented them and they lacked the financial

12  resources to pay for other counsel.

13        "The hearing committee may well find

14  the Respondent believed on the advice of counsel at

15  that he did not have a conflict of interest in the

16  Benson and Paul matters, counts two and three.

17        "Respondent will testify that he did

18  not realize a financial gain in representing

19  Benson, Cobis and Paul and in fact represented

20  these persons pro bono at his own time and expense.

21        "The hearing committee may well find

22  Mr. Klayman did so because he believed that Cobis

22 (Pages 450 to 453)

In The Matter of:  Larry Klayman
July 16, 2019

Page 454

1    and Paul had have no other recourse in the lawsuits
2    against his former organization, Judicial Watch."
3           And this was signed both by Bar Counsel
4    Wallace Shipp, by myself, and the Assistant Bar
5    Counsel, H. Clay Smith, III.
6           So, while it's not in force and effect
7    and really is not relevant, the fact is that Judge
8    Navarro had this and could see exactly what the bar
9    itself had agreed to, yet chose to focus on my
10   signing an affidavit, which is no longer in effect.
11   It does show bias and prejudice.
12        Q.  So, I now turn your attention to
13   Exhibit 5.
14        A.  Let me also add there that -- as I said
15   I will testify later, and you know, as contained in
16   the orders of Judge Ron Gould, the dissent -- to be
17   refused admission pro hac vice to a criminal
18   defendant, particularly under these circumstances,
19   when the client faces life imprisonment, the lawyer
20   has to be on the verge of being disbarred.
21          No way I was in that position.  It was
22   totally unreasonable and an abuse of discretion and

Page 455

1    clearly erroneous to have kept me out of the public
2    case.  Because at that time I had to disciplinary
3    record and still don't in terms of DC.
4           So page five -- excuse me, Exhibit 5.
5    And I turn -- you know, on page one I'm not going
6    to go over old ground.  This explains the
7    negotiated discipline, that it was withdrawn.
8           But on page two, that's RX0040, and I
9    turn to line seven, it's between seven and eight,
10   where I'm talking about the ongoing bar
11   disciplinary proceeding over Cobis, Paul and Benson
12   that was started by Fitton of Judicial Watch, "Mr.
13   Klayman's comments were not a misrepresentation" --
14   this is what I told Judge Navarro -- "particularly
15   in light of expert and Professor Rotunda's sworn
16   testimony" -- he was our legal expert, which we
17   went over yesterday -- "to the contention that Mr.
18   Klayman ultimately should prevail as he committed
19   no ethical violations.
20          "Attached is Exhibit 2, Professor
21   Rotunda's initial opinion letter, which was later
22   followed up by his sworn testimony set forth in the

Page 456

1    brief, which I submitted to Judge Navarro, along
2    with his distinguished curriculum vitae and
3    expertise, which was also submitted to Judge
4    Navarro.
5           "Professor Rotunda is one of the top if
6    not the top professional legal ethics expert in the
7    nation, and thus his opinion must carry great
8    weight.
9           "Thus, it is not Mr. Klayman's opinion
10   that he will ultimately prevail."
11          And that's why I gave my opinion to
12   Judge Navarro in that regard.  I'm entitled to my
13   opinion.
14          And -- this is important.  Following
15   this, on page two, RX0040, this was put in front of
16   Judge Navarro...
17          "Importantly, Rule 17.10 of the
18   District of Columbia Board on Professional
19   Responsibility" -- Exhibit 10 was provided --
20   "which provides that a previously entered-into
21   negotiated discipline is of no force and effect if
22   it is rejected or withdrawn.

Page 457

1           "Thus, the court inadvertently did not
2    take into consideration this rule and the full
3    record of the disciplinary proceeding in writing
4    and issuing its order.
5           "This rule provides unequivocally, I
6    quote, 'admissions made by Respondent in the
7    petition for negotiated discipline, the
8    accompanying affidavit, or the limited hearing may
9    not be used as evidence against Respondent in a
10   contested disciplinary proceeding, under Chapter 7
11   of these rules, except for purposes of impeachment
12   at any subsequent hearing in a contested matter.'
13   District of Columbia Board Rule of Professional
14   Responsibility 17.10."
15          So that is where I derived the
16   authority, from the Board, itself, that the
17   negotiated discipline is of no force and effect and
18   the affidavit can only be used in another
19   disciplinary proceeding.  It doesn't say it can be
20   used anywhere else, including in front of Judge
21   Navarro.
22          And then I add on page three, in the

In The Matter of:  Larry Klayman
July 16, 2019

Page 458

1    subsequent proceeding that occurred -- page three.
2    That's Exhibit 0041, top of page three, RX0041 --
3        CHAIRPERSON MIMS:  Before we move on,
4    could we go back to that statement again on page
5    40, 0040.
6        MR. KLAYMAN:  Yes.
7        CHAIRPERSON MIMS:  So your argument is
8    that Judge Navarro was using that affidavit against
9    you to deny your pro hac vice, right?
10       MR. KLAYMAN:  Correct.
11       CHAIRPERSON MIMS:  Looking at the rule
12   that you quoted, "Admissions made by a Respondent
13   in the petition for negotiated discipline, the
14   accompanying affidavit or the limited hearing may
15   not be used as evidence against a Respondent in a
16   contested disciplinary proceeding."
17       My question is, that rule that you
18   read, it's referencing a contested disciplinary
19   proceeding, not a pro hac vice application.
20       So I'm a little bit confused at what
21   you're saying.
22       MR. KLAYMAN:  Well, there's two answers

Page 459

1    to that.
2        Number one the rule also says, when you
3    continue reading, "except for purposes of
4    impeachment at any subsequent hearing and in a
5    contested matter."
6        So consequently what the board is
7    saying, as I read this, black letter, is that it's
8    only to be able to be used for impeachment in our
9    proceedings.  It's not usable anywhere else.
10       But that's -- that even is not even the
11   major issue here.  The issue here is that a
12   negotiated discipline was withdrawn.  There is no
13   force and effect.
14       I contested the allegations, and you
15   have it in the record, it's in evidence, the
16   Disciplinary Counsel itself withdrawing the
17   negotiated discipline.
18       CHAIRPERSON MIMS:  Ok.
19       MR. KLAYMAN:  Yeah.
20       CHAIRPERSON MIMS:  And whenever we get
21   to a good breaking point, it might be good to take
22   a five-minute break.

Page 460

1        MR. KLAYMAN:  Ok, I'll finish this
2    exhibit and then we'll do it.  Thank you.
3    BY MR. KLAYMAN:
4        A.  (Answer continuing)  Page three,
5    Exhibit 0041, at the top, "Moreover, the affidavit
6    of which this court refers in its orders, see
7    Exhibit 9, was not even entered into evidence at
8    the hearing before the committee, because it was no
9    force and effect, thus it is not evidence."
10       The reason for this, the hearing before
11   the committee was a de novo proceeding.
12       And I just want to point out on page
13   five, that's RX0043, wherein it states, in the
14   second paragraph to the end, "Government counsel
15   has advised the under examined counsel that they do
16   not oppose Mr. Klayman's pro hac vice application
17   and therefore they filed no opposition to the
18   previously filed and served application."
19       Now, that's accurate and that's in the
20   pleadings.
21       But this is one of the reasons why I
22   objected to the entry of any of the exhibits that

Page 461

1    Bar Counsel offered with regard to submissions to
2    Judge Navarro with regard to my pro hac vice
3    application, in addition to what they submitted
4    before the 9th Circuit.  Because, talking out of
5    both sides of their mouth, the prosecution wanted
6    to have it both ways, given the strong right, the
7    6th Amendment right of counsel, that it's not to be
8    denied unless the lawyer is on the verge of
9    disbarment.
10       And as Judge Gould points out,
11   out-of-state counsel can certainly get pro hac
12   vice, even if there's an in-state counsel, because
13   you need a defense team.  That doesn't preclude
14   that.  There's case law to that.  I'll go over that
15   later.
16       The fact that the government knew that
17   if they were opposing my entry under the 6th
18   Amendment, after Mr. Bundy had already been
19   imprisoned in solitary confinement, after they had
20   already dishonestly convinced the judge to waive
21   speedy -- to nullify speedy trial, because they
22   wanted to try 19 defendants, which of course when

24 (Pages 458 to 461)

In The Matter of: Larry Klayman
July 16, 2019

Page 462

1  it came time to try any of them, they tried to
2  break it up, that they couldn't say they opposed my
3  pro hac vice entry, because that would be denial of
4  6th Amendment rights, which would create strong
5  arguments on appeal.
6      So they're trying to play it both ways
7  in a dishonest way, and later they were called
8  being dishonest by Judge Navarro, and that's why
9  she dismissed the supersedeas indictment. They
10  said "We're not opposing it" and then they dump all
11  this stuff in the record to try to get Navarro and
12  Bybee and others and Fletcher to keep me out.
13      This is why I do what I do. This is
14  why today I would focus solely on criminal defense.
15  Because this offended me. This is our government
16  that we pay money for to be honest, and their
17  supposed to be honest, and this is the way they
18  behave and this is why they railroad people into --
19  frequently, not always, into me agreements,
20  convictions of people who can't afford to defend
21  themselves and don't have counsel in this case,
22  like Mr. Bundy.

Page 463

1      That's where I take a break.
2      CHAIRPERSON MIMS: Ok.
3      MR. KLAYMAN: Thank you.
4      CHAIRPERSON MIMS: Let's take a break
5  and come back at 10:45.
6      (Recess taken.)
7      CHAIRPERSON MIMS: We're back on the
8  record to continue Respondent's testimony at 10:48.
9  BY MR. KLAYMAN:
10      A. (Answer continuing) I turn my
11  attention again to Respondent's Exhibit Number 5.
12  It's the consent judgment with the Florida Bar.
13  The Bates number is Respondent's -- Bates number
14  0143.
15      I'll give you time to find that.
16      This is the consent judgment that I
17  entered into with the Florida Bar. This is the
18  Natalia Humm case, criminal case. It's
19  Respondent's -- Bates number 144, I turn your
20  attention to that page. It describes the mediation
21  agreement that I entered into, and then at
22  paragraph E, capital E, "In response to the Florida

Page 464

1  Bar, Respondent indicated that he was facing a very
2  difficult financial situation but that he had every
3  intention of honoring his agreement with Humm.
4      "Respondent further indicated he would
5  be able to pay the outstanding amount by September
6  30, 2009."
7      I'm not going to go through all of this
8  to save time, because the hearing committee can
9  certainly review it.
10      I turn your attention to the next few
11  pages just to describe the difficulty, because I
12  was moving around, with regard to mail, ok, that I
13  didn't get notice that this proceeding had begun in
14  Florida.
15      I turn your attention to paragraph N at
16  page 147 --
17      MS. BELL: Excuse me, Mr. Klayman,
18  where were you living then in 2009?
19      MR. KLAYMAN: I was going back and
20  forth between Washington, D.C. and California
21  primarily.
22      MS. BELL: Ok, thank you.

Page 465

1      MR. KLAYMAN: I was still a citizen and
2  resident of Florida, but I hadn't been down there
3  at the time I left. I had come up here.
4  BY MR. KLAYMAN:
5      A. At paragraph N, "On or about March 9th,
6  2011, after a formal complaint had been filed with
7  the Florida Supreme Court in this matter, and after
8  he received the correspondence referenced in
9  paragraph N above, Respondent contacted the bar to
10  advise that he would reach a resolution of this
11  matter.
12      "Respondent further advised that he was
13  now in a position to make the outstanding payment
14  in the amount of $3,000 to Ms. Humm and immediately
15  made such payment in full satisfaction of the
16  outstanding obligation under the mediation
17  agreement."
18      So I satisfied that debt.
19      I turn your attention to paragraph six
20  on the next page. "Respondent submits" -- this is
21  what I agreed to with the Florida Bar...
22      "Respondent submits that the following

25 (Pages 462 to 465)

In The Matter of:  Larry Klayman
July 16, 2019

Page 466

1  factors apply in mitigation... 9.3(2)(a), absence
2  of a prior disciplinary record, Respondent has been
3  continuously a member of the Florida Bar in good
4  standing for nearly 35 years."  And then paragraph
5  9.3(2)(c), "personal or emotional problems.
6       "The Respondent maintains that, since
7  the time the mediation agreement was entered into,
8  he has sustained significant financial distress
9  which prevented him from making timely payments to
10  Humm and from providing timely responses to the
11  Florida Bar.
12       "Respondent further maintains that he
13  agreed to submit Humm's claim to mediation and
14  agreed to the terms of the mediation agreement
15  simply to save valuable time and resources for all
16  concerned.
17       "Respondent had agreed to represent
18  Humm in a criminal proceeding, but she subsequently
19  decided to retain new counsel when the case was
20  transferred from Miami to Orlando federal court.
21       "Respondent maintains that Humm was
22  never entitled to any refund and further asserts

Page 467

1  that Humm's subsequent counsel admitted as much in
2  an email he sent to Respondent where he stated,
3  quote, 'It is unlikely that you would want to
4  refund a cent, so please provide me with an
5  explanation so I may pass it along to Ms. Humm.'
6       Respondent also maintains that Humm had
7  similarly asked for prior counsel for a refund and
8  even requested that Respondent sue him."  That was
9  me, Respondent, which I -- "which, Respondent,
10  yours truly, refused to do it.
11       "Respondent thus claims a pattern of
12  Humm's behavior towards her counsel.  Nevertheless,
13  in an effort to promptly resolve the claim and save
14  valuable time and resources, Respondent agreed to
15  the terms of the mediation agreement, as the
16  mediator urged."
17       Then going town to 9.3(2)(g),
18  "Character, Reputation: Respondent has been a
19  respected member of the bar for nearly 35 years."
20       There is no statement in here that I
21  acted dishonestly in any way, and this matter was
22  signed both by me, yours true, and Daniela Rosette,

Page 468

1  Bar Counsel of the Florida Bar in Miami Florida.
2       And with regard to the whole issue of
3  the mail, I'd actually -- as you had asked, you
4  know, I was actually staying with a friend and
5  client, because at that point I couldn't even
6  afford to rent an apartment.  And there was a time
7  I was even living on the couch of a friend, of a
8  colleague of mine, Armstrong Williams, a talk show
9  host, sleeping on his couch, and I was literally
10  bankrupt.  I was going over to the Hyatt to get
11  apples for free.  I mean, that was the really low
12  point in my life.
13       So, I'll move on now -- the Hyatt in
14  Capitol Hill.
15       I'm not going to belabor prior
16  testimony, but go to Exhibit 8 of what was
17  submitted to Judge Navarro when she requested it.
18       MS. BELL:  Excuse me, Exhibit 8?
19       THE CLERK:  Yes, Respondent's
20  exhibit -- it's Bates number 152.
21       MS. BELL:  Eight?
22       MR. KLAYMAN:  Yes.

Page 469

1       CHAIRPERSON MIMS:  One fifty-two did
2  you say?
3       MR. KLAYMAN:  Yes, RX0152.  That's the
4  Bates number of Exhibit 5, Sub Exhibit 8.  I know
5  it's confusing.  But if you all can go to RX0158.
6       Are we there?
7       CHAIRPERSON MIMS:  Yes.
8  BY MR. KLAYMAN:
9       A.  (Answer continuing)  And I just wanted
10  to point out that although, as I previously
11  testified -- and I won't go back over it -- the
12  negotiated discipline was of no force and effect
13  and withdrawn.  That the affidavit as well that I
14  signed, which parroted the agreement that I signed
15  with Wallace Shipp, the Bar Counsel at the time,
16  stated in paragraph 14, my conduct did not involve
17  dishonesty or personal gain.  And that is reflected
18  also on the agreement I did sign with Wallace Shipp
19  again.
20       I'll just put it in the record, because
21  I've already testified to it.  That's found at
22  RX0173, the Bates number, wherein the Bar Counsel

26 (Pages 466 to 469)

In The Matter of: Larry Klayman
July 16, 2019

| Page 470 | Page 472 |
|---|---|

**Page 470**

1  agreed that there is no evidence of dishonesty and
2  Respondent accepted responsibility for his
3  misconduct.
4      Now I turn your attention to
5  Respondent's Exhibit 6, and turn your attention to
6  Respondent's Exhibit 0264.  That's the Bates
7  number, RX0264.
8      CHAIRPERSON MIMS:  Do you know which
9  writ this is that we're looking at?  Is it the
10  first writ that was filed?
11      MR. KLAYMAN:  This isn't a writ --
12  well, maybe it is.  Let me see.  Yes.
13      MR. PEER:  It's the first.
14      CHAIRPERSON MIMS:  It is the first.
15      MR. KLAYMAN:  The first one, yes.
16  Respondent's RX0264.
17      Have you all found that?
18      CHAIRPERSON MIMS:  Yes, we have.
19  BY MR. KLAYMAN:
20      A.  (Answer continuing)  Ok, this is the
21  resume or curriculum vitae, however you want to
22  say, of Professor Rotunda.  I just pointed out,

**Page 472**

1  of his choice includes the right to have an
2  out-of-state lawyer admitted pro hac vice."  I was
3  an out-of-state lawyer.
4      Then turning to the next page, also
5  provided to the 9th Circuit, which Judge Gould
6  relied upon in reaching his dissenting opinions, at
7  line three, "This court in the United States versus
8  Lilly, 989 F 2nd 1054/1056; 9th Circuit, 1993, also
9  explained" -- and I don't have to read the whole
10  thing, but the part that's important is what's
11  bolded, the most important part...
12      ..."but the defendant can't be denied
13  his choice of retained counsel just because the
14  request comes late or the court thinks current
15  counsel is doing an inadequate job."
16      And that was, as I'll show you later,
17  what Judge Gould relied upon in saying you need a
18  full defense counsel -- full defense team,
19  particularly in a complicated and serious case like
20  the Bundy case.
21      And then looking down, again, United
22  States versus Lilly, provided to the 9th Circuit,

| Page 471 | Page 473 |
|---|---|

**Page 471**

1  this was submitted to Judge Navarro to show just
2  how distinguished he was, may his sole rest in
3  peace, and just how deep his expertise was in
4  lawyer professional ethics.
5      Again, Mr. Rotunda gave the opinion
6  that I had not committed an ethical violation, and
7  I was entitled to my opinion, not just based on my
8  own opinion, but on his opinion.
9      Now turning back to the actual writ --
10  and I'll be brief here, because all of this is in
11  the record -- turning to page -- because I cite
12  some law here, which is important, which Judge
13  Gould later picked up on and agreed with.  This is
14  Respondent's -- Bates number RX0191.
15      I'm talking to the 9th Circuit -- Judge
16  Gould, Judge Bybee, Judge Fletcher -- at the bottom
17  of the page, "As this court has firmly ruled in the
18  course of its analyses of related issues, quote" --
19  this is a case I cited, Collins, 920 Federal 2nd at
20  626, "Finally that Cohan isn't a member of the
21  Oregon Bar and was not an adequate reason to deny
22  substitution.  A defendant's right to the counsel

**Page 473**

1  the court also said, "In the absence of any finding
2  that counsel is ethically unfit, it's irrelevant
3  that the district judge would be more comfortable
4  with another lawyer.  It's the client's comfort,
5  not the judge's, that the 6th Amendment protects."
6  This is the 9th Circuit speaking itself.
7      And turning to the next page, I already
8  went over that, and looking down at lines 10
9  through 23, 10th Circuit case, United States versus
10  Collins, 920 F 2nd 619, 626, 10th Circuit, 1990,
11  wherein the court said, "Before reaching the merits
12  of Defendant's 6th Amendment claim, we addressed
13  the effectiveness of the pro hac vice admission.
14  Although the admission of attorneys pro hac vice is
15  admitted at the discretion of the district courts,
16  denial of admission pro hac vice in criminal cases
17  implicates the Constitutional right to counsel of
18  choice."
19      And then going to page 15 wherein I
20  cite, United States versus Walters, 309 F 2nd 581/
21  582, 9th Circuit, California, 2002, line 21.  Let
22  me read line 13...

In The Matter of: Larry Klayman
July 16, 2019

|  | Page 474 |
|---|---|

1    "Even though a pro hac vice attorney
2  there may have properly been denied due to the fact
3  that he resided and had an office in California,
4  yet in a criminal context" -- that's different.
5  Criminal has much more at stake than a criminal
6  context. This is criminal -- "the tribunal found
7  the denial was improper because the district court
8  applied the local rule mechanistically without
9  discussion of whether the interest of the fair,
10  efficient and orderly administration of justice
11  required denial of the affidavit.
12    "Here Judge Navarro erred even more
13  than in United States versus Walters by
14  mechanistically applying arbitrary and erroneous
15  standards in that the attorney's application must
16  wait until the outcome of a bar proceeding, a Catch
17  22 that, without the standard, would result in
18  petitioner being tried and potentially convicted
19  and sentenced to life imprisonment before the
20  District of Columbia bar proceeding had even, with
21  all appeals, been concluded.
22    "The ruling amounts to an abuse of

|  | Page 475 |
|---|---|

1  discretion and is clear error as a matter of
2  Constitutional and related law.
3    "Therefore, Judge Navarro's ruling
4  leaves Cliven Bundy in jail, without bond, without
5  a full criminal defense team, denied the 6th
6  Amendment right to counsel."
7    Now these cases were found by my
8  colleague, Mr. Peer. I thank him for his efforts
9  in assisting me with this. But these case are out
10  there for everybody to find, and --
11    CHAIRPERSON MIMS: Mr. Klayman.
12    MR. KLAYMAN: Ok, too rhetorical?
13    CHAIRPERSON MIMS: Well, I think we
14  understand why you filed the writ.
15    I assume Ms. Porter is standing up
16  because she has an objection?
17    MS. PORTER: Yes, I do have some
18  concerns that it's now a little after 11:00
19  o'clock, and this document, the first petition, is
20  already in evidence.
21    I think if Mr. Klayman -- well, I would
22  suggest that Mr. Klayman be given an amount of

|  | Page 476 |
|---|---|

1  time, and if he wants to use it reading pleadings
2  that are already in evidence, I guess that's up for
3  the hearing committee. But I think it would be
4  really helpful if we stuck to the issues that are
5  present in this proceeding, not whether or not the
6  9th circuit was correct in finding that, unless
7  you're subject to a disbarrable offense, the court
8  gets to exercise discretion.
9    With all due respect, the 9th Circuit
10  and the supreme court have reviewed this -- five
11  times by the 9th Circuit and three times, not
12  including the motions for rehearing and motions to
13  correct records.
14    We're not here to decide whether the
15  9th Circuit and the supreme court were correct.
16    MR. KLAYMAN: It's --
17    MS. PORTER: So I would suggest that,
18  you know, if Mr. Klayman is going to be reading
19  from documents that are in evidence, if that's how
20  he wants to spend his time, and if that's ok with
21  the hearing committee, I'll sit down and be quiet.
22  But there's got to be an end to it.

|  | Page 477 |
|---|---|

1    MR. KLAYMAN: Let me say, I'm moving
2  this along, because I'm not going to go back over
3  this, your Honor.
4    We now have exhibits, almost 200
5  exhibits on both sides, and this is an opportunity
6  for me to assist the hearing committee through my
7  testimony when you review the evidence. So I'm
8  just simply pointing that out.
9    I'm not going to reread this again, and
10  this is also relevant because Disciplinary Counsel
11  raised an issue why a Bivens complaint was filed by
12  Mr. Hansen, and it was because the violation of 6th
13  Amendment rights was so severe as to rise to the
14  level of having to take that unfortunate action.
15    CHAIRPERSON MIMS: I'm not going to
16  limit your amount of time. I'm not going to
17  proscribe an amount of time for you. But I do
18  think we can be done with this first writ. We
19  understand why it was filed. I understand you've
20  pointed out some case law that you think was
21  relevant, but we aren't relitigating this.
22    MR. KLAYMAN: Ok. No, I understand --

28 (Pages 474 to 477)

Page 478

1     CHAIRPERSON MIMS: What would be
2 helpful -- I'm not going to tell you how to present
3 your case, but what would be helpful is for you to
4 move to the second writ and if you can explain to
5 the committee how the first writ was different from
6 the second writ, that's information that the
7 committee might find helpful.
8     MR. KLAYMAN: Let me say that on Page
9 17 we cite cases how you have to be at the point of
10 disbarment in a criminal case to have it denied.
11 BY MR. KLAYMAN:
12     A. (Answer continuing) I turn your
13 attention to Exhibit 7. This is the answer of
14 Judge Navarro when -- requested by the 9th Circuit,
15 or at least said she could make a supplemental
16 response.
17     MS. BELL: Is this the second writ?
18     CHAIRPERSON MIMS: No.
19     MR. KLAYMAN: Do you have that?
20     CHAIRPERSON MIMS: Yes.
21 BY MR. KLAYMAN:
22     A. (Answer continuing) And I've already

Page 479

1 testified, so I'm not going to go over it again,
2 your Honor, that this was ex post facto
3 justification after the fact for what she had done.
4 This is not the basis of her prior orders. Her
5 prior orders were based upon the DC Bar
6 disciplinary proceeding and made no reference to
7 anything else.
8     But I want to turn your attention to
9 footnote three on RX0332, footnote three. I'll
10 read the second sentence: "No prohibition has been
11 issued to prevent Klayman from consulting with
12 petitioner or acting in the capacity of a law clerk
13 or paralegal.
14     "It shows you the nonsensical" -- and
15 with all due respect, "nonsensical" is probably the
16 most mild word I could use -- "effect of her orders
17 denying me pro hac vice.
18     "Mr. Klayman, you, a lawyer with 40
19 years of experience at that point, can be a
20 paralegal, but you can't, whether Cliven Bundy
21 wants you to be his lawyer, be his lawyer."
22     As much as anything else, it shows how

Page 480

1 arbitrary and capricious and without basis in fact
2 or law the denial of the pro hac vice application
3 is, whether it's Judge Navarro or Judge Bybee or
4 Judge Fletcher, they're all in the 9th Circuit, and
5 it shows you why Judge Gould in part ruled in my
6 favor.
7     CHAIRPERSON MIMS: At some point after
8 this, and I don't remember the exact date, and
9 maybe we're going to get to this, your name starts
10 appearing on the pleadings, right, in this case, in
11 the caption?
12     Do you recall Ms. Porter asked you
13 about that yesterday?
14     MR. KLAYMAN: I'm trying to recollect.
15 I don't remember that. I was very tired yesterday.
16     MS. PORTER: It was both in the Bivens
17 action and also the motion to disqualify.
18     MR. KLAYMAN: Oh, yes, that was
19 because -- first of all, Hansen inadvertently
20 electronically signed my name, and we corrected
21 that. He had to come in and correct it. There is
22 a document in the record to that effect. But yes I

Page 481

1 was listed as of counsel on the Bivens action. I
2 did not sign as of counsel. I was listed as of
3 counsel.
4     CHAIRPERSON MIMS: On the Bivens
5 action?
6     MR. KLAYMAN: Yes, and that was
7 consistent with her statement that I consult the
8 paralegal, etc., later on. But no I was not the
9 counsel of record on the Bivens.
10     CHAIRPERSON MIMS: Did you consult as
11 an attorney on the case?
12     MR. KLAYMAN: I consulted in the
13 capacity that she told me I could consult, which,
14 you know, presumably is as a lawyer.
15     She said, "No prohibition has been
16 issued to prevent Klayman from consulting with
17 petitioner or acting in the capacity as a law clerk
18 or a paralegal."
19     So yes, I was consulting as an
20 attorney. She said I could.
21     And in fact, despite the fact I had
22 been denied entry the first time I tried to see Mr.

29 (Pages 478 to 481)

In The Matter of: Larry Klayman
July 16, 2019

Page 482

1  Bundy in prison, in federal prison, I had seen him
2  at Henderson County Jail, which is where he was
3  initially. He was then transferred to Pahrump --
4  interestingly enough Area 51, where people are now
5  saying they are going to storm it because there's
6  UFO debris there. It's a military base near there.
7       But I was allowed to see him as counsel
8  because I also had cases for him in the District of
9  Columbia, Freedom of Information Act lawsuits that
10 I had brought to get documentation that might be
11 helpful in his defense. And those are continuing
12 until today.
13      CHAIRPERSON MIMS: But is it your
14 testimony that this is footnote three that we're
15 looking at, that Judge Navarro gave you permission
16 to act as Mr. Bundy's counsel?
17      MR. KLAYMAN: To consult with him as
18 counsel. In other words, not to be counsel of
19 record, no. I was completely excluded from that.
20      And as I testified yesterday, that
21 hampered his defense, because I had to sit in the
22 gallery when the testimony was being elicited. I

Page 483

1  couldn't communicate with him or Mr. Whipple or the
2  other lawyers.
3       When there were breaks in the trial, I
4  had to leave the courtroom. I couldn't consult or
5  give my input to what was going on.
6       There was very high security. They
7  actually had I think a metal detector right in
8  front of the courtroom entrance, which is very
9  unusual. So this hampered the ability to assist
10 him significantly.
11      But I wanted to point that out,
12 because, the point I'm making here is that, you
13 know, she knew that she was wrong, so she was
14 trying to create an impression that somehow, you
15 know, I could participate without being counsel.
16 But it's not the same thing as being counsel of
17 record and being able to actually represent your
18 client in court.
19      CHAIRPERSON MIMS: Ok, we can move on
20 from that.
21      MR. KLAYMAN: Ok, going to Respondent's
22 exhibit book two.

Page 484

1       Oliver can you point our attention to
2  the second petition as the Chair asked me to.
3       MR. PEER: I know that it's in Bar
4  Counsel's Exhibit 73. It's definitely there.
5       CHAIRPERSON MIMS: So, just to repeat,
6  Mr. Klayman -- and maybe you know offhand. I don't
7  know if there was anything filed in between the
8  first writ and the second writ -- but I would like
9  to know how this writ is different from the first
10 writ, if at all.
11      MR. KLAYMAN: Your Honor, I don't think
12 that we have the right number.
13      MS. PORTER: It's 73, Exhibit 73.
14 Disciplinary Counsel's 73 is your second petition.
15      MR. KLAYMAN: You can see, your Honors,
16 on page 13, if you look at the table of contents at
17 73-002, it states, "Legal arguments and
18 substantially changed circumstances underscore
19 petitioner's need to have a full legal defense team
20 to represent him at trial," and then there are
21 other entries there about Judge Gould's rulings.
22      Let's turn to page 13 wherein it

Page 485

1  states, "The complex and contentious nature of the
2  ongoing trial of petitioner's codefendants, which
3  can only be described as the Wild West" -- we were
4  in the west -- "a release of the OIG's" -- Office
5  of Inspector General -- "report, and the district
6  court's extremely prejudicial ruling of petition
7  and his codefendants" -- there were things that
8  occurred in the interim -- "constitutes
9  substantially changed circumstances and underscore
10 petitioner's need to have a full legal defense
11 team, which includes Klayman."
12      And then going down, "As a result of
13 the damning revelations set forth in the report,
14 further discovery and investigation in light of its
15 disclosure will be required to mitigate damage to
16 petitioner and will thus be moot for given the fact
17 that Special Agent Love and the Bureau of Land
18 Management" -- that's BLM -- "will need to be
19 impeached.
20      "Petitioner needs a full account of
21 Special Agent Love's and BLM's illegal conduct
22 which includes his use of excessive force and other

30 (Pages 482 to 485)

In The Matter of: Larry Klayman
July 16, 2019

| | Page 486 |
|---|---|
| 1 | illegal actions at the Bundy ranch." |
| 2 | In other words, the case was heating |
| 3 | substantially in terms of the misconduct by the |
| 4 | Bureau of Land Management, by the FBI, by the |
| 5 | Justice Department. |
| 6 | And then I add, "Witnesses to be called |
| 7 | at Bundy's trial will testify under oath that |
| 8 | Special Agent Love both threatened the lives of the |
| 9 | Bundy family, as he threatened BLM agents at the |
| 10 | Burning Man, a pagan ritual, to try to force them |
| 11 | to testify against him to the Office of Inspector |
| 12 | General, among many other illegal acts. |
| 13 | "Since petitioner is scheduled to |
| 14 | commence trial with second tier defendants, the |
| 15 | trial may likely commence in April or May of this |
| 16 | year." |
| 17 | That matter later became subject to |
| 18 | dispute again as to the sequence. |
| 19 | (Continuing) "Time is quickly running |
| 20 | out for petitioner to mount a full defense. To |
| 21 | that extent, petitioner needs a full legal defense |
| 22 | team, including his counsel of choice, Klayman, |

| | Page 488 |
|---|---|
| 1 | CHAIRPERSON MIMS: What I would like to |
| 2 | ask now is was there anything new filed in the |
| 3 | third writ? |
| 4 | MR. KLAYMAN: Mr. Peer, will you help |
| 5 | me find the third writ. Too many exhibits here. |
| 6 | MS. PORTER: The third writ is 95. |
| 7 | MR. KLAYMAN: That's in Bar Counsel |
| 8 | Exhibit 95. |
| 9 | CHAIRPERSON MIMS: And really, Mr. |
| 10 | Klayman, the question is merely if you can direct |
| 11 | us to the new argument that was made in there. |
| 12 | MR. KLAYMAN: All right. |
| 13 | CHAIRPERSON MIMS: We don't need it |
| 14 | read to us. I just want to make sure that I |
| 15 | understand where it is. |
| 16 | MR. KLAYMAN: Ok. |
| 17 | THE WITNESS: This is at page 16, |
| 18 | Exhibit 95. |
| 19 | CHAIRPERSON MIMS: Bates number 16? |
| 20 | MR. KLAYMAN: Excuse me 15. |
| 21 | CHAIRPERSON MIMS: Just tell me -- |
| 22 | MR. KLAYMAN: Bates number 95-019, and |

| | Page 487 |
|---|---|
| 1 | immediately. |
| 2 | "A full legal defense team is |
| 3 | absolutely necessary to review the documents that |
| 4 | the district court has ordered be produced from the |
| 5 | government" -- |
| 6 | CHAIRPERSON MIMS: Mr. Klayman, I don't |
| 7 | want to interrupt you, but we don't need you to |
| 8 | read from the document. |
| 9 | MR. KLAYMAN: All right. Well, let me |
| 10 | just summarize. I agree. |
| 11 | CHAIRPERSON MIMS: And you've answered |
| 12 | my question, I think -- |
| 13 | MR. KLAYMAN: Ok. |
| 14 | CHAIRPERSON MIMS: That there were |
| 15 | changed circumstances. |
| 16 | And I also see that this is where you |
| 17 | included an argument about Judge Gould's dissenting |
| 18 | opinion. |
| 19 | MR. KLAYMAN: Right. |
| 20 | CHAIRPERSON MIMS: And that does |
| 21 | sufficiently answer my question. |
| 22 | MR. KLAYMAN: Ok. |

| | Page 489 |
|---|---|
| 1 | I turn your attention to page 19, and this makes |
| 2 | reference to the fact that Cliven Bundy had fired |
| 3 | Bret Whipple. |
| 4 | CHAIRPERSON MIMS: Ok, I see that. |
| 5 | MR. KLAYMAN: And Bundy had no lawyer. |
| 6 | And that's the changed circumstances, primarily. |
| 7 | CHAIRPERSON MIMS: How about writ |
| 8 | number four? Let me ask you while we're getting |
| 9 | out writ number four... |
| 10 | Did you believe that that didn't really |
| 11 | relate to you, that it related to Mr. Bundy and his |
| 12 | ineffective assistance of counsel, I guess, is one |
| 13 | way to word it, or what he believed to be that |
| 14 | would change Judge Navarro's mind? |
| 15 | MR. KLAYMAN: Well, I was going back to |
| 16 | the -- |
| 17 | CHAIRPERSON MIMS: As it related to the |
| 18 | substantive reason why she disallowed your |
| 19 | application? |
| 20 | MR. KLAYMAN: Well, I'm a perpetual |
| 21 | optimist, your Honor, and, you know, persistence |
| 22 | sometimes pays off. It's even in the Bible, right, |

31 (Pages 486 to 489)

In The Matter of: Larry Klayman
July 16, 2019

Page 490

1  where people don't give up.
2       CHAIRPERSON MIMS:  Well, and I guess it
3  wouldn't be -- I'm sorry, I misspoke.
4       MR. KLAYMAN:  The 9th Circuit.
5       CHAIRPERSON MIMS:  It would be the 9th
6  Circuit.
7       MR. KLAYMAN:  Again I was asking for
8  another panel at the same time in and around this
9  time period.
10      But, you know, I'm going to talk about
11  the hearing that was held, the Ferreta hearing that
12  was held with regard to Bret Whipple's withdrawal
13  as counsel after he was terminated.
14      And at that hearing, just to summarize,
15  Mr. Whipple admitted that he was not prepared to go
16  to trial.  Mr. Bundy testified that he had only
17  visited with Mr. Whipple a few times -- I'll let
18  the transcript speak for itself -- that they didn't
19  go through discovery much at all, and the only time
20  he had seen Mr. Whipple was during joint defense
21  meetings one on one.
22      I knew that because I was trying to get

Page 491

1  Mr. Whipple to come out to the federal prison in
2  Pahrump to meet with me and with Bundy and he was
3  never available.  He didn't return my calls.
4       I didn't take it personally.  He didn't
5  return anybody's calls, including Carol Bundy, the
6  wife.
7       CHAIRPERSON MIMS:  Had he testified at
8  the hearing that you're discussing right now that
9  you were the only one that could represent him?
10      MR. KLAYMAN:  Bundy?
11      CHAIRPERSON MIMS:  Yes.
12      MR. KLAYMAN:  I don't recollect whether
13  he said that or not.  At that time he wanted to
14  represent himself.  He was so fed up.
15      CHAIRPERSON MIMS:  That's what I
16  thought.
17      MR. KLAYMAN:  He was so fed up with
18  Whipple that Cliven used to say, "I have a
19  15-second defense, and it's that there's no
20  jurisdiction because the land belongs to the State
21  of Nevada and not to the federal government, and
22  there is a valid legal claim in that regard."

Page 492

1       I actually have a lawsuit pending in
2  the state court in Colorado.
3       CHAIRPERSON MIMS:  The question is, if
4  he was testifying that he wanted to represent
5  himself, why did you continue to file writs?
6       MR. KLAYMAN:  Because he also wanted me
7  to come in for him, and his wife wanted me to come
8  in for him.  We didn't want to leave him
9  vulnerable.
10      And then of course the judge -- the
11  magistrate denied that, so then he was stuck with
12  Whipple again.
13      So at that point, yes, he would rather
14  have me in addition -- rather to have me before as
15  counsel.  He had no counsel that he had faith in.
16      CHAIRPERSON MIMS:  Let's take us to the
17  fourth writ.
18      Do you know what exhibit that is?
19      MS. PORTER:  One hundred.
20      MR. PEER:  One hundred?
21      CHAIRPERSON MIMS:  One hundred.  Thank
22  you.

Page 493

1       MR. KLAYMAN:  Let me just clarify that
2  he had no counsel at that point that was prepared
3  to go to trial, and he had no --
4       CHAIRPERSON MIMS:  That's at the point
5  of the third writ?
6       MR. KLAYMAN:  Yeah, yeah.
7       And again I'm in constant communication
8  with him.  I visited him in federal prison at least
9  30 times.
10      Mr. Peer, where do I find that?
11      CHAIRPERSON MIMS:  One hundred.
12      MR. KLAYMAN:  One hundred, ok.
13      In any event, 100, your Honor, is
14  because, at that point, the supersedeas indictment
15  had been dismissed and there is a significant body
16  of legal authority that says that, once it's
17  dismissed, it moots out prior collateral orders.
18  They should be vacated.
19      So I was asking it be vacated, because
20  at the time these orders were being used against me
21  in various proceedings and ultimately resulted in
22  this bar proceeding.

32  (Pages 490 to 493)

In The Matter of:  Larry Klayman
July 16, 2019

Page 494

1  CHAIRPERSON MIMS:  So this was filed
2  after the case against Bundy had been declared a
3  mistrial?
4  Is that what you're saying?
5  MR. KLAYMAN:  It was first declared a
6  mistrial and then it was dismissed --
7  CHAIRPERSON MIMS:  Dismissed, ok.
8  MR. KLAYMAN:  -- with prejudice.
9  CHAIRPERSON MIMS:  And you filed this,
10  why?
11  MR. KLAYMAN:  Because I wanted to have
12  the 9th Circuit orders vacated, in other words
13  declared inapplicable, null and void.  That would
14  have eliminated, in my view, this proceeding, and
15  that would have also eliminated it being used
16  against me by adversaries in various cases where I
17  was seeking pro hac vice entry.
18  Judge Gould makes reference to that in
19  his dissenting opinion when he says the matter
20  should have been vacated, the order should have
21  been vacated.  He talks about the harm to me that
22  is being caused unnecessarily, because this matter

Page 495

1  is overblown.
2  CHAIRPERSON MIMS:  All right, what
3  about the fifth writ?  There was a fifth, right?
4  MR. PEER:  Bar Counsel's 109.
5  MR. KLAYMAN:  Yes, that was primarily
6  geared, your Honor, to correct the record because
7  the statements of Judge Bybee -- which, in my view,
8  based on evidence, were misstatements -- were
9  harming me and were on my record and being used
10  against me.
11  When these new matters came up, for
12  instance page 15 -- page 14 and 15 --
13  CHAIRPERSON MIMS:  Bates number 15?
14  MR. KLAYMAN:  Yes, 109-17, 109-18.
15  At this point, your Honor, these, what
16  I claim are misstatements by Judge Bybee, and I
17  believe I have reasonable basis to come to that
18  conclusion, resulted in them being used against me
19  in a case I brought for a gay woman who was
20  attacked by Antifa.  The judge used that as a basis
21  to keep me out of that case pro hac vice.  It's now
22  up on appeal in the 9th Circuit.

Page 496

1  CHAIRPERSON MIMS:  She used one of
2  these 9th Circuit orders?
3  MR. KLAYMAN:  Yes.  Same reasoning.
4  And I told her that there wasn't a final matter,
5  ruling in the DC.  But she didn't understand that
6  or didn't want to understand it.
7  And then by this point, Bar Counsel had
8  initiated this proceeding against me, which I make
9  reference to, and it was my view and my legal
10  strategy, on behalf of myself and Mr. Bundy, to
11  have these orders vacated, because, if there were
12  no 9th Circuit orders at issue, in theory, this bar
13  proceeding should not continue.  There was nothing
14  to use against me in the bar proceeding.
15  So that was the basis of these rulings.
16  Plus, who knows what was going to
17  happen in the future with regard to Mr. Bundy.
18  As Judge Gould pointed out in his
19  decisions, and I'll go through that, he said the
20  matter should be vacated now...  "If this matter
21  should ever come back on appeal, Mr. Klayman can
22  reapply for pro hac vice status.  Let's just go

Page 497

1  back to square one here."
2  Because this is -- typically, in cases
3  like this, the order should be vacated.  It's a
4  collateral order.  It's not an order which is
5  material to the substance of the prosecution and
6  the dismissal of the indictment, other than the
7  fact that Mr. Klayman -- other than the fact that
8  Mr. Bundy was denied his 6th Amendment right of
9  counsel improperly.
10  So, yes, there was a valid basis for
11  all five.
12  Here is the thing that I find, as I
13  said in my opening statement, most troubling is the
14  nicest word I could use, is that as a lawyer to be
15  sanctioned, as a lawyer to be disciplined because
16  he zealously represents his client and represents
17  his interest as well --
18  CHAIRPERSON MIMS:  I understand --
19  MR. KLAYMAN:  That's the issue.
20  CHAIRPERSON MIMS:  All right.  Let's
21  not have testimony if that sounds something more
22  like you want to include in a closing, if we allow

33  (Pages 494 to 497)

In The Matter of:  Larry Klayman
July 16, 2019

---

Page 498

1  closings here.
2      MR. KLAYMAN:  Ok.
3      CHAIRPERSON MIMS:  Let's move on to the
4  rest of your testimony.
5      MR. KLAYMAN:  Thank you.
6      I just want to add one line there, if I
7  may...
8      CHAIRPERSON MIMS:  Go ahead.
9      MR. KLAYMAN:  Because this is an
10  admission by Bar Counsel.
11      Both Ms. Herman and the current
12  Disciplinary Counsel, Hamilton Fox, said to me, "We
13  don't like the way you practice law."
14      Well, that's not for them to decide.
15      What is for them to decide in terms of
16  instituting a complaint is whether I committed an
17  ethical violation.
18      My style of practicing law is
19  different.  All lawyers have different approaches
20  and different styles.
21      But, you know, I am a controversial
22  lawyer.  I have taken strong actions and, you know,

---

Page 499

1  I'm paying the price.
2  BY MR. KLAYMAN:
3      A.  (Answer continuing)  Now I turn your
4  attention to Exhibit 9.  This is a petition for
5  writ of mandamus to the supreme court.  And I'm not
6  going to belabor the argument in this.  I'm not
7  going to read it to you, to save time.  But one
8  thing that is clear is that the supreme court takes
9  up very few petitions for writs of mandamus.  It's
10  very rare and it's very difficult, with the
11  caseload of the supreme court, as we all know, to
12  get them to focus on an issue.
13      To the extent that there was any
14  implication, that because I filed petitions for
15  writ of mandamus with the supreme court, zealously,
16  to try to defend my client, that should not be held
17  against me.  The supreme court did not take up
18  those writs, and that's why I would go back to the
19  9th Circuit, when there were changed circumstances.
20      Turning to Exhibit 10 is the motion
21  that I filed to correct the record with the 9th
22  Circuit with regard to the alleged misstatements of

---

Page 500

1  Judge Bybee in the majority opinion.
2      Now, at this point I want to turn your
3  Honor's attention to Disciplinary Counsel's Exhibit
4  64.  Turning your attention to Judge Gould's
5  dissenting opinion at Bates numbers 64-013 -- and
6  I'm not going to go through all the legal
7  reasoning, but just a few portions...
8      "Wherein Judge Gould recognizes"... at
9  64-015 --
10      CHAIRPERSON MIMS:  Mr. Klayman, we
11  don't have to re-review Judge Gould's dissent.
12      MR. KLAYMAN:  Ok.
13      CHAIRPERSON MIMS:  We understand that
14  he dissented.
15      MR. KLAYMAN:  May I just point out the
16  provisions?  I'll just testify generally to them.
17      He found that I had --
18      CHAIRPERSON MIMS:  If you want to make
19  a general statement to them and then we can move
20  on.
21      MR. KLAYMAN:  Ok, that he found that I
22  provided all information that I was required to

---

Page 501

1  provide to Judge Navarro; that this was an unusual
2  case, high profile, very controversial, and in
3  cases like this it is made -- it is beneficial in
4  all likelihood that the defendant have a strong and
5  even at times controversial lawyer who stands up to
6  judges, notwithstanding the law that he cited in
7  favor of granting the writ, granting the pro hac
8  vice application.
9      Your Honor asked the question about
10  changed circumstances.  I'm not going to belabor
11  that.  It's in some of these exhibits.
12      Ok, I turn your attention to Exhibit
13  12, Respondent's Exhibit 12, at page 11.  That's
14  Bates number RX0695.
15      CHAIRPERSON MIMS:  Bates number what?
16      MS. BELL:  Zero six nine five.
17      MR. KLAYMAN:  Zero six nine fie.
18      We have about seven more minutes that
19  we can go, because we need to take a break.  One of
20  the members has a call at noon.
21      MR. KLAYMAN:  Ok.
22      CHAIRPERSON MIMS:  So we're going to

---

34  (Pages 498 to 501)

In The Matter of: Larry Klayman
July 16, 2019

Page 502

1  break at about ten of 12:00.
2        MR. KLAYMAN: Thank you.
3        CHAIRMAN MIMS: If that works for
4  everybody.
5        MR. KLAYMAN: Yes, this will be brief.
6        CHAIRPERSON MIMS: Ok.
7        MR. KLAYMAN: Page 11, Bates Number
8  0695, wherein I write, "In this regard, it has only
9  recently come to Mr. Klayman's attention towards
10  the end of Mr. Bundy's trial through Shauna Cox" --
11  that's S-h-a-u-n-a C-o-x --    "a paralegal on
12  Mr. Bundy's defense team, that Judge Bybee and
13  Judge Navarro are close friends and associates."
14  It deals with some of the other issues we talked
15  about.
16        I think this would be a good point to
17  break. Exhibit 14 will require a little more
18  explanation.
19        CHAIRPERSON MIMS: All right. Why
20  don't we go ahead and break for lunch. Does 12:30
21  work for everyone, 45 minutes?
22        MR. KLAYMAN: Yes.

Page 503

1        CHAIRPERSON MIMS: Let's resume at
2  12:30.
3        (Whereupon at 11:45 a.m. a luncheon
4  recess was taken.)

Page 504

1  A F T E R N O O N   S E S S I O N
2        (Whereupon at 12:30 p.m. the hearing
3  resumed.)
4        CHAIRPERSON MIMS: We're back on the
5  record at 12:30, and we'll resume Mr. Klayman's
6  direct of himself.
7        Oh, before we begin, Mr. Klayman, what
8  does the schedule look like for the rest of the day
9  in terms of time that you'll be on the stand and
10  any witnesses? I know you can't account for how
11  long --
12        MR. KLAYMAN: Yeah, I don't know how
13  long cross will be. I'll probably be another hour
14  and a half to two hours maybe. We will see how it
15  goes. Maybe it will go faster.
16        CHAIRPERSON MIMS: Ok.
17        MR. KLAYMAN: And then Mr. Peer is
18  going to testify.
19        CHAIRPERSON MIMS: And that's all you
20  have for today?
21        MR. KLAYMAN: That's all I have, your
22  Honor.

Page 505

1        CHAIRPERSON MIMS: Whenever you're
2  ready.
3        MR. KLAYMAN: I am.
4        CONTINUED DIRECT EXAMINATION
5        ON BEHALF OF RESPONDENT
6        BY MR. KLAYMAN:
7    A.  (Answer Continuing) I turn the court's
8  attention to Respondent's Exhibit 14. Since you
9  have Judge Gould's prior dissents, I'm going to be
10  relatively brief here.
11        This is a dissent that was issued with
12  regard to vacating for mootness the 9th Circuit
13  orders which had the underlying Judge Navarro
14  orders. I turn to page three --
15        CHAIRPERSON MIMS: Well, this is an
16  order in response to which writ?
17        MR. KLAYMAN: I believe it was the
18  fourth or fifth writ.
19        Mr. Peer?
20        CHAIRPERSON MIMS: Ok. It's dated
21  4/24/2018, so it has to be one of the later ones I
22  think.

35 (Pages 502 to 505)

In The Matter of:  Larry Klayman
July 16, 2019

Page 506

1    MR. KLAYMAN:  Yes.  And if I may just
2  read this portion, your Honor...
3  BY MR. KLAYMAN:
4    A.  (Answer Continuing)  "I respectfully
5  dissent from the denial of the current mandamus
6  petition because of what I consider to be an
7  unnecessary and an excessive negative impact on the
8  district court's decision denying pro hac vice
9  admission in our prior decisions denying mandamus
10  relief on the practice and reputation of Klayman.
11    "I do not share the petitioner's view
12  that there has been any bias against him, but I am
13  motivated to dissent because these proceedings have
14  become over blown.
15    "If, as I believe, the criminal case
16  against Bundy is over, with the pro hac vice
17  admission here being the dead letter, then I see no
18  substantial reason in fairness why the prior
19  decisions of the district court and of our court in
20  this matter should stay in the record, serving no
21  purpose at this stage and potentially and unfairly
22  being of detriment to Klayman's practice and

Page 507

1  reputation.
2    "Having dissented from the initial
3  denial of the mandamus relief by us when Klayman
4  was first challenged his denial of pro hac vice
5  status in the district court, I respectfully
6  maintain my dissent here.
7    "I respectfully continue to believe
8  that denial of pro hac vice was wrong in substance
9  and in the standard applied.  It was wrong in
10  substance because Klayman is an inventive and
11  aggressive criminal defense attorney, a counsel of
12  choice for Bundy, who faced the risk of life
13  imprisonment, at his age more than 70.
14    "In my view, Klayman was just what
15  Bundy needed because of Bundy's controversial
16  status as a defendant and the broader array of
17  federal power lined up against Bundy.
18    "In those circumstances, archaic rules
19  giving the district courts substantial discretion
20  to control what attorneys appear in this district
21  court and other district courts should necessarily
22  give way to the 6th Amendment right of the

Page 508

1  defendant to the counsel of his or her choice as a
2  part of the defense team, except when exclusion of
3  a chosen defense counsel is justified by the most
4  extreme circumstances, showing a superior
5  government interest.  But such circumstances were
6  not present here.
7    "The decision is also wrong for
8  applying the incorrect standard in this respect,
9  like the 5th Circuit In Re: Evans, 524 F 2nd
10  1004/1007, 5th Circuit, 1975; and the 11th Circuit
11  in Schlumberger Tech, Inc., versus Wiley" --
12  S-c-h-l-u-m-b-e-r-g-e-r -- "113 F 3rd, 1553/1561,
13  11th Circuit, 1997, we should have held that only a
14  prior suspension or disbarment of Klayman or facts
15  warranting that would justify denying pro hac vice
16  admission.  See In Re: Bundy, F 3rd, 1056,
17  Judge Gould dissenting.
18    "Instead, we mistakenly allowed the
19  district court to deny Klayman's admission when a
20  major part of the district court's reasoning
21  concerned a pending negative bar proceeding that
22  had never been completed and subjected to appeals.

Page 509

1    "The standard we chose to easily let a
2  district court eliminate a criminal defense lawyer
3  who promised to be a thorn in the side of the
4  district court, but indeed, that was just what
5  Bundy then needed and what should have been
6  permissible in a high-stakes contest like this,
7  with liberty for life at stake.
8    "We should have instead applied the
9  standard use by the 5th and 11th Circuits,
10  suggesting that a defense counsel of choice should
11  not be eliminated through the pro hac vice
12  admission process, absent an ethical violation
13  sufficient to warrant a disbarment for facts
14  determined finally to that extent.
15    "For these reasons I respectfully
16  dissent."
17    I turn your attention to Respondent's
18  Exhibit 16.  This is a letter that I wrote on
19  February 14th, 2018, to H. Clay Smith, III,
20  Assistant Disciplinary Counsel.
21    This proceeding was, in my view, given
22  to Ms. Porter because of a decision made by the

36 (Pages 506 to 509)

In The Matter of:  Larry Klayman
July 16, 2019

Page 510

1   bar -- the Disciplinary Counsel, not the bar, to
2   eliminate me from the practice of law.  They gave
3   it to a senior counsel and took it away from H.
4   Clay Smith, who I've always found to be a
5   relatively reasonable person.  What I'm saying to
6   Mr. Smith at this point in time is that, "These
7   matters are still pending in court, wait 'till
8   they're concluded before you make a decision, and
9   even when you make one, do not commence a bar
10  proceeding."  I thought that anyway it's premature.
11  So I sent him these pleadings, which he had asked
12  for, because I was in communication with Mr. Smith.
13          I found it very strange but I had a
14  meeting with Mr. Smith at one point, and he
15  suggested to me, he said, "Larry, you could avoid
16  all of this if you would just simply resign from
17  the bar."  And I couldn't quite figure out why that
18  was.  He said, "You can do it quietly and it won't
19  be publicized," which isn't the case, actually.  It
20  would be.  I'd be admitting to disbarment.
21          But I began to understand why, because
22  he was dealing with the hierarchy in the Office of

Page 511

1   Disciplinary Counsel who had made a decision that
2   they don't like the way I practice law and I should
3   be removed from the practice of law.  And that in
4   my view is why this matter was reassigned to Ms.
5   Porter.  I don't think H. Clay Smith agreed with
6   the proceeding.  I don't know for a fact.  That's
7   just my own feeling.
8           I turn your attention to Exhibit 18.
9   This is an article that was written in the Las
10  Vegas Review Journal: "Judge bans defense arguments
11  in Bundy retrial."  It's cited in some of the
12  briefs.  About, it wasn't just Larry Klayman whose
13  Constitutional rights, vis-a-vis Cliven Bundy -- I
14  should say Bundy's rights were being violated, but
15  all of the defendants in this case, and based on my
16  experience, Las Vegas Review Journal, that's a
17  mainstream publication.  That's like the Washington
18  Post for Las Vegas City, and it starts off by
19  saying -- and this is in my briefs and something
20  that I also confirmed through my own experience in
21  this whole matter, quote, "Government prosecutors
22  have a friend in U.S. District Judge Gloria

Page 512

1   Navarro."  And then it goes on and -- I'll let the
2   article speak for itself.  I'm not going to read
3   it -- setting forth why this mainstream publication
4   believes that Judge Navarro violated the
5   Constitutional rights of a number of defendants.
6           Moving on to Respondent's Exhibit 19 --
7           I might add in that regard, the Las
8   Vegas Review Journal had reporters in court all the
9   time.  This was a very high-profile case for Las
10  Vegas.  At one point it intersected with the "Las
11  Vegas Massacre".  You probably all can remember
12  that this individual called Stephen Paddock had
13  massacred a number of people from one of the hotel
14  rooms at the Mandolin Bay.  That actually had an
15  impact on the beginning of trial.  It changed the
16  date.  So that's another variable factor.  Because
17  defense counsel did not want the case to precede,
18  once we were in court, the ones who had public
19  defenders and to some extent some of the defendant
20  themselves.  Not Cliven.  Cliven wanted to go
21  forward.  But it was not that the use of a gun --
22          CHAIRPERSON MIMS:  I'm not sure that

Page 513

1   has relevance to this.
2           MR. KLAYMAN:  Ok, it goes to the fact
3   that the date of commencement was delayed.
4           CHAIRPERSON MIMS:  The date of
5   commencement of?
6           MR. KLAYMAN:  Of the trial, of the
7   Bundy trial.
8           CHAIRPERSON MIMS:  Of the Bundy trial.
9           MR. KLAYMAN:  Because they were trying
10  to create some distance of this massacre of someone
11  using a gun and this trial.  Because it was alleged
12  that the defendants were armed.  Bundy was never
13  armed, but some of the other defendants did
14  exercise their 2nd Amendment rights and were
15  carrying arms, which they were allowed to do.
16          CHAIRPERSON MIMS:  I don't think that
17  relates to this case.
18          MR. KLAYMAN:  Ok, I'm just giving you
19  some background here.
20  BY MR. KLAYMAN:
21      A.  (Answer Continuing)  Now Exhibit 19 is
22  communications between Clay Smith and I over the

37 (Pages 510 to 513)

In The Matter of: Larry Klayman
July 16, 2019

## Page 514

1  underlying proceeding, which is the first Judicial
2  Watch proceeding filed by Fitton, and the
3  negotiated discipline. What they show is that Bar
4  Counsel came back after it was rejected by the
5  panel, the negotiated discipline, and said, "Let's
6  try to renegotiate another agreement here." And I
7  was open to doing that, but not on the basis which
8  I would have to admit to doing anything that was
9  ethically incorrect, or at least with regard to the
10  suggested sanction.
11      CHAIRPERSON MIMS: This is with respect
12  to the Judicial Watch?
13      MR. KLAYMAN: Yes, the underlying
14  proceeding that Judge Navarro says must await
15  completion "before I'll let you in pro hac vice."
16  BY MR. KLAYMAN:
17      A. (Answer Continuing) Here are some of
18  the communications between me and H. Clay Smith.
19  "Clay" -- it's the first document which is
20  Respondent's Exhibit 0786, from H. Clay Smith, III,
21  Gene Shipp. He was the Office of Disciplinary
22  Counsel, the main guy -- "asked me to communicate

## Page 515

1  with you about the recent voicemail message you
2  left for him regarding the negotiated discipline in
3  the above-referenced matter.
4      "This office will not revisit any of
5  the language set forth in the petition for a
6  negotiated discipline, which was fully negotiated
7  and executed by both you and the office in
8  September 2014."
9      I did not ask for that response, but
10  that was what H. Clay Smith was suggesting. He had
11  previously told me that they wanted to renegotiate
12  and see if we could come up with a solution that
13  the hearing committee would accept.
14      MS. BELL: Mr. Klayman, is there any
15  record of what he previously negotiated with you?
16      MR. KLAYMAN: Not in emails.
17      MS. BELL: Ok.
18      MR. KLAYMAN: No, it was done orally on
19  the phone.
20      CHAIRPERSON MIMS: Can you tell me what
21  the relevance of this is?
22      MR. KLAYMAN: It shows that I decided

## Page 516

1  to go to a hearing and did not want to renegotiate
2  an agreement on their terms in the end.
3      CHAIRPERSON MIMS: After they rejected
4  the prior negotiated --
5      MR. KLAYMAN: Right, after the Bar
6  Counsel suggested we could do that.
7      They came back to me and said, you
8  know, "We'll agree to a three-month suspension, two
9  months on probation, so you'd only have to be
10  suspended for a month."
11      And I said "No, I'm not going to agree
12  to that. I don't feel I did anything wrong."
13      At the time I felt I was doing things
14  right and that's reflected in the last email
15  here...
16      "I thought you might want to review
17  this before deciding whether to proceed. This
18  issue" --
19      CHAIRPERSON MIMS: What page?
20      MR. KLAYMAN: Zero seven eight eight,
21  Bates Number 0788, the Respondent.
22      By the way, the prior email, 0787, you

## Page 517

1  can see I actually had a meeting with Mr. Smith.
2  I've had more than one. That was when he made that
3  statement to me, which I couldn't figure out at the
4  time, that I just testified to, that I should
5  resign from the bar. And I don't believe it came
6  from his heart. That was the impression that I
7  had. He was warning me of what might ensue.
8  BY MR. KLAYMAN:
9      A. (Answer Continuing) And then the last
10  page, Respondent's exhibit 0788, I wrote to Mr.
11  Smith and said, "Gentlemen" -- Mr. Smith and Mr.
12  Shipp -- "Gentlemen, I thought you might want to
13  review this before deciding whether to proceed. The
14  issue was moot by the time this writ of mandamus
15  was to be decided, however it contains in part the
16  case I will present to the hearing committee.
17      "Gene and Clay, I feel strongly that I
18  did not ethically do anything wrong, but I'm not
19  going to get down on my knees here. It's a matter
20  of principal for me, among other considerations,
21  particularly given that this entire affair, this
22  proceeding, is going on 11 years.

38 (Pages 514 to 517)

In The Matter of: Larry Klayman
July 16, 2019

| Page 518 |
|---|

1    "Sincerely, Larry Klayman."
2        So at that point, you know, I didn't
3    even want to negotiate anything. I just wanted to
4    go to the hearing.
5        In the same exhibit, Respondent's
6    Number 0790, Clay is writing to me, Clay Smith,
7    "Before I finally put an end to all of this" -- and
8    it shows that they wanted to renegotiate, meaning
9    ODC, "Mr. Klayman, I have not heard from you
10   concerning whether or not you will accept the
11   revised terms of the negotiated discipline that we
12   discussed several weeks ago.
13       "Because of the length of time that has
14   passed since the hearing committee rejected our
15   submission, I feel that we must advise them soon of
16   our resolution of the matter.
17       "To that end, if I do not hear from you
18   by the end of this week, I intend to submit notice
19   to the Committee that we are withdrawing from the
20   negotiated discipline process and I will ask the
21   board to reinitiate the process of the hearing on
22   the merits." And that's one that I read to you

| Page 519 |
|---|

1    previously. That email was sent at 11:11 a.m.
2    Eastern, and then I responded June 18th to what I
3    just read to you.
4        I turn your attention now to
5    supplemental Respondent Exhibit 24.
6        CHAIRPERSON MIMS: We have it.
7        MR. KLAYMAN: Ok, great.
8    BY MR. KLAYMAN:
9        A. (Answer Continuing) This is an email
10   that I wrote to Bret Whipple on December 11th, 2017
11   at 5:59 p.m., Pacific. "Bret" -- and if I may read
12   this. I'm not going to read a lot of stuff here,
13   but this is a very important email.
14       "I have now called four times over the
15   last two days and you respond only with cryptic
16   text messages. The last one says that you did not
17   file a pro hac vice supplement, as you committed to
18   Carol" -- that's Cliven's wife -- "that you would
19   do this morning because you now claim that Cliven
20   told you not to.
21       "While I doubt that, there was no
22   reason not to file. And why did you not timely

| Page 520 |
|---|

1    advise me of your unilaterally-induced decision?
2        "The supplement does not have anything
3    to do with the motions to dismiss which the other
4    counsel filed. These motions gave rise to the
5    dismissal later in the indictment and now the
6    expressed reason that the judge may grant the other
7    counsel's reason to dismiss tomorrow, Tuesday.
8        "First, this is not accurate, as the
9    judge said Thursday, for the government to file its
10   brief and then the defendants have a right of
11   reply. And she's reconvening the trial a week from
12   Wednesday for December 20th. So how is this a
13   reason not to file the pro hac vice supplement?
14       "No motion to dismiss will be granted
15   tomorrow, as your cryptic text implies. Second,
16   it's more than highly likely that this judge will
17   dismiss" -- "it is more than highly unlikely that
18   this judge will dismiss the indictment. She
19   obviously wants time to write a memorandum opinion
20   which will try to provide for mechanisms to allow
21   the case to proceed or declare a mistrial and start
22   over.

| Page 521 |
|---|

1    "I don't think we can harbor illusions
2    about the motivations of the judge. We cannot let
3    our guard down in any event. The judge may be your
4    friend, but she harbors no goodwill towards Cliven
5    or his family.
6        "Bret, I continue as one of Cliven's
7    counsel that's concerned that you gave short shrift
8    to him, Carol and me, and it is rude not to return
9    calls, just as a matter of professional courtesy.
10   Do you think your time is more valuable than the
11   rest of us?
12       "Lastly, I don't get the impression
13   that you were fully prepared on the first day of
14   trial. I was sitting there watching the trial from
15   the gallery and rest primarily on what the other
16   counsel have done and their arguments.
17       "This is why my entry pro hac vice is
18   in the best interest of the client. Cliven needs a
19   full defense team with more than one attorney, and
20   I am not here to take your place. I'm not here to
21   take your place.
22       "Today, for instance, I had to leave

39 (Pages 518 to 521)

In The Matter of:  Larry Klayman
July 16, 2019

---

Page 522

1  the courtroom before the judge went into a sealed
2  session and it would have been more than helpful
3  for me to be there.
4        "To be direct, it's time that you put
5  the clients' interest ahead of your own as you have
6  nothing to fear from my possible entry pro hac
7  vice.
8        "If we win in the end, you can have the
9  credit, I don't care, as I just don't want to see
10  Cliven and his friends go away for life but be set
11  free unconditionally.
12        "Given the stakes, please start taking
13  the time to consult with everyone and for this
14  reason I propose a meeting with Cliven in prison on
15  Wednesday with you.  Let me know if I can expect
16  the courtesy of the client getting a return call."
17        CHAIRPERSON MIMS:  Mr. Cliven, you
18  testified that Mr. Bundy fired Mr. Whipple?
19        MR. KLAYMAN:  He did ultimately.
20        CHAIRPERSON MIMS:  When did that take
21  place?
22        MR. KLAYMAN:  After this.

---

Page 523

1        Excuse me.  This was after -- no, it
2  was an September 27th in and around that time
3  period.  So Whipple had been continuing on the case
4  and not, in my perception, doing his job or
5  communicating with Carol or me.
6        CHAIRPERSON MIMS:  Was that perception
7  of -- did Mr. Bundy give you any statements as to
8  how he felt?
9        MR. KLAYMAN:  Yes.  He said he didn't
10  feel he was being probably represented.  This was a
11  very to have email.  I didn't want to be abrasive,
12  but I had to wake him up.
13        Because Cliven was telling me that he
14  would come in unprepared and was scribbling notes
15  about what he was going to say before he would get
16  up and speak at the hearing -- at the trial.
17        I was watching the trial.  He wasn't
18  prepared.  He was resting on the work that was
19  being done by the public defenders, who were doing
20  a good job for their clients.
21        And I always tried to get along with
22  Bret, but this was like a come-to-Jesus email,

---

Page 524

1  like, "Wake up Bret, because we are in potential
2  jeopardy here, for Cliven.  I had to do that as his
3  lawyer.
4        So I wrote this very strong email and I
5  said, "I don't need to take the credit.  I'll work
6  with you.  I want to work with you, but he needs
7  the help."
8        But this is the problem that Cliven was
9  having -- and of course, you know that Cliven -- it
10  was imposed upon him to use Bret Whipple by the
11  magistrate and the judge.  And the fact that he was
12  asking to go pro se, Cliven -- I didn't make this
13  clear earlier, but I think it was implied -- is
14  that I had been excluded, so he had no choice but
15  to represent himself.  And that's what gave rise.
16        MS. BELL:  So, Mr. Klayman, so that I
17  understand...
18        MR. KLAYMAN:  Yes.
19        MS. BELL:  Mr. Bundy did hire you as
20  his lawyer?  Because you just said "as his
21  attorney."
22        MR. KLAYMAN:  I'm sorry.  Yeah, I was

---

Page 525

1  hired from the beginning.
2        MS. BELL:  Oh, ok.
3        MR. KLAYMAN:  And I have a legal fee
4  agreement with him in terms of how I get paid.
5        But because I couldn't get entry into
6  the case --
7        MS. BELL:  Right.
8        MR. KLAYMAN:  -- he had no choice,
9  because he wanted to dismiss Bret Whipple that he
10  would ask to represent himself pro se.  That was
11  then denied, reimposed on him.  I'm going to get to
12  that.  And what I'm saying is, "Bret, you know,
13  there have been a lot of changed circumstances with
14  regard" -- and you saw some of them -- "with regard
15  to prosecutorial misconduct.  There is the
16  likelihood of a mistrial, of a dismissal.  Let's
17  resubmit."
18        And Cliven wanted it resubmitted, the
19  pro hac vice application, that perhaps now Judge
20  Navarro would reconsider and let me in, since she
21  had now seen how the government had hid evidence,
22  suborned false testimony.  This was on the verge of

---

40  (Pages 522 to 525)

---

Page 526

1  the case going before --
2  MS. BELL: You answered my question.
3  MR. KLAYMAN: Ok.
4  BY MR. KLAYMAN:
5  A. (Answer Continuing) I turn your
6  attention to Respondent's Exhibit 28. This is the
7  hearing where, after Mr. Whipple filed his motion
8  to withdraw, the magistrate judge took up the issue
9  of letting him out of the case.
10  I'm not going to belabor all of it.
11  You can read it. It's very telling and it's also
12  very interesting.
13  The court says, page six, line 15,
14  "Prior to Monday, September 18th, 2007" -- that's
15  when I believed Mr. Whipple submitted his motion to
16  withdraw, based on memory -- "had Mr. Bundy ever
17  directly requested that you terminate the
18  attorney/client relationship with him?"
19  Mr. Whipple answers -- the answer is
20  "Yes. When I was there on Monday afternoon, he
21  said that he had sent me a letter."
22  Ok, now, later on in this transcript --

---

Page 527

1  I'll let it speak for itself -- the magistrate
2  judge is asking, "Why did you wait ten weeks to
3  come in to me and say you want to withdraw?"
4  MS. PORTER: I'm sorry, where in the
5  transcript does it say "weeks," just so I know?
6  MR. KLAYMAN: Well, I'm just
7  paraphrasing. I'll let them read it.
8  MS. PORTER: Ok.
9  CHAIRPERSON MIMS: I'm sorry, can you
10  repeat the statement.
11  MR. KLAYMAN: I said I'm paraphrasing
12  the magistrate's statement "Why did it take you
13  time to come in after Mr. Bundy asked you to
14  withdraw?"
15  CHAIRPERSON MIMS: All right.
16  MR. KLAYMAN: I'm going to let it speak
17  for itself. I'm not characterizing what the
18  magistrate said.
19  BY MR. KLAYMAN:
20  A. (Answer Continuing.) Page 17, this is
21  where this comes from. The magistrate judge is
22  asking Mr. Bundy, "When did you make the decision?"

---

Page 528

1  which was to fire Bret Whipple.
2  "Well, it's been two weeks ago last
3  Thursday when I basically made" --
4  CHAIRPERSON MIMS: What line?
5  MR. KLAYMAN: Line ten.
6  CHAIRPERSON MIMS: I see, thank you.
7  MR. KLAYMAN: "Well, it's been two
8  weeks ago Thursday when basically I made it myself.
9  I wrote him a letter, it's notarized and I would
10  have received -- I guess he received that over a
11  week ago. Probably about, you know -- it was sent
12  in the mail I think last Tuesday."
13  And then on page 18, lines five through
14  nine, the court asks Mr. Bundy, "And has Mr.
15  Whipple and his staff gone over the discovery with
16  you that the government has produced in this case
17  justifying his prosecution in this matter?"
18  Mr. Bundy, "Maybe one percent."
19  "THE COURT: All right, have you had
20  access to the discovery during the course" -- I
21  think she meant "the case".
22  "THE DEFENDANT: "I have, yeah, I have.

---

Page 529

1  Yes, I have had access to it."
2  And then the judge asks -- the
3  magistrate judge asks, "All right, sir. And has
4  your lawyer been respectful with you throughout the
5  course of your attorney/client relationship?"
6  Mr. Bundy, "Yes, he has."
7  "THE COURT: And has he discussed with
8  you any possible defenses you have to the crimes
9  that you've been accused of in a superseding
10  indictment?"
11  Mr. Bundy responds, "Well, not really,
12  never any particular charge or ever any working any
13  of those things outs."
14  Then the judge asks, "Well, have you
15  had regular discussions about how to defend the
16  case? I don't want to know the content. I just
17  want to know if you've had discussions."
18  Mr. Bundy responds, "Just some brief
19  discussions of discovery."
20  THE COURT: All right. Have you been
21  able to communicate with Mr. Whipple throughout the
22  course of your attorney/client relationship?

---

41 (Pages 526 to 529)

In The Matter of: Larry Klayman
July 16, 2019

---

Page 530

1      "THE DEFENDANT: Well, it's been pretty
2   hard. You know, we have had -- we've had -- we
3   have had very few times now. When you talk about
4   visits, I, you know -- just a guess, I would say
5   maybe we've had five."
6      Because I've testified I visited with
7   Mr. Bundy over 30 times, and I wasn't counsel of
8   record.
9      "THE COURT: All right. And you've
10  also had regular defense meetings with" --
11     CHAIRPERSON MIMS: Mr. Klayman, I don't
12  think we need to read it.
13     MR. KLAYMAN: Ok, that's fine.
14     CHAIRPERSON MIMS: I think we
15  understand.
16     MR. KLAYMAN: So, you know, my goal was
17  not to be abrasive with Mr. Whipple, but just to
18  wake him up, that it was getting to be dire straits
19  here. I wanted to work with Mr. Whipple as part of
20  a team.
21  BY MR. KLAYMAN:
22     A.  (Answer Continuing) The motion to

---

Page 531

1   withdraw Mr. Whipple was filed on or about
2   September 21st, 2017. That's attached to Exhibit
3   24. I won't belabor that.
4      And Mr. Whipple gives an affidavit
5   here, which is attached -- which states in
6   paragraph five, "Affidavit of Bret O. Whipple,
7   paragraph five, "Notwithstanding the client's
8   attempt to cease my representation of him in this
9   matter at the present time, I am prepared to go to
10  trial for this matter and otherwise acted in due
11  diligence in my representation of the defendant."
12     That was not a true statement, but
13  that's what you have to say if you want to get out
14  of the case, at least in my experience.
15     Now I understand -- I don't need to
16  belabor it now -- but the issues that Ms. Porter
17  had for ODC in agreeing to admit these documents,
18  these court records, that she only wanted to hear
19  testimony with regard to my emails, in that regard.
20  The rest are court records and I will ask that they
21  be admitted, you know, when I conclude my
22  testimony. And she may ask me questions about the

---

Page 532

1   emails. I have no problem with that.
2      CHAIRPERSON MIMS: All right.
3      MR. KLAYMAN: May I consult with Mr.
4   Peer for a second?
5      CHAIRPERSON MIMS: Sure.
6      (Discussion off the record.)
7      MR. KLAYMAN: Your Honor, if I may just
8   have one minute here. I'm just seeing what else I
9   need to finish.
10     CHAIRPERSON MIMS: Go ahead.
11     MR. KLAYMAN: I might not be as long as
12  I anticipated.
13     CHAIRPERSON MIMS: All right.
14     (Brief pause.)
15  BY MR. KLAYMAN:
16     A.  (Answer continuing) I turn your
17  attention to Disciplinary Counsel's Exhibit 12.
18  We've gone over this before. I just want to bring
19  it to the honorable hearing committee's attention.
20     This is the motion of Bar Counsel to
21  withdraw a petition for a negotiated discipline,
22  which was then withdrawn; no force and effect.

---

Page 533

1   There is the attached email to this from Clay Smith
2   saying that he's going to do that on behalf of
3   Office of Disciplinary Counsel.
4      With regard to the AT&T case, I want to
5   just add a little testimony there, that is I was
6   one of a number of lawyers. I think I testified
7   earlier that case ultimately resulted in the
8   breakup of the AT&T monopoly. It was obviously a
9   very complex piece of litigation.
10     Now, with regard to the Bundy case, the
11  Bundy case continues in that, as I said previously,
12  it's now the Trump Justice Department that's
13  appealing it. So there is nothing that separates
14  the ability of the government to protect itself
15  when required. That's now on appeal and Mr. Bundy
16  still faces the possibility of life imprisonment,
17  because if the dismissal of the supersedeas
18  indictment is reversed -- again it was dismissed
19  with prejudice, but the government appealed it --
20  then he could be back on trial and --
21     CHAIRPERSON MIMS: Do you have any
22  motions or applications pending now in --

---

42  (Pages 530 to 533)

In The Matter of:  Larry Klayman
July 16, 2019

---

Page 534

1    MR. KLAYMAN:  I am representing Mr.
2    Bundy in the 9th Circuit with his appeal.
3    CHAIRPERSON MIMS:  Ok.
4    MR. KLAYMAN:  Yes, and I recently asked
5    for an extension of 30 days to file the appeal.
6    The government took a year almost to
7    file its initial appellate briefs and they asked
8    for a number of extensions.
9    I recently asked for a 30-day extension
10   because we just got documents in another case I
11   brought for Mr. Bundy here in the District of
12   Columbia, a Freedom of Information Act request,
13   with regard to a whistleblower --
14   CHAIRPERSON MIMS:  I don't think the
15   details of that are relevant.
16   MR. KLAYMAN:  All I'm saying is I
17   remain Mr. Bundy's lawyer.
18   CHAIRPERSON MIMS:  Yes, ok.
19   MR. KLAYMAN:  Those are my testimonies,
20   your Honor.  Thank you for your indulgence.
21   CHAIRPERSON MIMS:  Oh, are you
22   finished?

---

Page 535

1    MR. KLAYMAN:  I have concluded my
2    direct.
3    CHAIRPERSON MIMS:  Ms. Porter?
4    MS. PORTER:  Thank you.
5    CROSS-EXAMINATION
6    ON BEHALF OF DISCIPLINARY COUNSEL:
7    BY MS. PORTER:
8    Q.  Mr. Klayman, these questions are
9    basically going to be in the order that you
10   testified, beginning this morning.  So they may be
11   a little bit random and not I guess telling a
12   story, but I do want to clarify...
13   I think you testified this morning that
14   you joined the Busby firm as an associate here in
15   DC before the trial in the AT&T case?
16   A.  No, I --
17   Q.  Did I understand you --
18   A.  The case never went to trial.
19   Q.  The AT&T case?
20   A.  It settled.  It never went to trial in
21   terms of a -- I think there was a --
22   Q.  Go ahead, I'm sorry.

---

Page 536

1    A.  There was a settlement that was
2    reached.
3    Q.  You understand that that settlement --
4    the trial started in January of '81 and the
5    settlement wasn't until January of 82 and there was
6    a trial for approximately one year with a couple
7    months off by Judge Harold Greene.
8    You understand that?
9    A.  No, I don't understand that based on
10   your testimony anything.  And no lack of
11   disrespect.  No lack of disrespect.  The fact that
12   you say it's so doesn't make it so.
13   But I left before that case was
14   disposed of.  I took a job at Busby Rehm and
15   Leonard.
16   Q.  So am I correct that you left the
17   Department of Justice sometime in late 1981?
18   A.  Correct.
19   CHAIRPERSON MIMS:  Was it late 1985?
20   MR. KLAYMAN:  '81.
21   MS. PORTER:  '81.
22   BY MS. PORTER:

---

Page 537

1    Q.  I believe that the only criminal matter
2    that you identified while you were involved or
3    while you were an employee of the Department of
4    Justice was the Troxler matter?
5    A.  That's specifically what I remember but
6    there were other matters involving the Food and
7    Drug Administration.
8    Q.  This was the Troxler Hosiery Company?
9    A.  That's correct.
10   Q.  And that case involved actually a 1978
11   complaint for forfeiture by the Department of
12   Justice.  So that was before your time.
13   A.  Well, the case had begun before that.
14   That was a civil matter.  And what I testified to
15   was the bond was broken on the children's
16   sleepwear.  It contained Tris.  The Consumer
17   Product Safety Commission had regulated the use of
18   Tris to prevent -- it was flame retardant.  It
19   turned out it was carcinogenic.
20   Troxler broke the bond to cease and
21   exported it to Venezuela.
22   Q.  Well, you didn't export it.  It was

---

43 (Pages 534 to 537)

Page 538

1 Troxler that exported it, and then there was a --
2     A.  Well --
3     Q.  And then there was a --
4         MR. KLAYMAN:  Your Honor, may I have an
5 instruction, because she's testifying?
6         MS. PORTER:  No, I'm asking a question.
7         CHAIRPERSON MIMS:  Let her get the
8 question.
9 BY MS. PORTER:
10     Q.  It was Troxler who exported the
11 products and that was based upon a criminal
12 contempt?  That was the criminal proceeding against
13 Troxler?
14         Isn't that correct?
15     A.  Correct.
16     Q.  And you, as I think you testified
17 yesterday, were not involved in the trial or the
18 hearing, but the criminal contempt, which was the
19 only criminal matter against Troxler?
20     A.  That's correct.  But we were working up
21 the criminal case against Troxler and ultimately
22 the company was indicted and convicted.  The

Page 539

1 individual was not --
2     Q.  Well, you say "indicted".  It wasn't an
3 indictment.  It was a complaint for criminal
4 contempt because they had violated the court order.
5         Isn't that correct?
6     A.  That's what I meant by that.  I used
7 the term loosely.
8     Q.  And again you weren't involved at all
9 in the hearing on the criminal contempt?
10     A.  No, I was not involved in a hearing.
11         CHAIRPERSON MIMS:  Let me ask another
12 question about that.
13         MS. PORTER:  Sure.
14         CHAIRPERSON MIMS:  Can you explain your
15 role in the criminal -- in representing Troxler in
16 the criminal contempt charges that were brought.
17         MR. KLAYMAN:  Right, I was working
18 under the direction of John Fleder, the assistant
19 chief, and John Fleder was primarily responsible,
20 but I was working closely with him in that case
21 with regard to Troxler.
22         Not only were we engaged in the

Page 540

1 analysis of the criminality and moving forward to
2 hold Troxler accountable, the company, but also the
3 CEO, Andy Troxler.  And an issue arose, as I said,
4 that the Justice Department at the higher level had
5 instructed us to proceed against Troxler,
6 himself.  He was very close with the U.S. Attorney
7 in Greensboro, North Carolina.
8         That was actually one of the reasons I
9 left the Department of Justice and transferred
10 before that to AT&T because I was so upset that
11 politics played a role in that prosecution that I
12 I left.
13         CHAIRPERSON MIMS:  All right, thank
14 you.
15 BY MS. PORTER:
16     Q.  I have a few follow-up questions on
17 some of the four criminal matters that are listed
18 in the docket sheet 115.
19         The first is the Pushkareva in which
20 the document or the docket sheet and some of the
21 pleadings are contained in Exhibit 117, and I just
22 want to confirm a couple of things, Mr. Klayman...

Page 541

1         Number one, you did not enter your
2 appearance in that case until September of 2006?
3 You weren't involved until then?
4     A.  I don't recollect off the top of my
5 head.  It's so old when I issued a -- or when I
6 entered a notice of appearance.
7     Q.  If I can direct you to the docket
8 sheet, if that will assist you.  It's Exhibit
9 Number 117 at 005.
10     A.  Ok, where do you want to direct me?
11     Q.  To the docket entry 385, September 1st,
12 2006?
13     A.  Correct.
14     Q.  By April of 2007, approximately seven
15 or eight months later, your client entered a plea
16 to resolve the case?
17     A.  Sounds about right.
18     Q.  And I think you testified, but I just
19 want to confirm, that you were not her only
20 counsel.  There were at least two other lawyers
21 listed as her counsel?
22     A.  Well, the reason it was, and it was

In The Matter of:  Larry Klayman
July 16, 2019

Page 542

1  consistent with my testimony, is that there had
2  been a prior indictment of her and she had
3  negotiated with her counsel a plea agreement, and
4  she then fled the country.  Under that agreement
5  she was not entitled to leave the jurisdiction.
6        She was then arrested in Belize and
7  brought back.
8      Q.  I believe that was Natalia Humm and I'm
9  not on her yet.
10      A.  I'm sorry.  You're right, you're right.
11  I'm sorry.
12        CHAIRPERSON MIMS:  Well, I don't know
13  that we need to revisit all this.
14        MS. PORTER:  No, I just want to confirm
15  this --
16        CHAIRPERSON MIMS:  He testified I think
17  this was the client he may have said six or seven
18  months in each of them.
19        MS. PORTER:  Yes --
20  BY MS. PORTER:
21      Q.  So but I wanted to confirm that there
22  were other counsel on her case as her counsel,

Page 543

1  including Greg Gillen and I believe there was
2  another -- Haley Schwinn?
3      A.  Yes, Haley Schwinn was my associate,
4  worked for me, Klayman Law Firm, and Greg Gillen
5  was my Emory Law School classmate who I brought
6  down to represent me and Ms. Pushkareva when the
7  Justice Department contested that she could pay
8  legal fees to me from the proceeds of her house,
9  which she had sold.
10        Ok, that was the limited involvement of
11  Greg Gillen.  I handled the case, primarily, and
12  Haley Schwinn worked for me.
13      Q.  In the Humm case that you just referred
14  to, you entered your appearance as her counsel in
15  August of 2007?
16      A.  Where is that?
17      Q.  Exhibit Number 119 at page three.
18      A.  What entry?
19      Q.  Four.
20      A.  That's what the docket says.
21        Sometimes docket sheets are not exactly
22  right, but it probably was in and around that time.

Page 544

1      Q.  And the case was transferred to Orlando
2  and you didn't of any further involvement after she
3  appeared in front of the court in Orlando?
4      A.  Well, I did have further involvement.
5        She hadn't made a decision yet on
6  counsel.  I was still negotiating with -- I
7  believe.  This is on memory now.  We're going back
8  how many years here?  Twelve years.
9        I was trying to have reinstated her
10  original plea.  So I was doling with the U.S.
11  attorney in Orlando, whose name I don't remember
12  right now, the assistant.
13      Q.  But after she retained counsel in
14  Orlando, she had no further involvement.
15        Is that correct?
16      A.  I may have had involvement even after
17  that trying to get her her plea, but ultimately she
18  decided to go with counsel in Orlando.
19      Q.  And that counsel entered his appearance
20  in September 2007, approximately a month later?
21  That's Exhibit Number 119 at page 12.
22      A.  That may be, but to the best of my

Page 545

1  recollection I was still dealing with the U.S.
2  Attorney trying to get it put back to the old plea,
3  in Miami.
4      Q.  And am I correct you never entered your
5  appearance as counsel in the Orlando case?
6      A.  That's correct.  But I was still her
7  counsel because it was the same case.
8        So I don't think that you see a notice
9  of withdrawal here.
10      Q.  That's because you never entered your
11  appearance in the Orlando case.
12        Is that correct?
13        CHAIRPERSON MIMS:  I think we can move
14  on.
15        MR. KLAYMAN:  It's the same lawsuit,
16  Ms. Porter.  Please don't misrepresent.  It's the
17  same criminal prosecution.
18  BY MS. PORTER:
19      Q.  I'm reading from I guess what you had
20  already read into the record concerning your
21  discipline in Florida which involved Ms. Humm
22  filing a complaint against you.

45 (Pages 542 to 545)

In The Matter of: Larry Klayman
July 16, 2019

Page 546

1    A. Right.
2        CHAIRPERSON MIMS: What exhibit,
3    please?
4        MS. PORTER: Exhibit Number 5 at page
5    148.
6        CHAIRPERSON MIMS: Respondent's Exhibit
7    5?
8        MS. PORTER: Yeah, Respondent's Exhibit
9    5. I apologize.
10
11   BY MS. PORTER:
12   Q. I just want to confirm the accuracy of
13   this statement, Mr. Klayman. Reading again
14   Respondent's Exhibit Number 5...
15   A. You're at one forty-eight?
16   Q. Yes.
17   A. There is no Exhibit 148.
18       CHAIRPERSON MIMS: Exhibit 5.
19       MR. KLAYMAN: My Exhibit 5?
20       MS. PORTER: Yes.
21       CHAIRPERSON MIMS: And you want Bates
22   number page 148?

Page 547

1        MS. PORTER: Yes.
2        MS. BELL: It's in exhibit part one.
3        MS. PORTER: It's in the first
4    notebook, left-hand side.
5        MR. KLAYMAN: Page 148?
6    BY MS. PORTER:
7    Q. Yes.
8    A. Yes.
9    Q. And in that submission or the Florida
10   matter, you represented or stated, "Respondent had
11   agreed to represent Humm in a criminal proceeding
12   but she subsequently decided to retain new counsel
13   when the case was transferred from Miami to Orlando
14   federal court."
15       Is that a truthful statement?
16   A. Yes, and what I was saying, this was an
17   overlap because I was still trying to have her put
18   back to her other plea.
19   Q. You also testified about the rulings of
20   Judge Keller --
21   A. Let me also emphasize there. I still
22   remained counsel of record. I was simply in Miami,

Page 548

1    ok.
2        So what I meant was that she was
3    relying upon that lawyer in Orlando to go forward
4    if the matter had ever been tried.
5        CHAIRPERSON MIMS: She had provided you
6    with a $25,000 retainer?
7        MR. KLAYMAN: Correct.
8        CHAIRPERSON MIMS: And remind me, was
9    your position that you had worked all of those
10   hours for that retainer?
11       MR. KLAYMAN: Yes, I spent a lot of
12   time working with her.
13       CHAIRPERSON MIMS: Do you recall what
14   your hourly fee was at that time?
15       MR. KLAYMAN: Pretty low. I wasn't
16   billing by Washington, D.C. standards.
17       It probably was -- I'm just going by
18   recollection -- it probably was $295 an hour,
19   something in that range.
20   BY MS. PORTER:
21   Q. I guess another point of clarification,
22   it is my understanding, Mr. Klayman, that you

Page 549

1    charged her a nonrefundable $25,000 fee. You
2    weren't charging hourly fees?
3    A. No, it still goes on hourly, but it's
4    nonrefundable as far as the law. That's what I'm
5    trying to say.
6    Q. Did you ever produce your time records?
7    A. No, it didn't get to that, because I
8    settled this thing with a mediator. I agreed to
9    pay back $25,000, which was nonrefundable.
10       And you're also not reading the part
11   where her other lawyer said he didn't think it
12   likely that I'd want to refund a cent.
13       But under Florida law you can have
14   nonrefundable retainers.
15   Q. You done?
16   A. Yes.
17   Q. I want to ask you a little bit about
18   the decisions by Judge Keller and Judge Chin that
19   you testified about today.
20       I believe that in the case involving
21   Judge Keller you represented that your client
22   prevailed.

46 (Pages 546 to 549)

In The Matter of: Larry Klayman
July 16, 2019

---

Page 550

1  In fact, didn't the Baldwin Company
2  prevail?
3      A.  Which case are you talking about?
4      There was an International Trade
5  Commission case.  That's where the result was
6  favorable.  I said I didn't know whether it was a
7  settlement.  I don't remember whether it was a
8  litigated decision.  But it was a favorable
9  decision, as I remember it.
10      Maybe I'm wrong, but that's the way I
11  remember it.
12      Q.  And you would agree with me that the
13  United States Court of Appeals Federal Circuit's
14  description of your conduct in Judge Keller's
15  ruling is different from your I guess description
16  of it?
17      A.  I don't remember specifically.
18      CHAIRPERSON MIMS:  Wait, I'm sorry.  I
19  don't really understand the question.
20      MS. PORTER:  Ok.
21  BY MS. PORTER:
22      Q.  So, you described what you contend went

---

Page 551

1  on before Judge Keller this morning.
2      MR. KLAYMAN:  First of all, I'm going
3  to object on relevancy, your Honor, because the
4  only issue is that I had disclosed to Judge Navarro
5  that I had been barred from his courtroom.
6      CHAIRPERSON MIMS:  It was your
7  testimony.
8      MR. KLAYMAN:  So I answered that
9  question.
10
11  BY MS. PORTER:
12      Q.  And my question was, the findings of
13  the United States Court of Appeals Federal Circuit
14  aren't consistent with your description of what
15  went on before Judge Keller?
16      CHAIRPERSON MIMS:  Are or are not?
17      MS. PORTER:  Are not.
18      MR. KLAYMAN:  I haven't read that
19  decision, but as I testified to I did not have the
20  transcript of what had occurred before Judge
21  Keller.  It went missing and the court reporter
22  apparently had died in the interim.  So there never

---

Page 552

1  was a record, a full record of that matter.
2      Now when the matter was reviewed by
3  Judge Kozinski of the 9th Circuit, they did find
4  some of the tapes.  They went looking for it.
5      Because Judge Keller has a record in
6  front of 9th Circuit, which is in my view rather
7  poor.  He had been admonished in the 9th Circuit in
8  other cases for prejudicial remarks about
9  minorities.
10      They only found a part of the tape.  So
11  they couldn't recreate the transcript.
12      CHAIRPERSON MIMS:  All right, but since
13  you have not read the opinion that she's referring
14  to --
15      MR. KLAYMAN:  I haven't read it.
16  BY MS. PORTER:
17      Q.  You've never read it?
18      A.  I read it a long time ago.
19      Q.  So you're familiar with the findings of
20  the 9th Circuit?
21      A.  I'm not familiar with them now.  I
22  don't remember specifically what they were.

---

Page 553

1      Q.  None of those findings, in fact not
2  even the ruling was disclosed to Judge Navarro in
3  connection with your initial application?
4      A.  All that was required to disclose was
5  the fact that I was barred by Judge Keller and that
6  I had not been disciplined by any bar association
7  for that.
8      That's my position and we all know what
9  the result was.  I didn't say that the result was
10  overturned of Judge Keller.
11      I mean, if that appeal had overturned
12  it, then it would have changed the status quo, but
13  the status quo was what I represented it to be to
14  Judge Navarro.
15      Q.  And the same is true with the 2nd
16  Circuit's decision concerning Judge Chin, the
17  description or the findings of the 2nd Circuit were
18  not consistent with your I guess description of
19  what occurred to the hearing committee or to Judge
20  Navarro in your petition for pro hac vice?
21      A.  No, I disagree.
22      CHAIRPERSON MIMS:  You're asking him

---

47 (Pages 550 to 553)

In The Matter of: Larry Klayman
July 16, 2019

| Page 554 | Page 556 |
|---|---|

**Page 554**

1 just about the description, the factual description
2 of --
3         MS. PORTER: The findings of the 2nd
4 Circuit.
5         CHAIRPERSON MIMS: Not the actual final
6 order that said he -- well, there wasn't an order,
7 right, that said that you weren't to appear?
8         MR. KLAYMAN: Right. I mean, that was
9 all that was really relevant.
10         CHAIRPERSON MIMS: There was or there
11 was not an order? I don't remember.
12         MR. KLAYMAN: For Judge Chin?
13         CHAIRPERSON MIMS: Yes.
14         MR. KLAYMAN: Right, he saw what Judge
15 Keller had done, in reference to that, and he said
16 "I'm doing the same thing."
17         CHAIRPERSON MIMS: Oh, right.
18 BY MS. PORTER:
19         Q.   And again you did not disclose the 2nd
20 Circuit decision to Judge Navarro in your petition
21 for pro hac vice?
22         A.   I wasn't requested to, and it wasn't

**Page 555**

1 irrelevant because I didn't contest the fact that I
2 had been barred from practicing in front of Judge
3 Chin. It was not contested.
4         Q.   I think you testified this morning that
5 you did disclose to Judge Navarro that there had
6 been a negotiated -- a petition for negotiated
7 discipline in DC, but in fact Judge Navarro
8 discovered that on her own and she included that in
9 the order which you've marked as Respondent's
10 Exhibit Number 4.
11         A.   Again, particularly as Judge Gould
12 wrote, and I turn the committee's attention to
13 that, that, from my reading of Judge Gould's
14 letter, I disclosed all that I had to disclose,
15 based on the question, and it was not relevant in
16 any event because the negotiated discipline had
17 been withdrawn. And as I read the Board's ruling,
18 it is of no force and effect.
19         Q.   That's not my question.
20         You testified this morning that you
21 disclosed the petition for negotiated discipline to
22 Judge Navarro. But in fact, if you look at

**Page 556**

1 Respondent's Exhibit Number 4, it was Judge Navarro
2 who discovered that and included it as an
3 attachment to the order denying your initial
4 petition.
5         A.   When she asked me about it, I disclosed
6 what the situation was, but when I filed the first
7 applications, as Judge Gould found in his dissent,
8 I had no obligation to refer to it.
9         But, yes, I discussed it with her and I
10 told her that it was of no force and effect.
11         Q.   And that was only --
12         A.   Just paraphrasing it.
13         Q.   -- only after she discovered it on her
14 own and asked you about it?
15         MR. KLAYMAN: I object to the use of
16 the word "discover," because there was nothing to
17 discover.
18         I had admitted that I had been barred
19 by judge -- excuse me, I admitted there was an
20 ongoing DC Bar Disciplinary proceeding that had not
21 been concluded. So I was not required to get into
22 that. There was no final decision and the Board

**Page 557**

1 rule says that it can be withdrawn and is of no
2 force and effect at this time.
3         Now we can beat a dead horse here, but
4 that's my testimony.
5         CHAIRPERSON MIMS: The ongoing
6 disciplinary action that you referred to in your
7 attachment, that is the negotiated discipline?
8         MR. KLAYMAN: No. No, that's this
9 proceeding, which continues on today. To this day,
10 it's still going forward.
11         CHAIRPERSON MIMS: You mean Judicial
12 Watch?
13         MR. KLAYMAN: Yeah, 13 years later; a
14 new world indoor record.
15 BY MS. PORTER:
16         Q.   So then when Judge Navarro asked you
17 about the petition for negotiated discipline, which
18 she attached to her initial order, you said you had
19 chosen not to pursue it, but you did not disclose
20 to Judge Navarro that the petition for negotiated
21 discipline had been rejected because the sanction
22 was too lenient?

48 (Pages 554 to 557)

In The Matter of:  Larry Klayman
July 16, 2019

Page 558

1          A.  That was -- I stand by what I said in
2   the pleadings.
3          Q.  Ok.
4          A.  I stand by what I said on it.
5          I'm not going to change what I said to
6   Judge Navarro.  What I said was perfectly
7   appropriate, as Judge Gould found.
8          Q.  You also testified about Mr. Rotunda's
9   opinion, and in fact I think you testified that it
10  was his opinion that you didn't violate any rules,
11  and in fact, Mr. Rotunda found that you did violate
12  the rules but that it was a technical violation or
13  technical violations that didn't merit sanction.
14         That was his opinion.
15         A.  He did not find that, and when he
16  testified -- there is testimony in the record from
17  Professor Rotunda during the hearing -- that I had
18  not violated any rules.  It wasn't the same matter
19  to create a conflict of interest.
20         That's what he testified to.
21         Q.  So Mr. Rotunda testified differently
22  than what he set forth in his opinion letter?

Page 559

1          CHAIRPERSON MIMS:  Where are you
2   looking at his opinion?
3          MS. PORTER:  Respondent's Exhibit
4   Number 25, pages 121 through 125.
5          CHAIRPERSON MIMS:  And if you can
6   direct me to the technical violation which you are
7   talking about.
8          MS. PORTER:  Sure.  It's on page 125,
9   third to last paragraph, "Given the delay,
10  seldom" -- "investigated for such a technical
11  violation."
12         MS. BELL:  We're not there yet.  One
13  second.
14         MS. PORTER:  Oh, sorry.
15         CHAIRPERSON MIMS:  Which paragraph?
16         MS. PORTER:  The one that begins,
17  "Given the delay"...
18         CHAIRPERSON MIMS:  Ok.
19         MS. PORTER:  And I think that Judge
20  Navarro, on the first page of his opinion, where he
21  is somewhat clever in his terminology where he says
22  --

Page 560

1          CHAIRPERSON MIMS:  Is there another
2   place in this letter where he ascribes the
3   technical violation?
4          MS. PORTER:  Yeah, the last one on the
5   paragraph, which is RX0121, "It is my expert
6   opinion that, in the present situation, Mr. Klayman
7   has not committed any offense that merits
8   discipline."  Not that he did not commit any
9   offense.
10         I just wanted to I guess clarify the
11  record as to that.
12         MR. KLAYMAN:  Your Honor, I take strong
13  exception to that.  I'm trying to keep my cool
14  here.  I really am.
15         CHAIRPERSON MIMS:  Let me ask you this:
16  what is the technical violation that he's referring
17  to?
18         MR. KLAYMAN:  Conflict of interest,
19  same or similar matter.
20         He testified in court -- I'll submit
21  the transcript -- that there was no such violation.
22         She's cleverly testifying herself.  She

Page 561

1   said -- Professor Rotunda said, "Mr. Klayman has
2   not committed any offense that merits discipline."
3          This was written early on in the case
4   before he testified, and he testified in front of
5   the committee.
6          CHAIRPERSON MIMS:  I think we
7   understand.
8          MR. KLAYMAN:  Ok, but I object to her
9   testifying for Professor Rotunda.
10         CHAIRPERSON MIMS:  I don't think she
11  testified for Professor Rotunda.  I was asking her
12  questions as to where she was getting the
13  information.
14         So that's overruled.
15  BY MS. PORTER:
16         Q.  With respect to the Bivens action that
17  was filed against Judge Navarro, I think you
18  testified yesterday that, while your name wasn't on
19  the complaint, you participated in the drafting of
20  that and approved its filing?
21         MR. KLAYMAN:  Your Honor, this is
22  beyond the scope of direct.  She's going back to

49  (Pages 558 to 561)

In The Matter of:  Larry Klayman
July 16, 2019

---

Page 562

1   yesterday.  So I think it's duplicative.
2       MS. PORTER:  No, he testified about it
3   this morning.
4       I'm just confirming, he again referred
5   to it as "Mr. Hansen's Bivens action," and I just
6   wanted to confirm that Mr. Klayman participated --
7       MR. KLAYMAN:  I did not use --
8       CHAIRPERSON MIMS:  You want -- go
9   ahead, finish your response.
10      MR. KLAYMAN:  I did not use those
11  words.  I said Mr. Hansen filed it.  See twists the
12  words.
13  BY MS. PORTER:
14      Q.  Mr. Hansen filed it but you
15  participated in the preparation and approved the
16  filing?
17      A.  My testimony yesterday stands.
18      MR. KLAYMAN:  This goes beyond the
19  scope of direct.
20      CHAIRPERSON MIMS:  I think I actually
21  asked a question in which you responded, bringing
22  up the Bivens action.  Because I asked about

---

Page 563

1   pleadings that your name was on and you then
2   brought up the Bivens action.
3       MR. KLAYMAN:  Yes, and I explained what
4   happened to her.
5   BY MS. PORTER:
6       Q.  And your name was also on all the
7   motions to disqualify Judge Navarro?
8       A.  As of counsel, I believe, if I can
9   recollect.  You can show me.  I'm going from
10  memory.
11      Not -- I didn't sign them.  Or if I did
12  there was something that was filed that said it was
13  an inadvertent error.  That's in the record.
14      MS. PORTER:  One second.
15      MR. KLAYMAN:  Show me what you're
16  talking about.
17      MS. PORTER:  I know what I'm looking
18  for.  I just have a lot of notebooks.
19  BY MS. PORTER:
20      Q.  The third petition that you filed with
21  the 9th Circuit, which I believe is 95, and 100
22  is the fourth petition.

---

Page 564

1       CHAIRPERSON MIMS:  Is this the third
2   writ?
3       MS. PORTER:  Yeah, the third petition
4   for a writ of mandamus filed with the 9th Circuit
5   on October 2nd, 2017, Exhibit Number 95.
6   BY MS. PORTER:
7       Q.  And Mr. Klayman, my notes reflect from
8   your testimony this morning that, when you filed
9   this, Mr. Bundy did not have counsel because he had
10  terminated Mr. Whipple.
11      Was that a correct description of your
12  testimony?
13      A.  He had tried to terminate Mr. Whipple,
14  but the court wouldn't let him terminate Mr.
15  Whipple.
16      I was still his counsel.  I was his
17  counsel.  I wasn't counsel of record in the
18  criminal case.
19      Q.  So, when you tiled this third petition,
20  Exhibit Number 95, Mr. Whipple was still acting as
21  counsel and in fact had filed a number of motions
22  between the September 27th, 2017 hearing and the

---

Page 565

1   filing of your third petition for writ of mandamus?
2       MR. KLAYMAN:  Again, your Honor, I
3   testified about this.  It's beyond the scope of my
4   direct.  I testified yesterday about it.  That's
5   why I didn't take the court's time up.
6       CHAIRPERSON MIMS:  I'm sorry, can you
7   repeat the question again?
8       MS. PORTER:  Sure.  I asked Mr. Klayman
9   that, in fact, Mr. Whipple was, at least according
10  to the docket record, representing his client
11  Cliven Bundy, including filing numerous motions
12  between September 27th, 2017 and the filing of Mr.
13  Klayman's third petition for a writ.
14      CHAIRPERSON MIMS:  That's fine.  I'll
15  allow that question.
16      MR. KLAYMAN:  All right, first of all,
17  let's clear something up here...
18      The motions that Mr. Whipple filed by
19  and large were motions that were filed by other
20  parties, which he then piggybacked on.  And I
21  provided evidence to show that Mr. Whipple was not
22  doing his job with regard to Mr. Bundy and he was

---

In The Matter of:  Larry Klayman
July 16, 2019

Page 566

1  dismissed.
2      The court imposed Mr. Whipple, and I
3  felt he noted a team, a full team to defend
4  himself, should he go to trial.
5      MS. PORTER:  The docket sheet is in
6  evidence.  I'll refer to that.
7      CHAIRPERSON MIMS:  Is there any dispute
8  that Mr. Whipple filed motions during that period?
9  I don't think that was disputed.
10      MR. KLAYMAN:  No.
11      CHAIRPERSON MIMS:  I don't think we
12  need to reviews those dockets.
13      MS. PORTER:  The implication is Mr.
14  Bundy doesn't have counsel or he didn't have
15  counsel that was ready and was willing to try this
16  case.
17      The docket sheets submitted suggest
18  something very different.
19      MR. KLAYMAN:  Yes, and I take strong
20  issue with that.
21      Based upon both what Mr. Bundy
22  testified to at his hearing -- and I went through

Page 567

1  the transcript -- and I also went through my
2  observations documented in my own email to Mr.
3  Whipple.
4  BY MS. PORTER:
5      Q.  When asked about the fifth petition
6  that you filed with the 9th Circuit, which is
7  Exhibit Number 109, I think you testified so that
8  other courts wouldn't take action against you based
9  on the 9th Circuit's rulings?
10      A.  That's not quite an accurate
11  representation.
12      I talked about that limited
13  circumstances with Robles where I did not -- I was
14  not able to gain entry pro hac vice.
15      Actually I had prior entry pro hac vice
16  and the judge revoked it.  I was in that case
17  initially, then she saw the 9th Circuit ruling and
18  then misinterpreted it, thinking that the DC Bar
19  proceeding was final.
20      Q.  Well, in fact the judge in that case
21  revoked your pro hac vice for a number of reasons,
22  not just what happened in the Bundy case, but your

Page 568

1  misconduct in front of her, including seeking to
2  disqualify her after she ruled against you.
3      A.  First of all, initially I asked her to
4  recuse herself.  I didn't move to disqualify her.
5  And that was only after she ruled, when I saw the
6  way she ruled.
7      The reason I did is because the
8  defendant in that case had been a student at the
9  University of Berkley, and she was a law professor
10  there as well as attended school there.  And I
11  thought it created an appearance.  And I asked her
12  nicely and politely to remove herself from the
13  case.
14      I did not move to disqualify herself
15  initially.  When I saw her ruling and we tried to
16  correct that ruling, because over and over again
17  she continued to take the position of Judge Bybee
18  and the majority that -- she didn't even take that
19  position.  She just was under the false impression
20  that had been presented to her from the lawyers
21  from the City of Berkley, and that the proceeding
22  in DC, the initial Fitton Judicial Watch case, was

Page 569

1  over and I lost it.  And I asked her to correct it,
2  and she wouldn't correct it.  And she dug her heals
3  in.
4      That matter is now up on appeal to the
5  9th Circuit.
6      Q.  You're aware then of the judge's
7  rulings about your misconduct in the Robles matter
8  by dismissing and re-filing the case so it could
9  get assigned to another judge?
10      A.  Well, I disagree with that.
11      We changed the -- there were
12  differences in the parties involved in that case.
13  So we did re-file it and we filed it in the court
14  we felt it would be appropriate.
15      I did dismiss it initially.  That's not
16  misconduct.  I wasn't sanctioned.  I wasn't
17  sanctioned by the judge.  I wasn't sanctioned by
18  her.
19      MS. PORTER:  Rather than characterizing
20  the judge's order, I'm going to go ahead and mark
21  it as 126.
22  BY MS. PORTER:

51 (Pages 566 to 569)

In The Matter of: Larry Klayman
July 16, 2019

Page 570

1    Q.  And I understand it's still on appeal,
2  but I'll just have you identify this.
3        MR. KLAYMAN:  I would ask, your Honor,
4  if he does that I'll be happy to submit our briefs
5  to the 9th Circuit to show the error in that
6  ruling.
7        This is also beyond the scope of my
8  direct, too.
9        MS. PORTER:  I don't believe it is.
10        MR. KLAYMAN:  In terms of these
11  rulings.
12        CHAIRPERSON MIMS:  Let's not talk back
13  and forth.  This should be in the format of a
14  question and answer.  Give all of us a minute to
15  just look at this.
16        MS. PORTER:  Sure.
17        (Brief pause.)
18        CHAIRPERSON MIMS:  All right.  So
19  you're going to ask a question about 126?
20        MS. PORTER:  I did, because I think his
21  representations this morning were that if he got
22  the 9th Circuit to eliminate or I guess void its

Page 571

1  decisions, that he wouldn't suffer from other
2  judges.
3        I'm saying that this judge cited
4  multiple reasons why she revoked his pro hac vice.
5        MR. KLAYMAN:  Yes.
6        MS. PORTER:  Not based solely on the
7  9th Circuit and the 9th Circuit's revocation
8  decision would have had an effect.
9        CHAIRPERSON MIMS:  So what is the
10  question?
11        MS. PORTER:  That was the question,
12  basically.
13  BY MS. PORTER:
14    Q.  The judge had numerous reasons for
15  revoking your pro hac vice application?
16    A.  My position is she did not.  And I
17  might point out that this is a tentative ruling.
18  This is not a final ruling.
19    Q.  She did finalize that ruling at some
20  point, did she did not?
21    A.  She did, at some point, and that's what
22  caused me -- but she reached back into what Keller

Page 572

1  did and Chin did and other people did, which wasn't
2  really before her.  And what I really believe
3  influenced her was the 9th Circuit ruling but she
4  misinterpreted it because she was dealing with
5  information by a counsel for the City of Berkley,
6  that that proceeding was final.
7        The matter is now up on appeal at the
8  9th Circuit.
9        So, now that she's made this an exhibit
10  I ask for leave to put into the record the entire
11  record of this matter and to supplement my exhibits
12  with the entire record.
13        CHAIRPERSON MIMS:  What constitutes the
14  entire record?
15        MR. KLAYMAN:  Well, just this
16  particular issue, the pro hac vice issue.
17        CHAIRPERSON MIMS:  But what would you
18  like to enter into the record?
19        MR. KLAYMAN:  Well, yes, the first
20  request for recusal -- it's was not a motion to
21  disqualify -- and the filings of the City of
22  Berkley and the feelings of me in response to that,

Page 573

1  and then the filings of me after the judge issued
2  her final order with regard to this issue.
3        CHAIRPERSON MIMS:  I assume that you'll
4  bring those probably Thursday now?
5        MR. KLAYMAN:  Yes.
6        CHAIRPERSON MIMS:  All right.  I will
7  allow this into the record and when you bring those
8  I'll allow those into the record as well.
9        I do have a question about Exhibit
10  126...
11        Under this tentative ruling under
12  paragraph one, under "Background," do you see where
13  I'm at?
14        MR. KLAYMAN:  Yes, mm-hmm.
15        CHAIRPERSON MIMS:  The first sentence
16  says, "Over the years numerous courts have
17  sanctioned Klayman, called his behavior into
18  question or revoked his pro hac vice admission."
19        Do you know what the court is referring
20  to where it says "numerous courts have sanctioned
21  Klayman"?
22        MR. KLAYMAN:  Yeah, the same thing.

52 (Pages 570 to 573)

In The Matter of:  Larry Klayman
July 16, 2019

|  | Page 574 |
|---|---|

1    Your Honor may remember that there's an
2 order of March 28th where I had asked to take
3 discovery if this case was going to involve prior
4 sanctions orders.  And your Honor ruled in that
5 order that it wasn't part of the Specification of
6 Charges, so therefore you were declining to
7 consider discovery on that point.
8    But Judge Gould makes reference to this
9 over the years, that, yes, I have locked horns with
10 judges.  These cases go back 20 and 30 years. I've
11 been a practicing lawyer for 42 years.  So these
12 are not a large number of sanction orders, but in
13 any of these orders I was never found to have
14 committed a violation.
15    CHAIRPERSON MIMS:  I think I'm just
16 confused.
17    I thought you had testified that you
18 hadn't been sanctioned, but was that in relation to
19 this matter?
20    MR. KLAYMAN:  No, sanctioned by a bar
21 association.
22    I freely admit that I locked horns with

|  | Page 575 |
|---|---|

1 judges.  Judges get to right decisions.  I don't.
2 If I had been able to write my decision, I would
3 have written what I wanted to write at the time,
4 too.
5    CHAIRPERSON MIMS:  Were you ever
6 sanctioned by Judge Navarro?
7    MR. KLAYMAN:  No.
8    CHAIRPERSON MIMS:  Were you ever
9 sanctioned by the 9th Circuit?
10    MR. KLAYMAN:  No.
11    CHAIRPERSON MIMS:  Go ahead.
12 BY MS. PORTER:
13    Q.  You recounted a conversation with Mr.
14 H. Clay Smith about resigning from the bar.
15    CHAIRPERSON MIMS:  Say that again,
16 please.
17    CHAIRPERSON MIMS:  Mr. Klayman
18 recounted a conversation he had with H. Clay Smith
19 about not resigning from the bar.
20 BY MS. PORTER:
21    Q.  Is that correct?
22    A.  Yes.

|  | Page 576 |
|---|---|

1    Q.  When did that conversation occur?
2    A.  I don't remember the exact date, but it
3 was in the context of the Judicial Watch proceeding
4 and the potential for this proceeding.
5    What he was saying to me is "Larry, you
6 can avoid all of the time and expense and angst if
7 you will simply resign.
8    "You can do it quietly and it won't be
9 a big deal."
10    Because I'm a public figure.  And I
11 said, "Clay, I wouldn't do that."
12    But I couldn't figure out at the time
13 why he was saying that.
14    CHAIRPERSON MIMS:  We've heard that
15 testimony before.
16 BY MS. PORTER:
17    Q.  Ok, and he actually said "resign"?
18    A.  Yes.
19    Q.  Did he tell you that you can't resign?
20    A.  That was what was so bizarre, because I
21 checked with other counsel who do this for a
22 living, and they said, "No, you can't in fact

|  | Page 577 |
|---|---|

1 resign.  You have to agree to be disbarred."
2    Q.  In fact, the DC court rules prohibit
3 disbarment, even when there is an investigation.
4    MR. KLAYMAN:  First of all, I ask her
5 not to testify here.
6    CHAIRPERSON MIMS:  She asked in the
7 form of a question.
8    MR. KLAYMAN:  That is correct.
9    I think what Mr. Smith was trying to
10 say -- and Clay is an understanding person, he has
11 a heart, like Gene Shipp did, the prior Bar
12 Counsel -- and I think he was trying to say,
13 "Larry, there's going to be dark clouds on the
14 horizon here.  Get ready for them."
15 BY MS. PORTER:
16    Q.  Respondent's Exhibit Number 24 are I
17 guess a collection of emails that you sent to Mr.
18 Whipple.
19    A.  Yes.
20    Q.  Am I correct that Mr. Whipple also sent
21 you emails and text messages?
22    A.  I don't know that he ever sent me an

53  (Pages 574 to 577)

In The Matter of:  Larry Klayman
July 16, 2019

Page 578

1  email.  He sent me these cryptic text messages.
2      Q.  And you have not included those as part
3  of these exhibits?
4      A.  No.  I don't think I have them any
5  more.  But I can tell you what they said generally,
6  what I said in the email: he's never had time --
7      CHAIRPERSON MIMS:  That wasn't the
8  question.
9      MR. KLAYMAN:  Ok.  I don't have them
10  anymore.
11  BY MS. PORTER:
12      Q.  As you recounted in your first email
13  that's part of Respondent's Exhibit Number 24, Mr.
14  Whipple told you that Mr. Bundy told him not to
15  file the pro hac vice supplement.
16      A.  Yes, that was false.  And that's why
17  later Cliven instructed him to file the pro hac
18  vice.  That was false.
19      Q.  And there was no court proceeding or
20  court record where Mr. Bundy ever raised
21  concerns -- I'm talking December 11th, during the
22  trial, December 11, 2017 onwards -- where Mr. Bundy

Page 579

1  ever raised concerns with the court about the
2  quality of Mr. Whipple's representation.
3      A.  Well, he did raise those concerns
4  during that hearing that I read, which was Exhibit
5  24.
6      Mr. Bundy didn't really talk during the
7  trial.  He sat there and he was being represented
8  by Mr. Whipple.
9      So he was trying to avoid, based upon
10  my discussions with him in federal prison, a
11  conflict with Mr. Whipple.  He wanted Mr. Whipple
12  to be more contentious, to put forth his defenses
13  and he complained -- let me give you a little
14  story.  I'll put it in context...
15      Cliven said to me -- who has a good
16  sense of humor -- he said, "I can't get Whipple to
17  do what I want him to do.  He doesn't listen to me
18  and I can't see him."
19      He said, "My daddy told me" -- he's a
20  rancher.  It's a family of cowboys.  He says, "When
21  you're riding a horse and you whip the horse and it
22  doesn't respond, in the rear end, the last resort

Page 580

1  is to hit him in the peter.  And if he doesn't
2  respond then, you got to get rid of the horse."
3      And that's what he was referring to
4  with Whipple, excuse the semi off-color language.
5      Q.  After the hearing on September 27th,
6  2017, Mr. Bundy never raised with the court any
7  problems that he had with Mr. Whipple?
8      A.  Well, he was being represented by
9  Whipple so --
10      Q.  Just answer my question.
11      A.  No, and that's a false premise.  That's
12  a loaded question.
13      He was being represented by Whipple and
14  what he did was he sent a letter, a certified
15  letter to Whipple saying, "You're dismissed".
16      Q.  I said after September 27th, 2017, Mr.
17  Klayman.  If you could focus on that time period
18  moving forward.
19      A.  Whipple --
20      Q.  Let me finish my question, please.
21      Mr. Bundy never raised with the court
22  any concerns that he had with Mr. Whipple's

Page 581

1  representation.
2      True or false?
3      MR. KLAYMAN:  Objection, relevancy, but
4  I will answer the question.  It's irrelevant.
5      CHAIRPERSON MIMS:  I would like you to
6  answer the question.  It's just did he raise any
7  concerns with the court?
8      MR. KLAYMAN:  Not directly with the
9  court, but he certainly raised them with me.
10      CHAIRPERSON MIMS:  You've testified to
11  that.
12      MS. PORTER:  No more questions, thank
13  you, and I would offer 126.  I don't know if you've
14  already admitted it.
15      CHAIRPERSON MIMS:  I did admit it.
16      MS. PORTER:  Ok, thank you.
17      CHAIRPERSON MIMS:  And we'll review
18  Respondent's exhibits to supplement this.
19      MR. KLAYMAN:  Your Honor, I would just
20  ask that my direct be left open if there are any
21  questions about the documents that we submit on
22  Thursday.

54 (Pages 578 to 581)

In The Matter of:  Larry Klayman
July 16, 2019

Page 582

1    CHAIRPERSON MIMS:  The supplemental
2  documents that go with this?
3    MR. KLAYMAN:  Yes, with regard to the
4  objections.
5    CHAIRPERSON MIMS:  That's fine.  I'll
6  allow that.
7    MR. KLAYMAN:  Let me just check with
8  Mr. Peer.
9    (Brief pause.)
10    MR. KLAYMAN:  This is my redirect.
11    REDIRECT EXAMINATION
12    ON BEHALF OF RESPONDENT
13    BY MR. KLAYMAN:
14  Q.  I turn the court's attention to Exhibit
15  38.
16    CHAIRPERSON MIMS:  Is this going to be
17  very brief, Mr. Klayman?
18    MR. KLAYMAN:  Very brief.
19  BY MR. KLAYMAN:
20  A.  (Answer Continuing)  Exhibit 38, your
21  Honor, is the errata that was filed by Joel Hansen,
22  himself.

Page 583

1    CHAIRPERSON MIMS:  It's the what, I'm
2  sorry?
3    MR. KLAYMAN:  Exhibit 38, Bar Counsel
4  Exhibit 38.
5
6  BY MR. KLAYMAN:
7  A.  (Answer Continuing)  He's filing an
8  errata, Joel Hansen, the local counsel, that he
9  inadvertently put an electronic signature on the
10  motion to disqualify Judge Navarro on my behalf.
11    He's withdrawing that electronic
12  signature saying it was a mistake.
13    So that clears up that issue.
14    Now I then draw your attention to Bar
15  Counsel's Exhibit 95, and I'm not going to belabor
16  Exhibit 95.  Perhaps Mr. Peer can show me this
17  provision, but 95 does not state that Mr. Bundy was
18  without counsel, only that Mr. Whipple was
19  unprepared.  Ok, but I'll let the document speak
20  for itself.
21    Finally, and I'll testify to this when
22  I bring in the new documentation with regard to the

Page 584

1  judge in the Robles case, that she was simply
2  following a list of things that Navarro had found
3  when ex post facto she had to come up with a reason
4  to keep me out of the proceeding.  That's where she
5  got that.
6    MR. KLAYMAN:  I have no further
7  questions for myself and will call Mr. Peer to the
8  witness stand.
9    (Mr. Klayman returns to counsel table.)
10    CHAIRPERSON MIMS:  Mr. Peer.
11    (Oliver Peer on the witness stand.)
12    CHAIRPERSON MIMS:  If you're ready,
13  I'll go ahead and swear the witness in.
14    MR. KLAYMAN:  Yes.
15    CHAIRPERSON MIMS:  State your name for
16  record, please.
17    THE WITNESS:  Oliver Peer.
18    CHAIRPERSON MIMS:  Mr. Peer, do you
19  solemnly swear or affirm that the testimony you
20  will give in this proceeding will be the truth, the
21  whole truth and nothing but the truth?
22    THE WITNESS:  Yes.

Page 585

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

55 (Pages 582 to 585)

In The Matter of:  Larry Klayman
July 16, 2019

| Page 586 |
| --- |

Whereupon,

1  OLIVER PEER

2  called as a witness on behalf of Respondent, and

3  after having been first duly sworn, was examined

4  and testified as follows:

5  DIRECT EXAMINATION BY COUNSEL FOR RESPONDENT:

6  BY MR. KLAYMAN:

7  Q.  Mr. Peer, do you work for me, with me?

8  A.  Yes.

9  Q.  Did there come a point in time when you

10  advised me, after I asked you to do research, as to

11  the relationship, if any, of Shannon Bybee to Judge

12  Jay Bybee?

13  A.  Yes.

14  Q.  What did you tell me?

15  A.  I told you that they were husband and

16  wife.

17  Q.  How did you come to that conclusion?

18  A.  I searched on Google.  I noted it

19  somewhere, and I was very certain of it, and I

20  think I just connected the two in my head.  And it

21  was just a mistake, yeah.

| Page 587 |
| --- |

1  Q.  When we found out it was a mistake, did

2  we take steps to correct the record?

3  A.  Yes.  I believe in our replay brief

4  that was relating to your original petition is

5  where we submitted an affidavit and we corrected

6  the record.

7  Q.  Was that in the exhibits that we

8  presented or that Bar Counsel has presented?

9  A.  Yeah, the affidavit is.  Yes.

10  Q.  Did you then execute a declaration to

11  that effect?

12  A.  Yes.

13  Q.  Is that Exhibit 23, Respondent's

14  Exhibit 23?

15  MS. PORTER:  I think I have it at 22.

16  MR. KLAYMAN:  Twenty-two?

17  THE WITNESS:  Yes, 22.

18  BY MR. KLAYMAN:

19  Q.  Can you read it.  It's very short.

20  A.  Ok.  "I, Oliver Peer, hereby being

21  sworn, deposes that the following is true and

22  correct, based on my personal knowledge and" --

| Page 588 |
| --- |

1  MR. KLAYMAN:  I don't think he's ever

2  been a witness before.

3  THE WITNESS:  "I, Oliver Peer, hereby

4  being sworn deposes and says that the following is

5  true and correct and based on my personal knowledge

6  and belief.

7  "I am over the age of 18 and mentally

8  and legally competent to make this affidavit sworn

9  under oath.

10  "I am employed by the counsel of

11  record, Mr. Larry Klayman, Mr. Klayman.

12  "I was tasked with researching the

13  relationships, associations and friendships between

14  the Honorable Jay Bybee, Judge Bybee, Senator Harry

15  Reid, Senator Reid, and the Honorable Gloria

16  Navarro, Judge Navarro.

17  "During the course of my research I

18  came across Shannon Bybee, who I mistakenly noted

19  as Judge Bybee's wife.

20  "I presented my research, which

21  contained in it statements to Mr. Klayman, who

22  subsequently relied on my error to prepare the

| Page 589 |
| --- |

1  petition for writ of mandamus.

2  "I hereby swear under oath and penalty

3  of perjury that the foregoing facts are true and

4  correct to the best of my knowledge and belief,"

5  executed on March 13th, 2018, with my signature,

6  electronic signature.

7  MR. KLAYMAN:  Thank you.  I have no

8  further questions, your Honor.

9  CHAIRPERSON MIMS:  You're a member of

10  the bar, correct?

11  THE WITNESS:  The California Bar.

12  CHAIRPERSON MIMS:  California Bar.

13  When did you become a member of the California Bar?

14  THE WITNESS:  The end of 2015.

15  CHAIRPERSON MIMS:  How long have you

16  worked for Mr. Klayman?

17  THE WITNESS:  Since March or May 2016.

18  March, I think, yeah.

19  CHAIRPERSON MIMS:  I don't have any

20  further questions.

21  MS. PORTER:  I just have a couple.

22  CHAIRPERSON MIMS:  Sure.

56 (Pages 586 to 589)

In The Matter of: Larry Klayman
July 16, 2019

---

**Page 590**

1    CROSS-EXAMINATION
2    ON BEHALF OF RESPONDENT'S COUNSEL
3        BY MS. PORTER:
4    Q.  It's just to clarify your employment,
5    Mr. Peer.
6        Are you employed by the Klayman Law
7    Group, Mr. Klayman personally?
8        I mean, who is your employer?
9    A.  I work for Mr. Klayman.
10       I just -- I do what he -- he gives me
11   tasks and I do them.
12       CHAIRPERSON MIMS:  Well, what does that
13   mean?
14       THE WITNESS:  Like he gives me
15   assignments and I do them.
16       CHAIRPERSON MIMS:  Legal assignments?
17       THE WITNESS:  Yes.
18       CHAIRPERSON MIMS:  You work for him as
19   an attorney?
20       THE WITNESS:  I work for him as an
21   attorney, yes.
22       BY MS. PORTER:

---

**Page 591**

1    Q.  And is he the one who pays your salary?
2    A.  You mean like out of his own pocket?
3    Q.  Well, do you get a 1099 or a W-2 at the
4    end of the year?
5    A.  I get a W-2.
6    Q.  Is that from Mr. Klayman?
7    A.  It's from Freedom Watch.
8    Q.  Ok, so is Freedom Watch your employer
9    or Mr. Klayman?
10   A.  I mean, if you ask technically, I guess
11   it would be Freedom Watch.  But Mr. Klayman is the
12   chairman of Freedom Watch.
13       So, as I understand it, I work for Mr.
14   Klayman and I just perform the tasks that he asks
15   me to do.
16   Q.  All right.  And you read your affidavit
17   and I just want to ask you a couple of things.
18       First you said you did a Google search
19   and you noted it somewhere.  So am I correct that
20   you have a written notation or record of the
21   search?
22   A.  Not any more.  I think I just jotted it

---

**Page 592**

1    down on a notepad.
2    Q.  And you also stated in your affidavit
3    that you presented your research to Mr. Klayman.
4        What did you present to Mr. Klayman and
5    what has I guess become of whatever you presented?
6    A.  Oh, I mean, I presented it orally to
7    him.  I told him that I had found that Shannon
8    Bybee and Jay Bybee were husband and wife.
9    Q.  And have you tried to I guess replicate
10   whatever research that led you to that conclusion?
11   A.  No, I haven't.
12   Q.  So you haven't looked on Google, which
13   I guess was the search engine you were using, to
14   find the source of that information?
15   A.  Well, the information is incorrect.
16       So, I would not be able to find that
17   information on Google.
18   Q.  Where did you tell Mr. Klayman that you
19   found that information?
20   A.  I didn't.  I just told him that I found
21   it.
22       CHAIRPERSON MIMS:  But you testified

---

**Page 593**

1    that you had done some Internet research, right?
2        THE WITNESS:  Yeah, I just -- he was --
3    I looked it up and then I think I jotted it down as
4    them being husband and wife, which is obviously not
5    true, but it's just something I linked in my head I
6    think, probably because they had the same last
7    name.
8        I was very confident at the time when I
9    told Mr. Klayman and I ultimately found out it was
10   incorrect.
11       BY MS. PORTER:
12   Q.  Did you still have that note when you
13   submitted your affidavit on March 14th, 2018?
14   A.  Excuse me?
15   Q.  Did you still have your notes on March
16   14th, 2018?
17   A.  I don't know.  I don't remember.
18   Q.  Did Mr. Klayman ever ask for them?
19   A.  No, he did not.
20   Q.  Did you ever give them to him?
21   A.  No.
22       MS. PORTER:  Nothing further.

---

57 (Pages 590 to 593)

In The Matter of:  Larry Klayman
July 16, 2019

| Page 594 | Page 596 |
|---|---|

**Page 594**

1          REDIRECT EXAMINATION
2      ON BEHALF OF DISCIPLINARY COUNSEL
3              BY MR. KLAYMAN:
4      Q.  Mr. Peer, you are aware that Freedom
5   Watch also represents Cliven Bundy?  We have a
6   Freedom of Information Act case in Washington, DC,
7   to get documents from the prosecution?
8      A.  Yes.
9      Q.  Was this an honest mistake on your
10  part?
11     A.  Yes.
12     Q.  Have you ever heard the name Bybee
13  before?
14     A.  I mean --
15     Q.  Other than --
16     A.  Yes.
17     Q.  Other than the judge?
18     A.  No.
19     Q.  It's not a common name, is it?
20     A.  Not that I know of.
21     MR. KLAYMAN:  Thank you.
22     CHAIRPERSON MIMS:  When did you

**Page 595**

1   graduate law school, sorry?
2      THE WITNESS:  2015.
3      CHAIRPERSON MIMS:  2015.
4      MR. KLAYMAN:  Thank you.
5      CHAIRPERSON MIMS:  You may step down.
6   (Witness is excused.)
7      MR. KLAYMAN:  Your Honor, that
8   concludes our presentation for today.
9      CHAIRPERSON MIMS:  Well, let's talk
10  about Thursday.  What's left in the case?  Is it
11  just the one witness?
12     MR. KLAYMAN:  I'm currently
13  contemplating -- I can let you know tomorrow --
14  whether I'm going to call J.P. Symkowicz.  I'm
15  leaning against it at this point.
16     MS. PORTER:  I would object to both Mr.
17  Symkowicz' complaint and his testimony.  It's
18  irrelevant to these proceedings.
19     MR. KLAYMAN:  It's not irrelevant --
20     CHAIRPERSON MIMS:  Tell me what he's
21  going to testify about, because I did look at the
22  affidavit.  He has an affidavit, right?

**Page 596**

1      MS. PORTER:  Yes.
2      MR. KLAYMAN:  He has a submission.  I'm
3   inclined not to put him on the witness stand.
4      I don't want to be confrontational in
5   this proceeding, but what he has experienced is a
6   13-year bar proceeding where he and his father,
7   with regard to a complaint that was filed by Ms.
8   Porter, as Office of Disciplinary Counsel, had to
9   endure, and during the course of that, Mr.
10  Symkowicz maintained there were a variety of false
11  representations made to both the hearing committee
12  and the Board, and he would testify to a pattern of
13  practice of falsifying information with regard to
14  bar proceedings.
15     But I don't want to be confrontational.
16  I don't want to create an issue here in that regard
17  in terms of bringing him in.  So I'm thinking about
18  not calling him as a witness.
19     CHAIRPERSON MIMS:  Well, we need you to
20  make a decision about that.  I don't see the
21  relevance of it, but I need you to let us know so
22  that I can make a ruling.

**Page 597**

1      I can make a ruling now if you want but
2   I don't see the relevance.
3      MR. KLAYMAN:  I can let you know
4   tomorrow on that.
5      CHAIRPERSON MIMS:  We're not in
6   tomorrow.
7      MR. KLAYMAN:  I can file something with
8   Ms. Borrazas, with the Board.  I'm leaning against
9   it, to bringing him in.
10     CHAIRPERSON MIMS:  We're here now.  And
11  was that the only remaining witness?
12     MR. KLAYMAN:  That's the only remaining
13  witness, other than myself when I bring those other
14  documents in.
15     CHAIRPERSON MIMS:  Was he the one that
16  was going to testify at 12:30 on Thursday?
17     MR. KLAYMAN:  No, that's Professor
18  Chemerinsky.  Yes, he's set for that time.
19     CHAIRPERSON MIMS:  What is his
20  relevance to this?  Because I thought I looked at a
21  submission, an affidavit for him, and it looked
22  largely to be about Constitutional law issues.

58  (Pages 594 to 597)

In The Matter of:  Larry Klayman
July 16, 2019

Page 598

1      MR. KLAYMAN:  No, it's more than that.
2  I think he's going to testify beyond that, but it's
3  going to get to the issues -- he reviewed the
4  documentation and he comes to the same conclusions
5  that I didn't misrepresent, that I told the truth,
6  that, yes, he does say that the pro hac vice should
7  have been issued.
8      His testimony will be relatively short.
9  I would like to have him take the stand, as your
10  Honor ruled, where on an issue-by-issue matter
11  there can be objections on that.
12      But he is a relevant expert.  He's Dean
13  of Berkley, which is ranked the fourth best law
14  school in the United States.
15      CHAIRPERSON MIMS:  I'm not sure that's
16  relevant either.  But we're not relitigating
17  whether --
18      MR. KLAYMAN:  Right, I don't intend to.
19      CHAIRPERSON MIMS:  -- whether Judge
20  Navarro should have approved your pro hac vice
21  application.
22      MR. KLAYMAN:  I don't intend to, and he

Page 599

1  will testify to related issues.  And your Honor
2  said we would entertain those objections one by
3  one.
4      Like I said, I don't want to make this
5  into a confrontational proceeding.  I don't.  I
6  want it to be decided on the merits, which is why
7  I'm not inclined to call Mr. Symkowicz.
8      MS. PORTER:  Not only do we,
9  Disciplinary Counsel, object to Mr. Symkowicz but,
10  based on the information that was provided by the
11  dean, his testimony is also irrelevant.
12      Whether or not he agrees with Judge
13  Gould as to whether or not the pro hac vice motion
14  should have been granted or not is really neither
15  here nor there.  That's not relevant to these
16  proceedings.
17      Second, whatever opinion he has and
18  whatever it's based on, given whether Mr. Klayman
19  was honest or forthright to the judge and to the
20  9th Circuit, is also not appropriate for the
21  hearing committee.  That's a decision for the
22  hearing committee.

Page 600

1      First, he doesn't have most of the
2  information that you have, both in the form of
3  documents and testimony.  Secondly, even if he did,
4  his opinion as to whether or not Mr. Klayman was
5  honest is an ultimate finding of fact for the
6  hearing committee, not for him.
7      Moreover, I don't see how he can have
8  any expertise in honesty or being candid.
9      MR. KLAYMAN:  Your Honor, he's
10  testified based on the record.  He does have all
11  the information that's relevant here.  He's simply
12  testifying about analyzing in terms of the pro hac
13  vice application, what I had to respond to, whether
14  I fulfilled my duty.
15      He's not making an opinion as to the
16  ultimate issue in this case, whether I violated
17  ethical obligations.  I made that very clear to
18  him.
19      So I'd like an opportunity to present
20  him.  You can weigh his testimony accordingly, but
21  this is a case that has very few witnesses.
22      CHAIRPERSON MIMS:  Tell me where his

Page 601

1  affidavit is again.
2      What I'd like to do is take five
3  minutes.  I'd like to go in and spoke with the rest
4  of the committee and come back in.
5      MR. KLAYMAN:  I might point out that
6  application does not cover all of his testimony,
7  that declaration.  Because he's looked at it since
8  then.
9      I'd like the opportunity, your Honor,
10  particularly since respectfully your Honor declined
11  that I could take discovery of Judge Bybee and also
12  the others here, to have my expert testify.
13      The prior proceedings that I've been in
14  we did have an expert testify.  We even had two
15  judges testify that have been referenced here.
16      So if your Honor will take the
17  testimony and then you can decide how to weigh it,
18  and you can only decide how to use it.  I want to
19  proffer it on the record regardless and I'm
20  entitled to proffer it on the record under the
21  rules.
22      So, I've gone to great lengths to

59  (Pages 598 to 601)

In The Matter of:  Larry Klayman
July 16, 2019

Page 602

1   arrange for him to testify.  I'm trying to
2   eliminate any controversy in this proceeding, which
3   is why I would like to be able to get to the
4   merits.  And that's what he's going to get to.
5       He's not going to make a decision on
6   the ultimate issues in this case, and we said that
7   in our witness statement, where we were specific.
8   But it's not just limited to that, because he's had
9   an opportunity to look at the documents further,
10  and you can ask him questions, too.
11      CHAIRPERSON MIMS:  Let's take a
12  five-minute break.
13      (Recess taken.)
14      CHAIRPERSON MIMS:  We are back on the
15  record at 2:38.
16      All right, did you have something else
17  you wanted to add, Mr. Klayman?
18      MR. KLAYMAN:  Yes, your Honor.  I was
19  going to give you the witness list, and in that
20  witness list we included a footnote two, "Expert
21  testimony is routinely admitted in disciplinary
22  cases in this jurisdiction, In Re: Fair, 780,

Page 603

1   Atlantic 2nd, 1106, DC, 2001: In Re: Stiller" --
2   S-t-i-l-l-e-r "725, Atlantic 2nd, 553, DC 1999.
3       "Furthermore, it is well settled that
4   in the District of Columbia experts are
5   permitted" -- I'm quoting -- "in the District of
6   Columbia to render opinions upon the ultimate facts
7   to be resolved by the jury: Jackson v. United
8   States, 76 Atlantic 2nd/3rd, 920-939, DC 2013."
9   And that was in the context of a disciplinary case.
10      "An expert may state a conclusion on
11  such facts provided that conclusions, one, that the
12  layman could not draw.  Such opinion testimony
13  often may be of great value."
14      Lastly, as per the Board's order of
15  March 28th, 2019, "An expert may proffer his
16  opinion as to the facts that, if found, would
17  support a conclusion that the legal standard at
18  issue was satisfied, but that he may not testify as
19  to whether the legal standard has been satisfied,
20  citing Steel v. Tiger Market, 854, Atlantic 2nd,
21  175-182, DC, 2004."
22      Those are the parameters upon which

Page 604

1   Dean Chemerinsky will testify.
2       CHAIRPERSON MIMS:  Outside of what is
3   listed in your witness list or your affidavit from
4   the dean, is there anything outside of those two
5   documents that he's going to testify about?
6       THE WITNESS:  He will testify --
7   because it is relevant in terms of Bivens actions
8   and the efficacy of bringing Bivens actions, if
9   they're legit actions that one can bring, based
10  upon facts of this case.  So that's something else
11  that will be explored, because that was raised.
12      You know, we have, your Honor -- based
13  on your order, following order, we have made the
14  arrangements for him.  The reason that I did for
15  Thursday was --
16      CHAIRPERSON MIMS:  I understand that.
17      MR. KLAYMAN:  Ok.
18      CHAIRPERSON MIMS:  I understand that.
19      So the only other thing that might not
20  be listed in here is the Bivens action.
21      MR. KLAYMAN:  Yes.  I wanted to expound
22  on what he said in the declaration, because it was

Page 605

1   done before he left for overseas.
2       CHAIRPERSON MIMS:  Well, I've looked at
3   them both.  What is relevant to this case, after
4   looking at them -- and I'm looking at your witness
5   list, page two -- is "That he will also testify
6   that the pleadings filed and other actions taken by
7   Mr. Klayman in his effort to obtain pro hac vice
8   admission to correct judicial record were
9   reasonable as he had entirely the right to correct
10  false statements on the judicial record,
11  particularly since they were being used against
12  him."
13      That and the Bivens actions will be the
14  entire scope of his testimony.  I do not see the
15  relevance of the rest of it.
16      MR. KLAYMAN:  I would like him to be
17  able to say that he looked at the application and
18  came to the same conclusion.
19      I'm not asking him for an ethical
20  finding, whether I violated an ethical rule or not,
21  but that he came to the same conclusion, based on
22  his review of the pro hac vice applications, that I

60 (Pages 602 to 605)

In The Matter of:  Larry Klayman
July 16, 2019

| Page 606 | Page 608 |
|---|---|

**Page 606**

1  answered that in which I was required to answer.
2  I'd like him to be able to testify to that.
3       CHAIRPERSON MIMS:  He can testify to
4  that.
5       MR. KLAYMAN:  Ok.  And then --
6       CHAIRPERSON MIMS:  I don't see that
7  taking an hour.
8       MR. KLAYMAN:  It may not.  I was trying
9  to be conservative so we can plan.
10       CHAIRPERSON MIMS:  And we were talking
11  about 12:30.  I assume that we can't get him in
12  here any sooner since that testimony is going to be
13  relatively short?
14       MR. KLAYMAN:  He just came back from
15  Europe and his schedule is really difficult.  He's
16  dean of Berkley.
17       CHAIRPERSON MIMS:  So that's 12:30?
18       MR. KLAYMAN:  Yes, it's fixed.
19       CHAIRPERSON MIMS:  Now, I should let
20  you be heard, Ms. Porter, see if you have any
21  objections to that.
22       MS. PORTER:  I do, actually.

**Page 607**

1       I mean, it's my understanding that the
2  dean is an expert in Constitutional law.  I hardly
3  see how he can be an expert and provide testimony
4  that's helpful or relevant or appropriate for the
5  hearing committee on whether or not Mr. Klayman
6  responded appropriately or truthfully, or however
7  he is going to word it, to the form application to
8  be admitted pro hac vice before Judge Navarro.
9       I don't think that's appropriate, and
10  moreover I don't think he has any expertise, and I
11  don't know what if any expertise he has on Bivens
12  actions, and I would like more of a proffer so I
13  may object with an understanding of what he could
14  possibly say with respect to the Bivens actions
15  that would be helpful and appropriate for this
16  hearing committee to hear.
17       CHAIRPERSON MIMS:  The objection is
18  overruled.  The way that we'll do it is the
19  committee will determine, based on his background
20  and he can go ahead and go a little bit into that
21  so that we understand more his qualifications, and
22  we can make that determination as to the weight to

**Page 608**

1  give to his testimony.  So that is allowed.
2       Are there any other witnesses that you
3  intend to call?
4       MR. KLAYMAN:  None other than myself to
5  authenticate and testify briefly on the documents
6  that arose with regard to the Robles case in the
7  Northern District.  That will be it.
8       CHAIRPERSON MIMS:  That will be it.  So
9  you're not going to call any of the other witnesses
10  on the list?
11       MR. KLAYMAN:  No.
12       CHAIRPERSON MIMS:  So that means that
13  we'll be wrapping up on Thursday.
14       I am inclined to do -- do the parties
15  want to do closings, I assume?
16       MR. KLAYMAN:  Yes.
17       MS. PORTER:  I was going to say that I
18  can give a brief closing, but because the hearing
19  committee requires post-hearing briefs and I think
20  that's what's going to be required here, I think
21  it's also helpful that the hearing committee want
22  the parties to pay particular attention to in their

**Page 609**

1  post-hearing briefs.
2       But, yes, I will be prepared to give a
3  closing, as well.
4       CHAIRPERSON MIMS:  I don't see why we
5  would need more than 15 or 20 minutes for closings.
6       MS. PORTER:  That will be fine.
7       MR. KLAYMAN:  That will be fine.
8       CHAIRPERSON MIMS:  What I will say to
9  Bar Counsel is if you can go through your charges
10  and link for us the evidence that you have put in
11  and which rules you believe those violate, I think
12  that would be helpful.
13       MS. PORTER:  I mean, there is a lot of
14  overlap, but I will do that.
15       CHAIRPERSON MIMS:  But I think that you
16  can, even in that limited amount of time.  There is
17  a lot of overlap in the evidence.  I think you can
18  generally state which rules that you alleged were
19  violated.
20       MS. PORTER:  I'll try my best.
21       CHAIRPERSON MIMS:  And I think 15, 20
22  minutes.  So we'll have one more witness and we'll

61 (Pages 606 to 609)

In The Matter of:  Larry Klayman
July 16, 2019

Page 610

1  finish up on Thursday.

2  MR. KLAYMAN:  And me to a limited

3  extent.

4  CHAIRPERSON MIMS:  To a limited extent,

5  the documents in response to Bar Counsel's Exhibit

6  26.

7  MS. PORTER:  And if Mr. Klayman could

8  provide those to me by the close of business

9  tomorrow, just so I have an understanding of what

10  in addition to 126 he's going to add, just so that

11  I have an issue with the completeness of it, like

12  if he's missing other court orders and I'd like to

13  offer those, that way I'll have an opportunity to

14  see what he wants to provide and for me to

15  supplement, as well.

16  CHAIRPERSON MIMS:  I think that's fair,

17  and they should be public documents.

18  MR. KLAYMAN:  Your Honor, in fact

19  that's what I was requesting with a more definite

20  statement to what she was going to present.  I

21  think that's fair.

22  CHAIRPERSON MIMS:  All right, so we

Page 611

1  will resume at 12:30.

2  You are all set, Mr. Klayman, with

3  being able to do the remote testimony, right?

4  (Mr. Klayman nods head in the

5  affirmative.)

6  MS. PORTER:  And may I ask does Dean

7  Chemerinsky have all the documents, because if he

8  is going to testify remotely and about the issues,

9  I may want to ask him about the documents.  So I'm

10  hoping that he already has the exhibits.

11  MR. KLAYMAN:  He has Respondent's

12  exhibits.  If she wants to show him anything in

13  cross-examination that will be fine.

14  MS. PORTER:  I have my own exhibits.  I

15  think that's a requirement of having the documents

16  provided.  You can get them from the Board office,

17  but it's your witness and it's your job to get him

18  all the exhibits.

19  MR. KLAYMAN:  He has all the material

20  exhibits.

21  CHAIRPERSON MIMS:  Wait a minute.  He's

22  testifying about a limited issue.

Page 612

1  MS. PORTER:  But I think that his

2  testimony has now been expanded to the pro hac vice

3  application and whether or not Mr. Klayman's

4  responses were appropriate, or whatever he's going

5  to I guess testify to, and he's also going to

6  testify as to the Bivens action it's my

7  understanding.

8  I don't even know if Mr. Klayman

9  included the Bivens actions and all the subsequent

10  pleadings that were related to the Bivens action,

11  including the motion to disqualify, the transcript

12  of the hearing on May 10th of 2013, when that was

13  first raised, whether it was filed when the judge

14  talked about it.

15  So those are issues and if he's going

16  to talk about the Bivens action and the motion

17  for -- or application for pro hac vice, he needs to

18  have those documents and the related documents in

19  front of him.

20  Or at least I --

21  CHAIRPERSON MIMS:  Let me ask you...

22  Does he have the pro hac vice, the

Page 613

1  writs, the supreme court filings?  Does he have all

2  those?

3  MR. KLAYMAN:  Yes, yes.

4  CHAIRPERSON MIMS:  Does he have the

5  Bivens filings?

6  MR. KLAYMAN:  I believe he does.  I'll

7  double-check.

8  CHAIRPERSON MIMS:  We'll revisit that

9  on Thursday.  If he doesn't have the appropriate

10  documents and you're unable to cross examine him,

11  then that testimony won't be allowed.

12  MR. KLAYMAN:  And I just was going to

13  ask him general questions to evaluate the efficacy

14  of the entire case.

15  CHAIRPERSON MIMS:  That is what I

16  assumed.

17  MR. KLAYMAN:  Yes, just about Bivens in

18  general.  All right, not about that case.

19  CHAIRPERSON MIMS:  All right.  Thank

20  you.  So we'll resume Thursday at 12:30.

21  (Whereupon at 2:48 p.m. the hearing was

22  adjourned until Thursday, July 18, 2019 at 9:00

62 (Pages 610 to 613)

In The Matter of:  Larry Klayman
July 16, 2019

Page 614

1     a.m.)
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

63 (Page 614)

In The Matter of:  Larry Klayman
July 16, 2019

**A**

**a.m** 370:3 503:3
519:1 614:1
**ability** 388:22 483:9
533:14
**able** 381:12 398:10
406:2 409:16
436:5 459:8 464:5
483:17 529:21
567:14 575:2
592:16 602:3
605:17 606:2
611:3
**above-referenced**
515:3
**abrasive** 523:11
530:17
**absence** 466:1
473:1
**absent** 509:12
**absolutely** 487:3
**abuse** 432:4 454:22
474:22
**accept** 446:3 515:13
518:10
**accepted** 387:7
388:14 450:5
451:19 452:19
470:2
**access** 528:20 529:1
**accessories** 421:1
**accompanying**
457:8 458:14
**account** 485:20
504:10
**accountable** 399:16
540:2
**accuracy** 546:12
**accurate** 460:19
520:8 567:10
**accuse** 426:6
**accused** 422:5
439:20 529:9
**acquittal** 432:5
**act** 400:6 402:13
438:1 444:5
446:12 482:9,16
534:12 594:6
**acted** 443:21 467:21
531:10
**acting** 479:12
481:17 564:20
**action** 442:22
443:16 445:8
446:15 449:1
477:14 480:17

481:1,5 557:6
561:16 562:5,22
563:2 567:8
604:20 612:6,10
612:16
**actions** 399:2 448:3
486:1 498:22
604:7,8,9 605:6
605:13 607:12,14
612:9
**active** 416:5
**acts** 486:12
**actual** 471:9 554:5
**Ad** 370:3,9
**Adams** 431:10,14
431:17,18
**add** 393:11 406:9
410:11 412:9
447:1 454:14
457:22 486:6
498:6 512:7 533:5
602:17 610:10
**added** 407:12
**addition** 394:16
400:1 452:5 453:5
461:3 492:14
610:10
**additional** 377:1
382:12 384:7
**additionally** 375:19
**address** 419:10
**addressed** 473:12
**addresses** 420:4
**adequate** 471:21
**adjourned** 613:22
**administration**
391:11,16 399:7,9
439:13 474:10
537:7
**administrative**
388:13 400:7
**admission** 454:17
473:13,14,16
498:10 506:9,17
508:16,19 509:12
573:18 605:8
**admissions** 457:6
458:12
**admit** 514:8 531:17
574:22 581:15
**admitted** 385:4
387:20 435:5,7
443:8 467:1 472:2
473:15 490:15
531:21 556:18,19
581:14 602:21

607:8
**admittedly** 420:6
**admitting** 510:20
**admonished** 552:7
**advance** 379:11
**advantage** 400:18
**adversaries** 494:16
**adversary** 392:20
**advice** 453:14
**advise** 465:10
518:15 520:1
**advised** 460:15
465:12 586:11
**affair** 517:21
**Affairs** 390:12
391:3 393:9 396:7
396:16,19
**affidavit** 450:20
454:10 457:8,18
458:8,14 460:5
469:13 474:11
531:4,6 587:5,9
588:8 591:16
592:2 593:13
595:22,22 597:21
601:1 604:3
**affidavits** 425:7
**affirm** 373:20
385:22 584:19
**affirmative** 444:12
611:5
**affirmed** 425:1
**afford** 462:20 468:6
**afternoon** 526:20
**age** 389:11 507:13
588:7
**agencies** 391:5,8
**Agent** 485:17,21
486:8
**agents** 431:4 486:9
**aggressive** 398:10
507:11
**ago** 384:14 409:2
413:16 518:12
528:2,8,11 552:18
**agree** 394:14,15
487:10 516:8,11
550:12 577:1
**agreed** 417:22
418:3 450:22
451:17 454:9
465:21 466:13,14
466:17 467:14
470:1 471:13
511:5 547:11
549:8

**agreeing** 531:17
**agreement** 404:19
406:1,2,15 407:22
463:21 464:3
465:17 466:7,14
467:15 469:14,18
514:6 516:2 525:4
542:3,4
**agreements** 413:2
462:19
**agrees** 599:12
**Agriculture** 391:18
**ahead** 378:22 379:7
379:8,8 452:12
498:8 502:20
522:5 532:10
535:22 562:9
569:20 575:11
584:13 607:20
**aisle** 413:1
**Alban** 382:21
**alcoholic** 426:17
**allegations** 420:21
459:14
**alleged** 405:11
499:22 513:11
609:18
**allegedly** 406:20
**allow** 497:22 520:20
565:15 573:7,8
582:6
**allowed** 482:7
508:18 513:15
608:1 613:11
**Amendment** 461:7
461:18 462:4
473:5,12 475:6
477:13 497:8
507:22 513:14
**amicably** 398:6
**amount** 399:10
414:3 417:19
464:5 465:14
475:22 477:16,17
609:16
**amounts** 474:22
**analyses** 471:18
**analysis** 540:1
**analyze** 393:6
**analyzing** 600:12
**Andy** 540:3
**Angeles** 401:12
426:10,14 435:15
**angst** 576:6
**answer** 390:21
397:2 417:9

420:18 422:18
428:10 430:6,21
437:5 438:10
440:21 442:1
450:13 452:16
460:4 463:10
469:9 470:20
478:12,13,22
487:21 499:3
505:7 506:4
513:21 514:17
517:9 519:9 526:5
526:19 527:20
530:22 532:16
570:14 580:10
581:4,6 582:20
583:7 606:1
**answered** 487:11
526:2 551:8 606:1
**answers** 458:22
526:19
**anti** 439:21,22
**anti-competition**
395:4
**anti-competitive**
394:2 395:4
**anti-dumping**
399:4
**anticipated** 532:12
**Antifa** 495:20
**antitrust** 389:15,21
389:22 390:4,11
390:13 391:9,21
392:1 393:3,12
394:13,17 396:7
396:16 397:3
400:12
**anybody** 403:11
442:5
**anybody's** 491:5
**anymore** 578:10
**anyway** 510:10
**apartment** 468:6
**Apologies** 379:21
**apologize** 383:12
415:12 428:15
441:21 446:2,5
447:16 546:9
**apology** 446:3
**apparently** 551:22
**appeal** 433:1,10
462:5 495:22
496:21 533:15
534:2,5 553:11
569:4 570:1 572:7
**appealed** 424:8

In The Matter of:  Larry Klayman
July 16, 2019

Page  616

533:19
appealing 533:13
appeals 369:1
  442:18 474:21
  508:22 550:13
  551:13
appear 383:4
  507:20 554:7
appearance 382:2
  384:17 541:2,6
  543:14 544:19
  545:5,11 568:11
appearances 370:8
  371:1 381:21
appeared 377:8
  401:13 420:19
  426:17 438:11
  544:3
appearing 480:10
appears 376:7
  377:14 378:1
appellate 534:7
apples 468:11
applicable 393:5
application 427:3,8
  435:3 441:18
  443:19 458:19
  460:16,18 461:3
  474:15 480:2
  489:19 501:8
  525:19 553:3
  571:15 598:21
  600:13 601:6
  605:17 607:7
  612:3,17
applications 533:22
  556:7 605:22
applied 474:8 507:9
  509:8
apply 466:1
applying 474:14
  508:8
appointee 439:12
appreciate 424:19
  445:14 448:6,10
approach 449:6
approaches 498:19
appropriate 558:7
  569:14 599:20
  607:4,9,15 612:4
  613:9
appropriately
  607:6
approved 561:20
  562:15 598:20
approximately

381:17 382:15
  536:6 541:14
  544:20
April 486:15 541:14
arbitrarily 379:6
arbitrary 474:14
  480:1
archaic 507:18
Archives 381:12
Area 482:4
argument 458:7
  487:17 488:11
  499:6
arguments 462:5
  484:17 511:10
  521:16
armed 513:12,13
arms 513:15
Armstrong 468:8
arose 432:3 540:3
  608:6
arraignments 408:8
arrange 602:1
arrangements
  604:14
array 507:16
arrested 434:5
  449:10 542:6
article 376:2,3,4,7,9
  426:10 511:9
  512:2
ascribes 560:2
Asian-American
  439:12 442:3
asked 375:3 377:5
  378:12 380:22
  403:15,16 425:11
  427:15 440:12
  442:2 467:7 468:3
  480:12 484:2
  501:9 510:11
  514:22 527:13
  534:4,7,9 556:5
  556:14 557:16
  562:21,22 565:8
  567:5 568:3,11
  569:1 574:2 577:6
  586:11
asking 423:6 440:13
  443:5 490:7
  493:19 524:12
  527:2,22 538:6
  553:22 561:11
  605:19
asks 528:14 529:2,3
  529:14 591:14

aspect 440:16
aspects 391:17
assault 430:21
asserts 466:22
assess 449:15
assigned 393:18,19
  569:9
assignments 423:21
  590:15,16
assist 477:6 483:9
  541:8
assistance 489:12
assistant 371:7
  389:14 392:9
  393:1,17 396:14
  408:6 432:13
  454:4 509:20
  539:18 544:12
assisting 475:9
associate 388:15
  395:12 440:13
  535:14 543:3
Associated 376:10
associates 420:19
  502:13
association 442:11
  442:12 446:22
  447:8 553:6
  574:21
associations 588:13
assume 443:12
  475:15 573:3
  606:11 608:15
assumed 613:16
AT&T 381:2
  383:17 393:13
  394:2,5,13 533:4
  533:8 535:15,19
  540:10
Atlanta 387:21
Atlantic 603:1,2,8
  603:20
attached 443:18,19
  455:20 531:2,5
  533:1 557:18
attachment 556:3
  557:7
attacked 495:20
attempt 384:15
  531:8
attend 392:8
attended 386:21
  387:20 392:2
  408:11 568:10
attention 435:4
  447:18 449:18

454:12 463:11,20
  464:10,15 465:19
  470:4,5 478:13
  479:8 484:1 489:1
  499:4 500:3,4
  501:12 502:9
  505:8 509:17
  511:8 519:4 526:6
  532:17,19 555:12
  582:14 583:14
  608:22
attentive 420:7
attorney 370:15,17
  389:14 392:9
  393:2 408:7,17,20
  409:19 414:1
  432:14,14 433:6
  452:6 453:6 474:1
  481:11,20 507:11
  521:19 524:21
  540:6 544:11
  545:2 590:19,21
attorney's 433:8
  474:15
attorney/client
  397:18 526:18
  529:5,22
attorneys 381:21
  453:10 473:14
  507:20
August 543:15
authenticate 608:5
authority 457:16
  493:16
automobile 395:9
available 491:3
avoid 510:15 576:6
  579:9
await 514:14
aware 383:18,22
  569:6 594:4

_____

B

back 373:4 380:7
  389:10 390:2
  401:11 406:12,17
  407:11,22 411:1,6
  411:10,13 414:3
  417:10,22 418:11
  418:19 420:9
  422:14 423:20
  424:5 437:8
  446:18 448:1
  451:2,9 458:4
  463:5,7 464:19
  469:11 471:9

477:2 489:15
  496:21 497:1
  499:18 504:4
  514:4 516:7
  533:20 542:7
  544:7 545:2
  547:18 549:9
  561:22 570:12
  571:22 574:10
  601:4 602:14
  606:14
background 386:19
  390:22 395:13
  397:7 405:13
  434:17 438:8
  448:7 513:19
  573:12 607:19
bad 398:3 419:12
bail 407:12 411:4
Baldwin 421:4,19
  550:1
Bank 438:13
bankrupt 398:12
  423:22 425:20
bans 511:10
bar 369:5 415:2
  418:1,13 427:2
  429:10 435:5,6
  442:11,12 444:8
  444:15,17 445:8
  445:10 446:22
  447:7 450:18,22
  451:18 452:1,17
  453:1 454:3,4,8
  455:10 461:1
  463:12,17 464:1
  465:9,21 466:3,11
  467:19 468:1,1
  469:15,22 471:21
  474:16,20 479:5
  484:3 488:7
  493:22 495:4
  496:7,12,14
  498:10 508:21
  510:1,1,9,17
  514:3 516:5 517:5
  532:20 553:6
  556:20 567:18
  574:20 575:14,19
  577:11 583:3,14
  587:8 589:10,11
  589:12,13 596:6
  596:14 609:9
  610:5
Barbour 437:16

In The Matter of: Larry Klayman
July 16, 2019

**barely** 393:19
**barking** 422:2
**barred** 551:5 553:5
  555:2 556:18
**bars** 446:10 447:9
**base** 482:6
**based** 471:7 479:5
  495:8 511:15
  526:16 536:9
  538:11 555:15
  566:21 567:8
  571:6 579:9
  587:22 588:5
  599:10,18 600:10
  604:9,12 605:21
  607:19
**basic** 380:17
**basically** 393:8
  421:3 432:21
  528:3,8 535:9
  571:12
**basis** 479:4 480:1
  495:17,20 496:15
  497:10 514:7
**Bates** 449:19 451:3
  451:10,11,12
  463:13,13,19
  468:20 469:4,22
  470:6 471:14
  488:19,22 495:13
  500:5 501:14,15
  502:7 516:21
  546:21
**bathroom** 421:1,2
**Bay** 512:14
**BCCI** 404:3 409:19
  410:10 413:5
  415:22
**beat** 557:3
**Beerman** 432:12
**began** 510:21
**beginning** 512:15
  525:1 535:10
**begins** 559:16
**begun** 464:13
  537:13
**behalf** 370:6,17
  374:5,9 383:10
  386:6,9 401:13
  434:16 496:10
  505:5 533:2 535:6
  582:12 583:10
  586:3 590:2 594:2
**behave** 462:18
**behavior** 467:12
  573:17

**belabor** 400:13
  468:15 499:6
  501:10 526:10
  531:3,16 583:15
**Belgium** 388:4
  398:16 400:11
**belief** 588:6 589:4
**believe** 388:14
  395:2 401:8,9
  403:10,15 412:4
  412:21 433:4
  443:20 489:10
  495:17 505:17
  506:15 507:7
  517:5 537:1 542:8
  543:1 544:7
  549:20 563:8,21
  570:9 572:2 587:3
  609:11 613:6
**believed** 397:20,20
  424:5 453:14,22
  489:13 526:15
**believes** 512:4
**Belize** 407:9,10,13
  411:9 542:6
**bell** 370:12 389:13
  418:20,22 419:3,7
  419:9,15,18 420:2
  420:5 422:12,16
  450:9 451:7,10
  464:17,22 468:18
  468:21 478:17
  501:16 515:14,17
  524:16,19 525:2,7
  526:2 547:2
  559:12
**belongs** 491:20
**bench** 423:11
  438:19,21 439:13
**beneficial** 501:3
**Benson** 453:16,19
  455:11
**Berkley** 568:9,21
  572:5,22 598:13
  606:16
**best** 388:21 400:19
  432:19 521:18
  544:22 589:4
  598:13 609:20
**better** 390:8 408:1
**beyond** 561:22
  562:18 565:3
  570:7 598:2
**bias** 454:11 506:12
**Bible** 489:22
**bid** 387:12

**big** 392:12 398:17
  405:10 421:4
  439:5 576:9
**Biggs** 387:14
**bigoted** 422:10
**Bill** 438:19
**billing** 548:16
**bit** 392:1 411:2
  437:6 452:11
  458:20 535:11
  549:17 607:20
**Bivens** 399:1
  477:11 480:16
  481:1,4,9 561:16
  562:5,22 563:2
  604:7,8,20 605:13
  607:11,14 612:6,9
  612:10,16 613:5
  613:17
**bizarre** 576:20
**black** 459:7
**Blackwell** 388:16
  389:7
**blatant** 402:12
**BLM** 432:10 485:18
  486:9
**BLM's** 485:21
**blown** 404:11
  506:14
**board** 369:2,3
  370:1 391:14
  456:18 457:13,16
  459:6 518:21
  556:22 596:12
  597:8 611:16
**Board's** 555:17
  603:14
**boats** 405:1
**body** 493:15
**bolded** 472:11
**bond** 475:4 537:15
  537:20
**bono** 453:20
**book** 483:22
**books** 412:10
**border** 426:2
**born** 386:14,16
**Borrazas** 597:8
**Boston** 431:11
**bottom** 451:13
  471:16
**boutique** 395:1
**Boyd** 380:17
**bragging** 599:22
**branches** 428:21
**Brantley** 369:22

370:4
**brass** 393:20
**breach** 389:3 400:2
**break** 393:12
  459:22 462:2
  463:1,4 501:19
  502:1,17,20
  602:12
**breaking** 459:21
**breaks** 483:3
**breakup** 533:8
**Bret** 489:3 490:12
  519:10,11 521:6
  523:22 524:1,10
  525:9,12 528:1
  531:6
**brief** 430:13 448:14
  456:1 471:10
  502:5 505:10
  520:10 529:18
  532:14 570:17
  582:9,17,18 587:3
  608:18
**briefer** 441:9
**briefly** 386:18
  608:5
**briefs** 511:12,19
  534:7 570:4
  608:19 609:1
**bring** 390:16 391:6
  404:7 532:18
  573:4,7 583:22
  597:13 604:9
**bringing** 404:22,22
  421:13 433:10
  562:21 596:17
  597:9 604:8
**British** 431:11
**broad** 391:20
**broader** 391:20
  507:16
**broke** 401:11
  537:20
**broken** 537:15
**brought** 399:18
  400:9 405:6 407:1
  407:11 411:10
  413:20 417:6
  421:5 427:2,4,6
  482:10 495:19
  534:11 539:16
  542:7 543:5 563:2
**Brown** 381:9,9
**Brussels** 388:4
**BUFFY** 370:10
**bulls** 431:2

**Bundy** 409:14
  430:10,12 431:5
  431:20 433:17
  434:5 449:9
  461:18 462:22
  472:20 475:4
  479:20 482:1
  486:1,9 489:2,5
  489:11 490:16
  491:2,5,10 494:2
  496:10,17 497:8
  506:16 507:12,15
  507:17 508:16
  509:5 511:11,13
  513:7,8,12 522:18
  523:7 524:19
  526:16 527:13,22
  528:14,18 529:6
  529:11,18 530:7
  533:10,11,15
  534:2,11 564:9
  565:11,22 566:14
  566:21 567:22
  578:14,20,22
  579:6 580:6,21
  583:17 594:5
**Bundy's** 482:16
  486:7 502:10,12
  507:15 511:14
  534:17
**Bundys** 432:11
**Bureau** 485:17
  486:4
**buried** 426:4
**Burning** 486:10
**Busby** 394:22 395:7
  395:11 397:5,22
  400:15 535:14
  536:14
**business** 610:8
**businessman**
  401:14 420:20
**Bybee** 375:17,22
  376:18 377:18
  378:5,9 434:8
  462:12 471:16
  480:3 495:7,16
  500:1 502:12
  568:17 586:12,13
  588:14,14,18
  592:8,8 594:12
  601:11
**Bybee's** 377:10
  588:19

C

In The Matter of:  Larry Klayman
July 16, 2019

C 373:1
C-o-x 502:11
C.S.R 369:22 370:4
California 421:20
  435:14 464:20
  473:21 474:3
  589:11,12,13
call 421:15 423:2
  501:20 522:16
  584:7 595:14
  599:7 608:3,9
called 374:5 386:6
  388:16 390:2
  394:22 400:5
  401:14 404:5
  408:14 429:17
  434:6 440:21
  462:7 486:6
  512:12 519:14
  573:17 586:3
calling 422:19
  596:18
calls 491:3,5 521:9
camel's 401:11
Camera 387:14
cameras 387:15
campaign 437:11
  437:20
candid 600:8
capacity 389:22
  431:22 479:12
  481:13,17
capital 463:22
Capitol 468:14
capricious 480:1
caption 480:11
capture 380:7
carcinogenic
  537:19
care 522:9
Carol 491:5 519:18
  521:8 523:5
Carolina 540:7
carry 456:7
carrying 513:15
Carter 425:8
case 381:2,6,11,19
  383:2,17,19,21
  384:2,14,17 394:4
  394:5,10 399:20
  402:3 404:5,6,13
  404:14,18 407:18
  408:7,17 409:20
  410:6,8,17,17
  411:16 413:12,20
  414:1 415:7,8,21

416:5,7,7,14,14
416:15,22 421:5,9
421:10,21 423:7
423:15,17,17,18
424:2,11 425:17
426:18 427:16
428:5,18 432:21
433:17 438:16
439:10,15,15
440:7,14,19
441:10 443:7
448:4,21 455:2
461:14 462:21
463:18,18 466:19
471:19 472:19,20
473:9 475:9
477:20 478:3,10
480:10 481:11
486:2 494:2
495:19,21 501:2
506:15 510:19
511:15 512:9,17
513:17 517:16
520:21 523:3
525:6 526:1,9
528:16,21 529:16
531:14 533:4,7,10
533:11 534:10
535:15,18,19
536:13 537:10,13
538:21 539:20
541:2,16 542:22
543:11,13 544:1
545:5,7,11 547:13
549:20 550:3,5
561:3 564:18
566:16 567:16,20
567:22 568:8,13
568:22 569:8,12
574:3 584:1 594:6
595:10 600:16,21
602:6 603:9
604:10 605:3
608:6 613:14,18
caseload 499:11
cases 389:1,4,4
396:3,5,12 397:8
397:10 399:5,20
399:21 400:10,12
400:12 402:5,16
402:19,21 403:5
403:14,19 404:1
406:8 410:13
411:19,20,21,21
412:3 413:5
414:15 415:5

424:10,21,21,21
424:22 425:13
426:5 430:2 440:2
473:16 475:7
478:9 482:8
494:16 497:2
501:3 552:8
574:10 602:22
catalyst 428:11
Catch 449:5 474:16
caused 494:22
  571:22
cease 531:8 537:20
cent 467:4 549:12
central 421:19
  441:4
CEO 540:3
certain 421:22
  586:20
certainly 461:11
  464:9 581:9
certificate 446:20
certificates 435:4
certified 580:14
cetera 437:14
Chair 370:11 484:2
chairman 502:3
  591:12
CHAIRPERSON
  373:2,10,13,16,19
  375:12 378:16
  379:4,10,15,22
  383:8 384:12,19
  384:21 385:2,4,7
  385:12,15,19
  390:17 395:14,19
  396:1,6,10,15,22
  401:15,18 402:1,6
  402:18 403:1,5,13
  404:1,13,17 405:6
  406:4,7,22 407:17
  408:3,11,16,19,22
  409:18 410:1,5,12
  411:17 412:1
  413:4,8,11,19,22
  415:13,17,20
  416:4,13,17,21
  417:4 418:20
  420:12,16 426:19
  426:21 427:5,7,11
  427:19 428:1,4
  429:1,21 430:19
  434:22 435:8,12
  435:16,19 436:3
  436:13,18 438:3,6

441:6,10,17
442:19 443:2,10
443:17 444:4,10
444:15,19 445:3
445:12,18 446:6
446:16 447:19
448:6 451:4
452:10,14 458:3,7
458:11 459:18,20
463:2,4,7 469:1,7
470:8,14,18
475:11,13 477:15
478:1,18,20 480:7
481:4,10 482:13
483:19 484:5
487:6,11,14,20
488:1,9,13,19,21
489:4,7,17 490:2
490:5 491:7,11,15
492:3,16,21 493:4
493:11 494:1,7,9
495:2,13 496:1
497:18,20 498:3,8
500:10,13,18
501:15,22 502:6
502:19 503:1
504:4,16,19 505:1
505:15,20 512:22
513:4,8,16 514:11
515:20 516:3,19
519:6 522:17,20
523:6 527:9,15
528:4,6 530:11,14
532:2,5,10,13
533:21 534:3,14
534:18,21 535:3
536:19 538:7
539:11,14 540:13
542:12,16 545:13
546:2,6,18,21
548:5,8,13 550:18
551:6,16 552:12
553:22 554:5,10
554:13,17 557:5
557:11 559:1,5,15
559:18 560:1,15
561:6,10 562:8,20
564:1 565:6,14
566:7,11 570:12
570:18 571:9
572:13,17 573:3,6
573:15 574:15
575:5,8,11,15,17
576:14 577:6
578:7 581:5,10,15
581:17 582:1,5,16

583:1 584:10,12
584:15,18 589:9
589:12,15,19,22
590:12,16,18
592:22 594:22
595:3,5,9,20
596:19 597:5,10
597:15,19 598:15
598:19 600:22
602:11,14 604:2
604:16,18 605:2
606:3,6,10,17,19
607:17 608:8,12
609:4,8,15,21
610:4,16,22
611:21 612:21
613:4,8,15,19
challenged 507:4
change 377:11
  489:14 558:5
changed 380:11
  392:9 484:18
  485:9 487:15
  489:6 499:19
  501:10 512:15
  525:13 553:12
  569:11
changes 377:6
Chapter 457:10
character 399:18
  467:18
characterizing
  527:17 569:19
charge 529:12
charged 549:1
charges 405:7,8
  407:1,12 413:20
  435:17 539:16
  574:6 609:9
charging 549:2
Chechnya 404:8,11
check 390:22 582:7
checked 576:21
Chemerinsky
  597:18 604:1
  611:7
chief 389:19 396:14
  539:19
children's 537:15
Chin 427:2 437:1,1
  437:6 438:4,20,20
  439:10,12 440:10
  440:19 441:9,12
  441:16 442:1,13
  443:22 444:14,18
  445:7 549:18

In The Matter of:  Larry Klayman
July 16, 2019

553:16 554:12
555:3 572:1
**Chin's** 442:20,21
443:6
**China** 437:12
438:15 439:19
**Chinagate** 437:10
**Chinese** 422:1
434:3 438:14,15
439:7,17,21,22
440:1,6
**choice** 472:1,13
473:18 486:22
507:12 508:1
509:10 524:14
525:8
**chose** 454:9 509:1
**chosen** 508:3
557:19
**Christ** 419:19
**CHRISTIAN**
370:14
**circuit** 424:8,10,11
424:12,13,14
425:11 433:12
436:15 447:3
461:4 471:15
472:5,8,22 473:6
473:9,10,21 476:6
476:9,11,15
478:14 480:4
490:4,6 494:12
495:22 496:2,12
499:19,22 505:12
508:9,10,10,13
534:2 551:13
552:3,6,7,20
553:17 554:4,20
563:21 564:4
567:6,17 569:5
570:5,22 571:7
572:3,8 575:9
599:20
**Circuit's** 550:13
553:16 567:9
571:7
**Circuits** 509:9
**circumstances**
454:18 484:18
485:9 487:15
489:6 499:19
501:10 507:18
508:4,5 525:13
567:13
**cite** 471:11 473:20
478:9

**cited** 471:19 501:6
511:11 571:3
**citing** 603:20
**citizen** 465:1
**citizenship** 406:21
**City** 392:12 511:18
568:21 572:5,21
**civil** 391:7 397:8
401:4 402:11,15
421:13 426:11
430:1 537:14
**claim** 410:9 466:13
467:13 473:12
491:22 495:16
519:19
**claimed** 434:2
**claims** 424:18
467:11
**clarification** 414:10
415:5 548:21
**clarify** 493:1 535:12
560:10 590:4
**Clark** 441:1
**classified** 439:6
**classmate** 543:5
**Clay** 454:5 509:19
510:4 511:5
513:22 514:18,19
514:20 515:10
517:17 518:6,6
533:1 575:14,18
576:11 577:10
**CLE** 447:12
**clear** 411:18 444:13
447:19 475:1
499:8 524:13
565:17 600:17
**clearly** 455:1
**clears** 583:13
**clerk** 374:19,21
381:9 468:19
479:12 481:17
**clerking** 388:13
**clever** 559:21
**cleverly** 560:22
**client** 397:14,17
404:14 413:6
415:10 422:1
425:8 439:14
454:19 468:5
483:18 497:16
499:16 521:18
522:16 541:15
542:17 549:21
565:10
**client's** 473:4 531:7

**clients** 398:11,13
406:8 409:13
412:20 423:9
425:7 432:20
440:1 523:20
**clients'** 522:5
**Clinton** 437:22
438:19 439:5,13
**Clinton/Gore**
437:11
**Cliven** 409:14
430:10,12 449:9
475:4 479:20
489:2 491:18
511:13 512:20,20
519:19 521:4,18
522:10,14,17
523:13 524:2,8,9
524:12 525:18
565:11 578:17
579:15 594:5
**Cliven's** 519:18
521:6
**close** 438:14 502:13
540:6 610:8
**closely** 393:17
539:20
**closing** 497:22
608:18 609:3
**closings** 498:1
608:15 609:5
**clouds** 577:13
**Coast** 405:2
**Cobis** 453:9,19,22
455:11
**codefendants** 485:2
485:7
**Cohan** 471:20
**collateral** 493:17
497:4
**colleague** 468:8
475:8
**colleagues** 392:3
**collection** 577:17
**Collins** 471:19
473:10
**colonists** 431:12
**Colorado** 492:2
**Colton** 389:20
390:2
**Columbia** 369:1
370:6 435:6
448:21 452:1,3
453:1,3 456:18
457:13 474:20
482:9 534:12

603:4,6
**come** 379:17 389:10
392:13 422:3
426:18 432:9
435:21 439:15
463:5 465:3
480:21 491:1
492:7,7 495:17
496:21 502:9
515:12 523:14
527:3,13 584:3
586:10,18 601:4
**come-to-Jesus**
523:22
**comes** 472:14
527:21 598:4
**comfort** 473:4
**comfortable** 473:3
**coming** 421:18
**commence** 486:14
486:15 510:9
**commencement**
513:3,5
**commencing** 370:3
**comments** 455:13
**Commerce** 397:15
399:3,12,14,20
439:4
**commercial** 439:15
**Commission** 388:12
391:9,12 400:4
421:6,12,14,17
537:17 550:5
**commit** 444:12
560:8
**committed** 455:18
471:6 498:16
519:17 560:7
561:2 574:14
**committee** 370:4,9
375:2,15 376:2,14
377:4 380:3 381:5
437:12 439:20
447:16,20 452:9
453:13,21 455:17
460:8,11 464:8
476:3,21 477:6
478:5,7 515:13
517:16 518:14,19
553:19 561:5
596:11 599:21,22
600:6 601:4 607:5
607:16,19 608:19
608:21
**committee's** 435:3
532:19 555:12

**common** 594:19
**Commons** 431:11
**communicate**
409:16 483:1
514:22 529:21
**communicating**
523:5
**communication**
493:7 510:12
**communications**
513:22 514:18
**communist** 438:15
**companies** 395:8
398:16
**company** 398:17,18
421:5 537:8
538:22 540:2
550:1
**compare** 378:21
**competent** 588:8
**competition** 391:10
**competitive** 429:7
**complained** 579:13
**complaining** 399:12
**complaint** 411:5,13
425:12 429:8
465:6 477:11
498:16 537:11
539:3 545:22
561:19 595:17
596:7
**completed** 508:22
**completely** 482:19
**completeness**
610:11
**completion** 514:15
**complex** 485:1
533:9
**complicated** 472:19
**comply** 448:17
**component** 404:9
**conceived** 429:4
**concerned** 466:16
508:21 521:7
**concerning** 393:5
518:10 545:20
553:16
**concerns** 475:18
578:21 579:1,3
580:22 581:7
**conclude** 531:21
**concluded** 410:15
410:16 474:21
510:8 535:1
556:21
**concludes** 595:8

conclusion 495:18
  586:18 592:10
  603:10,17 605:18
  605:21
conclusions 598:4
  603:11
conduct 394:2
  423:16 436:1
  469:16 485:21
  550:14
confident 593:8
confinement 461:19
confirm 540:22
  541:19 542:14,21
  546:12 562:6
confirmed 511:20
confirming 562:4
conflict 453:15
  558:19 560:18
  579:11
confrontational
  596:4,15 599:5
confused 452:11
  458:20 574:16
confusing 469:5
connected 381:11
  586:21
connection 375:1
  553:3
consent 393:2,3
  417:12 418:6
  463:12,16
consequently 459:6
conservative 606:9
consider 417:17
  442:7 506:6 574:7
consideration 457:2
considerations
  517:20
consistent 378:11
  481:7 542:1
  551:14 553:18
constant 493:7
constitutes 485:8
  572:13
Constitutional
  473:17 475:2
  511:13 512:5
  597:22 607:2
consult 481:7,10,13
  482:17 483:4
  522:13 532:3
consulted 481:12
consulting 479:11
  481:16,19
consumer 390:12

391:3,12 393:9
  395:5 396:7,16,18
  537:16
consumers 391:13
contact 394:7
contacted 465:9
contained 454:15
  537:16 540:21
  588:21
contains 517:15
contemplating
  595:13
contempt 442:7,8
  443:4 538:12,18
  539:4,9,16
contend 550:22
content 529:16
contentious 485:1
  579:12
contents 484:16
contest 509:6 555:1
contested 457:10,12
  458:16,18 459:5
  459:14 543:7
  555:3
context 410:21
  437:7 448:9 474:4
  474:6 576:3
  579:14 603:9
continuation
  434:13
continue 447:12
  459:3 463:8 492:5
  496:13 507:7
  521:6
continued 371:1
  402:20 404:18
  430:7 505:4
  568:17
continues 533:11
  557:9
continuing 390:21
  397:2 417:9 420:9
  420:18 422:18
  428:10 430:6,21
  437:5 438:10
  442:1 450:13
  452:16 460:4
  463:10 469:9
  470:20 478:12,22
  482:11 486:19
  499:3 505:7 506:4
  513:21 514:17
  517:9 519:9 523:3
  526:5 527:20
  530:22 532:16

582:20 583:7
continuously 447:2
  447:5 452:2 453:2
  466:3
contract 389:3
  400:2
contributions 399:6
  399:8 428:14
  437:19
control 507:20
controversial
  498:21 501:2,5
  507:15
controversy 602:2
conversation
  575:13,18 576:1
convict 432:20
convicted 407:20
  432:20 474:18
  538:22
convictions 413:2
  462:20
convinced 461:20
convincing 444:13
cool 560:13
cooperated 405:14
  451:17 452:17
cooperation 404:19
  406:1
copy 436:10 442:10
correct 382:22
  384:5,8 397:14
  412:3,4 444:1,2
  458:10 476:6,13
  476:15 480:21
  495:6 499:21
  536:16,18 537:9
  538:14,15,20
  539:5 541:13
  544:15 545:4,6,12
  548:7 564:11
  568:16 569:1,2
  575:21 577:8,20
  587:2,22 588:5
  589:4,10 591:19
  605:8,9
corrected 397:20
  480:20 587:5
correctly 413:10
correspondence
  465:8
Corsi 430:3
Cosmetic 402:13
couch 468:7,9
counsel 370:20
  374:6,9,17 383:1

384:2 393:14,15
  396:13 407:15
  417:7 427:2 430:4
  434:15 444:8,16
  444:17 445:15,19
  449:22 450:1,22
  453:12,14 454:3,5
  459:16 460:14,15
  461:1,7,11,12
  462:21 466:19
  467:1,7,12 468:1
  469:15,22 471:22
  472:13,15,18
  473:2,17 475:6
  477:10 481:1,2,3
  481:9 482:7,16,18
  482:18 483:15,16
  486:22 488:7
  489:12 490:13
  492:15,15 493:2
  496:7 497:9
  498:10,12 507:11
  508:1,3 509:10,20
  510:1,3 511:1
  512:17 514:4,22
  516:6 520:4 521:7
  521:16 530:7
  532:20 533:3
  535:6 541:20,21
  542:3,22,22
  543:14 544:6,13
  544:18,19 545:5,7
  547:12,22 563:8
  564:9,16,17,17,21
  566:14,15 572:5
  576:21 577:12
  583:3,8,18 584:9
  586:6 587:8
  588:10 590:2
  594:2 596:8 599:9
  609:9
counsel's 375:7
  415:2 451:18
  452:18 484:4,14
  495:4 500:3 520:7
  532:17 583:15
  610:5
countervailing
  399:4
country 406:16,16
  411:9 425:21
  542:4
counts 453:9,16
County 482:2
couple 384:13
  419:13 536:6

540:22 589:21
  591:17
course 398:19
  421:21 430:11
  437:21 438:16
  461:22 471:18
  492:10 524:9
  528:20 529:5,22
  588:17 596:9
courses 412:10
court 369:1 370:5
  375:4 381:8
  382:19 397:15
  400:2 422:6
  424:12,18 425:5
  436:11,12,22
  439:16 442:2,12
  442:17 443:6,20
  457:1 460:6 465:7
  466:20 471:17
  472:7,14 473:1,11
  474:7 476:7,10,15
  483:18 487:4
  492:2 499:5,8,11
  499:15,17 506:19
  506:19 507:5,21
  508:19 509:2,4
  510:7 512:8,18
  526:13 528:14,19
  529:7,20 530:9
  531:18,20 539:4
  544:3 547:14
  550:13 551:13,21
  560:20 564:14
  566:2 569:13
  573:19 577:2
  578:19,20 579:1
  580:6,21 581:7,9
  610:12 613:1
court's 485:6 505:7
  506:8 508:20
  565:5 582:14
courtesy 521:9
  522:16
courtroom 425:15
  483:4,8 522:1
  551:5
courts 392:17
  428:12,20 442:16
  443:8 473:15
  507:19,21 567:8
  573:16,20
cover 601:6
cowboys 579:20
Cox 502:10
crash 418:10

**create** 462:4 483:14
    513:10 558:19
    596:16
**created** 568:11
**credibility** 449:15
**credit** 522:9 524:5
**crimes** 529:8
**criminal** 391:7
    396:3,4,12 397:8
    402:3,4,11,14,16
    402:18 404:2
    405:7,8 412:3,10
    412:20 430:1,7,8
    434:13 454:17
    462:14 463:18
    466:18 473:16
    474:4,5,5,6 475:5
    478:10 506:15
    507:11 509:2
    537:1 538:11,12
    538:18,19,21
    539:3,9,15,16
    540:17 545:17
    547:11 564:18
**criminality** 540:1
**cross** 372:2 504:13
    613:10
**cross-examination**
    383:10 535:5
    590:1 611:13
**crossed** 426:2
**cryptic** 519:15
    520:15 578:1
**current** 429:6
    472:14 498:11
    506:5
**currently** 595:12
**curriculum** 456:2
    470:21
**Customs** 397:9,9
**cut** 420:2

───────────

**D**

**D** 372:1 373:1
    401:13
**D.C** 388:10 464:20
    548:16
**dad** 392:6
**daddy** 579:19
**damage** 485:15
**damages** 421:16
**damning** 485:13
**Dan** 431:4
**Daniela** 467:22
**dark** 577:13
**date** 378:18,21

379:2 390:16
    447:2 480:8
    512:16 513:3,4
    576:2
**dated** 505:20
**dates** 377:9
**day** 376:19 378:7
    378:22 379:1,3,4
    379:7,20,20,21
    389:11 412:17
    422:3,4 439:16
    446:22 447:8
    504:8 521:13
    557:9
**days** 423:19 519:15
    534:5
**DC** 369:10 370:2,17
    374:16 381:8
    423:20 442:17
    443:9,20 446:10
    446:22 447:9,10
    455:3 479:5 496:5
    535:15 555:7
    556:20 567:18
    568:22 577:2
    594:6 603:1,2,8
    603:21
**DDN** 369:6
**de** 460:11
**dead** 425:6 506:17
    557:3
**deal** 423:11 576:9
**dealing** 394:16
    396:12 397:8
    404:4 420:21
    430:3 437:17,21
    510:22 545:1
    572:4
**deals** 502:14
**dealt** 408:6,8,9
**dean** 598:12 599:11
    604:1,4 606:16
    607:2 611:6
**death** 375:20,21
**debris** 482:6
**debt** 440:8 465:18
**December** 435:5,7
    519:10 520:12
    578:21,22
**decide** 444:9 476:14
    498:14,15 601:17
    601:18
**decided** 387:8 389:9
    390:8 410:22
    418:15 466:19
    515:22 517:15

544:18 547:12
    599:6
**deciding** 516:17
    517:13
**decision** 425:1
    436:16 506:8
    508:7 509:22
    510:8 511:1 520:1
    527:22 544:5
    550:8,9 551:19
    553:16 554:20
    556:22 571:8
    575:2 596:20
    599:21 602:5
**decision-making**
    399:10
**decisions** 382:21
    496:19 506:9,19
    549:18 571:1
    575:1
**declaration** 587:10
    601:7 604:22
**declare** 520:21
**declared** 494:2,5,13
**declined** 601:10
**declining** 574:6
**decrees** 393:3,3,5
**deep** 471:3
**defend** 391:8 413:3
    431:21 462:20
    499:16 529:15
    566:3
**defendant** 426:7
    454:18 472:12
    501:4 507:16
    508:1 512:19
    528:22 530:1
    531:11 568:8
**defendant's** 471:22
    473:12
**defendants** 383:2
    425:15 461:22
    486:14 511:15
    512:5 513:12,13
    520:10
**defended** 400:8,10
    431:11,14
**defenders** 512:19
    523:19
**defending** 431:20
**defense** 391:5
    412:10,20 433:9
    461:13 462:14
    472:18,18 475:5
    482:11,21 484:19
    485:10 486:20,21

487:2 490:20
    491:19 502:12
    507:11 508:2,3
    509:2,10 511:10
    512:17 521:19
    530:10
**defenses** 529:8
    579:12
**definite** 610:19
**definitely** 484:4
**delay** 559:9,17
**delayed** 422:7 513:3
**democratic** 437:12
    439:1,20
**demoted** 432:16
**denial** 462:3 473:16
    474:7,11 480:2
    506:5 507:3,4,8
**denied** 461:8
    472:12 474:2
    475:5 478:10
    481:22 492:11
    497:8 525:11
**Denny** 438:20,20
**deny** 458:9 471:21
    508:19
**denying** 479:17
    506:8,9 508:15
    556:3
**department** 388:19
    389:12 391:1,16
    391:17 392:22
    393:7,11 397:15
    399:3,12,14,21
    400:16,21 405:19
    405:21 406:14
    412:14 433:7
    439:4 486:5
    533:12 536:17
    537:3,11 540:4,9
    543:7
**deported** 406:12
    416:11
**deposes** 587:21
    588:4
**deposition** 438:18
**Deputy** 370:20
**derived** 457:15
**describe** 381:4
    410:5 464:11
**described** 485:3
    550:22
**describes** 463:20
**description** 550:14
    550:15 551:14
    553:17,18 554:1,1

564:11
**despite** 481:21
**details** 534:15
**detector** 483:7
**determination**
    607:22
**determine** 382:9
    607:19
**determined** 509:14
**detriment** 506:22
**Dick** 387:9
**died** 551:22
**differences** 569:12
**different** 389:11
    390:4 394:5 395:8
    398:15 403:7
    450:1 474:4 478:5
    484:9 498:19,19
    498:20 550:15
    566:18
**differently** 558:21
**difficult** 422:20
    464:2 499:10
    606:15
**difficulty** 464:11
**diligence** 531:11
**diligent** 420:3
**dire** 530:18
**direct** 372:2 374:8
    385:9 386:9
    488:10 504:6
    505:4 522:4 535:2
    541:7,10 559:6
    561:22 562:19
    565:4 570:8
    581:20 586:6
**direction** 539:18
**directly** 526:17
    581:8
**disagree** 553:21
    569:10
**disallowed** 489:18
**disbarment** 461:9
    478:10 508:14
    509:13 510:20
    577:3
**disbarrable** 476:7
**disbarred** 454:20
    577:1
**disburse** 405:5
**disciplinary** 370:17
    370:20 374:5,9,16
    375:1,7 417:7
    436:16 443:16
    444:3 448:21
    449:1,21 450:1

In The Matter of:  Larry Klayman
July 16, 2019

455:2,11 457:3,10
457:19 458:16,18
459:16 466:2
477:10 479:6
484:14 498:12
500:3 509:20
510:1 511:1
514:21 532:17
533:3 535:6
556:20 557:6
594:2 596:8 599:9
602:21 603:9
**discipline** 449:20
450:17 451:15
455:7 456:21
457:7,17 458:13
459:12,17 469:12
514:3,5 515:2,6
518:11,20 532:21
545:21 555:7,16
555:21 557:7,17
557:21 560:8
561:2
**disciplined** 452:3
453:3 497:15
553:6
**disclose** 553:4
554:19 555:5,14
557:19
**disclosed** 551:4
553:2 555:14,21
556:5
**disclosure** 485:15
**discover** 556:16,17
**discovered** 555:8
556:2,13
**discovery** 485:14
490:19 528:15,20
529:19 574:3,7
601:11
**discretion** 454:22
473:15 475:1
476:8 507:19
**discussed** 417:1
518:12 529:7
556:9
**discussing** 491:8
**discussion** 452:8
474:9 532:6
**discussions** 529:15
529:17,19 579:10
**dishonest** 462:7,8
**dishonestly** 461:20
467:21
**dishonesty** 418:4,17
450:5 451:21

452:21 469:17
470:1
**disingenuous** 449:5
**dismiss** 432:2,21
520:3,7,14,17,18
525:9 569:15
**dismissal** 497:6
520:5 525:16
533:17
**dismissed** 462:9
493:15,17 494:6,7
533:18 566:1
580:15
**dismissing** 569:8
**disposed** 536:14
**dispute** 412:13
486:18 566:7
**disputed** 566:9
**disqualify** 480:17
563:7 568:2,4,14
572:21 583:10
612:11
**disrespect** 536:11
536:11
**disrespectful**
445:15
**dissent** 454:16
500:11 505:11
506:5,13 507:6
509:16 556:7
**dissented** 500:14
507:2
**dissenting** 472:6
487:17 494:19
500:5 508:17
**dissents** 505:9
**distance** 513:10
**distinguished** 456:2
471:2
**distracts** 428:2
**distress** 466:8
**district** 369:1 370:6
381:8 411:10,11
421:20 435:6
441:5 448:21
452:1,3 453:1,3
456:18 457:13
473:3,15 474:7,20
482:8 485:5 487:4
506:8,19 507:5,19
507:20,21 508:19
508:20 509:2,4
511:22 534:11
603:4,5 608:7
**division** 389:15,21
390:5,7,11,13

394:13,18 397:3
402:5
**docile** 424:22
**docket** 369:3,5
381:13,14,16
384:4,16 403:2,3
403:6 415:6,16
540:18,20 541:7
541:11 543:20,21
565:10 566:5,17
**dockets** 566:12
**document** 376:13
376:14 475:19
480:22 487:8
514:19 540:20
583:19
**documentation**
438:1 482:10
583:22 598:4
**documented** 567:2
**documents** 375:18
375:19 438:11,17
440:9 476:19
487:3 531:17
534:10 581:21
582:2 594:7
597:14 600:3
602:9 604:5 608:5
610:5,17 611:7,9
611:15 612:18,18
613:10
**dog** 422:2
**doing** 381:7 394:22
398:19 405:20
411:20 417:17
429:18 437:13,15
437:20 440:17,18
440:20 472:15
514:7,8 516:13
523:4,19 554:16
565:22
**DOJ** 405:6
**doling** 544:10
**domestic** 434:6
**Donovan** 392:11
**double-check** 613:7
**doubt** 412:12
519:21
**Doug** 389:20 390:2
**downstream** 426:8
**Dr** 418:20 430:3
**drafting** 561:19
**draw** 583:14 603:12
**drive** 433:21
**Drug** 391:10 402:13
537:7

**drugs** 391:11
**due** 474:2 476:9
479:15 531:10
**dug** 569:2
**Duke** 386:21 387:5
395:20
**duly** 374:6 386:7
586:4
**dump** 462:10
**duplicative** 434:21
447:15 562:1
**duties** 399:11
**duty** 399:4 600:14

_____

**E**

**E** 369:5 370:2 371:3
372:1,4 373:1,1
386:5 398:7
463:22,22 504:1,1
**earlier** 524:13
533:7
**early** 392:4,7
421:22 422:11
561:3
**easily** 509:1
**Eastern** 519:2
**economic** 401:4
**Economics** 387:8
**economy** 395:6
**edit** 377:9
**edits** 377:8
**educate** 430:7
**educational** 386:18
**effect** 418:18 421:8
430:17 432:13
450:18 451:16
454:6,10 456:21
457:17 459:13
460:9 469:12
479:16 480:22
532:22 555:18
556:10 557:2
571:8 587:11
**effectively** 431:15
**effectiveness**
473:13
**efficacy** 604:8
613:13
**efficient** 474:10
**effort** 467:13 605:7
**efforts** 475:8
**eight** 376:20 416:10
455:9 468:21
516:20,20 541:15
**either** 424:10
598:16

**Electric** 381:2
**electronic** 583:9,11
589:6
**electronically**
480:20
**elicited** 482:22
**eliminate** 509:2
510:2 570:22
602:2
**eliminated** 494:14
494:15 509:11
**Eliot** 386:13
**email** 467:2 516:14
516:22 519:1,9,13
523:11,22 524:4
533:1 567:2 578:1
578:6,12
**emails** 515:16
531:19 532:1
577:17,21
**Emory** 387:21
388:1,9 396:21
543:5
**emotional** 466:5
**emphasize** 547:21
**employed** 374:20
588:10 590:6
**employee** 537:3
**employer** 590:8
591:8
**employment** 590:4
**ended** 403:8
**ends** 428:5
**endure** 596:9
**enforcement** 397:9
402:10 405:21
**engaged** 450:22
539:22
**engine** 592:13
**engineering** 405:12
**ensue** 517:7
**enter** 436:10 541:1
572:18
**entered** 391:2 460:7
463:17,21 466:7
541:6,15 543:14
544:19 545:4,10
**entered-into** 456:20
**enterprise** 404:6
**entertain** 599:2
**entire** 440:5,6
517:21 572:10,12
572:14 605:14
613:14
**entirely** 605:9
**entitled** 456:12

In The Matter of:  Larry Klayman
July 16, 2019

466:22 471:7
542:5 601:20
**entrance** 483:8
**entries** 484:21
**entry** 382:2 460:22
461:17 462:3
481:22 494:17
521:17 522:6
525:5 541:11
543:18 567:14,15
**environmental**
434:3
**equal** 401:10
**equally** 424:6
**equals** 440:11
**equating** 431:9
**equipment** 394:6
**equitable** 421:15
**errata** 582:21 583:8
**erred** 474:12
**erroneous** 455:1
474:14
**error** 475:1 563:13
570:5 588:22
**ESQUIRE** 370:10
370:14,19 371:3,6
**established** 380:18
380:19,20,21
**estimate** 403:14,20
**estimated** 412:7
**et** 437:14
**ethical** 444:13
455:19 471:6
498:17 509:12
600:17 605:19,20
**ethically** 473:2
514:9 517:18
**ethics** 397:20 411:5
411:13 456:6
471:4
**ethnicity** 401:7
**Europe** 606:15
**evaluate** 613:13
**Evans** 508:9
**event** 493:13 521:3
555:16
**events** 387:3
**everybody** 390:16
401:10 475:10
502:4
**evidence** 405:17
431:1 432:5,17
437:10 444:14
450:5 457:9
458:15 459:15
460:7,9 470:1

475:20 476:2,19
477:7 495:8
525:21 565:21
566:6 609:10,17
**ex** 479:2 584:3
**ex-wife** 420:1
**exact** 377:19 414:3
480:8 576:2
**exactly** 378:5 379:9
421:8 435:19
454:8 543:21
**EXAMINATION**
374:8 386:9 505:4
582:11 586:6
594:1
**examine** 613:10
**examined** 374:7
386:8 460:15
586:4
**excellent** 399:19
**exception** 560:13
**excessive** 485:22
506:7
**exclude** 421:17
**excluded** 482:19
524:14
**exclusion** 508:2
**exculpatory** 432:4
432:17
**excuse** 397:4 418:22
422:12 435:11
438:19 445:18
455:4 464:17
468:18 488:20
523:1 556:19
580:4 593:14
**excused** 384:20
595:6
**execute** 587:10
**executed** 515:7
589:5
**executive** 428:21
**executives** 394:17
**exercise** 476:8
513:14
**exhibit** 375:8,14
376:8,13 377:15
377:21 378:1,14
380:2,11,13,14
384:10 413:13
414:12,17 415:14
434:19 436:18,20
445:1,6 446:8,13
446:14,18 447:13
447:18 449:19
451:5,7 454:13

455:4,20 456:19
458:2 460:2,5,7
463:11 468:16,18
468:20 469:4,4
470:5,6 478:13
483:22 484:4,13
488:8,18 492:18
499:4,20 500:3
501:12,13 502:17
505:8 509:18
511:8 512:6
513:21 514:20
517:10 518:5
519:5 526:6 531:2
532:17 540:21
541:8 543:17
544:21 546:2,4,6
546:8,14,17,18,19
547:2 555:10
556:1 559:3 564:5
564:20 567:7
572:9 573:9
577:16 578:13
579:4 582:14,20
583:3,4,15,16
587:13,14 610:5
**exhibits** 375:8,11
415:2 436:14
446:9 460:22
477:4,5 488:5
501:11 572:11
578:3 581:18
587:7 611:10,12
611:14,18,20
**expanded** 612:2
**expect** 522:15
**expense** 453:20
576:6
**experience** 390:8
391:20 479:19
511:16,20 531:14
**experienced** 596:5
**expert** 397:11
455:15,16 456:6
560:5 598:12
601:12,14 602:20
603:10,15 607:2,3
**expertise** 456:3
471:3 600:8
607:10,11
**experts** 603:4
**explain** 377:3 402:8
410:21 437:5
478:4 539:14
**explained** 472:9
563:3

**explaining** 427:9
441:8
**explains** 455:6
**explanation** 447:22
467:5 502:18
**explored** 604:11
**export** 537:22
**exported** 537:21
538:1,10
**expound** 604:21
**expressed** 520:6
**extension** 534:5,9
**extensions** 534:8
**extent** 382:9 486:21
499:13 509:14
512:19 610:3,4
**extra** 387:16
**extreme** 508:4
**extremely** 485:6

_____

**F**

**F** 472:8 473:10,20
504:1 508:9,12,16
**faced** 507:12
**faces** 454:19 533:16
**facing** 464:1
**fact** 446:15 449:11
453:19 454:7
461:16 474:2
479:3 480:1
481:21,21 485:16
489:2 497:7,7
511:6 513:2
524:11 536:11
550:1 553:1,5
555:1,7,22 558:9
558:11 564:21
565:9 567:20
576:22 577:2
600:5 610:18
**facto** 479:2 584:3
**factor** 512:16
**factors** 451:15
466:1
**facts** 508:14 509:13
589:3 603:6,11,16
604:10
**factual** 554:1
**fair** 398:21 450:3
474:9 602:22
610:16,21
**fairness** 506:18
**faith** 492:15
**false** 525:22 568:19
578:16,18 580:11
581:2 596:10

605:10
**falsifying** 596:13
**familiar** 405:19
552:19,21
**family** 431:5 433:18
438:13,14 486:9
521:5 579:20
**far** 381:5 549:4
**faster** 504:15
**father** 431:10,16
596:6
**favor** 480:6 501:7
**favorable** 550:6,8
**favoring** 428:12
**FBI** 390:22 405:18
405:18 486:4
**FDA** 396:12 402:11
402:11
**fear** 522:6
**February** 376:17,21
377:6,7 378:5
379:13 380:10
509:19
**fed** 491:14,17
**federal** 377:10
391:8,14 394:10
394:11 403:5
412:2 424:8,10,11
424:13 434:1
439:13 466:20
471:19 482:1
491:1,21 493:8
507:17 547:14
550:13 551:13
579:10
**fee** 525:3 548:14
549:1
**feel** 516:12 517:17
518:15 523:10
**feeling** 511:7
**feelings** 572:22
**fees** 543:8 549:2
**felt** 391:19 400:18
409:12,13 429:7
516:13 523:8
566:3 569:14
**Ferreta** 490:11
**fie** 501:17
**fifteen** 415:15,20
**fifth** 495:3,3 505:18
567:5
**fifty-two** 469:1
**fighting** 428:11
**figuratively** 409:10
**figure** 439:17
510:17 517:3

In The Matter of:  Larry Klayman
July 16, 2019

576:10,12
**file** 417:20 442:16
  492:5 519:17,22
  520:9,13 534:5,7
  578:15,17 597:7
**filed** 411:5,12
  425:12 429:8
  435:17 438:2
  460:17,18 465:6
  470:10 475:14
  477:11,19 484:7
  488:2 494:1,9
  499:14,21 514:2
  520:4 526:7 531:1
  556:6 561:17
  562:11,14 563:12
  563:20 564:4,8,21
  565:18,19 566:8
  567:6 569:13
  582:21 596:7
  605:6 612:13
**filing** 545:22 561:20
  562:16 565:1,11
  565:12 583:7
**filings** 381:10
  382:12,14,15,16
  382:18 449:17
  572:21 573:1
  613:1,5
**filled** 439:16 440:6
**final** 447:6 496:4
  554:5 556:22
  567:19 571:18
  572:6 573:2
**finalize** 571:19
**finally** 471:20
  509:14 518:7
  583:21
**financial** 453:11,18
  464:2 466:8
**find** 428:6 436:2
  442:14 450:9
  453:13,21 463:15
  475:10 478:7
  488:5 493:10
  497:12 552:3
  558:15 592:14,16
**finding** 444:12
  473:1 476:6 600:5
  605:20
**findings** 433:13
  436:17 551:12
  552:19 553:1,17
  554:3
**fine** 388:20 394:11
  416:18 427:21

530:13 565:14
582:5 609:6,7
  611:13
**fining** 424:3
**finish** 427:22 428:7
  460:1 532:9 562:9
  580:20 610:1
**finished** 421:13
  534:22
**finishing** 417:2
**fire** 398:16 528:1
**fired** 489:2 522:18
**firm** 388:16 389:6,6
  392:12 394:21
  395:15 396:2
  397:22 402:2,19
  402:21 403:8,9,9
  420:14,19 429:16
  535:14 543:4
**firmly** 471:17
**first** 373:7 374:6
  376:20 386:7
  387:10 396:2
  415:21,22 417:11
  422:4 439:12
  448:15 470:10,13
  470:14,15 475:19
  477:18 478:5
  480:19 481:22
  484:8,9 494:5
  507:4 514:1,19
  520:8 521:13
  540:19 547:3
  551:2 556:6
  559:20 565:16
  568:3 572:19
  573:15 577:4
  578:12 586:4
  591:18 600:1
  612:13
**Fitton** 449:13
  455:12 514:2
  568:22
**five** 455:4 460:13
  476:10 497:11
  501:16 528:13
  530:5 531:6,7
  601:2
**five-minute** 459:22
  602:12
**fixed** 606:18
**flame** 537:18
**fled** 411:9 425:21
  542:4
**Fleder** 539:18,19
**fleeing** 407:13

**Fletcher** 462:12
  471:16 480:4
**Flick** 388:17
**flip** 451:8
**Florida** 388:15
  396:2 405:4
  411:11,11,14
  417:12 418:1,13
  429:14 435:5,10
  435:13 443:9
  446:11,22 447:10
  463:12,17,22
  464:14 465:2,7,21
  466:3,11 468:1,1
  545:21 547:9
  549:13
**focus** 454:9 462:14
  499:12 580:17
**focusing** 441:18
**follow** 375:18
  399:15
**follow-up** 540:16
**followed** 455:22
**following** 456:14
  465:22 584:2
  587:21 588:4
  604:13
**follows** 374:7 386:8
  586:5
**Food** 391:10 402:13
  537:6
**footnote** 479:9,9
  482:14 602:20
**force** 450:18 454:6
  456:21 457:17
  459:13 460:9
  469:12 485:22
  486:10 532:22
  555:18 556:10
  557:2
**forced** 432:2
**foregoing** 589:3
**foreign** 399:5
  400:10 437:19
**forfeiture** 537:11
**forget** 393:15 425:8
**form** 577:7 600:2
  607:7
**formal** 435:17
  465:6
**format** 570:13
**former** 398:15
  433:6 454:2
**forms** 418:6
**forth** 425:10 432:9
  455:22 464:20

485:13 512:3
515:5 558:22
570:13 579:12
**forthright** 599:19
**fortunate** 398:9
**forty-eight** 546:15
**forward** 432:10
  512:21 540:1
  548:3 557:10
  580:18
**forwarding** 419:10
  420:4
**found** 377:19
  425:13 426:6
  437:16 443:4,21
  444:5 446:11
  450:3 469:21
  470:17 474:6
  475:7 500:17,21
  510:4,13 552:10
  556:7 558:7,11
  574:13 584:2
  587:1 592:7,19,20
  593:9 603:16
**founded** 429:4
  452:6 453:6
**founding** 431:10,16
**four** 380:12 403:19
  409:2 411:18
  413:15 415:5
  440:11 489:8,9
  519:14 540:17
  543:19
**fourth** 413:11
  492:17 505:18
  563:22 598:13
**Fox** 498:12
**France** 387:4
**Francisco** 438:17
**Frank** 401:14 421:7
  421:20 425:19
**fraud** 407:2,3,3
  413:21
**free** 395:1,2 468:11
  522:11
**Freedom** 429:14
  438:1 452:7 453:7
  482:9 534:12
  591:7,8,11,12
  594:4,6
**freely** 574:22
**French** 387:1 388:5
  398:2
**frequently** 462:19
**friend** 468:4,7
  511:22 521:4

**friends** 502:13
  522:10
**friendships** 588:13
**frightened** 409:5
**front** 392:17,18
  400:8 401:13,19
  420:13,20 436:6
  439:10 440:19
  441:11 447:7
  456:15 457:20
  483:8 544:3 552:6
  555:2 561:4 568:1
  612:19
**Ft** 405:1
**FTC** 400:6
**fulfilled** 600:14
**full** 374:13 415:22
  457:2 465:15
  472:18,18 475:5
  484:19 485:10,20
  486:20,21 487:2
  521:19 552:1
  566:3
**fully** 515:6 521:13
**funny** 407:8
**further** 383:7 384:9
  464:4 465:12
  466:12,22 485:14
  544:2,4,14 584:6
  589:8,20 593:22
  602:9
**Furthermore** 603:3
**future** 379:11,13
  496:17

----

**G**

**G** 373:1
**gain** 453:18 469:17
  567:14
**gallery** 439:16
  440:5,6 482:22
  521:15
**game** 411:12
**gatekeepers** 439:1
**gay** 422:8,9 425:9
  426:6 495:19
**geared** 495:6
**Gene** 450:2 514:21
  517:17 577:11
**general** 389:14
  392:9 393:2 433:6
  436:11 485:5
  486:12 500:19
  613:13,18
**generally** 392:19
  400:17 410:5

In The Matter of: Larry Klayman
July 16, 2019

Page 625

433:18 500:16
578:5 609:18
**Gentlemen** 517:11
517:12
**Georgia** 387:21
388:3
**gestured** 445:20
**getting** 392:7 411:3
441:14 489:8
522:16 530:18
561:12
**Gilbert** 430:3
**Gillen** 543:1,4,11
**give** 373:21 385:22
420:4 463:15
483:5 490:1
507:22 523:7
570:14 579:13
584:20 593:20
602:19 608:1,18
609:2
**given** 408:14 443:6
447:21 461:6
475:22 485:16
509:21 517:21
522:12 559:9,17
599:18
**gives** 531:4 590:10
590:14
**giving** 438:7 439:7
448:10 507:19
513:18
**Gloeckner** 388:14
**Gloria** 511:22
588:15
**go** 376:12 378:14,20
380:7 387:8
389:13 392:6
394:19 395:14
398:11 400:7
409:7,8 410:18
423:20 431:6
432:1,19 442:15
450:16 452:12
455:6 458:4
461:14 464:7
468:16 469:5,11
477:2 479:1
490:15,19 493:3
496:19,22 498:8
499:18 500:6
501:19 502:20
504:15 512:20
516:1 518:4
522:10 524:12
531:9 532:10

535:22 544:18
548:3 562:8 566:4
569:20 574:10
575:11 582:2
584:13 601:3
607:20,20 609:9
**goal** 530:16
**goes** 432:5 504:15
512:1 513:2 549:3
562:18
**going** 375:6 385:19
394:12 405:9,9
406:9 407:12
408:21 409:10
413:5 414:3 418:8
418:10 419:4
420:9 422:14
423:15 424:4,9
426:2 428:18
432:1 436:21
437:11 441:3
442:6,10,11,15
443:7 446:18
448:1 449:3,11
450:16 451:2
455:5 464:7,19
467:17 468:10,15
473:19 476:18
478:2 479:1 480:9
482:5 483:5,21
485:12 489:15
490:10 496:16
499:6,7 500:6
501:10,22 504:18
505:9 512:2
516:11 517:19,22
519:12 523:15
525:11 526:1,10
527:16 533:2
535:9 544:7
548:17 551:2
557:10 558:5
561:22 563:9
569:20 570:19
574:3 577:13
582:16 583:15
595:14,21 597:16
598:2,3 602:4,5
602:19 604:5
606:12 607:7
608:9,17,20
610:10,20 611:8
612:4,5,15 613:12
**good** 373:4,10
379:16 398:4

590:7
**guard** 405:2 521:3
**guess** 374:11 377:1
377:13 382:5,9
476:2 489:12
490:2 528:10
530:4 535:11
545:19 548:21
550:15 553:18
560:10 570:22
577:17 591:10
592:5,9,13 612:5
**guilty** 406:3
**gun** 512:21 513:11
**guy** 514:22

———————————
**H**
———————————

**H** 454:5 509:19
510:3 511:5
514:18,20 515:10
575:14,18
**hac** 427:3 435:2
436:11 441:18
443:18,19 447:4
454:17 458:9,19
460:16 461:2,11
462:3 472:2
473:13,14,16
474:1 479:17
480:2 494:17
495:21 496:22
501:7 506:8,16
507:4,8 508:15
509:11 514:15
519:17 520:13
521:17 522:6
525:19 553:20
554:21 567:14,15
567:21 571:4,15
572:16 573:18
578:15,17 598:6
598:20 599:13
600:12 605:7,22
607:8 612:2,17,22
**Haley** 437:16 543:2
543:3,12
**half** 504:14
**Hamilton** 498:12
**hampered** 482:21
483:9
**hand** 409:9
**handle** 389:1
**handled** 389:2
402:8 543:11
**handles** 391:9 399:4
**Hansen** 477:12

400:21 411:3
435:4 446:20
447:1,4,9 451:22
452:22 459:21,21
466:3 502:16
523:20 579:15
**goodwill** 521:4
**Google** 375:17
586:19 591:18
592:12,17
**gotten** 405:15 441:1
**Gould** 454:16
461:10 471:13,16
472:5,17 480:5
494:18 496:18
500:8 508:17
555:11 556:7
558:7 574:8
599:13
**Gould's** 484:21
487:17 500:4,11
505:9 555:13
**government** 381:22
382:3 383:2 387:4
391:4 397:21
398:20 401:5
412:22 430:15
434:2,2 439:8
460:14 461:16
462:15 487:5
491:21 508:5
511:21 520:9
525:21 528:16
533:14,19 534:6
**graduate** 395:17
595:1
**graduated** 386:22
396:20
**grandfather** 392:7
**grandparents** 424:5
**grant** 520:6
**granted** 520:14
599:14
**granting** 501:7,7
**Gray** 388:16
**great** 394:8 399:22
423:5 447:21
456:7 519:7
601:22 603:13
**Greene** 394:9 536:7
**Greensboro** 540:7
**Greg** 543:1,4,11
**Grisham** 425:5
**ground** 430:22
450:16 455:6
**Group** 429:17

480:19 562:11,14
582:21 583:8
**Hansen's** 562:5
**happen** 496:17
**happened** 401:1
408:6 417:18,21
427:18 435:9,20
441:11 563:4
567:22
**happening** 405:3
**happens** 434:8
**happy** 412:5 570:4
**harbor** 521:1
**harbors** 521:4
**hard** 530:2
**hardware** 421:1,4
**harm** 494:21
**harming** 495:9
**Harold** 394:9 536:7
**Harriton** 386:20
**Harry** 434:10
588:14
**hated** 409:7
**head** 541:5 586:21
593:5 611:4
**heads** 394:8 449:5
**heals** 569:2
**hear** 518:17 531:18
607:16
**heard** 431:2 442:22
518:9 576:14
594:12 606:20
**hearing** 369:12
370:1,3,9 375:2
375:15 376:2,14
377:3 380:3 381:4
435:3 445:14
453:13,21 457:8
457:12 458:14
459:4 460:8,10
464:8 476:3,21
477:6 490:11,11
490:14 491:8
504:2 515:13
516:1 517:16
518:4,14,21
523:16 526:7
532:19 538:18
539:9,10 553:19
558:17 564:22
566:22 579:4
580:5 596:11
599:21,22 600:6
607:5,16 608:18
608:21 612:12
613:21

In The Matter of:  Larry Klayman
July 16, 2019

Page  626

hearings 408:9,12
  425:17
heart 430:9 431:20
  517:6 577:11
heating 486:2
heavy-handed
  404:9
held 442:8 490:11
  490:12 499:16
  508:13
help 488:4 524:7
helped 393:6
helpful 447:22
  476:4 478:2,3,7
  482:11 522:2
  607:4,15 608:21
  609:12
helps 395:5,6 428:5
Henderson 482:2
Herman 498:11
Hernandez 404:5
  416:14
hernia 422:7
hero 431:17
hid 525:21
hiding 432:4
hierarchy 510:22
high 386:20 483:6
  501:2
high-profile 512:9
high-stakes 509:6
higher 540:4
highly 399:6 401:6
  405:13 520:16,17
Highway 391:15
Hill 468:14
hire 524:19
hired 392:10 397:6
  525:1
history 378:20
hit 440:11 580:1
Hoc 370:3,9
Hoehl 388:17
hold 399:16 409:9
  425:17 442:7
  540:2
holidays 387:15
homework 423:21
honest 397:21
  416:20 462:16,17
  594:9 599:19
  600:5
honesty 449:7 600:8
Hong 437:18
Honor 375:10 385:3
  416:13 423:3

430:13 434:20
  436:8,21 442:4,14
  445:16 447:15
  448:5,16 451:14
  477:3 479:2
  484:11 489:21
  493:13 495:6,15
  501:9 504:22
  506:2 532:7
  534:20 538:4
  551:3 560:12
  561:21 565:2
  570:3 574:1,4
  581:19 582:21
  589:8 595:7
  598:10 599:1
  600:9 601:9,10,16
  602:18 604:12
  610:18
Honor's 500:3
honorable 532:19
  588:14,15
honoring 464:3
honors 387:1
  484:15
hoped 392:18
  418:12
hoping 433:12
  611:10
horizon 577:14
horns 574:9,22
horse 557:3 579:21
  579:21 580:2
Hosiery 537:8
host 468:9
hotel 512:13
hour 504:13 548:18
  606:7
hourly 548:14
  549:2,3
hours 403:16,20,22
  411:21 412:8
  504:14 548:10
house 543:8
Humm 406:18,19
  410:20 413:5
  416:21 417:9
  463:18 464:3
  465:14 466:10,18
  466:21 467:6
  542:8 543:13
  545:21 547:11
Humm's 410:17
  466:13 467:1,12
Humm.' 467:5
humor 579:16

hundred 492:19,20
  492:21 493:11,12
hurting 428:6
husband 586:16
  592:8 593:4
Hyatt 468:10,13

─────────
I
idealogue 401:8
identified 402:21
  412:2 427:15
  448:17 537:2
identify 375:14
  380:2 430:12,14
  570:2
II 369:7
III 454:5 509:19
  514:20
illegal 404:7 437:18
  485:21 486:1,12
illusions 521:1
immediately 465:14
  487:1
immigrants 404:7
  424:7
immigration 407:3
impact 395:5 506:7
  512:15
impassioned 424:4
impeached 485:19
impeachment
  450:19 457:11
  459:4,8
impetuses 397:19
implicates 402:14
  473:17
implication 499:14
  566:13
implied 524:13
implies 520:15
import 421:17
important 398:22
  415:1 448:19
  449:14 450:14
  456:14 471:12
  472:10,11 519:13
Importantly 456:17
importer 422:8,9
importers 395:9
  399:5,5
imports 395:3
imposed 524:10
  566:2

imprisoned 461:19
imprisonment
  449:10 454:19
  474:19 507:13
  533:16
improper 474:7
improperly 410:9
  497:9
in-state 461:12
inactive 447:11
inadequate 472:15
inadvertent 563:13
inadvertently 457:1
  480:19 583:9
inapplicable 494:13
incantations 403:8
incident 435:9
inclined 596:3
  599:7 608:14
include 497:22
included 377:20
  487:17 555:8
  556:2 578:2
  602:20 612:9
includes 378:9
  472:1 485:11,22
including 442:17
  457:20 476:12
  486:22 491:5
  543:1 565:11
  568:1 612:11
incorrect 508:8
  514:9 592:15
  593:10
indicated 464:1,4
indication 381:18
indicted 410:7
  434:5 538:22
  539:2
indictment 432:2
  462:9 493:14
  497:6 520:5,18
  529:10 533:18
  539:3 542:2
individual 437:22
  438:10 512:12
  539:1
Indonesian 438:14
indoor 557:14
indulgence 534:20
industries 395:10
industry 393:6
  395:9,10
inebriated 426:18
ineffective 489:12
inequity 428:12

influence 428:13
influenced 399:6
  401:6 572:3
information 377:19
  377:20 378:6,8,9
  380:10,18 384:6,8
  397:14 404:20
  405:18 438:1
  439:7 478:6 482:9
  500:22 534:12
  561:13 572:5
  592:14,15,17,19
  594:6 596:13
  599:10 600:2,11
informed 381:10
infringement 400:3
  400:3,11 420:22
  420:22
initial 435:2 455:21
  507:2 534:7 553:3
  556:3 557:18
  568:22
initially 411:8 482:3
  567:17 568:3,15
  569:15
initiated 496:8
injury 389:3
injustice 428:20
innocence 412:21
input 483:5
insistent 406:14
Inspector 485:5
  486:11
instance 400:5
  404:4 495:12
  521:22
instituting 498:16
instruct 445:16
instructed 540:5
  578:17
instruction 538:5
insulated 424:15
integrity 423:5
intellectual 424:14
  449:7
intelligent 405:13
intend 385:8 518:18
  598:18,22 608:3
intention 463:3
intentional 402:13
interest 391:22
  392:16 452:6
  453:6,15 474:9
  497:17 508:5
  521:18 522:5
  558:19 560:18

In The Matter of:  Larry Klayman
July 16, 2019

**interested** 395:13 411:17 412:11
**interesting** 388:7 440:7 526:12
**interestingly** 482:4
**interests** 434:3
**interim** 485:8 551:22
**international** 388:6 388:11 389:21,22 390:7,10 391:21 394:22 395:1 400:4,17 421:6,12 421:14,16 550:4
**Internet** 375:3 377:2 593:1
**internships** 388:9
**interrupt** 487:7
**interrupting** 446:4
**interrupting** 446:4
**intersected** 512:10
**inventive** 507:10
**investigated** 559:10
**investigation** 437:10 451:18 452:18 485:14 577:3
**involve** 451:21 452:21 469:16 574:3
**involved** 404:5 405:15 406:20 433:11 537:2,10 538:17 539:8,10 541:3 545:21 569:12
**involvement** 381:19 382:10 543:10 544:2,4,14,16
**involving** 394:4 400:10 404:6 537:6 549:20
**Ironically** 412:18
**irony** 439:18 440:2
**irrelevant** 473:2 555:1 581:4 595:18,19 599:11
**isolated** 409:15
**issue** 439:5 441:12 459:11,11 468:2 477:11 496:12 497:19 499:12 516:18 517:14 526:8 540:3 551:4 566:20 572:16,16 573:2 583:13 596:16 600:16

603:18 610:11 611:22
**issue-by-issue** 598:10
**issued** 479:11 481:16 505:11 541:5 573:1 598:7
**issues** 391:10 394:12 397:18 418:9 471:18 476:4 502:14 531:16 597:22 598:3 599:1 602:6 611:8 612:15
**issuing** 457:4
**Italian** 398:14,14 439:14
**Italy** 398:13

―――――― **J** ――――――

**J** 370:10
**J.P** 595:14
**Jackson** 603:7
**jail** 475:4 482:2
**JAMS** 400:11
**January** 377:7,18 380:8,9 536:4,5
**Jay** 586:13 588:14 592:8
**Jeff** 433:3,5
**jeopardy** 524:2
**Jerry** 393:16
**Jewish** 422:10,22 423:1 425:8 426:15
**Jewish-Christian** 419:17
**job** 388:12 394:21 395:11 397:5 411:3 472:15 523:4,20 536:14 565:22 611:17
**jobs** 433:15
**Joel** 430:3 582:21 583:8
**John** 389:15 392:9 425:4 431:10,14 431:17,18 438:11 438:18,21 440:14 440:15 539:18,19
**joined** 393:13 535:14
**joint** 388:2 490:20
**jotted** 591:22 593:3
**Journal** 426:10,14 511:10,16 512:8

**judge** 376:18 377:10,18 378:4,9 380:4 382:21 388:13,13 394:9 394:10,10,11 400:8 401:12,16 401:20 420:10,13 421:22 425:11,14 426:12,14,17 427:1,1 431:22 432:18 434:8,9 435:9,10,12,20 436:17 437:2 438:4,20 439:10 439:12 440:10,19 441:3,11,12,16 442:1,13,19,21 447:4,7 448:13,15 449:2,7,16 454:7 454:16 455:14 456:1,3,12,16 457:20 458:8 461:2,10,20 462:8 468:17 471:1,12 471:15,16,16 472:5,17 473:3 474:12 475:3 478:14 480:3,3,4 480:5 482:15 484:21 487:17 489:14 492:10 494:18 495:7,16 495:20 496:18 500:1,4,8,11 501:1 502:12,13 505:9,13 508:17 511:10,22 512:4 514:14 520:6,9,16 520:18 521:2,3 522:1 524:11 525:19 526:8 527:2,21 529:2,3 529:14 536:7 547:20 549:18,18 549:21 550:14 551:1,4,15,20 552:3,5 553:2,5 553:10,14,16,19 554:12,14,20 555:2,5,7,11,13 555:22 556:1,7,19 557:16,20 558:6,7 559:19 561:17 563:7 567:16,20 568:17 569:9,17 571:3,14 573:1

574:8 575:6 583:10 584:1 586:12 588:14,16 588:19 594:17 598:19 599:12,19 601:11 607:8 612:13
**judge's** 473:5 569:6 569:20
**judges** 401:5 428:19 434:10 439:2 501:6 571:2 574:10 575:1,1 601:15
**judgment** 393:22 405:20 417:12 463:12,16
**judicial** 377:10 428:14,17 429:1 429:13 437:8 440:17,19,20 445:13 449:12 452:6 453:6 454:2 455:12 514:1,12 557:11 568:22 576:3 605:8,10
**JULIA** 370:19
**Julian** 381:9
**July** 369:9 386:15 429:3 613:22
**jumped** 411:3
**jumping** 407:12
**June** 396:20 519:2
**jurisdiction** 491:20 542:5 602:22
**jury** 603:7
**justice** 389:12 391:1 400:16,20 401:9 402:3 405:19,21 406:14 412:13 424:6 433:7,11 439:4 474:10 486:5 533:12 536:17 537:4,12 540:4,9 543:7
**justification** 479:3
**justified** 508:3
**justify** 508:15
**justifying** 528:17

―――――― **K** ――――――

**keep** 394:2 398:20 462:12 495:21 560:13 584:4
**Keller** 401:13,16,20 420:10,13 421:22

425:2,11,14 426:12 427:1 428:18 435:9,10 435:12,20 436:17 437:3 441:2,3,11 442:9 443:22 444:11 547:20 549:18,21 551:1 551:15,21 552:5 553:5,10 554:15 571:22
**Keller's** 550:14
**kept** 455:1
**Key** 416:12
**Khashoggi** 413:18 413:19 414:13 415:7,11,22
**kill** 405:16 431:2 432:13
**killing** 431:12
**Kim** 369:22 370:4
**kind** 388:7 389:1 390:15 392:15 394:6 399:2 401:4 407:7 426:4 431:6 437:2 440:11 448:2
**kinds** 389:4
**Klayman** 369:5 371:3,7 372:4 375:10 382:1,16 383:8,9,11,15 384:9 385:3,5,8 385:10,14,17,21 386:3,5,10,11,13 390:19,20 395:18 395:21 396:4,8,11 396:18 397:1 398:8 401:1,17,21 402:4,7,20 403:3 403:7,21 404:3,16 404:18 405:8 406:6,9 407:2,19 408:5,13,18,21 409:1,21 410:3,7 410:15 411:22 412:4 413:7,9,14 413:21 414:2,7,20 415:3,19 416:3,9 416:15,19 417:2,5 417:8 419:2,6,8 419:11,16,19 420:3,5,6,8,15,17 422:12,14,17,21 423:14 426:19,20 427:4,6,9,13,21

In The Matter of:  Larry Klayman
July 16, 2019

428:3,7,9 429:3
429:17 430:1,5,20
434:18,20 435:1,8
435:11,14,18,22
436:4,21 437:4
438:5,7,9 441:6,8
441:13,20,22
442:21 443:4,12
444:1,7,11,17,21
445:7,13,19 446:1
446:3,14,17,19
447:20 448:5,8,11
449:6 450:11,12
451:6,8,12 452:13
452:15 453:22
455:18 458:6,10
458:22 459:19
460:1,3 463:3,9
464:17,19 465:1,4
468:22 469:3,8
470:11,15,19
475:11,12,21,22
476:16,18 477:1
477:22 478:8,11
478:19,21 479:11
479:18 480:14,18
481:6,12,16
482:17 483:21
484:6,11,15
485:11 486:22
487:6,9,13,19,22
488:4,7,10,12,16
488:20,22 489:5
489:15,20 490:4,7
491:10,12,17
492:6 493:1,6,12
494:5,8,11 495:5
495:14 496:3,21
497:7,19 498:2,5
498:9 499:2
500:10,12,15,21
501:17,21 502:2,5
502:7,22 504:7,12
504:17,21 505:3,6
505:17 506:1,3,10
507:3,10,14
508:14 511:12
513:2,6,9,18,20
514:13,16 515:14
515:16,18,22
516:5,20 517:8
518:1,9 519:7,8
522:19,22 523:9
524:16,18,22
525:3,8 526:3,4
527:6,11,16,19

528:5,7 530:11,13
530:16,21 532:3,7
532:11,15 534:1,4
534:16,19 535:1,8
536:20 538:4
539:17 540:22
543:4 545:15
546:13,19 547:5
548:7,11,15,22
551:2,8,18 552:15
554:8,12,14
556:15 557:8,13
560:6,12,18 561:1
561:8,21 562:6,7
562:10,18 563:3
563:15 564:7
565:2,8,16 566:10
566:19 570:3,10
571:5 572:15,19
573:5,14,17,21,22
574:20 575:7,10
575:17 577:4,8
578:9 580:17
581:3,8,19 582:3
582:7,10,13,17,18
582:19 583:3,6
584:6,9,14 586:7
587:16,18 588:1
588:11,11,21
589:7,16 590:6,7
590:9 591:6,9,11
591:14 592:3,4,18
593:9,18 594:3,21
595:4,7,12,19
596:2 597:3,7,12
597:17 598:1,18
598:22 599:18
600:4,9 601:5
602:17,18 604:17
604:21 605:7,16
606:5,8,14,18
607:5 608:4,11,16
609:7 610:2,7,18
611:2,4,11,19
612:8 613:3,6,12
613:17
**Klayman's** 381:19
382:9 383:4 415:9
455:13 456:9
460:16 502:9
504:5 506:22
508:19 565:13
612:3
**knees** 517:19
**knew** 417:19 449:2
461:16 483:13

490:22
**know** 378:17
379:21 384:14
389:18 399:1,13
399:14 404:2
409:9,12 410:7,18
411:19 413:15
417:6,15 419:12
419:14 422:5
425:6,16 427:17
429:5 430:2,6
431:21 433:9
436:11,22 439:3
440:4,15 441:1
443:10 445:9,20
447:17 449:21
454:15 455:5
468:4 469:4 470:8
476:18 481:14
483:13,15 484:3,6
484:7,9 489:21
490:10 492:18
498:21,22 499:11
504:10,12 511:6
516:8 518:2
522:15 524:9
525:12 527:5
528:11 529:16,17
530:2,4,16 531:21
542:12 550:6
553:8 563:17
573:19 577:22
581:13 593:17
594:20 595:13
596:21 597:3
604:12 607:11
612:8
**knowledge** 379:18
587:22 588:5
589:4
**known** 417:17
**knows** 496:16
**Kong** 437:18
**Kozinski** 552:3

——————————
**L**
——————————

**L** 370:19
**labor** 387:3
**lack** 394:19 422:1
445:8 449:7
536:10,11
**lacked** 453:11
**Lafayette** 424:17
**land** 430:18 433:19
433:19,20,20,21
434:1 485:17

486:4 491:20
**language** 515:5
580:4
**lap** 445:22
**large** 400:8 404:8
565:19 574:12
**largely** 597:22
**largest** 389:5
**Larkin** 388:21
400:19
**Larry** 369:5 371:3
372:4 382:1,16
383:15 386:5,13
398:7 419:20
432:9 510:15
511:12 518:1
576:5 577:13
588:11
**Las** 376:5 511:9,16
511:18 512:7,9,10
**Lastly** 521:12
603:14
**late** 472:14 536:17
536:19
**Latino** 426:1
**Lauderdale** 405:2
**law** 374:19,21
380:17 387:21
388:3,13,16 389:5
394:21 395:15,17
396:17,19,21
398:7,7 399:15,15
402:2,19,21 403:8
403:9,9 420:14,19
429:16,17 430:8
431:15 440:18
461:14 471:12
475:2 477:20
479:12 480:2
481:17 498:13,18
501:6 510:2 511:2
511:3 543:4,5
549:4,13 568:9
590:6 595:1
597:22 598:13
607:2
**lawsuit** 400:9 492:1
545:15
**lawsuits** 454:1
482:9
**lawyer** 388:6,20,21
390:9 391:2
393:18 398:12
401:4 407:4
410:22 411:2
412:20 417:11,13

417:18 422:20
426:11,12 431:6,8
454:19 461:8
471:4 472:2,3
473:4 479:18,21
479:21 481:14
489:5 497:14,15
498:22 501:5
509:2 524:3,20
529:4 534:17
548:3 549:11
574:11
**lawyers** 382:3
383:18,20 384:1
393:11 397:9
400:17 421:15
426:15 483:2
498:19 533:6
541:20 568:20
**layman** 603:12
**lead** 393:14,15
396:13
**leaning** 595:15
597:8
**learned** 398:13
400:15,19 407:15
438:12
**learning** 412:15,16
**leave** 406:15 483:4
492:8 521:22
542:5 572:10
**leaves** 475:4
**led** 592:10
**leeway** 447:21
448:10
**left** 398:6 406:16
429:12 465:3
515:2 536:13,16
540:9,12 581:20
595:10 605:1
**left-hand** 547:4
**legal** 455:16 456:6
484:17,19 485:10
486:21 487:2
491:22 493:16
496:9 500:6 525:3
543:8 590:16
603:17,19
**legally** 588:8
**legislative** 428:20
**legit** 604:9
**Leisure** 392:11
**length** 518:13
**lengths** 601:22
**lenient** 557:22
**Leonard** 394:22

In The Matter of: Larry Klayman
July 16, 2019

395:7,12 397:5
398:1 400:15
536:15
let's 379:6 409:18
446:6 463:4
484:22 492:16
496:22 497:20
498:3 503:1 514:5
525:16 565:17
570:12 595:9
602:11
letter 440:12 443:18
455:21 459:7
506:17 509:18
526:21 528:9
555:14 558:22
560:2 580:14,15
letting 526:9
level 477:14 540:4
liability 389:3
liberal 387:10
liberty 509:7
license 441:4 452:4
453:4
lied 423:5
life 399:22 419:13
419:13 431:3,5
434:7 449:10
454:19 468:12
474:19 507:12
509:7 522:10
533:16
light 455:15 485:14
liked 407:10 440:1
likelihood 501:4
525:16
Lilly 472:8,22
limit 477:16
limited 391:21
457:8 458:14
543:10 567:12
602:8 609:16
610:2,4 611:22
line 377:12,20
380:10 416:1
455:9 472:7
473:21,22 498:6
526:13 528:4,5
lined 507:17
lines 473:8 528:13
link 434:11 609:10
linked 593:5
Lippo 438:13
list 383:1 427:12
432:13 584:2
602:19,20 604:3

605:5 608:10
listed 382:1,16
384:2,16 415:7,8
481:1,2 540:17
541:21 604:3,20
listen 579:17
listening 430:19
literally 389:12
409:8 468:9
literature 387:1
litigated 421:10
550:8
litigation 382:10
388:19 389:6
392:14,14,16
397:6,11 398:19
400:1,14,14
412:14 424:16
429:20,22 533:9
litigator 388:7,22
429:20
litigators 397:7
400:18
little 374:22 387:16
437:6 438:8
452:11 458:20
475:18 502:17
533:5 535:11
549:17 579:13
607:20
Litvack 392:10,13
393:1
lives 486:8
living 464:18 468:7
576:22
loaded 580:12
loading 405:1
local 474:8 583:8
located 381:11
424:12,17
locked 574:9,22
London 387:7
long 374:20 381:16
392:21 408:19
409:1,19 411:20
413:16,22 414:3
416:6 439:9
504:11,13 532:11
552:18 589:15
long-winded 428:16
441:15 447:15
longer 451:16
453:10 454:10
look 377:5,7,17
378:22 379:12,13
379:19 380:22

381:18 382:12
393:2 413:13,15
413:17 415:5
421:3 425:12
484:16 504:8
555:22 570:15
595:21 602:9
looked 378:6,17
380:9 381:20
382:11,12 393:5
423:10 445:3
592:12 593:3
597:20,21 601:7
605:2,17
looking 376:1
377:17 393:11
415:19 426:21
452:11 458:11
470:9 472:21
473:8 482:15
552:4 559:2
563:17 605:4,4
looks 416:4
loosely 539:7
Los 401:12 426:10
426:14 435:15
lose 433:15 449:6
lost 399:20,21
431:15 440:14
443:14 569:1
lot 389:2 392:3
395:8 400:1,13
407:21 408:6
409:4 411:15,16
418:8,12 419:4
519:12 525:13
548:11 563:18
609:13,17
love 431:4 443:14
485:17 486:8
Love's 485:21
loved 387:16 392:17
low 468:11 548:15
lower 386:20 395:5
lunch 502:20
luncheon 503:3
lying 432:4

_____

**M**

M 369:22 370:4
mafia 404:7 405:15
magistrate 492:11
524:11 526:8
527:1,18,21 529:3
magistrate's 527:12
mail 407:2 419:8

464:12 468:3
528:12
main 433:10 514:22
mainstream 511:17
512:3
maintain 507:6
maintained 596:10
maintains 466:6,12
466:21 467:6
major 459:11
508:20
majority 500:1
568:18
makers 400:8
making 410:9 423:8
466:9 483:12
600:15
man 407:9 423:5
430:17 433:18
450:3 486:10
Management
432:12 485:18
486:4
mandamus 499:5,9
499:15 506:5,9
507:3 517:14
564:4 565:1 589:1
Mandolin 512:14
manipulated
399:11
manufacturers
400:10
March 465:5 574:2
589:5,17,18
593:13,15 603:15
Margarita 407:16
415:9
mark 569:20
marked 555:9
market 394:3
418:10 603:20
marry 406:21
massacre 512:11
513:10
massacred 512:13
massive 404:5
432:3
masterminds
405:12
mate 406:19
material 497:5
611:19
matter 369:4 375:2
379:1 411:7 417:6
429:12 430:11
433:1 448:20

451:18 452:18
459:5 465:7,11
467:21 475:1
486:17 494:19,22
496:4,20,20
506:20 511:4,21
515:3 517:19
518:16 521:9
528:17 531:9,10
537:1,4,14 538:19
547:10 548:4
552:1,2 558:18
560:19 569:4,7
572:7,11 574:19
598:10
matter.' 457:12
matters 396:12
425:17 437:17
453:8,16 495:11
510:7 537:6
540:17
MCI 393:20,22
394:8,16
mean 379:4 398:1
413:16 420:2
424:16 444:6,15
468:11 553:11
554:8 557:11
590:8,13 591:2,10
592:6 594:14
607:1 609:13
meaning 518:8
means 608:12
meant 528:21 539:6
548:2
mechanisms 520:20
mechanistically
474:8,14
mediation 463:20
465:16 466:7,13
466:14 467:15
mediator 418:1
467:16 549:8
meet 383:15,16
392:4 394:13
491:2
meeting 510:14
517:1 522:14
meetings 490:21
530:10
Melissa 372:3 373:8
373:9,12 374:4,14
member 370:13,15
442:17 447:1
451:22 452:22
466:3 467:19

471:20 589:9,13
**members** 452:9
501:20
**memorandum**
520:19
**memorandums**
382:20 383:5
**memory** 408:21
526:16 544:7
563:10
**men** 407:10
**mentally** 588:7
**merely** 488:10
**Merion** 386:21
**merit** 433:5 558:13
**merits** 441:11 448:2
473:11 518:22
560:7 561:2 599:6
602:4
**message** 515:1
**messages** 519:16
577:21 578:1
**met** 406:18
**metal** 483:7
**Miami** 388:15
389:6 400:20
407:11 408:9
411:10 466:20
468:1 545:3
547:13,22
**Middle** 411:11
**mild** 479:16
**military** 482:6
**MIMS** 370:10
373:2,10,13,16,19
375:12 378:16
379:4,10,15,22
383:8 384:12,19
384:21 385:2,4,7
385:12,15,19
390:17 395:14,19
396:1,6,10,15,22
401:15,18 402:1,6
402:18 403:1,5,13
404:1,13,17 405:6
406:4,7,22 407:17
408:3,11,16,19,22
409:18 410:1,5,12
411:17 412:1
413:4,8,11,19,22
414:5,11,17,22
415:13,17,20
416:4,13,17,21
417:4 418:20
420:12,16 426:19
426:21 427:5,7,11

427:19 428:1,4
429:1,21 430:19
434:22 435:8,12
435:16,19 436:3
436:13,18 438:3,6
441:6,10,17
442:19 443:2,10
443:17 444:4,10
444:15,19 445:3
445:12,18 446:6
446:16 447:19
448:6 451:4
452:10,14 458:7
458:11 459:18,20
463:2,4,7 469:1,7
470:8,14,18
475:11,13 477:15
478:1,18,20 480:7
481:4,10 482:13
483:19 484:5
487:6,11,14,20
488:1,9,13,19,21
489:4,7,17 490:2
490:5 491:7,11,15
492:3,16,21 493:4
493:11 494:1,7,9
495:2,13 496:1
497:18,20 498:3,8
500:10,13,18
501:15,22 502:3,6
502:19 503:1
504:4,16,19 505:1
505:15,20 512:22
513:4,8,16 514:11
515:20 516:3,19
519:6 522:17,20
523:6 527:9,15
528:4,6 530:11,14
532:2,5,10,13
533:21 534:3,14
534:18,21 535:3
536:19 538:7
539:11,14 540:13
542:12,16 545:13
546:2,6,18,21
548:5,8,13 550:18
551:6,16 552:12
553:22 554:5,10
554:13,17 557:5
557:11 559:1,5,15
559:18 560:1,1,5
561:6,10 562:8,20
564:1 565:6,14
566:7,11 570:12
570:18 571:9
572:13,17 573:3,6

573:15 574:15
575:5,8,11,15,17
576:14 577:6
578:7 581:5,10,15
581:17 582:1,5,16
583:1 584:10,12
584:15,18 589:9
589:12,15,19,22
590:12,16,18
592:22 594:22
595:3,5,9,20
596:19 597:5,10
597:15,19 598:15
598:19 600:22
602:11,14 604:2
604:16,18 605:2
606:3,6,10,17,19
607:17 608:8,12
609:4,8,15,21
610:4,16,22
611:21 612:21
613:4,8,15,19
**mind** 489:14
**mine** 391:22 468:8
**minorities** 552:9
**minute** 532:8
570:14 611:21
**minutes** 501:18
502:21 601:3
609:5,22
**misconduct** 433:14
450:6,8 451:1,19
451:20 452:19,20
470:3 486:3
525:15 568:1
569:7,16
**misinterpreted**
567:18 572:4
**misrepresent**
545:16 598:5
**misrepresentation**
455:13
**missing** 425:3
551:21 610:12
**misspoke** 395:21
490:3
**misstatements**
495:8,16 499:22
**mistake** 418:2
424:9 583:12
586:22 587:1
594:9
**mistakenly** 508:18
588:18
**mistrial** 494:3,6
520:21 525:16

**mitigate** 485:15
**Mitigating** 451:14
**mitigation** 451:2
452:17 466:1
**mix** 388:7 390:10
**mm-hmm** 573:14
**momentarily**
385:13
**Monday** 376:5
526:14,20
**monetary** 391:14
**money** 387:16
410:9 411:6
418:19 437:11,13
437:18 462:16
**monitors** 428:19
**monopoly** 393:12
533:8
**month** 410:3 516:10
544:20
**months** 406:3 409:2
410:1,3,4 414:5,8
416:8,10,10
423:19 425:18
516:9 536:7
541:15 542:18
**moot** 485:16 517:14
**mootness** 505:12
**moots** 493:17
**morning** 373:4,10
519:19 535:10,13
551:1 555:4,20
562:3 564:8
570:21
**Moscow** 404:11
**motion** 480:17
499:20 520:14
526:7,15 530:22
532:20 572:20
583:10 599:13
612:11,16
**motions** 476:12,12
520:3,4 533:22
563:7 564:21
565:11,18,19
566:8
**motivated** 506:13
**motivations** 521:2
**mount** 486:20
**mouth** 461:5
**move** 393:7 401:15
446:7 458:3
468:13 478:4
483:19 498:3
500:19 545:13
568:4,14

**moved** 410:18
416:12 432:16
445:21
**movie** 393:6
**moving** 418:12
419:4 464:12
477:1 512:6 540:1
580:18
**Muller** 434:15
**multiple** 571:4
**Myway** 432:15

**N**

**N** 372:1 373:1
464:15 465:5,9
504:1,1,1
**name** 373:11,14
374:13 378:10
381:9 383:4,13
386:12 388:20
393:15 397:17
401:12 413:6
414:21 425:9
431:10 438:11
480:9,20 544:11
561:18 563:1,6
584:15 593:7
594:12,19
**named** 426:11
432:9 450:2
**names** 402:8
**narrowed** 394:12
**Natalia** 406:18,19
407:7 463:18
542:8
**nation** 456:7
**national** 381:12
391:15 404:21
437:12 439:20
**nature** 485:1
**Navarro** 380:5
432:1,18 434:9
447:4 448:13,16
449:2,8,16 454:8
455:14 456:1,4,12
456:16 457:21
458:8 461:2 462:8
462:11 468:17
471:1 474:12
478:14 480:3
482:15 501:1
502:13 505:13
512:1,4 514:14
525:20 551:4
553:2,14,20
554:20 555:5,7,22

In The Matter of:  Larry Klayman
July 16, 2019

556:1 557:16,20
558:6 559:20
561:17 563:7
575:6 583:10
584:2 588:16,16
598:20 607:8
**Navarro's** 475:3
489:14
**near** 431:9 482:6
**nearly** 440:5 452:2
453:2 466:4
467:19
**necessarily** 507:21
**necessary** 448:4
487:3
**need** 437:6 450:9
461:13 472:17
484:19 485:10,18
487:7 488:13
501:19 524:5
530:12 531:15
532:9 542:13
566:12 596:19,21
609:5
**needed** 437:13
507:15 509:5
**needs** 485:20
486:21 521:18
524:6 612:17
**negative** 424:17
506:7 508:21
**negotiate** 394:18
518:3
**negotiated** 404:19
407:5 408:1
449:20 450:17
451:15 455:7
456:21 457:7,17
458:13 459:12,17
469:12 514:3,5
515:2,6,6,15
516:4 518:11,20
532:21 542:3
555:6,6,16,21
557:7,17,20
**negotiating** 544:6
**neither** 599:14
**neutral** 398:20
**Nevada** 433:8
491:21
**never** 389:17 398:4
399:17,20 403:11
423:4 425:2,19
426:3 433:5 436:5
439:22 443:20
444:2 446:21

447:5 452:2 453:2
466:22 491:3
508:22 513:12
529:12 535:18,20
545:4,10 551:22
552:17 574:13
578:6 580:6,21
**Nevertheless**
467:12
**new** 392:11 403:9
430:2 438:20
440:22 466:19
488:2,11 495:11
547:12 557:14
583:22
**nice** 383:16 409:6
**nicely** 568:12
**nicest** 497:14
**nickname** 450:2
**night** 387:15
**nine** 377:4,5 501:16
501:17 528:14
**nods** 611:4
**Noise** 383:15
**nominated** 387:10
434:9
**nonrefundable**
411:14,15 549:1,4
549:9,14
**nonsensical** 479:14
479:15
**noon** 501:20
**North** 540:7
**Northern** 608:7
**notarized** 528:9
**Notary** 370:5
**notation** 591:20
**note** 593:12
**notebook** 547:4
**notebooks** 563:18
**noted** 566:3 586:19
588:18 591:19
**notepad** 522:1
**notes** 426:22 445:4
523:14 564:7
593:15
**notice** 408:14
464:13 518:18
541:6 545:8
**notices** 418:13
419:3
**notwithstanding**
501:6 531:7
**novel** 425:5
**novo** 460:11
**null** 450:17 451:16

494:13
**nullify** 461:21
**number** 375:8
376:8,13 378:1,15
380:2,14 398:15
414:12,18 415:8
432:14 434:19
436:18,20 445:2
449:19 451:3,10
451:11,12 459:2
463:11,13,13,19
468:20 469:4,22
470:7 471:14
484:12 488:19,22
489:8,9 495:13
501:14,15 502:7
512:5,13 516:21
518:6 533:6 534:8
541:1,9 543:17
544:21 546:4,14
546:22 555:10
556:1 559:4 564:5
564:20,21 567:7
567:21 574:12
577:16 578:13
**numbers** 427:16
500:5
**numerous** 383:20
565:11 571:14
573:16,20
**NW** 370:2

_____

## O

**O** 373:1 504:1,1,1
531:6
**o'clock** 373:5 392:6
475:19
**oath** 432:4 486:7
588:9 589:2
**obituary** 375:17
**object** 551:3 556:15
561:8 595:16
599:9 607:13
**objected** 460:22
**objection** 385:6
475:16 581:3
607:17
**objections** 385:2
582:4 598:11
599:2 606:21
**obligation** 465:16
556:8
**obligations** 600:17
**observations** 567:2
**obtain** 398:11 605:7
**obtained** 393:22

398:13 410:10
417:14
**obviously** 430:1
520:19 533:8
593:4
**occasion** 403:11
**occupation** 378:10
**occur** 576:1
**occurred** 377:11
379:9 418:7 458:1
485:8 551:20
553:19
**October** 564:5
**ODC** 518:9 531:17
**off-color** 423:1
580:4
**Off-the-record**
452:8
**offend** 430:15
**offended** 401:10
422:19 462:15
**offense** 476:7 560:7
560:9 561:2
**offer** 384:10 581:13
610:13
**offered** 388:12
390:11,12 394:21
461:1
**offering** 390:3
**offhand** 484:6
**office** 374:16 398:1
398:7,7 417:6
433:8 449:21
474:3 485:4
486:11 510:22
514:21 515:4,7
533:3 596:8
611:16
**officials** 401:5
**Oh** 415:15 435:16
451:10 480:18
504:7 525:2
534:21 554:17
559:14 592:6
**OIG's** 485:4
**ok** 375:9 377:16
378:3 379:22
380:4 382:18
385:7,12 396:1,22
397:2 402:6
404:17 411:22
417:4 418:2
419:15,18 420:16
427:7,18,21 428:3
435:16 438:6
445:12 446:16

448:5,8 459:18
460:1 463:2
464:12,22 470:20
475:12 476:20
477:22 483:19,21
487:13,22 488:16
489:4 493:12
494:7 498:2
500:12,21 501:12
501:21 502:6
504:16 505:20
513:2,18 515:17
519:7 525:2 526:3
526:22 527:8
530:13 534:3,18
541:10 543:10
548:1 550:20
558:3 559:18
561:8 576:17
578:9 581:16
583:19 587:20
591:8 604:17
606:5
**okay** 383:14
**old** 393:2 403:9
416:16 450:16
455:6 541:5 545:2
**Oliver** 371:6 372:5
484:1 584:11,17
586:2 587:20
588:3
**once** 493:16 512:18
**ones** 403:2 412:2
437:9 505:21
512:18
**ongoing** 449:3
455:10 485:2
556:20 557:5
**online** 375:16 381:7
**onwards** 578:22
**open** 514:7 581:20
**opening** 497:13
**operation** 422:6
**opinion** 455:21
456:7,9,11,13
471:5,7,8,8
487:18 494:19
500:1,5 520:19
552:13 558:9,10
558:14,22 559:2
559:20 560:6
599:17 600:4,15
603:12,16
**opinions** 382:20,20
472:6 603:6
**opportunity** 477:5

600:19 601:9
602:9 610:13
**oppose** 460:16
**opposed** 462:2
**opposing** 445:15,19
461:17 462:10
**opposition** 460:17
**optimist** 489:21
**option** 378:20
**orally** 515:18 592:6
**order** 436:10,12,13
436:16 437:2
442:10,14,19,20
442:21 443:3,6
447:6 448:12,12
448:15 457:4
494:20 497:3,4,4
505:16 535:9
539:4 554:6,6,11
555:9 556:3
557:18 569:20
573:2 574:2,5
603:14 604:13,13
**ordered** 394:13
442:16 443:5
487:4
**orderly** 474:10
**orders** 383:5 454:16
460:6 479:4,5,16
493:17,20 494:12
496:2,11,12
505:13,14 574:4
574:12,13 610:12
**Oregon** 471:21
**Orfanedes** 440:13
440:22
**organization**
428:19 454:2
**origin** 413:10
438:14
**original** 453:10
544:10 587:4
**Orlando** 408:7
410:18 411:8,11
417:14 466:20
544:1,3,11,14,18
545:5,11 547:13
548:3
**out-of-state** 461:11
472:2,3
**outcome** 474:16
**outs** 529:13
**outside** 604:2,4
**outstanding** 464:5
465:13,16
**overblown** 495:1

**overlap** 547:17
609:14,17
**overruled** 561:14
607:18
**overseas** 395:8,10
605:1
**overturned** 553:10
553:11
**owned** 438:13
**ownership** 434:2

----

**P**

**P** 373:1
**p.m** 504:2 519:11
613:21
**PA** 429:17
**Pacer** 382:11
415:10 442:15
**Pacific** 519:11
**packers** 392:4
**Paddock** 512:12
**pagan** 486:10
**page** 376:7,16 377:4
377:5,14,16,17
378:1,3,6,11
380:11 415:6
448:18,20 450:9
450:11 451:2,3,7
451:8 452:12
455:4,5,8 456:15
457:22 458:1,2,4
460:4,12 463:20
464:16 465:20
471:11,17 472:4
473:7,19 478:8
484:16,22 488:17
489:1 495:12,12
501:13 502:7
505:14 516:19
517:10 526:13
527:20 528:13
543:17 544:21
546:4,22 547:5
559:8,20 605:5
**pages** 376:20
381:17 451:9
464:11 559:4
**Pahrump** 482:3
491:2
**paid** 410:20 425:19
440:8 525:4
**panel** 490:8 514:5
**paragraph** 460:14
463:22 464:15
465:5,9,19 466:4
469:16 531:6,7

559:9,15 560:5
573:12
**paralegal** 479:13,20
481:8,18 502:11
**parameters** 603:22
**paraphrasing**
417:14 423:15
527:7,11 556:12
**Paris** 398:1,3
**parroted** 437:2
469:14
**part** 391:16 406:14
432:7 436:4
449:19 472:10,11
480:5 508:2,20
517:15 530:19
547:2 549:10
552:10 574:5
578:2,13 594:10
**participate** 483:15
**participated** 384:1
394:16 397:10
561:19 562:6,15
**particular** 399:3
529:12 572:16
608:22
**particularly** 405:20
412:11 454:18
455:14 472:19
517:21 555:11
601:10 605:11
**particulars** 397:16
**parties** 370:7
437:20 565:20
569:12 608:14,22
**partner** 392:11
**pass** 467:5
**passed** 518:14
**patent** 400:3,11
420:21 424:11,20
424:21
**pattern** 467:11
596:12
**Paul** 388:20 400:19
440:13 453:9,16
453:19 454:1
455:11
**pause** 448:14
532:14 570:17
582:9
**pay** 417:22 418:11
418:18 453:12
462:16 464:5
543:7 549:9
608:22
**paying** 499:1

**payment** 465:13,15
**payments** 466:9
**pays** 489:22 591:1
**peace** 394:11 471:3
**peculiar** 421:11
**Peer** 371:6 372:5
413:18 415:12
427:15 444:22
445:6 451:11
470:13 475:8
484:3 488:4
492:20 493:10
495:4 504:17
505:19 532:4
582:8 583:16
584:7,10,11,17,18
586:2,8 587:20
588:3 590:5 594:4
**penalties** 402:14
**penalty** 589:2
**pending** 492:1
508:21 510:7
533:22
**Pennsylvania**
386:17,21 387:9
392:5 443:9
447:10,11
**people** 399:11,13
400:20 404:22
405:3 406:21,21
413:1 422:1 424:6
426:1 428:12
434:14 437:17
439:2 440:1
462:18,20 482:4
490:1 512:13
572:1
**percent** 528:18
**perception** 523:4,6
**perfect** 433:16
**perfectly** 558:6
**perform** 591:14
**period** 378:12 382:6
382:13 388:1
416:8 490:9 523:3
566:8 580:17
**perjury** 589:3
**permissible** 509:6
**permission** 482:15
**permitted** 603:5
**perpetual** 489:20
**persistence** 489:21
**person** 419:14
429:6 510:5
577:10
**personal** 378:8

389:3 394:7 418:9
466:5 469:17
587:22 588:5
**personally** 447:17
491:4 590:7
**persons** 453:20
**peter** 580:1
**petition** 448:22
457:7 458:13
475:19 484:2,14
485:6 499:4 506:6
515:5 532:21
553:20 554:20
555:6,21 556:4
557:17,20 563:20
563:22 564:3,19
565:1,13 567:5
587:4 589:1
**petitioner** 474:18
479:12 481:17
485:16,20 486:13
486:20,21
**petitioner's** 484:19
485:2,10 506:11
**petitions** 499:9,14
**Philadelphia**
386:17 392:5
**phon** 432:15
**phone** 515:19
**photography**
387:17
**physically** 409:6
**picked** 407:10
429:11 471:13
**picking** 405:2
**pictures** 432:11
**piece** 533:9
**piggybacked**
565:20
**place** 398:3 407:22
521:20,21 522:21
560:2
**placed** 439:5
**Plaintiff's** 434:18
446:18
**plan** 606:9
**play** 462:6
**played** 540:11
**plea** 406:2,15 407:6
407:22 411:3
413:2 541:15
542:3 544:10,17
545:2 547:18
**plead** 406:2
**pleadings** 433:8
460:20 476:1

480:10 510:11
540:21 558:2
563:1 605:6
612:10
**please** 373:11
386:11 390:18
467:4 522:12
545:16 546:3
575:16 580:20
584:16
**pled** 407:20
**Plus** 496:16
**pocket** 591:2
**point** 393:10,16
397:13 401:19
402:1,22 414:9
415:4 432:7
441:14 448:19
449:4,14 459:21
460:12 468:5,12
469:10 478:9
479:19 480:7
483:11,12 484:1
492:13 493:2,4,14
495:15 496:7
500:2,15 502:16
510:6,14 512:10
518:2 548:21
571:17,20,21
574:7 586:10
595:15 601:5
**pointed** 470:22
477:20 496:18
**pointing** 477:8
**points** 448:3 461:10
**poles** 437:14
**policy** 391:14
**Politburo** 438:15
**polite** 430:16
**politely** 423:6
568:12
**political** 387:1,2
399:7 413:1
428:14 433:4
437:19
**politics** 540:11
**poor** 552:7
**Porter** 370:19 373:6
373:8 374:10
375:13 379:12
380:1 383:7
384:10,22 414:9
414:13,19 415:4
415:16 433:10
436:15,20 445:1
445:21 446:5

475:15,17 476:17
480:12,16 484:13
488:6 492:19
509:22 511:5
527:4,8 531:16
535:3,4,7 536:21
536:22 538:6,9
539:13 540:15
542:14,19,20
545:16,18 546:4,8
546:11,20 547:1,3
547:6 548:20
550:20,21 551:11
551:17 552:16
554:3,18 557:15
559:3,8,14,16,19
560:4 561:15
562:2,13 563:5,14
563:17,19 564:3,6
565:8 566:5,13
567:4 569:19,22
570:9,16,20 571:6
571:11,13 575:12
575:20 576:16
577:15 578:11
581:12,16 587:15
589:21 590:3,22
593:11,22 595:16
596:1,8 599:8
606:20,22 608:17
609:6,13,20 610:7
611:6,14 612:1
**portion** 506:2
**portions** 394:5
500:7
**position** 374:18
388:15 390:10
391:1 454:21
465:13 548:9
553:8 568:17,19
571:16
**positions** 390:3
**positive** 398:10
424:16
**possibility** 533:16
**possible** 522:6
529:8
**possibly** 607:14
**post** 389:18 479:2
511:18 584:3
**post-hearing**
608:19 609:1
**posture** 391:6
**potential** 432:5
524:1 576:4
**potentially** 433:15

474:18 506:21
**power** 399:7 507:17
**powerful** 428:13
**powers** 388:17
402:12
**practice** 420:10
429:19 431:15
435:21 436:5
440:18 443:8
498:13 506:10,22
510:2 511:2,3
596:13
**practicing** 498:18
555:2 574:11
**precede** 512:17
**preclude** 421:12
461:13
**precursor** 393:21
**prejudged** 423:7
**prejudice** 454:11
494:8 533:19
**prejudicial** 425:10
485:6 552:8
**premature** 510:10
**premise** 580:11
**preparation** 562:15
**prepare** 588:22
**prepared** 490:15
493:2 521:13
523:18 531:9
609:2
**present** 370:6 371:2
422:3 434:15
476:5 478:2 508:6
517:16 531:9
560:6 592:4
600:19 610:20
**presentation** 595:8
**presented** 568:20
587:8,8 588:20
592:3,5,6
**president** 387:11
**presidents** 438:22
**Press** 376:10
**presumably** 481:14
**pretrial** 408:9
**pretty** 379:16
399:18 424:22
530:1 548:15
**prevail** 455:18
456:10 550:2
**prevailed** 549:22
**prevent** 406:11
479:11 481:16
537:18
**prevented** 466:9

**previously** 456:20
460:18 469:10
515:11,15 519:1
533:11
**price** 499:1
**prices** 395:6
**primarily** 394:9
397:6 404:8 437:9
464:21 489:6
495:5 521:15
539:19 543:11
**primary** 387:12
392:16
**principal** 403:10
517:20
**printed** 415:6
**prior** 407:22 410:22
466:2 467:7
468:15 479:4,5
493:17 505:9
506:9,18 508:14
516:4,22 526:14
542:2 567:15
574:3 577:11
601:13
**prison** 406:3,19
409:5,6 416:12
482:1,1 491:1
493:8 522:14
579:10
**prisons** 409:7
**private** 420:10
439:10 440:18,19
**pro** 427:3 435:2
436:11 441:18
443:18,19 447:3
453:20 454:17
458:9,19 460:16
461:2,11 462:3
472:2 473:13,14
473:16 474:1
479:17 480:2
494:17 495:21
496:22 501:7
506:8,16 507:4,8
508:15 509:11
514:15 519:17
520:13 521:17
522:6 524:12
525:10,19 553:20
554:21 567:14,15
567:21 571:4,15
572:16 573:18
578:15,17 598:6
598:20 599:13
600:12 605:7,22

607:8 612:2,17,22
**probably** 382:15
401:21 412:19
479:15 504:13
512:11 523:10
528:11 543:22
548:17,18 573:4
593:6
**probation** 516:9
**problem** 524:8
532:1
**problems** 420:1
466:5 580:7
**procedure** 430:8
**proceed** 444:9
516:17 517:13
520:21 540:5
**proceeding** 373:21
386:1 418:15
444:3 449:12
455:11 457:3,10
457:19 458:1,16
458:19 460:11
464:13 466:18
474:16,20 476:5
479:6 493:22
494:14 496:8,13
496:14 508:21
509:21 510:10
511:6 514:1,2,14
517:22 538:12
547:11 556:20
557:9 567:19
568:21 572:6
576:3,4 578:19
584:4,20 596:5,6
599:5 602:2
**proceedings** 392:17
459:9 493:21
506:13 595:18
596:14 599:16
601:13
**proceeds** 543:8
**process** 422:6
509:12 518:20,21
**produce** 549:6
**produced** 487:4
528:16
**product** 389:2
391:12 537:17
**products** 391:13
398:15,16 538:11
**professional** 369:2
370:1 409:9 456:6
456:18 457:13
471:4 521:9

In The Matter of:  Larry Klayman
July 16, 2019

Page  634

professionally 447:17
professor 455:15,20 456:5 470:22 558:17 561:1,9,11 568:9 597:17
proffer 601:19,20 603:15 607:12
proffered 433:9
profile 501:2
program 388:2
prohibit 577:2
prohibition 479:10 481:15
project 393:1
projects 392:22
prominent 439:3
promise 398:4
promised 509:3
promptly 467:13
pronounce 413:6
pronouncing 413:9
properly 474:2
propose 522:14
proscribe 477:17
prosecuted 433:15
prosecution 412:11 433:4 461:5 497:5 528:17 540:11 545:17 594:7
prosecutions 391:7
prosecutor 412:12
prosecutorial 391:5 432:3 433:14 525:15
prosecutors 511:21
protect 533:14
protecting 433:11
protection 398:16
protects 473:5
provide 381:12 467:4 501:1 520:20 607:3 610:8,14
provided 405:17 448:7 456:19 472:5,22 500:22 548:5 565:21 599:10 603:11 611:16
provides 456:20 457:5
providing 466:10
provision 583:17
provisions 500:16
provoked 431:12

public 370:5,13 381:1 418:3 452:5 453:5 455:1 512:18 523:19 576:10 610:17
publication 511:17 512:3
publicity 440:4
publicized 510:19
publicly 426:13
published 376:3,4,5 376:9,10
punishment 436:5
purportedly 433:22
purpose 506:21
purposes 450:19 457:11 459:3
pursue 557:19
push 430:17
Pushkareva 404:4 407:16 413:7,8 414:14 415:9 540:19 543:6
put 379:2 381:21 398:4 403:17 407:21 411:21 434:7 437:6 456:15 469:20 518:7 522:4 545:2 547:17 572:10 579:12,14 583:9 596:3 609:10

Q

qualifications 607:21
quality 579:2
question 377:13,22 418:21 419:1 440:12 442:3,5 443:5 458:17 487:12,21 488:10 492:3 501:9 526:2 538:6,8 539:12 550:19 551:9,12 555:15,19 562:21 565:7,15 570:14 570:19 571:10,11 573:9,18 577:7 578:8 580:10,12 580:20 581:4,6
questions 384:9,13 427:15 531:22 535:8 540:16 561:12 581:12,21 584:7 589:8,20

602:10 613:13
quicker 385:11
quickly 398:11 404:15 486:19
quiet 432:15 476:21
quietly 510:18 576:8
quite 391:22 411:2 510:17 567:10
quo 553:12,13
quote 457:6 467:3 471:18 511:21
quoted 426:13 458:12
quoting 603:5

R

R 373:1 504:1
R-o-l-f-f-o-t 373:15
race 401:7
racket 398:17,18
racketeering 404:6
rackets 400:9
racks 421:2
railroad 462:18
railroaded 413:2
raise 437:18 579:3 581:6
raised 477:11 578:20 579:1 580:6,21 581:9 604:11 612:13
Ramsey 441:1
ran 387:12 407:8
ranch 486:1
rancher 579:20
ranching 433:19
random 535:11
rang 389:12
range 409:3 422:15 548:19
ranked 598:13
rare 499:10
re-file 569:13
re-filing 569:8
re-instituted 429:16
re-review 500:11
reach 394:14 417:21 465:10
reached 536:2 571:22
reaching 472:6 473:11
reacted 434:4
read 391:22 412:10 426:9 458:18

459:7 472:9 473:22 479:10 487:8 488:14 499:7 506:2 512:2 518:22 519:3,11 519:12 526:11 527:7 530:12 545:20 551:18 552:13,15,17,18 555:17 579:4 587:19 591:16
reading 459:3 476:1 476:18 545:19 546:13 549:10 555:13
ready 373:2,6 385:13,15 505:2 566:15 577:14 584:12
Reagan 387:11,12 399:8
real 418:10
realize 453:18
really 390:9 391:19 395:3 419:22 422:11 440:1 454:7 468:11 476:4 488:9 489:10 529:11 550:19 554:9 560:14 572:2,2 579:6 599:14 606:15
reapply 496:22
rear 579:22
reason 460:10 471:21 489:18 506:18 519:22 520:6,7,13 522:14 541:22 568:7 584:3 604:14
reasonable 495:17 510:5 605:9
reasoning 496:3 500:7 508:20
reasons 460:21 509:15 540:8 567:21 571:4,14
reassigned 511:4
recall 413:12 480:12 548:13
received 465:8 528:10,10
recess 463:6 503:4 602:13
recognizance 407:9

recognizes 500:8
recollect 402:7,22 409:21 414:2,20 421:8 480:14 491:12 541:4 563:9
recollection 427:1 443:3 545:1 548:18
recommend 439:2
recommended 434:10 438:19,21 440:10
reconsider 525:20
reconvening 520:11
record 373:5,11 374:12 384:2 399:22 400:21 408:20 409:19 414:1 432:7 437:1 444:20 455:3 457:3 459:15 462:11 463:8 466:2 469:20 471:11 480:22 481:9 482:19 483:17 495:6,9 499:21 504:5 506:20 515:15 530:8 532:6 545:20 547:22 552:1,1,5 557:14 558:16 560:11 563:13 564:17 565:10 572:10,11 572:12,14,18 573:7,8 578:20 584:16 587:2,6 588:11 591:20 600:10 601:19,20 602:15 605:8,10
records 375:4 381:1 381:6,8,10 415:10 476:13 531:18,20 549:6
recounted 575:13 575:18 578:12
recourse 454:1
recreate 552:11
rectify 428:20
recusal 572:20
recuse 423:6 568:4
recusing 423:14
redirect 582:10,11 594:1
refer 378:10 556:8

566:6
reference 401:3
  418:5 479:6 489:2
  494:18 496:9
  554:15 574:8
referenced 448:22
  465:8 601:15
referencing 458:18
referred 543:13
  557:6 562:4
referring 552:13
  560:16 573:19
  580:3
refers 460:6
reflect 564:7
reflected 380:7
  469:17 516:14
refund 466:22
  467:4,7 549:12
refused 440:21
  454:17 467:10
regard 396:9
  404:20 434:14
  447:13 456:12
  461:1,2 464:12
  468:2 490:12
  491:22 496:17
  499:22 502:8
  505:12 512:7
  514:9 525:14,14
  531:19,19 533:4
  533:10 534:13
  539:21 565:22
  573:2 582:3
  583:22 596:7,13
  596:16 608:6
regarding 376:18
  447:3 515:2
regardless 601:19
regular 529:15
  530:10
regulated 537:17
regulates 391:11
rehearing 476:12
Rehm 394:22 395:7
  395:11 397:5
  398:1 400:15
  536:14
Reid 433:22 434:4
  434:11 588:15,15
reimposed 525:11
reinitiate 518:21
reinstated 544:9
rejected 456:22
  514:4 516:3
  518:14 557:21

relate 489:11
related 427:2 438:3
  471:18 475:2
  489:11,17 599:1
  612:10,18
relates 446:10
  513:17
relating 587:4
relation 574:18
relationship 526:18
  529:5,22 586:12
relationships
  588:13
relatively 404:14
  505:10 510:5
  598:8 606:13
release 485:4
relevance 427:8
  441:7 513:1
  515:21 596:21
  597:2,20 605:15
relevancy 551:3
  581:3
relevant 427:20
  454:7 477:10,21
  534:15 554:9
  555:15 598:12,16
  599:15 600:11
  604:7 605:3 607:4
relied 472:6,17
  588:22
relief 421:15 506:10
  507:3
religion 401:8
religious 419:14
relitigate 448:2
relitigating 477:21
  598:16
relying 548:3
remain 447:4,8
  534:17
remained 391:22
  392:16 547:22
remaining 597:11
  597:12
remark 426:13
remarks 421:22
  422:10 423:1,8
  425:10,14 552:8
remember 408:15
  410:8 416:18,19
  480:8,15 512:11
  537:5 544:11
  550:7,9,11,17
  552:22 554:11
  574:1 576:2

593:17
remembering
  383:12
remind 390:17
  548:8
remote 611:3
remotely 611:8
remove 441:4
  568:12
removed 511:3
removing 439:6
render 603:6
renegotiate 514:6
  515:11 516:1
  518:8
rent 468:6
repeat 390:14 484:5
  527:10 565:7
replay 587:3
replicate 592:9
reply 520:11
report 485:5,13
reported 369:21
  426:6
reporter 370:5
  425:5 551:21
reporters 512:8
represent 408:3
  431:7 453:9
  466:17 483:17
  484:20 491:9,14
  492:4 524:15
  525:10 543:6
  547:11
representation
  531:8,11 567:11
  579:2 581:1
representations
  570:21 596:11
represented 391:4
  395:7 406:4 407:5
  421:7,20 439:14
  441:2 453:11,19
  523:10 547:10
  549:21 553:13
  579:7 580:8,13
representing 382:3
  420:11 434:14
  453:18 534:1
  539:15 565:10
represents 497:16
  497:16 594:5
reprimand 418:3
republican 387:10
  439:1
republicans 437:15

439:21
reputation 399:19
  432:22 467:18
  506:10 507:11
request 438:2
  472:14 534:12
  572:20
requested 467:8
  468:17 478:14
  526:17 554:22
requesting 610:19
require 502:17
required 427:12
  474:11 485:15
  500:22 533:15
  553:4 556:21
  606:1 608:20
requirement
  611:15
requires 608:19
reread 452:13
  477:9
research 378:4
  380:16,16 586:11
  588:17,20 592:3
  592:10 593:1
researched 383:17
researching 381:5
  588:12
Reserve 391:14
resided 474:3
resident 397:11
  465:2
resign 510:16 517:5
  576:7,17,19 577:1
resigning 575:14,19
resolution 407:18
  465:10 518:16
resolve 467:13
  541:16
resolved 449:1
  603:7
resort 579:22
resources 413:3
  453:12 466:15
  467:14
respect 377:14,22
  380:6 396:9 422:2
  443:21 476:9
  479:15 508:8
  514:11 561:16
  607:14
respected 467:19
respectful 529:4
respectfully 506:4
  507:5,7 509:15

601:10
respective 370:7
respond 519:15
  579:22 580:2
  600:13
responded 519:2
  562:21 607:6
Respondent 369:6
  371:4 383:10
  386:7,9 450:5,7
  451:17,22 452:5
  452:17,22 453:5,8
  453:14,17 457:6,9
  458:12,15 464:1,4
  465:9,12,20,22
  466:2,6,12,17,21
  467:2,6,8,9,9,11
  467:14,18 470:2
  505:5 516:21
  519:5 547:10
  582:12 586:3,6
Respondent's 445:6
  451:3,20 452:20
  463:8,11,13,19
  468:19 470:5,6,16
  471:14 483:21
  501:13 505:8
  509:17 512:6
  514:20 517:10
  518:5 526:6 546:6
  546:8,14 555:9
  556:1 559:3
  577:16 578:13
  581:18 587:13
  590:2 611:11
responds 529:11,18
response 463:22
  478:16 505:16
  515:9 562:9
  572:22 610:5
responses 466:10
  612:4
responsibility 369:2
  370:2 409:13
  410:6 450:6
  451:19 452:19
  456:19 457:14
  470:2
responsible 539:19
rest 394:11 471:2
  498:4 504:8
  521:11,15 531:20
  601:3 605:15
resting 523:18
restricting 395:2
resubmit 525:17

resubmitted 525:18
result 376:18 378:3
  380:15 398:8
  474:17 485:12
  550:5 553:9,9
resulted 493:21
  495:18 533:7
results 376:20
  399:9
resume 390:5
  470:21 503:1
  504:5 611:1
  613:20
resumed 504:3
retailer 422:9 425:9
retain 466:19
  547:12
retained 472:13
  544:13
retainer 410:20
  411:14,15 548:6
  548:10
retainers 549:14
retaliation 429:10
retardant 537:18
retired 450:2
retrial 511:11
return 417:16 491:3
  491:5 521:8
  522:16
returns 584:9
revelations 485:13
reversed 533:18
reverses 433:13
review 381:14
  426:10,14 433:3
  444:8 464:9 477:7
  487:3 511:10,16
  512:8 516:16
  517:13 581:17
  605:22
reviewed 444:5
  446:11 476:10
  552:2 598:3
reviews 566:12
revised 518:11
revisions 378:20
  379:9
revisit 515:4 542:13
  613:8
revocation 571:7
revoked 567:16,21
  571:4 573:18
revoking 571:15
rhetorical 475:12
Riady 438:13

rich 428:13
rid 418:1 580:2
riding 579:21
right 409:11 415:21
  416:21 422:16
  436:3 441:13
  446:6 452:12
  458:9 461:6,7
  471:22 472:1
  473:17 475:6
  480:10 483:7
  484:12 487:9,19
  488:12 489:22
  491:8 495:2,3
  497:8,20 502:19
  507:22 516:5,14
  520:10 525:7
  527:15 528:19
  529:3,20 530:9
  532:2,13 539:17
  540:13 541:17
  542:10,10 543:22
  544:12 546:1
  552:12 554:7,8,14
  554:17 565:16
  570:18 573:6
  575:1 591:16
  593:1 595:22
  598:18 602:16
  605:9 610:22
  611:3 613:18,19
rights 401:4 426:11
  462:4 477:13
  511:13,14 512:5
  513:14
rise 477:13 520:4
  524:15
risk 507:12
ritual 486:10
RNC 437:17
ROBIN 370:12
Robles 567:13
  569:7 584:1 608:6
Roger 434:16
role 539:15 540:11
Rolffot 372:3 373:8
  373:9,12,12,16,18
  373:19,20 374:4
  374:14,15 383:14
Ron 454:16
Ronald 387:11
rooms 512:14
Rory 434:1
Rosette 467:22
Rotunda 456:5
  470:22 471:5

558:11,17,21
  561:1,9,11
Rotunda's 455:15
  455:21 558:8
routinely 602:21
rude 521:8
rule 456:17 457:2,5
  457:13 458:11,17
  459:2 474:8 557:1
  605:20
ruled 471:17 480:5
  568:2,5,6 574:4
  598:10
rules 421:11 450:19
  457:11 507:18
  558:10,12,18
  577:2 601:21
  609:11,18
ruling 474:22 475:3
  485:6 496:5
  550:15 553:2
  555:17 567:17
  568:15,16 570:6
  571:17,18,19
  572:3 573:11
  596:22 597:1
rulings 444:5,10
  446:11 447:3,3
  484:21 496:15
  547:19 567:9
  569:7 570:11
run 386:18 429:13
running 429:15
  486:19
runs 429:6
Russian 404:7
  405:15 406:19
  413:10
Russians 404:9,21
RX0037 449:19
  450:4
RX0040 455:8
  456:15
RX0041 458:2
RX0043 460:13
RX0121 560:5
RX0152 469:3
RX0158 469:5
RX0173 469:22
RX0191 471:14
RX0264 470:7,16
RX0332 479:9
RX0695 501:14

_____
          S
_____
S 373:1 380:16

504:1,1,1
S-c-h-l-u-m-b-e-r...
  508:12
S-h-a-u-n-a 502:11
S-t-i-l-l-e-r 603:2
safe 391:13
Safety 391:12,15
  537:17
salary 591:1
San 438:17
sanction 514:10
  557:21 558:13
  574:12
sanctioned 426:12
  426:15,16 497:15
  569:16,17,17
  573:17,20 574:18
  574:20 575:6,9
sanctions 574:4
Sandy 392:10
sat 579:7
satisfaction 465:15
satisfied 465:18
  603:18,19
save 432:21 464:8
  466:15 467:13
  499:7
saw 377:21 382:14
  383:6,20 384:3
  399:9 401:5 437:2
  440:9 525:14
  554:14 567:17
  568:5,15
saying 409:10
  458:21 459:7
  472:17 482:5
  494:4 510:5
  511:19 525:12
  533:2 534:16
  547:16 571:3
  576:5,13 580:15
  583:12
says 423:11 459:2
  493:16 494:19
  514:14 519:16
  526:13 543:20
  557:1 559:21
  573:16,20 579:20
  588:4
scandal 439:19
  440:20
schedule 504:8
  606:15
scheduled 486:13
scheme 406:20
Schlumberger

508:11
Schmuckler 422:21
  422:22
school 380:17
  386:20 387:7,21
  388:3 395:17
  396:17,20,21
  543:5 568:10
  595:1 598:14
Schweiker 387:9,19
Schwinn 543:2,3,12
science 387:1,2
scope 561:22
  562:19 565:3
  570:7 605:14
scores 430:16
scribbling 523:14
se 524:12 525:10
sealed 522:1
search 375:16
  376:17,18,19,21
  377:2,3,7 378:12
  380:4,6 381:7
  591:18,21 592:13
searched 586:19
searches 375:3
second 448:12
  460:14 478:4,6,17
  479:10 484:2,8,14
  486:14 520:15
  532:4 559:13
  563:14 599:17
Secondly 600:3
section 390:1,12
  391:3,4 393:9
  400:5,5,6 402:10
sections 390:4
security 404:21
  483:6
see 382:1,2,16
  393:3 416:2
  417:11 418:14
  419:5 421:2
  424:20 430:15
  440:22 441:7
  450:21 454:8
  460:6 470:12
  481:22 482:7
  484:15 487:16
  489:4 504:14
  506:17 508:16,16
  515:12 517:1
  522:9 528:6 545:8
  562:11 573:12
  579:18 596:20
  597:2 600:7

605:14 606:6,20
607:3 609:4
610:14
**seeing** 410:13 532:8
**seeking** 494:17
568:1
**seen** 401:3 412:22
482:1 490:20
525:21
**seldom** 559:10
**sell** 434:1
**selling** 387:14
**semi** 580:4
**seminars** 392:3,8
392:14
**Senate** 429:13,15
**Senator** 387:9,19
433:22 434:10
588:14,15
**send** 442:10,11
443:7
**sending** 430:16
**senior** 374:19,21
392:11 400:20
510:3
**sense** 398:10 424:14
579:16
**sent** 398:2 418:13
419:7 442:16
467:2 510:11
519:1 526:21
528:11 577:17,20
577:22 578:1
580:14
**sentence** 479:10
573:15
**sentenced** 408:4
449:10 474:19
**separated** 406:13
**separates** 533:13
**September** 376:6
376:10 464:5
515:8 523:2
526:14 531:2
541:2,11 544:20
564:22 565:12
580:5,16
**sequence** 395:16
486:18
**serious** 395:4
472:19
**served** 400:16 406:3
460:18
**service** 377:11
**services** 394:4,5
**serving** 506:20

**session** 522:2
**Sessions** 433:3,5
**set** 455:22 485:13
515:5 522:10
558:22 597:18
611:2
**sets** 391:14
**setting** 425:9 512:3
**settle** 417:13 418:16
**settled** 417:13
535:20 549:8
603:3
**settlement** 417:22
421:9 536:1,3,5
550:7
**seven** 455:9,9
501:18 516:20
541:14 542:17
**seventeen** 414:19
415:3
**severe** 407:14
477:13
**Shannon** 375:17,21
586:12 588:18
592:7
**share** 506:11
**Shauna** 502:10
**sheet** 381:13,14,16
403:2,4,6,18
540:18,20 541:8
566:5
**sheets** 543:21
566:17
**Shenefield** 389:15
392:10
**Shipp** 450:3 454:4
469:15,18 514:21
517:12 577:11
**shooting** 431:12
**short** 392:14 439:9
521:7 587:19
598:8 606:13
**shortly** 393:19
**show** 454:11 468:8
471:1 472:16
514:3 563:9,15
565:21 570:5
583:16 611:12
**showed** 425:13
**showing** 377:16
418:4,17 508:4
**shown** 423:7
**shows** 379:2 380:11
380:17 449:7
479:14,22 480:5
515:22 518:8

**shrift** 521:7
**side** 509:3 547:4
**sides** 381:22 412:22
461:5 477:5
**sighs** 445:14
**sign** 469:18 481:2
563:11
**signature** 583:9,12
589:5,6
**signed** 411:4 449:22
454:3 467:22
469:14,14 480:20
**significance** 446:19
**significant** 466:8
493:15
**significantly** 483:10
**signing** 454:10
**similar** 425:14
560:19
**similarly** 467:7
**simple** 423:18
439:14
**simply** 466:15
477:8 510:16
547:22 576:7
584:1 600:11
**Sincerely** 518:1
**sir** 529:3
**sister** 430:22
**sit** 476:21 482:21
**sitting** 394:10
425:15 521:14
**situation** 464:2
556:6 560:6
**situations** 404:10
**six** 376:8 416:10
426:15 465:19
501:16,17 526:13
542:17
**skewed** 399:10
**skills** 398:20 400:14
**sleeping** 468:9
**sleepwear** 537:16
**small** 394:1 420:18
451:13
**Smith** 454:5 509:19
510:4,6,12,14
511:5 513:22
514:18,20 515:10
517:1,11,11 518:6
533:1 575:14,18
577:9
**Snauwaert** 398:17
**so-called** 397:11
437:10 449:20
**sold** 543:9

**sole** 394:11 471:2
**solely** 462:14 571:6
**solemnly** 373:20
385:21 584:19
**solitary** 461:19
**solution** 515:12
**somewhat** 559:21
**son** 392:4 405:15
406:13 434:1
**sons** 431:1
**soon** 518:15
**sooner** 606:12
**sorry** 378:16 379:15
379:18 384:21
441:14 446:1
452:10 490:3
524:22 527:4,9
535:22 542:10,11
550:18 559:14
565:6 583:2 595:1
**sound** 410:14
445:20
**sounds** 497:21
541:17
**source** 592:14
**South** 405:4
**Southern** 411:10
**speak** 384:15 388:5
389:13 398:14
490:18 512:2
523:16 527:1,16
583:19
**speaking** 398:2
409:7,10 473:6
**special** 430:4
434:15 485:17,21
486:8
**specific** 602:7
**specifically** 381:20
416:20 537:5
550:17 552:22
**Specification** 574:5
**spectrum** 413:1
**speech** 424:4
**speedy** 461:21,21
**spell** 373:13
**spend** 412:15
476:20
**spent** 409:4 411:15
548:11
**spoke** 381:8 389:19
601:3
**square** 424:17
497:1
**staff** 389:20 528:15
**stage** 506:21

**stake** 474:5 509:7
**stakes** 522:12
**stand** 373:9 399:15
504:9 558:1,4
584:8,11 596:3
598:9
**standard** 474:17
507:9 508:8 509:1
509:9 603:17,19
**standards** 394:1
474:15 548:16
**standing** 435:4
446:20 447:1,5,9
452:1 453:1 466:4
475:15
**stands** 501:5 562:17
**start** 397:22 428:18
520:21 522:12
**started** 398:6 402:2
402:19 403:9
418:15 428:14,17
429:14 449:12
455:12 536:4
**starting** 377:4
**starts** 451:7 480:9
511:18
**state** 373:11 374:13
386:11 491:20
492:2 583:17
584:15 603:10
609:18
**State's** 405:17
**stated** 467:2 469:16
547:10 592:2
**statement** 443:18
444:2 446:10
458:4 467:20
481:7 497:13
500:19 517:3
527:10,12 531:12
546:13 547:15
602:7 610:20
**statements** 495:7
523:7 588:21
605:10
**states** 381:1 405:17
421:18 449:20
451:14 460:13
472:7,22 473:9,20
474:13 484:17
485:1 531:5
550:13 551:13
598:14 603:8
**status** 496:22 507:5
507:16 553:12,13
**stay** 423:20 506:20

stayed 397:12
staying 468:4
steel 395:9 603:20
step 595:5
Stephen 512:12
stepped 453:8
steps 587:2
stern 423:10
Steve 426:11
Steven 432:14
Stiller 603:1
stipulations 394:14
 394:19
stock 418:10
Stone 434:16
stood 424:2 435:22
 442:1
storm 430:17 482:5
storms 423:11
story 392:21 439:9
 535:12 579:14
straighten 419:20
straits 530:18
strange 510:13
strategy 392:14
 496:10
straw 401:11
Street 370:2
street-level 424:15
strong 433:13 461:6
 462:4 498:22
 501:4 524:4
 560:12 566:19
strongly 517:17
stuck 476:4 492:11
student 568:8
students 387:3
studied 388:2
studying 412:15,16
stuff 445:21 462:11
 519:12
style 498:18
styles 498:20
Su 401:14 421:7,20
 425:20
Sub 469:4
subject 430:11
 447:6 476:7
 486:17
subjected 508:22
submission 518:15
 547:9 596:2
 597:21
submissions 461:1
submit 425:7 436:9
 436:12 466:13

518:18 560:20
 570:4 581:21
submits 465:20,22
submitted 390:5
 397:14 456:1,3
 461:3 468:17
 471:1 526:15
 566:17 587:5
 593:13
suborned 525:22
suborning 422:5
subsequent 457:12
 458:1 459:4 467:1
 612:9
subsequently
 466:18 547:12
 588:22
substance 497:5
 507:8,10
substantial 506:18
 507:19
substantially
 484:18 485:9
 486:3
substantive 489:18
substitution 471:22
success 400:22
successful 387:13
successfully 431:14
sudden 418:14
sue 467:8
suffer 571:1
sufficient 509:13
sufficiently 487:21
suggest 475:22
 476:17 566:17
suggested 418:2
 510:15 514:10
 516:6
suggesting 509:10
 515:10
suit 399:18 421:13
 421:19
summarize 487:10
 490:14
summer 389:11
Sun 376:5
superior 508:4
supersedeas 462:9
 493:14 533:17
superseding 529:9
supervisor 432:11
supplement 436:22
 519:17 520:2,13
 572:11 578:15
 581:18 610:15

supplemental
 478:15 519:5
 582:1
support 603:17
supposed 423:18
 462:17
suppressed 432:16
supreme 465:7
 476:10,15 499:5,8
 499:11,15,17
 613:1
sure 391:13 395:15
 401:17 419:2
 423:4 426:3
 431:22 445:5
 488:14 512:22
 532:5 539:13
 559:8 565:8
 570:16 589:22
 598:15
surprised 426:16
suspect 417:16
suspended 446:21
 450:7 451:1 452:4
 453:4 516:10
suspension 508:14
 516:8
sustained 466:8
swear 373:20
 385:20,21 584:13
 584:19 589:2
swimming 426:7
sworn 374:6 385:17
 386:7 455:15,22
 586:4 587:21
 588:4,8
Symkowicz 595:14
 596:10 599:7,9
Symkowicz' 595:17
system 370:18
 401:9

—————
T
—————
T 504:1
table 484:16 584:9
tactics 392:15
tails 449:5
Taiwanese 420:20
Taiwanese/Chinese
 401:14
take 387:4 408:2
 412:9,20 413:17
 424:10 437:19
 457:2 459:21
 463:1,4 477:14
 491:4 492:16

499:17 501:19
 521:20,21 522:20
 524:5 527:12
 560:12 565:5
 566:19 567:8
 568:17,18 574:2
 587:2 598:9 601:2
 601:11,16 602:11
taken 370:1 442:22
 443:16 463:6
 498:22 503:4
 602:13 605:6
takes 499:8
talk 382:18 409:18
 426:1 440:14,16
 468:8 490:10
 530:3 570:12
 579:6 595:9
 612:16
talked 413:4 502:14
 567:12 612:14
talking 401:19
 415:14 426:10
 440:15 455:10
 461:4 471:15
 550:3 559:7
 563:16 578:21
 606:10
talks 436:16 494:21
tape 552:10
tapes 552:4
tase 431:1
tasked 588:12
tasks 590:11 591:14
teach 392:13
team 384:1 393:12
 393:14 461:13
 472:18 475:5
 484:19 485:11
 486:22 487:2
 502:12 508:2
 521:19 530:20
 566:3,3
Tech 508:11
technical 558:12,13
 559:6,10 560:3,16
technically 432:7
 591:10
technique 411:6
telecommunicatio...
 394:3
tell 376:2,14 379:8
 416:6 433:2
 445:10 478:2
 488:21 515:20
 576:19 578:5

586:15 592:18
 595:20 600:22
telling 523:13
 526:11 535:11
ten 423:19 502:1
 527:2 528:5
tennis 398:17,18
 400:9
tentative 571:17
 573:11
term 422:22 539:7
terminate 526:17
 564:13,14
terminated 490:13
 564:10
terminology 559:21
terms 388:22
 430:10 432:8
 455:3 466:14
 467:15 486:3
 498:15 504:9
 516:2 518:11
 525:4 535:21
 570:10 596:17
 600:12 604:7
terrorist 404:8
terrorists 434:6
testified 374:7
 386:8 396:8 412:5
 419:16 445:9
 450:15 469:11,21
 479:1 482:20
 490:16 491:7
 517:4 522:18
 530:6 533:6
 535:10,13 537:14
 538:16 541:18
 542:16 547:19
 549:19 551:19
 555:4,20 558:8,9
 558:16,20,21
 560:20 561:4,4,11
 561:18 562:2
 565:3,4 566:22
 567:7 574:17
 581:10 586:5
 592:22 600:10
testify 502:10
 453:17 454:15
 486:7,11 500:16
 504:18 577:5
 583:21 595:21
 596:12 597:16
 598:2 599:1
 601:12,14,15
 602:1 603:18

In The Matter of:  Larry Klayman
July 16, 2019

604:1,5,6 605:5
606:2,3 608:5
611:8 612:5,6
testifying 492:4
538:5 560:22
561:9 600:12
611:22
testimonies 534:19
testimony 373:21
385:22 390:15
405:14 426:22
432:8 447:2
455:16,22 463:8
468:16 477:7
482:14,22 497:21
498:4 525:22
531:19,22 533:5
536:10 542:1
551:7 557:4
558:16 562:17
564:8,12 576:15
584:19 595:17
598:8 599:11
600:3,20 601:6,17
602:21 603:12
605:14 606:12
607:3 608:1 611:3
612:2 613:11
text 519:16 520:15
577:21 578:1
thank 384:19 385:7
385:12 396:22
420:5 434:22
436:7 448:9 460:2
463:3 464:22
475:8 492:21
498:5 502:2 528:6
534:20 535:4
540:13 581:12,16
589:7 594:21
595:4 613:19
theory 496:12
thereof 394:19
thesis 387:2
thing 392:15 394:6
399:2 406:10
413:21 414:14
426:4 437:16
439:18 440:3
441:9 442:9
449:11 472:10
483:16 497:12
499:8 549:8
554:16 573:22
604:19
things 390:6 404:12

418:10 419:4
421:1 427:18
485:7 516:13
529:13 540:22
584:2 591:17
think 379:14 385:10
403:17 407:19
409:2 415:1,22
416:7,22 417:15
418:20 424:19
427:5,7,19 428:1
428:4,5 429:10
445:3 447:20,21
448:1,4 475:13,21
476:3 477:18,20
483:7 484:11
487:12 502:16
505:22 511:5
513:16 521:1,10
524:13 528:12,21
530:12,14 533:6
534:14 535:13,21
538:16 541:18
542:16 545:8,13
549:11 555:4
558:9 559:19
561:6,10,17 562:1
562:20 566:9,11
567:7 570:20
574:15 577:9,12
578:4 586:21
587:15 588:1
589:18 591:22
593:3,6 598:2
607:9,10 608:19
608:20 609:11,15
609:17,21 610:16
610:21 611:15
612:1
thinking 567:18
596:17
thinks 472:14
third 375:7 488:3,5
488:6 493:5 559:9
563:20 564:1,3,19
565:1,13
thirty 414:7
thorn 509:3
thought 395:19
398:2 427:14,22
428:11 441:17
491:16 510:10
516:16 517:12
568:11 574:17
597:20
threaten 430:18

431:3
threatened 405:16
431:5 432:15
486:8,9
three 390:4 406:8
409:2 413:5,15
415:6 423:19
425:18 448:20
453:10,16 457:22
458:1,2 460:4
472:7 476:11
479:9,9 482:14
505:14 543:17
three-month 516:8
throw 430:22
Thursday 520:9
528:3,8 573:4
581:22 595:10
597:16 604:15
608:13 610:1
613:9,20,22
tier 486:14
Tiger 603:20
tiled 564:19
till 412:16 510:7
time 377:8,12
381:13 387:10
388:8 389:5 390:1
393:10 394:20
396:15 397:3,13
398:14,18 399:8
402:22 406:3
407:14 408:4,17
408:18 409:1,4
411:16 412:15
414:3,4 418:9,19
420:12 423:22
432:8 439:10,11
443:9 449:22
451:17 453:20
455:2 462:1
463:15 464:8
465:3 466:7,15
467:14 468:6
469:15 476:1,20
477:16,17 481:22
486:19 490:8,9,19
491:13 493:20
499:7 504:9 510:6
512:9 516:13
517:4,14 518:13
520:19 521:10
522:4,13 523:2
527:13 531:9
537:12 543:22
548:12,14 549:6

552:18 557:2
565:5 575:3 576:6
576:12 578:6
580:17 586:10
593:8 597:18
609:16
timely 418:11 466:9
466:10 519:22
times 409:14 419:13
476:11,11 490:17
493:9 501:5
519:14 530:3,7
tired 480:15
today 389:17 429:6
430:9 434:12
462:14 482:12
504:20 521:22
549:19 557:9
595:8
today's 394:1
told 389:20 390:3
407:7,9 435:20
455:14 481:13
496:4 515:11
519:20 556:10
578:14,14 579:19
586:16 592:7,20
593:9 598:5
tomorrow 423:12
423:13 520:7,15
595:13 597:4,6
610:9
top 393:20 426:9
456:5,6 458:2
460:5 541:4
total 403:19 422:1
totally 454:22
tough 399:18
404:10
towel 421:2
town 467:17
trade 388:12 391:8
395:1,1 400:4,17
421:6,12,14,16
550:4
trademark 400:2
420:22 424:21,22
trader 395:1,2
Traffic 391:15
transcript 425:2
490:18 526:22
527:5 551:20
552:11 560:21
567:1 612:11
transferred 397:4
408:8 411:7

466:20 482:3
540:9 544:1
547:13
Transportation
391:17
treated 422:1
treating 424:6
trial 384:1 388:20
390:8 394:12,19
394:21 400:7
422:4,4 425:16
432:3 434:16
436:1 439:15
461:21 483:3
484:20 485:2
486:7,14,15
490:16 493:3
502:10 512:15
513:6,7,8,11
520:11 521:14,14
523:16,17 531:10
533:20 535:15,18
535:20 536:4,6
538:17 566:4
578:22 579:7
trials 400:2
tribunal 474:6
tried 387:4 406:11
411:12 432:19
433:21 441:4
462:1 474:18
481:22 523:21
548:4 564:13
568:15 592:9
triggered 437:9
Tris 537:16,18
Troopers 430:17
troops 431:11
troubling 497:13
Troxler 396:9,10
402:3 537:4,8,20
538:1,10,13,19,21
539:15,21 540:2,3
540:5
true 382:5 467:22
531:12 553:15
581:2 587:21
588:5 589:3 593:5
truly 467:10
Trump 433:6,7
533:12
truth 373:22,22
374:1 386:1,1,2
584:20,21,21
598:5
truthful 547:15

In The Matter of: Larry Klayman
July 16, 2019

truthfully 607:6
try 390:14 398:20
  423:16 434:20
  442:14 461:22
  462:1,11 486:10
  499:16 514:6
  520:20 566:15
  609:20
trying 394:2 407:21
  427:17 428:2
  430:16 431:21
  433:3 434:1
  437:18 447:14
  449:15 462:6
  480:14 483:14
  490:22 513:9
  544:9,17 545:2
  547:17 549:5
  560:13 577:9,12
  579:9 602:1 606:8
Tuesday 369:9
  520:7 528:12
turn 375:6 414:22
  434:18 435:3
  447:18 449:18
  454:12 455:5,9
  463:10,19 464:10
  464:15 465:19
  470:4,5 478:12
  479:8 484:22
  489:1 499:3 500:2
  501:12 505:7,14
  509:17 511:8
  519:4 526:5
  532:16 555:12
  582:14
turned 405:17
  425:6 537:19
turning 471:9,11
  472:4 473:7
  499:20 500:4
turns 425:4
Twelve 544:8
twenty-five 380:15
twenty-two 384:22
  587:16
twists 562:11
two 374:22 397:12
  403:16,17 409:2
  420:19 431:1
  440:11,11 448:18
  453:16 455:8
  456:15 458:22
  483:22 504:14
  516:8 519:15
  528:2,7 541:20

586:21 601:14
  602:20 604:4
  605:5
type 424:15 429:21
types 391:9 404:1
typically 497:2

——————
      U
——————
U.S 395:8 399:5
  406:21 408:7
  429:13,15 432:14
  432:14 433:7
  511:22 540:6
  544:10 545:1
UFO 482:6
Ukraine 406:12,17
ultimate 600:5,16
  602:6 603:6
ultimately 388:5
  406:11 407:19
  408:2 455:18
  456:10 493:21
  522:19 533:7
  538:21 544:17
  593:9
unable 613:10
unconditionally
  522:11
uncovered 439:11
  439:19
underdog 430:14
underlying 505:13
  514:1,13
underscore 484:18
  485:9
understand 379:10
  395:15 399:1
  408:22 409:16
  448:3,9 475:14
  477:19,19,22
  488:15 496:5,6
  497:18 500:13
  510:21 524:17
  530:15 531:15
  535:17 536:3,8,9
  550:19 561:7
  570:1 591:13
  604:16,18 607:21
understanding
  414:16 548:22
  577:10 607:1,13
  610:9 612:7
unequivocally
  457:5
unethical 429:8
  447:7

unethically 443:21
  444:6 446:12
unfairly 506:21
unfit 473:2
unfortunate 477:14
unilaterally-indu-
  520:1
unions 387:4
United 381:1
  405:16 421:18
  472:7,21 473:9,20
  474:13 550:13
  551:13 598:14
  603:7
University 386:22
  387:5,21 388:3
  568:9
unnecessarily
  494:22
unnecessary 506:7
unprepared 523:14
  583:19
unreasonable
  454:22
unsuccessful
  429:15
unusual 483:9
  501:1
upset 446:1 540:10
upstream 426:7
urged 467:16
USA 413:18
usable 459:9
use 399:1 450:19
  451:11 476:1
  479:16 485:22
  496:14 497:14
  509:9 512:21
  524:10 537:17
  556:15 562:7,10
  601:18
uses 428:19
usually 424:22

——————
      V
——————
v 603:7,20
vacate 393:7
vacated 393:4
  493:18,19 494:12
  494:20,21 496:11
  496:20 497:3
vacating 505:12
valid 491:22 497:10
valuable 404:20
  466:15 467:14
  521:10

value 603:13
variable 512:16
variety 596:10
various 493:21
  494:16
Vegas 376:5 511:10
  511:16,18 512:8
  512:10,11
Venezuela 537:21
verge 454:20 461:8
  525:22
Verification 448:20
verified 448:22
Verizon 393:21
version 377:14
  378:1
versions 377:2
versus 381:1 413:18
  472:7,22 473:9,20
  474:13 508:11
vice 387:11 427:3
  435:2 436:11
  441:18 443:19
  447:4 454:17
  458:9,19 460:16
  461:2,12 462:3
  472:2 473:13,14
  473:16 474:1
  479:17 480:2
  494:17 495:21
  496:22 501:8
  506:8,16 507:4,8
  508:15 509:11
  514:15 519:17
  520:13 521:17
  522:7 525:19
  553:20 554:21
  567:14,15,21
  571:4,15 572:16
  573:18 578:15,18
  598:6,20 599:13
  600:13 605:7,22
  607:8 612:2,17,22
video 430:22
view 424:15 429:8
  434:4 449:6,15
  494:14 495:7
  496:9 506:11
  507:14 509:21
  511:4 552:6
violate 558:10,11
  609:11
violated 511:14
  512:4 539:4
  558:18 600:16
  605:20 609:19

violation 402:12,14
  444:13 471:6
  477:12 498:17
  509:12 558:12
  559:6,11 560:3,16
  560:21 574:14
violations 455:19
  558:13
vis-a-vis 511:13
visit 416:11
visited 409:14
  490:17 493:8
  530:6
visits 530:4
vitae 456:2 470:21
voicemail 515:1
void 450:17 451:16
  494:13 570:22
VOL 369:7
volume 375:7
voluntarily 406:16
volunteered 392:22
  393:13 405:22
vulnerable 492:9

——————
      W
——————
W-2 591:3,5
wait 474:16 510:7
  527:2 550:18
  611:21
waive 461:20
wake 523:12 524:1
  530:18
walked 389:12
  424:7
Walker 388:16
  389:8
Wallace 450:2
  454:4 469:15,18
walls 432:12
Walters 473:20
  474:13
want 378:21 392:3
  395:15 397:15,17
  406:13 409:17
  410:11,21 423:1
  427:22 444:9
  447:16 460:12
  467:3 470:21
  479:8 487:7
  488:14 492:8
  496:6 497:22
  498:6 500:2,18
  512:17 516:1,16
  517:12 518:3
  522:9 523:11

524:6 527:3
529:16,17 531:13
532:18 533:4
535:12 540:22
541:10,19 542:14
546:12,21 549:12
549:17 562:8
579:17 591:17
596:4,15,16 597:1
599:4,6 601:18
608:15,21 611:9
**wanted** 378:22
379:7,12,19,20
388:6 389:10,20
390:9 394:12
397:19,21 410:22
417:9 432:9 436:7
445:4 448:8
450:21 461:5,22
469:9 483:11
491:13 492:4,6,7
494:11 512:20
515:11 518:3,8
525:9,18 530:19
531:18 542:21
560:10 562:6
575:3 579:11
602:17 604:21
**wants** 476:1,20
479:21 520:19
610:14 611:12
**warning** 517:7
**warrant** 509:13
**warranting** 508:15
**Washington** 369:10
370:2 388:9
389:10 464:20
511:17 548:16
594:6
**wasn't** 405:2 420:3
422:3 440:7 442:3
496:4 511:12
523:17 530:7
536:5 539:2
548:15 554:6,22
554:22 558:18
561:18 564:17
569:16,16,17
572:1 574:5 578:7
**Watch** 428:15,17
429:1,13,14 437:8
440:17,20,20
445:14 449:12
452:6,7 453:6,7
454:2 455:12
514:2,12 557:12

568:22 576:3
591:7,8,11,12
594:5
**watching** 521:14
523:17
**way** 401:4 404:10
409:9,13 419:12
423:11 424:5,16
425:19 437:15
452:3 453:3
454:21 462:7,17
467:21 489:13
498:13 507:22
511:2 516:22
550:10 568:6
607:18 610:13
**ways** 461:6 462:6
**we'll** 460:2 504:5
516:8 581:17
607:18 608:13
609:22,22 613:8
613:20
**we're** 420:9 428:2
429:5 432:1
462:10 463:7
470:9 476:14
480:9 482:14
489:8 501:22
504:4 544:7
559:12 597:5,10
598:16
**we've** 530:2,5
532:18 576:14
**Wednesday** 520:12
522:15
**week** 379:8 390:2
423:19 518:18
520:11 528:11
**weekends** 387:15
423:22
**weeks** 518:12 527:2
527:5 528:2,8
**weigh** 600:20
601:17
**weight** 456:8
607:22
**went** 381:7 384:3
386:20 388:3
389:19 390:21
394:20 396:18
397:22 401:2
406:16 407:10
423:17,22 424:20
425:3,18,20
427:14 439:15
440:22 442:8

448:16 455:17
473:8 522:1
535:18,20 550:22
551:15,21 552:4
566:22 567:1
**weren't** 383:18
397:7 403:1
418:10 539:8
541:3 549:2 554:7
**west** 416:12 485:3,4
**Western** 381:1
**Westlaw** 382:11
**whip** 579:21
**Whipple** 483:1
489:3 490:15,17
490:20 491:1,18
492:12 519:10
522:18 523:3
524:10 525:9
526:7,15,19 528:1
528:15 529:21
530:17,19 531:1,4
531:6 564:10,13
564:15,20 565:9
565:18,21 566:2,8
567:3 577:18,20
578:14 579:8,11
579:11,16 580:4,7
580:9,13,15,19
583:18
**Whipple's** 490:12
579:2 580:22
**whistle-blower**
432:8
**whistleblower**
534:13
**WHITE** 370:14
**wife** 378:10 398:14
398:15 491:6
492:7 519:18
586:17 588:19
592:8 593:4
**Wikipedia** 376:16
377:2,17 378:19
380:4,16
**Wild** 485:3
**Wiley** 508:11
**William** 380:16
401:12
**Williams** 468:8
**willing** 566:15
**win** 449:5 522:8
**winning** 399:20
**wire** 407:2
**wish** 436:10
**wished** 392:13

**withdraw** 526:8,16
527:3,14 531:1
532:21
**withdrawal** 490:12
545:9
**withdrawing**
459:16 518:19
583:11
**withdrawn** 450:18
455:7 456:22
459:12 469:13
532:22 555:17
557:1
**witness** 373:7,9,15
373:18 374:2,5
378:19 379:6,17
384:18,20 386:6
426:7 488:17
584:8,11,13,17,22
586:3 587:17
588:2,3 589:11,14
589:17 590:14,17
590:20 593:2
595:2,6,11 596:3
596:18 597:11,13
602:7,19,20 604:3
604:6 605:4
609:22 611:17
**witnesses** 372:2
486:6 504:10
600:21 608:2,9
**woman** 495:19
**won** 421:8
**Wong** 438:11,18,21
439:3 440:11,14
440:15
**Wooten** 432:9
**word** 479:16 489:13
497:14 556:16
607:7
**words** 391:6 427:10
482:18 486:2
494:12 562:11,12
**work** 374:15 389:20
392:6 393:20
396:3,4 407:21
411:2,15 417:19
434:14 502:21
523:18 524:5,6
530:19 586:8
590:9,18,20
591:13
**worked** 387:8,14,18
388:11,21 393:14
393:17 394:3
403:11 405:18

412:3 416:6,7
543:4,12 548:9
589:16
**working** 383:19
396:14 405:19
419:21 438:12
529:12 538:20
539:17,20 548:12
**works** 502:3
**world** 433:16
557:14
**wouldn't** 392:3
423:20 442:2
490:3 564:14
567:8 569:2 571:1
576:11
**wound** 421:7
431:20
**wrapping** 608:13
**writ** 470:9,10,11
471:9 475:14
477:18 478:4,5,6
478:17 484:8,8,9
484:10 488:3,5,6
489:7,9 492:17
493:5 495:3 499:5
499:15 501:7
505:16,18 517:14
564:2,4 565:1,13
589:1
**write** 502:8 520:19
575:2,3
**write-ups** 375:21
**writing** 457:3 518:6
**writs** 492:5 499:9
499:18 613:1
**written** 385:5 511:9
561:3 575:3
591:20
**wrong** 415:18
483:13 507:8,9
508:7 516:12
517:18 550:10
**wrote** 387:2 440:12
441:19 509:18
517:10 519:10
524:4 528:9
555:12

**X**

**X** 369:3,7 372:1
**X's** 432:12

**Y**

**Yagman** 426:11
441:2

In The Matter of:  Larry Klayman
July 16, 2019

Page  642

**Yagman's** 441:4
**yeah** 382:20 401:17
    408:13 409:1
    410:3 413:14
    414:13 415:16
    416:19 419:6
    420:3,6 427:13
    448:8 459:19
    493:6,6 504:12
    524:22 528:22
    546:8 557:13
    560:4 564:3
    573:22 586:22
    587:9 589:18
    593:2
**year** 379:1,8,11,21
    387:6,19 390:18
    396:17 401:18
    422:13 486:16
    534:6 536:6 591:4
**years** 374:22 389:9
    393:8 397:12
    401:2 410:2 414:6
    414:7 416:15
    420:10 428:11
    433:19 449:4,4
    452:2 453:2 466:4
    467:19 479:19
    517:22 544:8,8
    557:13 573:16
    574:9,10,11
**yesterday** 390:15
    396:9 401:3
    402:22 412:5
    419:16 426:22
    434:21 445:4,10
    448:17 450:15
    455:17 480:13,15
    482:20 538:17
    561:18 562:1,17
    565:4
**Yiddish** 422:22
**York** 392:12 438:20
    440:22
**young** 393:18
    398:12

**Z**

**zealously** 497:16
    499:15
**Zero** 501:16,17
    516:20

**0**

**003** 416:1
**0034** 451:12

**0040** 458:5
**0041** 458:2 460:5
**005** 541:9
**009** 377:21
**0143** 463:14
**0264** 470:6
**0695** 502:8
**0786** 514:20
**0787** 516:22
**0788** 516:21 517:10
**0790** 518:6

**1**

**1** 434:19 446:19
**1.8B** 393:22
**10** 382:15,15 451:2
    451:3,7,8 456:19
    473:8 499:20
**10:45** 463:5
**10:48** 463:8
**100** 493:13 563:21
**1004/1007** 508:10
**1054/1056** 472:8
**1056** 508:16
**109** 495:4 567:7
**109-17** 495:14
**109-18** 495:14
**1099** 591:3
**10th** 473:9,10
    612:12
**11** 501:13 502:7
    517:22 578:22
**11:00** 475:18
**11:11** 519:1
**11:45** 503:3
**1106** 603:1
**113** 508:12
**115** 615:6,16,19
    540:18
**115-003** 415:21
**117** 415:1,8 540:21
    541:9
**119** 543:17 544:21
**11th** 508:10,13
    509:9 519:10
    578:21
**12** 377:14,16 449:4
    501:13,13 532:17
    544:21
**12:00** 502:1
**12:30** 502:20 503:2
    504:2,5 597:16
    606:11,17 611:1
    613:20
**121** 436:20 559:4
**122** 375:8 376:8

384:10
**122-003** 376:1
**123** 376:13 377:15
    378:2
**124** 377:12,21
    378:15 380:3,4
**125** 380:14 384:11
    385:1 559:4,8
**126** 569:21 570:19
    573:10 581:13
    610:10
**13** 406:3 450:11
    473:22 484:16,22
    557:13
**13-year** 596:6
**13th** 589:5
**14** 469:16 495:12
    502:17 505:8
**144** 463:19
**147** 464:16
**148** 546:5,17,22
    547:5
**14th** 509:19 593:13
    593:16
**15** 473:19 488:20
    495:12,12,13
    526:13 609:5,21
**15-second** 491:19
**150** 433:19
**152** 468:20
**1553/1561** 508:12
**16** 369:9 488:17,19
    509:18
**17** 478:9 527:20
**17.10** 456:17 457:14
**175-182** 603:21
**18** 511:8 528:13
    588:7 613:22
**18-BD-070** 369:4
**18th** 519:2 526:14
**19** 401:22 461:22
    489:1 512:6
    513:21
**1951** 386:15
**1968** 387:3
**1969** 395:22
**1973** 386:22
**1975** 508:10
**1977** 386:22 395:18
    396:20 435:6
**1978** 537:10
**1979** 382:5,13
    390:19 391:2
    396:19
**1980** 435:7
**1981** 536:17

**1983** 382:6,13 398:8
**1985** 536:19
**1990** 422:15 473:10
**1992** 422:15
**1993** 472:8
**1994** 428:15,17
    429:2,3,3
**1996** 437:8
**1997** 508:13
**1998** 380:21
**1999** 603:2
**1st** 541:11

**2**

**2** 455:20
**2:38** 602:15
**2:48** 613:21
**20** 383:18 574:10
    609:5,21
**20,000** 424:3 436:2
**200** 477:4
**2001** 603:1
**2002** 473:21
**2003** 376:6,11
    429:13
**2004** 416:5 603:21
**2004-CR-20631**
    415:7
**2006** 541:2,12
**2007** 416:5 526:14
    541:14 543:15
    544:20
**2008** 418:8
**2009** 376:21 464:6
    464:18
**2011** 465:6
**2013** 603:8 612:12
**2014** 515:8
**2015** 589:14 595:2,3
**2016** 589:17
**2017** 519:10 531:2
    564:5,22 565:12
    578:22 580:6,16
**2017-D051** 369:6
**2018** 377:6,7,7,18
    378:5,18 380:8,9
    380:10 509:19
    589:5 593:13,16
**2019** 369:9 376:17
    603:15 613:22
**20th** 386:15 429:3
    520:12
**21** 378:1,3 416:15
    473:21
**211** 381:17
**21st** 376:11 531:2

**22** 449:5 474:17
    587:15,17
**22nd** 376:6 435:7
**23** 473:9 587:13,14
**23-002** 378:11
**24** 519:5 531:3
    577:16 578:13
    579:5
**25** 559:4
**25,000** 410:20
    411:13 417:10,16
    548:6 549:1,9
**26** 448:20 610:6
**27th** 523:2 564:22
    565:12 580:5,16
**28** 526:6
**28th** 574:2 603:15
**295** 548:18
**2nd** 436:15 471:19
    472:8 473:10,20
    508:9 513:14
    553:15,17 554:3
    554:19 564:5
    603:1,2,20
**2nd/3rd** 603:8

**3**

**3,000** 465:14
**30** 383:18 393:19,19
    398:12 409:14
    464:6 493:9 530:7
    534:5 574:10
**30-day** 534:9
**309** 473:20
**337** 400:6
**34** 451:3
**35** 466:4 467:19
**37** 452:2 453:2
**374** 372:3
**38** 582:15,20 583:3
    583:4
**383** 372:3
**385** 541:11
**386** 372:4
**3rd** 508:12,16

**4**

**4** 380:11 447:18
    451:5,7 555:10
    556:1
**4/24/2018** 505:21
**4:00** 392:6
**40** 458:5 479:18
**400** 403:21 412:7
**42** 574:11
**430** 370:2

In The Matter of:  Larry Klayman
July 16, 2019

Page  643

**45** 400:6 502:21

**5**

**5** 445:2,6 446:8,13
  446:14 454:13
  455:4 463:11
  469:4 546:4,7,9
  546:14,18,19
**5,000** 417:22
**5:59** 519:11
**51** 482:4
**524** 508:9
**536** 372:4
**553** 603:2
**581/** 473:20
**582** 473:21
**584** 372:4
**587** 372:5
**591** 372:5
**595** 372:5
**5th** 508:9,10 509:9

**6**

**6** 470:5
**600** 403:22 412:8
**619** 473:10
**626** 471:20 473:10
**64** 500:4
**64-013** 500:5
**64-015** 500:9
**68** 380:10
**6th** 376:17,21
  379:13 461:7,17
  462:4 473:5,12
  475:5 477:12
  497:8 507:22

**7**

**7** 457:10 478:13
**70** 507:13
**725** 603:2
**73** 395:20,22 484:4
  484:13,13,14
**73-002** 484:17
**76** 603:8
**77** 395:20 396:20
**780** 602:22
**7th** 435:6

**8**

**8** 468:16,18 469:4
**81** 536:4,20,21
**82** 536:5
**83** 402:19
**854** 603:20

**9**

**9** 460:7 499:4
**9.3(2)(a)** 466:1
**9.3(2)(c)** 466:5
**9.3(2)(g)** 467:17
**9/11** 389:18
**9:00** 370:3 373:5
  613:22
**90** 401:22
**90%** 389:6
**92** 401:22
**920** 471:19 473:10
**920-939** 603:8
**95** 488:6,8,18
  563:21 564:5,20
  583:15,16,17
**95-019** 488:22
**98%** 429:19
**989** 472:8
**9th** 380:8 425:11
  433:12 447:3
  461:4 465:5
  471:15 472:5,8,22
  473:6,21 476:6,9
  476:11,15 478:14
  480:4 490:4,5
  494:12 495:22
  496:2,12 499:19
  499:21 505:12
  534:2 552:3,6,7
  552:20 563:21
  564:4 567:6,9,17
  569:5 570:5,22
  571:7,7 572:3,8
  575:9 599:20



RECEIVED

August 14, 2019

Board on Professional
Responsibility

**Date:** July 18, 2019

**Case:** In Re:  Larry E. Klayman



ACE·FEDERAL

Ace-Federal Reporters, Inc.
Phone: 202-347-3700
Fax: 202-737-3638
Email: info@acefederal.com
Internet: www.acefederal.com

In Re: Larry E. Klayman
July 18, 2019

Page 645

DISTRICT OF COLUMBIA COURT OF APPEALS

BOARD ON PROFESSIONAL RESPONSIBILITY

- - - - - - - - - - - -x

In re:                    :    Board Docket Number

LARRY E. KLAYMAN,         :    18-BD-070

        Respondent.       :    Bar No. 2017-D051

- - - - - - - - - - - - -x


            Thursday, July 18, 2019

            Washington, D.C.




            HEARING








REPORTED BY:

        SABRINA K. BELL

In Re: Larry E. Klayman
July 18, 2019

| Page 646 | |
|---|---|

1  Hearing, taken at the Board on
2  Professional Responsibility, 430 E Street NW,
3  Washington, DC, Courtroom II, commencing at 1:30
4  p.m., before the Ad Hoc Hearing Committee, and
5  before Sabrina K. Bell, a court reporter and Notary
6  Public in and for the District of Columbia, when
7  were present on behalf of the respective parties:
8
9  APPEARANCES:
10  AD HOC HEARING COMMITTEE:
11  BUFFY J. MIMS, ESQUIRE
12  Chair
13  MS. ROBIN BELL
14  Public Member
15  CHRISTIAN WHITE, ESQUIRE
16  Attorney Member
17
18  On behalf of the DC Attorney Disciplinary
19  System:
20  JULIA L. PORTER, ESQUIRE
21  Deputy Disciplinary Counsel

| Page 648 | |
|---|---|

1  I N D E X
2  WITNESSES:        EXAMINATION
3  ERWIN CHEMERINSKY      645, 694, 698
4  LARRY E. KLAYMAN        700
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

| Page 647 | |
|---|---|

1  APPEARANCES CONTINUED:
2  ALSO PRESENT:
3  LARRY E. KLAYMAN, ESQUIRE
4  Respondent
5  and
6  OLIVER PEER, ESQUIRE
7  Assistant to Mr. Klayman
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

| Page 649 | |
|---|---|

1  P R O C E E D I N G S
2  CHAIRPERSON MIMS:  Back on the record
3  at 12:34 on Thursday, July 18th.
4  You may get started, Mr. Klayman.
5  MR. KLAYMAN:  Yes.  We're going to be
6  starting with the testimony of Dean Erwin
7  Chemerinsky of the University of California,
8  Dean -- Boalt School of Law.
9  Dean Chemerinsky?
10  (Calling witness on telecom.)
11  MR. CHEMERINSKY:  This is Dean
12  Chemerinsky.  Hello?
13  MR. KLAYMAN:  Yes.  Dean Chemerinsky, this
14  is Larry Klayman.  How are you?
15  MR. CHEMERINSKY:  I'm well.  I'm going to
16  put this on speaker because it's going to be
17  easier, but let me know if there's any problems.
18  MR. KLAYMAN:  Okay.
19  MR. CHEMERINSKY:  Can you hear me okay?
20  MR. KLAYMAN:  Yes.  We're about ready to
21  begin.
22  MR. CHEMERINSKY:  I'm here if you can hear

2 (Pages 646 to 649)

In Re: Larry E. Klayman
July 18, 2019

Page 650

1   me okay.

2       MR. KLAYMAN: Yes, we can. Thank you.

3       CHAIRPERSON MIMS: Dean Chemerinsky, this

4   is Buffy Mims. I'm Chair of the Committee here.

5   We'll go ahead and get started here by swearing you

6   in, if that's okay?

7       MR. CHEMERINSKY: All right.

8       CHAIRPERSON MIMS: Can you go ahead and

9   state your full name for the record.

10      MR. CHEMERINSKY: Sure. Erwin, E-r-w-i-n,

11  Chemerinsky, C-h-e-m-e-r-i-n-s-k-y.

12      CHAIRPERSON MIMS: And do you go by

13  Dean Chemerinsky?

14      MR. CHEMERINSKY: Yes. That's my official

15  title, but whatever the Committee is comfortable

16  with is fine with me.

17  Whereupon,

18          ERWIN CHEMERINSKY

19  called as a witness by Disciplinary Counsel, and

20  after having been first duly sworn, was examined

21  and testified as follows:

22          DIRECT EXAMINATION

Page 651

1   BY MR. KLAYMAN:

2    Q.  Dean Chemerinsky, it's Larry Klayman.

3   Thank you for appearing.

4        Would you please state your name and your

5   position at the University of California.

6    A.  My name is Erwin Chemerinsky. And I'm the

7   dean and Jesse H. Choper Distinguished Professor of

8   Law at the University of California, Berkeley,

9   School of Law.

10   Q.  And you have executed a declaration, which

11  is Respondent's Exhibit 21, which is in evidence.

12  I just --

13      MS. PORTER: Objection. I don't think it

14  is in evidence. I thought we had gone over this on

15  Tuesday that Mr. -- Dean Chemerinsky, excuse me,

16  was not going to be permitted to testify as to the

17  two matters in that declaration.

18      CHAIRPERSON MIMS: Well, I'm not sure it

19  is in evidence. Is it?

20      MR. KLAYMAN: Yeah, it is. It already is.

21      MS. PORTER: It has never been offered.

22      MR. KLAYMAN: Yes, it has.

Page 652

1       MS. PORTER: No, it has not.

2       MR. KLAYMAN: It was offered in our

3   exhibit book. It was not objected to. And we went

4   through that on Monday.

5       MS. PORTER: I'm sorry. The only

6   objections that were required prior to the hearing

7   were to authenticity. I objected -- well, as set

8   forth in our motion about remote testimony, we did

9   object, if Dean Chemerinsky was going to be asked

10  about the 6th Amendment issue because we -- it's

11  irrelevant to these proceedings.

12      Moreover, we also objected to him

13  testifying about whether or not Mr. Klayman was

14  truthful. And I believe we -- it's never been

15  offered. And we would object on those relevancy

16  grounds.

17      And I think we also discussed that at the

18  close of the hearing on Tuesday. So it's never

19  been offered in evidence. And when we --

20  Disciplinary Counsel has never been given the

21  opportunity to object if it is being offered, which

22  is why I'm standing up, because I do object.

Page 653

1       MR. KLAYMAN: She has a right to

2   cross-examine --

3       CHAIRPERSON MIMS: Before you respond to

4   that, I do believe he offered his binders into

5   evidence of exhibits.

6       MS. PORTER: No. That's not true because

7   I have objections to other documents as well.

8       CHAIRPERSON MIMS: Okay.

9       MR. KLAYMAN: No. That's not my

10  understanding. The record will show otherwise.

11      Anyway, Ms. Porter will get a chance to

12  cross-examine.

13      CHAIRPERSON MIMS: Okay. Well, let's --

14  now, let's deal with the facts that we did discuss

15  on Tuesday that the contents of what was in

16  Dean Chemerinsky's affidavit were irrelevant to

17  this proceeding.

18      We had a specific discussion that he was

19  going to testify as to what was on your witness

20  list. The description there, which related to the

21  reasonableness of the filings -- and I can get back

22  and read the sentence to you -- as well as

3 (Pages 650 to 653)

In Re: Larry E. Klayman
July 18, 2019

|  | Page 654 |
|---|---|

1  potentially the Bivens actions.
2      But I think we also made the qualification
3  that we would hear about his qualifications and
4  ability to be able to testify about those actions.
5      MR. KLAYMAN: Yes. And there's no --
6  there was nothing said about that he couldn't give
7  his opinion with regard to the findings of
8  Judge Gould. I'm not talking specifically about
9  the pro hac vice entry in terms of its -- should be
10  granted or not granted.
11      Although, I will proffer the declaration,
12  which expert Chemerinsky has filed under Rule 7.16,
13  regardless of Your Honor's ruling, one way or the
14  other. So I proffer it on the record.
15      But I would like him to be able to
16  testify. She can make a relevancy objections. And
17  we can decide these issues after he testifies.
18  It's not going to be a long testimony.
19      CHAIRPERSON MIMS: But what exactly in the
20  declaration are you attempting to illicit testimony
21  about?
22      MR. KLAYMAN: Well, specifically his

|  | Page 655 |
|---|---|

1  background, the fact that he's reviewed certain
2  exhibits as he states in paragraphs -- he agrees
3  with the analysis of Judge Gould, having reviewed
4  the pro hac vice applications that I answered that
5  -- which I was required to answer, that I didn't
6  make a misstatement based upon that application,
7  and that Judge Gould rulings -- he agrees with him
8  generally speaking.
9      And we set forth in the declaration
10  exactly the reasons for that and it was my
11  understanding that we're getting, Your Honor, in
12  all respect, sandbagged a little bit here because
13  this is in evidence right now.
14      She can make her relevancy objections.
15  And you can then decide ultimately when you do you
16  report and recommendation what's appropriate and
17  what's not.
18      But I'd like to be able to have Dean
19  Chemerinsky, who's testifying, taking his time,
20  he's very busy, to just authenticate his
21  declaration at this point. That's all I was trying
22  to do.

|  | Page 656 |
|---|---|

1      But with respect to Judge Gould's
2  opinions, his opinions are what they are. And we
3  will accept them, and we can review them if we
4  think they're relevant, but that's actually not
5  what we're here about today, is Judge Gould's
6  opinion.
7      How is Judge Gould's opinion relevant?
8      MR. KLAYMAN: Your Honor, yesterday, I
9  cited the rules that said there is a presumption
10  that we should be able to present expert testimony
11  as long as that testimony does not go to a opinion
12  as to whether or not I violated an ethical rule.
13  Okay? The law is very clear on that. I cited two
14  cases on that.
15      I don't understand why Counsel is trying
16  to prevent the Committee from getting a full
17  reading according to the cases that I put on the
18  record. Certainly, they can make relevancy -- she
19  can make relevancy objections, but we're here to
20  get the truth. And we're here to follow the law.
21      I have had in other proceedings expert
22  testimony submitted, for instance Professor

|  | Page 657 |
|---|---|

1  Rotunden (phonetic) and in other matters. And
2  there was never a problem in having it done. But
3  you will be able to weigh it once it comes in. And
4  you decide what you want to use and what you don't
5  want to use.
6      But in any event, under Rule 7.16 of the
7  Board, I can put it on the record anyway as a
8  proffer subject to the Board's review.
9      CHAIRPERSON MIMS: But you still haven't
10  answered my question. The question that's pending
11  is how is Judge Gould's opinion relevant to this
12  hearing?
13      MR. KLAYMAN: Because it's an expert who's
14  looking at it -- who's an expert on constitutional
15  law and professional ethics. And he's saying --
16  he's looking at this, too, and he's saying, I agree
17  with minority opinion here of Judge Gould. And I
18  analyzed it, too. And this is my expert opinion.
19  And that is crucial here because --
20      CHAIRPERSON MIMS: Whether or not Judge
21  Navarro granted your pro hac is not at issue here.
22      MR. KLAYMAN: That's not what I'm talking

4 (Pages 654 to 657)

In Re:  Larry E. Klayman
July 18, 2019

Page 658

1  about.  I'm talking about having looked at the pro
2  hac vice applications and determined, based upon
3  his expertise, that I did not have to answer
4  that -- which I did not have to answer it, and I
5  did not misrepresent with regard to matters which
6  are alleged.
7       And I should be able to put that on the
8  record.  Professor Chemerinsky has limited time.
9  He's very busy.  I don't mean to rush you or
10 anybody here, but can we deal with this at the end?
11 I'm able to put it on the record as to a proffer in
12 any event.
13      CHAIRPERSON MIMS:  You can put on the
14 record the testimony that we discussed yesterday,
15 which relates to the reasonableness of the filings.
16 I thought we were very clear yesterday that that is
17 what his testimony was going to be.
18      MR. KLAYMAN:  You know, there's the
19 rule -- yeah.  There's the rule here that if you
20 don't object to the exhibits, that you waive your
21 objections regardless of what she filed for
22 which was premature to Ms. Porter.

Page 659

1       CHAIRPERSON MIMS:  I'm not even talking
2  about her filings.  When we had the discussion on
3  Tuesday, I specifically stated that nothing in his
4  affidavit was relevant.
5       MR. KLAYMAN:  Well --
6       CHAIRPERSON MIMS:  So if the --
7       MR. KLAYMAN:  I don't --
8       CHAIRPERSON MIMS:  -- testimony that he's
9  about to give relates to the reasonableness of the
10 filing --
11      MR. KLAYMAN:  I don't recollect your
12 saying that the whole affidavit was not valid.  We
13 didn't get into the substance of it on Tuesday.
14      And again, Your Honor, if I may reiterate,
15 I can make the proffer.  I can put the testimony on
16 the record.  I can put the declaration on the
17 record.  The Board will be making the ultimate
18 decision here subject to appeal to the DC Court of
19 Appeals.  So I'd like to put it on the record in
20 all due respect.  I respect you.  But that's the
21 rule.  I can.
22      If you're excluding it, I can put it on

Page 660

1  there as a proffer.  And Your Honor can decide,
2  with your Committee members, what to do with it
3  when you write your report and recommendation.
4       CHAIRPERSON MIMS:  Here's the sentence
5  that I read into the record.  "He will also testify
6  that the pleadings filed in other actions taken by
7  Mr. Klayman in his effort to obtain pro hac vice
8  admission, and to correct the judicial record were
9  reasonable as he had inter alia, the right to
10 correct false statements on the judicial record,
11 particularly, since they were being used against
12 him."
13      I read that statement on Tuesday and I
14 said that is what he could testify about.
15      MR. KLAYMAN:  Yeah.  And that's subsumes
16 the misstatements that are alleged for which Bar
17 counsel would like me disciplined.  So it gets to
18 that issue -- false statements.
19      I was correcting the false statements of
20 Judge Bybee and Judge Fletcher, and I'm entitled to
21 get that testimony.  But I'm also entitled to put
22 this declaration on the record because this Hearing

Page 661

1  Committee will be subject to review by the Board
2  and it should have that testimony if they disagree,
3  respectfully, with limiting the testimony.
4       I don't understand what Disciplinary
5  Counsel has to hide -- not hide, but what they're
6  worried about in getting the truth out.  They
7  represent me as well as they represent the Office
8  of Disciplinary Counsel.  I've never had an issue
9  in any of these cases in using expert testimony
10 before.
11      So, consequently, I would ask that
12 Professor Chemerinsky, who only has an hour here,
13 be able to testify as to these matters.  And you
14 can then decide whether they're relevant,
15 irrelevant, or whatever.
16      CHAIRPERSON MIMS:  He can testify as to
17 the matters that we've discussed on Tuesday.  And I
18 don't want to rehash what has already been decided.
19 I mean, we were very clear.  I don't think there
20 will be any danger of going outside the hour,
21 because it's a very limited scope.
22      And if the questions you're about to ask

5 (Pages 658 to 661)

In Re:  Larry E. Klayman
July 18, 2019

Page 662

1  him relate to the statement I read or you want to
2  also illicit his qualifications to discuss the
3  Bivens filings, then that's what he can testify to.
4      MR. KLAYMAN:  But I want to -- okay.  But
5  I want that declaration in the record as a proffer
6  under Rule 7.16.
7      CHAIRPERSON MIMS:  Well, let's put the
8  declaration aside because we'll take a break and
9  I'll decide if that can come in as a proffer.
10     But for right now, for his testimony,
11 we're not going to go back to the declaration,
12 unless, there is a paragraph in there that
13 specifically relates to -- or information in there
14 that relates to what I just read.
15     MR. KLAYMAN:  Yes.
16     CHAIRPERSON MIMS:  I remember it being
17 largely related to the 6th Amendment issue, which
18 we said we weren't going to discuss.
19     MR. KLAYMAN:  Your Honor, that is
20 relevant, too.  And I want to put this on the
21 record because -- and we can argue about it later.
22 But the fact that this was so clear cut that I

Page 663

1  should have the right to represent my client who
2  faced life imprisonment, and that Judge Bybee
3  writing majority opinions, would go outside of
4  those -- even the documents, and, in fact, become
5  and advocate for Judge Navarro, shows that it's
6  relevant as to whether those applications should
7  have been granted.
8      That shows the bias that I'm talking about
9  that caused him to write those orders.  And --
10     CHAIRPERSON MIMS:  If your argument is
11 that the 6th Amendment issue -- because those have
12 been implicated and Dean Chemerinsky is going to
13 testify that supported the reasonableness of your
14 filings, to that limited extent, it can come in.
15     MR. KLAYMAN:  Okay.  But I also want this
16 proffered on the record.  And I have an absolute
17 right to have it on the record.
18     And it would be appealable error if it's
19 not on the record.
20     CHAIRPERSON MIMS:  Let's address that
21 after his testimony.
22     MR. KLAYMAN:  I'd like to get his

Page 664

1  testimony -- I'll get to those issues, but I want
2  to proffer his testimony on other issues as well as
3  a proffer.
4      CHAIRPERSON MIMS:  You can make the
5  proffer, but after.  Let's get his testimony done
6  since we know he only has an hour.
7      MR. KLAYMAN:  Yes.  But I want him to be
8  able to testify to those issues as a proffer.
9      CHAIRPERSON MIMS:  Oh, I see.
10     MR. KLAYMAN:  Yes.
11     MS. PORTER:  Well, I guess I'm a little
12 bit confused because I thought we did resolve this
13 on Tuesday.  And if he's being offered as an expert
14 in something other than 6th Amendment or
15 constitutional law, I'd also like to also be able
16 to voir dire him on his expertise, or, you know,
17 his qualifications to testify as, expert.
18     MR. KLAYMAN:  I have no problem with that,
19 Your Honor.  Unlike my esteemed co-counsel, I say
20 lay it all on the table and let people decide, not
21 restrict the analysis here.  You deserve a full
22 record here.

Page 665

1      MS. PORTER:  But I'd like a proffer as to
2  what he's being offered as an expert of that --
3      MR. KLAYMAN:  I just went through it.
4  He's being offered regard to reviewing the pro hac
5  vice applications, looking at them, saying that I
6  didn't fail to disclose that, which I didn't have
7  to disclose, and that I didn't make
8  misrepresentations.  And that, in addition to that,
9  because this was such a strong case for pro hac
10 vice entry that that, based on his opinion, colored
11 the thinking of Judge Bybee because of what he
12 wrote.  It was just simply wrong.
13     And that is relevant.  And he is not just
14 an expert on constitutional law and criminal
15 procedure, which he is.  He's also an expert on
16 judicial ethics.  And she's certainly able to
17 question him.
18     He is the dean of one of the most
19 prestigious law schools in this country.  He has a
20 distinguished past.  He deserves the opportunity to
21 be able to testify here.  I'm going to ask him a
22 question, he's not -- I'm not paying anything to

6  (Pages 662 to 665)

In Re: Larry E. Klayman
July 18, 2019

Page 666

1  testify. He's doing it because he thinks it's
2  right.
3        And, consequently, I think it's -- it's
4  not only inappropriate what Ms. Porter is trying to
5  do, I think it also doesn't pay the sufficient
6  degree of respect to Dean Chemerinsky. He deserves
7  to be able to testify. He's going to great effort
8  to do that.
9        CHAIRPERSON MIMS: I think I've heard the
10  decisions sufficiently. And I'm going to go back
11  to the original ruling on Tuesday to say he can
12  testify as to what he put in your witness list with
13  the sentence I read. We also discussed Bivens.
14        I think that you need to ask about his
15  background and his experience in order to put him
16  forward as an expert. We would like to hear that.
17        MR. KLAYMAN: I will do that.
18        CHAIRPERSON MIMS: And then to ask him
19  about the limited subject, which we already
20  discussed on Tuesday.
21        MR. KLAYMAN: Now, let me say --
22        CHAIRPERSON MIMS: But as it relates to

Page 667

1  Judge Bybee, Judge Gould, and those issues, you
2  were overruled on that already.
3        MR. KLAYMAN: Let me -- I respectfully
4  disagree on that. I did not understand that.
5        (A short interruption re-calling the
6  witness.)
7        Yes. One other thing, Your Honor, is that
8  when Ms. Porter on behalf of Office of Disciplinary
9  Counsel filed after I had simply asked for remote
10  testimony statements opposing his testimony, Your
11  Honor said that we would take it up at the
12  appropriate time, which I understood to be as the
13  testimony is elicited. She can certainly make an
14  objection here.
15        But this is, in my view, should come in
16  for the truth of the matter as to the substance of
17  his declaration, but also as a proffer so the Board
18  can review it and decide what to do. And that's
19  important.
20        And I might add one other thing, is that
21  the only material witness in this case of any
22  substance is me. Office of Disciplinary Counsel

Page 668

1  has no material substantiative witnesses other than
2  law clerks looking at documents. And it's very
3  important to me, particularly since Your Honor
4  denied discovery here, with regard to Judge Bybee
5  and others. And there's an issue involving, you
6  know, his familial relationships with others.
7  We're going on the basis of what he said, but I
8  have no way to get behind that.
9        Professor Chemerinsky is not being offered
10  for that. But I'm just saying is, is that it seems
11  like I've been excluded from defending my case.
12  And I deserve to be able to do a full defense. And
13  I don't mean that in any lack of respect to you
14  because, you know, I appreciate, you know, the way
15  you've administered to this. But I deserve to get
16  it on the record. And that's all I'm asking.
17        CHAIRPERSON MIMS: I understand your
18  argument. I did understand it on Tuesday when it
19  was made the first time. We do not need to go over
20  things that the Board considers -- that the Hearing
21  Committee considers irrelevant.
22        And, I think, right now, we're wasting

Page 669

1  time going over this because --
2        MR. KLAYMAN: Well, okay, then --
3        CHAIRPERSON MIMS: -- I'm going to stick to
4  the ruling that was put forth on Tuesday.
5        MR. KLAYMAN: Well, that's fine, Your
6  Honor, but I also ask that we stick to Rule 7.16
7  and allow me to make a proffer. That's a Board
8  rule.
9        CHAIRPERSON MIMS: You're objection is
10  been noted.
11        MR. KLAYMAN: Okay. And I'm going to get
12  through this stuff that you suggest initially. And
13  then I'm going to make the proffer on the other
14  issues.
15        BY MR. KLAYMAN:
16        Q.  Dean Chemerinsky, Respondent's Exhibit 21,
17  did you sign that document?
18        A.  If this is the declaration, I did.
19        Q.  Yes. And is it true and correct to the
20  best of your knowledge --
21        MS. PORTER: Objection.
22        CHAIRPERSON MIMS: He is going to -- he

7 (Pages 666 to 669)

In Re:  Larry E. Klayman
July 18, 2019

Page 670

1  can, at the end of his testimony, put in a proffer
2  as to what he would have testified with respect to
3  the declaration.
4        That is what I will allow you to do.
5  We're not going to elicit testimony from him.  He
6  can say that he signed the document.
7        When he's done testifying about what I've
8  already ruled is relevant to this hearing, okay --
9  when we're done with that testimony, you can then
10  put in a proffer as to what he would have
11  testified.  But we don't need to hear testimony
12  about it.
13        MR. KLAYMAN:  All I'm just doing is
14  authenticating, and then you can decide what the
15  testimony --
16        CHAIRPERSON MIMS:  You can authenticate
17  the document.
18        MR. KLAYMAN:  I am.
19        BY MR. KLAYMAN:
20     Q.  Is it true and correct to the best of your
21  knowledge -- the declaration?
22     A.  Yes.

Page 671

1     Q.  And you swore to it under oath?
2     A.  Yes.
3     Q.  Okay.  Professor -- Dean Chemerinsky,
4  would you please state for the Hearing Committee
5  your qualifications, your background, and your
6  expertise.
7     A.  As I said, I'm the dean of Law School and
8  a professor at University of California Berkeley
9  School of Law.  Before I came here, I was the
10  founding dean and Raymond Pryke Professor of First
11  Amendment Law at the University of California
12  Irvine School of Law for nine years.  Before that I
13  was the Alston & Bird Professor of Law and
14  Political Science at Duke Law School for four
15  years.  Before that I spent 20 years as a professor
16  at the University of Southern California, including
17  as the Sydney M. Irmes Professor of Public Interest
18  Law and Legal Ethics and Political Science.  I
19  teach in the areas of constitutional laws, federal
20  jurisdiction.  I've also for many years taught in
21  the area of professional responsibility.
22        CHAIRPERSON MIMS:  Dean, I just want to

Page 672

1  just give you a brief reminder that we have a court
2  reporter taking down everything that you say, and
3  you're talking rather quickly.
4        THE WITNESS:  I'm sorry.
5        CHAIRPERSON MIMS:  Yeah.  Thank you.
6        BY MR. KLAYMAN:
7     Q.  Now, you had an opportunity, did you not,
8  Dean Chemerinsky, to review Exhibits 1 --
9  Respondent Exhibit 1 and Respondent Exhibit 5 with
10  regard to the pro hac vice application that I had
11  submitted to Judge Gloria Navarro of the U.S.
12  District Court for the District of Nevada?
13        MS. PORTER:  I would object at this point
14  because I don't know what Mr. Dean Chemerinsky is
15  being offered as an expert in.
16        I understand the Chair's ruling about the
17  pro hac vice motion and the Bivens action, and I'd
18  like some, I guess, testimony or information about
19  his qualifications.  I understand he's an expert in
20  constitutional law, but these are two other issues.
21        What, if any, qualifications, experience,
22  or knowledge does he have about these issues that

Page 673

1  would qualify him for an expert?
2        So I object to his expert testimony on
3  this until he's qualified as an expert in these
4  areas.
5        CHAIRPERSON MIMS:  And which areas are
6  those?
7        MS. PORTER:  Well, my understanding is
8  that the Chair ruled that he could testify as to
9  the pro hac vice applications.  So what, if any,
10  expertise does he have with respect to federal pro
11  hac vice applications?
12        And, also, the Bivens actions.  What, if
13  any, expertise does he have with respect to Bivens
14  actions?
15        CHAIRPERSON MIMS:  I think that's fair.  I
16  think you should establish some qualifications.  I
17  think with the qualifications he's already put in
18  the record is probably subsumed with that, but you
19  can ask him a couple of specific questions as it
20  relates to the areas that we're about to get into.
21        BY MR. KLAYMAN:
22     Q.  Professor Chemerinsky, what membership and

8 (Pages 670 to 673)

In Re:  Larry E. Klayman
July 18, 2019

Page 674

1   bars are you a member of?
2       A.  I'm a member of the bar in the State of
3   Illinois since 1978.  A member of the District of
4   Columbia bar since 1979.  And then, a member of the
5   United States Supreme Court bar and the bar of
6   almost every federal court of appeals.
7       Q.  Okay.  And in addition to being a
8   distinguished professor and scholar, you have, from
9   time to time, yourself, submitted pro hac vice
10  applications in district courts?
11      A.  That is correct.
12      Q.  You're familiar with the procedure?
13      A.  Yes, I am.
14      Q.  Did I hear you correctly to say that
15  you're not only an expert with regard to
16  constitutional law, criminal law and procedure, but
17  that you also teach courses in professional
18  responsibility and ethics?
19      A.  I taught professional responsibility most
20  of the years that I was at the University of
21  Southern California Law School.  I continued to
22  lecture on professional responsibility for students

Page 676

1   it has always been granted, but that's the extent
2   of my knowledge of pro hac vice.
3       Q.  With respect -- I don't think Mr. Klayman
4   even asked you about Bivens actions.
5       A.  There I do have more expertise.  I've been
6   teaching the course on federal courts since 1982,
7   and have done it most years since 1982 and covered
8   Bivens as a part of that.  Also, I've written
9   extensively on Bivens.  I have a treatise on
10  federal jurisdiction and chapter nine is about
11  Bivens actions.  I've also litigated a number of
12  Bivens actions myself, most importantly, I think a
13  key circuit case on Bivens is Plaim v. Cheney,
14  which I argued in both the District Court and the
15  Circuit, but I've also handled other Bivens actions
16  as a lawyer.
17      MS. PORTER:  Okay.  Thank you.
18
19
20
21
22

Page 675

1   who were getting ready for the multi-state
2   professional responsibility exam.
3       MR. KLAYMAN:  Okay.  I therefore submit
4   that he's qualified as an expert in all three areas
5   that he just testified to.
6       MS. PORTER:  May I ask some questions
7   before he's qualified as an expert?
8       CHAIRPERSON MIMS:  Yes, go ahead.
9       BY MS. PORTER:
10      Q.  Dean Chemerinsky, my name is Julia Porter,
11  and I represent the Office of Disciplinary Counsel
12  in this matter.  Can you hear me okay?
13      A.  I can.
14      Q.  Other than filling out your own
15  applications for pro hac vice admission, what, if
16  any other, I guess, knowledge or experience have
17  that you had with pro hac vice applications, and, I
18  guess, dealing with specifically with the federal
19  courts?
20      A.  I'm familiar with the case law concerning
21  when pro hac vice status should be granted.  And I
22  have, as was pointed out, applied for it myself and

Page 677

1       CHAIRPERSON MIMS:  Dean Chemerinsky, this
2   is Ms. Mims again, the Hearing Committee Chair.  I
3   have just a few follow-up questions.
4       BY HEARING CHAIR MIMS:
5       Q.  You mentioned that you have been teaching
6   on federal courts.  Does that include a federal
7   court's procedure?
8       A.  Yes.  Law schools, as you know, have a
9   course.  Sometimes it's called "federal court."
10  Sometimes it's called "federal jurisdiction."  And
11  I've taught that course most years since 1982.  I
12  taught at DuPaul.  I taught it at USC.  I taught it
13  at Duke.  And I taught it at Irvine.  And I have a
14  treatise titled "Federal Jurisdiction," and it
15  parallels what is covered in the course.
16      HEARING CHAIR MIMS:  Thank you.
17      BY MR. KLAYMAN (Resuming):
18      Q.  I also understand, based on your
19  declaration, that you've authored 12 books, including
20  case books and treatises about Constitutional law,
21  criminal, procedural, and federal jurisdiction.  Am I
22  right?

9 (Pages 674 to 677)

In Re: Larry E. Klayman
July 18, 2019

Page 678

1    A    That's correct.
2    Q    Okay. Now you've had an opportunity to
3  review, did you not, Respondent's Exhibit 1 and 5,
4  which were the original pro hoc vice application to
5  Judge Navaro and the U.S. District Court for the
6  District of Nevada, and the supplemental filing which
7  is Respondent's Exhibit 5, when she asked certain
8  questions. And based upon your review of that, do
9  you have an opinion as to whether I answered all the
10 questions that I was required to answer truthfully?
11       MS. PORTER: Objection. That goes to the
12 ultimate question for this Hearing Committee.
13       MR. KLAYMAN: I'm not asking him to make
14 an ethical determination. I'm just asking him, based
15 upon his review and his expertise, with regard to
16 federal procedure and pro hoc vice applications,
17 whether he came to the same conclusion as Judge Gould
18 did when he reviewed that. And that's in the
19 declaration.
20       MS. PORTER: Well first, I would object to
21 that being Judge Gould's finding. But, second, the
22 question was: Was I, the Claimant, truthful? That

Page 679

1  is no an appropriate question. I mean, I understand
2  Dean Chemerinsky's expertise in Constitutional law,
3  but that is a question about whether someone is being
4  candid or truthful with the court.
5        MR. KLAYMAN: Your Honor, I'm just simply
6  asking whether, based upon his review of the
7  applications, I answered those questions which I was
8  required to answer and did not need to go beyond
9  that. That's my question.
10       CHAIRPERSON MIMS: We are here. The
11 objection is sustained. You cannot ask him a
12 question that goes to the ultimate issue in this
13 matter. He is permitted to testify as to whether
14 your filings were reasonable, including the Bivens
15 actions, and so that's what we need to focus on.
16       MR. KLAYMAN: Well I didn't file the
17 Bivens action, Your Honor. Okay, despite the fact
18 that Ms. Porter tried to create that impression with
19 the way she phrases questions--
20       CHAIRPERSON MIMS: I misspoke.
21       MR. KLAYMAN: --which is quite, for lack
22 of a better word, dishonest. I never filed that

Page 680

1  action. And consequently I should be able to ask the
2  question as to whether, based upon his review, I did
3  that which I was required to answer. I'm not asking
4  him to make an ultimate ethical decision as to
5  whether I violated any ethical rule. I'm not. I
6  should be able to ask him that. So to the extent
7  that Your Honor thinks that that was your ruling--and
8  I disagree--I would ask for reconsideration of that
9  and allow the record to be complete here.
10       What is the point of limiting his
11 testimony when you're going to get to rule it's
12 relevant or not?
13       CHAIRPERSON MIMS: Repeat the question
14 again for me, in a way that does not ask him a
15 question on what the Committee is here ultimately to
16 decide.
17       MR. KLAYMAN: I didn't ask him that.
18       CHAIRPERSON MIMS: Okay.
19       MR. KLAYMAN: What I asked him was, based
20 upon your review of the pro hoc vice applications,
21 Exhibit 1 and 5, Respondent's Exhibits 1 and 5, and
22 your experience and expertise in pro hoc vice and

Page 681

1  federal procedure, did I answer all the questions
2  that I was required to answer by those applications.
3        CHAIRPERSON MIMS: He's not asking him
4  about the truthfulness of it. I'm going to allow him
5  to answer.
6        WITNESS CHEMERINSKY: Yes.
7        BY MR. KLAYMAN:
8    Q    As a general rule, and Judge Gould's
9  decision subsumed this, do you agree with the
10 dissenting opinions of Judge Gould with regard to my
11 pro hoc vice application?
12       MS. PORTER: Objection.
13       CHAIRPERSON MIMS: Sustained.
14       MR. KLAYMAN: Can I proffer here?
15       CHAIRPERSON MIMS: Are you done asking him
16 about every other--the issue that we're here to ask
17 him about? My ruling was, let's get through his
18 testimony that I've already ruled was relevant. And
19 then if you want to make a proffer as to what I've
20 already overruled, we can make a proffer so that you
21 have that on the record.
22       MR. KLAYMAN: As long as he's here, I'm

10 (Pages 678 to 681)

In Re: Larry E. Klayman
July 18, 2019

---

Page 682

1  entitled under Rule 7.16 to put his testimony on the
2  record. That's an absolute rule by the Board.
3      CHAIRPERSON MIMS: I'll repeat myself.
4  Let's get through what I've ruled he can testify is
5  relevant. And that relates to the reasonableness of
6  the filings, as well as the Bivens actions. And
7  then we can quickly go through what you would like to
8  proffer into the record. But I want to get through
9  what we've already ruled is relevant, first.
10      BY MR. KLAYMAN (Resuming):
11      Q    Now, Professor Chemerinsky, with regard
12  to judges, in your expert opinion are judges above
13  the law?
14      A    No, of course not.
15      Q    And is it not the case that judges can
16  be--actions can be brought with regard to injunctive
17  relief in certain situations with regard to judges?
18      A    I'll take your question literally. In
19  certain situations, it can be. But generally judges
20  cannot be sued for money or for injunctive relief.
21      A    But there are cases, for instance Hagan
22  versus Coggins, Action No. FW990878 2000, U.S.

---

Page 683

1  District Lexus, 22-062-11, Northern District of
2  Texas, April 26, 2000, the year 2000, where in a head
3  note it says: The Hagan court allowed a Bivens
4  plaintiff leave to amend regarding plaintiff's claim
5  that Judge Buckmeyer, B-U-C-K-M-E-Y-E-R, denied Judge
6  Lindsay, L-I-N-D-S-A-Y, access to investigative
7  reports prepared by the FBI that substantiate
8  plaintiff's claims against Coggins and Scott. The
9  court ordered an amended complaint with more
10  specificity, but did not deny it as a matter of law.
11      So is it fair to say that some
12  practitioners and experts believe that a Bivens
13  action with regard to injunctive relief, at a
14  minimum, is colorable, is sustainable?
15      A    Might it help the panel if I explain my
16  views on this a bit? I think it would be difficult
17  to answer it 'yes' or 'no.' I can do so in just a
18  few sentences, if it's acceptable to the panel.
19      CHAIRPERSON MIMS: Yes, go ahead.
20      WITNESS CHEMERINSKY: The Supreme Court
21  has said that judges have absolute immunity in civil
22  suits for money damages for their judicial tasks, but

---

Page 684

1  not immunity for their administrative tasks.
2      The Supreme Court in Employer versus Allen
3  then said judges do not have immunity to sue for
4  injunctive relief. Congress amended Section 1983 in
5  the Judicial Improvements Act of 1996 to say that
6  judges cannot be sued for injunctive relief unless
7  there's an absence of declaratory relief where
8  they're violating a declaratory judgment.
9      So in answering your question, can there
10  ever be suits against injunction, the literal answer
11  is: Yes, but it's quite restricted. In answer to
12  the case, you say there are some cases that are
13  allowed injunctive suits against judges, but
14  generally judges can't be sued for money or for an
15  injunction.
16      I hope that elaboration of the law is
17  useful.
18      Q    Based upon your experience, since we live
19  in a common law system where law is being made all
20  the time, and the practitioner in this case, Mr. Joel
21  Hanson--because I didn't file the complaint--can he
22  assert a colorable claim for injunctive relief with

---

Page 685

1  regard to judicial violation of Constitutional
2  rights? Is that something that he should be
3  sanctioned for doing?
4      MS. PORTER: Objection. I mean, I don't
5  understand the sanctions issue, and how Dean
6  Chemerinsky, with all due respect, has any expertise
7  in that.
8      MR. KLAYMAN: He does have expertise, and
9  I would ask that he respond.
10      CHAIRPERSON MIMS: I actually don't
11  understand the question.
12      BY MR. KLAYMAN (Resuming):
13      Q    The question is: In our system of
14  justice, Dean Chemerinsky, is it not true that law is
15  made case by case, generally speaking?
16      A    Yes.
17      Q    And you can test the limits of the
18  common law by filing various legal proceedings?
19  That's the way it works in our system?
20      A    Yes.
21      Q    And that given what you've just
22  testified to, a lawyer can attempt to expand on the

---

11 (Pages 682 to 685)

In Re:  Larry E. Klayman
July 18, 2019

Page 686

1  law by filing legal proceedings, in a case-by-case
2  analysis?
3      A    Yes, within the constraints of the rules
4  of ethics.
5      Q    Now in the documents that you reviewed,
6  did you see anywhere that Mr. Hanson was sanctioned
7  by Judge Navaro or the Ninth Circuit for filing a
8  Bivens action?
9      A    I did not focus on that in my reading of
10 the documents.  That was not the scope of the
11 declaration that I did.
12     Q    Okay.  Based upon your expertise and your
13 experience, in a case such as the Bundy case--well,
14 let me back up.  Are you aware of the context of the
15 Bundy case, the criminal prosecution in Las Vegas?
16     A    Yes.
17     Q    How did you become aware of that?  The
18 context?  How did you become aware of the nature of
19 the Bundy case in Las Vegas?
20     A    How did I become aware?
21     Q    Yes.
22     A    I'm having trouble hearing.

Page 687

1      Q    How did you become aware of the nature of
2  the prosecution of Cliven Bundy, his sons, and 14
3  other defendants in Las Vegas, Nevada?
4      A    I became aware primarily from media
5  accounts.  Also, a friend of mine was one of the
6  defense lawyers from the Federal Defenders Office,
7  and so I hear some of it from her.
8      Q    What's her name?
9      A    Brenda Wessler.  She's now a magistrate
10 judge in the District of Nevada.
11     Q    Now you are aware that in that case
12 there were 17 or so counts of criminal conduct
13 against the defendant?
14     A    Yes.
15     Q    And that my client, Cliven Bundy, faced
16 the prospect of life imprisonment for those 17
17 counts?  He's 71 years old at the time.
18         CHAIRPERSON MIMS:  Mr. Klayman, I think
19 you need to make sure you're leaning into the
20 microphone.
21         BY MR. KLAYMAN (Resuming):
22     Q    Could you hear me, Dean Chemerinsky?

Page 688

1      AIt was going in and out, I'm sorry.
2      Q    Yeah, your general knowledge is that
3  there were many counts, 17 to be precise, of
4  criminal charges against my client, Cliven Bundy, and
5  others in that case?
6      A    Yes, I was aware of that.
7      Q    And that if Cliven Bundy had been
8  convicted, along with the others, he could face a
9  sentence of life imprisonment?
10     A    Yes, I was aware of that.
11     Q    And based on your expertise, under those
12 circumstances is a lawyer--is a strong lawyer
13 necessary against this kind of a prosecution to
14 zealously represent his client?
15     A    Of course.
16     Q    Based on your experience, are there
17 lawyers that you've been in contact with, or
18 litigated cases with, who have been sanctioned by
19 judges for strong actions vis-a-vis the judge?
20     A    Yes.
21     Q    And with regard to what you know about
22 the Bundy case, just what you know, do you know of

Page 689

1  any such sanctions having been issued in that case?
2  Or with regard to my pro hoc vice application?
3      A    I do not know sanctions with regard to
4  your pro hoc vice application.  I do know what the
5  ultimate disposition of it was based on the judge's
6  termination of prosecutorial misconduct.
7      Q    That was why the superceding indictment
8  was dismissed?
9      A    Yes.
10     Q    Now given the dismissal of the
11 supercedious indictment, should the orders that you
12 reviewed of the Ninth Circuit and the underlying
13 orders of Judge Navaro, based on your expert opinion,
14 be vacated as moot, as Judge Gould ruled in this
15 case?
16         MS. PORTER:  Objection.  I mean, Dean
17 Chemerinsky may have his views, but it's the court
18 that gets to decide these things.  And whether or not
19 he agrees with Judge Gould on this issue or other
20 issues is really not relevant.
21         MR. KLAYMAN:  He can give his expert
22 opinion.

12 (Pages 686 to 689)

In Re: Larry E. Klayman
July 18, 2019

Page 690

1  CHAIRPERSON MIMS:  We have gone over this.
2  The objection is sustained.  But do you mind if I ask
3  a few questions?  I don't want to interrupt your
4  statement--
5  MR. KLAYMAN:  Sure.
6  CHAIRPERSON MIMS:  --but I know we're
7  running out of time with him.
8  BY CHAIRPERSON MIMS:
9  Q    Dean Chemerinsky, have you reviewed, I
10  believe there were five writs of mandamus filed in
11  this action.  Have you reviewed those writs?
12  A    Yes, I have.
13  Q    In your practice of teaching about
14  federal courts, have you seen writs like this
15  previously?
16  A    I've certainly seen lawyers try to get
17  review of trial courts vis writs of mandamus, and so
18  I think the answer to your question have I seen
19  writs of mandamus as a way of reviewing district
20  court decisions, the answer would be yes.
21  Q    From your experience in teaching and
22  reviewing, you know, attorneys filing writs like

Page 691

1  this, did you--do you have an opinion as to whether
2  the filing of these five writs, either individually
3  or in total, was reasonable?
4  A    Yes, I do.  I think that it was
5  reasonable under the circumstances of this case.
6  Q    Why?
7  A    This is about the ability of a criminal
8  defendant to have counsel of choice; that the
9  district court had refused to allow the pro hoc vice
10  status; and the defendant wanted to have Mr. Klayman
11  represent him.  And the only way of having the
12  district court decision reviewed was through these
13  writs of mandamus.
14  CHAIRPERSON MIMS:  Thank you.  I may have
15  one or two more follow-ups, but I'm going to let Mr.
16  Klayman finish.
17  Do you have a hard stop in ten minutes?
18  WITNESS CHEMERINSKY:  I can probably
19  extend it about 10 minutes.  Beyond that, I have a
20  speaking engagement in San Francisco that I have to
21  get to.  But I can probably go another 20 minutes, if
22  that's okay with you.

Page 692

1  CHAIRPERSON MIMS:  That's fine.  I just
2  want to make sure that we give Bar Counsel enough
3  time to question you, as well.
4  And, Mr. Klayman, I think to be fair,
5  we're going to let you ask a few more questions.  Why
6  don't you go about five more minutes, but we do have
7  to give Ms. Porter time to ask questions, as well.
8  BY MR. KLAYMAN (Resuming):
9  Q    In reviewing the court's orders, your
10  honor--excuse me, Dean Chemerinsky--and you are
11  "your honor" as well--judged by the majority of the
12  opinions which you wrote, is it your opinion that he
13  went beyond that which he should have in analyzing
14  whether or not my pro hoc vice should be granted?  In
15  other words, did he become an advocate for Judge
16  Navaro?  That's what I'm asking, the essence of it.
17  MS. PORTER:  Objection.
18  CHAIRPERSON MIMS:  Sustained.
19  (Pause.)
20  CHAIRPERSON MIMS:  Mr. Klayman?
21  BY MR. KLAYMAN (Resuming):
22  Q    Did you hear the question?

Page 693

1  A    Yes, sir.
2  CHAIRPERSON MIMS:  Yes, but the objection
3  is sustained.  We need to move on.
4  MR. KLAYMAN:  Oh, I'm sorry.  I'm sorry.
5  BY MR. KLAYMAN (Resuming):
6  Q    Now, Professor Chemerinsky, have I paid
7  you any remuneration for your testimony now, or has
8  that been promised in the future?
9  A    No, I have not been paid and will not
10  take any payment for this testimony.
11  Q    I want to ask a factual question, not as
12  an expert but as a factual question.  Have you ever
13  had any experience with a judge called William D.
14  Keller?
15  A    Not personally, no.  I never appeared in
16  front of him.
17  Q    Do you know of his reputation?
18  MS. PORTER:  Objection.
19  CHAIRPERSON MIMS:  I don't see how this is
20  relevant, Mr. Klayman.
21  MR. KLAYMAN:  That's fine.  No further
22  questions.  I reserve the right to redirect.

13  (Pages 690 to 693)

In Re: Larry E. Klayman
July 18, 2019

---

Page 694

1    CHAIRPERSON MIMS: Ms. Porter?

2    MR. KLAYMAN: Let me say one other thing.

3  Your Honor, I do ask that the declaration, whatever

4  Your Honor ultimately rules is relevant or not, be

5  placed on the record as a proffer, at a minimum,

6  under Rule 7.16. That is Dean Chemerinsky's

7  declaration.

8    CHAIRPERSON MIMS: Ms. Porter?

9    BAR COUNSEL EXAMINATION

10   BY MS. PORTER:

11   Q    Good afternoon, Dean Chemerinsky. My

12  name, again, is Julia Porter. I just have a few

13  questions. I think you've testified that judges,

14  acting in their judicial capacity, have absolute

15  immunity for a Bivens action. Is that correct?

16   MR. KLAYMAN: Objection.

17   WITNESS CHEMERINSKY: That's right.

18  Judges in the judicial capacity cannot be sued for

19  money damages, whether it's through Bivens if it's a

20  federal judge, or if it's a state judge through

21  Section 1983.

22   BY MS. PORTER (Resuming):

---

Page 695

1    Q    And that's very well established even by

2  Supreme Court precedent?

3    A    Yes. The Supreme Court in Stump versus

4  Sparkman in 1980 said that judges have absolute

5  immunity for their judicial tasks.

6    Q    And as a federal district court, and even

7  as the Ninth Circuit, you're required to follow the

8  Supreme Court's ruling on those matters? Is that

9  correct?

10   A    Yes.

11   Q    Presidents also have absolute immunity

12  in Bivens actions. Isn't that correct?

13   A    A President cannot be sued for money

14  damages for anything done in carrying out the

15  presidency. That's Nixon versus Fitzgerald, 1982.

16  There have been no follow up cases in terms of the

17  scope of that. And the lower courts have said

18  Presidents can be sued for injunctive relief.

19   Q    With respect to Bivens action, would you

20  agree that it would be unwarranted to file a Bivens

21  action against a judge for denying a pro hoc vice

22  application?

---

Page 696

1    MR. KLAYMAN: Objection. Lacks

2  foundation, and she's getting into the same areas

3  that you objected--

4    MS. PORTER: I'm asking a hypothetical

5  question of an expert.

6    MR. KLAYMAN: It's not a hypothetical.

7  Besides, I didn't sign it, but it's not a

8  hypothetical.

9    CHAIRPERSON MIMS: I'm going to sustain

10  the objection.

11   BY MS. PORTER (Resuming):

12   Q    One more question, Dean Chemerinsky.

13  Would you agree that, even though a client

14  hypothetically is entitled to, or has a Sixth

15  Amendment right to counsel of choice, that would not

16  permit the counsel to make false or misleading

17  representations to the court?

18   MR. KLAYMAN: She's doing exactly what she

19  kept me from doing. She's asking for an opinion on

20  an ethics violation of the Rules of Professional

21  Responsibility.

22   CHAIRPERSON MIMS: But she's not asking

---

Page 697

1  about anything specific in the record. And we did

2  allow, to some extent, his testimony about the right

3  to counsel. And he gave general opinions on that,

4  so--

5    MR. KLAYMAN: What's the question?

6    MS. PORTER: Do you want me to restate it?

7    CHAIRPERSON MIMS: Repeat the question.

8    BY MS. PORTER (Resuming):

9    Q    Dean Chemerinsky, would you agree that

10  with respect to a criminal defendant's Sixth

11  Amendment right to counsel, that would not permit a

12  lawyer who is seeking admission as the defendant's

13  counsel to make false or misleading statements to the

14  court?

15   A    Yes, I would agree with that.

16   MR. KLAYMAN: Objection.

17   CHAIRPERSON MIMS: Overruled.

18   BY MS. PORTER (Resuming):

19   Q    Could you restate your answer, please,

20  just so that the court reporter gets it?

21   A    Yes, I would agree.

22   MS. PORTER: I have no more questions.

---

14 (Pages 694 to 697)

In Re: Larry E. Klayman
July 18, 2019

| | |
|---|---|
| **Page 698** | **Page 700** |

**Page 698**

1  Thank you.
2       FURTHER EXAMINATION
3       BY MR. KLAYMAN:
4    Q   Based upon your understanding of the
5  Bundy prosecution, is it your expert opinion that
6  Judge Navaro violated the Constitutional rights of
7  Cliven Bundy and the defendants?
8       MS. PORTER:  Objection.
9       CHAIRPERSON MIMS:  Sustained.
10      MR. KLAYMAN:  No further questions.  I'd
11  like him to proffer an answer.
12      CHAIRPERSON MIMS:  If you want to do a
13  proffer right now and read into the record what you
14  would have had him testify about, and he can agree
15  that that would have been his testimony had it not
16  been overruled by the Committee, then why don't you
17  go ahead and do that.
18      BY MR. KLAYMAN:
19   Q   Thank you.  And I'm referring to your
20  declaration, Dean Chemerinsky, Exhibit 21.  If you
21  had been permitted to testify fully, would you have
22  testified as to the matters that you set forth at

**Page 699**

1  pages 1, 2, 3, 4, and 5 of your declaration?
2    A   Yes.
3    Q   And did you set forth there, based on
4  your knowledge and belief and expertise, is true and
5  correct?
6    A   Yes.
7       MR. KLAYMAN:  No further questions.
8       CHAIRPERSON MIMS:  Thank you so much,
9  Dean.  I know you are a very busy person, and we
10  appreciate your coming in to help out on this matter.
11      WITNESS CHEMERINSKY:  It's my pleasure.
12  Thank you for listening to me.
13      CHAIRPERSON MIMS:  Thank you.
14      MR. KLAYMAN:  Thank you.
15      CHAIRPERSON MIMS:  Does that conclude your
16  witnesses, Mr. Klayman?
17      MR. KLAYMAN:  No, I just need to finish.
18  We left my testimony open yesterday to add some
19  exhibits.
20      CHAIRPERSON MIMS:  With respect to the
21  supplemental exhibits?
22      MR. KLAYMAN:  Yes.

**Page 700**

1       CHAIRPERSON MIMS:  Okay, I'll allow that.
2       You filed--did you file three exhibits?
3   Three additional exhibits?  Are they all included
4   within this binder here, Mr. Klayman?
5       MR. KLAYMAN:  No, the binder is dealing
6   with the case in the Northern District of California.
7   This is reference.  And 2 and 3 are matters that
8   concern my direct and cross-examination.  They are
9   actually in the back of--
10      CHAIRPERSON MIMS:  They are?  Thank you.
11      COMMITTEE MEMBER WHITE:  Mr. Klayman, with
12  regard to--
13      CHAIRPERSON MIMS:  Mr. Klayman, you
14  understand that you are still under oath as you were
15  on Tuesday?
16      MR. KLAYMAN:  Yes, thank you.
17      CHAIRPERSON MIMS:  Thank you.
18      COMMITTEE MEMBER WHITE:  With regard to
19  Respondent's Exhibit No. 1, Supplemental Exhibit No.
20  1, what are those documents?
21      MR. KLAYMAN:  They are documents that
22  provide a larger record of what had been--what I've

**Page 701**

1  been questioned about by Ms. Porter, dealing with a
2  case that was brought in the U.S. District Court for
3  the Northern District of California, that was
4  assigned to Judge Wilken.  And they concern an attack
5  by ANTIFA, who has become rather notorious over the
6  years, against a gay woman, a gay conservative woman
7  who went to hear a speech of Milo Yanapolois--if I'm
8  pronouncing his name correctly--and she was attacked
9  by members of the ANTIFA.  And she was thrown to the
10  ground, and she was assaulted.
11      And the first lawsuit that I filed is
12  contained at pages 1 through, excuse me, Bates
13  numbers are RSX-001 through and including RSX-0040.
14  And that was filed in the Northern District.
15      Now the complaint ultimately was dismissed
16  without prejudice, voluntarily dismissed, and that is
17  at RSX-0041.  A new case was filed in a complaint in
18  the U.S. District Court of the Northern District of
19  California in the San Francisco Division.  And the
20  mix of the defendants is different than in the first
21  case.  It centers primarily around the activities of
22  ANTIFA.  So there are many fewer defendants.  And

15 (Pages 698 to 701)

In Re: Larry E. Klayman
July 18, 2019

## Page 702

1  that venue was chosen because ANTIFA's place of
2  business, if you want to call it that, their place of
3  criminal conduct is San Francisco, California. We
4  felt that was the proper venue.
5      Now in the first case, we noticed that
6  Judge Wilken had attended, ironically, the University
7  of California at Berkeley, which I hold obviously in
8  high respect given the fact that Dean Chemerinsky
9  testified on my behalf. She also taught law before
10  Dean Chemerinsky became dean at the University of
11  California at Berkeley Law School, both Bolt Hall.
12  And that created an appearance that there could be
13  some bias here.
14      As a result, because we did sue Berkeley,
15  the University of California and the City, and the
16  issues involved in these cases with regard to the
17  City of Berkeley and the University was that the
18  police force stood around and watched these attacks
19  happen. And Berkeley is ultimately responsible for
20  the inaction and what appeared to be a lack of
21  concern for the safety of my client, Kiara Robles and
22  others.

## Page 703

1      I did not move to disqualify Judge Wilken.
2  I filed, and it's in these pleadings that are part of
3  Supplemental Exhibit 1, I filed a request for her
4  voluntarily to recuse. I was very polite.
5      CHAIRPERSON MIMS: What page is that in
6  the filing, please?
7      MR. KLAYMAN: Mr. Peer?
8      MR. PEER: The Bates number is RSX-39 to
9  40.
10      MR. KLAYMAN: Thank you, Mr. Peer.
11      Wherein I wrote: Plaintiff Kiara Robles
12  hereby respectfully requests that the Honorable
13  Claudia Wilken, W-I-L-K-E-N, voluntarily recuse
14  herself from, and transfer this instant matter to
15  another judge. This matter is very short. I'll just
16  read it.
17      This matter arises out of a heavily
18  politicized incident--
19      CHAIRPERSON MIMS: Mr. Klayman, we don't
20  need you to read that. Thank you.
21      MR. KLAYMAN: Okay. I was just doing it
22  for the record. Nunc pro hoc vice was granted by the

## Page 704

1  magistrate judge for that case, and it was granted by
2  the magistrate judge for the case that was refiled,
3  the new case, in San Francisco because ANTIFA's
4  headquarters are in San Francisco and they were a
5  primary target.
6      On the case was a local counsel, Michael
7  Kolodsney--his name is on the pleadings. I don't
8  need to belabor that. He came on as local counsel
9  because of the requirement to have local counsel in
10  the Northern District. But he made it clear to me
11  and to the client that he could not take the role of
12  litigating this case. It was just simply to have a
13  local counsel.
14      And also, Ms. Robles had a difficult time
15  finding counsel because of the fact that ANTIFA is
16  violent. And it's a similar situation to Bundy, but
17  maybe even more severe, given the fact that she was
18  beaten up by ANTIFA. And lawyers feared retaliation
19  against them. Also, if you're local in that
20  community it's not something that's going to win you
21  friends and influence people bringing a lawsuit
22  against the City of Berkeley. So he was in there

## Page 705

1  only as a local counsel.
2      And what happened in the second case in
3  the U.S. District Court for the Northern District of
4  San Francisco, is that the City of Berkeley
5  challenged my pro hoc vice entry and sought to revoke
6  it. In so doing, it cited the opinions of the orders
7  of Judge Navaro and Judge Viden. So this was harming
8  me. It was harming my client.
9      CHAIRPERSON MIMS: Is that contained
10  within--
11      MR. KLAYMAN: Yes, it's all contained in
12  there.
13      CHAIRPERSON MIMS: Can I have a page
14  number for what he's referring to, please?
15      MR. KLAYMAN: This is the--
16      CHAIRPERSON MIMS: This is the Northern
17  District either denying or challenging your pro hoc?
18      MS. PORTER: I believe he didn't put in
19  Berkeley's motion. He just put in his response,
20  which is on page RSX-0075. He didn't put in
21  Berkeley's motion.
22      MR. KLAYMAN: Well I might add that what

16 (Pages 702 to 705)

Page 706

1 was put in by Ms. Porter was simply a tentative
2 decision which is not even applicable. So I'm trying
3 to explain that what's in the decision is incorrect,
4 and I'm entitled to put in the argument that I made.
5     CHAIRPERSON MIMS: Go ahead and proceed.
6     MR. KLAYMAN: So they challenged my pro
7 hoc vice entry, and parroted what Judge Bibey had
8 written, and before that Judge Navaro when she ex
9 poste facto tried to justify she created this
10 Catch-22 that she'd consider my application only
11 after a D.C. Bar Disciplinary proceeding brought by
12 Tom Fitten was concluded.
13     And it was at that point that Judge Wilken
14 issued her tentative ruling, which we went through
15 yesterday. So I then went back and--because she gave
16 an opportunity. In California, it's a peculiar
17 jurisdiction because the judges generally issue
18 tentative rulings and then they allow you to try to
19 convince them they're right or wrong, whatever
20 side you may be on. So we asked for a hearing, and
21 we submitted briefs. And it's all in here. And I'll
22 see if I can encapsulate it for Your Honor.

Page 707

1     And we argued what we had argued in front
2 of the Ninth Circuit and Judge Gould, and pointed out
3 what Judge Gould had ruled, that I did not
4 misrepresent, and that there's a strong Sixth
5 Amendment right to counsel. But that in any event,
6 the City of Berkeley made misrepresentations claims
7 that the prior disciplinary case filed on Mr. Fitten
8 of my former group Judicial Watch, which I founded,
9 that that was final. And we pointed out it was not
10 final. There's been no disciplinary action taken as
11 a final matter; that I've been a member in good
12 standing of my Bars continuously for going on 38 and
13 42 years.
14     And then we attached affidavits of Kiara
15 Robles, and you can find this at Respondent's
16 Exhibit, Supplemental Exhibit 0167 and 168, and turn
17 to that, and at paragraph five it states:
18     Should this court revoke Mr. Klayman's pro
19 hoc vice status, I do not believe that I will be able
20 to find another attorney to represent me.
21     Paragraph six: Since this case has been
22 filed, I've been threatened by who I believe are

Page 708

1 members of Defendant ANTIFA--some people say
2 "anti-FAA".
3     Seven: Even before the filing of this
4 case, I had enormous difficulty finding an attorney
5 who would represent me in this matter, especially
6 given the fact that some of the defendants are
7 members of ANTIFA.
8     Paragraph eight: Mr. Klayman is the only
9 attorney that I was able to find who was ready,
10 willing, and able to file this case and litigate it.
11     Paragraph nine: That if Mr. Klayman is not
12 permitted to represent me, I am certain, given my
13 past efforts, that I cannot find another attorney to
14 represent me since Mr. Klayman is representing me pro
15 bono, and because of the risks involved with
16 prosecuting this case given ANTIFA's very violent
17 actions to harm me both physically and emotionally.
18 In this event, I will be unable to proceed with this
19 case, and I will lose all of my legal rights.
20     Signed under penalty of perjury, Kiara
21 Robles, K-I-A-R-A R-O-B-L-E-S. And we also
22 submitted an affidavit to Judge Wilken from my local

Page 709

1 counsel, Michael Klodskney, and said that if I'm not
2 able to continue, that he couldn't continue. He
3 didn't have the resources to do it.
4     At paragraph five of his affidavit, which
5 are Bates numbers 0170 and 0171 of the Supplemental
6 Exhibits No. 1, paragraph five:
7     My agreement with Mr. Klayman was that he
8 would serve as lead counsel on this case.
9     Paragraph six: Should this court revoke
10 Mr. Klayman's pro hoc vice status, I will be unable
11 to continue representation of plaintiff Kiara Robles
12 on my own due to a lack of available time and
13 resources.
14     Ultimately there was a hearing. And that
15 testimony is--not "testimony," but the oral argument
16 is contained in the record at numerous places, but
17 one place you can find it is at Bates Numbers 0192
18 through and including Bates Number 0205. Ironically,
19 July 19th, 2018, a year ago.
20     Despite the argument that I've just made,
21 which is detailed in greater degree with Judge
22 Wilken, and I was extremely respectful. Your Honor

17 (Pages 706 to 709)

In Re:  Larry E. Klayman
July 18, 2019

Page 710

1  can see that I'm always respectful to judicial
2  officers and others.  I do, you know, I feel that if
3  I feel the other counsel is not acting appropriately
4  I will let it be known.  I am a strong advocate.  But
5  I was very respectful to Judge Wilken, and I was
6  hoping that she would not just rubber stamp her
7  tentative decision, because she continued to make
8  errors in the analysis.  She continued to believe
9  what Berkeley had told her, the City of Berkeley,
10  that there was a final decision in the Board on
11  Professional Responsibility in D.C., and there was
12  not.  And she was relying on the findings of and
13  rulings of Judge Navaro and Judge Vidden.
14          Now she sustained her prior ruling with
15  little recognition that in fact she had erred.  In
16  fact, almost none.  Where is that found, Oliver?
17          MR. PEER:  That's going to be page number
18  RSX-0176 to RSX-0177.
19          MR. KLAYMAN:  This provision--I'm looking
20  at the second line of this order, which is simply not
21  true, with all due respect--Claimant presents no new
22  arguments or facts that would change the court's

Page 711

1  tentative ruling.  The court addresses some of
2  Claimant's points.  And the judge--the court's
3  dissenting opinion in In Re Bundy that was already
4  before the court at the time of the tentative ruling,
5  again this shows the harm of the rulings of Judge
6  Viddey and Judge Navaro that I later made reference
7  to when I filed a petition for writ of mandamus for
8  changed circumstances with regard to both the Supreme
9  Court and the Ninth Circuit.
10          The Court nevertheless found the reasoning
11  of the majority opinion to be more persuasive.
12  Moreover, even though the D.C. Bar's recommendation
13  is still on appeal, it's finding--
14          CHAIRPERSON MIMS:  Mr. Klayman, we don't
15  need you to read it.
16          MR. KLAYMAN:  And, Your Honor, this is
17  disingenuous, okay?  I mean, I'm going to be honest.
18  That's disingenuous.  That's a judge that wants to
19  keep you out of the case at all costs, and will not
20  recognize what I said, and I do believe that her bias
21  did enter into this.  And judges are people.  They're
22  human beings like everybody else.  Lawyers have bias.

Page 712

1  Judges have bias.  We all have biases.  That's why we
2  have appeals.
3          And she entered that order before she even
4  ruled on a pending motion that I had filed to correct
5  her rulings.  And she entered that appeal before she
6  even--she entered that order before she even ruled
7  upon whether she should get off the case, finally.
8          So a notice of appeal was filed.  That's
9  Supplemental Exhibit, Bates No. 0210 and 0211.  And I
10  attached the brief, the initial brief that was filed
11  just on June 3rd, 2019, on behalf of Kiara Robles.
12          CHAIRPERSON MIMS:  Was your only motion
13  filed that related directly to the judge, the motion
14  regarding the voluntary recusal?  Or was there
15  another one.
16          MR. KLAYMAN:  I later, I believe, moved--
17  correct me if I'm wrong, Oliver--to disqualify her.
18          MR. PEER:  He is not wrong.  That is going
19  to start at page number--that starts on (off
20  microphone)--
21          MS. PORTER:  That's 78.
22          MR. PEER:  It starts at Bates 178, yes.

Page 713

1          MR. KLAYMAN:  And that's because their
2  decisions were so wrong, and there's authority.  The
3  Witecki Supreme Court case says that you can glean
4  judicial bias and prejudice from intentional errors,
5  or grossly negligent errors in a judge's decision.
6  Otherwise, they wouldn't make them.  And we had no
7  choice at that point.  I was trying to avoid having
8  to do that.  But, yes, I am a zealous advocate.  I do
9  represent my client.  My client had been beaten up.
10  By the way, Milo Yianapolis, he's also gay, and
11  that's one of the reasons why she went to hear him
12  speak.  I believe she was beaten up because she was
13  gay, and also because she was a conservative.
14          CHAIRPERSON MIMS:  The underlying issues
15  really aren't relevant, but I do have another
16  question.  So is it these two motions that you filed
17  related directly to the judge, the motion for
18  voluntary recusal and then the motion to disqualify
19  Judge Wilken, was it those two?
20          MR. KLAYMAN:  Yes.  And I say the latter
21  was a last resort.  And she issued that order, and
22  this in my view is a violation of judicial ethics,

18  (Pages 710 to 713)

Page 714

1 before she even ruled on the disqualification. She
2 affirmed her tentative ruling. She should have ruled
3 on the disqualification before she jumped the gun to
4 shut the door. And to this day, if I'm successful on
5 appeal, because I'm a member of the Ninth Circuit,
6 Kiara Robles is left without a lawyer and her rights
7 have been extinguished as a result of Judge Wilken's
8 relying on, albeit improperly, the rulings of Judge
9 Navaro and Judge Viddey. So that's what that's
10 about, Your Honor.
11       I thought you should see, you know, the
12 full argument that I made, because the tentative
13 ruling that was put forth by Office of Disciplinary
14 Counsel is skewed and it does not tell the story.
15 Now--nor the testimony she sought to elicit.
16       Now there were also issues raised in
17 cross-examination about my criminal background,
18 criminal defense background--
19       MS. PORTER: At this point, I would
20 object. I understood that the Chair was going to
21 allow Mr. Klayman to supplement the record with
22 respect to the Robles matter. Also, that we weren't

Page 715

1 reopening the record for testimony about other
2 matters that he may have thought of, or other
3 documents he may have gathered that existed decades
4 ago.
5       So I will object to anything other than
6 Mr. Klayman's testimony about the Robles matter.
7       MR. KLAYMAN: Well this is part of my
8 redirect. I'm entitled to redirect, Your Honor.
9       MS. PORTER: It's my understanding that
10 you finished your redirect yesterday--
11       MR. KLAYMAN: No, I did not.
12       CHAIRPERSON MIMS: Let me respond. The
13 ruling was that you could discuss the Robles matter.
14 Unless you came with additional documents related to
15 your criminal experience, I don't think we need to
16 reopen that.
17       I do think that we have enough evidence on
18 that that's in the record. But if you--are you
19 offering another exhibit?
20       MR. KLAYMAN: Yes.
21       CHAIRPERSON MIMS: What is that exhibit?
22       MR. KLAYMAN: Supplemental Exhibit 2.

Page 716

1       CHAIRPERSON MIMS: Is that in this book?
2       MR. KLAYMAN: Yes--no, it's--
3       CHAIRPERSON MIMS: Tell me what this is,
4 please?
5       MR. KLAYMAN: This is a case, on top,
6 Exhibit 252 to 253. It's Cara Leslie Alexander
7 versus FBI. It is the famous Filegate case where the
8 Clinton Administration obtained 900 FBI files of
9 adversaries that gave rise to a Clinton scandal, for
10 lack of a better word, in the '90s.
11       In the course of that case--you know, this
12 is a motion for criminal contempt proceedings, okay,
13 which I sought, which had been initiated already.
14       CHAIRPERSON MIMS: Is this a criminal
15 case?
16       MR. KLAYMAN: It is, yes, in the context
17 of the criminal contempt proceeding.
18       CHAIRPERSON MIMS: Is this while you were
19 working at Department of Justice?
20       MR. KLAYMAN: It's while I was Chairman
21 and General Counsel of Judicial Watch, yes. And so
22 this is--I filed this after I left Judicial Watch

Page 717

1 because Judge Lambert had sat on this for quite
2 awhile. And I politely asked him to make a ruling on
3 the contempt.
4       So we went through a three-month trial of
5 criminal contempt against the Clinton Administration,
6 certain individuals, and I filed this on behalf of
7 one of the defendants who chose to continue to retain
8 me after I left Judicial Watch and ran for the U.S.
9 Senate, and then came out into private practice. And
10 also at Freedom Watch, Mr. Joseph Cate, C-A-T-E.
11       CHAIRPERSON MIMS: Can you tell me what
12 the attachments, pages relating to Mr. Corsey, have
13 to do with the 2008 case?
14       MR. KLAYMAN: If I may finish this first,
15 briefly, there's a docket sheet with regard to this
16 filegate criminal contempt proceeding, and at Docket
17 entry 01069, 1069, it shows that there was a criminal
18 contempt proceeding that was initiated by me and was
19 underway, and that proceeding lasted several months.
20       MS. PORTER: May I ask where the entries
21 for that criminal contempt proceeding are?
22       MR. KLAYMAN: Yeah, I just--

19 (Pages 714 to 717)

In Re:  Larry E. Klayman
July 18, 2019

## Page 718

1     MS. PORTER:  There is a motion--

2     CHAIRPERSON MIMS:  I'm sorry?  I didn't

3 hear you.

4     MS. PORTER:  I'm just asking, he's making

5 representations and I don't see anything in this

6 record indicating a criminal contempt proceeding,

7 much less Mr. Klayman's involvement.

8     MR. KLAYMAN:  I also continue to

9 appreciate--she's going to get a chance, you know,

10 her chance, Your Honor--but --

11     CHAIRPERSON MIMS:  I think we have an

12 objection.  Make the objection.

13     MS. PORTER:  Well I have objected because

14 I think that this goes outside the bounds of what we

15 were going to have Mr. Klayman offer additional

16 documents in brief testimony.  This has nothing to

17 do with the Robles case.  Moreover, the documents

18 indicate that this is a civil case, and he's making

19 representations that are not borne out by the

20 documents.  And I really don't think we need to

21 spend more time exploring this.  Because, number one,

22 I think it's not relevant to these proceedings.  And,

## Page 719

1 two, he had an opportunity to discuss whatever

2 criminal matters he was involved in when he was

3 examined by Disciplinary Counsel, and when he was

4 examined on his own.

5     So I do object to reopening the record for

6 him to add additional evidence and records, which

7 apparently--well, Disciplinary Counsel submits, don't

8 support how he's describing them.  But I do object.

9     MR. KLAYMAN:  Yes, well I--

10     CHAIRPERSON MIMS:  Mr. Klayman, can you

11 just direct me to--because that is why I asked is it

12 a criminal case, because on the first page it says

13 "civil docket."  So how is this a criminal case?

14     MR. KLAYMAN:  Because a criminal case, if

15 you commit the criminal act in the context of the

16 civil case, it can be converted into a criminal

17 contempt proceeding.  And that's what I'm saying.

18     CHAIRPERSON MIMS:  Where is the criminal

19 contempt proceeding?

20     MR. KLAYMAN:  I made reference to it on

21 the first page of the Plaintiff Joseph Cate's motion

22 for court to issue ruling on criminal contempt

## Page 720

1 proceedings concerning missing emails.

2     CHAIRPERSON MIMS:  What line?

3     MR. KLAYMAN:  The first paragraph.

4 "Plaintiff Joseph Cate moves this Honorable Court

5 to"--

6     CHAIRPERSON MIMS:  Are you on page 255?

7     MR. KLAYMAN;  252.  "Plaintiff Joseph

8 Cate moves this Honorable Court to issue a ruling on

9 criminal contempt proceedings previously subject to

10 lengthy evidentiary hearings in the year 2000.  This

11 should not have been ruled upon for eight years, as

12 grounds therefore Plaintiff would show."

13     Obviously I didn't know I was going to be

14 facing this issue here today, so--

15     CHAIRPERSON MIMS:  So why is the docket

16 sheet attached?

17     MR. KLAYMAN:  Just to show that that's

18 when these matters were litigated and initiated.

19 This is the year 2000, Judge Royce Lambert.  If you

20 want, Your Honor, we can call Judge Lambert and he

21 can verify exactly what I wrote in that email--in

22 that pleading.  I had no reason--you know, this isn't

## Page 721

1 an ex poste facto attempt, like Judge Navaro and

2 Viddey, to figure something out for my benefit.  I

3 wrote this at the time, contemporaneously.

4     CHAIRPERSON MIMS:  Can you explain to me

5 the relevance of 264 to the criminal contempt

6 proceeding?

7     MR. KLAYMAN:  264?  I represented a client

8 named Dennis Montgomery who was a whistleblower and

9 left the employment of the contractor of the National

10 Security Agency--excuse me, the CIA--

11     CHAIRPERSON MIMS:  Is this a criminal--

12     MR. KLAYMAN:  It's criminal, yes.

13     CHAIRPERSON MIMS:  This is dated 2015.

14     MR. KLAYMAN:  Correct.  And what I'm

15 saying is that my expertise that I acquired over time

16 allowed me to get a very good result for Mr.

17 Montgomery, because he had left with 47 hard drives

18 over 600,000 pages of information, some of it

19 classified, dealing with illegal mass surveillance

20 against the American people.

21     And I was able to negotiate immunity

22 agreements for him, and derivative use agreements, to

20  (Pages 718 to 721)

In Re: Larry E. Klayman
July 18, 2019

Page 722

1  turn over all of that information and documentation
2  to the FBI. I did it under the auspices of James
3  Baker, who was the General Counsel of the FBI at the
4  time, and James Comey, who was the Director.
5      CHAIRPERSON MIMS: Let me rule on the
6  document, please.
7      MR. KLAYMAN: It shows that I have the
8  expertise to get something done that's very, very
9  important.
10     CHAIRPERSON MIMS: I'm going to overrule
11  the objection, and I'm going to allow in pages 252 to
12  263.
13     Ms. Porter, you spent a great deal of time
14  talking about his lack of criminal experience, and
15  going back a decade I think it's fair if he has
16  remembered a case that relates to that, that that be
17  added into the record.
18     The pages from 264 through to the end I'm
19  going to disallow.
20     MR. KLAYMAN: And let me just make a
21  proffer here, Your Honor. The reason I did that is
22  because I was able to accomplish what I did for Mr.

Page 723

1  Montgomery and what I accomplished for Mr. Corsey,
2  Dr. Corsey, because of that criminal expertise. And
3  as these documents reflect, Dr. Corsey believed he
4  was going to be indicted by Special Counsel Robert
5  Mueller. And I kept him from being indicted. That
6  was quite a victory, one of the biggest ones in my
7  career. Roger Stone was indicted. And Dr. Corsey
8  could very well be a witness at Stone's trial where
9  I'll also have to be present.
10     So these are the fruits of my criminal
11  expertise, and it's why, in my opinion, Dr. Corsey
12  retained me. So it's relevant, given the fact that I
13  have had that experience. I know how to deal with
14  the U.S. Government. I've done that my whole life.
15  And I've had a number of jury trials, and I know how
16  to handle myself in court. Your Honor can decide how
17  good that is, or not.
18     CHAIRPERSON MIMS: We heard that testimony
19  already. Was there another exhibit?
20     MR. KLAYMAN: Yes, I just want to put this
21  on the record. I don't want to make a big issue
22  about it. But Exhibit 3 is a blog of Professor

Page 724

1  Michael Frisch at Georgetown. And I can't figure out
2  why, since these matters are supposed to be
3  confidential, he knew of charges against me,
4  especially since he wrote a public blog at the time
5  the Specification of Charges were instituted.
6      MS. PORTER: The way that Mr. Klayman--
7  object--number one, to the way that he's
8  characterized this, it's like some secret
9  confidential. The charges against Mr. Klayman and
10  every other respondent who Disciplinary Counsel has
11  filed charges on, are on the D.C. Bar's web page.
12  You can go to www.dcbar.org and see the charges
13  against Mr. Klayman and every other respondent who we
14  file charges against.
15     His suggestion that these were secret
16  charges against him is not true. As well, these
17  charges were filed in August of last year, 2018.
18  They have been a matter of public record, and on the
19  D.C. Bar's web page, since then. So I do object to
20  his characterization of these being some secret
21  charges and that Professor Frisch had some secret
22  access to them, which is not true.

Page 725

1      CHAIRPERSON MIMS: Why is this relevant,
2  Mr. Klayman?
3      MR. KLAYMAN: Because I put this in the
4  context, Your Honor, that--and you'll hear it--I
5  mean, you heard it before--is this is piling on.
6  This case is a effort to have me removed from the
7  practice of law because of, in my view, my advocacy
8  and my beliefs, and other things. And I didn't want
9  to make an issue. I said yesterday I'm not. I was
10  going to call Mr. Simkowitz because Professor Frisch
11  has written some rather defamatory things about him
12  even after he won. This is a former colleague of Ms.
13  Porter and ODC. But I'm trying not to be
14  confrontational. I just want to get the facts out.
15  But I just wanted this on the record, that's all.
16     I'm not making any accusations here. I'm
17  just giving you what my understanding is. For
18  instance, this hearing--and it's attached--
19     CHAIRPERSON MIMS: Mr. Klayman, the--
20     MR. KLAYMAN: It's proffered.
21     CHAIRPERSON MIMS: The objection to
22  Exhibit 3 is sustained. I don't see the relevance to

21 (Pages 722 to 725)

In Re:  Larry E. Klayman
July 18, 2019

Page 726

1   this proceeding.
2           MS. PORTER:  Is Mr. Klayman done with his
3   testimony?
4           MR. KLAYMAN:  No.
5           MR. KLAYMAN:  May I ask--
6           CHAIRPERSON MIMS:  Are we going over
7   anything related to Robles?  And I think that is all
8   of the exhibits that have been filed since Tuesday.
9           MR. KLAYMAN:  Well, I mean I just put it
10  on the record, Your Honor.  It's my understanding
11  that I'm in my redirect now, and that there is not
12  another recross.
13          CHAIRPERSON MIMS:  Ms. Porter may ask
14  questions related to--I will allow her a brief
15  questions, if she has any, directly related to the
16  Robles filing, which was what you were committed--
17          MR. KLAYMAN:  And I'm not defensive about
18  it.
19          MS. PORTER:  I only have one question and
20  one document.  And that is, Mr. Klayman, you said you
21  wanted to make a larger record.  And you did omit
22  from your record Judge Wilken's decision of October

Page 727

1   24, 2018, and I would like to offer that.  And I have
2   no questions.
3           CHAIRPERSON MIMS:  Any objections?
4           MR. KLAYMAN:  No, because I want it in
5   evidence, as well.  That's fine.
6           CHAIRPERSON MIMS:  Bar Counsel's exhibit
7   is admitted.
8           MR. KLAYMAN:  Yeah, we can do the
9   housekeeping later, Your Honor, but I--
10          MS. PORTER:  Well; I would also like to
11  address the issue of Respondent has not offered any
12  of his exhibits, other than the ones that we talked
13  about today.  He has not previously offered his
14  exhibits.  I don't have objections to most of them
15  because they're records from the Bundy case, but I do
16  object to some of them.
17          CHAIRPERSON MIMS:  I don't know whether
18  that's true or not.  I thought he had offered his
19  exhibits into evidence.  Is that your recollection?
20          MR. KLAYMAN:  Yes.
21          CHAIRPERSON MIMS:  Let me check, and we'll
22  deal with that before.  Let's take a break before

Page 728

1   closing, if there are no other issues, and then we
2   can go back and check.  And then we can just deal
3   with that briefly right before closing.
4           Is that the only issue that remains?
5           MS. PORTER:  That's the only issue that
6   Disciplinary Counsel would post objections to a few
7   of his exhibits.
8           CHAIRPERSON MIMS:  Okay.  Any other
9   issues, Mr. Klayman, before we go to closing?
10          MR. KLAYMAN:  I'll just check my notes.
11  Thanks, Your Honor.
12          CHAIRPERSON MIMS:  So let's take a
13  ten-minute break.  Is that sufficient for the
14  parties?  Alright, let's take a ten-minute break and
15  then we'll come back.  We'll figure out if his
16  exhibits have been offered in, and we'll do closings.
17          Just a reminder that it was about 15 or 20
18  minutes for each side.  We'll go off the record now
19  at 2:05.  Thank you.
20          (Whereupon, at 2:05 p.m., a 10-minute
21  recess was taken.)
22          CHAIRPERSON MIMMS:  We have a different

Page 729

1   recollection of the exhibit issue.  I did think that
2   Mr. Klayman entered his exhibits, but I think out of
3   an abundance of caution, you should enter them all
4   again and I will hear your objections.
5           MS. PORTER:  Thank you.
6           MR. KLAYMAN:  Your Honor, in that regard
7   there's a rule, if not the pattern, in practice that
8   you had to object at the time that exhibits -- you
9   know we were supposed to put objections and they
10  weren't.
11          Again, I make the same argument here is
12  that the purpose of this proceeding is to get to the
13  truth, not to exclude the truth.  And when I was a
14  young, justice lawyer, the first thing they told me
15  on the first day was you don't just represent the
16  government, you represent the people on the other
17  side of the table.
18          Consequently, these exhibits are not
19  prejudicial.  They're not in any way harmful to
20  anybody.
21          CHAIRPERSON MIMMS:  I haven't even made a
22  ruling on the exhibits.

22  (Pages 726 to 729)

In Re:  Larry E. Klayman
July 18, 2019

Page 730

1    MR. KLAYMAN:  I know but I'm saying that
2  they're in evidence.  Your Honor did rule they're in
3  evidence.
4    CHAIRPERSON MIMMS:  I do think they're in
5  evidence, but I want to make sure for both parties in
6  the event that you didn't move them into evidence
7  that we move them into evidence.  So, why don't you
8  go ahead and move them into evidence.  I think most
9  of the objections are already written down -- has
10  already been filed anyway.
11    MS. PORTER:  That's not correct.
12    CHAIRPERSON MIMMS:  Oh, that's not.
13  Okay.
14    MR. KLAYMAN:  Yes, I move for admitting
15  -- re-move for admitting Exhibits 1 through 28 and
16  Supplemental Exhibits 1 and Supplemental Exhibit 2
17  and Supplemental Exhibit 3.
18    CHAIRPERSON MIMMS:  Now, I don't think we
19  have to deal with the supplemental exhibits because
20  I've ruled on those.  I ruled some of those were
21  excluded and I specified the specific pages of those
22  earlier.

Page 731

1    MR. KLAYMAN:  Okay, I just want to have
2  them on the record.  You know the proffer the ones
3  that you excluded.
4    CHAIRPERSON MIMMS:  Alright.
5    MR. KLAYMAN:  Okay.
6  Ms. Porter?
7    MS. PORTER:  Yes.  And just so the record
8  is clear, and I think the transcripts will bear me
9  out, Mr. Klayman had not previously moved into
10  evidence his exhibits.  And also, I would refer the
11  Committee to the Chair's Order of March 28.  The only
12  thing that was due prior to the hearing were
13  objections to authenticity of proposed documentary
14  evidence, not to relevance.
15    CHAIRPERSON MIMMS:  Alright, we did say
16  we'd deal with those here.
17    MS. PORTER:  Right.  I would object to
18  Exhibit -- Respondent's Exhibit No. 20, what Mr.
19  Klayman describes as the J.K. Simkowitz's case file.
20  It's irrelevant.  There's been no testimony on it and
21  it doesn't give disciplinary counsel an opportunity
22  to present other evidence.

Page 732

1    I'd also object to Exhibit No. 21, which
2  is a declaration of Dean Chermerinsky, which we've
3  already gone over and I believe that the Hearing
4  Committee Chair ruled on, both on Tuesday afternoon
5  and also we revisited today.  But Disciplinary
6  Counsel did -- also objects to that for the reasons
7  we've already gone over.
8    The declaration of Harvey Jessup there
9  was no testimony.  I don't see the relevance -- I'm
10  sorry, Exhibit No. 23 -- Respondent's Exhibit No. 23.
11    CHAIRPERSON MIMMS:  Give me a minute to
12  get that one in front of me.
13    MS. PORTER:  Sure.
14    CHAIRPERSON MIMMS:  The objection to
15  Exhibit 20 is sustained.
16    MS. PORTER:  Twenty-one is Dean
17  Chemerinsky's declaration.  And I do hope we don't
18  have to have further argument on it.  I'm just
19  stating that Disciplinary Counsel objects to
20  Respondent's 21.  I do not want to repeat our
21  arguments and I don't believe that Mr. Klayman should
22  be able to do so as well, so we can move on.

Page 733

1    CHAIRPERSON MIMMS:  Right.  Well, he made
2  a proffer on this.
3    MS. PORTER:  That's fine.  A proffer is a
4  proffer.
5    CHAIRPERSON MIMMS:  I've ruled -- yeah.
6    MR. KLAYMAN:  Wait.
7    MS. PORTER:  And exhibit number --
8    MR. KLAYMAN:  Please.  There were
9  portions that Your Honor said were appropriate.  I'll
10  stick on the prior record, but it's not true that it
11  was all excluded, but I did proffer the entire thing.
12    CHAIRPERSON MIMMS:  The next exhibit?
13    MS. PORTER:  Twenty-three.  I don't
14  understand the relevance and there was no testimony
15  about it as to what, if any, relevance it had to
16  these proceedings.
17    And again, if it had been offered, I
18  would've offered the testimony of a disciplinary
19  counsel witness who was present and who could give
20  additional information to the Hearing Committee.  So,
21  it was never offered.  I had no opportunity to
22  object, but had I, I would've.  And if it had been

23  (Pages 730 to 733)

In Re:  Larry E. Klayman
July 18, 2019

Page 734

1 admitted, I would've asked for an opportunity to call
2 a disciplinary counsel witness concerning the matter.
3          CHAIRPERSON MIMMS:  What's the relevance
4 of Exhibit 23?
5          MR. KLAYMAN:  That was put in, Your
6 Honor.  This one, you know, I'll withdraw it you know
7 to be agreeable.
8          MS. PORTER:  Thank you.
9          MR. KLAYMAN:  Wait.  Wait.  I just want
10 her to understand why I put it in.  Because Ms.
11 Porter would not tell me what the basis of her
12 witness's testimony was and Mr. Jessup had made some
13 contact with her -- Ms. Jaconi or something like.
14          MS. PORTER:  Chekerio.
15          MR. KLAYMAN:  Chekerio.  And I'd
16 requested at that time to meet with Ms. Porter over
17 documents that had been withheld and she wouldn't
18 come out of her office and meet with me.  That's why
19 I had it in there, but it's not -- I want it in there
20 as a proffer, even if it's not admitted.
21          CHAIRPERSON MIMMS:  Well, do you want to
22 withdraw it?

Page 735

1          MR. KLAYMAN:  No, I don't want to
2 withdraw it.  I just want it in as a proffer.
3          CHAIRPERSON MIMMS:  The objection is
4 sustained.
5          MS. PORTER:  As for 26, I guess I don't
6 really objection; although, there is a picture -- I
7 think it's at page 2 and it's unclear what the
8 providence of it was and who it is and so I don't
9 really understand where it's from, but --
10          CHAIRPERSON MIMMS:  Let me get to 26.
11          MS. PORTER:  Sure, 26.
12          MR. KLAYMAN:  The picture is of Judge
13 Navarro and Senator Harry Reid.
14          CHAIRPERSON MIMMS:  I have two 28's, but
15 no 26.  Do you have an extra copy of 26?  I don't
16 think any of us have 26.
17          MALE SPEAKER:  Twenty-four and
18 twenty-seven are all together.
19          CHAIRPERSON MIMMS:  Oh, alright, then I
20 do have it.  Sorry.  I do not remember these being
21 offered into evidence.  I thought he had offered the
22 binders into evidence.

Page 736

1          Alright, we're at 26?
2          MR. KLAYMAN:  I might add that
3 Ms. Porter --
4          CHAIRPERSON MIMMS:  And you're objecting
5 to the whole exhibit.
6          MS. PORTER:  No, I'm just saying that the
7 second -- I withdraw my objection.  It's just that
8 the second picture it claims to be Internet articles,
9 but there's a random picture thrown in with no
10 indication of where it's from, when it was taken, or
11 anything else.  So, it is what it is.  I withdraw my
12 objection.
13          Twenty-seven, which I also, I think, part
14 of that same stapled group of papers.  Again, I would
15 object in that there was no testimony about this.  It
16 wasn't offered.  And had there been testimony and had
17 it been offered, Disciplinary Counsel would've asked
18 Mr. Klayman questions about his litigation against
19 City Pages and other filings he made in that case and
20 judges' Orders issued in that case.
21          So, I would object because there's been
22 no testimony and dubious relevance or no relevance in

Page 737

1 any event.
2          CHAIRPERSON MIMMS:  This is the response
3 to the Court's Order to Show Cause?
4          MS. PORTER:  Yeah, in Klayman v. City
5 Pages.
6          CHAIRPERSON MIMMS:  Mr. Klayman?
7          MR. KLAYMAN:  Well, since it has no
8 relevance and she says it's not an issue, I'll
9 withdraw it.
10          CHAIRPERSON MIMMS:  Thank you.
11          MS. PORTER:  That's it.  I think, as the
12 Chair said, you've already ruled on the supplemental
13 exhibits today.
14          CHAIRPERSON MIMMS:  Are you ready to
15 start, Ms. Porter, with your closing?
16          MS. PORTER:  I am.
17          Mr. Klayman, I'm going to remove your
18 water, please and you want to take your papers?
19 Thank you.
20          Disciplinary Counsel has charged the
21 Respondent, Larry Klayman, with violating a number of
22 rules when he sought to be admitted pro hac vice as

24  (Pages 734 to 737)

In Re:  Larry E. Klayman
July 18, 2019

## Page 738

1  counsel for Cliven Bundy in a high profile criminal
2  case.
3       The related litigation that was filed,
4  including against the judge who denied his pro hac
5  vice application, and in successive petitions --
6  petitions for rehearings, supplemental petitions with
7  the Ninth Circuit and the Supreme Court.
8       The rule violations fall into basically
9  three categories and then there's a subcategory.  The
10  first category of violations are the dishonesty
11  violations.  We've charged Mr. Klayman --
12  Disciplinary Counsel has changed Mr. Klayman with
13  Violations 8.4(C), which is the General Dishonesty
14  Provision; 3.3(A), which is knowingly making a false
15  statement to a tribunal or failing to correct a false
16  statement; and Rule 8.1, which is a rule that says in
17  applying for admission -- in this case admission pro
18  hac vice, a lawyer shall not make knowingly false
19  statements or omit material information.
20       The Dishonesty prohibitions in these
21  three Rules prohibit not only false representations
22  or misrepresentations, but misleading statements by

## Page 739

1  omission.  That is concealing or omitting information
2  that's necessary to make a statement complete and
3  accurate and truthful.  In Shorter, one of the
4  seminal dishonesty cases, a case 570, Atlantic 2nd,
5  760, decided 1990.
6       MALE SPEAKER:  Shorter?
7       MS. PORTER:  Shorter -- In Re: John
8  Shorter, the Court said that even technically true
9  statements can still violate the Dishonesty
10  provisions if it is misleading.  And the intent
11  that's required to violate the Dishonesty Rules
12  includes not only statements made with the intent to
13  defraud or mislead, but also reckless statements.
14  You can find that in Re: Romaski, 825, Atlantic 2nd,
15  311, for 2013.
16       Okay, the second series of charges or
17  charges are the baseless and frivolous claims.  These
18  are claims that are brought without any bases in fact
19  or law.  In Re: Spikes, 881, Atlantic 2nd, 1118, says
20  that that was a case involving a lawyer who sued a
21  complainant who filed a Bar complainant the lawyer
22  and he sued that complainant for defamation.  The

## Page 740

1  Court found that that was frivolous because the
2  complainant had absolute immunity in filing a Bar
3  complaint.
4       In deciding whether or not Mr. Spikes
5  violated 3.1, prohibition against frivolous or
6  baseless claims, the Court applies an objective
7  standard.  That is, would a reasonable attorney have
8  concluded that the defamation case in that case was
9  frivolous?
10       The third set of violations involve
11  8.4(D), which is conduct seriously interfering with
12  the administration of justice.  Again, the seminal
13  case in the District of Columbia defining the
14  elements of an 8.4(D) violation is in Re: Hopkins,
15  677, Atlantic 2nd, at 55.  In order to violate it,
16  the conduct has to be improper, bear directly on the
17  judicial process, and taint the judicial process in
18  more than a de minimis way.
19       That does not mean that the Court has to
20  make an incorrect ruling, but rather that it could or
21  could rely on information where it was false or
22  misleading.  So, conduct prejudicial has been applied

## Page 741

1  to lawyers who make false or misleading statements to
2  the Court.  It also includes claims that are
3  frivolous or baseless, so it kind of includes the
4  first two categories of charges, but it also includes
5  conduct where a lawyer unreasonably multiplies the
6  process and burdens the Court.  So, there's that
7  element or that conduct also can violate the Rule.
8       And finally, kind of the subcategory that
9  is 8.4(A) and this is a rule --
10       CHAIRPERSON MIMMS:  I'm sorry.  Can you
11  go back?
12       MS. PORTER:  Sure.
13       THE COURT:  It includes conduct that
14  burdens?
15       MS. PORTER:  No, that taints the system
16  in more than a de minimis way.  And the way that the
17  Court -- 8.4(D)?
18       CHAIRPERSON MIMMS:  We're at 8.4(D) for
19  that one?
20       MS. PORTER:  Yeah.  And the Court had --
21       CHAIRPERSON MIMMS:  Is that from a case
22  that you're reading?

25  (Pages 738 to 741)

In Re:  Larry E. Klayman
July 18, 2019

Page 742

1    MS. PORTER:  Sure, in Re: Hopkins.  And
2  it's cited in probably dozens of cases since Hopkins
3  was decided.  And the Court has also said that the
4  Court doesn't have to reach an incorrect decision,
5  but rather it taints the process.  Robles and Parsons
6  is an en banc case where they said that by filing a
7  verified complaint that hadn't actually been signed
8  by the client, so it was misleading to the Court.
9  Even though the verified complaint they filed was
10  identical to the earlier complaint, the Court said
11  that tainted the process because it was misleading to
12  the Court in that the lawyers didn't disclose it.
13  They had resigned and notarized the complaint because
14  the first one had been dismissed because they failed
15  to serve the opposing party.
16    And then 8.4(A) is basically kind of an
17  aiding and abetting or assisting or inducing another
18  one to violate the Rules.  Basically, you can't do
19  indirectly what you can't do directly.  And this is
20  applicable in the Bivens and the disqualification,
21  even -- because while Mr. Hanson signed the
22  documents, Mr. Klayman was involved in their

Page 743

1  preparation and approved their filing and was also
2  listed on a number of the pleadings.
3    So, let me start with the Dishonesty, the
4  evidence showing that Mr. Klayman engaged in multiple
5  instances of dishonesty conduct.  It started with his
6  initial application for admission pro hac vice that
7  he filed in March of 2016.  The application, among
8  other things, asked if he was involved in any
9  disciplinary proceedings.  His responses, Judge
10  Navarro and the Ninth Circuit, ultimately found was
11  incomplete and misleading.
12    Mr. Klayman, prior to filing that
13  application --
14    CHAIRPERSON MIMMS:  Before you go on,
15  tell me what he should have included in the pro hac
16  application?  And I understand that Judge Navarro
17  made a ruling and she had six things listed in that
18  ruling, but he did attach a statement to that that
19  clarified his response and gave a little bit more
20  detail than his response on the page.  And it had the
21  judicial watch case on there.  It had the issue
22  before Judge Keller and Judge Chin which I'm not even

Page 744

1  sure are disciplinary proceedings and maybe you can
2  tell me exactly what disciplinary proceeding is.  So,
3  it had those items on there, so tell me what was
4  missing.
5    MS. PORTER:  Let's go to the language of
6  the application and that's on 22 -- on page --
7    CHAIRPERSON MIMMS:  What exhibit is this
8  again, 22?
9    MS. PORTER:  Disciplinary Exhibit 22.
10  It's actually Question 5 on the bottom of page 2.
11  So, the question is that there are or have been no
12  disciplinary proceedings instituted against
13  Petitioner nor any suspension of any license,
14  certificate, or privilege to appear.  And I guess
15  that second sentence deals with --
16    CHAIRPERSON MIMMS:  Yeah.
17    MS. PORTER:  -- and I'll get to the
18  Keller and Chin rulings.  But with respect to the
19  disciplinary proceedings, Disciplinary Counsel
20  doesn't dispute that Mr. Klayman was entitled to give
21  his view, but he was also required to provide context
22  and information to Judge Navarro with respect to

Page 745

1  those proceedings.  Number one, that he had already
2  admitted that he had violated four rules -- three
3  violations of Rule 1.9 and one violation of Rule
4  8.4(D).
5    He did not disclose the prior history nor
6  did he disclose the fact that there'd been three days
7  of hearing and, albeit, there was a preliminary
8  nonbinding finding there'd still been a finding by
9  the Hearing Committee that Disciplinary Counsel,
10  preliminarily, had proven by clear and convincing
11  evidence that Mr. Klayman engaged in misconduct.
12    CHAIRPERSON MIMMS:  Let me ask questions
13  as you go along --
14    MS. PORTER:  Okay, that's fine.
15    CHAIRPERSON MIMMS:  -- because I don't
16  want to forget them.  You said that he should have
17  stated that he previously admitted violations.
18  Weren't those admitted violations not at issue
19  anymore because the Bar Council had said we're not
20  going to accept this?
21    MS. PORTER:  Well, they are still
22  admissions and they still can be used as impeachment

26  (Pages 742 to 745)

Page 746

1    or whatever else, but they are sworn statements under
2    penalty of perjury that Mr. Klayman made. And it's
3    not just the fact that he admitted it, but how he
4    characterized the evidence.
5         As Disciplinary Counsel stated, it's fine
6    to say, okay, this is what I -- you know this is my
7    position, but this is what actually happened. That
8    is I admitted it. Even his expert, who's report he
9    mischaracterizes in the sense that Rotunda said that
10   there were technical violations. And for the reasons
11   set forth in his report, he believed or he opined
12   that Mr. Klayman should not be sanctioned, but he
13   never said that there weren't any violations.
14        So, it was misleading to characterize
15   that and Judge Navarro went out and found on her own
16   the fact that there had been this petition and there
17   had been an affidavit sworn by Mr. Klayman that he
18   engaged in this. And when she went back and asked
19   Mr. Klayman about that disciplinary proceeding, he,
20   again, made statements that were incomplete and
21   misleading.
22        He told Judge Navarro, well, I thought

Page 747

1    the better of it and I decided to withdraw my
2    affidavit and the petition. But that's not really
3    complete and accurate. That only happened after the
4    Hearing Committee held a hearing where he was sworn
5    and he gave testimony under oath and they found that
6    the public censure that had initially had been agreed
7    to was too lenient for the misconduct that he
8    admitted engaging in. So, that, too, was misleading
9    because of its incompleteness and how he
10   characterized it.
11        With respect to Judge Keller's and Judge
12   Chin's decisions, he didn't -- again, Mr. Klayman may
13   be free to say, well, this was my position, but he
14   has to accurately reflect what these two judges found
15   and the basis of their decision, as well as the
16   Federal Appeals Court's decisions affirming them.
17   Instead, he characterized it as some sort of
18   vindictive action by Judge Keller and Judge Chin.
19        Well, that may be his belief, but he
20   can't just say that without disclosing, as the form
21   required, information about why they suspended his
22   privilege to practice for life in those two courts.

Page 748

1         CHAIRPERSON MIMMS: Where does it say
2    that he has -- he disclosed that he was barred from
3    practicing before them? That's in his statement, but
4    where does it say that he has to go into details
5    about the reasons why?
6         MS. PORTER: It doesn't say that he has
7    to go into details, but if he does provide
8    information, which he did, it has to be complete. It
9    has to be accurate and it can't be misleading. And
10   the information that Mr. Klayman provided was
11   misleading. It didn't provide the context of what
12   actually happened or at least what the Courts found
13   happened before these two judges nor did it disclose
14   the fact that he'd appealed both of them and far from
15   finding that they were vindictive, the Federal Court
16   -- the United States Court of Appeals for the Federal
17   Circuit and the Second Circuit found many reasons or
18   you know substantial evidence to support both judges
19   findings and it had to do with more than just him
20   accusing them of being biased and prejudiced,
21   including because of their race or because of
22   economic -- but because he didn't comply with the

Page 749

1    rules. He unreasonably and vexatiously multiplied
2    the proceedings. He claimed rulings were invalid.
3    He accused the judge of bias, which is a recurring
4    theme for Mr. Klayman. So, if he's going to
5    characterize those decisions, he's got to do so in a
6    way that was honest and complete or complete enough
7    that the Court can have an understanding of what
8    actually -- what happened. He didn't do that.
9         CHAIRPERSON MIMMS: Is it your position
10   that after Judge Navarro issued her Order which
11   required him -- she asked him to do six things in
12   that Order. When his response to that Order -- is it
13   your position that his response to that Order also
14   violated some of the rules.
15        MS. PORTER: Yes.
16        CHAIRPERSON MIMMS: Okay. So, tell me
17   specifically what.
18        MS. PORTER: I think I've already alluded
19   to at least one of the instances and that is when she
20   asked him to explain the petition for negotiated
21   disposition in his affidavit where he previously
22   admitted to violating the rules.

27 (Pages 746 to 749)

In Re: Larry E. Klayman
July 18, 2019

| Page 750 |
|---|

1    CHAIRPERSON MIMMS: Where's her Order, if
2  you know?
3    MS. PORTER: Yes, it is --
4    CHAIRPERSON MIMMS: I don't know how you
5  know all these so well, but you seem to.
6    MS. PORTER: Okay, her Order is 25.
7    CHAIRPERSON MIMMS: Twenty-five.
8    MS. PORTER: And Mr. Klayman's submission
9  after that was 26. So, I'll just deal with the
10  disciplinary matter that was pending and Judge
11  Navarro asked for information about it. So, if you
12  look at the bottom --
13    CHAIRPERSON MIMMS: What number was that
14  in her request? In Keller and Chin, it's number two.
15    MS. PORTER: Right. Verification --
16    CHAIRPERSON MIMMS: Oh, yeah, I see it,
17  number six.
18    MS. PORTER: Yep. So, in response to
19  that -- and this is Exhibit No. 26, beginning at the
20  first -- well, on the first page, Mr. Klayman says he
21  attempted to resolve the matter by agreement, but
22  then thought the better of having signed the

| Page 751 |
|---|

1  affidavit and agreed to -- and he still feels. And
2  he said basically he withdrew it.
3    Again, it's kind of half of the story and
4  it's misleading in that he doesn't explain to Judge
5  Navarro -- and again, it's something that Judge
6  Navarro again found on her own, and that is he
7  actually went to a hearing on that negotiated
8  disposition and it was rejected because his sanction
9  was too light.
10    And he attaches to his submission,
11  Exhibit No. 26, his own post-hearing brief. But you
12  would think that if he was trying to give Judge
13  Navarro all the information that was available about
14  the case he would've submitted also Disciplinary
15  Counsel's exhibit. And I think he was even -- Mr.
16  Klayman was asked about this during the Ninth Circuit
17  argument. And if you look at Exhibit No. 61, which
18  is the transcript, his response to the judge was I
19  would say misleading, at best, as to whether or not
20  Disciplinary Counsel's exhibits or excuse me
21  post-hearing briefs were available to him when he
22  submitted this to Judge Navarro.

| Page 752 |
|---|

1    CHAIRPERSON MIMMS: Where is that in the
2  transcript please?
3    MS. PORTER: E-1?
4    CHAIRPERSON MIMMS: Yeah.
5    MS. PORTER: If you give me -- it may
6  take me a minute to find it.
7    CHAIRPERSON MIMMS: Oh, alright.
8    MS. PORTER: If you don't mind.
9    CHAIRPERSON MIMMS: Sure.
10    MS. PORTER: Okay, on page 42. This is
11  Judge Bybee asking him about a response to his brief.
12  And he says "There was." And he says, "Okay. And
13  you didn't file that with the District Court." "I'm
14  not sure that it was available at the time that I
15  filed it." And in fact, Disciplinary Counsel had
16  filed the opening brief, which Mr. Klayman ignored
17  the Reply brief. So, the notion that it wasn't
18  available to him is not accurate.
19    CHAIRPERSON MIMMS: Well, he said "I'm
20  not sure."
21    MS. PORTER: Well, I think it's true of a
22  lot of things that Mr. -- when Mr. Klayman is caught

| Page 753 |
|---|

1  in a lie or a misrepresentation, he changes his
2  story. I'll give you -- I mean this is kind of
3  jumping ahead in this story, but I'll give you
4  another example.
5    When he filed his first petition with the
6  Supreme Court, he labeled it as an emergency
7  petition. And the basis for the emergency was that
8  Mr. Bundy was scheduled to go to trial on February 6,
9  2017. Well, Mr. Klayman knew that that was not true
10  because the Magistrate Judge and the Judge had
11  already issued a scheduling order dividing the
12  defendants into three groups.
13    CHAIRPERSON MIMMS: They had, but didn't
14  he testify that he was going to be in court on that
15  day? If you have a client or you're counseling
16  someone or you're involved in a case at all, you
17  would want to be there at the start of the case.
18    MS. PORTER: But that's an example of
19  making a statement -- he didn't say that to the
20  Supreme Court. He said that his client was scheduled
21  to go to trial on February 6, 2017. I mean I know
22  this is kind of a small issue in the grand scheme of

28 (Pages 750 to 753)

In Re:  Larry E. Klayman
July 18, 2019

Page 754

1    things, but it's typical.  He made a false
2    representation.  He didn't say other defendants are
3    going to go on trial or the group of defendants and I
4    need to be there to observe the trial.  He said his
5    client.  It was only when I confronted him about this
6    representation, which he knew was not true, that he
7    came up with another excuse and that is, oh, well, I
8    meant that I needed to be in the courtroom because
9    the other defendants.  Well, that's not what he said
10   to the Supreme Court.
11           And it's the same thing with Judge
12   Navarro.  Every time Judge Navarro asked him about
13   something he'd concede or he'd admit what she found
14   out on his (sic) own, but he put another spin on it,
15   which was false and misleading.  And that was also
16   true with respect to the date to the Supreme Court.
17           CHAIRPERSON MIMMS:  His filings -- of all
18   of these writ filings, which I assume you are saying
19   are part of the frivolous argument.
20           MS. PORTER:  Well, I guess I want to put
21   things in context.  So, there are things -- there are
22   claims that he's making that we don't contend are

Page 755

1    frivolous.  There are other claims within those
2    filings that we do contend are frivolous and some of
3    them false.
4            CHAIRPERSON MIMMS:  Do you claim that the
5    filing of the writ itself was frivolous?
6            MS. PORTER:  Well, you can't separate it
7    in the sense that it's not just filing a complaint or
8    a writ.  No, we're not claiming that the filing of an
9    application or the filing of any petition, in and of
10   itself, was frivolous, but 3.1 deals with pursuing
11   claims or defenses within a petition within a
12   complaint that are frivolous.  So, I would like to
13   kind of address those maybe in some order.  I mean
14   one claim that Mr. Klayman made -- and again, you
15   have to understand it in the context and I'm trying
16   not to go over everything that we've already gone
17   over in excruciating detail, but his claims about his
18   own experience.  But particularly, in relationship to
19   the experience of the other lawyers, and Mr.
20   Whipple, in particular, it was --
21           CHAIRPERSON MIMMS:  But it is true that
22   -- I think we looked at records that said that Bundy

Page 756

1    was going to fire Whipple.
2            MS. PORTER:  Well, when that happened
3    that was September of 2017.  Mr. Whipple became his
4    counsel -- lead counsel, sole counsel October of
5    2016.  So, you have to understand when these
6    representations are being made and the context.  So,
7    let me kind of outline some of the false and
8    misleading --
9            CHAIRPERSON MIMMS:  You can, but before
10   we move off of this criminal experience --
11           MS. PORTER:  Right.
12           CHAIRPERSON MIMMS:  -- you went through
13   great detail you know in this to make points that he
14   was only on a very limited number of filings.  During
15   that time, he was a very young attorney in terms of
16   his years of experience, I think, or had only -- he
17   had been at Justice for a limited number of years.
18   It's not unusual not to be on filings.  I mean I have
19   areas of my practice that I might not be on a single
20   filing and I've worked up the whole case.
21           MS. PORTER:  I agree.  But you don't give
22   the impression to both the federal judge and the

Page 757

1    Ninth Circuit that you have -- I think he had
2    extensive criminal -- federal criminal defense
3    experience and was a former federal prosecutor,
4    suggesting that he had actually done criminal cases
5    while at the Department of Justice.  And that's the
6    clear implication of what he's saying; particularly,
7    when you compare it to what he's then also saying
8    about Brett Whipple, who he claimed had no
9    experience.
10           And we did go over the experience -- the
11   criminal experience that Mr. Klayman had in his brief
12   tenure at the Department of Justice and it included
13   -- well, first, AT&T, which he claimed he was
14   instrumental in breaking up.  He had a peripheral --
15   well, a relatively minor role and he wasn't involved
16   in actually putting on evidence at the trial.  The
17   only case he could identify at the Consumer Affairs
18   section was Trassler and that was a case that --
19   well, the forfeiture had occurred before he even
20   started with the Justice Department and he admitted
21   that he had no involvement in the trial of the
22   criminal contempt.

29 (Pages 754 to 757)

In Re:  Larry E. Klayman
July 18, 2019

Page 758

1    So, to suggest to the Ninth Circuit over
2  and over and to the Supreme Court that not only am I
3  a federal former prosecutor, but I have this vast
4  experience in criminal defense, and I won't belabor
5  those because I know we've already gone over it, was,
6  at best, misleading; particularly, when he compared
7  his experience to that of Mr. Whipple.  And I think
8  the Ninth Circuit when they called him on it -- I
9  mean not only did the Ninth Circuit call him on it,
10  but the U.S. Attorney's Office had already outlined
11  Mr. Whipple's experience when he first got in the
12  case.  So, Mr. Klayman couldn't defend his conduct by
13  saying I didn't know.  These were in the pleadings.
14    Judge Navarro also outlined Brett
15  Whipple's experience, including the fact that he'd
16  been a public defender for six years and did -- for
17  the last three years did murder and felony one.  And
18  also, all the cases that he's done involving complex
19  criminal cases involving multi-defendants, which
20  Judge Navarro cited.  And the Ninth Circuit cited one
21  case that he had a 14-day trial in 2013, so the
22  suggestion that Brett Whipple had no experience;

Page 759

1  particularly, when compared to Mr. Klayman was false.
2  It was misleading.
3    CHAIRPERSON MIMMS:  Well, if it's true
4  that Mr. Whipple made a statement that he didn't know
5  what a writ of mandamus was or whatever -- I don't
6  remember exactly which pleading he was referring to.
7  If that's true, is it fair that he would not have had
8  pause about his level of expertise to defend Mr.
9  Bundy?
10    MS. PORTER:  Well, I would answer that in
11  two ways.  First, that assumes that that statement
12  was -- that there was actually a conversation.
13    CHAIRPERSON MIMMS:  I said if it's true.
14    MS. PORTER:  Yes.  Number two, it doesn't
15  explain away or provide any defense for the
16  misrepresentations by Mr. Klayman.  And in fact, when
17  the Ninth Circuit called him on those lies, when
18  Judge Navarro and the Ninth Circuit called him on the
19  lies, that's what Mr. Klayman did do.  He, again,
20  kind of instead of admitting that he misrepresented,
21  not only Mr. Whipple's experience, but his own, by
22  comparison, he tried to change it around.  And he

Page 760

1  said, well, it was my belief that he didn't have.  He
2  only offered that after he was caught lying.  So, I
3  think that you should also consider that.  That, you
4  know, when does he come up with these other
5  explanations, only when he's confronted with
6  information that they obtained on their own or caught
7  him or confront him with a lie.
8    I'm trying to jump ahead so I don't go
9  over things that you've asked me about, but there's
10  other false and misleading statements that Mr.
11  Klayman made in briefs.  One of those was involving
12  Mr. Bundy's being ordered in solitary confinement.
13  This was an issue that Mr. Klayman included in the
14  Biven's action, in the motion to disqualify Judge
15  Navarro, and also in numerous petitions that he filed
16  with the Ninth Circuit and the Supreme Court.
17    Mr. Bundy was never ordered in solitary
18  confinement and Mr. Klayman knew that.  He was in
19  court on May 10, 2016 when this issue came up.  Judge
20  Navarro said, well, the Magistrate Judge and I have
21  never ordered this and I don't see any record of
22  anyone else ordering it.  The government counsel

Page 761

1  confirmed that.  And most importantly, at page 62 of
2  Bar Exhibit No. 30, which is a transcript of that
3  hearing and there was earlier pages where it reflects
4  that Mr. Klayman was there and Mr. Klayman admitted
5  in his testimony he was there.  But most importantly,
6  Mr. Hanson --
7    CHAIRPERSON MIMMS:  I'm sorry.  Give me
8  that exhibit number again and page number.
9    MS. PORTER:  Sure.  It's Exhibit 30.  And
10  if you look --
11    CHAIRPERSON MIMMS:  Page 62?
12    MS. PORTER:  Sixty-two.  Mr. Hanson,
13  after conferring with Mr. Bundy, who was sitting with
14  him at counsel table, confirmed to Judge Navarro that
15  Mr. Bundy had agreed that he wanted to be confined
16  from the other inmates because he was fearful because
17  of some his prior statements that he might be in
18  danger.  So, there was never, ever any evidence of
19  anyone ordering Mr. Bundy to be put in solitary
20  confinement.
21    To the contrary, Mr. Bundy had asked and
22  agreed for it because he was fearful, not --

30  (Pages 758 to 761)

In Re:  Larry E. Klayman
July 18, 2019

Page 762

1    CHAIRPERSON MIMMS:  When did he make the
2  representation?  It was, you're saying, after the
3  date in this transcript?
4    MS. PORTER:  Yeah.  I have a number of
5  instances and I can provide those to you.  I
6  certainly will provide those to you in our
7  post-hearing briefs, but he made them in the Ninth
8  Circuit, which was obviously after that because that
9  was after May 10, 2016, and he made it the Supreme
10  Court.  And there are a number of instances where he
11  repeated that claim, knowing it was false and knowing
12  it had no basis.
13    There was another claim that he made that
14  was false and when he told it was false he again
15  repeated it.  And that is that Judge Navarro had
16  threatened to hold Mr. Whipple in contempt.  And
17  again, I will spell out in excruciating detail all
18  the times where he did this, but Judge Navarro denied
19  it.  The government denied it in writing in
20  pleadings.  Whipple never said it was true.  They
21  repeatedly said this never happened.
22    Mr. Klayman never had a transcript.  And

Page 763

1  if had been said, it would've been a proceeding,
2  never had any statement from Whipple, who denied it.
3  It didn't happen; yet, Mr. Klayman repeated this
4  claim, which was false and had no basis repeatedly
5  before the Ninth Circuit and also before the Supreme
6  Court as a basis for his renewed petitions.  It was
7  false and it was misleading.
8    Another false and misleading claim that
9  Mr. Klayman made repeatedly was about -- well, I
10  guess I'll put this in context.
11    MR. KLAYMAN:  Your Honor, may I just say
12  this?  I'm not trying to cut anybody off here, but I
13  thought it was maximum 20 minutes.
14    CHAIRPERSON MIMMS:  It is, but I can ask
15  -- I've been taking up half this time with my
16  questions.
17    MR. KLAYMAN:  I mean I'm in favor of
18  getting everything out.
19    CHAIRPERSON MIMMS:  I wanted to wait
20  until the end before we started, so we had the time
21  limitations, but some of them I don't want to forget
22  the questions, so I think she's probably coming close

Page 764

1  to an end.
2    MS. PORTER:  I will try to speed things
3  up.  Change circumstances, and I know this was an
4  issue or was addressed in his successive petitions.
5  And I'll get to the changed circumstances that he
6  used as a basis to file successive petitions, both at
7  the Ninth Circuit and the -- but according to Mr.
8  Klayman, the sole basis for Judge Navarro to deny his
9  pro hac vice was the fact that he had ongoing
10  disciplinary proceedings in the District of
11  Columbia.
12    Well, if that was the sole basis and
13  changed circumstances was -- a changed circumstances
14  was relevant to his petitions to try to get
15  admission, the rulings of the Hearing Commission and
16  the Board were clearly relevant to that changed
17  circumstance; yet, Mr. Klayman never disclosed those
18  rulings to either Judge Navarro or to the Ninth
19  Circuit.  Instead, what --
20    CHAIRPERSON MIMMS:  Never disclosed which
21  rulings?
22    MS. PORTER:  The Hearing Committee's

Page 765

1  report finding that he had violated the rules and the
2  he should be suspended for 90 days with a fitness
3  requirement and subsequently, the Board's decision or
4  report and recommendation.
5    And I understand that those decisions
6  were not final, but they were changed circumstances.
7  And Mr. Klayman stated -- and I can give you a couple
8  of cites -- Exhibit No. 95 at page 9, footnote 1;
9  Exhibit No. 100, at page 9, and others where he said
10  that he has never once been found to have acted
11  unethically by any Bar Association who reviewed his
12  conduct before a judge.  And I think he also made
13  that same representation to Judge Wilkin in the
14  Robles matter.
15    I mean I can understand if you say
16  there's been no final action, but he says no finding.
17  And this is in the context where you know these
18  disciplinary proceeding, according to him, where the
19  key reason to keep him out; yet, he never disclosed
20  those.  He also repeatedly states that Judge Gould
21  found he was truthful and not dishonest.  In fact, he
22  goes so far as saying that Judge Gould clearly and

31 (Pages 762 to 765)

Page  766

1  unequivocally found that Mr. Klayman had fulfilled
2  his obligation.
3        Well, I submit to you that you should
4  reads the full descents of Judge Gould and Mr.
5  Klayman's characterizations of those findings or his
6  rulings -- how he interprets those rulings is not
7  accurate.
8        The other false and baseless claims
9  included the claims against Judge Bybee.  He had a
10 conflict of interest.  He was biased.  And that was
11 only because he had authored the initial decision,
12 but he went further than that.  The fourth petition
13 to the Ninth Circuit Mr. Klayman made a number of
14 allegations that were not only false, but had no
15 bases.  That he was -- Judge Bybee was basically in
16 cahoots or there was a quid pro quo with Senator Reid
17 because Senator Reid had supported his nomination.
18 He was married to Shannon Bybee, who was on the
19 Gaming Commission.
20       Now, I know that Mr. Peer testified about
21 this affidavit, but it's understandable why he signed
22 this affidavit, but the statements in there that

Page  767

1  there was some research that he uncovered and that he
2  presented to Mr. Klayman, which Mr. Klayman
3  represented to the Court once he was caught in this
4  lie is false.  There is no research.  No one can look
5  for Shannon here in Nevada and not know that he had
6  died 13 years earlier and was not married to Judge
7  Bybee.
8        These were not the only statements.
9  There was the bias and prejudice because Judge
10 Navarro and Judge Bybee both lived in Nevada or had
11 links to UNLV.  One such example is that they were
12 very friendly with one another because Judge Bybee
13 helped establish the law school in UNLV and Judge
14 Navarro had gone to undergrad at UNLV.  Well, that's
15 a pretty far stretch, but it becomes even more
16 preposterous when you know, as Mr. Klayman knew or
17 should've known, that the law school was created in
18 1998 and Judge Navarro graduated from undergrad
19 school in 1989.  So, I mean, again, these false and
20 misleading statements to the Court.
21       You know a lot of these are false and
22 misleading are also baseless.  The Bivens' action

Page  768

1  Dean Chemerinsky pretty much confirm that you can't
2  sue a federal judge for her judicial acts.  You can't
3  sue a president, but Mr. Klayman, with the assistance
4  of Mr. Hanson, did just that.  Look at the
5  allegations in that Bivens' actions.  I mean, among
6  other things, they claim that Judge Navarro was a
7  benefactor and therefore doing the bidding of Senator
8  Reid.
9        She was a benefactor and doing the
10 bidding of President Obama.  She was a Latino
11 Democrat woman and a Latino activist and a
12 Mexican-American who trying to get points so that if
13 Clinton was elected she could become a judge in a
14 higher court.  He accused Judge Navarro of unethical
15 and unconstitutional conduct by dishonestly denying
16 his pro hac vice.  He accused her of being malicious
17 and corrupt.
18       Mr. Klayman admitted that he participated
19 in preparing the Bivens' actions and also the
20 disqualification motions which include these same or
21 are based on these same allegations.  While his
22 signature was removed from the first motion to

Page  769

1  disqualify, his signature, and name appear on the
2  others.
3        CHAIRPERSON MIMS:  Let me ask you, if
4  these motions were frivolous.  If they contained
5  preposterous statements as you alleged, why is there
6  no court who has issued a sanction regarding any of
7  these filings that are issued here today, or even a
8  warning or anything about any of these filings?
9        MS. PORTER:  Well, I'll answer that in
10 three ways.  Number one, courts are known to sanction
11 people, particularly when they can get rid of the
12 case.  The Biven's actions was actually dismissed
13 when the 9th Circuit agreed to hear the first
14 petition for sure.
15       So, it's not as if the fair to impose
16 sanctions is any indication that these have any
17 merit.  And it is rare -- it is very rare for a
18 court to sanction a lawyer, particularly sua sponte.
19 And you know, the government was, I guess, walking a
20 fine line and they didn't want to appear to be in any
21 way interfering with Mr. Bundy's 6th Amendment
22 rights, but at the same -- so, they're not going to

In Re: Larry E. Klayman
July 18, 2019

Page 770

1  ask the court to sanction him, and it's very rare for
2  a court to do it sua sponte, but that does not mean
3  that the statements that he made to the court were
4  not false as the court found, including the 9th
5  Circuit, or that these claims that he made against
6  Judge Navarro, Judge Bybee and others had any merit
7  -- they didn't.
8       No reasonable lawyer could think that the
9  claims that he made against Judge Navarro and later
10  Judge Bybee had any merit or any chance of success.
11  You know, and again legally they were without basis
12  -- judges are absolutely immune, so are Presidents.
13       The allegations of this vast conspiracy
14  between Judge Navarro and others -- as Judge Navarro
15  found, displayed a lack of respect for the judiciary
16  and a complete lack of ignorance of the independent
17  jury.  And as the 9th Circuit found, they were for
18  intimidation and retaliation because she had denied
19  his pro hac vice.
20       And I'll get finally to the last issue and
21  that is kind of the repetitive nature of the claims.
22  Yes, in some of the petitions Mr. Klayman said they

Page 771

1  were changed circumstances, but if you go back and
2  look at the second 9th Circuit decision denying his
3  second petition, which I believe is 79, you'll see
4  that those changed circumstances -- the IG's report,
5  or alleged government misconduct.
6       They had nothing to do with whether or not
7  the pro hac vice application should have been granted
8  or that Judge Navarro had a basis to deny it.  And
9  indeed, these claims have changed circumstances for
10  procedural, completely inappropriate because they
11  were being raised for the first time on appeal.  But
12  it was the -- it wasn't just these changed
13  circumstances, but a lot of the allegations that
14  I've already gone over -- that Mr. Whipple was
15  threatened with contempt, that Mr. Bundy was ordered
16  in solitary confinement.
17       That Mr. Klayman had been completely
18  honest on his pro hac vice, that Judge Bybee lacked
19  appreciation and sensitivity because his prior
20  rulings or involvement in the drafting of a memo.
21  These were repeated, sometimes verbatim, over and
22  over and over again.

Page 772

1       And even his claim, which disciplinary
2  counsel doesn't claim was illegitimate or wasn't made
3  in good faith, that Mr. Bundy should have been given,
4  you know, his right to counsel of choice
5  notwithstanding the disciplinary matters.  That's a
6  legitimate argument, but it's not okay to raise it
7  in at least 15 -- at least 15 separate pleadings,
8  over and over and over again, which he did, and I can
9  cite to all of them in our post-hearing brief.
10       So, I think the evidence shows both
11  clearly and convincingly that Mr. Klayman engaged in
12  misconduct.  And I confirmed that the record of the
13  pre-hearing motions and -- which include the
14  disciplinary complaints that Mr. Klayman filed
15  against disciplinary counsel, are already part of the
16  record.
17       And I'd say his conduct in this proceeding
18  confirms that he should not continue to have the
19  privilege of being a lawyer because he cannot conform
20  himself to the ethical rules.
21       CHAIRPERSON MIMS:  Before you step down, I
22  don't know if anyone else has any questions.  I do

Page 773

1  have one question and maybe you've answered it, but I
2  want to be sure I'm clear.  Under Rule 8.1, which is
3  one, it's in the specification of charges and you've
4  discussed a little bit.  Rule 8.1 is, you say, "In
5  his application and supplemental application for
6  admission to the District Court, Respondent
7  knowingly made false statements of fact or material
8  fact, and he failed to disclose a fact necessary to
9  correct a misapprehension known by the applicant."
10       I just want to be clear on what that
11  misapprehension is that you're referring to?
12       A   Well, and I think I've kind of gone over
13  it with Judge Navarro understanding what was going on
14  with respect to the disciplinary proceedings and also
15  with respect to the two judges who had banned him and
16  kind of the basis for that decision, and everything
17  else.
18       CHAIRPERSON MIMS:  Alright, alright, thank
19  you.
20       MR. KLAYMAN:  May I take two minutes and
21  go to the restroom?
22       CHAIRPERSON MIMS:  Yes, sure.  Let's go

In Re: Larry E. Klayman
July 18, 2019

Page 774

1  off the record at 3:12, you can take five minutes.
2       MR. KLAYMAN: Yes, thank you.
3       (Off the record 3:12)
4       (On the record at 3:18)
5       MR. KLAYMAN: May it please the Honorable
6  Committee. I want to thank you for listening so
7  intently. I, obviously, during my testimony was
8  seeing how thorough you were and how you were paying
9  attention. I really appreciate that. It's not easy
10  to listen to these kinds of proceedings. I know
11  they're painful, particularly for me, for everybody.
12       But I want to put this in context. It's
13  very important, it's what Judge Gould was talking
14  about. It's what Professor Chemerinsky was talking
15  about. We're dealing here with a man who faced life
16  imprisonment. He was 71 years old. He was charged
17  with 17 counts of felonies.
18       I believe that Cliven Bundy is
19  controversial. While I don't equate myself at all as
20  I said on the stand to John Adams, we do have a small
21  similarity in that I will take cases that other
22  people will not take, to defend people who are on the

Page 775

1  other side of the street -- the underdog.
2       Now, that has to be put in the context of
3  my efforts, to try to get into the case. I knew I
4  was probably the only lawyer as Judge Gould said, who
5  would really stand there with Cliven Bundy. And I
6  did have the experience to be there. I had the
7  experience not just with regard to criminal matters,
8  but with regard to being a litigator -- I've had many
9  jury trials in my life.
10       I'm not bragging, I've only lost one in 42
11  years of practice. I've been a lawyer in good
12  standing for those 42 years. I was admitted to
13  practice on December 7th, 1977 in Florida, and on
14  December 22nd, I believe it was, 1980 in the
15  District of Columbia. Maybe I should have taken heed
16  that it was actually Pearl Harbor Day when I was
17  admitted and sworn in in Florida.
18       I knew that it would be a rough ride
19  because I have represented some very, very important
20  clients, controversial clients, and yes, I'm a lawyer
21  that stands there for my clients. I won't take a
22  case, as I testified, unless I believe in it.

Page 776

1       Now, with regard to the way this case has
2  been litigated, I'm the only substantive witness in
3  addition to Professor Chemerinsky. We heard a lot of
4  testimony here from the other side, but it was from
5  Miss Porter. She's not a witness. She wasn't sworn
6  in, and you heard it just now, what the motivation is
7  here.
8       I should be disbarred. I should not be
9  able to practice law. I should not be able to make a
10  living. I should not be able to represent people
11  like Cliven Bundy. That's the motivation. Now,
12  given the fact that there's no final finding by the
13  D.C. Court of Appeals, much less the D.C. Board of
14  Appeals with regard to this Judicial Watch matter
15  filed by my former colleague, Mr. Fitten, who's not a
16  lawyer, how does that warrant responding?
17       I mean there is something here that I
18  think you can see, it's palpable. And it's a dislike
19  of what I do, what I stand for, my beliefs in orders.
20  But now let me get down to the evidence because it's
21  important. The standard here is clear and
22  convincing.

Page 777

1       Based upon the rulings of Judge Gould, the
2  dissenting opinions, he's a very distinguished
3  jurist. I might add, I have friends who are not like
4  me politically. They're not conservative. I respect
5  everybody. Judge Gould does not like me.
6       He was appointed by judges who -- by
7  Presidents who I've taken on in court. And I've
8  taken on Bush 2 and others on the other side -- I'm
9  non-partisan. But here you have a judge of the 9th
10  Circuit, of great esteem and qualification and
11  honesty -- he's an honest judge.
12       I wanted him to come before you and to
13  testify, but that wasn't possible. But I turn your
14  attention, because his rulings frankly are good
15  enough. And I appreciate the good faith of
16  everything that's going on here with this Committee.
17  But let's look at the opinions, this Disciplinary
18  Counsel Exhibit 64. I'm turning to 64-0146.
19       CHAIRPERSON MIMS: Give us a minute to get
20  there. Exhibit 64?
21       MR. KLAYMAN: Yes, excuse me, Exhibit 64
22  at Bates Number 64016. I'm reading in the last

34 (Pages 774 to 777)

Page 778

1    paragraph on that page. This is Judge Gould's
2    finding, "Claimant properly disclosed the ongoing
3    disciplinary proceeding in his initial application
4    for pro hac vice admission, saying that the
5    proceeding had not yet been resolved and disclosure
6    was accurate." That was confirmed by the analysis of
7    Professor Chemerinsky, the Dean of the fourth most
8    prestigious law school in this country, according to
9    the U.S.A. Today rankings.
10       He then goes on to say on the next page,
11   "I agree with Claimant, that he was not obligated to
12   relitigate the D.C. proceeding before the District
13   Court and he did not have to provide the District
14   Court with the entire record from D.C.
15       And if he is -- and if his disclosures
16   were selected, still he is an advocate -- an advocate
17   representing Defendant Cliven Bundy. And after
18   submitting a compliant response to questions in the
19   pro hac vice application, he had no greater duty to
20   disclose any possible blemish on his career or
21   reputation beyond responding to the District Court's
22   further requests."

Page 779

1       And that's important to remember. I am an
2   advocate. I was standing in the breech for my client
3   Cliven Bundy. I felt that he needed me, and Cliven
4   needed me and there is evidence in the record, and
5   you saw it -- affidavits of Bundy and his wife
6   saying, "We want Larry as our lawyer."
7       And of course, Cliven Bundy did try to
8   dismiss Fred Whipple when he wasn't doing his job,
9   when he wasn't following what Cliven had asked him to
10   do. And I did, conversations -- and I testified.
11   See, there's no testimony from the side of the Office
12   of Disciplinary Counsel. This is Miss Porter who's
13   testifying, and I might add not under oath.
14       CHAIRPERSON MIMS: What is your response
15   to the fact that bar counsel says that in your
16   response to Judge Navarro's order at 6, the 6 things
17   that she requested regarding the negotiated
18   discipline, that you should have informed Judge
19   Navarro of your sworn statements with respect to that
20   negotiated discipline that you had violated some
21   rules?
22       MR. KLAYMAN: Number one, the negotiated

Page 780

1    discipline was withdrawn, ordered by the Board
2   withdrawn. And that is Bar Counsel Exhibit 12. So,
3   there was no force --
4       CHAIRPERSON MIMS: But the statement still
5   existed. There were still sworn statements.
6       MR. KLAYMAN: I understood that that was
7   not useable in any other proceeding pursuant to the
8   rule that I cited during this proceeding, Rule 17.10.
9   And I also understood that it was only useable for
10   impeachment if I was to get up on a witness stand and
11   say something different.
12       But it wasn't, at that point, operative.
13   And that's my basis for it. And besides, I did
14   address the issue when Judge Navarro asked me for
15   information, and I submitted a brief which was very
16   detailed. I urge Your Honors to read it.
17       Because I'm rebutting what is being said
18   by Judge Navarro and the 9th Circuit, excuse me --
19   I'm rebutting what was said in that Judicial Watch
20   proceeding. And you can see that I'm addressing the
21   issues that were raised in that proceeding.
22       So, to me, it's nit-picking. It's a fly.

Page 781

1   I mean I sat here, and you did too, for probably
2   about 45 minutes and it would seem that everything I
3   ever say is false. And if I say that my dog doesn't
4   have the best haircut in the world and it turns out
5   that Miss Porter thinks that she does have a great
6   haircut, then I would be lying. By the way I love
7   my dog.
8       So, but this is a situation that you know,
9   it's clear what the motivation is here. So, load it
10   up, pile on and these proceedings are very costly,
11   that's why I'm defending myself. I mean in the
12   Judicial Watch case I've already spent, you know,
13   several hundred thousand dollars. I can't afford not
14   to represent myself. And I want you to see who I
15   am.
16       Judge Gould also wrote -- the other, and
17   this is on the same page, 64-017. "The other
18   concerns raised by the District Court in its briefing
19   in this court, and the two orders denying Claimant
20   admission in my view carry less weight.
21       First, the allegations underlying the D.C.
22   proceeding are unproven, and we cannot know what the

35 (Pages 778 to 781)

In Re: Larry E. Klayman
July 18, 2019

Page 782

1  resolution will be.  The District Court held this
2  uncertainty against Mr. Klayman stating in its two
3  orders denying his admission that Claimant would need
4  to show that the proceeding was resolved in his favor
5  before the court would admit him.  This is
6  important.
7        This approach is contrary to our legal
8  tradition's instinct to presume innocence until
9  finding guilt.  Of course, the D.C. proceeding
10 involves attorney discipline and not criminal
11 prosecution.  But fundamental principals still have
12 weight, at least in terms of evaluating the District
13 Court's exercise and discretion.
14       At this time, Claimant is still a member
15 of the D.C. Bar and has not been disciplined by its
16 Board of Professional Responsibility.  Moreover,
17 Claimant has submitted a letter from Professor
18 Rotunda, an expert on legal ethics, expressing the
19 opinion that Claimant's actions at issue were
20 ethical.  This is all the more reason, not
21 uncritically to credit unproven bar allegations."
22       And that's very important, and what Judge

Page 783

1  Navarro did, and this really says it all.  It gets to
2  the essence of -- and I'm trying to be diplomatic,
3  but, you know, I have to say it straight up,
4  disingenuous and her lack of frankly, intellectual
5  integrity here, because she created a catch-22.
6        Heads I win, tails you lose.  Mr. Klayman,
7  you can reapply.  This was her only reason for
8  denying pro hac vice until Judge Bybee and company
9  went back and said give me more.  He assumed the role
10 of an advocate, which is not his role.  He was to
11 view the record.
12       And what they're saying is sometime in the
13 future when the D.C. Bar proceeding is finished, and
14 we all know how long they take, I may reconsider.  At
15 that point, Cliven Bundy is convicted and put away
16 for life along with his sons and the other Defendant.
17       That's not the type of conduct of the
18 judge who cares about the rights of the little guy or
19 the person who's controversial.  And that is why I,
20 you know, I've taken this strong position.  That's
21 why I started Judicial Watch, that's why I do what I
22 do today.

Page 784

1        And then Judge Gould goes on to say -- and
2  I might add, Judge Gould says in this opinion that
3  you need a strong advocate.  You need a judge that
4  will stand up to judges.  You need judges, you need
5  lawyers who are harassable that will take them on,
6  because you're dealing here with the criminal
7  Defendant's right to freedom.
8        You all remember the O.J. Simpson case --
9  whatever side.  All those lawyers ended up getting
10 sanctions.  I never got sanctioned at all in any of
11 this entire time.  Miss Porter would like to sanction
12 me, but she's not the judge.  Nobody has sanctioned
13 me.
14       The District Court -- and it goes on to
15 say, "The District Court and the majority also point
16 to the two instances of federal judges banning
17 Claimant from their courtrooms.  While serious
18 punishments, these orders were issued 22 and 18 years
19 ago, two decades, half of Mr. Klayman's career, is
20 enough time for the incidents to be relatively poor
21 predictors of Claimant's likely behavior today.
22       District Court, as well as the New York

Page 785

1  State Court that denied Mr. Klayman a pro hac vice
2  admission, noted that other judges, even recently
3  have in their written orders expressed irritation or
4  disapproval of Mr. Klayman's actions."  This is
5  really important.
6        That's what I'm saying.  That's what any
7  strong trial lawyer will say and will do.  We will
8  put ourselves in front of our client to protect our
9  client and to defend our client.  And if that's -- if
10 we can no longer do that, then I don't want to be a
11 lawyer anymore.
12       Obviously, I want to be a lawyer.  I love
13 being a lawyer.  I love defending people who are on
14 the other side of the street.  "Maybe the Claimant is
15 not an attorney who all District Court Judges would
16 favor making an appearance in their courtroom.
17       It seems that he has been and may continue
18 to be the thorn in the side still.  Concerns about
19 trial judge irritation pale in comparison to a
20 criminal Defendant's need for robust defense and
21 providing a full and fair defense in every criminal
22 Defendant, it will be by necessity -- occasions, when

36  (Pages 782 to 785)

In Re:  Larry E. Klayman
July 18, 2019

## Page 786

1   the difficult nature of the case evokes sharply
2   confrontational lawyering in tough cases with
3   skilled prosecutors, aggressive positions by defense
4   lawyers are sometimes an unavoidable part of strong
5   advocacy and contribute to making the proceeding an
6   ultimately fair one for the Defendant."
7          Now that's important.  It shows you the
8   wisdom of Judge Gould as well as the correctness of
9   his decision.  It's because our job is to be
10  provocative as a defense lawyer.  Our job is to be
11  provocative in any context if its warranted, and it
12  was warranted here -- catch-22.
13         But one of the things -- and I'm going to
14  have this, get this issue out of the way quickly is
15  the issue of the Bivens complaint.
16         CHAIRPERSON MIMS:  Before you move on to
17  Bivens, what about the fact that you stated that you
18  withdrew the negotiated discipline, but really it was
19  rejected?
20         MR. KLAYMAN:  It was rejected, and then as
21  the record will show, bar counsel came back to me and
22  said let's continue with the negotiation and see if

## Page 787

1   we can reach a resolution.  There are emails in the
2   record to H. Clay Smith, III, saying that I don't
3   believe I did anything wrong.  I will go to the
4   hearing.  I don't want to continue with the
5   negotiated discipline -- that's what I meant by I
6   withdrew.
7          I withdrew from negotiating another one.
8   Consequently, on top of the fact that the negotiated
9   discipline had been withdrawn, I was totally truthful
10  about that.
11         CHAIRPERSON MIMS:  Is there a record
12  anywhere that says it was withdrawn?
13         MR. KLAYMAN:  Yes, an order of bar
14  counsel.
15         CHAIRPERSON MIMS:  Withdrawn not rejected.
16         MR. KLAYMAN:  No, Bar Counsel C-12,
17  they're withdrawing negotiated discipline.
18         CHAIRPERSON MIMS:  Yes, okay.
19         MR. KLAYMAN:  Now, number one, I didn't
20  file the Bivens action.  I'm not counsel of record.
21  And Miss Porter, on several occasions, kept saying
22  you filed it.  She's very smart, and you can see

## Page 788

1   that.
2          CHAIRPERSON MIMS:  But your name is on
3   some of those pleadings right on the front.
4          MR. KLAYMAN:  As of counsel, but not -- I
5   don't even know if it is on that, but I was not
6   counsel of record, and I testified truthfully that I
7   had input with Mr. Hanson -- Joel Hanson, but I was
8   not counsel of record.
9          Number two -- there is authority that says
10  that you can sue a judge under Bivens, and I call
11  your attention to Catholic University Law Review,
12  here in this city, Volume 29, Issue 4, Article 4, The
13  Judge Needs a Lawyer by Frank Q. Nebeker,
14  N-e-b-e-c-k-e-r, and I did site a case in the
15  Northern District of Texas, Hagan v. Coggins, 2000
16  U.S. District Dist. Lexus, 2006 at page 11, Northern
17  District of Texas, April 26, 2000.
18         So, and as I asked Professor Chemerinsky,
19  we live in a common law system.  We test the limits
20  of jurisdiction.  We create new law.  In every case,
21  as Your Honors know, it depends on the facts of that
22  particular case.

## Page 789

1          The case here was so egregious.  First of
2   all -- and I testified to this.  Miss Porter's
3   testimony is not evidence.  I testified -- how does
4   someone end up in solitary confinement -- the judge
5   didn't order it?  Your prisons are not going to do
6   that.  Cliven was completely peaceful.  He didn't
7   threaten anybody.
8          MS. BELL:  You said, I'm not an attorney.
9          MR. KLAYMAN:  Cliven.
10         MS. BELL:  Cliven?  No.
11         MR. KLAYMAN:  No, Mr. Bundy.
12         MS. BELL:  I'm not an attorney but -- and
13  I do, you know, work and go in prisons and things a
14  lot, and from my knowledge, I don't know of judges
15  throwing people in solitary confinement while they're
16  in prison.  They're in prison, they're part of the
17  Bureau of Prisons now, not the court.
18         MR. KLAYMAN:  That's a good question.  You
19  know --
20         MS. BELL:  It's not a question, it's a
21  comment.
22         MR. KLAYMAN:  As one example, I was denied

37 (Pages 786 to 789)

In Re:  Larry E. Klayman
July 18, 2019

Page 790

1  entry to see Cliven the first time and I was told by
2  the Marshall that the judge had ordered me not to see
3  him.  I had to then go back through Mr. Hanson or Mr.
4  Whipple, at the time as the case may be, and move to
5  get in.
6       They do control that.  Mr. Bundy was
7  considered to be -- because this was a standoff --
8       MS. BELL:  A high-profile case.
9       MR. KLAYMAN:  Not just high-profile, but
10  the allegations in the indictment were that he was
11  armed, his sons were armed, the other Defendants were
12  armed, they had threatened federal officials with the
13  use of arms.
14       He was denied bail, right?  It turned out
15  that that's not true at all, you know, and I'm not
16  going to get into the merits, but one reason this
17  thing was dismissed was because he didn't carry a
18  gun.
19       MS. BELL:  Yeah, but my comment or
20  question is how does a judge throw an inmate in
21  solitary confinement?  They are now in the hands of
22  the Bureau of Prisons?

Page 791

1       MR. KLAYMAN:  They can communicate with
2  the Bureau of Prisons, and they can play a role in
3  that and I on good faith believed that they did.
4       MS. BELL:  Okay, alright.
5       MR. KLAYMAN:  Good save, it's not really a
6  material fact.  The fact is he's in solitary
7  confinement.
8       MS. BELL:  Right, and I can believe he
9  was, but to say that the judge threw him in there.
10       MR. KLAYMAN:  I have reason to believe
11  that she did based on all the conduct that I had
12  seen, but another aspect later when Mr. Hanson makes
13  reference to Mr. Bundy saying okay, maybe leave me in
14  there.  This was not an initial, this was after
15  several months, is that he felt that his life was at
16  risk at that point.
17  But this is an issue for the case.
18       MS. BELL:  So, your testimony is that Mr.
19  Bundy told Mr. Hanson in that conversation that was
20  referred to by bar counsel, he was saying leave him
21  in solitary confinement, not that he requested to be
22  there?

Page 792

1       MR. KLAYMAN:  He never said that to me,
2  that's what Mr. Whipple -- excuse me, what Mr. Hanson
3  said.  He never told me that, so I believed honestly
4  that he had been put in solitary confinement
5  improperly.
6       On top of that his speedy trial rights had
7  been overwritten.  You have a right to go to trial
8  quickly, with this non-meritorious argument by the
9  government we had the trial and 19 together, okay.
10       On top of that his right of counsel was
11  denied here.  His wife couldn't see him for all those
12  two years.  And when the indictment --
13       MS. BELL:  But can I ask why?  Why
14  couldn't his wife see him for two years in prison?
15       MR. KLAYMAN:  Because they don't allow his
16  wife to visit, they don't allow for visitation.  Some
17  state courts do but in federal you can look at the
18  monitor, but you can't actually visit with your
19  husband unless you're a lawyer you can't visit them.
20       MS. BELL: In prisons, state and federal,
21  unless you are a felon yourself, your wife, your
22  family can visit and there are contact visits in

Page 793

1  prison.
2       MR. KLAYMAN:  That was not true in this
3  case.
4       MS. BELL:  Okay.
5       MR. KLAYMAN:  Okay, I swear under oath,
6  I'm still under oath.  That was not true in this
7  case.  This was very, as you said a high-profile case
8  with allegations that my client had threatened
9  federal officers and I believe this was retaliatory
10  and I agree with you, because I've been in prisons
11  many times and I've seen family members there, but
12  not in this case, she did not.
13       So, you know, this is something which you
14  know, there was a good faith belief that we could
15  bring a Bivens case and in that Bivens case as
16  Professor Chemerinsky testified, the Dean of Berkeley
17  Law School, there was claims for injunctive relief --
18  equitable relief, which he stated are possible with
19  regard to judges under certain circumstances.
20       CHAIRPERSON MIMS:  Your good faith belief
21  that you could bring a Bivens case was what?
22       MR. KLAYMAN:  That this law review

38  (Pages 790 to 793)

In Re:  Larry E. Klayman
July 18, 2019

| | |
|---|---|
| Page 794 | Page 796 |

Page 794

1  article, this case, that it was -- which said that
2  there is a colorable claim there, and the
3  extraordinary circumstances of this case where
4  Constitutional rights were violated to this degree,
5  and that's what Bivens is when you violate
6  Constitutional rights.  I did not bring the case.
7          MR. WHITE:  Are you referring to the
8  article you mentioned earlier, Frank Nebeker and The
9  Judge Needs a Lawyer, is that the one?
10         MR. KLAYMAN:  Yes.  Now, moving on to what
11 else Judge Gould said, and I'll just gloss over this
12 but he stated, "At least two other Circuits have held
13 that the only thing a District Court may consider in
14 pro hac vice admissions, is whether the out of state
15 attorney is guilty of conduct so unethical as to
16 justify disbarment."  See this also shows the extreme
17 nature.
18         CHAIRPERSON MIMS:  Sorry, repeat that
19 sentence again?
20         MR. KLAYMAN:  "At least two other
21 Circuits," this is Judge Gould on page 64-01A, "have
22 held that the only thing a District Court may

Page 795

1  consider in pro hac vice admission is whether the out
2  of state attorney is guilty of conduct so unethical
3  as to justify disbarment."
4          "I would hold," and I'm reading further
5  down, "That the District Court abused its discretion
6  resulting in clear error."  Right, reading down again
7  on page 64-01A with Exhibit 64 of the disciplinary
8  counsel.  "There is doubtless some merit to the
9  bright line views of the 5th and 11th Circuits, that
10 a counsel of choice should not be eliminated through
11 the pro hac vice admission process, absent an
12 ethical violation that could merit disbarment.
13         But even accepting our Circuit's broader
14 view that ethical problems short of those may be
15 pertinent to a District Court's decision on whether a
16 lawyer should be admitted pro hac vice, there are
17 nonetheless, limits on a District Court's exercise of
18 discretion, and I think they are transgressed here."
19         Now, see this factors in because the law
20 is so strong that I should have been allowed pro hac
21 vice admission, that it creates a strong presumption
22 that there's extra judicial bias and prejudice here.

Page 796

1          And not just with me, in fact it wasn't
2  even really me.  It was Bundy.  Bundy is the
3  lightening rod.
4          CHAIRPERSON MIMS:  But what -- are you
5  saying that supports some of your filing?
6          MR. KLAYMAN:  I'm saying that that's the
7  reason why we were aggressive in our litigation
8  because we -- it was so wrong.  The issue was not
9  Larry Klayman, the issue was Cliven Bundy and the
10 other Defendants.  The issue was not me.  But I
11 became the lightning rod.  I became the fall guy,
12 and that's not right because what counts are his
13 rights above all.
14         Now, with regard to the February 6th trial
15 date, one of the things Miss Porter omitted when she
16 heard me say it, is that the date wasn't certain.
17 Cliven Bundy had gone back with the other Defendants.
18 They didn't want the case tried in three parts.
19 Cliven didn't want it tried in three parts -- he
20 wanted to get it over with, he was already in jail
21 nearly two years.
22         And it was uncertain whether the case

Page 797

1  would start with one group of Defendants, or whether
2  there'd then be two trials, or whether they'd then be
3  consolidated.  That was still being thought out, but
4  the fact is, and this is correct.  I need to be there
5  all the time because in prior trial, which where
6  there were mistrials, there had already been
7  mistrials, is that the government tarred Cliven Bundy
8  in abstention.
9          They accused him of a conspiracy to commit
10 felonies when he wasn't even there and couldn't even
11 defend himself.  And his wife -- she was accused as a
12 co-conspirator.
13         CHAIRPERSON MIMS:  But did the order say
14 that either the first group of Defendants, or second
15 group of Defendants, or did it say it was unclear?  I
16 thought it said who was going to start on that.
17         MR. KLAYMAN:  It was being challenged.
18 This was in the process of being challenged, and I
19 needed to be present from day one, okay, that's the
20 point.
21         Now, Judge Gould later, when I sought to
22 move this thing out that there is a very strong legal

In Re: Larry E. Klayman
July 18, 2019

Page 798

1 argument that could be made both in a criminal
2 context. It is true, certainly in a civil context,
3 as Judge Gould ruled, that when a case is over,
4 collateral orders -- orders that don't deal with
5 issues of the Defendant directly himself or herself,
6 should be declared moot.
7      That means the order is no longer of any
8 force and effect. And Judge Gould ruled that in fact
9 those orders should be mooted out. And I pointed out
10 to him that this was causing me harm and my clients
11 harm. Me because I got a bar proceeding and other
12 things, and also my client, Kiera Robelus (ph), who's
13 being used against her to deny her right of counsel
14 by a judge in Berkeley.
15      And the judge said -- and I turn your
16 attention to Disciplinary Counsel Exhibit 105.
17      CHAIRPERSON MIMS: Where are you getting
18 the statement that collateral orders should be ruled
19 moot?
20      MR. KLAYMAN: I'm interpreting what Judge
21 Gould said in the order.
22      CHAIRPERSON MIMS: Oh, what Judge Gould

Page 799

1 said.
2      MR. KLAYMAN: Yes.
3      CHAIRPERSON MIMS: And where did he say
4 that?
5      MR. KLAYMAN: He doesn't use the word
6 collateral, but he's talking about orders that don't
7 go to the merits of the case.
8      CHAIRPERSON MIMS: Okay.
9      MR. KLAYMAN: Okay. Those are collateral
10 orders, and he found that because of not just as a
11 matter of law that these matters should be vacated,
12 if they had been vacated there wouldn't be a
13 proceeding here today unless there's extreme
14 vindictiveness here.
15      But he said, "I respectfully dissent from
16 the denial of the current mandamus petition that was
17 to vacate the orders of what I consider to be an
18 unnecessary and excessive negative impact of the
19 District Court's decision denying pro hac vice
20 admission and our prior decisions denying mandamus
21 relief on the practice and reputation of Mr.
22 Klayman."

Page 800

1      And he goes down a sentence, "But I am
2 motivated to dissent because these proceedings have
3 become overblown. I see just how overblown they've
4 become."
5      CHAIRPERSON MIMS: Will you address the
6 D.C. Bar Counsel's statement that you falsely
7 threatened -- that you said that it was a false
8 statement by you to say that Judge Navarro threatened
9 to hold you in contempt?
10      MR. KLAYMAN: That wasn't me being held in
11 contempt, that was Whipple. Yes, that was Whipple.
12      CHAIRPERSON MIMS: Threatened to hold
13 Whipple in contempt?
14      MR. KLAYMAN: Yes.
15      CHAIRPERSON MIMS: Judge Navarro threatened
16 to hold Whipple in contempt?
17      MR. KLAYMAN: That's what Whipple told me.
18 That's what Mr. Whipple told me.
19      CHAIRPERSON MIMS: Oh, oh, okay. I
20 misunderstood that.
21      MR. KLAYMAN: And that -- it was a
22 closed-door hearing. The genesis of this, we've

Page 801

1 heard a lot of testimony from me, not from anybody
2 else, it's uncontroverted, uncontested, is that Fred
3 Whipple had put down -- and these are in the
4 documents, the judge's husband has a witness to the
5 criminal defense of Cliven Bundy.
6      Her husband is named Brian Rutledge, he's
7 a Deputy District Attorney in Clark County, Nevada.
8 And he was asked to investigate what went on at the
9 Bundy ranch. So, Whipple put him down because he
10 thought he may have some information, in an abundance
11 of caution he listed all the witnesses that he might
12 need if the case went to trial.
13      I then asked Cliven Bundy -- not Cliven
14 Bundy, I then asked Fred, even around that time, I
15 thought maybe the passage of time Judge Navarro might
16 reconsider and allow me into the case, particularly
17 since it was apparent Whipple was under manned at a
18 minimum. He refused to put that forward, and he
19 said to me, "Larry, if I do that, I may get held in
20 contempt. The Judge is threatening to hold me in
21 contempt for putting her husband down as a witness."
22      CHAIRPERSON MIMS: Okay, I remember that

40 (Pages 798 to 801)

In Re: Larry E. Klayman
July 18, 2019

Page 802

1 testimony.

2 MR. KLAYMAN: Okay, and there is a

3 transcript of that, but I couldn't get it, it was

4 sealed. Okay, so it's not correct for Miss Porter to

5 testify what went on. I did try to get it but it

6 wasn't there, but there are emails to and from or at

7 least to Mr. Whipple which have been part of the

8 exhibits which in part reflect what was going on at

9 that time, and I had to have Cliven Bundy, because

10 this is what he wanted to do, order Fred Whipple to

11 resubmit my application pro hac vice.

12 There's affidavits in the pleadings, in

13 the exhibits to that effect.

14 CHAIRPERSON MIMS: Is there a point at

15 which it becomes too much? So, you kept re-raising

16 this issue a number of times and bar counsel has

17 represented that that was 15 or so times. Is there a

18 point at which you would agree it becomes too much?

19 MR. KLAYMAN: Not in this case because

20 they were changed circumstances every step of the

21 way. Your Honor asked some very good questions about

22 that. There were changed circumstances. Things were

Page 803

1 happening that changed the equation, and you heard

2 Dean Chemerinsky say that he felt that what I did was

3 reasonable.

4 CHAIRPERSON MIMS: Do you believe there's

5 any point at which it becomes too much?

6 MR. KLAYMAN: Yeah, but not in this case

7 and not with me. And I'm dealing here with a client

8 that is facing life in prison, that he's 71 years

9 old, will never see the light of day again. I didn't

10 do it for me. I stick my neck out not for me, I

11 stick it out for my clients.

12 You can say -- my grandmother who used to

13 say, I said, "Nanny, are you fearful of dying?" And

14 she would say to me, "Well, Larry, at least there's

15 no aggravation afterwards." And what do I need the

16 aggravation for if I don't believe my client and what

17 I'm doing honestly and ethically? I'm not the

18 glutton for punishment.

19 This was necessary in this case and we

20 were dealing with someone who didn't have counsel and

21 you see, there's a transcript in the record, that Mr.

22 Whipple admitted he was not prepared. Cliven Bundy

Page 804

1 testified to the Magistrate Judge Lean, that he had

2 maybe met with him a few times in all those years,

3 but they never really went through much of anything

4 with the discovery, which was voluminous, and that

5 he didn't follow his instructions.

6 And it was so bad he wanted to represent

7 himself and he knew that I had been denied pro hac

8 vice. That's why he ordered Whipple to resubmit the

9 pro hac vice application. He wanted me to represent

10 him, and then there's sworn statements in the record

11 to that too.

12 So, let me wrap it all up because I

13 prepared for 20 minutes, but I guess I got a little

14 bit longer. For me to be found liable for any

15 ethical violation there has to be clear and

16 convincing evidence. In other words, if everything

17 is equal, it's much less than equal here. It's

18 overwhelming that there's no evidence for clear and

19 convincing against me.

20 But even if it was equal, the accused

21 would win. The benefit goes with the accused. And

22 in this case, based on what Judge Gould found, and

Page 805

1 based upon what Dean Chemerinsky said, clearly if

2 there's a difference of opinion, that does not mean

3 that there's clear and convincing evidence that I

4 committed any ethical violation -- it can't happen.

5 And that's why at the beginning of this

6 case I tried to head it off and I said, how can we

7 proceed here when you have rulings by Judge Gould the

8 way he ruled? And just the very facts and the nature

9 of the case. But there's something more afoot here

10 than this particular case. There's a bigger object

11 and that's to remove me, to disbar me from the

12 practice of law.

13 And that's just not right. And I have

14 been a member in good standing of the bars of Florida

15 and the District of Columbia for going on -- I'm

16 really good at math, that's why I'm a lawyer I guess,

17 for 40-some years. Never, ever suspended for one

18 day. Not sanctioned in this case by any judge.

19 Yet here we stand today. And I thank you

20 for listening to me, and I thank you for making a

21 fair decision because I love what I do, and I want to

22 remain a lawyer, and I want to represent people like

41 (Pages 802 to 805)

In Re:  Larry E. Klayman
July 18, 2019

## Page 806

1  Cliven Bundy, who thankfully no one else will
2  represent unless someone like Larry Klayman comes
3  in.
4          There are other lawyers who have done this
5  in the past, with different political stripes --
6  Ralph Nader, who actually I know, counselor, others,
7  you need lawyers like that.  You don't want to remove
8  them from the practice of law because then you leave
9  criminal Defendants and civil litigants at the mercy
10 of the big powers, the rich and the powerful who want
11 to and will use their power to try to destroy them,
12 thank you.
13         CHAIRPERSON MIMS:  Any response, Miss
14 Porter?
15         MS. PORTER:  No.
16         CHAIRPERSON MIMS:  Alright, why don't we
17 take a break.  I would say come back and wait for us
18 in 20 minutes.  I don't know that we'll be done in 20
19 minutes.  It may be longer.  If you want to take a
20 longer break, we can say a half an hour, a half an
21 hour?  Let's reconvene at a half an hour, and if
22 we're not back in a half an hour it means that we're

## Page 807

1  not ready yet, so just try and hang around closely to
2  the courtroom.
3          We're off the record at 3:57, thank you.
4          (Off the record 3:57.)
5          (On the record 5:22.)
6          CHAIRMAN MIMS:  Alright, we're back on
7  the record at 5:22.  So, the Hearing Committee has
8  been unable to reach a non-binding determination.
9  So, at this point we're going to have to set a
10 briefing schedule.
11         Before we do that, I do want to talk a
12 little bit about what we'd like to see in the briefs
13 in some of the areas that -- of why we're unable to
14 come to an agreement and find a violation.
15         It's a clear and convincing case, so for
16 the statements and let's start with the pro hac
17 motion.  For the statements, for the omissions or the
18 misleading things that you found in there where you
19 believe that there were violations, we would like you
20 to be very specific about those.
21         I know that in your closings you did go
22 through a number of examples.  I mean we've gone

## Page 808

1  through the misrepresentation of Mr. Whipple's
2  experience.  Mr. Klayman's misrepresentation or
3  misleading of his own criminal experience.  The issue
4  of not disclosing the Hearing Committee report, and
5  addressing his arguments that it wasn't final, that
6  it was an ongoing matter and also that the
7  affidavits, the sworn testimony that he had violated
8  a rule, that that had been withdrawn.
9          Accusing Judge Navarro of being malicious
10 and corrupt.  For each of these items -- we need you
11 to specifically spell out how that rises to the level
12 of clear and convincing.  And on the same token, Mr.
13 Klayman, we need -- what I'd like you to do is for
14 your statement of facts, listed out in paragraph
15 form, so that Mr. Klayman can either admit it or
16 deny it.
17         And Mr. Klayman, we need you to respond
18 specifically to the statements in the brief.  I
19 understand that you may think that there is a big
20 issue with 6th Amendment in here, we don't really see
21 that.  There may be a very limited case in which  you
22 might bring that up, but I doubt it's going to be

## Page 809

1  much.
2          And bar counsel's brief, the extent that
3  it's in your response I think can be pretty limited.
4  I mean you've made your points on the 6th Amendment
5  issue and the constitutionality issues.  We've heard
6  them.  I think the relevance is probably limited in
7  terms of your advocacy of the issue, and so I really
8  need you to respond so that the Committee can sift
9  through all of this.
10         Respond to her points in the brief.  You
11 admit it, or you deny it.  And if you deny whatever
12 fact it is, give us a specific reason of why you deny
13 it.  Okay.  So, the timing is generally 10 days
14 after the transcript comes in, and as I understand it
15 the transcript comes in in two weeks.
16         MR. KLAYMAN:  Your Honor, may I address
17 you on that?
18         CHAIRPERSON MIMS:  Yes.
19         MR. KLAYMAN:  If we may have additional
20 time, my wife is pregnant and will be giving birth
21 around this time period.
22         CHAIRPERSON MIMS:  Okay, when is --

In Re: Larry E. Klayman
July 18, 2019

|  | Page 810 |
| --- | --- |

1	congratulations.
2	    MR. KLAYMAN: Thank you.
3	    CHAIRPERSON MIMS: What is her due date?
4	    MR. KLAYMAN: August 24th. We may have 30
5	days?
6	    CHAIRPERSON MIMS: To respond?
7	    MR. KLAYMAN: Once the transcript is
8	available.
9	    CHAIRPERSON MIMS: Well the way -- so, the
10	way it will work is the transcript comes in in two
11	weeks, bar counsel has 10 days and then you would
12	have 10 days -- but let me see where that puts us in
13	timing.
14	    If the transcript came in in two weeks
15	that would be August 1st or thereabouts. 10 days
16	would put us -- well, I'd probably say it would be
17	due around the 12th because that's a Monday.
18	    MS. PORTER: May I be heard?
19	    CHAIRPERSON MIMS: Yes.
20	    MS. PORTER: I will be out of town from
21	the 5th through the 9th, and that's been scheduled
22	for more than a year.

|  | Page 811 |
| --- | --- |

1	    CHAIRPERSON MIMS: Okay.
2	    MS. PORTER: So, having the transcript for
3	one business day after -- before I leave is not going
4	to be possible.
5	    CHAIRPERSON MIMS: Oh, I see. Well 10
6	days actually wouldn't be the 12th. I'm not sure,
7	business days, okay. You're out of town the 5th to
8	the 9th, is that what you said?
9	    MS. PORTER: The 4th and the 10th
10	actually.
11	    CHAIRPERSON MIMS: Okay.
12	    MS. PORTER: I'm sure you don't care about
13	the weekend.
14	    CHAIRPERSON MIMS: How about if we make
15	the bar counsel's brief due on the 19th? Then I need
16	to see how much time. That's a month from now. And
17	I assume you would start drafting it right away? I
18	think you need the transcript really mostly for
19	cites. I mean we're all here. What is your
20	suggestion Mr. Klayman?
21	    Because if we did a month, that would be
22	before your wife's delivery due date.

|  | Page 812 |
| --- | --- |

1	    MR. KLAYMAN: The due date is August 24th.
2	    CHAIRPERSON MIMS: Oh, August 24th.
3	    MR. KLAYMAN: August 24th.
4	    CHAIRPERSON MIMS: Oh, okay. Well, how
5	about if we put your -- let me see how many extra
6	days I'm giving bar counsel. Actually, I don't
7	know that we're giving you any extra days.
8	    MS. PORTER: Not many.
9	    CHAIRPERSON MIMS: If we give you until
10	the 23rd, and then we made the reply -- the
11	opposition to your response I should say. You want
12	September 13th?
13	    MR. KLAYMAN: The 14th, just because I'm
14	superstitious.
15	    MS. PORTER: It's a Saturday.
16	    MR. KLAYMAN: Okay, 13th's fine, that's
17	fine.
18	    CHAIRPERSON MIMS: I can make it the 12th?
19	    MR. KLAYMAN: The 13th.
20	    CHAIRPERSON MIMS: Alright, so the 13th
21	and then we'll stick with the 5/5 or the replies
22	after that. So, your reply would be due the 20th of

|  | Page 813 |
| --- | --- |

1	September. And then I guess if there was a serve
2	reply that would be the 27th.
3	    MS. PORTER: I'm scheduled to be on
4	vacation in September. I'm returning on the 15th, so
5	I would like -- the problem is I also have a hearing
6	on the 24th through the 26th in another matter, In
7	Re: Michael Haines, so I will only have two days --
8	two and half days to do a reply.
9	    CHAIRPERSON MIMS: The only way to fix
10	that is if we move up the 23rd date, which we can do.
11	Wait, the -- I have your original date as --
12	    MS. PORTER: The 19th.
13	    CHAIRPERSON MIMS: Due on the 19th.
14	    MS. PORTER: Just so you know, I'm
15	scheduled to be out of town two weeks from September
16	5th through the 18th. I mean I scheduled, sorry --
17	but I scheduled vacations and a conference about a
18	year ago when we had this hearing in March, so I
19	wasn't foreseeing --
20	    CHAIRPERSON MIMS: No, I understand.
21	Let's try and figure out a way to make it less
22	painful.

In Re:  Larry E. Klayman
July 18, 2019

Page 814

1    MS. PORTER:  Okay.
2    CHAIRPERSON MIMS:  I think the way to do
3  that, because it's such an extended period of time,
4  is to push -- it would be to push the due date
5  earlier than the 19th.
6    MS. PORTER:  But if the reply is due any
7  time from the 5th through the 18th, I'm out of town
8  those two weeks.  September 5th through the 18th.
9    CHAIRPERSON MIMS:  And I have your reply
10  with the current date saying it would be due when?
11    MS. PORTER:  Pardon?
12    CHAIRPERSON MIMS:  What is the date I gave
13  you for the reply?
14    MS. PORTER:  The 20th, which means I would
15  have two days.
16    CHAIRPERSON MIMS:  I see.
17    MS. PORTER:  And I have a hearing the
18  following week, the 24th through the 26th, so even
19  giving me an additional week wouldn't be helpful
20  because I have a three-day hearing.
21    CHAIRPERSON MIMS:  Well it's a reply.
22    MS. PORTER:  Well my experience with the

Page 815

1  reply, particularly if you're going to stop the
2  Board's briefing schedule, is that they take a lot
3  longer than the opening brief just because we have to
4  respond to every single allegation or supposed
5  finding in the Respondent's brief.
6    If it were a simple reply, I would agree
7  with you, but that's not my experience.  And they do
8  take some time, and I guess there's the issue too
9  about you know, word limits or page limits, given
10  that we have a very big record.  If I get a --
11    CHAIRPERSON MIMS:  We're not going over
12  the limits, which I think is 14,000 and 7,000.  We
13  can put that in an order, but I just asked about that
14  downstairs and I was told 14,000 -- around just over
15  14,000 and 7,000.
16    MS. PORTER:  And that would apply to
17  Respondents as well.
18    CHAIRPERSON MIMS:  Of course.
19    MS. PORTER:  Okay.
20    CHAIRPERSON MIMS:  So, to account for that
21  you said you're returning on the 18th, we'll make the
22  reply due on the 25th.

Page 816

1    MS. PORTER:  I'm in a three-day hearing,
2  the 24th, the 25th and the 26th, and I have two days.
3  I mean I also have witness prep on the 23rd, so I am
4  not available other than those two days, and I won't
5  be able to do anything on the 23rd, 24th, 25th and
6  the 26th.  The soonest I'll be able to return to this
7  matter is the 27th.
8  So, I could do it on the 30th.
9    CHAIRPERSON MIMS:  I think the only way to
10  do it is to move up the dates.  We're not going to
11  get into October and November for this.
12    MS. PORTER:  Well is it okay to move up
13  the dates?
14    CHAIRPERSON MIMS:  I mean you have these
15  two weeks, right?  Or --
16    MS. PORTER:  Yes.
17    CHAIRPERSON MIMS:  While we're waiting for
18  the transcript?
19    MS. PORTER:  Right.
20    CHAIRPERSON MIMS:  If the transcript comes
21  in on the 1st, ten days would be the 15th.
22    MS. PORTER:  This hearing -- first it's

Page 817

1  been postponed for almost a year because of Mr.
2  Klayman's motion for whatever else.  I believe that
3  disciplinary counsel is owed the courtesy of at least
4  trying to accommodate my schedule, since this was
5  initially scheduled in March.
6    CHAIRPERSON MIMS:  We are trying to
7  accommodate your schedule.
8    MS. PORTER:  Yeah, but I am not available
9  the week of the 5th through the 9th because I will be
10  away at a conference.  I agreed to speak at a
11  conference more than a year ago, and as for the two
12  weeks I have on vacation, that was also scheduled
13  some time ago.
14    So, I do not want to give up my
15  opportunity to attend a conference because I'm
16  already committed to speak at, nor do I want to give
17  up my two weeks of vacation which was scheduled some
18  time ago.
19    So, I understand that the Hearing
20  Committee wants these briefs as soon as possible, but
21  I also have a schedule.
22    CHAIRPERSON MIMS:  Alright, what about

44  (Pages 814 to 817)

In Re: Larry E. Klayman
July 18, 2019

```
                              Page 818
1    this schedule. Bar counsel's initial filing would be
2    due on August 26th. Respondent's response due on
3    September 18th. And then Respondent's reply on
4    September 30th and then any additional reply on
5    October 11th.
6          MS. PORTER: I guess I'm confused. Would
7    it be disciplinary counsel's reply on the 30th?
8          CHAIRPERSON MIMS: Yes.
9          MS. PORTER: And so, Board rules don't
10   provide for Respondents having a sir reply.
11   Disciplinary counsel has the --
12         CHAIRPERSON MIMS: Okay, then your
13   response would be due on September 30th.
14         MS. PORTER: Okay. And that would be the
15   end of the case.
16         MR. KLAYMAN: I would request a brief
17   reply.
18         CHAIRPERSON MIMS: Well let's -- if
19   there's nothing new in it.
20         MR. KLAYMAN: Okay, we can --
21         CHAIRPERSON MIMS: Let's wait until that
22   time.
```

```
                              Page 819
1          MR. KLAYMAN: Okay.
2          CHAIRPERSON MIMS: I don't think it will
3    be necessary unless there's something new in there.
4    Are those dates, do they work for both of you?
5          MS. PORTER: Yes.
6          MR. KLAYMAN: Yes, thank you, Your Honor.
7          CHAIRPERSON MIMS: Anything else that we
8    need to?
9          MR. KLAYMAN: Thank you for your time.
10         CHAIRPERSON MIMS: Thank you.
11         MR. KLAYMAN: Have a nice weekend.
12         MS. PORTER: See you this fall.
13         (Whereupon, at 5:47 p.m.m the hearing was
14   concluded.)
15
16
17
18
19
20
21
22
```

45 (Pages 818 to 819)

**A**

abetting 742:17
ability 654:4 691:7
able 654:4,15
  655:18 656:10
  657:3 658:7,11
  661:13 664:8,15
  665:16,21 666:7
  668:12 680:1,6
  707:19 708:9,10
  709:2 721:21
  722:22 732:22
  776:9,9,10 816:5
  816:6
absence 684:7
absent 795:11
absolute 663:16
  682:2 683:21
  694:14 695:4,11
  740:2
absolutely 770:12
abstention 797:8
abundance 729:3
  801:10
abused 795:5
accept 656:3 745:20
acceptable 683:18
accepting 795:13
access 683:6 724:22
accommodate
  817:4,7
accomplish 722:22
accomplished 723:1
account 815:20
accounts 687:5
accurate 739:3
  747:3 748:9
  752:18 766:7
  778:6
accurately 747:14
accusations 725:16
accused 749:3
  768:14,16 797:9
  797:11 804:20,21
accusing 748:20
  808:9
acquired 721:15
act 684:5 719:15
acted 765:10
acting 694:14 710:3
action 672:17
  679:17 680:1
  682:22 683:13
  686:8 690:11
  694:15 695:19,21
  707:10 747:18

760:14 765:16
  767:22 787:20
actions 654:1,4
  660:6 673:12,14
  676:4,11,12,15
  679:15 682:6
  688:19 695:12
  708:17 768:5,19
  769:12 782:19
  785:4
activist 768:11
activities 701:21
acts 768:2
Ad 646:4,10
Adams 774:20
add 667:20 699:18
  705:22 719:6
  736:2 777:3
  779:13 784:2
added 722:17
addition 665:8
  674:7 776:3
additional 700:3
  715:14 718:15
  719:6 733:20
  809:19 814:19
  818:4
address 663:20
  727:11 755:13
  780:14 800:5
  809:16
addressed 764:4
addresses 711:1
addressing 780:20
  808:5
administered
  668:15
administration
  716:8 717:5
  740:12
administrative
  684:1
admission 660:8
  675:15 697:12
  738:17,17 743:6
  764:15 773:6
  778:4 781:20
  782:3 785:2 795:1
  795:11,21 799:20
admissions 745:22
  750:21 807:14
admit 754:13 782:5
  808:15 809:11
admitted 727:7
  734:1,20 737:22
  745:2,17,18 746:3

746:8 747:8
  749:22 757:20
  761:4 768:18
  775:12,17 795:16
  803:22
admitting 730:14
  730:15 759:20
adversaries 716:9
advocacy 725:7
  786:5 809:7
advocate 663:5
  692:15 710:4
  713:8 778:16,16
  779:2 783:10
  784:3
Affairs 757:17
affidavit 653:16
  659:4,12 708:22
  709:4 746:17
  747:2 749:21
  751:1 766:21,22
affidavits 707:14
  779:5 802:12
  808:7
affirmed 714:2
affirming 747:16
afford 781:13
afoot 805:9
afternoon 694:11
  732:4
Agency--excuse
  721:10
aggravation 803:15
  803:16
aggressive 786:3
  796:7
ago 709:19 715:4
  784:19 813:18
  817:11,13,18
agree 657:16 681:9
  695:20 696:13
  697:9,15,21
  698:14 756:21
  778:11 793:10
  802:18 815:6
agreeable 734:7
agreed 747:6 751:1
  761:15,22 769:13
  817:10
agreement 709:7
  750:21 807:14
agreements 721:22
  721:22
agrees 655:2,7
  689:19
ahead 650:5,8

675:8 683:19
  698:17 706:5
  730:8 753:3 760:8
aiding 742:17
Alt 688:1
albeit 714:8 745:7
Alexander 716:6
alia 660:9
allegation 815:4
allegations 766:14
  768:5,21 770:13
  771:13 781:21
  782:21 790:10
  793:8
alleged 658:6
  660:16 769:5
  771:5
Allen 684:2
allow 669:7 670:4
  680:9 681:4 691:9
  697:2 700:1
  706:18 714:21
  722:11 726:14
  792:15,16 801:16
allowed 683:3
  684:13 721:16
  795:20
alluded 749:18
alright 728:14
  731:4,15 735:19
  736:1 752:7
  773:18,18 791:4
  806:16 807:6
  812:20 817:22
Alston 671:13
amend 683:4
amended 683:9
  684:4
Amendment 652:10
  662:17 663:11
  664:14 671:11
  696:15 697:11
  707:5 769:21
  808:20 809:4
American 721:20
analysis 655:3
  664:21 686:2
  710:8 778:6
analyzed 657:18
analyzing 692:13
and--because
  706:15
answer 655:5 658:3
  658:4 678:10
  679:8 680:3 681:1
  681:2,5 683:17

684:10,11 690:18
  690:20 697:19
  698:11 759:10
  769:9
answered 655:4
  657:10 678:9
  679:7 773:1
answering 684:9
anti-FAA 708:2
ANTIFA 701:5,9
  701:22 704:15,18
  708:7
ANTIFA's 702:1
  704:3 708:16
ANTIFA--some
  708:1
anybody 658:10
  729:20 763:12
  789:7 801:1
anymore 745:19
  785:11
anyway 653:11
  657:7 730:10
apparent 801:17
apparently--well
  719:7
appeal 659:18
  711:13 712:5,8
  714:5 771:11
appealable 663:18
appealed 748:14
appeals 645:1
  659:19 674:6
  712:2 747:16
  748:16 776:13,14
appear 744:14
  769:1,20
appearance 702:12
  785:16
APPEARANCES
  646:9 647:1
appeared 693:15
  702:20
appearing 651:3
applicable 706:2
  742:20
applicant 773:9
application 655:6
  672:10 678:4
  681:11 689:2,4
  695:22 706:10
  738:5 743:6,7,13
  743:16 744:6
  755:9 771:7 773:5
  773:5 778:3,19
  802:11 804:9

In Re: Larry E. Klayman
July 18, 2019

**applications** 655:4
  658:2 663:6 665:5
  673:9,11 674:10
  675:15,17 678:16
  679:7 680:20
  681:2
**applied** 675:22
  740:22
**applies** 740:6
**apply** 815:16
**applying** 738:17
**appointed** 777:6
**appreciate** 668:14
  699:10 774:9
  777:15
**appreciate--she's**
  718:9
**appreciation**
  771:19
**approach** 782:7
**appropriate** 655:16
  667:12 679:1
  733:9
**appropriately**
  710:3
**approved** 743:1
**April** 683:2 788:17
**area** 671:21
**areas** 671:19 673:4
  673:5,20 675:4
  696:2 756:19
  807:13
**argue** 662:21
**argued** 676:14
  707:1,1
**argument** 663:10
  668:18 706:4
  709:15,20 714:12
  729:11 732:18
  751:17 754:19
  772:6 792:8 798:1
**arguments** 710:22
  732:21 808:5
**arises** 703:17
**armed** 790:11,11,12
**arms** 790:13
**article** 788:12 794:1
  794:8
**articles** 736:8
**aside** 662:8
**ask--** 726:5
**asked** 652:9 667:9
  676:4 678:7
  680:19 706:20
  717:2 719:11
  734:1 736:17

743:8 746:18
  749:11,20 750:11
  751:16 754:12
  760:9 761:21
  779:9 780:14
  788:18 801:8,13
  801:14 802:21
  815:13
**asking** 668:16
  678:13,14 679:6
  680:3 681:3,15
  692:16 696:4,19
  696:22 718:4
  752:11
**aspect** 791:12
**assaulted** 701:10
**assert** 684:22
**assigned** 701:4
**assistance** 768:3
**Assistant** 647:7
**assisting** 742:17
**Association** 765:11
**assume** 754:18
  811:17
**assumed** 783:9
**assumes** 759:11
**AT&T** 757:13
**Atlantic** 739:4,14
  739:19 740:15
**attach** 743:18
**attached** 707:14
  712:10 720:16
**attached--** 725:18
**attaches** 751:10
**attachments** 717:12
**attack** 701:4
**attacked** 701:8
**attacks** 702:18
**attempt** 685:22
  721:1
**attempted** 750:21
**attempting** 654:20
**attend** 817:15
**attended** 702:6
**attention** 774:9
  777:14 788:11
  798:16
**attorney** 646:16,18
  707:20 708:4,9,13
  740:7 756:15
  782:10 785:15
  789:8,12 794:15
  795:2 801:7
**Attorney's** 758:10
**attorneys** 690:22
**August** 724:17

810:4,15 812:1,2
  812:3 818:2
**auspices** 722:2
**authenticate** 655:20
  670:16
**authenticating**
  670:14
**authenticity** 652:7
  731:13
**authored** 677:19
  766:11
**authority** 713:2
  788:9
**available** 709:12
  751:13,21 752:14
  752:18 810:8
  816:4 817:8
**avoid** 713:7
**aware** 686:14,17,18
  686:20 687:1,4,11
  688:6,10
**awhile** 717:2

_____

**B**

**B-U-C-K-M-E-Y-...**
  683:5
**back** 649:2 653:21
  662:11 666:10
  686:14 700:9
  706:15 722:15
  728:2,15 741:11
  746:18 771:1
  783:9 786:21
  790:3 796:17
  806:17,22 807:6
**background** 655:1
  666:15 671:5
  714:17
**background--**
  714:18
**bad** 804:6
**bail** 790:14
**Baker** 722:3
**banc** 742:6
**banned** 773:15
**banning** 784:16
**bar** 645:7 660:16
  674:2,4,5,5 692:2
  694:9 706:11
  727:6 739:21
  740:2 745:19
  761:2 765:11
  779:15 780:2
  782:15,21 783:13
  786:21 787:13,16
  791:20 798:11

800:6 802:16
  809:2 810:11
  811:15 812:6
  818:1
**Bar's** 711:12 724:11
  724:19
**barred** 748:2
**bars** 674:1 707:12
  805:14
**based** 655:6 658:2
  665:10 677:18
  678:8,14 679:6
  680:2,19 684:18
  686:12 688:11,16
  689:5,13 698:4
  699:3 768:21
  777:1 791:11
  804:22 805:1
**baseless** 739:17
  740:6 741:3 766:8
  767:22
**bases** 739:18 766:15
**basically** 738:8
  742:16,18 751:2
  766:15
**basis** 668:7 734:11
  747:15 753:7
  762:12 763:4,6
  764:6,8,12 770:11
  771:8 773:16
  780:13
**Bates** 701:12 703:8
  709:5,17,18 712:9
  712:22 777:22
**be--actions** 682:16
**bear** 731:8 740:16
**beaten** 704:18
  713:9,12
**been--what** 700:22
**before--is** 725:5
**beginning** 750:19
  805:5
**behalf** 646:7,18
  667:8 702:9
  712:11 717:6
**behavior** 784:21
**beings** 711:22
**belabor** 704:8 758:4
**belief** 699:4 747:19
  760:1 793:14,20
**beliefs** 725:8 776:19
**believe** 652:14
  653:4 683:12
  690:10 705:18
  707:19,22 710:8
  711:20 712:16

713:12 732:3,21
  771:3 774:18
  775:14,22 787:3
  791:8,10 793:9
  803:4,16 807:19
  817:2
**believed** 723:3
  746:11 791:3
  792:3
**Bell** 645:22 646:5
  646:13 789:8,10
  789:12,20 790:8
  790:19 791:4,8,18
  792:13,20 793:4
**benefactor** 768:7,9
**benefit** 721:2
  804:21
**Berkeley** 651:8
  671:8 702:7,11,14
  702:17,19 704:22
  705:4 707:6 710:9
  710:9 793:16
  798:14
**Berkeley's** 705:19
  705:21
**best** 669:20 670:20
  751:19 758:6
  781:4
**better** 679:22
  716:10 747:1
  750:22
**beyond** 679:8
  691:19 692:13
  778:21
**bias** 663:8 702:13
  711:20,22 712:1
  713:4 749:3 767:9
  795:22
**biased** 748:20
  766:10
**biases** 712:1
**Bibey** 706:7
**bidding** 768:7,10
**big** 723:21 806:10
  808:19 815:10
**bigger** 805:10
**biggest** 723:6
**binder** 700:4,5
**binders** 653:4
  735:22
**Bird** 671:13
**birth** 809:20
**bit** 655:12 664:12
  683:16 743:19
  773:4 804:14
  807:12

**Biven's** 760:14
769:12
**Bivens** 654:1 662:3
666:13 672:17
673:12,13 676:4,8
676:9,11,12,13,15
679:14,17 682:6
683:3,12 686:8
694:15,19 695:12
695:19,20 742:20
786:15,17 787:20
788:10 793:15,15
793:21 794:5
**Bivens'** 767:22
768:5,19
**blemish** 778:20
**blog** 723:22 724:4
**Boalt** 649:8
**Board** 645:2,5
646:1 657:7
659:17 661:1
667:17 668:20
669:7 682:2
710:10 764:16
776:13 780:1
782:16 818:9
**Board's** 657:8
765:3 815:2
**Bolt** 702:11
**bono** 708:15
**book** 652:3 716:1
**books** 677:19,20
**borne** 718:19
**bottom** 744:10
750:12
**bounds** 718:14
**bragging** 775:10
**break** 662:8 727:22
728:13,14 806:17
806:20
**breaking** 757:14
**breech** 779:2
**Brenda** 687:9
**Brett** 757:8 758:14
758:22
**Brian** 801:6
**brief** 672:1 712:10
712:10 718:16
726:14 751:11
752:11,16,17
757:11 772:9
780:15 808:18
809:2,10 811:15
815:3,5 818:16
**briefing** 781:18
807:10 815:2

**briefly** 717:15
728:3
**briefs** 706:21
751:21 760:11
762:7 807:12
817:20
**bright** 795:9
**bring** 793:15,21
794:6 808:22
**bringing** 704:21
**broader** 795:13
**brought** 682:16
701:2 706:11
739:18
**Buckmeyer** 683:5
**Buffy** 646:11 650:4
**Bundy** 686:13,15
686:19 687:2,15
688:4,7,22 698:5
698:7 704:16
711:3 727:15
738:1 753:8
755:22 759:9
760:17 761:13,15
761:19,21 771:15
772:3 774:18
775:5 776:11
778:17 779:3,5,7
783:15 789:11
790:6 791:13,19
796:2,2,9,17
797:7 801:5,9,13
801:14 802:9
803:22 806:1
**Bundy's** 760:12
769:21
**burdens** 741:6,14
**Bureau** 819:7
790:22 791:2
**Bush** 777:8
**business** 702:2
811:3,7
**busy** 655:20 658:9
699:9
**Bybee** 660:20 663:2
665:11 667:1
668:4 752:11
766:9,15,18 767:5
767:7,10,12 770:6
770:10 771:18
783:8

---

**C**

**C** 649:1
**C-12** 787:16
**C-A-T-E** 717:10

**C-h-e-m-e-r-i-n-s...**
650:11
**cahoots** 766:16
**California** 649:7
651:5,8 671:8,11
671:16 674:21
700:6 701:3,19
702:3,7,11,15
706:16
**call** 702:2 720:20
725:10 734:1
758:9 788:10
**called** 650:19 677:9
677:10 693:13
758:8 759:17,18
**Calling** 649:10
**candid** 679:4
**capacity** 694:14,18
**Cara** 716:6
**care** 811:12
**career** 723:7 778:20
784:19
**cares** 783:18
**carry** 781:20
790:17
**carrying** 695:14
**case** 665:9 667:21
668:11 675:20
676:13 677:20
682:15 684:12,20
685:15,15 686:13
686:15,19 687:11
688:5,22 689:1,15
691:5 700:6 701:2
701:17,21 702:5
704:1,2,3,6,12
705:2 707:7,21
708:4,10,16,19
709:8 711:19
712:7 713:3 716:5
716:7,15 717:13
718:17,18 719:12
719:13,14,16
722:16 725:6
727:15 731:19
736:19,20 738:2
738:17 739:4,20
740:8,8,13 741:21
742:6 743:21
751:14 753:16,17
756:20 757:17,18
758:12,21 769:12
775:3,22 776:1
781:12 784:8
786:1 788:14,20
788:22 789:1

**790**:4,8 791:17
793:3,7,7,12,15
793:15,21 794:1,3
794:6 796:18,22
798:3 799:7
801:12,16 802:19
803:6,19 804:22
805:6,9,10,18
807:15 808:21
818:15
**case--well** 686:13
**case--you** 716:11
**case-by-case** 686:1
**cases** 656:14,17
661:9 682:21
684:12 688:18
695:16 702:16
739:4 742:2 757:4
758:18,19 774:21
786:2
**catch-22** 706:10
783:5 786:12
**Cate** 717:10 720:4,8
**Cate's** 719:21
**categories** 738:9
741:4
**category** 738:10
**Catholic** 788:11
**caught** 677:13
752:22 760:2,6
767:3
**Cause** 737:3
**caused** 663:9
**causing** 798:10
**caution** 729:3
801:11
**censure** 747:6
**centers** 701:21
**certain** 655:1 678:7
682:17,19 708:12
717:6 793:19
796:16
**certainly** 656:18
665:16 667:13
690:16 762:6
798:2
**certificate** 744:14
**Chair** 646:12 650:4
673:8 677:2,4,16
714:20 732:4
737:12
**Chair's** 672:16
731:11
**Chairman** 716:20
807:6
**CHAIRPERSON**

**649**:2 650:3,8,12
651:18 653:3,8,13
654:19 657:9,20
658:13 659:1,6,8
660:4 661:16
662:7,16 663:10
663:20 664:4,9
666:9,18,22
668:17 669:3,9,22
670:16 671:22
672:5 673:5,15
675:8 677:1
679:10,20 680:13
680:18 681:3,13
681:15 682:3
683:19 685:10
687:18 690:1,6,8
691:14 692:1,18
692:20 693:2,19
694:1,8 696:9,22
697:7,17 698:9,12
699:8,13,15,20
700:1,10,13,17
703:5,19 705:9,13
705:16 706:5
711:14 712:12
713:14 715:12,21
716:1,3,14,18
717:11 718:2,11
719:10,18 720:2,6
720:15 721:4,11
721:13 722:5,10
723:18 725:1,19
725:21 726:6,13
727:3,6,17,21
728:8,12,22
729:21 730:4,12
730:18 731:4,15
732:11,14 733:1,5
733:12 734:3,21
735:3,10,14,19
736:4 737:2,6,10
737:14 741:10,18
741:21 743:14
744:7,16 745:12
745:15 748:1
749:9,16 750:1,4
750:7,13,16 752:1
752:4,7,9,19
753:13 754:17
755:4,21 756:9,12
759:3,13 761:7,11
762:1 763:14,19
764:20 769:3
772:21 773:18,22
777:19 779:14

780:4 786:16
787:11,15,18
788:2 793:20
794:18 796:4
797:13 798:17,22
799:3,8 800:5,12
800:15,19 801:22
802:14 803:4
806:13,16 809:18
809:22 810:3,6,9
810:19 811:1,5,11
811:14 812:2,4,9
812:18,20 813:9
813:13,20 814:2,9
814:12,16,21
815:11,18,20
816:9,14,17,20
817:6,22 818:8,12
818:18,21 819:2,7
819:10
**challenged** 705:5
706:6 797:17,18
**challenging** 705:17
**chance** 653:11
718:9,10 770:10
**change** 710:22
759:22 764:3
**changed** 711:8
738:12 764:5,13
764:13,16 765:6
771:1,4,9,12
802:20,22 803:1
**changes** 753:1
**chapter** 676:10
**characterization**
724:20
**characterizations**
766:5
**characterize** 746:14
749:5
**characterized**
724:8 746:4
747:10,17
**charged** 737:20
738:11 774:16
**charges** 688:4 724:3
724:5,9,11,12,14
724:16,17,21
739:16,17 741:4
773:3
**check** 727:21 728:2
728:10
**Chekerio** 734:14,15
**Chemerinsky** 648:3
649:7,9,11,12,13
649:15,19,22

650:3,7,10,11,13
650:14,18 651:2,6
651:15 652:9
654:12 655:19
658:8 661:12
663:12 666:6
668:9 669:16
671:3 672:8,14
673:22 675:10
677:1 681:6
682:11 683:20
685:6,14 687:22
689:17 690:9
691:18 693:6
694:11,17 696:12
697:9 698:20
699:11 702:8,10
768:1 774:14
776:3 778:7
788:18 793:16
803:2 805:1
**Chemerinsky's**
653:16 679:2
694:6 732:17
**Chemerinsky--and**
692:10
**Cheney** 676:13
**Chermerinsky**
732:2
**Chin** 743:22 744:18
747:18 750:14
**Chin's** 747:12
**choice** 691:8 696:15
713:7 772:4
795:10
**Choper** 651:7
**chose** 717:7
**chosen** 702:1
**CHRISTIAN**
646:15
**CIA--** 721:10
**circuit** 676:13,15
686:7 689:12
695:7 707:2 711:9
714:5 738:7
743:10 748:17,17
751:16 757:1
758:1,8,9,20
759:17,18 760:16
762:8 763:5 764:7
764:19 766:13
769:13 770:5,17
771:2 777:10
780:18
**Circuit's** 795:13
**Circuits** 794:12,21

795:9
**circumstance**
764:17
**circumstances**
688:12 691:5
711:8 764:3,5,13
764:13 765:6
771:1,4,9,13
793:19 794:3
802:20,22
**cite** 772:9
**cited** 656:9,13
705:6 742:2
758:20,20 780:8
**cites** 765:8 811:19
**city** 702:15,17
704:22 705:4
707:6 710:9
736:19 737:4
788:12
**civil** 683:21 718:18
719:13,16 798:2
806:9
**claim** 683:4 684:22
755:4,14 762:11
762:13 763:4,8
768:6 772:1,2
794:2
**Claimant** 678:22
778:2,11 781:19
782:3,14,17
784:17 785:14
**Claimant's** 711:2
782:19 784:21
**claimed** 749:2
757:8,13
**claiming** 755:8
**claims** 683:8 707:6
736:8 739:17,18
740:6 741:2
754:22 755:1,11
755:17 766:8,9
770:5,9,21 771:9
793:17
**clarified** 743:19
**Clark** 801:7
**classified** 721:19
**Claudia** 703:13
**Clay** 787:2
**clear** 656:13 658:16
661:19 662:22
704:10 731:8
745:10 757:6
773:2,10 776:21
781:9 795:6
804:15,18 805:3

807:15 808:12
**clearly** 764:16
765:22 772:11
805:1
**clerks** 668:2
**client** 663:1 687:15
688:4,14 696:13
702:21 704:11
705:8 713:9,9
721:7 742:8
753:15,20 754:5
779:2 785:8,9,9
793:8 798:12
803:7,16
**clients** 775:20,20,21
798:10 803:11
**Clinton** 716:8,9
717:5 768:13
**Cliven** 687:2,15
688:4,7 698:7
738:1 774:18
775:5 776:11
778:17 779:3,3,7
779:9 783:15
789:6,9,10 790:1
796:9,17,19 797:7
801:5,13,13 802:9
803:22 806:1
**close** 652:18 763:22
**closed-door** 800:22
**closely** 807:1
**closing** 728:1,3,9
737:15
**closings** 728:16
807:21
**co-conspirator**
797:12
**co-counsel** 664:19
**Coggins** 682:22
683:8 788:15
**collateral** 798:4,18
799:6,9
**colleague** 725:12
776:15
**colorable** 683:14
684:22 794:2
**colored** 665:10
**Columbia** 645:1
646:6 674:4
740:13 764:11
775:15 805:15
**come** 662:9 663:14
667:15 728:15
734:18 760:4
777:12 806:17
807:14

**comes** 657:3 806:2
809:14,15 810:10
816:20
**Comey** 722:4
**comfortable** 650:15
**coming** 699:10
763:22
**commencing** 646:3
**comment** 789:21
790:19
**Commission** 764:15
766:19
**commit** 719:15
797:9
**committed** 805:4
817:16
**committed--** 726:16
**Committee** 646:4
646:10 650:4,15
656:16 660:2
661:1 668:21
671:4 677:2
678:12 680:15
698:16 700:11,18
731:11 732:4
733:20 745:9
747:4 774:6
777:16 807:7
808:4 809:8
817:20
**Committee's**
764:22
**common** 684:19
685:18 788:19
**communicate** 791:1
**community** 704:20
**company** 783:8
**compare** 757:7
**compared** 758:6
759:1
**comparison** 759:22
785:19
**complainant**
739:21,21,22
740:2
**complaint** 683:9
701:15,17 740:3
742:7,9,10,13
755:7,12 786:15
**complaint--can**
684:21
**complaints** 772:14
**complete** 680:9
739:2 747:3 748:8
749:6,6 770:16
**completely** 771:10

In Re:  Larry E. Klayman
July 18, 2019

771:17 789:6
**complex** 758:18
**compliant** 778:18
**comply** 748:22
**concealing** 739:1
**concede** 754:13
**concern** 700:8
701:4 702:21
**concerning** 675:20
720:1 734:2
**concerns** 781:18
785:18
**conclude** 699:15
**concluded** 706:12
740:8 819:14
**conclusion** 678:17
**conduct** 687:12
702:3 740:11,16
740:22 741:5,7,13
743:5 758:12
765:12 768:15
772:17 783:17
791:11 794:15
795:2
**conference** 813:17
817:10,11,15
**conferring** 761:13
**confidential** 724:3,9
**confined** 761:15
**confinement** 760:12
760:18 761:20
771:16 789:4,15
790:21 791:7,21
792:4
**confirm** 768:1
**confirmed** 761:1,14
772:12 778:6
**confirms** 772:18
**conflict** 766:10
**conform** 772:19
**confront** 760:7
**confrontational**
725:14 786:2
**confronted** 754:5
760:5
**confused** 664:12
818:6
**congratulations**
810:1
**Congress** 684:4
**consequently**
661:11 666:3
680:1 729:18
787:8
**conservative** 701:6
713:13 777:4

**consider** 706:10
760:3 794:13
795:1 799:17
**considered** 790:7
**considers** 668:20,21
**consolidated** 797:3
**conspiracy** 770:13
797:9
**constitutional**
657:14 664:15
665:14 671:19
672:20 674:16
677:20 679:2
685:1 698:6 794:4
794:6
**constitutionality**
809:5
**constraints** 686:3
**Consumer** 757:17
**contact** 688:17
734:13 792:22
**contained** 701:12
705:9,11 709:16
769:4
**contemporaneous...**
721:3
**contempt** 716:12,17
717:3,5,16,18,21
718:6 719:17,19
719:22 720:9
721:5 757:22
762:16 771:15
800:9,11,13,16
801:20,21
**contend** 754:22
755:2
**contents** 653:15
**context** 686:14,18
716:16 719:15
725:4 744:21
748:11 754:21
755:15 756:6
763:10 765:17
774:12 775:2
786:11 798:2,2
**continue** 709:2,2,11
717:7 718:8
772:18 785:17
786:22 787:4
**continued** 647:1
674:21 710:7,8
**continuously**
707:12
**contractor** 721:9
**contrary** 761:21
782:7

**contribute** 786:5
**control** 790:6
**controversial**
774:19 775:20
783:19
**conversation**
759:12 791:19
**conversations**
779:10
**converted** 719:16
**convicted** 688:8
783:15
**convince** 706:19
**convincing** 745:10
776:22 804:16,19
805:3 807:15
808:12
**convincingly**
772:11
**copy** 735:15
**correct** 660:8,10
669:19 670:20
674:11 678:1
694:15 695:9,12
699:5 712:4,17
721:14 730:11
738:15 773:9
797:4 802:4
**correcting** 660:19
**correctly** 674:14
**correctly--and**
701:8
**correctness** 786:8
**corrupt** 768:17
808:10
**Corsey** 717:12
723:1,2,3,7,11
**costly** 781:10
**costs** 711:19
**Council** 745:19
**counsel** 646:21
650:19 652:20
656:15 660:17
661:5,8 667:9,22
675:11 691:8
692:2 694:9
696:15,16 697:3
697:11,13 704:6,8
704:9,13,15 705:1
707:5 709:1,8
710:3 714:14
716:21 719:3,7
722:3 723:4
724:10 728:6
731:21 732:6,19
733:19 734:2

736:17 737:20
738:1,12 744:19
745:9 746:5
752:15 756:4,4,4
760:22 761:14
772:2,4,15 777:18
779:12,15 780:2
786:21 787:14,16
787:20 788:4,6,8
791:20 792:10
795:8,10 798:13
798:16 802:16
803:20 810:11
812:6 817:3
818:11
**counsel's** 727:6
751:15,20 800:6
809:2 811:15
818:1,7
**counseling** 753:15
**counselor** 806:6
**country** 665:19
778:8
**counts** 687:12,17
688:3 774:17
796:12
**County** 801:7
**couple** 673:19 765:7
**course** 676:6 677:9
677:11,15 682:14
688:15 716:11
779:7 782:9
815:18
**courses** 674:17
**court** 645:1 646:5
659:18 672:1,12
674:5,6 676:14
677:9 678:5 679:4
683:3,9,20 684:2
689:17 690:20
691:9,12 695:2,3
695:6 696:17
697:14,20 701:2
701:18 705:3
707:18 709:9
711:1,4,9,10
713:3 719:22
720:4,8 723:16
738:7 739:8 740:1
740:6,19 741:2,6
741:13,17,20
742:3,4,8,10,12
748:15,16 749:7
752:13 753:6,14
753:20 754:10,16
758:2 760:16,19

762:10 763:6
767:3,20 768:14
769:6,18 770:1,2
770:3,4 773:6
776:13 777:7
778:13,14 781:18
781:19 782:1,5
784:14,15,22
785:1,15 789:17
794:13,22 795:5
**court's** 677:7 692:9
695:8 710:22
711:2 737:3
747:16 778:21
782:13 795:15,17
799:19
**courtesy** 817:3
**courtroom** 646:3
754:8 785:16
807:2
**courtrooms** 784:17
**courts** 674:10
675:19 676:6
677:6 690:14,17
695:17 747:22
748:12 769:10
792:17
**covered** 676:7
677:15
**create** 679:18
788:20
**created** 702:12
706:9 767:17
783:5
**creates** 795:21
**credit** 782:21
**criminal** 665:14
674:16 677:21
686:15 687:12
688:4 691:7
697:10 702:3
714:17,18 715:15
716:12,14,17
717:5,16,17,21
718:6 719:2,12,13
719:14,15,16,18
719:22 720:9
721:5,12 722:14
723:2,10 738:1
756:10 757:2,2,4
757:11,22 758:4
758:19 775:7
782:10 784:6
785:20,21 798:1
801:5 806:9 808:3
**criminal--** 721:11

In Re: Larry E. Klayman
July 18, 2019

Page 825

**cross-examination**
700:8 714:17
**cross-examine**
653:2,12
**crucial** 657:19
**current** 799:16
814:10
**cut** 662:22 763:12

**D**

**D** 648:1 649:1
693:13
**D.C** 645:11 706:11
710:11 711:12
724:11,19 776:13
776:13 778:12,14
781:21 782:9,15
783:13 800:6
**damages** 683:22
694:19 695:14
**danger** 661:20
761:18
**date** 754:16 762:3
796:15,16 810:3
811:22 812:1
813:10,11 814:4
814:10,12
**dated** 721:13
**dates** 816:10,13
819:4
**day** 714:4 729:15
753:15 775:16
797:19 803:9
805:18 811:3
**days** 745:6 765:2
809:13 810:5,11
810:12,15 811:6,7
812:6,7 813:7,8
814:15 816:2,4,21
**DC** 646:3,18 659:18
**de** 740:18 741:16
**deal** 653:14 658:10
722:13 723:13
727:22 728:2
730:19 731:16
750:9 798:4
**dealing** 675:18
700:5 701:1
721:19 774:15
784:6 803:7,20
**deals** 744:15 755:10
**dean** 649:6,8,9,11
649:13 650:3,13
651:2,7,15 652:9
653:16 655:18
663:12 665:18

666:6 669:16
671:3,7,10,22
672:8,14 675:10
677:1 679:2 685:5
685:14 687:22
689:16 690:9
692:10 694:6,11
696:12 697:9
698:20 699:9
702:8,10,10 732:2
732:16 768:1
778:7 793:16
803:2 805:1
**decade** 722:15
**decades** 715:3
784:19
**December** 775:13
775:14
**decide** 654:17
655:15 657:4
660:1 661:14
662:9 664:20
667:18 670:14
680:16 689:18
723:16
**decided** 661:18
739:5 742:3 747:1
**deciding** 740:4
**decision** 659:18
680:4 681:9
691:12 706:2,3
710:7,10 713:5
726:22 742:4
747:15 765:3
766:11 771:2
773:16 786:9
795:15 799:19
805:21
**decisions** 666:10
690:20 713:2
747:12,16 749:5
765:5 799:20
**declaration** 651:10
651:17 654:11,20
655:9,21 659:16
660:22 662:5,8,11
667:17 669:18
670:3,21 677:19
678:19 686:11
694:3,7 698:20
699:1 732:2,8,17
**declaratory** 684:7,8
**declared** 798:6
**defamation** 739:22
740:8
**defamatory** 725:11

**defend** 758:12
759:8 774:22
785:9 797:11
**defendant** 687:13
691:8,10 708:1
778:17 783:16
785:22 786:6
798:5
**defendant's** 697:10
697:12 784:7
785:20
**defendants** 687:3
698:7 701:20,22
708:6 717:7
753:12 754:2,3,9
790:11 796:10,17
797:1,14,15 806:9
**defender** 758:16
**Defenders** 687:6
**defending** 668:11
781:11 785:13
**defense** 668:12
687:6 714:18
757:2 758:4
759:15 785:20,21
786:3,10 801:5
**defenses** 755:11
**defensive** 726:17
**defining** 740:13
**defraud** 739:13
**degree** 666:6
709:21 794:4
**delivery** 811:22
**Democrat** 768:11
**denial** 799:16
**denied** 668:4 683:5
738:4 762:18,19
763:2 770:18
785:1 789:22
790:14 792:11
804:7
**Dennis** 721:8
**deny** 683:10 764:8
771:8 798:13
808:16 809:11,11
809:12
**denying** 695:21
705:17 768:15
771:2 781:19
782:3 783:8
799:19,20
**Department** 716:19
757:5,12,20
**depends** 788:21
**Deputy** 646:21
801:7

**derivative** 721:22
**descents** 766:4
**describes** 731:19
**describing** 719:8
**description** 653:20
**deserve** 664:21
668:12,15
**deserves** 665:20
666:6
**despite** 679:17
709:20
**destroy** 806:11
**detail** 743:20
755:17 756:13
762:17
**detailed** 709:21
780:16
**details** 748:4,7
**determination**
678:14 807:8
**determined** 658:2
**died** 767:6
**difference** 805:2
**different** 701:20
728:22 780:11
806:5
**difficult** 683:16
704:14 786:1
**difficulty** 708:4
**diplomatic** 783:2
**dire** 664:16
**direct** 650:22 700:8
719:11
**directly** 712:13
713:17 726:15
740:16 742:19
798:5
**Director** 722:4
**disagree** 661:2
667:4
**disagree--I** 680:8
**disallow** 722:19
**disapproval** 785:4
**disbar** 805:11
**disbarment** 794:16
795:3,12
**disbarred** 776:8
**disciplinary** 646:18
646:21 650:19
652:20 661:4,8
667:8,22 675:11
706:11 707:7,10
714:13 719:3,7
724:10 728:6
731:21 732:5,19
733:18 734:2

736:17 737:20
738:12 743:9
744:1,2,9,12,19
744:19 745:9
746:5,19 750:10
751:14,20 752:15
764:10 765:18
772:1,5,14,15
773:14 777:17
778:3 779:12
795:7 798:16
817:3 818:7,11
**discipline** 779:18,20
780:1 782:10
786:18 787:5,9,17
**disciplined** 660:17
782:15
**disclose** 665:6,7
742:12 745:5,6
748:13 773:8
778:20
**disclosed** 748:2
764:17,20 765:19
778:2
**disclosing** 747:20
808:4
**disclosure** 778:5
**disclosures** 778:15
**discovery** 668:4
804:4
**discretion** 782:13
795:5,18
**discuss** 653:14
662:2,18 715:13
719:1
**discussed** 652:17
658:14 661:17
666:13,20 773:4
**discussion** 653:18
659:2
**dishonest** 679:22
765:21
**dishonestly** 768:15
**dishonesty** 738:10
738:13,20 739:4,9
739:11 743:3,5
**disingenuous**
711:17,18 783:4
**dislike** 776:18
**dismiss** 779:8
**dismissal** 689:10
**dismissed** 689:8
701:15,16 742:14
769:12 790:17
**displayed** 770:15
**disposition** 689:5

749:21 751:8
**dispute** 744:20
**disqualification**
 714:1,3 742:20
 768:20
**disqualify** 703:1
 712:17 713:18
 760:14 769:1
**dissent** 799:15
 800:2
**dissenting** 681:10
 711:3 777:2
**Dist** 788:16
**distinguished** 651:7
 665:20 674:8
 777:2
**district** 645:1 646:6
 672:12,12 674:3
 674:10 676:14
 678:5,6 683:1,1
 687:10 690:19
 691:9,12 695:6
 700:6 701:2,3,14
 701:18,18 704:10
 705:3,3,17 740:13
 752:13 764:10
 773:6 775:15
 778:12,13,21
 781:18 782:1,12
 784:14,15,22
 785:15 788:15,16
 788:17 794:13,22
 795:5,15,17
 799:19 801:7
 805:15
**dividing** 753:11
**Division** 701:19
**docket** 645:5
 717:15,16 719:13
 720:15
**document** 669:17
 670:6,17 722:6
 726:20
**documentary**
 731:13
**documentation**
 722:1
**documents** 653:7
 663:4 668:2 686:5
 686:10 700:20,21
 715:3,14 718:16
 718:17,20 723:3
 734:17 742:22
 801:4
**dog** 781:3,7
**doing** 666:1 670:13

685:3 696:18,19
 703:21 705:6
 768:7,9 779:8
 803:17
**dollars** 781:13
**door** 714:4
**doubt** 808:22
**doubtless** 795:8
**downstairs** 815:14
**dozens** 742:2
**Dr** 723:2,3,7,11
**drafting** 771:20
 811:17
**drives** 721:17
**dubious** 736:22
**due** 659:20 685:6
 709:12 710:21
 731:12 810:3,17
 811:15,22 812:1
 812:22 813:13
 814:4,6,10 815:22
 818:2,2,13
**Duke** 671:14 677:13
**duly** 650:20
**DuPaul** 671:12
**duty** 778:19
**dying** 803:13

_____

**E**

**E** 645:6 646:2 647:3
 648:1,4 649:1,1
**E-1** 752:3
**E-r-w-i-n** 650:10
**earlier** 730:22
 742:10 761:3
 767:6 794:8 814:5
**easier** 649:17
**easy** 774:9
**economic** 748:22
**effect** 798:8 802:13
**effort** 660:7 666:7
 725:6
**efforts** 708:13 775:3
**egregious** 789:1
**eight** 708:8 720:11
**either** 691:2 705:17
 764:18 797:14
 808:15
**elaboration** 684:16
**elected** 768:13
**element** 741:7
**elements** 740:14
**elicit** 670:5 714:15
**elicited** 667:13
**eliminated** 795:10
**email--in** 720:21

**emails** 720:1 787:1
 802:6
**emergency** 753:6,7
**emotionally** 708:17
**Employer** 684:2
**employment** 721:9
**en** 742:6
**encapsulate** 706:22
**ended** 784:9
**engaged** 743:4
 745:11 746:18
 772:11
**engagement** 691:20
**engaging** 747:8
**enormous** 708:4
**enter** 711:21 729:3
**entered** 712:3,5,6
 729:2
**entire** 733:11
 778:14 784:11
**entitled** 660:20,21
 682:1 696:14
 706:4 715:8
 744:20
**entries** 717:20
**entry** 654:9 665:10
 705:5 706:7
 717:17 790:1
**equal** 804:17,17,20
**equate** 774:19
**equation** 803:1
**equitable** 793:18
**erred** 710:15
**error** 663:18 795:6
**errors** 710:8 713:4
 713:5
**Erwin** 648:3 649:6
 650:10,18 651:6
**especially** 708:5
 724:4
**ESQUIRE** 646:11
 646:15,20 647:3,6
**essence** 692:16
 783:2
**establish** 673:16
 767:13
**established** 695:1
**esteem** 777:10
**esteemed** 664:19
**ethical** 656:12
 678:14 680:4,5
 772:20 782:20
 795:12,14 804:15
 805:4
**ethically** 803:17
**ethics** 657:15

665:16 671:18
 674:18 686:4
 696:20 713:22
 782:18
**evaluating** 782:12
**even--she** 712:6
**event** 657:6 658:12
 707:5 708:18
 730:6 737:1
**everybody** 711:22
 774:11 777:5
**evidence** 651:11,14
 651:19 652:19
 653:5 655:13
 715:17 719:6
 727:5,19 730:2,3
 730:5,6,7,8
 731:10,14,22
 735:21,22 743:4
 745:11 746:4
 748:18 757:16
 761:18 772:10
 776:20 779:4
 789:3 804:16,18
 805:3
**evidentiary** 720:10
**evokes** 651:1
**ex** 706:8 721:1
**exactly** 654:19
 655:10 696:18
 720:21 744:2
 759:6
**exam** 675:2
**EXAMINATION**
 648:2 650:22
 694:9 698:2
**examined** 650:20
 719:3,4
**example** 753:4,18
 767:11 789:22
**examples** 807:22
**excessive** 799:18
**exclude** 729:13
**excluded** 668:11
 730:21 731:3
 733:11
**excluding** 659:22
**excruciating** 755:17
 762:17
**excuse** 651:15
 701:12 751:20
 754:7 777:21
 780:18 792:2
**executed** 651:10
**exercise** 782:13
 795:17

**exhibit** 651:11
 652:3 669:16
 672:9,9 678:3,7
 680:21 698:20
 700:19,19 703:3
 707:16,16 712:9
 715:19,21,22
 716:6 723:19,22
 725:22 727:6
 729:1 730:16,17
 731:18,18 732:1
 732:10,10,15
 733:7,12 734:4
 736:5 744:7,9
 750:19 751:11,15
 751:17 761:2,8,9
 765:8,9 777:18,20
 777:21 780:2
 795:7 798:16
**exhibits** 653:5
 655:2 658:20
 672:8 680:21
 699:19,21 700:2,3
 709:6 726:8
 727:12,14,19
 728:7,16 729:2,8
 729:18,22 730:15
 730:16,19 731:10
 737:13 751:20
 802:8,13
**existed** 715:3 780:5
**expand** 685:22
**experience** 666:15
 672:21 675:16
 680:22 684:18
 686:13 688:16
 690:21 693:13
 715:15 722:14
 723:13 755:18,19
 756:10,16 757:3,9
 757:10,11 758:4,7
 758:11,15,22
 759:21 775:6,7
 808:2,3 814:22
 815:7
**expert** 654:12
 656:10,21 657:13
 657:14,18 661:9
 664:13,17 665:2
 665:14,15 666:16
 672:15,19 673:1,2
 673:3 674:15
 675:4,7 682:12
 689:13,21 693:12
 696:5 698:5 746:8
 782:18

expertise 658:3
  664:16 671:6
  673:10,13 676:5
  678:15 679:2
  680:22 685:6,8
  686:12 688:11
  699:4 721:15
  722:8 723:2,11
  759:8
experts 683:12
explain 683:15
  706:3 721:4
  749:20 751:4
  759:15
explanations 760:5
exploring 718:21
expressed 785:3
expressing 782:18
extend 691:19
extended 814:3
extensive 757:2
extensively 676:9
extent 663:14 676:1
  680:6 697:2 809:2
extinguished 714:7
extra 735:15 795:22
  812:5,7
extraordinary
  794:3
extreme 794:16
  799:13
extremely 709:22

          F
face 688:8
faced 663:2 687:15
  774:15
facing 720:14 803:8
fact 655:1 662:22
  663:4 679:17
  702:8 704:15,17
  708:6 710:15,16
  723:12 739:18
  745:6 746:3,16
  748:14 752:15
  758:15 759:16
  764:9 765:21
  773:7,8,8 776:12
  779:15 786:17
  787:8 791:6,6
  796:1 797:4 798:8
  809:12
facto 706:9 721:1
factors 795:19
facts 653:14 710:22
  725:14 788:21

805:8 808:14
factual 693:11,12
fail 665:6
failed 742:14 773:8
failing 738:15
fair 673:15 683:11
  692:4 722:15
  759:7 769:15
  785:21 786:6
  805:21
faith 772:3 777:15
  791:3 793:14,20
fall 738:8 796:11
  819:12
false 660:10,18,19
  696:16 697:13
  738:14,15,18,21
  740:21 741:1
  754:1,15 755:3
  756:7 759:1
  760:10 762:11,14
  762:14 763:4,7,8
  766:8,14 767:4,19
  767:21 770:4
  773:7 781:3 800:7
falsely 800:6
familial 668:6
familiar 674:12
  675:20
family 792:22
  793:11
famous 716:7
far 748:14 765:22
  767:15
favor 763:17 782:4
  785:16
FBI 683:7 716:7,8
  722:2,3
feared 704:18
fearful 761:16,22
  803:13
February 753:8,21
  796:14
federal 671:19
  673:10 674:6
  675:18 676:6,10
  677:6,6,9,10,14
  677:21 678:16
  681:1 687:6
  690:14 694:20
  695:6 747:16
  748:15,16 756:22
  757:2,3 758:3
  768:2 784:16
  790:12 792:17,20
  793:9

feel 710:2,3
feels 751:1
felon 792:21
felonies 774:17
  797:10
felony 758:17
felt 702:4 779:3
  791:15 803:2
fewer 701:22
figure 721:2 724:1
  728:15 813:21
file 679:16 684:21
  695:20 700:2
  708:10 724:14
  731:19 752:13
  764:6 787:20
filed 654:12 658:21
  660:6 667:9
  679:22 690:10
  701:11,14,17
  703:2,3 707:7,22
  711:7 712:4,8,10
  712:13 713:16
  716:22 717:6
  724:11,17 726:8
  730:10 738:3
  739:21 742:9
  743:7 752:15,16
  753:5 760:15
  772:14 776:15
  787:22
filed--did 700:2
filegate 716:7
  717:16
files 716:8
filing 659:10 678:6
  685:18 686:1,7
  690:22 691:2
  703:6 708:3
  726:16 740:2
  742:6 743:1,12
  755:5,7,8,9
  756:20 796:5
  818:1
filings 653:21
  658:15 659:2
  662:3 663:14
  679:14 682:6
  736:19 754:17,18
  755:2 756:14,18
  769:7,8
filling 675:14
final 707:9,10,11
  710:10 765:6,16
  776:12 808:5
finally 712:7 741:8

770:20
find 707:15,20
  708:9,13 709:17
  739:14 752:6
  807:14
finding 678:21
  704:15 708:4
  745:8,8 748:15
  765:1,16 776:12
  778:2 782:9 815:5
finding-- 711:13
findings 654:7
  710:12 748:19
  766:5
fine 650:16 669:5
  692:1 693:21
  727:5 733:3
  745:14 746:5
  769:20 812:16,17
finish 691:16
  699:17 717:14
finished 715:10
  783:13
fire 756:1
first 650:20 668:19
  671:10 678:20
  682:9 701:11,20
  702:5 717:14
  719:12,21 720:3
  729:14,15 738:10
  741:4 742:14
  750:20,20 753:5
  757:13 758:11
  759:11 768:22
  769:13 771:11
  781:21 789:1
  790:1 797:14
  816:22
fitness 765:2
Fitten 706:12 707:7
  776:15
Fitzgerald 695:15
five 690:10 691:2
  692:6 707:17
  709:4,6 774:1
fix 813:9
Fletcher 660:20
Florida 775:13,17
  805:14
fly 780:22
focus 679:15 686:9
follow 656:20 695:7
  695:16 804:5
follow-up 677:3
follow-ups 691:15
following 779:9

814:18
follows 650:21
footnote 765:8
force 702:18 780:3
  798:8
foreseeing 813:19
forfeiture 757:19
forget 745:16
  763:21
form 747:20 808:15
former 707:8
  725:12 757:3
  758:3 776:15
forth 655:8 665:9
  669:4 698:22
  699:3 714:13
  746:11
forward 666:16
  801:18
found 710:16
  711:10 740:1
  743:10 746:15
  747:5,14 748:12
  748:17 751:6
  754:13 765:10,21
  766:1 770:4,15,17
  799:10 804:14,22
  807:18
foundation 696:2
founded 707:8
founding 671:10
four 671:14 745:2
fourth 766:12 778:7
Francisco 691:20
  701:19 702:3
  704:3,4 705:4
Frank 788:13 794:8
frankly 777:14
  783:4
Fred 779:8 801:2
  801:14 802:10
free 747:13
freedom 717:10
  784:7
friend 687:5
friendly 767:12
friends 704:21
  777:3
Frisch 724:1,21
  725:10
frivolous 739:17
  740:1,5,9 741:3
  754:19 755:1,2,5
  755:10,12 769:4
front 693:16 707:1
  732:12 785:8

In Re: Larry E. Klayman
July 18, 2019

Page 828

788:3
**fruits** 723:10
**fulfilled** 766:1
**full** 650:9 656:16
  664:21 668:12
  714:12 766:4
  785:21
**fully** 698:21
**fundamental**
  782:11
**further** 693:21
  698:2,10 699:7
  732:18 766:12
  778:22 795:4
**future** 693:8 783:13
**FW990878** 682:22

_____
G

**G** 649:1
**Gaming** 766:19
**gathered** 715:3
**gay** 701:6,6 713:10
  713:13
**general** 681:8 688:2
  697:3 716:21
  722:3 738:13
**generally** 655:8
  682:19 684:14
  685:15 706:17
  809:13
**genesis** 800:22
**Georgetown** 724:1
**getting** 655:11
  656:16 661:6
  675:1 696:2
  763:18 784:9
  798:17
**give** 654:6 659:9
  672:1 689:21
  692:2,7 731:21
  732:11 733:19
  744:20 751:12
  752:5 753:2,3
  756:21 761:7
  765:7 777:19
  783:9 809:12
  812:9 817:14,16
**given** 652:20 685:21
  689:10 702:8
  704:17 708:6,12
  708:16 712:12
  772:3 776:12
  815:9
**giving** 725:17
  809:20 812:6,7
  814:19

**glean** 713:3
**Gloria** 672:11
**gloss** 794:11
**glutton** 803:18
**go** 650:5,8,12
  656:11 662:11
  663:3 666:10
  668:19 675:8
  679:8 682:7
  683:19 691:21
  692:6 698:17
  706:5 724:12
  728:2,9,18 730:8
  741:11 743:14
  744:5 745:13
  748:4,7 753:8,21
  754:3 755:16
  757:10 760:8
  771:1 773:21,22
  787:3 789:13
  790:3 792:7 799:7
  807:21
**goes** 678:11 679:12
  718:14 765:22
  778:10 784:1,14
  800:1 804:21
**going** 649:5,15,16
  651:16 652:9
  653:19 654:18
  658:17 661:20
  662:11,18 663:12
  665:21 666:7,10
  668:7 669:1,3,11
  669:13,22 670:5
  680:11 681:4
  688:1 691:15
  692:5 696:9
  704:20 707:12
  710:17 711:17
  712:18 714:20
  718:9,15 720:13
  722:10,11,15,19
  723:4 725:10
  726:6 737:17
  745:20 749:4
  753:14 754:3
  756:1 769:22
  773:13 777:16
  786:13 789:5
  790:16 797:16
  802:8 805:15
  807:9 808:22
  811:3 815:1,11
  816:10
**good** 694:11 707:11
  721:16 723:17

772:3 775:11
  777:14,15 789:18
  791:3,5 793:14,20
  802:21 805:14,16
**Gould** 654:8 655:3
  655:7 657:17
  667:1 678:17
  681:10 689:14,19
  707:2,3 765:20,22
  766:4 774:13
  775:4 777:1,5
  781:16 784:1,2
  786:8 794:11,21
  797:21 798:3,8,21
  798:22 804:22
  805:7
**Gould's** 656:1,5,7
  657:11 678:21
  681:8 778:1
**government** 723:14
  729:16 760:22
  762:19 769:19
  771:5 792:9 797:7
**graduated** 767:18
**grand** 753:22
**grandmother**
  803:12
**granted** 654:10,10
  657:21 663:7
  675:21 676:1
  692:14 703:22
  704:1 771:7
**great** 666:7 722:13
  756:13 777:10
  781:5
**greater** 709:21
  778:19
**grossly** 713:5
**ground** 701:10
**grounds** 652:16
  720:12
**group** 707:8 736:14
  754:3 797:1,14,15
**groups** 753:12
**guess** 664:11 672:18
  675:16,18 735:5
  744:14 754:20
  763:10 769:19
  804:13 805:16
  813:1 815:8 818:6
**guilt** 782:9
**guilty** 794:15 795:2
**gun** 714:3 790:18
**guy** 783:18 796:11

_____
H

**H** 651:7 787:2
**hac** 654:9 655:4
  657:21 658:2
  660:7 665:4,9
  672:10,17 673:9
  673:11 674:9
  675:15,17,21
  676:2 737:22
  738:4,18 743:6,15
  764:9 768:16
  770:19 771:7,18
  778:4,19 783:8
  785:1 794:14
  795:1,11,16,20
  799:19 802:11
  804:7,9 807:16
**Hagan** 682:21
  683:3 788:15
**Haines** 813:7
**haircut** 781:4,6
**half** 751:3 763:15
  784:19 806:20,20
  806:21,22 813:8
**Hall** 702:11
**handle** 723:16
**handled** 676:15
**hands** 790:21
**hang** 807:1
**Hanson** 686:6
  742:21 761:6,12
  768:4 788:7,7
  790:3 791:12,19
  792:2
**Hanson--because**
  684:21
**happen** 702:19
  763:3 805:4
**happened** 705:2
  746:7 747:3
  748:12,13 749:8
  756:2 762:21
**happening** 803:1
**harassable** 784:5
**Harbor** 775:16
**hard** 691:17 721:17
**harm** 708:17 711:5
  798:10,11
**harmful** 729:19
**harming** 705:7,8
**Harry** 735:13
**Harvey** 732:8
**head** 683:2 805:6
**headquarters** 704:4
**Heads** 783:6
**hear** 649:19,22
  654:3 666:16

670:11 674:14
  675:12 687:7,22
  692:22 701:7
  713:11 718:3
  725:4 729:4
  769:13
**heard** 666:9 723:18
  725:5 776:3,6
  796:16 801:1
  803:1 809:5
  810:18
**hearing** 645:14
  646:1,4,10 652:6
  652:18 657:12
  660:22 668:20
  670:8 671:4 677:2
  677:4,16 678:12
  686:22 706:20
  709:14 731:12
  732:3 733:20
  745:7,9 747:4,4
  751:7 761:3
  764:15,22 787:4
  800:22 807:7
  808:4 813:5,18
  814:17,20 816:1
  816:22 817:19
  819:13
**hearing--and**
  725:18
**hearings** 720:10
**heavily** 703:17
**heed** 775:15
**held** 747:4 782:1
  794:12,22 800:10
  801:19
**Hello** 649:12
**help** 683:15 699:10
**helped** 767:13
**helpful** 814:19
**hide** 661:5,5
**high** 702:8 738:1
**high-profile** 790:8,9
  793:7
**higher** 768:14
**history** 745:5
**hoc** 646:4,10 678:4
  678:16 680:20,22
  681:11 689:2,4
  691:9 692:14
  695:21 703:22
  705:5,17 706:7
  707:19 709:10
**hold** 702:7 762:16
  795:4 800:9,12,16
  801:20

honest 711:17 749:6
  771:18 777:11
honestly 792:3
  803:17
honesty 777:11
honor 655:11 656:8
  659:14 660:1
  662:19 664:19
  667:7,11 668:3
  669:6 679:5,17
  680:7 692:11
  694:3,4 706:22
  709:22 711:16
  714:10 715:8
  720:20 722:21
  723:16 725:4
  726:10 727:9
  728:11 729:6
  730:2 733:9 734:6
  763:11 802:21
  809:16 819:6
Honor's 654:13
Honor--but 718:10
honor--excuse
  692:10
Honorable 703:12
  720:4,8 774:5
Honors 780:16
  788:21
hope 684:16 732:17
hoping 710:6
Hopkins 740:14
  742:1,2
hour 661:12,20
  664:6 806:20,21
  806:21,22
housekeeping 727:9
human 711:22
hundred 781:13
husband 792:19
  801:4,6,21
hy 706:9
hypothetical 696:4
  696:6,8
hypothetically
  696:14

_____

I

I-- 719:9 727:9
identical 742:10
identify 757:17
IG's 771:4
ignorance 770:16
ignored 752:16
II 646:3
III 787:2

illegal 721:19
illegitimate 772:2
illicit 654:20 662:2
Illinois 674:3
immune 770:12
immunity 683:21
  684:1,3 694:15
  695:5,11 721:21
  740:2
impact 799:18
impeachment
  745:22 780:10
implicated 663:12
implication 757:6
important 667:19
  668:3 722:9
  774:13 775:19
  776:21 779:1
  782:6,22 785:5
  786:7
importantly 676:12
  761:1,5
impose 769:15
impression 679:18
  756:22
imprisonment
  663:2 687:16
  688:9 774:16
improper 740:16
improperly 714:8
  792:5
Improvements
  684:5
inaction 702:20
inappropriate
  666:4 771:10
incident-- 703:18
incidents 784:20
include 677:6
  768:20 772:13
included 700:3
  743:15 757:12
  760:13 766:9
includes 739:12
  741:2,3,4,13
including 671:16
  677:19 679:14
  701:13 709:18
  738:4 748:21
  758:15 770:4
incomplete 743:11
  746:20
incompleteness
  747:9
incorrect 706:3
  740:20 742:4

independent 770:16
indicate 718:18
indicating 718:6
indication 736:10
  769:16
indicted 723:4,5,7
indictment 689:7
  689:11 790:10
  792:12
indirectly 742:19
individually 691:2
individuals 717:6
inducing 742:17
influence 704:21
information 662:13
  672:18 721:18
  722:1 733:20
  738:19 739:1
  740:21 744:22
  747:21 748:8,10
  750:11 751:13
  760:6 780:15
  801:10
informed 779:18
initial 712:10 743:6
  766:11 778:3
  791:14 818:1
initially 669:12
  747:6 817:5
initiated 716:13
  717:18 720:18
injunction 684:10
  684:15
injunctive 682:16
  682:20 683:13
  684:4,6,13,22
  695:18 793:17
inmate 790:20
inmates 761:16
innocence 782:8
input 788:7
instance 656:22
  682:21 725:18
instances 743:5
  749:19 762:5,10
  784:16
instant 703:14
instinct 782:8
instituted 724:5
  744:12
instructions 804:5
instrumental
  757:14
integrity 783:5
intellectual 783:4
intent 739:10,12

intentional 713:4
intently 774:7
inter 660:9
interest 671:17
  766:10
interfering 740:11
  769:21
Internet 736:8
interpreting 798:20
interprets 766:6
interrupt 690:3
interruption 667:5
intimidation 770:18
invalid 749:2
investigate 801:8
investigative 683:6
involve 740:10
involved 702:16
  708:15 719:2
  742:22 743:8
  753:16 757:15
involvement 718:7
  757:21 771:20
involves 782:10
involving 668:5
  739:20 758:18,19
  760:11
Irmes 671:17
ironically 702:6
  709:18
irrelevant 652:11
  653:16 661:15
  668:21 731:20
irritation 785:3,19
Irvine 671:12
  677:13
is--I 716:22
is--not 709:15
issue 652:10 657:21
  660:18 661:8
  662:17 663:11
  668:5 679:12
  681:16 685:5
  689:19 706:17
  719:22 720:8,14
  723:21 725:9
  727:11 728:4,5
  729:1 737:8
  743:21 745:18
  753:22 760:13,19
  764:4 770:20
  780:14 782:19
  786:14,15 788:12
  791:17 796:8,9,10
  802:16 808:3,20
  809:5,7 815:8

issued 689:1 706:14
  713:21 736:20
  749:10 753:11
  769:6,7 784:18
issues 654:17 664:1
  664:2,8 667:1
  669:14 672:20,22
  689:20 702:16
  713:14 714:16
  728:1,9 780:21
  798:5 809:5
it's-- 716:2
it--I 725:4
items 744:3 808:10

_____

J

J 646:11
J.K 731:19
Jaconi 734:13
jail 796:20
James 722:2,4
Jesse 651:7
Jessup 732:8
  734:12
job 779:8 786:9,10
Joel 684:20 788:7
John 739:7 774:20
Joseph 717:10
  719:21 720:4,7
judge 654:8 655:3,7
  656:1,5,7 657:11
  657:17,20 660:20
  660:20 663:2,5
  665:11 667:1,1
  668:4 672:11
  678:5,17,21 681:8
  681:10 683:5,5
  686:7 687:10
  688:19 689:13,14
  689:19 692:15
  693:13 694:20,20
  695:21 698:6
  701:4 702:6 703:1
  703:15 704:1,2
  705:7,7 706:7,8
  706:13 707:2,3
  708:22 709:21
  710:5,13,13 711:5
  711:6,18 712:13
  713:17,19 714:7,8
  714:9 717:1
  720:19,20 721:1
  726:22 735:12
  738:4 743:9,16,22
  743:22 744:22
  746:15,22 747:11

In Re: Larry E. Klayman
July 18, 2019

Page 830

747:11,18,18
749:3,10 750:10
751:4,5,12,18,22
752:11 753:10,10
754:11,12 756:22
758:14,20 759:18
760:14,19,20
761:14 762:15,18
764:8,18 765:12
765:13,20,22
766:4,9,15 767:6
767:9,10,12,13,18
768:2,6,13,14
770:6,6,9,10,14
770:14 771:8,18
773:13 774:13
775:4 777:1,5,9
777:11 778:1
779:16,18 780:14
780:18 781:16
782:22 783:8,18
784:1,2,3,12
785:19 786:8
788:10,13 789:4
790:2,20 791:9
794:9,11,21
797:21 798:3,8,14
798:15,20,22
800:8,15 801:15
801:20 804:1,22
805:7,18 808:9
**judge's** 689:5 713:5
801:4
**judge--the** 711:2
**judges** 682:12,12,15
682:17,19 683:21
684:3,6,13,14
688:19 694:13,18
695:4 706:17
711:21 712:1
747:14 748:13,18
770:12 773:15
777:6 784:4,4,16
785:2,15 789:14
793:19
**judges'** 736:20
**judgment** 684:8
**judicial** 660:8,10
665:16 683:22
684:5 685:1
694:14,18 695:5
707:8 710:1 713:4
713:22 716:21,22
717:8 740:17,17
743:21 768:2
776:14 780:19

781:12 783:21
795:22
**judiciary** 770:15
**Julia** 646:20 675:10
694:12
**July** 645:10 649:3
709:19
**jump** 760:8
**jumped** 714:3
**jumping** 753:3
**June** 712:11
**jurisdiction** 671:20
676:10 677:10,14
677:21 706:17
788:20
**jurist** 777:3
**jury** 723:15 770:17
775:9
**just--** 717:22
**justice** 685:14
716:19 729:14
740:12 756:17
757:5,12,20
**justify** 706:9 794:16
795:3

**K**

**K** 645:22 646:5
**K-I-A-R-A** 708:21
**keep** 711:19 765:19
**Keller** 693:14
743:22 744:18
747:18 750:14
**Keller's** 747:11
**kept** 696:19 723:5
787:21 802:15
**key** 676:13 765:19
**Kiara** 702:21
703:11 707:14
708:20 709:11
712:11 714:6
**Kiera** 798:12
**kind** 688:13 741:3,8
742:16 751:3
753:2,22 755:13
756:7 759:20
770:21 773:12,16
**kinds** 774:10
**Klayman** 645:6
647:3,7 648:4
649:4,5,13,14,18
649:20 650:2
651:1,2,20,22
652:2,13 653:1,9
654:5,22 656:8
657:13,22 658:18

659:5,7,11 660:7
660:15 662:4,15
662:19 663:15,22
664:7,10,18 665:3
666:17,21 667:3
669:2,5,11,15
670:13,18,19
672:6 673:21
675:3 676:3
677:17 678:13
679:5,16,21
680:17,19 681:7
681:14,22 682:10
685:8,12 687:18
687:21 689:21
690:5 691:10,16
692:4,8,20,21
693:4,5,20,21
694:2,16 696:1,6
696:18 697:5,16
698:3,10,18 699:7
699:14,16,17,22
700:4,5,11,13,16
700:21 703:7,10
703:19,21 705:11
705:15,22 706:6
708:8,11,14 709:7
710:19 711:14,16
712:16 713:1,20
714:21 715:7,11
715:20,22 716:2,5
716:16,20 717:14
717:22 718:8,15
719:9,10,14,20
720:3,7,17 721:7
721:12,14 722:7
722:20 723:20
724:9,13 725:2,3
725:19,20 726:2,4
726:9,17,20 727:4
727:8,20 728:9,10
729:2,6 730:1,14
731:1,5,9,19
732:21 733:6,8
734:5,9,15 735:1
735:12 736:2,18
737:4,6,7,17,21
738:11,12 742:22
743:4,12 744:20
745:11 746:2,12
746:17,19 747:12
748:10 749:4
750:20 751:16
752:16,22 753:9
755:14 757:11
758:12 759:1,16

759:19 760:11,13
760:18 761:4,4
762:22 763:3,9,11
763:17 764:8,17
765:7 766:1,13
767:2,2,16 768:3
768:18 770:22
771:17 772:11,14
773:20 774:2,5
777:21 779:22
780:6 782:2 783:6
785:1 786:20
787:13,16,19
788:4 789:9,11,18
789:22 790:9
791:1,5,10 792:1
792:15 793:2,5,22
794:10,20 796:6,9
797:17 798:20
799:2,5,9,22
800:10,14,17,21
802:2,19 803:6
806:2 808:13,15
808:17 809:16,19
810:2,4,7 811:20
812:1,3,13,16,19
818:16,20 819:1,6
819:9,11
**Klayman's** 707:18
709:10 715:6
718:7 750:8 766:5
784:19 785:4
808:2 817:2
**Klayman--I** 724:6
**Klodskney** 709:1
**knew** 724:3 753:9
754:6 760:18
767:16 775:3,18
804:7
**know** 649:17
658:18 664:6,16
668:6,14,14
672:14 677:8
688:21,22,22
689:3,4 690:6,22
693:17 699:9
710:2 714:11
716:11 718:9
720:13,22 723:13
723:15 727:17
729:9 730:1 731:2
734:6,6 746:6
748:18 750:2,4,5
753:21 756:13
758:5,13 759:4
760:4 764:3

765:17 766:20
767:5,16,21
769:19 770:11
772:4,22 774:10
781:8,12,22 783:3
783:14,20 788:5
788:21 789:13,14
789:19 790:15
793:13,14 806:6
806:18 807:21
812:7 813:14
815:9
**knowing** 762:11,11
**knowingly** 738:14
738:18 773:7
**knowledge** 669:20
670:21 672:22
675:16 676:2
688:2 699:4
789:14
**known** 710:4
767:17 769:10
773:9
**Kolodsney--his**
704:7

**L**

**L** 646:20
**L-I-N-D-S-A-Y**
683:6
**labeled** 753:6
**lack** 668:13 679:21
702:20 709:12
716:10 722:14
770:15,16 783:4
**lacked** 771:18
**Lacks** 696:1
**Lambert** 717:1
720:19,20
**language** 744:5
**largely** 662:17
**larger** 700:22
726:21
**Larry** 645:6 647:3
648:4 649:14
651:2 737:21
779:6 796:9
801:19 803:14
806:2
**Las** 686:15,19
687:3
**lasted** 717:19
**Latino** 768:10,11
**law** 649:8 651:8,9
656:13,20 657:15
664:15 665:14,19

668:2 671:7,9,11
671:12,13,14,18
672:20 674:16,16
674:21 675:20
677:8,20 679:2
682:13 683:10
684:16,19,19
685:14,18 686:1
702:9,11 725:7
739:19 767:13,17
776:9 778:8
788:11,19,20
793:17,22 795:19
799:11 805:12
806:8
**laws** 671:19
**lawsuit** 701:11
704:21
**lawyer** 676:16
685:22 688:12
697:12 714:6
729:14 738:18
739:20,21 741:5
769:18 770:8
772:19 775:4,11
775:20 776:16
779:6 785:7,11,12
785:13 786:10
788:13 792:19
794:9 795:16
805:16,22
**lawyer--is** 688:12
**lawyering** 786:2
**lawyers** 687:6
688:17 690:16
704:18 711:22
741:1 742:12
755:19 784:5,9
786:4 806:4,7
**lay** 664:20
**lead** 709:8 756:4
**Lean** 804:1
**leaning** 687:19
**leave** 683:4 791:13
791:20 806:8
811:3
**lecture** 674:22
**left** 699:18 714:6
716:22 717:8
721:9,17
**legal** 671:18 685:18
686:1 708:19
782:7,18 797:22
**legally** 770:11
**legitimate** 772:6
**lengthy** 720:10

**lenient** 747:7
**Leslie** 716:6
**let's** 653:13,14
662:7 663:20
664:5 681:17
682:4 727:22
728:12,14 744:5
773:22 777:17
786:22 806:21
807:16 813:21
818:18,21
**letter** 782:17
**level** 759:8 808:11
**Lexus** 683:1 788:16
**liable** 804:14
**license** 744:13
**lie** 753:1 760:7
767:4
**lies** 759:17,19
**life** 663:2 687:16
688:9 723:14
747:22 774:15
775:9 783:16
791:15 803:8
**light** 751:9 803:9
**lightening** 796:3
**lightning** 796:11
**limitations** 763:21
**limited** 658:8
661:21 663:14
666:19 756:14,17
808:21 809:3,6
**limiting** 661:3
680:10
**limits** 685:17
788:19 795:17
815:9,9,12
**Lindsay** 683:6
**line** 710:20 720:2
769:20 795:9
**links** 767:11
**list** 653:20 666:12
**listed** 743:2,17
801:11 808:14
**listen** 774:10
**listening** 699:12
774:6 805:20
**literal** 684:10
**literally** 682:18
**litigants** 806:9
**litigate** 708:10
**litigated** 676:11
688:18 720:18
776:2
**litigating** 704:12
**litigation** 736:18

738:3 796:7
**litigator** 775:8
**little** 655:12 664:11
710:15 743:19
773:4 783:18
804:13 807:12
**live** 684:18 788:19
**lived** 767:10
**living** 776:10
**load** 781:9
**local** 704:6,8,9,13
704:19 705:1
708:22
**long** 654:18 656:11
681:22 783:14
**longer** 785:10 798:7
804:14 806:19,20
815:3
**look** 750:12 751:17
761:10 767:4
768:4 771:2
777:17 792:17
**looked** 658:1
755:22
**looking** 657:14,16
665:5 668:2
710:19
**lose** 708:19 783:6
**lost** 775:10
**lot** 752:22 767:21
771:13 776:3
789:14 801:1
815:2
**love** 781:6 785:12
785:13 805:21
**lower** 695:17
**lying** 760:2 781:6

_____

**M**

**M** 671:17
**magistrate** 687:9
704:1,2 753:10
760:20 804:1
**majority** 663:3
692:11 711:11
784:15
**making** 659:17
718:4,18 725:16
738:14 753:19
754:22 785:16
786:5 805:20
**MALE** 735:17
739:6
**malicious** 768:16
808:9
**man** 774:15

**mandamus** 690:10
690:17,19 691:13
711:7 759:5
799:16,20
**manned** 801:17
**March** 731:11
743:7 813:18
817:5
**married** 766:18
767:6
**Marshall** 790:2
**mass** 721:19
**material** 667:21
668:1 738:19
773:7 791:6
**math** 805:16
**matter** 667:16
675:12 679:13
683:10 699:10
703:14,15,17
707:11 708:5
714:22 715:6,13
724:18 734:2
750:10,21 765:14
776:14 799:11
808:6 813:6 816:7
**matters** 651:17
657:1 658:5
661:13,17 695:8
698:22 700:7
715:2 719:2
720:18 724:2
772:5 775:7
799:11
**maximum** 763:13
**mean** 658:9 661:19
668:13 679:1
685:4 689:16
711:17 725:5
726:9 740:19
753:2,21 755:13
756:18 758:9
763:17 765:15
767:19 768:5
770:2 776:17
781:1,11 805:2
807:22 809:4
811:19 813:16
816:3,14
**means** 798:7 806:22
814:14
**meant** 754:8 787:5
**media** 687:4
**meet** 734:16,18
**member** 646:14,16
674:1,2,3,4

**mandamus** 690:10
700:11,18 707:11
714:5 782:14
805:14
**members** 660:2
701:9 708:1,7
793:11
**membership**
673:22
**memo** 771:20
**mentioned** 677:5
794:8
**mercy** 806:9
**merit** 769:17 770:6
770:10 795:8,12
**merits** 790:16 799:7
**met** 804:2
**Mexican-American**
768:12
**Michael** 704:6
709:1 724:1 813:7
**microphone** 687:20
**microphone)--**
712:20
**Milo** 701:7 713:10
**MIMMS** 728:22
729:21 730:4,12
730:18 731:4,15
732:11,14 733:1,5
733:12 734:3,21
735:3,10,14,19
736:4 737:2,6,10
737:14 741:10,18
741:21 743:14
744:7,16 745:12
745:15 748:1
749:9,16 750:1,4
750:7,13,16 752:1
752:4,7,9,19
753:13 754:17
755:4,21 756:9,12
759:3,13 761:7,11
762:1 763:14,19
764:20
**Mims** 646:11 649:2
650:3,4,8,12
651:18 653:3,8,13
654:19 657:9,20
658:13 659:1,6,8
660:4 661:16
662:7,16 663:10
663:20 664:4,9
666:9,18,22
668:17 669:3,9,22
670:16 671:22
672:5 673:5,15
675:8 677:1,2,4

In Re: Larry E. Klayman
July 18, 2019

677:16 679:10,20
680:13,18 681:3
681:13,15 682:3
683:19 685:10
687:18 690:1,6,8
691:14 692:1,18
692:20 693:2,19
694:1,8 696:9,22
697:7,17 698:9,12
699:8,13,15,20
700:1,10,13,17
703:5,19 705:9,13
705:16 706:5
711:14 712:12
713:14 715:12,21
716:1,3,14,18
717:11 718:2,11
719:10,18 720:2,6
720:15 721:4,11
721:13 722:5,10
723:18 725:1,19
725:21 726:6,13
727:3,6,17,21
728:8,12 769:3
772:21 773:18,22
777:19 779:14
780:4 786:16
787:11,15,18
788:2 793:20
794:18 796:4
797:13 798:17,22
799:3,8 800:5,12
800:15,19 801:22
802:14 803:4
806:13,16 807:6
809:18,22 810:3,6
810:9,19 811:1,5
811:11,14 812:2,4
812:9,18,20 813:9
813:13,20 814:2,9
814:12,16,21
815:11,18,20
816:9,14,17,20
817:6,22 818:8,12
818:18,21 819:2,7
819:10
mind 690:2 752:8
mine 687:5
minimis 740:18
741:16
minimum 683:14
694:5 801:18
minor 757:15
minority 657:17
minute 732:11
752:6 777:19

minutes 691:17,19
691:21 692:6
728:18 763:13
773:20 774:1
781:2 804:13
806:18,19
misapprehension
773:9,11
mischaracterizes
746:9
misconduct 689:6
745:11 747:7
771:5 772:12
mislead 739:13
misleading 696:16
697:13 738:22
739:10 740:22
741:1 742:8,11
743:11 746:14,21
747:8 748:9,11
751:4,19 754:15
756:8 758:6 759:2
760:10 763:7,8
767:20,22 807:18
808:3
misrepresent 658:5
707:4
misrepresentation
753:1 808:1,2
misrepresentations
665:8 707:6
738:22 759:16
misrepresented
759:20
missing 720:1 744:4
misspoke 679:20
misstatement 655:6
misstatements
660:16
mistrials 797:6,7
misunderstood
800:20
mix 701:20
Monday 652:4
810:17
money 682:20
683:22 684:14
694:19 695:13
monitor 792:18
Montgomery 721:8
721:17 723:1
month 811:16,21
months 717:19
791:15
moot 689:14 798:6
798:19

mooted 798:9
motion 652:8
672:17 705:19,21
712:4,12,13
713:17,18 716:12
719:21 760:14
768:22 807:17
817:2
motion-- 718:1
motions 713:16
768:20 769:4
772:13
motivated 800:2
motivation 776:6
776:11 781:9
move 693:3 703:1
730:6,7,8,14
732:22 756:10
786:16 790:4
797:22 813:10
816:10,12
moved 731:9
moved-- 712:16
moves 720:4,8
moving 794:10
Mueller 723:5
multi-defendants
758:19
multi-state 675:1
multiple 743:4
multiplied 749:1
multiplies 741:5
murder 758:17

_____
N
N 648:1 649:1
N-e-b-e-c-k-e-r
788:14
Nader 806:6
name 650:9 651:4,6
675:10 687:8
694:12 701:8
704:7 769:1 788:2
named 721:8 801:6
Nanny 803:13
National 721:9
nature 686:18
687:1 770:21
786:1 794:17
805:8
Navaro 678:5 686:7
689:13 692:16
698:6 705:7 706:8
710:13 711:6
714:9 721:1
Navarro 657:21

663:5 672:11
735:13 743:10,16
744:22 746:15,22
749:10 750:11
751:5,6,13,22
754:12,12 758:14
758:20 759:18
760:15,20 761:14
762:15,18 764:8
764:18 767:10,14
767:18 768:6,14
770:6,9,14,14
771:8 773:13
779:19 780:14,18
783:1 800:8,15
801:15 808:9
Navarro's 779:16
nearly 796:21
Nebeker 788:13
794:8
necessary 688:13
739:2 773:8
803:19 819:3
necessity 785:22
neck 803:10
need 666:14 668:19
670:11 679:8,15
687:19 693:3
699:17 703:20
704:8 711:15
715:15 718:20
754:4 782:3 784:3
784:3,4,4 785:20
797:4 801:12
803:15 806:7
808:10,13,17
809:8 811:15,18
819:8
needed 754:8 779:3
779:4 797:19
Needs 788:13 794:9
negative 799:18
negligent 713:5
negotiate 721:21
negotiated 749:20
751:7 779:17,20
779:22 786:18
787:5,8,17
negotiating 787:7
negotiation 786:22
Nevada 678:12
678:6 687:3,10
767:5,10 801:7
never 651:21
652:14,18,20
657:2 661:8

679:22 693:15
733:21 746:13
760:17,21 761:18
762:20,21,22
763:2 764:17,20
765:10,19 784:10
792:1,3 803:9
804:3 805:17
nevertheless 711:10
new 701:17 704:3
710:21 784:22
788:20 818:19
819:3
nice 819:11
nine 671:12 676:10
708:11
Ninth 686:7 689:12
695:7 707:2 711:9
714:5 738:7
743:10 751:16
757:1 758:1,8,9
758:20 759:17,18
760:16 762:7
763:5 764:7,18
766:13
nit-picking 780:22
Nixon 695:15
no.' 683:17
nomination 766:17
non-binding 807:8
non-meritorious
792:8
non-partisan 777:9
nonbinding 745:8
Northern 683:1
700:6 701:3,14,18
704:10 705:3,16
788:15,16
notarized 742:13
Notary 646:5
note 683:3
noted 669:10 785:2
notes 728:10
notice 712:8
noticed 702:5
notion 752:17
notorious 701:5
notwithstanding
772:5
November 816:11
Now--nor 714:15
number 645:5
676:11 703:8
705:14 709:18
710:17 718:21
723:15 733:7

In Re: Larry E. Klayman
July 18, 2019

Page 833

737:21 743:2
745:1 750:13,14
750:17 756:14,17
759:14 761:8,8
762:4,10 766:13
769:10 777:22
779:22 787:19
788:9 802:16
807:22
**number--that**
712:19
**numbers** 701:13
709:5,17
**numerous** 709:16
760:15
**NW** 646:2

___

**O**

**O** 649:1
**O.J** 784:8
**oath** 671:1 700:14
747:5 779:13
793:5,6
**Obama** 768:10
**object** 652:9,15,21
652:22 658:20
672:13 673:2
678:20 714:20
715:5 719:5,8
724:19 727:16
729:8 731:17
732:1 733:22
736:15,21 805:10
**object--number**
724:7
**objected** 652:3,7,12
718:13
**objected--** 696:3
**objecting** 736:4
**objection** 651:13
667:14 669:9,21
678:11 679:11
681:12 685:4
689:16 690:2
692:17 693:2,18
694:16 696:1,10
697:16 698:8
718:12,12 722:11
725:21 732:14
735:3,6 736:7,12
**objections** 652:6
653:7 654:16
655:14 656:19
658:21 727:3,14
728:6 729:4,9
730:9 731:13

**objective** 740:6
**objects** 732:6,19
**obligated** 778:11
**obligation** 766:2
**observe** 754:4
**obtain** 660:7
**obtained** 716:8
760:6
**obviously** 702:7
720:13 762:8
774:7 785:12
**occasions** 785:22
787:21
**occurred** 757:19
**October** 726:22
756:4 816:11
818:5
**ODC** 725:13
**of--** 700:9
**offer** 718:15 727:1
**offered** 651:21
652:2,15,19,21
653:4 664:13
665:2,4 668:9
672:15 727:11,13
727:18 728:16
733:17,18,21
735:21,21 736:16
736:17 760:2
**offering** 711:6
**office** 661:7 667:8
667:22 675:11
687:6 714:13
734:18 758:10
779:11
**officers** 710:2 793:9
**official** 650:14
**officials** 790:12
**oh** 664:9 693:4
730:12 735:19
750:16 752:7
754:7 798:22
800:19,19 811:5
812:2,4
**okay** 649:18,19
650:1,6 653:8,13
656:13 662:4
663:15 669:2,11
670:8 671:3 674:7
675:3,12 676:17
678:2 679:17
680:18 686:12
691:22 700:1
703:21 711:17
716:12 728:8
730:13 731:1,5

739:16 745:14
746:6 749:16
750:6 752:10,12
772:6 787:18
791:4,13 792:9
793:4,5 797:19
799:8,9 800:19
801:22 802:2,4
809:13,22 811:1,7
811:11 812:4,16
814:1 815:19
816:12 818:12,14
818:20 819:1
**old** 687:17 774:16
803:9
**Oliver** 647:6 710:16
**Oliver--to** 712:17
**omission** 739:1
**omissions** 807:17
**omit** 726:21 738:19
**omitted** 796:15
**omitting** 739:1
**once** 657:3 765:10
767:3 810:7
**ones** 723:6 727:12
731:2
**ongoing** 764:9
778:2 808:6
**open** 699:18
**opening** 752:16
815:3
**operative** 780:12
**opined** 746:11
**opinion** 654:7 656:6
656:7,11 657:11
657:17,18 665:10
678:9 682:12
689:13,22 691:1
692:12 696:19
698:5 711:3,11
723:11 782:19
784:2 805:2
**opinions** 656:2,2
663:3 681:10
692:12 697:3
705:6 777:2,17
**opportunity** 652:21
665:20 672:7
678:2 706:16
719:1 731:21
733:21 734:1
817:15
**opposing** 667:10
742:15
**opposition** 812:11
**oral** 709:15

**order** 666:15
710:20 712:3,6
713:21 731:11
737:3 740:15
749:10,12,12,13
750:1,6 753:11
755:13 779:16
787:13 789:5
797:13 798:7,21
802:10 815:13
**ordered** 683:9
760:12,17,21
771:15 780:1
790:2 804:8
**ordering** 760:22
761:19
**orders** 663:9 689:11
689:13 692:9
705:6 736:20
776:19 781:19
782:3 784:18
785:3 798:4,4,9
798:18 799:6,10
799:17
**original** 666:11
678:4 813:11
**other--the** 681:16
**outline** 756:7
**outlined** 758:10,14
**outside** 661:20
663:3 718:14
**overblown** 800:3,3
**overrule** 722:10
**overruled** 667:2
681:20 697:17
698:16
**overwhelming**
804:18
**overwritten** 792:7
**owed** 817:3

___

**P**

**P** 649:1
**p.m** 646:4 728:20
**p.m.m** 819:13
**page** 703:5 705:13
705:20 710:17
712:19 719:12,21
720:6 724:11,19
735:7 743:20
744:6,10 750:20
752:10 761:1,8,11
765:8,9 778:1,10
781:17 788:16
794:21 795:7
815:9

**pages** 699:1 701:12
717:12 721:18
722:11,18 730:21
736:19 737:5
761:3
**paid** 693:6,9
**painful** 774:11
813:22
**pale** 785:19
**palpable** 776:18
**panel** 683:15,18
**papers** 736:14
737:18
**paragraph** 662:12
707:17,21 708:8
708:11 709:4,6,9
720:3 778:1
808:14
**paragraphs** 655:2
**parallels** 677:15
**Pardon** 814:11
**parroted** 706:7
**Parsons** 742:5
**part** 676:8 703:2
715:7 736:13
754:19 772:15
786:4 789:16
802:7,8
**participated** 768:18
**particular** 755:20
788:22 805:10
**particularly** 660:11
668:3 755:18
757:6 758:6 759:1
769:11,18 774:11
801:16 815:1
**parties** 646:7
728:14 730:5
**parts** 796:18,19
**party** 742:15
**passage** 801:15
**pattern** 729:7
**pause** 692:19 759:8
**pay** 666:5
**paying** 665:22
774:8
**payment** 693:10
**peaceful** 789:6
**Pearl** 775:16
**peculiar** 706:16
**Peer** 647:6 703:7,8
703:10 710:17
712:18,22 766:20
**penalty** 708:20
746:2
**pending** 657:10

712:4 750:10
**people** 664:20
704:21 708:1
711:21 721:20
729:16 769:11
774:22,22 776:10
785:13 789:15
805:22
**period** 809:21 814:3
**peripheral** 757:14
**perjury** 708:20
746:2
**permit** 696:16
697:11
**permitted** 651:16
679:13 698:21
708:12
**person** 699:9
783:19
**personally** 693:15
**persuasive** 711:11
**pertinent** 795:15
**petition** 711:7
746:16 747:2
749:20 753:5,7
755:9,11 766:12
769:14 771:3
799:16
**Petitioner** 744:13
**petitions** 738:5,6,6
760:15 763:6
764:4,6,14 770:22
**ph** 798:12
**phonetic** 657:1
**phrases** 679:19
**physically** 708:17
**picture** 735:6,12
736:8,9
**pile** 781:10
**piling** 725:5
**place** 702:1,2
709:17
**placed** 694:5
**places** 709:16
**Plaim** 676:13
**plaintiff** 683:4
703:11 709:11
719:21 720:4,7,12
**plaintiff's** 683:4,8
**play** 791:2
**pleading** 720:22
759:6
**pleadings** 660:6
703:2 704:7 743:2
758:13 762:20
772:7 788:3

802:12
**please** 651:4 671:4
697:19 703:6
705:14 716:4
722:6 733:8
737:18 752:2
774:5
**pleasure** 699:11
**point** 655:21 672:13
680:10 706:13
713:7 714:19
780:12 783:15
784:15 791:16
797:20 802:14,18
803:5 807:9
**pointed** 675:22
707:2,9 798:9
**points** 711:2 756:13
768:12 809:4,10
**police** 702:18
**polite** 703:4
**politely** 717:2
**political** 671:14,18
806:5
**politically** 777:4
**politicized** 703:18
**poor** 784:20
**Porter** 646:22
651:13,21 652:1,5
653:6,11 658:22
664:11 665:1
666:4 667:8
669:21 672:13
673:7 675:6,9,10
676:17 678:11,20
679:18 681:12
685:4 689:16
692:7,17 693:18
694:1,8,10,12,22
696:4,11 697:6,8
697:18,22 698:8
701:1 705:18
706:1 712:21
714:19 715:9
717:20 718:1,4,13
722:13 724:6
725:13 726:2,5,13
726:19 727:10
728:5 729:5
730:11 731:6,7,17
732:13,16 733:3,7
733:13 734:8,11
734:14,16 735:5
735:11 736:3,6
737:4,11,15,16
739:7 741:12,15

741:20 742:1
744:5,9,17 745:14
745:21 748:6
749:15,18 750:3,6
750:8,15,18 752:3
752:5,8,10,21
753:18 754:20
755:6 756:2,11,21
759:10,14 761:9
761:12 762:4
764:2,22 769:9
776:5 779:12
781:5 784:11
787:21 796:15
802:4 806:14,15
810:18,20 811:2,9
811:12 812:8,15
813:3,12,14 814:1
814:6,11,14,17,22
815:16,19 816:1
816:12,16,19,22
817:8 818:6,9,14
819:5,12
**Porter's** 789:2
**portions** 733:9
**position** 651:5
746:7 747:13
749:9,13 783:20
**positions** 786:3
**possible** 777:13
778:20 793:18
811:4 817:20
**post** 728:6
**post-hearing**
751:11,21 762:7
772:9
**poste** 706:9 721:1
**postponed** 817:1
**potentially** 654:1
**power** 806:11
**powerful** 806:10
**powers** 806:10
**practice** 690:13
717:9 725:7 729:7
747:22 756:19
775:11,13 776:9
799:21 805:12
806:8
**practicing** 748:3
**practitioner** 684:20
**practitioners**
683:12
**pre-hearing** 772:13
**precedent** 695:2
**precise** 688:3
**predictors** 784:21

**pregnant** 809:20
**prejudice** 701:16
713:4 767:9
795:22
**prejudiced** 748:20
**prejudicial** 729:19
740:22
**preliminarily**
745:10
**preliminary** 745:7
**premature** 658:22
**prep** 816:3
**preparation** 743:1
**prepared** 683:7
803:22 804:13
**preparing** 768:19
**preposterous**
767:16 769:5
**present** 646:7 647:2
656:10 723:9
731:22 733:19
797:19
**presented** 767:2
**presents** 710:21
**presidency** 695:15
**president** 695:13
768:3,10
**Presidents** 695:11
695:18 770:12
777:7
**prestigious** 665:19
778:8
**presume** 782:8
**presumption** 656:9
795:21
**pretty** 767:15 768:1
809:3
**prevent** 656:16
**previously** 690:15
720:9 727:13
731:9 745:17
749:21
**primarily** 687:4
701:21
**primary** 704:5
**principals** 782:11
**prior** 652:6 707:7
710:14 731:12
733:10 743:12
745:5 761:17
771:19 797:5
799:20
**prison** 789:16,16
792:14 793:1
803:8
**prisons** 789:5,13,17

790:22 791:2
792:20 793:10
**private** 717:9
**privilege** 744:14
747:22 772:19
**pro** 654:9 655:4
657:21 658:1
660:7 665:4,9
672:10,17 673:9
673:10 674:9
675:15,17,21
676:2 678:4,16
680:20,22 681:11
689:2,4 691:9
692:14 695:21
703:22 705:5,17
706:6 707:18
708:14 709:10
737:22 738:4,17
743:6,15 764:9
766:16 768:16
770:19 771:7,18
778:4,19 783:8
785:1 794:14
795:1,11,16,20
799:19 802:11
804:7,9 807:16
**probably** 673:18
691:18,21 742:2
763:22 775:4
781:1 809:6
810:16
**problem** 657:2
664:18 813:5
**problems** 649:17
795:14
**procedural** 677:21
771:10
**procedure** 665:15
674:12,16 677:7
678:16 681:1
**proceed** 706:5
708:18 805:7
**proceeding** 653:17
706:11 716:17
717:16,18,19,21
718:6 719:17,19
721:6 726:1
729:12 744:2
746:19 763:1
765:18 772:17
778:3,5,12 780:7
780:8,20,21
781:22 782:4,9
783:13 786:5
798:11 799:13

proceedings 652:11
   656:21 685:18
   686:1 716:12
   718:22 720:1,9
   733:16 743:9
   744:1,12,19 745:1
   749:2 764:10
   773:14 774:10
   781:10 800:2
process 740:17,17
   741:6 742:5,11
   795:11 797:18
professional 645:2
   646:2 657:15
   671:21 674:17,19
   674:22 675:2
   696:20 710:11
   782:16
professor 651:7
   656:22 658:8
   661:12 668:9
   671:3,8,10,13,15
   671:17 673:22
   674:8 682:11
   693:6 723:22
   724:21 725:10
   774:14 776:3
   778:7 782:17
   788:18 793:16
proffer 654:11,14
   657:8 658:11
   659:15 660:1
   662:5,9 664:2,3,5
   664:8 665:1
   667:17 669:7,13
   670:1,10 681:14
   681:19,20 682:8
   694:5 698:11,13
   722:21 731:2
   733:2,3,4,11
   734:20 735:2
proffered 663:16
   725:20
profile 738:1
prohibit 738:21
prohibition 740:5
prohibitions 738:20
promised 693:8
pronouncing 701:8
proper 702:4
properly 778:2
proposed 731:13
prosecuting 708:16
prosecution 686:15
   687:2 688:13
   698:5 782:11

prosecutor 757:3
   758:3
prosecutorial 689:6
prosecutors 786:3
prospect 687:16
protect 785:8
proven 745:10
provide 700:22
   744:21 748:7,11
   759:15 762:5,6
   778:13 818:10
provided 748:10
providence 735:8
providing 785:21
Provision 738:14
provision--I'm
   710:19
provisions 739:10
provocative 786:10
   786:11
Pryke 671:10
public 646:6,14
   671:17 724:4,18
   747:6 758:16
punishment 803:18
punishments
   784:18
purpose 729:12
pursuant 780:7
pursuing 755:10
push 814:4,4
put 649:16 656:17
   657:7 658:7,11,13
   659:15,16,19,22
   660:21 662:7,20
   666:12,15 669:4
   670:1,10 673:17
   682:1 705:18,19
   705:20 706:1,4
   714:13 723:20
   725:3 726:9 729:9
   734:5,10 754:14
   754:20 761:19
   763:10 774:12
   775:2 783:15
   785:8 792:4 801:3
   801:9,18 810:16
   812:5 815:13
puts 810:12
putting 757:16
   801:21

                Q
qualification 654:2
   777:10
qualifications 654:3

662:2 664:17
   671:5 672:19,21
   673:16,17
qualified 673:3
   675:4,7
qualify 673:1
question 657:10,10
   665:17,22 678:12
   678:22 679:1,3,9
   679:12 680:2,13
   680:15 682:18
   684:9 685:11,13
   690:18 692:3,22
   693:11,12 696:5
   696:12 697:5,7
   713:16 726:19
   744:10,11 773:1
   789:18,20 790:20
questioned 701:1
questions 661:22
   673:19 675:6
   677:3 678:8,10
   679:7 681:1 690:3
   692:5,7 693:22
   694:13 697:22
   698:10 699:7
   726:14,15 727:2
   736:18 745:12
   763:16,22 772:22
   778:18 802:21
questions-- 679:19
quickly 672:3 682:7
   786:14 792:8
quid 766:16
quite 679:21 684:11
   717:1 723:6
quo 766:16

                R
R 649:1
R-O-B-L-E-S
   708:21
race 748:21
raise 772:6
raised 714:16
   771:11 780:21
   781:18
Ralph 806:6
ran 717:8
ranch 801:9
random 736:9
rankings 778:9
rare 769:17,17
   770:1
Raymond 671:10
re-calling 667:5

re-move 730:15
re-raising 802:15
reach 742:4 787:1
   807:8
read 653:22 660:5
   660:13 662:1,14
   666:13 698:13
   703:16,20 711:15
   780:16
reading 656:17
   686:9 741:22
   777:22 795:4,6
reads 766:4
ready 649:20 675:1
   708:9 737:14
   807:1
really 689:20
   713:15 718:20
   735:6,9 747:2
   774:9 775:5 783:1
   785:5 786:18
   791:5 796:2 804:3
   805:16 808:20
   809:7 811:18
reapply 783:7
reason 722:21
   765:19 782:20
   783:7 790:16
   791:10 796:7
   809:12
reason--you 720:22
reasonable 660:9
   679:14 691:3,5
   740:7 770:8 803:3
reasonableness
   653:21 658:15
   659:9 663:13
   682:5
reasoning 711:10
reasons 655:10
   713:11 732:6
   746:10 748:5,17
rebutting 780:17,19
recess 728:21
reckless 739:13
recognition 710:15
recognize 711:20
recollect 659:11
recollection 727:19
   729:1
recommendation
   655:16 660:3
   711:12 765:4
reconsider 783:14
   801:16
reconsideration

680:8
reconvene 806:21
record 649:2 650:9
   653:10 654:14
   656:18 657:7
   658:8,11,14
   659:16,17,19
   660:5,8,10,22
   662:5,21 663:16
   663:17,19 664:22
   668:16 673:18
   680:9 681:21
   682:2,8 694:5
   697:1 698:13
   700:22 703:22
   709:16 714:21
   715:1,18 718:6
   719:5 722:17
   723:21 724:18
   725:15 726:10,21
   726:22 728:18
   731:2,7 733:10
   760:21 772:12,16
   774:1,3,4 778:14
   779:4 783:11
   786:21 787:2,11
   787:20 788:6,8
   803:21 804:10
   807:3,4,5,7
   815:10
records 719:6
   727:15 755:22
recross 726:12
recurring 749:3
recusal 712:14
   713:18
recuse 703:4,13
redirect 693:22
   715:8,8,10 726:11
refer 731:10
reference 700:7
   711:6 719:20
   791:13
referred 791:20
referring 698:19
   705:14 759:6
   773:11 794:7
refiled 704:2
reflect 723:3 747:14
   802:8
reflects 761:3
refused 691:9
   801:18
regard 654:7 658:5
   665:4 668:4
   672:10 674:15

678:15 681:10
682:11,16,17
683:13 685:1
688:21 689:2,3
700:12,18 702:16
711:8 717:15
729:6 775:7,8
776:1,14 793:19
796:14
**regarding** 683:4
712:14 769:6
779:17
**regardless** 654:13
658:21
**rehash** 661:18
**rehearings** 738:6
**Reid** 735:13 766:16
766:17 768:8
**reiterate** 659:14
**rejected** 751:8
786:19,20 787:15
**relate** 662:1
**related** 653:20
662:17 712:13
713:17 715:14
726:7,14,15 738:3
**relates** 658:15
659:9 662:13,14
666:22 673:20
682:5 722:16
**relating** 717:12
**relationship** 755:18
**relationships** 668:6
**relatively** 757:15
784:20
**relevance** 721:5
725:22 731:14
732:9 733:14,15
734:3 736:22,22
737:8 809:6
**relevancy** 652:15
654:16 655:14
656:18,19
**relevant** 656:4,7
657:11 659:4
661:14 662:20
663:6 665:13
670:8 680:12
681:18 682:5,9
689:20 693:20
694:4 713:15
718:22 723:12
725:1 764:14,16
**relief** 682:17,20
683:13 684:4,6,7
684:22 695:18

793:17,18 799:21
**relitigate** 778:12
**rely** 740:21
**relying** 710:12
714:8
**remain** 805:22
**remains** 728:4
**remember** 662:16
735:20 759:6
779:1 784:8
801:22
**remembered**
722:16
**reminder** 672:1
728:17
**remote** 652:8 667:9
**remove** 737:17
805:11 806:7
**removed** 725:6
768:22
**remuneration**
693:7
**renewed** 763:6
**reopen** 715:16
**reopening** 715:1
719:5
**repeat** 680:13 682:3
697:7 732:20
794:18
**repeated** 762:11,15
763:3 771:21
**repeatedly** 762:21
763:4,9 765:20
**repetitive** 770:21
**replies** 812:21
**reply** 752:17 812:10
812:22 813:2,8
814:6,9,13,21
815:1,6,22 818:3
818:4,7,10,17
**report** 655:16 660:3
746:8,11 765:1,4
771:4 808:4
**REPORTED**
645:21
**reporter** 646:5
672:2 697:20
**reports** 683:7
**represent** 661:7,7
663:1 675:11
688:14 691:11
707:20 708:5,12
708:14 713:9
729:15,16 776:10
781:14 804:6,9
805:22 806:2

**representation**
709:11 754:2,6
762:2 765:13
**representations**
696:17 718:5,19
738:21 756:6
**represented** 721:7
767:3 775:19
802:17
**representing**
708:14 778:17
**reputation** 693:17
778:21 799:21
**request** 703:3
750:14 818:16
**requested** 734:16
779:17 791:21
**requests** 703:12
778:22
**required** 652:6
655:5 678:10
679:8 680:3 681:2
695:7 739:11
744:21 747:21
749:11
**requirement** 704:9
765:3
**research** 767:1,4
**reserve** 693:22
**resigned** 742:13
**resolution** 782:1
787:1
**resolve** 664:12
750:21
**resolved** 778:5
782:4
**resort** 713:21
**resources** 709:3,13
**respect** 655:12
656:1 659:20,20
666:6 668:13
670:2 673:10,13
676:3 685:6
695:19 697:10
699:20 702:8
714:22 744:18,22
747:11 754:16
770:15 773:14,15
777:4 779:19
**respect--Claimant**
710:21
**respectful** 709:22
710:1,5
**respectfully** 661:3
667:3 703:12
799:15

**respective** 646:7
**respond** 653:3
685:9 715:12
808:17 809:8,10
810:6 815:4
**respondent** 645:7
647:4 672:9,9
724:10,13 727:11
737:21 773:6
**Respondent's**
651:11 669:16
678:3,7 680:21
700:19 707:15
731:18 732:10,20
815:5 818:2,3
**Respondents**
815:17 818:10
**responding** 776:16
778:21
**response** 705:19
737:2 743:19,20
749:12,13 750:18
751:18 752:11
778:18 779:14,16
806:13 809:3
812:11 818:2,13
**responses** 743:9
**responsibility** 645:2
646:2 671:21
674:18,19,22
675:2 696:21
710:11 782:16
**responsible** 702:19
**restate** 697:6,19
**restrict** 664:21
**restricted** 684:11
**restroom** 773:21
**resubmit** 802:11
804:8
**result** 702:14 714:7
721:16
**resulting** 795:6
**Resuming** 677:17
682:10 685:12
687:21 692:8,21
693:5 694:22
696:11 697:8,18
**retain** 717:7
**retained** 723:12
**retaliation** 704:18
770:18
**retaliatory** 793:9
**return** 816:6
**returning** 813:4
815:21
**review** 656:3 657:8

661:1 667:18
672:8 678:3,8,15
679:6 680:2,20
690:17 788:11
793:22
**reviewed** 665:1,3
678:18 686:5
689:12 690:9,11
691:12 765:11
**reviewing** 665:4
690:19,22 692:9
**revisited** 732:5
**revoke** 705:5
707:18 709:9
**rich** 806:10
**rid** 769:11
**ride** 775:18
**right** 650:7 653:1
655:13 660:9
662:10 663:1,17
666:2 668:22
677:22 693:22
694:17 696:15
697:2,11 698:13
706:19 707:5
728:3 731:17
733:1 750:15
756:11 772:4
784:7 788:3
790:14 791:8
792:7,10 795:6
796:12 798:13
805:13 811:17
816:15,19
**rights** 685:2 698:6
708:19 714:6
769:22 783:18
792:6 794:4,6
796:13
**rise** 716:9
**rises** 808:11
**risk** 791:16
**risks** 708:15
**Robelus** 798:12
**Robert** 723:4
**ROBIN** 646:13
**Robles** 702:21
703:11 704:14
707:15 708:21
709:11 712:11
714:6,22 715:6,13
718:17 726:7,16
742:5 765:14
**robust** 785:20
**rod** 796:3,11
**Roger** 723:7

**role** 704:11 757:15
783:9,10 791:2
**Romaski** 739:14
**Rotunda** 746:9
782:18
**Rotunden** 657:1
**rough** 775:18
**Royce** 720:19
**RSX-001** 701:13
**RSX-0040** 701:13
**RSX-0041** 701:17
**RSX-0075** 705:20
**RSX-0176** 710:18
**RSX-0177** 710:18
**RSX-39** 703:8
**rubber** 710:6
**rule** 654:12 656:12
657:6 658:19,19
659:21 662:6
669:6,8 680:5,11
681:8 682:1,2
694:6 722:5 729:7
730:2 738:8,16,16
741:7,9 745:3,3
773:2,4 780:8,8
808:8
**ruled** 670:8 673:8
681:18 682:4,9
689:14 707:3
712:4,6 714:1,2
720:11 730:20,20
732:4 733:5
737:12 798:3,8,18
805:8
**rules** 656:9 686:3
694:4 696:20
737:22 738:21
739:11 742:18
745:2 749:1,14,22
765:1 772:20
779:21 818:9
**ruling** 654:13
666:11 669:4
672:16 681:17
695:8 706:14
710:14 711:1,4
714:2,13 715:13
717:2 719:22
720:8 729:22
740:20 743:17,18
**ruling--and** 680:7
**rulings** 655:7
706:18 710:13
711:5 712:5 714:8
744:18 749:2
764:15,18,21

766:6,6 771:20
777:1,14 805:7
**running** 690:7
**rush** 658:9
**Rutledge** 801:6

**S**

**S** 649:1
**Sabrina** 645:22
646:5
**safety** 702:21
**San** 691:20 701:19
702:3 704:3,4
705:4
**sanction** 751:8
769:6,10,18 770:1
784:11
**sanctioned** 685:3
686:6 688:18
746:12 784:10,12
805:18
**sanctions** 685:5
689:1,3 769:16
784:10
**sandbagged** 655:12
**sat** 717:1 781:1
**Saturday** 812:15
**save** 791:5
**saw** 779:5
**saying** 657:15,16
659:12 665:5
668:10 719:17
721:15 730:1
736:6 754:18
757:6,7 758:13
762:2 765:22
778:4 779:6
783:12 785:6
787:2,21 791:13
791:20 796:5,6
814:10
**says** 683:3 713:3
719:12 737:8
738:16 739:19
750:20 752:12,12
765:16 779:15
783:1 784:2
787:12 788:9
**scandal** 716:9
**schedule** 807:10
815:2 817:4,7,21
818:1
**scheduled** 753:8,20
810:21 813:3,15
813:16,17 817:5
817:12,17

**scheduling** 753:11
**scheme** 753:22
**scholar** 674:8
**school** 649:8 651:9
671:7,9,12,14
674:21 702:11
767:13,17,19
778:8 793:17
**schools** 665:19
677:8
**Science** 671:14,18
**scope** 661:21
686:10 695:17
**Scott** 683:8
**sealed** 802:4
**second** 678:21
705:2 710:20
736:7,8 739:16
744:15 748:17
771:2,3 797:14
**secret** 724:8,15,20
724:21
**section** 684:4
694:21 757:18
**Security** 721:10
**see** 664:9 686:6
693:19 706:22
710:1 714:11
718:5 724:12
725:22 732:9
750:16 760:21
771:3 776:18
779:11 780:20
781:14 786:22
787:22 790:1,2
792:11,14 794:16
795:19 800:3
803:9,21 807:12
808:20 810:12
811:5,16 812:5
814:16 819:12
**seeing** 774:8
**seeking** 697:12
**seen** 690:14,16,18
791:12 793:11
**selected** 778:16
**seminal** 739:4
740:12
**Senate** 717:9
**Senator** 735:13
766:16,17 768:7
**sense** 746:9 755:7
**sensitivity** 771:19
**sentence** 653:22
660:4 666:13
688:9 744:15

**794:**19 800:1
**sentences** 683:18
**separate** 755:6
772:7
**September** 756:3
812:12 813:1,4,15
814:8 818:3,4,13
**series** 739:16
**serious** 784:17
**seriously** 740:11
**serve** 709:8 742:15
813:1
**set** 652:7 655:9
698:22 699:3
740:10 746:11
807:9
**Seven** 708:3
**severe** 704:17
**Shannon** 766:18
767:5
**sharply** 786:1
**she'd** 706:10
**sheet** 717:15 720:16
**short** 667:5 703:15
795:14
**Shorter** 739:3,6,7,8
**should've** 767:17
**show** 653:10 720:12
720:17 737:3
782:4 786:21
**showing** 743:4
**shows** 663:5,8
711:5 717:17
722:7 772:10
786:7 794:16
**shut** 714:4
**sic** 754:14
**side** 706:20 728:18
729:17 775:1
776:4 777:8
779:11 784:9
785:14,18
**sift** 809:8
**sign** 669:17 696:7
**signature** 768:22
769:1
**signed** 670:6 708:20
742:7,21 750:22
766:21
**similar** 704:16
**similarity** 774:21
**Simkowitz** 725:10
**Simkowitz's** 731:19
**simple** 815:6
**simply** 665:12
667:9 679:5

704:12 706:1
710:20
**Simpson** 784:8
**single** 756:19 815:4
**sir** 693:1 818:10
**site** 788:14
**sitting** 761:13
**situation** 704:16
781:8
**situations** 682:17
682:19
**six** 707:21 709:9
743:17 749:11
750:17 758:16
**Sixth** 696:14 697:10
707:4
**Sixty-two** 761:12
**skewed** 714:14
**skilled** 786:3
**small** 753:22 774:20
**smart** 787:22
**Smith** 787:2
**so--** 697:4 720:14
**sole** 756:4 764:8,12
**solitary** 760:12,17
761:19 771:16
789:4,15 790:21
791:6,21 792:4
**sons** 687:2 783:16
790:11
**soon** 817:20
**soonest** 816:6
**sorry** 652:5 672:4
688:1 693:4,4
718:2 732:10
735:20 741:10
761:7 794:18
813:16
**sort** 747:17
**sought** 705:5
714:15 716:13
737:22 797:21
**Southern** 671:16
674:21
**Sparkman** 695:4
**speak** 713:12
817:10,16
**speaker** 649:16
735:17 739:6
**speaking** 655:8
685:15 691:20
**Special** 723:4
**specific** 653:18
673:19 697:1
730:21 807:20
809:12

In Re: Larry E. Klayman
July 18, 2019

**specifically** 654:8
654:22 659:3
662:13 675:18
749:17 808:11,18
**specification** 724:5
773:3
**specificity** 683:10
**specified** 730:21
**speech** 701:7
**speed** 764:2
**speedy** 792:6
**spell** 762:17 808:11
**spend** 718:21
**spent** 671:15 722:13
781:12
**Spikes** 739:19 740:4
**spin** 754:14
**sponte** 769:18 770:2
**stamp** 710:6
**stand** 774:20 775:5
776:19 780:10
784:4 805:19
**standard** 740:7
776:21
**standing** 652:22
707:12 775:12
779:2 805:14
**standoff** 790:7
**stands** 775:21
**stapled** 736:14
**start** 712:19 737:15
743:3 753:17
797:1,16 807:16
811:17
**started** 649:4 650:5
743:5 757:20
763:20 783:21
**starting** 649:6
**starts** 712:19,22
**state** 650:9 651:4
671:4 674:2
694:20 785:1
792:17,20 794:14
795:2
**stated** 659:3 745:17
746:5 765:7
786:17 793:18
794:12
**statement** 660:13
662:1 738:15,16
739:2 743:18
748:3 753:19
759:4,11 763:2
780:4 798:18
800:6,8 808:14
**statement--** 690:4

**statements** 660:10
660:18,19 667:10
697:13 738:19,22
739:9,12,13 741:1
746:1,20 760:10
761:17 766:22
767:8,20 769:5
770:3 773:7
779:19 780:5
804:10 807:16,17
808:18
**states** 655:2 674:5
707:17 748:16
765:20
**stating** 732:19
782:2
**status** 675:21
691:10 707:19
709:10
**step** 772:21 802:20
**stick** 669:3,6 733:10
803:10,11 812:21
**Stone** 723:7
**Stone's** 723:8
**stood** 702:18
**stop** 691:17 815:1
**story** 714:14 751:3
753:2,3
**straight** 783:3
**street** 646:2 775:1
785:14
**stretch** 767:15
**stripes** 806:5
**strong** 665:9 688:12
688:19 707:4
710:4 783:20
784:3 785:7 786:4
795:20,21 797:22
**students** 674:22
**stuff** 669:12
**Stump** 695:3
**sua** 769:18 770:2
**subcategory** 738:9
741:8
**subject** 657:8
659:18 661:1
666:19 720:9
**submission** 750:8
751:10
**submit** 675:3 766:3
**submits** 719:7
**submitted** 656:22
672:11 674:9
706:21 708:22
751:14,22 780:15
782:17

**submitting** 778:18
**subsequently** 765:3
**substance** 659:13
667:16,22
**substantial** 748:18
**substantiate** 683:7
**substantiative**
668:1
**substantive** 776:2
**subsumed** 673:18
681:9
**subsumes** 660:15
**success** 770:10
**successful** 714:4
**successive** 738:5
764:4,6
**sue** 684:3 702:14
768:2,3 788:10
**sued** 682:20 684:6
684:14 694:18
695:13,18 739:20
739:22
**sufficient** 666:5
728:13
**sufficiently** 666:10
**suggest** 669:12
758:1
**suggesting** 757:4
**suggestion** 724:15
758:22 811:20
**suits** 683:22 684:10
684:13
**superceding** 689:7
**supercedious**
689:11
**superstitious**
812:14
**supplement** 714:21
**supplemental** 678:6
699:21 700:19
703:3 707:16
709:5 712:9
715:22 730:16,16
730:17,19 737:12
738:6 773:5
**support** 719:8
748:18
**supported** 663:13
766:17
**supports** 796:5
**supposed** 724:2
729:9 815:4
**Supreme** 674:5
683:20 684:2
695:2,3,8 711:8
713:3 738:7 753:6

753:20 754:10,16
758:2 760:16
762:9 763:5
**sure** 650:10 651:18
687:19 690:5
692:2 730:5
732:13 735:11
741:12 742:1
744:1 752:9,14,20
761:9 769:14
773:2,22 811:6,12
**surveillance** 721:19
**suspended** 747:21
765:2 805:17
**suspension** 744:13
**sustain** 696:9
**sustainable** 683:14
**sustained** 679:11
681:13 690:2
692:18 693:3
698:9 710:14
725:22 732:15
735:4
**swear** 793:5
**swearing** 650:5
**swore** 671:1
**sworn** 650:20 746:1
746:17 747:4
775:17 776:5
779:19 780:5
804:10 808:7
**Sydney** 671:17
**system** 646:19
684:19 685:13,19
741:15 788:19

_____

**T**

**table** 664:20 729:17
761:14
**tails** 783:6
**taint** 740:17
**tainted** 742:11
**taints** 741:15 742:5
**take** 662:8 667:11
682:18 693:10
704:11 727:22
728:12,14 737:18
752:6 773:20
774:1,21,22
775:21 783:14
784:5 806:17,19
815:2,8
**taken** 646:1 660:6
707:10 728:21
736:10 775:15
777:7,8 783:20

**talk** 807:11
**talked** 727:12
**talking** 654:8
657:22 658:1
659:1 663:8 672:3
722:14 774:13,14
799:6
**target** 704:5
**tarred** 797:7
**tasks** 683:22 684:1
695:5
**taught** 671:20
674:19 677:11,12
677:12,12 702:9
**teach** 671:19 674:17
**teaching** 676:6
677:5 690:13,21
**technical** 746:10
**technically** 739:8
**telecom** 649:10
**tell** 714:14 716:3
717:11 734:11
743:15 744:2,3
749:16
**ten** 691:17 816:21
**ten-minute** 728:13
728:14
**tentative** 706:1,14
706:18 710:7
711:1,4 714:2,12
**tenure** 757:12
**termination** 689:6
**terms** 654:9 695:16
756:15 782:12
809:7
**test** 685:17 788:19
**testified** 650:21
670:2,11 675:5
685:22 694:13
698:22 702:9
766:20 775:22
779:10 788:6
789:2,3 793:16
804:1
**testifies** 654:17
**testify** 651:16
653:19 654:4,16
660:5,14 661:13
661:16 662:3
663:13 664:8,17
665:21 666:1,7,12
673:8 679:13
682:4 698:14,21
753:14 777:13
802:5
**testifying** 652:13

In Re: Larry E. Klayman
July 18, 2019

655:19 670:7
779:13
**testimony** 649:6
652:8 654:18,20
656:10,11,22
658:14,17 659:8
659:15 660:21
661:2,3,9 662:10
663:21 664:1,2,5
667:10,10,13
670:1,5,9,11,15
672:18 673:2
680:11 681:18
682:1 693:7,10
697:2 698:15
699:18 709:15,15
714:15 715:1,6
718:16 723:18
726:3 731:20
732:9 733:14,18
734:12 736:15,16
736:22 747:5
761:5 774:7 776:4
779:11 789:3
791:18 801:1
802:1 808:7
**Texas** 683:2 788:15
788:17
**thank** 650:2 651:3
672:5 676:17
677:16 691:14
698:1,19 699:8,12
699:13,14 700:10
700:16,17 703:10
703:20 728:19
729:5 734:8
737:10,19 773:18
774:2,6 805:19,20
806:12 807:3
810:2 819:6,9,10
**thankfully** 806:1
**Thanks** 728:11
**that--and** 725:4
**the--** 705:15 725:19
**theme** 749:4
**thereabouts** 810:15
**they'd** 797:2
**thing** 667:7,20
694:2 729:14
731:12 733:11
754:11 790:17
794:13,22 797:22
**things** 668:20
689:18 725:8,11
743:8,17 749:11
752:22 754:1,21

754:21 760:9
764:2 768:6
779:16 786:13
789:13 796:15
798:12 802:22
807:18
**think** 651:13 652:17
654:2 656:4
661:19 666:3,5,9
666:14 668:22
673:15,16,17
676:3,12 683:16
687:18 690:18
691:4 692:4
694:13 715:15,17
718:11,14,20,22
722:15 726:7
729:1,2 730:4,8
730:18 731:8
735:7,16 736:13
737:11 749:18
751:12,15 752:21
755:22 756:16
757:1 758:7 760:3
763:22 765:12
770:8 772:10
773:12 776:18
795:18 808:19
809:3,6 811:18
814:2 815:12
816:9 819:2
**thinking** 665:11
**thinks** 666:1 680:7
781:5
**third** 740:10
**thorn** 785:18
**thorough** 774:8
**thought** 651:14
658:16 664:12
714:11 715:2
727:18 735:21
746:22 750:22
763:13 797:3,16
801:10,15
**thousand** 781:13
**threaten** 789:7
**threatened** 707:22
762:16 771:15
790:12 793:8
800:7,8,12,15
**threatening** 801:20
**three** 675:4 700:2,3
738:9,21 745:2,6
753:12 758:17
769:10 796:18,19
**three-day** 814:20

816:1
**three-month** 717:4
**threw** 791:9
**throw** 790:20
**throwing** 789:15
**thrown** 701:9 736:9
**Thursday** 645:10
649:3
**time** 655:19 658:8
667:12 668:19
669:1 674:9,9
684:20 687:17
690:7 692:3,7
704:14 709:12
711:4 718:21
721:3,15 722:4,13
724:4 729:8
734:16 752:14
754:12 756:15
763:15,20 771:11
782:14 784:11,20
790:1,4 797:5
801:14,15 802:9
809:20,21 811:16
814:3,7 815:8
817:13,18 818:22
819:9
**times** 762:18 793:11
802:16,17 804:2
**timing** 809:13
810:13
**title** 650:15
**titled** 677:14
**to--** 700:12
**to--because** 719:11
**to--I** 726:14
**to"--** 720:5
**today** 656:5 720:14
727:13 732:5
737:13 769:7
778:9 783:22
784:21 799:13
805:19
**token** 808:12
**told** 710:9 729:14
746:22 762:14
790:1 791:19
792:3 800:17,18
815:14
**Tom** 706:12
**top** 716:5 787:8
792:6,10
**total** 691:3
**totally** 787:9
**tough** 786:2
**town** 810:20 811:7

813:15 814:7
**tradition's** 782:8
**transcript** 751:18
752:2 761:2 762:3
762:22 802:3
803:21 809:14,15
810:7,10,14 811:2
811:18 816:18,20
**transcripts** 731:8
**transfer** 703:14
**transgressed**
795:18
**Trassler** 757:18
**treatise** 676:9
677:14
**treatises** 677:20
**trial** 690:17 717:4
723:8 753:8,21
754:3,4 757:16,21
758:21 785:7,19
792:6,7,9 796:14
797:5 801:12
**trials** 723:15 775:9
797:2
**tribunal** 738:15
**tried** 679:18 706:9
759:22 796:18,19
805:6
**trouble** 686:22
**true** 653:6 669:19
670:20 685:14
699:4 710:21
724:16,22 727:18
733:10 739:8
752:21 753:9
754:6,16 755:21
759:3,7,13 762:20
790:15 793:2,6
798:2
**truth** 656:20 661:6
667:16 729:13,13
**truthful** 652:14
678:22 679:4
739:3 765:21
787:9
**truthfully** 678:10
788:6
**truthfulness** 681:4
**try** 690:16 706:18
764:2,14 775:3
779:7 802:5
806:11 807:1
813:21
**trying** 655:21
656:15 666:4
706:2 713:7

725:13 751:12
755:15 760:8
763:12 768:12
783:2 817:4,6
**Tuesday** 651:15
652:18 653:15
659:3,13 660:13
661:17 664:13
666:11,20 668:18
669:4 700:15
726:8 732:4
**turn** 707:16 722:1
777:13 798:15
**turned** 790:14
**turning** 777:18
**turns** 781:4
**Twenty-five** 750:7
**Twenty-four**
735:17
**Twenty-one** 732:16
**twenty-seven**
735:18 736:13
**Twenty-three**
733:13
**two** 651:17 656:13
672:20 691:15
713:16,19 719:1
735:14 741:4
747:14,22 748:13
750:14 759:11,14
773:15,20 781:19
782:2 784:16,19
788:9 792:12,14
794:12,20 796:21
797:2 809:15
810:10,14 813:7,8
813:15 814:8,15
816:2,4,15 817:11
817:17
**type** 783:17
**typical** 754:1

---
**U**

**U.S** 672:11 678:5
682:22 701:2,18
705:3 717:8
723:14 758:10
788:16
**U.S.A** 778:9
**ultimate** 659:17
678:12 679:12
680:4 689:5
**ultimately** 655:15
680:15 694:4
701:15 702:19
709:14 743:10

786:6
**unable** 708:18
  709:10 807:8,13
**unavoidable** 786:4
**uncertain** 796:22
**uncertainty** 782:2
**unclear** 735:7
  797:15
**unconstitutional**
  768:15
**uncontested** 801:2
**uncontroverted**
  801:2
**uncovered** 767:1
**uncritically** 782:21
**underdog** 775:1
**undergrad** 767:14
  767:18
**underlying** 689:12
  713:14 781:21
**understand** 656:15
  661:4 667:4
  668:17,18 672:16
  672:19 677:18
  679:1 685:5,11
  700:14 733:14
  734:10 735:9
  743:16 755:15
  756:5 765:5,15
  808:19 809:14
  813:20 817:19
**understandable**
  766:21
**understanding**
  653:10 655:11
  673:7 698:4 715:9
  725:17 726:10
  749:7 773:13
**understood** 667:12
  714:20 780:6,9
**underway** 717:19
**unequivocally**
  766:1
**unethical** 768:14
  794:15 795:2
**unethically** 765:11
**United** 674:5
  748:16
**University** 649:7
  651:5,8 671:8,11
  671:16 674:20
  702:6,10,15,17
  788:11
**UNLV** 767:11,13
  767:14
**unnecessary** 799:18

**unproven** 781:22
  782:21
**unreasonably** 741:5
  749:1
**unusual** 756:18
**unwarranted**
  695:20
**urge** 780:16
**USC** 677:12
**use** 657:4,5 721:22
  790:13 799:5
  806:11
**useable** 780:7,9
**useful** 684:17

_____

**V**

**v** 676:13 737:4
  788:15
**vacate** 799:17
**vacated** 689:14
  799:11,12
**vacation** 813:4
  817:12,17
**vacations** 813:17
**valid** 659:12
**various** 685:18
**vast** 758:3 770:13
**Vegas** 686:15,19
  687:3
**venue** 702:1,4
**verbatim** 771:21
**Verification** 750:15
**verified** 742:7,9
**verify** 720:21
**versus** 682:22 684:2
  695:3,15 716:7
**vexatiously** 749:1
**vice** 654:9 655:4
  658:2 660:7 665:5
  665:10 672:10,17
  673:9,11 674:9
  675:15,17,21
  676:2 678:4,16
  680:20,22 681:11
  689:2,4 691:9
  692:14 695:21
  703:22 705:5
  706:7 707:19
  709:10 737:22
  738:5,18 743:6
  764:9 768:16
  770:19 771:7,18
  778:4,19 783:8
  785:1 794:14
  795:1,11,16,21
  799:19 802:11

804:8,9
**victory** 723:6
**Vidden** 710:13
**Viddey** 711:6 714:9
  721:2
**Viden** 705:7
**view** 667:15 713:22
  725:7 744:21
  781:20 783:11
  795:14
**views** 683:16
  689:17 795:9
**vindictive** 747:18
  748:15
**vindictiveness**
  799:14
**violate** 739:9,11
  740:15 741:7
  742:18 794:5
**violated** 656:12
  680:5 698:6 740:5
  745:2 749:14
  765:1 779:20
  794:4 808:7
**violating** 684:8
  737:21 749:22
**violation** 685:1
  696:20 713:22
  740:14 745:3
  795:12 804:15
  805:4 807:14
**violations** 738:8,10
  738:11,13 740:10
  745:3,17,18
  746:10,13 807:19
**violent** 704:16
  708:16
**vis** 690:17
**vis-a-vis** 688:19
**visit** 792:16,18,19
  792:22
**visitation** 792:16
**visits** 792:22
**voir** 664:16
**Volume** 788:12
**voluminous** 804:4
**voluntarily** 701:16
  703:4,13
**voluntary** 712:14
  713:18

_____

**W**

**W-I-L-K-E-N**
  703:13
**wait** 733:6 734:9,9
  763:19 806:17

813:11 818:21
**waiting** 816:17
**waive** 658:20
**walking** 769:19
**want** 657:4,5
  661:18 662:1,4,5
  662:20 663:15
  664:1,7 671:22
  681:19 682:8
  690:3 692:2
  693:11 697:6
  698:12 702:2
  720:20 723:20,21
  725:8,14 727:4
  730:5 731:1
  732:20 734:9,19
  734:21 735:1,2
  737:18 745:16
  753:17 754:20
  763:21 769:20
  773:2,10 774:6,12
  779:6 781:14
  785:10,12 787:4
  796:18,19 805:21
  805:22 806:7,10
  806:19 807:11
  812:11 817:14,16
**wanted** 691:10
  725:15 726:21
  761:15 763:19
  777:12 796:20
  802:10 804:6,9
**wants** 711:18
  817:20
**warning** 769:8
**warrant** 776:16
**warranted** 786:11
  786:12
**Washington** 645:11
  646:3
**wasn't** 736:16
  752:17 757:15
  771:12 772:2
  776:5 777:13
  779:8,9 780:12
  796:1,16 797:10
  800:10 802:6
  808:5 813:19
**wasting** 668:22
**watch** 707:8 716:21
  716:22 717:8,10
  743:21 776:14
  780:19 781:12
  783:21
**watched** 702:18
**water** 737:18

**way** 654:13 668:8
  668:14 679:19
  680:14 685:19
  690:19 691:11
  713:10 724:6,7
  729:19 740:18
  741:16,16 749:6
  769:21 776:1
  781:6 786:14
  802:21 805:8
  810:9,10 813:9,21
  814:2 816:9
**ways** 759:11 769:10
**we'll** 650:5 662:8
  727:21 728:15,15
  728:16,18 806:18
  812:21 815:21
**we're** 649:5,20
  655:11 656:5,19
  656:20 662:11
  668:7,22 670:5,9
  673:20 681:16
  690:6 692:5 736:1
  741:18 745:19
  755:8 774:15
  806:22,22 807:3,6
  807:9,13 811:19
  812:7 815:11
  816:10,17
**we've** 661:17 682:9
  732:2,7 738:11
  755:16 758:5
  800:22 807:22
  809:5
**web** 724:11,19
**week** 814:18,19
  817:9
**weekend** 811:13
  819:11
**weeks** 809:15
  810:11,14 813:15
  814:8 816:15
  817:12,17
**weigh** 657:3
**weight** 781:20
  782:12
**well--judged**
  692:11
**went** 652:3 665:3
  692:13 701:7
  706:14,15 713:11
  717:4 746:15,18
  751:7 756:12
  766:12 783:9
  801:8,12 802:5
  804:3

weren't 662:18
  714:22 729:10
  745:18 746:13
Wessler 687:9
Whipple 755:20
  756:1,3 757:8
  758:7,22 759:4
  762:16,20 763:2
  771:14 779:8
  790:4 792:2
  800:11,11,13,16
  800:17,18 801:3,9
  801:17 802:7,10
  803:22 804:8
Whipple's 758:11
  758:15 759:21
  808:1
whistleblower
  721:8
WHITE 646:15
  700:11,18 794:7
wife 779:5 792:11
  792:14,16,21
  797:11 809:20
wife's 811:22
Wilken 701:4 702:6
  703:1,13 706:13
  708:22 709:22
  710:5 713:19
Wilken's 714:7
  726:22
Wilkin 765:13
William 693:13
willing 708:10
win 704:20 783:6
  804:21
wisdom 786:8
Witecki 713:3
withdraw 734:6,22
  735:2 736:7,11
  737:9 747:1
withdrawing
  787:17
withdrawn 780:1,2
  787:9,12,15 808:8
withdrew 751:2
  786:18 787:6,7
withheld 734:17
within-- 705:10
witness 649:10
  650:19 653:19
  666:12 667:6,21
  672:4 681:6
  683:20 691:18
  694:17 699:11
  723:8 733:19

734:2 776:2,5
  780:10 801:4,21
  816:3
witness's 734:12
witnesses 648:2
  668:1 699:16
  801:11
woman 701:6,6
  768:11
won 725:12
word 679:22 716:10
  799:5 815:9
words 692:15
  804:16
work 789:13 810:10
  819:4
worked 756:20
working 716:19
works 685:19
world 781:4
worried 661:6
would've 733:18,22
  734:1 736:17
  751:14 763:1
wouldn't 713:6
  734:17 799:12
  811:6 814:19
wrap 804:12
writ 711:7 754:18
  755:5,8 759:5
write 660:3 663:9
writing 663:3
  762:19
writs 690:10,11,14
  690:17,19,22
  691:2,13
written 676:8 706:8
  725:11 730:9
  785:3
wrong 665:12
  706:19 712:17,18
  713:2 787:3 796:8
wrote 665:12
  692:12 703:11
  720:21 721:3
  724:4 781:16
www.dcbar.org
  724:12

_____

X

x 645:4,8 648:1

_____

Y

Yanapolois--if
  701:7
yeah 651:20 658:19

660:15 672:5
  688:2 717:22
  727:8 733:5 737:4
  741:20 744:16
  750:16 752:4
  762:4 790:19
  803:6 817:8
year 683:2 709:19
  720:10,19 724:17
  810:22 813:18
  817:1,11
years 671:12,15,15
  671:20 674:20
  676:7 677:11
  687:17 701:6
  707:13 720:11
  756:16,17 758:16
  758:17 767:6
  774:16 775:11,12
  784:18 792:12,14
  796:21 803:8
  804:2 805:17
Yep 750:18
yes' 683:17
Yes--no 716:2
yesterday 656:8
  658:14,16 699:18
  706:15 725:9
yesterday-- 715:10
Yianapolis 713:10
York 784:22
you--are 715:18
you--do 691:1
young 729:14
  756:15

_____

Z

zealous 713:8
zealously 688:14

_____

0

01069 717:17
0167 707:16
0170 709:5
0171 709:5
0192 709:17
0205 709:18
0210 712:9
0211 712:9

_____

1

1 672:8,9 678:3
  680:21,21 699:1
  700:19,20 701:12
  703:3 709:6
  730:15,16 765:8

1.9 745:3
1:30 646:3
10 691:19 760:19
  762:9 809:13
  810:11,12,15
  811:5
10-minute 728:20
100 765:9
105 798:16
1069 717:17
10th 811:9
11 788:16
1118 739:19
11th 795:9 818:5
12 677:19 780:2
12:34 649:3
12th 810:17 811:6
  812:18
13 767:6
13th 812:12,19,20
13th's 812:16
14 687:2
14-day 758:21
14,000 815:12,14,15
14th 812:13
15 728:17 772:7,7
  802:17
15th 813:4 816:21
168 707:16
17 687:12,16 688:3
  774:17
17.10 780:8
178 712:22
18 645:10 784:18
18-BD-070 645:6
18th 649:3 813:16
  814:7,8 815:21
  818:3
19 792:9
1977 775:13
1978 674:3
1979 674:4
1980 695:4 775:14
1982 676:6,7 677:11
  695:15
1983 684:4 694:21
1989 767:19
1990 739:5
1996 684:5
1998 767:18
19th 709:19 811:15
  813:12,13 814:5
1st 810:15 816:21

_____

2

2 699:1 700:7

715:22 730:16
  735:7 744:10
  777:8
2:05 728:19,20
20 671:15 691:21
  728:17 731:18
  732:15 763:13
  804:13 806:18,18
2000 682:22 683:2,2
  720:10,19 788:15
  788:17
2006 788:16
2008 717:13
2013 739:15 758:21
2015 721:13
2016 743:7 756:5
  760:19 762:9
2017 753:9,21 756:3
2017-D051 645:7
2018 709:19 724:17
  727:1
2019 645:10 712:11
20th 812:22 814:14
21 651:11 669:16
  698:20 732:1,20
22 744:6,8,9 784:18
22-062-11 683:1
22nd 775:14
23 732:10,10 734:4
23rd 812:10 813:10
  816:3,5
24 727:1
24th 810:4 812:1,2
  812:3 813:6
  814:18 816:2,5
25 750:6
252 716:6 720:7
  722:11
253 716:6
255 720:6
25th 815:22 816:2,5
26 683:2 735:5,10
  735:11,15,15,16
  736:1 750:9,19
  751:11 788:17
263 722:12
264 721:5,7 722:18
26th 813:6 814:18
  816:2,6 818:2
27th 813:2 816:7
28 730:15 731:11
28's 735:14
29 788:12
2nd 739:4,14,19
  740:15

In Re:  Larry E. Klayman
July 18, 2019

Page  842

**3**

**3** 699:1 700:7
    723:22 725:22
    730:17
**3.1** 740:5 755:10
**3.3(A)** 738:14
**3:12** 774:1,3
**3:18** 774:4
**3:57** 807:3,4
**30** 761:2,9 810:4
**30th** 816:8 818:4,7
    818:13
**311** 739:15
**38** 707:12
**3rd** 712:11

**4**

**4** 699:1 788:12,12
**40** 703:9
**40-some** 805:17
**42** 707:13 752:10
    775:10,12
**430** 646:2
**45** 781:2
**47** 721:17
**4th** 811:9

**5**

**5** 672:9 678:3,7
    680:21,21 699:1
    744:10
**5/5** 812:21
**5:22** 807:5,7
**5:47** 819:13
**55** 740:15
**570** 739:4
**5th** 795:9 810:21
    811:7 813:16
    814:7,8 817:9

**6**

**6** 753:8,21 779:16
    779:16
**600,000** 721:18
**61** 751:17
**62** 761:1,11
**64** 777:18,20,21
    795:7
**64-0146** 777:18
**64-017** 781:17
**64-01A** 794:21
    795:7
**64016** 777:22
**645** 648:3
**677** 740:15
**694** 648:3

**698** 648:3
**6th** 652:10 662:17
    663:11 664:14
    769:21 796:14
    808:20 809:4

**7**

**7,000** 815:12,15
**7.16** 654:12 657:6
    662:6 669:6 682:1
    694:6
**700** 648:4
**71** 687:17 774:16
    803:8
**760** 739:5
**78** 712:21
**79** 771:3
**7th** 775:13

**8**

**8.1** 738:16 773:2,4
**8.4(A)** 741:9 742:16
**8.4(C)** 738:13
**8.4(D)** 740:11,14
    741:17,18 745:4
**825** 739:14
**881** 739:19

**9**

**9** 765:8,9
**90** 765:2
**900** 716:8
**90s** 716:10
**95** 765:8
**9th** 769:13 770:4,17
    771:2 777:9
    780:18 810:21
    811:8 817:9

EXHIBIT 7

**IN THE UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA**

LARRY KLAYMAN, an individual
7050 W. Palmetto Park Road
Boca Raton, FL, 33433

        Plaintiff,

v.

DISTRICT OF COLUMBIA COURT OF
APPEALS
430 E St NW
Washington, DC 20001

   And

BOARD ON PROFESSIONAL
RESPONSIBILITY
901 4th Street, NW
Washington, D.C. 20001

   And

BUFFY MIMS
c/o 901 4th Street, NW
Washington, D.C. 20001

   And

ROBIN BELL
c/o 901 4th Street, NW
Washington, D.C. 20001

   And

CHRISTIAN WHITE
c/o 901 4th Street, NW
Washington, D.C. 20001

   And

BERNADETTE SARGEANT
901 4th Street, NW
Washington, D.C. 20001

   And

ROBERT WALKER
901 4th Street, NW
Washington, D.C. 20001

Case No.:

**COMPLAINT**

1

And

SARA BLUMENTHAL
901 4th Street, NW
Washington, D.C. 20001

And

MARGARET CASSIDY
901 4th Street, NW
Washington, D.C. 20001

And

THOMAS GILBERTSEN
901 4th Street, NW
Washington, D.C. 20001

And

WILLIAM HINDLE
901 4th Street, NW
Washington, D.C. 20001

And

SHARON RICE-HICKS
901 4th Street, NW
Washington, D.C. 20001

And

MICHAEL TIGAR
901 4th Street, NW
Washington, D.C. 20001

And

LESLIE SPIEGEL
901 4th Street, NW
Washington, D.C. 20001

Defendants.

## I.    INTRODUCTION

Plaintiff Larry Klayman ("Mr. Klayman") brings this action against the District of Columbia Court of Appeals ("DCCA"), the Board on Professional Responsibility ("Board"),

Bernadette Sargeant, Robert Walker, Sara Blumenthal, Margaret Cassidy, Thomas Gilbertsen, William Hindle, Sharon Rice-Hicks, Michael Tigar,  Leslie Spiegel (collectively the "Board Defendants"), Buffy Mims, Robin Bell, and Christian White (collectively the "AHHC Defendants")

## II.    JURISDICTION AND VENUE

1.    This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 as this actions arises under the United States Constitution and 42 U.S.C. § 1983.

2.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because Defendants reside in this district and the acts underlying this Court occurred in this district.

## III.    PARTIES

3.    Plaintiff Larry Klayman is an individual, a natural person. Mr. Klayman is at all relevant times a citizen and resident of the state of Florida.

4.    Defendant DCCA is the highest Court in the District of Columbia and is ultimately responsible for adjudicating attorney discipline matters.

5.    Defendant Board is appointed by Defendant DCCA and serves as its disciplinary arm, responsible for the adjudication of disciplinary cases and the administration of the attorney discipline system. The Ad Hoc Hearing Committee ("AHHC") preside over disciplinary hearings and are appointed by the Board.

6.    Defendant Mims is an individual, natural person. Defendant Mims was at all material times the chairperson of the AHHC in the disciplinary proceeding styled *In re Klayman*, 18-BD-070 (the "Bundy Matter") and is being sued in her individual and official capacities.

7.     Defendant Bell is an individual, natural person. Defendant Bell was at all material times a member of the AHHC in the Bundy Matter and is being sued in her individual and official capacities..

8.     Defendant White is an individual, natural person. Defendant White was at all material times a member of the AHHC in the Bundy Matter and is being sued in his individual and official capacities.

9.     Defendant Sargeant is an individual, natural person and at all material times, was a member of Defendant Board as its chairperson. She is being sued in her official capacity as a member of the Board and in her individual capacity.

10.    Defendant Walker is an individual, natural person and at all material times, was a member of Defendant Board. He is being sued in his official capacity as a member of the Board and in his individual capacity.

11.    Defendant Blumenthal is an individual, natural person and at all material times, was a member of Defendant Board. She is being sued in her official capacity as a member of the Board and in her individual capacity.

12.    Defendant Cassidy is an individual, natural person and at all material times, was a member of Defendant Board. She is being sued in her official capacity as a member of the Board and in her individual capacity.

13.    Defendant Gilbertsen is an individual, natural person and at all material times, was a member of Defendant Board. He is being sued in his official capacity as a member of the Board and in his individual capacity.

14.     Defendant Rice-Hicks is an individual, natural person and at all material times, was a member of Defendant Board. She is being sued in her official capacity as a member of the Board and in her individual capacity.

15.     Defendant Tigar is an individual, natural person and at all material times, was a member of Defendant Board. He is being sued in his official capacity as a member of the Board and in his individual capacity.

16.     Defendant Spiegel is an individual, natural person and at all material times, was a member of Defendant Board. She is being sued in her official capacity as a member of the Board and in her individual capacity.

17.     Defendant Hindle is an individual, natural person and at all material times, was a member of Defendant Board. He is being sued in his official capacity as a member of the Board and in his individual capacity.

## IV.    STANDING AND DAMAGES

18.     Mr. Klayman has standing to bring this action because he has been directly affected by the unlawful conduct complained herein.  His injuries are proximately related to the conduct of Defendants.

19.     The Board Defendants have refused to apply Board on Professional Responsibility Rule 12.2 ("Rules 12.2") - which rule was promulgated by the Defendant DCCA and assigned to Defendant Board to enforce – to dismiss an ongoing disciplinary action against Mr. Klayman (the "Bundy Matter"). This is despite the fact that Rule 12.2 has been unequivocally and egregiously violated by the AHHC Defendants, who withheld their Report and Recommendation for **over four (4) years**, well past the required 120 days. Because the Board refused to enforce Rule 12.2, Mr. Klayman was forced to sue the Board to seek injunctive

relief in the form of an order requiring that Rule 12.2 be enforced (the "Bundy Litigation"), which would moot out the entire disciplinary proceeding. Mr. Klayman asked Defendant DCCA to either dismiss the disciplinary action on the basis of Rule 12.2 or to stay this disciplinary proceeding pending the outcome of the Bundy Litigation, but Defendant DCCA refused to do so, which necessitated this instant litigation. To make matters worse, the Board Defendants precipitously issued a Report and Recommendation while the Bundy Litigation was still pending, therefore creating the potential for a "temporary suspension" condition for Mr. Klayman, which in and of itself will cause him, his colleagues, his clients, and his family irreparable harm. And, even more, Office of Disciplinary Counsel ("ODC") is illegally sending out *ex parte* copies of the Board's non-binding Report and Recommendation to foreign jurisdictions and courts where Mr. Klayman is licensed to practice for the sole purpose of vindictively harming and tortiously interfering with Mr. Klayman and his clients and colleagues, giving rise to *Klayman v. Porter et al*, 2024-CAB-005220 (D.C. Sup. Ct.). In sum, the persons and entities of D.C. Attorney Discipline Apparatus as alleged herein are working together closely in concert to try to inflict as much harm as possible on Mr. Klayman to try to have him removed from the practice of law because he is a prominent conservative and Republican activist and attorney who they desire to silence contrary to his First Amendment rights. This is set forth in detail herein.

## V.    FACTS

### *Background Facts*

20.    Mr. Klayman is a prominent conservative and Republican activist and attorney who engages in public speech furthering his conservative and Republican activist views and associates with other conservative and Republican activists and attorneys. Mr. Klayman brings in the public interest lawsuits furthering conservative and Republican ideals and engages in public

speech through his weekly radio show and other fora furthering his conservative and Republican ideals. Mr. Klayman's biography is attached hereto as Exhibit A.

21.    In or around 2017, Mr. Klayman was retained by Cliven Bundy ("Mr. Bundy") to represent him in his criminal trial in the U.S. District Court for the District of Nevada ("Nevada Court") stemming from a 2016 standoff with federal agents on Mr. Bundy's land (the "Bundy Trial"). The stakes of the Bundy Trial were extremely high, as Mr. Bundy was facing the possibility of life imprisonment.

22.    Presiding over the Bundy Trial was the Honorable Gloria Navarro ("Judge Navarro").

23.    Because Mr. Klayman was not a member of the Nevada Bar, he moved for admission *pro hac vice* in the Bundy Trial. Judge Navarro denied Mr. Klayman's motion, and Mr. Klayman appealed that decision to the U.S. Court of Appeals for the Ninth Circuit ("Ninth Circuit").

24.    Ultimately, there were multiple appeals and motions filed by Mr. Klayman to try to gain entry as counsel into the Bundy Trial due to the fact that Mr. Klayman was trying to zealously represent his client, Mr. Bundy. Mr. Klayman and Mr. Bundy saw that there was an enormous amount of prosecutorial misconduct going on in the Bundy Trial, which caused Mr. Klayman to push even harder to get into the case in order to zealously defend Mr. Bundy's rights within the bounds of ethics and the law.

25.    Mr. Klayman and Mr. Bundy's suspicions were more than confirmed when ultimately in January of 2018, Judge Navarro dismissed the charges against Mr. Bundy with prejudice as a result of gross prosecutorial misconduct in failing to turn over exculpatory

documents and lying to the Court. Mr. Klayman never was able to gain admission into the Bundy Trial.

26.     Despite Mr. Klayman having never been sanctioned by the Nevada Court or the Ninth Circuit for his efforts to gain admission into the Bundy Trial, ODC still initiated a disciplinary complaint against Mr. Klayman for simply trying to represent his client in a life-or-death criminal trial, alleging among other entirely frivolous and manufactured, contrived allegations, that Mr. Klayman had been dishonest and that his repeated attempts to gain *pro hac vice* admission into the Bundy Trial were somehow unethical.

27.     This was despite the fact that the Honorable Ronald Gould ("Judge Gould") of the Ninth Circuit, who was a part of the panel overseeing the appeals at issue, made factual findings that Mr. Klayman had fulfilled his duty of candor:

> Klayman properly disclosed the ongoing disciplinary proceeding in his initial application for pro hac vice admission, saying that the proceeding had not yet been resolved. This disclosure was accurate…. I agree with Klayman that he was not obligated to re-litigate the D.C. proceeding before the district court and that he did not have to provide the district court with the entire record from D.C. And if his disclosures were selective, still he is an advocate, an advocate representing defendant Cliven Bundy, **and after submitting a compliant response to the questions in the pro hac vice application, he had no greater duty to disclose any possible blemish on his career or reputation beyond responding to the district court's further direct requests.** *In re: Cliven D. Bundy*, 16-72275 (9th Cir. Oct. 28, 2016).

28.     The language of Judge Gould's portion of the opinion is irrefutably clear. *First*, Mr. Klayman submitted "a compliant response to the questions in the pro hac vice application." *Second*, Mr. Klayman "had no greater duty to disclose any possible blemish on his career or reputation beyond responding to the district court's further direct requests."

### *Facts Pertaining to Disparate First Amendment Viewpoint Discrimination*

29.     The fact that ODC chose to prosecute Mr. Klayman for his attempts to gain *pro hac vice* entry in the Bundy Trial can be explained by the highly politicized environment in the District of Columbia, which has caused and created an attorney discipline apparatus that has

disparately and selectively targeted attorneys who are conservative and Republican activists for removal from the practice of law.

30.     The fact that Mr. Klayman and numerous prominent Republican and conservative activist attorneys have become targeted for legal removal in the District of Columbia has even been observed by Harvard law professor emeritus Alan Dershowitz's latest book, "Get Trump," which compared the state of affairs to the "kind of ridicule that suspected communists faced during the era of Sen. Joe McCarthy in the 1950s."[1] Professor Dershowitz stated:

> If you are perceived as enabling Trump in the in the [left-wing] communities of New York and Washington, D.C., your personal life will be affected; and judges are influenced by that….That's why there cannot be a trial of Trump either in Manhattan or in the District of Columbia, because no judge will have the courage to throw out the case and have their personal and family and professional lives ruined. We are living in an age of left-wing McCarthyism, and I went through the original McCarthyism. This is extraordinarily dangerous.

Specifically, in "Get Trump" Dershowitz opined:

> In addition to targeting Donald Trump himself, the "Get Trump" campaign is also out to get his lawyers and anyone associated with him. The targeting of his lawyers is especially troubling, since it implicates the Sixth Amendment right to effective assistance of counsel. Good lawyers are understandably afraid of becoming the subjects of criminal or bar investigation if they dare to defend Trump. Even I, who has never been suspected or accused of any misconduct during my representation of Trump in the Senate, have been subject to punishment, cancellation, and a bar complaint. My family, too, has been attacked. Several first-rate lawyers have told me that they don't want to be "Dershiwitzed" – that is, subjected to the kind of punishments to which I have been subjected. *Id*. at 8.

> In at least one respect, the current attacks on our fundamental rights by "Get Trump" zealots are even more dangerous than the past attacks on our fundamental rights by McCarthyites. McCarthyites were generally old men who represented America's past. McCarthyism lasted less than a decade and its effects were quickly overcome. *Id*. at 10.

31.     Additionally, in an article titled *Democrats Work to Strip All Opponents of Representation in Court,* Joy Pullman, the executive editor of The Federalist, observes and

---

[1] Michael Katz, Dershowitz to Newsmax: Left-Wing McCarthyism Targets Trump Defenders, Newsmax, Mar. 24, 2023, available at https://www.newsmax.com/newsmax-tv/alan-dershowitz-left-wing-mccarthyism/2023/03/24/id/1113761/

opines: "[d]iscplining conservative, or simply neutral, lawyers can strip Democrats' opponents of high-quality legal defense, erasing justice by skewing the legal playing field." "Democrats are not just seeking to eliminate competent legal defense from Trump. They're pursuing lawyers who oppose their policies in any domain…." Ms. Pullman lists numerous examples of this, including William Barr, Jeff Clark, John Eastman, Ken Paxton, and Kari Lake. An attorney who was targeted in this ongoing scheme, Jim Bopp, Jr., was quoted: "[t]heir most sweeping goal is to discourage and chill lawyers from representing Republicans and conservatives, particularly in election law cases. They want to apply a much higher standard in order to punish them."

32.     Recently, it has been revealed that Bar Disciplinary Counsel Hamilton Fox III ("Fox") has personally gone after other Trump affiliated Republican legal counsel, such as Jeffrey Clark and Rudy Giuliani, often gloating to the media about his personal involvement. This is incredibly telling because it is almost unheard of for Bar Disciplinary Counsel to personally handle, try and litigate cases himself and not delegate them to his Deputy or Assistant Bar Disciplinary Counsel, so the fact that he chose to personally take on these matters shows conclusively what Fox's motivation is about, since it is nearly unheard of for Bar Disciplinary Counsel to take on and litigate these matters himself. With regard to Jeffrey Clark, the DCCA had step in and stop Fox and ODC's attempts to strip away Mr. Clark's constitutional Fifth Amendment rights, and Fox responded by saying "I'm not going to push that hearing back unless somebody cuts off one of my arms."[2]

33.     This is underscored by the fact that during the Trump years in particular, ethics complaints were filed, accepted and initiated against Trump White House Counsellor Kellyanne

---

[2]    https://www.politico.com/news/2024/02/26/jeff-clark-subpoena-trump-bar-investigation-00143469.

Conway[3] over remarks she made on cable news, against former Trump Attorney General William Barr[4] (the complaint was outrageously and incredibly filed by all prior presidents of the District of Columbia Bar as well as a former senior bar counsel) for withdrawing the indictment of General Mike Flynn and for remarks he made on Fox News, Senators Ted Cruz[5] and Josh Hawley[6] over their role in advocating for President Trump in the last presidential election, Professor John Eastman[7] who served as a legal counsel for President Trump, and of course former U.S. Attorney Rudy Giuliani[8] over his representation of President Trump, to name just a few. Indeed, Giuliani was just recently disbarred by the Bar over his association with and legal representation of President Trump.[9]

34.    As evidence of disparate, selective First Amendment selective viewpoint discrimination, the Court must look to the treatment afforded to leftist Democrat lawyers David Kendall, Kevin Clinesmith, and Marc Elias.

35.    When a complaint was filed against leftist Democrat lawyer David Kendall of Williams & Connolly over his admitted involvement in the destruction of Hillary Clinton's

---

[3]    https://www.washingtonpost.com/politics/law-professors-file-misconduct-complaint-against-kellyanne-conway/2017/02/23/442b02c8-f9e3-11e6-bf01-d47f8cf9b643_story.html

[4]    https://thehill.com/regulation/court-battles/508489-more-than-two-dozen-dc-bar-members-urge-disciplinary-probe-of-ag

[5]    https://www.texasstandard.org/stories/lawyers-law-students-officially-file-grievances-seeking-to-disbar-senator-ted-cruz/

[6]    https://thehill.com/homenews/state-watch/534783-attorneys-urge-missouri-supreme-court-to-probe-hawleys-actions

[7]    https://www.reuters.com/legal/ex-top-justice-dept-officials-testimony-sought-ethics-hearing-trump-ally-clark-2022-10-06/

[8]    https://www.law.com/newyorklawjournal/2021/03/03/nyc-bar-details-complaints-calling-for-full-attorney-discipline-investigation-of-giuliani/#:~:text=Under%20the%20New%20York%20state,censured%20or%20receive%20no%20punishment.

[9]    https://www.cnn.com/2024/09/26/politics/rudy-giuliani-disbarred-washington-dc/index.html

33,000 emails, many classified, and illegally retained on a private server, which complicity is not even in dispute, ODC summarily and quickly rejected a complaint filed by former Justice Department lawyer and conservative lawyer and public interest advocate Ty Clevenger, who was also pursued by ODC with the goal of disbarring him as well.[10]

36.     Next, this Court need only look to the matter of Kevin Clinesmith in *In Matter of Kevin E. Clinesmith*, 21-BG-018 (D.C. App.). In that case, Kevin Clinesmith—the former senior FBI lawyer and admittedly anti-Trump partisan who dishonestly falsified a surveillance document in the Trump-Russia investigation and who pled guilty to felony charges—was completely ignored by ODC and only temporarily suspended for only <u>five months</u> after he pled guilty, and only after ODC's "blind eye" was uncovered and subjected to negative publicity.

37.     Clinesmith  did not submit an affidavit, as required under Rule 14(g), for five (5) months after he was suspended. Despite this, not only did the D.C. attorney disciplinary apparatus fast-track, if not whitewash, his case—clearly in order to minimize his temporary suspension period —this D.C. Court of Appeals let Clinesmith off with barely a slap on the wrist with "time served" in just  seven (7) months, likely due to inappropriate if not conflicted insider influence by  his counsel, Eric Yaffe, Esq., the former chairperson of the Board and who now incredibly and conveniently represents the Board against Mr. Klayman in ongoing litigation styled *Klayman v, Board on Professional Responsibility,* 24-cv-0366 (D.C. Ct. App.) (the "Bundy Litigation"). And importantly, this Court imposed no reinstatement provision on Clinesmith despite him literally being a convicted felon over making false statements to the

---

[10] Ty Clevenger, State bar prosecutors are flouting the law, protecting Hillary Clinton and her lawyers, LawFlog, available at: https://lawflog.com/?p=1389

government. In stark contrast, the Michigan Bar automatically suspended Clinesmith immediately upon his felony conviction, and then ordered a suspension period of two (2) years.[11]

38.    Lastly, attached hereto and incorporated by reference is a report written by Paul Sperry titled "Trump's Toughest Foe Could Be Harris Lawyer Marc Elias" (the "Elias Article"). Exhibit B. The Elias Article details how Marc Elias' ("Elias") efforts to use the court system to prevent Donald Trump from being elected president. The Elias Article details in pertinent part:

> The longtime Democratic Party lawyer has already filed more than 60 preelection lawsuits to stop Trump from becoming president again by combatting what he calls Republican "voter suppression" efforts such as requiring voters to provide identification at the polls.
>
> …
>
> At the same time, Elias has been sending letters to election officials in Georgia and other key swing states threatening legal action if they uphold challenges to voter rolls to remove noncitizens and other ineligible registrants.
>
> …
>
> As general counsel to Hillary Clinton's 2016 presidential campaign, he helped lead the effort to manufacture and leak spurious "opposition research" claiming to reveal illicit ties between Trump and Russia. Elias later testified that he was worried – then as now – that Trump was a threat to democracy: "I received information that was troubling as someone who cares about democracy." That "information" turned out to be a fictitious "dossier" linking Trump to the Kremlin crafted by former British spook and FBI informant Christopher Steele, who huddled with Elias in his Washington office.
>
> …
>
> But Elias has since taken on other clients – including Kamala Harris – who have more than made up for the loss in revenue. So far in this election cycle, the latest FEC filings show the Elias Law Group has received a total of more than $22 million in disbursements from a host of major Democratic and anti-Trump clients.

---

[11]    https://www.michbar.org/journal/Details/Orders-of-Discipline-and-Disability-November-2021?ArticleID=4277

39.     Elias' efforts with regard to the 2016 election, "[s]pecial Counsel John Durham found Elias intentionally sought to conceal Clinton's role in the dossier. According to court records, Elias acted as a cutout for more than $1 million in campaign payments for the dossier." As the Elias Article set forth, the Durham probe as disclosed by Paul Sperry "**raised ethical issues with the D.C. Bar** and Elias' former law firm, Perkins Coie, reportedly leading to their breakup in August 2021…." Exhibit B. Given that Elias was never disciplined by the D.C. bar, the only possible conclusion is that this was also covered up and buried by the D.C. attorney discipline apparatus.

40.     This is the exact type of discriminatory selective prosecutorial discriminatory treatment that the U.S. Court of Appeals for the District of Columbia Circuit has found to be unconstitutional and illegal in *Frederick Douglass Found., Inc. v. District of Columbia*, 82 F.4th 1122 (D.C. Cir. 2023) ("*Douglass*").

41.     *Douglass* involved the Frederick Douglass Foundation ("Foundation"), a pro-life foundation, which had its advocates arrested for writing with chalk "Black Pre-Born Lives Matter." *Id*. at 1131. The Foundation sued the District of Columbia, alleging among other causes of action, First Amendment free speech selective enforcement. As evidence of disparate treatment, the Foundation pointed to the fact that in the summer of 2020, "thousands of protesters flooded the streets of the District to proclaim 'Black Lives Matter.' Over several weeks, the protesters covered streets, sidewalks, and storefronts with paint and chalk. The markings were ubiquitous and in open violation of the District's defacement ordinance, yet none of the protesters were arrested." *Id*.   The D.C. Circuit found that both the Foundation and the BLM protestors were similarly situated and that the Foundation had adequately alleged that the

District of Columbia had engaged in viewpoint selective prosecutorial discrimination in violation of the First Amendment:

> In particular, the District permitted individuals expressing the "Black Lives Matter" message to violate the defacement ordinance, as evidenced by the widespread painting, graffiti, and other defacement on public sidewalks, streets, and buildings, and on private property. By making no arrests, the police effectively exempted advocates of the "Black Lives Matter" message from the requirements of the ordinance. In contrast, the police showed up in force to the Foundation's small rally and arrested individuals who chalked "Black Pre-Born Lives Matter" on the sidewalk. *Id*. at 1142.

42.     The D.C. Circuit reasoned and ruled: "It is fundamental to our free speech rights that the government cannot pick and choose between speakers, not when regulating and not when enforcing the laws." *Id*. at 1141. "[T]he government has no authority to license one side to fight freestyle, while forbidding the other to fight at all." *Id.* at 1142. "The government may not enforce the laws in a manner that picks winners and losers in public debates. It would undermine the First Amendment's protections for free speech if the government could enact a content-neutral law and then discriminate against disfavored viewpoints under the cover of prosecutorial discretion." *Id*. at 1142.

43.     It is clear to see how *Douglass* applies to this instant case. Conservative and Republican activist public interest attorneys have been prosecuted by ODC while, as set forth above, convicted felons such as Clinesmith who has committed egregious ethics violations involving dishonesty are barely given a "slap on the wrist" simply because they were Democrat leftists adverse to Trump and employed as counsel the insider influential former Chairman of the Board Eric Yaffe – consistent with the overarching goal of silencing and abridging the First Amendment rights of activist conservative and Republican attorneys, such as Mr. Klayman.

***Facts Pertaining to Disciplinary Proceeding***

44.    It was under this partisan, compromised, and corrupted political atmosphere that Mr. Klayman was summoned before the AHHC comprised of Defendants Mims, Bell, and White in July of 2019 and September of 2019 for disciplinary proceedings initiated by ODC for his efforts to gain entry into the Bundy Trial *pro hac vice*.

45.    At this hearing, Mr. Klayman not only produced numerous character witnesses who testified glowingly in favor of him, but he even had Professor Erwin Chemerinsky ("Dean Chemerinsky") of the University of California at Berkeley's Boalt Hall testify pro bono on his behalf. Dean Chemerinsky testified that he did not believe that Mr. Klayman did anything unethical and that Mr. Klayman's actions were reasonable:

> Yes, I do. I think that it was reasonable under the circumstances of the case…
> This is about the ability of a criminal defendant to have counsel of choice; that the
> district court had refused to allow the pro hoc vice status; and the defendant
> wanted to have Mr. Klayman represent him. And the only way of having the
> district court decision reviewed was through these writs of mandamus. Exhibit C.

46.    To the contrary, ODC did not have a single witness, and instead had its incredibly conflicted prosecutor, Julia Porter ("Porter") serving as both prosecutor and witness[12].

---

[12] On occasion, some members of ODC, such as Deputy Bar Counsel Porter have engaged in unethical and dishonest conduct themselves, as evidenced by her crusade to have a father and son law firm of J.P. and John Szymkowicz – not coincidentally with J.P. being the only conservative white male Republican member of the D.C. city government – removed from the practice of law on a contrived and fraudulent Bar disciplinary proceeding involving an alleged female victim that lasted thirteen (13) years which drove them to the brink of bankruptcy by causing them to lose clients and causing  extreme emotional distress. When Porter ultimately failed to obtain disbarment or any sanction at all, she had former Senior Assistant Bar Disciplinary Counsel Michael Frisch, now professor at Georgetown Law School and, like Porter, a leftist Democrat, to defame them in his public blog postings, a tactic that she also used with Mr. Klayman. *See Klayman v. Porter et al*, 1:21-cv-727 (D.D.C.). This gave rise to the Board committing to do an internal review of Porter's conduct when the former chairman of the Board Richard Bernius wrote: "The Board, however, may conduct an administrative review of allegations of misconduct against members of the Office of Disciplinary Counsel. We will undertake such a review in this case." App. 243. This was however later deep sixed when the new chairman, Matthew Kaiser ("Kaiser"), took over. This can be explained by the fact that Kaiser has proven to be a leftist Democrat who was who was associated with the leftist legal publication "Above the Law," and wrote complementary columns extolling the virtues of an "honest" Hillary Clinton, but trashing Donald Trump, who Mr. Klayman had supported. Kaiser was even lead counsel a civil lawsuit which he filed against Donald Trump, *Garza v. Trump* et al, 1:23-cv-00038 (D.D.C.), which

47.    It is therefore no surprise that at the conclusion of first three-day hearing before the AHHC on July 18, 2019, when the facts and evidence were fresh in the committee members' minds,  the chairperson, Defendant Mims stated on the record that "the Hearing Committee has been unable to reach a non-binding determination." Exhibit D. This finding, coming at this preliminary stage, is rare and unique, as hearing committee usually provisionally issues non-binding rulings which then permit them to take evidence on factors involving mitigation and/or aggravation. This was memorialized in the AHHC's August 8, 2019 order which stated:

> Following the conclusion of the evidentiary portion of the hearing and the parties' respective closing arguments, the Hearing Committee went into executive session and determined that it could not make a preliminary finding that Disciplinary Counsel had proven any disciplinary rule violation. Exhibit D.

48.    Then, for over four (4) years – almost an egregious and unbelievable half a decade - the AHHC went silent, leaving Mr. Klayman to very reasonably to rightly conclude that this matter had been laid to rest and thus disposed of, given the AHHC's finding after the hearing that ODC had failed to prove any ethical violations as well as because of Board Rule 12.2 ("Rule 12.2), which was promulgated by Defendant DCCA:

> The Hearing Committee's report shall be filed with the Board **not later than 120 days following the conclusion of the hearing.** The 120 days provided for by the Court's rules for the preparation of the Hearing Committee's report shall start to run at the conclusion of the hearing.

49.    Yet, on September 20, 2023 – over four (4) years after the AHHC Hearing concluded - nearly half of a decade later -  the AHHC incredibly without factual, legal and other bases reversed course 180 degrees and issued an AHHC Report and instead recommended a one-year suspension with a reinstatement provision.

---

lawsuit defies well-settled principles of presidential immunity. Like Mr. Klayman, J.P. and his father were not ideological kin to Kaiser.

50.     Rule 12.2 is the equivalent of a statute of limitations and thus the fact that the AHHC let this limitations period run means that this matter must be summarily dismissed. However, even under the improper and erroneous interpretation of Rule 12.2 as not being the equivalent of a statute of limitations, Defendants Mims, Bell, and White chose not to ask this Court – which promulgated Rule 12.2 – for an extension of time, however improper, to submit their Report, and thus, any such request would therefore be waived, particularly given the egregious four (4) year delay.

51.     It more than appears that given this egregious and violative passage of time, the Defendants Mims, Bell, and White simply forgot everything that occurred at the hearing back in 2019 and thus made the decision to simply "rubber stamp" what was presented to them back in 2019 by ODC and Porter. This is improper for a litany of reasons, none more compelling than the fact that ODC and Porter already made all of their same arguments at the 2019 AHHC hearing. Absolutely nothing new was put into the record in the interim four (4) year period of delay. Thus, the only explanation for the AHHC reversing course nearly half of a decade later is that they simply copied and adopted wholesale the briefs of Porter and ODC from 2019 given that the four (4) year delay has caused them to either forget everything that happened at the AHHC hearing, or simply wanted to harm Mr. Klayman, his family and his colleagues given his support of Donald Trump, who was then running for President again in the 2024 presidential election.

52.     Even more, it has become regrettably evident recently that the purpose for this four (4) year delay logically had to be carefully conceived, during a highly charged partisan period in our nation's history when supporters of President Donald Trump have been under attack, to "stack" disciplinary proceedings against Mr. Klayman to ensure that he remains

ineligible to practice law in the District of Columbia given that he has only recently on August 6, 2024 petitioned for reinstatement to practice following the conclusion of the suspension period in *In re Klayman*, 20-BG-583 (D.C.C.A.) (the "Sataki Matter"), which order is still being seriously challenged and currently on appeal and under review by this Court. *Klayman v. Sataki et al*, 24-cv-0226 (D.C. Ct. App.).

53.     This type of "stacking" of disciplinary proceedings has been found to be illegal and unethical in jurisdictions such as Florida. *Fla. Bar v. Rubin*, 362 So. 2d 12 (Fla. 1978*)*. Here the Supreme Court of Florida, which is the highest authority in Florida just as this Court is here in the District of Columbia, in dismissing the disciplinary complaint against the respondent attorney, Ellis Rubin, held:

> Whatever other objects the rule may seek to achieve, it obviously contemplates that *the Bar should not be free to withhold a referee 's report which it finds too lenient until additional cases can be developed* against the affected attorney, in an effort to justify the more severe discipline which might be warranted by cumulative misconduct. The Bar's violation of the prompt filing requirement in this case, to allow a second grievance proceeding against Rubin to mature, is directly antithetical to the spirit and intent of the rule. In addition, it has inflicted upon Rubin the 'agonizing ordeal' of having to live under a cloud of uncertainties, suspicions, and accusations for a period in excess of that which the rules were designed to tolerate. (emphasis added).

*See also Fl. Bar v. D'Ambrosio*, 25 So. 3d 1209 (Fla. 2010)(referring to the practice of "stacking" disciplinary proceedings as "unfair."). **Again, the disciplinary complaint against the attorney in *Rubin* was dismissed**.

54.     When Mr. Klayman brought the egregious violation of Rule 12.2 to the Board's attention, the Board and the Board Defendants incredibly refused to enforce Rule 12.2 with regard to Mr. Klayman. This led to the Bundy Litigation where Mr. Klayman sought injunctive relief in the form of an order directing the Board to enforce Rule 12.2, and which is currently on appeal to the Defendant DCCA.

55.     Mr. Klayman also asked the Defendant DCCA to stay the Bundy Matter pending the Bundy Litigation, as the Bundy Litigation would moot out the Bundy Matter, but the Defendant DCCA refused to even grant this stay, which would be in the interests of judicial economy and fundamental fairness and justice, particularly since Mr. Klayman's financial resources will be severely taxed by having to defend a time-barred and non-meritorious disciplinary proceeding. This refusal to stay the Bundy Matter regrettably necessitated this instant litigation.

56.     On information and belief, and which will be borne out in discovery, the refusal to enforce Rule 12.2 to dismiss the Bundy Matter is due to Mr. Klayman's conservative and Republican activism, speech, association, and beliefs. On information and belief, there are many other examples of the Defendants selectively enforcing the Board Rules to the benefit of leftist and Democrat attorneys and to the detriment of conservative and Republican activist attorneys.

57.     Indeed, Porter and ODC's motivation is no secret, as at the conclusion of the AHHC hearing in the Bundy Matter, Defendant Porter couldn't help but to blurt out that Mr. Klayman "should not continue to have the privilege of being a lawyer," evidencing that she was being driven by a personal animus and dislike for Mr. Klayman, as with J.P. Szymkowicz, also as a white male conservative and Republican activist attorney.

58.     Accordingly, the ongoing Bundy Matter was brought in bad faith for the purpose of harassing Mr. Klayman and chilling his constitutional rights.

59.     The state court is an inadequate forum to adjudicate this matter because the DCCA is named as a party to this matter and therefore would have a conflict of interest in ruling on its own unconstitutional conduct. Furthermore, this Complaint has alleged the inherent biases

of the state court, which governs all of the Defendants and oversees the entire attorney discipline process.

60.    Under 28 U.S.C. § 2283, a court of the United States may enjoin a state court proceeding where it is necessary to "protect of effectuate its judgments." In this case, the judgment at issue is the *Douglass* Opinion, and the Defendants cannot be allowed to intentionally ignore the holding of the *Douglass* Opinion in selectively and disparately targeting conservative and Republican attorneys for removal from the practice of law

61.    This is not what the disciplinary process was meant to be. It should be based on facts and law, not personal and political biases. Instead, the Defendants have, with discriminatory intent, selectively and disparately targeted conservative and Republican attorneys, such as Mr. Klayman, for removal from the practice of law. This is expressly forbidden under *Douglass*.

62.    Importantly, "[i]t has long been established that the loss of constitutional freedoms, `for even minimal periods of time, unquestionably constitutes irreparable injury." *Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009). Mr. Klayman's constitutional rights have been egregiously violated by the Defendants here, as there is no immunity for unconstitutional acts. *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388 (1971).

63.    Accordingly, this Court must enter an order dismissing the Bundy Matter.

64.    Furthermore, the AHHC Defendants and the Board Defendants were not acting within the scope of their official duties because enforcing Rule 12.2 – as well as all of the Board Rules – is the fundamental purpose of their positions. Thus, intentionally refusing to enforce Rule 12.2 is the equivalent of intentionally refusing to perform their official duties, and thus, the

allegations set forth herein clearly fall outside the scope of the AHHC Defendants and the Board Defendants' official duties for which they are not immune. *Loper Bright Enterprises et al v. Raimondo, Secretary of Commerce, et al*, 22-451 (U.S. 2024). *See also Trump v. United States*, 23-939 (U.S. 2024).

**FIRST CAUSE OF ACTION**
*Violation of the First Amendment to the U.S. Constitution*
*Freedom of Association*

65.     Mr. Klayman repeats and re-alleges all of the previous allegations of the entirety of this Complaint, including, but not limited to, the Introduction and the exhibits to this Complaint, with the same force and effect, as if fully set forth herein again at length.

66.     The First Amendment to the U.S. Constitution protects the right to freedom of association.

67.     Mr. Klayman holds conservative and Republican activist views, including support of Trump, and associates with other conservative and Republican activist attorneys for the purpose of more effectively expressing that viewpoint and ideology.

68.     The Defendants' selective and discriminatory prosecution of conservative and Republican activist attorneys chills, deters, and restricts Mr. Klayman from participating in activities organized around his conservative and Republican activist views.

69.     The Defendants' selective and discriminatory prosecution of conservative and Republican activist attorneys serves no legitimate or compelling government interest and is not narrowly tailored to further any government interest.

70.     The Defendants' selective and discriminatory prosecution of conservative and Republican activist attorneys impermissibly infringes on Mr. Klayman's right to associate on the basis of his conservative and Republican activist beliefs.

71.    The Defendants' selective and discriminatory prosecution of conservative and Republican activist attorneys is therefore unconstitutional under the First Amendment to the United States Constitution.

72.    In violating Mr. Klayman's First Amendment rights, Defendants were acting under the color of state law

73.    Accordingly, the Defendants' selective and discriminatory prosecution of conservative and Republican activist attorneys entitles Mr. Klayman to damages pursuant to 42 U.S.C. § 1983 against the individual AHHC Defendants and the individual Board Defendants as well as the injunctive and equitable relief as set forth in the Prayer for Relief.

**SECOND CAUSE OF ACTION**
*Violation of the First Amendment to the U.S. Constitution*
*Freedom of Speech*

74.    Mr. Klayman repeats and re-alleges all of the previous allegations of the entirety of this Complaint, including, but not limited to, the Introduction and the exhibits to this Complaint, with the same force and effect, as if fully set forth herein again at length.

75.    The First Amendment to the U.S. Constitution protects the right to freedom of speech.

76.    Mr. Klayman holds conservative and Republican activist views, including support of President Trump, and engages in public speech furthering his conservative and Republican activist views as part of his duties as a prominent conservative and Republican public interest activist and attorney.

77.    The Defendants' selective and discriminatory prosecution of conservative and Republican activist attorneys chills, deters, and restricts Mr. Klayman from engaging in public speech furthering his conservative and Republican activist views.

78.     The Defendants' selective and discriminatory prosecution of conservative and Republican activist attorneys serves no legitimate or compelling government interest and is not narrowly tailored to further any government interest.

79.     The Defendants' selective and discriminatory prosecution of conservative and Republican activist attorneys impermissibly infringes on Mr. Klayman's right to engage in public speech furthering his conservative and Republican activist views.

80.     The Defendants' selective and discriminatory prosecution of conservative and Republican activist attorneys is therefore unconstitutional under the First Amendment to the United States Constitution.

81.     In violating Mr. Klayman's First Amendment rights, Defendants were acting under the color of state law.

82.     Accordingly, the Defendants' selective and discriminatory prosecution of conservative and Republican activist attorneys entitles Mr. Klayman to damages pursuant to 42 U.S.C. § 1983 against the individual AHHC Defendants and the individual Board Defendants as well as the injunctive and equitable relief as set forth in the Prayer for Relief.

### THIRD CAUSE OF ACTION
*Violation of the Fifth Amendment to the U.S. Constitution*
*Due Process*

83.     Mr. Klayman repeats and re-alleges all of the previous allegations of the entirety of this Complaint, including, but not limited to, the Introduction and the exhibits to this Complaint, with the same force and effect, as if fully set forth herein again at length.

84.     The Due Process Clause of the Fifth Amendment to the U.S. Constitution requires that the government treat all similarly situated individuals equally.

85.    The Defendants' selective and discriminatory prosecution of conservative and Republican activist attorneys has impermissibly subjected Mr. Klayman to unequal treatment from similarly situated individuals, namely leftist and Democrat attorneys.

86.    The Defendants' selective and discriminatory prosecution of conservative and Republican activist attorneys serves no legitimate or compelling government interest and is not narrowly tailored to further any government interest.

87.    The Defendants' selective and discriminatory prosecution of conservative and Republican activist attorneys impermissibly in the form of applying the Board Rules to some members of the D.C. Bar, while refusing to apply the Board Rules to other members of the bar based on their political beliefs and ideologies has impermissibly subjected Mr. Klayman to unequal treatment compared to similarly situated individuals, namely leftist and Democrat attorneys.

88.    The Defendants' selective and discriminatory prosecution of conservative and Republican activist attorneys is therefore unconstitutional under the Fifth Amendment to the United States Constitution.

89.    In violating Mr. Klayman's Fifth Amendment rights, Defendants were acting under the color of state law.

90.    Accordingly, the Defendants' selective and discriminatory prosecution of conservative and Republican activist attorneys entitles Mr. Klayman to damages pursuant to 42 U.S.C. § 1983 against the individual AHHC Defendants and the individual Board Defendants as well as the injunctive and equitable relief as set forth in the Prayer for Relief.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Klayman prays that

(1) the Bundy Matter be dismissed pursuant to Rule 12.2 and the First and Fifth Amendments of the U.S. Constitution;

(2) actual, compensatory, and punitive damages in a sum to be determined at trial for a violation of his constitutional First Amendment rights under 42 U.S.C. § 1983 against the individual AHHC Defendants and the individual Board Defendants;

(3) preliminary and permanent injunctive relief against all the Defendants;

(4) an award of attorneys fees and costs; and

(5) any other relief that the Court deems just and proper.

**<u>DEMAND FOR JURY TRIAL</u>**

Plaintiff demands a trial by jury on all counts, as to all issues so triable.

DATED: October 22, 2024                         Respectfully submitted,

Larry Klayman
Klayman Law Group P.A.
7050 W. Palmetto Park Road
Boca Raton, FL 33433
Email: leklayman@gmail.com
Tel: 561-558-5336


*Plaintiff Pro Se*

# EXHIBIT A

# ABOUT LARRY KLAYMAN

Larry Klayman, founder of Judicial Watch and Freedom Watch, is known for his strong public interest advocacy in furtherance of ethics in government and individual freedoms and liberties. During his tenure at Judicial Watch, he obtained a court ruling that Bill Clinton committed a crime, the first lawyer ever to have done so against an American president. Larry became so famous for fighting corruption in the government and the legal profession that the NBC hit drama series "West Wing" created a character after him: [Harry Klaypool of Freedom Watch](). His character was played by actor John Diehl.

In 2004, Larry ran for the U.S. Senate as a Republican in Florida's primary. After the race ended, he founded Freedom Watch.

Larry graduated from Duke University with honors in political science and French literature. Later, he received a law degree from Emory University. During the administration of President Ronald Reagan, Larry was a Justice Department prosecutor and was on the trial team that succeeded in breaking up the telephone monopoly of AT&T, thereby creating competition in the telecommunications industry.

Between Duke and Emory, Larry worked for U.S. Senator Richard Schweiker (R-Pa.) during the Watergate era. He has also studied abroad and was a stagiaire for the Commission of the European Union in its Competition Directorate in Brussels, Belgium. During law school, Larry also worked for the U.S. International Trade Commission in Washington, D.C.

Larry speaks four languages—English, French, Italian, and Spanish—and is an international lawyer, among his many areas of legal expertise and practice.

The author of two books, *Fatal Neglect* and *Whores: Why and How I Came to Fight the Establishment,* Larry has a third book in the works dealing with the breakdown of our political and legal systems. His current book, *Whores,* is on now sale at WND.com, Amazon.com, BarnesandNoble.com, Borders.com, and all major stores and booksellers.

Larry is a frequent commentator on television and radio, as well as a weekly columnist, on Friday, for WND.com. He also writes a regular blog for Newsmax called "Klayman's Court."

Larry has been credited as being the inspiration for the Tea Party movement. (See "[Larry Klayman - The One Man TEA Party](http://fwusa.org/KFA)," by Dr. Richard Swier, http://fwusa.org/KFA)



**Support the work of Freedom Watch at [www.FreedomWatchUSA.org](http://www.FreedomWatchUSA.org)**

# EXHIBIT B





If Donald Trump gets past Kamala Harris on Nov. 5, he'll likely face a fiercer opponent in court – her campaign attorney, Marc Elias.

The longtime Democratic Party lawyer has already filed more than 60 preelection lawsuits to stop Trump from becoming president again by combatting what he calls Republican "voter suppression" efforts such as requiring voters to provide identification at the polls. Echoing a standard Democratic talking point, Elias maintains that such requirements are "racist" strategies designed to make it harder for minorities to vote.

At the same time, Elias has been sending letters to election officials in Georgia and other key swing states threatening legal action if they uphold challenges to voter rolls to remove noncitizens and other ineligible registrants. Some Georgia officials complain that his intimidation tactics are interfering with county registrars' ability to check the qualifications of voters.

If Trump is declared the winner, the hard-charging attorney threatens to overturn his election by deploying an army of more than 75 lawyers to sue for ballot recounts in several swing states. Trump, in turn, has threatened to lock Elias up for election interference, as ABC News moderator David Muir pointed out in last month's presidential debate between Trump and Kamala Harris.

Elias symbolizes the growing impact of lawfare on U.S. elections as both parties are turning increasingly to the courts to gain an edge. According to a newly disclosed Republican National Committee memo, the Trump campaign has filed or joined 123 election lawsuits in 26 states, 82 of which are in battleground states, to combat what it describes as voter fraud. It has also hired thousands of lawyers to fend off what a Trump lawyer expects will be "an onslaught of litigation" from the Harris campaign contesting the results of the election. Of course, that army of lawyers will also be used to push recounts should Trump lose.



Elias keeps a sign behind his desk that says "BEWARE OF ATTACK DEMOCRAT."

MSNBC

Election experts say that these GOP efforts – fueled, in part, by Trump's claim that Democrats stole the 2020 election – are playing catch-up. Democrats have long been at the forefront of strategies to use the court to impact elections, and no one has been more important to that cause than Elias, who keeps a sign behind his desk that warns: "BEWARE OF ATTACK DEMOCRAT."

To many Democrats, he is a hero. The headline of a 2022 profile of Elias in the New Yorker called Elias, "The First Defense Against Trump's Assault on Democracy."

Conservatives tend to see Elias in a much different light. "Mr. Elias is part of a massive and well-funded partisan leftist operation notorious for using lawfare to undermine election integrity," says Tom Fitton, president of Judicial Watch. "Making it easier to steal elections is the antithesis of 'democracy.'"

Nevertheless, in the expanding world of lawfare, Elias, a 55-year-old graduate of Duke University's law school, continues to stand apart. While scoring many victories in the courthouse, he has also worked closely with campaigns on partisan efforts that have little to do with jurisprudence.

### More Than a Courtroom Partisan

As general counsel to Hillary Clinton's 2016 presidential campaign, he helped lead the effort to manufacture and leak spurious "opposition research" claiming to reveal illicit ties between Trump and Russia.



Elias later testified that he was worried – then as now – that Trump was a threat to democracy: "I received information that was troubling as someone who cares about democracy." That "information" turned out to be a fictitious "dossier" linking Trump to the Kremlin crafted by former British spook and FBI informant Christopher Steele, who huddled with Elias in his Washington office.



Elias was deeply involved in Christopher Steele's spurious dossier linking Trump to Russia.

AP

"Some of the information that was in it I think has actually proved true. It was accurate and important," Elias testified in a closed-door hearing on Capitol Hill in December 2017, according to a declassified transcript. Actually, Steele's allegations proved to be a collection of improbable rumors and fabricated allegations invented by Steele's top researcher and a Clinton campaign adviser.

Nonetheless, the disinformation was fed to the FBI and media, igniting criminal investigations (including illegal electronic surveillance), congressional probes, and a media frenzy that crippled Trump's presidency with bad press for years.

In a parallel operation against Trump, Elias worked with his then-law partner Michael Sussmann and Clinton campaign officials – including Jake Sullivan, who is now President Biden's national security adviser – to develop misleading evidence of a "secret hotline" between Trump and Russian President Vladimir Putin that allegedly used a "back channel" connection between email servers at Trump Tower and Russian-owned Alfa Bank. These false allegations were posted on social media and brought to the attention of the FBI, triggering a separate criminal investigation targeting Trump and his campaign. Like other Russiagate probes, it was eventually discredited.

But the damage was done. By spreading fake Russian dirt on Trump, Elias was able to create scandals that dogged Trump for years, tarnishing his electability. The Democratic lawyer's machinations, however, drew scrutiny from other investigators and hurt his own reputation – albeit temporarily.

During his probe of Russiagate, Special Counsel John Durham found Elias intentionally sought to conceal Clinton's role in the dossier. According to court records, Elias acted as a cutout for more than $1 million in campaign payments for the dossier. By laundering its payments through a law firm, the Clinton campaign and Elias were able to claim attorney-client confidentiality when Durham sought their internal emails (the assertion of that privilege also blocked investigators from accessing communications between Elias and Steele's immediate employer, the Washington-based opposition research firm, FusionGPS). But their shell game got the Clinton campaign in trouble with the Federal Election Commission, which later fined it and the Democratic National Committee $113,000 for misreporting the purpose of the payments as "legal expenses," rather than opposition research, in violation of FEC laws.

The Durham probe, which Elias insists was "politically motivated," nonetheless raised ethical issues with the D.C. Bar and Elias' former law firm, Perkins Coie, reportedly leading to their breakup in August 2021, when Elias suddenly left the powerhouse after almost 30 years. The firm, which Elias had joined fresh out of law school in 1993, grew "increasingly uncomfortable" with the unwanted scrutiny the Durham probe invited on it, according to published reports. The veteran prosecutor exposed questionable billing practices by the firm. Durham also revealed the Democratic firm had set up an FBI workspace within its Washington offices, further calling into question the FBI's impartiality in investigating Trump.



Special Counsel John Durham found Elias served as cutout for Hillary Clinton's dirty tricks in 2016.

AP

In late 2021, Elias opened his own firm, the Elias Law Group, but soon lost major clients who reportedly grew weary of his aggressive tactics and go-it-alone style. Last year, the DNC severed its 15-year relationship with Elias; then more recently, the Biden campaign parted company with him. In 2020, Elias had quarterbacked Biden's legal team that fought Trump's claims in court that the election had been stolen. He also beat back GOP measures to ensure election integrity

after Democrats took advantage of the COVID-19 pandemic to dramatically loosen rules for voting – including allowing ballot harvesting, drop boxes, and ballots arriving up to four days after Election Day to still be counted.

Top Democratic Party officials were said to sour on Elias after he filed election-related lawsuits without consulting with them, some of which backfired with unfavorable – and lasting – rulings. Biden's team reportedly also became frustrated with his fees. Elias billed the DNC and Biden campaign more than $20 million during the 2020 election cycle.



Elias has been retained by Vice President Kamala Harris for post-election litigation and recounts.
**AP**

But Elias has since taken on other clients – including Kamala Harris – who have more than made up for the loss in revenue. So far in this election cycle, the latest FEC filings show the Elias Law Group has received a total of more than $22 million in disbursements from a host of major Democratic and anti-Trump clients. In addition to the Harris For President campaign, where he's in charge of recounts and post-election litigation (it's not known if he also has a hand in opposition research, as he did in 2016), Elias has signed retainer agreements with the:

- Democratic Congressional Campaign Committee
- Democratic Senatorial Campaign Committee
- [Democratic] Senate Majority PAC
- Stop Trump PAC
- The Lincoln Project

Elias has also been retained by Mind The Gap, a political action committee set up to help Democrats take back the House. Mind The Gap was founded by Barbara Fried, the mother of convicted crypto kingpin Sam Bankman-Fried. In a lawsuit filed last year, Fried, a Stanford law professor, is accused of orchestrating a potentially illegal scheme to funnel political contributions from her son to her PAC.

Among Elias' other clients are Democratic Rep. Adam Schiff, a leader of House efforts to impeach Trump who, records show, is shelling out a six-figure retainer for Elias as he runs for an open U.S. Senate seat in California, and Democratic Rep. Dan Goldman, who previously served as Schiff's chief counsel during the first Trump impeachment.

Elias also represents Democratic Sen. Sherrod Brown of Ohio, who polls show is narrowly leading GOP challenger Bernie Moreno in his race for reelection, according to the RealClearPolitics Average. That race could determine control of the Senate.

The business of political lawfare – or "protecting democracy," as Elias calls his job – has made the super lawyer super-rich. The most recent property records show Elias lives in a $2.6 million mansion in Great Falls, Va., and FEC records show he has the wherewithal to donate generous sums to his party, including a combined total of at least $65,000 in gifts to the Democratic Congressional Campaign Committee and the Democratic Senatorial Campaign Committee.

**"Aggressive Bully"**

Case 3:22-mc-00014-JRK    Document 18    Filed 09/21/25    Page 683 of 782 PageID 7182

**"Aggressive Bully"**

Elias first earned his reputation as a fierce and effective advocate in 2009, when he won an eight-month recount battle to get his client, Al Franken, elected to the Senate. He also scored a series of victories against the Trump campaign in 2020.

"My team and I beat [Trump] in court 60-plus times," Elias boasted on X last month, in his trademark brashness. "Here is my message to the GOP: If you try to subvert the election in 2024, you will be sued and you will lose."

Representing Biden electors in Arizona, for example, Elias in late 2020 defeated a post-election Trump lawsuit alleging voter fraud in Maricopa County by arguing at trial the plaintiff showed the court only "garden variety errors" but provided "no evidence about misconduct, no evidence about fraud, no evidence about illegal votes."

But Elias' aggressive posture has also backfired.

In 2016, he sued Arizona to strike down two laws that, he argued, made it harder for blacks and Hispanics to vote. One banned the practice of partisans going door-to-door and collecting mail-in ballots and bringing them to a polling place, and the other canceled ballots that were cast at the wrong precinct. Elias argued the measures violated a key part of the Voting Rights Act – Section 2 – prohibiting states from passing voting laws that discriminate based on race. After a lower court in Arizona refused to block the measures prior to the election, Elias appealed and won a favorable ruling from the liberal U.S. Ninth Circuit Court of Appeals. But in the case, *Brnovich v. DNC,* the U.S. Supreme Court sided with Arizona, ruling that the state's ballot-integrity measures lacked discriminatory intent.

UCLA law professor Rick Hasen speculates that the conservative Supreme Court used the *Brnovich* case as "an opportunity to weaken" Section 2, which Democratic voting-rights lawyers have relied on as a tool for civil rights enforcement. Regardless of the justices' motives, the *Brnovich* decision does establish a precedent whereby voting rules resulting in only small disparities for voters of color can no longer be challenged. Some Democrats complain that Elias' loss in Arizona opened the door for all red states to impose "restrictions" on voting.



"Marc didn't listen to such criticism and he brought an extremely weak Voting Rights Act case in Arizona to disastrous results," Hasen wrote in a recent blog. "It is fine to be zealous in one's advocacy," he added, "but one need not be an aggressive bully."

Elias has also aggravated judges. He's been disciplined for filing frivolous lawsuits and motions. In 2021, for instance, the U.S. Court of Appeals for the Fifth Circuit sanctioned Elias for refiling a motion that was previously rejected by a lower court "without disclosing the previous denial." The appellate court ordered him to pay attorneys' fees and court costs incurred by opponents in the Texas election case over his "duplicative" motion.

UCLA's Rick Hasen characterized Elias as an "aggressive bully."
**Wikimedia**

"Using lawfare as Elias does is legal — unless the litigation is frivolous," said Paul Kamenar, general

Case 3:22-mc-00014-JRK    Document 18    Filed 09/21/25    Page 684 of 782 PageID 7183

sling lawfare as Elias does is legal – unless the litigation is frivolous," said Paul Kamenar, general counsel for the National Legal and Policy Center in Washington.

Elias and an attorney representing him did not reply to requests for comment. But in a previous interview, he dismissed the criticism that he is unnecessarily belligerent, arguing that the "existential threat Trump poses to democracy" demands tough action. He acknowledged that he can be brusque but explained he discarded lawyerly circumspection and restraint after Trump's 2016 election "radicalized" him.

"And so I became a much more polarized person and a more polarizing lawyer," Elias told The New Yorker.

In a recent column for his Democracy Docket website, Elias attacked Trump as another "Hitler" who is "plotting to overthrow American democracy." He even warned that a reelected Trump "is almost certain to convert the military into his personal domestic police force" and "seize voting machines [and] control ballot counting," even though state laws govern elections.

Still, he denies filing groundless grievances over voting rules. He insists many of the tighter rules imposed by Republicans serve no legitimate purpose. And he doesn't buy their argument that they're needed to stop fraudulent voting because, as he claims, voter fraud is rare (or, more precisely, rarely prosecuted).

**Anti-Trump War Room**

"Republicans are working every day to make it harder to vote," Elias recently posted on X. "They are also planning to subvert the elections when they lose."

Noting the GOP's flurry of preelection lawsuits, including in the battleground states of Pennsylvania, Michigan, Nevada, and North Carolina, Elias recently told MSNBC that Republicans will do anything to push Trump over the top because he cannot win on his own. "He is set to lose to Kamala Harris," Elias claimed, "and Republicans know that their only way of winning this election is by intimidating voters, making it hard for voters to participate in the process, and by setting up a structure after the election for them to be able to engage in the kind of frivolous and harassing litigation and ultimately the kind of tactics we saw in 2020 – but on a much wider scale."



Elias says he is now litigating 66 anti-Trump lawsuits in 23 states, three times the number filed in 2020.
**Pool Getty Images/AP**

To combat this, "My law firm is litigating 66 voting and election lawsuits in 23 states," he said on X, with most of them concentrated in Arizona, Georgia, and Wisconsin. "And we are winning!" By comparison, Elias filed 20 voting-related lawsuits in 14 states at this point in the 2020 election cycle, making him more than three times as litigious this time.

His anti-Trump legal war room includes a for-profit operation he founded in 2020 called Democracy Docket LLC, which employs 16 and is housed in the same office as his law firm, records show. The digital platform tracks several hundred voting-related cases and publishes a weekly organ distributed to more than 225,000 paid subscribers (at $120 a year), who include lawyers, politicians, and journalists.

A sister operation, Democracy Docket Legal Fund, supports election litigation to protect the voting rights of primarily minority voters. Another spinoff, the Democracy Docket Action Fund, raises money for voting rights lawsuits. According to the Capital Research Center, the two organizations are bankrolled by millions

ot dollars in so-called dark money, including from leftwing billionaire George Soros – whom Elias has called "a hero." Through these vehicles, Elias has virtually "unlimited funding" to challenge any voting law in any state if he thinks it will help his party and his Democratic clients win elections, according to Americans for Public Trust, a government watchdog group based in Alexandria, Va.

While Elias publicly claims he's "defending free and fair elections," it's clear from his actions behind the scenes that his motives are purely partisan, critics say. Last month, he sent a letter to Virginia state election officials threatening to sue them if they don't remove Cornel West, the presidential nominee of the leftwing Justice for All Party, from the state ballot. Elias is also trying to keep West, a progressive black college professor, off the ballot in 15 other states, including key battlegrounds. These efforts clearly have nothing to do with voting rights. Elias is simply worried West will bleed off enough votes from his Democratic client Kamala Harris to cost her victories in states where she is leading by razor-thin margins against Trump.

In a column he wrote last year for Democracy Docket, Elias admitted: "A vote for No Labels, Robert F. Kennedy Jr., Cornel West or any other third-party candidate is effectively a vote for Trump."



In addition, Elias is quietly working with immigrant advocacy groups that want to make it possible for noncitizens to vote. In August, for example, Elias stepped in to represent El Pueblo in its quest to stop North Carolina's State Board of Elections from removing noncitizens from voter registration rolls as required by a 2023 law. An estimated 325,000 "unauthorized" immigrants reside in the state.

Elias is also suing to keep Cornel West off ballots in more than 15 states.
AP

As more than a dozen jurisdictions run by Democrats now allow noncitizens to vote in some local elections, the push to redefine who is eligible for the franchise promises to become an ever more potent and divisive issue in American politics. Much of this debate will almost certainly be hashed out in the courtroom battles and behind-the-scenes political maneuvering that are Marc Elias' special practice.

*After this article was published, Marc Elias's representative said a donation Elias had made to the nonprofit Just Neighbors was not in support of illegal immigrants. He said it was to help victims of a snowstorm in Vermont.*

*We're proud to make our journalism accessible to everyone, but producing high-quality investigative pieces still comes at a cost.*

*That's why we need your help. By making a contribution today, you'll be supporting RealClearInvestigations and ensuring that we can keep providing in-depth reporting that holds the powerful accountable.*

*Donate now and help us continue to publish distinctive journalism that makes a difference. Thank you for your support!*

**Support RealClearInvestigations →**



# EXHIBIT C



RECEIVED

August 14, 2019

Board on Professional
Responsibility

**Date:** July 18, 2019

**Case:** In Re:  Larry E. Klayman



ACE·FEDERAL

Ace-Federal Reporters, Inc.
Phone: 202-347-3700
Fax: 202-737-3638
Email: info@acefederal.com
Internet: www.acefederal.com

Page 645

DISTRICT OF COLUMBIA COURT OF APPEALS

BOARD ON PROFESSIONAL RESPONSIBILITY


- - - - - - - - - - - -x

In re:                 :   Board Docket Number

LARRY E. KLAYMAN,      :   18-BD-070

        Respondent.    :   Bar No. 2017-D051

- - - - - - - - - - - -x



            Thursday, July 18, 2019

            Washington, D.C.




            HEARING








REPORTED BY:

        SABRINA K. BELL

In Re: Larry E. Klayman
July 18, 2019

| | |
|---|---|
| **Page 646** | **Page 648** |

**Page 646**

1   Hearing, taken at the Board on
2   Professional Responsibility, 430 E Street NW,
3   Washington, DC, Courtroom II, commencing at 1:30
4   p.m., before the Ad Hoc Hearing Committee, and
5   before Sabrina K. Bell, a court reporter and Notary
6   Public in and for the District of Columbia, when
7   were present on behalf of the respective parties:
8
9   APPEARANCES:
10   AD HOC HEARING COMMITTEE:
11   BUFFY J. MIMS, ESQUIRE
12   Chair
13   MS. ROBIN BELL
14   Public Member
15   CHRISTIAN WHITE, ESQUIRE
16   Attorney Member
17
18   On behalf of the DC Attorney Disciplinary
19   System:
20   JULIA L. PORTER, ESQUIRE
21   Deputy Disciplinary Counsel

**Page 648**

1   I N D E X
2   WITNESSES:          EXAMINATION
3   ERWIN CHEMERINSKY      645, 694, 698
4   LARRY E. KLAYMAN       700
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

**Page 647**

1   APPEARANCES CONTINUED:
2   ALSO PRESENT:
3   LARRY E. KLAYMAN, ESQUIRE
4   Respondent
5   and
6   OLIVER PEER, ESQUIRE
7   Assistant to Mr. Klayman
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

**Page 649**

1   P R O C E E D I N G S
2   CHAIRPERSON MIMS:  Back on the record
3   at 12:34 on Thursday, July 18th.
4   You may get started, Mr. Klayman.
5   MR. KLAYMAN:  Yes.  We're going to be
6   starting with the testimony of Dean Erwin
7   Chemerinsky of the University of California,
8   Dean -- Boalt School of Law.
9   Dean Chemerinsky?
10   (Calling witness on telecom.)
11   MR. CHEMERINSKY:  This is Dean
12   Chemerinsky.  Hello?
13   MR. KLAYMAN:  Yes.  Dean Chemerinsky, this
14   is Larry Klayman.  How are you?
15   MR. CHEMERINSKY:  I'm well.  I'm going to
16   put this on speaker because it's going to be
17   easier, but let me know if there's any problems.
18   MR. KLAYMAN:  Okay.
19   MR. CHEMERINSKY:  Can you hear me okay?
20   MR. KLAYMAN:  Yes.  We're about ready to
21   begin.
22   MR. CHEMERINSKY:  I'm here if you can hear

In Re:  Larry E. Klayman
July 18, 2019

| | |
|---|---|
| Page 650 | Page 652 |

Page 650

1   me okay.

2      MR. KLAYMAN:  Yes, we can.  Thank you.

3      CHAIRPERSON MIMS:  Dean Chemerinsky, this

4   is Buffy Mims.  I'm Chair of the Committee here.

5   We'll go ahead and get started here by swearing you

6   in, if that's okay?

7      MR. CHEMERINSKY:  All right.

8      CHAIRPERSON MIMS:  Can you go ahead and

9   state your full name for the record.

10      MR. CHEMERINSKY:  Sure.  Erwin, E-r-w-i-n,

11   Chemerinsky, C-h-e-m-e-r-i-n-s-k-y.

12      CHAIRPERSON MIMS:  And do you go by

13   Dean Chemerinsky?

14      MR. CHEMERINSKY:  Yes.  That's my official

15   title, but whatever the Committee is comfortable

16   with is fine with me.

17   Whereupon,

18      ERWIN CHEMERINSKY

19   called as a witness by Disciplinary Counsel, and

20   after having been first duly sworn, was examined

21   and testified as follows:

22      DIRECT EXAMINATION

Page 651

1   BY MR. KLAYMAN:

2     Q.  Dean Chemerinsky, it's Larry Klayman.

3   Thank you for appearing.

4      Would you please state your name and your

5   position at the University of California.

6     A.  My name is Erwin Chemerinsky.  And I'm the

7   dean and Jesse H. Choper Distinguished Professor of

8   Law at the University of California, Berkeley,

9   School of Law.

10     Q.  And you have executed a declaration, which

11   is Respondent's Exhibit 21, which is in evidence.

12   I just --

13      MS. PORTER:  Objection.  I don't think it

14   is in evidence.  I thought we had gone over this on

15   Tuesday that Mr. -- Dean Chemerinsky, excuse me,

16   was not going to be permitted to testify as to the

17   two matters in that declaration.

18      CHAIRPERSON MIMS:  Well, I'm not sure it

19   is in evidence.  Is it?

20      MR. KLAYMAN:  Yeah, it is.  It already is.

21      MS. PORTER:  It has never been offered.

22      MR. KLAYMAN:  Yes, it has.

Page 652

1      MS. PORTER:  No, it has not.

2      MR. KLAYMAN:  It was offered in our

3   exhibit book.  It was not objected to.  And we went

4   through that on Monday.

5      MS. PORTER:  I'm sorry.  The only

6   objections that were required prior to the hearing

7   were to authenticity.  I objected -- well, as set

8   forth in our motion about remote testimony, we did

9   object, if Dean Chemerinsky was going to be asked

10   about the 6th Amendment issue because we -- it's

11   irrelevant to these proceedings.

12      Moreover, we also objected to him

13   testifying about whether or not Mr. Klayman was

14   truthful.  And I believe we -- it's never been

15   offered.  And we would object on those relevancy

16   grounds.

17      And I think we also discussed that at the

18   close of the hearing on Tuesday.  So it's never

19   been offered in evidence.  And when we --

20   Disciplinary Counsel has never been given the

21   opportunity to object if it is being offered, which

22   is why I'm standing up, because I do object.

Page 653

1      MR. KLAYMAN:  She has a right to

2   cross-examine --

3      CHAIRPERSON MIMS:  Before you respond to

4   that, I do believe he offered his binders into

5   evidence of exhibits.

6      MS. PORTER:  No.  That's not true because

7   I have objections to other documents as well.

8      CHAIRPERSON MIMS:  Okay.

9      MR. KLAYMAN:  No.  That's not my

10   understanding.  The record will show otherwise.

11      Anyway, Ms. Porter will get a chance to

12   cross-examine.

13      CHAIRPERSON MIMS:  Okay.  Well, let's --

14   now, let's deal with the facts that we did discuss

15   on Tuesday that the contents of what was in

16   Dean Chemerinsky's affidavit were irrelevant to

17   this proceeding.

18      We had a specific discussion that he was

19   going to testify as to what was on your witness

20   list.  The description there, which related to the

21   reasonableness of the filings -- and I can get back

22   and read the sentence to you -- as well as

In Re:  Larry E. Klayman
July 18, 2019

| Page 654 | Page 656 |
|---|---|

**Page 654**

1   potentially the Bivens actions.

2         But I think we also made the qualification

3   that we would hear about his qualifications and

4   ability to be able to testify about those actions.

5         MR. KLAYMAN:  Yes.  And there's no --

6   there was nothing said about that he couldn't give

7   his opinion with regard to the findings of

8   Judge Gould.  I'm not talking specifically about

9   the pro hac vice entry in terms of its -- should be

10   granted or not granted.

11         Although, I will proffer the declaration,

12   which expert Chemerinsky has filed under Rule 7.16,

13   regardless of Your Honor's ruling, one way or the

14   other.  So I proffer it on the record.

15         But I would like him to be able to

16   testify.  She can make a relevancy objections.  And

17   we can decide these issues after he testifies.

18   It's not going to be a long testimony.

19         CHAIRPERSON MIMS:  But what exactly in the

20   declaration are you attempting to illicit testimony

21   about?

22         MR. KLAYMAN:  Well, specifically his

**Page 655**

1   background, the fact that he's reviewed certain

2   exhibits as he states in paragraphs -- he agrees

3   with the analysis of Judge Gould, having reviewed

4   the pro hac vice applications that I answered that

5   -- which I was required to answer, that I didn't

6   make a misstatement based upon that application,

7   and that Judge Gould rulings -- he agrees with him

8   generally speaking.

9         And we set forth in the declaration

10   exactly the reasons for that and it was my

11   understanding that we're getting, Your Honor, in

12   all respect, sandbagged a little bit here because

13   this is in evidence right now.

14         She can make her relevancy objections.

15   And you can then decide ultimately when you do you

16   report and recommendation what's appropriate and

17   what's not.

18         But I'd like to be able to have Dean

19   Chemerinsky, who's testifying, taking his time,

20   he's very busy, to just authenticate his

21   declaration at this point.  That's all I was trying

22   to do.

**Page 656**

1         But with respect to Judge Gould's

2   opinions, his opinions are what they are.  And we

3   will accept them, and we can review them if we

4   think they're relevant, but that's actually not

5   what we're here about today, is Judge Gould's

6   opinion.

7         How is Judge Gould's opinion relevant?

8         MR. KLAYMAN:  Your Honor, yesterday, I

9   cited the rules that said there is a presumption

10   that we should be able to present expert testimony

11   as long as that testimony does not go to a opinion

12   as to whether or not I violated an ethical rule.

13   Okay?  The law is very clear on that.  I cited two

14   cases on that.

15         I don't understand why Counsel is trying

16   to prevent the Committee from getting a full

17   reading according to the cases that I put on the

18   record.  Certainly, they can make relevancy -- she

19   can make relevancy objections, but we're here to

20   get the truth.  And we're here to follow the law.

21         I have had in other proceedings expert

22   testimony submitted, for instance Professor

**Page 657**

1   Rotunden (phonetic) and in other matters.  And

2   there was never a problem in having it done.  But

3   you will be able to weigh it once it comes in.  And

4   you decide what you want to use and what you don't

5   want to use.

6         But in any event, under Rule 7.16 of the

7   Board, I can put it on the record anyway as a

8   proffer subject to the Board's review.

9         CHAIRPERSON MIMS:  But you still haven't

10   answered my question.  The question that's pending

11   is how is Judge Gould's opinion relevant to this

12   hearing?

13         MR. KLAYMAN:  Because it's an expert who's

14   looking at it -- who's an expert on constitutional

15   law and professional ethics.  And he's saying --

16   he's looking at this, too, and he's saying, I agree

17   with minority opinion here of Judge Gould.  And I

18   analyzed it, too.  And this is my expert opinion.

19   And that is crucial here because --

20         CHAIRPERSON MIMS:  Whether or not Judge

21   Navarro granted your pro hac is not at issue here.

22         MR. KLAYMAN:  That's not what I'm talking

4  (Pages 654 to 657)

In Re: Larry E. Klayman
July 18, 2019

Page 658

1    about. I'm talking about having looked at the pro
2    hac vice applications and determined, based upon
3    his expertise, that I did not have to answer
4    that -- which I did not have to answer it, and I
5    did not misrepresent with regard to matters which
6    are alleged.
7        And I should be able to put that on the
8    record. Professor Chemerinsky has limited time.
9    He's very busy. I don't mean to rush you or
10   anybody here, but can we deal with this at the end?
11   I'm able to put it on the record as to a proffer in
12   any event.
13       CHAIRPERSON MIMS: You can put on the
14   record the testimony that we discussed yesterday,
15   which relates to the reasonableness of the filings.
16   I thought we were very clear yesterday that that is
17   what his testimony was going to be.
18       MR. KLAYMAN: You know, there's the
19   rule -- yeah. There's the rule here that if you
20   don't object to the exhibits, that you waive your
21   objections regardless of what she filed later
22   which was premature to Ms. Porter.

Page 659

1        CHAIRPERSON MIMS: I'm not even talking
2    about her filings. When we had the discussion on
3    Tuesday, I specifically stated that nothing in his
4    affidavit was relevant.
5        MR. KLAYMAN: Well --
6        CHAIRPERSON MIMS: So if the --
7        MR. KLAYMAN: I don't --
8        CHAIRPERSON MIMS: -- testimony that he's
9    about to give relates to the reasonableness of the
10   filing --
11       MR. KLAYMAN: I don't recollect your
12   saying that the whole affidavit was not valid. We
13   didn't get into the substance of it on Tuesday.
14       And again, Your Honor, if I may reiterate,
15   I can make the proffer. I can put the testimony on
16   the record. I can put the declaration on the
17   record. The Board will be making the ultimate
18   decision here subject to appeal to the DC Court of
19   Appeals. So I'd like to put it on the record in
20   all due respect. I respect you. But that's the
21   rule. I can.
22       If you're excluding it, I can put it on

Page 660

1    there as a proffer. And Your Honor can decide,
2    with your Committee members, what to do with it
3    when you write your report and recommendation.
4        CHAIRPERSON MIMS: Here's the sentence
5    that I read into the record. "He will also testify
6    that the pleadings filed in other actions taken by
7    Mr. Klayman in his effort to obtain pro hac vice
8    admission, and to correct the judicial record were
9    reasonable as he had inter alia, the right to
10   correct false statements on the judicial record,
11   particularly, since they were being used against
12   him."
13       I read that statement on Tuesday and I
14   said that is what he could testify about.
15       MR. KLAYMAN: Yeah. And that's subsumes
16   the misstatements that are alleged for which Bar
17   counsel would like me disciplined. So it gets to
18   that issue -- false statements.
19       I was correcting the false statements of
20   Judge Bybee and Judge Fletcher, and I'm entitled to
21   get that testimony. But I'm also entitled to put
22   this declaration on the record because this Hearing

Page 661

1    Committee will be subject to review by the Board
2    and it should have that testimony if they disagree,
3    respectfully, with limiting the testimony.
4        I don't understand what Disciplinary
5    Counsel has to hide -- not hide, but what they're
6    worried about in getting the truth out. They
7    represent me as well as they represent the Office
8    of Disciplinary Counsel. I've never had an issue
9    in any of these cases in using expert testimony
10   before.
11       So, consequently, I would ask that
12   Professor Chemerinsky, who only has an hour here,
13   be able to testify as to these matters. And you
14   can then decide whether they're relevant,
15   irrelevant, or whatever.
16       CHAIRPERSON MIMS: He can testify as to
17   the matters that we've discussed on Tuesday. And I
18   don't want to rehash what has already been decided.
19   I mean, we were very clear. I don't think there
20   will be any danger of going outside the hour,
21   because it's a very limited scope.
22       And if the questions you're about to ask

5 (Pages 658 to 661)

In Re: Larry E. Klayman
July 18, 2019

Page 662

1  him relate to the statement I read or you want to
2  also illicit his qualifications to discuss the
3  Bivens filings, then that's what he can testify to.
4      MR. KLAYMAN: But I want to -- okay. But
5  I want that declaration in the record as a proffer
6  under Rule 7.16.
7      CHAIRPERSON MIMS: Well, let's put the
8  declaration aside because we'll take a break and
9  I'll decide if that can come in as a proffer.
10     But for right now, for his testimony,
11  we're not going to go back to the declaration,
12  unless, there is a paragraph in there that
13  specifically relates to -- or information in there
14  that relates to what I just read.
15     MR. KLAYMAN: Yes.
16     CHAIRPERSON MIMS: I remember it being
17  largely related to the 6th Amendment issue, which
18  we said we weren't going to discuss.
19     MR. KLAYMAN: Your Honor, that is
20  relevant, too. And I want to put this on the
21  record because -- and we can argue about it later.
22  But the fact that this was so clear cut that I

Page 663

1  should have the right to represent my client who
2  faced life imprisonment, and that Judge Bybee
3  writing majority opinions, would go outside of
4  those -- even the documents, and, in fact, become
5  and advocate for Judge Navarro, shows that it's
6  relevant as to whether those applications should
7  have been granted.
8      That shows the bias that I'm talking about
9  that caused him to write those orders. And --
10     CHAIRPERSON MIMS: If your argument is
11  that the 6th Amendment issue -- because those have
12  been implicated and Dean Chemerinsky is going to
13  testify that supported the reasonableness of your
14  filings, to that limited extent, it can come in.
15     MR. KLAYMAN: Okay. But I also want this
16  proffered on the record. And I have an absolute
17  right to have it on the record.
18     And it would be appealable error if it's
19  not on the record.
20     CHAIRPERSON MIMS: Let's address that
21  after his testimony.
22     MR. KLAYMAN: I'd like to get his

Page 664

1  testimony -- I'll get to those issues, but I want
2  to proffer his testimony on other issues as well as
3  a proffer.
4      CHAIRPERSON MIMS: You can make the
5  proffer, but after. Let's get his testimony done
6  since we know he only has an hour.
7      MR. KLAYMAN: Yes. But I want him to be
8  able to testify to those issues as a proffer.
9      CHAIRPERSON MIMS: Oh, I see.
10     MR. KLAYMAN: Yes.
11     MS. PORTER: Well, I guess I'm a little
12  bit confused because I thought we did resolve this
13  on Tuesday. And if he's being offered as an expert
14  in something other than 6th Amendment or
15  constitutional law, I'd also like to also be able
16  to voir dire him on his expertise, or, you know,
17  his qualifications to testify as, an expert.
18     MR. KLAYMAN: I have no problem with that,
19  Your Honor. Unlike my esteemed co-counsel, I say
20  lay it all on the table and let people decide, not
21  restrict the analysis here. You deserve a full
22  record here.

Page 665

1      MS. PORTER: But I'd like a proffer as to
2  what he's being offered as an expert of that --
3      MR. KLAYMAN: I just went through it.
4  He's being offered regard to reviewing the pro hac
5  vice applications, looking at them, saying that I
6  didn't fail to disclose that, which I didn't have
7  to disclose, and that I didn't make
8  misrepresentations. And that, in addition to that,
9  because this was such a strong case for pro hac
10  vice entry that that, based on his opinion, colored
11  the thinking of Judge Bybee because of what he
12  wrote. It was just simply wrong.
13     And that is relevant. And he is not just
14  an expert on constitutional law and criminal
15  procedure, which he is. He's also an expert on
16  judicial ethics. And she's certainly able to
17  question him.
18     He is the dean of one of the most
19  prestigious law schools in this country. He has a
20  distinguished past. He deserves the opportunity to
21  be able to testify here. I'm going to ask him a
22  question, he's not -- I'm not paying anything to

6 (Pages 662 to 665)

In Re:  Larry E. Klayman
July 18, 2019

| | Page 666 |
|---|---|
| 1 | testify.  He's doing it because he thinks it's |
| 2 | right. |
| 3 | And, consequently, I think it's -- it's |
| 4 | not only inappropriate what Ms. Porter is trying to |
| 5 | do, I think it also doesn't pay the sufficient |
| 6 | degree of respect to Dean Chemerinsky.  He deserves |
| 7 | to be able to testify.  He's going to great effort |
| 8 | to do that. |
| 9 | CHAIRPERSON MIMS:  I think I've heard the |
| 10 | decisions sufficiently.  And I'm going to go back |
| 11 | to the original ruling on Tuesday to say he can |
| 12 | testify as to what he put in your witness list with |
| 13 | the sentence I read.  We also discussed Bivens. |
| 14 | I think that you need to ask about his |
| 15 | background and his experience in order to put him |
| 16 | forward as an expert.  We would like to hear that. |
| 17 | MR. KLAYMAN:  I will do that. |
| 18 | CHAIRPERSON MIMS:  And then to ask him |
| 19 | about the limited subject, which we already |
| 20 | discussed on Tuesday. |
| 21 | MR. KLAYMAN:  Now, let me say -- |
| 22 | CHAIRPERSON MIMS:  But as it relates to |

| | Page 668 |
|---|---|
| 1 | has no material substantiative witnesses other than |
| 2 | law clerks looking at documents.  And it's very |
| 3 | important to me, particularly since Your Honor |
| 4 | denied discovery here, with regard to Judge Bybee |
| 5 | and others.  And there's an issue involving, you |
| 6 | know, his familial relationships with others. |
| 7 | We're going on the basis of what he said, but I |
| 8 | have no way to get behind that. |
| 9 | Professor Chemerinsky is not being offered |
| 10 | for that.  But I'm just saying is, is that it seems |
| 11 | like I've been excluded from defending my case. |
| 12 | And I deserve to be able to do a full defense.  And |
| 13 | I don't mean that in any lack of respect to you |
| 14 | because, you know, I appreciate, you know, the way |
| 15 | you've administered to this.  But I deserve to get |
| 16 | it on the record.  And that's all I'm asking. |
| 17 | CHAIRPERSON MIMS:  I understand your |
| 18 | argument.  I did understand it on Tuesday when it |
| 19 | was made the first time.  We do not need to go over |
| 20 | things that the Board considers -- that the Hearing |
| 21 | Committee considers irrelevant. |
| 22 | And, I think, right now, we're wasting |

| | Page 667 |
|---|---|
| 1 | Judge Bybee, Judge Gould, and those issues, you |
| 2 | were overruled on that already. |
| 3 | MR. KLAYMAN:  Let me -- I respectfully |
| 4 | disagree on that.  I did not understand that. |
| 5 | (A short interruption re-calling the |
| 6 | witness.) |
| 7 | Yes.  One other thing, Your Honor, is that |
| 8 | when Ms. Porter on behalf of Office of Disciplinary |
| 9 | Counsel filed after I had simply asked for remote |
| 10 | testimony statements opposing his testimony, Your |
| 11 | Honor said that we would take it up at the |
| 12 | appropriate time, which I understood to be as the |
| 13 | testimony is elicited.  She can certainly make an |
| 14 | objection here. |
| 15 | But this is, in my view, should come in |
| 16 | for the truth of the matter as to the substance of |
| 17 | his declaration, but also as a proffer so the Board |
| 18 | can review it and decide what to do.  And that's |
| 19 | important. |
| 20 | And I might add one other thing, is that |
| 21 | the only material witness in this case of any |
| 22 | substance is me.  Office of Disciplinary Counsel |

| | Page 669 |
|---|---|
| 1 | time going over this because -- |
| 2 | MR. KLAYMAN:  Well, okay, then -- |
| 3 | CHAIRPERSON MIMS:  -- I'm going to stick to |
| 4 | the ruling that was put forth on Tuesday. |
| 5 | MR. KLAYMAN:  Well, that's fine, Your |
| 6 | Honor, but I also ask that we stick to Rule 7.16 |
| 7 | and allow me to make a proffer.  That's a Board |
| 8 | rule. |
| 9 | CHAIRPERSON MIMS:  You're objection is |
| 10 | been noted. |
| 11 | MR. KLAYMAN:  Okay.  And I'm going to get |
| 12 | through this stuff that you suggest initially.  And |
| 13 | then I'm going to make the proffer on the other |
| 14 | issues. |
| 15 | BY MR. KLAYMAN: |
| 16 | Q.  Dean Chemerinsky, Respondent's Exhibit 21, |
| 17 | did you sign that document? |
| 18 | A.  If this is the declaration, I did. |
| 19 | Q.  Yes.  And is it true and correct to the |
| 20 | best of your knowledge -- |
| 21 | MS. PORTER:  Objection. |
| 22 | CHAIRPERSON MIMS:  He is going to -- he |

7  (Pages 666 to 669)

In Re:  Larry E. Klayman
July 18, 2019

| Page 670 | Page 672 |
|---|---|

**Page 670**

1  can, at the end of his testimony, put in a proffer
2  as to what he would have testified with respect to
3  the declaration.
4        That is what I will allow you to do.
5  We're not going to elicit testimony from him.  He
6  can say that he signed the document.
7        When he's done testifying about what I've
8  already ruled is relevant to this hearing, okay --
9  when we're done with that testimony, you can then
10  put in a proffer as to what he would have
11  testified.  But we don't need to hear testimony
12  about it.
13        MR. KLAYMAN:  All I'm just doing is
14  authenticating, and then you can decide what the
15  testimony --
16        CHAIRPERSON MIMS:  You can authenticate
17  the document.
18        MR. KLAYMAN:  I am.
19        BY MR. KLAYMAN:
20    Q.  Is it true and correct to the best of your
21  knowledge -- the declaration?
22    A.  Yes.

**Page 671**

1    Q.  And you swore to it under oath?
2    A.  Yes.
3    Q.  Okay.  Professor -- Dean Chemerinsky,
4  would you please state for the Hearing Committee
5  your qualifications, your background, and your
6  expertise.
7    A.  As I said, I'm the dean of Law School and
8  a professor at University of California Berkeley
9  School of Law.  Before I came here, I was the
10  founding dean and Raymond Pryke Professor of First
11  Amendment Law at the University of California
12  Irvine School of Law for nine years.  Before that I
13  was the Alston & Bird Professor of Law and
14  Political Science at Duke Law School for four
15  years.  Before that I spent 20 years as a professor
16  at the University of Southern California, including
17  as the Sydney M. Irmes Professor of Public Interest
18  Law and Legal Ethics and Political Science.  I
19  teach in the areas of constitutional laws, federal
20  jurisdiction.  I've also for many years taught in
21  the area of professional responsibility.
22        CHAIRPERSON MIMS:  Dean, I just want to

**Page 672**

1  just give you a brief reminder that we have a court
2  reporter taking down everything that you say, and
3  you're talking rather quickly.
4        THE WITNESS:  I'm sorry.
5        CHAIRPERSON MIMS:  Yeah.  Thank you.
6        BY MR. KLAYMAN:
7    Q.  Now, you had an opportunity, did you not,
8  Dean Chemerinsky, to review Exhibits 1 --
9  Respondent Exhibit 1 and Respondent Exhibit 5 with
10  regard to the pro hac vice application that I had
11  submitted to Judge Gloria Navarro of the U.S.
12  District Court for the District of Nevada?
13        MS. PORTER:  I would object at this point
14  because I don't know what Mr. Dean Chemerinsky is
15  being offered as an expert in.
16        I understand the Chair's ruling about the
17  pro hac vice motion and the Bivens action, and I'd
18  like some, I guess, testimony or information about
19  his qualifications.  I understand he's an expert in
20  constitutional law, but these are two other issues.
21        What, if any, qualifications, experience,
22  or knowledge does he have about these issues that

**Page 673**

1  would qualify him for an expert?
2        So I object to his expert testimony on
3  this until he's qualified as an expert in these
4  areas.
5        CHAIRPERSON MIMS:  And which areas are
6  those?
7        MS. PORTER:  Well, my understanding is
8  that the Chair ruled that he could testify as to
9  the pro hac vice applications.  So what, if any,
10  expertise does he have with respect to federal pro
11  hac vice applications?
12        And, also, the Bivens actions.  What, if
13  any, expertise does he have with respect to Bivens
14  actions?
15        CHAIRPERSON MIMS:  I think that's fair.  I
16  think you should establish some qualifications.  I
17  think with the qualifications he's already put in
18  the record is probably subsumed with that, but you
19  can ask him a couple of specific questions as it
20  relates to the areas that we're about to get into.
21        BY MR. KLAYMAN:
22    Q.  Professor Chemerinsky, what membership and

8 (Pages 670 to 673)

In Re:  Larry E. Klayman
July 18, 2019

Page 674

1  bars are you a member of?
2      A.  I'm a member of the bar in the State of
3  Illinois since 1978.  A member of the District of
4  Columbia bar since 1979.  And then, a member of the
5  United States Supreme Court bar and the bar of
6  almost every federal court of appeals.
7      Q.  Okay.  And in addition to being a
8  distinguished professor and scholar, you have, from
9  time to time, yourself, submitted pro hac vice
10  applications in district courts?
11      A.  That is correct.
12      Q.  You're familiar with the procedure?
13      A.  Yes, I am.
14      Q.  Did I hear you correctly to say that
15  you're not only an expert with regard to
16  constitutional law, criminal law and procedure, but
17  that you also teach courses in professional
18  responsibility and ethics?
19      A.  I taught professional responsibility most
20  most of the years that I was at the University of
21  Southern California Law School.  I continued to
22  lecture on professional responsibility for students

Page 676

1  it has always been granted, but that's the extent
2  of my knowledge of pro hac vice.
3      Q.  With respect -- I don't think Mr. Klayman
4  even asked you about Bivens actions.
5      A.  There I do have more expertise.  I've been
6  teaching the course on federal courts since 1982,
7  and have done it most years since 1982 and covered
8  Bivens as a part of that.  Also, I've written
9  extensively on Bivens.  I have a treatise on
10  federal jurisdiction and chapter nine is about
11  Bivens actions.  I've also litigated a number of
12  Bivens actions myself, most importantly, I think a
13  key circuit case on Bivens is Plaim v. Cheney,
14  which I argued in both the District Court and the
15  Circuit, but I've also handled other Bivens actions
16  as a lawyer.
17      MS. PORTER:  Okay.  Thank you.
18
19
20
21
22

Page 675

1  who were getting ready for the multi-state
2  professional responsibility exam.
3      MR. KLAYMAN:  Okay.  I therefore submit
4  that he's qualified as an expert in all three areas
5  that he just testified to.
6      MS. PORTER:  May I ask some questions
7  before he's qualified as an expert?
8      CHAIRPERSON MIMS:  Yes, go ahead.
9      BY MS. PORTER:
10      Q.  Dean Chemerinsky, my name is Julia Porter,
11  and I represent the Office of Disciplinary Counsel
12  in this matter.  Can you hear me okay?
13      A.  I can.
14      Q.  Other than filling out your own
15  applications for pro hac vice admission, what, if
16  any other, I guess, knowledge or experience have
17  that you had with pro hac vice applications, and, I
18  guess, dealing with specifically with the federal
19  courts?
20      A.  I'm familiar with the case law concerning
21  when pro hac vice status should be granted.  And I
22  have, as was pointed out, applied for it myself and

Page 677

1      CHAIRPERSON MIMS:  Dean Chemerinsky, this
2  is Ms. Mims again, the Hearing Committee Chair.  I
3  have just a few follow-up questions.
4      BY HEARING CHAIR MIMS:
5      Q.  You mentioned that you have been teaching
6  on federal courts.  Does that include a federal
7  court's procedure?
8      A.  Yes.  Law schools, as you know, have a
9  course.  Sometimes it's called "federal court."
10  Sometimes it's called "federal jurisdiction."  And
11  I've taught that course most years since 1982.  I
12  taught at DuPaul.  I taught it at USC.  I taught it
13  at Duke.  And I taught it at Irvine.  And I have a
14  treatise titled "Federal Jurisdiction," and it
15  parallels what is covered in the course.
16      HEARING CHAIR MIMS:  Thank you.
17      BY MR. KLAYMAN (Resuming):
18      Q.  I also understand, based on your
19  declaration, that you've authored 12 books, including
20  case books and treatises about Constitutional law,
21  criminal, procedural, and federal jurisdiction.  Am I
22  right?

9  (Pages 674 to 677)

In Re:  Larry E. Klayman
July 18, 2019

Page 678

1    A    That's correct.
2    Q    Okay.  Now you've had an opportunity to
3  review, did you not, Respondent's Exhibit 1 and 5,
4  which were the original pro hoc vice application to
5  Judge Navaro and the U.S. District Court for the
6  District of Nevada, and the supplemental filing which
7  is Respondent's Exhibit 5, when she asked certain
8  questions.  And based upon your review of that, do
9  you have an opinion as to whether I answered all the
10  questions that I was required to answer truthfully?
11         MS. PORTER:  Objection.  That goes to the
12  ultimate question for this Hearing Committee.
13         MR. KLAYMAN:  I'm not asking him to make
14  an ethical determination.  I'm just asking him, based
15  upon his review and his expertise, with regard to
16  federal procedure and pro hoc vice applications,
17  whether he came to the same conclusion as Judge Gould
18  did when he reviewed that.  And that's in the
19  declaration.
20         MS. PORTER:  Well first, I would object to
21  that being Judge Gould's finding.  But, second, the
22  question was:  Was I, the Claimant, truthful?  That

Page 679

1  is no an appropriate question.  I mean, I understand
2  Dean Chemerinsky's expertise in Constitutional law,
3  but that is a question about whether someone is being
4  candid or truthful with the court.
5         MR. KLAYMAN:  Your Honor, I'm just simply
6  asking whether, based upon his review of the
7  applications, I answered those questions which I was
8  required to answer and did not need to go beyond
9  that.  That's my question.
10         CHAIRPERSON MIMS:  We are here.  The
11  objection is sustained.  You cannot ask him a
12  question that goes to the ultimate issue in this
13  matter.  He is permitted to testify as to whether
14  your filings were reasonable, including the Bivens
15  actions, and so that's what we need to focus on.
16         MR. KLAYMAN:  Well I didn't file the
17  Bivens action, Your Honor.  Okay, despite the fact
18  that Ms. Porter tried to create that impression with
19  the way she phrases questions--
20         CHAIRPERSON MIMS:  I misspoke.
21         MR. KLAYMAN:  --which is quite, for lack
22  of a better word, dishonest.  I never filed that

Page 680

1  action.  And consequently I should be able to ask the
2  question as to whether, based upon his review, I did
3  that which I was required to answer.  I'm not asking
4  him to make an ultimate ethical decision as to
5  whether I violated any ethical rule.  I'm not.  I
6  should be able to ask him that.  So to the extent
7  that Your Honor thinks that that was your ruling--and
8  I disagree--I would ask for reconsideration of that
9  and allow the record to be complete here.
10         What is the point of limiting his
11  testimony when you're going to get to rule it's
12  relevant or not?
13         CHAIRPERSON MIMS:  Repeat the question
14  again for me, in a way that does not ask him a
15  question on what the Committee is here ultimately to
16  decide.
17         MR. KLAYMAN:  I didn't ask him that.
18         CHAIRPERSON MIMS:  Okay.
19         MR. KLAYMAN:  What I asked him was, based
20  upon your review of the pro hoc vice applications,
21  Exhibit 1 and 5, Respondent's Exhibits 1 and 5, and
22  your experience and expertise in pro hoc vice and

Page 681

1  federal procedure, did I answer all the questions
2  that I was required to answer by those applications.
3         CHAIRPERSON MIMS:  He's not asking him
4  about the truthfulness of it.  I'm going to allow him
5  to answer.
6         WITNESS CHEMERINSKY:  Yes.
7         BY MR. KLAYMAN:
8    Q    As a general rule, and Judge Gould's
9  decision subsumed this, do you agree with the
10  dissenting opinions of Judge Gould with regard to my
11  pro hoc vice application?
12         MS. PORTER:  Objection.
13         CHAIRPERSON MIMS:  Sustained.
14         MR. KLAYMAN:  Can I proffer here?
15         CHAIRPERSON MIMS:  Are you done asking him
16  about every other--the issue that we're here to ask
17  him about?  My ruling was, let's get through his
18  testimony that I've already ruled was relevant.  And
19  then if you want to make a proffer as to what I've
20  already overruled, we can make a proffer so that you
21  have that on the record.
22         MR. KLAYMAN:  As long as he's here, I'm

10 (Pages 678 to 681)

In Re: Larry E. Klayman
July 18, 2019

Page 682

1  entitled under Rule 7.16 to put his testimony on the
2  record. That's an absolute rule by the Board.
3      CHAIRPERSON MIMS: I'll repeat myself.
4  Let's get through what I've ruled he can testify is
5  relevant. And that relates to the reasonableness of
6  the filings, as well as the Bivens actions. And
7  then we can quickly go through what you would like to
8  proffer into the record. But I want to get through
9  what we've already ruled is relevant, first.
10     BY MR. KLAYMAN (Resuming):
11     Q   Now, Professor Chemerinsky, with regard
12 to judges, in your expert opinion are judges above
13 the law?
14     A   No, of course not.
15     Q   And is it not the case that judges can
16 be--actions can be brought with regard to injunctive
17 relief in certain situations with regard to judges?
18     A   I'll take your question literally. In
19 certain situations, it can be. But generally judges
20 cannot be sued for money or for injunctive relief.
21     A   But there are cases, for instance Hagan
22 versus Coggins, Action No. FW990878 2000, U.S.

Page 683

1  District Lexus, 22-062-11, Northern District of
2  Texas, April 26, 2000, the year 2000, where in a head
3  note it says: The Hagan court allowed a Bivens
4  plaintiff leave to amend regarding plaintiff's claim
5  that Judge Buckmeyer, B-U-C-K-M-E-Y-E-R, denied Judge
6  Lindsay, L-I-N-D-S-A-Y, access to investigative
7  reports prepared by the FBI that substantiate
8  plaintiff's claims against Coggins and Scott. The
9  court ordered an amended complaint with more
10 specificity, but did not deny it as a matter of law.
11     So is it fair to say that some
12 practitioners and experts believe that a Bivens
13 action with regard to injunctive relief, at a
14 minimum, is colorable, is sustainable?
15     A   Might it help the panel if I explain my
16 views on this a bit? I think it would be difficult
17 to answer it 'yes' or 'no.' I can do so in just a
18 few sentences, if it's acceptable to the panel.
19     CHAIRPERSON MIMS: Yes, go ahead.
20     WITNESS CHEMERINSKY: The Supreme Court
21 has said that judges have absolute immunity in civil
22 suits for money damages for their judicial tasks, but

Page 684

1  not immunity for their administrative tasks.
2      The Supreme Court in Employer versus Allen
3  then said judges do not have immunity to sue for
4  injunctive relief. Congress amended Section 1983 in
5  the Judicial Improvements Act of 1996 to say that
6  judges cannot be sued for injunctive relief unless
7  there's an absence of declaratory relief where
8  they're violating a declaratory judgment.
9      So in answering your question, can there
10 ever be suits against injunction, the literal answer
11 is: Yes, but it's quite restricted. In answer to
12 the case, you say there are some cases that are
13 allowed injunctive suits against judges, but
14 generally judges can't be sued for money or for an
15 injunction.
16     I hope that elaboration of the law is
17 useful.
18     Q   Based upon your experience, since we live
19 in a common law system where law is being made all
20 the time, and the practitioner in this case, Mr. Joel
21 Hanson--because I didn't file the complaint--can he
22 assert a colorable claim for injunctive relief with

Page 685

1  regard to judicial violation of Constitutional
2  rights? Is that something that he should be
3  sanctioned for doing?
4      MS. PORTER: Objection. I mean, I don't
5  understand the sanctions issue, and how Dean
6  Chemerinsky, with all due respect, has any expertise
7  in that.
8      MR. KLAYMAN: He does have expertise, and
9  I would ask that he respond.
10     CHAIRPERSON MIMS: I actually don't
11 understand the question.
12     BY MR. KLAYMAN (Resuming):
13     Q   The question is: In our system of
14 justice, Dean Chemerinsky, is it not true that law is
15 made case by case, generally speaking?
16     A   Yes.
17     Q   And you can test the limits of the
18 common law by filing various legal proceedings?
19 That's the way it works in our system?
20     A   Yes.
21     Q   And that given what you've just
22 testified to, a lawyer can attempt to expand on the

11 (Pages 682 to 685)

In Re: Larry E. Klayman
July 18, 2019

Page 686

1    law by filing legal proceedings, in a case-by-case
2    analysis?
3         A    Yes, within the constraints of the rules
4    of ethics.
5         Q    Now in the documents that you reviewed,
6    did you see anywhere that Mr. Hanson was sanctioned
7    by Judge Navaro or the Ninth Circuit for filing a
8    Bivens action?
9         A    I did not focus on that in my reading of
10   the documents.  That was not the scope of the
11   declaration that I did.
12        Q    Okay.  Based upon your expertise and your
13   experience, in a case such as the Bundy case--well,
14   let me back up.  Are you aware of the context of the
15   Bundy case, the criminal prosecution in Las Vegas?
16        A    Yes.
17        Q    How did you become aware of that?  The
18   context?  How did you become aware of the nature of
19   the Bundy case in Las Vegas?
20        A    How did I become aware?
21        Q    Yes.
22        A    I'm having trouble hearing.

Page 687

1         Q    How did you become aware of the nature of
2    the prosecution of Cliven Bundy, his sons, and 14
3    other defendants in Las Vegas, Nevada?
4         A    I became aware primarily from media
5    accounts.  Also, a friend of mine was one of the
6    defense lawyers from the Federal Defenders Office,
7    and so I hear some of it from her.
8         Q    What's her name?
9         A    Brenda Wessler.  She's now a magistrate
10   judge in the District of Nevada.
11        Q    Now you are aware that in that case
12   there were 17 or so counts of criminal conduct
13   against the defendant?
14        A    Yes.
15        Q    And that my client, Cliven Bundy, faced
16   the prospect of life imprisonment for those 17
17   counts?  He's 71 years old at the time.
18        CHAIRPERSON MIMS:  Mr. Klayman, I think
19   you need to make sure you're leaning into the
20   microphone.
21        BY MR. KLAYMAN (Resuming):
22        Q    Could you hear me, Dean Chemerinsky?

Page 688

1    AIt was going in and out, I'm sorry.
2         Q    Yeah, your general knowledge is that
3    there were many counts, 17 to be precise, of
4    criminal charges against my client, Cliven Bundy, and
5    others in that case?
6         A    Yes, I was aware of that.
7         Q    And that if Cliven Bundy had been
8    convicted, along with the others, he could face a
9    sentence of life imprisonment?
10        A    Yes, I was aware of that.
11        Q    And based on your expertise, under those
12   circumstances is a lawyer--is a strong lawyer
13   necessary against this kind of a prosecution to
14   zealously represent his client?
15        A    Of course.
16        Q    Based on your experience, are there
17   lawyers that you've been in contact with, or
18   litigated cases with, who have been sanctioned by
19   judges for strong actions vis-a-vis the judge?
20        A    Yes.
21        Q    And with regard to what you know about
22   the Bundy case, just what you know, do you know of

Page 689

1    any such sanctions having been issued in that case?
2    Or with regard to my pro hoc vice application?
3         A    I do not know sanctions with regard to
4    your pro hoc vice application.  I do know what the
5    ultimate disposition of it was based on the judge's
6    termination of prosecutorial misconduct.
7         Q    That was why the superceding indictment
8    was dismissed?
9         A    Yes.
10        Q    Now given the dismissal of the
11   supercedious indictment, should the orders that you
12   reviewed of the Ninth Circuit and the underlying
13   orders of Judge Navaro, based on your expert opinion,
14   be vacated as moot, as Judge Gould ruled in this
15   case?
16        MS. PORTER:  Objection.  I mean, Dean
17   Chemerinsky may have his views, but it's the court
18   that gets to decide these things.  And whether or not
19   he agrees with Judge Gould on this issue or other
20   issues is really not relevant.
21        MR. KLAYMAN:  He can give his expert
22   opinion.

12  (Pages 686 to 689)

In Re: Larry E. Klayman
July 18, 2019

|   | Page 690 |
|---|---|

1    CHAIRPERSON MIMS:  We have gone over this.
2    The objection is sustained.  But do you mind if I ask
3    a few questions?  I don't want to interrupt your
4    statement--
5    MR. KLAYMAN: Sure.
6    CHAIRPERSON MIMS:  --but I know we're
7    running out of time with him.
8    BY CHAIRPERSON MIMS:
9    Q    Dean Chemerinsky, have you reviewed, I
10    believe there were five writs of mandamus filed in
11    this action.  Have you reviewed those writs?
12    A    Yes, I have.
13    Q    In your practice of teaching about
14    federal courts, have you seen writs like this
15    previously?
16    A    I've certainly seen lawyers try to get
17    review of trial courts vis writs of mandamus, and so
18    I think the answer to your question have I seen
19    writs of mandamus as a way of reviewing district
20    court decisions, the answer would be yes.
21    Q    From your experience in teaching and
22    reviewing, you know, attorneys filing writs like

|   | Page 691 |
|---|---|

1    this, did you--do you have an opinion as to whether
2    the filing of these five writs, either individually
3    or in total, was reasonable?
4    A    Yes, I do.  I think that it was
5    reasonable under the circumstances of this case.
6    Q    Why?
7    A    This is about the ability of a criminal
8    defendant to have counsel of choice; that the
9    district court had refused to allow the pro hoc vice
10    status; and the defendant wanted to have Mr. Klayman
11    represent him.  And the only way of having the
12    district court decision reviewed was through these
13    writs of mandamus.
14    CHAIRPERSON MIMS:  Thank you.  I may have
15    one or two more follow-ups, but I'm going to let Mr.
16    Klayman finish.
17    Do you have a hard stop in ten minutes?
18    WITNESS CHEMERINSKY:  I can probably
19    extend it about 10 minutes.  Beyond that, I have a
20    speaking engagement in San Francisco that I have to
21    get to.  But I can probably go another 20 minutes, if
22    that's okay with you.

|   | Page 692 |
|---|---|

1    CHAIRPERSON MIMS:  That's fine.  I just
2    want to make sure that we give Bar Counsel enough
3    time to question you, as well.
4    And, Mr. Klayman, I think to be fair,
5    we're going to let you ask a few more questions.  Why
6    don't you go about five more minutes, but we do have
7    to give Ms. Porter time to ask questions, as well.
8    BY MR. KLAYMAN (Resuming):
9    Q    In reviewing the court's orders, your
10    honor--excuse me, Dean Chemerinsky--and you are
11    "your honor" as well--judged by the majority of the
12    opinions which you wrote, is it your opinion that he
13    went beyond that which he should have in analyzing
14    whether or not my pro hoc vice should be granted?  In
15    other words, did he become an advocate for Judge
16    Navaro?  That's what I'm asking, the essence of it.
17    MS. PORTER:  Objection.
18    CHAIRPERSON MIMS:  Sustained.
19    (Pause.)
20    CHAIRPERSON MIMS:  Mr. Klayman?
21    BY MR. KLAYMAN (Resuming):
22    Q    Did you hear the question?

|   | Page 693 |
|---|---|

1    A    Yes, sir.
2    CHAIRPERSON MIMS:  Yes, but the objection
3    is sustained.  We need to move on.
4    MR. KLAYMAN:  Oh, I'm sorry.  I'm sorry.
5    BY MR. KLAYMAN (Resuming):
6    Q    Now, Professor Chemerinsky, have I paid
7    you any remuneration for your testimony now, or has
8    that been promised in the future?
9    A    No, I have not been paid and will not
10    take any payment for this testimony.
11    Q    I want to ask a factual question, not as
12    an expert but as a factual question.  Have you ever
13    had any experience with a judge called William D.
14    Keller?
15    A    Not personally, no.  I never appeared in
16    front of him.
17    Q    Do you know of his reputation?
18    MS. PORTER:  Objection.
19    CHAIRPERSON MIMS:  I don't see how this is
20    relevant, Mr. Klayman.
21    MR. KLAYMAN:  That's fine.  No further
22    questions.  I reserve the right to redirect.

13 (Pages 690 to 693)

In Re:  Larry E. Klayman
July 18, 2019

## Page 694

1    CHAIRPERSON MIMS:  Ms. Porter?

2    MR. KLAYMAN:  Let me say one other thing.

3  Your Honor, I do ask that the declaration, whatever

4  Your Honor ultimately rules is relevant or not, be

5  placed on the record as a proffer, at a minimum,

6  under Rule 7.16.  That is Dean Chemerinsky's

7  declaration.

8    CHAIRPERSON MIMS:  Ms. Porter?

9      BAR COUNSEL EXAMINATION

10    BY MS. PORTER:

11    Q    Good afternoon, Dean Chemerinsky.  My

12  name, again, is Julia Porter.  I just have a few

13  questions.  I think you've testified that judges,

14  acting in their judicial capacity, have absolute

15  immunity for a Bivens action.  Is that correct?

16    MR. KLAYMAN:  Objection.

17    WITNESS CHEMERINSKY:  That's right.

18  Judges in the judicial capacity cannot be sued for

19  money damages, whether it's through Bivens if it's a

20  federal judge, or if it's a state judge through

21  Section 1983.

22    BY MS. PORTER (Resuming):

## Page 695

1    Q    And that's very well established even by

2  Supreme Court precedent?

3    A    Yes.  The Supreme Court in Stump versus

4  Sparkman in 1980 said that judges have absolute

5  immunity for their judicial tasks.

6    Q    And as a federal district court, and even

7  as the Ninth Circuit, you're required to follow the

8  Supreme Court's ruling on those matters?  Is that

9  correct?

10    A    Yes.

11    Q    Presidents also have absolute immunity

12  in Bivens actions.  Isn't that correct?

13    A    A President cannot be sued for money

14  damages for anything done in carrying out the

15  presidency.  That's Nixon versus Fitzgerald, 1982.

16  There have been no follow up cases in terms of the

17  scope of that.  And the lower courts have said

18  Presidents can be sued for injunctive relief.

19    Q    With respect to Bivens action, would you

20  agree that it would be unwarranted to file a Bivens

21  action against a judge for denying a pro hoc vice

22  application?

## Page 696

1    MR. KLAYMAN:  Objection.  Lacks

2  foundation, and she's getting into the same areas

3  that you objected--

4    MS. PORTER:  I'm asking a hypothetical

5  question of an expert.

6    MR. KLAYMAN:  It's not a hypothetical.

7  Besides, I didn't sign it, but it's not a

8  hypothetical.

9    CHAIRPERSON MIMS:  I'm going to sustain

10  the objection.

11    BY MS. PORTER (Resuming):

12    Q    One more question, Dean Chemerinsky.

13  Would you agree that, even though a client

14  hypothetically is entitled to, or has a Sixth

15  Amendment right to counsel of choice, that would not

16  permit the counsel to make false or misleading

17  representations to the court?

18    MR. KLAYMAN:  She's doing exactly what she

19  kept me from doing.  She's asking for an opinion on

20  an ethics violation of the Rules of Professional

21  Responsibility.

22    CHAIRPERSON MIMS:  But she's not asking

## Page 697

1  about anything specific in the record.  And we did

2  allow, to some extent, his testimony about the right

3  to counsel.  And he gave general opinions on that,

4  so--

5    MR. KLAYMAN:  What's the question?

6    MS. PORTER:  Do you want me to restate it?

7    CHAIRPERSON MIMS:  Repeat the question.

8    BY MS. PORTER (Resuming):

9    Q    Dean Chemerinsky, would you agree that

10  with respect to a criminal defendant's Sixth

11  Amendment right to counsel, that would not permit a

12  lawyer who is seeking admission as the defendant's

13  counsel to make false or misleading statements to the

14  court?

15    A    Yes, I would agree with that.

16    MR. KLAYMAN:  Objection.

17    CHAIRPERSON MIMS:  Overruled.

18    BY MS. PORTER (Resuming):

19    Q    Could you restate your answer, please,

20  just so that the court reporter gets it?

21    A    Yes, I would agree.

22    MS. PORTER:  I have no more questions.

14 (Pages 694 to 697)

In Re: Larry E. Klayman
July 18, 2019

## Page 698

1  Thank you.
2      FURTHER EXAMINATION
3      BY MR. KLAYMAN:
4      Q   Based upon your understanding of the
5  Bundy prosecution, is it your expert opinion that
6  Judge Navaro violated the Constitutional rights of
7  Cliven Bundy and the defendants?
8      MS. PORTER:  Objection.
9      CHAIRPERSON MIMS:  Sustained.
10     MR. KLAYMAN:  No further questions.  I'd
11  like him to proffer an answer.
12     CHAIRPERSON MIMS:  If you want to do a
13  proffer right now and read into the record what you
14  would have had him testify about, and he can agree
15  that that would have been his testimony had it not
16  been overruled by the Committee, then why don't you
17  go ahead and do that.
18     BY MR. KLAYMAN:
19     Q   Thank you.  And I'm referring to your
20  declaration, Dean Chemerinsky, Exhibit 21.  If you
21  had been permitted to testify fully, would you have
22  testified as to the matters that you set forth at

## Page 699

1  pages 1, 2, 3, 4, and 5 of your declaration?
2      A   Yes.
3      Q   And did you set forth there, based on
4  your knowledge and belief and expertise, is true and
5  correct?
6      A   Yes.
7      MR. KLAYMAN:  No further questions.
8      CHAIRPERSON MIMS:  Thank you so much,
9  Dean.  I know you are a very busy person, and we
10  appreciate your coming in to help out on this matter.
11     WITNESS CHEMERINSKY:  It's my pleasure.
12  Thank you for listening to me.
13     CHAIRPERSON MIMS:  Thank you.
14     MR. KLAYMAN:  Thank you.
15     CHAIRPERSON MIMS:  Does that conclude your
16  witnesses, Mr. Klayman?
17     MR. KLAYMAN:  No, I just need to finish.
18  We left my testimony open yesterday to add some
19  exhibits.
20     CHAIRPERSON MIMS:  With respect to the
21  supplemental exhibits?
22     MR. KLAYMAN:  Yes.

## Page 700

1      CHAIRPERSON MIMS:  Okay, I'll allow that.
2      You filed--did you file three exhibits?
3      Three additional exhibits?  Are they all included
4  within this binder here, Mr. Klayman?
5      MR. KLAYMAN:  No, the binder is dealing
6  with the case in the Northern District of California.
7  This is reference.  And 2 and 3 are matters that
8  concern my direct and cross-examination.  They are
9  actually in the back of--
10     CHAIRPERSON MIMS:  They are?  Thank you.
11     COMMITTEE MEMBER WHITE:  Mr. Klayman, with
12  regard to--
13     CHAIRPERSON MIMS:  Mr. Klayman, you
14  understand that you are still under oath as you were
15  on Tuesday?
16     MR. KLAYMAN:  Yes, thank you.
17     CHAIRPERSON MIMS:  Thank you.
18     COMMITTEE MEMBER WHITE:  With regard to
19  Respondent's Exhibit No. 1, Supplemental Exhibit No.
20  1, what are those documents?
21     MR. KLAYMAN:  They are documents that
22  provide a larger record of what had been--what I've

## Page 701

1  been questioned about by Ms. Porter, dealing with a
2  case that was brought in the U.S. District Court for
3  the Northern District of California, that was
4  assigned to Judge Wilken.  And they concern an attack
5  by ANTIFA, who has become rather notorious over the
6  years, against a gay woman, a gay conservative woman
7  who went to hear a speech of Milo Yanapolois--if I'm
8  pronouncing his name correctly--and she was attacked
9  by members of the ANTIFA.  And she was thrown to the
10  ground, and she was assaulted.
11     And the first lawsuit that I filed is
12  contained at pages 1 through, excuse me, Bates
13  numbers are RSX-001 through and including RSX-0040.
14  And that was filed in the Northern District.
15     Now the complaint ultimately was dismissed
16  without prejudice, voluntarily dismissed, and that is
17  at RSX-0041.  A new case was filed in a complaint in
18  the U.S. District Court of the Northern District of
19  California in the San Francisco Division.  And the
20  mix of the defendants is different than in the first
21  case.  It centers primarily around the activities of
22  ANTIFA.  So there are many fewer defendants.  And

15  (Pages 698 to 701)

# EXHIBIT D

In Re: Larry E. Klayman
July 18, 2019

|  | Page 806 |
|---|---|

1  Cliven Bundy, who thankfully no one else will
2  represent unless someone like Larry Klayman comes
3  in.
4         There are other lawyers who have done this
5  in the past, with different political stripes --
6  Ralph Nader, who actually I know, counselor, others,
7  you need lawyers like that. You don't want to remove
8  them from the practice of law because then you leave
9  criminal Defendants and civil litigants at the mercy
10 of the big powers, the rich and the powerful who want
11 to and will use their power to try to destroy them,
12 thank you.
13        CHAIRPERSON MIMS: Any response, Miss
14 Porter?
15        MS. PORTER: No.
16        CHAIRPERSON MIMS: Alright, why don't we
17 take a break. I would say come back and wait for us
18 in 20 minutes. I don't know that we'll be done in 20
19 minutes. It may be longer. If you want to take a
20 longer break, we can say a half an hour, a half an
21 hour? Let's reconvene at a half an hour, and if
22 we're not back in a half an hour it means that we're

|  | Page 808 |
|---|---|

1  through the misrepresentation of Mr. Whipple's
2  experience. Mr. Klayman's misrepresentation or
3  misleading of his own criminal experience. The issue
4  of not disclosing the Hearing Committee report, and
5  addressing his arguments that it wasn't final, that
6  it was an ongoing matter and also that the
7  affidavits, the sworn testimony that he had violated
8  a rule, that that had been withdrawn.
9         Accusing Judge Navarro of being malicious
10 and corrupt. For each of these items -- we need you
11 to specifically spell out how that rises to the level
12 of clear and convincing. And on the same token, Mr.
13 Klayman, we need -- what I'd like you to do is for
14 your statement of facts, listed out in paragraph
15 form, so that Mr. Klayman can either admit it or
16 deny it.
17        And Mr. Klayman, we need you to respond
18 specifically to the statements in the brief. I
19 understand that you may think that there is a big
20 issue with 6th Amendment in here, we don't really see
21 that. There may be a very limited case in which you
22 might bring that up, but I doubt it's going to be

|  | Page 807 |
|---|---|

1  not ready yet, so just try and hang around closely to
2  the courtroom.
3         We're off the record at 3:57, thank you.
4         (Off the record 3:57.)
5         (On the record 5:22.)
6         CHAIRMAN MIMS: Alright, we're back on
7  the record at 5:22. So, the Hearing Committee has
8  been unable to reach a non-binding determination.
9  So, at this point we're going to have to set a
10 briefing schedule.
11        Before we do that, I do want to talk a
12 little bit about what we'd like to see in the briefs
13 in some of the areas that -- of why we're unable to
14 come to an agreement and find a violation.
15        It's a clear and convincing case, so for
16 the statements and let's start with the pro hac
17 motion. For the statements, for the omissions or the
18 misleading things that you found in there where you
19 believe that there were violations, we would like you
20 to be very specific about those.
21        I know that in your closings you did go
22 through a number of examples. I mean we've gone

|  | Page 809 |
|---|---|

1  much.
2         And bar counsel's brief, the extent that
3  it's in your response I think can be pretty limited.
4  I mean you've made your points on the 6th Amendment
5  issue and the constitutionality issues. We've heard
6  them. I think the relevance is probably limited in
7  terms of your advocacy of the issue, and so I really
8  need you to respond so that the Committee can sift
9  through all of this.
10        Respond to her points in the brief. You
11 admit it, or you deny it. And if you deny whatever
12 fact it is, give us a specific reason of why you deny
13 it. Okay. So, the timing is generally 10 days
14 after the transcript comes in, and as I understand it
15 the transcript comes in in two weeks.
16        MR. KLAYMAN: Your Honor, may I address
17 you on that?
18        CHAIRPERSON MIMS: Yes.
19        MR. KLAYMAN: If we may have additional
20 time, my wife is pregnant and will be giving birth
21 around this time period.
22        CHAIRPERSON MIMS: Okay, when is --

42 (Pages 806 to 809)

DISTRICT OF COLUMBIA COURT OF APPEALS
BOARD ON PROFESSIONAL RESPONSIBILITY
AD HOC HEARING COMMITTEE

FILED

August 8, 2019

Board on Professional
Responsibility

In the Matter of                           :
                                           :
    LARRY E. KLAYMAN,                       :
                                           :    Board Docket No. 18-BD-070
Respondent.                                :    Disc. Docket No. 2017-D051
                                           :
A Member of the Bar of the                  :
District of Columbia Court of Appeals:      :
(Bar Registration Number: 334581)           :

ORDER

A hearing was held in this matter on July 15 – 16 and July 18, 2019 before
Buffy J. Mims, Esquire, Chair of the Ad Hoc Hearing Committee; Dr. Robin J. Bell,
Public Member; and Christian S. White, Esquire, Attorney Member. Deputy
Disciplinary Counsel Julia Porter, Esquire, represented the Office of Disciplinary
Counsel and Respondent appeared *pro se*. Following the conclusion of the
evidentiary portion of the hearing and the parties' respective closing arguments, the
Hearing Committee went into executive session and determined that it could not
make a preliminary finding that Disciplinary Counsel had proven any disciplinary
rule violation. This order sets forth the post-hearing briefing schedule.

As a preliminary matter, the parties' List of Exhibits forms appear not to have
been filed with the Board office. Thus, the parties are directed to review each other's
List of Exhibits Form and note on such Forms those exhibits that were admitted

during the hearing.  The parties shall file their respective forms on or before **August 12, 2019**.

The parties are directed to file proposed findings of fact and conclusions of law according to the following schedule:  Disciplinary Counsel's opening brief is due on or before **August 26, 2019;** Respondent's response brief is due on or before **September 18, 2019**; and Disciplinary Counsel's reply brief is due on or before **September 30, 2019**.  Respondent shall not file a responsive document without leave of the Chair.

Disciplinary Counsel's opening brief shall contain proposed findings of fact that shall consist of numbered paragraphs, including within each paragraph specific references to the parts of the record that support the facts set forth in that paragraph. Respondent's brief shall contain a response to each numbered paragraph in Disciplinary Counsel's proposed findings of fact, including, in the case of any disagreement, specific references to the parts of the record relied upon. Respondent's proposed findings of fact shall consist of numbered paragraphs, including within each paragraph specific references to the parts of the record relied upon.  If Respondent proposes additional findings of fact, Disciplinary Counsel's reply shall contain a response to each numbered paragraph in Respondent's proposed findings of fact, including, in the case of any disagreement, specific references to the parts of the record relied upon.

In addition to filing hard four copies of each submission with the Office of the Executive Attorney, as required by Board Rule 12.1(b), each party shall also submit an electronic copy of the word processing file used to produce each brief, by filing a cd-rom or flash drive with the Office of the Executive Attorney, or by emailing the word processing file to the Board's Case Manager, Meghan Borrazas at CaseManager@dcbpr.org.

The Office of the Executive Attorney is directed to serve a copy of this Order by email and U.S. Mail.

It is so Ordered.

AD HOC HEARING COMMITTEE

By: _____
        Buffy J. Mims
        Chair

cc:

Larry E. Klayman
2020 Pennsylvania Avenue
#800
Washington, D.C. 20006

And to:

269 South Beverly Drive
Suite 1298
Beverly Hills, California 90212
leklayman@gmail.com

Julia L. Porter, Esquire
Senior Assistant Disciplinary Counsel
Office of Disciplinary Counsel
515 5th Street, N.W.
Building A, Room 117
Washington, D.C.  20001
porterj@dcodc.org

EXHIBIT 8

DISTRICT OF COLUMBIA COURT OF APPEALS
BOARD ON PROFESSIONAL RESPONSIBILITY
AD HOC HEARING COMMITTEE

In the Matter of:

    **LARRY E. KLAYMAN, ESQ.**

Respondent.                                             Bar Docket No.  DDN 2017-D051

A Member of the Bar of the District of
  Columbia Court of Appeals

(Bar Registration No. 334581)

## DECLARATION OF ERWIN CHEMERINSKY

    1. I, Erwin Chemerinsky, hereby being sworn deposes and says that the following is true and correct and based on my personal knowledge and belief.

    2. I am over the age of 18 and mentally and legally competent to make this affidavit, sworn under oath.

    3. I am Dean and Jesse H. Choper Distinguished Professor of Law, University of California, Berkeley School of Law.  Prior to assuming this position, from 2008-2017, I was the founding Dean and Distinguished Professor of Law, and Raymond Pryke Professor of First Amendment Law, at University of California, Irvine School of Law, with a joint appointment in Political Science.  Before that I was the Alston and Bird Professor of Law and Political Science at Duke University from 2004-2008, and from 1983-2004 was a professor at the University of Southern California Law School, including as the Sydney M. Irmas Professor of Public Interest

RX0849

Law, Legal Ethics, and Political Science. I also have taught at DePaul College of Law and UCLA Law School.

I am  the author of twelve books, including leading casebooks and treatises about constitutional law, criminal procedure, and federal jurisdiction.  I also am the author of more than 250 law review articles.  I frequently argue appellate cases, including in the United States Supreme Court.  In 2016, I was named a fellow of the American Academy of Arts and Sciences. In 2017, National Jurist magazine again named Dean Chemerinsky as the most influential person in legal education in the United States.

I received a B.S. from Northwestern University in 1975 and a J.D. from Harvard Law School in 1978.  I am a member of the bar in Illinois and the District of Columbia.

4.   I have carefully reviewed the documents including but not limited to: (1) Mr. Klayman's *pro hac vice* applications and supplements thereto, (2) orders and opinions by the Honorable Gloria M. Navarro of the U.S. District Court for the District of Nevada regarding Mr. Klayman's *pro hac* vice *applications*, (3) orders and opinions of the U.S. Court of Appeals for the Ninth Circuit regarding Mr. Klayman's *pro hac vice* admission, (4) Mr. Klayman's Petition for Writ of Mandamus to the Supreme Court, (5) the letter opinion  by Professor Ronald Rotunda concerning the subject and on-going District of Columbia Bar disciplinary proceeding, and (6) other related pleadings and documents pertaining to Mr. Larry Klayman's ("Mr. Klayman") attempts to gain admission *pro hac vice* in the criminal trial of Cliven Bundy in the District of Nevada. *United States v. Bundy*, 2:16-cr-00046 (D. Nev.) (the "*Bundy* Case").

5.   Upon review of these court orders, pleadings and documents, it is my opinion, based on the relevant facts and relevant law, that Mr. Klayman should have been granted admission *pro hac vice* in the *Bundy* Case pursuant to Mr. Bundy's Sixth Amendment right to counsel of choice,

RX0850

and that denial of *pro hac vice* status was in serious error.

6.    A criminal defendant's right to counsel of choice under the Sixth Amendment is paramount. "It is hardly necessary to say that, the right to counsel being conceded, a defendant should be afforded a fair opportunity to secure counsel of his own choice." *Powell v. Alabama*, 287 U.S. 45, 53 (1932).

7.    As a result, an application for admission pro hac vice generally should not be denied to a lawyer who is in good standing of the bar of a state. The U.S. Court of Appeals for the Fifth Circuit has held that:

> [a]n applicant for admission pro hac vice who is a member in good standing of a state bar may not be denied the privilege to appear except "on a showing that in any legal matter, whether before the particular district court or in another jurisdiction, he has been guilty of unethical conduct of such a nature as to justify disbarment of a lawyer admitted generally to the bar of the court." *In re Evans*, 524 F.2d 1004, 1007 (5th. Cir.).

Likewise, the U.S Court of Appeals for the Eleventh Circuit has held that "Absent a showing of unethical conduct rising to a level that would justify disbarment, the court must admit the attorney." *Schlumburger Techs., Inc. v. Wiley*, 113 F.3d 1553, 1561 (11th Cir. 1997).

8.    I believe that this is the standard that should have been employed by the U.S. District Court for Nevada ("District Court") and the U.S. Court of Appeals for the Ninth Circuit ("Ninth Circuit") in deciding Mr. Klayman's *pro hac vice* admission, under which Mr. Klayman would have then satisfied and been admitted to represent Mr. Bundy in his criminal prosecution.

9.    In this regard I also agree with the reasoning set forth by the Honorable Ronald M. Gould ("Judge Gould") of  the Ninth Circuit regarding why Mr. Klayman should have been granted *pro hac vice* admission. *Bundy v. United States Dist. Court (In re Bundy)*, 840 F.3d 1034  (9th Cir. Oct. 28, 2016). It is apparent to me that Mr. Klayman did not deceive or mislead

3

RX0851

the Court, and that he simply answered the questions that were presented to him on the Nevada District Court's *pro hac vice* application. Judge Gould found that this is indeed what had occurred and that Mr. Klayman fulfilled his duty of candor on his application to be admitted *pro hac vice* in the *Bundy* Case:

> I agree with Klayman that he was not obligated to re-litigate the D.C. proceeding before the district court and that he did not have to provide the district court with the entire record from D.C. And if his disclosures were selective, still he is an advocate, an advocate representing defendant Cliven Bundy, and after submitting a compliant response to the questions in the pro hac vice application, he had no greater duty to disclose any possible blemish on his career or reputation beyond responding to the district court's further direct requests *Bundy v. United States Dist. Court (In re Bundy)*, 840 F.3d 1034, 1055 (9th Cir. Oct. 28, 2016).

Mr. Klayman properly gave his opinion that he believed that the ongoing proceeding before the District of Columbia Board of Professional Responsibility would ultimately be resolved in his favor. He never misled the Court to try to get it to falsely believe that the proceedings had already been terminated in his favor, but he simply gave an opinion of what he believed was the likely outcome.

10. I also believe that Mr. Klayman's application for *pro hac vice* admission should have been granted regardless of any purported "ethical concerns" raised by Judge Gloria Navarro or the majority panel of the Ninth Circuit, given the importance of a criminal defendant's right to counsel of choice under the Sixth Amendment. I again agree with Judge Gould:

> Yet given the number of serious charges Bundy faces, the complexity of his trial, his likely difficulty in finding other qualified counsel, and Klayman's own qualifications, I conclude that the district court's concerns over Klayman's practice history and candor are outweighed by Bundy's need for adequate representation in this important and complex case. *Bundy v. United States Dist. Court (In re Bundy)*, 840 F.3d 1034, 1057 (9th Cir. 2016)

Specifically, Judge Gould's reasoning was correct because he properly balanced any "ethical" concerns against Mr. Bundy's Sixth Amendment rights:

RX0852

And here, even if the purported ethical flaws marshaled by the majority and the district court are beyond "mouse" proportions, they are still relatively small in this special context, where the elephant is Bundy's general entitlement to the counsel of his choice and to a vigorous defense at trial. In my view, concerns about whether at this stage Bundy will have adequate and vigorous representation, absent Klayman, outweigh the ethical concerns that have been expressed by the district court and the majority. *Bundy v. United States Dist. Court (In re Bundy)*, 840 F.3d 1034, 1057 (9th Cir. Oct. 28, 2016).

Thus, I strongly believe that Mr. Klayman should have been admitted *pro hac vice* and that the sound reasoning of Judge Gould should apply and have been followed.

11.  I will do my best to be available to expand on and testify with regard to the contents of this declaration via remote testimony from Berkeley, California during Mr. Klayman's hearing. Unfortunately, due to my duties as Dean of UC Berkeley School of Law, I am unable travel to Washington D.C. to give live testimony during the week of July 15, 2019.

Sworn to this __1st__ day of __July__, 2019

_Erwin Chemerinsky_
_____
Erwin Chemerinsky

:

RX0853

EXHIBIT 9

```
1                 IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLUMBIA
2
                              ---
3
    LARRY ELLIOT KLAYMAN,          )
4                                  )
                                   )
5        Plaintiff,                )  CIVIL ACTION 24-2997
                                   )
6    v.                            )
                                   )  Tuesday, May 27, 2025
7    DISTRICT OF COLUMBIA COURT    )
     OF APPEALS, et al.,           )
8                                  )
                                   )
9        Defendants.               )
    _____ )
10

11         TRANSCRIPT OF PRELIMINARY INJUNCTION HEARING

12         BEFORE THE HONORABLE REGGIE B. WALTON
                  UNITED STATES DISTRICT JUDGE
13

14
    APPEARANCES:        KLAYMAN LAW GROUP P.A.
15                      BY:  LARRY ELLIOT KLAYMAN
                        7050 W. Palmetto Park Road
16                      Boca Raton, Florida 33433
                        310-595-0800
17                      Email:  Leklayman@gmail.com

18                      For the Plaintiff

19                              ---

20

21

22

23
    COURT REPORTER:     CHANDRA R. KEAN, RMR
24                      Official Court Reporter
                        333 Constitution Avenue, NW
25                      Washington, DC 20001
```

```
1    APPEARANCES (CONT'D):

2
                        OFFICE OF ATTORNEY GENERAL FOR DC
3                       BY:  JESSICA N. KRUPKE
                        400 6th Street NW, Suite 10100
4                       Washington, DC 20001
                        202-727-2125
5                       Email:  Jessica.krupke@dc.gov

6                       For DCCA

7                       O'HAGAN MEYER, PLLC
                        BY:  LESLIE PAUL MACHADO
8                       2560 Huntington Avenue, Suite 204
                        Alexandria, Virginia 22303
9                       703-775-8607
                        Email:  Lmachado@ohaganmeyer.com
10
                        For the Defendants BPR
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

|  | 1 | **PROCEEDINGS** |
|---|---|---|
|  | 2 | (Court called to order at 10:06 a.m.) |
| 10:06:13 | 3 | DEPUTY COURTROOM CLERK:  This is civil action |
| 10:06:15 | 4 | 24-2997, *Larry Elliot Klayman v. District of Columbia* |
| 10:06:22 | 5 | *Court of Appeals, et al.* |
| 10:06:23 | 6 | May I have the parties approach the lectern, state |
| 10:06:26 | 7 | your appearance for the record, beginning with the |
| 10:06:28 | 8 | plaintiff. |
| 10:06:29 | 9 | MR. KLAYMAN:  Good morning, Your Honor.  Larry |
| 10:06:31 | 10 | Klayman for myself, pro se. |
| 10:06:37 | 11 | THE COURT:  Good morning. |
| 10:06:39 | 12 | MR. MACHADO:  Good morning, Your Honor.  Les |
| 10:06:41 | 13 | Machado on behalf of the Board on Profession |
| 10:06:44 | 14 | Responsibility, the nine board members, and the three |
| 10:06:46 | 15 | Hearing Committee members who have been sued as |
| 10:06:49 | 16 | defendants. |
| 10:06:49 | 17 | THE COURT:  Good morning. |
| 10:06:52 | 18 | MS. KRUPKE:  Good morning.  Jessica Krupke on |
| 10:06:54 | 19 | behalf of the District of Columbia Court of Appeals in a |
| 10:07:00 | 20 | limited capacity as the District of Columbia Court of |
| 10:07:02 | 21 | Appeals has not been served properly. |
| 10:07:03 | 22 | Thank you. |
| 10:07:03 | 23 | THE COURT:  Good morning.  Mr. Klayman, this |
| 10:07:06 | 24 | matter is before the Court today on your motion for a |
| 10:07:08 | 25 | preliminary injunction.  You may proceed. |

| | | |
|---|---|---|
| 10:07:11 | 1 | MR. KLAYMAN:  Your Honor, may I address some |
| 10:07:13 | 2 | preliminary matters -- |
| 10:07:14 | 3 | THE COURT:  Yes. |
| | 4 | MR. KLAYMAN:  -- with you? |
| 10:07:35 | 5 | Your Honor, first of all, it's my intention to take |
| 10:07:37 | 6 | the witness stand to testify here today.  There are |
| 10:07:40 | 7 | factual issues involved in this case with regard to |
| 10:07:46 | 8 | viewpoint discrimination and selective prosecution. |
| 10:07:48 | 9 | I do note that I submitted an affidavit.  There was |
| 10:07:52 | 10 | no contrary affidavit.  It was not -- anything that I |
| 10:07:57 | 11 | said rebutted, consequently it's admitted.  But there |
| 10:08:00 | 12 | are other factual issues that I want to bring in front |
| 10:08:03 | 13 | of the Court.  The pattern and practice of |
| 10:08:06 | 14 | discriminatory viewpoint discrimination against |
| 10:08:08 | 15 | conservative and Republican activist lawyers such as |
| 10:08:13 | 16 | myself, and of course, those issues in terms of |
| 10:08:16 | 17 | substantial similarity of what's been going on.  So it's |
| 10:08:20 | 18 | absolutely required that I be able to testify and |
| 10:08:22 | 19 | present evidence to this Court. |
| 10:08:25 | 20 | The briefs are very thorough, and I wanted to point |
| 10:08:29 | 21 | out, because Your Honor didn't pick up on it the first |
| 10:08:34 | 22 | time, is that attached to the preliminary injunction |
| 10:08:36 | 23 | motion is also our motion -- excuse me, our opposition |
| 10:08:41 | 24 | to the motion to dismiss in this case.  And that lays |
| 10:08:44 | 25 | out specifically a lot of the legal arguments, and it's |

10:08:50  1    incorporated into the preliminary injunction motion by

10:08:52  2    reference.  And I'm going to make reference to some of

10:08:54  3    them today.

10:08:55  4         The issues in this case are very, very important

10:08:58  5    because this Court in particular and others throughout

10:09:03  6    the country have been enforcing the First and Fifth

10:09:09  7    Amendment with regard to discriminatory viewpoint

10:09:12  8    discrimination.

10:09:12  9         The *Douglass* case, of course, is a good example,

10:09:15  10   and I'm sure Your Honor is familiar with that, but also

10:09:18  11   we have recent cases that came down by Judge McFadden,

10:09:24  12   Judge Bates, and others with regards to viewpoint

10:09:27  13   discrimination as allegedly practiced by President Trump

10:09:30  14   and his administration.  And in those cases, actions

10:09:33  15   were enjoined as a result.

10:09:38  16        So the case law cuts both ways.  And although

10:09:41  17   *Douglass* deals with Black Lives Matter and a Black Lives

10:09:46  18   Matter pro-life group, it equally applies to

10:09:47  19   conservatives and Republican activist lawyers under our

10:09:50  20   Constitution.  So it's extremely important that we go

10:09:52  21   through these various issues with the Court.

10:09:54  22        I might also add, in *Douglass*, there was a motion

10:09:57  23   to dismiss that had been filed by the government at the

10:10:06  24   time and it was denied ultimately.  It was granted by

10:10:10  25   Judge Boasberg, but it went up to the D.C. Circuit.  And

10:10:15  1    there's a very strong opinion in *Douglass* that reversed

10:10:18  2    that, and it came back.  And that case is currently in

10:10:22  3    discovery.

10:10:22  4         In terms of the motion to dismiss which is in front

10:10:24  5    of you, Your Honor, it's 12(b)(6).  And it's not a high

10:10:30  6    standard to get over a 12(b)(6); there just has to be

10:10:33  7    some plausibility under the *Twombly* case and its progeny

10:10:38  8    and to what's being alleged here.  So this case is going

10:10:42  9    to have to go into discovery just like *Douglass*, but

10:10:46  10   today, for purposes of a preliminary injunction, it's

10:10:50  11   important that I be able to testify and go through

10:10:53  12   various factual matters for Your Honor.

10:10:56  13        At the end of this proceeding, under our local

10:11:01  14   rules and the Rules of Civil Procedure, Your Honor has

10:11:04  15   to do findings of fact and conclusions of law.  We had a

10:11:09  16   previous case in front of Your Honor where that didn't

10:11:11  17   occur, and -- respectfully, the D.C. Circuit reversed

10:11:16  18   you on that, found that there were not adequate grounds

10:11:18  19   for you to declare me a vexatious litigant, not being

10:11:23  20   able to pursue my constitutional rights, particularly

10:11:25  21   under the Sixth Amendment.

10:11:27  22        So consequently, I just ask Your Honor,

10:11:30  23   respectfully, to weigh the evidence very carefully, as

10:11:34  24   well as the law, and issue findings of fact and

10:11:37  25   conclusions of law, because that is very important,

10:11:41  1    because this preliminary injunction proceeding,

10:11:42  2    whichever which way it goes, and I'm confident it will

10:11:46  3    go in my behalf, is appealable to the D.C. Circuit.  And

10:11:51  4    of course the D.C. Circuit has set this precedent in the

10:11:54  5    *Douglass* case.

10:11:56  6         So it's important that it have a record of how Your

10:11:59  7    Honor is making the decision, not the cursory proposed

10:12:02  8    order that was given to you by the defendants.

10:12:07  9         This is important, Your Honor, for --

10:12:09  10         THE COURT:  Well, you know, Mr. Klayman, there

10:12:11  11   are some matters I think we have to address before we

10:12:14  12   even get to where you want to go.  And that is, first of

10:12:17  13   all, that D.C. Court of Appeals says it has not been

10:12:22  14   appropriately served, so they're saying I don't have

10:12:24  15   jurisdiction because of that.  And then there's the

10:12:27  16   other issue regarding the fact that this issue, as I

10:12:32  17   understand it, has already been litigated over in

10:12:34  18   Superior Court, went up to the Court of Appeals, and the

10:12:38  19   appeal was denied.

10:12:40  20         And, you know, with the current state of the law,

10:12:43  21   what would be the basis for this Court to, in a sense,

10:12:47  22   act as an appellate court regarding a decision made by

10:12:53  23   the equivalent of a state court system?

10:12:57  24         MR. KLAYMAN:  You're not acting as an appellate

10:12:59  25   court, Your Honor, because as we pointed out in the

10:13:03  1    briefs, under the *Rooker* case and also under the *Younger*

10:13:06  2    case, the remedies which are being sought here, in

10:13:08  3    particular, are different than what were being sought

10:13:11  4    before the Superior Court and before the D.C. Court of

10:13:15  5    Appeals.  We're asking --

10:13:15  6           THE COURT:  The legal issue is the same.

10:13:18  7           MR. KLAYMAN:  -- for damages --

10:13:19  8           THE COURT:  You're asking me to take a position

10:13:21  9    contrary to what's already been ruled over in Superior

10:13:28  10   Court.

10:13:28  11          MR. KLAYMAN:  I'm not, because this is a

10:13:30  12   constitutional issue.  We did not litigate the

10:13:34  13   constitutional issues in front of the Superior Court or

10:13:37  14   the D.C. Court of Appeals.  This is a serious

10:13:43  15   constitutional issue that Your Honor must address.  And,

10:13:46  16   you know, whether you do it or not is another question,

10:13:48  17   but it's going to go up to the D.C. Circuit again --

10:13:50  18          THE COURT:  I'm not afraid of that, sir.  You

10:13:53  19   keep raising that.  I mean, I've been a judge for

10:13:56  20   43 years, and that comes with the territory.

10:13:58  21          MR. KLAYMAN:  Your Honor, I don't think you

10:13:59  22   need to take that personally.  I'm just making arguments

10:14:01  23   here --

10:14:01  24          THE COURT:  I'm not taking it personally.  I'm

10:14:03  25   just saying you don't have to bring up the fact that

10:14:07   1    it's going to go to the Court of Appeals.  I assume

10:14:09   2    every case I rule on is going to go to the Court of

10:14:11   3    Appeals --

10:14:11   4         MR. KLAYMAN:  Well, of course, but here's the

10:14:13   5    problem, Your Honor, is that by making your ruling as

10:14:15   6    you make it, you delay what's going on here.  What in

10:14:17   7    effect happened was that this is a stacking proceeding.

10:14:23   8    As Your Honor is aware, I was challenging a prior

10:14:28   9    disciplinary order, and that was in front of Your Honor,

10:14:30   10   in part.  And in that matter, there was a motion for

10:14:35   11   clarification.  There was a delay of nine months.  It

10:14:40   12   virtually mooted out the entire case.

10:14:42   13        When you were reversed by the D.C. Circuit, it went

10:14:45   14   back to you, and you have sat on that for 11 months,

10:14:47   15   okay.  As the same thing happened again in this context,

10:14:51   16   the D.C. Office of Disciplinary Counsel sent out the

10:14:56   17   Board's recommendation -- it wasn't a final order -- to

10:14:59   18   my other -- courts where I'm a member of those courts

10:15:04   19   and those jurisdictions.  They sent it out in a

10:15:08   20   retaliatory, vindictive way.

10:15:11   21        This has taken up time and expense.  It has created

10:15:14   22   uncertainty with my clients, being able to practice law.

10:15:19   23   So time is of the essence.  It's important that we get

10:15:22   24   to the decisions quickly and to make a reasoned

10:15:25   25   decision.  I mean no disrespect for you, Your Honor.  I

10:15:29  1    do not.  But I have to protect myself.

10:15:31  2         And when I'm talking about stacking, as they waited

10:15:34  3    for the *Sataki* order to come off, to no longer be in

10:15:39  4    effect, and they held back for over four years in

10:15:43  5    issuing a recommendation.  While that case over there in

10:15:48  6    the Superior Court and the Court of Appeals was pending,

10:15:51  7    they didn't have to do that.  They rushed to do that.

10:15:53  8    Because they wanted to institute temporary suspension

10:15:56  9    against me to make sure that I wouldn't have any ability

10:15:58  10   to continue to practice in the District of Columbia, so

10:16:05  11   they stacked it.

10:16:05  12        In a landmark case by the Florida Supreme Court,

10:16:09  13   which is a well-respected bar -- it wins the award every

10:16:11  14   year along with Texas for the way it administers the

10:16:14  15   cases -- *Florida Bar v. Rubin*, they held that that is

10:16:18  16   unethical, illegal, and unfair to a bar -- to a lawyer

10:16:23  17   as a member of the bar.

10:16:25  18        So they're stacking here.  And what they're

10:16:29  19   attempting to do is not only to continue to exclude me

10:16:33  20   in the District of Columbia but to trigger reciprocal

10:16:35  21   proceedings in other courts and jurisdictions where I'm

10:16:38  22   a member of the court and the bar.  That's extremely

10:16:42  23   costly and time-consuming, and it, again, prevents me

10:16:48  24   from practicing law.  Given what the D.C. Bar has done

10:16:52  25   over these years, it takes up -- and I'm going to

10:16:55    1    testify to this -- approximately 60 percent of my time

10:16:58    2    and my associate's time -- and I'm a sole practitioner

10:17:03    3    with one associate -- in dealing with these issues to

10:17:08    4    preserve my right to practice law.

10:17:09    5        I have been a member in good standing of the

10:17:11    6    Florida Bar for well over 48 years -- going on 48 years.

10:17:18    7    I was a member in good standing of this bar for many,

10:17:22    8    many years as well, and still am a member of this bar,

10:17:26    9    and I deserve to have my rights fully litigated and

10:17:30    10   respected.

10:17:31    11       And this is why I want to be able to take the

10:17:35    12   witness stand, and I deserve and have the right to take

10:17:38    13   the witness stand to take Your Honor through those facts

10:17:46    14   and law which apply to this case.

10:17:48    15       Now, let me deal with something specifically that

10:17:50    16   you're mentioning.  It's not, again, in all due respect,

10:17:58    17   a way out, to shorten this proceeding.  However, it

10:18:00    18   needs -- it would need to proceed expeditiously by

10:18:04    19   saying the issue was decided in another court.  That

10:18:07    20   issue was dealing with Rule 1.2, which is --

10:18:12    21           THE COURT:  You had the opportunity to raise

10:18:13    22   the issue that you seek to raise here in that proceeding

10:18:17    23   also.

10:18:19    24           MR. KLAYMAN:  Well, I raised it here because

10:18:21    25   this Court is under the jurisdiction of the D.C.

10:18:23  1    Circuit.

10:18:23  2          THE COURT:  Yeah, but you could have raised it

10:18:25  3    over there.

10:18:26  4          MR. KLAYMAN:  The fact that I could have done

10:18:27  5    something --

10:18:28  6          THE COURT:  It seems to me you can't piecemeal

10:18:30  7    your litigation by only raising certain issues before a

10:18:34  8    state court and then -- when you had the ability to

10:18:36  9    raise those issues in that court also, and then come

10:18:40  10    over here after you don't prevail in state court and

10:18:43  11    then raise an issue that you could have raised over

10:18:46  12    there.

10:18:46  13          MR. KLAYMAN:  No, that's not accurate, Your

10:18:48  14    Honor.  I have the right to be in front of this Court.

10:18:50  15    I have an absolute right to be in front of this Court.

10:18:53  16    And I did it timely.  And -- let me give you the

10:18:55  17    timeline for that.

10:18:57  18       This Court is under the jurisdiction of D.C.

10:18:59  19    Circuit.  Over there, they're dealing with a court

10:19:03  20    system which is inherently compromised because you're

10:19:07  21    asking the D.C. Court of Appeals to rule on its own

10:19:10  22    conduct, which has already refused to stay this action

10:19:15  23    pending the other case in state court.  They would not

10:19:19  24    stay it.  And they wouldn't stay it with regard to this

10:19:21  25    case either.  I asked them to stay it.  They wouldn't.

10:19:25  1        They predetermined their decision.  They don't

10:19:27  2    believe that their rules need to be enforced.  Their

10:19:34  3    rules are enforced depending on who the litigant is in

10:19:38  4    front of them.  We're talking about almost half a

10:19:41  5    decade.  And the prejudice to me constitutionally is

10:19:45  6    that I have now been subjected to this proceeding when

10:19:50  7    in fact the statute is clear.

10:19:54  8        The statute is clear because it states the Hearing

10:19:58  9    Committee's report should be filed with the Board not

10:20:00  10   later than 120 days following the conclusion of this

10:20:04  11   hearing.

10:20:05  12       "Shall," not "may."  Shall, not may.

10:20:08  13       And we cite a number of cases in our briefs, and I

10:20:11  14   hope Your Honor has an opportunity to look --

10:20:14  15           THE COURT:  I have looked at it.  The Court of

10:20:17  16   Appeals said that -- contrary to your position, that

10:20:18  17   that is not a mandatory requirement.  That's what

10:20:21  18   they --

10:20:23  19           MR. KLAYMAN:  They said that in other cases.

10:20:25  20   First of all, the first case --

10:20:25  21           THE COURT:  Those other cases are still

10:20:27  22   controlling.

10:20:27  23           MR. KLAYMAN:  They're not controlling at all.

10:20:29  24   Let me tell you why.  *Morrell*, which was only a

10:20:33  25   four-month delay, occurred with a rule that was

10:20:35  1    promulgated by the Board itself.

10:20:39  2         Then, the Court of Appeals, to allow for more time,

10:20:44  3    changed the rule and promulgated itself and made it

10:20:47  4    120 days.  Didn't say "may."  It said "shall."  Under

10:20:52  5    the rules of statutory construction, and we cite a lot

10:20:54  6    of cases, that governs when the language is clear.

10:20:58  7    There was no ambiguity to that.

10:21:00  8         And that's also true of the other cases.  They were

10:21:03  9    all under the old rule, not the new rule of the D.C.

10:21:07  10   Court of Appeals.

10:21:08  11        You're not telling me, Your Honor, that the D.C.

10:21:10  12   Court of Appeals doesn't have to enforce its own rules.

10:21:13  13   And the fact that it won't --

10:21:15  14        THE COURT:  I'm not saying that, but what I'm

10:21:17  15   saying is that I don't see how I, as a federal judge,

10:21:21  16   have authority to usurp the authority of the local court

10:21:30  17   system to control the practice of law in the District of

10:21:36  18   Columbia.

10:21:36  19        MR. KLAYMAN:  You're not controlling -- you're

10:21:40  20   not --

10:21:40  21        THE COURT:  I mean, I don't know of any

10:21:42  22   situation where a federal court has basically taken over

10:21:47  23   and -- the responsibility of policing lawyers who

10:21:52  24   practice and who are authorized to practice in a

10:21:57  25   particular jurisdiction.

10:21:58  1            MR. KLAYMAN:  When there's a constitutional

10:22:00  2   violation involved --

10:22:00  3            THE COURT:  But you had the opportunity --

          4            MR. KLAYMAN:  -- the *Rooker* --

10:22:01  5            THE COURT:  -- to raise that constitutional

10:22:04  6   violation over there.  And a state court is just as

10:22:08  7   classified to address constitutional issues as are

10:22:10  8   appellate --

10:22:12  9            MR. KLAYMAN:  And I have the right to

10:22:14  10  exhaust -- I have the right to exhaust my remedies over

10:22:16  11  there, but this Court is -- the D.C. Court of Appeals is

10:22:20  12  conflicted in this case because -- and it's evidenced by

10:22:22  13  the fact that they wouldn't even grant a stay while

10:22:26  14  litigation over in the state court was pending.

10:22:29  15      Why not?  What was the harm to the Court, Your

10:22:32  16  Honor?  There was no harm in that.

10:22:34  17      Here's the hard fact, Your Honor, and I'll just be

10:22:37  18  blunt, okay?  The District of Columbia -- and you can

10:22:40  19  look at the composition of the Board on Professional

10:22:45  20  Responsibility.  You can look at the composition of the

10:22:48  21  Court.  They are all of a political and ideological

10:22:51  22  bent, which is 180 degrees from mine and many other

10:22:55  23  lawyers that have been subject to disciplinary

10:22:57  24  proceedings.

10:22:57  25      And I'm going to present evidence to that effect.

10:23:00  1    I'm talking about Kellyanne Conway.  I'm talking

10:23:02  2    about former Attorney General Bill Barr.  I'm talking

10:23:06  3    about former Deputy Attorney General and Mayor of New

10:23:12  4    York City, Rudy Giuliani, who has been disbarred.  I'm

10:23:13  5    talking about Jeffrey Clark.  I'm talking about Senators

10:23:17  6    Josh Hawley and Ted Cruz.

10:23:20  7    This system here, to be direct, has been

10:23:24  8    weaponized, which is exactly why now there's a new

10:23:26  9    division created at the Department of Justice to look

10:23:29  10   into that, which will be headed by Ed Martin in that

10:23:34  11   regard.  And he, himself, has been retaliated against

10:23:39  12   with two bar complaints by this disciplinary counsel.

10:23:44  13   Let me also be direct.  This used to be a fair

10:23:46  14   disciplinary counsel when it was under Wallace "Gene"

10:23:51  15   Shipp.  Everything changed when Hamilton Fox became the

10:23:55  16   Bar counsel; highly partisan.  There is not one person

10:23:59  17   in the D.C. Bar disciplinary apparatus -- not that they

10:24:04  18   have to -- has given one cent to a Republican candidate

10:24:10  19   yet.

10:24:11  20   Most of them had given -- in fact, all of them have

10:24:13  21   given -- nearly all of them have given to Democrat

10:24:17  22   candidates, including people that I have sued in my

10:24:20  23   public interest capacity, including President Clinton,

10:24:23  24   President Obama, and President Biden.

10:24:26  25   This is a weaponized system, Your Honor.  And when

10:24:30    1    that happens and when there's selective prosecution and

10:24:34    2    viewpoint discrimination, I have a right to come to a

10:24:37    3    federal court.  A federal court is in control in

10:24:41    4    determining what the Constitution requires, particularly

10:24:44    5    when it's under and you are under, Your Honor, the arm

10:24:46    6    of the D.C. Circuit, which has made it clear in *Douglass*

10:24:49    7    that this is not tolerated.

10:24:51    8        So while I was timely in coming to this Court

10:24:53    9    because I tried to exhaust remedies at the lower court,

10:24:56    10    but that wasn't possible, I couldn't even get a stay, I

10:24:59    11    have a right to be here now.  And there's about ready to

10:25:03    12    be damage -- significant damage done to me.

10:25:06    13        I have shown a likelihood of success with regard to

10:25:12    14    Rule 1.2, going over by half a decade, causing prejudice

10:25:21    15    to me, which is not just the stacking, but what's going

10:25:25    16    to happen in terms of cascading effect and what has

10:25:28    17    happened to damage my law practice, my colleagues, and

10:25:30    18    my family, is significant irreparable injury.  But even

10:25:35    19    more important than that, you have *United States v.*

10:25:37    20    *Mills* [sic], which says when there's an abridgement of

10:25:41    21    constitutional rights for even one minute, that is

10:25:43    22    irreparable harm per se, in and of itself.  So I've

10:25:47    23    demonstrated that.

10:25:49    24        Public interest, there's a public interest here

10:25:50    25    because members of this Bar, of which I remain a proud

10:25:55  1    member, notwithstanding my views about disciplinary

10:25:59  2    counsel and the way they have behaved is -- public

10:26:04  3    interest is ripe for Bar members to feel that the rules

10:26:08  4    promulgated by the Court of Appeals have meaning, that

10:26:12  5    they just can't be changed depending on who you are.

10:26:15  6    They have a right to rely on them.

10:26:17  7        There's no harm to the Bar in terms of granting the

10:26:20  8    preliminary injunction allowing this matter to be fully

10:26:23  9    litigated, but there's significant harm to me, not just

10:26:26  10   under *Mills* but actual harm.

10:26:29  11       And they rest on the *Rooker-Feldman* doctrine, which

10:26:33  12   is a very, very limited doctrine and does not preclude

10:26:37  13   an action by a federal court to enjoin a state court if

10:26:42  14   it's violating a federal court order.

10:26:44  15       And here's the bottom line: *Douglass* is a federal

10:26:47  16   court order. *Douglass* comes from the D.C. Circuit. You

10:26:52  17   have a duty to enforce what the D.C. Circuit has said

10:26:57  18   and has ruled. And that duty cannot be shirked. That

10:27:03  19   duty has to be addressed.

10:27:04  20       So that is a very, very important aspect of what's

10:27:08  21   going on. And I would ask -- it's not just me -- yes,

10:27:15  22   I've submitted an affidavit. I want to testify. I want

10:27:18  23   to put forth on the record the facts as to why there's

10:27:22  24   viewpoint discrimination here, but I would also ask for

10:27:24  25   leave to submit an affidavit from Professor Alan

08:40:48  1    Dershowitz, who is a constitutional scholar, as Your

10:27:31  2    Honor knows.  He's not of the same ideological bent as

10:27:33  3    me, but he has a high degree of integrity and honesty,

10:27:37  4    so I would ask to be able to submit that affidavit as

10:27:39  5    well.

10:27:39  6        I had hoped that he could be here today, but he

10:27:42  7    could not for various reasons.  But that's what I'm

10:27:47  8    seeking to do, Your Honor.

10:27:48  9        What happened to me and is happening to me is

10:27:51  10   substantially similar to what happened to others in

10:27:56  11   front of this Court who are not in my ideological and

10:28:00  12   political bent.  Let me give you three examples.  It's

10:28:03  13   in the pleadings.

10:28:05  14       Number one, Kevin Clinesmith.  Kevin Clinesmith,

10:28:09  15   who just happened to be represented cleverly by the

10:28:12  16   former member of the board, Board on Professional

10:28:17  17   Responsibility, was able to not even be sanctioned to

10:28:24  18   any great degree -- time served, seven months.  Having

10:28:27  19   been convicted of a felony, of lying in an affidavit

10:28:31  20   which triggered the Russian collusion investigation in

10:28:34  21   large part, he gets off with a slap of a wrist.

10:28:39  22       No reinstatement provision.  Seven months.  Time

10:28:42  23   served.  He didn't even file an affidavit.  They gave

10:28:45  24   him the right to be -- not to be temporarily suspended.

10:28:49  25   That's a fact.

10:28:50  1      Then we have the situation with Marc Elias.  Marc

10:28:56  2  Elias, who is found by Special Counsel Durham to have

10:29:03  3  participated in a money laundering scheme to money

10:29:08  4  launder to Christopher Steele, which also -- on behalf

10:29:10  5  of Hillary Clinton, and then lying about it.  He lied

10:29:14  6  about it.

10:29:15  7      The D.C. Bar doesn't take that up at all.  It was

10:29:18  8  all over the news.  But that's fine because he's a

10:29:21  9  Democrat and a leftist.  It's okay for them.  They can

10:29:24  10  do whatever they want.  No consequence.

10:29:26  11      Then you have the situation of David Kendall, who

10:29:33  12  admittedly helped Hillary Clinton destroy 33,000 emails

10:29:39  13  on her private server.

10:29:40  14      A lawyer, Ty Clevinger, files a complaint, a public

10:29:45  15  advocate, and that's thrown in the trash, literally.  No

10:29:48  16  action at all.  Kendall happens to represent the

10:29:51  17  Clintons and Democrats and leftist clients.

10:29:55  18      So there is a huge dichotomy here, Your Honor, in

10:29:58  19  the way the law is enforced, and Your Honor has to

10:30:02  20  address it.  And you can't just say, okay, it was in

10:30:05  21  front of another court because Your Honor has a duty to

10:30:09  22  seriously review this matter here.

10:30:13  23      THE COURT:  Okay.  I think I understand your

10:30:14  24  position.  Let me --

10:30:14  25      MR. KLAYMAN:  I would like to take the witness

10:30:16  1    stand.

10:30:16  2            THE COURT:  Let me hear from the defendants.

10:30:22  3            MR. KLAYMAN:  By the way, let me give you

10:30:24  4    this --

10:30:24  5            THE COURT:  First I'll hear from counsel for --

10:30:28  6            MR. KLAYMAN:  They were served, and I'll

10:30:30  7    present that as evidence.

10:30:31  8            THE COURT:  -- counsel for the Court of Appeals

10:30:32  9    who says that --

10:30:34  10           MR. KLAYMAN:  And that was the --

10:30:35  11           THE COURT:  Counsel, I'm talking, please.  I

10:30:37  12   gave you the respect of listening to you.  When I start

10:30:40  13   talking, please.

10:30:41  14       I'll hear from counsel for the Court of Appeals who

10:30:45  15   says that the Court was not appropriately served with

10:30:48  16   process.

10:30:49  17           MS. KRUPKE:  Good morning, Your Honor.

10:30:54  18       Plaintiff Klayman has filed an affidavit of service

10:30:58  19   stating that an A. Jefferson was served on May 15, 2025.

10:31:05  20   It's my understanding that the attempted service in this

10:31:09  21   case was brought to the public office of the D.C. Court

10:31:13  22   of Appeals.

10:31:13  23           THE COURT:  Who is that person?

10:31:16  24           MS. KRUPKE:  A. Jefferson.  I don't actually

10:31:18  25   know this person's first name, but it's my understanding

10:31:20  1   they work in the public office of the District of

10:31:24  2   Columbia Court of Appeals.  And that this person is not

10:31:26  3   authorized to accept service, that the Office of --

10:31:28  4            THE COURT:  Who is authorized to accept service

10:31:30  5   on behalf of the Court?

10:31:32  6            MS. KRUPKE:  The Office of General Counsel at

10:31:33  7   the Court.

10:31:35  8            THE COURT:  And is there something in writing

10:31:37  9   to that effect?

10:31:39  10           MS. KRUPKE:  Not that I have in front of me.

10:31:42  11  I've -- that's my understanding --

10:31:43  12           THE COURT:  How would I know that that's the

10:31:45  13  appropriate -- that that's the person who has to be

10:31:48  14  served?

10:31:49  15           MS. KRUPKE:  I don't have anything to submit,

10:31:51  16  Your Honor, on that regard.

10:31:55  17           THE COURT:  Then I don't know how I can rule in

10:31:57  18  your favor, then.  I mean, if it was given to somebody

10:31:59  19  at the Court and you can't tell me that there's somebody

10:32:02  20  else who it should have been given to because they're

10:32:04  21  the person who appropriately has to be served, I don't

10:32:08  22  see how I conclude that there was an appropriate

10:32:11  23  service.

10:32:11  24           MS. KRUPKE:  Well, here, Your Honor, it's not

10:32:13  25  even an entire time.  As Your Honor has just stated,

10:32:15  1    it's just A. Jefferson, and so I'm at this hour trying

10:32:19  2    to determine who A. Jefferson is and --

10:32:21  3        THE COURT:  I thought you said somebody by that

10:32:24  4    name does work somewhere in the Court of Appeals.

10:32:27  5        MS. KRUPKE:  I have been in contact with the

10:32:29  6    Court of Appeals, and there does appear to be someone

10:32:32  7    who has that initial and last name who works at the

10:32:35  8    Court of Appeals but that that person -- that the actual

10:32:39  9    document was received by the public office rather than

10:32:43  10   the general counsel.

10:32:45  11       THE COURT:  Yeah, but you're not showing me

10:32:47  12   anything that says it has to be the general counsel who

10:32:50  13   has to be served in order for the Court to be

10:32:52  14   appropriately served.

10:32:54  15       MS. KRUPKE:  No, Your Honor, I don't at this

10:32:56  16   time.  When we filed the opposition, this affidavit of

10:32:59  17   service had not been on the record, and so we didn't

10:33:01  18   have the opportunity to explore and -- then it was filed

10:33:03  19   after the close of business on Friday.

10:33:05  20       So this morning we've been trying to explore this

10:33:07  21   affidavit of service, but given that it was just filed

10:33:11  22   on a holiday weekend, we were not able to do so before

10:33:15  23   coming before Your Honor other than to confirm, as best

10:33:19  24   I could, that this person appears to work in the public

10:33:22  25   office.

10:33:23  1          I do also want to note, Your Honor --

10:33:25  2          THE COURT:  There's some discrepancy as to when

10:33:28  3  the Court of Appeals is going to hear Mr. Klayman's

10:33:32  4  case, whether it's the 28th or the 29th.

10:33:35  5      Which day is it?

10:33:37  6          MS. KRUPKE:  I believe it was the 28th, but --

10:33:40  7          THE COURT:  Mr. Klayman, which --

10:33:41  8          MR. KLAYMAN:  The 29th, Your Honor.  Initially,

10:33:43  9  it was the 28th.

        10          THE COURT:  Okay.

10:33:44  11          MR. KLAYMAN:  And they changed it to the 29th.

10:33:46  12          MS. KRUPKE:  I do also want to note, Your

10:33:48  13  Honor, that the Court of Appeals is non sui juris, so at

10:33:51  14  this point even if service was effective, that has been

10:33:54  15  brought against a party that is not able to be served.

10:33:57  16          THE COURT:  So it should have been the City.

10:34:00  17          MS. KRUPKE:  The District of Columbia --

10:34:01  18          THE COURT:  Right.

10:34:04  19          MS. KRUPKE:  -- should not be substituted here.

10:34:07  20  That is our position.  But that would be the

10:34:08  21  appropriate -- at least an appropriate party to sue.

10:34:11  22      The District of Columbia Court of Appeals just

10:34:14  23  cannot be sued in its individual capacity as a

10:34:17  24  corporation.

10:34:19  25          THE COURT:  But if the Court of Appeals

10:34:21  1    theoretically was found liable for damages, for example,

10:34:25  2    would it be the city that would pay those damages?

10:34:28  3         MS. KRUPKE:  So the Court of Appeals typically

10:34:32  4    would be dismissed as a party if there was proper

10:34:35  5    service.  And the District of Columbia is an appropriate

10:34:39  6    entity to sue here, but in order to do that, to make out

10:34:43  7    a Section 1983 violation, the plaintiff would have to

10:34:46  8    make a Monell claim for liability because, of course,

10:34:49  9    the District of Columbia cannot just generally be sued

10:34:53  10   for its actions.

10:34:57  11        THE COURT:  Okay.

10:34:58  12        MR. KLAYMAN:  May I address that briefly, Your

10:35:00  13   Honor?

10:35:00  14        THE COURT:  One moment.  Let me -- is that your

10:35:02  15   argument?  You're finished, on the issue of service?

10:35:05  16        MS. KRUPKE:  On the issue of service, yes.

10:35:08  17        THE COURT:  Yes.

10:35:09  18        MR. KLAYMAN:  If I may.  I made several

10:35:14  19   attempts prior to that to get the Court to accept

10:35:17  20   service of process.  In any event -- and I'm going to

10:35:23  21   ask that this be admitted as Exhibit 1.

10:35:26  22      May I approach the bench and give it to you, or

10:35:29  23   give it to your assistant?

          24      (Document tendered)

10:35:39  25        MR. KLAYMAN:  Attached is an affidavit of

10:35:40  1    service and emails showing attempted service amicably by

10:35:44  2    accepting service, which the Court wouldn't do -- or

10:35:47  3    couldn't do, or whatever their excuse was at the time.

10:35:50  4        And it's hard to understand that a Court would not

10:35:52  5    accept responsibility to accept service of process.  But

10:35:56  6    in any event, Michael Weaver, the private process

10:36:02  7    server, his affidavit, states that:

10:36:04  8        "Being duly sworn, deposed, and say that I have

10:36:06  9    been duly authorized to make service of the summons,

10:36:09  10   notice, consent, and reference of the civil action to a

10:36:12  11   magistrate judge, notice of right to consent to trial

10:36:15  12   before a United States magistrate judge.  And also

10:36:18  13   importantly, plaintiff's motion for preliminary

10:36:21  14   injunction and exhibits and complaint and exhibits in

10:36:23  15   the above-entitled case, that I am over 18 years of age,

10:36:27  16   and not a party or otherwise interested in this action;

10:36:30  17       "That on May 15th, 2025 -- that's a week ago -- I

10:36:35  18   served District of Columbia Court of Appeals at 430 E

10:36:39  19   Street Northwest, Washington, D.C., with a summons,

10:36:41  20   notice, consent in reference of a civil action to a

10:36:45  21   magistrate judge, notice of right to consent to trial

10:36:48  22   before a United States magistrate judge, and

10:36:51  23   importantly, plaintiff's motion for preliminary

10:36:53  24   injunction with exhibits and complaint by serving A.

10:36:57  25   Jefferson, Clerk -- Clerk -- authorized to accept

10:37:00  1    service" --

10:37:01  2            THE COURT:  Counsel for the government wasn't

10:37:03  3    able to tell me what authority says who has to be served

10:37:08  4    in order for the Court of Appeals to be appropriately

10:37:12  5    served.

10:37:12  6        Do you know something in the law that says where

10:37:16  7    service has to be effected in order to appropriately --

10:37:19  8            MR. KLAYMAN:  Not with regard to the Court, no.

10:37:21  9    And, again, this says that the Clerk of the Court -- she

10:37:26  10   obviously had to get permission to accept service -- was

10:37:29  11   authorized to accept service; the Clerk of the Court.

10:37:29  12       That can't -- you can't get better than that.

10:37:31  13           THE COURT:  Was the Clerk served?

10:37:33  14           MR. KLAYMAN:  Yes, that's what it says.

10:37:35  15       "A. Jefferson, Clerk, authorized to accept

10:37:40  16   service."

10:37:40  17       You can't get more direct than that, Your Honor.

10:37:46  18       Right at the bottom.  And then he describes the

10:37:50  19   physical appearance of Ms. Jefferson, "signed under

10:37:55  20   penalty of perjury."

10:38:15  21           THE COURT:  I'm sorry, but I'm missing where

10:38:18  22   you're saying somebody in the Clerk's Office was served.

10:38:21  23           MR. KLAYMAN:  Yeah, look at the fourth -- where

10:38:23  24   it says Michael Weaver up top:  "I, Michael Weaver,"

10:38:27  25   second paragraph.  Third paragraph, "I'm over the age of

10:38:30  1    18."  And, Your Honor, please read the third paragraph

10:38:32  2    there, that "on May 15th, 2025."

10:38:40  3            THE COURT:  Michael Weaver is the process

10:38:43  4    server.

10:38:45  5            MR. KLAYMAN:  Correct.

10:38:45  6            THE COURT:  I'm asking about who in the Clerk's

10:38:49  7    Office, if you're saying it was somebody in the Clerk's

         8    Office --

         9            MR. KLAYMAN:  Yes.

10:38:51  10           THE COURT:  -- was served.

10:38:52  11           MR. KLAYMAN:  Yes, in the third paragraph.

10:38:53  12      The Clerk -- "A. Jefferson, Clerk, was authorized

10:38:56  13   to accept service."  That says that in the next

10:38:59  14   paragraph.  I'll read it again.

10:39:00  15      "That on May 15th, 2025, at 2:59 p.m., I served the

10:39:06  16   District of Columbia Court of Appeals at 430 E Street

10:39:10  17   Northwest, Washington, D.C., 20001, with a summons,

10:39:14  18   notice, consent in reference of the civil action to --

10:39:17  19           THE COURT:  How do I know that this A.

10:39:19  20   Jefferson was in fact authorized to accept service on

10:39:23  21   behalf of the Court?

10:39:25  22           MR. KLAYMAN:  Because she told the process

10:39:27  23   server to that effect, and he's saying he went to the

10:39:30  24   Court and he served it upon her, and she told him that

10:39:33  25   she was authorized to accept service.

```
10:39:36   1              THE COURT:  Where does it say that?
10:39:38   2              MR. KLAYMAN:  At the bottom.
10:39:41   3         It says served with all these things, including the
10:39:44   4    preliminary injunction motion by serving -- last line of
10:39:47   5    that paragraph -- "A. Jefferson, Clerk, authorized to
10:39:50   6    accept service."
10:39:57   7              THE COURT:  How do I know that she was
10:39:58   8    authorized to accept service?
10:40:01   9              MR. KLAYMAN:  Because she told the process
10:40:03  10    server that.
10:40:03  11              THE COURT:  This doesn't say that.
10:40:05  12              MR. KLAYMAN:  Yes, it does.
10:40:10  13              THE COURT:  It says -- it doesn't say that she
10:40:14  14    was authorized to accept.
10:40:15  15              MR. KLAYMAN:  Your Honor, we can play semantics
10:40:17  16    here but the fact is --
10:40:19  17              THE COURT:  I'm not trying to play semantics,
10:40:21  18    sir.  I'm just saying there's nothing here that says
10:40:24  19    that she said that she was authorized to accept service
10:40:27  20    on behalf of the Court.  That doesn't say that here.
10:40:30  21              MR. KLAYMAN:  What it says is -- well, process
10:40:32  22    servers in the ordinary course ask if you're able to
10:40:36  23    accept service.  He went there --
10:40:37  24              THE COURT:  That doesn't say that.
10:40:38  25              MR. KLAYMAN:  And he didn't --
```

10:40:40  1          THE COURT:  That does not say that here.

10:40:42  2     You're asking me to read something into the document

10:40:45  3     that's not here.

10:40:46  4          MR. KLAYMAN:  Well, two reasons why, Your

10:40:48  5     Honor.  With or without acceptance of service, the Court

10:40:50  6     was served.  And that's clear right here, that he went

10:40:52  7     to the courthouse and went to the Clerk's Office --

10:40:54  8          THE COURT:  He just can't serve anybody.  You

10:40:55  9     couldn't go there, for example, and serve a janitor and

10:40:58  10    say that the Court was appropriately served.

10:41:00  11         I have no idea who this person --

10:41:02  12         MR. KLAYMAN:  One way or the other, whether

10:41:04  13    authorization or not -- and I would disagree with you on

10:41:06  14    that -- the Clerk was served.  There's the name of the

10:41:08  15    person, she was given the complaint, and importantly,

10:41:10  16    she was given the preliminary injunction motion.  The

10:41:12  17    Clerk was given the preliminary injunction motion

10:41:15  18    because -- and they had notice of it.  And that's all

10:41:19  19    that's required at this stage is notice, to be here and

10:41:22  20    to argue.

10:41:23  21         But let me also point out in terms of the relief.

10:41:25  22    The relief is requesting you, in addition to enjoining

10:41:29  23    the Court, which you have the authority to do, by the

10:41:31  24    way, if you look at the *Douglass* case --

10:41:34  25         THE COURT:  That's -- you're going off on a --

```
10:41:36   1    I've already heard this.  I'm only asking about --
10:41:38   2         MR. KLAYMAN:  We're asking you for --
10:41:39   3         THE COURT:  I'm only asking about whether the
10:41:41   4    Court was appropriately served.  That has nothing to do
10:41:44   5    with service.
10:41:46   6         MR. KLAYMAN:  If I may just add one thing, is
10:41:48   7    that we're asking you to vacate the report and
10:41:50   8    recommendation of the Board and also of the Ad Hoc
10:41:53   9    Hearing Committee because it's unconstitutional.
10:41:56  10         THE COURT:  Counsel, I've heard that.  You can
10:41:57  11    be seated.
10:41:58  12         MR. KLAYMAN:  I wanted to get it on the record,
10:42:00  13    Your Honor.  You know, we can --
10:42:01  14         THE COURT:  I don't know who this person is.
10:42:03  15    The government doesn't seem to know who this person is.
10:42:05  16    So I don't know how I can make a determination that
10:42:08  17    there was appropriate service.
10:42:09  18      The government can't even tell me who can accept
10:42:15  19    service.
10:42:16  20         MR. KLAYMAN:  What I would suggest, Your Honor,
10:42:18  21    as a matter of due process and equity, is that we allow
10:42:21  22    the matter to proceed with the Court right now and Your
10:42:23  23    Honor can order that this issue be clarified to your --
10:42:27  24         THE COURT:  Well, we've got some time.  I
10:42:31  25    mean -- so we could do this later today, but I think I
```

10:42:34  1    need to know, because I don't have anything before me.

10:42:37  2    I don't know who has to be appropriately served in order

10:42:41  3    for there to be appropriate service.  And clearly, there

10:42:43  4    has to be someone authorized to receive service who

10:42:45  5    received it in order for me to have jurisdiction.

10:42:48  6        So --

10:42:49  7            MR. KLAYMAN:  We made an attempt before that to

10:42:51  8    do that and they just bobbed and weaved and wouldn't

10:42:55  9    accept earlier --

10:42:56  10           THE COURT:  I understand.

10:42:57  11           MR. KLAYMAN:  -- so I had to send the process

10:42:59  12   server.

10:42:59  13           THE COURT:  I understand, but I'm going to be

10:43:01  14   instructing counsel to find out who it is who has to be

10:43:03  15   appropriately served.  I don't know.

10:43:07  16           MR. KLAYMAN:  I think you have to instruct them

10:43:09  17   as well as to whether Ms. Jefferson told the process

10:43:14  18   server that she was authorized to accept.

10:43:16  19           THE COURT:  Well, merely because she says that

10:43:17  20   doesn't make it so.

10:43:19  21           MR. KLAYMAN:  She's not going to do that

10:43:20  22   without getting authorization.  She's the Clerk.

10:43:23  23           THE COURT:  I don't know if that's -- I don't

10:43:24  24   know if she's the Clerk or not.

10:43:26  25       Is she the Clerk?

10:43:28    1          MR. KLAYMAN:  That's what it says.

10:43:29    2          THE COURT:  Well, the government -- I mean,

10:43:30    3    counsel for the -- did you check and see whether this A.

10:43:33    4    Jefferson is the Clerk for the Court of Appeals?

10:43:36    5          MS. KRUPKE:  Your Honor, I --

10:43:39    6          THE COURT:  Come up.  You have to talk from the

10:43:42    7    podium.

10:43:43    8          MS. KRUPKE:  Your Honor, I've made inquiries,

10:43:46    9    and I apologize.  That's why I've been checking my phone

10:43:49   10    so much to see if I've received a response yet as to who

10:43:53   11    A. Jefferson is and if that person would have been

10:43:55   12    authorized to accept service, notwithstanding my prior

10:43:58   13    understanding that the Office of General Counsel is the

10:43:59   14    appropriate entity to serve in order to have service

10:44:02   15    effectuated on the Court of Appeals.

10:44:04   16       And so I --

10:44:05   17          THE COURT:  Is there a general counsel?  Again,

10:44:07   18    I don't know what the structure is for the Court of

10:44:11   19    Appeals.

10:44:11   20          MS. KRUPKE:  Yes --

10:44:11   21          THE COURT:  But there's a general counsel who

10:44:14   22    is a part of the Court of Appeals?

10:44:16   23          MS. KRUPKE:  Yes, there's an Office of General

10:44:18   24    Counsel at the Court that is authorized to accept

10:44:20   25    service.

10:44:20  1       So I have made inquiries, specifically as to A.

10:44:23  2   Jefferson, and I've only been told by one person that

10:44:27  3   that person is not authorized to accept service, but

10:44:29  4   they were going to make additional inquiries to make

10:44:32  5   sure that we weren't making misrepresentations to the

10:44:34  6   Court.

10:44:34  7       I do also just want to point out, though, that

10:44:37  8   under Rule 4(m) of -- I'm sorry, 4(j) of how service is

10:44:41  9   to be effectuated on a state or local government, that

10:44:45  10  the two provisions that it has are 4(j)(A) delivering to

10:44:49  11  the chief executive, which obviously this affidavit of

10:44:53  12  service does not allege that has been done, or 4(j)(B),

10:44:57  13  serving in a manner consistent with the state's local

10:44:59  14  law.

10:45:00  15     Now, under the Superior Court Rules of Procedure of

10:45:02  16  how service would be effectuated on an entity within the

10:45:07  17  District of Columbia government, the entity would need

10:45:10  18  to be served and the Office of the Attorney General

10:45:12  19  would need to be served.  There's been no representation

10:45:14  20  that that service has been made.

10:45:16  21     And so under this kind of amalgamation of the two

10:45:22  22  Rules of Civil Procedure, service would not be proper

10:45:25  23  even if the Clerk was authorized to accept service.

10:45:33  24       THE COURT:  What provision of the D.C. rules

10:45:35  25  are you referencing -- or the rules?

| | | |
|---|---|---|
| 10:45:38 | 1 | MS. KRUPKE:  I believe it's also 4(j). |
| | 2 | THE COURT:  Of the local -- |
| 10:45:42 | 3 | MS. KRUPKE:  Of the Superior Court Rules of |
| | 4 | Civil Procedure. |
| 10:45:46 | 5 | THE COURT:  Okay.  We'll look at that. |
| 10:45:46 | 6 | MR. KLAYMAN:  May I add one thing, Your Honor? |
| 10:45:48 | 7 | THE COURT:  Yes. |
| 10:45:52 | 8 | MR. KLAYMAN:  Your Honor, I've listened to that |
| 10:45:52 | 9 | argument, and I would submit that does not apply to the |
| 10:45:54 | 10 | Court.  The Court is an independent entity, is that |
| 10:45:56 | 11 | they've had notice of this for a long time.  And we |
| 10:45:59 | 12 | attempted service before; they wouldn't accept.  They |
| 10:46:03 | 13 | were served with a preliminary injunction motion.  They |
| 10:46:06 | 14 | had a duty to come forward with their argument.  They |
| 10:46:09 | 15 | can make their argument today.  Nobody is preventing |
| 10:46:11 | 16 | them from doing it. |
| 10:46:12 | 17 | THE COURT:  Well, do you have authority that |
| 10:46:14 | 18 | supports what you said, that it's a separate entity and |
| 10:46:18 | 19 | therefore all you need do is serve somebody at the |
| 10:46:22 | 20 | Court? |
| 10:46:24 | 21 | MR. KLAYMAN:  I'm making the argument that what |
| 10:46:25 | 22 | she cited was dealing mostly with cases against the |
| 10:46:28 | 23 | government itself, not the Court.  And I'm making an |
| 10:46:31 | 24 | argument that they had notice -- they had notice of |
| 10:46:33 | 25 | this.  So they can certainly defend -- you know, they're |

10:46:35  1    a public agency that owes a duty to everybody in the

10:46:38  2    District of Columbia and elsewhere.  And the fact that

10:46:41  3    they would make an issue even with service of process

10:46:46  4    frankly underscores my point --

10:46:48  5         THE COURT:  I don't -- Counsel, come on.  I

10:46:50  6    don't buy that.  I mean, the rules are the rules.  And

10:46:51  7    you can't say that just because of the circumstances of

10:46:54  8    a particular case that you can abdicate the rules and do

10:46:57  9    whatever you want.  I mean, if service has to be

10:47:00  10   effected in a certain way, it has to be done in the

10:47:02  11   context of this case just like any other case.

10:47:04  12        So we'll check the rules and we'll get back on that

10:47:08  13   in a minute.

10:47:09  14        Other counsel?

10:47:20  15        MR. MACHADO:  Good morning, Your Honor.  Again,

10:47:21  16   Les Machado on behalf of the Board defendants.

10:47:24  17        I'm just going to be very brief because I think

10:47:26  18   this has been fully fleshed out in the papers.

10:47:29  19        Your Honor has picked up on exactly the right issue

10:47:33  20   from the *Rooker-Feldman* doctrine.  Mr. Klayman went to

10:47:36  21   the Superior Court and he asked that Superior Court for

10:47:38  22   the exact relief that he's seeking from this Court.

10:47:40  23        He said to that court, the Board issued -- the

10:47:42  24   Board Hearing Committee issued the report and

10:47:45  25   recommendation beyond the time frames required by the

10:47:47  1    rules and therefore you need to sort of set it aside.

10:47:50  2         THE COURT:  But he says the issue he wants to

10:47:51  3    raise here is a constitutional issue based upon the

10:47:54  4    First Amendment.  He did not raise it over there, but

10:47:58  5    he's saying he should have a right to raise it here even

10:48:01  6    though he clearly could have raised it there because

10:48:04  7    case authority clearly says that a constitutional issue

10:48:07  8    can be raised both in state court and in the federal

10:48:11  9    court.

10:48:12  10        MR. MACHADO:  I understand his argument, Your

10:48:14  11   Honor, but you're exactly right, which is that is an

10:48:16  12   argument that could have been raised in the federal

10:48:18  13   court and should have been raised in the federal court.

10:48:21  14        THE COURT:  You mean in the --

10:48:23  15        MR. MACHADO:  Excuse me, in the state court.  I

          16   apologize.

10:48:26  17        And in fact, the *Rooker-Feldman* doctrine speaks

10:48:29  18   exactly to this topic.  It says, essentially -- and let

10:48:32  19   me find the right citation here, Your Honor -- "it

10:48:36  20   precludes a party in state court from seeking what is in

10:48:39  21   substance an appellate review of the state court

10:48:42  22   judgment in a United States District Court based on the

10:48:45  23   losing party's claim that the state judgment itself

10:48:48  24   violates the loser's federal rights.

10:48:51  25        That's *Johnson v. De Grande*, Supreme Court case

10:48:56   1    from 1994 that we cited in our motion to dismiss.

10:48:58   2         It prevents courts from hearing suits, quote,

10:49:00   3    "brought by state court losers complaining of injuries

10:49:05   4    caused by state court judgments rendered before the

10:49:06   5    District Court proceedings commenced and inviting the

10:49:09   6    District Court review and rejection of those

10:49:11   7    judgments."  That's the *Exxon Mobile* case from 2005,

10:49:14   8    Supreme Court.

10:49:14   9         It's exactly what's going on here.  He went to the

10:49:18   10   Superior Court, he said set aside the Board's Hearing

10:49:21   11   Committee because it was issued beyond these time

10:49:23   12   frames.  He lost that.  He appealed that.  He lost

10:49:26   13   again.  And in the interim, he came to this court

10:49:29   14   repackaging it as a violation of my federal rights.

10:49:32   15        You can't do that.  It would mean every plaintiff

10:49:35   16   who lost in state court could come to federal court and

10:49:38   17   say, "My First Amendment rights are being violated," and

10:49:41   18   "My Fifth Amendment rights are being violated," and you

10:49:43   19   get another bite of the apple.

10:49:45   20        And so whether you look at it as claim spinning,

10:49:47   21   which is I think what Your Honor was alluding to, which

10:49:49   22   is, you know, I'm going to bring some arguments there

10:49:51   23   and preserve other arguments for federal court --

10:49:53   24   whether you look at it as a second bite of the apple,

10:49:56   25   the fact at the end of the day is that the

10:49:59  1    *Rooker-Feldman* doctrine prevents him from doing exactly

10:50:02  2    what he wants to do here.  And try as he might to say,

10:50:05  3    well, this is really about my federal constitutional

10:50:07  4    rights, we're here today because he's seeking the

10:50:10  5    identical relief he sought in the state court.

10:50:13  6        He said to the state court, "Stop the disciplinary

10:50:17  7    proceeding from -- the *Bundy* disciplinary proceeding

10:50:21  8    from going on because the Hearing Committee report and

10:50:23  9    recommendation was issued beyond the 120 days.  It is

10:50:27 10    exactly the same relief he is seeking from you.  And try

10:50:30 11    as he might to dance around the topic, *Rooker-Feldman*

10:50:33 12    bars that.

10:50:34 13        Setting that --

10:50:34 14            THE COURT:  As I understand, that issue did go

10:50:37 15    up to the Court of Appeals?

10:50:38 16            MR. MACHADO:  It did, Your Honor.  It was

10:50:40 17    appealed to the D.C. Court of Appeals.  And then last

10:50:42 18    month they issued an order affirming the dismissal of

10:50:44 19    the Superior Court decision.  But, notably, for purpose

10:50:47 20    of what we're doing today, acknowledging that

10:50:50 21    Mr. Klayman has raised issues about that 12(b)(2) rule.

10:50:55 22        Is it mandatory?  Is it discretionary?  What

10:50:58 23    happens if it's violated?

10:50:59 24        And they essentially said, "We're going to take

10:51:01 25    these up when we -- when we take up the Bundy

10:51:07  1   disciplinary matter."  They acknowledged he had brought

10:51:09  2   up these arguments.  They acknowledged that those

10:51:10  3   arguments had been fully fleshed out in the briefing at

10:51:13  4   that disciplinary matter.

10:51:14  5       He's regurgitated all of those arguments in his

10:51:18  6   briefing to the D.C. Court of Appeals, and they

10:51:19  7   essentially said, this is all going to be a part of the

10:51:21  8   argument that's going to happen on the 29th.

10:51:23  9       And so for him to come to this Court and say,

10:51:26  10  without any factual support, "Well, the D.C. Court of

10:51:29  11  Appeals has prejudged the outcome," it just -- he has

10:51:35  12  not come close to satisfying the standard for a

10:51:37  13  preliminary injunction.

10:51:37  14          THE COURT:  What did -- the Court of Appeals,

10:51:42  15  you're saying, said that they were going to consider the

10:51:44  16  rule and whether that was violated by the delay in a

10:51:47  17  proceeding with his disciplinary matter, but I assume

10:51:51  18  they didn't because it wasn't raised, say that they were

10:51:53  19  going to take up the constitutional issue.

10:51:56  20          MR. MACHADO:  I don't -- I don't -- they

10:52:00  21  certainly did not say that in the opinion affirming the

10:52:03  22  Superior Court's denial.  So I don't know how broad that

10:52:08  23  consideration of that issue is going to be.  What I know

10:52:10  24  is what the -- what I know is what the D.C. Court of

10:52:16  25  Appeals' opinion said, and -- what the D.C. Court of

10:52:24  1    Appeals' opinion said.

10:52:27  2            THE COURT:  Okay.  Anything else?  I'm going to

10:52:30  3    go look at this rule that was referenced.

10:52:32  4            MR. MACHADO:  Yeah, I understand, Your Honor,

10:52:33  5    that, you know, there's obviously four factors.  We

10:52:35  6    know -- there's a likelihood of success.  We don't think

10:52:38  7    he can satisfy that.  There's the irreparable harm.  We

10:52:40  8    don't think they can satisfy that.

10:52:41  9        Again, just briefly on that, Mr. Klayman is

10:52:43  10   essentially saying without any factual support, the D.C.

10:52:48  11   Court of Appeals has prejudged his arguments.  They've

10:52:51  12   not.  There's no evidence of that.

10:52:52  13       He said, Well, it's going to cause me time and

10:52:57  14   energy and money to have to deal with this discipline in

10:53:00  15   other jurisdictions.  In our opposition to his motion

10:53:03  16   for a PI we, of course, cited cases saying that's not

10:53:07  17   enough to show irreparable harm.

10:53:08  18       And then finally, those final two factors, Your

10:53:10  19   Honor:  The balancing of the equities and the public

10:53:13  20   interest.  There's nothing that would suggest that this

10:53:15  21   Court stopping a state court -- as Your Honor said, a

10:53:19  22   state court that is responsible for overseeing

10:53:24  23   discipline of attorneys in the jurisdiction, for this

10:53:26  24   Court to sort of say to that state court, "You should

10:53:29  25   stop what you're doing."  Again, we don't think the

10:53:31  1    public interest supports that dramatic and extraordinary

10:53:33  2    remedy.

10:53:36  3              THE COURT:  Okay.

10:53:37  4              MR. KLAYMAN:  Your Honor, in all due respect,

10:53:43  5    that was a shell game argument.  What I mean by that is

10:53:47  6    that the only issue in front of the D.C. Superior Court

10:53:51  7    and the Court of Appeals was whether 12.2 was violated.

10:53:56  8              THE COURT:  Yeah, but you did have the

10:53:59  9    opportunity to raise the constitutional challenge that

10:54:02  10   you're making here in that court, right?

10:54:05  11        You could have raised that.

10:54:07  12             MR. KLAYMAN:  I have -- yes, I could have, but

10:54:09  13   I have also the option to exercise my rights in front of

10:54:13  14   this Court.

10:54:13  15             THE COURT:  I don't agree with that.  I don't

10:54:15  16   think a litigant can go to state court, raise issues

10:54:19  17   before the state court, omit some issues, lose, and then

10:54:22  18   come to federal court and raise issues that they could

10:54:25  19   have raised in the state court before the federal --

10:54:28  20             MR. KLAYMAN:  I respectfully disagree with

10:54:30  21   that, Your Honor.

10:54:30  22             THE COURT:  What authority --

10:54:31  23             MR. KLAYMAN:  Let me --

10:54:32  24             THE COURT:  Hold -- Mr. Klayman, please, I'm

10:54:35  25   trying to be understanding that you're upset about this.

10:54:38  1    But when I talk, you have to -- I let you talk.  When I

10:54:41  2    talk, you have to be quiet, okay?

10:54:43  3         Can we agree on that?

10:54:44  4              MR. KLAYMAN:  Yes.

10:54:45  5              THE COURT:  Okay.  What authority says that you

10:54:48  6    can piecemeal your litigation by pursuing only some

10:54:51  7    claims in the state court, which you could have raised

10:54:54  8    but didn't, and then when you lose, come to federal

10:54:57  9    court and raise those issues that you didn't raise in

10:55:00  10   state court that you could have?

10:55:02  11             MR. KLAYMAN:  Number one, the D.C. Court of

10:55:04  12   Appeals is conflicted, okay?  It's making rulings that

10:55:07  13   would pertain against itself.  It refused to do that,

10:55:12  14   refused to even stay.  So there's a huge conflict of

10:55:14  15   interest there.

10:55:15  16        They have taken the position consistently that it

10:55:18  17   doesn't matter what they promulgated as a rule, that the

10:55:21  18   Board can do whatever it wants.  As long as the litigant

10:55:24  19   is someone like Larry Klayman, we'll let it proceed.

10:55:28  20        In our briefs we set forth with particularity how

10:55:32  21   that was under a prior rule of the Board, okay?  The new

10:55:35  22   rule of the Court gave it 120 days.  "Shall," not "may."

10:55:40  23   That's not discretionary.

10:55:41  24        We set forth a number of cases --

10:55:43  25             THE COURT:  But isn't your remedy -- if you're

10:55:45  1    saying that the Court -- that the Superior Court and the

10:55:47  2    Court of Appeals both got it wrong, isn't it your remedy

10:55:50  3    to go to the Supreme Court?

10:55:52  4          MR. KLAYMAN:  You know how hard it is to go up

10:55:54  5    to the Supreme Court, Your Honor?

10:55:55  6          THE COURT:  Yeah, but I mean -- again, I don't

10:55:57  7    know of any authority that says because it's difficult

10:55:59  8    to get before the Supreme Court that you can circumvent

10:56:02  9    that and therefore bring it to a lower federal court.

10:56:06  10         MR. KLAYMAN:  That's our right, Your Honor.

10:56:07  11   But let me read to you why the *Rooker-Feldman* doctrine

10:56:10  12   does not apply, and it's a short but succinct portion of

10:56:14  13   our brief on the preliminary injunction.

10:56:17  14         Defendant's attempt to argue that the District of

10:56:20  15   Columbia Superior Court dismissal of the Bundy

10:56:23  16   litigation bars Mr. Klayman from seeking relief for a

10:56:27  17   violation of his First Amendment rights under the

10:56:29  18   *Rooker-Feldman* doctrine.  This argument has no merit.

10:56:33  19         Quote, "the Supreme Court has explained that the

10:56:35  20   purpose of the *Rooker-Feldman* doctrine is to effectuate

10:56:39  21   28 U.S.C. Section 1257," which, quote, "vests authority

10:56:45  22   to review a state court's judgment solely in the Supreme

10:56:49  23   Court," unquote.

10:56:50  24         *D.C. Healthcare Systems v. District of Columbia*,

10:56:54  25   441, U.S. Appeals, D.C., 126, 131, 2019.  Quote, "the

10:57:03  1    Supreme Court has repeatedly described the

10:57:05  2    *Rooker-Feldman* doctrine as a narrow one," unquote.

10:57:09  3        Quote, "Indeed the Court has found it applicable

10:57:12  4    only twice," unquote.

10:57:14  5        Importantly, quote, "if," unquote, the federal

10:57:18  6    plaintiff presents an independent claim, it is not an

10:57:22  7    impediment to exercise -- to the exercise of federal

10:57:25  8    jurisdiction that the same or related question was

10:57:28  9    earlier aired between the parties in the state court; id

10:57:33  10   at 132.  There you go.

10:57:35  11       The *Bundy* litigation was a state court action that

10:57:38  12   solely sought injunctive relief and declaratory relief

10:57:42  13   that the Board must enforce under Rule 12.2.

10:57:46  14       The instant matter brings claims under 42 U.S.C.

10:57:49  15   1920 -- 1983 -- I'll repeat that -- 42 U.S.C. 1983, for

10:57:55  16   violation of Mr. Klayman's First and Fifth Amendment

10:57:58  17   rights and seeks damages from the defendants in that

10:58:01  18   regard, in addition to seeking injunctive and equitable

10:58:04  19   relief.  These claims could not be more different, and

10:58:08  20   this instant matter clearly presents the Court with an

10:58:11  21   independent claim, quote-unquote, "that falls outside of

10:58:15  22   the *Bundy* litigation," citing *D.C. Healthcare Systems*

10:58:19  23   441 U.S. Appeals D.C., at 131.

10:58:24  24       "Thus, particularly given the extremely narrow

10:58:27  25   application of the *Rooker-Feldman* doctrine, id, it is

10:58:32  1    clear that the *Rooker-Feldman* doctrine does not preclude

10:58:35  2    this instant action."

10:58:37  3         THE COURT:  I have an 11:00 motions hearing I

10:58:41  4    have to hear, so I'm going to have to take a recess in

10:58:44  5    this case.  We'll look at the rule that was referenced

10:58:46  6    regarding service of process, and I'll get back with

10:58:49  7    this matter as soon as I can deal with this other

10:58:53  8    matter.

10:58:53  9         And counsel for the Court needs to try and find out

10:58:58  10   who this person is and find out some authority as to

10:59:02  11   what it says about who has to be served in order for the

10:59:06  12   Court to be appropriately served with process.

10:59:09  13        MR. KLAYMAN:  Is there some time frame, Your

10:59:12  14   Honor, that you think you'll need for this other motion?

10:59:14  15        THE COURT:  I have no idea.  It shouldn't take

10:59:17  16   too long, but we'll get back to this as soon as we can.

10:59:22  17        I'll give the court reporter a five-minute recess.

10:59:27  18        (Court in recess from 10:59 a.m. to 11:20 a.m.)

11:20:01  19        THE COURT:  We can recall the case.

11:20:03  20        DEPUTY COURTROOM CLERK:  Yes, Your Honor.

11:20:05  21        Recalling civil action 24-2997, *Larry Elliot*

11:20:11  22   *Klayman v. District of Columbia Court of Appeals,* et

11:20:15  23   *al.*  All parties are present.

11:20:17  24        THE COURT:  Okay.  We have looked at the

11:20:20  25   Superior Court rule regarding service of process on a

11:20:25  1    component of the City, and the rule seemingly

11:20:30  2    provides -- or requires that the chief executive officer

11:20:33  3    of the component itself has to be served.  And I would

11:20:40  4    conclude that that would be the Clerk of the Court, who

11:20:45  5    I assume would be the chief executive officer of the

11:20:48  6    Court of Appeals for D.C.

11:20:49  7        And it also does require, as counsel indicated,

11:20:54  8    that the Attorney General Office also be served since,

11:21:01  9    if there was some type of financial liability that would

11:21:06  10   lie, obviously it would be the City since the Court of

11:21:09  11   Appeals for D.C. is a part of the City, would be the

11:21:11  12   entity that would be responsible.

11:21:14  13       So besides the fact that -- I think it's

11:21:17  14   questionable as to whether the Court of Appeals itself

11:21:19  15   can be sued as compared to the City being sued.  As far

11:21:23  16   as service of process is concerned on the Court of

11:21:25  17   Appeals, I would have to conclude that the rule does

11:21:27  18   require that there be dual service both on the chief

11:21:30  19   executive officer of the Court but also on the Attorney

11:21:35  20   General's Office.  And there's no indication that there

11:21:38  21   was service on the Attorney General's Office, so I would

11:21:39  22   have to conclude that at this -- at least at this point,

11:21:43  23   without proper service, I don't have jurisdiction over

11:21:46  24   the Court of Appeals.

11:21:49  25       Anything?

| | | |
|---|---|---|
| 11:21:55 | 1 | MR. KLAYMAN:  Assuming that that applies, Your |
| 11:21:58 | 2 | Honor, we would ask that the matter proceed in any |
| 11:22:00 | 3 | event.  They adopted the arguments of the court -- of |
| 11:22:03 | 4 | the Board, so the same arguments -- |
| 11:22:04 | 5 | THE COURT:  How can I proceed if there hasn't |
| 11:22:06 | 6 | been appropriate service?  If there hasn't been |
| 11:22:08 | 7 | appropriate service, I don't have jurisdiction. |
| 11:22:11 | 8 | MR. KLAYMAN:  Well, you certainly can proceed |
| 11:22:12 | 9 | with the Board, okay?  They were served and they |
| 11:22:14 | 10 | accepted service. |
| 11:22:15 | 11 | THE COURT:  What good would that do?  Because |
| 11:22:19 | 12 | the Board can't tell the Court of Appeals not to act. |
| 11:22:25 | 13 | And now the case is before the Court of Appeals, so the |
| 11:22:27 | 14 | Court of Appeals will either go forward or not go |
| 11:22:29 | 15 | forward.  And if the Board is restrained, that would |
| 11:22:34 | 16 | have no impact on whether the Court of Appeals -- |
| 11:22:37 | 17 | MR. KLAYMAN:  The relief I requested, Your |
| 11:22:39 | 18 | Honor, was that Your Honor order that for purposes of |
| 11:22:45 | 19 | preliminary injunction that the Board's report is void |
| 11:22:51 | 20 | ab initio and cannot be enforced by the Court.  The |
| 11:22:54 | 21 | Board is a defendant here, and they have been served. |
| 11:22:58 | 22 | We can go forward at least to that extent with regard to |
| 11:23:01 | 23 | the equitable relief. |
| 11:23:02 | 24 | The other relief with regard to damages -- we're |
| 11:23:04 | 25 | not having a trial here today on damages.  We're having |

11:23:08   1    a hearing with regard to equitable relief and an

11:23:11   2    injunctive relief and a declaratory ruling, and

11:23:15   3    therefore, you can make a ruling that the Board's ruling

11:23:18   4    here -- the Board's report and recommendation is of no

11:23:21   5    force and effect because of viewpoint discrimination.

11:23:25   6        So I would respectfully request that I be able to

11:23:29   7    testify here today and put evidence on the record to

11:23:31   8    that effect because this issue will go up to the D.C.

11:23:35   9    Circuit right away.

11:23:36  10        THE COURT:  Well, I'm prepared to rule.  And as

11:23:41  11    I was indicating when we were here previously, before we

11:23:44  12    took the recess, I just don't see how a litigant can

11:23:51  13    pursue a matter before the equivalent of a state court,

11:23:55  14    raise some issues before the state court, lose before

11:24:00  15    that court, could have raised other arguments before

11:24:03  16    that court but did not, but then seek to raise those

11:24:07  17    same issues before a federal court.  I just don't see

11:24:12  18    how you can do that.  And I think that's the problem.

11:24:16  19        And I think the *Rooker-Feldman* doctrine also is an

11:24:24  20    impediment to me addressing this matter in light of the

11:24:30  21    fact that the Court of Appeals -- I mean, the Superior

11:24:33  22    Court made its ruling.

11:24:36  23        Subsequently, that was appealed to the Court of

11:24:38  24    Appeals.  The Court of Appeals affirmed the Superior

11:24:41  25    Court.  And I just don't see how I have the authority to

11:24:44  1    make a decision now inconsistent with issues that were

11:24:49  2    raised before the Court of Appeals, at least in

11:24:52  3    reference to the rule issue.  But as I said, in

11:24:54  4    reference to the constitutional issue that's being

11:24:57  5    raised, that could have been raised before, before the

11:25:00  6    state court.  It was not raised.  And I don't see how it

11:25:03  7    can now be raised in the first instance before this

11:25:06  8    Court.

11:25:08  9         MR. KLAYMAN:  Your Honor, I gave you the

11:25:09  10   authority when I read --

11:25:10  11        THE COURT:  And if I'm wrong, the Court of

11:25:12  12   Appeals will tell me that.

11:25:13  13        MR. KLAYMAN:  I would like to -- I would

11:25:14  14   respectfully request that I be able to proffer my

11:25:16  15   exhibits into evidence and authenticate them.  They're

11:25:22  16   self-authenticating, in any event.  I would like them on

11:25:27  17   the record before I take this up.

11:25:27  18        THE COURT:  Very well.

11:25:30  19        MR. KLAYMAN:  Thank you.

11:25:30  20      Can I take the stand, please?

11:25:34  21        THE COURT:  Yes?

          22        MR. MACHADO:  Your Honor --

11:25:41  23        THE COURT:  What exhibits are you seeking to

11:25:43  24   try and present?

11:25:47  25        MR. KLAYMAN:  I'm seeking to present exhibits

11:25:48  1    that show the pattern and practice of viewpoint

11:25:52  2    discrimination against me and against other

11:25:54  3    conservative --

11:25:54  4            THE COURT:  But if I don't have the authority

11:25:56  5    to entertain the issue because of the current state of

11:25:58  6    the law, i.e., you had the opportunity to raise the

11:26:01  7    issue previously and you didn't, how can I then let you

11:26:05  8    introduce that into the record?

11:26:06  9            MR. KLAYMAN:  Well, I'm proffering it, Your

11:26:08  10   Honor, proffering it so the Court of Appeals will have

11:26:10  11   it as part of its record.  It's a proffer.

11:26:16  12           THE COURT:  Yes.

11:26:18  13           MR. MACHADO:  Your Honor, just briefly --

11:26:22  14           THE COURT:  Number one -- I mean, I just don't

11:26:24  15   see how I get to the issue of whether there was a First

11:26:30  16   Amendment violation, and I don't see how the Court of

11:26:33  17   Appeals gets that issue.  They may see it differently in

11:26:38  18   light of the fact that, as I said, this was an issue

11:26:41  19   that could have been raised in the Superior Court.  It

11:26:44  20   was not raised, and therefore, I don't see how in the

11:26:47  21   first instance it can be raised here.

11:26:50  22       If I'm right on that, then all of these exhibits

11:26:52  23   are really irrelevant to the issue as to whether you had

11:26:56  24   a right to proceed before this Court.

11:26:59  25           MR. MACHADO:  We understand, Your Honor, and we

11:27:01  1    absolutely agree.  I just want to make one point because

11:27:04  2    Mr. Klayman has been very clear about his intent to take

11:27:08  3    this up.

11:27:08  4        If he's going to get on the stand for the pure and

11:27:11  5    narrow purpose of introducing these exhibits, and we

11:27:15  6    share the Court's concern or wonderment as to how -- why

11:27:21  7    it would even be relevant.  But if he's going to get on

11:27:23  8    the stand for that limited purpose, you know, that's one

11:27:26  9    issue.

11:27:26  10       If, on the other hand, he's going to get on the

11:27:29  11   stand and provide testimony, which is what he started

11:27:31  12   off this morning saying his intent was, we do note that

11:27:33  13   the local rules of which Mr. Klayman has repeatedly

11:27:40  14   cited to this Court and referenced in court -- in the

11:27:41  15   course of his 40 years of practice before this court

11:27:45  16   provide that the practice is to decide preliminary

11:27:48  17   injunction motions without live testimony.  And that if

11:27:50  18   a party intends to provide live testimony, they need to

11:27:54  19   give 72 hours' notice, which did not happen here.  And

11:27:57  20   that the Court may decline witnesses where the need for

11:27:59  21   live testimony is outweighed by considerations of undue

11:28:02  22   delay, waste of time, or needless presentation of

11:28:08  23   cumulative evidence.

11:28:08  24       I know the Court -- I know several judges on this

11:28:11  25   court.  I know the D.C. Circuit is intimately familiar

```
11:28:12   1    with Mr. Klayman's views about viewpoint discrimination.
11:28:16   2    And so if he's going to get on the stand and just
11:28:18   3    regurgitate that again, we would object for these
11:28:22   4    reasons, Your Honor.
11:28:28   5          MR. KLAYMAN:  Well, first of all, I don't need
11:28:29   6    to regurgitate that at this phase.  I can regurgitate
11:28:32   7    that when -- so to speak, when this case comes back to
11:28:34   8    this Court.
           9          Secondly --
11:28:36  10          THE COURT:  That's presumptuous on your part,
11:28:38  11    but go ahead.
11:28:41  12          MR. KLAYMAN:  Well, it's happened before.
11:28:41  13          THE COURT:  But I don't get reversed that
          14    much --
          15          MR. KLAYMAN:  So --
11:28:42  16          THE COURT:  I've been a judge for 43 years.
11:28:43  17    I've probably been reversed ten times in my history.
          18          MR. KLAYMAN:  No, but you can --
11:28:46  19          THE COURT:  But -- it does happen, but I don't
11:28:47  20    think it's going to happen here --
11:28:47  21          MR. KLAYMAN:  Secondly --
11:28:48  22          THE COURT:  -- but go ahead.
11:28:49  23          MR. KLAYMAN:  Secondly, I submitted a detailed
11:28:52  24    affidavit, which also incorporated by reference in the
11:28:55  25    brief that I filed in opposition to the motion to
```

11:28:57  1    dismiss as well as other documents, I submitted

11:29:01  2    testimony.  They submitted none.  They've therefore

11:29:05  3    conceded --

11:29:07  4              THE COURT:  But you see, Mr. Klayman, what

11:29:09  5    you're raising doesn't deal with the reason that I

11:29:12  6    conclude I can't go forward in this case.  And that is

11:29:15  7    because, as I said before, you could have raised this

11:29:18  8    issue in the Superior Court.  You didn't.  And I don't

11:29:21  9    think you can piecemeal your litigation, as I said, by

11:29:24  10   raising some issues over there, had the opportunity to

11:29:26  11   raise it there but didn't, and then come to this Court

11:29:28  12   and ask this Court to consider an issue that you could

11:29:30  13   have raised there.

11:29:33  14       Maybe I'm wrong.  If I'm wrong, the Court of

11:29:35  15   Appeals will tell me.

11:29:37  16             MR. KLAYMAN:  Respectfully, you're wrong, Your

11:29:39  17   Honor.

11:29:39  18             THE COURT:  Okay.

11:29:40  19             MR. KLAYMAN:  In any event, I'm just proffering

11:29:42  20   these documents into the record.  That's all I'm doing

11:29:44  21   right now.

          22             THE COURT:  What relevance do they have at this

          23   point?

11:29:45  24             MR. KLAYMAN:  You're preventing me from doing

11:29:46  25   that?

| | | |
|---|---|---|
| 11:29:46 | 1 | THE COURT: If the Court of Appeals tells me |
| 11:29:47 | 2 | that you have a right to proceed, yes, then I'll let -- |
| 11:29:50 | 3 | MR. KLAYMAN: Well, you're -- you're just |
| 11:29:51 | 4 | trying to slow this thing down -- |
| | 5 | THE COURT: I'm not trying to slow -- |
| | 6 | MR. KLAYMAN: -- is what you're doing. Then I |
| | 7 | ask again -- |
| 11:29:53 | 8 | THE COURT: Don't make allegations against me |
| 11:29:54 | 9 | that aren't fact-based. I've not done anything to slow |
| 11:29:58 | 10 | this matter down. In fact, I've speeded it up so we can |
| 11:30:01 | 11 | do this matter today before your hearing is scheduled |
| 11:30:04 | 12 | before the Court of Appeals. |
| 11:30:05 | 13 | MR. KLAYMAN: You speeded it up after we lost |
| 11:30:07 | 14 | seven days because Your Honor erroneously, for whatever |
| 11:30:10 | 15 | reason, and I believe it was not unintentional, found |
| 11:30:12 | 16 | that I had not complied with the rule for the -- |
| 11:30:16 | 17 | THE COURT: And I still am of the opinion that |
| 11:30:18 | 18 | you didn't comply with the rule, for the reason I |
| 11:30:20 | 19 | indicated in the order. But nonetheless, giving you the |
| 11:30:23 | 20 | benefit of the doubt, I overlooked that and held this |
| 11:30:26 | 21 | hearing. |
| 11:30:26 | 22 | MR. KLAYMAN: I disagree, Your Honor, and I |
| 11:30:28 | 23 | respectfully request -- |
| 11:30:28 | 24 | THE COURT: You have a right to disagree, but I |
| 11:30:30 | 25 | think I was still right. |

11:30:31  1          MR. KLAYMAN:  We've asked for your

11:30:33  2    disqualification before.  I renew that motion --

11:30:34  3          THE COURT:  And that was denied previously by

11:30:36  4    the Court of Appeals.

          5          MR. KLAYMAN:  Not in this context.

11:30:37  6          THE COURT:  I have nothing against you, sir.  I

11:30:39  7    don't know of -- I don't know you.  I have nothing

11:30:42  8    against you whatsoever.  My ruling is based upon my

11:30:45  9    impression of what the law says.

11:30:48 10          MR. KLAYMAN:  Well, I -- can I make a proffer

11:30:50 11    of these documents?

11:30:51 12          THE COURT:  Briefly, sir.

11:30:52 13          MR. KLAYMAN:  Well, I want to go through them.

11:30:54 14    I have 20 --

11:30:54 15          THE COURT:  No, I'm not going to entertain all

11:30:56 16    those documents because, as I said, until I'm told by

11:30:59 17    the Court of Appeals that you have a right to appear

11:31:01 18    before me and raise these issues, which in my view you

11:31:05 19    don't because of the reasons I previously indicated, and

11:31:08 20    until I'm told otherwise, that information, in my view,

11:31:11 21    is irrelevant.

11:31:14 22          MR. KLAYMAN:  Can I identify what these

11:31:16 23    exhibits are?

11:31:16 24          THE COURT:  Why?  If I don't have the authority

11:31:18 25    to hear about what you want to raise regarding the First

11:31:22  1    Amendment, how is that relevant?

11:31:25  2              MR. KLAYMAN:  Because a proffer is a normal way

11:31:27  3    to see what it is that you fail to consider, Your

          4    Honor --

          5              THE COURT:  Because I --

11:31:29  6              MR. KLAYMAN:  -- which would be a ground for

11:31:30  7    reversal.

11:31:31  8              THE COURT:  It has nothing to do with the

11:31:32  9    merits of your First Amendment claim.  My position is

11:31:35  10   that, as I said before -- maybe you don't understand

11:31:37  11   what I'm saying -- you had a right to raise it over in

11:31:40  12   the Superior Court.  You didn't raise it.

11:31:43  13             MR. KLAYMAN:  Do you have any authority for

11:31:44  14   that?

11:31:45  15             THE COURT:  Yes, there's plenty of authority

11:31:47  16   that says --

11:31:47  17             MR. KLAYMAN:  What authority do you have?  You

11:31:47  18   haven't cited any.

          19             THE COURT:  -- I can't tell you --

11:31:49  20             MR. KLAYMAN:  Other than you felt like making

11:31:50  21   that ruling, because you have no authority to cite that.

11:31:53  22             THE COURT:  There is clear authority that says

11:31:54  23   you can't raise certain issues in one court which you

11:31:58  24   had the opportunity to raise and then raise it in

11:32:00  25   another court.

11:32:01  1          MR. KLAYMAN:  I suggest, Your Honor, that you

11:32:02  2  read --

11:32:03  3          THE COURT:  Sir, if I'm wrong, the Court of

11:32:05  4  Appeals will tell me.  Thank you.

11:32:11  5       (Court adjourned, 11:32 a.m.)

11:32:24  6                          - - -

          7

          8

          9

          10                       CERTIFICATE

          11

          12     I, Chandra Kean, RMR, hereby certify that the

          13  foregoing transcript is a true and correct transcription

          14  of the proceedings held in the above-titled matter.

          15

          16  _____        May 27, 2025
                                               _____
          17    Chandra Kean, RMR                  DATE

          18

          19

          20

          21

          22

          23

          24

          25

**1**

**1** [1] - 25:21
**1.2** [2] - 11:20, 17:14
**10100** [1] - 2:3
**10:06** [1] - 3:2
**10:59** [1] - 46:18
**11** [1] - 9:14
**11:00** [1] - 46:3
**11:20** [1] - 46:18
**11:32** [1] - 58:5
**12(b)(2** [1] - 39:21
**12(b)(6** [1] - 6:14
**12(b)(6)** [1] - 6:5
**12.2** [2] - 42:7, 45:13
**120** [4] - 13:10, 14:4, 39:9, 43:22
**1257** [1] - 44:21
**126** [1] - 44:25
**131** [2] - 44:25, 45:23
**132** [1] - 45:10
**15** [1] - 21:19
**15th** [3] - 26:17, 28:2, 28:15
**18** [2] - 26:15, 28:1
**180** [1] - 15:22
**1920** [1] - 45:15
**1983** [3] - 37:5, 45:15
**1994** [1] - 38:1

**2**

**20** [1] - 56:14
**20001** [2] - 2:4, 28:17
**2005** [1] - 38:7
**2019** [1] - 44:25
**202-727-2125** [1] - 2:4
**2025** [5] - 21:19, 26:17, 28:2, 28:15, 58:16
**204** [1] - 2:8
**22303** [1] - 2:8
**24-2997** [2] - 3:4, 46:21
**2560** [1] - 2:8
**27** [1] - 58:16
**28** [1] - 44:21
**28th** [3] - 24:4, 24:6, 24:9
**29th** [4] - 24:4, 24:8, 24:11, 40:8
**2:59** [1] - 28:15

**3**

**33,000** [1] - 20:12

**4**

**4(j** [1] - 34:8
**4(j)** [1] - 35:1

**4(j)(A** [1] - 34:10
**4(j)(B** [1] - 34:12
**4(m** [1] - 34:8
**40** [1] - 52:15
**400** [1] - 2:3
**42** [2] - 45:14, 45:15
**43** [2] - 8:20, 53:16
**430** [2] - 26:18, 28:16
**441** [2] - 44:25, 45:23
**48** [2] - 11:6

**6**

**60** [1] - 11:1
**6th** [1] - 2:3

**7**

**703-775-8607** [1] - 2:9
**72** [1] - 52:19

**A**

**a.m** [4] - 3:2, 46:18, 58:5
**ab** [1] - 48:20
**abdicate** [1] - 36:8
**ability** [2] - 10:9, 12:8
**able** [13] - 4:18, 6:11, 6:20, 9:22, 11:11, 19:4, 19:17, 23:22, 24:15, 27:3, 29:22, 49:6, 50:14
**above-entitled** [1] - 26:15
**above-titled** [1] - 58:14
**abridgement** [1] - 17:20
**absolute** [1] - 12:15
**absolutely** [2] - 4:18, 52:1
**accept** [25] - 22:3, 22:4, 25:19, 26:5, 26:25, 27:10, 27:11, 27:15, 28:13, 28:20, 28:25, 29:6, 29:8, 29:14, 29:19, 29:23, 31:18, 32:9, 32:18, 33:12, 33:24, 34:3, 34:23, 35:12
**acceptance** [1] - 30:5
**accepted** [1] - 48:10
**accepting** [1] - 26:2
**accurate** [1] - 12:13
**acknowledged** [2] - 40:1, 40:2
**acknowledging** [1] - 39:20
**act** [2] - 7:22, 48:12
**acting** [1] - 7:24

**action** [11] - 3:3, 12:22, 18:13, 20:16, 26:10, 26:16, 26:20, 28:18, 45:11, 46:2, 46:21
**actions** [2] - 5:14, 25:10
**activist** [2] - 4:15, 5:19
**actual** [2] - 18:10, 23:8
**Ad** [1] - 31:8
**add** [3] - 5:22, 31:6, 35:6
**addition** [2] - 30:22, 45:18
**additional** [1] - 34:4
**address** [6] - 4:1, 7:11, 8:15, 15:7, 20:20, 25:12
**addressed** [1] - 18:19
**addressing** [1] - 49:20
**adequate** [1] - 6:18
**adjourned** [1] - 58:5
**administers** [1] - 10:14
**administration** [1] - 5:14
**admitted** [2] - 4:11, 25:21
**admittedly** [1] - 20:12
**adopted** [1] - 48:3
**advocate** [1] - 20:15
**affidavit** [14] - 4:9, 4:10, 18:22, 18:25, 19:4, 19:19, 19:23, 21:18, 23:16, 23:21, 25:25, 26:7, 34:11, 53:24
**affirmed** [1] - 49:24
**affirming** [2] - 39:18, 40:21
**afraid** [1] - 8:18
**age** [2] - 26:15, 27:25
**agency** [1] - 36:1
**ago** [1] - 26:17
**agree** [3] - 42:15, 43:3, 52:1
**ahead** [2] - 53:16, 53:22
**aired** [1] - 45:9
**al** [2] - 3:5, 46:23
**Alan** [1] - 18:25
**Alexandria** [1] - 2:8
**allegations** [1] - 55:8
**allege** [1] - 34:12
**alleged** [1] - 6:8
**allegedly** [1] - 5:13
**allow** [2] - 14:2, 31:21
**allowing** [1] - 18:8
**alluding** [1] - 38:21
**almost** [1] - 13:4

**amalgamation** [1] - 34:21
**ambiguity** [1] - 14:7
**Amendment** [10] - 5:7, 6:21, 37:4, 38:17, 38:18, 44:17, 45:16, 51:16, 57:1, 57:9
**amicably** [1] - 26:1
**apologize** [2] - 33:9, 37:16
**apparatus** [1] - 16:17
**appeal** [1] - 7:19
**appealable** [1] - 7:3
**appealed** [2] - 38:12, 39:17, 49:23
**Appeals** [70] - 3:5, 3:19, 3:21, 7:13, 7:18, 8:5, 8:14, 9:1, 9:3, 10:6, 12:21, 13:16, 14:2, 14:10, 14:12, 15:11, 18:4, 21:8, 21:14, 21:22, 22:2, 23:4, 23:6, 23:8, 24:3, 24:13, 24:22, 24:25, 25:3, 26:18, 27:4, 28:16, 33:4, 33:15, 33:19, 33:22, 39:15, 39:17, 40:6, 40:11, 40:14, 41:11, 42:7, 43:12, 44:2, 44:25, 45:23, 46:22, 47:6, 47:11, 47:14, 47:17, 47:24, 48:12, 48:13, 48:14, 48:16, 49:21, 49:24, 50:2, 50:12, 51:10, 51:17, 54:15, 55:1, 55:12, 56:4, 56:17, 58:4
**Appeals'** [2] - 40:25, 41:1
**appear** [2] - 23:6, 56:17
**appearance** [2] - 3:7, 27:19
**APPEARANCES** [1] - 2:1
**appellate** [4] - 7:22, 7:24, 15:8, 37:21
**apple** [2] - 38:19, 38:24
**applicable** [1] - 45:3
**application** [1] - 45:25
**applies** [2] - 5:18, 48:1
**apply** [1] - 11:14, 35:9, 44:12
**approach** [2] - 3:6, 25:22
**appropriate** [10] - 22:13, 22:22, 24:21,

**25:5, 31:17, 32:3, 33:14, 48:6, 48:7**
**appropriately** [11] - 7:14, 21:15, 22:21, 23:14, 27:4, 27:7, 30:10, 31:4, 32:2, 32:15, 46:12
**argue** [2] - 30:20, 44:14
**argument** [11] - 25:15, 35:9, 35:14, 35:15, 35:21, 35:24, 37:10, 37:12, 40:8, 42:5, 44:18
**arguments** [11] - 4:25, 8:22, 38:22, 38:23, 40:2, 40:3, 40:5, 41:11, 48:3, 48:4, 49:15
**arm** [1] - 17:5
**aside** [2] - 37:1, 38:10
**aspect** [1] - 18:20
**assistant** [1] - 25:23
**associate** [1] - 11:3
**associate's** [1] - 11:2
**assume** [3] - 9:1, 40:17, 47:5
**assuming** [1] - 48:1
**attached** [2] - 4:22, 25:25
**attempt** [2] - 32:7, 44:14
**attempted** [3] - 21:20, 26:1, 35:12
**attempting** [1] - 10:19
**attempts** [1] - 25:19
**Attorney** [6] - 16:2, 16:3, 34:18, 47:8, 47:19, 47:21
**ATTORNEY** [1] - 2:2
**attorneys** [1] - 41:23
**authenticate** [1] - 50:15
**authenticating** [1] - 50:16
**authority** [20] - 14:16, 27:3, 30:23, 35:17, 37:7, 42:22, 43:5, 44:7, 44:21, 46:10, 49:25, 50:10, 51:4, 56:24, 57:13, 57:15, 57:17, 57:21, 57:22
**authorization** [2] - 30:13, 32:22
**authorized** [20] - 14:24, 22:3, 22:4, 26:9, 26:25, 27:11, 27:15, 28:12, 28:20, 28:25, 29:5, 29:8, 29:14, 29:19, 32:4,

32:18, 33:12, 33:24,
34:3, 34:23
**Avenue** [1] - 2:8
**award** [1] - 10:13
**aware** [1] - 9:8

# B

**balancing** [1] - 41:19
**bar** [7] - 10:13, 10:16,
10:17, 10:22, 11:7,
11:8, 16:12
**Bar** [9] - 10:15, 10:24,
11:6, 16:16, 16:17,
17:25, 18:3, 18:7,
20:7
**Barr** [1] - 16:2
**bars** [2] - 39:12, 44:16
**based** [4] - 37:3,
37:22, 55:9, 56:8
**basis** [1] - 7:21
**Bates** [1] - 5:12
**became** [1] - 16:15
**beginning** [1] - 3:7
**behalf** [8] - 3:13, 3:19,
7:3, 20:4, 22:5,
28:21, 29:20, 36:16
**behaved** [1] - 18:2
**bench** [1] - 25:22
**benefit** [1] - 55:20
**bent** [3] - 15:22, 19:2,
19:12
**best** [1] - 23:23
**better** [1] - 27:12
**between** [1] - 45:9
**beyond** [3] - 36:25,
38:11, 39:9
**Biden** [1] - 16:24
**Bill** [1] - 16:2
**bite** [2] - 38:19, 38:24
**Black** [2] - 5:17
**blunt** [1] - 15:18
**Board** [17] - 3:13,
13:9, 14:1, 15:19,
19:16, 31:8, 36:16,
36:23, 36:24, 43:18,
43:21, 45:13, 48:4,
48:9, 48:12, 48:15,
48:21
**board** [2] - 3:14, 19:16
**Board's** [5] - 9:17,
38:10, 48:19, 49:3,
49:4
**Boasberg** [1] - 5:25
**bobbed** [1] - 32:8
**bottom** [3] - 18:15,
27:18, 29:2
**BPR** [1] - 2:10
**brief** [3] - 36:17,
44:13, 53:25

**briefing** [2] - 40:3,
40:6
**briefly** [4] - 25:12,
41:9, 51:13, 56:12
**briefs** [4] - 4:20, 8:1,
13:13, 43:20
**bring** [4] - 4:12, 8:25,
38:22, 44:9
**brings** [1] - 45:14
**broad** [1] - 40:22
**brought** [4] - 21:21,
24:15, 38:3, 40:1
**Bundy** [5] - 39:7,
39:25, 44:15, 45:11,
45:22
**business** [1] - 23:19
**buy** [1] - 36:6
**BY** [2] - 2:3, 2:7

# C

**candidate** [1] - 16:18
**candidates** [1] - 16:22
**cannot** [4] - 18:18,
24:23, 25:9, 48:20
**capacity** [3] - 3:20,
16:23, 24:23
**carefully** [1] - 6:23
**cascading** [1] - 17:16
**case** [36] - 4:7, 4:24,
5:4, 5:9, 5:16, 6:2,
6:7, 6:8, 6:16, 7:5,
8:1, 8:2, 9:2, 9:12,
10:5, 10:12, 11:14,
12:23, 12:25, 13:20,
15:12, 21:21, 24:4,
26:15, 30:24, 36:8,
36:11, 37:7, 37:25,
38:7, 46:5, 46:19,
48:13, 53:7, 54:6
**cases** [11] - 5:11, 5:14,
10:15, 13:13, 13:19,
13:21, 14:6, 14:8,
35:22, 41:16, 43:24
**caused** [1] - 38:4
**causing** [1] - 17:14
**cent** [1] - 16:18
**certain** [3] - 12:7,
36:10, 57:23
**certainly** [3] - 35:25,
40:21, 48:8
**CERTIFICATE** [1] -
58:10
**certify** [1] - 58:12
**challenge** [1] - 42:9
**challenging** [1] - 9:8
**Chandra** [2] - 58:12,
58:16
**changed** [4] - 14:3,
16:15, 18:5, 24:11

**check** [2] - 33:3, 36:12
**checking** [1] - 33:9
**chief** [4] - 34:11, 47:2,
47:5, 47:18
**Christopher** [1] - 20:4
**Circuit** [13] - 5:25,
6:17, 7:3, 7:4, 8:17,
9:13, 12:1, 12:19,
17:6, 18:16, 18:17,
49:9, 52:25
**circumstances** [1] -
36:7
**circumvent** [1] - 44:8
**citation** [1] - 37:19
**cite** [3] - 13:13, 14:5,
57:21
**cited** [5] - 35:22, 38:1,
41:16, 52:14, 57:18
**citing** [1] - 45:22
**City** [6] - 16:4, 24:16,
47:1, 47:10, 47:11,
47:15
**city** [1] - 25:2
**civil** [5] - 3:3, 26:10,
26:20, 28:18, 46:21
**Civil** [3] - 6:14, 34:22,
35:4
**claim** [6] - 25:8, 37:23,
38:20, 45:6, 45:21,
57:9
**claims** [3] - 43:7,
45:14, 45:19
**clarification** [1] - 9:11
**clarified** [1] - 31:23
**Clark** [1] - 16:5
**classified** [1] - 15:7
**clear** [8] - 13:7, 13:8,
14:6, 17:6, 30:6,
46:1, 52:2, 57:22
**clearly** [4] - 32:3, 37:6,
37:7, 45:20
**CLERK** [2] - 3:3, 46:20
**Clerk** [17] - 26:25,
27:9, 27:11, 27:13,
27:15, 28:12, 29:5,
30:14, 30:17, 32:22,
32:24, 32:25, 33:4,
34:23, 47:4
**Clerk's** [4] - 27:22,
28:6, 28:7, 30:7
**cleverly** [1] - 19:15
**Clevinger** [1] - 20:14
**clients** [2] - 9:22,
20:17
**Clinesmith** [2] - 19:14
**Clinton** [3] - 16:23,
20:5, 20:12
**Clintons** [1] - 20:17
**close** [2] - 23:19,
40:12

**colleagues** [1] - 17:17
**collusion** [1] - 19:20
**Columbia** [19] - 3:4,
3:19, 3:20, 10:10,
10:20, 14:18, 15:18,
22:2, 24:17, 24:22,
25:5, 25:9, 26:18,
28:16, 34:17, 36:2,
44:15, 44:24, 46:22
**coming** [2] - 17:8,
23:23
**commenced** [1] - 38:5
**Committee** [5] - 3:15,
31:9, 36:24, 38:11,
39:8
**Committee's** [1] - 13:9
**compared** [1] - 47:15
**complaining** [1] - 38:3
**complaint** [4] - 20:14,
26:14, 26:24, 30:15
**complaints** [1] - 16:12
**complied** [1] - 55:16
**comply** [1] - 55:18
**component** [2] - 47:1,
47:3
**composition** [2] -
15:19, 15:20
**compromised** [1] -
12:20
**conceded** [1] - 54:3
**concern** [1] - 52:6
**concerned** [1] - 47:16
**conclude** [5] - 22:22,
47:4, 47:17, 47:22,
54:6
**conclusion** [1] - 13:10
**conclusions** [2] -
6:15, 6:25
**conduct** [1] - 12:22
**confident** [1] - 7:2
**confirm** [1] - 23:23
**conflict** [1] - 43:14
**conflicted** [2] - 15:12,
43:12
**consent** [5] - 26:10,
26:11, 26:20, 26:21,
28:18
**consequence** [1] -
20:10
**consequently** [2] -
4:11, 6:22
**conservative** [2] -
4:15, 51:3
**conservatives** [1] -
5:19
**consider** [3] - 40:15,
54:12, 57:3
**consideration** [1] -
40:23
**considerations** [1] -

52:21
**consistent** [1] - 34:13
**consistently** [1] -
43:16
**Constitution** [2] -
5:20, 17:4
**constitutional** [15] -
6:20, 8:12, 8:13,
8:15, 15:1, 15:5,
15:7, 17:21, 19:1,
37:3, 37:7, 39:3,
40:19, 42:9, 50:4
**constitutionally** [1] -
13:5
**construction** [1] -
14:5
**consuming** [1] - 10:23
**CONT'D** [1] - 2:1
**contact** [1] - 23:5
**context** [3] - 9:15,
36:11, 56:5
**continue** [2] - 10:10,
10:19
**contrary** [3] - 4:10,
8:9, 13:16
**control** [2] - 14:17,
17:3
**controlling** [1] -
13:22, 13:23, 14:19
**convicted** [1] - 19:19
**Conway** [1] - 16:1
**corporation** [1] -
24:24
**correct** [2] - 28:5,
58:13
**costly** [1] - 10:23
**counsel** [19] - 16:12,
16:14, 16:16, 18:2,
21:5, 21:8, 21:11,
21:14, 23:10, 23:12,
27:2, 31:10, 32:14,
33:3, 33:17, 33:21,
36:14, 46:9, 47:7
**Counsel** [6] - 9:16,
20:2, 22:6, 33:13,
33:24, 36:5
**country** [1] - 5:6
**course** [8] - 4:16, 5:9,
7:4, 9:4, 25:8, 29:22,
41:16, 52:15
**Court** [167] - 3:2, 3:5,
3:19, 3:20, 3:24,
4:13, 4:19, 5:5, 5:21,
7:13, 7:18, 7:21, 8:4,
8:10, 8:13, 8:14, 9:1,
9:2, 10:6, 10:12,
11:25, 12:14, 12:15,
12:18, 12:21, 13:15,
14:2, 14:10, 14:12,
15:11, 15:15, 15:21,

17:8, 18:4, 19:11, 21:8, 21:14, 21:15, 21:21, 22:2, 22:5, 22:7, 22:19, 23:4, 23:6, 23:8, 23:13, 24:3, 24:13, 24:22, 24:25, 25:3, 25:19, 26:2, 26:4, 26:18, 27:4, 27:8, 27:9, 27:11, 28:16, 28:21, 28:24, 29:20, 30:5, 30:10, 30:23, 31:4, 31:22, 33:4, 33:15, 33:18, 33:22, 33:24, 34:6, 34:15, 35:3, 35:10, 35:20, 35:23, 36:21, 36:22, 37:22, 37:25, 38:5, 38:6, 38:8, 38:10, 39:15, 39:17, 39:19, 40:6, 40:9, 40:10, 40:14, 40:24, 40:25, 41:11, 41:21, 41:24, 42:6, 42:7, 42:14, 43:11, 43:22, 44:1, 44:2, 44:3, 44:5, 44:8, 44:15, 44:19, 44:23, 45:1, 45:3, 45:20, 46:9, 46:12, 46:18, 46:22, 46:25, 47:4, 47:6, 47:10, 47:14, 47:16, 47:19, 47:24, 48:12, 48:13, 48:14, 48:16, 48:20, 49:21, 49:22, 49:23, 49:24, 49:25, 50:2, 50:8, 50:11, 51:10, 51:16, 51:19, 51:24, 52:14, 52:20, 52:24, 53:8, 54:8, 54:11, 54:12, 54:14, 55:1, 55:12, 56:4, 56:17, 57:12, 58:3, 58:5

**COURT** [124] - 3:11, 3:17, 3:23, 4:3, 7:10, 8:6, 8:8, 8:18, 8:24, 11:21, 12:2, 12:6, 13:15, 13:21, 14:14, 14:21, 15:3, 15:5, 20:23, 21:2, 21:5, 21:8, 21:11, 21:23, 22:4, 22:8, 22:12, 22:17, 23:3, 23:11, 24:2, 24:7, 24:10, 24:16, 24:18, 24:25, 25:11, 25:14, 25:17, 27:2, 27:13, 27:21, 28:3, 28:6, 28:10, 28:19, 29:1, 29:7, 29:11, 29:13, 29:17, 29:24, 30:1, 30:8,

30:25, 31:3, 31:10, 31:14, 31:24, 32:10, 32:13, 32:19, 32:23, 33:2, 33:6, 33:17, 33:21, 34:24, 35:2, 35:5, 35:7, 35:17, 36:5, 37:2, 37:14, 39:14, 40:14, 41:2, 42:3, 42:8, 42:15, 42:22, 42:24, 43:5, 43:25, 44:6, 46:3, 46:15, 46:19, 46:24, 48:5, 48:11, 49:10, 50:11, 50:18, 50:21, 50:23, 51:4, 51:12, 51:14, 53:10, 53:13, 53:16, 53:19, 53:22, 54:4, 54:18, 54:22, 55:1, 55:5, 55:8, 55:17, 55:24, 56:3, 56:6, 56:12, 56:15, 56:24, 57:5, 57:8, 57:15, 57:19, 57:22, 58:3

**court** [65] - 7:22, 7:23, 7:25, 10:22, 11:19, 12:8, 12:9, 12:10, 12:19, 12:23, 14:16, 14:22, 15:6, 15:14, 17:3, 17:9, 18:13, 18:14, 18:16, 20:21, 36:23, 37:8, 37:9, 37:13, 37:15, 37:20, 37:21, 38:3, 38:4, 38:13, 38:16, 38:23, 39:5, 39:6, 41:21, 41:22, 41:24, 42:10, 42:16, 42:17, 42:18, 42:19, 43:7, 43:9, 43:10, 44:9, 45:9, 45:11, 46:17, 48:3, 49:13, 49:14, 49:15, 49:16, 49:17, 50:6, 52:14, 52:15, 52:25, 57:23, 57:25

**court's** [1] - 44:22

**Court's** [2] - 40:22, 52:6

**courthouse** [1] - 30:7

**COURTROOM** [2] - 3:3, 46:20

**courts** [4] - 9:18, 10:21, 38:2

**created** [2] - 9:21, 16:9

**Cruz** [1] - 16:6

**cumulative** [1] - 52:23

**current** [2] - 7:20, 51:5

**cursory** [1] - 7:7

**cuts** [1] - 5:16

## D

**D.C** [42] - 5:25, 6:17, 7:3, 7:4, 7:13, 8:4, 8:14, 8:17, 9:13, 9:16, 10:24, 11:25, 12:18, 12:21, 14:9, 14:11, 15:11, 16:17, 17:6, 18:16, 18:17, 20:7, 21:21, 26:19, 28:17, 34:24, 39:17, 40:6, 40:10, 40:24, 40:25, 41:10, 42:6, 43:11, 44:24, 44:25, 45:22, 45:23, 47:6, 47:11, 49:8, 52:25

**damage** [3] - 17:12, 17:17

**damages** [6] - 8:7, 25:1, 25:2, 45:17, 48:24, 48:25

**dance** [1] - 39:11

**DATE** [1] - 58:16

**David** [1] - 20:11

**days** [5] - 13:10, 14:4, 39:9, 43:22, 55:14

**DC** [2] - 2:2, 2:4

**DCCA** [1] - 2:6

**de** [1] - 37:25

**deal** [4] - 11:15, 41:14, 46:7, 54:5

**dealing** [4] - 11:3, 11:20, 12:19, 35:22

**deals** [1] - 5:17

**decade** [2] - 13:5, 17:14

**decide** [1] - 52:16

**decided** [1] - 11:19

**decision** [6] - 7:7, 7:22, 9:25, 13:1, 39:19, 50:1

**decisions** [1] - 9:24

**declaratory** [1] - 45:12, 49:2

**declare** [1] - 19:18

**decline** [1] - 52:20

**defend** [1] - 35:25

**defendant** [1] - 48:21

**defendant's** [1] - 44:14

**defendants** [5] - 3:16, 7:8, 21:2, 36:16, 45:17

**Defendants** [1] - 2:10

**degree** [2] - 19:3, 19:18

**degrees** [1] - 15:22

**delay** [5] - 9:6, 9:11, 13:25, 40:16, 52:22

**delivering** [1] - 34:10

**Democrat** [2] - 16:21, 20:9

**Democrats** [1] - 20:17

**demonstrated** [1] - 17:23

**denial** [1] - 40:22

**denied** [3] - 5:24, 7:19, 56:3

**Department** [1] - 16:9

**deposed** [1] - 26:8

**DEPUTY** [2] - 3:3, 46:20

**Deputy** [1] - 16:3

**Dershowitz** [1] - 19:1

**described** [1] - 45:1

**describes** [1] - 27:18

**deserve** [2] - 11:9, 11:12

**destroy** [1] - 20:12

**detailed** [1] - 53:23

**determination** [1] - 31:16

**determine** [1] - 23:2

**determining** [1] - 17:4

**dichotomy** [1] - 20:18

**different** [2] - 8:3, 45:19

**differently** [1] - 51:17

**difficult** [1] - 44:7

**direct** [3] - 16:7, 16:13, 27:17

**disagree** [4] - 30:13, 42:20, 55:22, 55:24

**disbarred** [1] - 16:4

**disciplinary** [11] - 9:9, 15:23, 16:12, 16:14, 16:17, 18:1, 39:6, 39:7, 40:1, 40:4, 40:17

**Disciplinary** [1] - 9:16

**discipline** [2] - 41:14, 41:23

**discovery** [2] - 6:3, 6:9

**discrepancy** [1] - 24:2

**discretionary** [2] - 39:22, 43:23

**discrimination** [9] - 4:8, 4:14, 5:8, 5:13, 17:2, 18:24, 49:5, 51:2, 53:1

**discriminatory** [2] - 4:14, 5:7

**dismiss** [5] - 4:24, 5:23, 6:4, 38:1, 54:1

**dismissal** [2] - 39:18, 44:15

**dismissed** [1] - 25:4

**disqualification** [1] - 56:2

**disrespect** [1] - 9:25

**District** [22] - 3:4, 3:19, 3:20, 10:10, 10:20, 14:17, 15:18, 22:1, 24:17, 24:22, 25:5, 25:9, 26:18, 28:16, 34:17, 36:2, 37:22, 38:5, 38:6, 44:14, 44:24, 46:22

**division** [1] - 16:9

**doctrine** [12] - 18:11, 18:12, 36:20, 37:17, 39:1, 44:11, 44:18, 44:20, 45:2, 45:25, 46:1, 49:19

**document** [2] - 23:9, 30:2

**Document** [1] - 25:24

**documents** [4] - 54:1, 54:20, 56:11, 56:16

**done** [6] - 10:24, 12:4, 17:12, 34:12, 36:10, 55:9

**doubt** [1] - 55:20

**Douglass** [10] - 5:9, 5:17, 5:22, 6:1, 6:9, 7:5, 17:6, 18:15, 18:16, 30:24

**down** [3] - 5:11, 55:4, 55:10

**dramatic** [1] - 42:1

**dual** [1] - 47:18

**due** [3] - 11:16, 31:21, 42:4

**duly** [2] - 26:8, 26:9

**Durham** [1] - 20:2

**duty** [6] - 18:17, 18:18, 18:19, 20:21, 35:14, 36:1

## E

**Ed** [1] - 16:10

**effect** [8] - 9:7, 10:4, 15:25, 17:16, 22:9, 28:23, 49:5, 49:8

**effected** [2] - 27:7, 36:10

**effective** [1] - 24:14

**effectuate** [1] - 44:20

**effectuated** [3] - 33:15, 34:9, 34:16

**either** [2] - 12:25, 48:14

**Elias** [2] - 20:1, 20:2

**Elliot** [2] - 3:4, 46:21

**elsewhere** [1] - 36:2

**Email** [2] - 2:5, 2:9

**emails** [2] - 20:12, 26:1

**end** [2] - 6:13, 38:25
**energy** [1] - 41:14
**enforce** [3] - 14:12, 18:17, 45:13
**enforced** [4] - 13:2, 13:3, 20:19, 48:20
**enforcing** [1] - 5:6
**enjoin** [1] - 18:13
**enjoined** [1] - 5:15
**enjoining** [1] - 30:22
**entertain** [2] - 51:5, 56:15
**entire** [2] - 9:12, 22:25
**entitled** [1] - 26:15
**entity** [7] - 25:6, 33:14, 34:16, 34:17, 35:10, 35:18, 47:12
**equally** [1] - 5:18
**equitable** [3] - 45:18, 48:23, 49:1
**equities** [1] - 41:19
**equity** [1] - 31:21
**equivalent** [2] - 7:23, 49:13
**erroneously** [1] - 55:14
**essence** [1] - 9:23
**essentially** [4] - 37:18, 39:24, 40:7, 41:10
**et** [2] - 3:5, 46:22
**event** [5] - 25:20, 26:6, 48:3, 50:16, 54:19
**evidence** [8] - 4:19, 6:23, 15:25, 21:7, 41:12, 49:7, 50:15, 52:23
**evidenced** [1] - 15:12
**exact** [1] - 36:22
**exactly** [7] - 16:8, 36:19, 37:11, 37:18, 38:9, 39:1, 39:10
**example** [3] - 5:9, 25:1, 30:9
**examples** [1] - 19:12
**exclude** [1] - 10:19
**excuse** [3] - 4:23, 26:3, 37:15
**executive** [4] - 34:11, 47:2, 47:5, 47:19
**exercise** [3] - 42:13, 45:7
**exhaust** [3] - 15:10, 17:9
**Exhibit** [1] - 25:21
**exhibits** [9] - 26:14, 26:24, 50:15, 50:23, 50:25, 51:22, 52:5, 56:23
**expeditiously** [1] - 11:18

**expense** [1] - 9:21
**explained** [1] - 44:19
**explore** [2] - 23:18, 23:20
**extent** [1] - 48:22
**extraordinary** [1] - 42:1
**extremely** [2] - 5:20, 10:22, 45:24
**Exxon** [1] - 38:7

**F**

**fact** [21] - 6:15, 6:24, 7:16, 8:25, 12:4, 13:7, 14:13, 15:13, 15:17, 16:20, 19:25, 28:20, 29:16, 36:2, 37:17, 38:25, 47:13, 49:21, 51:18, 55:9, 55:10
**fact-based** [1] - 55:9
**factors** [2] - 41:5, 41:18
**facts** [2] - 11:13, 18:23
**factual** [5] - 4:7, 4:12, 6:12, 40:10, 41:10
**fail** [1] - 23:1
**fair** [1] - 16:13
**falls** [1] - 45:21
**familiar** [2] - 5:10, 52:25
**family** [1] - 17:18
**far** [1] - 47:15
**favor** [1] - 22:18
**federal** [22] - 14:15, 14:22, 17:3, 18:13, 18:14, 18:15, 37:8, 37:12, 37:13, 37:24, 38:14, 38:16, 38:23, 39:3, 42:18, 42:19, 43:8, 44:9, 45:5, 45:7, 49:17
**Feldman** [12] - 18:11, 36:20, 37:17, 39:1, 39:11, 44:11, 44:18, 44:20, 45:2, 45:25, 46:1, 49:19
**felony** [1] - 19:19
**felt** [1] - 57:20
**Fifth** [3] - 5:6, 38:18, 45:16
**file** [1] - 19:23
**filed** [7] - 5:23, 13:9, 21:18, 23:16, 23:18, 23:21, 53:25
**files** [1] - 20:14
**final** [2] - 9:17, 41:18
**finally** [1] - 41:18
**financial** [1] - 47:9

**findings** [2] - 6:15, 6:24
**fine** [1] - 20:8
**finished** [1] - 25:15
**first** [10] - 4:5, 4:21, 7:12, 13:20, 21:5, 21:25, 50:7, 51:21, 53:5
**First** [8] - 5:6, 37:4, 38:17, 44:17, 45:16, 51:15, 56:25, 57:9
**five** [1] - 46:17
**five-minute** [1] - 46:17
**fleshed** [2] - 36:18, 40:3
**Florida** [3] - 10:12, 10:15, 11:6
**following** [1] - 13:10
**FOR** [1] - 2:2
**force** [1] - 49:5
**foregoing** [1] - 58:13
**former** [3] - 16:2, 16:3, 19:16
**forth** [3] - 18:23, 43:20, 43:24
**forward** [5] - 35:14, 48:14, 48:15, 48:22, 54:6
**four** [3] - 10:4, 13:25, 41:5
**four-month** [1] - 13:25
**fourth** [1] - 27:23
**Fox** [1] - 16:15
**frame** [1] - 46:13
**frames** [2] - 36:25, 38:12
**frankly** [1] - 36:4
**Friday** [1] - 23:19
**front** [13] - 4:12, 6:4, 6:16, 8:13, 9:9, 12:14, 12:15, 13:4, 19:11, 20:21, 22:10, 42:6, 42:13
**fully** [4] - 11:9, 18:8, 36:18, 40:3

**G**

**game** [1] - 42:5
**Gene** [1] - 16:14
**General** [7] - 16:2, 16:3, 22:6, 33:13, 33:23, 34:18, 47:8
**general** [4] - 23:10, 23:12, 33:17, 33:21
**GENERAL** [1] - 2:2
**General's** [2] - 47:20, 47:21
**generally** [1] - 25:9
**Giuliani** [1] - 16:4

**given** [13] - 7:8, 10:24, 16:18, 16:20, 16:21, 22:18, 22:20, 23:21, 30:15, 30:16, 30:17, 45:24
**government** [8] - 5:23, 27:2, 31:15, 31:18, 33:2, 34:9, 34:17, 35:23
**governs** [1] - 14:6
**Grande** [1] - 37:25
**grant** [1] - 15:13
**granted** [1] - 5:24
**granting** [1] - 18:7
**great** [1] - 19:18
**ground** [1] - 57:6
**grounds** [1] - 6:18
**group** [1] - 5:18

**H**

**half** [2] - 13:4, 17:14
**Hamilton** [1] - 16:15
**hand** [1] - 52:10
**hard** [3] - 15:17, 26:4, 44:4
**harm** [8] - 15:15, 15:16, 17:22, 18:7, 18:9, 18:10, 41:7, 41:17
**Hawley** [1] - 16:6
**headed** [1] - 16:10
**Healthcare** [2] - 44:24, 45:22
**hear** [6] - 21:2, 21:5, 21:14, 24:3, 46:4, 56:25
**heard** [2] - 31:1, 31:10
**hearing** [6] - 13:11, 38:2, 46:3, 49:1, 55:11, 55:21
**Hearing** [6] - 3:15, 13:8, 31:9, 36:24, 38:10, 39:8
**held** [4] - 10:4, 10:15, 55:20, 58:14
**helped** [1] - 20:12
**hereby** [1] - 58:12
**high** [2] - 6:5, 19:3
**highly** [1] - 16:16
**Hillary** [2] - 20:5, 20:12
**himself** [1] - 16:11
**history** [1] - 53:17
**Hoc** [1] - 31:8
**hold** [1] - 42:24
**holiday** [1] - 23:22
**honesty** [1] - 19:3
**Honor** [83] - 3:9, 3:12, 4:1, 4:5, 4:21, 5:10,

**6:5, 6:12, 6:14, 6:16, 6:22, 7:7, 7:9, 7:25, 8:15, 8:21, 9:5, 9:8, 9:9, 9:25, 11:13, 12:14, 13:14, 14:11, 15:16, 15:17, 16:25, 17:5, 19:2, 19:8, 20:18, 20:19, 20:21, 21:17, 22:16, 22:24, 22:25, 23:15, 23:23, 24:1, 24:8, 24:13, 25:13, 27:17, 28:1, 29:15, 30:5, 31:13, 31:20, 31:23, 33:5, 33:8, 35:6, 35:8, 36:15, 36:19, 37:11, 37:19, 38:21, 39:16, 41:4, 41:19, 41:21, 42:4, 42:21, 44:5, 44:10, 46:14, 46:20, 48:2, 48:18, 50:9, 50:22, 51:10, 51:13, 51:25, 53:4, 54:17, 55:14, 55:22, 57:4, 58:1
**hope** [1] - 13:14
**hoped** [1] - 19:6
**hour** [1] - 23:1
**hours'** [1] - 52:19
**huge** [2] - 20:18, 43:14
**Huntington** [1] - 2:8

**I**

**i.e** [1] - 51:6
**id** [2] - 45:9, 45:25
**idea** [2] - 30:11, 46:15
**identical** [1] - 39:5
**identify** [1] - 56:22
**ideological** [3] - 15:21, 19:2, 19:11
**illegal** [1] - 10:16
**impact** [1] - 48:16
**impediment** [2] - 45:7, 49:20
**important** [9] - 5:4, 5:20, 6:11, 6:25, 7:6, 7:9, 9:23, 17:19, 18:20
**importantly** [4] - 26:13, 26:23, 30:15, 45:5
**impression** [1] - 56:9
**including** [3] - 16:22, 16:23, 29:3
**inconsistent** [1] - 50:1
**incorporated** [2] - 5:1, 53:24
**Indeed** [1] - 45:3

**independent** [3] - 35:10, 45:6, 45:21
**indicated** [3] - 47:7, 55:19, 56:19
**indicating** [1] - 49:11
**indication** [1] - 47:20
**individual** [1] - 24:23
**information** [1] - 56:20
**inherently** [1] - 12:20
**initial** [1] - 23:7
**initio** [1] - 48:20
**injunction** [16] - 3:25, 4:22, 5:1, 6:10, 7:1, 18:8, 26:14, 26:24, 29:4, 30:16, 30:17, 35:13, 40:13, 44:13, 48:19, 52:17
**injunctive** [3] - 45:12, 45:18, 49:2
**injuries** [1] - 38:2
**injury** [1] - 17:18
**inquiries** [3] - 33:8, 34:1, 34:4
**instance** [2] - 50:7, 51:21
**instant** [3] - 45:14, 45:20, 46:2
**institute** [1] - 10:8
**instruct** [1] - 32:16
**instructing** [1] - 32:14
**integrity** [1] - 19:3
**intends** [1] - 52:18
**intent** [2] - 52:2, 52:12
**intention** [1] - 4:5
**interest** [7] - 16:23, 17:24, 18:3, 41:20, 42:1, 43:15
**interested** [1] - 26:16
**interim** [1] - 38:13
**intimately** [1] - 52:25
**introduce** [1] - 51:8
**introducing** [1] - 52:5
**investigation** [1] - 19:20
**inviting** [1] - 38:5
**involved** [2] - 4:7, 15:2
**irrelevant** [2] - 51:23, 56:21
**irreparable** [4] - 17:18, 17:22, 41:7, 41:17
**issue** [34] - 6:24, 7:16, 8:6, 8:12, 8:15, 11:19, 11:20, 11:22, 12:11, 25:15, 25:16, 31:23, 36:3, 36:19, 37:2, 37:3, 37:7, 39:14, 40:19, 40:23, 42:6, 49:8, 50:3,

50:4, 51:5, 51:7, 51:15, 51:17, 51:18, 51:23, 52:9, 54:8, 54:12
**issued** [5] - 36:23, 36:24, 38:11, 39:9, 39:18
**issues** [21] - 4:7, 4:12, 4:16, 5:4, 5:21, 8:13, 11:3, 12:7, 12:9, 15:7, 39:21, 42:16, 42:17, 42:18, 43:9, 49:14, 49:17, 50:1, 54:10, 56:18, 57:23
**issuing** [1] - 10:5
**itself** [8] - 14:1, 14:3, 17:22, 35:23, 37:23, 43:13, 47:3, 47:14

**J**

**janitor** [1] - 30:9
**Jefferson** [14] - 21:19, 21:24, 23:1, 23:2, 26:25, 27:15, 27:19, 28:12, 28:20, 29:5, 32:17, 33:4, 33:11, 34:2
**Jeffrey** [1] - 16:5
**JESSICA** [1] - 2:3
**Jessica** [1] - 3:18
**jessica.krupke@dc. gov** [1] - 2:5
**Johnson** [1] - 37:25
**Josh** [1] - 16:6
**judge** [7] - 8:19, 14:15, 26:11, 26:12, 26:21, 26:22, 53:16
**Judge** [3] - 5:11, 5:12, 5:25
**judges** [1] - 52:24
**judgment** [3] - 37:22, 37:23, 44:22
**judgments** [2] - 38:4, 38:7
**juris** [1] - 24:13
**jurisdiction** [9] - 7:15, 11:25, 12:18, 14:25, 32:5, 41:23, 45:8, 47:23, 48:7
**jurisdictions** [3] - 9:19, 10:21, 41:15
**Justice** [1] - 16:9

**K**

**Kean** [2] - 58:12, 58:16
**keep** [1] - 8:19
**Kellyanne** [1] - 16:1
**Kendall** [2] - 20:11,

20:16
**Kevin** [2] - 19:14
**kind** [1] - 34:21
**Klayman** [16] - 3:4, 3:10, 3:23, 7:10, 21:18, 24:7, 36:20, 39:21, 41:9, 42:24, 43:19, 44:16, 46:22, 52:2, 52:13, 54:4
**KLAYMAN** [94] - 3:9, 4:1, 4:4, 7:24, 8:7, 8:11, 8:21, 9:4, 11:24, 12:4, 12:13, 13:19, 13:23, 14:19, 15:1, 15:4, 15:9, 20:25, 21:3, 21:6, 21:10, 24:8, 24:11, 25:12, 25:18, 25:25, 27:8, 27:14, 27:23, 28:5, 28:9, 28:11, 28:22, 29:2, 29:9, 29:12, 29:15, 29:21, 29:25, 30:4, 30:12, 31:2, 31:6, 31:12, 31:20, 32:7, 32:11, 32:16, 32:21, 33:1, 35:6, 35:8, 35:21, 42:4, 42:12, 42:20, 42:23, 43:4, 43:11, 44:4, 44:10, 46:13, 48:1, 48:8, 48:17, 50:9, 50:13, 50:19, 50:25, 51:9, 53:5, 53:12, 53:15, 53:18, 53:21, 53:23, 54:16, 54:19, 54:24, 55:3, 55:6, 55:13, 55:22, 56:1, 56:5, 56:10, 56:13, 56:22, 57:2, 57:6, 57:13, 57:17, 57:20, 58:1
**Klayman's** [3] - 24:3, 45:16, 53:1
**knows** [1] - 19:2
**KRUPKE** [22] - 2:3, 3:18, 21:17, 21:24, 22:6, 22:10, 22:15, 22:24, 23:5, 23:15, 24:6, 24:12, 24:17, 24:19, 25:3, 25:16, 33:5, 33:8, 33:20, 33:23, 35:1, 35:3
**Krupke** [1] - 3:18

**L**

**landmark** [1] - 10:12
**language** [1] - 14:6
**large** [1] - 19:21
**Larry** [4] - 3:4, 3:9, 43:19, 46:21

**last** [3] - 23:7, 29:4, 39:17
**launder** [1] - 20:4
**laundering** [1] - 20:3
**law** [16] - 5:16, 6:15, 6:24, 6:25, 7:20, 9:22, 10:24, 11:4, 11:14, 14:17, 17:17, 20:19, 27:6, 34:14, 51:6, 56:9
**lawyer** [2] - 10:16, 20:14
**lawyers** [4] - 4:15, 5:19, 14:23, 15:23
**lays** [1] - 4:24
**least** [4] - 24:21, 47:22, 48:22, 50:2
**leave** [1] - 18:25
**lectern** [1] - 3:6
**leftist** [2] - 20:9, 20:17
**legal** [2] - 4:25, 8:6
**Les** [2] - 3:12, 36:16
**LESLIE** [1] - 2:7
**liability** [2] - 25:8, 47:9
**liable** [1] - 25:1
**lie** [1] - 47:10
**lied** [1] - 20:5
**life** [1] - 5:18
**light** [2] - 49:20, 51:18
**likelihood** [2] - 17:13, 41:6
**limited** [3] - 3:20, 18:12, 52:8
**line** [2] - 18:15, 29:4
**listened** [1] - 35:8
**listening** [1] - 21:12
**literally** [1] - 20:15
**litigant** [5] - 6:19, 13:3, 42:16, 43:18, 49:12
**litigate** [1] - 8:12
**litigated** [3] - 7:17, 11:9, 18:9
**litigation** [7] - 12:7, 15:14, 43:6, 44:16, 45:11, 45:22, 54:9
**live** [3] - 52:17, 52:18, 52:21
**Lives** [2] - 5:17
**lmachado@ ohaganmeyer.com** [1] - 2:9
**local** [6] - 6:13, 14:16, 34:9, 34:13, 35:2, 52:13
**look** [11] - 13:14, 15:19, 15:20, 16:9, 27:23, 30:24, 35:5, 38:20, 38:24, 41:3, 46:5

**looked** [2] - 13:15, 46:24
**lose** [3] - 42:17, 43:8, 49:14
**loser's** [1] - 37:24
**losers** [1] - 38:3
**losing** [1] - 37:23
**lost** [4] - 38:12, 38:16, 55:13
**lower** [2] - 17:9, 44:9
**lying** [2] - 19:19, 20:5

**M**

**MACHADO** [11] - 2:7, 3:12, 36:15, 37:10, 37:15, 39:16, 40:20, 41:4, 50:22, 51:13, 51:25
**Machado** [2] - 3:13, 36:16
**magistrate** [4] - 26:11, 26:12, 26:21, 26:22
**mandatory** [2] - 13:17, 39:22
**manner** [1] - 34:13
**Marc** [2] - 20:1
**Martin** [1] - 16:10
**matter** [20] - 3:24, 9:10, 18:8, 20:22, 31:21, 31:22, 40:1, 40:4, 40:17, 43:17, 45:14, 45:20, 46:7, 46:8, 48:2, 49:13, 49:20, 55:10, 55:11, 58:14
**Matter** [2] - 5:17, 5:18
**matters** [3] - 4:2, 6:12, 7:11
**Mayor** [1] - 16:3
**McFadden** [1] - 5:11
**mean** [14] - 8:19, 9:25, 14:21, 22:18, 31:25, 33:2, 36:6, 36:9, 37:14, 38:15, 42:5, 44:6, 49:21, 51:14
**meaning** [1] - 18:4
**member** [8] - 9:18, 10:17, 10:22, 11:5, 11:7, 11:8, 18:1, 19:16
**members** [4] - 3:14, 3:15, 17:25, 18:3
**mentioning** [1] - 11:16
**merely** [1] - 32:19
**merit** [1] - 44:18
**merits** [1] - 57:9
**MEYER** [1] - 2:7
**Michael** [4] - 26:6, 27:24, 28:3

**might** [3] - 5:22, 39:2, 39:11
**Mills** [2] - 17:20, 18:10
**mine** [1] - 15:22
**minute** [3] - 17:21, 36:13, 46:17
**misrepresentations** [1] - 34:5
**missing** [1] - 27:21
**Mobile** [1] - 38:7
**moment** [1] - 25:14
**Monell** [1] - 25:8
**money** [2] - 20:3, 41:14
**month** [2] - 13:25, 39:18
**months** [4] - 9:11, 9:14, 19:18, 19:22
**mooted** [1] - 9:12
**morning** [10] - 3:9, 3:11, 3:12, 3:17, 3:18, 3:23, 21:17, 23:20, 36:15, 52:12
**Morrell** [1] - 13:24
**most** [1] - 16:20
**mostly** [1] - 35:22
**motion** [19] - 3:24, 4:23, 4:24, 5:1, 5:22, 6:4, 9:10, 26:13, 26:23, 29:4, 30:16, 30:17, 35:13, 38:1, 41:15, 46:14, 53:25, 56:2
**motions** [2] - 46:3, 52:17
**MR** [104] - 3:9, 3:12, 4:1, 4:4, 7:24, 8:7, 8:11, 8:21, 9:4, 11:24, 12:4, 12:13, 13:19, 13:23, 14:19, 15:1, 15:4, 15:9, 20:25, 21:3, 21:6, 21:10, 24:8, 24:11, 25:12, 25:18, 25:25, 27:8, 27:14, 27:23, 28:5, 28:9, 28:11, 28:22, 29:2, 29:9, 29:12, 29:15, 29:21, 29:25, 30:4, 30:12, 31:2, 31:6, 31:12, 31:20, 32:7, 32:11, 32:16, 32:21, 33:1, 35:6, 35:8, 35:21, 36:15, 37:10, 37:15, 39:16, 40:20, 41:4, 42:4, 42:12, 42:20, 42:23, 43:4, 43:11, 44:4, 44:10, 46:13, 48:1, 48:8, 48:17, 50:9, 50:13, 50:19,

**N**

**name** [4] - 21:25, 23:4, 23:7, 30:14
**narrow** [3] - 45:2, 45:24, 52:5
**nearly** [1] - 16:21
**need** [12] - 8:22, 11:18, 13:2, 32:1, 34:17, 34:19, 35:19, 37:1, 46:14, 52:18, 52:20, 53:5
**needless** [1] - 52:22
**needs** [2] - 11:18, 46:9
**new** [3] - 14:9, 16:8, 43:21
**New** [1] - 16:3
**news** [1] - 20:8
**next** [1] - 28:13
**nine** [2] - 3:14, 9:11
**nobody** [1] - 35:15
**non** [1] - 24:13
**none** [1] - 54:2
**nonetheless** [1] - 55:19
**normal** [1] - 57:2
**Northwest** [2] - 26:19, 28:17
**notably** [1] - 39:19
**note** [4] - 4:9, 24:1, 24:12, 52:12
**nothing** [6] - 29:18, 31:4, 41:20, 56:6, 56:7, 57:8
**notice** [11] - 26:10, 26:11, 26:20, 26:21, 28:18, 30:18, 30:19, 35:11, 35:24, 52:19
**notwithstanding** [2] - 18:1, 33:12

**number** [5] - 13:13, 19:14, 43:11, 43:24, 51:14
**NW** [1] - 2:3

**O**

**O'HAGAN** [1] - 2:7
**Obama** [1] - 16:24
**object** [1] - 53:3
**obviously** [4] - 27:10, 34:11, 41:5, 47:10
**occur** [1] - 6:17
**occurred** [1] - 13:25
**OF** [1] - 2:2
**office** [4] - 21:21, 22:1, 23:9, 23:25
**Office** [13] - 9:16, 22:3, 22:6, 27:22, 28:7, 28:8, 30:7, 33:13, 33:23, 34:18, 47:8, 47:20, 47:21
**OFFICE** [1] - 2:2
**officer** [3] - 47:2, 47:5, 47:19
**old** [1] - 14:9
**omit** [1] - 42:17
**one** [16] - 11:3, 16:16, 16:18, 17:21, 19:14, 25:14, 30:12, 31:6, 34:2, 35:6, 43:11, 45:2, 51:14, 52:1, 52:8, 57:23
**opinion** [5] - 6:1, 40:21, 40:25, 41:1, 55:17
**opportunity** [8] - 11:21, 13:14, 15:3, 23:18, 42:9, 51:6, 54:10, 57:24
**opposition** [4] - 4:23, 23:16, 41:15, 53:25
**option** [1] - 42:13
**order** [19] - 3:2, 7:8, 9:9, 9:17, 10:3, 18:14, 18:16, 23:13, 25:6, 27:4, 27:7, 31:23, 32:2, 32:5, 33:14, 39:18, 46:11, 48:18, 55:19
**ordinary** [1] - 29:22
**otherwise** [2] - 26:16, 56:20
**outcome** [1] - 40:11
**outside** [1] - 45:21
**outweighed** [1] - 52:21
**overlooked** [1] - 55:20
**overseeing** [1] - 41:22
**owes** [1] - 36:1

**own** [2] - 12:21, 14:12

**P**

**p.m** [1] - 28:15
**papers** [1] - 36:18
**paragraph** [6] - 27:25, 28:1, 28:11, 28:14, 29:5
**part** [7] - 9:10, 19:21, 33:22, 40:7, 47:11, 51:11, 53:10
**participated** [1] - 20:3
**particular** [4] - 5:5, 8:3, 14:25, 36:8
**particularity** [1] - 43:20
**particularly** [3] - 6:20, 17:4, 45:24
**parties** [3] - 3:6, 45:9, 46:23
**partisan** [1] - 16:16
**party** [6] - 24:15, 24:21, 25:4, 26:16, 37:20, 52:18
**party's** [1] - 37:23
**pattern** [2] - 4:13, 51:1
**PAUL** [1] - 2:7
**pay** [1] - 25:2
**penalty** [1] - 27:20
**pending** [3] - 10:6, 12:23, 15:14
**people** [1] - 16:22
**per** [1] - 17:22
**percent** [1] - 11:1
**perjury** [1] - 27:20
**permission** [1] - 27:10
**person** [15] - 16:16, 21:23, 22:2, 22:13, 22:21, 23:8, 23:24, 30:11, 30:15, 31:14, 31:15, 33:11, 34:2, 34:3, 46:10
**person's** [1] - 21:25
**personally** [2] - 8:22, 8:24
**pertain** [1] - 43:13
**phase** [1] - 53:6
**phone** [1] - 33:9
**physical** [1] - 27:19
**PI** [1] - 41:16
**pick** [1] - 4:21
**picked** [1] - 36:19
**piecemeal** [3] - 12:6, 43:6, 54:9
**plaintiff** [5] - 3:8, 21:18, 25:7, 38:15, 45:6
**plaintiff's** [2] - 26:13, 26:23

**plausibility** [1] - 6:7
**play** [2] - 29:15, 29:17
**pleadings** [1] - 19:13
**plenty** [1] - 57:15
**PLLC** [1] - 2:7
**podium** [1] - 33:7
**point** [8] - 4:20, 24:14, 30:21, 34:7, 36:4, 47:22, 52:1, 54:23
**pointed** [1] - 7:25
**policing** [1] - 14:23
**political** [2] - 15:21, 19:12
**portion** [1] - 44:12
**position** [6] - 8:8, 13:16, 20:24, 24:20, 43:16, 57:9
**possible** [1] - 17:10
**practice** [11] - 4:13, 9:22, 10:10, 11:4, 14:17, 14:24, 17:17, 51:1, 52:15, 52:16
**practiced** [1] - 5:13
**practicing** [1] - 10:24
**practitioner** [1] - 11:2
**precedent** [1] - 7:4
**preclude** [2] - 18:12, 46:1
**precludes** [1] - 37:20
**predetermined** [1] - 13:1
**prejudged** [2] - 40:11, 41:11
**prejudice** [2] - 13:5, 17:14
**preliminary** [17] - 3:25, 4:2, 4:22, 5:1, 6:10, 7:1, 18:8, 26:13, 26:23, 29:4, 30:16, 30:17, 35:13, 40:13, 44:13, 48:19, 52:16
**prepared** [1] - 49:10
**present** [6] - 4:19, 15:25, 21:7, 46:23, 50:24, 50:25
**presentation** [1] - 52:22
**presents** [2] - 45:6, 45:20
**preserve** [2] - 11:4, 38:23
**President** [4] - 5:13, 16:23, 16:24
**presumptuous** [1] - 53:10
**prevail** [1] - 12:10
**preventing** [2] - 35:15, 54:24
**prevents** [1] - 10:23,

38:2, 39:1
**previous** [1] - 6:16
**previously** [4] - 49:11, 51:7, 56:3, 56:19
**private** [2] - 20:13, 26:6
**pro** [2] - 3:10, 5:18
**pro-life** [1] - 5:18
**problem** [2] - 9:5, 49:18
**Procedure** [4] - 6:14, 34:15, 34:22, 35:4
**proceed** [9] - 3:25, 11:18, 31:22, 43:19, 48:2, 48:5, 48:8, 51:24, 55:2
**proceeding** [9] - 6:13, 7:1, 9:7, 11:17, 11:22, 13:6, 39:7, 40:17
**proceedings** [4] - 10:21, 15:24, 38:5, 58:14
**PROCEEDINGS** [1] - 3:1
**process** [16] - 21:16, 25:20, 26:5, 26:6, 28:3, 28:22, 29:9, 29:21, 31:21, 32:11, 32:17, 36:3, 46:6, 46:12, 46:25, 47:16
**Profession** [1] - 3:13
**Professional** [2] - 15:19, 19:16
**Professor** [1] - 18:25
**proffer** [4] - 50:14, 51:11, 56:10, 57:2
**proffering** [3] - 51:9, 51:10, 54:19
**progeny** [1] - 6:7
**promulgated** [4] - 14:1, 14:3, 18:4, 43:17
**proper** [2] - 25:4, 34:22, 47:23
**properly** [1] - 3:21
**proposed** [1] - 7:7
**prosecution** [2] - 4:8, 17:1
**protect** [1] - 10:1
**proud** [1] - 17:25
**provide** [3] - 52:11, 52:16, 52:18
**provides** [1] - 47:2
**provision** [2] - 19:22, 34:24
**provisions** [1] - 34:10
**public** [12] - 16:23, 17:24, 18:2, 20:14, 21:21, 22:1, 23:9,

23:24, 36:1, 41:19, 42:1
**pure** [1] - 52:4
**purpose** [4] - 39:19, 44:20, 52:5, 52:8
**purposes** [2] - 6:10, 48:18
**pursue** [2] - 6:20, 49:13
**pursuing** [1] - 43:6
**put** [2] - 18:23, 49:7

**Q**

**questionable** [1] - 47:14
**quickly** [1] - 9:24
**quiet** [1] - 43:2
**quote** [7] - 38:2, 44:19, 44:21, 44:25, 45:3, 45:5, 45:21
**quote-unquote** [1] - 45:21

**R**

**raise** [24] - 11:21, 11:22, 12:9, 12:11, 15:5, 37:3, 37:4, 37:5, 42:9, 42:16, 42:18, 43:9, 49:14, 49:16, 51:6, 54:11, 56:18, 56:25, 57:11, 57:12, 57:23, 57:24
**raised** [23] - 11:24, 12:2, 12:11, 37:6, 37:8, 37:12, 37:13, 39:21, 40:18, 42:11, 42:19, 43:7, 49:15, 50:2, 50:5, 50:6, 50:7, 51:19, 51:20, 51:21, 54:7, 54:13
**raising** [4] - 8:19, 12:7, 54:5, 54:10
**rather** [1] - 23:9
**read** [6] - 28:1, 28:14, 30:2, 44:11, 50:10, 58:2
**ready** [1] - 17:11
**really** [2] - 39:3, 51:23
**reason** [3] - 54:5, 55:15, 55:18
**reasoned** [1] - 9:24
**reasons** [4] - 19:7, 30:4, 53:4, 56:19
**rebutted** [1] - 4:11
**recalling** [1] - 46:21
**receive** [1] - 32:4
**received** [3] - 23:9, 32:5, 33:10
**recent** [1] - 5:11

**recess** [4] - 46:4, 46:17, 46:18, 49:12
**reciprocal** [1] - 10:20
**recommendation** [6] - 9:17, 10:5, 31:8, 36:25, 39:9, 49:4
**record** [10] - 3:7, 7:6, 18:23, 23:17, 31:12, 49:7, 50:17, 51:8, 51:11, 54:20
**reference** [8] - 5:2, 26:10, 26:20, 28:18, 50:3, 50:4, 53:24
**referenced** [3] - 41:3, 46:5, 52:14
**referencing** [1] - 34:25
**refused** [3] - 12:22, 43:13, 43:14
**regard** [11] - 4:7, 5:7, 12:24, 16:11, 17:13, 22:16, 27:8, 45:18, 48:22, 48:24, 49:1
**regarding** [5] - 7:16, 7:22, 46:6, 46:25, 56:25
**regards** [1] - 5:12
**regurgitate** [3] - 53:3, 53:6
**regurgitated** [1] - 40:5
**reinstatement** [1] - 19:22
**rejection** [1] - 38:6
**related** [1] - 45:8
**relevance** [1] - 54:22
**relevant** [2] - 52:7, 57:1
**relief** [14] - 30:21, 30:22, 36:22, 39:5, 39:10, 44:16, 45:12, 45:19, 48:17, 48:23, 48:24, 49:1, 49:2
**rely** [1] - 18:6
**remain** [1] - 17:25
**remedies** [3] - 8:2, 15:10, 17:9
**remedy** [3] - 42:2, 43:25, 44:2
**rendered** [1] - 38:4
**renew** [1] - 56:2
**repackaging** [1] - 38:14
**repeat** [1] - 45:15
**repeatedly** [2] - 45:1, 52:13
**report** [6] - 13:9, 31:7, 36:24, 39:8, 48:19, 49:4
**reporter** [1] - 46:17
**represent** [1] - 20:16
**representation** [1] -

34:19
**represented** [1] - 19:15
**Republican** [3] - 4:15, 5:19, 16:18
**request** [3] - 49:6, 50:14, 55:23
**requested** [1] - 48:17
**requesting** [1] - 30:22
**require** [2] - 47:7, 47:18
**required** [3] - 4:18, 30:19, 36:25
**requirement** [1] - 13:17
**requires** [2] - 17:4, 47:2
**respect** [3] - 11:16, 21:12, 42:4
**respected** [2] - 10:13, 11:10
**respectfully** [7] - 6:17, 6:23, 42:20, 49:6, 50:14, 54:16, 55:23
**response** [1] - 33:10
**responsibility** [2] - 14:23, 26:5
**Responsibility** [3] - 3:14, 15:20, 19:17
**responsible** [2] - 41:22, 47:12
**rest** [1] - 18:11
**restrained** [1] - 48:15
**result** [1] - 5:15
**retaliated** [1] - 16:11
**retaliatory** [1] - 9:20
**reversal** [1] - 57:7
**reversed** [5] - 6:1, 6:17, 9:13, 53:13, 53:17
**review** [4] - 20:22, 37:21, 38:6, 44:22
**rights** [11] - 6:20, 11:9, 17:21, 37:24, 38:14, 38:17, 38:18, 39:4, 42:13, 44:17, 45:17
**ripe** [1] - 18:3
**RMR** [2] - 58:12, 58:16
**Rooker** [14] - 8:1, 15:4, 18:11, 36:20, 37:17, 39:1, 39:11, 44:11, 44:18, 44:20, 45:2, 45:25, 46:1, 49:19
**Rooker-Feldman** [12] - 18:11, 36:20, 37:17, 39:1, 39:11, 44:11, 44:18, 44:20, 45:2, 45:25, 46:1, 49:19

**Rubin** [1] - 10:15
**Rudy** [1] - 16:4
**Rule** [4] - 11:20, 17:14, 34:8, 45:13
**rule** [21] - 9:2, 12:21, 13:25, 14:3, 14:9, 22:17, 39:21, 40:16, 41:3, 43:17, 43:21, 43:22, 46:5, 46:25, 47:1, 47:17, 49:10, 50:3, 55:16, 55:18
**ruled** [2] - 8:9, 18:18
**rules** [14] - 6:14, 13:2, 13:3, 14:5, 14:12, 18:3, 34:24, 34:25, 36:6, 36:8, 36:12, 37:1, 52:13
**Rules** [4] - 6:14, 34:15, 34:22, 35:3
**ruling** [7] - 9:5, 49:2, 49:3, 49:22, 56:8, 57:21
**rulings** [1] - 43:12
**rushed** [1] - 10:7
**Russian** [1] - 19:20

**S**

**sanctioned** [1] - 19:17
**sat** [1] - 9:14
**Sataki** [1] - 10:3
**satisfy** [2] - 41:7, 41:8
**satisfying** [1] - 40:12
**scheduled** [1] - 55:11
**scheme** [1] - 20:3
**scholar** [1] - 19:1
**se** [2] - 3:10, 17:22
**seated** [1] - 3:11
**second** [2] - 27:25, 38:24
**secondly** [3] - 53:9, 53:21, 53:23
**Section** [2] - 25:7, 44:21
**see** [14] - 14:15, 22:22, 33:3, 33:10, 49:12, 49:17, 49:25, 50:6, 51:15, 51:16, 51:17, 51:20, 54:4, 57:3
**seek** [2] - 11:22, 49:16
**seeking** [9] - 19:8, 36:22, 37:20, 39:4, 39:10, 44:16, 45:18, 50:23, 50:25
**seeks** [1] - 45:17
**seem** [1] - 31:15
**seemingly** [1] - 47:1
**selective** [2] - 4:8, 17:1
**self** [1] - 50:16

**self-authenticating** [1] - 50:16

**semantics** [2] - 29:15, 29:17

**Senators** [1] - 16:5

**send** [1] - 32:11

**sense** [1] - 7:21

**sent** [2] - 9:16, 9:19

**separate** [1] - 35:18

**serious** [1] - 8:14

**seriously** [1] - 20:22

**serve** [4] - 30:8, 30:9, 33:14, 35:19

**served** [36] - 3:21, 7:14, 19:18, 19:23, 21:6, 21:15, 21:19, 22:14, 22:21, 23:13, 23:14, 24:15, 26:18, 27:3, 27:5, 27:13, 27:22, 28:10, 28:15, 28:24, 29:3, 30:6, 30:10, 30:14, 31:4, 32:2, 32:15, 34:18, 34:19, 35:13, 46:11, 46:12, 47:3, 47:8, 48:9, 48:21

**server** [7] - 20:13, 26:7, 28:4, 28:23, 29:10, 32:12, 32:18

**servers** [1] - 29:22

**service** [57] - 21:18, 21:20, 22:3, 22:4, 22:23, 23:17, 23:21, 24:14, 25:5, 25:15, 25:16, 25:20, 26:1, 26:2, 26:5, 26:9, 27:1, 27:7, 27:10, 27:11, 27:16, 28:13, 28:20, 28:25, 29:6, 29:8, 29:19, 29:23, 30:5, 31:5, 31:17, 31:19, 32:3, 32:4, 33:12, 33:14, 33:25, 34:3, 34:8, 34:12, 34:16, 34:20, 34:22, 34:23, 35:12, 36:3, 36:9, 46:6, 46:25, 47:16, 47:18, 47:21, 47:23, 48:6, 48:7, 48:10

**serving** [3] - 26:24, 29:4, 34:13

**set** [5] - 7:4, 37:1, 38:10, 43:20, 43:24

**setting** [1] - 39:13

**seven** [3] - 19:18, 19:22, 55:14

**several** [2] - 25:18, 52:24

**shall** [4] - 13:12, 14:4,

43:22

**share** [1] - 52:6

**shell** [1] - 42:5

**Shipp** [1] - 16:15

**shirked** [1] - 18:18

**short** [1] - 44:12

**shorten** [1] - 11:17

**show** [2] - 41:17, 51:1

**showing** [2] - 23:11, 26:1

**shown** [1] - 17:13

**sic** [1] - 17:20

**signed** [1] - 27:19

**significant** [3] - 17:12, 17:18, 18:9

**similar** [1] - 19:10

**similarity** [1] - 4:17

**situation** [3] - 14:22, 20:1, 20:11

**Sixth** [1] - 6:21

**slap** [1] - 19:24

**slow** [3] - 55:4, 55:5, 55:9

**sole** [1] - 11:2

**solely** [2] - 44:22, 45:12

**someone** [3] - 23:6, 32:4, 43:19

**somewhere** [1] - 23:4

**soon** [2] - 46:7, 46:16

**sorry** [2] - 27:21, 34:8

**sort** [2] - 37:1, 41:24

**sought** [4] - 8:2, 8:3, 39:5, 45:12

**speaks** [1] - 37:17

**Special** [1] - 20:2

**specifically** [3] - 4:25, 11:15, 34:1

**speeded** [2] - 55:10, 55:13

**spinning** [1] - 38:20

**stacked** [1] - 10:11

**stacking** [4] - 9:7, 10:2, 10:18, 17:15

**stage** [1] - 30:19

**stand** [9] - 4:6, 11:12, 11:13, 21:1, 50:20, 52:4, 52:8, 52:11, 53:2

**standard** [2] - 6:6, 40:12

**standing** [2] - 11:5, 11:7

**start** [1] - 21:12

**started** [1] - 52:11

**state** [3] - 3:6, 7:20, 7:23, 12:8, 12:10, 12:23, 15:6, 15:14, 18:13, 34:9, 37:8, 37:15, 37:20, 37:21,

37:23, 38:3, 38:4, 38:16, 39:5, 39:6, 41:21, 41:22, 41:24, 42:16, 42:17, 42:19, 43:7, 43:10, 44:22, 45:9, 45:11, 49:13, 49:14, 50:6, 51:5

**state's** [1] - 34:13

**States** [4] - 17:19, 26:12, 26:22, 37:22

**states** [2] - 13:8, 26:7

**stating** [1] - 21:19

**statute** [2] - 13:7, 13:8

**statutory** [1] - 14:5

**stay** [7] - 12:22, 12:24, 12:25, 15:13, 17:10, 43:14

**Steele** [1] - 20:4

**still** [4] - 11:8, 13:21, 55:17, 55:25

**Stop** [1] - 39:6

**stop** [1] - 41:25

**stopping** [1] - 41:21

**Street** [3] - 2:3, 26:19, 28:16

**strong** [1] - 6:1

**structure** [1] - 33:18

**subject** [1] - 15:23

**subjected** [1] - 13:6

**submit** [4] - 18:25, 19:4, 22:15, 35:9

**submitted** [5] - 4:9, 18:22, 53:23, 54:1, 54:2

**subsequently** [1] - 49:23

**substance** [1] - 37:21

**substantial** [1] - 4:17

**substantially** [1] - 19:10

**substituted** [1] - 24:19

**success** [2] - 17:13, 41:6

**succinct** [1] - 44:12

**sue** [2] - 24:21, 25:6

**sued** [6] - 3:15, 16:22, 24:23, 25:9, 47:15

**suggest** [3] - 31:20, 41:20, 58:1

**sui** [1] - 24:13

**Suite** [2] - 2:3, 2:8

**suits** [1] - 38:2

**summons** [3] - 26:9, 26:19, 28:17

**Superior** [21] - 7:18, 8:4, 8:9, 8:13, 10:6, 34:15, 35:3, 36:21, 38:10, 39:19, 40:22, 42:6, 44:1, 44:15, 46:25, 49:21, 49:24,

51:19, 54:8, 57:12

**support** [2] - 40:10, 41:10

**supports** [2] - 35:18, 42:1

**Supreme** [9] - 10:12, 37:25, 38:8, 44:3, 44:5, 44:8, 44:19, 44:22, 45:1

**suspended** [1] - 19:24

**suspension** [1] - 10:8

**sworn** [1] - 26:8

**system** [5] - 7:23, 12:20, 14:17, 16:7, 16:25

**Systems** [2] - 44:24, 45:22

---

**T**

**Ted** [1] - 16:6

**temporarily** [1] - 19:24

**temporary** [1] - 10:8

**ten** [1] - 53:17

**tendered** [1] - 25:24

**terms** [5] - 4:16, 6:4, 17:16, 18:7, 30:21

**territory** [1] - 8:20

**testify** [6] - 4:6, 4:18, 6:11, 11:1, 18:22, 49:7

**testimony** [5] - 52:11, 52:17, 52:18, 52:21, 54:2

**Texas** [1] - 10:14

**THE** [124] - 3:11, 3:17, 3:23, 4:3, 7:10, 8:6, 8:8, 8:18, 8:24, 11:21, 12:2, 12:6, 13:15, 13:21, 14:14, 14:21, 15:3, 15:5, 20:23, 21:2, 21:5, 21:8, 21:11, 21:23, 22:4, 22:8, 22:12, 22:17, 23:3, 23:11, 24:2, 24:7, 24:10, 24:16, 24:18, 24:25, 25:11, 25:14, 25:17, 27:2, 27:13, 27:21, 28:3, 28:6, 28:10, 28:19, 29:1, 29:7, 29:11, 29:13, 29:17, 29:24, 30:1, 30:8, 30:25, 31:3, 31:10, 31:14, 31:24, 32:10, 32:13, 32:19, 32:23, 33:2, 33:6, 33:17, 33:21, 34:24, 35:2, 35:5, 35:7, 35:17, 36:5, 37:2, 37:14, 39:14, 40:14, 41:2,

42:3, 42:8, 42:15, 42:22, 42:24, 43:5, 43:25, 44:6, 46:3, 46:15, 46:19, 46:24, 48:5, 48:11, 49:10, 50:11, 50:18, 50:21, 50:23, 51:4, 51:12, 51:14, 53:10, 53:13, 53:16, 53:19, 53:22, 54:4, 54:18, 54:22, 55:1, 55:5, 55:8, 55:17, 55:24, 56:3, 56:6, 56:12, 56:15, 56:24, 57:5, 57:8, 57:15, 57:19, 57:22, 58:3

**theoretically** [1] - 25:1

**therefore** [6] - 35:19, 37:1, 44:9, 49:3, 51:20, 54:2

**they've** [3] - 35:11, 41:11, 54:2

**third** [3] - 27:25, 28:1, 28:11

**thorough** [1] - 4:20

**three** [2] - 3:14, 19:12

**throughout** [1] - 5:5

**thrown** [1] - 20:15

**time-consuming** [1] - 10:23

**timeline** [1] - 12:17

**timely** [2] - 12:16, 17:8

**titled** [1] - 58:14

**today** [12] - 3:24, 4:6, 5:3, 6:10, 19:6, 31:25, 35:15, 39:4, 39:20, 48:25, 49:7, 55:11

**tolerated** [1] - 17:7

**took** [1] - 49:12

**top** [1] - 27:24

**topic** [2] - 37:18, 39:11

**transcript** [1] - 58:13

**transcription** [1] - 58:13

**trash** [1] - 20:15

**trial** [3] - 26:11, 26:21, 48:25

**tried** [1] - 17:9

**trigger** [1] - 10:20

**triggered** [1] - 19:20

**true** [2] - 14:8, 58:13

**Trump** [1] - 5:13

**try** [4] - 39:2, 39:10, 46:9, 50:24

**trying** [6] - 23:1, 23:20, 29:17, 42:25, 55:4, 55:5

**twice** [1] - 45:4

**two** [5] - 16:12, 30:4, 34:10, 34:21, 41:18
**Twombly** [1] - 6:7
**Ty** [1] - 20:14
**type** [1] - 47:9
**typically** [1] - 25:3

### U

**U.S** [2] - 44:25, 45:23
**U.S.C** [3] - 44:21, 45:14, 45:15
**ultimately** [1] - 5:24
**uncertainty** [1] - 9:22
**unconstitutional** [1] - 31:9
**under** [22] - 5:19, 6:7, 6:13, 6:21, 8:1, 11:25, 12:18, 14:4, 14:9, 16:14, 17:5, 18:10, 27:19, 34:8, 34:15, 34:21, 43:21, 44:17, 45:13, 45:14
**underscores** [1] - 36:4
**undue** [1] - 52:21
**unethical** [1] - 10:16
**unfair** [1] - 10:16
**unintentional** [1] - 55:15
**United** [4] - 17:19, 26:12, 26:22, 37:22
**unquote** [5] - 44:23, 45:2, 45:4, 45:5, 45:21
**up** [22] - 4:21, 5:25, 7:18, 8:17, 8:25, 9:21, 10:25, 20:7, 27:24, 33:6, 36:19, 39:15, 39:25, 40:2, 40:19, 44:4, 49:8, 50:17, 52:3, 55:10, 55:13
**upset** [1] - 42:25
**usurp** [1] - 14:16

### V

**vacate** [1] - 31:7
**various** [3] - 5:21, 6:12, 19:7
**vests** [1] - 44:21
**vexatious** [1] - 6:19
**view** [2] - 56:18, 56:20
**viewpoint** [9] - 4:8, 4:14, 5:7, 5:12, 17:2, 18:24, 49:5, 51:1, 53:1
**views** [2] - 18:1, 53:1
**vindictive** [1] - 9:20
**violated** [5] - 38:17, 38:18, 39:23, 40:16,

42:7
**violates** [1] - 37:24
**violating** [1] - 18:14
**violation** [7] - 15:2, 15:6, 25:7, 38:14, 44:17, 45:16, 51:16
**Virginia** [1] - 2:8
**virtually** [1] - 9:12
**void** [1] - 48:19

### W

**waited** [1] - 10:2
**Wallace** [1] - 16:14
**wants** [3] - 37:2, 39:2, 43:18
**Washington** [3] - 2:4, 26:19, 28:17
**waste** [1] - 52:22
**ways** [1] - 5:16
**weaponized** [2] - 16:8, 16:25
**weaved** [1] - 32:8
**Weaver** [4] - 26:6, 27:24, 28:3
**week** [1] - 26:17
**weekend** [1] - 23:22
**weigh** [1] - 6:23
**well-respected** [1] - 10:13
**whatsoever** [1] - 56:8
**whichever** [1] - 7:2
**wins** [1] - 10:13
**witness** [4] - 4:6, 11:12, 11:13, 20:25
**witnesses** [1] - 52:20
**wonderment** [1] - 52:6
**works** [1] - 23:7
**wrist** [1] - 19:21
**writing** [1] - 22:8

### Y

**year** [1] - 10:14
**years** [9] - 8:20, 10:4, 10:25, 11:6, 11:8, 26:15, 52:15, 53:16
**York** [1] - 16:4
**Younger** [1] - 8:1