**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

| | |
|---|---|
| IN RE: LARRY KLAYMAN | } |
| | } |
| | } |
| Petitioner | }  **Case Number: 3:22-mc-14-TJC-JRK** |
| | } |
| | } |
| | } |
| | } |

**EXPEDITED LARRY KLAYMAN'S  NOTICE OF FILING PETITION**
**PURSUANT TO RULE 2.04**

Petitioner Larry Klayman ("Mr. Klayman") hereby notifies the Court that he is filing the attached Petition to Chief Judge Concerning Suspension Order of the Supreme Court of Florida and Motion to Stay, Exhibit 1, in case number *In re Klayman*, 3:22-mc-14-TJC-JRK and is serving it by email to (1) Chief Judge Marcia Morales Howard: chambers_flmd_howard@flmd.uscourts.gov, (2)  Magistrate Judge James Klindt: chambers_flmd_klindt@flmd.uscourts.gov, and (3)Attorney Admissions Clerk: ATTORNEY_ADMISSIONS_ORL@flmd.uscourts.gov.

Mr. Klayman currently has pending an Expedited Motion for Clarification and/or Partial Reconsideration, Exhibit 1-C, which seeks clarification on how the attached Petition should be filed because it is in large related to the already pending stayed reciprocal discipline matter in *In re Klayman*, 3:22-mc-14-TJC-JRK. If the Court disposes of this pending motion confirming that another case must

1

be initiated, Mr. Klayman will so file and deliver a hard copy to the Chief Judge,

the Honorable Marcia Morales Howard. In an abundance of caution, Mr.

Klayman is also sending via Federal Express a hard copy of the Petition as well.

Dated: December 8, 2025                    Respectfully submitted,

                                           By: /s/ Larry Klayman_____
                                           Larry Klayman, Esq.
                                           Klayman Law Group P.A.
                                           7050 W. Palmetto Park Rd
                                           Boca Raton, FL, 33433
                                           Tel: 561-558-5536 cell
                                           leklayman@gmail.com

                                           Pro Se

## CERTIFICATE OF SERVICE

I hereby certify that on December 8, 2025 the foregoing was filed in *In re*

*Klayman*, 3:22-mc-14-JRK and served via email to the following:

Chief Judge Marcia Morales Howard:

chambers_flmd_howard@flmd.uscourts.gov

Magistrate Judge James Klindt:

 chambers_flmd_klindt@flmd.uscourts.gov

Attorney Admissions Clerk:

ATTORNEY_ADMISSIONS_ORL@flmd.uscourts.gov

EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

| | |
|---|---|
| IN RE: LARRY KLAYMAN }<br><br>       Petitioner }<br><br><br><br> | **Case Number:** |

---

### PETITION PURSUANT TO LOCAL RULE 2.04  OF LARRY ELLIOT KLAYMAN TO THE CHIEF JUDGE  CONCERNING SUSPENSION ORDER OF THE SUPREME COURT OF FLORIDA AND MOTION TO STAY

Petitioner Larry Klayman Larry Klayman ("Mr. Klayman") hereby petitions the Honorable Marcia Morales Howard, Chief Judge of this Honorable Court ("the Court"), pursuant to Local Rule 2.04(b) not to impose reciprocal discipline and to stay any consideration of reciprocal discipline pending his ongoing challenges as set forth herein.

### I.    INTRODUCTION AND STATEMENT OF RELEVANT FACTS

At issue is the November 6, 2025 order from the Supreme Court of Florida suspending Mr. Klayman from the practice of law in Florida for twenty-four (24) months (the "Florida Suspension Order"). The Florida Suspension Order is based upon a reciprocal discipline proceeding involving the suspension order of the District of Columbia Court of Appeals in *In re Klayman*, 20-BG-583 (D.C.C.A.)

(the "Sataki Suspension Order") and suspension order from the District of Columbia Court of Appeals in *In re Klayman*, 18-BG-100 (D.C.C.A.) (the "Judicial Watch Suspension Order"). The Sataki Suspension Order and the Judicial Watch Suspension Order stem from a highly partisan District of Columbia attorney apparatus concerning events that occurred in or around 2010 and 2006, respectively. Not only are these reciprocal proceedings time-barred under Florida law, there is a paucity of proof of any ethical violation as well as a multitude of due process violations that have occurred. These due process violations have surprisingly continued before the Supreme Court of Florida, which issued a Suspension Order apparently without having carefully reviewing Mr. Klayman's briefs and actual record, resulting in a very cursory and erroneous Suspension Order containing no record cites.

In this regard, Mr. Klayman currently has pending a Motion for Rehearing before the Supreme Court of Florida demonstrating clearly that the Florida Suspension Order is erroneous. Exhibit A. Mr. Klayman has provided the Supreme Court of Florida with not just a compelling analysis why this matter is time barred, but also with detailed and meticulous record cites evidencing a paucity of proof of any ethical violation. In addition, Mr. Klayman has clearly demonstrated due process and other constitutional violations resulting in a Florida Suspension Order that amount to a manifest injustice.

2

If reciprocal discipline is not summarily rejected by the Court, consideration thereof, at a minimum, should respectfully be stayed pending Mr. Klayman's ongoing challenges to the Florida Suspension Order in the form of his Motion for Rehearing, Exhibit A, as well as other ongoing collateral challenges to Sataki Suspension Order. These ongoing collateral challenges comprise: (1) an action pursuant to D.C. Superior Court Rule 60, *Klayman v. Sataki et al,* 2022-CAB-005235 (D.C. Sup. Ct.) (the "Rule 60 Action") to vacate the Sataki Suspension Order and (2) an action for fraud currently pending in the Fifteenth Judicial Circuit for Palm Beach County styled *Klayman v. Sataki, Klayman v. Sataki,* 2022-CA-010491 (15th Jud. Cir. Fla.) (the "Florida Action"). Importantly, this Court has already previously stayed consideration of reciprocal discipline of the Sataki Suspension Order pending these ongoing collateral challenges. *In re Klayman,* 3:22-mc-14-TJC-JRK (M.D. Fla.). Exhibit B. Furthermore, other courts and jurisdictions including (1) the Supreme Court of Pennsylvania, (2) U.S. Court of Appeals for the Fifth Circuit, and (3) the U.S. District Court for the Northern District of Texas have also stayed consideration of  reciprocal discipline with regard to the Sataki Suspension Order as well. Exhibit B. Thus, an order staying consideration of reciprocal discipline based on the related Florida Suspension Order would simply maintain the status quo, which is of particular importance due to the number of ongoing client matters that Mr. Klayman has before this

Court as set forth below and other important considerations and equities. *Infra* section III(b).

In any event, put simply, reciprocal discipline is respectfully not warranted, and Mr. Klayman requests a hearing before any such determination is considered or made. *See* Local Rule 2.04(a) ("In addition to a judge's sanction or use of another grievance mechanism, the court can — **after a hearing and for good cause** — disbar, suspend, reprimand, or otherwise discipline a member of the Middle District bar or a lawyer appearing by special admission."

## II.    LEGAL STANDARD

In deciding whether reciprocal discipline is warranted, courts under the U.S. Court of Appeals for the Eleventh Circuit have adopted the *Selling v. Radford*, 243 U.S. 46 (1917) factors. These factors are whether (1) the state proceeding lacked due process; (2) the proof in the state proceeding was so infirm "as to give rise to a clear conviction on our part that we could not, consistently with our duty, accept as final the conclusion" of the state court; or (3) "some other grave reason existed which should convince us that to allow the natural consequences of the judgment to have their effect would conflict with the duty which rests upon us not to disbar except upon the conviction that, under principles of right and justice, we were constrained so to do." *In re Calvo*, 88 F.3d 962, 966-67 (11th Cir. 1996). This Court, the U.S. District Court for the Middle

District of Florida has applied these same factors as well. *In re Henry*, No. 6:18-mc-26-Orl-23, 2018 U.S. Dist. LEXIS 223135 (M.D. Fla. Dec. 11, 2018).

## III.    LEGAL ARGUMENT

As set forth in detail in Mr. Klayman's Motion for Rehearing, <u>Exhibit A</u>, all of the factors under *Selling* that this Court considers with regard to reciprocal discipline matters weigh heavily in favor of not imposing such reciprocal discipline. Furthermore, a continued stay of this matter is more than warranted pending the outcome of Mr. Klayman's Motion to Rehearing and other collateral challenges.

### a.  Reciprocal Discipline Is Not Warranted

*First*, there was a significant denial of due process because the Florida Suspension Order is time-barred. The Florida Suspension Order is based on two underlying improperly stacked suspension orders from the District of Columbia, the Sataki Suspension Order and the Judicial Watch Suspension order. The Sataki Suspension Order involves events that occurred in 2010, now fifteen (15) years ago. The Judicial Watch Suspension Order involves events that occurred in 2006, now nearly twenty (20) years ago. Under any measure of reason, these proceedings should be time-barred now, in the year 2025 under both the doctrines of statute of limitations and laches. This is particularly true with regard to the Sataki Suspension Order, in which the complainant filed a disciplinary complaint with The Florida Bar on or about October 20, 2011, now over fourteen

(14) years ago. Because no action was taken, at that time, it is clear that Florida Office of Bar Counsel ("FOBC") at that time determined there was no probable cause, much less clear and convincing evidence, to pursue any disciplinary action against Mr. Klayman. Exhibit A Motion for Rehearing at Pages 9-12.

There was also a denial of due process with regard to the fact that he was denied discovery not only at the District of Columbia level, but also before the Referee, the Honorable J. Lee Marsh ("Referee Marsh") in Florida. Given the extraordinary amount of delay that had occurred, discovery was necessary to address and remedy   the extreme passage of time and thus avoid undue prejudice, which resulted in memories fading, records being lost and witnesses becoming unavailable to testify. Exhibit A Motion for Rehearing at Pages 14– 17.

*Second*, the "proof in the state proceeding was so infirm as to give rise to a clear conviction on our part that we could not, consistently with our duty, accept as final the conclusion of the state court" as set forth in full in Mr. Klayman's Motion for Rehearing. Exhibit A, Put simply, the Florida Suspension Order is egregiously factually and legally flawed. The record evidence was simply not considered  by whoever was assigned to draft the Florida Suspension Order as it appears to have been adopted virtually wholesale from the Report of Referee Marsh and therefore contains no record cites for this reason. Referee Marsh's Report was a virtual identical super copy of FOBC's Proposed Report, which was itself effectively a super copy of the District of Columbia Court of Appeals

("DCCA") and also contained no record cites. The result of this was a cascading series of legal and factual errors that Mr. Klayman had no bona fide opportunity to remedy at any step of this proceeding and in and of itself constitutes another due process violation as well. Thus, this Court respectfully must carefully review Mr. Klayman's' Motion for Rehearing, which meticulously details record evidence, including sworn testimony from Mr. Klayman's seven (7) material witnesses as well as documentary evidence refuting  any possible allegation of ethical misconduct, especially by the standard of clear and convincing evidence. Exhibit A Motion for Rehearing at Pages 30 – 59.

*Third*, there exists "some other grave reason" to decline to impose reciprocal discipline because there has been a clear stacking" of disciplinary proceedings, which practice has been found to be expressly forbidden by the Supreme Court of Florida in *Florida Bar v. Rubin*, 362 So.2d 12 (Fla. Sup. Ct. 1978). As set forth in full in the Motion for Rehearing, Exhibit A Motion for Rehearing at Pages 60 – 67, without this "stacking" and had the Sataki Matter and the Judicial Watch Matter been timely adjudicated, notwithstanding the paucity of proof, the suspensions would have already run. And, the suspension period in the Judicial Watch Matter and the Sataki Matter would have run concurrently had FOBC not intentionally held the Judicial Watch Matter back in order to "stack" disciplinary proceedings.

7

Taken altogether, each of the three *Selling* factors are more than satisfied by Mr. Klayman. The attached Motion for Rehearing, <u>Exhibit A</u>, has carefully and meticulously identified not only the time-barred nature of the disciplinary proceedings, but as important the necessary record evidence showing a clear paucity of proof of any ethical violation in either the Sataki Suspension Order or the Judicial Watch Suspension Order as well as the specific details showing a denial of due process both before the District of Columbia attorney discipline apparatus as well as the Supreme Court of Florida. Mr. Klayman therefore respectfully requests that the Court carefully review the Motion for Rehearing, which is incorporated herein by reference,  because it clearly demonstrates that reciprocal discipline is not warranted in this matter.

### b. A Stay of Reciprocal Discipline Proceedings Respectfully Must Continue

If the Court does not summarily reject reciprocal discipline, Mr. Klayman respectfully requests that the stay of proceedings previously entered by the Honorable James R. Klindt ("Magistrate Klindt") in *In re Klayman*, 3:22-mc-14-TJC-JRK (M.D. Fla.) with regard to the underlying suspension order from the District of Columbia, the Sataki Suspension Order, continue to take effect in this matter. <u>Exhibit B</u>. The ongoing collateral challenges giving rise to the stay issued by Magistrate Klindt are still ongoing, along with Mr. Klayman's pending Motion for Rehearing. Furthermore, numerous other Courts have also stayed

reciprocal discipline with regard to the Sataki Suspension Order, including (1) the Supreme Court of Pennsylvania, (2) U.S. Court of Appeals for the Fifth Circuit, and (3) the U.S. District Court for the Northern District of Texas. And, given that the Florida Suspension Order and Mr. Klayman's Motion for Rehearing involve both the Sataki Suspension Order and the Judicial Watch Suspension Order, both underlying disciplinary matters should be stayed in the interests of judicial economy, as it is not prudent to split consideration of these two underlying matters up at this point after FOBC has combined them. In addition, as set forth in Mr. Klayman's Motion for Rehearing, these two proceedings were improperly, unethically and illegally stacked, contrary to the Florida Supreme Court binding precedent in *Florida Bar v. Rubin*, 362 So.2d 12 (Fla. Sup. Ct. 1978).

"When entertaining an application for a stay the sliding scale factors to be considered for exercise of the Court's discretion are (i) the probability of irreparable injury if no stay is granted, (ii) the remediable quality of any such injury, and (iii) the likelihood of ultimate success on the merits." *Sullivan v. State*, 372 So. 2d 938, 941 (Fla. 1979). Here, the probability of irreparable injury is exceptionally high, in conjunction with the other *Sullivan* factors, making a stay all the more warranted under the circumstances

### i. Mr. Klayman and His Clients Will Suffer Irreparable Injury Absent a Stay

If Mr. Klayman is to be sanctioned before his Motion for Rehearing and collateral challenges have been decided, he will suffer severe irreparable harm. This irreparable harm is in the form of a violation to his due process rights, which constitutional injury always constitutes irreparable harm under *Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009). As set forth in detail in Mr. Klayman's' Motion for Rehearing, <u>Exhibit A Motion for Rehearing at Pages 59 – 69</u>, there have been a multitude of due process violations throughout this entire proceeding, both at the District of Columbia level and at the Florida level. These include (1) the enormous delay by the District of Columbia attorney discipline apparatus, which was then compounded by Florida Office of Bar Counsel ("FOBC"), (2) the denial of discovery in both the District of Columbia and in Florida compounding the harm caused by the delay, (3) the "stacking" of disciplinary proceedings, and (4) the lack of a neutral and unbiased District of Columbia attorney discipline apparatus and Referee in this Florida proceeding. Moreover, Mr. Klayman was effectively denied due process by the Supreme Court of Florida in its having failed to consider the record and simply adopting wholesale a biased and flawed Report by Referee Marsh, which levied a potentially career ending sanction. <u>Exhibit A Motion for Rehearing at Pages 75 – 88</u>.

If Mr. Klayman is forced to now expend what is left of his dwindling time and financial resources defending reciprocal discipline matters not only in

Florida, but all over the country, he will not be able to recover. Even if and when Mr. Klayman's Motion for Rehearing and/or collateral challenges are successful, Mr. Klayman will have already been brought to his financial knees. On the other hand, given the enormous delay that has already occurred, through no fault of Mr. Klayman, there is simply no prejudice to any party and this Court to allow the Motion for Rehearing and collateral challenges to conclude before considering whether to impose reciprocal discipline based on Florida Suspension Order. This will allow Mr. Klayman to save what is left of his already depleted time and financial resources and avoid irreparable injury. Finally, the harm to his family, clients, and colleagues will be severe if his legal challenges are not allowed to run their course.

Furthermore, the rights of Mr. Klayman's clients will be prejudiced without a stay, as he currently represents a number of clients in ongoing matters before this Court. These cases include:

(1) *Loomer v. Maher et al*, 5:24-cv-625 (M.D. Fl.) [Defamation case brought by Plaintiff Laura Loomer against Defendants Bill Maher and Home Box Office, Inc.]
(2) *ROKiT World Inc et al v. Rocketball LTD et al*, 3:24-cv-879 (M.D. Fla.) [ Case brought by the Plaintiffs against the Houston Rockets and their legal counsel for RICO violations, fraud, and assault]
(3) *Able Events et al v. Rocket Ball Ltd et al*, 3:25-cv-1041 (M.D. Fla.) [ Case brought by the Plaintiffs against the Houston Rockets and their legal counsel for RICO violations, fraud, and assault]
(4) *ROKit World Inc et al  v. Williams Grand Prix Engineering Limited et al*, 3:25-cv-0167 (M.D. Fla.) [Case brought by the Plaintiff against Williams Grand Prix Engineering and its agents for fraud ].

These clients are depending on Mr. Klayman to represent them in these crucial matters, and they will suffer irreparable harm if they are left without their counsel of choice representing them.

### ii.    Mr. Klayman's Reasonable Likelihood of Success on the Merits

A thorough review of his Motion for Rehearing demonstrates that Mr. Klayman also has a reasonable likelihood of success. <u>Exhibit A</u>. The Motion for Rehearing directly challenges the entirety of the Florida Suspension Order and would also vacate the Florida Suspension Order if successful. A stay is necessary to grant sufficient time for the Supreme Court of Florida to thoroughly review the record and correct a manifest injustice in the form of the Florida Suspension Order, which *Strazzulla v. Hendrick*, 177 So. 2d 1, 3 (Fla. 1965) found can be corrected at any time: "We may change 'the law of the case' at any time before we lose jurisdiction of a cause and will never hesitate to do so if we become convinced, as we are in this instance, that our original pronouncement of the law was erroneous and such [ruling resulted in manifest injustice. In such a situation a court of justice should never adopt a pertinacious attitude." Here, the irreparable harm resulting in a manifest injustice is so strong that a stay must be entered.

## IV.    CONCLUSION

WHEREFORE, Respondent Mr. Klayman respectfully requests that this Court—if it does not summarily decline to impose reciprocal discipline for the

compelling reasons set forth in Mr. Klayman's Motion for Rehearing, Exhibit A—stay reciprocal discipline proceedings based on the Florida Suspension Order until Mr. Klayman has had a full opportunity to litigate his Motion for Rehearing and his collateral challenges to the Sataki Suspension Order. This would maintain the status quo given Magistrate Klindt's previous order staying reciprocal discipline based on these collateral challenges to the Sataki Suspension Order in particular.  And, given that the Florida Suspension Order and Mr. Klayman's Motion for Rehearing involve both the Sataki Suspension Order and the Judicial Watch Suspension Order, both underlying disciplinary matters should be stayed in the interests of judicial economy, as it would not be prudent to split consideration of these two underlying matters up at this point after FOBC has combined them. In addition, as set forth in Mr. Klayman's Motion for Rehearing, these two proceedings were improperly, unethically and illegally stacked, contrary to the Florida Supreme Court binding precedent in *Florida Bar v. Rubin*, 362 So.2d 12 (Fla. Sup. Ct. 1978) and thus should have been subject to dismissal as in *Rubin.*

This would promote and protect the interests of due process, justice, fundamental fairness, and judicial efficiency, while preserving the resources of both the Court and Respondent Mr. Klayman. After decades of litigation, where bars have not acted timely or in good faith, to say the least, there is no prejudice to allowing Mr. Klayman's due process rights to proceed forward before Mr.

Klayman is given a potential "death penalty" to effectively end, at age 74, his distinguished and successful career.[1]

Dated:        December 8, 2025                Respectfully submitted,

                                             By: */s/ Larry Klayman*_____
                                             Larry Klayman, Esq.
                                             Klayman Law Group P.A.
                                             7050 W. Palmetto Park Rd
                                             Boca Raton, FL, 33433
                                             Tel: 561-558-5536 cell
                                             leklayman@gmail.com

                                             *Pro Se*


## CERTIFICATE OF SERVICE

I hereby certify that on December 8, 2025 the foregoing was filed in *In re Klayman*, 3:22-mc-14-JRK and served via email to the following:

Chief Judge Marcia Morales Howard:

chambers_flmd_howard@flmd.uscourts.gov

Magistrate Judge James Klindt:

 chambers_flmd_klindt@flmd.uscourts.gov

Attorney Admissions Clerk:

---

[1] Mr. Klayman currently has pending an Expedited Motion for Clarification and/or Partial Reconsideration, Exhibit C, which seeks clarification on how this Petition should be filed because it is in large part a result, however incorrect. of the already pending Sataki Suspension Order, consideration of which was stayed.

ATTORNEY_ADMISSIONS_ORL@flmd.uscourts.gov

# EXHIBIT A

## IN THE SUPREME COURT OF FLORIDA

THE FLORIDA BAR,                    }
                                    }
                                    }
                Complainant         }    **Case Number: SC23-1219**
                                    }
v.                                  }
                                    }
LARRY ELLIOT KLAYMAN                }
                                    }
                Respondent.         }
                                    }

## RESPONDENT LARRY ELLIOT KLAYMAN'S MOTION FOR REHEARING

Respondent Larry Klayman ("Mr. Klayman") hereby this honorable Court pursuant to Florida Rule of Appellate Procedure 9.330 for rehearing of the Court's November 6, 2025 [1] order suspending Mr. Klayman from the practice of law in Florida for twenty-four (24) months (the "Suspension Order"). <u>Exhibit 1</u>. The Suspension Order is based upon a reciprocal discipline proceeding involving the suspension order of the District of Columbia Court of Appeals in *In re Klayman*, 20-BG-583 (D.C.C.A.) (the "Sataki

---

[1] Mr. Klayman has moved the Court for an extension to file this Motion, with consent from FOBC. This, along with other filings by Mr. Klayman, has not disposed of by this Court.

1

Suspension Order") and suspension order from the District of Columbia Court of Appeals in *In re Klayman*, 18-BG-100 (D.C.C.A.) (the "Judicial Watch Suspension Order").

The Sataki Suspension Order and the Judicial Watch Suspension Order stem from a highly partisan District of Columbia attorney apparatus concerning events that occurred in or around 2010 and 2006, respectively. Not only are these reciprocal proceedings time-barred under Florida law, there is a paucity of proof of any ethical violation as well as a multitude of due process violations that have occurred. With no disrespect, these due process violations have surprisingly continued before this Court, where it has issued a Suspension Order apparently without having carefully reviewed the Mr. Klayman's briefs and actual record, resulting in a very cursory Suspension Order containing no record cites.

Mr. Klayman has been a member continuously in good standing with The Florida Bar for nearly forty-eight (48) years. The only slight blemish on his record was a public reprimand which occurred in 2011 and involved a period of great financial difficulty when he was having a hard time repaying a negotiated settlement fee. It did not involve Mr. Klayman's ability or practice as an

attorney representing clients in Florida. He has practiced law in Florida without even a blemish since that time. Accordingly, the reciprocal discipline proceedings and resulting Suspension Order at this point, in the year 2025—now nineteen (19) years removed from the events of the Judicial Watch Matter, fifteen (15) years removed from the Sataki Matter, and fourteen (14) years removed from his agreed public reprimand—are purely punitive at this point, as alluded to by this Court at oral argument:

> Justice: NOW IT IS 2025 15 YEARS AGO WAS HE PRACTICING? I KNOW THERE WAS EVENTUALLY DISCIPLINE IN DC . HOW MANY YEARS PERCY FOCUSING BETWEEN 2010 AND NOW I'M WONDERING IS THERE ANY INDICATION OF ANY WRONGDOING IN THAT TIME? Exhibit 2 at 6.

> Justice: I'M SORRY TO INTERRUPT I JUST WANT TO GIVE YOU A CHANCE TO ADDRESS JUST SOMETHING I'M KIND OF STRUGGLING WITH WITH THIS CASE WHICH IS IT SEEMS LIKE THERE IS SOME ATTRACTIVENESS TO THE IDEA THAT REGARDLESS OF WHAT HAPPENED HERE IT WAS A LONG TIME AGO THERE WAS DISCIPLINE IN DC. ADDING TWO MORE YEARS TO IT MIGHT BE OVERKILL. Exhibit 2 at 6.

The Court's astute observations at oral argument were correct. At this stage, reciprocal discipline is purely punitive and calculated to effectively provide a virtual "death sentence" effectively ending Mr. Klayman's long, distinguished practice of law in Florida for the past

forty-eight (48) years – nearly half a century. This violates well-established precedent that attorney discipline must "protect the public from unethical conduct" and "not deny the public the services of a qualified lawyer." 4 Fla. Jur. 2d Attorneys at Law §107. Thus, where a proceeding is purely punitive and where Mr. Klayman has an established track record of ethical practice law in Florida for nearly half a century, the current Suspension Order, if left uncorrected, constitutes more than a manifest injustice.

Importantly, this Court has held that a Court may correct what would be a manifest injustice at any time under *Strazzulla v. Hendrick*, 177 So. 2d 1, 3 (Fla. 1965). "We may change 'the law of the case' at any time before we lose jurisdiction of a cause and will never hesitate to do so if we become convinced, as we are in this instance, that our original pronouncement of the law was erroneous and such ruling resulted in manifest injustice. In such a situation a court of justice should never adopt a pertinacious attitude." This is exactly the type of manifest injustice which has thus far occurred in this case.

## I.   INTRODUCTION AND STATEMENT OF THE CASE

Mr. Klayman has had a distinguished legal career as a public interest conservative and Republican activist attorney as the founder of both Judicial Watch, Inc. and Freedom Watch, Inc, and in his private practice. He ran for U.S. Senate in Florida in 2003 – 2004. He is a citizen and resident of Florida and primarily practices in this jurisdiction for both his public interest and private capacities. He had been a proud member continuously in good standing with The Florida Bar since his admission on December 7, 1977, nearly forty-eight (48) years ago, almost half a century. In short, he cherishes the honor and privilege of practicing law in Florida, and his ability to do so is crucial to the well-being of his legal career, his livelihood, and his family, colleagues, and his clients.

### a. The Sataki Suspension Order

During his long and distinguished legal career, Mr. Klayman has represented several women who have been the victims of sexual harassment or abuse. Examples of these types of cases litigated by Mr. Klayman include but are not limited to Alice Alyse, Juanita Broaderick, Paula Jones, Kathleen Willey, Dolly Kyle Browning, Gennifer Flowers, and of course Ms. Elham Sataki and

others. Because of his commitment to women's rights, Mr. Klayman generally is inclined to accept these cases when they are presented to him. Based on his experience with this type of case, he recognizes the debilitating effect that this type of harassment and can have on women in the workplace and in their daily lives. In short, he is a strong advocate for and believer in the advancement of women's rights and has consistently advocated against the discrimination and pay-gap issues that persist still in the workplace. In this regard, one of the material witnesses who testified on his behalf in the Sataki Suspension Order is his personal friend, famed women's rights attorney, Gloria Allred. Sataki Hearing Transcript 1096 – 1100.

Accordingly, when in or around 2010, now fifteen (15) years ago, Complainant Elham Sataki ("Ms. Sataki") sought Mr. Klayman's legal representation for alleged sexual harassment[2] that had occurred at her place of employment, Voice of America ("VOA"), Mr. Klayman agreed to represent her. With Ms. Sataki crying and

---

[2] Unbeknownst to Mr. Klayman at the time, these allegations of sexual harassment turned out to be false, as found by Voice of America's Office of Civil Rights after its investigation, further impeaching Ms. Sataki's credibility.

claiming to be destitute, his heart went out to her. He therefore agreed to represent her *pro bono* because representing victims of sexual harassment is a cause that he truly believes is worth fighting for. Ultimately, Mr. Klayman was not able to achieve a favorable outcome for Ms. Sataki, but it certainly was not for lack of effort or zealous and diligent representation as evidenced by the fact that Ms. Sataki's union representative and president at VOA, Mr. Timothy Shamble ("Mr. Shamble") who formed a *de facto* legal team with Mr. Klayman and Ms. Sataki, testified under oath: "I've had several employees that have hired attorneys, and they have asked for the union to cooperate with them and to, you know, help them with their cases. But, in all honesty, I've never seen one go as far and as dedicated as Mr. Klayman was towards Ms. Sataki. I felt like he went above and beyond." Sataki Hearing Transcript 903 - 04. Mr. Shamble even testified that he referred others who were aggrieved by VOA to Mr. Klayman. Respondent Exhibit ("FRX") 24 at 901- 902: "Q. Why did you recommend me to another employee? A. Another employee came to me, Ms. Vera Wiley, who wanted an aggressive attorney for her case, and I recommended that she contact you." Indeed, Mr. Klayman was never charged with a lack of

7

competent legal representation, even by a very partisan if not widely recognized "weaponized" District of Columbia Office of Bar Disciplinary Counsel. Thus, there was never any finding that whatever type of feelings Mr. Klayman felt towards Ms. Sataki adversely impacted his legal representation of her.

But Mr. Klayman's dedicated effort and zealous representation did not placate Ms. Sataki, who became upset when she did not win her case. As a result, she reactively blamed him and filed bar complaints against Mr. Klayman in the District of Columbia as well as in Florida and Pennsylvania on or around October 20, 2011, now nearly fifteen (15) years ago. This is confirmed in Ms. Sataki's October 20, 2011 complaint filed with District of Columbia Office of Disciplinary Counsel ("DCODC") where, in response to the question "Have you filed a complaint about this matter anywhere else," she responded, "Complaint also filed in Pennsylvania and Florida." FRX 7. This is further confirmed as recently January 5, 2023, when Ms. Sataki through her counsel Robert O. Saunooke confirmed that she had sent a disciplinary complaint to Florida in 2011 in her Motion to Amend Answer and Motion to Dismiss filed in an ongoing case

styled *Klayman v. Sataki*, 2022-CA-010491 (15th Jud. Cir. Fla.). FRX 8.

Based on this uncontroverted fact alone, this reciprocal discipline proceeding should never have been brought under both the doctrines of statute of limitations and laches. Fla. Bar Rule 3-7.16(a)(1); *Fla. Bar v. Phoenix*, 311 So. 3d 825, 831 (Fla. 2021). This is because at the time that these complaints were filed, none of these jurisdictions pursued disciplinary proceedings against Mr. Klayman, meaning that they must have logically at that time determined that there was no probable cause, much less clear and convincing evidence, to pursue any disciplinary action against Mr. Klayman.

The Court regrettably failed to give proper weight and consideration to this because the Suspension Order has been adopted virtually wholesale from the Report of the Referee, Hon. J. Lee Marsh ("Referee Marsh"). The Suspension Order contains no record cites for this reason, as Referee Marsh's Report—which was a virtual identical super copy of Florida Office of Bar Counsel's ("FOBC") Proposed Report (which was itself effectively a super copy of the District of Columbia Court of Appeals ("DCCA") FRX 3—also

contained no record cites. The result of this was a cascading series of legal and factual errors that Mr. Klayman had no bona fide opportunity to remedy at any step of this proceeding.

Chief amongst this cascading series of legal and factual errors was the refusal to give bona fide consideration to the issues of laches and statute of limitations. FOBC manufactured out of thin air an argument, which Referee Marsh tellingly chose not to question, that there was no evidence that The Florida Bar had actually received the complaint from Ms. Sataki in 2011. At the sanctions hearing, Referee Marsh made the following flippant, disrespectful, mocking and uncalled for statement, evidencing his mindset and bias as discussed below in further detail:

> There is no indication of what address it was sent to, whether it was sent to the proper place. It could have been sent to the governor. It could have been sent to the legislature. It could have been sent to the local 7-11, for all the referee knows. There's a paucity of evidence for it actually being sent to the Florida Bar." Transcript March 28, 2024. at 202:4 – 12.

Then, in his Report, the Referee stated, "that there is no indication of the complaint being made under penalty of perjury or that it may or may not have been served in Florida.....Accordingly, this referee finds that Respondent failed to show that the original complaint

10

was ever transmitted to or received by The Florida Bar." Report at 15. The Referee's statements are plainly unsupported by the record. There is not one iota of actual record evidence that The Florida Bar did not receive Ms. Sataki's Complaint in 2011 and in response to this fact, Referee Marsh simply illogically presumes that Ms. Sataki sent her Complaint in 2011 to "the governor" or a "local 7-11" instead of the address that certainly would have been provided on the actual complaint itself. Of course, Mr. Klayman is left without any avenue to prove where Ms. Sataki's Complaint was sent going n fifteen (15) years later because Florida Bar records are destroyed after five (5) years. This is the exactly the type of severe prejudice that the doctrine of laches was intended to remedy.

Referee Marsh's contrived presumption – made out of thin air -- is, in any event, highly illogical, as the Court is certainly aware that the overwhelming majority of people are able to properly address and send a letter to their desired location and not some random "local 7-11" instead. Indeed, the Pennsylvania Bar confirmed that it received a complaint from Ms. Sataki on or around October 20, 2011 and closed the file without any adjudication, FRX 27, further evidencing the fact that The Florida Bar received the

complaint as well contemporaneously. Then, in his Report, Referee Marsh stated, "that there is no indication of the complaint being made under penalty of perjury or that it may or may not have been served in Florida.....Accordingly, this referee finds that Respondent failed to show that the original complaint was ever transmitted to or received by The Florida Bar." Report at 15. This is belied by the fact that the Supplemental Complaint clearly includes the attestation that Ms. Sataki "certifies to the Office of Bar Counsel that the statements in the foregoing Complaint are true and correct to the best of my knowledge." FRX 7.

It therefore is evident that Referee Marsh was looking for a way to discredit the evidence presented by Mr. Klayman, no matter how illogical. This, and the Referee's conduct, are the reasons exactly why Mr. Klayman was forced to file his Updated and Renewed Motion for Recusal and to Vacate Report and Recommendation, Ind. 89, which was notably and erroneously left unaddressed by the Court in its Suspension Order.

In the District of Columbia, Ms. Sataki's Complaint was also not acted upon for seven (7) years, rendering it abandoned under its own rules. FRX 15.. However, in 2017 when Bar Counsel Hamilton

Fox, III ("Fox") took over DCODC, it transformed and morphed into a highly partisan weaponized tool to attempt to remove conservative and Republican activist attorneys like Mr. Klayman from the practice of law. <u>Exhibit 5</u>. The politicization of the District of Columbia attorney discipline apparatus has become widely known and recognized, particularly in the age of Donald Trump, as set forth in Mr. Klayman's prior briefs. DCODC, taking advantage of the lack of a statute of limitations in that jurisdiction for attorney discipline matters, literally used a private investigator to hunt down Ms. Sataki in order to file its Specification of Charges on July 20, 2017, seven (7) years later. FRX 4. Then, Mr. Klayman was forced to appear before a hostile and biased Ad Hoc Hearing Committee comprised of an avowed communist, Michael Tigar ("Tigar") who early career had been fired, at the urging of FBI Director J. Edgar Hoover, from his High Court clerkship by Justice William Brennan for his subversive communist ties. FRX 30. Joining Mr. Tigar was the committee chair, Anthony Warren Fitch, also of the ideological left. He at every step of the way seemed to defer to Mr. Tigar and appeared and acted as if he was in awe of him. FRX 24.

This bias regrettably helps explains why Mr. Klayman was denied even basic discovery despite the seven (7) year delay by DCODC in filing its Specification of Charges, which passage of time resulted in memories fading, documents having been discarded and lost, and witnesses becoming unavailable. During this time period, one of Mr. Klayman's key material witnesses, Professor Ronald Rotunda sadly passed away without and Ms. Sataki's psychologist, Dr. Arlene Aviera ("Dr. Aviera") who had contemporaneously treated Ms. Sataki during the underlying events around 2010 and was aware of all of the details of Respondent Mr. Klayman's representation of Ms. Sataki, contracted terminal illness and was unavailable to testify.

As shown in FRX 17, Mr. Klayman on numerous occasions sought and was denied even basic discovery from Dr. Aviera and others, including in his February 15, 2018 Motion to Notice and Have Issued Subpoenas Duces Tecum to Take the Depositions of Elham Sataki and Arlene Aviera. FRX 17. In that motion, Respondent Mr. Klayman wrote, "[i]t is thus believed that the deposition testimony of…Ms. Aviera will disclose crucial exculpatory evidence necessary for Respondent's defense, and reveal that he

acted properly at all times and even sought to get Ms. Sataki other counsel."

Tellingly, even this simple request was vehemently opposed by DCODC and then denied by the AHHC despite discovery clearly being allowed and an integral part of the attorney discipline process, particularly in a case such as this one where DCODC delayed over seven (7) years to even file a Specification of Charges, resulting in passage of time causing memories to fade, documents to be discarded and lost, and witnesses to become unavailable. *See* Board on Professional Responsibility Rules, Chapter 3. Importantly, whether discovery was allowed is an important and crucial factor that this Court must consider in determining whether to adopt discipline from another jurisdiction. *Florida Bar v. Tipler*, 8 So. 3d 1109, 1117 (Fla. 2009).

Then, even further prejudicing Mr. Klayman, and taking advantage of the AHHC's refusal to allow Mr. Klayman <u>any</u> <u>discovery</u>, and the fact that their delay had caused Dr. Aviera to be unavailable to testify due to illness, DCODC and Ms. Sataki on the eve of the commencement of the hearings in this proceeding, very conveniently "discovered" so called records from Dr. Aviera that

15

were previously undisclosed and introduced them into the record. The AHHC did not care that these "cherry picked" so called records from Dr. Aviera constituted unsubstantiated hearsay by virtue of her not being available to authenticate them (and thus should have been inadmissible), much less an inaccurate representation of the facts. Respondent Mr. Klayman therefore renewed his request for discovery at the hearing, citing this significant due process violation, yet was still denied by the highly partisan and biased AHHC:

> At this point, for the record, as your Honor may recall, I had requested to be able to depose Dr. Aviera. That would have alleviated this issue, and I was denied. That's why I also needed her file, because this is just selective things that are being produced by Bar Counsel from her file, not the whole file. So this is a highly prejudicial area of testimony for her to be testifying, A, without my having discovery, which I requested early on, and B without Dr. Aviera to testify. FRX 24 at 132.

The due process violations did not end there. Mr. Klayman was not even allowed to take the deposition of Ms. Sataki, despite the over seven (7) year delay caused by DCODC in even filing the Specification of Charges. Had Mr. Klayman been allowed to depose Ms. Sataki, he would have been able to avoid the severe prejudice that resulted from DCODC and Ms. Sataki conspiring to introduce a

litany of alleged and specious unauthenticated records for the first time literally on the eve of the hearing, without giving Mr. Klayman any opportunity to review them, as set forth above. And, even more importantly he would have been able to uncover fraudulently withheld exculpatory evidence in the form of a video interview of Ms. Sataki publicizing her case, despite falsely claiming, belatedly at one point, at the hearing that she did not approve of publicity in her case, which Referee Marsh refused to even allow into the record, further denying his due process rights.

Even without having been granted any discovery, during the AHHC hearing Mr. Klayman presented seven (7) material witnesses including Mr. Shamble, Keya Dash, Gloria Allred, the Honorable Stanley Sporkin, the latter a retired federal judge, that conclusively refuted every single one of DCODC's manufactured arguments. To the contrary, DCODC did not have a single material factually substantive witness other than Ms. Sataki, whose testimony was impeached and refuted at every turn. FRX 24. This made no difference to the biased and hostile AHHC, however, who used the AHHC to push their biased agenda, including taking umbrage and being hyper fixated on the fact that Mr. Klayman had filed a *Bivens*

Complaint on behalf of Ms. Sataki naming their ideological kin Hillary Clinton as a defendant, despite the fact that Ms. Clinton was Secretary of State and as such was the head of the Voice of America's Board of Governors at the time, meaning that she was clearly a necessary party and Mr. Klayman had also named conservative personal friend of Mr. Klayman, the conservative Blanquita Collum, who was also a governor of VOA, as a Defendant. There was no political motivation for any of Mr. Klayman's actions, yet the AHHC tellingly "bent over backwards" to try to improperly *ex post facto* insert this into the proceeding. This led to the following erroneous finding in the Board Report, which Mr. Klayman was never given a bona fide opportunity to correct. The Board Report stated:

> The Hearing Committee found – that Respondent's litigation strategy was driven by a desire to harm then Secretary of State Hillary Clinton and by a desire for publicity for himself...He filed suit on behalf of E.S. against VOA and named the members of the Broadcasting Board of Governors individually – the Board is chaired ex officio by the Secretary of State, who, at the time, was Hillary Clinton. Board Report at 8.

In addition to this clear political bias, Mr. Klayman, ironically, also fell victim to bias as a white male during a period the #MeToo

movement. Because the Complainant was a woman, in violation of Mr. Klayman's equal protection rights, her testimony was readily accepted by the AHHC regardless of how thoroughly it was impeached, and the testimony of Mr. Klayman and all of his material witnesses were given no weight, much less largely even referred to. This is highlighted by the fact that Mr. Klayman's name appears in the Sataki Suspension Order , but Ms. Sataki is referred to as E.S. As a result, Mr. Klayman's name and reputation has been smeared all over the leftist anti-conservative media and Ms. Sataki was protected in a case where Mr. Klayman was not charged with sexual harassment, because there was no such thing!

### b. The Judicial Watch Suspension Order

In effectively adopting the Judicial Watch Suspension Order, FRX 3, the Court also failed to properly consider the significant record evidence showing the multitude of legal and factual errors at issue. Importantly, in the Judicial Watch Suspension Order, the DCCA found we [the Court] are not left with 'serious doubt' or 'real skepticism' that M. Klayman can practice ethically." FRX 3 at 30. There are several other factors, which are omitted from the

Suspension Order that show a paucity of proof, which are set forth in detail in this motion.

Chief among these factors, beyond even the "paucity of proof," is the egregious unjustified delay caused by DCODC in this matter as well, resulting in the "stacking" of disciplinary proceedings. This practice has been held to be unethical and illegal in Florida, as this Court has found in *Florida Bar v. Rubin*, 362 So.2d 12 (Fla. Sup. Ct. 1978). The stacking is shown through the following timeline:

**Around 2006** – Underlying events; Mr. Klayman's representation of Ms. Benson, Ms. Cobas, and Mr. Paul.

**October 1, 2013** – DCODC institutes a Specification of Charges. FRX 42.

**June 11, 2020** – D.C. Court of Appeals suspends Mr. Klayman for ninety (90) days.

**August 29, 2023** – FOBC initiates reciprocal discipline complaint.

Just like the Sataki Suspension Order, this proceeding should have been time-barred in the District of Columbia under the doctrine of laches, given the approximate twelve (12) year delay between the events at issue and DCODC issuing its Specification of Charges, in addition to the additional egregious and unjustified three (3) year delay in Florida to commence reciprocal discipline – a total of about

fifteen (15) years. FRX 42. This constitutes stacking because had Judicial Watch Matter and the Sataki Matter been timely handled, notwithstanding the paucity of proof, the suspensions would have already run. And, the suspension period in the Judicial Watch Matter and the Sataki Matter would have run concurrently had FOBC not intentionally held the Judicial Watch Matter back in order to "stack" disciplinary proceedings. This type of conduct is not permittable, as also opined and documented by Professor Rotunda:

> That brings up the problem of laches. The doctrine of laches bars untimely claims not otherwise barred by the statute of limitations.... Laches applies to bar a claim when a plaintiff has unreasonably delayed in asserting a claim and there was undue prejudice to the defendant as a result of the delay. *Jeanblanc v. Oliver Carr Co.*, 1995 U.S. App. LEXIS 19995, *9 (D.C. Cir. June 21, 1995). Among the inequities that the doctrine of laches protects against is the loss of or difficulty in resurrecting pertinent evidence. *Id.*

> Note that Mr. Klayman left Judicial Watch on September 19, 2003. He filed his appearance on behalf of Ms. Cobas on August 7, 2006 — long after he left Judicial Watch. There is no claim that he violated any confidences of Judicial Watch or that he earlier represented Judicial Watch against Ms. Cobas. This Bar Complaint was filed on May 1, 2014. The delay in filing the complaint was nearly 8 years.

> The conduct alleged by Bar Counsel occurred between seven and eight years ago. Given the substantial delay in bringing the present Petition before the Board, Mr.

Klayman's ability to defend this case has been detrimentally prejudiced, particularly as recollection and memory fade over the course of approximately seven to eight years and witnesses and the individuals involved may be unavailable in support of Mr. Klayman's defense. In Paul's case, for instance, he is in federal prison in Texas. Ms. Cobas has health problems and Ms. Benson is now an 83-year-old woman. The Bar should not use this unique factual situation to discipline Mr. Klayman given the equitable doctrine of laches. FRX 45.

Next, the egregious over three-year delay by FOBC in initiating reciprocal discipline severely compounds the even greater prejudicial harm stemming from the delay in the District of Columbia, and the doctrine of laches must be applied here as well. This is notwithstanding the fact that FOBC's motivation in delaying the reciprocal discipline proceeding was apparently due to a transparent improper and unethical attempt to "stack" disciplinary proceedings—the Judicial Watch Suspension Matter with the Sataki Suspension Matter— again a practice that has been expressly forbidden by this very Court in *Rubin*:

Whatever other objects the rule may seek to achieve, it obviously contemplates that *the Bar should not be free to withhold a referee 's report which it finds too lenient until additional cases can be developed* against the affected attorney, in an effort to justify the more severe discipline which might be warranted by cumulative misconduct. The Bar's violation of the prompt filing requirement in this case, to allow a second grievance proceeding against

Rubin to mature, is directly antithetical to the spirit and intent of the rule. In addition, it has inflicted upon Rubin the 'agonizing ordeal' of having to live under a cloud of uncertainties, suspicions, and accusations for a period in excess of that which the rules were designed to tolerate. (emphasis added).

*See also Fla. Bar v. D'Ambrosio*, 25 So. 3d 1209 (Fla. 2009) (referring to the practice of "stacking" disciplinary proceedings as unfair).

Thus, in sum, had Judicial Watch Matter and the Sataki Matter been timely addressed, notwithstanding the paucity of proof, the suspensions would have already run. And, the suspension period in the Judicial Watch Matter and the Sataki Matter would have run concurrently had FOBC not intentionally held the Judicial Watch Matter back in order to "stack" disciplinary proceedings. Without this intentional and calculated delay, Mr. Klayman would not now, at the age of seventy-four (74) be facing stacked disciplinary proceedings that could amount to a "death sentence" to end his legal career, if the Suspension Order is not reheard, corrected based on the record and the law, and this manifest injustice remedied.

### c. Proceedings Before Referee Marsh

The inexcusable delay and denial of due process in both disciplinary proceedings at issue was not limited to just the District of Columbia. This continued in Florida before Referee Marsh and FOBC.

*First*, even assuming that there were substantive grounds to impose discipline on Mr. Klayman, which as set forth herein there are not, Mr. Klayman has been severely prejudiced by the significant delay in this matter. Notwithstanding the fact that The Florida Bar had already declined to prosecute the Sataki Suspension Order in 2011, it further tacked on to the egregious delay in the District of Columbia by holding back reciprocal discipline in the Judicial Watch Suspension Order for three (3) years and the Sataki Suspension Order for nearly one (1) year in order to "stack" these proceedings in direct contravention of this Court's jurisprudence in *Rubin*. FRX 3. Had the FOBC acted timely, any period of suspension regardless of its lack of merit, would again have already concluded. Now that Mr. Klayman is seventy-four (74) years old, he is facing these "stacked" disciplinary proceedings all at once in what can only be explained as a punitive attempt to end his legal career in Florida by FOBC.

During this interim period, Mr. Klayman has practiced law in Florida as a member continuously in good standing. Mr. Klayman did in 2011, fourteen (14) years ago,  agree to a public reprimand with regard to an issue regarding repayment of a fee during a time of great financial difficulty, which had no relation to his ability to practice law. This was recognized by Chief Justice Carlos Muniz at the oral argument in this matter:

> Chief Justice Carlos Muniz: I'M SORRY TO INTERRUPT YOU. THE LOGIC IT SEEMS LIKE SORT OF THE LOGIC OF THE RECIPROCAL DISCIPLINE THE REASON WE DON'T RELITIGATE ALL OF THAT IS JUST THE IDEA YOU HAVE A PROBLEM IN ANOTHER STATE YOU GO THROUGH THE PROCESS IT RESULTS IN SOME KIND OF DISCIPLINE IN A PERFECT WORLD IF SOMEONE ELSE WITH DUE PROCESS IS ALREADY DECIDING THIS PERSON SHOULD NOT BE PRACTICING AND OFFERING THE SERVICES TO THE PUBLIC FOR TWO YEARS YOU WANT TO PROTECT PEOPLE IN FLORIDA FOR THE SAME TWO YEARS. I THINK THE PROBLEM HERE IS THE STACKING OF THE TIME ESPECIALLY IN THE CONTEXT WHERE THE WRONGDOING IS FROM 15 YEARS AGO BASICALLY. CAN YOU ADDRESS THAT? Exhibit 2 at 8.

*Second*, Referee Marsh' Report, which contained no record cites, was a virtual super copy of the proposed Report submitted by FOBC, which also contained no record cites. This was despite Referee Marsh having received a proposed order from Mr. Klayman

which was well documented and conformed to the actual evidence.
Exhibit 3. In this regard, Mr. Klayman's proposed order had
meticulously detailed record cites supporting each of the underlying
facts setting forth and supporting his legal arguments, in stark
contrast to FOBC's proposed order which was strategically devoid of
any record cites. Surprisingly, Referee Marsh had asked  and been
granted by this Court up and  until May 31, 2024 to issue his
Report, thereby leaving him with ample time to carefully review both
parties' submissions. Instead, Referee Marsh rushed in haste to
adopt wholesale FOBC's patently deficient proposed order just
incredibly only a  few days later on May 1, 2024. Further
prejudicing Mr. Klayman is the fact that FOBC essentially just
mirrored the District of Columbia Court of Appeals' order of
suspension, which itself was incredibly devoid of record cites. Thus,
Mr. Klayman did not receive a bona fide review and/or  adjudication
at any level comporting with due process, with each step of the
process the entity or Referee  essentially adopting whatever was
presented to it, resulting in a cascading series of legal and factual
errors that went uncorrected. Regrettably, the Suspension Order of
this Court, which must be reversed, appears to have been hastily

written and effectively adopts Referee Marsh' Report. It also contains no record cites. This belies the fine reputation of this Court, as the Suspension Order is simply put, not well reasoned or supported by the facts. The Court had a duty to thoroughly review the record and Mr. Klayman's briefs, and appears to have abdicated, for whatever reason,  this solemn responsibility to ensure due process and equal protection resulting in a severe compounding of the due process violations and harm to Mr. Klayman. It now behooves this Court to correct what would be a manifest injustice, which it has the authority to do under *Strazzulla v. Hendrick*, 177 So. 2d 1, 3 (Fla. 1965). "We may change 'the law of the case' at any time before we lose jurisdiction of a cause and will never hesitate to do so if we become convinced, as we are in this instance, that our original pronouncement of the law was erroneous and such ruling resulted in manifest injustice. In such a situation a court of justice should never adopt a pertinacious attitude."

## II.   LEGAL STANDARD

*First,* Fla. R. App. P. Rule 9.330(a)(2)(A) says: "[a] motion for rehearing shall state with particularity the points of law or fact that, in the opinion of the movant, the court has overlooked or

misapprehended in its order or decision." This Motion sets forth in detail the factual record  material and the law that was overlooked by the Court in the Suspension Order.

Furthermore, when the Court is presented with an issue of reciprocal discipline, the law is well settled that the Court is "not automatically bound by an out-of-state determination of guilt by a disciplinary agency." *Fla. Bar v. Kandekore*, 766 So. 2d 1004, 1007 (Fla. 2000). The Florida Supreme Court has established the following standard for determining whether another jurisdiction's findings should be accepted as conclusive:

> [W]hen the accused attorney shows that the proceeding in the foreign state was so deficient or lacking in notice or opportunity to be heard, that there was such a paucity of proof, or that there was some other grave reason which would make it unjust to accept the foreign judgment as conclusive proof of guilt of the misconduct involved Florida can elect not to be bound thereby. *Id.*

*See also Fla. Bar v. Wilkes*, 179 So. 2d 193 (Fla. 1965). *Wilkes* explained the logic behind the decision to not automatically adopt findings made in other jurisdictions:

> For at least two reasons it would be incongruous to apply the principle of the full faith and credit provision to judgments of disbarment. First, the issues adjudicated are not the kind to which the clause was intended to apply.... Second, to our knowledge neither of the

principles under discussion has ever been held to require one state automatically to admit to practice an individual merely because a sister state has admitted him. (Those states which do admit to practice on a showing of admission in certain other states do so on the basis of reciprocity, and not on any obligation of comity or full faith and credit.) Thus, if these principles do not control or affect admission to practice there is no logical basis upon which they can be made applicable to disbarment or removal from practice. This is so because the authority and responsibility of the state is the same in admission to practice as it is in disbarment. It is to protect the public against those who for any reason are unfit to practice law. Both functions are given to this court under our state constitution and we must exercise both or abdicate our constitutional mandate under Art. V, Sec. 23, Florida Constitution, F.S.A. *Id.* at 196.

*See also Florida Bar v. Tipler*, 8 So. 3d 1109 (Fla. 2009), Furthermore, even where proof of "guilt" by another jurisdiction is deemed adopted, a finding to that effect does not apply to the discipline imposed. "[T]he discipline awarded in the foreign judgment is not binding on Florida." *Id.* at 201. Lastly, whether discovery was allowed in a foreign jurisdiction is a factor this Court must consider in determining whether to adopt discipline from another jurisdiction. *Id.* at 1117.

Here, all of these factors under *Kandekore* are present. There was (1) a lack of due process in the District of Columbia and Florida due to unconscionable and egregious  delay and a lack of discovery,

(2) a clear paucity of proof, and (3) a manifest injustice in the form of "stacking," as well as the other grounds enumerated herein, which constitute a "grave reason which would make it unjust to accept the foreign judgment as conclusive proof of guilt." These significant issues, and in particular the denial of due process and delay, were glossed over by the Court in its Suspension Order and must be thoroughly considered, reviewed, digested, and corrected at this time, in order to prevent a manifest injustice.

## III.   LEGAL ARGUMENT

### a. The Record Reflects a "Paucity of Proof" Under *Kandekore*

As set forth above, this Court is not automatically and slavishly beholden to the orders of the DCCA if it is shown that there was a "paucity of proof" in the District of Columbia disciplinary proceedings. As set forth herein the record is replete with both testimonial and non-testimonial evidence demonstrating the "paucity of proof." For whatever reason, this record material was not considered by the Court in issuing its Suspension Order, which contained no record cites just like Referee Marsh's Report and

FOBC's Proposed Report. Put simply, this record material **must be considered**.

### i. Sataki Suspension Order

The Suspension Order primarily finds that Mr. Klayman did not abide by Ms. Sataki's wishes with regard to publicity and termination and that he had failed to have a written fee agreement with Ms. Sataki. The record evidence conclusively disproves these findings, along with each and every finding of misconduct by the DCCA.

### 1. Use of Publicity

The record is replete with evidence, both testimonial and non-testimonial, from Ms. Sataki herself as well as other material witnesses that Ms. Sataki at all times consented to, and even participated personally in, garnering publicity for her case as a tool to try to settle her case favorably. The record supports no other possible conclusion, and as such there can be no possible finding that there was "clear and convincing" evidence of an ethical violation.

*First*, Ms. Sataki's own admissions conclusively show that she agreed to publicity:

Q: "Did you ultimately agree with Mr. Klayman about the publicity? A: "I did." FRX 24 at 775.

Q: "And that we agreed we would get some positive publicity here to try to coerce VOA into  a favorable settlement so you could be in LA,  correct?" A: "Correct." FRX 24 at 397 – 398.

Q: "You are aware that, and you testified to this yesterday, that I believed that you had agreed to that and I wrote articles that were very favorable to you. You're aware of that?" A. "Yes." Q. And I sent you copies of them at the time." A. "Yes." Q. "Emailed them to you." A. "Yes, you did.".…. "Q. But you are aware that I copied you on an email to Los Angeles Times where I was trying to get an interview for you?".… "And you never sent me back anything saying, "Larry don't do this. I don't want to have an interview with the LA Times." A. "Correct, I -- correct." FRX 24 at  398 – 403.

A: I explained to you my problem with VOA. … So I don't know why this conversation was so intimate to you (about her alleged harassment and workplace retaliation), because it was definitely not intimate to me. **Everybody knew. In that case, I had an intimate conversation with everybody**."  FRX 24 at 329.

We talked about that, the fact that publicity always is going to help everybody. You always said that." FRX 24 at 759.

Q. The question was you never, ever went  to Mr. Shamble and said, "Don't use publicity on my behalf and please instruct Mr. Klayman not to use publicity on my behalf, too"? You never said that to Mr. Shamble. You never went to Mr. Shamble with that. A. No, I didn't. FRX 24 at 762.

*Second*, the unrefuted testimony of Mr. Shamble, who had contemporaneous knowledge of everything that occurred by virtue of his role as Ms. Sataki's union representative who worked closely with Mr. Klayman and Ms. Sataki more than confirms this:

A)  Q: "Did there come a time when we had discussions, you, me and her, about using publicity to try to coax the agency into settlement or a reasonable solution?" A. "Yes." Q. "Was she present at the time?" A. "Yes. It was in my office." FRX 24 at 892

B)  Q. "And did there come a point in time when you actually went with her and distributed publicity?" A. "I remember one time. The VOA was on the mall here in Washington, some kind of public -- it might have been a recruitment fair or something. But we had an article and both her and I were distributing it to people in the vicinity, tried to let people know and to let the agency know that, you know, we were going to publicize this."…. Q. "And she was there when she gave it out and she approved of that?" A. "Yes. We were both on the mall handing that out." FRX 24 at 893 – 894.

C)  "[w]e've done it. It's something that you can use to pressure managers, if they're intractable, you know, to try to get them to come to some sort of agreement. We have our own website, so we use it, too."

This is further confirmed in the supplemental affidavit of Mr. Shamble, FRX 79, <u>Exhibit 4</u>:

1. I sat in and was present at, at least, one meeting with Larry Klayman and Elham Sataki where using public relations such as press articles and news stories to describe and publicize the alleged sexual and workplace

harassment of Elham at VOA was discussed. Indeed, the idea was that public relations could help push the agency into a settlement or resolution of Elham's claims especially since the VOA had been consistently ranked as one of the worst agencies in the federal government according to the OPM

2. In this regard, attached is an email between Larry Klayman, Elham and two other broadcaster of VOA, who Larry Klayman was also seeking to help - as they too along with others in the Persian News Network branch of VOA believed that they were experiencing work place harassment of various sorts -- about an interview with the Los Angeles Times.

3. The understanding was that this public relations strategy, including interviews and articles, might also serve to convince congressmen on Capitol Hill to step in and help Elham settle or resolve her claims with VOA. In this regard, Larry Klayman asked me to accompany him to the offices of congressmen on Capitol Hill to make the case for them to help Elham and some others at VOA in the Persian News Network that were subject to alleged sexual and/or workplace harassment. At, at least one event, we handed out a flyer about Elham's alleged claims to get support for, her and pressure the VOA to reach a beneficial settlement. VOA management is generally non-responsive to amicably resolving such issues.

4. Public relations can influence entities such as VOA and congressmen to take positive action, as the press can be very influential in this regard. It was my impression that Elham understood this and approved it.

5. As a broadcaster and TV anchor, I believed that Elham understood the benefit of public relations. I am not aware that any public relations about Elham's situation were anything but positive and complimentary about her.

*Third*, testimony of multiple other material witnesses also confirmed that Ms. Sataki at all times consented to, and even participated personally in, garnering publicity for her case as a tool to try to settle her case favorably. This includes the testimony of Joshua Ashley Klayman:

> Q. During the meeting with Ms. Sataki, did she discuss the issue of her case and what was being done? A. Yes, quite openly. And I met her multiple times. It wasn't that I just met her one  time. Yes, she was quite open with what the circumstances of her challenges were. Q. Did she discuss the issue of publicity in her case? A. She did. I mean, she was very, very open, which -- I'm not a litigator. I don't  really know anything about litigations, but I was  surprised that she was so open. FRX 24 at 1524.

This also includes the testimony of Keya Dash testified that he was present at a dinner with Mr. Klayman and Ms. Sataki where they sought the assistance of then Speaker of the House of Representatives John Boehner regarding Ms. Sataki's case:

> Q. What did I say to Ms. Sataki about Mr. Boehner?
> A. "Let's go talk to Mr. Boehner."
> Q. With regard to helping her?
> A. That's right. To plead her case to him  and enlist his support.
> Q. What did you observe at that point? Did we then go over and I introduced Ms. Sataki?
> A. I observed a couple of things: that you knew him, that you were friendly with him, that he heard the case. He

seemed very interested in it. In fact he seemed to side with her. And that it was a good interaction.

Q. Were you aware as to whether or not I then sought his help?

A. Excuse me?

Q. Are you aware whether or not we sought his help to resolve a situation with her at Voice of America after that?

A. Yes, I am aware that that was the entire purpose. FRX 24 at 1346 – 1347.

Mr. Dash also testified that Ms. Sataki sought his help personally to publicize her case using his connections in the Persian community:

> Q. So, Mr. Dash, you used your personal efforts and the prestige of your family in the Persian community to try to help Ms. Sataki? A. Yes. I believe she knew I was reluctant to help in the beginning and **she tried to have me coax them, and I did**. I did speak to her. FRX 24 at 1361 (emphasis added).

*Fourth*, the encounter with Mr. Boehner was also testified to under oath by Mr. Klayman, who confirmed that after this encounter, he and Ms. Sataki personally met with Mr. Boehner to seek his assistance with her case:

> When the meeting ended, he gave her a  kiss on the cheek. It wasn't anything untoward. And he said "I just wish you well and we'll help you." So we went up to his office, too, and we asked them for help, and nothing ever transpired there either. I was getting very  disillusioned that he wouldn't help somebody like this, you know, who had a need." FRX 24 at 988.

*Fifth*, Mr. Klayman incredibly learned during the Board briefing process that Ms. Sataki had participated in making a documentary about her case, with intimate personal details about her against VOA which further undercuts any possible false claim that Ms. Sataki did not agree to publicize her case.[3]  The video, which is in Ms. Sataki's Iranian native language, Farsi, was translated by one of Respondent Mr. Klayman's witnesses, Keya Dash, as well as a respected Farsi certified translator who used to work for VOA. FRX 13-6. To be certain of and confirm the content, Respondent Mr. Klayman had the documentary translated by Mohammad Moslehi, a certified translator who did translations for VOA. FRX 13-6. Mr. Moslehi translates this "smoking gun" as follows:

> Whenever I am at my desk and I am not paying attention, he allows himself, to touch me under variety of pretexts. (displaying Elham [Sataki]'s photo) former broadcaster of VOA.
> Mr. Falahati, Asal has written this for us, Well: let us answer the first caller (by the name of - Translator) Hossain from Kerman. Hello, go ahead please.
> (displaying photo of Mehdi Falahati) broadcaster for the VOA network VOA: Voice of America

---

[3] https://www.youtube.com/watch?v=e3g5f61muZ4

Voice of America has been recognized as the worst entity of American government. Therefore, lots of such coteries and issues exist there. Everybody says that the atmosphere is of a security one. Nobody can talk with anybody. Everybody makes insinuations against one another. The environment is very dirty.

This week is second evening of being online with the subject of presidential elections in Iran and it's outcome, with your phone calls, emails and online weblogs and websites that Elham [Sataki] will introduce to you.

Regarding Mr. Falahati: He repeatedly asked me to go out with him. I didn't want to do it. Mr. Falahati and I started the ONLINE show together and we were performing it together. Aside from other aspects, it was very unprofessional.

When two individuals appear on camera and conduct a show, going out on a date, since it can directly affect the show is not right. They may fight with each other and that will affect the show, and vice-versa. He was not the type of person that I would accept his offer, and say that, all right let's go on a date.

The problem was, he did not know how to take a no. After a while I reached to the point that I was always calling sick and did not go to work. Since I wanted to start working, and Mr. Falahati wanted to come to my desk and again ask me let's go have a coffee or have dinner·. And this no, and saying no to him repeatedly had become exhausting for me, had made me very tired. I went to Suzanne who was our executive producer and told her the situation, that he (Mr. Falahati) does so. and I (Elham [Sataki]) don't know what to do at this point. Personally, I am not able to handle it.

The situation will go over the board of the status of going out for dinner, and he will come to my desk and while I am not paying attention, under various excuses touch me. Since I was afraid, I told her (Suzanne) that, can you handle it without anybody to know?? That day she told me that "Legally I cannot do it and you must formally file a complaint."

Mr. Falahati wanted to take revenge, since I complained and stated that the situation was so. As I was behind my desk, twice he came to my desk (audio censored) the dress that I had on and my bra-cord. I hollered at him (audio censored) he laughed and said "don't tell anybody." I was not feeling well. I was seeing psychiatrist. I was seeing psychologist. I was not feeling well. All the documents are available. Everything related (to this matter) exists. I was seeing doctor and the doctor was prescribing relaxing pills for me to take.

At this point, I am just saying, Mr. Falahati is a sick person that has not done so just with me, but the system of VOA has problem. Jamshid Chalangi testified for me. Look what happened? Mahmonir, another lady testified for me. She suffered a lot. Mr. Ali Sajjadi and Mr. Falahati were friends. At that time Mr. Sajjadi was very powerful there. They all got together. And even Suzanne who was my executive producer and was mad from this incident, she teamed up with them. And this caused the problem to be difficult for me, and no attorney was taking my case, because this case had become very big. And when the case became so big, then the Board of Governors had to defend itself, and defending itself caused the case to become against me. And they say that Elham left, Falahati stayed. When they fired me, I was not the only girl. There are a number of others.

Caption displaying Falahati and [Sataki] with written scripts.

The lawsuit against Mehdi Falahati due to the VOA influence did not get to anywhere, and El ham Sattaki was fired from this network .. After a short period of time Jamshid Chalangi and Ms. Mahmonir Rahimi were fired from this network.

Display of Mehdi Falahati laughing loud.

It is clear to see how this crucial piece of evidence completely destroys the fabricated allegation that Respondent Mr. Klayman

ignored Ms. Sataki's "wishes" to not use publicity, in addition to the avalanche of testimony set forth above and underscores why it was such an unexplainable and egregious error for the Referee to refuse to admit this piece of crucial evidence into the record. March 27 Transcript at 214. The record therefore must be opened up to include this crucial evidence disproving one of the primary bases upon which the Suspension Order rests.

## 2. Failure to Cease Representation

Furthermore, the record does not support any finding that there was an ethical violation for a failure to terminate his representation of Ms. Sataki. The Court's Suspension Order vaguely references that Ms. Sataki "wrote Klayman a letter telling him withdraw the remaining lawsuit" without providing any record cite as to what letter the Court is relying upon.

If the Court is referring to the November 15, 2010 letter, the record clearly shows that it was sent by Ms. Sataki to the wrong address and it was not received by Mr. Klayman. This is proven through the testimony of Ms. Sataki who admits that this was "a mistake."

Q. Now, turn to the next page. This is a letter which you claim was sent to me terminating my services on or about November 15th, 2010. That's the date that you claim you terminated by services, correct? A. Correct. Q. Now look at the address there. Klayman Law Firm, 2000 Pennsylvania Avenue, Northwest, Suite 345, Washington, D.C., 20006. Are you aware that's not my address? A. That was the only address I could find of you. Q. You're aware that the address is actually 2020 Pennsylvania Avenue, Northwest? A. So that was a mistake. Q. So, since you had the wrong address, isn't it likely that I never got this letter, even if you sent it? FRX 24 at 539 – 541.

If the Court is referring to the August 4, 2010 letter purportedly terminating Mr. Klayman's services, the record shows that it was written to Mr. Danforth Austin and not Mr. Klayman. Furthermore, as shown in the testimony of Mr. Klayman, it was obviously not written by Ms. Sataki, whose English proficiency was poor:

So this is part and parcel to the problems that I was having during that period in time. That's why I wanted to contact her. Because I was getting communications that didn't appear to come to her. It wasn't in her way of speaking. It wasn't in her English. It was in virtually perfect English, as the letter to Mr. Austin demonstrates. That's why I needed to be able to talk to her, and that's why the first. FRX 24 at 1041.

Mr. Klayman had a duty to confirm that the alleged "communications" were actually coming from Ms. Sataki, during a

period of time that communication with her had become extremely difficult as testified to by Mr. Shamble:

> Q: "Based on your testimony, you were aware I was having difficulty interacting and communicating with Ms. Sataki?" A. "Correct." FRX 24 at 928.

Given that Mr. Klayman had a duty of zealous and competent representation to his client, Ms. Sataki, he could not terminate representation based on alleged communications from her which were clearly not written by her personally given her poor English proficiency. Mr. Klayman simply did what any ethical lawyer would do in that situation, which is to ensure that his client did not lose her legal rights. Ms. Sataki could have still filed a civil rights complaint when the VOA Office of Civil Rights denied her administrative claim and it was Mr. Klayman's responsibility to preserve that right should she wish to pursue it. Ms. Sataki could have prevented this situation had she simply responded to Mr. Klayman and Mr. Shamble at that time to confirm whether she actually wanted her cases terminated. Her lack of response put Mr. Klayman in an impossible situation, and Mr. Klayman simply erred on the side of caution to preserve her legal rights. And as conclusive evidence that Mr. Klayman, at his time and expense, acted

pursuant to Ms. Sataki's wishes, Ms. Sataki herself filed a notice of appeal, purportedly *pro se,* later that year, which would not have been possible without Mr. Klayman acting to protect her legal rights.  FRX 24 at  1031.

### 3. Lack of a Written Fee Agreement

Neither the DCCA nor the Board concluded that Mr. Klayman had violated any rule for not having a written fee agreement with Ms. Sataki. Specifically the DCCA wrote: "[t]he Board, however, did not explicitly state its own conclusion on that issue.... we see no need to address that issue given the other violations that we uphold." FRX 3 at 58.  Despite this, in his Report, Referee Marsh gratuitously wrote that Mr. Klayman was "found to have violated the District of Columbia Rules of Professional Conduct...1.5(b)..." which was then adopted by the Court in its Suspension Order. The record clearly reflects that there is no ethical violation here because there was never any fee agreement between Mr. Klayman and Ms. Sataki. The record shows that the representation was *pro bono.*

The record shows that from the beginning of the representation, it was agreed that the representation would be *pro*

*bono*. In fact, this was one of the several areas where Ms. Sataki's

testimony was impeached by her own admissions:

> Mr. Klayman: "And I told you that I would help you as a friend, did I not?"
> Ms. Sataki: "You told me you help me, yes."
> Mr. Klayman: "Yeah, and that you had no money, that I would help you and not charge you, correct?"
> Ms. Sataki: **Yes. We talked about that**. At the end you're going to get 40 percent. I explained, I don't have any money to pay for a lawyer, but then you said that I – we can -- at the end, "because this is a strong case  and I'm going to help you with that," and we get 40 percent. We talked about that."
> Mr. Klayman: **"It's not true that that 40 percent came up at that time at that dinner. It did not come up, did it?"**
> Ms. Sataki: **"I don't remember."**
> Mr. Klayman: **Then why did you just say that?"** FRX 24 at 332 – 333 (emphasis added).

This is buttressed by the unrefuted testimony of Mr. Klayman

detailing this agreement:

> And I said, "Well, I'll try to help you, and, you know, I'll do it out of friendship. We're now friends." I mean, I do that. I'm not wealthy. I don't have much. I never made a lot of money, and so it was clear I would do it pro bono for her and try to help her, you know. FRX 24 at 977.

It was not until later on, when the representation of Ms. Sataki

became difficult as previously discussed that Mr. Klayman

**proposed** a contingency fee of 50% **going forward**. This was

admitted by Ms. Sataki as well:

Q: But what I was talking about, Ms. Sataki, is if I continued to represent you, given the difficulty in our relationship, regardless of what the cause was, then I'm saying then I **want 50     percent going forward, correct**?" A. "Correct." Q. "But we never got to that point, because representation ceased before I ever started to pursue any damage claims, correct?" FRX 24 at 557 – 558 (emphasis added).

This **proposal** was never agreed to, which is why there was never anything memorialized in writing. "The basic elements of an enforceable contract are offer, acceptance, consideration, and sufficient specification of essential terms." *Jericho All-Weather Opportunity Fund, LP v. Pier Seventeen Marina & Yacht Club*, 207 So. 3d 938, 941 (Fla. Dist. Ct. App. 2016). Here, there was an offer, but no acceptance by Ms. Sataki. Thus, there was no valid contract between the parties to memorialize into writing.  And, lastly, it is crucial that Mr. Klayman has, to this day, never tried to collect a single dollar from Ms. Sataki despite having paid himself the expense of the litigation as a friend—further conclusively proving that the agreement between the parties was a *pro bono* relationship. FRX 24 at 1058. This is best summarized in the legal opinion of Professor Rotunda:

Mr. Klayman tells me that he did disclose the fee when they first talked about the case. The fee was zero - he did

it as a pro bono matter. Several months later, when the case got more difficult than either of them expected, he told the client that he would have charge a fee. Or, of course, she would retain another lawyer and he could transfer the files to that other lawyer. She chose not to hire a new lawyer and he proposed a contingent fee. She never signed a fee agreement because she was hard to contact and the case ended at her request. He never charged her any fee. FRX 9.

### 4. "Emotional Interest" is Not an Ethical Violation

The Court alluded to Mr. Klayman's emotional interest in Ms. Sataki, but the bottom line is that this is not an ethical violation in any jurisdiction. Indeed, this entire "issue" exemplifies the due process issues that have plagued this entire proceeding from its initiation in the District of Columbia. The cascading series of legal and factual errors with no bona fide review and no record citations has allowed false "facts" to become the law of the case. No matter how much evidence that Mr. Klayman presents to refute these false "facts," this evidence is simply ignored as this matter proceeded up the line with each step "rubber stamping" whatever had been presented from the prior stage.

The DCCA did not find that Mr. Klayman had any sexual or romantic feelings towards Ms. Sataki. It was Referee Marsh who

gratuitously inserted, without any record evidence, that Mr. Klayman had expressed "romantic feelings" towards Ms. Sataki. This also underscores the issues that have plagued this proceeding.

This is once again belied and refuted by the record, which contains uncontroverted testimony by Mr. Klayman on this matter. Mr. Klayman explained that it was true that he cared deeply for Ms. Sataki, but the "love" he had for her was in a platonic sense and he never intended a sexual or romantic relationship with her:

> I never wanted a sexual relationship. I never had a sexual relationship. I never touched her. I'm someone who gravitates to somebody and, you know, I did love Ms. Sataki, but it wasn't in any way intended to be a long-term relationship or marriage or anything like that. Because I was going through a difficult period of my life and I sympathized with her and I fell in love with her. And I did that because I kind of projected to myself, too, the difficulties that I was going through at the time. And it was 1 a way also of trying to forget about my issues, you know, and trying to help other people. And I felt bad for her. I had gotten divorced before that. I felt that I didn't do enough to try to help. Maybe I was responsible in part for the earlier divorce, I didn't give enough attention to my female wife. So I wanted -- I'm not trying to psychoanalyze myself, but I'm basically trying to say that I tried to help her. I tried to help out a woman in need. I believe in women's rights. Ms. Allred's my friend. You know, we're politically different. So it was a combination of factors. I said that: "I'm not your boyfriend. I don't want to be your boyfriend." That's in the correspondence. FRX 24 at 1080 – 1081.

Given this, it is clear that there was simply no evidence of any ethical violation. "Emotional interest" is not a real ethical violation in any jurisdiction. Neither the D.C. Court of Appeals nor the Referee have provided a single piece of legal authority finding that it is. This is for good reason—there almost certainly is not a single jurisdiction who has found that an attorney is not allowed to care deeply for, or even love, their client. Such an illogical finding would mean that attorneys are prohibited from representing spouses, family members, and even friends. Bar associations can only police the **actions** of their members. It is impossible for them, or frankly anyone,  to police nebulous, undefinable, subjective **feelings**— particularly in a situation where there has been a near decade and a half delay. Most people cannot accurately remember how they felt one week ago, much more nearly fifteen (15) years ago.

Conclusively proving this argument is the fact that nearly every bar association has actually implemented rules pertaining to sexual relationships between attorneys and clients. This shows that bar associations have considered this issue and decided that only an **actions** can give rise to attorney discipline. Here, the record unequivocally reflects that there was no sexual component to Mr.

Klayman and Ms. Sataki's relationship, and thus there is no conflict of interest.

Even more, assuming *arguendo*, that there was a sexual component to Mr. Klayman and Ms. Sataki's relationship, it is extremely telling that this would still not have been an ethical violation under Florida's rules. In Florida, sexual relationships with clients are not prohibited unless that relationship "exploits or adversely affects the interests of the client or the lawyer-client relationship." Fl. St. Bar Rule 4-8.4. Given that there is not even an allegation of a sexual component to this relationship, there is simply no ethical violation here.

Furthermore, importantly, there are no allegations that Mr. Klayman failed to represent Ms. Sataki zealously, diligently, or competently, as found by AHHC chairperson Mr. Fitch, FRX 24 at 166, and the fact that Mr. Shamble testified that he actually recommended Mr. Klayman to many other VOA employees after seeing how hard he worked for Ms. Sataki. FRX 24 at 902. Mr. Shamble also testified, "I've had several employees that have hired attorneys, and they have asked for the union to cooperate with them and to, you know, help them with their cases. But, in all

49

honesty, I've never seen one go as far and as dedicated as Mr. Klayman was towards Ms. Sataki. **I felt like he went above and beyond**." FRX 24 at 903- 04 (emphasis added).

The finding that Mr. Klayman had been rendered him "nonfunctional" as a result of his "feelings" for Ms. Sataki was made without context. Mr. Klayman only said this to Ms. Sataki to explain to her why she should get new counsel to represent her—and indeed, as set forth below—referred her to other counsel, Gloria Allred and Tim Shea.  It was Ms. Sataki who refused to retain new counsel and demanded that Mr. Klayman continue representing her, as found by the Board. FRX 6 at 11. This only occurred because of the conduct of Ms. Sataki, who when she did not get what she wanted, became incredibly angry and belligerent at Mr. Klayman. This was manifested in emails where she mocked and disparaged Mr. Klayman's religion as a Messianic Jew and accused him of taking bribes to undermine her case, despite him having gone "above and beyond" to help her *pro bono* as testified by Mr. Shamble. FRX 24 at 903- 04. For instance, Ms. Sataki wrote the following email to Mr. Klayman:

I do not know if you are Christian or Jewish, because whichever suits you best, you become one. But I believe in karma and what you have done with my case and losing it. Ms. Sataki also wrote: And what you have done with my case and losing it and not stopping working on it when I ordered you, one day you'll answer to God, even if you throw your life and play with people life. I am nobody, just a little girl who was retaliated and harassment by some VOA employee and you seed (sic) that you can help me. Not only did you not help me, but destroyed my life to nothing....

Mr. Klayman are you happy now that you've complete destroyed and lost my case? A case with so many evidence and witnesses. Only a very bad and clueless attorney could lose it, or lost it on purps (sic) because you made a dill (sic), with the other party. FRXX 26 at 62.

When Ms. Sataki was not abusing and berating Mr. Klayman, she shifted her focus to trying to manipulate him into buying things for her, including a Mercedes Benz convertible, which she admitted at the AHHC hearing. FRX 24 at 429, 432-35. This was confirmed by Mr. Klayman's witness, Joshua Ashley Klayman, who testified "I mean, I vacillated between kind of liking her and being suspicious of her, quite frankly, as your sister...she was very forward in terms of requesting different things for her personally." FRX 24 at 1527 – 1528.

It was therefore due to this conduct that Ms. Sataki that Mr. Klayman advised her to seek new counsel. However, again, the

record reflects that even if there was a conflict of interest – where there categorically was not -  it was waived by Ms. Sataki. The record indisputably shows that  once Mr. Klayman realized that his representation of Ms. Sataki was becoming difficult due to their personal relationship, he advised Ms. Sataki to seek other counsel, such as Ms. Gloria Allred or Tim Shea. FRX 24 at 1079 – 1080. Despite this, it was Ms. Sataki who directed Mr. Klayman to continue representing her. This is shown in the Board's Report where it wrote Respondent Mr. Klayman "repeatedly communicated his feelings to [Ms. Sataki]" and "she asked him to continue with the representation." FRX 6 at 11.

Thus, in sum, there is a paucity of proof that there was any conflict of interest. The record clearly shows that Mr. Klayman simply had cared deeply for Ms. Sataki, which is not an ethical violation in any jurisdiction, and even if it was, it was waived by Ms. Sataki

### ii.  Judicial Watch Suspension Order

Importantly, in the Judicial Watch Suspension Order, the DCCA clearly found: "we [the Court] are not left with 'serious doubt' or 'real skepticism' that M. Klayman can practice ethically." FRX 3

at 30. There are several factors, which are omitted from the Court's Suspension Order, that show a paucity of proof that there was any ethical violation.

*First*, DCCA found that Mr. Klayman had not acted dishonestly or testified untruthfully, and that he had acted under what he believed to be advice of counsel that he did not have any conflict of interest. Mr. Klayman had sought the advice of a District of Columbia, Daniel Dugan, Esq. ("Mr. Dugan") on this specific issue. Mr. Klayman testified the following:

> And I want to add one other point, and I'm glad you asked it, Mr. Corcoran, and I believed that Mr. Duggan had given the advice of counsel that I could do this, otherwise he wouldn't have prepared the pleading. So that's another one of my defenses in this case. This is a very reputable firm in Philadelphia, and he's a seasoned litigator. FRX 44 at 359.

The DCCA rejected any allegation that Mr. Klayman had testified dishonestly in this regard:

> Additionally, Mr. Klayman's testimony was to the effect that the circumstances caused him to believe that Mr. Dugan had given the advice of counsel. We agree with the Board that there was not proof by clear and convincing evidence that Mr. Klayman testified dishonestly as to his belief and recollection. Accordingly, we accept the Board's conclusion rejecting the finding that Mr. Klayman testified falsely. FRX 3 at 29.

Mr. Dugan further testified that he would not have taken any action that he believed violated the D.C. Rules of Professional Conduct, such as filing an opposition to Judicial Watch's motion to disqualify if he did not have grounds to do so:

> Q: As a member of both the District of Columbia Bar, and as a member of the U.S. District Court for the District of Columbia, you would not take any action or file any pleading (denying a conflict), which you believed violated any D.C. Bar rule or the rule of the District Court?
> A: That's correct. FRX 44 at 687.

*Second*, the Honorable Royce Lamberth ("Judge Lamberth"), the jurist presiding over Mr. Paul's case, was the only person who ruled that Mr. Klayman should be disqualified as a result of a conflict of interest. *Paul v. Judicial Watch, Inc.*, 571 F. Supp. 2d 17, 27 (D.D.C. 2008). FRX 49. No other court, including the courts presiding over the matters involving Ms. Benson and Ms. Cobas, issued an order disqualifying Mr. Klayman, and Mr. Klayman ceased representation in those cases after Judge Lamberth ruled, evidencing his good faith. In fact, Judge Lamberth took special note of the extraordinary circumstances in this case, specifically of the potential hardship to the client, Mr. Paul, which informed Mr. Klayman's actions:

...the Court takes note of Paul's argument that he will suffer prejudice if Mr. Klayman is disqualified...the essence of the hardship that Paul asserts will result from disqualification of Klayman is an inability to obtain alternate counsel for lack of financial resources. The Court is not unsympathetic to this concern. FRX 49.

*Third*, despite granting Judicial Watch's Motion to Disqualify, Judge Lamberth chose not to sanction Mr. Klayman which demonstrates that Judge Lamberth did not believe that Mr. Klayman's conduct warranted any sanctions and/or discipline. As Judge Lamberth presided over Mr. Paul's case, he had firsthand knowledge of all of the intricate facts at issue in that matter. Thus, his decision must be afforded great deference.

*Fourth,* not only did Judge Lamberth choose not to sanction Mr. Klayman, he actually took time out of his incredibly busy schedule to testify on his behalf at the AHHC hearing in the voluntarily, without being subpoenaed. FRX 47. Judge Lamberth provided the AHHC with compelling testimony that he believed that there was, at a minimum, a clear ambiguity with regard to Mr. Klayman's representation of Mr. Paul, and that as such, there was a "legitimate debate about [Mr. Klayman's] conduct." FRX 47. Judge Lamberth further testified that he did not see fit to refer Mr.

Klayman Bar Counsel in the District of Columbia, despite having done so on numerous occasions in the past with other lawyers:

> Well, I -- during the course of my career, I have referred a number of matters to Bar Counsel. Sometimes I -- I think I felt I was overwhelming them with the numbers of referrals I've made. It seems to me in a case like this, where there was a legitimate debate about the conduct -- although I -- I ended up saying it was clear in the opinion, but it took me a number of pages to say it. FRX 47.

Judge Lamberth further explained the extraordinary circumstances involved in this case, particularly with regard to Mr. Paul's situation:

> …but also that there was some notion I had that Mr. Paul was in a very bad position. He was unable to afford counsel, he couldn't find other counsel. He was in a bind, and I had some feeling that there was a situation that was unusual, in the sense that counsel for Mr. Paul, who had previously been with Judicial Watch, found himself in an awkward position, where he had a very needy client who needed services who could not otherwise afford services. And so I thought it was a fairly unusual circumstance. FRX 47.

Thus, where the presiding jurist over Mr. Paul's case voluntarily took the time to testify on Mr. Klayman's  behalf that he did not think Mr. Klayman's conduct was sanctionable, there clearly exist a "paucity of proof" of misconduct  under *Kandekore*.

*Fifth,* in addition to Judge Lamberth's testimony, Mr. Klayman provided the AHHC with the opinion one of the nation's preeminent experts in legal ethics, Professor Rotunda, who came to the same conclusion as Judge Lamberth in his letter opinion of June 2, 2014, FRX 45, and as reflected in his sworn hearing testimony. FRX 46. Indeed, Professor Rotunda, one of the top legal experts in professional ethics in the nation before he sadly died, observed: "[t]he situation involving these particular clients...provided a unique set of circumstances, one that the D.C. Rules of Professional Conduct do not expressly take into account. Given this unprecedented situation, Respondent, out of necessity, attempted to correct the wrongs caused by Judicial Watch . . ." Specifically, Professor Rotunda opined, pro bono, that Mr. Klayman was acting under the doctrine of necessity to preserve the rights of his clients:

> One should also consider Mr. Klayman's actions in light of the doctrine of necessity. We know that judges can decide cases even if they are otherwise disqualified if there is no other judge available to decide the case. For example, the Court of Claims applied the "rule of necessity" and held that, under that rule, its judges could hear the case involving their own salaries. Otherwise, no judge would be available to decide some important legal questions. The court then turned to the judges' substantive claim and denied it. Atkins v. United States, 556 F.2d 1028 (Ct.Cl.1977) (per curiam), cert. denied,

> 434 U.S. 1009 (1978). See also, *United States v. Will*, 449 U.S. 200 (1980). The *Will* Court explained: "The Rule of Necessity had its genesis at least five-and-a-half centuries ago. Its earliest recorded invocation was in 1430, when it was held that the Chancellor of Oxford could act as judge of a case in which he was a party when there was no provision for appointment of another judge."
>
> Faced with the dilemma of either representing Cobra, Paul, and Benson, or allowing them to lose their legal rights, Mr. Klayman sided with the rights of the clients, in accordance with Rule 1.3, and thus, justifiably, chose to represent them. FRX 45.

Mr. Klayman only did what he did because Cobas, Paul, and Benson could not afford other counsel, and Mr. Klayman, in that regard, represented them *pro bono* for no reason other than to protect their rights, as found by Professor Rotunda: "Further establishing Mr. Klayman's ethical intentions is the fact that he represented these aggrieved individuals pro bono and paid court and other costs out of his own pocket simply to protect the rights of Cobas, Paul, and Benson." FRX 45.

*Sixth*, in any event, Mr. Klayman has taken CLE courses on conflict of interest, showing that the Court's finding that Mr. Klayman lacked any contrition or remorse is not true. Mr. Klayman has taken the steps to ensure that he will not be placed in this type

of situation ever again, and in the unlikely event that he is, he will know exactly what he needs to do.

### b. There Has Been a Deprivation of Due Process And Other "Grave Reason" To Decline Reciprocal Discipline Due to Stacking

In addition to the clear paucity of proof with regard to both the Sataki Suspension Order and the Judicial Watch Suspension Order, there has been a significant deprivation of due process and other "grave reason" constituting a manifest injustice that requires that reciprocal discipline be denied under *Kandekore*.

### i. Mr. Klayman Was Denied Discovery

As set forth above, Mr. Klayman was denied discovery in the Sataki Suspension Order by the District of Columbia attorney discipline apparatus. This alone constitutes a severe due process violation, particularly given the extreme seven (7) year delay by DCODC in filing it Specification of Charges. FRX 4.

In this reciprocal discipline proceeding, this due process violation was amplified by Referee Marsh, who also denied Mr. Klayman necessary discovery. As set forth in Mr. Klayman's Updated and Renewed Motion for Recusal and to Vacate Report and Recommendation, Ind. 89, which was left unaddressed by the

Court in its Suspension Order, Mr. Klayman had sought and was granted the depositions of members of the District of Columbia attorney discipline apparatus, Hamilton Fox III, Matthew Kaiser, Warren Anthony Fitch, Michael Tigar and H. Clay Smith. Referee Marsh initially issued subpoenas for these depositions. Then, during the March 27, 2024 hearing before Referee Marsh, he quashed these subpoenas, leaving Mr. Klayman no opportunity to file an interlocutory appeal with this Court. As a result, Mr. Klayman has been forced to participate in a reciprocal discipline proceeding, nearly a decade and a half after the events had occurred, without any discovery at any level. This is a severe deprivation of his due process rights.

### ii.  The Significant Delay At Every Level Constitutes Unethical and Illegal Stacking

For the Court's convenience, below is a brief timeline of relevant dates in both the Judicial Watch Suspension Order and the Sataki Suspension Order, which show the clear inexcusable delay as well as the stacking of disciplinary proceedings, which was not addressed by this Court in the Suspension Order. This "stacking" is

a prime example of FOBC's bad faith and improper conduct and evidence of its intent to punish Mr. Klayman.

**Around 2006** – Underlying events; Mr. Klayman's representation of Ms. Benson, Ms. Cobas, and Mr. Paul

**2010 – 2011**: Mr. Klayman's representation of Ms. Sataki.

**November 2, 2010**: Ms. Sataki files a complaint against Mr. Klayman with DCODC. FRX 7.

**July 7, 2011**: DCODC sends Ms. Sataki a letter asking for a written reply to Mr. Klayman's explanations on or before July 15, 2011 which stated "[i]f we do not hear from you promptly, we may assume that you are satisfied with the attorney's explanations." FRX 15. Ms. Sataki never replied. FRX 16.

**October 24, 2011**: Ms. Sataki files Supplemental Complaint with DCODC where she attests - with a certification that this is true and correct to the best of her knowledge - "Complaint also filed in Pennsylvania and Florida." FRX 7. This included a signed attestation that Ms. Sataki "certifies to the Office of Bar Counsel that the statements in the foregoing Complaint are true and correct to the best of my knowledge." FRX 7. This renders the Referee's primary reason to try to discredit that Ms. Sataki's supplemental complaint as not being made "under penalty of perjury" completely erroneous.

**October 1, 2013** – DCODC institutes a Specification of Charges in the Judicial Watch Suspension order. FRX 42

**January 15, 2014**: H. Clay Smith, Assistant Bar Counsel of DCODC emails a private investigator to try to "locate a complainant that has dropped off the map." Mr. Smith admits that Ms. Sataki did not respond to their July 7, 2011 letter and that they have not heard from her since 2011, thereby abandoning her complaint against Mr. Klayman. FRX 16.

**July 20, 2017**: DCODC files a Specification of Charges. FRX 4.

**June 11, 2020** – D.C. Court of Appeals suspends Mr. Klayman for ninety (90) days in the Judicial Watch Suspension Order

**January 7, 2021**: The D.C. Court of Appeals "temporarily" suspends Mr. Klayman.

**September 15, 2022**: The D.C. Court of Appeals suspends Mr. Klayman for another eighteen (18) months.

**August 9, 2023**: FOBC initiates this reciprocal discipline matter in Florida for both the Judicial Watch Suspension Order and the Sataki Suspension Order.

Florida imposes a six-year statute of limitations for attorney discipline matters. The Bar is required to open an investigation "within 6 years from the time the matter giving rise to the investigation is discovered or, with due diligence, should have been discovered." Bar Rule 3-7.16(a)(1); *Fla. Bar v. Phoenix*, 311 So. 3d 825, 831 (Fla. 2021). And, in addition to this hard statute of limitations, Florida also imposes the doctrine of laches to unjustifiable delays in attorney discipline matters. *See The Florida Bar v. Walter*, 784 So.2d 1085 (Fla. Sup. Ct. 2001). Based on the above timeline,

*First*, given that Ms. Sataki filed a disciplinary complaint with The Florida Bar stemming from Mr. Klayman's representation in 2011, FRX 7, and there was no action taken by The Florida Bar for more than six (6) years, this matter is precluded by the statute of limitations. The *ex post facto*

*Second*, at a minimum, the doctrine of laches applies to both matters given that the underlying events of the Judicial Watch Matter occurred around 2006 – now nearly twenty (20) years ago – and the underlying events of the Sataki Matter occurred around 2010 – now fifteen (15) years ago. Both the District of Columbia attorney discipline apparatus and The Florida Bar had ample opportunity to prosecute these matters decades ago without working a severe prejudice to Mr. Klayman caused by delay and they chose not to do so, and instead piled on two untimely proceedings which worked to unduly punish him. This is a textbook application of the doctrine of laches and a violation due to stacking.

*Third*, the timeline above clearly shows that the "stacking" of disciplinary proceedings has occurred, not only in the District of Columbia but also in Florida. FOBC had notice of the Judicial Watch Suspension Order in 2020 and withheld reciprocal discipline

for over three (3) years in order to stack it with the Sataki Suspension Order. This practice has been expressly forbidden by this Court in *Florida Bar v. Rubin*, 362 So.2d 12 (Fla. Sup. Ct. 1978):

> Whatever other objects the rule may seek to achieve, it obviously contemplates that *the Bar should not be free to withhold a referee's report which it finds too lenient until additional cases can be developed* against the affected attorney, in an effort to justify the more severe discipline which might be warranted by cumulative misconduct. The Bar's violation of the prompt filing requirement in this case, to allow a second grievance proceeding against Rubin to mature, is directly antithetical to the spirit and intent of the rule. In addition, it has inflicted upon Rubin the 'agonizing ordeal' of having to live under a cloud of uncertainties, suspicions, and accusations for a period in excess of that which the rules were designed to tolerate. (emphasis added).

*See also Fla. Bar v. D'Ambrosio*, 25 So. 3d 1209 (Fla. 2009) (referring to the practice of "stacking" disciplinary proceedings as unfair)

*Fourth*, this Court, at oral argument, already recognized the due process and stacking issues caused by this delay despite ultimately failing to give this crucial issue proper consideration and weight.

> Justice: I'M SORRY TO INTERRUPT I JUST WANT TO GIVE YOU A CHANCE TO ADDRESS JUST SOMETHING

I'M KIND OF STRUGGLING WITH WITH THIS CASE WHICH IS IT SEEMS LIKE THERE IS SOME ATTRACTIVENESS TO THE IDEA THAT REGARDLESS OF WHAT HAPPENED HERE IT WAS A LONG TIME AGO THERE WAS DISCIPLINE IN DC. ADDING TWO MORE YEARS TO IT MIGHT BE OVERKILL. Exhibit 2 at 3.

Justice: BUT THE CASE FOR PROTECTING THE PUBLIC FROM HARM SEEMS TO ME TO BE SUBSTANTIALLY WEAKENED BY THE DELAY THAT THE BAR SEEMS TO HAVE TAKEN IN THIS MATTER. IF MR KLAYMAN BECAUSE OF HIS CONDUCT WAS AT SUBSTANTIAL RISK TO THE PUBLIC WHY DID YOU WAIT SO LONG TO ACT? Exhibit 2 at 5.

Chief Justice Carlos Muniz: CAN I ASK YOU A QUESTION IS THE TWO YEARS SUSPENSION HERE NECESSARY TO PROTECT THE PUBLIC OR IS THIS MORE ESSENTIALLY JUST A PUNISHMENT. Exhibit 2 at 5.

This Court's skepticism, if not alarming surprise, concerning the enormous delay caused by the District of Columbia attorney discipline apparatus and then FOBC was well-taken, but for whatever reason, was also essentially side-stepped and not a significant or real factor in the Suspension Order.

*Fifth*, the Court must give proper weight and consideration to the opinion letters of Professor Rotunda, one of the preeminent experts in legal ethics. With regard to the Judicial Watch Suspension Order, Professor Rotunda opined:

That brings up the problem of laches. The doctrine of laches bars untimely claims not otherwise barred by the statute of limitations…. Laches applies to bar a claim when a plaintiff has unreasonably delayed in asserting a claim and there was undue prejudice to the defendant as a result of the delay. *Jeanblanc v. Oliver Carr Co.*, 1995 U.S. App. LEXIS 19995, *9 (D.C. Cir. June 21, 1995). Among the inequities that the doctrine of laches protects against is the loss of or difficulty in resurrecting pertinent evidence. *Id.*

Note that Mr. Klayman left Judicial Watch on September 19, 2003. He filed his appearance on behalf of Ms. Cobas on August 7, 2006 — long after he left Judicial Watch. There is no claim that he violated any confidences of Judicial Watch or that he earlier represented Judicial Watch against Ms. Cobas. This Bar Complaint was filed on May 1, 2014. The delay in filing the complaint was nearly 8 years.

The conduct alleged by Bar Counsel occurred between seven and eight years ago. Given the substantial delay in bringing the present Petition before the Board, Mr. Klayman's ability to defend this case has been detrimentally prejudiced, particularly as recollection and memory fade over the course of approximately seven to eight years and witnesses and the individuals involved may be unavailable in support of Mr. Klayman's defense. In Paul's case, for instance, he is in federal prison in Texas. Ms. Cobas has health problems and Ms. Benson is now an 83-year-old woman. The Bar should not use this unique factual situation to discipline Mr. Klayman given the equitable doctrine of laches. FRX 45.

With regard to the Sataki Suspension Order, Professor Rotunda

opined on June 2, 2014:

A very surprising item about this complaint is that it was filed over five years ago about alleged events that occurred in. December 2009 and shortly thereafter. The complainant, Elham Sataki, made similar complaints to the Pennsylvania Bar and the Florida Bar, both of which dismissed the complaint years ago. For some reason, [DCODC] sat on this complaint for years and is now resurrecting it…. The caselaw shows that DCODC is subject to laches. FRX 9.

Accordingly, this delay has severely harmed and prejudiced Mr. Klayman and serves as a compelling reason under *Fla. Bar v. Kandekore*, 766 So. 2d 1004, 1007 (Fla. 2000) why this Court is "not automatically bound by an out-of-state determination of guilt by a disciplinary agency."

### c. There Has Been A Manifest Injustice That Must be Corrected Under *Kandekore*

Crucially, *Kandekore* provides another basis beyond the paucity of proof and denial of due process, which Mr. Klayman has already shown above, which demonstrates that the Court is not bound by the Sataki Suspension Order and the Judicial Watch Suspension Order. There has been a manifest injustice here, which under *Kandekore* constitutes a "grave reason which would make it unjust to accept the foreign judgment."

Put simply, the Suspension Order is factually and legally wrong. The record in this case was simply ignored by whoever was assigned to draft the Suspension Order. This sidesteps the duty of this Court on appeal, which is defined as "The complaint to a superior court of an injustice done or error committed by an inferior one, whose judgment or decision the court above is called upon to correct or reverse. [4]" The Suspension Order has been adopted virtually wholesale from the Report of Referee Marsh and therefore contains no record cites for this reason. Referee Marsh's Report was a virtual identical super copy of FOBC's Proposed Report, which was itself effectively a super copy of the DCCA's opinion, FRX 3, and also contained no record cites. The result of this was a cascading series of legal and factual errors that Mr. Klayman had no bona fide opportunity to remedy at any step of this proceeding.

This instant Motion for Rehearing has done everything necessary to encapsulate the record and provide the Court with the necessary facts that it <u>must</u> now thoroughly consider and digest before issuing a ruling. Another ruling containing no record cites or evidence would deny due process and equal protection rights, where

---

[4] https://thelawdictionary.org/appeal/#google_vignette

Mr. Klayman entire legal career is at stake. The Court must take the time that it needs—no matter how long—to carefully, thoroughly, and methodically review the record evidence presented in this motion. Anything short of this would be a catastrophic denial of Mr. Klayman's due process rights and a gross manifest injustice. It now behooves this Court to correct this manifest injustice, which is its duty to do under *Strazzulla v. Hendrick*, 177 So. 2d 1, 3 (Fla. 1965). "We may change 'the law of the case' at any time before we lose jurisdiction of a cause and will never hesitate to do so if we become convinced, as we are in this instance, that our original pronouncement of the law was erroneous and such [ruling resulted in manifest injustice. In such a situation a court of justice should never adopt a pertinacious attitude."

### d. The Sanction Imposed By The Court is Not Supported By Case Law

The cases used by this Court to justify its currently punitive Suspension Order simply do not apply to the facts of this case.

In *Fla. Bar v. Herman*, 8 So. 3d 1100 (Fla. 2009), the attorney was suspended from the practice of law for ninety days with a probation period of two years. *Id.* at 1102. Herman, represented

companies Aero Controls and Triple J Leasing—companies in the business of selling and repairing component airplane parts and leasing aircrafts, respectively—in a contract dispute and litigation over the purchase of an aircraft and in a lease agreement of another aircraft to Air Kazakhstan. *Id.* The trial in the contract dispute concluded in February of 2018 and the lease agreement matter concluded in March of 2018. *Id.* In June of 2018, Herman incorporated a company called Nation Aviation as a direct competitor to Aero Controls and Triple J Leasing. Even more, Herman put Thomas Bristow—Aero Controls' former top salesman—in charge of his company. Then:

> By January 1999, Herman was the sole monetary investor in Nation Aviation. At that point, he had to choose between closing Nation Aviation and losing his investment or allowing Bristow to run the company exclusively as a seller and lessor of aircraft parts. Herman chose the latter, putting his company (which was now under the direction of his client's former top salesman) in direct competition with his client, Aero Controls. **The referee concluded that Herman, who was still representing Aero Controls, should have called Titus at that point to disclose the conflict and request a waiver, but did not, because of monetary concerns. His failure to disclose was dishonest and deceitful**. *Id.* at 1103 (emphasis added).

To the contrary, any conflict of interest that Mr. Klayman may have had in the Judicial Watch Suspension Order was certainly not driven by monetary concerns. He was acting solely in the interests of his clients, under the doctrine of necessity, as opined by Professor Rotunda. There was also nothing dishonest or deceitful in Mr. Klayman's conduct. He never hid anything from anyone. Thus, *Herman* is similarly inapplicable to the facts here.

In *The Florida Bar v Rush*[5], 361 So.3d 796 (Fla. 2023), the attorney was suspended for a period of three years on a set of facts that is not even remotely comparable or even similar to the facts at issue here. In *Rush*, the attorney was retained in an eminent domain action between his clients, North Park, and Florida Department of Transportation ("FDOT") involving placement of a drainage pond on the property. *Id.* at 799. Rush insisted on pursuing a "nonmonetary benefit" argument involving relocating the drainage pond because it would entitle him to an award of statutory attorney's fees. *Id.* While Rush's clients initially agreed, they later

---

[5] *The Florida Bar v. Lee Segal*, SC2023-1067 (Fla. Aug. 10, 2023) [TFB # 2021-10,292(6D), et al.] and *The Florida Bar v Joseph Scott Lanford*, SC21-1008 [2016,30, 658(18C)] are non-published opinions that have no precedential effect.

changed their minds when a buyer of the property was not able to fund the purchase until the eminent domain case was settled. *Id.* Rush was then instructed to settle the eminent domain action quickly to facilitate the sale of the property. *Id.* Despite this instruction, "Rush began filing a series of unauthorized pleadings and motions in the eminent domain case seeking to preserve and advance his claim for attorney's fees based on his nonmonetary benefits argument." *Id.* Rush even "sent FDOT a settlement proposal waiving monetary benefits in favor of Rush's nonmonetary benefits argument." *Id.* at 800. When North Park hired additional counsel to settle the eminent domain case as quickly as possible. Mr. Petitt, Rush refused to cooperate with him, leading to confusion by the Court further delaying the eminent domain case. *Id.* Rush then threatened counsel for FDOT at a hearing to the extent where he "continued to berate her and followed the pair out of the courthouse." *Id.* As a result, FDOT refused to settle informally with North Park, further delaying the eminent domain action. Lastly, when Mr. Petitt sent Rush a client-approved settlement offer for Rush to sign and submit to FDOT with the instruction that it could not be modified, Rush still modified the language without approval

because he feared that the language constituted a waiver of his attorney's fees. *Id.* When Rush was finally terminated, he sued North Park seeking fee arbitration and 21 causes of action, all of which were denied. *Id.* Free from Rush's interference, North Park and FDOT settled whereby North Park was paid the monetary value of the property taken. Despite this, Rush still continued to seek his attorneys' fees based on his nonmonetary benefit argument. Under these egregious facts, Rush was suspended for three years.

The facts of *Rush* cannot even remotely be applied analogously here. Rush's actions were driven solely by his desire to maximize the amount of attorney's fees he would receive, and in that regard, ignored direct instructions from his clients and even committed fraud to achieve his goals. He sued his clients to try to collect his fees. To the contrary, Mr. Klayman's only interests were to help Ms. Sataki achieve her desired outcome and to preserve her legal rights when she became unresponsive. Mr. Klayman has never once asked to be paid back and has certainly never tried to collect a single penny from Ms. Sataki. These cases are completely distinguishable.

With regard to the appropriate sanction, the case that the Court should strongly consider is its precedential holding in *Fla.*

*Bar v. Glick*, 383 So. 2d 642 (Fla. 1980). In *Glick*, the attorney was found to have committed serious ethical violations on the following facts:

> …respondent improperly handled a quiet title suit; that, although he had not been and would not be successful in clearing the title to the property, and, even though he had not undertaken any efforts to clear the title of the interest reserved to the state, respondent closed the transaction and allowed his client to take title to the property without advising his client that the defects in the title continued to exist; that respondent prepared an incomplete deed; and that respondent has never refunded to his client the $ 1,000 fee paid for the handling of the quiet title suit. The complaint charged, and the referee also found, that respondent was asked to represent a party in a breach of warranty suit; that he failed to notify his client of the date of the hearing on the matter and, because his client failed to appear at the hearing, the court dismissed the client's action; that respondent did not initiate contact with his client within a reasonable time before the scheduled hearing in order to prepare for the final hearing and to arrange for the attendance of witnesses; and that respondent never attempted to reopen the case. *Id.* at 643.

The attorney was found guilty of violating Florida Bar Code of Professional Responsibility Disciplinary Rule 6-101(A)(1), (A)(2), and (A)(3) and FOBC recommended a sixty-day suspension and probation. The Court, however, took particular note of the attorney's thirty (30) year career practicing law in Florida without disciplinary history and that the charges did not involve dishonesty

or fraud, *id.*, and instead only ordered a public reprimand and one year conditional probation. These facts line up with this instant case perfectly. Mr. Klayman has been a member continuously in good standing with The Florida Bar for forty eight (48) years – almost half a century! The charges against him do not involve dishonesty or fraud, and even more, do not involve his competency, diligence, or zeal in representing clients. Thus, similar to *Glick*, notwithstanding his innocence, in the worst case scenario Mr. Klayman should receive, at most, a public reprimand or probation.

### e. The Court Must Address Mr. Klayman's Updated and Renewed Motion for Recusal and to Vacate Report and Recommendation

In its Suspension Order, the Court did not and thus failed to address Mr. Klayman's Motion for Recusal and to Vacate Report and Recommendation and Updated and Renewed Motion for Recusal and to Vacate Report and Recommendation, Ind. # 89. This crucial issue needed to be addressed by the Court especially because Referee Marsh's Report was effectively adopted wholesale in the Order. This runs contrary to Fla. Fla. Stat. § 38.10, which states:

> Whenever a party to any action or proceeding makes and files an affidavit stating fear that he or she will not receive a fair trial in the court where the suit is pending on account of the prejudice of the judge of that court against the applicant or in favor of the adverse party, the judge shall proceed no further.....

The issue of Referee Marsh's bias and prejudice was never addressed in the context of his having been subject to motions to recuse himself or be disqualified. The Court should have dealt with this issue, which was briefed extensively, as it bears on the content of his Report, which it adopted virtually wholesale. As shown herein, Referee Marsh must be disqualified and as a result, the Suspension Order must be vacated and, if not remedied by this Court, this matter remanded to an unbiased and neutral Referee. There is simply too much at stake for Mr. Klayman for any other outcome to occur, and the Court must take this issue up now, at a minimum, after having ignored it when it was raised in Mr. Klayman's' initial briefing. *See* Mr. Klayman's Initial Brief at 66: "Those concerns are set forth in detail in Mr. Klayman's Updated and Renewed Motion for Recusal and to Vacate Report and Recommendation, which was denied by the Referee after just one

day. (R-90, 4347). Those recusal and/or disqualification grounds must now be considered by this Court.")

Importantly, the threshold for disqualification is not high. "Actual bias or prejudice need not be shown, **rather it is** **the appearance of bias or prejudice** which requires disqualification." *Menada, Inc. v. Arevalo*, 341 So. 3d 1189, 1191 (Fla. Dist. Ct. App. 2022) (emphasis added). In *Franco v.* State, 777 So. 2d 1138 (Fla. Dist. Ct. App. 2001), the Court held, " trial court's prejudice against an attorney may be grounds for disqualification when such prejudice is of a degree that it adversely effects the litigant." Furthermore, there is a "longstanding, well-established Florida Supreme Court rule that a trial court may not address the truth of the facts alleged in a motion to disqualify." *Manuel v. Est. of Manuel*, 367 So. 3d 520, 522 (Fla. Dist. Ct. App. 2023). *See also Hayslip v. Douglas*, 400 So. 2d 553 (Fla. Dist. Ct. App. 1981) (The judge against whom the motion is directed shall determine only the legal sufficiency of the motion. The judge shall not pass on the truth of the facts alleged. If the motion is legally sufficient, the judge shall enter an order of disqualification and proceed no further in the action.")

*Brown v. St. George Island, Ltd.*, 561 So. 2d 253 (Fla. 1990) held "When a party seeks to disqualify a judge under section 38.10, the judge cannot pass on the truth of the statements of fact set forth in the affidavit....The facts and reasons for the belief of prejudice must be taken as true, and the judge may only pass on the legal sufficiency of the motion and supporting affidavits to invoke the statute." *Id.* at 255. In *Brown*, this Court held that a judge must be disqualified where he stated that he would not believe a litigant, effectively accusing him of being dishonest. *Id.* at 257.

In *Peterson v. Asklipious*, 833 So. 2d 262 (Fla. Dist. Ct. App. 2002), the Fourth District Court of Appeals found that the trial judge should have been disqualified where he declined to allow a party to introduce testimonial evidence and stating that he would not believe the party in any event. *Id.* at 263. *See also Edwards-Freeman v. State*, 138 So. 3d 507, 509 (Fla. Dist. Ct. App. 2014) ("A judge's gratuitous remarks about counsel or her character undermine respect for the judiciary and the proceedings and leave an impression that the judge is not fair and impartial.")

### i. Referee Marsh Sua Sponte Increased the Sanction Requested by FOBC Without Any Legal or Factual Basis

One of the key indicators of Referee Marsh's extrajudicial bias and prejudice is that he *sua sponte* increased the sanction from the FOBC's requested eighteen (18) months to twenty-four (24) months without any basis to do so, and which the Referee himself recognized was a "rare" occurrence.  March 28  Transcript at 210 ("This is the rare case where I'm going to go above what the Bar is asking for."). Despite FOBC only seeing fit to seek eighteen (18) months, and even if the suspension periods for both disciplinary matters were added together, it would only total twenty-one (21) months, Referee Marsh went beyond even that number to twenty-four (24 months), which can only be explained by an extrajudicially biased and prejudiced mindset towards Respondent Mr. Klayman, as detailed below.

### ii. Referee Marsh Refused To Accept Highly Relevant Evidence Into the Record

Referee Marsh also incredibly refused to admit FRX 79 and 80 into the record – USB drives containing the entire underlying records in the two disciplinary proceedings at issue as well as FRX

81 - video of Elham Sataki's interview publicizing her case. Referee Marsh's refusal to admit FRX 79 and 80 serves as undisputable evidence of the Referee having prejudged this matter, as there is absolutely no prejudice to any party in simply having access to a full record, which record every other court and jurisdiction considering the issue of reciprocal discipline actually required that Respondent Mr. Klayman produce. Indeed, the Court must respectfully open up the record in this regard.

This is even more so the case with regard to FRX 81, which is compelling exculpatory evidence that conclusively shows that Mr. Klayman did not commit the primary ethical violation at issue in the Sataki Suspension Order – improperly using publicity and disclosing client confidences. Referee Marsh would not even watch the video to determine its relevance before refusing to admit it into the record, clearly showing once again his prejudgment; how could he possibly know whether the video was relevant if he would not even take the time to watch it? Referee Marsh's prejudged mindset is shown thorough the exchange between the parties:

> MR. KLAYMAN: The Court may wish to see certain things.

THE COURT: Well, "may wish to see" doesn't -- again, why do they see it -- I think this a fundamental misunderstanding. In 47 years, I think that -- the record is different than evidence admitted in an evidentiary hearing by which a, in this case, referee, in other cases a judge, and in other cases, a jury makes factual findings. So whether it goes up as part of the record is different than whether it is admitted into evidence. It's much like in a criminal case. If a defendant confesses and they confess all over themselves and there is a motion to suppress and it, say, is granted, then that is not admitted into evidence but it becomes part of the record that would go up on the appeal. So what is the relevance of that as to admissibility in this evidentiary hearing?

MR. KLAYMAN: Here's my understanding, your Honor, is that courts, some of which, most of which have stayed reciprocal discipline, they have all asked me for the complete record. I provided it to them. So this is exactly what I provided at least with regard to Sataki to these courts that were considering reciprocal discipline.

THE COURT: But we're not –

MR. KLAYMAN: So I felt it was relevant here too as well.

THE COURT: I got it. The objection is sustained. The Court finds it irrelevant for purposes of this evidentiary hearing. And that's 79 and 80....As to 81, the Court -- that goes along with -- the objection as to relevance is also sustained. We had previously discussed that matter as it related to the translation of the video. And so that will be sustained as well.

Referee Marsh then compounded his egregious these errors above by then refusing to admit into evidence articles concerning Respondent Mr. Klayman's character, FRX 84, 86, 91 – 98, despite

character being a pertinent area of inquiry during the sanctions hearing. Even more, the Referee, mockingly referred to a feature article by the Washington Post as an "advertisement for a book." March 28 Transcript at 156:9.

Referee Marsh's actions therefore indicate that he appears not to have been interested in the required effort to consider the truth. The entire underlying disciplinary record is thus essential to determining whether Respondent Mr. Klayman's due process rights were violated by the District of Columbia attorney discipline apparatus – a fundamental inquiry under *Fla. Bar v. Kandekore*, 766 So. 2d 1004, 1007 (Fla. 2000). The Referee's refusal to even allow all of this highly relevant evidence into the record shows that he had already prejudged the deprivation of due process and did not want any evidence to the contrary to be admitted into the record.

### iii. Referee Marsh Made Numerous Hostile, Belittling Statements Towards Mr. Klayman

Referee Marsh also made numerous hostile, acrimonious and belittling statements towards Mr. Klayman that evidence not only bias and prejudice, but also a clearly deep personal animus and

dislike of Mr. Klayman. At the March 27 – 28 sanctions hearing in this matter, Mr. Klayman was repeatedly cut off, mocked, and simply not allowed to present his case. Referee Marsh also abbreviated the hearing, preventing Mr. Klayman from calling many of the witnesses that he wished to call. Referee Marsh gave little to no consideration to the multitude of experts who testified that this proceeding is indisputably time-barred. Prominent further examples of the Referee's extrajudicial bias and animus include, but are not limited to:

a)    Discrediting the testimony of Respondent Mr. Klayman's expert, Robert Klein, Esq., as being "based...on the one line in Respondent's Exhibit 1 that say the complaint was provided to the State of Florida" and then following it up with the completely illogical argument that "There is no indication of what address it was sent to, whether it was sent to the proper place. It could have been sent to the governor. It could have been sent to the legislature. It could have been sent to the local 7-11, for all the referee knows. There's a paucity of evidence for it actually being sent to the Florida Bar." March 28 Transcript at 202:4 – 12. There is so much wrong with this that it is difficult to determine where to start. The referee, without a single shred of evidence in support, decides to simply **presume** that Ms. Sataki did not send her complaint to The Florida Bar. This completely disregards the fact that just about any adult is able to follow simple directions as to where to send things. Attorney discipline complaints all come with instructions on where to send them. The Referee decides to simply **presume** that Ms. Sataki lacked the mental capacity to follow even basic directions, which is improper. If any presumption was proper, it should have been to presume that

Ms. Sataki was able to follow simple directions and sent her complaint to the right place. This is why Respondent Mr. Klayman repeatedly tried to depose The Florida Bar's Intake Director, Shanell Schuyler, to receive confirmation that The Florida Bar did, in fact receive Ms. Sataki's complaint back in 2011, but was predictably not able to get a straight answer from her.

b)    Repeatedly minimizing Respondent Mr. Klayman's exhibits and arguments as "political ax grinding" March 28 Transcript at 144:18, and as "MSNBC vs. Fox," March 27 Transcript at 169:23, despite there being no evidence proffered by FOBC to counter Respondent Mr. Klayman's argument that the District of Columbia attorney discipline apparatus has evolved into a highly-politicized weapon aimed at eliminating conservative and Republican activist attorneys from the practice of law.

c)    Accusing Respondent of being "argumentative" and not "stick[ing] with facts" March 27 Transcript at 174:18 – 19 when he was simply raising pertinent issues, such the issue of FOBC "stacking" disciplinary proceedings.

> MR. KLAYMAN: And even though the District of Columbia doesn't have, apparently, a statute of limitations, laches does apply in the District of Columbia. And [Professor Rotunda] gets into that. And he gets into many of the cases that I've cited in this case, whether it was the Florida Bar vs. Rubin, about stacking. That's one of the issues here, your Honor. In fact, you can see it with what has happened with regard to the Judicial Watch complaint. That somehow arises from the dead at the same time that my suspension order is ending with regard to Sataki. The Bar could have brought that three years earlier, but they didn't. They held it back.
>
> THE COURT: Objection. Argumentative. Sustained. Sir, let's stick with facts. I'll let you make closing

argument, but you're going to eat up all your time in this hearing and not have the time to make a closing argument.

Despite instructing Respondent Mr. Klayman to save his "argument" for closing, the Referee then foreclosed that opportunity by only granting Respondent Mr. Klayman a mere fifteen (15) minutes in closing, most of which had to be devoted to correcting misstatements made by FOBC in their closing. *See also Id.* at 180: 11 – 17.

d)    In issuing his ruling, the Referee ignored the strong character references of the Honorable Royce Lamberth, who actually presided over the Judicial Watch Matter, <u>FRX 77</u>, and was therefore in a uniquely qualified position to render an opinion, as well as the testimony of the Honorable Stanley Sporkin, <u>FRX 24</u>, in addition to devaluing Respondent Mr. Klayman's other character witnesses.

e)    *Sua sponte* referencing former president Bill Clinton's ethics complaint as an unnecessary and highly irrelevant not too veiled shot against Respondent Mr. Klayman, who has sued the Clintons on many occasions in the past as part of his public interest advocacy work: ""It's going to come up now, is that, some, jeez, now, some 25 years ago or so, there was a prominent Democrat attorney who happened to be president of the United States. And there was a conservative organization that thought the fact that he lied under oath during a deposition showed he was unfit to be an attorney, not -- just because they're a conservative organization and they want to -- and this was not Judicial Watch -- "Well, you might have had this -- the group that actually pushed for the sanctions in the state of Arkansas that was -- there was another group that was Southeastern --Legal Foundation. So, again, the fact that they're a conservative organization, have very conservative leanings, don't like the policies of this prominent Democrat who is trying to enlarge the government. They want limited government. They want conservative principles. And they feel he is not doing that. Are they not able to go seek sanctions

from the Bar despite the underlying misconduct of that individual attorney? I mean, that's the part that I have a problem with, where this political implication is, why don't we throw politics out of this and stick with what are the facts. March 27 Transcript at 9:17 – 10:17.

f)    Repeatedly cutting Respondent Mr. Klayman off and preventing him from making argument. As just one prominent example of the myriad of instances contained in the transcripts is the following exchange:

> MR. KLAYMAN: But when -- and if I may say this, please, if you may indulge me, when I began at the Justice Department, the first thing that I was told by my supervisor, the chief -- THE COURT: Sir, you've written that in your -- I have read that at least three times. We're not going to waste the Court's time -- MR. KLAYMAN: You're being very deferential to the Bar, your Honor. You're being very deferential to them. And you're cutting me off at every argument that I've made. *See also* March 27 Transcript at 57:1 – 6; 204:6 – 7; 205:3 – 4.

g)    Diminishing the character testimony of Stephen Sulzer, Esq. simply because he was not familiar with the specifics of the underlying disciplinary proceedings. The Referee said "He had no specific knowledge of the underlying DC cases in this case. And he wasn't aware of the Florida Rules of Evidence. So the Court, although accepting it, reduces the value of that individual opinion based on some of the lack of personal knowledge about the underlying conduct which has occurred in this case." March 28 Transcript at 206:5 – 11. Mr. Sulzer was not there to testify as an expert about the disciplinary proceedings. He was there to give his opinion of Respondent Mr. Klayman's character. There was no basis for the Referee to openly diminish Mr. Sulzer's testimony.

h)    Allowing a line of improper questioning by FOBC calling for Respondent Mr. Klayman's character witnesses to

speculate on Respondent Mr. Klayman's character based on assumptions and fabricated scenarios not in evidence. For instance, FOBC was allowed to ask "Mr. Barr, if all of these courts found that Mr. Klayman engaged in unprofessional conduct and failed to follow court rules, would you consider that good character?" over the strong objection of Respondent Mr. Klayman March 28 Transcript at 116.

i)    On no fewer than three occasions during the March 27th to March 28th hearing abruptly stormed off the bench, without explanation why,  while Mr. Klayman was on the witness stand, and made various noises which Respondent Mr. Klayman has never seen before. This conduct very reasonably placed Respondent Mr. Klayman in serious doubt that he could receive any semblance of a fair adjudication before the Referee[6].

### iv. Numerous Other Basis for Recusal Set Forth in Full in Mr. Klayman's Updated and Renewed Motion for Recusal and to Vacate Report and Recommendation Must Be Ruled Upon

As set forth in full in Mr. Klayman's Updated and Renewed Motion for Recusal and to Vacate Report and Recommendation, the above is just a sampling of the multitude of reasons that Referee Marsh must be disqualified. Referee Marsh has also (1) falsely and without legal or factual basis accused Mr. Klayman of dishonesty,

---

[6] *See also* Affidavit of Frederick Sujat. Mr. Sujat was present at the hearing before Referee Marh and declared under oath the following: "At the March 28, 2024 hearing, I observed the demeanor and conduct of Referee Marsh, and it struck me that he was highly offensive and disrespectful towards Mr. Klayman and even strangely towards myself when I testified on Mr. Klayman's behalf." Exhibit 6.

(2) denied Mr. Klayman due process with regard to necessary discovery, (3) refused to hold FOBC accountable for intentional false statements, and (4) refused to correct the record when his false statements were corrected by Mr. Klayman. The Court must thoroughly review Mr. Klayman's Updated and Renewed Motion for Recusal and to Vacate Report and Recommendation, Ind. # 89, disqualify Referee Marsh, vacate his Report and therefore the Suspension Order and remand this for further proceedings before a neutral and unbiased Referee.

## IV.    CONCLUSION

Put simply, the bottom line here is that the Court must thoroughly review the record evidence. This Motion has carefully and meticulously identified the necessary record evidence showing a clear paucity of proof of any ethical violation in either the Sataki Suspension Order or the Judicial Watch Suspension Order. The Court cannot once again simply "gloss over" this record evidence and abdicate its duty and responsibility to actually adjudicate this matter based on the record evidence. It cannot simply adopt without question the Report of a biased and prejudiced Referee

Marsh without giving necessary weight or consideration to the record evidence in this matter.

This Motion for Rehearing has undoubtedly identified for the Court with more than the pre-existing required record evidence that there was a paucity of proof of any ethical violation, which was originally set forth in Mr. Klayman's initial brief and reply brief to this Court and which was simply "glossed over" or side-stepped in the Suspension Order. As one compelling example, he has provided AHHC hearing pin cites in the Sataki Suspension Order where Ms. Sataki admits that she approved of pursuing her claims with publicity and even personally publicizing her case with her union representative, Mr. Shamble, on Capitol Hill. FRX 24 at 893. He has provided also unrefuted testimony from Mr. Shamble, Mr. Dash, Ms. Klayman, and others that Ms. Sataki at all times agreed to use publicity on her case. The final, most compelling evidence, which was for whatever reason not admitted by the Referee, is video evidence of Ms. Sataki participating in a documentary about her case! FRX 81.

This Motion for Rehearing, most importantly, has also shown this matter is time-barred at every level, with regard to both

disciplinary proceedings and also with regard to the egregious, unjustifiable delays which occurred in both in District of Columbia as well as in Florida. As perhaps the most prominent example, the record clearly reflects that Ms. Sataki filed a disciplinary complaint against Mr. Klayman on or around October 20, 2011, FRX 7, 8, and no action was ever taken or the Complaint dismissed by The Florida Bar. This is a clear-cut case which triggers the statute of limitations. The Referee and FOBC try to seize on the fact that any evidence that The Florida Bar received Ms. Sataki's disciplinary complaint in or around 2011 has long since been lost and/or destroyed given the now nearly fifteen (15) year passage of time. However, the Court must plainly realize that any harm flowing from this loss of evidence cannot be placed on Mr. Klayman, as he did not occasion this delay. Indeed, this type of situation is the exact reason why the doctrine of laches was created—to protect individuals from undue prejudice resulting from a delay that they simply had no control over.

The Motion for Rehearing has also shown a number of serious due process violations in this case in both the District of Columbia and Florida that must be considered by the Court. The most

prominent example is the fact that Mr. Klayman was completely denied discovery, despite the enormous passage of time caused solely by DCODC, which resulted in memories fading, records being lost and witnesses becoming unavailable to testify. In any jurisdiction, events such as these would clearly raise due process concerns.

Finally, this Motion for Reconsideration has shown a manifest injustice resulting from the record in this case was simply ignored by whoever was assigned to draft the Suspension Order. The Suspension Order has been adopted  virtually wholesale from the Report of Referee Marsh and therefore contains no record cites for this reason. Referee Marsh's Report was a virtual identical super copy of FOBC's Proposed Report, which was itself effectively a super copy of the DCCA's order, FRX  3, and also contained no record cites. The result of this was a cascading series of legal and factual errors that Mr. Klayman had no bona fide opportunity to remedy at any step of this proceeding. This Court must now act to correct what would be a manifest injustice, which it has the authority to do under *Strazzulla v. Hendrick*, 177 So. 2d 1, 3 (Fla. 1965). "We may change 'the law of the case' at any time before we lose jurisdiction of

a cause and will never hesitate to do so if we become convinced, as we are in this instance, that our original pronouncement of the law was erroneous and such [ruling resulted in manifest injustice. In such a situation a court of justice should never adopt a pertinacious attitude."

In sum, this motion must be carefully reviewed and considered by the Court. The record here is clear. There has been a manifest injustice, which this Court has a duty to correct and remedy as a matter of due process and fundamental fairness. This is also respectfully necessary to preserve the integrity of this honorable Court's appellate process and its fine reputation.

Dated:    December 3, 2025        Respectfully submitted,


By: */s/ Larry Klayman*_____
        Larry Klayman, Esq.
        Klayman Law Group P.A.
        7050 W. Palmetto Park Rd
        Boca Raton, FL, 33433
        Tel: 561-558-5536 (cell)
        leklayman@gmail.com

        *Pro Se*


**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on December 3, 2025, a true copy of the foregoing was filed via the Court's electronic filing system and served via the Court's ECF procedures on all counsel of record to:

Patricia Ann Toro Savitz - psavitz@floridabar.org

Shanee L. Hinson - shinson@floridabar.org

Mark Mason – mmason@floridabar.org

*/s/ Larry Klayman*

EXHIBIT 1

# Supreme Court of Florida

_____

No. SC2023-1219
_____

**THE FLORIDA BAR,**
Complainant,

vs.

**LARRY ELLIOT KLAYMAN,**
Respondent.

November 6, 2025

PER CURIAM.

We have for review a report of referee recommending that Respondent, Larry Elliot Klayman, be found guilty of professional misconduct and suspended from the practice of law.  Klayman challenges the referee's report in its entirety.[1]  We hereby approve the referee's findings of fact and recommendations as to guilt and sanctions.  Accordingly, Klayman is suspended from the practice of law for a period of two years and ordered to pay the Bar's costs in the amount of $4,536.93.

_____

1.  We have jurisdiction.  *See* art. V, § 15, Fla. Const.

## BACKGROUND

On August 29, 2023, The Florida Bar filed a Formal Complaint for Reciprocal Discipline against Klayman, alleging that he had been suspended from practicing law in the District of Columbia through a pair of orders issued by the D.C. Court of Appeals. The Bar alleged that under Rule Regulating The Florida Bar 3-4.6 (Discipline by Foreign or Federal Jurisdiction; Choice of Law), the D.C. suspension orders constitute conclusive proof of misconduct for purposes of a Florida Bar discipline proceeding.

Because the underlying conduct described in the complaint took place several years before Klayman was disciplined in D.C., Klayman argued that this disciplinary proceeding was time-barred on statute of limitations and laches grounds. On May 17, 2024, following a hearing on sanctions, the referee filed a report, concluding that the proceeding was not time-barred and that the D.C. Court of Appeals' suspension orders constituted conclusive proof of Klayman's guilt. For sanctions, the referee recommended suspending Klayman for a period of two years, explaining that the aggravating circumstances warrant a harsher sanction than that imposed by the D.C. Court of Appeals.

*Referee's Findings as to Count One*

The referee made the following factual findings regarding Count One of the Bar's complaint, which addressed Klayman's 90-day suspension imposed by the D.C. Court of Appeals in 2020.

In 1994, Klayman founded an organization called Judicial Watch and served as its in-house counsel until 2003.  During his time with the organization, an employee named Sandra Cobas complained to Judicial Watch about employment conditions, and Klayman provided legal advice to Judicial Watch about Cobas' complaints.  Cobas later filed a lawsuit against Judicial Watch in the Florida court system, but her case was dismissed.  Then, without seeking consent from Judicial Watch to represent Cobas, Klayman entered an appearance on Cobas' behalf and filed a motion to vacate the court's dismissal order.  He later filed a notice of appeal and an appellate brief on Cobas' behalf.

In a second case, Klayman, acting as Judicial Watch's chairman and general counsel in 2002, solicited donations for the organization from a donor named Louise Benson.  Benson later sued Judicial Watch to recover her donated money, and Klayman

entered an appearance on her behalf—again without seeking consent from Judicial Watch.

In a third case, Klayman prepared a representation agreement on behalf of Judicial Watch in 2001 to represent a new client named Peter Paul.  Paul later sued Judicial Watch for breach of the agreement, and Klayman entered an appearance on Paul's behalf—again without seeking consent from Judicial Watch.

Klayman's conduct in the above three cases was found to be violative of D.C. Rule of Professional Conduct 1.9 (Conflict of Interest) and resulted in Klayman being suspended for 90 days in D.C.

*Referee's Findings as to Count Two*

The referee made the following factual findings regarding Count Two of the Bar's complaint, which addressed Klayman's 18-month suspension imposed by the D.C. Court of Appeals in 2022.  In 2010, Klayman began representing Elham Sataki in a sexual harassment suit.  Klayman and Sataki agreed to a 40% contingency fee agreement with no retainer, but Klayman later unilaterally increased his fee to 50%.  When negotiations with the defendant failed, Klayman encouraged Sataki to move from D.C. to

Los Angeles, and he paid for her relocation and living expenses. He and Sataki agreed that he would be reimbursed out of any award she won in the case, in addition to his fee.

Klayman filed a civil suit on Sataki's behalf against her supervisors and the individual accused of harassing her, but while Sataki wanted the matter to be handled quietly, Klayman engaged in a public strategy designed to draw attention to the case. He sued both the governing board of the company and the Broadcasting Board of Governors, which included several prominent figures, despite Sataki insisting that she wanted to focus only on her supervisors and the individual who harassed her. Klayman also wrote numerous public articles about the case in which he revealed confidential information. Sataki was against publication of the articles, but she agreed to the public approach after Klayman told her it would be beneficial to her case.

In April 2010, Klayman began to repeatedly express strong feelings for Sataki. When Sataki told him they could only be friends, he persisted. He told her that his feelings for her rendered him nonfunctional as a lawyer and that she would get better legal representation from someone else. Sataki wrote Klayman a letter

telling him to withdraw the remaining lawsuit, but Klayman did not dismiss the entire case and continued acting on Sataki's behalf. Sataki wrote Klayman another letter stating that his services had been terminated.  She later wrote him again and reiterated that he was not representing her in any capacity, but he sent her a reply stating that he could not allow her legal rights to be lost.  He then filed a notice of appeal in Sataki's civil case without speaking to her about whether she wanted to file an appeal.

During the hearing before the referee, Klayman denied having romantic intentions toward Sataki and insisted that he had consulted with Sataki about all actions taken on her case.  Klayman also disputed the existence of a contingency fee agreement, and he denied pressuring Sataki to pursue publicity.

This conduct was found to be violative of numerous D.C. Rules of Professional Conduct and resulted in Klayman being suspended for a period of 18 months in D.C.

*Referee's Recommendations as to Guilt and Sanctions*

The referee found that Klayman admitted to the disciplinary orders imposed against him by the D.C. Court of Appeals and concluded that for purposes of a Florida Bar reciprocal discipline

proceeding, those orders are final and are conclusive proof of misconduct.  The referee found no paucity of proof in the D.C. orders, no lack of notice or opportunity to be heard in D.C., and no other grave reason suggesting that this Court should elect not to be bound by the foreign judgments.

Based on the above findings, the referee recommends that Klayman be found guilty of the violations set forth in the complaint. For Count One, the referee recommends finding Klayman guilty of violating D.C. Rule of Professional Conduct 1.9 (Conflict of Interest). For Count Two, the referee recommends finding Klayman guilty of violating D.C. rules 1.2(a) (lawyer shall abide by client's decisions as to objectives of representation and shall consult with client as to means used); 1.4(b) (lawyer shall appropriately explain matter to client); 1.5(b) (requiring written agreement regarding representation); 1.5(c) (contingent fee agreement shall be in writing); 1.6(a)(1) and (a)(3) (lawyer shall not knowingly reveal a confidence or secret of a client or use such for lawyer's advantage); 1.7(b)(4) (lawyer shall not represent client if lawyer's professional judgment will be or reasonably may be adversely affected by the lawyer's own

personal interests); and 1.16(a)(3) (discharged lawyer shall withdraw from representation).

Regarding discipline, the referee recommends suspending Klayman for two years.  The referee found several aggravators, including: (1) dishonest or selfish motive; (2) pattern of misconduct; (3) multiple offenses; (4) bad faith obstruction of the disciplinary proceeding by failing to comply with the rules or orders of a disciplinary agency; (5) submission of false evidence; (6) refusal to acknowledge the wrongful nature of the conduct; and (7) substantial experience in the practice of law.  The referee also found that Klayman had a prior disciplinary offense, and while Klayman argued that his prior discipline was for minor misconduct, the referee explained that the consent judgment in that case included admissions to violations of rules that contemplated more than minor misconduct.  The referee also found two mitigating factors: character and reputation (established by witness testimony at the sanction hearing); and remoteness of the prior offense.

## ANALYSIS

In Bar discipline cases, this Court conducts a limited review of a referee's findings of fact.  If a referee's findings are supported by

competent, substantial evidence, we will not reweigh the evidence or substitute our own judgment for that of the referee.  *Fla. Bar v. Schwartz*, 284 So. 3d 393, 396 (Fla. 2019).  For recommendations as to guilt, the referee's factual findings must be sufficient under the applicable rules to support the referee's conclusions.  *Fla. Bar v. Shoureas*, 913 So. 2d 554, 557-58 (Fla. 2005).  The party challenging a referee's findings of fact or recommendations as to guilt has the burden to show "that there is no evidence in the record to support those findings or that the record evidence clearly contradicts the conclusions."  *Fla. Bar v. Germain*, 957 So. 2d 613, 620 (Fla. 2007).

Under Rule Regulating The Florida Bar 3-4.6, which addresses reciprocal discipline proceedings, whenever a foreign jurisdiction disciplines a lawyer who is also licensed in Florida, this Court has jurisdiction to discipline the same lawyer in Florida for the same misconduct.  And "when an attorney is adjudicated guilty of misconduct by the disciplinary agency of another jurisdiction, the adjudication serves as conclusive proof of commission of the misconduct charged."  *Fla. Bar v. Kandekore*, 766 So. 2d 1004, 1007 (Fla. 2000).  While this Court is not automatically bound by

an out-of-state determination of guilt, we will only elect not to accept such foreign judgment if the accused attorney shows

> that the proceeding in the foreign state was so deficient or lacking in notice or opportunity to be heard, that there was such a paucity of proof, or that there was some other grave reason which would make it unjust to accept the foreign judgment as conclusive proof of guilt of the misconduct involved.

*Id.* (quoting *Fla. Bar v. Wilkes*, 179 So. 2d 193, 198 (Fla. 1965)).

Klayman argues that the D.C. Court of Appeals failed to provide notice and opportunity to be heard. However, he participated in every stage of the D.C. proceedings and has not shown that he was without notice or opportunity to be heard at any point in those proceedings. Thus, this Court would only elect not to be bound by the D.C. orders if "there was such a paucity of proof, or . . . some other grave reason which would make it unjust to accept the foreign judgment as conclusive proof of guilt." *Id.*

*Whether Paucity of Proof in the D.C. Orders Would Make It Unjust to Accept the Foreign Judgments as Conclusive Proof of Klayman's Guilt*

Klayman argues that the D.C. disciplinary proceedings failed to establish proof of guilt of the charged misconduct. He insists that they were sham proceedings initiated as retaliation for his conservative watchdog efforts against prominent liberal figures.

- 10 -

But whatever the circumstances may have been, the violations found in the D.C. Court of Appeals' 2020 and 2022 suspension orders are not without support in the record.

Regarding Klayman's conflict-of-interest violations, the record contains ample evidence that Klayman represented three clients in actions against Judicial Watch, an organization for which he had previously served as chairman and in-house counsel, and that he did so without first obtaining consent from Judicial Watch to represent the clients.

Regarding the misconduct involving Klayman's representation of Sataki, the record includes writings from Klayman in which he expressed to Sataki that his emotions had rendered him nonfunctional as a lawyer.  The record also includes evidence that Klayman continued to represent Sataki after he made such statements, that he continued to act on her behalf and did not withdraw from representation after she tried to terminate his services, and that he wrote and published articles revealing confidential information about her case even after she terminated representation and stopped contacting him.

Furthermore, the record contains evidence that Klayman inappropriately explained legal matters to Sataki—filing motions and pleadings without her consent, engaging in strategies to which she was opposed, and repeatedly communicating strong feelings for her while explaining her legal options. All these actions support the D.C. Court of Appeals' conclusion that Klayman did not appropriately explain his client's legal options.

Regarding the found contingency fee violations, Klayman argues that he had never been working for a contingency fee, but the record contains emails between Sataki and Klayman in which she refers to an agreed 40% contingency fee and he demands a 50% fee based on his time and expense.

Klayman claims the referee in this case has exaggerated the D.C. suspension orders. He argues that the referee describes Klayman's feelings for Sataki as romantic or sexual, where the D.C. Court of Appeals only stated that Klayman had strong feelings for Sataki. But however the referee describes Klayman's behavior, it is the D.C. orders themselves—not the referee's summary of those orders—that serve as proof of Klayman's guilt. Even assuming the referee overstated Klayman's feelings for Sataki, Klayman was not

- 12 -

disciplined in D.C. for any misconduct of a sexual nature, and the referee has not recommended that Klayman be found guilty of any misconduct not included in the D.C. suspension orders.

*Whether Some Other Grave Reason Would Make It Unjust to Accept the Foreign Judgments as Conclusive Proof of Klayman's Guilt*

Because Klayman was given notice and opportunity to be heard in the D.C. disciplinary proceedings, and because the D.C. Court of Appeals' suspension orders do not have a paucity of proof such that we would decline to accept them as conclusive proof of guilt, we would only elect not to be bound by the foreign judgments if there is "some other grave reason which would make it unjust to accept the foreign judgment as conclusive proof of guilt of the misconduct involved." *Kandekore*, 766 So. 2d at 1007.

To that end, Klayman argues that the length of time between the underlying conduct and the initiation of disciplinary proceedings in D.C. is a grave reason for Florida not to be bound by the D.C. suspension orders. But this is a reciprocal proceeding, and D.C. has no statute of limitations for attorney discipline cases. Members of the D.C. Bar, including Klayman, are on notice that their misconduct can subject them to discipline in that jurisdiction,

even decades after the underlying conduct took place.  The D.C.
disciplinary proceedings were therefore not conducted in an
untimely manner.  Because the D.C. proceedings operated in
accordance with governing law, we cannot say that it would be
unjust to accept the D.C. suspension orders as conclusive proof of
Klayman's guilt, even if similar charges would have had to be
brought sooner in a case arising in Florida.

### Whether This Case Is Time-barred

Klayman argues that even if the D.C. suspension orders were
not so defective that this Court would decline to accept them for
purposes of reciprocal discipline, this Florida disciplinary
proceeding is time-barred.  He relies on Rule Regulating The Florida
Bar 3-7.16(a) (Limitation on Time to Open Investigation), which
generally operates as a statute of limitations for lawyer discipline
proceedings in Florida.  Rule 3-7.16(a)(1) provides: "The Florida Bar
must open an investigation initiated by The Florida Bar within 6
years from the time the matter giving rise to the investigation is
discovered or, with due diligence, should have been discovered."

Notably, this case did not arise from a Florida Bar
investigation following an inquiry or complaint filed by a

complaining witness; it arose as a reciprocal discipline proceeding initiated because the Bar learned of Klayman's suspension in D.C. A Florida Bar reciprocal discipline cause of action does not accrue until discipline has been imposed by a foreign jurisdiction. This is based on the general rule in Florida that "[a] cause of action accrues when the last element constituting the cause of action occurs." § 95.031(1), Fla. Stat. (2023); *see R.R. v. New Life Comm. Church of CMA, Inc.*, 303 So. 3d 916, 921 (Fla. 2020).

In a reciprocal discipline proceeding, the elements constituting the cause of action are the foreign judgments on which the reciprocal discipline is based, not the underlying conduct. Given that the D.C. orders giving rise to the present cause of action were issued in 2020 and 2022, and Klayman notified the Bar of those orders shortly after each order was issued, this reciprocal proceeding—opened in 2023—was initiated in a timely manner.

Notably, the referee analyzed the applicability of *Merkle v. Robinson*, 737 So. 2d 540 (Fla. 1999), in which this Court articulated a test for determining choice of law questions. Klayman argues that *Merkle* is inapplicable because the case specifically addressed tort actions, not lawyer discipline. But more broadly,

- 15 -

*Merkle* does not apply because the significant relationship test articulated in *Merkle* is geared toward resolving conflict-of-law issues. The timeliness of this reciprocal disciplinary proceeding turns on claim accrual, not on a conflict-of-law analysis. Thus, we need not engage in a significant relationship analysis to determine when this cause of action accrued.

### DISCIPLINE

We now turn to the referee's recommendation to impose a two-year suspension for Klayman's misconduct. "Prior to making a recommendation as to discipline, referees must consider the Standards for Imposing Lawyer Sanctions, which are subject to aggravating and mitigating circumstances, and this Court's existing case law." *Fla. Bar v. Strems*, 357 So. 3d 77, 90 (Fla. 2022).

Our review of a referee's recommendation on discipline is broader than our review of a referee's findings of fact, for it is ultimately this Court's responsibility to determine the appropriate discipline. *Fla. Bar v. Alters*, 260 So. 3d 72, 83 (Fla. 2018) (citing *Fla. Bar v. Anderson*, 538 So. 2d 852, 854 (Fla. 1989)); *see also* art. V, § 15, Fla. Const. That said, we have recognized that the referee "is in a unique position to assess the credibility of witnesses, and

- 16 -

his judgment regarding credibility should not be overturned absent clear and convincing evidence that his judgment is incorrect." *Fla. Bar v. Tobkin*, 944 So. 2d 219, 224 (Fla. 2006) (quoting *Fla. Bar v. Thomas*, 582 So. 2d 1177, 1178 (Fla. 1991)).  Notably, in a reciprocal discipline proceeding premised on an adjudication of guilt in a foreign jurisdiction, this Court is free to impose a more severe punishment than the punishment imposed by the sister state. *Fla. Bar v. Hagendorf*, 921 So. 2d 611, 614 (Fla. 2006).

*Standards*

In looking at the Standards, we find support for suspension as the presumptive sanction in this case.  For Standard 4.2(b), the referee found that Klayman knowingly revealed information about his representation of Sataki, causing her injury or potential injury. For Standard 4.3(b), the referee found that Klayman knowingly failed to avoid conflicts of interest, causing injury or potential injury to his clients.  Finally, for Standard 7.1(b), the referee found that Klayman knowingly engaged in conduct that was violative of duties he owed as a professional, causing injury or potential injury to his clients, the public, or the legal system.  Klayman does not assert

- 17 -

that the referee erred in finding these Standards applicable, and we conclude that the referee did not err.

*Aggravating and Mitigating Factors*

"Like other factual findings, a referee's findings of mitigation and aggravation carry a presumption of correctness and will be upheld unless clearly erroneous or without support in the record." *Fla. Bar v. Scheinberg*, 129 So. 3d 315, 319 (Fla. 2013) (quoting *Germain*, 957 So. 2d at 621). A referee's finding that an aggravator or mitigator applies, or failure to find that an aggravator or mitigator applies, is due the same deference. *Id.* Accordingly, the party challenging a referee's finding of aggravation or mitigation "must establish there is a lack of evidence in the record to support such findings or that the record clearly contradicts the referee's conclusions." *Fla. Bar v. Horton*, 332 So. 3d 943, 949 (Fla. 2019) (quoting *Fla. Bar v. Glueck*, 985 So. 2d 1052, 1056 (Fla. 2008)).

Here, the referee found several aggravating factors, including: dishonest or selfish motive (Standard 3.2(b)(2)); pattern of misconduct (Standard 3.2(b)(3)); multiple offenses (Standard 3.2(b)(4)); bad faith obstruction of the disciplinary proceeding by intentionally failing to comply with rules or orders of the

- 18 -

disciplinary agency (Standard 3.2(b)(5)); submission of false evidence, false statements, or other deceptive practices during the disciplinary process (Standard 3.2(b)(6)); refusal to acknowledge the wrongful nature of the conduct (Standard 3.2(b)(7)); and substantial experience in the practice of law (Standard 3.2(b)(9)).  The referee also found two mitigators: character or reputation (Standard 3.3(b)(7)); and remoteness of prior offenses (Standard 3.3(b)(13)).

Klayman does not argue that the record lacks competent, substantial evidence in support of the aggravating factors.  Instead, he argues that the referee should have afforded greater weight to the character and reputation mitigator and should have found absence of a prior disciplinary record as an additional mitigator.

Regarding the first argument, while Klayman takes issue with how the referee describes his character and reputation, the referee nevertheless afforded significant weight to this mitigating factor, going so far as to state that Klayman's misconduct would warrant a greater sanction were it not for the significant character and reputation evidence presented on his behalf.  Thus, Klayman has not shown that the referee erred in the degree of weight afforded to this mitigating factor.

As to whether the referee should have found absence of a prior disciplinary record as an additional mitigator, Klayman's argument is that while he has been disciplined in the past, it was long ago and only for minor misconduct.  But in the prior instance, Klayman was publicly reprimanded after a formal complaint was filed, and he entered a consent judgment to violating rules that contemplated more than minor misconduct.  Thus, the referee correctly found that Klayman's prior discipline was remote (a mitigating factor found by the referee), but it is not accurate to say Klayman has no prior discipline whatsoever.

Klayman further argues that the referee should have found two other mitigators: that Klayman lacked a dishonest or selfish motive and that he had a cooperative attitude during the disciplinary proceeding.  But Klayman's explanations and scant excerpts from the record fail to establish that the referee clearly erred in declining to find that Klayman lacked a dishonest or selfish motive or that he had a cooperative attitude throughout the proceeding.  *See Fla. Bar v. Herman*, 8 So. 3d 1100, 1106 (Fla. 2009) ("The fact that there is some evidence in the record to support

a finding that a mitigating factor might apply does not mean that the referee should have necessarily found it applicable.").

*Case Law*

Because the Standards "do not suggest the appropriate length of a suspension, the Court examines caselaw to determine whether the referee's recommendation . . . has a reasonable basis." *Fla. Bar v. Maurice*, 955 So. 2d 535, 541 (Fla. 2007).

In *Herman*, 8 So. 3d at 1106, an attorney was suspended for 18 months for failing to get consent from a client before starting a business that directly competed with the client's business. *Herman* was decided before we began to move toward imposing harsher sanctions, but even so, the lawyer in *Herman* had no prior discipline, had fewer aggravating factors, and had only engaged in a single conflict-of-interest violation, whereas Klayman committed numerous ethical violations, including three conflict-of-interest violations across separate cases.

In *Florida Bar v. Rush*, 361 So. 3d 796, 804 (Fla. 2023), we suspended an attorney for three years based in part on his "repeated failure to accede to [a client]'s clear directives and his unwillingness to put his client's interests over his own pecuniary

- 21 -

gain." Klayman engaged in similar behavior. However, a lesser sanction than that imposed in *Rush* is appropriate here, for the referee did not find that Klayman's misconduct while representing Sataki was motivated by pecuniary gain, and as noted above, the referee found significant character and reputation evidence in mitigation, justifying a lesser sanction.

Ultimately, the relevant Standards and existing case law support the referee's recommendation for a two-year suspension, and while that exceeds the discipline imposed by the D.C. Court of Appeals, this Court is free to impose a harsher sanction in a reciprocal discipline proceeding than that imposed in the foreign jurisdiction. For these reasons, we approve the referee's recommendations and suspend Klayman for two years.

## CONCLUSION

For the reasons stated above, we approve the referee's findings of fact and recommendations on guilt and sanctions. Accordingly, Larry Elliot Klayman is hereby suspended from the practice of law for two years. The suspension will be effective 30 days from the filing of this opinion so that Klayman can close out his practice and protect the interests of existing clients. If Klayman notifies this

Court in writing that he is no longer practicing and does not need the 30 days to protect existing clients, the Court will enter an order making the suspension effective immediately.  Klayman shall fully comply with rule 3-5.1(h) and, if applicable, rule 3-6.1.  Further, he shall accept no new business from the date this opinion is filed until he is reinstated.

Judgment is entered for The Florida Bar, 651 East Jefferson Street, Tallahassee, Florida 32399-2300, for recovery of costs from Larry Elliot Klayman in the amount of $4,536.93, for which sum let execution issue.

It is so ordered.

MUÑIZ, C.J., and CANADY, LABARGA, COURIEL, GROSSHANS, FRANCIS, and SASSO, JJ., concur.

THE FILING OF A MOTION FOR REHEARING SHALL NOT ALTER THE EFFECTIVE DATE OF THIS SUSPENSION.

Original Proceeding – The Florida Bar

Joshua E. Doyle, Executive Director, Patricia Ann Toro Savitz, Staff Counsel, and Mark Lugo Mason, Bar Counsel, The Florida Bar, Tallahassee, Florida,

for Complainant

Robert M. Klein of Freeman Mathis & Gary, LLP, Miami, Florida,

for Respondent

EXHIBIT 2

>> Chief Justice Carlos Muniz: THIS IS THE FLORIDA BAR V. LARRY ELLIOT KLAYMAN CASE NO.SC2023-1219.

>> Robert M. Klein,Respondent: IT IS INDEED IF I MAY JUSTICE COURIEL THE START OF SOMETHING YOU SAID EARLIER TODAY DUE PROCESS REQUIRES PROCESS.

THAT IS THE VAST MAJORITY OF WHAT I'M HERE TO ARGUE. IS THAT THE MANNER IN WHICH THIS CASE HAS PROCEEDED HAS DENIED DUE PROCESS AT EVERY TURN STARTING WITH THE DISTRICT OF COLUMBIA.

AND THAT THIS MATTER SHOULD NEVER HAVE BEEN BROUGHT . WE ALSO ARGUED IT IS TIME-BARRED.

WITHOUT GETTING INTO THE CHRONOLOGY IN GREAT DETAIL WHICH WE SET FORTH IN THE BRIEF.

THERE IS NO QUESTION ABOUT THE FACT THAT THE ACTIONS THAT ARE THE SUBJECT OF THESE COMPLAINTS THAT WERE BROUGHT BY THE DISTRICT OF COLUMBIA INVOLVE MATTERS THAT RANGED IN TIME FROM 2006 -2010 SOME 15 YEARS AGO.

THERE WAS ALSO NO QUESTION ABOUT THE FACT THAT THE 2010 COMPLAINT THE COMPLAINT WAS SERVED IN THREE DIFFERENT JURISDICTIONS INCLUDING FLORIDA. PENNSYLVANIA AND THE DISTRICT OF COLUMBIA.

THE BAR GOES INTO GREAT DETAIL TRYING ARGUE TO THAT AS TO THE REFEREE NOTED IN HIS EARLY IN THE HEARING TRANSCRIPT THAT WE HAVE NO CONCLUSIVE PROOF THAT FLORIDA ACTUALLY RECEIVED THE COMPLAINT BUT WE HAVE ENOUGH TO RECORD A CERTIFIED FLORIDA BAR COMPLAINT FORM THAT FLAT OUT SAYS IN ADDITION TO MAKING THE COMPLAINTS FROM.

[LISTING NAMES] I ALSO FILED COMPLAINTS IN PENNSYLVANIA AND THE DISTRICT OF COLUMBIA.

>> Justice: AS AN ASIDE COUNSELOR CAN YOU ADDRESS THE STATEMENT ON PAGE 72 OF YOUR AMENDED INITIAL BRIEF THAT THERE IS AN ABSENCE OF PRIOR DISCIPLINE WHEN IN FACT THE REFEREE'S REPORT ACKNOWLEDGES THAT THERE WAS IN FACT A PRIOR PUBLIC REPRIMAND IS THAT AN OVERSIGHT?

>> Robert M. Klein,Respondent: YES IT WAS I HEARD ABOUT IT EARLIER IT WAS QUITE A LONG TIME AGO?

FRANKLY THAT SHOULD'VE BEEN CORRECTED.

WE WOULD'VE FILED AN AMENDMENT BECAUSE THERE WAS IN FACT A VERY MINOR PRIOR DISCIPLINARY MATTER INVOLVING A VERY LIMITED SUM OF MONEY AND THAT THE COURT BASED ON SAID THERE WAS NOTHING SIGNIFICANT ABOUT IT AND I'M GOING TO SAY A PUBLIC REPRIMAND AND THAT PORT OF TAMPA YES THERE WAS.

>> Justice: ON THE ISSUE OF THE COMPLAINT BEING SENT TO FLORIDA THOUGH IF WE THINK THE STATUTE OF LIMITATIONS TRIGGER FOR ORDER PURPOSES HERE THAT THE RELEVANT DATE WOULD BE WHEN THE DC DISCIPLINE HAPPENED THEN THIS PROCEEDING WOULD HAVE BEEN WITHIN THAT.

WHAT IS THE RELEVANCE I KNOW THAT YOU DISPUTE OR YOU CONTEST WHETHER THAT IS THE RELEVANT ARGUMENT IF WE THINK THAT IS THE RELEVANT ARGUMENT,

WHAT OTHER ELEMENTS WOULD BE WHETHER THERE WAS A COMPLAINT SENT TO FLORIDA OR NOT WHAT OTHER RELEVANCE WOULD THAT HAPPEN.

>> Robert M. Klein,Respondent: WHEN YOU HAVE SOMEBODY WHO'S BEEN SUBJECT TO YEARS OF THIS PLAN.

IN ANOTHER JURISDICTION, THEN FLORIDA IS ADVISED ABOUT THAT THE ORDERS THAT WERE ENTERED IN DISTRICT OF COLUMBIA AND DOES NOTHING FOR THREE YEARS, TO ME THE IDEA THAT YOU GOING TO ALLOW TIME IS PASSING MEMORIES ARE FADING.

DOCUMENTS ARE DISAPPEARING. THE IDEA THAT YOU CAN COME IN AND THEN SAY WE WILL START INVESTIGATING WE WILL START PROSECUTING AT THIS POINT IN TIME WHEN YOU HAVE A FULL-BLOWN RECORD LAID OUT FOR YOU SUGGESTED THAT HAS TO MEAN SOMETHING.

>> Chief Justice Carlos Muniz: YOU ARE SAYING LATCHES AS TO THE THREE YEAR GAP.

>> Robert M. Klein,Respondent: YES BECAUSE OF THE TIME THAT WAS INVOLVED OBVIOUSLY WE HAVE A SIX-YEAR PROBLEM IF YOU GO BACK TO 2010 THERE'S NO QUESTION ABOUT A LIMITATION ISSUE.

BUT THE IDEA OF LATCHES IS THAT YOU HAVE TO MOVE EXPEDITIOUSLY AND YOU CANNOT JUST SIT ON YOUR RIGHTS. WHEN THE CLOCK IS TICKING AND FLORIDA KNOWS WITHOUT QUESTION THAT THERE HAS BEEN AN EXTRAORDINARY PERIOD OF TIME FROM 2010 IN THE FIRST SATAKE COMPLAINT WAS FILED AND THE OTHER THREE TRANSGRESSIONS THAT WERE INVOLVED IN MR KLAYMAN'S REPRESENTATION  ADVERSE TO HIS FORMER EMPLOYER ONE WOULD THINK THAT YOU WOULD WANT TO JUMP ON THOSE ACTIONS BECAUSE IF YOU LOOK AT AS A MATTER FACT THERE WERE SOME REALLY INTERESTING LANGUAGE I WOULD LIKE A QUOTE FOR THE COURT.

I THINK IT WAS IN RANDOLPH.

WHERE THE COURT IS TALKING ABOUT ASPIRATIONAL GOALS AND HOW THE BAR HAS AMENDED THE RULES AND WHAT THE BAR IS TALKING ABOUT IS PROMPT PROSECUTION OF THESE BAR COMPLAINTS BECAUSE OBVIOUSLY IF A LAWYER IS DOING SOMETHING THAT IS DETRIMENTAL TO THE PUBLIC AT LARGE HE NEEDS TO BE DISCIPLINED.

BUT THE FLIPSIDE OF THAT THE COURT NOTES IN RANDOLPH THE LAWYER IS ENTITLED NOT TO HAVE TO SIT AND WAIT TO HEAR WHAT IT IS THAT THEY ARE GOING TO DO AND WHAT HE SAYS WAS ACCORDING.

[LISTING NAMES] WAS WORKING ON THE AMENDMENTS TO THE BAR ACCORDINGLY WITH THE POWERS OF THE DISCIPLINARY RULE THOSE WHO TRESPASS UPON OUR ETHICS CAN EXPECT TO BE CALLED ON ACCOUNT IMMEDIATELY THERE WILL BE NO MORE 2.5 YEAR DELAYS. THE FINAL DISCIPLINARY ACTION WILL BE COMPLETE WITHIN APPROXIMATELY SIX MONTHS.

>> Justice: IS THERE A CASE WHERE WE APPLIED LATCHES WHERE WE APPLIED THE DOCTRINE OF LATCHES IN AT THIS POINT?

>> Robert M. Klein,Respondent: NOT TO MY KNOWLEDGE.

>> Justice: WHAT WOULD BE DIFFERENT FROM PRECEDENT THAT TAKES INTO

ACCOUNT THE PASSAGE OF TIME AND MITIGATION OR IN THE WEIGHT OF THE
EVIDENCE IS ASSIGNED WHEN WE HAVE A RULE IN ESTABLISHING THE STATUTE OF
LIMITATIONS WHAT WOULD BE THE JUSTIFICATION FOR THIS COURT TO SET A NEW
COURSE AND APPLY LATCHES?

>> Attorney: BECAUSE I THINK THE IDEA OF LATCHES IS YOU CANNOT ALWAYS
PIGEONHOLE SOMETHING DIRECTLY INTO A STATUTE. IT IS MORE OF AN EQUITABLE
DOCTRINE AND IT'S THE OTHER THE SOMETHING IF YOU LOOK AT THE ENTIRE
SITUATION IS NOT FAIR OR REASONABLE THAT IS A LARGE PART OF WHAT'S GOING
ON HERE YOU HAVE PEOPLE WRITING AND SAYING IN A COUPLE CASES PRESENTED
WITH THE COURT HAS THROWN OUT DISCIPLINARY ACTION THIS COURT HAS
THROWN OUT DISCIPLINARY ACTION FOR FAILURE TO PROPERLY PROSECUTE IN
THOSE CASES YOU USUALLY TALK ABOUT MATTERS THAT ARE PRINCIPALLY
EQUITABLE.

WAS THIS FAIR?

WAS THIS PROCESS FAIR?

IN THIS CASE MR KLAYMAN WAS ALLOWED TO DISCOVERY.

IN THE DC ACTION HE WAS NOT ALLOWED TO TAKE ANY DEPOSITIONS.

THERE IS ACTUAL TESTIMONY IN THE RECORD FROM ONE OF THE LURES WITHOUT
THE PROCEEDINGS THAT THEY WERE BRINGING IN DOCUMENTS FOR MS. SATAKE
THAT THEY'VE NEVER SEEN BECAUSE THEY HAVE NEVER BEEN ALLOWED TO TAKE
HER DEPOSITION AND THEY WERE NEVER ALLOWED TO PAPER DISCOVERY AT ALL
BY THE WAY THAT WAS NOT A COURT DECISION THAT WAS A DECISION BY THE DC
BAR. NOT TO ALLOW ANY OPPORTUNITY IN WHAT PROCESS IN WHAT PLANET ARE
YOU REQUIRED TO GO AND CONFRONT SOMEBODY WHO WAS ACCUSING YOU OF
MISCONDUCT AND NOT KNOW WHAT THEY'RE GOING TO SAY AND NOT HAVE THE
DOCUMENTS THAT THEY WILL PRESENT FOR CONSIDERATION BY THE PANEL. THAT IS
WHAT HAPPENED HERE. IN DC. THAT PERMEATES THIS ENTIRE PROCEEDING. BY THE
WAY HE WAS DENIED THE OPPORTUNITY AT EVERY STEP OF THIS PROCEEDING TO
TAKE ANY KIND OF DISCOVERY WHATSOEVER.

>> Justice: I'M SORRY TO INTERRUPT I JUST WANT TO GIVE YOU A CHANCE TO
ADDRESS JUST SOMETHING I'M KIND OF STRUGGLING WITH WITH THIS CASE WHICH
IS IT SEEMS LIKE THERE IS SOME ATTRACTIVENESS TO THE IDEA THAT REGARDLESS
OF WHAT HAPPENED HERE IT WAS A LONG TIME AGO THERE WAS DISCIPLINE IN DC.
ADDING TWO MORE YEARS TO IT MIGHT BE OVERKILL.

ON THE OTHER HAND IT SEEMS LIKE THERE IS NO ACCEPTANCE OF RESPONSE
ABILITY EVEN AS TO THE THINGS THAT REALLY ARE NOT CONTESTED WITH THE
CONFLICT OF INTEREST STUFF.

A LOT OF YOUR ARGUMENTS ARE JUST TRYING TO RELITIGATE WHAT HAPPENED IN
DC WHICH KIND OF GOES AGAINST THE IDEA OF JUST SAYING LOOK, BE
REASONABLE HERE.

IT SEEMS LIKE IF WE WERE INCLINED TO ESSENTIALLY JUST TREAT THIS MORE AS A
MATTER OF "WHAT IS FAIR" IT SEEMS LIKE YOUR ARGUMENTS ARE KIND OF
CROSSCUTTING.

THERE IS NOTHING THE MORE YOU TRY TO RELITIGATE DC AND THE MORE YOU DON'T ACKNOWLEDGE ANY KIND OF WRONGDOING OR ANYTHING THAT SORT OF LESS ATTRACTIVE YOUR FAIRNESS ARGUMENT I UNDERSTAND YOU ARE IN A TOUGH POSITION. CAN YOU JUST KIND OF HOW SHOULD WE DO ABOUT THAT.

>> Robert M. Klein,Respondent: I THINK THE QUOTE FROM THIS COURT MANY YEARS AGO THAT THE PROCESS ITSELF CAN ESSENTIALLY SUPPLANT FORMAL DISCIPLINE. IF IT TAKES TOO LONG.

IF TOO MUCH TIME IS SPENT ON THE PROCESS ITSELF.

THAT IS PART OF WHAT WE ARE ARGUING HERE.

I THINK WHEN YOU DON'T HAVE A PROPER RECORD DEVELOPED I THINK THAT QUESTION REALLY GOES TO SOME OF THE SEPARATE CLAIMS THAT MR KLAYMAN BROUGHT AGAINST HIS FORMER EMPLOYER.

THERE IS JUST THIS ASSUMPTION THAT THERE WAS A CONFLICT. IF YOU GO THROUGH EACH ONE OF THE THREE OF THOSE SEPARATE EVENTS, I DON'T KNOW THERE WAS A CONFLICT AND YOU CANNOT TELL FROM THIS RECORD BECAUSE THE REALITY IS REPRESENTING SOMEBODY AGAINST A FORMER EMPLOYER IS NOT A PER SE CONFLICT UNLESS YOU HAVE SOME EVIDENCE THAT INFORMATION THAT WAS GAINED DURING THE COURSE OF YOUR EMPLOYMENT IS SOMEHOW BEING USED ADVERSE TO THE FORMER EMPLOYER. WE'VE HAD CREWS PLAN CASES WHERE THE CRUISE LINE WHEN AFTER THE FORMER IN-HOUSE COUNSEL WHO HAVE BECOME PLAINTIFFS COUNSEL THEIR REPORTED DECISIONS THING THAT IS NOT A CONFLICT. UNLESS YOU ARE SHOWN THERE IS INFORMATION THAT WAS GAINED THAT IS USED ADVERSE TO THE FORMER EMPLOYER. BUT THAT ASSUMPTION IS ESSENTIALLY MADE IN A DC AND IT HAS BEEN MIMICKED EVER SINCE.

ANOTHER INVOLVED WHETHER OR NOT THE MERE FACT THAT A CONTRACT HAD BEEN DRAFTED BY MR KLAYMAN MEANT HE COULD NOT REPRESENT SOMEONE ADVERSE TO THE JUDICIAL WATCH TO TALK ABOUT THE FACT THAT THEY WERE VIOLATING THE CONTRACT.

THOSE KINDS OF CASES HAVE BEEN IN FLORIDA ALL THE TIME AND LAWYERS ARE NOT NECESSARILY DISQUALIFIED. IF.

>> Justice: YOU ARE SAYING ALL THE TIME THAT LAWYERS DRAFT CONTRACTS THEN SUE THE SAME CLIENT OVER THAT CONTRACT.

>> Robert M. Klein,Respondent: I'VE BEEN REPRESENTING LAWYERS FOR OVER 50 YEARS LAWYERS ORIGINALLY SUED FOR GETTING INVOLVED IN A CASE WHERE THEY ARE ADVERSE TO THE FORMER EMPLOYERS SOME OF THEM INVOLVE INTERNAL CONTRACTS SOME OF THEM INVOLVE INTERNAL ORGANIZATION THE QUESTION BECOMES IS THERE ANYTHING INVOLVED IN THE PRIOR EMPLOYMENT THAT IS NECESSARILY GOING TO BE AT ISSUE IN THE NEW CASE. IF THAT IS THE CASE THE LAWYER CANNOT HANDLE THE CASE. THAT IS A CONFLICT. BUT THERE ARE OTHER CASES WHERE A LAWYER MAY BE A MATERIAL WITNESS TO THE CREATION OF A CONTRACT AND THE LAW FIRM THAT WORKED ON THAT WITH HIM PROSECUTE THE CASE BUT THAT LAWYER CANNOT PARTICIPATE AT THE TRIAL BECAUSE HE IS A WITNESS AT TRIAL. THERE ARE CASES ALONG THOSE LINES ALL OVER IT THE STATE.

THEY HAPPEN ALL THE TIME.

THE CONFLICT REALLY BECOMES ARE YOU USING INFORMATION THAT YOU GAINED THAT WOULD NOT HAVE BEEN PUBLIC INFORMATION. SUING SOMEBODY FOR CREATING A HOSTILE WORK ENVIRONMENT WITHIN THREE YEARS AFTER YOU LEFT, IT IS NOT A PER SE CONFLICT.

THERE IS NOT A HINT IN THIS RECORD OF WHAT INFORMATION WOULD HAVE BEEN USED FOR THAT WOULD'VE BEEN ADVERSE TO JUDICIAL WATCHES INTEREST. NOTHING. IT IS JUST NOT THERE.

I CAN GO ON.

>> Justice: YOU ARE WELCOME TO KEEP GOING BUT YOUR REBUTTAL.

>> Robert M. Klein,Respondent: LET ME TAKE ADVANTAGE OF REBUTTAL.

>> Chief Justice Carlos Muniz: OKAY.

>> Attorney: MAY IT PLEASE THE COURT MARK L. MASON, APPEARANCE FOR COMPLAINANT

>> Chief Justice Carlos Muniz: CAN I ASK YOU A QUESTION IS THE TWO YEARS SUSPENSION HERE NECESSARY TO PROTECT THE PUBLIC OR IS THIS MORE ESSENTIALLY JUST A PUNISHMENT.

>> Mark L. Mason,Complainant: THE TWO-YEAR SUSPENSION AS OPPOSED TO THE 18 MONTH WHICH WAS THE RECOMMENDATION THE FINDING

>> Chief Justice Carlos Muniz:  18 MONTHS OR TWO YEARS OR ANYTHING GIVEN THE TIME THAT HAS PASSED ETC. THERE IS ALREADY BEEN DISCIPLINE IN DC WHAT IS THE POINT OF ADDING ON TO THAT?

>> Mark L. Mason,Complainant: THE REFEREE'S HOLDING WAS THERE WAS SUBSTANTIAL AGGRAVATING CIRCUMSTANCES THAT LED TO HIS DECISION TO INCREASE IT TO A TWO-YEAR SUSPENSION.

IT WAS ALREADY MENTIONED EARLIER THE REFUSAL TO ACKNOWLEDGE WRONGDOING. THAT WAS A BIG ONE. THE PATTERN OF MISCONDUCT WE ARE TALKING ABOUT CONFLICT OF INTEREST THAT SPREAD OVER THE THREE JUDICIAL WATCH CASES AND IT ALSO INCLUDED THE 2020 SATAKE SUSPENSION ORDER.

>> Justice: BUT THE CASE FOR PROTECTING THE PUBLIC FROM HARM SEEMS TO ME TO BE SUBSTANTIALLY WEAKENED BY THE DELAY THAT THE BAR SEEMS TO HAVE TAKEN IN THIS MATTER.

IF MR KLAYMAN BECAUSE OF HIS CONDUCT WAS AT SUBSTANTIAL RISK TO THE PUBLIC WHY DID YOU WAIT SO LONG TO ACT?

>> Mark L. Mason,Complainant: WE DIDN'T WAIT SO LONG TO ACT WHAT WE DID WAS WE ACTED ON THE SATAKE SUSPENSION ORDER WHAT HE'S TALKING ABOUT WITH THE THREE YEARS ISSUE WAS THE JUDICIAL WATCH 90 DAY SUSPENSION ORDER.

IN THAT CASE IT CAME UP DURING THE SECTION HEARING THAT THERE WAS A QUESTION RAISED ABOUT DID YOU NOTIFY THE FLORIDA BAR OF THIS ORDER? HE ANSWERED YES I DID.

I FILED A PETITION FOR REHEARING AND ASKED THAT YOU WAIT.

DID NOT FOLLOW UP WITH US AGAIN IT FELL TO THE WAYSIDE THEN THE SATAKE SUSPENSION ORDER WE SEE THE LETTERS HE NEVER LET US KNOW ABOUT THE

OUTCOME OF THE PETITION FOR THAT HEARING WAS ADVERSE TO HIM. ON THAT POINT WE MOVED ON BOTH OF THEM TOGETHER BUT WE ONLY SAW THE 18 MONTH SUSPENSION WHEN WE WENT AND TOOK THE CASE TO THE REFEREE RATHER THAN COMBINING THE TWO AND SETTING THEM WHICH WAS SUGGESTED IN THE INITIAL BRIEF. THAT DIDN'T HAPPEN.

>> Justice: MISCONDUCT OCCURRED WHEN?

>> Mark L. Mason,Complainant: THE JUDICIAL WATCH CASES SPANNED FROM 2006-2008. THE SATAKE MATTER WAS MOSTLY IN 2010.

>> Justice: NOW IT IS 2025 15 YEARS AGO WAS HE PRACTICING? I KNOW THERE WAS EVENTUALLY DISCIPLINE IN DC . HOW MANY YEARS PERCY FOCUSING BETWEEN 2010 AND NOW I'M WONDERING IS THERE ANY INDICATION OF ANY WRONGDOING IN THAT TIME?

>> Mark L. Mason,Complainant: THE 2011 PUBLIC REPRIMAND HAPPENED DURING THAT WINDOW.

>> Chief Justice Carlos Muniz: THE ONE HERE IN FLORIDA VISITING JUST THE ONE HERE IN FLORIDA THAT WAS REFERENCED EARLIER.

>> Justice Charles Canady: WHAT DO WE KNOW ABOUT THE CASE?

>> Mark L. Mason,Complainant: IT WAS A PUBLIC REPRIMAND HAVING TO DO WITH HIS FAILURE TO PAY A CLIENT A MEDIATED SETTLEMENT I BELIEVE IT WAS $5000 HE SAID HE CANNOT AFFORD AT THE TIME JUST ENOUGH. IT TOOK INITIATION OF A BARBER SITTING BEFORE EVENTUALLY DID PAY IT.

NOW WHAT WE ARE HERE ON IS SUBSTANTIALLY WORSE CONDUCT I THINK THAT IS PART AND PARCEL OF WHEN YOU LOOK AT IT IN A PUBLIC REPRIMAND.

>> Justice Charles Canady: A MEDIATED SETTLEMENT OF WHAT.

>> Mark L. Mason,Complainant: IT HAD TO DO WITH HIS REPRESENTATION OF A CRIMINAL DEFENDANT WAS HAPPY WITH THE SERVICES IT WAS AGREED HE WOULD REIMBURSE I BELIEVE IT WAS $5000.

>> Justice: WHAT DO WE KNOW ABOUT WHAT HE'S BEEN UP TO SINCE 2010? YOU MENTIONED THE 2011 ISSUE.

I'M TRYING TO GET A SENSE OF WE ARE TALKING ABOUT ON THE ONE HAND THE DC STUFF IS SERIOUS.

JUST SPEAKING FOR MYSELF I'M NOT REALLY INTERESTED IN RELITIGATING ALL OF THAT. ON THE OTHER HAND WE ARE BEING ASKED TO TACK TWO MORE YEARS ONTO THIS TO REMEDY OR TO ADDRESS CONDUCT THAT HAPPENED 15 YEARS AGO. I'M JUST TRYING TO UNDERSTAND IS THERE ANYTHING ELSE HOW LONG FOR THAT INTERIM TIME HOW LONG WAS HE ABLE STILL TO PRACTICE?

>> Mark L. Mason,Complainant: HE WAS SUBJECT TO AN END AND FIRM SUSPENSION WHILE THE DC SUSPENSION WAS ONGOING I'M NOT AWARE IF HE WAS READMITTED. HE HAS BEEN SUSPENDED IN PENNSYLVANIA IS ON A TEMPORARY LICENSE AS WELL I CANNOT SPEAK TO WHAT LAW HE PRACTICED ONCE HE WAS SUSPENDED.

>> Chief Justice Carlos Muniz: WHEN DID INTERIM SUSPENSION START.

>> Mark L. Mason,Complainant: THAT WOULD'VE BEEN DURING THE SATAKE APPEAL WHICH WOULD HAPPENED I'M NOT EXACTLY SURE THE YEAR.

IT HAPPENED DURING THE TERM OF THE APPEAL OF THE SATAKE SUSPENSION
WHICH LED TO THE 2022 ORDER IT WENT THROUGH THIS VERY LONG APPEAL
PROCESS WHICH IS PART AND PARCEL OF THE DELAY BECAUSE WE ARE ACTING ON
A RECIPROCAL MATTER.

IT IS NOT A BOTHER WE RECEIVE SOMETHING IN 2011 WHICH IS STILL JUST
CONJECTURE.

ON HIS PART IT WAS AN UNSWORN DOCUMENT IT WAS REFERENCED IT WAS NOT A
FLORIDA BAR COMPLAINT FORM IT WAS NOT IT WAS A WASHINGTON DC BAR
COMPLAINT FORM.

>> Chief Justice Carlos Muniz: LET'S ASSUME THAT THE BAR ACTED WITHIN A
REASONABLE AMOUNT OF TIME IN THE PROCESS.

CAN YOU JUST WHAT IS THE POINT OF TWO MORE YEARS OF SUSPENSION?

>> Mark L. Mason,Complainant: THE POINT OF TWO MORE YEARS HAS TO DO WITH THE
AGGRAVATING CIRCUMSTANCES THAT WERE SHOWN TO THE REFEREE.

IT WAS REFUSAL TO ACKNOWLEDGE ANY WRONGDOING WHATSOEVER HE IS STILL
FRAMING IT AS THOUGH THIS IS A POLITICAL IDEOLOGY WITCHHUNT AGAINST THEM
THERE WAS THE ACCUSATIONS AGAINST THE BAR COUNSEL THAT THE REFEREE
REFERENCED IN THE REPORT REFEREE HAVING TO DO WITH OUR COUNSEL TIPPED
OFF WITNESSES I WAS TRYING TO SUBPOENA. ABSOLUTELY NO FACTUAL BASIS TO
ASSERT THAT. WHATSOEVER.

YET HE SAID IT ANYWAY.

IT WAS JUST THAT KIND OF CONDUCT THROUGHOUT THE HEARING AND THAT THIS
NOTION THAT WAS NEVER ENTITLED WITH ANY DISCOVERY HE'S RECEIVED HEARING
AND HEARINGS THE SATAKE WAS ALONE IT WAS A SIX-DAY FINAL HEARING THIS
NOTION HE WAS NOT ENTITLED TO ANY DISCOVERY HE HAS TO TAKE TWO
DEPOSITIONS AND THAT THERE IS A RULE IN DC THAT SAID YOU NEED TO SHOW
COMPELLING NEED TO DO IT.

HE SIMPLY DID NOT DO THAT.

THERE IS THIS CONSTANT KIND OF OVERSTATEMENT OF NO DISCOVERY NO DUE
PROCESS WHATSOEVER. BUT IT WENT THROUGH A THREE-TIER REVIEW PROCESS IN
WASHINGTON DC. WHEN IT COMES TO US WE ARE NOT LOOKING TO RELITIGATE THE
CASE I'M NOT GOING TO BANDY ABOUT ON THAT POINT TOO MUCH LONGER. WE
TOOK IT AND WE ACTED TIMELY. WELL WITHIN IF YOU SAY 3â ¨7.16 IN A SIX YEAR
RULE IF THAT APPLIES ALL IT WOULD BE TRIGGERED WHEN WE GET NOTICE OF THE
SUSPENSION ORDERS. WE ARE WELL WITHIN THAT SECURE TIMEFRAME. WHAT IS HE
TALKING ABOUT IS THE SEAT OF THE LONG THEIR ORDER SAID THE DELAY WAS
UNFORTUNATE THERE IS NOT REALLY AN EXCUSE FOR IT BUT WE HAVE IN OUR
STANDARDS UNREASONABLE DELAY IT IS A MITIGATING FACTOR AT BEST.

I'M NOT SAYING IT DOES NOT APPLY BUT IT WAS NOT ARGUED IN THE INITIAL BRIEF IT
WAS THAT FOUND IN THE REPORT OF THE REFEREE. IT CAN APPLY BUT ULTIMATELY
WHEN YOU LOOK AT ALL OF THESE AGGRAVATING FACTORS THE SELFISH MOTIVE
THAT HE HAD WITH PURSUING THESE COMPLAINTS IN DC AND DRAWING UP ALL THIS
MEDIA ATTENTION AND ALL THAT. AND YOU COMBINE IT WITH HIS MULTIPLE

OFFENSES AND THIS PATTERN THAT IS WHAT THE REFEREE WAS LOOKING OUT TO SAY, THIS IS WHERE THE REHABILITATIVE SUSPENSION IN THIS CASE A TWO YEAR SUSPENSION BASED ON AN 18 MONTH SUSPENSION ORDER MISCONDUCT DURING THE PROCEEDING AND HIS PRIORS THEY DID A 90 DAY SUSPENSION AND THE PUBLIC REPRIMAND.

>> Justice Charles Canady: CAN I ASK A QUESTION I'M SORRY IF YOU ALREADY SAID THIS WANT TO CLARIFY WHAT IS MR KLAYMAN'S CURRENT STATUS WITH THE FLORIDA BAR.

>> Mark L. Mason,Complainant: IHS CURRENT STATUS IF HE IS LICENSED.

>> Justice Charles Canady: THERE IS NO SUSPENSION.

>> Mark L. Mason,Complainant: THERE HAS NEVER BEEN ANY ACTION ON HIS LICENSE BUT THE FLORIDA BAR OTHER THAN A PUBLIC FORMAT IN 2011 NO CURRENT ACTION ON HIS LICENSE IS NOT RECEIVED ANY PENALTY FOR IT AT THIS TIME.

AT THIS POINT THIS IS WHAT THE PURPOSE OF RECIPROCAL DISCIPLINE IS FOR WE DON'T RELITIGATE ACCEPT THE FINDINGS OF GUILT MUST SEEK AND ESTABLISH HIS BURDEN.

HIS BURDEN IS GRAVE INJUSTICE.

A PAUCITY OF PROOF A COMPLETE WANT OF DUE PROCESS THAT IS WHAT THE CASE LAW SAYS HE IS NOT ESTABLISH THAT WHAT HE ESTABLISHED HE RAISED DUE PROCESS ARGUMENTS IN DC AND THEY FAILED.

IT WENT THROUGH 183 PAGE ORDER AND FIRST REVIEW THEN ANOTHER ORDER SAYING THAT ORDER RECOMMENDING A 33 MONTH SUSPENSION WAS TOO MUCH.

>> Chief Justice Carlos Muniz: I'M SORRY TO INTERRUPT YOU. THE LOGIC IT SEEMS LIKE SORT OF THE LOGIC OF THE RECIPROCAL DISCIPLINE THE REASON WE DON'T RELITIGATE ALL OF THAT IS JUST THE IDEA YOU HAVE A PROBLEM IN ANOTHER STATE YOU GO THROUGH THE PROCESS IT RESULTS IN SOME KIND OF DISCIPLINE IN A PERFECT WORLD IF SOMEONE ELSE WITH DUE PROCESS IS ALREADY DECIDING THIS PERSON SHOULD NOT BE PRACTICING AND OFFERING THE SERVICES TO THE PUBLIC FOR TWO YEARS YOU WANT TO PROTECT PEOPLE IN FLORIDA FOR THE SAME TWO YEARS. I THINK THE PROBLEM HERE IS THE STACKING OF THE TIME ESPECIALLY IN THE CONTEXT WHERE THE WRONGDOING IS FROM 15 YEARS AGO BASICALLY. CAN YOU ADDRESS THAT?

>> Mark L. Mason,Complainant: I THINK A LOT OF THAT HAS TO DO WITH THE WAY THESE CASES GET LITIGATED AND DRAGGED OUT FRANKLY A RECIPROCAL DISCIPLINE SHOULD BE A QUICK MATTER IN WHICH THERE WAS OVERLAP.

>> Chief Justice Carlos Muniz: YOU AGREE IN THEORY IF YOU ARE LOOKING AT IT FROM A COMMON SENSE PERSPECTIVE IF DC THOUGHT THE PUBLIC NEEDED TO BE PROTECTED FROM DISPERSANT FOR COUPLE OF YEARS YOU WOULD GIVE FLORIDIANS THE SAME PROTECTION THEN EVERYBODY PRESENT AND HOPEFULLY THE PERSON ASKED THE WAY THEY SHOULD GOING FORWARD ISN'T THAT THE WAY IDEALLY IT SHOULD WORK?

>> Mark L. Mason,Complainant: CORRECT, IN DC WITH A SET IN THE SATAKE SUSPENSION ORDER IS HE NEEDED TO DEMONSTRATE HIS BUSINESS BEFORE BEING

REINSTATED TO THE PRACTICE OF LAW I THINK THAT IS VERY FAIR TO ASK FOR IN THIS CASE THE REFEREE THOUGHT IT WARRANTED A TWO YEAR. THE BAR REQUESTED 18 MONTHS SAME AS SUSPENSION ORDER AND THINK THAT WAS FAIR BASED UPON THE PATTERN OF MISCONDUCT.

THAT HE IS DONE HERE.

WE DID NOT ADD ON THE EXTRA 90 DAYS FROM THE JUDICIAL WATCH SUSPENSION ORDER HE FOUND WE RECOGNIZE THAT ONE IS A BIT OLDER.

WE WEREN'T GOING TO PUSH ON THAT BUT WHEN HE ACTED AS HE DID IN THE PROCEEDING AND RESULTED IN A VERY DELAYED PROCEEDING IT RESULTED IN A LOT OF ACCUSATIONS THROWN OUT ABOUT WHAT OUR COUNSEL DID WITH TIPPING OFF WITNESSES THE CASE WILL TAKE LONGER.

TO COMPLAIN THAT NOW IT IS 2025 BECAUSE HE TOOK SEVEN YEARS TO APPEAL JUST THAT JUDICIAL WATCH SUSPENSION ORDER THERE IS A SPECIFICATION TO THE CHARGES IN 2013 ON THAT ONE THAT IS HOW LONG IT TOOK BEFORE THE 2020 SUSPENSION ORDER HE DID A THREE-TIER REVIEW PROCESS EVERY SINGLE TIME WHERE HE GOT OPINIONS ALL THE WAY UP TO THE DISTRICT OF COLUMBIA COURT OF APPEALS AND THEY ULTIMATELY CONCLUDED THAT WAS ALWAYS GOING TO TAKE A SUBSTANTIAL AMOUNT OF TIME HE IS NOT ATTRIBUTABLE TO ALL THE DELAY ON THAT SAME BETTER UNDERSTAND DC TOOK A WHILE TO BRING THE CASE. LONGER THAN THEY SHOULD HAVE. BUT WITHOUT PREJUDICE BY IT.

HE IS TALKING ABOUT LOST DOCUMENTS MEMORY IS FADED THEY REJECTED THOSE ARGUMENTS HIS RECOLLECTION WAS FUN MS. SATAKE RECOLLECTION WAS FINE THAT WAS THE FINDING HE DID NOT IDENTIFY A SINGLE DOCUMENT HE NEEDED OR THEY LOST. WHY WOULD HE GET RID OF THEM?

SHE MADE THE COMPLAINT IN 2010 AND A SUPPLEMENTAL IN 2011 HE WAS ON NOTICE OF THOSE COMPLAINTS WHY DID HE DELETE RECORDS THAT HE SAID HE DELETED?

IT IS NOT MAKE SENSE HE WOULD DO THAT BECAUSE WE NEVER TOLD THE CASE WAS CLOSED OUT.

ALL OF THESE NOTIONS THAT THESE DUE PROCESS ARGUMENTS RESULTED IN A PAUCITY PROOF OR WANT OF DUE PROCESS OR GRAVE INJUSTICE THESE ARE JUST TYPICAL ARGUMENTS THAT.

>> Justice Charles Canady: WHAT DO YOU SAY IN RESPONSE TO COUNSEL'S ARGUMENT THAT HE WAS DENIED DISCOVERY CAN YOU ADDRESS THAT.

>> Mark L. Mason,Complainant: I WOULD LIKE TO BE SPECIFIC ABOUT THAT BECAUSE THE DISCOVERY HE REQUESTED WAS TO DEPOSE TWO WITNESSES ONE WAS MS. SATAKE AND ONE WAS HER PSYCHIATRIST DR. [LISTING NAMES] WITH MS. SATAKE WITH THE RULE BEING IN COLUMBIA YOU NEED TO DEMOCRAT A COMPELLING NEED SHE WAS COMING FROM CALIFORNIA TO DC THE WAY THEY DO IT IN DC AT THE AD HOC COMMITTEE THEY PUT HER ON THE DAY HER TESTIMONY AND THEN HE DID SUBSTANTIAL CROSS-EXAMINATION. WHAT I MEAN BY SUBSTANTIAL SHE TESTIFIED FOR THREE OF THE SIX DAYS OF THAT FINAL HEARING.

HE WAS NOT LIMITED TO WHAT SHE SAID AND CROSS-EXAMINATION HE IS

EXPLORING OTHER AVENUES THROUGHOUT THAT ENTIRE PROCEEDING.

>> Justice Charles Canady: YOU ARE SAYING HE BASICALLY GOT THE DISCOVERY IN THE PROCEEDING.

>> Mark L. Mason,Complainant: GOT THE DISCOVERY IN THEIR PROCEEDING HE WAS ALLOWED TO EXPLORE IF THERE WAS A BREAK BEFORE THEY CONTINUED ON WITH OTHER WITNESSES SO HE COULD PREPARE HIS CASE IN CHIEF AS WELL. WITH REGARD TO THE PSYCHIATRIST HE WAS NOT ALLOWED TO DEPOSE THAT WAS ADDRESSED IN THE SUSPENSION ORDER.

THE TESTIMONY SHE WOULD'VE OFFERED IS INSUBSTANTIAL MOST OF IT WOULD'VE BEEN PRIVILEGED ANYWAY ALTHOUGH HE FALSELY CLAIMED THERE WAS NO DOCTOR-PATIENT PRIVILEGE REGARDING THAT DOCTOR. ON TOP OF THAT HE JUST WANT TO EXPLAIN THAT ANY EMOTIONAL ISSUES WITH MS. SATAKE ALLEGED EMOTIONAL ISSUES WERE NOT HIS FAULT IT WAS COMPLETELY IRRELEVANT TO WHAT THE RULE VIOLATIONS WORK WHICH WAS A CONFLICT OF INTEREST WHICH WAS FRANKLY ESTABLISHED JUST BY HIS EMAILS THAT HE SENT TO HER ALONE. AND NOTHING ELSE.

THERE WAS NOT JUST NO DUE PROCESS WERE NOT ALLOWED TO TAKE TWO DEPOSITIONS THAT WAS IT.

>> Chief Justice Carlos Muniz: IN THE UNUSUAL SITUATION HERE IF HE GOT A 90 DAY SUSPENSION HE WOULD HAVE TO SHOW IF HE WANTED TO BE REINSTATED IN FLORIDA HE WOULD HAVE TO SHOW ESSENTIALLY THAT THE PROBLEMS HAVE BEEN ADDRESSED THE BAR WOULD HAVE A CHANCE TO LOOK AND SEE WHAT HE'S BEEN UP TO SINCE 2010 THEY WOULD BE ABLE TO SEE WHAT THE STATUS OF WHAT'S GOING ON IN DC AND PENNSYLVANIA IS.

WHY ISN'T THAT ENOUGH TO PROTECT THE PUBLIC?

>> Mark L. Mason,Complainant: I THINK IT IS NOT ENOUGH TO PROTECT THE PUBLIC JUST BASED UPON WHAT THE REFEREE FOUND IN TERMS OF THE AGGRAVATING CIRCUMSTANCES.

MAINLY HIS REFUSAL BUT ALSO THE PATTERN AND JUST THIS IS SOMEONE WHO HAS HAD A LOT OF TIME TO REFLECT ON CONDUCT THAT HAPPENED AS EARLY AS 2006-2010 AND HE STILL NOT HAS ACKNOWLEDGED A SINGLE BIT OF WRONGDOING.

>> Chief Justice Carlos Muniz: IT SOUNDS TO ME IS ALMOST MORE PUNITIVE AND PARTLY BASED ON THE BEHAVIOR IN THIS PROCEEDING ITSELF.

>> Mark L. Mason,Complainant: I THINK THE REFEREE HAD A UNIQUE VANTAGE POINT TO GAUGE WHETHER TO SOMEONE WHO SHOULD BE GIVEN THE SHORTEST AMOUNT OF TIME BEFORE PETITIONING FOR REINSTATEMENT OR A SUBSTANTIAL AMOUNT OF YEARS. I THINK THE REFEREE'S REPORT JUSTIFIED WHY HE DID NOT ACCEPT THE 18 MONTH SUSPENSION AND DECIDED TO INCREASE IT TO A TWO-YEAR RECOMMENDATION.

WITH THAT I SEE HIM OVER MY TIME.

>> Chief Justice Carlos Muniz: I THINK I INTERRUPTED SOMEONE.

>> Justice: YOU KNOW WHEN THE BAR GOT NOTICED ABOUT THE 2020 ORDER?

>> Mark L. Mason,Complainant: YES, ACTUALLY IT WAS IN OCTOBER 2022 IT WAS ONE

OF HIS EXHIBITS IF I CAN FIND IT HERE.

>> Justice: OKAY IT WAS OCTOBER 2022 WHEN YOU WERE AWARE OF THE DC DISCIPLINE'S

>> Mark L. Mason,Complainant: CORRECT IN THE LETTER HE NOTIFIED US HE ALSO ASKED US TO STAY THE PROCEEDINGS WHILE HE DID COLLATERAL ATTACKS OF IT I JUST WANT TO ADD THAT INTO EXPLAIN A LOT OF THE DELAY.

>> Justice: WHEN DID THE BAR GET NOTICED IT WAS DONE.

>> OCTOBER 2022 THAT IS WHEN DC HAD CONCLUDED THE SATAKE MATTERS. HE WAS STILL PLANNING ON SUING ANOTHER AVENUES TO ATTACK THE JUDGMENT.

>> Justice: IT WAS ALMOST ABOUT A YEAR AFTER THAT HE FILED A PETITION FOR RECIPROCAL DISCIPLINE.

>> Mark L. Mason,Complainant: OUR COMPLAINT FOR RECIPROCAL WAS IN AUGUST 2023 JUST A LITTLE LESS THAN ONE YEAR.

>> Chief Justice Carlos Muniz: YOU CAN HAVE 30 SECONDS TO FINISH UP IF YOU WANT.

>> Mark L. Mason,Complainant: I WOULD JUST LIKE TO SAY IN CLOSING THAT I BELIEVE THAT THE REFEREE JUSTIFIED IT WITH THE CASE LAW PARTICULARLY THE RUSH CASE WHERE YOU PRIORITIZE A CLIENT'S INTEREST OR EXCEEDS ME ADVERTISING YOUR INTEREST OVER THE CLIENTS TO THE DETRIMENT OF THE CLIENT. THAT WAS A THREE-YEAR SUSPENSION I'M NOT SUGGESTING HE NEEDS THAT MUCH BUT THERE IS CASE LAW THAT THE REFEREE ADDRESSED SUPPORTING THAT AND FOR THAT REASON WE ASK YOU ACCEPT THE TWO-YEAR SUSPENSION.

>> Chief Justice Carlos Muniz: THANK YOU VERY MUCH.

>> Robert M. Klein,Respondent:

>> Chief Justice Carlos Muniz: HAS YOUR CLAIM BEEN RESTATED EVERY YEAR HAS HE BEEN REINSTATED IN DC OR PENNSYLVANIA?

>> Robert M. Klein,Respondent: PENNSYLVANIA HE HAD A CLE REQUIREMENT THAT WAS ALL I DON'T BELIEVE THERE IS ANY SUSPENSION DURING THE PENDENCY OF THE APPEAL.

>> Chief Justice Carlos Muniz: WHAT ABOUT DC.

>> Robert M. Klein,Respondent: AS FAR AS I KNOW DC ITSELF GIVE NOTICE TO BOTH FLORIDA AND TO PENNSYLVANIA ABOUT THE RESULTS IS NOT JUST A MATTER.

>> Chief Justice Carlos Muniz: IS HE STILL SUSPENDED IN DC HAS HE BEEN REINSTATED IN DC.

>> Robert M. Klein,Respondent: AS FAR AS I KNOW HE HAS NOT APPLIED FOR REINSTATEMENT.

>> Chief Justice Carlos Muniz: HE HAS NOT APPLIED?

>> Robert M. Klein,Respondent: THE PROBLEM I'M HEARING WITH THIS IS THAT IF YOU DON'T GET DISCOVERY IN THE FIRST PLACE AND YOU ARE NOT ALLOWED TO TAKE DEPOSITIONS THE IDEA THAT HE MAY HAVE BEEN ABLE TO CROSS-EXAMINE THIS WITNESS CALLED MS. SATAKE IN PARTICULAR DOES VERY LITTLE IN TERMS OF DUE PROCESS. BECAUSE THE REALITY IS YOU DON'T HAVE AN OPPORTUNITY TO LOOK AT THE DOCUMENTS YOU DON'T HAVE AN OPPORTUNITY TO FIND OUT IF SHE HAS OTHER

DOCUMENTS. EVEN FROM THE DOCUMENTS IN HER SUBMITTED THAT WERE
SUBMITTED BY SATAKE IN THIS CASE THEY ARE BACK AND FORTH FOR THE BETTER
PART OF EIGHT MONTHS THROUGHOUT 2010 AS TO WHAT IS GOING TO HAPPEN
WHETHER OR NOT IT IS GOING TO HAPPEN. HOW IT IS GOING TO HAPPEN.
NO LAWYER IN FLORIDA IS OBLIGATED TO GET A CLIENT'S AUTHORITY TO DO
EVERYTHING ANYTHING OTHER THAN THE ULTIMATE GOAL THAT IS THE CLIENTS
ASPIRATION.
YOU DON'T TALK TO THE CLIENT ABOUT HOW YOU WILL PROSECUTE EVERY CASE
THAT YOU WILL TAKE ON. BUT AT THE SAME TIME YOU CANNOT CROSS-EXAMINE
ANYONE ABOUT WHAT THEY BELIEVE THEIR OPINIONS WERE OR WHAT THEY WERE
TELLING YOU TO DO WHEN YOU DON'T HAVE ACCESS TO COMMUNICATIONS THAT
WERE BEING HAD, FOR EXAMPLE WITH HER UNION REP WHO TESTIFIED UNDER OATH
IN THIS CASE ALONG WITH THE YOUNG LAWYER WHO WENT TO THE HEARING ABOUT
THE HOSTILITY, THAT WAS DIRECTED TOWARDS HER AND IT TO HIM AT ONE POINT OR
ANOTHER. BY JUDICIAL WATCH. IN FACT THE LAWYER WHO TESTIFIED IN THIS CASE
TESTIFIED UNDER OATH ABOUT THE MANNER IN WHICH MR. CLAIMANT WAS TREATED
BY THE DC BAR DURING THOSE HEARINGS.
I WOULD ASK THE COURT TO TAKE A CLOSE LOOK AT THAT TESTIMONY BECAUSE IT
IS VERY CLEAR THAT THINGS IN THIS DAY AND AGE WHEN EVERYBODY TALKS ABOUT
WEAPONIZATION IT'S THE FIRST TIME EVER USED THAT WORD IN MY LIFE IF YOU
LOOK AT THE WAY THIS PROSECUTION WENT DOWN AT THE DC BAR IT WAS NOTHING
ABOUT IT THAT WAS AFFORDED ANY MANNER OF DUE PROCESS. THAT RESONATES
THROUGHOUT THIS ENTIRE CASE.
THE CONCEPT OF CONFLICT MORPHED AND HAS MORPHED IN THIS CASE FIRST IT
WAS HE WAS DOING THIS FOR HIS OWN PERSONAL GOOD. OR TO ADVANCE HIS OWN
REPUTATION. THEN IT WAS BECAUSE HE HAD A ROMANTIC INTEREST IN MS. SATAKE.
JUDGE LAMBERTH HIMSELF WHO DENIED THE MOTION THE CONFLICT ISSUES AND IT
DENIED THE OPPORTUNITY TO TAKE DEPOSITIONS SAID THAT IT WAS A CLOSE CALL.
HE HAS REFERRED LAWYERS ON MULTIPLE OCCASIONS TO THE BAR .
>> Chief Justice Carlos Muniz: I'M SORRY TO INTERRUPT YOU CAN HAVE ONE MINUTE TO
INTERRUPT.
>> Robert M. Klein,Respondent: HE FELT IN THIS CASE THERE WAS NO REASON TO
BELIEVE AS ELEVENTH CIRCUIT THE DC CIRCUIT NOTED IN ITS OPINION ANY REASON
TO BELIEVE THAT MR KLAYMAN COULD NOT AND WOULD NOT PRACTICE ETHICALLY
AND COMPETENTLY. IN FACT COMMENDED THE MANNER IN WHICH ALL OF THESE
CASES ARE HANDLED. YOU LOOK AT ALL OF THESE PEOPLE WHO TESTIFIED IN THIS
CASE THE ONLY ONE OF TESTIFIED ADVERSE TO MR. CLAIMANT WAS MS. SATAKE.
AND SHE WAS IMPEACHED REGULARLY AS WAS NOTED BY THE COURT OF APPEAL.
ON MULTIPLE ISSUES. WHEN CONFRONTED THAT IS THE WHOLE POINT IS
CONFRONTATION WRITTEN TO BE ABLE TO CONFRONT SOMEONE YOU ENTITLED TO
RUDIMENTARY DISCOVERY AND AT A MINIMUM A DEPOSITION NOT HAVE TO DO IT
COLD -
>> Chief Justice Carlos Muniz: THANK YOU VERY MUCH WE WILL BE IN RECESS FOR 10

MINUTES.
>> Marshal: ALL RISE

EXHIBIT 3

**IN THE SUPREME COURT OF FLORIDA**
**(Before a Referee)**

|                        |     |                                        |
|------------------------|-----|----------------------------------------|
| THE FLORIDA BAR,       | }   |                                        |
|                        | }   |                                        |
|    Complainant | } | **Case Number: SC23-1219**        |
| v.                     | }   |                                        |
|                        | }   | **TFB File No. 2020-00,515 (2A)**      |
| LARRY ELLIOT KLAYMAN   | }   |                                        |
|                        | }   |                                        |
|    Respondent. | } |                                       |

---

## [PROPOSED] ORDER OF RESPONDENT

THIS CAUSE having been heard on March 27 – March 28, 2024 on the issue of Respondent Larry Klayman's reciprocal discipline ("Respondent"), and the Honorable J. Lee Marsh ("Referee") having considered the pleadings, having heard argument of counsel, and being otherwise fully advised in the premises, it is hereby **ORDERED:**

## I.    INTRODUCTION AND BACKGROUND

The complaint for reciprocal discipline assigned to Florida Office of Bar Counsel ("FOBC") involves two suspension orders by the D.C. Court of Appeals ("DCCA"). The first is styled *In re Klayman*, 20-BG-583 (D.C.C.A.) (the "Sataki Suspension Order") and the second is styled *In re Klayman*, 18-BG-100 (D.C.C.A.) (the "Judicial Watch Suspension Order").

The underlying events in the Sataki Suspension Order began in 2010, fourteen (14) years ago. Complainant Elham Sataki ("Ms. Sataki") filed a complaint against Respondent on November 2, 2010, and a supplemental complaint on October 24, 2011. Respondent Exhibit ("FRX") 7. Yet the District of Columbia Office of Disciplinary Counsel ("DCODC") did not file a Specification of Charges until July 20, 2017, over seven years later. FRX 4. The DCCA issued the order of suspension on September 15, 2022, approximately 12 years later. Nearly one year later, on August 29, 2023, FOBC filed its reciprocal discipline complaint. FRX 3.

1

The events raised in the Judicial Watch Suspension Order took place in approximately 2006, some eighteen (18) years ago. The initial complaint was filed by Tom Fitton of Judicial Watch on January 23, 2008. Yet DCODC did not institute a Specification of Charges until October 1, 2013, nearly six (6) years later. FRX 43. It took approximately seven years, or until June 11, 2020, for the DCCA to issue an order of suspension. FRX 3. The record indicates that FOBC was notified of this suspension on or around June 11, 2020 via letter from the DCODC. Respondent's Supplemental Exhibit ("Supp.") 0047. FOBC did not file their reciprocal discipline complaint until August 29, 2023, over three years later. FRX 3.

## II.    LEGAL STANDARD

When the Court is presented with an issue of reciprocal discipline, the law is well settled that the Court is "not automatically bound by an out-of-state determination of guilt by a disciplinary agency." *Fla. Bar v. Kandekore*, 766 So. 2d 1004, 1007 (Fla. 2000). The Florida Supreme Court has established the following standard for determining whether another jurisdiction's findings should be accepted as conclusive:

> [W]hen the accused attorney shows that the proceeding in the foreign state was so deficient or lacking in notice or opportunity to be heard, that there was such a paucity of proof, or that there was some other grave reason which would make it unjust to accept the foreign judgment as conclusive proof of guilt of the misconduct involved Florida can elect not to be bound thereby. *Id*.

*See also Fla. Bar v. Wilkes*, 179 So. 2d 193 (Fla. 1965). *Wilkes* explained the logic behind the decision to not automatically adopt findings made in other jurisdictions:

> For at least two reasons it would be incongruous to apply the principle of the full faith and credit provision to judgments of disbarment. First, the issues adjudicated are not the kind to which the clause was intended to apply…. Second, to our knowledge neither of the principles under discussion has ever been held to require one state automatically to admit to practice an individual merely because a sister state has admitted him. (Those states which do admit to practice on a showing of admission in certain other states do so on the basis of reciprocity, and not on any obligation of comity or full faith and credit.) Thus, if these principles do not

> control or affect admission to practice there is no logical basis upon which they can be made applicable to disbarment or removal from practice. This is so because the authority and responsibility of the state is the same in admission to practice as it is in disbarment. It is to protect the public against those who for any reason are unfit to practice law. Both functions are given to this court under our state constitution and we must exercise both or abdicate our constitutional mandate under Art. V, Sec. 23, Florida Constitution, F.S.A. *Id*. at 196.

*See also Florida Bar v. Tipler*, 8 So. 3d 1109 (Fla. 2009), Furthermore, even where proof of "guilt" by another jurisdiction is deemed adopted, a finding to that effect does not apply to the discipline imposed. "[T]he discipline awarded in the foreign judgment is not binding on Florida." *Id*. at 201. Lastly, whether discovery was allowed in a foreign jurisdiction is a factor this Court must consider in determining whether to adopt discipline from another jurisdiction. *Id*. at 1117.

## III.    THE LAW

For the reasons set forth herein, the referee finds that no sanction is warranted with regard to either disciplinary proceeding. The Referee addresses each disciplinary proceeding *in seriatim* before addressing the sanction at the end of this order.

### A.    The Sataki Suspension Order

Respondent has persuasively argued that the Sataki Suspension Order is (1) time barred, (2) fits the criteria set forth under *Kandekore* requiring that the Referee decline to adopt the Sataki Suspension Order, and (3) constitutes the practice of "stacking." The Referee finds these arguments persuasive, for the reasons set forth below.

#### 1.    The Sataki Suspension Order is Time Barred

Respondent has provided the Referee with case authority and expert testimony that the Sataki Suspension Order is time-barred by the statute of limitations and the doctrine of laches.

Under the applicable statute of limitations, The Florida Bar is required to open an investigation "within 6 years from the time the matter giving rise to the investigation is

3

discovered or, with due diligence, should have been discovered." Bar Rule 3-7.16(a)(1); *Fla. Bar v. Phoenix*, 311 So. 3d 825, 831 (Fla. 2021). Here, the record reflects that Ms. Sataki submitted a disciplinary complaint with The Florida Bar on or around October 24, 2011, FRX 7, nearly twelve (12) years prior to the filing by the FOBC of its reciprocal discipline complaint. See also FRX 8. The court determines that this proceeding was not timely filed.

The Referee finds particularly instructive the affidavit and testimony of Robert Klein, Esq. ("Mr. Klein") FRX 11. He opines that:

> "The Florida Bar would have investigated Ms. Sataki's Complaint back in 2011 when it was filed. The only reasonable conclusion is that The Bar found it to have no merit and dismissed it, as Mr. Klayman was never subjected to any form of discipline as a result of Ms. Sataki's Complaint. Now, some twelve (12) years following the filing of Ms. Sataki's complaint, I believe The Florida Bar should forgo initiating any disciplinary action which relates to Mr. Klayman's representation of Ms. Sataki." FRX 11 ¶ 19. "Under this scenario, full faith and credit should be given to The Florida Bar's decision to dismiss the Sataki Matter back in and around 2011, and The Florida Bar should not be allowed to relitigate this matter." FRX 11 ¶ 20.

Mr. Klein then provided the following sworn testimony on March 28, 2024:

> If, in fact, the Florida Bar investigated, and there is certainly record evidence that it did, then that – the determination by the Florida Bar not to proceed further should prevent any proceedings at this point in time based upon the same facts and the same allegations. And I believe that that's, you know, well established under Florida law and the Court -- the parties have negotiated the cases back and forth. I do believe that --in fact, there was a South Carolina opinion that I advanced in my affidavit that I found -- a South Dakota opinion that, really, I felt did a better job that I could, really, in summarizing, you know, why that is, you know. And if you look at the opinions that are cited, some of the opinions from other jurisdictions make it clear that each state really has to abide by its own rules and decide under its own laws whether or not to proceed and to what extent to proceed on claims being advanced against a lawyer in multiple jurisdictions. Tr. 89:6 – 23.

At the hearing, a choice of law issue was raised pursuant to *Merkle v. Robinson*, 737 So. 2d 540 (Fla. 1999). *Merkle* was a tort case involving statute of limitations for a medical malpractice case. *Merkle* expressly finds that "[t]his Court has held that **in tort actions** involving more than

4

one state, all substantive issues should be determined in accordance with the law of the state having the most 'significant relationship' to the occurrence and parties." *Id*. at 542 (emphasis added). The Referee finds that *Merkle* does not preclude application of Florida's six-year statute of limitations for the following reasons:

*First*, *Merkle* expressly limited its finding to tort actions. This instant matter is not a tort action. It is a reciprocal disciplinary process, and therefore an administrative proceeding.

*Second*, even assuming that the logic in *Merkle* might be applicable here, and analysis would still be required to determine which state has the most "significant relationship" to the occurrence and the parties. That assessment clearly favors the application of Florida law. This is a reciprocal discipline proceeding being conducted under the authority of the Florida Supreme Court. The rules applied to this case necessarily implicate Florida's rules, including the rules governing the Florida bar and the evidentiary rules governing the proceedings. For example, the court applied Florida's rules regarding the presentation of witness testimony by Zoom. Discovery was also governed by Florida's discovery rules. Finally, as Mr. Klein noted during his expert testimony, "if you look at the opinions that are cited, some of the opinions from other jurisdictions make it clear that each state really has to abide by its own rules and decide under its own laws whether or not to proceed and to what extent to proceed on claims being advanced against a lawyer in multiple jurisdictions." FRX 11 at 89. This appears to be particularly true to the extent that The Florida Bar is asking a Florida judge to limit a Florida lawyer's ability to practice law in Florida – not Washington DC.

This reasoning is confirmed by the Florida Supreme Court in *Fla. Bar v. Wilkes*, 179 So. 2d 193 (Fla. 1965), where the Court used the analogy of reciprocal admission to the Bar to explain why the Florida Bar ultimately governs issues of attorney reciprocal discipline:

Second, to our knowledge neither of the principles under discussion has ever been held to require one state automatically to admit to practice an individual merely because a sister state has admitted him. (Those states which do admit to practice on a showing of admission in certain other states do so on the basis of reciprocity, and not on any obligation of comity or full faith and credit.) Thus, if these principles do not control or affect admission to practice there is no logical basis upon which they can be made applicable to disbarment or removal from practice. This is so because the authority and responsibility of the state is the same in admission to practice as it is in disbarment. It is to protect the public against those who for any reason are unfit to practice law. Both functions are given to this court under our state constitution and we must exercise both or abdicate our constitutional mandate under Art. V, Sec. 23, Florida Constitution, F.S.A. *Id*. at 196.

Lastly, the only rights affected by this proceeding are Respondent's right to practice law in Florida, within the purview of Florida's rules and laws. Based on that assessment, even if *Merkle* is in fact applicable – and Respondent argues that it is not – Florida's six-year statute of limitations would apply.

The doctrine of laches provides another, alternative basis upon which the Referee finds this matter to be time barred. Regardless of *Merkle*, it cannot be disputed that both Florida and the District of Columbia apply laches to attorney discipline proceedings. *See The Florida Bar v. Walter*, 784 So.2d 1085 (Fla. Sup. Ct. 2001) and *In re Williams*, 513 A.2d 793, 796 (D.C. 1986).

Respondent has provided evidence of prejudice occasioned by the unprecedented delays in this matter, including but not limited to the unavailability of witnesses such as Professor Ronald Rotunda and Dr. Arlene Aviera -both of whom are deceased -  and the loss of records, including but not limited to evidence which should have been available to confirm that The Florida Bar received a complaint from Ms. Sataki in 2011. This is further underscored by the sworn affidavit testimony of Mr. Klein, who stated:

[T]here can be little dispute about the fact that Mr. Klayman will be hampered in the defense of any proceedings initiated in Florida – as he was in the District of Columbia – given the extraordinary passage of time…. The fact that records have now been destroyed should not be used to the detriment of Mr. Klayman, *who did*

*not occasion this delay*. To the contrary, this is precisely why courts in every state recognize laches as a defense to the prosecution of stale claims…. I believe that there should be a per se bar in place for the prosecution of a decade-old complaint. FRX 11 ¶ 23.

This was further persuasively emphasized by the proffered ethics opinion of one of the preeminent professional ethics experts, Ronald Rotunda, who had wanted to testify on Respondent's behalf, pro bono, but he passed away during the extremely prejudicial delay of seven (7) years caused by the delayed prosecution by DCODC. FRX 13-1. Thus, the Referee finds that under both Florida's statute of limitations and the doctrine of laches applicable in both Florida and the District of Columbia, this proceeding is time-barred.

> ### 2. The Has Been a Deprivation of Due Process, Paucity of Proof, and other Grave Reasons Which Would Make it Unjust to Accept the Foreign Judgment as *Conclusive* Proof of Guilt

The Referee recognizes here that he is "not automatically bound by an out-of-state determination of guilt by a disciplinary agency." *Fla. Bar v. Kandekore*, 766 So. 2d 1004, 1007 (Fla. 2000). The relevant inquiry is as follows:

> [W]hen the accused attorney shows that the proceeding in the foreign state was so deficient or lacking in notice or opportunity to be heard, that there was such a paucity of proof, or that there was some other grave reason which would make it unjust to accept the foreign judgment as conclusive proof of guilt of the misconduct involved Florida can elect not to be bound thereby. *Id*.

Respondent has introduced substantial evidence in the record that shows that he was deprived of due process at every stage of this disciplinary matter, which ties into a paucity of proof as to the issues in this matter, which include the failed recollection of several witnesses. This calls into question innumerable grave reasons that all serve to justify why this Referee should not to be bound by the Sataki Suspension Order.

> #### a. Respondent Was Denied Due Process

The Referee finds that Respondent was denied his due process rights beginning at the Ad

Hoc Hearing Committee ("AHHC") stage. Respondent provided record evidence to demonstrate the highly partisan nature of the District of Columbia attorney discipline apparatus, *see e.g.* FRX 12, *Affidavit of Anthony Caso*. However, those concerns were also manifested in the composition of the AHHC, which included Michael Tigar, who has proudly advertised his communist ties and affinities, along with chairperson Warren Anthony Fitch, of a similar ideological bent. FRX 38. This bias resulted in discernable due process violations against Respondent, which include but are not limited to the following:

*First,* the Referee is particularly disturbed by the fact that the events underlying the Sataki Suspension Order began in 2010, fourteen (14) years ago. Yet this matter was not even instituted by DCODC until 2017 – over seven (7) years after the Complaint had been filed by the Complainant! FRX 4. The Referee believes that this represents an unjustifiable and prejudicial delay, that violates Respondent's due process rights, in addition to serving as a time-bar.

*Second,* Respondent was denied discovery, FRX 17, despite the fact that discovery is clearly allowed in a bar proceeding and represents an integral part of the attorney disciplinary process, particularly in a case such as this, where DCODC delayed over seven (7) years before it even filed a Specification of Charges. Without question, the resulting passage of time resulted in testimony by individuals whose memories had faded, the outright unavailability or loss of witnesses, as well as the loss of documents, which had obviously been discarded at some point. *See* District of Columbia Board on Professional Responsibility Rules, Chapter 3. Of particular importance is the fact that Respondent was not permitted to take the deposition of Ms. Sataki despite the over seven (7) year delay by DCODC in filing its Specification of Charges. The Referee also finds it compelling that Respondent provided evidence that he sought the deposition testimony of not only Ms. Sataki, but also her psychologist, Dr. Arlene Aviera ("Dr. Aviera"),

8

FRX 17. Respondent explained that deposition testimony of both Ms. Sataki and Dr. Aviera was essential as to Ms. Sataki's "psychological frame of mind and condition, both during the time that Respondent represented her and thereafter." FRX 17. By the time that the AHHC hearing occurred, Dr. Aviera was unavailable, since she had developed stage-four cancer. FRX 24 at 126. Yet throughout the AHHC hearing, on numerous occasions, Ms. Sataki testified about her interactions with Dr. Aviera, including sessions where they discussed Respondent. FRX 24 at 125: "…but it went to Mr. Klayman and everything that I had to deal with him on a daily basis. She started helping me with that." *See also* FRX 24 at 139, 184 – 185, 430 – 432. Respondent was never given an opportunity to explore – let alone refute – that testimony through any type of traditional discovery, due to the unavailability of Dr. Aviera as a witness, which was of course occasioned by the extraordinary delay in the presentation of this complaint. The Referee finds that Respondent's inability to explore that critical element of testimony constituted a denial of his due process rights.  If an inability to secure legitimate discovery can be viewed as fundamental to the fairness and re- propriety of a civil proceeding, the Referee finds that it is far more essential in a proceeding which seeks to deprive Respondent of his right to practice law.

This problem was only compounded to the extent that record reflects that DCODC and Ms. Sataki were allowed to "discover" alleged records from Dr. Aviera that were previously undisclosed on the eve of the commencement of the AHHC hearing, where they were then allowed to introduce those records here. FRX 18, over the objection of Respondent. FRX 24 at 133 – 135. It was a due process violation to allow these documents into the record, despite the fact that the records included unsubstantiated hearsay. Dr. Aviera was not available to authenticate the records. Further, as was shown earlier, Respondent had been denied the opportunity to depose Dr. Avieira. FRX 18. That prejudice was not lost on AHHC, which

nevertheless introduced the documents into the record:

> I think that the Respondent's team must be concerned that these documents, if admitted and heard about, would be unduly prejudicial to him. But I don't know how to address that conundrum, because we're required to include the documents in the record and give a recommendation to the Board. FRX 24 at 204.

The Referee is unconvinced that the AHHC had no choice but to allow these unauthenticated documents into the record, as the transcript clearly reflects that it made the ultimate decision as to which documents would be proffered for the record.

The Referee has determined that Respondent was subjected to additional due process violations at the Board level. Respondent requested that the Board thoroughly review the record, which it appears they failed to do. FRX 19. Furthermore, when Respondent learned during the Board briefing process that Ms. Sataki had participated in making a documentary about her case, with intimate personal details about herself, against Voice of America ("VOA"), the Board refused to include this crucial piece of exculpatory evidence, which had not previously been disclosed by DCODC or Ms. Sataki. FRX 20. The Board Rules provide a mechanism for the record to be supplemented, Board Rule 13.7; nevertheless, for whatever reason, the Board chose not to include this highly exculpatory evidence.

The Board appears to have given undue and unjustified deference to the findings of the AHHC, which were the result of numerous due process violations, as is more fully as set forth above. The Board's refusal to thoroughly review the record and to conduct an independent analysis only serves to highlight – and compound – the due process violations that occurred at the AHHC.

The Referee also finds that the DCCA gave undue deference to the findings of the AHHC and Board; in essence, those findings were "rubberstamped." This is demonstrated by virtue of the fact that the DCCA's suspension order, FRX 3, *did not include a single record cite*, which

reflects that it was done in a hasty and conclusory manner which could not possibly have considered Respondent's arguments carefully.

In retrospect, the Referee now recognizes that Respondent's due process rights were further violated during the course of this ongoing reciprocal discipline proceeding, which Respondent set forth in full in his Motion for Recusal and/or Disqualification. Of particular importance in this regard are the third-party subpoenas that this Referee issued allowing Respondent to take the depositions of Messrs. Fox, Kaiser, Smith, Fitch, and Tigar. FRX 71. Despite being provided with conclusive evidence that these third-party deponents were willfully evading service of process, FRX 63, FRX 64 – constituting another due process violation by the D.C. attorney discipline apparatus. With the benefit of hindsight the Referee has concluded that he tacitly ratified this misconduct. In retrospect, the Referee now also recognizes that similar errors were made to the extent that he declined to accept as evidence the underlying disciplinary record in both disciplinary proceedings at issue along with the exculpatory evidence in the form of Ms. Sataki's video interview. This deprived Respondent of the ability to place a full and complete record in front of the Florida Supreme Court.

### b.    There Was a Paucity of Proof

The Referee also finds that there was a paucity of proof for each and every ethical violation that Respondent was charged with in the Sataki Suspension Order, based on Ms. Sataki's own testimony and other uncontroverted evidence.

*First*, the Referee finds that there was a paucity of proof that Respondent violated D.C. Rule of Professional Conduct ("Rule") 1.2 or Rule 1.6 with regard to pursuing Ms. Sataki's claims with publicity. To the contrary, the record reflects that Ms. Sataki gave informed consent to pursue her claims through the use of publicity. For instance, FRX 24 at 397 – 398 contains the

following admission from Ms. Sataki: Q: "And that we agreed we would get some positive publicity here to try to coerce VOA into a favorable settlement so you could be in LA, correct?" A: "Correct." Another admission is found in FRX 24 at 775: "Q: "Did you ultimately agree with Mr. Klayman about the publicity? A: "I did." Lastly, the Referee finds persuasive the uncontroverted testimony of Ms. Sataki's union representative, Timothy Shamble, that he and Ms. Sataki personally participated in publicizing her case. FRX 24 at 893 – 994: ".

> Q: "And did there come a point in time when you actually went with her and distributed publicity?"
> A. "I remember one time. The VOA was on the mall here in Washington, some kind of public -- it might have been a recruitment fair or something. But we had an article and both her and I were distributing it to people in the vicinity, tried to let people know and to let the agency know that, you know, we were going to publicize this."….
> Q. "And she was there when she gave it out and she approved of that?"
> A. "Yes. We were both on the mall handing that out." Tr. 893 – 894.

Other important examples of admissions by Ms. Sataki and other uncontroverted testimony can be found at FRX 24 at 96, 398 – 403, 329, 453 – 458, 892.

*Second*, the Referee finds that there was a paucity of proof that Respondent violated Rule 1.7 with regard to Ms. Sataki's decision to move to Los Angeles. The record reflects that Ms. Sataki repeatedly admitted that she wanted to be in Los Angeles. FRX 24 at 106 contains an admission that Ms. Sataki had proposed to VOA to transfer her to Los Angeles. Also:

> "Q: "You told me earlier your goal was to get out of the presence -- I'll go through it again -- get out of the presence of the alleged harasser, Falahati, and be transferred to Los Angeles, because you like Los Angeles a lot more than Washington, D.C., you had spent many years there, had family there, et cetera. You did say that to me during that dinner, right?" A. "Yes." *Id*. at 335.

The record also shows that Ms. Sataki would not accept employment in the Central News Division in Washington D.C. because she thought she was "being set up" to fail. FRX 24 at 346. Other important examples of admissions by Ms. Sataki and other uncontroverted testimony can

be found at FRX 24 at 347, 351, 354, and 369 – 370 (testimony that the move was necessary based on case strategy because Ms. Sataki was living with a coworker in D.C. at the time).

*Third*, the Referee finds that there was a paucity of proof that Respondent violated Rule 1.2 with regard to being terminated by Ms. Sataki as counsel. The record shows that Ms. Sataki admitted that she did not want to stop pursuing her case, as she even asked DCODC if they could litigate it for her. FRX 24 at 489:

> Q: "That you wanted Bar Counsel to file a sexual harassment case for you. You asked them that within the last year, against VOA."
> A: "I asked if it's doable."
> Q "And you asked Bar Counsel to do it for you, correct?
> A: "I asked if it's doable…."

Furthermore, the record reflects that the November 15, 2010 letter terminating Respondent as counsel was sent to the incorrect address. Ms. Sataki admitted that was a "mistake," FRX 24 at 540. The record also reflects that the August 4, 2010 letter was not written in Ms. Sataki's admittedly poor English, *id* at 310, which is why Respondent felt compelled to talk with her before simply dismissing all of her cases. FRX 24 at 1041. Respondent's suspicions were confirmed when Ms. Sataki admitted that the August 4, 2010 letter was *not* written by her, and instead was written with the assistance of Kathleen Staunton. FRX 24 at 156:"Q. Did someone help you write this particular letter?  A. Yes.  Q. Who is that? "A. Kathleen." This admission is confirmed on numerous other occasions. *Id*. at 301, 317, 469 – 474.

*Fourth*, the Referee finds that there was a paucity of proof that Respondent violated Rule 1.4(b) with regard to keeping Ms. Sataki informed on her litigation, specifically with regard to filing a Motion to Disqualify the Honorable Colleen Kollar Kotelly ("Judge Kotelly"). The record shows that Ms. Sataki was informed from the very beginning of Respondent's prior difficulties with Judge Kotelly. FRX 24 at 407 – 410:

13

"Q. "And I told you at the time that we had drawn a very difficult judge that I had been in front of in the past. You remember that?" A: "Yes, I remember that…. That it was a very difficult judge, and that he had problem with that judge." Q. "And her name was Colleen Kollar-Kotelly, correct?" A. "Correct, I remember that." Q. "And I told you that I had had other cases with her where I had difficulty, right?" A. "Yes…." Q. "For that reason, I filed pleadings to try to get the case sent to another judge, Judge John Roberts, who the case had initially been assigned to, but then somehow it got reassigned to Judge Kotelly. You remember that?" A: "Yes." Q. "But that request for reassignment was denied by the court, correct?" "A. Yes."

The record also shows that Ms. Sataki was aware and remembered that Judge Kotelly had denied their request for even an evidentiary hearing, FRX 24 at 415, one of the grounds upon which a motion to disqualify was required.

*Fifth*, the Referee finds that there was a paucity of proof that Respondent violated Rule 1.5(b) with regard to the absence of a fee agreement. The record shows that the representation agreement was *pro bono* and the goal of Respondent and Ms. Sataki's representation agreement was to obtain equitable relief, and thus there would be no recovery of damages to split. FRX 24 at 335 – 336:

Q. You told me earlier your goal was to get out of the presence -- I'll go through it again -- get out of the presence of the alleged harasser, Falahati, and be transferred to Los Angeles, because you like Los Angeles a lot more than Washington, D.C., you had spent many years there, had family there, et cetera. You did say that to me during that dinner, right ?
A. Yes.
Q. And we really didn't discuss at that dinner whether you could get damages for what had happened to you? The goal was to go back to LA and work for Persia News Network, for Voice of America there?
A. Yes.

----

Q. When we met I told you that I would try to help you, that I wasn't going to charge you for my legal services because it was offered in friendship.
A. Yes, you said that.

The Referee is further persuaded by the fact that the record shows that Ms. Sataki knew that Respondent represented many of her colleagues at Voice of America *pro bono*  as well, including

14

Mahmonir Rahimi and John Chalangi, and Kaveh,   FRX 24 at 403 – 404, 424, that Respondent

spent his own money to help Ms. Sataki without ever asking to be reimbursed,  *Id* at 108 – 109,

350, and that Ms. Sataki recognized that her alleged harasser, Mr. Falahati, was destitute, so

there could be no financial recovery even if a monetary judgment against him was pursued. *Id*. at

393.

    *Sixth*, the Referee finds that there was a paucity of proof that Respondent violated Rule

1.7 with regard to "emotional interest." The record shows that there was never any romantic

contact between Ms. Sataki and Respondent. FRX 24 at 142:

> Q. Did you ever have any romantic interactions with Mr. Klayman? A. Absolutely
> not.  Q. Did you ever have any physical contact  with Mr. Klayman, other than
> like a handshake?  A. No.

The record also reflects that Respondent referred Ms. Sataki to Ms. Gloria Allred and another

attorney named Tim Shea when it appeared to him that he should no longer represent her, *Id*. at

145, but it was Ms. Sataki who asked that Respondent continue to represent her. This

uncontroverted finding by the Board itself, FRX 6 at 10, clearly indicates that there was a paucity

of proof that Respondent violated Rule 1.7 in this regard.

    **B.**    **The Judicial Watch Suspension Order**

    The Referee also finds that he is not bound by the Judicial Watch Suspension Order by

the DCCA pursuant to *Kandekore*. The Referee finds the following portions of the record

persuasive in this regard.

    *First*, the Honorable Royce Lamberth ("Judge Lamberth"), the jurist presiding over the

Judicial Watch Matter, was the only person who ruled that Respondent should be disqualified.

*Paul v*. *Judicial Watch*, *Inc*., 571 F. Supp. 2d 17, 27 (D.D.C. 2008). No other court, including the

court presiding over the matters involving Lousie Benson and Sandy Cobas, issued an order

disqualifying Respondent. In fact, Judge Lamberth took special note of the extraordinary circumstances in this case, specifically of the potential hardship to the client, Mr. Peter Paul, which informed Respondent's actions:

> …the Court takes note of Paul's argument that he will suffer prejudice if Mr. Klayman is disqualified…the essence of the hardship that Paul asserts will result from disqualification of Klayman is an inability to obtain alternate counsel for lack of financial resources. The Court is not unsympathetic to this concern. *Id*.

*Second*, despite granting Judicial Watch's Motion to Disqualify, Judge Lamberth chose not to sanction Respondent, which demonstrates that Judge Lamberth did not believe that Respondent's conduct warranted any sanctions and/or discipline. As Judge Lamberth presided over the Judicial Watch Matter, he was the only person with firsthand knowledge of all of the intricate facts at issue in that matter. Thus, his decision must be afforded great deference.

*Third*, not only did Judge Lamberth choose not to sanction Respondent, the Referee observes that he actually took time out of his incredibly busy schedule to testify on his behalf at the AHHC hearing in the voluntarily, without being subpoenaed. FRX 47.  Judge Lamberth provided the AHHC with compelling testimony that he believed that there was, at a minimum, a clear ambiguity with regard to Respondent's representation of Mr. Paul, and that as such, there was a "legitimate debate about [Mr. Klayman's] conduct." FRX 47.  Judge Lamberth further testified that he did not see fit to refer Respondent to Bar Counsel in the District of Columbia, despite having done so on numerous occasions in the past with other lawyers:

> Well, I -- during the course of my career, I have referred a number of matters to Bar Counsel. Sometimes I -- I think I felt I was overwhelming them with the numbers of referrals I've made. It seems to me in a case like this, where there was a legitimate debate about the conduct -- although I -- I ended up saying it was clear in the opinion, but it took me a number of pages to say it. FRX 47.

Judge Lamberth further explained the extraordinary circumstances involved in this case, particularly with regard to Mr. Paul's situation:

…but also that there was some notion I had that Mr. Paul was in a very bad position. He was unable to afford counsel, he couldn't find other counsel. He was in a bind, and I had some feeling that there was a situation that was unusual, in the sense that counsel for Mr. Paul, who had previously been with Judicial Watch, found himself in an awkward position, where he had a very needy client who needed services who could not otherwise afford services. And so I thought it was a fairly unusual circumstance. FRX 47.

Thus, where the presiding jurist over the Judicial Watch Matter voluntarily took the time to testify on Respondent's behalf that he did not think Respondent's conduct was sanctionable, the Referee is convinced that there exists a "paucity of proof" under *Kandekore*.

*Fourth*, in addition to Judge Lamberth's testimony, Respondent provided the AHHC with the opinion one of the nation's preeminent experts in legal ethics, Professor Rotunda , who came to the same conclusion as Judge Lamberth in his letter opinion of June 2, 2014, FRX 45, and as reflected in his sworn hearing testimony. FRX 46. Indeed, Professor Rotunda, one of the top legal experts in professional ethics in the nation observed: "[t]he situation involving these particular clients…provided a unique set of circumstances, one that the D.C. Rules of Professional Conduct do not expressly take into account. Given this unprecedented situation, Respondent, out of necessity, attempted to correct the wrongs caused by Judicial Watch . . ."

### C. FOBC Has Engaged in Stacking

Whatever other objects the rule may seek to achieve, it obviously contemplates that *the Bar should not be free to withhold a referee 's report which it finds too lenient until additional cases can be developed* against the affected attorney, in an effort to justify the more severe discipline which might be warranted by cumulative misconduct. The Bar's violation of the prompt filing requirement in this case, to allow a second grievance proceeding against Rubin to mature, is directly antithetical to the spirit and intent of the rule. In addition, it has inflicted upon Rubin the 'agonizing ordeal' of having to live under a cloud of uncertainties, suspicions, and accusations for a period in excess of that which the rules were designed to tolerate. *Florida Bar v. Rubin*, 362 So.2d 12 (Fla. Sup. Ct. 1978)

The Florida Supreme Court has made it clear that "the Bar has an obligation to process disciplinary cases in a fair and just [timely] manner." *Fla. Bar v. Kane*, 202 So. 3d 11, 19 (Fla.

2016). These cases stand for the proposition that FOBC is not permitted to "stack" disciplinary proceedings against Respondent, which they have attempted to do here.

The record shows that FOBC was aware of the Judicial Watch Suspension Order on or around June 11, 2020. Supp. 0047. It did not file its complaint for reciprocal discipline until August 29, 2023, over three years later. The only possible rationale for this nearly three-year delay is that FOBC was attempting to stack the discipline here with the Sataki Suspension Order, which FOBC almost certainly knew was ongoing, since it was admittedly in communication with DCODC. This is the precise conduct which has been expressly forbidden by the Florida Supreme Court in *Rubin,* and provides another compelling basis for this Referee to decline to recommend imposing reciprocal discipline on Respondent.

### D.    No Sanction is Warranted Against Respondent Mr. Klayman

For the reasons set forth above, the Referee finds that Respondent has more than shown "that the proceeding in the foreign state was so deficient or lacking in notice or opportunity to be heard," "that there was such a paucity of proof," and other "grave reasons" that the Referee is not bound by either order of suspension by the DCCA. The Referee instead finds that no sanctions are warranted against Respondent for the reasons set forth above as well as the following:

*First*, the Referee recognizes the extreme and unprecedented passage of time that has occurred in both matters. The Sataki Suspension Order involves events that occurred approximately fourteen (14) years ago; the Judicial Watch Suspension Order involves events that occurred approximately eighteen (18) years ago. This is far beyond what any Court would deem an acceptable amount of delay, particularly in Florida, which applies both a hard six-year statute of limitations and the doctrine of laches to attorney discipline matters. In fact, to paraphrase Mr. Klein's testimony, the court finds this delay to be per se unreasonable, prejudicial, and unfair.

Respondent has presented uncontroverted evidence in the form of Ms. Sataki's Supplemental Complaint, FRX 7, that she had filed a bar complaint against Respondent in or around October of 2011. Respondent then presented additional evidence that as recently as January of 2023, Ms. Sataki's counsel in another proceeding styled *Klayman v. Sataki*, 2022-CAB-010491 (15th Jud. Cir. Fla.) admitted that a disciplinary complaint was filed in Florida in or around 2011. FRX 8. Coupled with the testimony of Respondent's expert witness, Mr. Klein, the Referee can only conclude that The Florida Bar had already investigated the Sataki Suspension Order and decided that no discipline was warranted. Given the enormous unconscionable passage of time, and the fact that there have been no similar allegations against Respondent made during this interim period, the earlier decision by the Bar should be given full faith and credit and cannot now be resurrected and relitigated in 2024.

*Second*, the Referee acknowledges the cascading due process violations that have occurred at every step of these assorted proceedings, which have prevented Respondent from having a genuine opportunity to be heard or to present his case in the Sataki Suspension Order matter. This alone constitutes grounds for the Referee to reject the DCCA's opinion pursuant to *Kandekore*, *Wilkes*, and other cases stemming from those decisions. The lack of discovery afforded to Respondent also strongly weighs in favor of declining to impose yet another sanction at this late date. *See Tipler*, 8 So. 3d at 1117.

*Third*, the Referee takes cognizance of the mitigating factors set forth by The Florida Bar in its publication "Florida's Standards for Imposing Lawyer Sanctions." Many of those mitigating factors are readily applicable here. They include (1) absence of a prior disciplinary record, FRX 2 (certificate of good standing); (2) absence of dishonest of selfish motive, FRX 24 at 1225 (testimony of Tim Shamble); (3) full and free disclosure to bar and cooperative attitude,

FRX 10 (Letter to Florida Bar); (4) character and reputation evidence, FRX 77 (recommendation letter of Hon. Royce Lamberth), FRX 24 at 1316 – 1317 (testimony of Hon. Stanley Sporkin), March 28 transcript at 108 (testimony of Robert Barr), March 28 transcript at 49 (testimony of Stephen Sulzer), March 28 transcript at 8 (testimony of Frederick Sujat) and (5) timely good faith effort to rectify consequences of misconduct (Respondent took required CLE courses on conflict of interest). The Referee is further persuaded by the fact that there has never been any showing that Respondent acted *dishonestly;* to the contrary, the D.C. Court of Appeals in the Judicial Watch Suspension Order found that "we are not left with serious doubt or real skepticism that Mr. Klayman can practice ethically." RSX 3-1 (internal quotations omitted). In conjunction with the enormous passage of time that has occurred in this case, the Referee finds that it would be manifestly unjust to impose any sanction in this matter.

*Fourth*, the Referee recognizes that Respondent is entitled to present a full defense pursuant to his due process rights and cannot be sanctioned for attempting to do so. Respondent and his counsel, Mr. Richard Greenberg, cannot be sanctioned for inadvertently missing a deadline to file a dispositive motion, as this did not work any prejudice to FOBC or the Referee.

ACCORDINGLY, based on the foregoing, the Referee finds that he is not bound by the suspension orders issued by the DCCA in either disciplinary proceeding and instead recommends that Respondent not be sanctioned, or at the most be given an admonishment with time served, for reasons set forth in this order.

**DONE AND ORDERED** in chambers at Leon County, Florida, this _____ day of _____, 2024.

_____
The Honorable J. Lee Marsh
Circuit Court Judge

EXHIBIT 4

## SUPPLEMENTAL DECLARATION OF TIM SHAMBLE

My name is Timothy Shamble and I am the president of the American Federation of Government Employees, Local 1812 which represents the broadcasters and journalists at the Voice of America (VOA), and hereby attest to the following information:

1.  I sat in and was present at, at least, one meeting with Larry Klayman and Elham Sataki where using public relations such as press articles and news stories to describe and publicize the alleged sexual and workplace harassment of Elham at VOA was discussed. Indeed, the idea was that public relations could help push the agency into a settlement or resolution of Elham's claims especially since the VOA had been consistently ranked as one of the worst agencies in the federal government according to the OPM.

2.  In this regard, attached is an email between Larry Klayman, Elham and two other broadcasters of VOA, who Larry Klayman was also seeking to help – as they too along with others in the Persian News Network branch of VOA believed that they were experiencing work place harassment of various sorts -- about an interview with the Los Angeles Times.

3.  The understanding was that this public relations strategy, including interviews and articles, might also serve to convince congressmen on Capitol Hill to step in and help Elham settle or resolve her claims with VOA. In this regard, Larry Klayman asked me to accompany him to the offices of congressmen on Capitol Hill to make the case for them to help Elham and some others at VOA in the Persian News Network that were subject to alleged sexual and/or workplace harassment. At, at least one event, we handed out a flyer about Elham's alleged claims to get support for her and pressure the VOA to reach a beneficial settlement. VOA management is generally non-responsive to amicably resolving such issues.

4.  Public relations can influence entities such as VOA and congressmen to take positive action, as the press can be very influential in this regard. It was my impression that Elham understood this and approved it.

5.  As a broadcaster and TV anchor, I believed that Elham understood the benefit of public relations. I am not aware that any public relations about Elham's situation were anything but positive and complimentary about her.

I swear that the above is true and correct to the best of my recollection.

_____
Timothy Shamble

07 / 09 / 17
_____
Date

EXHIBIT 5



# From Lawfare to Barfare: Another Way To Target Trump Allies

**By Benjamin Weingarten, RealClearInvestigations**
**September 30, 2025**

Fulton County Sheriff's Office

*Jeffrey Clark's 2023 arraignment photo on charges related to the 2020 election.*

When Jeffrey Clark was tapped to lead the second Trump administration's chief regulatory review office, it marked an astonishing redemption.

For years, congressional investigators and prosecutors had pursued the former Department of Justice official primarily over an unsent letter he drafted, in support of President Trump's 2020 election challenge, calling for Georgia to consider launching a last-minute legislative session to review its results.

Trump's return to power has not ended Clark's troubles: Washington, D.C.'s legal disciplinary authority has recommended he be disbarred over his conduct from five years ago. Lawyers for Clark claim that the effort seeks to punish "thought crime" regarding their client's belief in potential irregularities in an election that authorities declared devoid of widespread fraud.

Even as President Trump's critics now claim he is engaging in retribution against a wide range of past assailants, including former FBI Director James Comey, his supporters say Clark's case reveals there is an ongoing, politically motivated push to punish MAGA advocates. In their telling, the president's adversaries who weaponized the justice system through "lawfare" have opened another front in their war through "barfare."

## The Rise of Barfare

Since 2020, Democratic officials and progressive groups established specifically to target conservatives have lodged bar complaints against dozens of Trump-allied attorneys such as Clark. While supporters of these efforts say they are trying to hold officeholders and advocates accountable for actions that betrayed the canons of ethical legal practice, conservative opponents say the push to punish their political foes via

Case 3:22-mc-00014-JRK    Document 25    Filed 12/08/25    Page 176 of 199 PageID 8331

the customs of ethical legal practice, conservative opponents say the push to punish their political foes via bar complaints, often brought in politically partisan jurisdictions, threatens not only the ability of presidents to receive counsel but the American legal system itself.

"The most politicized situations are the ones where the bar should be the most reticent," to consider punishing attorneys over their work, James Burnham, former DOGE general counsel, said during a recent panel discussion on alleged bar weaponization hosted by the right-leaning Federalist Society. "That's when lawyers are supposed to be the most creative and the most aggressive. But it's not the kind of situation where we want lawyers to be afraid to even engage in advocacy in the first place."

The Clark complaint concerned his activities in the final weeks of the first Trump administration, while he served in part as acting assistant attorney general for the Justice Department's Civil Division. Clark, an environmental and regulatory lawyer by background, believed that there was potentially election-altering fraud or irregularities in Georgia and other states, requiring resolution before the fast-approaching January 6, 2021, election certification date.



The Trump DOJ officials responsible for probing the 2020 election, Jeffrey Rosen (center) and Richard Donoghue (right), rejected Clark's analysis.
**AP**

In response, he wrote a draft letter dated Dec. 28 and addressed to Georgia leaders recommending that the state legislature convene a special session to further probe potential irregularities and take remedial steps as necessary if they impacted the election outcome.

Clark circulated the letter to acting Attorney General Jeffrey Rosen and Deputy Attorney General Richard Donoghue, who were responsible for probing 2020 election issues. Rosen and Donoghue disagreed with its thrust – especially the suggestion that there was potentially election-altering fraud – and declined to sign and deliver it.

## Trump Gets Wind

As Trump's election challenge proceeded, he got wind of Clark's views. Apparently finding an ally, the president floated the idea of making Clark acting attorney general. Clark allegedly offered to decline any such appointment if Rosen would sign off on the letter, the then-Democrat-led Senate Judiciary Committee would later report – an allegation Clark would flatly deny. In opposition to a possible appointment, Clark's superiors convened a Jan. 3, 2021, meeting with President Trump and other officials, at which several said they and other colleagues would resign en masse should the president elevate him.

Ultimately, the president backed off, and Clark's letter was consigned to the ashbin of history – until one or several ex-Trump administration officials leaked word of its existence and contents to the New York Times. The Times wrote about Clark's efforts in a Jan. 22 article titled "Trump and Justice Dept. Lawyer Said to Have Plotted to Oust Acting Attorney General."

A flurry of probes pertaining to the president's election challenge would follow. Clark – a Harvard- and Georgetown-educated litigator who had spent the bulk of his career as a partner at white-shoe law firm Kirland & Ellis – would spend the next several years facing the scrutiny of congressional committees, including the Democrat-dominated January 6 Committee, and prosecution in cases brought by Fani Willis in Fulton County, Georgia, and Special Counsel Jack Smith in Washington, D.C. In June 2022, he was forced to wait outside his home in his undergarments while federal investigators searched his suburban Virginia residence, seizing electronic devices in connection with their January 6 probe.



The House panel investigating the Jan. 6 attack on the Capitol held Clark in contempt for refusing to cooperate.
**AP**

In July 2022, in response to a complaint lodged by the then-Democrat-led Senate, the D.C. Board on Professional Responsibility charged Clark with violating the D.C. Rules of Professional Conduct. It accused him of engaging "in conduct involving dishonesty" by drafting the letter the board alleged contained false statements, and for "attempt[ing] to engage in conduct that would seriously interfere with the administration of justice."

The allegations against Clark rested in part on the argument that because his superiors disagreed with his views on potential election fraud in Georgia, Clark's assertions in the letter were fraudulent.

**Unprecedented Case**

In his defense, Clark invoked a slew of privileges, and raised myriad procedural and substantive arguments – including that the local D.C. disciplinary board lacked jurisdiction over Clark's conduct as a federal lawyer providing counsel to the president; that Clark enjoyed immunity from liability while rendering advice to the president; and that the purported false statements were merely proposed Justice Department positions for consideration by superiors – positions largely consistent, as his lawyers noted, with those raised by several U.S. Supreme Court justices and nearly 20 state attorneys general.

Clark's lawyers argued during his trial that "[N]o one has ever been charged by the D.C. Bar with attempted dishonesty in a draft letter that recommended a change in policy or position where that document was not approved and never even left the office."

His lawyers made the point that sanctioning him for such conduct would lead to a limitless array of disciplinary actions against attorneys over private or internal deliberations on behalf of clients should they hold contrarian views.

Government "lawyers will be afraid to give their candid opinions for fear of losing their careers. Likewise, lawyers will not join government for the same reason," Harry MacDougald, one of Clark's lawyers, told RealClearInvestigations.

*"Government lawyers will be afraid to give their candid opinions for fear of losing their careers."*

On July 31, 2025, despite acknowledging "that there are no factually comparable prior disciplinary cases," a majority of the board recommended that Clark be disbarred. While rejecting Clark's arguments, including that he was protected as a government lawyer giving advice, the nine-member board said that the charges against him "focus on the truthfulness of the factual assertions" in the letter that he authored.

Although Clark's superiors had testified that Clark had "sincere *personal* concerns" regarding the integrity of the election, the board said, "they also agreed that the *Justice Department* had not identified potentially

Case 3:22-mc-00014-JRK    Document 25    Filed 12/08/25    Page 178 of 199 PageID 8333

outcome-determinative issues in Georgia or other states."

Therefore, his continued efforts to press officials to send the letter "constituted an attempt to make intentionally false statements about the results of the Justice Department's investigation," the board said.

The tribunal added that Clark "should be disbarred as a consequence and to send a message to the rest of the Bar and to the public that this behavior will not be tolerated."

The disbarment decision is pending before the D.C. Court of Appeals, which has final say over such decisions in the nation's capital.

### Claims of Unequal Justice

In an August 2025 filing with the appeals court obtained by RCI detailing Clark's exceptions to the board's order, his counsel contrasted the disciplinary tribunal's treatment of the Justice Department lawyer with that of FBI lawyer Kevin Clinesmith. He received just a one-year suspension for doctoring a document submitted to the FISA Court supporting the government's FISA warrant application that enabled them to surveil Trump adviser Carter Page.

"The disciplinary process in the D.C. bar is radically disparate according to the political affiliation and views of the respondent attorney," Clark's lawyers charged.



A preliminary review of public records indicates that a majority of the board that made the Clark recommendation was comprised of registered Democrats, individuals who had contributed to Democrat candidates, or public advocates of progressive causes. Only one board member was publicly identifiable as a Republican.

Clark's lawyers said the D.C. Bar was far kinder to former FBI lawyer Kevin Clinesmith, whose actions hurt a Trump ally.
**YouTube/Fox News**

The board recommendation followed a trial before a separate three-member panel, at least two of whom were registered Democrats and had contributed financially to Democratic Party candidates, public records show.

The Office of Disciplinary Counsel, which handed down the original charges against Clark and effectively prosecutes such cases, is also headed by an attorney, Hamilton P. Fox III, who, according to public records, is a Democrat.

"D.C. voted Democrat more than 90% against Trump all three times he was on the ballot – the most lopsided margin in the country to have its own Bar," MacDougald noted on X in a response to the disciplinary authority's decision.

Many prominent Republicans also took issue with the actions of Trump and his confidantes in challenging the 2020 election. This includes the sole publicly identifiable Republican board member, Margaret M. Cassidy, a member of the Republican National Lawyers Association who concurred in the recommendation that Clark be disbarred.

After the panel handed down its recommendation to disbar Clark, MacDougald told RCI, "the reason Jeff has been singled out is lawfare – straight up political persecution."

EXHIBIT 6

## IN THE SUPREME COURT OF FLORIDA

THE FLORIDA BAR,

              Complainant

v.

LARRY ELLIOT KLAYMAN

              Respondent.

**Case Number: SC2025-1604**

## AFFIDAVIT OF FREDERICK J. SUJAT

1.     I, Frederick J. Sujat swear under oath, that the following is true and correct and based on my personal knowledge and belief.

2.     I am over the age of 18 and competent to testify to the matters set forth herein.

3.     I attended the March 28, 2024 hearing before the Honorable J. Lee Marsh ("Referee Marsh") in the Sataki Matter as a material witness to Respondent Larry Klayman's strong character.

4.     I have known Mr. Klayman for a long time and we have worked together for a very long time as well. I have a high regard for Mr. Klayman's ethics and character in the legal profession and generally.

5.     I am a member in good standing with The Florida Bar.

6.     At the March 28, 2024 hearing, I observed the demeanor and conduct of Referee Marsh, and it struck me that he was highly offensive and disrespectful towards Mr. Klayman and even strangely towards myself when I testified on Mr. Klayman's behalf.

7.     [Blank]

1

8.    For instance, he questioned and minimized my military history in what I perceived to a condescending manner, which I was entirely gratuitous and meant only to embarrass and harass me, as my military history was only given as background information and had no relevance to my testimony:

> THE COURT: **All right. The Court does have one question, Mr. Sujat. You had testified to your time with the Judge Advocate General for the Air Force. And then I have Respondent's 100, this document talking about your other professions. How much time did you actually spend on active duty in the Air Force, Air Force Reserve, or Air National Guard, actual active duty time?**
>
> THE WITNESS: That's very -- that's impossible for me to answer, your Honor, without getting documentation from the Department of Defense. I was a --
> THE COURT: Well, let's ball-park it. Hold on. I'll rephrase the question.
> THE WITNESS: Sure.
> THE COURT: **So what was your initial period of active duty?**
> …
> THE COURT: **I don't need -- I'm trying to figure out the amount of time you spent on active duty.** Because I understand you retired as a colonel in the Guard. I'm just trying to decide -- I'm looking at this period of '74 to '76. It says Air Force and VA. Were you a VA employee? An Air Force employee? Both? When was your active duty time? That's what I'm trying to --
> THE WITNESS: Okay. Yeah. The active duty, I'd have to look at my DD-214. It was 190 days. It was --
> THE COURT: Were there any periods --
> THE WITNESS: That period started in March of '75 and ended in May of '75. And while I was there, I was assigned to the office -- the International Affairs Division of the Judge Advocate General of the Air Force. And while I was there and working on the manual, the international manual, they asked me, they said, do you want to work at the White House. And I said, that sounds pretty
> interesting. And they said, you know, Senator de Gaulle -- Goodell of New York needs someone to help over there. And so I offered to -- I believe that they were asking different agencies if they had people that they wanted to go over there. So that's how I -- that's how I spent my time. And after that, that's where I met lawyers, a Florida lawyer here who was with me there, who, he said, I'm working at the Board of Veterans Appeals. Would you like to work there. And so I said, okay, I'll work there as a civil servant.
> THE COURT: **Okay. So any active duty periods for greater than one year?**

2

THE WITNESS: No --

THE COURT: **Okay.**

THE WITNESS: -- continuous active duty.


March 28th Transcript at 44 – 46.

9.    Other examples that I witnessed were Referee Marsh minimizing and mocking Mr. Klayman's proposed exhibits as "advertisement for a book" and as "political ax grinding." March 28th Transcript at 156:9 and 144:18

10.    I also noticed that Judge Marsh frequently cut Mr. Klayman off and did not allow him a chance to speak uninterrupted and make his arguments.

11.    While I was in the courtroom on March 28, 2024, I observed the behavior of Referee Marsh storming off the bench on more than one occasion. I had the impression that he despised Mr. Klayman.

12.    At the conclusion of the hearing on March 28, 2024, Referee Marsh *sua sponte*, without any evident bona fide legal or factual basis, increased the eighteen month sanction sought by Florida Office of Bar Counsel to twenty-four months.

13.    I hereby swear that the foregoing is true and correct under penalty of perjury of the state of Florida and the United States.

October 31, 2025

*Frederick J. Sujat*

Frederick Sujat

# EXHIBIT B

**Supreme Court of Pennsylvania**



**Disciplinary Docket No. 3 Docket Sheet**

**Docket Number:  2918 DD3**

**Page 4 of 4**

| DOCKET ENTRY | | | |
|---|---|---|---|
| Filed Date | Docket Entry / Representing | Participant Type | Filed By |
| **February 2, 2023** | **Order Granting Motion for Stay** | | |
| | | | Per Curiam |

Comments:
AND NOW, this 2nd day of February, 2023, the Motion to Stay is granted.  Respondent shall keep this Court informed of the status of the proceedings before the Superior Court of the District of Columbia.

| | | | |
|---|---|---|---|
| **April 17, 2024** | **Respondent Larry Klayman's Supplement to Motion to Stay & Order Granting Stay** | | |
| | | Respondent | Klayman, Larry Elliot |
| **April 22, 2024** | **ODC's Answer to Supplement to Motion to Stay and Order Granting Stay** | | |
| | | Petitioner | Office of Disciplinary Counsel |
| **May 7, 2024** | **Order Extending the Stay Imposed on February 2, 2023** | | |
| | | | Per Curiam |

Comments:
AND NOW, this 7th  day of May, 2024, upon consideration of Respondent's request to continue the stay imposed on February 2, 2023, and the Office of Disciplinary Counsel's answer, the stay shall remain in effect.  Within 10 days of the date or filing of a dispositive ruling on his appeal by the District of Columbia Court of Appeals, Respondent shall notify this Court's Prothonotary, Western District Office, as well as the Office of Disciplinary Counsel, that the appeal to the District of Columbia Court of Appeals has been concluded and provide a copy of all related order , opinions, or judgments.

**IN THE SUPREME COURT OF PENNSYLVANIA**

| | | |
|---|---|---|
| In the Matter of | : | No. 2918 Disciplinary Docket No. 3 |
| | : | |
| LARRY ELLIOT KLAYMAN | : | No. 141 DB 2022 |
| | : | |
| | : | (District of Columbia Court of Appeals, No. |
| | : | 20-BG-583) |
| | : | |
| | : | Attorney Registration No. 54628 |
| | : | |
| | : | (Out of State) |

**ORDER**

**PER CURIAM**

   **AND NOW**, this 2nd day of February, 2023, the Motion to Stay is granted.
Respondent shall keep this Court informed of the status of the proceedings before the
Superior Court of the District of Columbia.

Received 4/22/2024 12:57:35 PM Supreme Court Western District

Filed 4/22/2024 12:57:35 PM Supreme Court Western District
2918 DD3

IN THE SUPREME COURT OF PENNSYLVANIA

In the Matter of

LARRY ELLIOT KLAYMAN

: No. 2918 Disciplinary Docket No. 3
:
:
: No. 141 DB 2022
:
:
: (District of Columbia Court of Appeals,
: No. 20-BG-583)
:
: Attorney Registration No. 54628
:
: (Out of State)

## OFFICE OF DISCIPLINARY COUNSEL'S ANSWER TO RESPONDENT LARRY KLAYMAN'S SUPPLEMENT TO MOTION TO STAY AND ORDER GRANTING STAY

Office of Disciplinary Counsel (PA-ODC), by Anthony P. Sodroski, Disciplinary Counsel-in-Charge, Special Projects, and Thomas J. Farrell, Chief Disciplinary Counsel, responds to Respondent's supplemental pleading filed April 17, 2024 ("supplemental pleading") and avers as follows:

1.  By Opinion and Order decided September 15, 2022, the District of Columbia Court of Appeals ("the DC Court of Appeals") suspended Respondent from the practice of law.

2. On November 2, 2022, Respondent filed in the Superior Court for the District of Columbia ("DC Superior Court") a civil action against a former client (Ms. Elham Sataki), the District of Columbia Office of Disciplinary Counsel (DC-ODC), several DC bar counsel, two members of the Ad Hoc Hearing Committee, and one member of the DC Board on Professional Responsibility. *Klayman v. Sataki, et al.*, No. 2022-005235 ("the *Sataki* case").

3. By Order dated February 2, 2023, this Honorable Court granted Respondent's motion to stay the within reciprocal disciplinary proceeding; on that date, the *Sataki* case was pending before the Honorable Ebony M. Scott, Associate Judge of DC Superior Court ("Judge Scott").

4. By Omnibus Order filed March 1, 2024, Judge Scott dismissed the *Sataki* case with prejudice.

5. On March 8, 2024, Respondent filed a Notice of Appeal to the DC Court of Appeals.

6. In his supplemental pleading, Respondent avers that Judge Scott "erred and there is a likelihood of success on appeal." These are conclusions of law to which no response is required.

7. The relief requested by Respondent is "that this matter remain stayed pending appeal."

8.    PA-ODC does not oppose the stay remaining in place, but reserves the right to move to dissolve the stay at the conclusion of the appeal before the DC Court of Appeals. PA-ODC respectfully requests that the order provide that within ten days of the date or filing of a final order, opinion or judgment of the DC Court of Appeals, or any dispositive ruling on a timely petition for reconsideration thereof, whichever occurs later, Respondent shall notify this Court's Prothonotary, Western District Office, with copy to PA-ODC, that the appeal to the DC Court of Appeals has been concluded, and provide a copy of all orders, opinions or judgments. A proposed Order is attached.

Respectfully submitted,

OFFICE OF DISCIPLINARY COUNSEL

Thomas J. Farrell
Chief Disciplinary Counsel

By _____

Anthony P. Sodroski
Disciplinary Counsel-in-Charge,
Special Projects
1601 Market Street, Suite 3320
Philadelphia, PA  19103
(215) 560-6296

3

# IN THE SUPREME COURT OF PENNSYLVANIA

In the Matter of     : No. 2918 Disciplinary Docket No. 3
          :
LARRY ELLIOT KLAYMAN  : No. 141 DB 2022
          :
          : (District of Columbia Court of Appeals,
          : No. 20-BG-583)
          :
          : Attorney Registration No. 54628
          :
          : (Out of State)

## ORDER

**PER CURIAM**

  **AND NOW**, this     day of      , 2024, after

consideration of Respondent's request to continue the stay imposed by the

Court on February 2, 2023, and Office of Disciplinary Counsel's answer, it

is hereby ORDERED that the stay shall remain in effect. Within ten days of

the date or filing of a final order, opinion or judgment of the District of

Columbia Court of Appeals, or any dispositive ruling on a timely petition for

reconsideration thereof, whichever occurs later, Respondent shall notify

this Court's Prothonotary, Western District Office, with copy to Office of

Disciplinary Counsel, that the appeal to the District of Columbia Court of

Appeals has been concluded, and provide a copy of all orders, opinions or

judgments.

IN THE SUPREME COURT OF PENNSYLVANIA

In the Matter of

LARRY ELLIOT KLAYMAN

:  No. 2918 Disciplinary Docket No. 3
:
:  No. 141 DB 2022
:
:  (District of Columbia Court of Appeals,
:  No. 20-BG-583)
:
:  Attorney Registration No. 54628
:
:  (Out of State)

## PROOF OF SERVICE

I hereby certify that I am this day serving the foregoing document upon the person and in the manner indicated below, which service satisfies the requirements of Pa.R.A.P. 121:

Service by First Class Mail
addressed as follows:

Larry Elliot Klayman
7050 W. Palmetto Park Road
Boca Raton, FL  33433

Service by email to:

leklayman@gmail.com

(Respondent)

Date:  April 22, 2024

Anthony P. Sodroski
Attorney Registration No. 32463
Disciplinary Counsel-in-Charge,
Special Projects

## CERTIFICATE OF COMPLIANCE

I certify that this filing complies with the provisions of the *Public Access Policy of the Unified Judicial System of Pennsylvania*: *Case Records of the Appellate and Trial Courts* that require filing confidential information and documents differently than non-confidential information and documents.

Submitted by: Office of Disciplinary Counsel

Signature: *Anthony P. Sodroski*

Name: Anthony P. Sodroski, Counsel-in-Charge, Special Projects

Attorney No. (if applicable): 32463

# *United States Court of Appeals*
**FIFTH CIRCUIT**
**OFFICE OF THE CLERK**

**LYLE W. CAYCE**
**CLERK**

**TEL.  504-310-7799**
**600 S. MAESTRI PLACE**
**NEW ORLEANS, LA  70130**

December 8, 2022

Larry Klayman
7050 W. Palmetto Park Road
Boca Raton, FL 33433

Dear Mr. Klayman:

Further to your response to this Court's Order to Show Cause, please be advised that the order of suspension became final on December 7, 2022. However, the Court has chosen to withdraw the suspension order and hold this Court's reciprocal disciplinary proceeding against you in abeyance pending final disposition of your Superior Court Rule 60 complaint and writ of mandamus or certiorari petition proceedings.

Please advise this Court when the above-referenced proceedings are concluded. Failure to keep this Court informed of the status of the proceedings may result in the imposition of reciprocal discipline without further notice.

Please find enclosed a copy of an order withdrawing the order of suspension.

Very truly yours,

LYLE W. CAYCE, Clerk

By _____
        Melissa Shanklin, Deputy Clerk

Enclosure

# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

December 8, 2022

Lyle W. Cayce
Clerk

## ORDER

On November 2, 2022 this Court issued an order directing Larry E. Klayman to show cause why his right to practice before this Court should not be suspended reciprocal to a September 15, 2022 order of suspension issued by the District of Columbia Court of Appeals. This Court's self-executing show cause suspension order became effective December 7, 2022.

At the direction of the Chief Judge, IT IS ORDERED that the order of suspension hereby is WITHDRAWN.

LYLE W. CAYCE, Clerk
United States Court of Appeals for the Fifth Circuit

By _Melissa Shanklin_____

Melissa Shanklin, Deputy Clerk

A True Copy
Certified Dec 08, 2022

_Lyle W. Cayce_

Clerk, U.S. Court of Appeals, Fifth Circuit

FOR THE COURT - BY DIRECTION
Address:
Clerk of Court,
U.S. Court of Appeals for the Fifth Circuit
F. Edward Hebert Building
600 S. Maestri Place
New Orleans, LA 70130

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

IN RE: LARRY KLAYMAN           Case No. 3:22-mc-14-JRK

_____

**O R D E R**

In response to this Court's Order entered January 13, 2023 (Doc. No. 3), Mr. Klayman filed an interim response (Doc. No. 4), and then an updated petition (Doc. No. 5), and also submitted a USB drive containing the record of the prior disciplinary proceedings in the District of Columbia. That record needs to be made part of this record. **The Clerk** is directed to **file** in the above-captioned matter all documents included in the USB drive submitted by Mr. Klayman on about January 27, 2023.

Mr. Klayman also filed a "Motion to the Chief Judge, the Honorable Timothy J. Corrigan, to Stay" (Doc. No. 6; "Motion"), on February 3, 2023. At Judge Corrigan's request, the undersigned is designated to decide the Motion. Upon review of the Motion and Mr. Klayman's other filings, the Motion is **GRANTED** to the extent that this matter is **STAYED pending further Order**.

Mr. Klayman is **DIRECTED** to immediately provide this Court with copies of any materials he provides to the United States Court of Appeals for the Fifth Circuit in response to the Clerk of that Court's December 8, 2022 letter to him directing that he advise that Court when the proceedings in the District of Columbia Superior Court are concluded and when the writ of mandamus or certiorari proceedings are concluded. **Mr. Klayman is advised that the failure to keep this Court informed of the status of those proceedings or any material change in circumstance may result in the imposition of reciprocal discipline without further notice.**

**DONE AND ORDERED** in Jacksonville, Florida on February 6, 2023.

James R. Klindt

JAMES R. KLINDT
United States Magistrate Judge

kaw
Copies to:
    Hon. Timothy J. Corrigan
    Chief U.S. District Judge
    Middle District of Florida

    Larry Klayman, Esquire

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

IN RE: LARRY E. KLAYMAN                    §        Misc. No. 3:20-MC-043-B

Before FITZWATER, Senior District Judge, and BOYLE and O'CONNOR, District Judges.

## ORDER

The hearing in this reciprocal discipline matter set for Tuesday, February 21, 2023, at 10:00 a.m. is vacated.

Respondent Larry E. Klayman, Esquire is directed to provide this panel with copies of any materials that he hereafter provides to the United States Court of Appeals for the Fifth Circuit in response to the December 8, 2022 letter to him from the clerk of that court directing that he advise that court when the proceedings in the District of Columbia Court of Appeals are concluded and that he keep the Fifth Circuit informed of the status of the proceedings in the District of Columbia Court of Appeals.

**SO ORDERED**.

January 11, 2023.

FOR THE PANEL

SIDNEY A. FITZWATER
SENIOR JUDGE

# EXHIBIT C

**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

|                          |     |                                       |
|--------------------------|-----|---------------------------------------|
| IN RE: LARRY KLAYMAN     | }   |                                       |
|                          | }   |                                       |
| Petitioner               | }   | **Case Number: 3:22-mc-14-TJC-JRK**   |
|                          | }   |                                       |
|                          | }   |                                       |
|                          | }   |                                       |
|                          | }   |                                       |

**EXPEDITED LARRY KLAYMAN'S  MOTION FOR CLARIFICATION**
**AND/OR PARTIAL RECONSIDERATION**

Petitioner Larry Klayman ("Mr. Klayman") hereby respectfully moves the Court for clarification and/or partial reconsideration of the Court's December 4, 2025 order on Mr. Klayman's Motion for Extension of Time Nunc Pro Tunc and/or For Clarification. ECF No. 23.

Mr. Klayman thanks the Court for granting his request for an extension of time until December 8, 2025 to file his Local Rule 2.04(b)(2) Petition. In that Order, the Court held: "[g]iven that the instant miscellaneous case concerns a different disciplinary proceeding, the forthcoming petition shall be filed in a new miscellaneous case, with the proper miscellaneous filing fee paid to the Clerk." Mr. Klayman files this instant expedited motion to seek clarification from the Court with regard to the fact that the November 6, 2025 Suspension Order of the Supreme Court of Florida at issue now is a continuation of the order by the

1

District of Columbia Court of Appeals already at issue in this matter, *In re Klayman*, 20-BG-583 because it is an order granting reciprocal discipline. Reference to the Florida reciprocal discipline proceeding, which stems in large part from the prior fifteen (15) year old District of Columbia disciplinary proceeding which has been before and remains pending before the Magistrate Judge, is set forth in Mr. Klayman's November 10, 2025 Status Report, which was filed in this matter. *See* <u>Exhibit 1</u>. Thus, this new matter is substantially related to the prior matter.

WHEREFORE, Mr. Klayman respectfully requests clarification and/or partial rehearing on this issue and an order allowing him to file his Local Rule 2.04(b)(2) Petition electronically in the pending and related previous case. However, if it is deemed necessary to commence a separate proceeding, Mr. Klayman will also do so.

Dated: December 5, 2025                    Respectfully submitted,

By: */s/ Larry Klayman* _____
Larry Klayman, Esq.
Klayman Law Group P.A.
7050 W. Palmetto Park Rd
Boca Raton, FL, 33433
Tel: 561-558-5536 cell
leklayman@gmail.com

*Pro Se*